**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| US DOMINION, INC., *et al.*, )<br><br>Plaintiffs, )<br><br>        vs. )<br><br>PATRICK BYRNE, )<br><br>Defendant. )<br>_____ ) | Case No. 1:21-cv-02131-CJN |

**MEMORANDUM IN SUPPORT OF**
<u>**DEFENDANT PATRICK BYRNE'S MOTION TO DISMISS COMPLAINT**</u>

MCGLINCHEY STAFFORD PLLC
Robert N. Driscoll (DC Bar #486451)
Alfred D. Carry (DC Bar #1011877)
1275 Pennsylvania Avenue NW, Suite 420
Washington, DC 20004
Tel: (202) 802-9999

*Counsel for Defendant Patrick Byrne*

Dated: November 17, 2021

**TABLE OF CONTENTS**

Pages

I.   INTRODUCTION ................................................................................................ 1

II.  BACKGROUND ................................................................................................ 7

     A.   The Parties .............................................................................................. 7

     B.   Historical Security Concerns about Electronic Voting Machines and
          Dominion Machines in Particular ........................................................ 9

     C.   November 2020 Election Lawsuit Claims about Dominion ................ 11

     D.   Byrne's Commentary and Dominion's Subsequent Lawsuit ............... 15

III. LEGAL STANDARD ....................................................................................... 15

IV.  ARGUMENT ................................................................................................... 16

     A.   Byrne's Statements are Protected under the Fair Report Privilege ...... 17

     B.   Byrne's Statements are not False, are not Actionable, or are not
          Defamatory .......................................................................................... 20

          1.   Some of the Challenged Statements are not Actionable because
               they are not "Of and Concerning" Dominion ............................ 21

          2.   Some of the Challenged Statements are not Actionable because
               they are not Publications or are Preempted by Federal Law .......... 23

          3.   Some of the Challenged Statements are not False .................... 27

          4.   Other Statements Consist of Byrne's Commentary Based on Fully-
               Disclosed Facts and are thus Protected Opinions ...................... 28

          5.   Other Statements are not Capable of Defamatory Meaning or
               Susceptible to Proof .................................................................. 30

               a.   The Broad and Specific Context of Byrne's Commentary
                    Confirms These Statements are Constitutionally Protected
                    as Opinion ........................................................................ 33

     C.   Dominion Has Failed to Plead that Byrne Acted with Actual Malice ................ 36

          1.   Dominion is a Public Plaintiff Subject to the Actual Malice
               Standard .................................................................................... 37

               a.   Dominion Qualifies as a Public Official ........................... 37

               b.   Dominion Qualifies as a Limited Public Figure .............. 39

          2.   Dominion has not Pled Actual Malice under the Knowledge of
               Falsity Prong ............................................................................. 40

          3.   Dominion has not Pled Actual Malice under the Reckless
               Disregard Prong ......................................................................... 42

i

a.      The Reasonably Prudent Man is not the Yardstick for
        Reckless Conduct ......................................................................... 46

b.      Preconceived Notions, Suspicions, or Partisan Agendas do
        not Show Reckless Conduct ........................................................ 48

c.      Refusing to Accept Denials or Demands for Retraction
        does not Show Reckless Conduct ................................................ 49

d.      Profit Motive does not Show Reckless Conduct ........................... 49

e.      Alone or Together, Dominion's Purported Theories for
        Reckless Conduct do not Amount to Actual Malice .................... 52

V.      CONCLUSION .............................................................................................. 53

# TABLE OF AUTHORITIES

Pages

<u>Cases</u>

*Abrams v. United States*,
    250 U.S. 616 (1919)........................................................................................................ 35

*American Freedom Defense Initiative v. Lynch*,
    217 F. Supp. 3d 100 (D.D.C. 2016) ............................................................................ 25

*Armstrong v. Thompson*,
    80 A.3d 177 (D.C. 2013) ............................................................................................. 30

*Arpaio v. Cottle*,
    404 F. Supp. 3d 80 (D.D.C. 2019) .............................................................................. 41

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................... 15, 16, 40, 46

*Atlantic Monthly Group*,
    950 F. Supp. 2d 249 (D.D.C. 2013) ............................................................................ 17

*Bauman v. Butowsky*,
    377 F. Supp. 3d 1 (D.C. Cir. 2019)....................................................................... passim

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................................... 15

*Biospherics, Inc. v. Forbes, Inc.*,
    151 F.3d 180 (4th Cir. 1998) ...................................................................................... 28

*Bose Corp. v. Consumers Union of United States, Inc.*,
    466 U.S. 485 (1984)..................................................................................................... 45

*Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*,
    138 F. Supp. 3d 1191 (D. Colo. 2015), *aff'd*, 861 F.3d 1081 (10th Cir. 2017) ......... 6

*BuzzFeed, Inc. v. U.S. Dep't of Justice*, 318 F. Supp. 3d 347 (D.D.C. 2018) ............... 18

*Campbell v. Citizens for an Honest Gov't, Inc.*,
    255 F.3d 560 (8th Cir. 2001) ...................................................................................... 34

*Churchill v. State*,
    876 A.2d 311 (N.J. Super. Ct. App. Div. 2005)......................................................... 24

*Clemmons v. Academy for Educational Development*,
    70 F. Supp. 3d 282 (D.D.C. 2014) ............................................................................. 30

*Competitive Enterprise Institute v. Mann*,
    150 A.3d 1213 (D.C. 2016) ........................................................................................ 31

*Croixland Properties Ltd. Partnership v. Corcoran*,
    174 F.3d 213 (D.C. Cir. 1999) ......................................................................... 17, 21, 23

*Crowley v. North Am. Telecomm. Ass'n*,
   691 A.2d 1169 (D.C. 1997) ........................................................................... 17

*Curling v. Raffensperger*,
   493 F. Supp. 3d 1264 (N.D. Ga. 2020) ...................................................... 10, 39

*Dameron v. Washington Mag., Inc.*,
   779 F.2d 736 (D.C. Cir. 1985) .................................................................. 17, 18

*Deripaska v. Associated Press*,
   282 F. Supp. 3d 133 (D.D.C. 2017) ........................................................... 30, 40

*DiLorenzo v. Norton*,
   No. 07-144, 2009 WL 2381237 (D.D.C. Jul. 31, 2009) ...................................... 1

*Doctor's Data Inc. v. Barrett*,
   170 F. Supp. 3d 1087 (N.D. Ill. 2016) ............................................................ 24

*EEOC v. St. Francis Xavier Parochial Sch.*,
   117 F.3d 621 (D.C. Cir. 1997) ........................................................................ 1

*Fairfax v. CBS Corporation*,
   2 F.4th 286 (4th Cir. 2021) ............................................................................ 6

*Farah v. Esquire Mag.*,
   736 F.3d 528 (D.C. Cir. 2013) .................................................... 23, 33, 34, 36

*Foretich v. Glamour*,
   741 F. Supp. 247 (D.D.C. 1990) ................................................................... 23

*Fram v. Yellow Cab Co. of Pittsburg*,
   380 F. Supp. 1314 (W.D. Pa. 1974) ............................................................... 36

*Fridman v. Orbis Bus. Intel. Ltd.*,
   229 A.3d 494 (D.C. Cir. 2020) ..................................................................... 37

*Fudge v. Penthouse Intern., Ltd.*,
   840 F.2d 1012 (1st Cir. 1988) ...................................................................... 34

*Garrison v. Louisiana*,
   379 U.S. 64 (1964) ................................................................................. 6, 42

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974) ............................................................................. 37, 40

*Ghafur v. Bernstein*,
   131 Cal. App. 4th 1230 (1st Dist. 2005) ......................................................... 38

*Green v. Northern Publishing Co.*,
   655 P.2d 736 (Alaska 1982), *cert. denied*, 463 U.S. 1208 ................................ 39

*Haefner v. N.Y. Media, L.L.C.*,
   918 N.Y.S. 2d 103 (App. Div. 2011) .............................................................. 24

*Harper v. Walters*,
   822 F. Supp. 817 (D.D.C. 1993) ................................................................... 17

iv

*Harris v. Amalgamated Transit Union Local 689,*
  825 F. Supp. 2d 82 (D.D.C. 2011) ............................................................. 16

*Harte-Hanks Communications, Inc. v. Connaughton,*
  491 U.S. 657 (1989) ............................................................. 42, 46, 52

*Hatfill v. New York Times Co.,*
  488 F. Supp. 2d 522 (E.D. Va. 2007) ............................................................. 38

*HBO, A Div. of Time Warner Entertainment Co., L.P. v. Harrison,*
  983 S.W.2d 31 (Tex. App. Houston 14th Dist. 1998) ............................................................. 38

*Herbert v. Lando,*
  781 F.2d 298 (2d Cir. 1986) ............................................................. 44

*Herring Networks, Inc. v. Maddow,*
  445 F. Supp. 3d 1042 (S.D. Cal. 2020), *aff'd,* 8 F. 4th 1148 (9th Cir. 2021) ............ 33, 35

*Horsley v. Rivera,*
  292 F.3d 695 (11th Cir. 2002) ............................................................. 31, 34

*Huon v. Breaking Media, LLC,*
  75 F. Supp. 3d 747 (N.D. Ill. 2014),
  *aff'd in part, rev'd in part sub nom. Huon v. Denton,* 841 F.3d 733 (7th Cir. 2016) .............. 18

*Hurd v. District of Columbia,*
  864 F.3d 671 (D.C. Cir. 2017) ............................................................. 1

*In re Overstock Sec. Lit.,*
  No. 2:19-cv-00709-DAK, 2021 WL 2043052 (D. Utah Feb. 25, 2021) ............................. 8

*In re Phila. Newspapers, L.L.C.,*
  690 F.3d 161 (3d Cir. 2012) ............................................................. 24

*Jankovic v. International Crisis Grp.,*
  822 F.3d 576 (D.C. Cir. 2016) ............................................................. passim

*Johnson v. Arden,*
  614 F.3d 785 (8th Cir. 2010) ............................................................. 25

*Jolevare v. Alpha Kappa Alpha Sorority, Inc.,*
  521 F. Supp. 2d 1 (D.D.C. 2007) ............................................................. 27

*Kowal v. MCI Commc'ns Corp.,*
  16 F.3d 1271 (D.C. Cir. 1994) ............................................................. 16

*La Liberte v. Reid,*
  966 F.3d 79 (2d Cir. 2020) ............................................................. 26

*Lane v. Random House, Inc.,*
  985 F. Supp. 141 (D.D.C. 1995) ............................................................. 21

*Liberty Lobby, Inc. v. Dow Jones & Co.,*
  838 F.2d 1287 (D.C. Cir. 1988) ............................................................. 40

*Libre By Nexus v. Buzzfeed,*
  No. 17-cv-1460, 2018 WL 6573281 (D.D.C. Dec. 13, 2018) ............................. 18

v

*Lohrenz v. Donnelly,*
　　350 F.3d 1272 (D.C. Cir. 2003) .................................................................. 40, 45, 49

*Lokhova v. Halper,*
　　441 F. Supp. 3d 238 (E.D. Va. 2020) .................................................................. 24

*Lorain J. Co. v. Milkovich,*
　　474 U.S. 953 (1985) .................................................................................................. 37

*Masson v. New Yorker Magazine, Inc.,*
　　501 U.S. 496 (1991) .................................................................................................. 27

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.,*
　　674 F.3d 369 (4th Cir. 2012) .................................................................................. 41

*McDougal v. Fox News Network LLC,*
　　489 F. Supp. 3d 174 (S.D.N.Y. 2020) .................................................................. 36

*McFarlane v. Esquire Magazine,*
　　74 F.3d 1296 (D.C. Cir. 1996) ................................................................................ 37

*McFarlane v. Sheridan Square Press, Inc.,*
　　91 F.3d 1501 (D.C. Cir. 1996) .................................................................. 43, 45, 47, 52

*McNamara v. Koehler,*
　　429 P.3d 6 (Wash. Ct. App. 2018) ........................................................................ 19

*Michaelis v. CBS, Inc.,*
　　119 F.3d 697 (8th Cir. 1997) .................................................................................. 33

*Milkovich v. Lorain Journal Co.,*
　　497 U.S. 1 (1990) ............................................................................................. passim

*Moldea v. New York Times Co.,*
　　22 F.3d 310 (D.C. Cir. 1994) ........................................................................... 28, 34

*Montgomery v. Risen,*
　　197 F. Supp. 3d 219 (D.D.C. 2016) ...................................................................... 18

*Myers v. D.C. Hous. Auth.,*
　　No. 1:20-cv-00700-APM, 2021 WL 1167032 (D.D.C. Mar. 26, 2021) .................. 18

*New York Times Co. v. Sullivan,*
　　376 U.S. 254 (1964) .......................................................................................... 5, 21, 40

*OAO Alfa Bank v. Center for Public Integrity,*
　　387 F. Supp. 2d 20 (D.D.C. 2005) .......................................................................... 6

*Obado v. Magedson,*
　　No. 13-2382(JAP), 2014 WL 3778261 (D.N.J. Jul. 31, 2014) ............................. 25

*Parisi v. Sinclar,*
　　774 F. Supp. 2d 310 (D.D.C. 2011) ...................................................................... 26

*Parsi v. Daioleslam,*
　　890 F. Supp. 2d 77 (D.D.C. 2012) ........................................................................ 47

*Phila Newspapers, Inc. v. Hepps*,
   475 U.S. 767 (1986) ................................................................................. 27

*Rosen v. American Israel Public Affairs Comm., Inc.*,
   41 A.3d 1250 (D.C. 2012) .................................................................. 20, 30

*Rosenblatt v. Baer*,
   383 U.S. 75 (1966) ....................................................................... 21, 37, 38

*Schatz v. Republican State Leadership Comm.*,
   669 F.3d 50 (1st Cir. 2012) ..................................................................... 41

*Schnare v. Ziessow*,
   104 F'Appx. 847 (4th Cir. 2004) ............................................................. 34

*Sissel v. U.S. Dep't of Health & Human Servs.*,
   760 F.3d 1 (D.C. Cir. 2014) ..................................................................... 16

*Skipkovitz Boley v. Wash. Post Co.*,
   571 F. Supp. 2d 178 (D.D.C. 2008) ......................................................... 17

*Snyder v. Phelps*,
   562 U.S. 443 (2011) ................................................................................. 35

*St. Amant v. Thompson*,
   390 U.S. 721 (1968) ..................................................................... 37, 42, 48, 52

*Tah v. Global Witness Publ'g, Inc.*,
   991 F.3d 231 (D.C. Cir. 2021) ......................................... 37, 41, 42, 48

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987) ....................................... 39, 41, 49, 50

*Truedeau v. Fed. Trade Comm'n*,
   456 F.3d 178 (D.C. Cir. 2006) ................................................................ 16

*U.S. Dominion, Inc., et al. v. Powell, et al.*,
   Nos. 1:21-cv-00040, 1:21-cv-00213, 1:21-cv-00445,
   2021 WL 3550974 (D.D.C. Aug. 11, 2021) ..................................... 48, 50

*Vance v. Chao*,
   496 F. Supp. 2d 182 (D.D.C. 2007) .......................................................... 1

*Von Kahl v. Bureau of Nat. Affairs, Inc.*,
   810 F. Supp. 2d 138 (D.D.C. 2011) ......................................................... 17

*Washington v. Smith*,
   893 F. Supp. 60 (D.D.C. 1955) ................................................................ 35

*Weyrich v. New Republic, Inc.*,
   235 F.3d 617 (D.C. Cir. 2001) ................................................................ 20

*White v. Fraternal Order of Police*,
   909 F.2d 512 (D.C. Cir. 1990) ................................................................ 17

*Wood v. American Federation of Government Employees*,
   316 F. Supp. 3d 475 (D.D.C. 2018) ........................................................ 30

*Xeras v. Heiss*,
   933 F. Supp. 2d 1 (D.D.C. 2013) ........................................................................ 30

*Young v. CBS Broadcasting, Inc.*,
   2012 WL 6722061 (Cal. App. 3d Dist. 2012) .................................................... 38

<u>Statutes</u>

47 U.S.C. § 230 ................................................................................................... 25, 26

<u>Other Authorities</u>

Restatement (2d) Torts § 578 ................................................................................... 23

Restatement (2d) Torts § 611 ................................................................................... 18

<u>Rules</u>

Fed. R. Civ. P. 12 .................................................................................................... 15

Fed. R. Evid. 201 ...................................................................................................... 1

## I.   INTRODUCTION

For at least the past 20 years, election observers have raised concerns about the potential that the outcome of elections in the United States might be affected by inaccurate or unreliable election technology, or parties looking to exploit weak security or manipulate ballot counting.[1] Beginning with the contested election of President Bush in 2000 and continuing thereafter, skeptical supporters of the losing presidential ticket have worried that inadequate election security and technology cost them the election. For example,

- In July 2001, scientists from Massachusetts Institute of Technology and California Institute of Technology released an academic study that found millions of votes were "not counted" in the 2000 presidential election, citing "faulty voting equipment" and other problems. (Ex. A1.)

- In January 2005, members of Congress objected to the certification of Ohio's electoral college votes based on a House Judiciary Committee Report that found "numerous, serious election irregularities" in Ohio that led to "a significant disenfranchisement of voters." (Ex. A2.)

- In October 2008, then presidential candidate John McCain warned viewers during a debate with the Democratic nominee Barack Obama that the November 2008 election could be marred by voter fraud, adding that Obama and ACORN—a voter outreach and low-income advocacy group—were trying to "steal" the election and were "on the verge of maybe perpetrating one of the greatest frauds in voter history in this country, maybe destroying the fabric of democracy." (Ex. A3.)

---

[1] At the pleading stage, a court may consider extrinsic documents attached as exhibits or incorporated by reference in the Complaint, and matters about which the court may take judicial notice. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 625 (D.C. Cir. 1997). Judicial notice is proper for all public documents, including court records or SEC filings. *See Vance v. Chao*, 496 F. Supp. 2d 182, 184 n.1 (D.D.C. 2007) (court records); *DiLorenzo v. Norton*, No. 07-144, 2009 WL 2381237, at *2 n.7 (D.D.C. Jul. 31, 2009) (SEC filings). A court may also properly take judicial notice of "a fact that is not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Hurd v. District of Columbia*, 864 F.3d 671, 686 (D.C. Cir. 2017) (quoting Fed. R. Evid. 201(b)). The articles and other documents attached to or cited herein are all the proper subject of judicial notice, which Byrne hereby requests.

- In May 2019, defeated presidential candidate Hillary Clinton told audiences and others that "you can have the election stolen from you," implying the same thing befell her in her 2016 bid for the White House. (Ex. A4.)

The country's latest 2020 presidential election followed this pattern. In the weeks leading up to the election, former President Trump said that if he lost his bid for the White House, it would be because the election was rigged or due to widespread voter fraud. (Ex. A5.) News outlets did not call the presidential election for candidate Joe Biden until a few days after election day, as there were close contests in multiple states, and mail-in and early votes—the volume of which were unprecedented given pandemic-related changes in many state and local election laws—shifted vote tallies in Biden's favor starting the morning after election day and continuing for several days thereafter.

President Trump asserted that voter fraud and irregularities called into doubt the reported election results. As support, Trump cited alleged abuses in mail-in voting and insecure processes to verify voter identity. He also referenced the use of electronic voting machines, alleging that their technology was at fault and presented opportunities for fraud. With respect to these voting machines—long the subject of bipartisan criticism and election integrity concerns going back many election cycles—Trump claimed that electronic voting machines were vulnerable to manipulation or hacking to change votes. The Trump campaign and others then filed lawsuits across the country making similar claims, relying on purported experts and witnesses willing to sign sworn affidavits directly addressing these issues. This legal effort was led by well-known attorneys and former federal prosecutors. And all of these allegations and issues, many of which were hotly disputed, were eagerly reported by various journalists around the globe and argued about at watercoolers, the dinner table, and on Facebook or other social media websites.

Dominion's complaint attempts to create a narrative of Byrne being a serial defamer, who lied for financial gain and worked in a concerted effort to take down this little-known but giant billion dollar voting machine company to "get what he wants." (Compl. ¶ 40.) But these claims are baseless and the record shows that questions regarding electronic voting machine systems generally and Dominion's in particular did not originate with Byrne, but actually predate all the lawsuits and November 2020 post-election claims.

For years, some critics have never been convinced that electronic voting machine technology is reliable and can yield the accuracy and security standards our elections demand. For instance, Michael Kinsley proclaimed in the New York Times that the 2000 election was "actually stolen." (Ex. A6.) In an article published in an issue of Rolling Stone, Robert F. Kennedy Jr. concluded, while discussing the 2004 election, that the voting machines and software altered "upwards of 80,000 votes for Kerry" that were wrongly attributed to Bush. (Ex. A7.) Well-credentialed scientists and other observers have also conducted tests and provided literature on the vulnerabilities of voting machines. (Ex. A11.)  Indeed, specific alarms have been raised about Dominion's machines, and these warnings have been credited by a federal judge and state governments, the latter of which have expressly decided not to use them. (Ex. C3.)

It is in this context of strong words by a sitting president and distressing skepticism surrounding the integrity and legitimacy of the country's latest election, with decades of well-publicized concerns about the risks and potential vulnerabilities of electronic voting machines in tow, that Patrick Byrne—who is not a Trump partisan and in fact did not vote for President Trump in the 2020 election (*see* Compl. ¶ 153a)—began to investigate, ask questions, and comment on what he learned and what the public controversy was all about via his online blog or in various media appearances.

Byrne is no stranger to championing popular, unpopular, or to some, unlikely narratives. He has previously engaged in a years-long effort to expose "naked short selling" in the market by prime brokerages—a practice that involves short-selling shares that have not been affirmatively determined to exist, which manipulates markets by putting artificial downward pressure on the price of a stock. He eventually prevailed in this effort, reaching a multi-million dollar resolution of a claim brought against the most powerful firms on Wall Street. He has also been a long-time advocate of blockchain technology and cryptocurrencies, positioning the online retail giant he founded, Overstock.com, to become a player in the booming cryptocurrency space by making investments many skeptics viewed at the time as foolhardy.

Having left Overstock in 2019 and given the swell of press on the serious charges being made, Byrne took an interest in the security of the 2020 election. (Compl. ¶ 1.) In a six-part blog series, he explained how he viewed his role:

> My ultimate purpose (my only real purpose) is to deliver to the public as honest a rendering as I may construct of the events between November 3 and January 20. It seems like a historically worthy thing to do. . . . I may have done other things in life, but in addition I'm a journalist, and I have the rights any journalist has.

(*See generally* Compl. at n.13, 99, 104, and 168; *see* Compl. ¶ 153r.) Thus Byrne, a philosopher with post-graduate and doctoral degrees from prestigious universities, a successful CEO, public intellectual, and student of American history, researched to find out as much as he could about President Trump's claims and the mechanics of the 2020 election, and Byrne then reported what he found as an investigative and citizen journalist, occasionally offering his own commentary and opinions about the same. There can be no doubt that this is core First Amendment protected activity and that Dominion's complaint must therefore fail.

First, Dominion's complaint must fail because the First Amendment enshrines "the profound national commitment to the principle that debate on public issues should be

uninhibited, robust, and wide open[.]" *New York Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964). Nowhere is this constitutional promise more important than in reporting on security concerns about presidential elections or official public proceedings including judicial ones, as Byrne did here. That is, Byrne presented the factual allegations against Dominion and basis for the in-court claims being made by President Trump, his campaign, and his legal team. Byrne also presented the official actions of state actors like those in the State of Texas against Dominion with proper attribution to the same. Byrne's reporting on this was fair and accurate. Thus his statements are privileged and immune from liability, even if, taking Dominion's allegations as true, an underlying official document contained statements that were untrue or defamatory.

Second, Dominion's complaint must fail because many of Byrne's statements are not actionable. Some are not about Dominion. Some are not "publications." Some are not actionable defamation as preempted by federal law. Some reflect Byrne's mere subjective beliefs. And others still reflect conclusions or interpretations based on fully-disclosed facts, or simply hyperbolic rhetoric, figurative language, suspicions, or expressions of outrage, all of which receive full constitutional protection. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20-21 (1990).

Third, Dominion's complaint must fail because Dominion has not pled sufficient facts to clearly and convincingly establish that Byrne made the challenged statements with actual malice—that is, with knowledge or reckless disregard of their falsity and that Byrne in fact entertained serious doubts about the truth. It does not matter that Dominion disagrees with Byrne's reporting and his theories, interpretations, opinions, or conclusions he reached at various times. It also does not matter that many people might disagree with him—though millions of people do not. As Byrne himself is aware given his decades in the public eye and having at times been subjected to significant press coverage, people are allowed to hold negative opinions about

public figures, draw negative inferences about them, or make exaggerated or even inaccurate statements about them. "[W]here the criticism is of public officials and their conduct of public business, the interest in private reputation is overborne by the larger public interest, secured by the Constitution, in the dissemination of truth." *Garrison v. Louisiana*, 379 U.S. 64, 72-73 (1964). In other words, "sometimes false is the burden that our system of laws quite consciously places on the shoulders of public figures." *OAO Alfa Bank v. Center for Public Integrity*, 387 F. Supp. 2d 20, 56 (D.D.C. 2005).

To survive a motion to dismiss, Dominion must plead clearly and convincingly that Byrne expressed or implied provably false facts *about Dominion* with actual malice. This standard is not met here. Thus, to the extent Dominion wishes "to set the record straight" (Compl. ¶ 12), Dominion "must be content . . . to contradict and counteract the allegedly false accusations" outside of court. *Fairfax v. CBS Corporation*, 2 F.4th 286, 295-96 (4th Cir. 2021) (reasoning that public figures are less worthy of protection by defamation because they have greater access to means of communication to respond to alleged defamation to 'set the record straight').

Because the threat of protracted litigation in this case could have a chill on the constitutionally protected right of free speech, early resolution of this action by motion to dismiss is proper. *See, e.g.*, *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 138 F. Supp. 3d 1191, 1199 (D. Colo. 2015) ("prompt resolution of defamation actions, either by motion to dismiss or summary judgment, is appropriate"), *aff'd*, 861 F.3d 1081 (10th Cir. 2017).

For these and other reasons discussed below, the Complaint should be dismissed with prejudice.

## II.   BACKGROUND

### A.   The Parties

US Dominion, Inc., Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation (collectively, "Dominion") are related corporate entities that develop technology and supply voting machines and software in the United States. (Compl. ¶¶ 13-15, 25-27.) US Dominion, Inc. is a Delaware corporation based in Denver, Colorado. (Compl. ¶¶ 14 and 28.) Its origins lie in 2002 with the founding of Dominion Voting Systems Corporation, a Canadian company and now subsidiary of US Dominion, Inc. (Compl. ¶ 29.) Dominion contracts with state and local governments to supply voting systems and services in elections across the country. (Compl. ¶ 30.) At the time of the 2020 presidential election, Dominion had contracts to supply those services in over half of the states, serving about 40% of the American voting public spread across 28 states and Puerto Rico. (Compl. ¶¶ 30 and 68 n.63; *see also* Ex. A8.)

In 2010, Dominion acquired Sequoia Voting Systems, a leading American maker of electronic voting machine systems. (Compl. ¶ 112.) Sequoia was previously owned by Smartmatic Corporation, another voting machine company. Smartmatic was founded in Venezuela by entrepreneurs with purported links to the Venezuelan government and President Hugo Chavez. (Ex. A9.) Smartmatic was the subject of controversy in 2004 when the Hugo Chavez-led government selected Smartmatic to provide the voting machine systems and tabulation support for the presidential recall election—an election that was reportedly tampered with by an algorithm that adjusted the vote in Chavez's favor. (Exs. A9 and C1.)

During Smartmatic's ownership of Sequoia, Sequoia voting machines were connected to irregularities in the March 2006 Chicago primary elections that predated the midterm elections that same year. (Ex. A9.) The U.S. government launched a foreign investment risk review of Smartmatic. Smartmatic resultantly sold Sequoia because the foreign ties to the Venezuelan

government posed national security concerns about election integrity. (Ex. C1.) Dominion inherited Sequoia's assets as their purchaser. (Compl. ¶ 112.)

Patrick Byrne is the founder and former CEO and director of Overstock.com. He is a Dartmouth-educated Marshall Scholar. He holds a PhD in Philosophy from Stanford University, and he is outspoken with respect to many topics. (Compl. ¶¶ 33-38.) A citizen journalist, Byrne started an acclaimed website called DeepCapture.com where he laid out his views and theories that frequently took aim at the so-called "deep state" or permanent Washington bureaucracy. A cutting edge thinker, Byrne has also long recognized the transformational potential that blockchain technology might offer for capital markets, political life, voting,, land titling, or even world poverty. (Compl. ¶¶ 35-38.) His public advocacy and support for blockchain technology is well documented and spans years. Indeed, his evangelism for blockchain would eventually manifest as CEO of Overstock where he would diversify the company by expanding its core online retail business with initiatives that worked on developing blockchain technologies, which Overstock pursues through its wholly-owned subsidiary Medici Ventures, Inc. (Compl. ¶ 38.)

Referencing this expansion at Overstock, Dominion attempts to claim that Byrne still has a financial interest in blockchain voting technology. (Compl. ¶ 39.) However, Byrne's resignation from Overstock on August 22, 2019 (Compl. ¶¶ 9 and 34) coincided with his decision to sell the remainder of his Overstock holdings executed in September 2019.[2]

---

[2] The law and SEC regulations require officers of public companies to disclose stock sales two business days after they happen via a Form 4. *See* 17 C.F.R. § 240.16a-3(g)(1). Byrne filed a copy of his Form 4 with the SEC, which is publicly available from the SEC on its EDGAR website, and it discloses Byrne's sale of the remainder of his entire holdings in Overstock as recently found by Judge Kimball of the U.S. District Court for the District of Utah, of which this Court may take judicial notice. *See In re Overstock Sec. Lit.*, No. 2:19-cv-00709-DAK, 2021 WL 2043052, at *4 (D. Utah Feb. 25, 2021) ("Between September 16 and 18, 2019, Byrne sold his entire remaining common stock in Overstock[.]").

**B.     Historical Security Concerns about Electronic Voting Machines and Dominion Machines in Particular**

The most recent presidential election occurred on November 3, 2020. The bitter battle for the White House between then President Donald Trump and former Vice President Joe Biden produced no clear winner by election night, with the race being too close to call and millions of votes still uncounted. By November 7, many news organizations called the 2020 election for Joe Biden, although public concern and questions about that outcome, in the face of mounting legal challenges in several states with allegations of voter fraud and voting machine problems, was hardly over.

This is not the first time that public controversy surrounding an election, or political ire aimed at voting machines, have permeated the public discourse. For example,

- After the 2004 election, the electronic voting machine maker Diebold was accused of manipulating the results in favor of President George W. Bush. (Ex. A10.)

- In 2006, Congresswoman Carolyn Maloney raised voter tampering and national security concerns about Smartmatic's purchase of Sequoia given that "Smartmatic has been associated by the press with the Venezuelan government led by Hugo Chavez, which is openly hostile to the United States." (Ex. C2.) These concerns triggered a formal inquiry of Smartmatic and its U.S.-based subsidiary Sequoia on the eve of the 2006 midterm elections by the Committee on Foreign Investment in the United States (CFIUS). (Ex. C1.) This spotlight on Sequoia's purchase caused Smartmatic to divest ownership of Sequoia, which led the way for its assets to be acquired by Dominion. (Ex. A9; Compl. ¶ 112.)

- In 2016, U.S. intelligence agencies revealed that Russian hackers attempted to access various state election systems. With Russia having meddled in the 2016 election, Politico Magazine published an article on the work of Princeton Professor Andrew Appel, who exposed—despite prior threats of legal action against him—"unacceptable problems" by hacking into a voting machine himself. He reportedly purchased a Sequoia voting machine and was able to throw off the tally of votes in mere minutes and without a trace. (Ex. A11.)

In fact, concerns about Dominion specifically and the vulnerability of its machines also predate the November 2020 election. On January 9, 2020, Dominion founder and chief executive

John Poulos, together with CEOs from Election System & Software (ES&S) and Hart InterCivic—the three of which make more than 80% of the country's voting machines—testified before Congress to answer questions from lawmakers about the security of their machines, cybersecurity practices, susceptibility to hacking given their design or ability to connect to the internet, and ways the infrastructure of voting machines can be modernized given the 15-year-old federal security standards that the voting-machine-maker-industry follows. (Ex. A12.)

Later that month, on January 24, 2020, following a two-day examination by six experts in October 2019, the Texas Secretary of State refused to certify Dominion's system for the third time, questioning whether it "is safe from fraudulent or unauthorized manipulation." (Ex. C3.)[3]

In 2019, Georgia voters and the Coalition for Good Governance filed a federal lawsuit, alleging that Dominion's system was not secure. District Judge Amy Totenberg heard argument on the claims, reviewed the evidence, and in October 2020 issued an opinion that credited the testimony of an "array of experts and subject matter specialists [who] provided a huge volume of significant evidence regarding the security risks and deficits in the [Dominion] system." *Curling v. Raffensperger*, 493 F. Supp. 3d 1264, 1278 (N.D. Ga. 2020). Judge Totenberg warned that Dominion's technology "presents serious system security vulnerability and operational issues" caused by "fundamental deficits and exposure"—risks the court found "neither hypothetical nor remote." *Id.* at 1340-41. The court concluded that "national cybersecurity experts convincingly present evidence that this is not a question of 'might this actually ever happen?'—but 'when it will happen.'" *Id.* at 1342.

---

[3] According to the Texas Secretary of State website, Dominion's requests for certification of its system for use in Texas have been denied three times, including on March 12, 2013, on June 20, 2019, and most recently again on January 24, 2020. *See* SOS.Texas.gov, Voting System Examination(s) and Status for Dominion, *available at* https://www.sos.texas.gov/elections/laws/dominion.shtml (last visited Nov. 17, 2021).

The *Curling* litigation and findings of Judge Totenberg about Dominion machines received saturation coverage by the news media. USA Today warned that "[m]illions of voters going to the polls Tuesday will cast their ballots on machines blasted as unreliable and inaccurate for two decades by computer scientists from Princeton University to Lawrence Livermore National Laboratory." (Ex. A13.) The New York Times reported that Dominion's system was a "Rube Goldbergian assemblage of interrelated components" with expert witnesses seeing "the multitude of components as more vulnerable to attack and to technical problems." (Ex. A14.) The Washington Post added that "election integrity activists say the new [Dominion] voting machines are unaccountable and unverifiable and have many of the same security vulnerabilities as the old ones." (Ex. A15.) The Associated Press explained that voters using Dominion machines "cannot be confident their votes are accurately counted." (Ex. A16.) And the local Atlanta metropolitan daily newspaper reported that Dominion's system "is vulnerable to attacks that could undermine public confidence, create chaos at the polls or even manipulate the results on Election Day." (Ex. A17.)

### C.   November 2020 Election Lawsuit Claims about Dominion

By mid-November 2020, the Wall Street Journal noticed that Trump had repeatedly "lashed out at Dominion, tweeting and retweeting comments about the company at least a dozen times over the past week and calling its equipment 'not good or secure.'" (Compl. ¶ 68 n.63; *see also* Ex. A8.) Around the same time, the Trump campaign and allies filed more than 40 lawsuits to challenge the election's outcome. (Ex. A18.) In these cases, plaintiffs argued that Dominion voting machines were defective, problematic, or had software that enabled others to manipulate or alter votes.

On November 7, for instance, the Trump campaign filed a lawsuit in Arizona state court in which the campaign alleged that Dominion machines in Maricopa County had wrongly rejected thousands of ballots perceived to be "overvotes." (Ex. B1.)

On November 11, the Trump campaign filed another federal lawsuit in the Western District of Michigan, alleging that the "Dominion Voting Systems election management system and voting machines (tabulators), which were used in Antrim County [and] many other Michigan counties, including Wayne County, were at fault." (Ex. B2.)

On November 13, Georgia voter and attorney Lin Wood filed a separate lawsuit in the Northern District of Georgia naming himself as plaintiff. In this lawsuit, Wood claimed that Georgia's election procedures had been unconstitutionally irregular and so he sought to block certification of the state's election results. (Ex. B3.) For support, he filed an 8-page declaration attached to an emergency motion for injunctive relief that said Dominion's software is "a descendant of the Smartmatic" system, which was allegedly used to perpetrate a rigged election in Venezuela. (Ex. B4.) Under penalty of perjury, the declarant specifically said:

> 21.    I want to point out that the software and fundamental design of the electronic electoral system and software of Dominion and other election tabulating companies relies upon software that is a descendant of the Smartmatic Electoral Management System. In short, the Smartmatic software is in the DNA of every vote tabulating company's software and system.

> 22.    Dominion is one of three major companies that tabulates votes in the United States. Dominion uses the same methods and fundamentally same software design for the storage, transfer and computation of voter identification data and voting data. Dominion and Smartmatic did business together. The software, hardware and system have the same fundamental flaws which allow multiple opportunities to corrupt the data and mask the process in a way that the average person cannot detect any fraud or manipulation. The fact that the voting machine displays a voting result that the voter intends and then prints out a paper ballot which reflects that change does not matter. It is the software that counts the digitized vote and reports the results. The software itself is the one that changes the information electronically to the result that the operator of the software

and vote counting system intends to produce that counts. That's how it is done. So the software, the software itself configures the vote and voting result -- changing the selection made by the voter. The software decides the result regardless of what the voter votes.

23. All of the computer controlled voting tabulation is done in a closed environment so that the voter and any observer cannot detect what is taking place unless there is a malfunction or other event which causes the observer to question the process. I saw first-hand that the manipulation and changing of votes can be done in real-time at the secret counting center which existed in Caracas, Venezuela. For me it was something very surprising and disturbing. I was in awe because I had never been present to actually see it occur and I saw it happen. So, I learned firsthand that it doesn't matter what the voter decides or what the paper ballot says. It's the software operator and the software that decides what counts – not the voter.

* * *

26. I am alarmed because of what is occurring in plain sight during this 2020 election for President of the United States. The circumstances and events are eerily reminiscent of what happened with Smartmatic software electronically changing votes in the 2013 presidential election in Venezuela. What happened in the United States was that the vote counting was abruptly stopped in five states using Dominion software. At the time that vote counting was stopped, Donald Trump was significantly ahead in the votes. Then during the wee hours of the morning, when there was no voting occurring and the vote count reporting was off-line, something significantly changed. When the vote reporting resumed the very next morning there was a very pronounced change in voting in favor of the opposing candidate, Joe Biden.

(Ex. B4.)

All of the foregoing events, statements, and attendant public controversy—always simmering and at times boiling in the public discourse—occurred before Byrne uttered his first allegedly false statement. Although Dominion makes assertions about Byrne "predicting a 'stolen election' as early as August 2020," Dominion does not allege any public comment by him until after the election. Per the Complaint, Byrne did not publish his first purported defamatory statement until November 17, 2020. (Compl. ¶¶ 41, 153a.)

On November 25, attorney for the Trump campaign, former federal prosecutor, and experienced litigator Sidney Powell then filed two similar election-related lawsuits in Michigan and Georgia federal courts on behalf of registered voters who alleged "massive election fraud" and "multiple violations" of state and federal law. (Exs. B5 and B6.) Citing sworn affidavits, Powell's complaint in Michigan charged:

- "The Dominion systems derive from the software designed by Smartmatic Corporation, which became Sequoia in the United States." (Ex. B5 at ¶ 4.)

- "Smartmatic and Dominion were founded by foreign oligarchs and dictators . . . to make certain Venezuelan dictator Hugo Chavez never lost another election." (Ex. B5 at ¶ 5.)

- "A core requirement of the Smartmatic software design ultimately adopted by Dominion . . . was the software's ability to hide its manipulation of votes from any audit." (Ex. B5 at ¶ 7.)

- Dominion's system "is designed to facilitate vulnerability and allow a select few to determine which votes will be counted in any election." (Ex. B5 at ¶ 146.)

- "The first red flag is the Antrim County, Michigan 'glitch' that switched 6,000 Trump ballots to Biden" which only became "discoverable through a manual hand recount." (Ex. B5 at ¶ 128.)

- An "analysis of the Dominion software system by a former US Military Intelligence expert concludes that the system and software have been accessible and were certainly compromised by rogue actors, such as Iran and China. By using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, Dominion neglectfully allowed foreign adversaries to access data and intentionally provided access to their infrastructure in order to monitor and manipulate elections, including the most recent one in 2020." (Ex. B5 at ¶ 150.)

On December 1 and December 2, Powell filed two other election-result challenges in Arizona and Wisconsin federal courts that made similar allegations (Exs. B7 and B8), though the Arizona complaint added:

- Dominion machines "make determinations on what ballots to invalidate or validate based on an algorithm that operates offshore before tallying the votes locally." (Ex. B7 at ¶ 49.)

14

- Expert witness Russell James Ramsland Jr. "also identifies an impossibility: 'an improbable, and possibly impossible spike in processed votes,' . . . like those also found in Georgia, Michigan, and Wisconsin. Specifically at 8:06:40 PM on November 3, 2020, there was a spike of 143,100 votes for Biden in Maricopa and Pima Counties. . . . Mr. Ramsland believes that the spike in Arizona, like those in the other three States he analyzed could have been manufactured by Dominion voting machines[.]" (Ex. B7 at ¶ 60.)

### D.    Byrne's Commentary and Dominion's Subsequent Lawsuit

Against this backdrop, from November 17, 2020 to June 26, 2021, Byrne reported,

publicly wrote about, and commented on these election-related lawsuits and their supporting

sworn affidavits—together with every other major news organizations or civic-minded

American—occasionally offering his thoughts, beliefs, opinions, theories, or inferences on the

same.[4] Nearly a year later, Dominion sued Byrne asserting defamation per se. (*See generally*

Compl.) Dominion alleges that Byrne's statements constitute defamation per se "as they impute

serious criminal conduct to Dominion and also malign Dominion in the conduct of its business or

trade." (Compl. ¶ 161.)

### III.  LEGAL STANDARD

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that it is plausible on its

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 570 (2007)). Plaintiffs must plead more than the mere possibility of relief. "Threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements," cannot

---

[4] *See, e.g.*, Compl. ¶¶ 104 and 153e, where Dominion attempts to allege that Byrne defamed Dominion by discussing, relying on, and publishing in full via hyperlink the date-stamped sworn affidavit of Joshua Merritt, aka the Spyder Declaration, signed under penalty of perjury on November 23, 2020, which Powell used and filed in support of her Michigan federal court lawsuit. A copy of this sworn affidavit is attached as Exhibit B9.

withstand scrutiny. *Iqbal*, 556 U.S. at 678. The Court "assumes the truth of all well-pleaded

factual allegations in the complaint and construes reasonable inferences from those allegations in

the plaintiff's favor[.]" *Sissel v. U.S. Dep't of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir.

2014). However, the Court need not accept as true "a legal conclusion couched as a factual

allegation[.]" *Truedeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006). Nor does it

need to accept an unreasonable conclusion or unwarranted inference that is "unsupported by the

facts set out in the complaint." *Id.* at 193 (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271,

1276 (D.C. Cir. 1994). The Court may consider "documents attached to or incorporated in the

complaint, matters of which courts may take judicial notice, and documents appended to a

motion to dismiss whose authenticity is not disputed, if they are referred to in the complaint and

integral to a claim." *Harris v. Amalgamated Transit Union Local 689*, 825 F. Supp. 2d 82, 85

(D.D.C. 2011).

## IV.  ARGUMENT

Dominion's allegations—scattershot and prolix as they are—concern complaints about

statements that either: (1) reflect fair and accurate reporting of official government and judicial

proceedings; (2) contain Byrne's protected commentary or opinions (*e.g.*, protesting that "the

outcome was rigged and should be completely ignored or discounted"); (3) are not actionable

under applicable law (*e.g.*, merely providing a hyperlink or retweeting another's tweet on

Twitter); or (4) relate to minor details or do not even concern Dominion but rather other people

or entities (*e.g.*, referring to "election officials" or "the elites").

To succeed on a defamation claim, a plaintiff must show four things:

(1) that the defendant made a false and defamatory statement; (2) that the
defendant published the statement without privilege to a third party; (3) that the
defendant's fault in publishing the statement amounted to at least negligence [or
actual malice where plaintiff is a public official or figure]; and (4) either that the

statement was actionable as a matter of law irrespective of special harm, or that its publication caused the plaintiff special harm.

*Croixland Properties Ltd. Partnership v. Corcoran*, 174 F.3d 213, 215 (D.C. Cir. 1999) (quoting *Crowley v. North Am. Telecomm. Ass'n*, 691 A.2d 1169, 1172 n.2 (D.C. 1997). For the reasons discussed below, Dominion has failed plead the requisite elements to state a claim.

### A.  Byrne's Statements are Protected under the Fair Report Privilege

Byrne's challenged speech is absolutely protected as reporting and commenting on allegations made in government proceedings. Known as the "fair report privilege," this protection completely shields "the publication of fair and accurate reports of official proceedings" as an exception to the general rule "that one who repeats or republishes a defamation uttered by another 'adopts' it as his own." *Dameron v. Washington Mag., Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985).

The fair report privilege "extends to reports of judicial proceedings." *Von Kahl v. Bureau of Nat. Affairs, Inc.*, 810 F. Supp. 2d 138, 144 (D.D.C. 2011). Indeed, the privilege has been held to broadly include "reports of proceedings before any court," *White v. Fraternal Order of Police*, 909 F.2d 512, 527 (D.C. Cir. 1990), which necessarily includes the content of court documents like complaints or affidavits. *Skipkovitz Boley v. Wash. Post Co.*, 571 F. Supp. 2d 178, 183 (D.D.C. 2008) (pleadings); *Atlantic Monthly Group*, 950 F. Supp. 2d 249, 258-59 (D.D.C. 2013) (affidavits).

Significantly, the reporting of both true and false factual matters is covered by the privilege. "Misstatements of fact as well as opinion are protected under the privilege," *Harper v. Walters*, 822 F. Supp. 817, 826 (D.D.C. 1993), for the privilege is intended to encourage the dissemination of official records, regardless of their truth, "whether verbatim or in fair summaries—without fear of liability for any false, defamatory material that they might contain."

17

*Dameron*, 779 F.2d at 739. "If the author's work is a fair and accurate representation of an official report, the work is privileged, regardless of the veracity of the official report and even if the official documents contain erroneous information." *Montgomery v. Risen*, 197 F. Supp. 3d 219, 266 n.41 (D.D.C. 2016) (internal quotes and citations omitted), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017).

Further, failure to investigate and verify claims made in official or judicial proceedings is not a condition precedent the law requires. "Nothing in the law requires a news organization to first establish the bona fides of the allegations underlying [an official proceeding] before it reports[.]" Such a rule would run "head long into the fair report privilege and, if accepted, would effectively put the media in a straightjacket when it comes to reporting on [official proceedings]." *Libre By Nexus v. Buzzfeed*, No. 17-cv-1460, 2018 WL 6573281, at *2 (D.D.C. Dec. 13, 2018) (citing *BuzzFeed, Inc. v. U.S. Dep't of Justice*, 318 F. Supp. 3d 347, 351 (D.D.C. 2018)).

Finally, the "fair report privilege is not limited to members of the traditional media." *Myers v. D.C. Hous. Auth.*, No. 1:20-cv-00700-APM, 2021 WL 1167032, at *5 (D.D.C. Mar. 26, 2021). As the Restatement (2d) of Torts and others have made clear, the fair report privilege:

> is commonly exercised by newspapers, broadcasting stations and others who are in the business of reporting news to the public. It is not, however, limited to these publishers. It extends to *any person* who makes an oral, written or printed report to pass on the information that is available to the general public.

*Myers*, 2021 WL 1167032, at *5 (quoting Restatement (2d) Torts § 611 comment c (emphasis added)); *Huon v. Breaking Media, LLC*, 75 F. Supp. 3d 747, 762-63 (N.D. Ill. 2014), *aff'd in part, rev'd in part sub nom. Huon v. Denton*, 841 F.3d 733 (7th Cir. 2016) ("Since the availability of the privilege hinges not on the reporter's status or source but on the accuracy and fairness of the report, the privilege applies regardless of whether the reporter is part of the

established press and regardless of whether the reporter obtained the information directly from the official proceeding."); *McNamara v. Koehler*, 429 P.3d 6, 12 (Wash. Ct. App. 2018) (bloggers may claim protection under the privilege).

Byrne's statements are protected by the fair report privilege. For example, in paragraph 153e, Dominion accuses Byrne of defaming Dominion by republishing in full an affidavit filed in the *King v. Whitmer* litigation in the Eastern District of Michigan. (Compl. ¶ 153e.) Dominion asserts the affidavit contained false and defamatory information. (Ex. B9.) Whether the affidavit contained erroneous information, however, is of no consequence because Byrne's republication of the affidavit is immune from liability pursuant to the fair report privilege.

For the privilege to attach, a defendant must "clear[ ] two major hurdles." *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 89 (D.C. 1980), *cert. denied*, 451 U.S. 989 (1981). His publication must be both fair and accurate and properly attributed to a qualified government source. *Jankovic v. Int'l Crisis Grp.*, 593 F.3d 22, 26 (D.C. Cir. 2010). Applied here, this is not a close question. A sworn affidavit published *verbatim* is fair and accurate. *Dameron*, 779 F.2d at 739 (permitting dissemination of an official record "whether verbatim or in fair summaries"). On the score of proper attribution to a qualified government source, a sworn affidavit filed in a federal court is undeniably an official source. *See Atlantic Monthly Group*, 950 F. Supp. 2d 249, 258-59 (D.D.C. 2013) (including affidavits); *Johnson v. Johnson Publ'g Co.*, 271 A.2d 696 (D.C. 1970) (holding that the fair report privilege applies to complaints and pleadings); *Harper*, 822 F. Supp. at 824 (recognizing the same). When examining that affidavit (Ex. B9), it is further readily apparent on its face that specific attribution has been made, including by reference to a federal court case number and ECF document number that correspond to the *King v. Whitmer* litigation.

**B.      Byrne's Statements are not False, are not Actionable, or are not Defamatory**

For a defamation claim to succeed, it is well established that an actionable statement must be both "false as well as defamatory." *Rosen v. American Israel Public Affairs Comm., Inc.*, 41 A.3d 1250, 1256 (D.C. 2012). "In other words, the statements at issue must be both 'verifiable' as false 'and reasonably capable of defamatory meaning.'" *Bauman v. Butowsky*, 377 F. Supp. 3d 1, 10 (D.C. Cir. 2019) (quoting *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 620 (D.C. Cir. 2001).

According to the Complaint, in a series of blog posts, interviews, social media activity, or other media between November 2020 and June 2021, Byrne: (1) claimed that election irregularities in Dallas 2018 were rooted in Dallas's use of Dominion voting machines, that investigators conducted an audit, and that the State of Texas outlawed Dominion machines as a result of that audit; (2) protested that the election was "hacked" or "rigged" and should be thrown out by the courts; (3) criticized the so-called "elites" or other unnamed "officials" for their involvement in stealing the election; (4) published or retweeted the research of others, expressing his like, agreement, or approval—quintessential statements of opinion—in the same; (5) conveyed his nondefamatory suspicions about the vote results in certain states and manner by which Joe Biden won; (6) provided his subjective beliefs and opined on and drew negative inferences based on factual allegations and supporting affidavits that were asserted in the various election-related lawsuits; and (7) made hyperbolic, rhetorical, or figurative comments about Dominion. (Compl. ¶ 153.) As discussed below, none of the foregoing types of statements support an actionable defamation claim.

### 1.     Some of the Challenged Statements are not Actionable because they are not "Of and Concerning" Dominion

First, the constitutional right to free speech requires a plaintiff to plead that the alleged defamatory statement is "of and concerning" the plaintiff. *New York Times*, 376 U.S. at 288-89. This requirement is amplified where, as here, the plaintiff is a public figure.[5] To satisfy the "of and concerning" requirement, the plaintiff must effectively plead that the statements at issue either expressly mention the plaintiff or "lead the listener to conclude that the speaker is referring to the plaintiff by description, even if the plaintiff is never named or is misnamed." *Croixland*, 174 F.3d at 213. "Full constitutional protection exists for rhetoric that, due to its loose, figurative tone cannot reasonably be interpreted as stating actual facts about an individual, and for imprecise statements that are not susceptible of being proved true or false." *Lane v. Random House, Inc.*, 985 F. Supp. 141, 150 (D.D.C. 1995) (citing *Milkovich*, 497 U.S. at 20-21)).

Dominion alleges that each of the alleged false and defamatory statements uttered by Byrne were about Dominion. (Compl. ¶ 153.) They are mistaken. On closer examination, many of the statements alleged by Dominion to be defamatory, or at least portions of them, are not about Dominion, but rather the so-called "elites," unnamed "officials," or others.

Throughout the Complaint, Dominion frequently omits key elements of Byrne's alleged defamatory statements, in some cases suggesting "Byrne made, endorsed, and adopted" the false statements of others where no such endorsements were made. In other cases, Dominion creates a misimpression of what happened or what was being said. For example, in paragraph 153c, Dominion's pleading suggests that Byrne's alleged statements were part of a live, question-and-

---

[5] In *Rosenblatt v. Baer*, for instance, the Supreme Court reversed a jury award against a defendant newspaper out of concern that it criticized generally the management of a county recreation facility without mentioning the plaintiff official. *Rosenblatt v. Baer*, 383 U.S. 75, 82-83 (1966).

answer broadcast on OAN. (Compl. ¶ 153c.) However, an examination of the underlying video, from which the purported pleading and exhibit transcript come, shows that Byrne's appearance on television was not part of a breaking news, live interview between Channel Rion and Byrne. The video was a self-contained taped news report—otherwise known as a news package—that played pre-recorded snippets of Byrne.

In these snippets, Byrne never mentioned Dominion, but rather expressed his opinions and suspicions about the election results. *Bauman*, 377 F. Supp. at 11 (holding "suspicions" are not capable of being provably false). Specifically, Byrne expressed his skepticism about what he perceived to be statistical anomalies and mathematical oddities in the election results that he thought should invite larger scrutiny in the outcome of the election. (Compl. ¶ 153c.)

In paragraph 153f, Dominion alleges that Byrne falsely accused Dominion of rigging the 2020 presidential election in a handful of cities, among other things. But Byrne was not talking about Dominion in this instance. What Dominion omits is that Byrne had expressly accused the so-called "elites" or "elite class" of wrongdoing, not Dominion. (Compl. ¶ 153f.)

The same is true with respect to paragraph 153k. Here, Byrne is not accusing Dominion of election fraud, but again is referring to "the elites"—specifically, "left elites"—and other unnamed "election officials." Byrne said:

> [W]hat's going on is the elites are once again using the black community as their shield. . . . It's not voter fraud, it's election fraud. The election officials and a machinery is what cheated. . . . And what I hope is . . . the black community wakes up to how they've been used by left elites.

(Compl. ¶ 153k.)

The Constitution "provides protection for statements that cannot reasonably be interpreted as stating actual facts about an individual." *Farah v. Esquire Mag.*, 736 F.3d 528, 534

22

(D.C. Cir. 2013) (internal quotes omitted). Because the foregoing alleged defamatory statements do not state actual facts *about Dominion*, they are not actionable.

### 2. Some of the Challenged Statements are not Actionable because they are not Publications or are Preempted by Federal Law

Second, a plaintiff alleging defamation must plead that the defendant published a statement without a privilege or other immunity. *See Croixland*, 174 F.3d at 215. Some of the challenged statements fail for want of the element of an actionable publication.

In paragraph 153e, Dominion alleges it was defamed because Byrne "republished" on his blog, DeepCapture.com, the sworn affidavit of Joshua Merritt that had been filed in Michigan federal court. Dominion alleges that Merritt wrongly described himself as a military intelligence analyst, who falsely accused Dominion of "using servers and employees connected with rogue actors and hostile foreign influences . . . to monitor and manipulate elections, including the most recent one in 2020." (Compl. ¶ 153e.) Dominion correspondingly attempts to tether Byrne's liability to the underlying sworn statements of Merritt.

While it is generally true that one who republishes defamatory matter is subject to liability as if he or she had originally published it, *see Foretich v. Glamour*, 741 F. Supp. 247, 253 (D.D.C. 1990); and Restatement (2d) Torts § 578 (1977), Byrne, as discussed above, submits this purported republication is privileged under the fair report privilege. Even if not privileged, this purported republication is no publication at all. Byrne merely provided a hyperlink on his blog to download the affidavit, and made a nondefamatory statement of opinion (*i.e.*, "this fine . . . affidavit") and a fleeting reference about the affidavit's content. Specifically, Byrne wrote:

**PENETRATION OF ELECTION BY CHINA, IRAN, & RUSSIA:**
Download this fine, heavily-documented affidavit from a Military intelligence analyst concerning Chinese, Iranian, and Russian penetration of Dominion Voting: **Download**

(Compl. ¶ 153e.)

Courts have routinely held that merely providing a hyperlink to a publication is not in itself a republication from which defamation liability might attach. *See, e.g.*, *In re Phila. Newspapers, L.L.C.*, 690 F.3d 161, 174 (3d Cir. 2012) (summarizing the court's holding that hyperlinks to formerly published material is not republication); *Churchill v. State*, 876 A.2d 311, 315 (N.J. Super. Ct. App. Div. 2005) (reaffirming that "technical amendments to the website, which altered the means by which website visitors accessed the report, did not constitute republication"); *Haefner v. N.Y. Media, L.L.C.*, 918 N.Y.S. 2d 103, 104 (App. Div. 2011) (stating that access to a web article via website links does not constitute republication).

Transitory references to the content of a hyperlink also do not convert a hyperlink into a publication. *See, e.g.*, *Lokhova v. Halper*, 441 F. Supp. 3d 238, 256 (E.D. Va. 2020) (finding that a hyperlink accompanied by a "passing reference to a general conclusion in the original article" did not constitute republication); *Doctor's Data Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1137 (N.D. Ill. 2016) (finding that a hyperlink was not a republication because "it does not duplicate the content of a prior publication"). Because the creation of a hyperlink to alleged defamatory words is not, in itself, a publication, this claim must fail.

In paragraph 153m, Dominion alleges Byrne retweeted and vouched for a false and defamatory story indicating a "Georgia Tabulating Machine Sent Results to China," which was purportedly published and originally tweeted by The Thinking Conservative (@TnkConservative). Dominion contends the retweeted article amounts to an actionable publication by Byrne. A copy of the alleged defamatory retweet is below:



(Compl. ¶ 153m.) The claim falls short, however, because Byrne enjoys broad immunity against state-law claims under the federal Communications Decency Act (CDA), 47 U.S.C. § 230.

The CDA commands that "[n]o provider *or user* of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," *id.* at § 230(c)(1) (emphasis added), and the CDA expressly preempts any state law to the contrary, *id.* at § 230(e)(3). Courts have explicitly held that CDA immunity preempts state-law defamation actions. *See, e.g.*, *Johnson v. Arden*, 614 F.3d 785, 792 (8th Cir. 2010); *Obado v. Magedson*, No. 13-2382(JAP), 2014 WL 3778261 (D.N.J. Jul. 31, 2014). Thus, the provisions of the CDA bar defamation plaintiffs from holding either interactive computer service providers or users legally responsible for information that third parties may create or develop.

It is undisputed that Twitter is an interactive computer service provider. *See, e.g.*, *American Freedom Defense Initiative v. Lynch*, 217 F. Supp. 3d 100, 104 (D.D.C. 2016). It is

25

undisputed that Byrne qualifies as a user of Twitter. Under the broad mantle of immunity of the CDA, which offers "user" protection, Byrne is immune from liability for this retweet.

As Dominion admits in its pleadings, Byrne did not originate the alleged defamatory content of The Thinking Conservative (@TnkConservative). He retweeted it. Since retweeters simply share another's content, retweeters are not the original publisher or speaker. Per the CDA, Dominion's remedy is against, and Dominion's sole possible defendant for this statement is, the original publisher. *See, e.g.*, *La Liberte v. Reid*, 966 F.3d 79, 83 (2d Cir. 2020) (recognizing the force of the CDA but concluding that the cable TV personality Joy Reid didn't have immunity under the CDA because she originated the alleged defamatory content versus merely repeat what had been previously published by another content provider).

The preface "I vouch for this" by Byrne does not change the binding nature and preemptive force of the CDA. The CDA is meant to shield interactive computer service providers and users from liability for otherwise actionable speech from other information content providers. *Parisi v. Sinclar*, 774 F. Supp. 2d 310, 315 (D.D.C. 2011) (discussing Congress's "legislative judgment to effectively immunize providers [and users] . . . from civil liability in tort with respect to material . . . created by others."). Congress intended to eliminate any possible chilling effect that could be caused by the application of some state-law hook for defamation, or threat of a tort-based lawsuit against interactive service providers or users for injuries caused by the communications of others. *Id.* The CDA's terms provide no exception for "liking," "approving," or "vouching" for another's content, rather the CDA plainly disallows "treat[ing]" a user as "the publisher or speaker of any information provided by another[.]" 47 U.S.C.§ 230(c)(1). Dominion's claim here quite simply attempts to hold Byrne accountable for the publication of an allegedly defamatory post by a third party. CDA immunity applies.

### 3.      Some of the Challenged Statements are not False

Third, the Complaint dwells on Byrne's statements about how Dominion voting machines "ran the Dallas 2018 election," which led to an investigation and the State of Texas "outlaw[ing]" Dominion machines "as a result of that audit." (*See, e.g.*, Compl. ¶¶ 153a, 153b, 153c, 153d, 153f, and 153h.) Dominion insists their machines weren't involved in the Dallas 2018 election. Even accepting that as true, Dominion's claims with respect to these particular statements still fail because Byrne's statements are substantially true.

As the Supreme Court has confirmed, the defense of substantial truth will absolve a defendant even if he cannot "justify every word of the alleged defamatory matter; it is sufficient if the substance of the charge be proved true, irrespective of slight inaccuracy in the details." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516-17 (1991). In other words, "literal truth is not required." *Jolevare v. Alpha Kappa Alpha Sorority, Inc.*, 521 F. Supp. 2d 1, 13-14 (D.D.C. 2007). So long as the "the substance, the gist, [or] the sting of the libelous charge [is] justified," minor inaccuracies do not amount to actionable defamation. *Masson*, 501 U.S. at 517. The burden is on a plaintiff to prove the statement's falsity. *Phila Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986).

Here, the sting of Byrne's public comment is that "Texas outlawed [Dominion's system] in Texas as a result of [an] audit." That statement is true and undisputed by Dominion. Following an examination, the Texas Secretary of State on January 24, 2020 refused to certify Dominion's system for use in the state, citing concerns about whether it "is safe from fraudulent or unauthorized manipulation." (Ex. C3.)[6] Whether the precipitating event is the Dallas 2018

---

[6] *See also* note 3, *supra*.

27

election, or Dominion's request for certification of its system, that ultimate conclusion is an insignificant and minor detail.

###### 4. Other Statements Consist of Byrne's Commentary Based on Fully-Disclosed Facts and are thus Protected Opinions

Fourth, other challenged statements are not actionable because they are Byrne's own opinions based on fully-disclosed facts. "When the bases for . . . the conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related." *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 185 (4th Cir. 1998); *Moldea v. New York Times Co.*, 22 F.3d 310, 317 (D.C. Cir. 1994) ("Because the reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation.") This sensible rule recognizes that "when a defendant provides the facts underlying the challenged statements, it is clear that the challenged statements represent his own interpretation of those facts, which leaves the reader free to draw his own conclusions." *Bauman*, 377 F. Supp. 3d at 11 n.7 (internal quotes omitted); *see also Milkovich*, 497 U.S. at 27 n.3 (explaining the difference between an opinion implying *undisclosed* facts and an opinion setting forth its factual basis, and confirming the latter is nonactionable).

Byrne frequently provided the underlying facts on which he opined. While Dominion alleges that Byrne's evidence was "manufactured" (Compl. ¶ 1), the Complaint itself shows that he often based his statements on facts that were fully disclosed. Throughout the statements that are alleged to be defamatory, Byrne cites his sources, as well as affirmatively encourages his readers to do their own research. In fact, on Byrne's website DeepCapture.com, he describes his process as eschewing "journalistic methodology" in favor of self-sufficient investigations led by

28

individuals, directly encouraging his supporters to do their own research and verify their own facts. (Ex. D.)

In paragraph 153e, Dominion's alleged defamatory statements are really Byrne's interpretations, conclusions, and inferences based on fully-disclosed facts and thoroughly-cited evidence. In this blog entry, Byrne summarizes the evidence he believes show irregularities. He discusses the origin and history of Smartmatic and its reported connections to Venezuela, which Dominion does not dispute. He discusses the functionality of voting machines generally which create the potential risk for manipulation by administrators or mere user error, which Dominion does not dispute. He drops footnotes with hyperlinks to sworn affidavits filed in federal court. He includes screenshots of emails, screenshots of networking software, press releases from government agencies like Cybersecurity & Infrastructure Security Agency (CISA). He cites articles in the New York Times, TV interviews, licensing arrangements, and he includes charts, bars, tables, and graphs, based on data  from the New York Times, that highlight spikes in vote tallies at specific dates and times in specific states. Using figurative and expressive language, Byrne submits:

**Conclusion**: Election 2020 is an egg that can't be unscrambled.

(Compl. ¶ 153e.) This is a textbook form of constitutionally protected speech.

Other examples of Byrne giving opinions based on fully-disclosed facts and encouraging readers and listeners to draw their own conclusions, include the following:

- During a live interview with Christopher McDonald on *The McFiles*, Byrne shared his thoughts and opinions and told listeners to review the "graphs I'll be putting up tonight or tomorrow morning . . . . I post things on DeepCapture.com." (Compl. ¶ 153f.)

- In another blog entry on DeepCapture.com, Byrne states, "You wanted the evidence. Here is the evidence," followed by a hyperlink to download a forensic report of the Allied Security Operations Group, which discussed the events that

occurred in Antrim County, Michigan and drew negative inferences from such events. (Compl. ¶ 153j.)

- The statements made in paragraph 153q contain screenshots of graphs filed in sworn affidavits that he relied on to support the claims made. (Compl. ¶ 153q.)

### 5. Other Statements are not Capable of Defamatory Meaning or Susceptible to Proof

Fifth, even where Byrne does not fully disclose facts, some of the challenged statements are still not actionable because "opinion statements that lend themselves to varying interpretations are insufficient for a defamation claim because they cannot be proved false." *Clemmons v. Academy for Educational Development*, 70 F. Supp. 3d 282, 308 (D.D.C. 2014) (concluding statement that plaintiff's leadership resulted in "management problems" was unverifiable opinion); *see also, e.g.*, *Xeras v. Heiss*, 933 F. Supp. 2d 1, 18 (D.D.C. 2013) (statements that plaintiff engaged in "dishonest" and "deceptive" business practices were not provably false); *Wood v. American Federation of Government Employees*, 316 F. Supp. 3d 475, 488 (D.D.C. 2018) (statement that plaintiff was a "gang member" was hyperbole that "would not reasonably be understood in context as being fully and literally true"); *Armstrong v. Thompson*, 80 A.3d 177, 187 (D.C. 2013) (holding that statements suggesting the plaintiff engaged in "serious integrity violations" and other "serious issues of misconduct . . . and unethical behavior" were unverifiable opinions that simply "reflected one person's subjective view of the underlying conduct"); *Rosen*, 41 A.3d at 1258 (statement that plaintiff's conduct "did not comport with the standards that AIPAC expects of its employees" was not provably false because "standards" is "a general term capable of multiple meanings" and "communicates no specific message about a discernible fact to an uninformed hearer"); *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 147 (D.D.C. 2017) ("whether Deripaska's business deals are worth investigating is not a

verifiable statement of fact"); *Bauman*, 377 F. Supp. 3d at 11 (statement that plaintiff's

involvement was "extremely suspicious" lacks provability and "therefore is not actionable").

This is so because the First Amendment "protects speech" and right to the freedom of

thought. "[C]onstitutionally speaking, 'there is no such thing as a false idea.'" *Bauman*, 377

F. Supp. 3d at 10 (citing *Competitive Enterprise Institute v. Mann*, 150 A.3d 1213, 1241 (D.C.

2016) (quoting *Milkovich*, 497 U.S. at 18)).

> Accordingly, expressions of a subjective view, an interpretation, a theory,
> conjecture, or surmise are not provably false and thus cannot undergird a claim
> of defamation. In the same way, statements that amount to imaginative expression or
> rhetorical hyperbole cannot be libelous, as such statements are used not to
> implicate underlying acts but merely in a loose, figurative sense to demonstrate
> strong disagreement with another.

*Bauman*, 377 F. Supp. 3d at 11 (internal quotes and citations omitted).

Throughout the Complaint, Dominion liberally accuses Byrne of defaming Dominion in

his criticisms that the election was rigged. "This election was hacked, the outcome was rigged

and should be completely ignored or discounted, I mean, through the court system. The courts

should throw it out." (*See, e.g.*, Compl. ¶ 153a.) This is paradigmatic protected opinion as

"imaginative expression," rhetorical hyperbole," or "expression of outrage." *Bauman*, 377

F. Supp. 3d at 11; *see also Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002).

Dominion attempts to argue that any claim asserting a U.S. election was "rigged" is

extraordinary and must be based on verifiable evidence. (Compl. ¶ 65.) But the reality is these

types of claims are hardly novel, much less actionable. Indeed, the "election is rigged" cry has a

long history. For as long as there have been elections, there have been fears that somebody might

rig or steal them. History shows that in the hotly contested race of 1800, supporters of Aaron

Burr insisted that Thomas Jefferson had cheated him out of the presidency. Allegations of stolen

elections similarly plagued the 1824 contest between Andrew Jackson and John Quincy Adams.

In more modern times, four out of the last six presidential elections have been subject to accusations that they were "stolen" or "rigged." Byrne's statements here are no different.

In paragraph 153c and elsewhere, Dominion quotes Byrne as saying:

When you get talking about, you know, thousands of votes in a row for one candidate, just to give you the mathematical odds against it, if you're talking about a group that has a 96% percent affinity for Biden. So imagine we're talking about very heavily Biden ward, the chance of having a hundred votes in a row for Biden. If it's not, if the chance of every vote is 96% for Biden, the chance he would have a hundred in a row is about 1.6%. The chances you would have a thousand in a row goes to it's about a quad, um, a couple quadrillion to one, and the chances that you would have the kinds of numbers we were seeing, where there were places where there were tens of  thousands of votes in a row for Biden, the chances of that are quadrillions and quadrillions and quadrillions against that could ever happen in nature.

(Compl. ¶ 153c.) But these types of statements amount to nothing more than Byrne's mere imaginative expressions and constitutionally protected suspicions, and they are not actionable as defamation.

The same is true with respect to the following challenged statements:

- "[T]he outcome was rigged and should be completely ignored or discounted. . . . Doesn't [it] seem a little odd that Mr. Biden was behind in states 800-, 600,000 votes, and then he has this come-from behind victory and wins by 14,000?" (Compl. ¶ 153a.)

- "This stuff, from a security point of view, this election machinery . . . is a joke." (Compl. ¶ 153d.)

- "Election 2020 is an egg that can't be unscrambled." (Compl. ¶ 153e.)

- "[T]he beauty of using those four cities is when they cheat there, then as it starts to get revealed they can say oh, you don't like black people, you're trying to suppress the vote…This is really the elite class has always hid behind black people." (Compl. ¶ 153f.)

- "There's all kinds of crooked [inaudible] and the people who are saying otherwise are talking through their hats." (Compl. ¶ 153g.)

- "An eighth grader could hack this stuff." (Compl. ¶ 153g.)

- "What was Seth Rich, before he got killed . . . he had a particular position in the DNC, that would have put him in a position to know all the things you're now hearing. . . . They couldn't let him walk around if he was not on board." (Compl. ¶ 153i.)

- "[W]hat's going on is the elites are once again using the black community as their shield. . . . It's not voter fraud, it's election fraud. The election officials and a machinery is what cheated. . . . And what I hope is . . . the black community wakes up to how they've been used by left elites." (Compl. ¶ 153k.)

For hyperbolic statements and subjective beliefs such as these, no reasonable factfinder could conclude that Byrne was defaming Dominion or any other party. These statements constitute his "take" on the possibility that the election was stolen, not a defamatory attack on Dominion's alleged role in the 2020 presidential election.

### a. The Broad and Specific Context of Byrne's Commentary Confirms These Statements are Constitutionally Protected as Opinion

The full context in which Byrne made his statements confirms they are protected opinion. In considering whether an alleged defamatory statement was one of fact or opinion, the context of the statement is a critical part of the analysis. *Farah*, 736 F.3d at 534-35; *see also Herring Networks, Inc. v. Maddow*, 445 F. Supp. 3d 1042, 1049 (S.D. Cal. 2020) (the court must examine the "totality of the circumstances" in which the statement was made), *aff'd*, 8 F. 4th 1148 (9th Cir. 2021); *Michaelis v. CBS, Inc.*, 119 F.3d 697, 700 (8th Cir. 1997) ("In determining whether a particular statement is defamatory, a court must review the statement in the context in which it was presented, give the words their obvious an natural meaning, and consider the innuendos which follow from the statement."); *Bauman*, 377 F. Supp. 3d at 11 (observing that the line between fact and opinion is not always bright, that statements don't always fit neatly into categories, and that the answer, "quite often, depends on the context of the statement in question.'").

This context "includes not only the immediate context of the disputed statements, but also the type of publication, the genre of writing, and the publication's history of similar works." *Farah*, 736 F.3d at 535. The "broader social context" too is critical to discerning whether a disputed statement is actionable. *Id.* After all, the setting or surrounding circumstances of a statement can reveal how the audience might receive it. *Moldea*, 22 F.3d at 314. In *Bauman v. Butowsky*, for instance, the defendant's statements were not actionable defamation, but instead were part of a "charged, back-and-forth public exchange . . . over Butowsky's role in spreading a conspiracy theory about Seth Rich's murder." *Bauman*, 377 F. Supp. 3d at 14.[7]

Byrne's statements were just a sprinkling in a hurricane of public controversy surrounding the outcome of the 2020 presidential election and long history and ongoing debate about the reliability of electronic voting. There were: (a) election-related lawsuits filed in various states across the country, with the full-support of the president and senior congressional members in his party; (b) controversies between states and direct appeals to the Supreme Court of the United States; (c) inaccurate vote tabulation results in Antrim County, Michigan, which gained national attention due to reported human error; (d) independent audits of election results in various states and counties; (e) election integrity and security claims led by a *sitting President of the United States* and an experienced legal team; and (f) swirling news media with political

---

[7] *See also Schnare v. Ziessow*, 104 F'Appx. 847, 851 (4th Cir. 2004) (holding accusation was not actionable defamation because, in context, the assertion was part of a "vigorous and angry expression[ ] of disagreement."); *Horsley v. Rivera*, 292 F.3d 695 (11th Cir. 2002) (defendant's claim that plaintiff was "an accomplice to homicide" was non-actionable hyperbole because, among other things, it was made during "an emotional debate concerning emotionally-charged issues of significant public concern."); *Fudge v. Penthouse Intern., Ltd.*, 840 F.2d 1012, 1017 (1st Cir. 1988) ("In the charged context of a debate over a matter of public concern, the reader will expect a certain amount of hyperbole and loose characterization—in short, a certain amount of opinion."); *Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560, 577 (8th Cir. 2001) ("[w]hile we are not aficionados of conspiracy theories, we suppose that if [defendant's] assertions are true, there would be inherent difficulties in verifying or refuting such a claim").

punditry on the same. (*See generally* Compl.) All of this, along with other ongoing factors in 2020, such as the rise of unconventional beliefs against the establishment, the shift in political tone throughout the Trump administration, and the dissatisfaction of many citizens with the results and perceived cultural and social elite, inform the context in which Byrne made his statements asking questions about and criticizing the propriety of the election.

Courts recognize the value in some level of "imaginative expression" or "rhetorical hyperbole" in our public debate, *Milkovich*, 497 U.S. at 2, in recognition of the value "reached by [the] free trade in ideas—that the best test of truth is the power of the thought to go get itself accepted in the competition of the market," *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting); *Snyder v. Phelps*, 562 U.S. 443, 460-61 (2011). Further, reasonable consumers of political news and commentary must understand that a considerable portion of political content is subjective opinion and that statements contained in this setting must be viewed in this context. *See, e.g.*, *Washington v. Smith*, 893 F. Supp. 60, 64 (D.D.C. 1955) (holding that readers of sports magazines, for instance, "understand that a considerable portion of the magazine's content is subjective opinion," and that the statements contained therein "must be viewed in this context.").

So too here, in light of this broad political context and with respect to Byrne's statements, he was simply articulating his own theories and subjective beliefs.

In addition, it bears noting that Byrne made his statements predominantly on conservative-leaning news networks, such as Newsmax, OAN, and BizTV. (*See generally* Compl. ¶ 153.) Courts give a great deal of deference when considering the context of statements made during a cable broadcast television show. *See, e.g.*, *Herring*, 8 F.4th at 1157-58 (affirming district court's conclusion that Rachel Maddow's comment that OAN "really, literally is paid

Russian propaganda" was obvious exaggeration based on the nature and context of *The Rachel Maddow* show itself); *McDougal v. Fox News Network LLC*, 489 F. Supp. 3d 174, 182-84 (S.D.N.Y. 2020) (determining that Tucker Carlson's statements constituted "rhetorical hyperbole" and were not defamatory given an established reputation for "overheated rhetoric" and "pitched commentary"); *Fram v. Yellow Cab Co. of Pittsburg*, 380 F. Supp. 1314, 1330-31 (W.D. Pa. 1974) (talk-show viewers, "accustomed to hearing criticism, accusation, and controversy" would understand accusations as opinion).

Byrne also made statements on his personal blog, DeepCapture.com. With respect to blogs and the internet, a court may consider the appearance of the site itself, how the website categorizes or tags individual blog posts, and how headlines are titled to discern the context of their content. *See Farah*, 863 F. Supp. 2d at 38.

An examination of the specific context in which Byrne's statements were made establish an environment of subjective commentary, not just assertions of fact. The news networks on which he appeared are known for unscripted, unrehearsed dialogue where hot-button issues are discussed and opinions are made in a tone that is at best biased or rhetorical, but constitutionally speaking, still protected as opinion. As for the websites, Byrne's personal blog had a specific brand that reasonable consumers would understand contain subjective beliefs. In fact, the website describes DeepCapture.com as a website that "was created to bypass the 'captured' institutions that mediate our nation's discourse" and advance theories intended to uncover the secrets of social institutions. (Ex. D.)

### C.    Dominion Has Failed to Plead that Byrne Acted with Actual Malice

Dominion's complaint should also be dismissed for the entirely separate reason that it has failed to plead actual malice. Dominion must plead actual malice with clear and convincing evidence because Dominion is a public official or limited public figure. Actual malice is a

"famously daunting" standard. *Tah v. Global Witness Publ'g, Inc.*, 991 F.3d 231, 240 (D.C. Cir. 2021) (citing *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996)). It is a subjective test that requires a plaintiff to show that the defendant speaker "in fact" had a "high degree of awareness of probable falsity." *St. Amant v. Thompson*, 390 U.S. 721, 731 (1968). Dominion's allegations fall short.

### 1.    Dominion is a Public Plaintiff Subject to the Actual Malice Standard

Initially, there can be no doubt that Dominion—which trumpets how it supplied electronic voting services to nearly half of American voters spread across 28 states and Puerto Rico in the 2020 presidential election (Compl. ¶ 30)—is a public official or limited public figure.

Public officials are those persons "who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966). They include any individual, down to a school teacher, who plays some fundamental part in governmental affairs. *Lorain J. Co. v. Milkovich*, 474 U.S. 953, 959-60 (1985). They also include any person who holds "a position in government [of] such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it." *Rosenblatt*, 383 U.S. at 86.

A limited public figure is a person or entity that "voluntarily injects" itself "to the forefront of a particular public controversy" or "is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974); *Fridman v. Orbis Bus. Intel. Ltd.*, 229 A.3d 494, 504 (D.C. Cir. 2020). Under either metric, Dominion is a public plaintiff.

### a.    Dominion Qualifies as a Public Official

Dominion is a public official because it fulfills a vital government role in the election process: counting and tabulating votes in an election. Dominion provides this function in over

half of the states in the country by contracting with state and local governments for the provision

of voting systems and services. (Compl. ¶ 30.) Dominion admittedly performs this role in

exchange for "tens of thousands of dollars" or "over a hundred million dollars" from the public

fisc. (Compl. ¶ 30.) These facts demonstrate that Dominion holds a position that invites public

discussion and scrutiny over how it operates and performs its role. They also demonstrate that

Dominion is a public official that has placed itself at the heart of one of the most important

functions of government: determining the victor of an election and thus very makeup of our

government itself. And these facts establish beyond a doubt that Dominion has "substantial

responsibility for or control over the conduct of governmental affairs" and that "the public has an

independent interest in [Dominion's] qualifications and performance." *Rosenblatt*, 383 U.S. at

85-86.

Even though virtually all public officials are government employees, the fact that

Dominion is instead a private entity is not controlling because "[g]overnment employment is not

a dispositive factor where the plaintiff in all other respects serves as a public official." *Young v.

CBS Broadcasting, Inc.*, 2012 WL 6722061 (Cal. App. 3d Dist. 2012).[8] To be sure, an entity that

contracts with state and local governments to supply over half the country with electronic voting

systems, voting equipment, software, training, and technical assistance to count and tabulate

votes and verify election results is undeniably a public official.[9]

---

[8] *See also Ghafur v. Bernstein*, 131 Cal. App. 4th 1230, 1239 (1st Dist. 2005) (superintendent of private charter school system held to be a public official where charter schools under California law are considered part of the public school system); *HBO, A Div. of Time Warner Entertainment Co., L.P. v. Harrison*, 983 S.W.2d 31, 37-38 (Tex. App. Houston 14th Dist. 1998) (court-appointed psychologist held to be a public official where court gave him power to decide issues of visitation).

[9] *See, e.g.*, *Hatfill v. New York Times Co.*, 488 F. Supp. 2d 522 (E.D. Va. 2007) (holding that a weaponry expert who contracted with the government to perform governmental functions and train other government officials was a "public official"); *Green v. Northern Publishing Co.*, 655

**b.      Dominion Qualifies as a Limited Public Figure**

Dominion alternatively took on the status of a limited public figure. As discussed in the background section above and as Dominion points out in its complaint (Compl. ¶¶ 58, 60, 66, 69), debate over the security and integrity of electronic voting machines generally and Dominion's system in particular has persisted in the public discourse for decades. This debate over electronic voting machines and Dominion's system predates the November 2020 election, and Dominion has been a willing participant in the conversation. Indeed, Dominion squarely thrust itself into the public eye for the specific purpose of building voter confidence in the fidelity of its voting machines and technology at the highest levels.

On January 9, 2020, Dominion founder and chief executive John Poulos appeared before Congress—along with Dominion's competitors and other witnesses—where he testified:

> I agree with the importance of this—of the issues being raised by the Chairperson and Ranking Member regarding election security and integrity at today's hearing. American elections safeguard and preserve the freedoms and rights guaranteed by the U.S. Constitution. At Dominion, we take pride in our small role in assuring voters that they can have confidence in election results. We go to work every day understanding this important responsibility. . . . This past year alone, Dominion assisted State and local election officials in conducting nearly 300 elections complete with the rigorous public scrutiny that comes with it.

(Ex. C4.) In addition, Dr. Eric Coomer, Director of Product Strategy and Security for Dominion, defended the security and reliability of Dominion's voting machines in the *Curling* litigation on behalf of the State of Georgia defendants. *See Curling*, 493 F. Supp. 3d at 1278.

The "touchstone" of the public figure analysis "remains whether an individual has 'assumed [a] role[ ] of especial prominence in the affairs of society . . . [that] invite[s] attention and comment.'" *Tavoulareas v. Piro*, 817 F.2d 762, 773 (D.C. Cir. 1987) (quoting *Gertz*, 418

---

P.2d 736 (Alaska 1982), *cert. denied*, 463 U.S. 1208 (holding that a doctor who contracted with the state government to provide medical services to jails was a "public official").

U.S. at 345). There is no question that Dominion is a limited public figure under this rubric. Dominion voluntarily participated in the ongoing debate about election security and integrity as it relates to its voting machines. This is a clear indication that Dominion "assumed the risk" that it could become embroiled in further controversy over election security or results. *Lohrenz v. Donnelly*, 350 F.3d 1272, 1280 (D.C. Cir. 2003); *Jankovic v. International Crisis Grp.*, 822 F.3d 576, 584 (D.C. Cir. 2016) (thrusting oneself into the forefront of public controversy "in order to influence the resolution of the issues involved" renders one a limited public figure). For these reasons, Dominion easily qualifies as a limited public figure.

### 2.    Dominion has not Pled Actual Malice under the Knowledge of Falsity Prong

As a public plaintiff, to hold a defendant liable for defamation, Dominion must plead and ultimately prove by clear and convincing evidence that Byrne acted with "actual malice." *New York Times*, 376 U.S. at 280; *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988). That is, with knowledge that the statement was false or with reckless disregard for the truth. *New York Times*, 376 U.S. at 280. Given the Supreme Court's requirement that to satisfy Rule 8 a complaint must contain "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, including state-of-mind fault, *Iqbal*, 556 U.S. at 686-87, "actual malice allegations must be supported by plausible factual allegations sufficient to meet the standard." *Deripaska*, 282 F. Supp. 3d at 133 (dismissing claim where pleaded facts failed to establish actual malice).

Dominion's complaint falls short of this daunting standard. Dominion alleges no facts which, if proven by clear and convincing evidence, would show that Byrne subjectively knew his statements were false. Instead, Dominion offers only the singular threadbare allegation that "Byrne actually knew" his statements "were false" (Compl. ¶ 154), which is insufficient to plead

actual malice. *See, e.g.*, *Tah*, 991 F.3d at 239 (citing *Twombly* and *Iqbal*); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 56 (1st Cir. 2012) (finding that a plaintiff's complaint using "actual-malice buzzwords" was not sufficient); *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377-78 (4th Cir. 2012) (rejecting argument that allegations of malice need only be articulated in general terms); *Arpaio v. Cottle*, 404 F. Supp. 3d 80, 84-85 (D.D.C. 2019) (citing *Mayfield*, *supra*).

Dominion has not alleged how Byrne's statements were published with knowledge of their falsity. Dominion only attempts to establish Byrne's state of mind by what he should have known because he "is far too intelligent" to believe the statements he made. (Compl. ¶ 9.) However, "it is not enough to show that defendant should have known better." *Jankovic*, 822 F.3d at 589. It is equally not enough to show actual malice in the abstract. *Tavoulareas*, 817 F.2d at 794. Dominion must plead that Byrne in fact knew, subjectively, that his statements were false, and Dominion must "demonstrate such actual malice *in conjunction* with a [particular] false defamatory statement" he made. *Id.* at 794 (emphasis in original). Dominion has failed to do that.

More significantly, Dominion's conclusory allegations are themselves belied by Byrne's statements. To be sure, Dominion's complaint falls short because Byrne never wavered in his statements and theories. Time and again, as Dominion's complaint makes plain, Byrne explained what he relied on and underscored his background and credentials, earnestly putting his own credibility on the line each time. For instance, in a television appearance on the Newsmax show *National Report* with host Emma Rechenberg, Byrne underscored: "I don't mean to sound like I'm beating my chest, I was a national entrepreneur of the year . . . I'm also a PhD from Stanford [and] a Marshall scholar in science. I'm putting all that credibility on the line. This election was

hacked, the outcome was rigged and should be completely ignored or discounted, I mean, through the court system. The courts should throw it out." (Compl. ¶ 153a.)[10]

In short, Byrne believed what he said then, and he still believes his statements now. The absence of any well-pled allegations showing Byrne, to the contrary, actually knew his statements were false is fatal. Accordingly, to the extent Dominion rests on the knowledge-of-falsity prong to establish actual malice, this case is doomed.

### 3.   Dominion has not Pled Actual Malice under the Reckless Disregard Prong

Dominion's complaint fares no better under the more lenient reckless disregard standard for actual malice. A defendant acts in reckless disregard of the truth if he acted "'with a high degree of awareness of [the statement's] probable falsity.'" *St. Amant*, 390 U.S. at 731 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)); *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989). Reckless conduct "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing" the statement. *St. Amant*, 390 U.S. at 731. Further, reckless conduct is not measured by a mere negligence or objective reasonableness standard. Rather, a public plaintiff must prove that the speaker "in fact entertained serious doubts as to the truth of [the] publication," *see id.*, or actually "harbored subjective doubt," *Jankovic*, 822 F.3d at 589. *See also Tah*, 991 F.3d at 240 (same).

This level of subjective doubt can be proven through direct or circumstantial evidence. However, whether through the cumulation of direct or circumstantial evidence, the reckless disregard standard is not met easily. *Tah*, 991 F.3d at 240 (confirming it is "daunting"). "Few

---

[10] *See also* Compl. ¶ 153f and n.160; and *see* Compl. Ex. 351 [Doc. 2-3] ("I normally wouldn't beat my chest about this. I'm a guy who built a two billion dollar e-commerce company. I was named national entrepreneur of the year. I'm a PhD from Stanford. I [am] something called a Marshal scholar. . . . This election was rigged, and I'm saying this not as a Trump supporter.").

public figures have been able clearly and convincingly to prove that the scurrilous things said

about them were published by someone with 'serious doubts as to the truth of his publication.'"

*McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996) (quoting *St.*

*Amant*, 390 U.S. at 731). And Dominion has not met that high standard here.

    As demonstrated throughout this section of the brief, Dominion's complaint fails on

numerous fronts to plead sufficient facts to support an inference of actual malice. Dominion's

allegations concerning "**The misleading photograph**" (Compl. ¶ 99 (emphasis in original))

exemplify the shortcomings in Dominion's pleadings regarding actual malice in the Complaint.

    In paragraph 99, Dominion alleges Byrne posted a photograph on his blog saying it

proved Dominion voting machines are manufactured in China. (Compl. ¶¶ 99 and 153o.)

Specifically, on January 31, 2021, Byrne, using idiomatic language, published the following:

> On the dictum that "a picture is worth 1,000 words," I will start with something to
> end debate on whether Dominion machines are made in China:



(Compl. ¶ 153o.)

Byrne is not an employee of Dominion. He does not have inside knowledge of the supply chain for Dominion parts. There is no allegation in the Complaint to the contrary. Rather, the boxes are large in size. They state "Dominion Voting . . . Made in China" on the exterior. Procuring electronics from China is not uncommon. (*See* Compl. ¶ 99 (conceding the same).) Byrne simply made a good educated guess. According to Dominion, however, Byrne was "well aware" that its voting machines were not sourced from China; apparently only "transport bags" and a "small number of subcomponents" come from there. (Compl. ¶ 99.) And Byrne knew all this because it "***specifically pointed*** [it] ***out to him in a letter on March 31, 2021***." (Compl. ¶ 99 (emphasis in original); *see also* Compl. Ex. 362 [Doc. 2-14 at 11-29].)

These allegations do not create a reasonable inference of actual malice. First, the denial letter relied on so heavily by Dominion cannot have raised any doubts by Byrne for the simple reason that it was issued in March 2021, two months after Byrne's alleged statement. *See, e.g.*, *Herbert v. Lando*, 781 F.2d 298, 305-06 (2d Cir. 1986) (information acquired after publication is not relevant). Second, there are no allegations that even remotely suggest, must less establish clearly and convincingly, that Byrne knew, or in fact harbored subjective doubt or *a high degree of awareness*, that his statement was inaccurate and that the boxes only contained bags and not machines as represented by Dominion.

Dominion indicates that the words "Transport Bag" were obscured in the photo behind a metal beam, but that part of the words could be made out. (Compl. ¶ 99.) How though could Byrne be certain, under these facts, about what's in the box? Even if the words were fully legible, Dominion expects him (or anyone else for that matter) to know for sure that these boxes only contain bags simply because the word bag is written on the box? Byrne did not have firsthand knowledge about this. Subjective awareness remains only pertinent at the time of

44

publication. *See McFarlane*, 91 F.3d at 1508 ("the inference of actual malice must necessarily be drawn solely upon the basis of information that was available to and considered by the defendant prior to publication.") (citing *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 498 (1984)). And Dominion's repeated assertions that Byrne was "well aware" that this was all a lie are simply conclusory assertions, unsupported by factual allegations, and they are entitled to no weight on this motion to dismiss.

The same errors seen in Dominion's treatment of this purported misleading photo plague the remainder of Dominion's other purported allegations of actual malice. To be sure, the Supreme Court has delineated three circumstances that may give rise to a subjective inference of actual malice: (1) where a story is "fabricated" by the defendant; (2) when the publisher's allegations are "so inherently improbable that only a reckless person would have put them in circulation;" and (3) where the story is "based wholly on an unverified anonymous telephone call or some other source that [it] had obvious reasons to doubt." *Lohrenz*, 350 F.3d at 1283. Dominion has not alleged facts to  reasonably support any of these circumstances.

Consider again Dominion's allegations with respect to the "misleading photograph." It is clear from the allegations in the Complaint that Byrne did not fabricate this photo. Indeed, Dominion does not deny the boxes are real. It is also not inherently improbable that Dominion machines may come from China when Dominion admits in its complaint that "a small number of subcomponents" for Dominion machines "*are* sourced from China" just like "microchips in many Americans' cell phones and computers are sourced from China." (Compl. ¶ 99 (emphasis mine).)

As another example, consider Dominion's allegations concerning statements linking Dominion to Smartmatic and/or Venezuela. The notion that a voting machine company could

have ties to Venezuela is not fabricated. Nor is it inherently improbable because it is, of course, a true story in the case of Smartmatic. It is also true that because of those Venezuelan ties, Smartmatic had to divest ownership of its former subsidiary Sequoia, whose assets were then subsequently purchased by Dominion. Dominion admits it purchased Sequoia's assets. Still, it insists that such assets "did not contain any Smartmatic software, source code, or algorithms." (Compl. ¶ 112.) Even if true, Dominion does not allege and could not allege that Byrne actually knew what specific assets from the Sequoia asset purchase were put to use by Dominion. The point here is not that the challenged statements and allegations are actually true, but that given the interlocking corporate history of the voting machine companies (*i.e.*, from Smartmatic to Sequoia to Dominion), it is not inherently improbable that technology would overlap.

Dominion nevertheless attempts to advance the following four bases for alleging actual malice, none of which—individually or collectively—"nudge[s]" Dominion's scienter claims "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680.

### a. The Reasonably Prudent Man is not the Yardstick for Reckless Conduct

To begin with, the Complaint alleges that "Byrne was not hoodwinked" and that he "is far too intelligent to buy the nonsense he has been selling to the American public" or to "tout" certain reports or sworn affidavits as evidence "about Dominion." (Compl. ¶¶ 9 and 56.) The Complaint further alleges that "so many knowledgeable sources had rebutted these lies Byrne . . . falsely claimed[.]" (Compl. ¶ 7.) Reckless disregard for the truth, however, "requires more than a departure from reasonably prudent conduct." *Harte-Hanks*, 491 U.S. at 688. It is the speaker's subjective understanding of falsity that a public plaintiff must demonstrate. It follows that "[e]ven highly unreasonable conduct constituting an extreme departure from the standards of

investigation and reporting ordinarily adhered to by reasonable publishers does not establish actual malice." *Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 81 (D.D.C. 2012).

Even if other "knowledgeable sources" may have "rebutted" Byrne's claims as alleged, that fact is insufficient to establish that Byrne had a high degree of awareness of probable falsity, or actually in fact entertained serious doubts. (Compl. ¶¶ 6-7.) This is because reckless conduct is not litigated based on consensus opinion. It is "not enough to show that a defendant should have known better; instead, the plaintiff must offer evidence that the defendant in fact harbored subjective doubt." *Jankovic*, 822. F.3d at 589.

The best evidence Dominion can point in support of its subjective doubt claims is the general controversy surrounding the reliability and credibility of some of Byrne's sources. To this, Dominion says throughout the Complaint that such sources were "wholly unreliable and discredited." (*See generally* Compl.) But even that evidence  "must be viewed in light of" whether "the very same allegations [were made] . . . under oath—and under the realistic threat of a penalty of perjury." *McFarlane*, 91 F.3d 1515-16.

The sources characterized by Dominion as "unreliable" are the same sources who eventually filed the verified complaints and sworn affidavits in the post-election lawsuits across the country. These lawsuits were covered, reported, and discussed by virtually all members of the press. Byrne similarly commented on these allegations and sworn affidavits that were submitted as official court documents by experienced litigators.[11] Under these facts, there simply

---

[11] In the separate defamation lawsuit commenced by Dominion against Sidney Powell, this very Court rejected Powell's 'no reckless disregard' defense on motion to dismiss partly because of her profession and experience. Dominion alleged that Powell is a former federal prosecutor and experienced litigator who knew about the grave problems with her experts' reliability and must have entertained serious doubts as to the truth of the statements she made in her pleadings in reliance on her experts' sworn affidavits. *See U.S. Dominion, Inc., et al. v. Powell, et al.*, Nos. 1:21-cv-00040, 1:21-cv-00213, 1:21-cv-00445, 2021 WL 3550974, at *11 (D.D.C. Aug. 11,

is not enough evidence to show that Byrne actually "entertained serious doubts as to the truth of"
his statements. *St. Amant*, 390 U.S. at 731.

>**b.** **Preconceived Notions, Suspicions, or Partisan Agendas do not Show Reckless Conduct**

Second, the Complaint exhausts the well-worn trope that Byrne "had a preconceived
narrative" that "Dominion had rigged the 2020 election." (Compl. ¶¶ 2, 46, 73, and 98.) Byrne
denies this. The alleged defamatory statements were motivated by the desire to discuss and give
an accounting of the issues involving electronic voting machines and the 2020 election as "a
historically worthy thing to do." (Compl. ¶ 153a.) Even assuming it were true that Byrne had a
preconceived narrative, it is well-established that "allegedly having a pre-conceived story line is
not sufficient to demonstrate actual malice." *Jankovic v. International Crisis Grp.*, 72
F. Supp. 3d 284, 312 (citing *Tucker v. Fischbein*, 237 F.3d 275, 286 (3d Cir. 2001)); *Tah*, 991
F.3d at 242 ("Our court . . . has made [this point] clear"). It is only the speaker's subjective
awareness of falsity that is at issue.

Further, the partisan agenda Dominion implies Byrne had—which he did not—is also
immaterial to the actual malice analysis. As the D.C. Circuit has explained, where a speaker
"may have adopted an adversarial stance" toward the subject of a challenged statement, that
"attitude is not antithetical to the truthful presentation of facts." *Jankovic*, 822 F.3d at 596.
Simply put, the First Amendment applies to advocates as well.

In any event, Dominion's own pleadings rebut the notion that Byrne acted according to a
preconceived narrative or partisan agenda. According to the Complaint and Byrne's actual
statements, he made clear that, "My ultimate purpose (my only real purpose) is to deliver to the

---

2021) (Nichols, J.). There is no equivalent allegation from which to draw a similar inference of
subjective doubt or high degree of awareness of probable falsity against Byrne here.

public as honest a rendering as I may construct" and to "honestly convey[ ] the truth for historical purpose." (Compl. ¶¶ 153a and 153r.)

### c.     Refusing to Accept Denials or Demands for Retraction does not Show Reckless Conduct

Third, Dominion seeks to draw an inference of actual malice from Byrne's failure to credit Dominion's denials and letter demands for retraction dated March 31 and June 18, 2021. (*See, e.g.*, Compl. ¶ 104 and n.112, and Compl. ¶ 123 and n.135; *see also* Compl. Ex. 362 [Doc. 2-14].) However, "[t]his too finds no support in our First Amendment case law." *Tah*, 991 F.3d at 242.

Failure to retract a publication upon request is "not adequate evidence of malice for constitutional purposes." *New York Times*, 376 U.S. at 286. A publisher "need not accept denials, however vehement" as such denials "are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Lohrenz*, 350 F.3d at 1285. In fact, even assuming Dominion's retraction letter arrived and was reviewed by Byrne prior to his alleged defamatory statements, refusing to retract a statement may actually "demonstrate [a] *lack* of malice—as showing continued genuine belief in the published account." *Tavoulareas*, 763 F.2d at 1477.

### d.     Profit Motive does not Show Reckless Conduct

Fourth, Dominion accuses Byrne of making the challenged statements out of a corrupt profit motive: he is "currently financially invested in" or "connected to those who stand to gain from" Dominion getting rejected in favor of blockchain voting technology. (Compl. ¶ 10.) Byrne denies this; at all times he was motivated by the desire "to deliver to the public as honest a rendering as I may construct" of what he surmised occurred in the 2020 election. (Compl. ¶ 153a.)

49

Dominion attempts to maintain that Byrne had a profit motive because of his past involvement as chief executive of Overstock, where on March 7, 2019 "Byrne announced that Overstock's blockchain portfolio company Voatz planned to introduce a pilot program for the upcoming Denver municipal elections allowing voters to use their own smartphones to cast votes." (Compl. ¶ 37.)

The problem is Dominion's allegations of this supposed profit motive are not tied to any allegedly defamatory statement. *See Tavoulareas*, 817 F.2d at 794 (public plaintiffs cannot "show actual malice in the abstract; they must demonstrate actual malice *in conjunction* with a false defamatory statement."). A close analysis of the various statements identified in paragraph 153 of the Complaint demonstrates that Byrne never mentioned an investment or financial interest in blockchain voting technology. (*See* Compl. ¶ 153a through 153r.)[12] Dominion attempts to fix this deficiency by cobbling together other stories about Byrne's blockchain history and blockchain advocacy to suggest he had a financial incentive to lie about Dominion. In this regard, Dominion alleges that Byrne "previously invested [in]" blockchain voting technology based on his prior work with Overstock, or has "continue[d] to promote" blockchain voting technology. (Compl. ¶ 119.) However, the implication still fails because it is fatally

---

[12] By contrast, in Dominion's separate defamation lawsuit against Mike Lindell and his company MyPillow, this Court denied the defendants' motions to dismiss predicated on a 'no subjective doubt' defense because, among other things, Dominion tied the defendants' profit motive to the alleged defamatory statements they made. For instance, Dominion alleged that MyPillow sponsored rallies where displays showed a MyPillow ad featuring Lindell and offering viewers a discount on MyPillow products if they used promotional codes like "ERIC," "PROOF," or "Gorka"—people or concepts that were tied to the "stop-the-steal" election integrity accusations being made against Dominion. In addition, Lindell appeared in television interviews where he told audiences that the "President loves" MyPillow, encouraging them to purchase MyPillow with promo codes after making additional claims of election fraud about Dominion. *See US Dominion*, 2021 WL 3550974, at *4-5. There is no similar direct connection so clearly and convincingly pled with respect to Byrne.

undermined and contradicted by Dominion's own pleadings, Byrne's actual statements, and the fact that Byrne's purported blockchain interests were sold well before any alleged defamatory statement was made.

With regard to Dominion's pleadings, Dominion essentially admits it doesn't have clear and convincing evidence of a profit motive because Dominion doesn't know the current size of Byrne's investment in blockchain voting technology, if any. (Compl. ¶ 39.) This confirms that Byrne sold his Overstock holdings in September 2019 when he parted ways from the company and had no interest in Oversotck or Voatz at the time his statements were made.[13] With regard to Byrne's actual statements, Dominion points to a bitcoin conference in "June 2021" where he gave a speech about bitcoin and the potential benefits that blockchain technology might offer society, including political life and voting. (Compl. ¶ 119.) However, nowhere in this speech does Byrne mention Dominion or their voting machines, and nowhere in the Complaint does Dominion allege otherwise. (Compl. ¶ 119 and n.129.)[14] Dominion also references a Forbes article published on June 10, 2021 as evidence of Byrne's financial incentive to knowingly and falsely disparage Dominion. (Compl. ¶ 119 and n.133.)[15] Yet the reported statement "I think our society needs to go to blockchain voting systems or we need to go back to paper" hardly

---

[13] *See* note 2, *supra*.

[14] A video of Patrick Byrne's approximately 30-minute speech at this bitcoin conference in June 2021 is available on YouTube at https://www.youtube.com/watch?v=dG86DLJKmNA (last visited Nov. 17, 2021).

[15] Billy Bambrough, *Pro-Trump Fundraiser Calls For A Radical Overhaul Of The U.S. Voting System Using Blockchain*, Forbes (Jun. 10, 2021), *available at* https://www.forbes.com/sites/billybambrough/2021/06/10/former-trump-advisor-calls-for-a-radical-overhaul-of-the-us-voting-system-using-blockchain/?sh=654f3942d9a6 (last visited Nov. 17, 2021).

qualifies as clear and convincing evidence of a profit motive to infer Byrne actually knew his statements were false or in fact entertained serious doubts about the truth.

Even if Byrne did have a profit motive—which he did not—it is well established that allegations about a profit motive do not, as a matter of law, suffice to establish actual malice without more. *Harte-Hanks*, 491 U.S. at 666-67; *Jankovic*, 822 F.3d at 596. Virtually every person has an interest to make or earn money, and nothing about that indicates malicious intent or a reckless disregard for the truth, and it would be dangerous—if not outright hostile to the Constitution from a First Amendment perspective—to infer otherwise.

### e. Alone or Together, Dominion's Purported Theories for Reckless Conduct do not Amount to Actual Malice

In sum, none of these actual malice allegations would, if proven with clear and convincing clarity, plausibly establish that Byrne knowingly published false and defamatory statements about Dominion, nor were such statements "so inherently improbable that only a reckless man would have put them in circulation." *St. Amant*, 390 U.S. at 732. That conclusion remains the same whether these allegations are considered individually or collectively. As the D.C. Circuit held in *McFarlane v. Sheridan Square Press, Inc.*, when each of plaintiff's arguments "provides little or no additional support for a finding of actual malice" on their own, even when viewed together "cumulatively, they do not amount to much, and surely not enough under the standard set by the Supreme Court." 91 F.3d at 1516; *accord Jankovic*, 822 F.3d at 597 (stating that plaintiff's individual arguments on actual malice "fare no better when viewed in the aggregate," and concluding that "[e]ven taking these flawed evidentiary assertions together, no reasonable jury could find by clear and convincing evidence that [defendant] acted with actual malice."). Dominion has simply failed to carry its burden to allege a plausible claim of actual malice.

## V.   CONCLUSION

For all of these reasons, Byrne respectfully requests that this Court enter an order

dismissing Dominion's complaint with prejudice, granting such other and further relief the Court

deems just and proper.

Dated: November 17, 2021                    Respectfully submitted,

                                                _____/s/_____

                                                  Robert N. Driscoll (DC Bar #486451)
                                                  Alfred D. Carry (DC Bar #1011877)
                                                  McGlinchey Stafford PLLC
                                                  1275 Pennsylvania Avenue NW, Suite 420
                                                  Washington, DC 20004
                                                  Tel: (202) 802-9999
                                                  Fax: (202) 318-1084
                                                  rdriscoll@mcglinchey.com
                                                  acarry@mcglinchey.com
                                                  *Counsel for Defendant Patrick Byrne*