# Exhibit A1

**The New York Times**

https://www.nytimes.com/2001/07/17/us/study-says-2000-election-missed-millions-of-votes.html

# Study Says 2000 Election Missed Millions of Votes

**By Katharine Q. Seelye**

July 17, 2001

See the article in its original context from
July 17, 2001, Section A, Page 15   Buy Reprints

VIEW ON TIMESMACHINE

TimesMachine is an exclusive benefit for home
delivery and digital subscribers.

A new study of the 2000 presidential election has found that 4 million to 6 million votes of the 100 million cast last November were not counted. The survey cited faulty voting equipment, confusing ballots, voter error and problems at polling places, including long lines, short hours and inconvenient locations.

The study, released yesterday by scientists from the Massachusetts Institute of Technology and California Institute of Technology, did not try to determine whether the lost or ruined votes would have changed the outcome of the race between George W. Bush and Al Gore.

The estimate of lost votes is at least twice as high as one released earlier this month by House Democrats, who said that about two million votes, or nearly 2 percent of the total, had not been counted.

More than eight months after Election Day, voting experts are still sorting through the aftermath of one of the closest presidential races ever. Yesterday's report is one of several expected in the next several weeks that will examine what went wrong and make recommendations to guide Congress and local governments as they seek to avoid the pitfalls of 2000.

While some analysts say time is running out to enact changes that could be in place by the elections in 2002, the bipartisan sponsors of a bill expected to be voted on in the House Science Committee this week are hoping the M.I.T.-Caltech study will give their bill new

urgency. The bill would direct the National Institute of Standards and Technology, a federal laboratory, and state and local election officials to set new technical standards for voting equipment.

The academic study concluded that many of the mechanical and human problems experienced last November could be solved if counties eliminated punch cards and lever machines and bought optical-scan equipment, in which voters use pencils to fill in circles, as on standardized tests.

The best such optical-scan equipment, the study said, counts ballots at the precinct level and kicks them back to voters if they have been filled out incorrectly. Other studies have reached the same conclusion.

''The U.S. can lower the number of lost votes in 2004 by replacing punch cards and lever machines with optical scanning,'' the report said.

It also said counties needed to upgrade their voter registration systems, chiefly by consolidating their registration lists in single databases that are available by computer at each precinct. And it endorsed provisional ballots, which allow a voter to vote even if his registration is in question and to have the ballot counted later. Nineteen states now use provisional ballots.

Such changes in the nation's election system could cost about $400 million a year. The report said the nation's 3,000 counties spent $1 billion on election administration in 2000.

''We view the price of these reforms -- $4 per voter per year -- as insurance: insurance against problematic elections in the future, insurance that each vote will be counted,'' the report said.

The report was the result of a six-month examination of the nation's voting system by a team of computer scientists, mechanical engineers and social scientists from the two universities, the nation's premier technical institutes.

The goal of their continuing project, financed by the Carnegie Corporation of New York, is to make recommendations about how computing technology can best be harnessed to improve elections.

No system is fool-proof, the scientists said. Jehoshua Bruck, an electrical engineer at Caltech, joked that the perfect system would read a voter's mind while she imagined a picture of the White House.

Short of that, Stephen Ansolabehere, a political scientist at M.I.T., acknowledged that so far, the two institutes had determined that one of the two best solutions was low-tech, the hand-counted paper ballot.

Just as reliable, the report said, are the optical-scan machines that count ballots at the precinct level and give voters a second chance if they make a mistake.

The scientists were skeptical of voting over the Internet. The Internet is too vulnerable to large-scale fraud, they said.

A version of this article appears in print on , Section A, Page 15 of the National edition with the headline: Study Says 2000 Election Missed Millions of Votes

# Exhibit A2

International Edition |

Member Center: Sign In | Register

The Web   CNN.com    [Search]    Powered by

Home Page
World
U.S.
Weather
Business
Sports
Politics
Law
Technology
Science & Space
Health
Entertainment
Travel
Education
Special Reports
Autos

SERVICES
Video
E-mail
Newsletters
Your E-mail
Alerts
RSS
CNNtoGO
TV Commercials
Contact Us

SEARCH
Web   CNN.com
[Search]   powered

Inside Politics

# Democrats challenge Ohio electoral votes

## Move delays official certification of presidential election

Thursday, January 6, 2005 Posted: 7:08 PM EST (0008 GMT)

Search    MORE

Enter Keywords
Enter City    ALL
Subr

**WASHINGTON (CNN) -- Alleging widespread "irregularities" on Election Day, a group of Democrats in Congress objected Thursday to the counting of Ohio's 20 electoral votes, delaying the official certification of the 2004 presidential election results.**

The move was not designed to overturn the re-election of President Bush, said Ohio Rep. Stephanie Tubbs Jones and California Sen. Barbara Boxer, who filed the objection.

The objecting Democrats, most of whom are House members, said they wanted to draw attention to the need for aggressive election reform in the wake of what they said were widespread voter problems.

In a letter to congressional leaders Wednesday, members of the group said they would take the action because a new report by Democrats on the House Judiciary Committee found "numerous, serious election irregularities," particularly in Ohio, that led to "a significant disenfranchisement of voters."

"How can we possibly tell millions of Americans who registered to vote, who came to the polls in record numbers, particularly our young people ... to simply get over it and move on?" Tubbs Jones told reporters.

VIDEO                                  more
Congress debates an objection challenging presidential vote in Ohio.
▶ PLAY VIDEO

RELATED
• How the Electoral College works

QUICKVOTE
Should Congress look into the validity of the presidential election results in Ohio?
Yes                                    ○
No                                     ○
VIEW RESULTS    [VOTE]

SPECIAL REPORT

• Bush: Politics stalling Bolton vote
• GOP building support for filibuster rule change
• Highlights: Bush budget
• Gallery: The Bush Cabinet
• Special Report

YOUR E-MAIL ALERTS
○ Ohio
○ Senate

The House of Representatives and Senate met Thursday afternoon in a constitutionally mandated session to count the electoral votes. Vice President Dick Cheney, in his role as president of the Senate, presided over the session.

○ Judiciary (system of justice)

○ House of Representatives

[Activate] or Create your own

Manage alerts | What is this?

The results from each state, read in alphabetical order, were ticked through quickly until Ohio was called, and a clerk read the letter of objection from Boxer and Tubbs Jones.

Cheney then ordered the lawmakers back to their respective chambers for two hours of debate on the merits of the challenge.

It is only the second such challenge since the current rules for counting electoral votes were established in 1877. The last was in 1969 and it concerned a so-called "faithless elector," according to congressional researchers.

Four years ago, after the disputed election results in Florida, members of the Congressional Black Caucus attempted to block Florida's electoral votes from being counted.

In a scene recalled in Michael Moore's movie "Fahrenheit 9/11," lawmaker after lawmaker was gaveled down by Vice President Al Gore because no senator would support the objections, as the law requires.

House Democrats involved in this year's protest worked for weeks to enlist the support of a senator in their party, and Boxer agreed to join the effort Wednesday.

"This is my opening shot to be able to focus the light of truth on these terrible problems in the electoral system," Boxer told a press conference.

"While we have men and women dying to bring democracy abroad, we've got to make it the best it can be here at home, and that's why I'm doing this."

If one member of each body of Congress objects, congressional rules require that lawmakers return to their chambers to vote on the merits.

A simple majority vote in each chamber would overturn the challenge -- something that should be easily achieved in the GOP-controlled Congress.

Republicans dismissed the effort as a stunt, noting that specific allegations of voting problems in Ohio have been investigated by journalists and, the Republicans said, found to be untrue.

"But apparently, some Democrats only want to gripe about counts, recounts, and recounts of recounts," said Rep. Deborah Pryce, an Ohio Republican.

"So eager are they to abandon their job as public servants, they have cast themselves in the role of Michael Moore, concocting wild conspiracy theories to distract the American public."

White House press secretary Scott McClellan dismissed the challenge as "partisan politics."

"The election is behind us," he said. "The American people now expect their leaders in Washington to focus on the big priorities facing this country."

Sen. John Kerry, the Democratic nominee for president, released a letter Wednesday saying he would not take part in the protest.

"Our legal teams on the ground have found no evidence that would change the outcome of the election," Kerry said.

Bush carried Ohio by more than 118,000 votes -- the Buckeye State win providing the margin of victory in the Electoral College race. The president received 286 to Kerry's 252 electoral votes.

"There are very troubling questions that have not yet been answered by Ohio election officials," the senator from Massachusetts said.

"In the coming months I will present a national proposal to ensure transparency and accountability in our voting process."

Kerry was not on hand Thursday. He is in Iraq to thank U.S. troops for their service.

*CNN's Ted Barrett contributed to this report.*



Story Tools

[Subscribe to Time for $1.99](#)

**Top Stories**
[Panel: Spy agencies in dark about threats](#)

• [White House calls pope inspiration for millions](#)
• [Lott delays vote on base closing nominee](#)
• [Former Clinton adviser Berger to plead guilty](#)

**Top Stories**
**CNN/Money:** [Security alert issued for 40 million credit cards](#)

• [Bin Laden deputy sends message](#)
• [U.S. House votes to keep U.N. dues](#)
• [Iran poll to go to run-off](#)

SEARCH    The Web ◉    CNN.com ○    [ ]    Search    Powered by

© 2005 Cable News Network LP, LLLP.
A Time Warner Company. All Rights Reserved.
[Terms](#) under which this service is provided to you.
Read our [privacy guidelines](#). [Contact us](#).

ext    All external sites will open in a new browser. CNN.com does not endorse external sites.

ᴾ    Denotes premium content.

Add [RSS headlines](#).

Exhibit A3

Case 1:21-cv-02131-CJN   Document 25-3   Filed 11/17/21   Page 10 of 148

**The New York Times** | https://www.nytimes.com/2008/10/27/us/politics/27vote.html

POLITICAL MEMO

# McCain's Warning About Voter Fraud Stokes a Fiery Campaign Even Further



Supporters of Al Gore and George W. Bush protested as the canvassing board for Palm Beach County, Fla., conducted a recount of the presidential voting there in November 2000.

Vincent Laforet/The New York Times

By Katharine Q. Seelye

Oct. 26, 2008

<mark>Senator John McCain warned at the last presidential debate that the Nov. 4 election could be marred by voter fraud and added that Acorn, an organizing group in minority and low-income communities, was "now on the verge of maybe perpetrating one of the greatest frauds in voter history in this country, maybe destroying the fabric of democracy."</mark>

The comments by Mr. McCain, the Republican nominee for president, threw another log onto a fire already burning in the conservative blogosphere and on talk radio, where McCain supporters contend that the Democratic nominee, Senator Barack Obama, is trying to <mark>"steal"</mark> the election through groups like Acorn (an accusation the Obama campaign calls outlandish).

The disclosure on Thursday that 30 percent of the 1.3 million voter registrations gathered by Acorn were faulty turned the issue into a roaring bonfire. Among the problems were registration forms filled out by "Mickey Mouse" and the starting lineup of the Dallas Cowboys.

Some voting rights advocates said they were surprised that the level of irregularities was so high, but they also said these irregularities, reported by Acorn itself, did not necessarily translate to fraud at the polls.

At the same time, Democrats are concerned that Republicans' focus on the "purity" of voter registration lists could add to confusion on Election Day and suppress the vote.

Republican charges of fraud   and Democratic charges of disenfranchisement   are not new. What is different this year is the degree of skirmishing, and the flurry of lawsuits, in advance of the election.

This is partly a legacy of Florida in 2000, when it became clear just how much the administration of elections could influence the outcome. That could be true again this year, when high voter turnout is expected to put an extra strain on the system and the tallies in some states could be extremely close.

"It is definitely happening earlier and with far more ferocity than we've ever seen," said Jonah Goldman, a lawyer with the Lawyers' Committee for Civil Rights.

Voting rights advocates say the Republicans' accusations of fraud (even though party operatives themselves face possible charges of fraud, most notably in California) are part of a deliberate strategy to create confusion among voters, to galvanize the conservative base and to set the table for possible legal challenges of voters at the polls and of the election results.

"There is a real concern that the courts will be asked once again to weigh in on tight races where the losing party may seek to raise real questions about the legitimacy of the vote," said Wade Henderson, president of the Leadership Conference on Civil Rights, a coalition of national civil rights and advocacy groups. "You can't help but conclude that this is an effort to lay a foundation for a subsequent challenge to an Obama victory, should it occur."

There has been ineptness at the polls   an elections official in Mississippi wrongly purged 10,000 voters from the rolls in March while using her home computer   as well as dubious interpretations of state laws, including the "no match, no vote" laws, which require a voter's registration information to match precisely that of government documents.

"There's always been a struggle, throughout the country's history, over who could vote, how their votes would be counted," said Michael Waldman, executive director of the Brennan Center for Justice at New York University Law School, "and this is not that different, but it does seem more strategic this year. The same arguments are being made all over the country at the same time."

Robert F. Bauer, who is general counsel for the Obama campaign and is overseeing its voter protection program, said that what was different this year was "the very aggressive involvement of the top of the ticket in promoting this fear message." Mr. Bauer said this was intended to create "an ominous atmosphere" to discourage people from voting.

"I don't recall in recent history," he added, "a presidential candidate before the fact trying to suggest in a nationally televised debate that the entire electoral system was under assault, the fabric of democracy was at risk."

Mr. McCain's campaign manager, Rick Davis, said in mid-October that the activities of Acorn had already put the election under a "cloud of suspicion."

Republicans have also been invoking the Florida debacle in 2000, a scene that could help galvanize their base. Ken Blackwell, a Republican who is a former secretary of state in Ohio, has warned, for example, that voters should expect "the kind of chaos you expect from a Category 5 hurricane, with radical groups sending the nation into a protracted legal battle even worse than the mess back in 2000."

A McCain campaign spokesman, Tucker Bounds, said the fraud was real. "When the F.B.I. is raiding Acorn offices and Mickey Mouse becomes a registered voter, it's not an accusation   it's a certifiable problem," Mr. Bounds said. "Barack Obama should stop with the half-cocked accusations and take action to curb the illicit activity."

Mr. Goldman said his concern with what he called pre-election hysteria was that it "ripens the climate for challenges" by undermining confidence in an already-vulnerable election system, one with incomplete voter rolls, long lines, misinformation and unreliable machines.

Richard L. Hasen, a professor specializing in election law at Loyola Law School in Los Angeles, said the Republicans were intentionally trying to foster an atmosphere of mistrust. "If you can convince the public and election officials that there's a lot of fraud in the voter rolls," Dr. Hasen said, "that's a reason to purge the lists and mount challenges on Election Day. Where you see claims about Acorn being raised is in battleground states."

Alexander Keyssar, a voting expert at the Kennedy School of Government at Harvard and the author of "The Right to Vote: The Contested History of Democracy in the United States," suggested another possible strategic reason for Mr. McCain's comments: an effort to "reinforce an image of the Democrats, or at least some Democrats, as the party that, A, will steal elections, and B, will steal elections by somehow mobilizing this threatening nameless mass of people who are 'other,' " a reference to the mostly minority and low-income people registered in drives like Acorn's.

Longer term, he said, the creating of a sense of chaos now could help "set the groundwork for more laws and procedural obstacles" to be enacted by the states before the next presidential election. He said several were already considering laws similar to one in Indiana that required voters to present a government-issued photo ID.

The Justice Department has opened a nationwide investigation into charges of fraud against Acorn. But some former lawyers for the department warned on Friday in a letter to Attorney General Michael B. Mukasey that the probe might violate department policy of not initiating such investigations until after an election, citing the "long recognized sensitivity to the role of federal law enforcement officials in elections."

Acorn said that of its faulty registrations, 20 percent to 25 percent were probably the result of duplications, 5 percent were incomplete and 1 percent to 1.5 percent were fraudulent.

Case 1:21-cv-02131-CJN Document 25-3 Filed 11/17/21 Page 13 of 148

Voting rights advocates say that there is no correlation between fraudulent registrations and fraudulent voting and that past elections have shown little evidence of actual voter fraud. While it does occur, they say, it is hardly rampant.

After the 2004 election in Ohio, for example, the Brennan Center found a voter fraud rate of .00004 of a percent, saying, "Americans are struck and killed by lightning about as often."

But Republican members of the Senate Judiciary Committee on Friday again called for hearings into "the allegations of systematic nationwide registration fraud" by Acorn. They said registration fraud "makes it possible to commit vote fraud in a way that is almost completely undetectable."

In the letter, the Republicans rejected the idea that they were trying "to create a panic in the electorate" by raising such concerns.

# Exhibit A4



**ON POLITICS**

# 'You can have the election stolen from you,' Hillary Clinton warns 2020 Democrats

**William Cummings** USA TODAY

Published 10:18 a.m. ET May 6, 2019

Hillary Clinton says she has been telling candidates seeking the 2020 Democratic nomination that even if they run a perfect campaign, the election could be "stolen" from them, implying that was what befell her in 2016.

Clinton said Saturday that she has been pouring over special counsel Robert Mueller's 448-page report on the Russian government's "sweeping and systematic" interference in the 2016 election and that she fears the same tactics will be "alive and well" in 2020.

"You can run the best campaign, you can even become the nominee, and you can have the election stolen from you," she said to cheers on the Los Angeles stop of her "Evening with the Clintons" tour with her husband, former President Bill Clinton.

During the tour's stop Friday in Seattle, Clinton pointed to FBI Director Christopher Wray's warning last month that Russia continues to pose a "very significant counterintelligence threat" and that efforts to influence U.S. elections with "social media, fake news" and "propaganda" has "continued pretty much unabated."

"There is no effort to try to have an organized national response to that," Clinton said. "Social media is still an incredible channel to communicate information that is untrue and defamatory about someone else."

Clinton said Americans need to "make sure that the election is not interfered with in that 'sweeping and systemic' way that Mueller found it was in the prior election" and how to "protect our candidates from that."

She also cautioned that Trump's ability to draw the news media's attention will present a "real dilemma" for the eventual Democratic nominee.

"Because Trump took up so much of the oxygen if I said one thing about Trump in a speech and then 30 minutes of something about jobs, the one thing I said would be what would be covered," Clinton said of the dynamic in 2016.

"The press could not give up their addiction to waiting to see what Trump would do next."

The former first lady, secretary of state and New York senator also said Saturday that Trump can be defeated despite a roaring economy that features the lowest unemployment rate in 50 years, stock indices near record highs and solid growth in the gross domestic product.

"It is the economy, it's always the economy, but that's not the only reason that we should elect a president, or in this case retire one," Clinton said, according to CNN.

"Yes, maybe the economy is still pumping along, but all of a sudden you've got tens of millions of Americans who are much less secure because their health care is gone," she said, referring to the Trump administration's effort to have the Affordable Care Act declared unconstitutional.

# Exhibit A5

**The New York Times** | https://www.nytimes.com/2020/10/09/us/politics/trump-campaign-poll-watch.html

# Trump Told Supporters to 'Watch' Voting. His Staff Is More Than Watching.

The campaign's focus on Election Day operations has intensified, with aggressive plans for poll monitoring and other tactics that Democrats say are efforts at vote suppression.

 

**By Danny Hakim and Stephanie Saul**

Oct. 9, 2020

When President Trump used the prime-time debate last week to urge his supporters to "go into the polls and watch very carefully," he wasn't just issuing a call for a grass-roots movement or raising the prospect of intimidation tactics at voting sites. He was also nodding to an extensive behind-the-scenes effort led by the lawyers and operatives on his campaign.

Over the summer, Mr. Trump named a new campaign manager, Bill Stepien, who was once a top aide to former Gov. Chris Christie of New Jersey before being fired amid the "Bridgegate" scandal. Mr. Stepien swiftly elevated a group of lieutenants focused on using aggressive electoral tactics, moves that led Marc E. Elias, the leading election lawyer for the Democratic Party, to tweet that Mr. Trump was "tripling down" on "opposing voting rights."

One of the main architects of the effort is Justin Clark, whom Mr. Stepien promoted to deputy campaign manager. He has been viewed with suspicion among Democrats since he was recorded last year saying, "Traditionally it's always been Republicans suppressing votes in places," and adding that in 2020 the party would "start playing offense a little bit."

Other key figures in the campaign include a senior aide who once oversaw a right-wing information-gathering operation for the conservative Koch brothers; an adviser who was involved in a secretive vote-challenge operation for President George W. Bush's re-election campaign in 2004; and a campaign counsel who is coordinating a series of lawsuits aimed at preventing the expansion of mail voting.

With polls showing Mr. Trump trailing Joseph R. Biden Jr. nationally and in most swing states, the president has increasingly focused attention on the voting process, declaring that the only way he could lose is if the election is rigged and refusing to commit to a peaceful transfer of power. With the election less than a month away, his campaign has moved the idea of voting irregularities to the forefront of both its ground operations and its legal strategy.

The campaign is trying to shape the voting process in many ways. Following the president's lead, it has undertaken a legal and rhetorical assault on mail-in balloting, claiming with no evidence that it is rife with fraud. It is also pushing the boundaries of traditional poll monitoring in ways that many Democrats believe amount to voter intimidation. And it has put legal pressure on states to aggressively purge their voter rolls.

Campaign officials tried to downplay Democratic anxiety and insisted they wanted everyone to vote who wants to do so.

"I think we need to just realize that we're in a political campaign and all just follow the law," Mr. Clark said in an interview. "There are laws everywhere about how many feet you can stand outside of a polling place and what you can wear and what you can do."

Few of the campaign's practices have prompted as much attention as its extensive plans for poll watching. While both parties have trained official poll watchers for decades, the president has stirred alarm among Democrats and some voting experts who fear he is encouraging extralegal menacing at polling sites by far-right groups and even random Trump supporters.

At the debate Mr. Trump said that the Proud Boys, a far-right extremist group, should "stand by," a comment some interpreted as a call to arms in aiding his election prospects in ways that could intimidate voters.

Those fears were heightened by an episode in Fairfax, Va., last month, when Trump supporters disrupted early voting, impeding access to a polling site.

"These are not trained poll workers, these aren't people who were recruited to do anything," Mr. Clark said. "There are — shocker — there's going to be politics in a presidential race. And people are going to wave flags and show stuff and drive around and hold mini-rallies and hold sign-waving rallies and do things like that, and it happens in a lot of places."

Mr. Clark and other campaign officials have said they will put 50,000 poll watchers and electoral observers on the ground, including at least 1,600 in Philadelphia alone. They are instructing them to record minutiae like the timing of paper jams at polling places, but also pushing beyond the typical activity by monitoring people picking up absentee ballots and videotaping the drop boxes where they deposit them. Mr. Trump has even floated the idea of sending sheriffs to the polls.

Republican administrations in several states, including the battleground of Georgia, have appointed voter fraud task forces they say are designed to root out cheating, though Democrats view the panels, stacked with Republican prosecutors, as instruments of voter suppression.

"These come out of somebody's Republican playbook," said Cathy Cox, a Democrat who served as Georgia's secretary of state. "Unfortunately the goal is to intimidate people and ultimately suppress votes."



Trump banners adorned a home across the street from a polling place in West Miami, Fla. Scott McIntyre for The New York Times

One Trump campaign official recently emailed party officials in North Carolina and told them "to not follow the procedures outlined" in a memo sent out by the state Board of Elections. Republican officials have also been tied to efforts to aid third-party candidates who could siphon votes from Mr. Biden.

The most visible Republican effort is in the courts. Matthew Morgan, who was promoted to campaign counsel this summer, had been directing a flurry of election litigation and challenging attempts to expand mail-in voting. Like Mr. Trump, he has disparaged mail balloting, claiming without evidence that "universal vote by mail opens the door to chaos and fraud."

**Sign Up for On Politics** A guide to the political news cycle, cutting through the spin and delivering clarity from the chaos. Get it sent to your inbox.

Election Day operations are now coordinated by Michael Roman, a Philadelphia native who once oversaw an operation for the billionaires Charles G. and David H. Koch that surveilled and gathered information on liberal adversaries. He frequently airs baseless claims that Democrats are plotting to "steal the election." Mr. Roman also played a central role in promoting a 2008 video of two members of the New Black Panther Party outside of a Philadelphia polling place, one carrying a baton; the video became a long running flash point for the right-wing media's claims of election interference by Democrats.

"This is somebody who I think has a reputation for hyping and distorting incidents to make it appear as though Democrats are cheating, and I think it adds to an overall dangerous message about election rigging," said Richard L. Hasen, a professor at the University of California, Irvine School of Law who writes the widely read Election Law Blog.

Mr. Roman declined to comment for this article.

Other notable figures doing work for the campaign include Bob Paduchik, a senior campaign adviser, who was involved in a secretive operation during the 2004 Bush campaign dubbed the "Voter Reg Fraud Strategy." The effort was aimed at challenging the legitimacy of absentee voters, according to emails released in a lawsuit filed by the Democratic National Committee.

Mr. Paduchik did not respond to requests for comment.

Poll watching is regulated by differing state laws. In official training videos, Republicans instruct workers to be courteous to Democrats, dress appropriately and stay on their toes: "Do not zone out."

---

**Trump's Bid to Subvert the Election**

**A monthslong campaign.** During his last days in office, President Donald J. Trump and his allies undertook an increasingly urgent effort to undermine the election results. That wide-ranging campaign included perpetuating false and thoroughly debunked claims of election fraud as well as pressing government officials for help.

---

This year, for the first time in more than three decades, the Republican National Committee is taking an active role in poll watching, after the courts in 2018 lifted a consent decree that had barred the R.N.C. from doing so. The ban stemmed from the committee's involvement in an operation to intimidate New Jersey voters in 1981.

There are already signs that Republicans, who have won only one popular presidential vote since 1988, will be unusually aggressive. In recent weeks, the Trump campaign sent personnel to attempt to enter satellite facilities in Philadelphia where voters could pick up and fill out mail-in ballots — offices that are not regarded as polls. (In an interview, Mr. Morgan pushed back on that concept, saying: "They say this is not a polling place. To us this sounds absurd, when you can register, get your ballot and vote in that location. So we don't accept that premise.")

States led by Republicans are also working to restrict access to voting; in Texas, for instance, Gov. Greg Abbott last week moved to close many of the locations where voters can drop off their ballots.



Trump supporters outside the Fairfax County Government Center during early voting in Virginia last month. At one point, they formed a line that voters had to walk around to get to their polling location.  Kenny Holston for The New York Times

Campaign officials said they had not been in contact with any outside groups to encourage or tacitly support unofficial poll watching and protests at polling sites, beyond the official poll watching activity that typically occurs. And they were confident there would not be a repeat of the kind of intimidation tactics that led to the consent decree.

"That's why we are recruiting people," Mr. Clark said. "We are training them, we are working with them to make sure that they're doing things the right way."

Still, Mr. Trump stirred alarm at the debate last week by equivocating when asked to condemn the Proud Boys; he only denounced them later amid criticism after the debate. When asked by The New York Times, the campaign also declined to renounce such groups.

Frank Figliuzzi, a former F.B.I. assistant director of counterintelligence, said the president's remarks could be interpreted by violent right-wing groups as "a call to action, a call to arms." Mr. Figliuzzi said the organizations' online communications reveal they are making plans to gather at polling stations.

"There are specific posts, from Proud Boys, for example, that encourage it," Mr. Figliuzzi said during a call held by the Lawyers' Committee for Civil Rights Under Law, a voting rights group.

Such groups also point to curiously timed and seemingly alarmist announcements of voting fraud investigations arising from small incidents. The Justice Department, for instance, announced it was starting an inquiry after a handful of ballots were found in a garbage can in Pennsylvania, apparently accidentally discarded by a contract worker. It was a highly unusual step, coming as the Trump administration weakened longstanding department policy that discouraged making voter fraud investigations public before an election.

Like the Justice Department, Mr. Trump's campaign is also amplifying his message.

"We've all seen the tweets about voter fraud and blah blah blah," Mr. Clark said when he was recorded last year, referring to Mr. Trump's claims. "Every time we're in with him, he asks: 'What are we doing about voter fraud, what are we doing about voter fraud?'"

Mr. Clark added, "He's committed on this."

Susan Beachy contributed research.

Danny Hakim is an investigative reporter for the business section. He has been a European economics correspondent and bureau chief in Albany and Detroit. He was also a lead reporter on the team awarded the 2009 Pulitzer Prize for Breaking News.  @dannyhakim  •  Facebook

Stephanie Saul covers national politics. Since joining The Times in 2005, she has also written about the pharmaceutical industry, education and the illicit foreign money fueling Manhattan's real estate boom.  @stefsaul

A version of this article appears in print on , Section A, Page 15 of the New York edition with the headline: Inside Trump Campaign's Strategy to Make Voting a Tooth-and-Nail Fight

<u>Exhibit A6</u>

**The New York Times** | https://www.nytimes.com/2006/11/05/books/review/Kinsley.t.html

**ESSAY**

# Election Day

**By Michael Kinsley**
Nov. 5, 2006

**Correction Appended**

Democracy is about more than just counting votes. It is about democratic institutions — legislatures, courts — and a culture of respect for them. It is about political egalitarianism: we may not be equal in any other way, but we are all supposed to be equal as citizens. In the American tradition, democracy is also about individual rights, even though protecting these rights can mean thwarting the will of a democratic majority.

A shelf of books this fall raises various alarms about the condition of American democracy. Some of the authors simply don't care for the policies our democracy produces. They advance no theories about why democracy is letting them down so badly. From the left, for example, there is Senator Byron L. Dorgan (Democrat of North Dakota) with "Take This Job and Ship It: How Corporate Greed and Brain-Dead Politics Are Selling Out America," an exercise in assertion rather than persuasion that takes for granted the obvious truth of what it purports to argue, which is boilerplate protectionism.

And from the right there is Patrick J. Buchanan at his usual fever pitch, this time about immigration, in "State of Emergency: The Third World Invasion and Conquest of America." (Earlier Buchanan titles, on other issues, have included "The Death of the West" and "The Great Betrayal.")

Buchanan quotes an Oxford historian who noted that in 376 A.D., "in a complete break with established Roman policy," the emperor admitted "a large band of Gothic refugees." In the space of two years, they revolted and killed him. The emperor, Buchanan observes, "had done … the Christian thing," but not "the Roman thing." So there you are. He recommends the Roman thing.

Speaking of "from the left" and "from the right," and of Pat Buchanan, another category of complaints about American democracy concerns the quality of the discussion, widely regarded asoverly disputatious, on television programs like the CNN show "Crossfire," where Buchanan used to work (me too). Complaints about the corrupting effect of money belong here as well. And negative advertising and opposition research and all the other stuff that makes political campaigns so cheesy. The old joke about academia is that the quarrels there are so vicious because the stakes are so small. In politics the stakes are not small, except in the sense that the arguments exceed by far any differences in what the two established parties actually do when they have the opportunity to govern. Republicans, as Evelyn Waugh is said to have complained about the British Tories, don't seem to turn back the clock by a single minute. But Democrats don't seem to push it forward either.

Recent elections have seen the rise of self-styled militant moderates, following the flag of white-horse candidates starting with the businessman Ross Perot and continuing, so far, through Gen. Wesley K. Clark. Business and the military are two fertile breeders of excessive self-confidence, but the only essential qualification for a white-horse candidate is a total lack of experience in running for or holding elective office. And the only essential requirement for white-horse voters is to be, like Howard Beale in Paddy Chayefsky's movie "Network," "mad as hell" and "not going to take this anymore." It is not essential to know why you are so mad, or what exactly you're not going to take.

The militant moderates drove "Crossfire" off the air after the comedian Jon Stewart appeared on the show and declared it was "hurting America." A Tocqueville-type outsider examining the condition of American democracy at this moment might well raise an eyebrow over the growing power of unelected television comedians to set the political agenda. But this complaint is on no one's list. Just don't get your militant moderate started on TV evangelists, though.

Of this season's books deploring the quality of our political discourse, the classiest is Ronald Dworkin's "Is Democracy Possible Here? Principles for a New Political Debate." Dworkin, a law professor at New York University and University College London and a distinguished liberal thinker, says with patent insincerity that he does not blame one side more than the other for the trashy state of our politics. But with as much intellectual honesty and energy as he can muster (which is a lot), he starts at Square 1 in search of general principles that everyone in a democracy ought to share and then moves on to specific policies we can argue about. Everyone must "take personal responsibility for his ethical convictions." Dworkin thinks that is, or should be, universally accepted. Special TV channels to cover election-year politics: that, we can argue about. In "Does American Democracy Still Work?" another distinguished liberal philosopher, Alan Wolfe, faces manfully up to "the new politics of democracy" in which sentimental populism seems to be owned by the right. Although Wolfe clearly regards this as terribly unfair (as do I) and a result of voters' failure to know their own self-interest, he manages to make his argument for more "quality control" in American democracy in ideologically neutral terms.

Norman J. Ornstein, a token liberal at the American Enterprise Institute, and Thomas E. Mann, of the Brookings Institution, are well known in Washington as astute observers of Congress. And Ornstein is legendary among journalists as the man to call for a quick quote about almost anything. But "The Broken Branch: How Congress Is Failing America and How to Get It Back on Track" reveals their relationship with the national legislature to be much more profound than mere observation. Frankly, it's love. And they are deeply distressed by Congress's current low esteem. Urging reform at every opportunity, they seem like the loyal spouse of an alcoholic or drug addict, desperately pushing their beloved into rehab. You may not share the authors' heartbreak over the decline of the "15-minute rule" — a not-so-old tradition (it began in the 1970's with electronic voting) that House votes should not last longer than 15 minutes, to prevent endless arm-twisting. But their reminders about some of the phony issues and false panaceas that litter the recent history of Congress — Remember the House bank scandal? The Contract With America? Term limits? — do make you despair of American politics. Issues and arguments come and go, depending entirely on whose ox is gored. And since our shared short-term memory seems to be completely shot, the authors' poli-sci-deadpan recounting of the rise and fall of Newt Gingrich is badly needed if we are to have any hope of stopping this bizarre and nefarious figure's current campaign for rehabilitation.

For a charmingly recherché complaint, check out "Activism, Inc.: How the Outsourcing of Grassroots Campaigns Is Strangling Progressive Politics in America," by Dana R. Fisher. Fisher, who teaches sociology at Columbia, is upset about the professionalization of grass-roots campaigning, which she believes has sliced the bottom rung off the political ladder and keeps inspired young people from entering politics and pointing it in a more salubrious direction. In fact, many aspects of politics that used to be volunteer work — not just dialing telephones or licking envelopes, but making strategy — are now businesses. That makes politics more expensive, and it gives almost all political campaigns access to the latest forms of legerdemain. If you want every current beef about American democracy — or at least every current left-wing beef — in one handy volume, what you need is Mark Green's latest collection of complaints, "Losing Our Democracy: How Bush, the Far Right and Big Business Are Betraying Americans for Power and Profit." Green, the former Naderite and long-term New York politician, has been producing volumes like this with unflagging enthusiasm since 1970. If he is discouraged by the general rightward drift of politics and his own series of electoral defeats, both extending over much of his adult life, he doesn't let it show.



Patrick Thomas

We have to be careful about sour grapes. The current result of American democracy (though this may change on Tuesday) is Republican control of the presidency, both houses of Congress and (undeniably by now) the federal courts. And that, in turn, has produced policies that, unless I badly misjudge the demographics, most readers of The New York Times Book Review don't care for: unjustified tax breaks for the rich, a miserable war in Iraq, unbelievable indifference to civil liberties (Secret prison camps? Torture?? America???), among other treats. But this doesn't prove any flaws in democracy itself. Maybe it's what people want.

The argument starts to go around in circles: How can people want what is so obviously wrong? Democracy must be flawed to produce an electorate so badly mistaken. No one forces me to believe what I believe. I believe it because reason has told me that it is right. Reason is equally available to every citizen. If self-interest cut the other way, that would be one thing. But the self-interest of most citizens coincides with what I believe, or so it seems to me. So in a fair fight, my side should win. If my side doesn't win, that proves the fight is not fair. The other side is cheating.

Thoughts like this must have gone through the minds of most liberals over the past four decades. After all, apart from cheating, there are only two possibilities: either you are wrong (and need to undergo intensive self-flagellation followed by extensive reinvention), or the voters are wrong (and even to think this is a severe violation of democratic etiquette). It is unattractive to say or think the voters are wrong. But if reason has led you to a certain set of political beliefs, the fact that others disagree perhaps should give you pause, but it should not automatically change your mind, no matter how many others there are.

The notion of cheating by the other side is a way out of this dilemma. The voters are not at fault and neither are you. But what is cheating? In my view, the worst form of cheating in American democracy today is intellectual dishonesty. The conversation in our democracy is dominated by disingenuousness. Candidates and partisan commentators strike poses of outrage that they don't really feel, take positions that they would not take if the shoe was on the other foot (e.g., criticizing Bush when you gave Clinton a pass, or vice versa), feel no obligation toward logical consistency. Our democracy occasionally punishes outright lies but not brazen insincerity. When we vote after a modern political campaign run by expensive professionals, we have almost no idea what the victor really believes or what he or she might do in office. It seems to me there is more than enough of this to explain all distressing election results without condemning either yourself or democracy.

But it is a complicated case to make. And there is a simpler case available: Not content to steal elections with dishonest arguments, the other side is literally tampering with the democratic machinery to steal votes. Democracy is about counting votes after all. We used to give little thought to the mechanics of voting, confident in even our lowest moments that we at least had that bit right. Stolen elections were the stuff of ancient lore about Chicago ("vote early and often"). Then came Florida 2000.

It is considered tiresome to complain that the White House was stolen in 2000. In fact, the ultimate triumph of the George W. Bush forces in the 2000 dispute has been to stamp any discussion of that episode as bad sportsmanship and therefore, in a way, undemocratic itself. You lost fair and square: "Get over it," as Justice Scalia advised.

Call me bitter: I am not over it and don't want to be over it. I still find it shocking that democracy was so openly subverted, and even more shocking that so few others seem to share my shock. "Stolen"? That depends, as the man said, on what you mean by that word. Here is what I mean. First, a clear majority of those who voted in Florida intended to vote for Gore and walked out of the voting booth (or away from the mailbox) sincerely believing that they had done so. Vindicating the assumptions of those who did vote about whom they voted for (a standard first suggested, as far as I know, by Jacob Weisberg of Slate) seems about the least you can demand of a voting system, and Florida failed this test.

Second, at every stage, Republican government officials thwarted all attempts to let democracy work in the minimal sense of the previous paragraph. Repeatedly, they interpreted the "discretion" that any public official must have as a license to produce the result they wanted, rather than as creating any obligation to do what is right. The Florida recount debate was a festival of intellectual dishonesty. On a whole series of technical issues (those butterfly ballots mispunched by the confused old ladies of Palm Beach, or military absentee ballots mailed after the deadline) there were plausible arguments on both sides. And these arguments had no obvious ideological cast. There is no natural conservative or liberal position on the dilemma of the dangling chad. So it is remarkable — amusing, depressing, not surprising I guess — how quickly and passionately Democrats and Republicans staked out their respective cui bono positions. But Republicans controlled the state and federal governments, so they got their way.

The Supreme Court's ruling in Bush v. Gore was surprising. Shocking, in fact. Probably the most fatuous — i.e., knowingly stupid — Supreme Court decision in history. The justices of Plessy v. Ferguson (1896), who upheld racial segregation, could at least plead historical blinders. The majority justices of Bush v. Gore have no such excuse. Both as a raw assertion of judicial power and as a more specific interpretation of the 14th Amendment, it was not merely wrong, but spectacularly wrong in precisely the ways that conservative justices like Scalia, Rehnquist and Thomas had been objecting to for years. The justices invented a nonsensical equal-protection "right" — essentially, the right to an equal risk of having your vote miscounted — and held that any attempt to correct mistakes through a recount was unfair to those who didn't get recounted. And then they declared this alleged right to be a one-time-only offer, like a grocery-store coupon. As Adam Cohen pointed out recently on the New York Times editorial page, the coupon has indeed expired. Bush v. Gore is rarely cited or applied in other situations.

It might be no bad thing if the Constitution's guarantee of "equal protection of the laws" was interpreted to outlaw the vagaries of voting, and not just Democratic victories. What we have learned, or been reminded, since 2000 is how inexact the art of vote counting is, and how far we are from what we presumed was the first axiom of democracy: majority rule.

Let us count the ways. First, at least regarding the presidency, our Constitution doesn't provide for majority rule. It dictates an arcane process involving the Electoral College and gives disproportionate weight to low-population states. We accept this with surprising equanimity. No one doubts that Al Gore got the most votes in 2000, but almost no one feels that this alone means that the presidency was stolen from him. One who does apparently feel that way is Sanford Levinson, a professor at the University of Texas Law School, who has written "Our Undemocratic Constitution: Where the Constitution Goes Wrong (and How We the People Can Correct It)," calling for wholesale

revision of our nation's founding document. This is admirably gutsy and unfashionable. Others may feel, though, that the Constitution is a Pandora's box better left unopened for fear of what else may get mucked around with. Even Al Gore may think that the Electoral College is a small price to pay for the First Amendment.



Patrick Thomas

Second, there is no way to count more than 100 million votes and get the same count every time. If the vote is close — and that is the only situation where a single vote matters — it is essentially a coin flip. This truth, driven home by the 2000 election, has reconciled me to the Electoral College, which I used to find an infuriating anachronism. Essentially it is a coin flip with a bit of protective historical coloration. And we need a coin flip of some sort.

Third, for no reason but incompetence, our vote-counting mechanisms turn out to be remarkably screwed up. Voting machines aren't reliable and don't generate a paper record. Or, worse, there are not enough voting machines, leading to impossible lines and voters giving up. Incomprehensible ballots. Stupid laws that needlessly require registration long in advance or excessive documentation when you show up to vote. You name it.

Fourth — and here it starts to get darker — there is the purposeful use of tools like registration laws and the distribution of assets like voting machines to discourage certain voters and potentially change the result. These abuses are the subject of "Stealing Democracy: The New Politics of Voter Suppression," by Spencer Overton, a professor at George Washington University Law School. Fifth — and darkest — is outright voting fraud, by "fixing" (that is, by breaking) the voting machines, as well as more traditional methods à la Chicago in the old days.

Like generals, reformers and conspiratorialists are always fighting the last war. The idea that a presidential election can be stolen was the stuff of airport fiction until someone did it. Now and here on out, every election will come with a theory of how the winner stole it (just as, since Vietnam, every war now comes with a medical "syndrome" for soldiers to sue over). Although resentment over the actually stolen election of 2000 is remarkably muted, there is a noisy contingent of citizens, led by Robert F. Kennedy Jr., who are convinced that the Republicans stole the election of 2004. "Was the 2004 Presidential Election Stolen?" by Steven F. Freeman and Joel Bleifuss, answers its own question with a resounding "yes." The evidence concerns the state of Ohio, which would have changed the result if it had gone for John Kerry instead of Bush. The argument is that Ohio did go for Kerry, based on exit polls, then mysteriously went for Bush in the final result. "Exit polls are a vital tool to ensure election integrity," the authors say. But that has never been their purpose, and the authors offer no particular reason to believe the random exit polls and disbelieve the actual vote.

The authors deny that their case rests on exit polls alone. "Far from relying only on the exit-poll data, we read widely and had countless soul-searching conversations with each other and with our colleagues," they write. Actually, the whole stolen-election-2004 indictment has that echo-chamber sound of people having soul-searching conversations with each other. Richard Hofstadter's "paranoid style," exhibited mainly on the right when he coined the term in the

1960's, seems to have been adopted by the left, as Nicholas Lemann recently pointed out in The New Yorker. It is remarkable that the chairman and chief executive of Diebold, the company that makes the voting machines used in Ohio, sent out a fund-raising letter for Bush in 2003 in which he said he was "committed to helping Ohio deliver its electoral votes to the president." This doesn't prove anything except that the C.E.O. is an idiot. He's an idiot if his company is not fixing the voting machines, and an even bigger idiot if it is. I hate to be reasonable at this historic moment, but the principle of Occam's razor favors the lesser idiot theory. And so the quotation and the fund-raiser don't really feed the case for conspiracy. Most of the other evidence offered by conspiratorialists is not about Category 5 — outright theft — but Category 4: strategic, purposeful, deplorable, but not illegal voter discouragement.

We might ask ourselves at this point: What is so magical about a majority anyway? As a standard for producing a result that is as pleasing as possible to as many people as possible, 50 percent is just one possible stopping point on the way from zero to unanimity. Anyway, in presidential elections we don't have majority rule. We have plurality rule. In the past four elections, only George W. Bush in 2004 got more than 50 percent of the vote. In losing, John Kerry received a higher fraction of the vote than Bush got in 2000. In raw numbers, more people voted for Kerry in 2004 than had ever voted for any candidate in American history except, of course, for George W. Bush in the same election.

A famous mathematical proof called Arrow's Impossibility Theorem, for which the Stanford economist Kenneth Arrow won the Nobel Prize 1972, demonstrated that whenever there are more than two choices (as there always are in presidential elections, if you include the primaries), no voting system can accurately translate individual preferences into a consensus winner even in theory. And that is true in spades of our election system in practice, which is only a snapshot of voter preferences at a particular moment. In the 2000 recount controversy, there was general agreement that you can't let people vote again, because you can't recreate the conditions of Election Day — e.g., was it raining? But what does rain have to do with democracy?

George W. Bush's re-election in 2004 was considered to be a solid triumph, if not a landslide. It gave about 62 million voters what they wanted — or what they thought, at that moment, that they wanted — and frustrated the desires of about 59 million. If Kerry somehow could have stolen this election, 59 million voters would be satisfied and 62 million would be frustrated: a swing of over 1 percent among 122 million voters — and even less than that if you include the millions who, for whatever reason, don't vote.

In even the most tepid political campaign, a presidential candidate's numbers often swing by more than the ultimate margin of victory. And after he takes office, a president's poll numbers swing more day-to-day as a result of policy decisions (or for more trivial reasons) than the margins that got him elected. When you put all this together, the chain of assumptions between voting and any notion of maximizing the satisfaction of the maximum number of people seems pretty strained. And for this reason, among others, refining and perfecting the mechanics of voting seems like an inefficient way to improve democracy.

According to the Federal Election Commission, in 2000, Al Gore got 543,895 more votes than George Bush, out of a total of more than 105 million. He deserved to be president. But the size of the injustice is minuscule (even if the practical difference in recent history is enormous). The great flaw in American democracy is not electoral irregularities, purposeful or accidental. It's not money (which, even under current law, cannot in the end actually buy votes). It's not even the inexplicable failure of all other Americans to vote my way or of politicians to enact my own agenda. It's not the broken promises and the outright lying, although we're getting close. The biggest flaw in our democracy is, as I say, the enormous tolerance for intellectual dishonesty. Politicians are held to account for outright lies, but there seems to be no sanction against saying things you obviously don't believe. There is no reward for logical consistency, and no punishment for changing your story depending on the circumstances. Yet one minor exercise in disingenuousness can easily have a greater impact on an election than any number of crooked voting machines. And it seems to me, though I can't prove it, that this problem is getting worse and worse.

A few days before the 2000 election, the Bush team started assembling people to deal with a possible problem: what if Bush won the popular vote but Gore carried the Electoral College. They decided on, and were prepared to begin, a big campaign to convince the citizenry that it would be wrong for Gore to take office under those circumstances. And

they intended to create a tidal wave of pressure on Gore's electors to vote for Bush, which arguably the electors as free agents have the authority to do. In the event, of course, the result was precisely the opposite, and immediately the Bushies launched into precisely the opposite argument: the Electoral College is a vital part of our Constitution, electors are not free agents, threatening the Electoral College result would be thumbing your nose at the founding fathers, and so on. Gore, by the way, never did challenge the Electoral College, although some advisers urged him to do so.

Of all the things Bush did and said during the 2000 election crisis, this having-it-both-ways is the most corrupt. It was reported before the election and is uncontested, but no one seems to care, because so much of our politics is like that. And no electoral reform can fix this problem. Intellectual dishonesty can't be banned or regulated or "capped" like money. The only way it can be brought under control is if people start voting against it. If they did, the problem would go away. That's democracy.

Exhibit A7

**Can You Chip In?**

They're trying to change history—don't let them. The Wayback Machine is a crucial resource in the fight against disinformation, and now more than ever we need your help. Right now we're preserving history as it unfolds, keeping track of who's saying what and when—all without charging for access, selling user data, or running ads. Instead, the Internet Archive (which runs this project) relies on the generosity of individuals to help us keep the record straight.

**We don't ask often, but right now, we have a 2-to-1 Matching Gift Campaign, tripling the impact of every donation.** If each of our users gave just $5, we could end this fundraiser today—so if you find all these bits and bytes useful, please pitch in.

Subscribe to Magazine | Ringtones | 🔊 RSS Feeds

| ARTISTS | **NEWS** | REVIEWS | PHOTOS | VIDEOS | POLITICS | COMMUNITY | LISTEN

Main    Cover Stories    Archive

Welcome

| ALL   ⌄    SEARCH

Login | New User

# Was the 2004 Election Stolen?

*Republicans prevented more than 350,000 voters in Ohio from casting ballots or having their votes counted -- enough to have put John Kerry in the White House. BY ROBERT F. KENNEDY JR.*

Page 1 2 3 4

*The complete article, with Web-only citations, follows.*
*Talk about it in our National Affairs blog, or see exclusive documents, sources, charts and commentary.*



Like many Americans, I spent the evening of the 2004 election watching the returns on television and wondering how the exit polls, which predicted an overwhelming victory for John Kerry, had gotten it so wrong. By midnight, the official tallies showed a decisive lead for George Bush -- and the next day, lacking enough legal evidence to contest the results, Kerry conceded. Republicans derided anyone who expressed doubts about Bush's victory as nut cases in "tinfoil hats," while the national media, with few exceptions, did little to question the validity of the election. *The Washington Post* immediately dismissed allegations of fraud as "conspiracy theories,"(1) and *The New York Times* declared that "there is no evidence of vote theft or errors on a large scale."(2)

But despite the media blackout, indications continued to emerge that something deeply troubling had taken place in 2004. Nearly half of the 6 million American voters living abroad(3) never received their ballots -- or received them too late to vote(4) -- after the Pentagon unaccountably shut down a state-of-the-art Web site used to file overseas registrations.(5) A consulting firm called Sproul & Associates, which was hired by the Republican National Committee to register voters in six battleground states,(6) was discovered shredding Democratic registrations.(7) In New Mexico, which was decided by 5,988 votes,(8) malfunctioning machines mysteriously failed to properly register a presidential vote on more than 20,000 ballots.(9) Nationwide, according to the federal commission charged with implementing election reforms, as many as 1 million ballots were spoiled by faulty voting equipment -- roughly one for every 100 cast.(10)

The reports were especially disturbing in Ohio, the critical battleground state that clinched Bush's victory in the electoral college. Officials there purged tens of thousands of eligible voters from the rolls, neglected to process registration cards generated by Democratic voter drives, shortchanged Democratic precincts when they allocated voting machines and illegally derailed a recount that could have given Kerry the presidency. A precinct in an evangelical church in Miami County recorded an impossibly high turnout of ninety-eight percent, while a polling place in inner-city Cleveland recorded an equally impossible turnout of only seven percent. In Warren County, GOP election officials even invented a nonexistent terrorist threat to bar the media from monitoring the official vote count.(11)

Any election, of course, will have anomalies. America's voting system is a messy patchwork of polling rules run mostly by county and city officials. "We didn't have one election for president in 2004," says Robert Pastor, who directs the Center for Democracy and Election Management at American University. "We didn't have fifty elections. We actually had 13,000 elections run by 13,000 independent, quasi-sovereign counties and municipalities."

But what is most anomalous about the irregularities in 2004 was their decidedly partisan bent: Almost without exception they hurt John Kerry and benefited George Bush. After carefully examining the evidence, I've become convinced that the president's party mounted a massive, coordinated campaign to subvert the will of the people in 2004. Across the country, Republican election officials and party stalwarts employed a wide range of illegal and unethical tactics to fix the election. A review of the available data reveals that in Ohio alone, at least 357,000 voters, the overwhelming majority of them Democratic, were prevented from casting ballots or did not have their votes counted in 2004(12) -- more than enough to shift the results of an election decided by

Illustration by Matt Mahurin

ADVERTISEMENT

Latest News: Petty vs. Chili Peppers, Townshend Explains Song and More
Download Now
The Beatles in Vegas
Sex & Scandal at Duke
Smoking Section
Soul Survivor
Crucifixes, Leather and Hits

MORE NEWS

118,601 votes.(13) (See Ohio's Missing Votes) In what may be the single most astounding fact from the election, *one in every four* Ohio citizens who registered to vote in 2004 showed up at the polls only to discover that they were not listed on the rolls, thanks to GOP efforts to stem the unprecedented flood of Democrats eager to cast ballots.(14) And that doesn?t even take into account the troubling evidence of outright fraud, which indicates that upwards of 80,000 votes for Kerry were counted instead for Bush. That alone is a swing of more than 160,000 votes -- enough to have put John Kerry in the White House.(15)

"It was terrible," says Sen. Christopher Dodd, who helped craft reforms in 2002 that were supposed to prevent such electoral abuses. "People waiting in line for twelve hours to cast their ballots, people not being allowed to vote because they were in the wrong precinct -- it was an outrage. In Ohio, you had a secretary of state who was determined to guarantee a Republican outcome. I'm terribly disheartened."

Indeed, the extent of the GOP's effort to rig the vote shocked even the most experienced observers of American elections. "Ohio was as dirty an election as America has ever seen," Lou Harris, the father of modern political polling, told me. "You look at the turnout and votes in individual precincts, compared to the historic patterns in those counties, and you can tell where the discrepancies are. They stand out like a sore thumb."

## I. The Exit Polls
The first indication that something was gravely amiss on November 2nd, 2004, was the inexplicable discrepancies between exit polls and actual vote counts. Polls in thirty states weren't just off the mark -- they deviated to an extent that cannot be accounted for by their margin of error. In all but four states, the discrepancy favored President Bush.(16)

Over the past decades, exit polling has evolved into an exact science. Indeed, among pollsters and statisticians, such surveys are thought to be the most reliable. Unlike pre-election polls, in which voters are asked to predict their own behavior at some point in the future, exit polls ask voters leaving the voting booth to report an action they just executed. The results are exquisitely accurate: Exit polls in Germany, for example, have never missed the mark by more than three-tenths of one percent.(17) "Exit polls are almost never wrong," Dick Morris, a political consultant who has worked for both Republicans and Democrats, noted after the 2004 vote. Such surveys are "so reliable," he added, "that they are used as guides to the relative honesty of elections in Third World countries."(18) In 2003, vote tampering revealed by exit polling in the Republic of Georgia forced Eduard Shevardnadze to step down.(19) And in November 2004, exit polling in the Ukraine -- paid for by

the Bush administration -- exposed election fraud that denied Viktor Yushchenko the presidency.(20)

But that same month, when exit polls revealed disturbing disparities in the U.S. election, the six media organizations that had commissioned the survey treated its very existence as an embarrassment. Instead of treating the discrepancies as a story meriting investigation, the networks scrubbed the offending results from their Web sites and substituted them with "corrected" numbers that had been weighted, retroactively, to match the official vote count. Rather than finding fault with the election results, the mainstream media preferred to dismiss the polls as flawed.(21)

"The people who ran the exit polling, and all those of us who were their clients, recognized that it was deeply flawed," says Tom Brokaw, who served as anchor for NBC News during the 2004 election. "They were really screwed up -- the old models just don't work anymore. I would not go on the air with them again."

In fact, the exit poll created for the 2004 election was designed to be the most reliable voter survey in history. The six news organizations -- running the ideological gamut from CBS to Fox News -- retained Edison Media Research and Mitofsky International,(22) whose principal, Warren Mitofsky, pioneered the exit poll for CBS in 1967(23) and is widely credited with assuring the credibility of Mexico's elections in 1994.(24) For its nationwide poll, Edison/Mitofsky selected a random subsample of 12,219 voters(25) -- approximately six times larger than those normally used in national polls(26) -- driving the margin of error down to approximately plus or minus one percent.(27)

On the evening of the vote, reporters at each of the major networks were briefed by pollsters at 7:54 p.m. Kerry, they were informed, had an insurmountable lead and would win by a rout: at least 309 electoral votes to Bush's 174, with fifty-five too close to call.(28) In London, Prime Minister Tony Blair went to bed contemplating his relationship with President-elect Kerry.(29)

As the last polling stations closed on the West Coast, exit polls showed Kerry ahead in ten of eleven battleground states -- including commanding leads in Ohio and Florida -- and winning by a million and a half votes nationally. The exit polls even showed Kerry breathing down Bush's neck in supposed GOP strongholds Virginia and North Carolina.(30) Against these numbers, the statistical likelihood of Bush winning was less than one in 450,000.(31) "Either the exit polls, by and large, are completely wrong," a Fox News analyst declared, "or George Bush loses."(32)

But as the evening progressed, official tallies began to show implausible disparities -- as much as 9.5 percent --

with the exit polls. In ten of the eleven battleground
states, the tallied margins departed from what the polls
had predicted. In every case, the shift favored Bush.
Based on exit polls, CNN had predicted Kerry defeating
Bush in Ohio by a margin of 4.2 percentage points.
Instead, election results showed Bush winning the state
by 2.5 percent. Bush also tallied 6.5 percent more than
the polls had predicted in Pennsylvania, and 4.9 percent
more in Florida.(33)

According to Steven F. Freeman, a visiting scholar at the
University of Pennsylvania who specializes in research
methodology, the odds against all three of those shifts
occurring in concert are one in 660,000. "As much as we
can say in sound science that something is impossible,"
he says, "it is impossible that the discrepancies between
predicted and actual vote count in the three critical
battleground states of the 2004 election could have been
due to chance or random error." (See The Tale of the Exit
Polls)

Puzzled by the discrepancies, Freeman laboriously
examined the raw polling data released by
Edison/Mitofsky in January 2005. "I'm not even political
-- I despise the Democrats," he says. "I'm a survey expert.
I got into this because I was mystified about how the exit
polls could have been so wrong." In his forthcoming
book, *Was the 2004 Presidential Election Stolen? Exit
Polls, Election Fraud, and the Official Count*, Freeman
lays out a statistical analysis of the polls that is deeply
troubling.

In its official postmortem report issued two months after
the election, Edison/Mitofsky was unable to identify any
flaw in its methodology -- so the pollsters, in essence,
invented one for the electorate. According to Mitofsky,
Bush partisans were simply disinclined to talk to exit
pollsters on November 2nd(34) -- displaying a heretofore
unknown and undocumented aversion that skewed the
polls in Kerry's favor by a margin of 6.5 percent
nationwide.(35)

Industry peers didn't buy it. John Zogby, one of the
nation's leading pollsters, told me that Mitofsky's
"reluctant responder" hypothesis is "preposterous."(36)
Even Mitofsky, in his official report, underscored the
hollowness of his theory: "It is difficult to pinpoint
precisely the reasons that, in general, Kerry voters were
more likely to participate in the exit polls than Bush
voters."(37)

Now, thanks to careful examination of Mitofsky's own
data by Freeman and a team of eight researchers, we can
say conclusively that the theory is dead wrong. In fact it
was *Democrats*, not Republicans, who were more
disinclined to answer pollsters' questions on Election
Day. In Bush strongholds, Freeman and the other
researchers found that fifty-six percent of voters
completed the exit survey -- compared to only fifty-three

percent in Kerry strongholds.(38) "The data presented to support the claim not only fails to substantiate it," observes Freeman, "but actually contradicts it."

What's more, Freeman found, the greatest disparities between exit polls and the official vote count came in Republican strongholds. In precincts where Bush received at least eighty percent of the vote, the exit polls were off by an average of ten percent. By contrast, in precincts where Kerry dominated by eighty percent or more, the exit polls were accurate to within three tenths of one percent -- a pattern that suggests Republican election officials stuffed the ballot box in Bush country. (39)

"When you look at the numbers, there is a tremendous amount of data that supports the supposition of election fraud," concludes Freeman. "The discrepancies are higher in battleground states, higher where there were Republican governors, higher in states with greater proportions of African-American communities and higher in states where there were the most Election Day complaints. All these are strong indicators of fraud -- and yet this supposition has been utterly ignored by the press and, oddly, by the Democratic Party."

The evidence is especially strong in Ohio. In January, a team of mathematicians from the National Election Data Archive, a nonpartisan watchdog group, compared the state's exit polls against the certified vote count in each of the forty-nine precincts polled by Edison/Mitofsky. In twenty-two of those precincts -- nearly half of those polled -- they discovered results that differed widely from the official tally. Once again -- against all odds -- the widespread discrepancies were stacked massively in Bush's favor: In only two of the suspect twenty-two precincts did the disparity benefit Kerry. The wildest discrepancy came from the precinct Mitofsky numbered "27," in order to protect the anonymity of those surveyed. According to the exit poll, Kerry should have received sixty-seven percent of the vote in this precinct. Yet the certified tally gave him only thirty-eight percent. The statistical odds against such a variance are just shy of one in 3 billion.(40)

Such results, according to the archive, provide "virtually irrefutable evidence of vote miscount." The discrepancies, the experts add, "are consistent with the hypothesis that Kerry would have won Ohio's electoral votes if Ohio's official vote counts had accurately reflected voter intent."(41) According to Ron Baiman, vice president of the archive and a public policy analyst at Loyola University in Chicago, "No rigorous statistical explanation" can explain the "completely nonrandom" disparities that almost uniformly benefited Bush. The final results, he adds, are "completely consistent with election fraud -- specifically vote shifting."

## II. The Partisan Official

No state was more important in the 2004 election than Ohio. The state has been key to every Republican presidential victory since Abraham Lincoln's, and both parties overwhelmed the state with television ads, field organizers and volunteers in an effort to register new voters and energize old ones. Bush and Kerry traveled to Ohio a total of forty-nine times during the campaign -- more than to any other state.(42)

But in the battle for Ohio, Republicans had a distinct advantage: The man in charge of the counting was Kenneth Blackwell, the co-chair of President Bush's re-election committee.(43) As Ohio's secretary of state, Blackwell had broad powers to interpret and implement state and federal election laws -- setting standards for everything from the processing of voter registration to the conduct of official recounts.(44) And as Bush's re-election chair in Ohio, he had a powerful motivation to rig the rules for his candidate. Blackwell, in fact, served as the "principal electoral system adviser" for Bush during the 2000 recount in Florida,(45) where he witnessed firsthand the success of his counterpart Katherine Harris, the Florida secretary of state who co-chaired Bush's campaign there.(46)

Blackwell -- now the Republican candidate for governor of Ohio(47) -- is well-known in the state as a fierce partisan eager to rise in the GOP. An outspoken leader of Ohio's right-wing fundamentalists, he opposes abortion even in cases of rape(48) and was the chief cheerleader for the anti-gay-marriage amendment that Republicans employed to spark turnout in rural counties(49). He has openly denounced Kerry as "an unapologetic liberal Democrat,"(50) and during the 2004 election he used his official powers to disenfranchise hundreds of thousands of Ohio citizens in Democratic strongholds. In a ruling issued two weeks before the election, a federal judge rebuked Blackwell for seeking to "accomplish the same result in Ohio in 2004 that occurred in Florida in 2000."(51)

"The secretary of state is supposed to administer elections -- not throw them," says Rep. Dennis Kucinich, a Democrat from Cleveland who has dealt with Blackwell for years. "The election in Ohio in 2004 stands out as an example of how, under color of law, a state election official can frustrate the exercise of the right to vote."

The most extensive investigation of what happened in Ohio was conducted by Rep. John Conyers, the ranking Democrat on the House Judiciary Committee.(52) Frustrated by his party's failure to follow up on the widespread evidence of voter intimidation and fraud, Conyers and the committee's minority staff held public hearings in Ohio, where they looked into more than 50,000 complaints from voters.(53) In January 2005, Conyers issued a detailed report that outlined "massive and unprecedented voter irregularities and anomalies in

Ohio." The problems, the report concludes, were "caused by intentional misconduct and illegal behavior, much of it involving Secretary of State J. Kenneth Blackwell."(54)

"Blackwell made Katherine Harris look like a cupcake," Conyers told me. "He saw his role as limiting the participation of Democratic voters. We had hearings in Columbus for two days. We could have stayed two weeks, the level of fury was so high. Thousands of people wanted to testify. Nothing like this had ever happened to them before."

When ROLLING STONE confronted Blackwell about his overtly partisan attempts to subvert the election, he dismissed any such claim as "silly on its face." Ohio, he insisted in a telephone interview, set a "gold standard" for electoral fairness. In fact, his campaign to subvert the will of the voters had begun long before Election Day. Instead of welcoming the avalanche of citizen involvement sparked by the campaign, Blackwell permitted election officials in Cleveland, Cincinnati and Toledo to conduct a massive purge of their voter rolls, summarily expunging the names of more than 300,000 voters who had failed to cast ballots in the previous two national elections.(55) In Cleveland, which went five-to-one for Kerry, nearly one in four voters were wiped from the rolls between 2000 and 2004.(56)

There were legitimate reasons to clean up voting lists: Many of the names undoubtedly belonged to people who had moved or died. But thousands more were duly registered voters who were deprived of their constitutional right to vote -- often without any notification -- simply because they had decided not to go to the polls in prior elections.(57) In Cleveland's precinct 6C, where more than half the voters on the rolls were deleted,(58) turnout was only 7.1 percent(59) -- the lowest in the state.

According to the Conyers report, improper purging "likely disenfranchised tens of thousands of voters statewide."(60) If only one in ten of the 300,000 purged voters showed up on Election Day -- a conservative estimate, according to election scholars -- that is 30,000 citizens who were unfairly denied the opportunity to cast ballots.

### III. The Strike Force

In the months leading up to the election, Ohio was in the midst of the biggest registration drive in its history. Tens of thousands of volunteers and paid political operatives from both parties canvassed the state, racing to register new voters in advance of the October 4th deadline. To those on the ground, it was clear that Democrats were outpacing their Republican counterparts: A *New York Times* analysis before the election found that new registrations in traditional Democratic strongholds were up 250 percent, compared to only twenty-five percent in Republican-leaning counties.(61) "The Democrats have

been beating the pants off us in the air and on the ground," a GOP county official in Columbus confessed to *The Washington Times*.(62)

To stem the tide of new registrations, the Republican National Committee and the Ohio Republican Party attempted to knock tens of thousands of predominantly minority and urban voters off the rolls through illegal mailings known in electioneering jargon as "caging." During the Eighties, after the GOP used such mailings to disenfranchise nearly 76,000 black voters in New Jersey and Louisiana, it was forced to sign two separate court orders agreeing to abstain from caging.(63) But during the summer of 2004, the GOP targeted minority voters in Ohio by zip code, sending registered letters to more than 200,000 newly registered voters(64) in sixty-five counties.(65) On October 22nd, a mere eleven days before the election, Ohio Republican Party Chairman Bob Bennett -- who also chairs the board of elections in Cuyahoga County -- sought to invalidate the registrations of 35,427 voters who had refused to sign for the letters or whose mail came back as undeliverable.(66) Almost half of the challenged voters were from Democratic strongholds in and around Cleveland.(67)

There were plenty of valid reasons that voters had failed to respond to the mailings: The list included people who couldn't sign for the letters because they were serving in the U.S. military, college students whose school and home addresses differed,(68) and more than 1,000 homeless people who had no permanent mailing address. (69) But the undeliverable mail, Bennett claimed, proved the new registrations were fraudulent.

By law, each voter was supposed to receive a hearing before being stricken from the rolls.(70) Instead, in the week before the election, kangaroo courts were rapidly set up across the state at Blackwell's direction that would inevitably disenfranchise thousands of voters at a time(71) -- a process that one Democratic election official in Toledo likened to an "inquisition."(72) Not that anyone was given a chance to actually show up and defend their right to vote: Notices to challenged voters were not only sent out impossibly late in the process, they were *mailed to the very addresses that the Republicans contended were faulty*.(73) Adding to the atmosphere of intimidation, sheriff's detectives in Sandusky County were dispatched to the homes of challenged voters to investigate the GOP's claims of fraud.(74)

**Next page**

--

1) Manual Roig-Franzia and Dan Keating, "Latest Conspiracy Theory -- Kerry Won -- Hits the Ether," *The Washington Post*, November 11, 2004.

2) The New York Times Editorial Desk, "About Those Election Results," *The New York Times*, November 14, 2004.

3) United States Department of Defense, August 6, 2004.

4) Overseas Vote Foundation, "2004 Post Election Survey Results," June 2005, page 11.

5) Jennifer Joan Lee, "Pentagon Blocks Site for Voters Outside U.S.," *International Herald Tribune*, September 20, 2004.

6) Meg Landers, "Librarian Bares Possible Voter Registration Dodge," *Mail Tribune* (Jackson County, OR), September 21, 2004.

7) Mark Brunswick and Pat Doyle, "Voter Registration; 3 former workers: Firm paid pro-Bush bonuses; One said he was told his job was to bring back cards for GOP voters," *Star Tribune* (Minneapolis, MN), October 27, 2004.

8) Federal Election Commission, Federal Elections 2004: Election Results for the U.S. President.

9) Ellen Theisen and Warren Stewart, Summary Report on New Mexico State Election Data, January 4, 2005, pg. 2

James W. Bronsan, "In 2004, New Mexico Worst at Counting Votes," Scripps Howard News Service, December 22, 2004. 10) "A Summary of the 2004 Election Day Survey; How We Voted: People, Ballots & Polling Places; A Report to the American People by the United States Election Assistance Commission", September 2005, pg. 10.

11) Facts mentioned in this paragraph are subsequently cited throughout the story.

12) See "Ohio's Missing Votes"

13) Federal Election Commission, Federal Elections 2004: Election Results for the U.S. President.

14) Democratic National Committee, Voting Rights Institute, "Democracy at Risk: The 2004 Election in Ohio", June 22, 2005. Page 5

15) See "VIII. Rural Counties."

16) Evaluation of Edison/Mitofsky Election System 2004" prepared by Edison Media Research and Mitofksy International for the National Election Pool (NEP), January 19, 2005, Page 3

17) This refers to data for German national elections in 1994, 1998 and 2002, previously cited by Steven F. Freeman.

18) Dick Morris, "Those Faulty Exit Polls Were Sabotage," *The Hill*, November 4, 2004.

19) Martin Plissner, "Exit Polls to Protect the Vote," *The New York Times*, October 17, 2004.

20) Matt Kelley, "U.S. Money has Helped Opposition in Ukraine," Associated Press, December 11, 2004.

Daniel Williams, "Court Rejects Ukraine Vote; Justices Cite Massive Fraud in Runoff, Set New Election," *The Washington Post*, December 4, 2004.

21) Steve Freeman and Joel Bleifuss, "Was the 2004 Presidential Election Stolen? Exit Polls, Election Fraud, and the Official Count," *Seven Stories Press*, July 2006, Page 102.

22) Evaluation of Edison/Mitofsky Election System 2004; prepared by Edison Media Research and Mitofsky International for the National Election Pool (NEP), January 19, 2005, Page 3.

23) Mitofsky International

24) Tim Golden, "Election Near, Mexicans Question the Questioners," *The New York Times*, August 10, 1994.

25) Evaluation of Edison/Mitofsky Election System 2004; prepared by Edison Media Research and Mitofsky International for the National Election Pool (NEP), January 19, 2005, Page 59.

26) Jonathan D. Simon, J.D., and Ron P. Baiman, Ph.D., "The 2004 Presidential Election: Who Won the Popular Vote? An Examination of the Comparative Validity of Exit Poll and Vote Count Data." FreePress.org, December 29, 2004, P. 9

27) Analysis by Steven F. Freeman.

28) Freeman and Bleifuss, pg. 134

29) Jim Rutenberg, "Report Says Problems Led to Skewing Survey Data," *The New York Times*, November 5, 2004.

30) Freeman and Bleifuss, pg. 134

31) Analysis of the 2004 Presidential Election Exit Poll Discrepancies. U.S. Count Votes. Baiman R, et al. March 31, 2005. Page 3.

32) Notes From Campaign Trail, Fox News Network, Live Event, 8:00 p.m. EST, November 2, 2004.

33) Freeman and Bleifuss, pg. 101-102

34) Evaluation of Edison/Mitofsky Election System 2004; prepared by Edison Media Research and Mitofsky International for the National Election Pool (NEP), January 19, 2005, Page 4.

35) Freeman and Bleifuss, pg. 120.

36) Interview with John Zogby

37) Evaluation of Edison/Mitofsky Election System 2004; prepared by Edison Media Research and Mitofsky International for the National Election Pool (NEP), January 19, 2005, Page 4.

38) Freeman and Bleifuss, pg. 128.

39) Freeman and Bleifuss, pg. 130.

40) "The Gun is Smoking: 2004 Ohio Precinct-level Exit Poll Data Show Virtually Irrefutable Evidence of Vote Miscount," U.S. Count Votes, National Election Data Archive, January 23, 2006.

41) "The Gun is Smoking," pg. 16.

42) *The Washington Post*, "Charting the Campaign: Top Five Most Visited States," November 2, 2004.

43) John McCarthy, "Nearly a Month Later, Ohio Fight Goes On," Associated Press Online, November 30, 2004.

44) Ohio Revised Code, 3501.04, Chief Election Officer"

45) Joe Hallett, "Blackwell Joins GOP's Spin Team," *The Columbus Dispatch*, November 30, 2004.

46) Gary Fineout, "Records Indicate Harris on Defense," *Ledger* (Lakeland, Florida), November 18, 2000.

47) http://www.kenblackwell.com/

48) Joe Hallett, "Governor; Aggressive First Round Culminates Tuesday," *Columbus Dispatch*, April 30, 2006.

49) Sandy Theis, "Blackwell Accused of Breaking Law by Pushing Same-Sex Marriage Ban," *Plain Dealer* (Cleveland, OH), October 29, 2004.

50) Raw Story, "Republican Ohio Secretary of State Boasts About Delivering Ohio to Bush."

51) In the United States District Court For the Northern District of Ohio Northern Division, The Sandusky County Democratic Party et al. v. J. Kenneth Blackwell, Case No. 3:04CV7582, Page 8.

52) Preserving Democracy: What Went Wrong in Ohio, Status Report of the House Judiciary Committee Democratic Staff (Rep. John Conyers, Jr.), January 5, 2005.

53) Preserving Democracy, pg. 8.

54) Preserving Democracy, pg. 4.

55) The board of elections in Cuyahoga, Franklin and Hamilton counties.

56) Analysis by Richard Hayes Phillips, a voting rights advocate.

57) Fritz Wenzel, "Purging of Rolls, Confusion Anger Voters; 41% of Nov. 2 Provisional Ballots Axed in Lucas County," *Toledo Blade*, January 9, 2005.

58) Analysis by Hayes Phillips.

59) Cuyahoga County Board of Elections

60) Preserving Democracy, pg. 6.

61) Ford Fessenden, "A Big Increase of New Voters in Swing States," *The New York Times*, September 26, 2004.

62) Ralph Z. Hallow, "Republicans Go 'Under the Radar' in Rural Ohio," *The Washington Times*, October 28, 2004.

63) Jo Becker, "GOP Challenging Voter Registrations," *The Washington Post*, October 29, 2004.

64) Janet Babin, "Voter Registrations Challenged in Ohio," NPR, All Things Considered, October 28, 2004.

65) In the United States District Court for the Southern District of Ohio, Western Division, Amy Miller et al. v. J. Kenneth Blackwell, Case no. C-1-04-735, Page 2.

66) Sandy Theis, "Fraud-Busters Busted; GOP's Blanket Challenge Backfires in a Big Way," *Plain Dealer*, October 31, 2004.

67) Daniel Tokaji, "Early Returns on Election Reform," *George Washington Law Review*, Vol. 74, 2005, page 1235

68) Sandy Theis, "Fraud-Busters Busted; GOP's Blanket Challenge Backfires in a Big Way," *Plain Dealer*, October 31, 2004.

69) Andrew Welsh-Huggins, "Out of Country, Off Beaten Path; Reason for Voting Challenges Vary," *Plain Dealer* (Cleveland, OH), October 27, 2004.

70) Ohio Revised Code; 3505.19

71) Directive No. 2004-44 from J. Kenneth Blackwell, Ohio Sec'y of State, to All County Boards of Elections Members, Directors, and Deputy Directors 1 (Oct. 26, 2004).

72) Fritz Wenzel, "Challenges Filed Against 931 Lucas County Voters," *Toledo Blade*, October 27, 2004.

73) In the United States District Court for the Southern District of Ohio, Western Division, Amy Miller et al. v. J.

Kenneth Blackwell, Case no. C-1-04-735, Page 4.

74) LaRaye Brown, "Elections Board Plans Hearing For Challenges," *The News Messenger*, October 26, 2004.

Page 1  **2**  **3**  **4**

EMAIL   PRINT

ALL        SEARCH

RSS  Subscribe to Rolling Stone **Music News** feed

**See all** available RSS feeds / **learn more**

HOME : MUSIC NEWS : WAS THE 2004 ELECTION STOLEN?

# RS UPDATES

Stay connected to Rolling Stone with:



Newsletters
Podcasts
RSS Feeds
Desktop Alerts



4 FREE ISSUES!
Renew
Back issues
Gifts
Customer service

MORE

PREMIUM PARTNERS




Enter Blue Note in Chicago Sweepstakes
Vote for your favorite Rolling Stone 'Hot' Cover!
Free Game Download!
Test Your Rock & Roll Knowledge

RS MUSIC STORE: Top 10 Songs For **49¢**

| | | |
|---|---|---|
| **1.** | "A Crush in the..." | **Jolie Holland** |
| **2.** | "Crazy Little Thing..." | **Rihanna** |
| **3.** | "Do ya (Remix)" | **Cam'ron** |
| **4.** | "Not Tonight" | **The New Cars** |
| **5.** | "Liar [It Takes..." | **Taking Back Sunday** |

SEE THE FULL TOP 10

[+] Tell us what you think of Rollingstone.com!

**Subscribe to Rolling Stone Magazine** | **Advertise With Us** | **Contact Us** | **Terms of Use** | **Privacy Policy** | **Site Map**

©RealNetworks, Inc. All rights reserved.
©Copyright 2006 Rolling Stone
Portions of album and DVD content provided by muze ® © 1948-2006, Muze Inc

# Exhibit A8

https://www.wsj.com/articles/voting-machine-supplier-criticized-by-trump-in-spotlight-on-election-integrity-11605624361

ELECTION 2020

# Voting Machine Supplier Criticized by Trump in Spotlight on Election Integrity

Dominion Voting Systems says its equipment is secure; federal agencies and state officials agree



A Dominion Voting machine in Atlanta. The company says its equipment serves about 40% of U.S. voters.

PHOTO: JOHN BAZEMORE/ASSOCIATED PRESS

*By* *Alexa Corse*
Nov. 17, 2020 9:46 am ET

Dominion Voting Systems Corp., a little-known voting-machine supplier that has come under criticism from President Trump, was a linchpin in the 2020 election that federal and state officials praise as being free from tampering.

Denver-based Dominion says its voting equipment serves about 40% of U.S. voters, spread across parts of 28 states and Puerto Rico. In Georgia, the company landed a roughly $100 million contract to modernize the state's election systems before this year's vote. Paper records of votes generated by Dominion machines are part of Georgia's ongoing, by-hand recount of the presidential race, in which President-elect Joe Biden leads Mr. Trump by roughly 14,000 votes.

As he contests the outcome of the election, Mr. Trump has lashed out at Dominion, tweeting and retweeting comments about the company at least a dozen times over the past week and calling its equipment "not good or secure." He has promoted unproven allegations about the company that Dominion voting machines deleted millions of votes for him and switched some of those votes to President-elect Joe Biden.

A phalanx of federal agencies, state officials across the country overseeing elections and voting-equipment vendors said last week that "there's no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised." Their statement didn't mention Mr. Trump.

Dominion is now battling to assure Americans that the election was secure and without major problems. "The conspiracy theories circulating about Dominion and, frankly, the integrity of the U.S. election system, are dangerous and absurd," Dominion CEO John Poulos said in an interview.

The company published a fact sheet to rebut several claims about the accuracy of vote tallies and its operations, calling itself a "nonpartisan U.S. company" that "works with all political parties."



Voters in Atlanta on Nov. 3. Federal and state officials said the U.S. voting system was secure during the 2020 election.
PHOTO: JESSICA MCGOWAN/GETTY IMAGES

Still, the allegations spread widely. Zignal Labs, a media analytics firm, found more than 1.46 million mentions of Dominion Voting on websites and in news reports last week. The firm analyzed social-media sites and news reports, including Twitter Inc. and Reddit Inc.

Dominion is part of a small cadre of privately-owned companies that supply most voting machines used in elections. The company was acquired by a New York-based private-equity firm, Staple Street Capital, in 2018, a Dominion spokeswoman said. Dominion's products include voting machines, scanners, and election-management software.

For years, cybersecurity experts have pointed out flaws in voting machines and called on those companies to improve their security practices and allow their systems to be scrutinized by independent researchers.

"It's impossible to eliminate cybersecurity vulnerabilities from electronic voting systems, so instead what we need to do is make sure that we're applying the strongest protections that we can before the election and after the election that there's a sufficiently rigorous audit to confirm that the computers have produced the right count," said J. Alex Halderman a computer science professor at the University of Michigan who studies the security of voting systems.

While security researchers have found bugs in electronic voting machines, there is no evidence that these problems have been exploited to change votes in any state during this election, Mr. Halderman said.

Some critics have seized on errors this election that election officials and researchers said were minor. In Michigan's Antrim County, a mix-up with unofficial vote tallies was caused by human error, not Dominion's voting system, the Michigan Secretary of State's office said. It was quickly identified and corrected.

Dominion's voting machines had a rocky debut in Georgia's primary in June. Many poll workers didn't know how to operate the new machines and some didn't show up because of Covid-19 fears, according to the Georgia secretary of state's office.

To avoid a repeat of such problems, the company said it placed about 900 tech workers at Georgia polling sites to address potential issues for the November election, augmenting similar efforts led by counties.

Republican Secretary of State Brad Raffensperger has defended Dominion. Mr. Raffensperger's office picked Dominion to supply the entire state's voting machines last year, and the state legislature approved the funding.

Part of the appeal was Dominion's touch screen machines, which print a paper copy of voters' selections that is then electronically scanned. State Democrats wanted a different system where voters directly marked paper ballots, which they said would be more affordable and less susceptible to tampering.

The by-hand recount of the 5 million ballots cast in the presidential race ordered by Mr. Raffensperger is possible for the first time in decades because of the paper records of votes. The state's previous electronic machines didn't provide paper records.

Mr. Raffensperger said last week that he didn't believe the recount would change the vote tally because he had confidence in the state's voting machines. "This new system can audit the vote," Jordan Fuchs, Georgia's deputy secretary of state, said Monday. "We can make sure that the ballots were tabulated correctly."

—*Robert McMillan contributed to this article.*

---

MORE ON ELECTION 2020

Latest Updates: Election 2020

Biden Names Senior White House Staff

Biden's Path Forward at DHS Faces Pressures

Trump Voters in Rural Georgia Look to Runoffs

Democrats Scrutinize Hits, Misses With Black Voters

Giuliani Joins Trump Pennsylvania Lawsuit

---

Write to Alexa Corse at alexa.corse@wsj.com

Copyright © 2021 Dow Jones & Company, Inc. All Rights Reserved

Exhibit A9

**The New York Times**     https://www.nytimes.com/2006/10/29/washington/29ballot.html

# U.S. Investigates Voting Machines' Venezuela Ties

**By Tim Golden**

Oct. 29, 2006

The federal government is investigating the takeover last year of a leading American manufacturer of electronic voting systems by a small software company that has been linked to the leftist Venezuelan government of President Hugo Chávez.

The inquiry is focusing on the Venezuelan owners of the software company, the Smartmatic Corporation, and is trying to determine whether the government in Caracas has any control or influence over the firm's operations, government officials and others familiar with the investigation said.

The inquiry on the eve of the midterm elections is being conducted by the Committee on Foreign Investment in the United States, or Cfius, the same panel of 12 government agencies that reviewed the abortive attempt by a company in Dubai to take over operations at six American ports earlier this year.

The committee's formal inquiry into Smartmatic and its subsidiary, Sequoia Voting Systems of Oakland, Calif., was first reported Saturday in The Miami Herald.

Officials of both Smartmatic and the Venezuelan government strongly denied yesterday that President Chávez's administration, which has been bitterly at odds with Washington, has any role in Smartmatic.

"The government of Venezuela doesn't have anything to do with the company aside from contracting it for our electoral process," the Venezuelan ambassador in Washington, Bernardo Alvarez, said last night.

Smartmatic was a little-known firm with no experience in voting technology before it was chosen by the Venezuelan authorities to replace the country's elections machinery ahead of a contentious referendum that confirmed Mr. Chávez as president in August 2004.

Seven months before that voting contract was awarded, a Venezuelan government financing agency invested more than $200,000 into a smaller technology company, owned by some of the same people as Smartmatic, that joined with Smartmatic as a minor partner in the bid.

In return, the government agency was given a 28 percent stake in the smaller company and a seat on its board, which was occupied by a senior government official who had previously advised Mr. Chávez on elections technology. But Venezuelan officials later insisted that the money was merely a small-business loan and that it was repaid before the referendum.

With a windfall of some $120 million from its first three contracts with Venezuela, Smartmatic then bought the much larger and more established Sequoia Voting Systems, which now has voting equipment installed in 17 states and the District of Columbia.

Since its takeover by Smartmatic in March 2005, Sequoia has worked aggressively to market its voting machines in Latin America and other developing countries. "The goal is to create the world's leader in electronic voting solutions," said Mitch Stoller, a company spokesman.

But the role of the young Venezuelan engineers who founded Smartmatic has become less visible in public documents as the company has been restructured into an elaborate web of offshore companies and foreign trusts.

"The government should know who owns our voting machines; that is a national security concern," said Representative Carolyn B. Maloney, Democrat of New York, who asked the Bush administration in May to review the Sequoia takeover.

"There seems to have been an obvious effort to obscure the ownership of the company," Ms. Maloney said of Smartmatic in a telephone interview yesterday. "The Cfius process, if it is moving forward, can determine that."

The concern over Smartmatic's purchase of Sequoia comes amid rising unease about the security of touch-screen voting machines and other electronic elections systems.

Government officials familiar with the Smartmatic inquiry said they doubted that even if the Chávez government was some kind of secret partner in the company, it would try to influence elections in the United States. But some of them speculated that the purchase of Sequoia could help Smartmatic sell its products in Latin America and other developing countries, where safeguards against fraud are weaker.

A spokeswoman for the Treasury Department, which oversees the foreign investment committee, said she could not comment on whether the panel was conducting a formal investigation.

"Cfius has been in contact with the company," said the spokeswoman, Brookly McLaughlin, citing discussions that were first disclosed in July. "It is important that the process is conducted in a professional and nonpolitical manner."

The committee has wide authority to review foreign investments in the United States that might have national security implications. In practice, though, it has focused mainly on foreign acquisitions of defense companies and other investments in traditional security realms.

Since the political furor over the Dubai ports deal, members of Congress from both parties have sought to widen the purview of such reviews to incorporate other emerging national security concerns.



A touch-screen machine by Sequoia Voting Systems was used this month during early balloting in Chicago.
Tim Boyle/Getty Images

In late July, the House and the Senate overwhelmingly approved legislation to expand the committee's scope, give a greater role to the office of the director of national intelligence and strengthen Congressional oversight of the review process.

But the Bush administration opposed major changes, and Congressional leaders did not act to reconcile the two bills before Congress adjourned.

Foreigners seeking to buy American companies in areas like defense manufacturing typically seek the committee's review themselves before going ahead with a purchase. Legal experts said it would be highly unusual for the panel to investigate a transaction like the Sequoia takeover, and even more unusual for the panel to try to nullify the transaction so long after it was completed.

It is unclear, moreover, what the government would need to uncover about the Sequoia sale to take such an action.

The investment committee's review typically involves an initial 30-day examination of any transactions that might pose a threat to national security, including a collective assessment from the intelligence community. Should concerns remain, one of the agencies involved can request an additional and more rigorous 45-day investigation.

In the case of the ports deal, the transaction was approved by the investment committee. But the Dubai company later abandoned the deal, agreeing to sell out to an American company after a barrage of criticism by legislators from both parties who said the administration had not adequately reviewed the deal or informed Congress about its implications.

The concerns about possible ties between the owners of Smartmatic and the Chávez government have been well known to United States foreign-policy officials since before the 2004 recall election in which Mr. Chávez, a strong ally of President Fidel Castro of Cuba, won by an official margin of nearly 20 percent.

Opposition leaders asserted that the balloting had been rigged. But a statistical analysis of the distribution of the vote by American experts in electronic voting security showed that the result did not fit the pattern of irregularities that the opposition had claimed.

At the same time, the official audit of the vote by the Venezuelan election authorities was badly flawed, one of the American experts said. "They did it all wrong," one of the authors of the study, Avi Rubin, a professor of computer science at Johns Hopkins University, said in an interview.

Opposition members of Venezuela's electoral council had also protested that they were excluded from the bidding process in which Smartmatic and a smaller company, the Bizta Corporation, were selected to replace a $120 million system that had been built by Election Systems and Software of Omaha.

Smartmatic was then a fledgling technology start-up. Its registered address was the Boca Raton, Fla., home of the father of one of the two young Venezuelan engineers who were its principal officers, Antonio Mugica and Alfredo Anzola, and it had a one-room office with a single secretary.

The company claimed to have only two going ventures, small contracts for secure communications software that a Smartmatic spokesman said had a total value of about $2 million.

At that point, Bizta amounted to even less. Company documents, first reported in 2004 by The Herald, showed the firm to be virtually dormant until it received the $200,000 investment from a fund controlled by the Venezuelan Finance Ministry, which took a 28 percent stake in return.

Weeks before Bizta and Smartmatic won the referendum contract, the government also placed a senior official of the Science Ministry, Omar Montilla, on Bizta's board, alongside Mr. Mugica and Mr. Anzola. Mr. Montilla, The Herald reported, had acted as an adviser to Mr. Chávez on elections technology.

More recent corporate documents show that before and after Smartmatic's purchase of Sequoia from a British-owned firm, the company was reorganized in an array of holding companies based in Delaware (Smartmatic International), the Netherlands (Smartmatic International Holding, B.V.), and Curaçao (Smartmatic International Group, N.V.). The firm's ownership was further shielded in two Curaçao trusts.

Mr. Stoller, the Smartmatic spokesman, said that the reorganization was done simply to help expand the company's international operations, and that it had not tried to hide its ownership, which he said was more than 75 percent in the hands of Mr. Mugica and his family.

"No foreign government or entity, including Venezuela, has ever held any stake in Smartmatic," Mr. Stoller said. "Smartmatic has always been a privately held company, and despite that, we've been fully transparent about the ownership of the corporation."

Mr. Stoller emphasized that Bizta was a separate company and said the shares the Venezuelan government received in it were "the guarantee for a loan."

Mr. Stoller also described concerns about the security of Sequoia's electronic systems as unfounded, given their certification by federal and state election agencies.

But after a municipal primary election in Chicago in March, Sequoia voting machines were blamed for a series of delays and irregularities. Smartmatic's new president, Jack A. Blaine, acknowledged in a public hearing that Smartmatic workers had been flown up from Venezuela to help with the vote.

Some problems with the election were later blamed on a software component, which transmits the voting results to a central computer, that was developed in Venezuela.

Exhibit A10

THE 2004 ELECTION  |  MARCH 2005

# OHIO'S ODD NUMBERS

No conspiracy theorist, and no fan of John Kerry's, the author nevertheless found the Ohio polling results impossible to swallow: Given what happened in that key state on Election Day 2004, both democracy and common sense cry out for a court-ordered inspection of its new voting machines.

BY CHRISTOPHER HITCHENS
OCTOBER 17, 2006



BY JAMIE-ANDREA YANAK/A.P. IMAGES.

I f it were not for Kenyon College, I might have missed, or skipped, the whole controversy. The place is a visiting lecturer's dream, or the ideal of a campus-movie director in search of a setting. It is situated in wooded Ohio hills, in the small town of Gambier, about an hour's drive from Columbus. Its literary magazine, *The Kenyon Review*, was founded by John Crowe Ransom in 1939. Its alumni include Paul Newman, E. L. Doctorow, Jonathan

Winters, Robert Lowell, Chief Justice William Rehnquist, and President Rutherford B. Hayes. The college's origins are Episcopalian, its students well mannered and well off and predominantly white, but it is by no means Bush-Cheney territory. Arriving to speak there a few days after the presidential election, I found that the place was still buzzing. Here's what happened in Gambier, Ohio, on decision day 2004.

The polls opened at 6:30 a.m. There were only two voting machines (push-button direct-recording electronic systems) for the entire town of 2,200 (with students). The mayor, Kirk Emmert, had called the Board of Elections 10 days earlier, saying that the number of registered voters would require more than that. (He knew, as did many others, that hundreds of students had asked to register in Ohio because it was a critical "swing" state.) The mayor's request was denied. Indeed, instead of there being extra capacity on Election Day, one of the only two machines chose to break down before lunchtime.

By the time the polls officially closed, at 7:30 that evening, the line of those waiting to vote was still way outside the Community Center and well into the parking lot. A federal judge thereupon ordered Knox County, in which Gambier is located, to comply with Ohio law, which grants the right to vote to those who have shown up in time. "Authority to Vote" cards were kindly distributed to those on line (voting is a right, not a privilege), but those on line needed more than that. By the time the 1,175 voters in the precinct had all cast their ballots, it was almost four in the morning, and many had had to wait for up to 11 hours. In the spirit of democratic carnival, pizzas and canned drinks and guitarists were on hand to improve the shining moment. TV crews showed up, and the young Americans all acted as if they had been cast by Frank Capra: cheerful and good-humored, letting older voters get to the front, catching up on laptop essays, many voting for the first time and all convinced that a long and cold wait was a small price to pay. Typical was Pippa White, who said that "even after eight hours and 15 minutes I still had energy. It lets you know how worth it this is." Heartwarming, until you think about it.

The students of Kenyon had one advantage, and they made one mistake. Their advantage was that their president, S. Georgia Nugent, told them that they could be excused from class for voting. Their mistake was to reject the paper ballots that were offered to them late in the evening, after attorneys from the Ohio Democratic Party had filed suit to speed up the voting process in this way. The ballots were being handed out (later to be counted by machine under the supervision of Knox County's Democratic and Republican chairs) when someone yelled through the window of the Community Center, "Don't use the paper ballots! The Republicans are going to appeal it and it won't count!" After that, the majority chose to stick with the machines.

Across the rest of Ohio, the Capra theme was not so noticeable. Reporters and eyewitnesses told of voters who had given up after humiliating or frustrating waits, and who often cited the unwillingness of their employers to accept voting as an excuse for lateness or absence. In some way or another, these bottlenecks had a tendency to occur in working-class and, shall we just say, nonwhite precincts. So did many disputes about "provisional" ballots, the sort that are handed out when a voter can prove his or her identity but not his or her registration at that polling place. These glitches might all be attributable to inefficiency or incompetence (though Gambier had higher turnouts and much shorter lines in 1992 and 1996). Inefficiency and incompetence could also explain the other oddities of the Ohio process—from machines that redirected votes from one column to the other to machines that recorded amazing tallies for unknown fringe candidates, to machines that apparently showed that voters who waited for a long time still somehow failed to register a vote at the top of the ticket for any candidate for the presidency of these United States.

However, for any of that last category of anomaly to be explained, one would need either a voter-verified paper trail of ballots that could be tested against the performance of the machines or a court order that would allow inspection of the machines themselves. The first of these does not exist, and the second has not yet been granted.

I don't know who it was who shouted idiotically to voters not to trust the paper ballots in Gambier, but I do know a lot of people who are convinced that there was dirty work at the crossroads in the Ohio vote. Some of these people are known to me as nutbags and paranoids of the first water, people whose grassy-knoll minds can simply cancel or deny any objective reasons for a high Republican turnout. (Here's how I know some of these people: In November 1999, I wrote a column calling for international observers to monitor the then upcoming presidential election. I was concerned about restrictive ballot-access laws, illegal slush funds, denial of access to media for independents, and abuse of the state laws that banned "felons" from voting. At the end, I managed to mention the official disenfranchisement of voters in my hometown of Washington, D.C., and the questionable "reliability or integrity" of the new voting-machine technology. I've had all these wacko friends ever since.) But here are some of the non-wacko reasons to revisit the Ohio election.

First, the county-by-county and precinct-by-precinct discrepancies. In Butler County, for example, a Democrat running for the State Supreme Court chief justice received 61,559 votes. The Kerry-Edwards ticket drew about 5,000 fewer votes, at 56,243. This contrasts rather markedly with the behavior of the Republican electorate in that county, who cast about 40,000 fewer votes for their judicial nominee than they did for Bush and Cheney. (The latter pattern, with vote totals tapering down from the top of the ticket, is by far the more general—and probable—one nationwide and statewide.)

In 11 other counties, the same Democratic judicial nominee, C. Ellen Connally, managed to outpoll the Democratic presidential and vice-presidential nominees by hundreds and sometimes thousands of votes. So maybe we have a barn-burning, charismatic future candidate on our hands, and Ms. Connally is a force to be reckoned with on a national scale. Or is it perhaps a trick of the Ohio atmosphere? There do seem to be a lot of eccentrics in the state. In Cuyahoga County, which includes the city of Cleveland, two largely black precincts on the East Side voted like this. In Precinct 4F: Kerry, 290; Bush, 21; Peroutka, 215. In Precinct 4N: Kerry, 318; Bush, 11; Badnarik, 163. Mr. Peroutka and Mr. Badnarik are, respectively, the presidential candidates of the Constitution and Libertarian Parties. In addition to this eminence, they also possess distinctive (but not particularly African-American-sounding) names. In 2000, Ralph Nader's best year, the total vote received in Precinct 4F by all third-party candidates combined was eight.

In Montgomery County, two precincts recorded a combined undervote of almost 6,000. This is to say that that many people waited to vote but, when their turn came, had no opinion on who should be the president, voting only for lesser offices. In these two precincts alone, that number represents an undervote of 25 percent, in a county where undervoting averages out at just 2 percent. Democratic precincts had 75 percent more undervotes than Republican ones.

In Precinct 1B of Gahanna, in Franklin County, a computerized voting machine recorded a total of 4,258 votes for Bush and 260 votes for Kerry. In that precinct, however, there are only 800 registered voters, of whom 638 showed up. Once the "glitch" had been identified, the president had to be content with 3,893 fewer votes than the computer had awarded him.

In Miami County, a Saddam Hussein–type turnout was recorded in the Concord Southwest and Concord South precincts, which boasted 98.5 percent and 94.27 percent turnouts, respectively, both of them registering overwhelming

majorities for Bush. Miami County also managed to report 19,000 additional votes for Bush after 100 percent of the precincts had reported on Election Day.

In Mahoning County, *Washington Post* reporters found that many people had been victims of "vote hopping," which is to say that voting machines highlighted a choice of one candidate after the voter had recorded a preference for another. Some specialists in election software diagnose this as a "calibration issue."

Machines are fallible and so are humans, and shit happens, to be sure, and no doubt many Ohio voters were able to record their choices promptly and without grotesque anomalies. But what strikes my eye is this: *in practically every case* where lines were too long or machines too few the foul-up was in a Democratic county or precinct, and *in practically every case* where machines produced impossible or improbable outcomes it was the challenger who suffered and the actual or potential Democratic voters who were shortchanged, discouraged, or held up to ridicule as chronic undervoters or as sudden converts to fringe-party losers.

This might argue in itself *against* any conspiracy or organized rigging, since surely anyone clever enough to pre-fix a vote would make sure, just for the look of the thing, that the discrepancies and obstructions were more evenly distributed. I called all my smartest conservative friends to ask them about this. Back came their answer: Look at what happened in Warren County.

On Election Night, citing unspecified concerns about terrorism and homeland security, officials "locked down" the Warren County administration building and prevented any reporters from monitoring the vote count. It was announced, using who knows what "scale," that on a scale of 1 to 10 the terrorist threat was a 10. It was also claimed that the information came from an F.B.I. agent, even though the F.B.I. denies that.

Warren County is certainly a part of Republican territory in Ohio: it went only 28 percent for Gore last time and 28 percent for Kerry this time. On the face of it, therefore, not a county where the G.O.P. would have felt the need to engage in any voter "suppression." A point for the anti-conspiracy side, then. Yet even those exact-same voting totals have their odd aspect. In 2000, Gore stopped running television commercials in Ohio some weeks before the election. He also faced a Nader challenge. Kerry put huge resources into Ohio, did not face any Nader competition, and yet got exactly the same proportion of the Warren County votes.

Whichever way you shake it, or hold it to the light, there is something about the Ohio election that refuses to add up. The sheer number of irregularities compelled a formal recount, which was completed in late December and which came out much the same as the original one, with 176 fewer votes for George Bush. But this was a meaningless exercise in reassurance, since there is simply no means of checking, for example, how many "vote hops" the computerized machines might have performed unnoticed.

There are some other, more random factors to be noted. The Ohio secretary of state, Kenneth Blackwell, was a state co-chair of the Bush-Cheney campaign at the same time as he was discharging his responsibilities for an aboveboard election in his home state. Diebold, which manufactures paper-free, touch-screen voting machines, likewise has its corporate headquarters in Ohio. Its chairman, president, and C.E.O., Walden O'Dell, is a prominent Bush supporter and fund-raiser who proclaimed in 2003 that he was "committed to helping Ohio deliver its electoral votes to the president next year." (See "Hack the Vote," by Michael Shnayerson, *Vanity Fair,* April 2004.) Diebold, together with its competitor, E.S.&S., counts more than half the votes cast in the United States. This not very acute competition is perhaps made still less acute by the fact that a vice president of E.S.&S. and a Diebold director of strategic services are brothers.

I would myself tend to discount most of the above, since an oligarchy bent on stealing an election would probably not announce itself so brashly as to fit into a Michael Moore script. Then, all state secretaries of state are partisan, after all, while in Ohio each of the 88 county election boards contains two Democrats and two Republicans. The chairman of Diebold is entitled to his political opinion just as much as any other citizen.

However, there is one soothing explanation that I don't trust anymore. It was often said, in reply to charges of vote tampering, that it would have had to be "a conspiracy so immense" as to involve a dangerously large number of people. Indeed, some Ohio Democrats themselves laughed off some of the charges, saying that they too would have had to have been part of the plan. The stakes here are very high: one defector or turncoat with hard evidence could send the principals to jail forever and permanently discredit the party that had engaged in fraud.

I had the chance to spend quality time with someone who came to me well recommended, who did not believe that fraud had yet actually been demonstrated, whose background was in the manufacture of the machines, and who wanted to be anonymous. It certainly could be done, she said, and only a very, very few people would have to be "in on it." This is because of the small number of firms engaged in the manufacturing and the even smaller number of people, subject as they are to the hiring practices of these firms, who understand the technology. "Machines were put in place with no sampling to make sure they were 'in control' and no comparison studies," she explained. "The code of the machines is not public knowledge, and none of these machines has since been impounded." In these circumstances, she continued, it's possible to manipulate both the count and the proportions of votes.

In the bad old days of Tammany Hall, she pointed out, you had to break the counter pins on the lever machines, and if there was any vigilance in an investigation, the broken pins would automatically incriminate the machine. With touch-screen technology, the crudeness and predictability of the old ward-heeler racketeers isn't the question anymore. But had there been a biased "setting" on the new machines it could be uncovered—if a few of them could be impounded. The Ohio courts are currently refusing all motions to put the state's voting machines, punch-card or touch-screen, in the public domain. It's not clear to me, or to anyone else, who is tending the machines in the meanwhile …

I asked her, finally, what would be the logical grounds for deducing that any tampering had in fact occurred. "Well, I understand from what I have read," she said, "that the early exit polls on the day were believed by both parties." That, I was able to tell her from direct experience, was indeed true. But it wasn't quite enough, either. So I asked, "What if all the anomalies and malfunctions, to give them a neutral name, were distributed along one axis of consistency: in other words, that they kept on disadvantaging only one candidate?" My question was hypothetical, as she had made no particular study of Ohio, but she replied at once: "Then that would be quite serious."

I am not any sort of statistician or technologist, and (like many Democrats in private) I did not think that John Kerry should have been president of any country at any time. But I have been reviewing books on history and politics all my life, making notes in the margin when I come across a wrong date, or any other factual blunder, or a missing point in the evidence. No book is ever free from this. But if all the mistakes and omissions occur in such a way as to be consistent, to support or attack only one position, then you give the author a lousy review. The Federal Election Commission, which has been a risible body for far too long, ought to make Ohio its business. The Diebold company, which also manufactures A.T.M.s, should not receive another dime until it can produce a voting system that is similarly reliable. And Americans should cease to be treated like serfs or extras when they present themselves to exercise their franchise.

# GET THE HIVE NEWSLETTER

The freshest-and most essential-updates from Washington, Wall Street, and Silicon Valley.

Enter your e-mail address

Your e-mail address

Sign Up

By signing up you agree to our User Agreement and Privacy Policy & Cookie Statement.

## SPONSORED STORIES

Powered By 



www.dogfoodexposed.com

Most Dog Owners Don't Know This Sign of Illness (It's More Common Than You Think)



Livingly

[Pics] Her Dress At The VMAs Will Be Spoken About For Centuries



newhealthylife.club

One Simple Method To Keep Your Blood Sugar Below 100



InsuranceQuotes.com

New Orleans, Louisiana: Are You Aware Of This?



Martha Stewart & Marley Spoon

People in New Orleans are Loving Martha Stewart's Meal Kit



Post Fun

Wedding Photos Might Help Explain Why Meghan Left The Royals

## READ MORE



**HIVE**

## "WHEN YOU GET YOUR ASS KICKED, YOU DON'T WANT TO OVERREACT": ROCKED BY GNARLY ELECTIONS, DEMOCRATS ARE GAMING OUT HOW TO REGROUP

Some top Democrats see New Jersey, and not Virginia, as a more worrisome sign. But, says one Biden adviser, the good news is it's November 2021—not October 2022. "We have the potential for an incredibly powerful message," this person says. "But we've got to get s–t done."

BY CHRIS SMITH



HIVE

## "WE'RE AT AN UNBELIEVABLY DANGEROUS TIME IN AMERICA": FORMER BUSH GUY MATTHEW DOWD IS TRYING TO TURN TEXAS BLUE

Though Democrats haven't won statewide in more than two decades, the GOP's hard-right turn on abortion and voting rights could open the door to change. As Julián Castro predicts, "These Republicans are living on borrowed time."

BY CHRIS SMITH



HIVE

## SENATE REPUBLICANS KICK DEMOCRACY IN THE BALLS WHILE IT'S DOUBLED OVER COUGHING UP BLOOD

The GOP has once again buried any hopes of a voting rights bill in a shallow grave.

BY BESS LEVIN

Exhibit A11

# POLITICO



Andrew Appel and a Sequoia AVC Advantage voting machine. | Alex Halderman

**THE FRIDAY COVER**

## How to Hack an Election in 7 Minutes

With Russia already meddling in 2016, a ragtag group of obsessive tech experts is warning that stealing the ultimate prize—victory on Nov. 8—would be child's play.

By BEN WOFFORD | August 05, 2016

When Princeton professor Andrew Appel decided to hack into a voting machine, he didn't try to mimic the Russian attackers who hacked into the Democratic National Committee's database last month. He didn't write malicious code, or linger near a polling place where the machines can go unguarded for days.

Instead, he bought one online.

With a few cursory clicks of a mouse, Appel parted with $82 and became the owner of an ungainly metallic giant called the Sequoia AVC Advantage, one of the oldest and vulnerable,

electronic voting machines in the United States (among other places it's deployed in Louisiana, New Jersey, Virginia and Pennsylvania). No sooner did a team of bewildered deliverymen roll the 250-pound device into a conference room near Appel's cramped, third-floor office than the professor set to work. He summoned a graduate student named Alex Halderman, who could pick the machine's lock in seven seconds. Clutching a screwdriver, he deftly wedged out the four ROM chips—they weren't soldered into the circuit board, as sense might dictate—making it simple to replace them with one of his own: A version of modified firmware that could throw off the machine's results, subtly altering the tally of votes, never to betray a hint to the voter. The attack was concluded in minutes. To mark the achievement, his student snapped a photo of Appel—oblong features, messy black locks and a salt-and-pepper beard—grinning for the camera, fists still on the circuit board, as if to look directly into the eyes of the American taxpayer: *Don't look at me— you're the one who paid for this thing*.

Appel's mischief might be called an occupational asset: He is part of a diligent corps of so-called cyber-academics—professors who have spent the past decade serving their country by relentlessly hacking it. Electronic voting machines—particularly a design called Direct Recording Electronic, or DRE's—took off in 2002, in the wake of *Bush v. Gore*. For the ensuing 15 years, Appel and his colleagues have deployed every manner of stunt to convince the public that the system is pervasively unsecure and vulnerable.

Beginning in the late '90s, Appel and his colleague, Ed Felten, a pioneer in computer engineering now serving in the White House Office of Science and Technology Policy, marsha led their Princeton students together at the Center for Information Technology Policy (where Felten is still director). There, they relentlessly hacked one voting machine after another, transforming the center into a kind of Hall of Fame for tech mediocrity: reprogramming one popular machine to play Pac-Man; infecting popular models with self-duplicating malware; discovering keys to voting machine locks that could be ordered on eBay. Eventually, the work of the professors and Ph.D. students grew into a singular conviction: It was only a matter of time, they feared, before a national election—an irresistible target—would invite an attempt at a coordinated cyberattack.

The revelation this month that a cyberattack on the DNC is the handiwork of Russian state security personnel has set off alarm bells across the country: Some officials have suggested that 2016 could see more serious efforts to interfere directly with the American election. The DNC hack, in a way, has compelled the public to ask the precise question the Princeton group hoped they'd have asked earlier, back when they were turning voting machines into

arcade games: *If motivated programmers could pull a stunt like this, couldn't they tinker with the results in November through the machines we use to vote?*

This week, the notion has been transformed from an implausible plotline in a Phil ip K. Dick novel into a deadly serious threat, outlined in detail by a raft of government security officials. "This isn't a crazy hypothetical anymore," says Dan Wallach, one of the Felten-Appel alums and now a computer science professor at Rice. "Once you bring nation states' cyber activity into the game?" He snorts with pity. "These machines, they barely work in a *friendly* environment."

The powers that be seem duly convinced. Homeland Security Secretary Jeh Johnson recently conceded the "longer-term investments we need to make in the cybersecurity of our election process." A statement by 31 security luminaries at the Aspen Institute issued a public statement: "Our electoral process could be a target for reckless foreign governments and terrorist groups." Declared Wired: "America's Electronic Voting Machines Are Scarily Easy Targets."

For the Princeton group, it's precisely the alarm it has been trying to sound for most of the new millennium. "Look, we could see 15 years ago that this would be perfectly possible," Appel tells me, speaking in subdued, clipped tones. "It's well within the capabilities of a country as sophisticated as Russia." He pauses for a moment, as if to consider this. "Actually, it's well within the capabilities of much less well-funded and sophisticated attackers."

In the uproar over the DNC, observers have been quick to point out the obvious: There is no singular national body that regulates the security or even execution of what happens on Election Day, and there never has been. It's a process regulated state by state. Technical standards for voting are devised by the National Institute of Standards and Technology and the Election Assistance Commission—which was formed after the dispute d 2000 presidential election that hinged on faulty ballots—but the guidelines are voluntary. (For three years the EAC limped on without confirmed commissioners—an EAC commissioner stepped down in 2005, calling its work a "charade"). Policy on voting is decided by each state and, in some cases, each county—a system illustrated vividly by the trench warfare of voter ID laws that pockmark the country. In total, more than 8,000 jurisdictions of varying size and authority administer the country's elections, almost entirely at the hands of an army of middle-age volunteers. Some would say such a system cries out for security standards.

If such standards come to fruition, it will be the Princeton group—the young Ph.D.'s who have since moved on to appointments and professorships around the country—and their contemporaries in the computer science world who suddenly matter.

The Princeton group has a simple message: That the machines that Americans use at the polls are less secure than the iPhones they use to navigate their way there. They've seen the skeletons of code inside electronic voting's digital closet, and they've mastered the equipment's vulnerabilities perhaps better than anyone (a contention the voting machine companies contest, of course). They insist the elections could be vulnerable at myriad strike points, among them the software that aggregates the precinct vote totals, and the voter registration rolls that are increasingly digitized. But the threat, the cyber experts say, starts with the machines that tally the votes and crucially keep a record of them—or, in some cases, don't.

Since their peak around 2007, voting districts have begun to rely less on the digital voting machines—a step in the right direction, as states bolt for the door on what the programmers describe as a bungled, $4 billion experiment. Instead , rushing to install paper backups, sell off the machines and replace them with optical scanners—in some cases, ban them permanently for posterity. But the big picture, like everything in this insular world, is complicated. As the number of machines dwindle—occasioned by aging equipment, vintage-era software that now lacks tech support, years without new study by the computer scientists, and a public sense that the risk has passed—the opportunities for interference may temporarily spike. Hundreds of digital-only precincts still remain, a significant portion of them in swing states that will decided the presidency in November. And, as the Princeton group warns, they become less secure with each passing year.

***

**In American politics,** an onlooker might observe that hacking an election has been less of a threat than a tradition. Ballot stuffing famously plagued statewide and some federal elections well into the 20th century. Huey Long was famously caught rigging the vote in 1932. Sixteen years later, 1948 saw the infamous "Lyndon Landslide," in which Johnson mysteriously overcame a 20,000 vote deficit in his first Senate race, a miracle that Robert Caro reports was the almost certain result of vote rigging. But even an unrigged election can go haywire, as the nation learned in horror during the Florida recount in 2000, when a mind-numbingly manual process of counting the ballots left a mystery as to which boxes voters had punched—giving the nation the "hanging chad," and weeks of uncertainty about who won the presidency.

In some ways, the country's response was suggestive of the real crime committed in Florida: Not inaccuracy, but anxiety. Congress's solution was to pass the Help America Vote Act in 2002, a nearly $4 billion federal fund meant to incentivize states to upgrade their voting machines. It worked. All 50 states took the money. Requirements included upgrading voter registration methods and making polls disability-friendly, but Section 102 provided funds specifically allocated for replacing outdated voting machines; almost universally, "upgrade" meant a new, computerized touch-screen voting machine. By 2006, states had spent nearly $250 million on new machines with Section 102 funds. In Pennsylvania, the funds purchased 20,597 new machines—around 19,900 of which were digital touchscreens. Some, like the Diebold TSX, Advanced WINvote, the ES&S iVotronic, and a variant of Appel's AVC Advantage—the Sequoia Edge—would be the same models to come under scrutiny by cybersecurity experts and academics. Thousands of touchscreen DREs were similarly sold in state contracts. Between Election Day 2000 and the HAVA cutoff in 2006, the stock prices of the major companies soared.

The appeal of such machines seemed plain: Voting was crisp, instantaneous, logged digitally. To state officials—and, at first, voters—the free federal money seemed like a bargain. To computer scientists, it seemed like a disaster waiting to happen. Wallach remembers when he testified before the Houston City Council, urging members not to adopt the machines. "My testimony was: 'Wow, these are a bad idea. They're just computers, and we know how to tamper with computers. That's what we do,'" Wallach recalls. "The county clerk, who has since retired, essentially said, 'You don't know anything about what you're talking about. These machines are great!' And then they bought them."

Almost from the day they were taken out of the box, the touch -screen machines demonstrated problems (the same companies had a much better track record with Optical Scan machines). During the primaries in Florida in 2002, some machines in Miami-Dade malfunctioned and failed to turn on, resulting in hours long lines that locked out untold numbers of voters—including then-gubernatorial candidate Janet Reno. That year, faulty software (and an administrator oversight) on Sequoia models led to a fourth of votes initially omitted during early voting in Albuquerque's Bernalillo County. In Fairfax County, Virginia, an investigation into a 2003 school board race found that a vote was subtracted for every 100 votes cast for one of the candidates on 10 machines. With margin sizes small enough to be noticed, local elections were vaulted into the forefront of these debates; Appel later found himself issuing expert testimony for a tiny election for the Democratic Executive Committee in Cumberland County, New Jersey, where a candidate lost by 24 votes. The margin was small enough that the losers sued, and called 28 voters as witnesses —who each swore they voted for them. The machine in use was a Sequoia AVC Advantage.

 Wow, these are a bad idea. They're just computers, and we know how to tamper with computers."

Cybersecurity researchers flocked to study the machines, but they say they were faced with an uncompromising adversary: the voting machine companies, which viewed the code of the machines as intellectual property. Until 2009, two companies, Diebold and ES&S, controlled the lion's share of the voting machine market. The accreditation process is equally narrow: Since 1990, a voluntary federal accreditation process has certified voting technology, a system that has come under fire for its lack of transparency. The laboratories ("Independent Testing Authorities") which conduct the certification reviews are typically paid by the manufacturers, and are usually required to sign non disclosure agreements. In 2008, five labs were accredited; one was suspended that year for poor lab procedures, and another temporarily suspended for insufficient quality control.

State authorities can typically request these lab reports, as Kathy Rogers of ES&S reminded me in an email. ("For security reasons we did not make that code widely available to just *anyone and everyone* who simply wanted a copy for their own purposes. We truly have nothing to hide.") But Appel, the Princeton group and others in cybersecurity have insisted that such measures—which they deem "security through obscurity"— pale to the types of rigorous testing that would result from releasing the code to the public or academics. One of the companies, Sequoia, later acquired by Dominion, once threatened Princeton's Felten and Appel with legal action if they attempted to examine one of their models.

Election officials have sometimes complained that the lab reports they do receive lack vital detail, and information from the labs, bound by the NDAs, can be unforthcoming. In 2004, when the California Secretary of State Kevin Shelley—in charge of overseeing the state's elections—asked one of the five laboratories for more information on the testing of machines, he was stonewalled, and told by a researcher, "We don't discuss our voting machine work." Because of a flood of machines introduced to the market after HAVA, the 2002 accreditation standards are the ones that matter—the same process that approved touch -screen Diebold machines that had supervisor passcodes of "1111" in order to access the voting system. Shelley later banned Diebold TSX machines, calling Diebold's conduct "deceitful."

In 2003, an employee at Diebold mistakenly left 40,000 files containing code for the Diebold AccuVote TS, one of the most widely used machines on the market, on a publically viewable website. The computer scientists moved in, and one of the early and formative

papers was published on the subject, co-authored by Wallach and led by Johns Hopkins' Avi Rubin. Its findings were devastating: The machine's smartcards could be jerry-rigged to vote more than once; poor cryptography left the voting records file easy to manipulate; and poor safeguards meant that a "malevolent developer"—an employee inside the company, perhaps—could reorder the ballot definition files, changing which candidates received votes. The encryption key, F2654hD4, could be found in the code essentially in plain view; all Diebold machines responded to it. (Rubin later remarked that he would flunk any undergrad who wrote such poor code.) "We read the code, and found really, really bad problems," Wallach tells me, sitting at his Houston dining table. He catches himself. "Actually, let me change that," he says. "We found *unacceptable* problems." Diebold dismissed the report, responding that the code was obsolete, and the study's findings thusly moot. But the 2003 report catalyzed a small movement: In CompSci departments across the country, vote hacking became a small, insular civic code of honor. Felten's group at Princeton led the pack, producing some of the most important papers throughout the 2000s.

> **❝❝** We read the code, and found really, really bad problems," Wallach tells me, sitting in his Houston dining table. He catches himself. "Actually, let me change that," he says. "We found *unacceptable* problems."

By the following year, professors in and around the Princeton group began the work of unwinding what they viewed as a 50-state debacle. Felten and Appel shared a taste for gallows humor and a flair for promotion. Felten took to blogging, and started a tradition: Each election, he snapped a photo standing alone with unguarded voting machines days before the election. In another study, the Sequoia AVC Edge was infected with malware that allowed it to do nothing but play Pac-Man; the students pulled off the feat without breaking the machines "tamper-proof" seals, and decorated the machine with Pac-Man logos. The team tore through topics including source code review of the larger Diebold voting system; advising election officials on security measures without new hardware; and designing malware for the Sequoia AVC Advantage that Appel had purchased, using a technique called a Return-Oriented Program. In less than a minute, they infected a Diebold machine with self-duplicating code, spreading from machine to machine through an administrator card, and programmed it to swing an election for Benedict Arnold over George Washington.

The latter hack was the result of a curious and enigmatic email, when Felten received a message from an anonymous source, presumably with ties to the voting machine industry. Diebold's response to the Rubin and Wallach study was brittle and evasive; the source wanted to give Felten a Diebold TS machine—the same one whose code had leaked in the study. Studying the machine itself would offer an unmissable opportunity—Felten put his grad students, Feldman and Halderman, then 25 years old, in charge of the effort. One night in April 2006, Halderman drove to New York City, and double -parked his car, lights blinking, in front of a hotel just a few blocks from Times Square. Halderman jogged into an alleyway, where his source stood patiently, dressed in a charcoal colored trench coat and wielding a black canvas bag. After a few terse formalities, he handed Halderman the bag with the machine inside. Halderman never saw the man again. ("There's a lot of cloak and dagger in election security," Halderman would tell me later .)

Throughout the summer of 2006, Feldman and Halderman set themselves to work in the basement of an academic building. Fearing retribution or a lawsuit, they didn't tell their colleagues in the department of their project. From noon until midnight, the two students met on the humid Princeton quad, and decamped to a claustrophobic, eggshell anteroom— enough space for a small table and two uncomfortable foldout chairs—and pored through reams of code and programming under the fluorescent lighting of the windowless room. At the center of the table was the subject of years of mystery: The squat, beige monitor of the Diebold TS. The authors would later describe the project as the first rigorous analysis of a physical touch -screen DRE—supposedly the kind of testing it would have received in one of the accredited labs.

When they were finished, they had another paper's worth of findings, and the most comprehensive understanding of how Diebold's machines worked. "We found the machine did not have any security mechanisms beyond what you'd find on a typical home PC," Halderman told me. "It was very easy to hack." Studying with Felten, Halderman had learned a key phrase—"Defense in Depth," meant to describe a system with various rings of security. Halderman joked that the model should more aptly be called "Vulnerability in Depth," so numerous were the entry points they discovered. Later, they found the key that opened the Diebold AccuVote TS was a standard corporate model, reproduced for minibars and other locks, available online. When their report revealed this detail, a commonplace reader found a picture of the key, filed down a blank from ACE Hardware and sent a copy to Feldman and Halderman as a souvenir (who then tested the key—it worked). That year, 10 percent of registered voters alone used the AccuVote TS to vote.

None of these breakthroughs were lost on states that had bought the machines, officials who were keeping an eye on academic reports. Felten would later write that the vulnerabilities in the Diebold machine they tested likely could not be rectified without fully redesigning the machine; but the solution for state officials was simple. If they could include a paper trail—a voter-verified paper receipt that printed alongside the digital vote—the electronic tally could, in theory, be cross-tested for accuracy. In December 2003, Nevada became the first state to mandate that voter verified printouts be used with digital touch screens. A wave of states followed.

But the tipping point came in 2006, when a major congressional race between Vern Buchanan and Christine Jennings in Florida's 13 th District imploded over the vote counts in Sarasota County—where 18,000 votes from paperless machines essentially went missing (technically deemed an "undervote") in a race decided by less than 400 votes. Felten drew an immediate connection to the primary suspect: The ES&S iVotronic machine, one of the many ordered in Pennsylvania after they deployed their HAVA funds. Shortly after the debacle, Governor Charlie Crist announced a deadline for paper backups in every count y in Florida that year ; Maryland Governor Bob Erlich urged his state's voters to cast an absentee ballot rather than put their hands on a digital touch screen—practically an unprecedented measure. By 2007, the touch screens were so unpopular that two senators, Bill Nelson of Florida and Sheldon Whitehouse of Rhode Island, had introduced legislation banning digital touch screens in time for the 2012 election.

Precincts today that vote with an optical scan machine—another form of DRE that reads a bubble tally on a large card—tend not to have this problem; simply by filling it out, you've generated the receipt yourself. But that doesn't mean the results can't still be tampered with, and Felten's students began writing papers that advised election officials on defending their auditing procedures from attempted manipulation.

Each state bears the scars of its own story with digital touch screens—a parabola of havoc and mismanagement that has been the 15-year nightmare of state and local officials. The touch screens peaked in 2006, touching nearly 40 percent of registered voters; in 2016, most voters will use some combination of paper, optical scan or paper backup. In 2013, Maryland sped up its wind-down process, pushing through a transition to optical scans for use in the 2016 election. So did Virginia, which has rushed to phase out as many as possible in time for 2016—and later passed legislation to ban them permanently by 2020, just for good measure.

The Virginia ban was the quixotic crusade of one computer science expert in the private sector, Jeremy Epstein. In 2002, Epstein walked into the elections office in Fairfax ,

Virginia, to complain about the poor design of the touch screens—a WINVote model—and walked out with a mission to get them barred from the state. The machines were connected to Wi-Fi—vulnerable to "anyone who wanted to could hack them from the comfort of their car out in the parking lot," Epstein told me. An investigation later revealed that the WINVote's encryption key was "abcde." The machines were certified in 2003, running on a version of Windows from 2002, and hadn't received an update since 2005.

Thirteen years later, Virginia announced its ban. "If these machines and elections weren't hacked," Epstein later told me, a credo he's said for years, "it was only because no one tried.

***

**In 2001,** the notion of foreign vote hacking felt like a far-fetched warning from a far-off time—it would be years, for instance, before North Korean agents would hack a company like Sony, or the Chinese would break into the federal government's personnel files. Citizen activists who had exposed the Diebold code leak and joined the counterreformation for paper ballots were concerned, but primarily about domestic hacking. Liberals tended to see the corporate voting machine companies as a threat to fair elections. Conservatives tended to see the incompetence of poorly designed machines as a threat to normalcy.

Today, Halderman reminds me, "the notion that a foreign state might try to interfere in American politics via some kind of cyber-attack is not far-fetched anymore."

The Princeton group has no shortage of things that keep them up at night. Among possible targets, foreign hackers could attack the state and county computers that aggregate the precinct totals on election night—machines that are technically supposed to remain non-networked, but that Appel thinks are likely connected to the Internet, even accidentally, from time to time. They could attack digitized voter registration databases—an increasingly utilized tool, especially in Ohio, where their problems are mounting—erasing voters' names from the polls (a measure that would either cause voters to walk away, or overload the provisional ballot system). They could infect software at the point of development, writing malicious ballot definition files that companies distribute, or do the same on a software patch. They could FedEx false software to a county clerk's office and, with the right letterhead and convincing cover letter, get it installed. If a county clerk has the wrong laptop connected to the Internet at the wrong time, that could be a wide enough entry window for an attack.

"No county clerk anywhere in the United States has the ability to defend themselves against advanced persistent threats," Wallach tells me, using the parlance of industry for highly

motivated hackers who "lay low and stick around for a while." Wallach painted an unseemly picture, in which a seasoned cyber warrior overseas squared off against a septuagenarian volunteer. "In the same way," continues Wallach, "you would not expect your local police department to be able to repel a foreign military power."

 No county clerk anywhere in the United States has the ability to defend themselves against advanced persistent threats."

In the academic research, hacks of the machines are far more pervasive; digitized voting registrations or tabulation software are not 10 years old and running on Windows 2000, unlike the machines. Still, they present risks of their own. "There are still plenty of computers involved" even without digital touch screens, says Appel. "Even with optical scan voting, it's not just the voting machines themselves—it's the desktop and laptop computers that election officials use to prepare the ballots, prepare the electronic files from the OpScan machines, panel voter registration, electronic poll books. And the computers that aggregate the results together from all of the optical scans."

"If any of those get hacked, it could could significantly disrupt the election."

The digital touch screens, even with voter verified paper trail, will still be pervasive this election; 28 states keep them in use to some degree, including Ohio and Florida, though increasingly in limited settings. Pam Smith, the director of Verified Voting—a group that tracks the use of voting equipment by precinct in granular detail—isn't sure how many digital touch screens are left; no one I spoke with seemed to know. Nor is it clear where they'll be deployed, a decision left up to county administrators. Smith confirms that after 2007, the number of states that adopted the machines plateaued, and has finally begun to shrink. The number of states using paperless touch screens—and nothing else—is five: South Carolina, Georgia, Louisiana, New Jersey and Delaware. But the number of states with a significant number of *counties* with the easily hacked machines is much larger, at 13, including Indiana, Virginia, and Pennsylvania. For hacking purposes, there's little difference: In a close election, only a few precincts with paperless touch screens would be required to deflate vote totals, says Appel, even if the majority of counties are still in the Stone Age. Many of Felten's mad-scientist experiments were designed to metastasize the nefarious code once it gained entry into a machine system.

The move away from electronic voting is a positive one, the professors say; the best option for election security are the optical scans. "Although the optical scan ballots are counted by

the computer in the OpScan machine—which you can't trust—you can trust the pile of ballots that accumulate in the ballot box, marked by users with their own hands," Appel tells me. With the right auditing policies, "you can recount or do a statistical sample of the ballot boxes to make sure there aren't cheating computers out there."

State policy make rs listened. In 2000, less than 30 percent of voters used the optical scanning system. In 2012, 56 percent did. But in the interim, the touch -screen machines are still in place; their dwindling percentage of votes has not necessarily diminished the risk of an attack, the professors say. In some ways, it's heightened it—turning the issue of easy-to-tamper touch screens from a bell-curve problem to a hockey-stick graph, in which a small number of machines generate a high amount of risk. The machines that are left are often running on vintage Windows software from the late '90s or early 2000s, some of which has long surpassed its support date. "They're probably about exactly as vulnerable as they were 10 years ago," Appel tells me. "And they still get their program out of the same ROM."

A study released by the Brennan Center last September, titled "Voting Machines at Risk" reached a similar conclusion. In 2016, 43 states will use machines that are at least 10 years old; 31 states suggested a serious need for new voting machines. Larry Norden, the report's author, said everything from software support, replacement parts and screen calibration were at risk; he pointed me to a YouTube video of a precinct in West Virginia, where voters' finger pressure on the screen selected an entirely different candidate, or caused the machine to go haywire (a symptom of the glue behind the screen loosening, Norden says). The HAVA money, says Wallach, was spent very quickly after 2002; "And it is not coming back," he adds.

As late as 2011, a team at the Argonne National Laboratory of the Department of Energy revisited the Diebold TSX, five years after the Princeton group's report. Its conclusion: With $26 worth of parts and an eighth -grade understanding of computers, virtually anyone could tamper with it—a variant of the model that Feldman and Halderman procured in the Times Square alleyway. Five years later, cyber experts tell me that little has changed in voter cybersecurity. The Diebold TSX model is slated to be used in 20 states in 2016, including Pennsylvania, Ohio, Florida, Missouri and Colorado.

State officials recognize that digital touch screens are headed out the door—and the professors are quick to remind me of how government contracts work: When profit projections fall, upkeep suffers. "The level of security confidence when it comes to these voting machines is much lower than the sort of industry standard—the level of security you'd expect from top companies like Google, Facebook, Apple. I mean, your iPhone is

probably much more secure than most of these voting machines," says Ari Feldman, one of Felten's acolytes and now a professor at the University of Chicago. "I think the level of technological competence of the people who work on these very popular commercial services and devices is just higher than those who these small voting machine manufacturers can attract."

No one doubts that the companies take security seriously. But the approach to security shared by the manufacturers and election officials seem to hinge on the idea that hacking a school board vote would be just too boring for anyone talented enough to pull off. "You would be hard pressed to find an example of our voting systems ever being hacked in a real election environment, as opposed to that of a hack attempt inside of a laboratory environment in which zero real world physical election processes are utilized," writes Kathy Rogers, a spokesperson with ES&S, in an email, and correctly so—it's never been proven that an election was deliberately hacked. "We feel *very* confident in the security of our voting systems —especially when you combine that security with the physical security, chain of custody, legal requirements and masses of pre-election testing." She added, "We are not suffering from sleepless nights worrying about whether our voting systems might be hacked."

A Virginia election official with decades of experience concurred, speaking to me on background. "I know that when some of the academics have hacked a machine, they've had unfettered access for an indefinite period of time," the election official said, describing this as an unrealistic precondition. "But one of the security thresholds isn't that it will be sitting in a public location here so anyone can have unfettered access for any in -depth period of time." He demurred when I brought up Felten's tradition of stalking the unguarded machines; he added, "Only people who have been authorized, sworn to uphold the process —they can have administrator access to these.

"It's old school, I realize that," he continued. "But it is the system in place."

In the event of a state-sponsored attack—however unlikely—can old school match wits? The adversary, more than one member of the Princeton group pointed out, may be more practiced than we know: A June 2014 report linked Russian hackers to an attempt to alter the election outcomes in Ukraine, by targeting the computerized aggregation software—one of the attacks Appel fears.

How different is Kiev from Gary, Indiana? As is the case in cyberattacks—at least in the examples of Stuxnet and Sony—it's never quite plausible, until it is. Hackers this year have

targeted voter registration rolls in Illinois and possibly Arizona, another attack highlighted by the Princeton alums.

But most identified Pennsylvania as the greatest concern. There, according to Verified Voting 47 counties of 67 vote on digital voting machines without a written backup record if something were to go awry—a reality that is very much on the minds of state officials (legislation is working its way through the House to examine the issue of voting modernization.) In Pittsburgh and Philadelphia—two Democratic strongholds whose turnout typically decide the fate of the state's outcome—around 900,000 voters will cast ballots entirely on paperless touchscreens DREs, if previous elections are any guide. Then, at least from the voters' perspective, they will disappear into a sea of ones and zeroes.

Montgomery County, a crucial Democratic redoubt in the suburbs of Philadelphia—an area sometimes seen as having the potential to swing the entire state—is one such locality that uses a paperless electronic machine, and only one machine, for all 425 precincts: Appel's Sequoia AVC Advantage.

"We are very, very confident in our machines," Val Arkoosh , the vice chair of the Montgomery County Board of Commissioners , tells me. She spoke with the staccato fervency and granular detail of someone who is thinking about this issue, and has been asked before. Yet when I asked her about Appel's hack and the Princeton group, next door across the Delaware River, she appeared not to have heard of it. She assured me their system is secure: "We program each of our machines individually—they're never connected to the Internet," and an internal hard drive "creates a permanent record each time that a vote is cast." At the end of the day, Arkoosh said, "the vote is transcribed on a thermal tape, the machines are closed to lock, the information is transferred to a standalone server that tallies the results." She describes the officials guarding the polling place, and adds for emphasis: "It would be extraordinarily difficult for someone to do something like that during the course of Election Day."

I asked Halderman to red-team Arkoosh's answer. "It's positive that they have procedures in place to cross-check that the counts produced by each machine match the tabulated results," Halderman wrote to me in an email. "However, none of that provides any defense against the kinds of attacks Andrew Appel wrote about, or the return-oriented programming attacks." He added, "An attacker with access to the administration system that's used to program the memory cartridges before the election could use ROP to distribute malicious code to all the machines."

"I can say that this is definitely a concern," says Kelly Green, the director of Voting Services in Montgomery County, who continued to describe efforts and conversations across Pennsylvania to improve the voting system. As a state issue, Green continued, "What I can tell you is, we've put it on the agenda."

***

**What would be the political motivation** for a state-sponsored attack? In the case of Russia hacking the Democrats, the conventional wisdom would appear that Moscow would like to see President Donald Trump strolling the Kremlin on a state visit. But the programmers also point out that other states may be leery. "China has a huge amount to lose. They would never dare do something like that," says Wallach, who recently finished up a term with the Air Force's science advisory board. Still, statistical threat assessment isn't about likelihoods, they insist; it's about anticipating unlikelihood.

The good news is that Wallach thinks we'd smell something fishy, and fairly fast: "If tampering happens, we will find it. But you need to have a 'then-what.' If you detect electronic tampering, then what?"

No one has a straight answer, except for a uniform agreement on one thing: chaos that would make 2000 look like child's play. (Trump aping about "rigged elections" before the vote is even underway has certainly not helped.) The programmers suggest we ought to allow, for the purposes of imagination, the prospect of a nationwide recount. Both sides would accuse the other of corruption and sponsoring the attack. And the political response to the country of origin would prove equally difficult—the White House is reported to be gauging how best to respond to the DNC attack, a question that poses no obvious answers. What does an Election Day cyber strike warrant? Cruise missiles?

The easiest and ostensibly cheapest defense—attaching a voter -verified paper receipt to every digital touch screen—presents its own problem. It assumes states audit procedures are robust. According to Pam Smith at Verified Voting, over 20 states have auditing systems that are inadequate—not using sufficient sample sizes, or auditing under only certain parameters that could be outfoxed by a sophisticated attack—states that include Virginia, Indiana and Iowa. But relying on paper trails also assumes voters understand their importance. Many may simply discard the paper on the way out without giving it a glance, or leave it hanging in the machine printer.

Optical scanning machines are far and away the first choice of the programmers—as the Princeton group analogizes, they don't require receipts, they *are* the receipts—and states

are increasingly ditching touch screens in favor of them. But the optical scans are still DRE models—we simply push paper, rather than push buttons. Jeremy Epstein, the Virginia computer scientist who led the charge against the WINVote system, points out that digital touch screens and optical scanning machines have something in common: "Whether it's an optical scanner or a DRE, the votes still get totaled on a memory card. And at the end of the election, you put that memory card into a central card system," Epstein tells me. "You could use it to infect the tabulator system, and once you infect the tabulator system, it could transmit on."

Then there are tech advancements that make the computer scientists shudder: To a person, they each warned me about the public's new delusion, one strikingly reminiscent of the aftermath of *Bush v. Gore*—Internet voting. As Halderman's work began to garner more attention, he sensed a new trend around the idea of voting online. With its lack of technical probity, an argument hanging entirely on convenience, and a stampede of purveyors from for-profit cyber companies, Halderman and others saw a facsimile of the voting machine companies they had sought to marginalize just years earlier. Yet elected officials found appeal in many of the same arguments. "In this world, we do so many things now online," Appel says, explaining the popularity of the idea. "You're banking online. You order coffee online. Somebody who's used to living so much of their life online will wonder why we're not voting online."

But Appel, and the others, share a categorical warning: "It would be a disaster," he tells me. "Anyone could hack in. The Russians, the North Koreans, anyone who wishes."

Like the voting machine companies, Internet voting services—mostly purveying their software in private or corporate elections—largely resist subjecting their work to public trial. That changed when, in 2010, the District of Columbia announced its intention to launch a city wide Internet voting platform, intended for overseas voters and a milestone for the concept. Just a month before the midterm elections in November, the District conducted a test drive. "It's not every day, of course, that you're invited to hack into government computers without going to jail," Halderman says, muffling a giggle. "We didn't want to let this opportunity, to have this be a realistic simulation of an attack, go to waste."

On October 1, 2010, two employees in the Washington, D.C.-based Office of the Chief Technology Officer, stormed down a hallway and charged through the double-doors that opened into the basement-floor server room. Earlier that day, they had learned strange news: Someone had called into the hotline to report a bug on the board's paperless ballot system. The program seemed to play obnoxious brass-band music each time subjects

submitted their ballot. The names on the ballots had all been changed to villainous robots: Bender for State Board of Education (from *Futurama*); Hal 9000 for Council Chairman (from *2001: A Space Odyssey)*. Then they learned that the hackers were likely watching them on the closed-circuit circuit feed, through the camera that was gazing down at them, right now.

Some 520 miles away, the scene played on a screen in the hacker's cramped headquarters. A whiteboard behind the computer declared a series of instructions in brown and purple marker, each skewered with a squiggly strike -through, followed by a perfunctory checkmark: "Replace old ballots." Check. "Steal temp ballots. Check. "Rig to replace new ballots." Check. The hackers exchanged high-fives in adulation. And when the D.C. tech officers' faces appeared on the screen, Alex Halderman peered back.

Halderman, now a professor at the University of Michigan, had not lost his mentors' taste for the dramatic. He had just pulled the most flamboyant hack in the short history of the Princeton group. Halderman was called before the D.C. Council, where he got to make the speech he wanted before a captive audience, who were forced to endure this barely 30-year -old's transported lecture seminar on the dangers of Internet voting.

Halderman shared a private, unreleased video with me that he took from the night of the attack, a project he launched with the help of two graduate students, each barely out of college. In the video, the team huddles around Halderman's small, beech wood office table, assuming a crouch in a strange coven of furious typing. Hours pass as afternoon tips into evening. Finally, a brown -haired student, Eric, slouched and raccoon-eyed, bolts upright: "Oh my God," he murmurs. "I have a shell." "We're in!" shouts his blonde-haired compatriot, rubbing his hands. The furious typing resumes.

Halderman explained that the student had used a technique called Shell Injection Vulnerability. He found a single, wayward quotation mark in the code, a crack in the floorboard through which they drove a tractor -trailer of attack commands.

Halderman's attack is now well-known in the world of elections administration; the Virginia election official I spoke with seemed doubtful that Internet voting could ever take off, citing the conventional view that the risks are too great. "Whether or not Internet voting happens, and whether we will introduce these new risks—I don't know," he says. "I'm not holding my breath."

Internet voting companies have the same incentives as voting tech conglomerates to convince the public they're worth their mettle; as in the case of HAVA, there would likely be

an enormous windfall. In 2004, Michigan deployed Internet voting in its Democratic primary. In 2009, West Virginia greenlighted a pilot to allow overseas military vote online. This year, the entire 2016 Utah primary was conducted online, and an initiative in California to introduce online voting nearly made it onto the state ballot.

Halderman finds it hard to believe he now has to make the same argument about the risk of hacking all over again. "It's not something only comic book villains can do," he explains. "These are students right out of college that are doing this."

*** 

**The concept of voting in private** is an invention in American politics, and a recent one. The first time a secret ballot was widely deployed was the presidential election of 1896— also the first election in which someone was not murdered on Election Day, according to Harvard professor Jill Lepore. The two are not a coincidence: Since the earliest days of the republic, voting was almost entirely a collectivist act. Citizens voted with their feet— standing on one side of a crowd or another, caucus-style—a setup which manipulative party bosses plainly preferred.

The cadre of computer programmers who made their home on the Princeton campus are now in a race, of sorts—against voting machine companies, against Internet voting firms— to invent the future of secure voting. And the most interesting ideas look to this 19th century arrangement not with revulsion, but intrigue. It turns out that, from the perspective of mathematical systems confirmation, Boss Tweed may have had a few things right.

After his testimony in Houston urging the council not to adopt the machines, Wallach, the Rice professor, spent the proceeding years working on research showing vulnerabilities on digital touch screens, and testifying in state legislatures across the country. But Wallach's focus has shifted from diagnosis to cure, and he's now working with Travis County, where Austin is located, as a leading researcher on the newest innovation in voting technology: Cryptographic voting.

Wallach walks backward through the concept by offering a thought experiment. The most unimpeachable election technique would be to count the votes on an enormous corkboard; every voter would pin his or her vote, and the public would count the results together. Everyone would see the votes, and everyone would agree on the result. Besides the problem of privacy and intimidation (and, ostensibly, killings on Election Day), such a system is ungainly—it's a lot of corkboard. But encrypting the vote would allow a public accounting

while keeping the actual votes private: voters would make their selection on a digital processing machine; they'd then receive an encrypted receipt, a random assortment of numbers and letters. Their vote would then be uploaded to a public bulletin board online; any voter could compare their encrypted vote to see if it matched the numbers and letters online. The vote itself would be scrambled and completely secret; a complex function, known as homomorphic cryptography, would count the votes without unencrypting the source.

"Crypto," as it's known in the field, would secure our elections something close to permanently. But it would change fundamentally the way we vote. It would make the act of gawking at random source code a civic requirement. And it would abolish the concept of a countable "ballot," forcing us to trust that incomprehensible code is the equivalent of a ballot. Cryptographic voting is still years away from ready. But it also begs the question of whether the concept has simply transferred a technocratic leap of faith from one part of the electronic system to another one. It seemed difficult to believe, after a bruising decade of invisible votes and disappearing ballots, that voters would put their faith in something so abstract. After four explanations from Wallach, I was still dumbfounded.

Wallach and other researchers point to another safeguard that is closer to application-ready, a new method of auditing. The technique is called Risk Limited Auditing, statistical innovation worked out by Philip Stark, a statistics professor at the University of California, Berkeley. The auditing techniques of most states aren't sophisticated enough to detect a subtle attack—every 100 th vote switched from Trump to Hillary Clinton, for instance. "The whole point of a Risk Limiting Audit is not to find the tally down to the last digit," explains Wallach. "The problem you're trying to figure out is if the error rate is big enough that I could change who won." RLA would enhance the auditing prospects of most states, 25 of which have inadequate auditing procedures, according to Verified Voting. Colorado is expected to implement RLA next year.

But there may be a simpler hack at hand. Appel, the Princeton cybersecurity expert—master of numbers, merry prankster of machines—proposes a radical idea to this 15-year nightmare: What if we took a page from the town criers of two centuries ago, and simply read the precinct results out loud?

"There's a very simple and old-fashioned recipe that we use in our American democracy," Appel says. "The vote totals in each polling place are announced at the time the polls closed, in the polling place, to all observers—the poll workers, the party challengers, any citizen that's observing the closing of the polls." He goes on to describe how the totals in

that precinct would be written on a piece of paper—pencils do just fine—then signed by the poll workers who have been operating that polling site.

"Any citizen can independently add up the precinct -by - precinct totals," he continues. "And that's a very important check. It's a way that with our precinct-based polling systems, we can have some assurance that hacked computers could not undetectably change the results of our election."

There could be a greater lesson in Appel's point. Technology didn't create the problem. Perhaps technology is intrinsic to the problem—our lack of trust that has metastasized in a surveillance culture was bound to aggrandize the problems of voting, the most trusting civic act we know. It seems unlikely to expect a singular cure to the American presidential election, not because of the incomprehensibility of cryptography or the untrustworthiness of tech companies, but because there is no such thing as the singular election: 8,000 jurisdictions in a leaky mess of federalism and poorly spent dollars. The neat results and cable announcements on election night represent an optical illusion, like a series of ones and zeroes, whizzing beyond our apprehension.

Wallach's encomium on cryptography reminded me of another tech item: The concept of shared fate, sometimes referenced in drone research. Researchers have long suggested our planes and trains could be made safer were they run by highly precise robots, or drone pilots—cool customers who don't have to save a burning plane while worrying about turbulence and screaming passengers. It may be one of the most enduring examples of psychology trumping technocracy: Even though systems would run better—even save lives—everyone knows this arrangement is unworkable. Humans require knowing that there's someone, like us, in the cockpit. We need to know we'll endure a shared fate.

If this century has shifted our trust from away from our neighbors toward machines, it might be time to switch back again. Eight countries in Europe that once flirted with digital voting have seen six go back to paper; Britain counted its Brexit votes by hand. Even if the vote were never hacked—and it is an exceedingly implausible event—the remotest possibility is an albatross on democracy and a boon for mischief-makers, and not just the cyber attackers. Trump's most recent jujitsu—pointing out that by virtue of the fact that the election is hackable, it could be rigged against him—illustrates this risk. Technology has amplified not only the threat of hacking, but the threat of a hack.

The Princeton alums can warn us—but they can't protect us. "We are in a collision -course between the technology we use in election administration and the growing reality of politically motivated, state level cyber attacks," Halderman tells me, arm propped on his

red office chair, sunlight pouring through his westward window. "We sit around all day and write research papers. But these people are full -time exploiters. They're the professionals. We're the amateurs."

# Exhibit A12

11/16/21, 5:19 PM

Case 1:21-cv-02131•CJN   Document 25-3   Filed 11/17/21   Page 90 of 148
Voting machine makers face questions from House lawmakers — but more remain

VOTE WATCH

## Voting machine makers face questions from House lawmakers — but more remain

The CEOs of the three companies that make more than 80 percent of the country's voting machines testified before Congress Thursday for the first time.



Jan. 9, 2020, 1:12 PM CST

**By Ben Popken**

For decades, the companies that dominated the U.S. voting machine industry operated in relative anonymity. Now, lawmakers want answers and transparency.

The CEOs of the three companies that make more than 80 percent of the country's voting machines testified before Congress Thursday for the first time, marking a new and bipartisan effort to ensure the security of the 2020 election.

The three companies, Election Systems & Software (ES&S), Dominion Voting Systems and Hart InterCivic, are almost entirely unregulated. But in recent years, policymakers and election advocates have begun to question who owns the companies, how they make their machines and whether they could be susceptible to remote hacking.

Zoe Lofgren, D-Calif., chair of the congressional subcommittee that oversees federal elections, said in her opening remarks that they need more information from the companies.

"Despite their outsized role in the mechanics of our democracy, some have accused these companies with obfuscating, and in some cases misleading election administrators and the American public," said. "There is much work to do, and much for Congress to learn about this industry."

The hearing touched on a wide range of issues from the security of the machines and the prospect of independent review to lobbying and voter registration databases. While there are certification standards for voting machines, the companies themselves are lightly regulated and must disclose little information.

## Related

### INVESTIGATIONS

**Chinese parts, hidden ownership, growing scrutiny: Inside America's biggest voting machine maker**

Because voting machines themselves aren't designed to be continuously connected to the internet, they're thought to be less vulnerable to remote hacking that could change election outcomes. But some voting systems do send tabulations via modem, and the recent revelation that the machines do have the ability to connect to the internet was a subject of concern for Lofgren.

All the vendors confirmed that some of its machines have wireless modems in order to send unofficial results.

"That's something we may want to look into further," Lofgren said.

Security measures for protecting the 2020 presidential vote are top of mind for policymakers after Russian interference in the 2016 election prompted the federal designation of election systems as "critical infrastructure."

The vendors agreed to support future legislation that would require additional disclosures around their supply chain, cybersecurity practices, cyber incident reports, employee background checks and screening, and corporate ownership.

The federal government's control over national elections is relatively limited because states are tasked with collecting votes. Rep. Rodney Davis, R-Ill., ranking member of the subcommittee, said the House still has a key oversight role.

"Instead of getting into a winded debate today between paper versus electronic or state versus federal, let's instead focus our efforts on areas within our federal reach that need improvement, areas where we may come to a bipartisan agreement," Davis said.

**Read more from NBC News/MSNBC Vote Watch.**

Despite the interference warnings from the intelligence community, President Donald Trump has rejected any scrutiny of the administration of the 2016 election – except for his own unproven allegations of voter fraud – as an attempt at invalidating the results.

But after a contentious year in which no proposed election security improvement bills were passed, the hearing Thursday provided evidence of bipartisan interest in the importance of election security procedures.

A key question posed to voting machine makers has been how they make their machines and where the parts come from. Lofgren cited a recent report by a supply chain analysis firm,

Interos, that an unnamed "widely used" voting system vendor had been found to use parts from China-based companies and suppliers with locations in China or Russia.

"Do you have components in the supply chain that come from Russia or China?" Lofgren said.

— An ES&S Federal Certification Specialist works in a testing lab Oct. 2, 2019, at Election Systems & Software in Omaha, Neb.   Scott Morgan / for NBC News

ES&S CEO Tom Burt said one of its "programmable logic devices" is from an American company that uses a factory in China. Later, he noted that Texas Instruments makes one of its chips and that ES&S's business is too small to get the supplier to change its global supply chain.

Dominion CEO John Poulos said that all of his company's machines were manufactured in the U.S. and that his company was not the subject of the Interos report. Hart's CEO said their company contained components from China but not from Russia.

In response to direct questions from Rep. Mark Walker, R-N.C., and Rep. Pete Aguilar, D-Calif., the three CEOs denied knowledge of any kind of cyber intrusions into their voting systems.

"We have never received any evidence or even commentary that these systems have been hacked," Burt said.

"We've had no breaches to report," he told Rep. Aguilar, later in the hearing.

The other two CEOs responded similarly.

Voting machine vendors testify before Congress on election security



Though no evidence has shown that a single vote was tampered with in the 2016 election, the scanning and probing of different elements of the voting process by groups connected to Russia

showed that security measures need to be scrutinized in an industry where most machines on the market follow 15-year-old federal security standards.

The privately held ES&S, Dominion and Hart InterCivic voiced their commitment to customizing solutions for individual jurisdictions, improving security, working with federal agencies and vetted outside partners, and providing as much transparency as possible.

Eddie Perez, global director of technology development for the Open Source Election Technology Institute, a nonprofit research organization, said that there is still a shroud of secrecy around voting machine companies. (NBC News has collaborated with OSET since 2016 to monitor technology-related election and voting issues.)

"The private companies that support election technology in the industry are not regulated, not as companies," Perez said. "They are private, with much information about their business and operational practices kept totally private."

The vendors praised Congress for its recent appropriation of $425 million in additional funding to the federal Election Assistance Commission to be distributed to states to improve election security, which could include buying new equipment.

The companies stressed the heightened levels of cooperation and communication with the Department of Homeland Security and other government partners. The vendors noted they sent their latest machines to the Idaho National Labs to be tested by "hackers" looking for exploits to fix. And they've worked to establish a new industry group that would evaluate vulnerabilities and coordinated on publicly disclosing them.

"We urge you to continuing work with election officials to help remove additional barriers that exist for modernizing their infrastructure," Poulous said.

## Get the Morning Rundown

Get a head start on the morning's top stories.

| Enter your email | **SIGN UP** |
| --- | --- |

THIS SITE IS PROTECTED BY RECAPTCHA
PRIVACY POLICY | TERMS OF SERVICE

Ben Popken

Ben Popken is a senior business reporter for NBC News.

## Sponsored Stories

by Taboola

PITAL ONE SHOPPING

**nazon Has Millions of Prime Subscribers — But Few Know About This Savings Trick**

NEXWISE COM

Exhibit A13


USA TODAY

INVESTIGATIONS

# Will your ballot be safe? Computer experts sound warnings on America's voting machines

**Pat Beall** USA TODAY

Published 5:01 a.m. ET Nov. 2, 2020 | **Updated 6:07 p.m. ET Nov. 2, 2020**

Millions of voters going to the polls Tuesday will cast their ballots on machines blasted as unreliable and inaccurate for two decades by computer scientists from Princeton University to Lawrence Livermore National Laboratory.

Toyed with by white-hat hackers and targeted for scathing reviews from secretaries of state in California and Ohio, Direct Recording Electronic voting systems, or DREs, have startled Illinois voters by flashing the word "Republican" at the top of a ballot and forgotten what day it was in South Carolina. They were questioned in the disappearance of 12,000 votes in Bernalillo County, New Mexico, in 2002 and 18,000 votes in Sarasota County, Florida, in 2006.

"Antiquated, seriously flawed and vulnerable to failure, breach, contamination and attack," U.S. District Judge Amy Totenberg wrote of Georgia's aging DRE system before ordering the state to replace it in 2019.

"No one is using a computer they purchased in the 1990s," said Warren Stewart, senior editor and data specialist for Verified Voting, a nonprofit advocacy group tracking election systems. But voters in more than 300 counties and 12,000 precincts will be casting ballots using DRE technology already aging in the 1990s, when flash drives were bleeding-edge tech and Netscape Navigator was the next new thing.

DREs aren't the only problematic voting systems. As late as July, more than 1,200 jurisdictions were planning to count absentees on scanners so old they are no longer manufactured, and it's not clear how many, if any, updated their equipment since then.

New technology also has its share of criticism. Internet voting has been roundly panned by computer experts citing wide-open opportunities for hacking. Georgia's replacement system

for DREs had been rejected by Texas and is the subject of a court battle over accuracy.

All election systems are for the most part black boxes: proprietary software and hardware jealously guarded by the handful of companies selling them. But state reviews and court cases opening up DRE systems of all makes and models for examination have for years flagged problems.

In New Jersey in 2008, Princeton computer scientist Andrew Appel and a five-member team got a rare look under the hood of an AVC Advantage DRE, part of a lawsuit alleging DREs could not reliably count votes.

**Presidential winner on election night?:** Mail-in ballots could put outcome in doubt for weeks

Among the findings: The system sometimes only seemed to record a vote. It sometimes did record a vote but seemed not to. It would take one screwdriver and seven minutes to insert a vote-stealing program. That kind of hack would probably be invisible, Appel concluded.

More than a decade later, Appel is still talking about DRE vulnerabilities. And although the New Jersey governor, citing COVID-19, has created a nearly all-mail election, 19 New Jersey counties still have their DRE equipment on hand for the next contest, according to state records.

Nationally, if the surge in absentee ballots has not decreased in-person voting, more than 14 million registered voters would be going Tuesday to polls that are equipped with DREs.

"The whole community of computer scientists is mystified why election officials will not listen to experts about technology but will listen to the vendors (selling and maintaining it)," said Duncan Buell, a professor of computer science and engineering at the University of South Carolina who examined that state's system.

## Paper is new gold standard for voting

DRE systems have been manufactured by different companies, and just as with any digital product, all have revised and upgraded their DREs over the years. Security patches have been added and machinery locks strengthened. Critics, though, have never been convinced that the technology can be brought to the accuracy and security standards an election demands.

To start with, the new gold standard for voting is paper.

Voters hand-marking their own paper ballots can verify their selection before the vote is counted by a machine. If the election is close or challenged, or if software fails, a paper ballot can be used to audit results. In 2018, the National Academies of Sciences, Engineering, and Medicine declared that elections should be using human-readable paper ballots by this year – and voting equipment without such ballots should be removed as soon as possible.

Without paper, the voter is completely dependent on the machine technology to count accurately. The vast majority of DREs flunk the paper test, according to data collected by Verified Voting.

"The real problem with DREs is that you cannot recover (vote results), even if you are lucky enough to detect that there is an error or it has been tampered with," said Marian Schneider, former president of Verified Voting.

**Voter fraud:** We analyzed a catalog of absentee ballot fraud: It's not a 2020 election threat

Some election officials could not afford to swap out their aging DREs even before COVID-19 costs for such things as absentee ballots, postage, and personal protective equipment for poll workers burned through their budgets.

Some mistakenly believe that as long as an election system is not directly connected to the internet it is secure. Others point to long track records with their DRE systems with no evidence of foul play.

"It does bother me a bit," said Louisiana Secretary of State Kyle Ardoin of criticism leveled at DREs. His own state's DREs are among the oldest in the country, purchased in 2005. When COVID-19 hit, the state leased newer equipment, and Ardoin has said he wants to purchase new machines. But it also bothers Ardoin that criticism of the DRE technology overlooks years of smooth elections.

Heading into the spring primaries, Lewis County, Kentucky was equally comfortable with its fleet of Shouptronic 1242s, hulking DRE tabulators so old that two are warehoused in the Smithsonian's National Museum of American History.

"It's always worked," said County Clerk Glenda Himes.

Election officials and companies consistently defend their DREs, arguing that security criticisms have been overblown, vulnerabilities fixed and puzzling outcomes explained.

Major vendors Election Systems & Software and Dominion Voting Systems Corp. have

conditions, much less evidence that a cybersecurity breach of a DRE jeopardized any vote. Still, Omaha, Nebraska-based Election Systems & Software, the largest of the top three election system companies, has announced it will stop selling any paperless election system for general use.

## Problems with voting touchscreens

In Alpharetta, Georgia, Nathaniel Lack spent part of Election Day in 2018 trying to hit a moving target. In a court affidavit, Lack said he tapped the touchscreen next to a candidate's name to vote, but it didn't register.

Trying again, he tapped the touchscreen a little farther from the candidate's name, and then a little farther until he finally got the vote to stick. A poll worker told him other voters had to tap on the machine's screen in "odd places."

Lack was among voters in a dozen Georgia counties reporting problems with DRE screens, including touchscreens that switched a voter's choice to a vote for another candidate.

It is an old problem. Between 2006 and 2008, reports of vote-switching DREs surfaced in New Jersey, Texas, West Virginia, Florida, Ohio and North Carolina. In Arkansas, then-Pulaski County Elections Director Susan Inman said she was told the problem was an optical illusion created when the view of the screen for voters over 6 feet tall was distorted by their height.

"I thought that was kind of silly," Inman said.

In her later unsuccessful bid for secretary of state, Inman ran on adopting an all-mail voting system. "They trounced me for that," she said. But, until recently in Pulaski, she said, "Could you believe it? They were still using the same system."

**Rejected ballots:** More than 1 million people could lose their vote on Nov. 3. That's the best-case scenario

In the contested 2018 Georgia governor's race, too-short voters, too-long fingernails and voters' too-fat fingers were all floated as possible explanations for why people voting for Democrat Stacey Abrams watched their on-screen votes shift to Republican Brian Kemp, the secretary of state overseeing elections and the ultimate winner.

The possibility of shifting names had figured into Pennsylvania computer scientists scrutiny of a widely used DRE. Among the "serious and undetectable hacks" made possible by a

laundry list of vulnerabilities, they found a PalmPilot, a magnet and about one minute would be enough to recalibrate a touchscreen and keep people from voting for a specific candidate.

Voter reports of shifting and disappearing names on Election Day in the 2006 Sarasota, Florida, 13th Congressional District race — and approximately 18,000 "missing" ballots — ignited a congressional hearing and General Accounting Office investigation.

The contest pitting former bank president Christine Jennings and businessman Vern Buchanan had given Buchanan a 369-vote edge. The final count also showed thousands of voters made choices for the race above the Jennings-Buchanan match on the ballot and below it, but cast no votes for either of the congressional contenders: a dramatic undervote.

The GAO report cleared the DRE system of miscounting. So did two separate Florida reviews.

But computer scientists David Dill of Stanford University and Dan Wallach of Rice University questioned whether the investigations went far enough. In one state report, researchers had referred to large numbers of bugs they found in the system, pointed out Dill and Wallace. The bugs weren't considered pertinent to the state investigation. They were not made public.

## An inside look at voting system

In 2007, secretaries of state in Ohio and California took a detailed look at how votes were being counted in their state.

The Ohio secretary of state's review found one DRE system in wide use both in Ohio and across the country had "several pervasive, critical failures," including failing to follow industry security standards.

California's secretary of state found one DRE system was built around an inherently fragile design. In another, virtually every important software security mechanism was vulnerable. A third appeared to be susceptible to a variety of attacks that would allow an attacker to control the system.

In all cases, cryptography, the coding enabling information to be kept secret, was flawed or missing.

It's against that backdrop that even small glitches raise eyebrows.

**Early voting turnout:** Despite suppression tactics, young voters are 'raising hell'

In the November 2018 election, Buell, the South Carolina computer scientist, reported a Barnwell County precinct terminal counted 58 votes — from the previous June. In Kershaw County, a terminal recorded it started counting votes the day after the election.

Other reports are more high-profile. University of Michigan computer scientist J. Alex Halderman, director of the university's Center for Computer Security and Society, showed two members of Congress in 2018 how a presidential contest won by George Washington could be flipped to Benedict Arnold. Eight years earlier, he and a colleague had programmed a DRE to play Pac Man.

DEF CON, an annual hackers' conference, has regularly packed a "Voting Village" with older election systems and invited people of all skill sets — including children — to poke for vulnerabilities. The very first machine to be hacked in the Voting Village launch was a DRE. It took minutes.

**Voting from jail:** Many prisoners are eligible to vote. But casting a ballot behind bars isn't easy

Shelby County, Tennessee, Elections Administrator Linda Phillips is skeptical.

Citing a panicked voter who sent her video of someone rebooting a machine at DEF CON, Phillips said hackers can leisurely disassemble equipment. That's not going to happen on Election Day.

"Some of my poll workers may be older, but I am sure they would notice if someone was taking a voting machine apart."

Even if the DRE technology was perfect, however, many of the systems are aging. Older screens can be trickier to calibrate. Parts can be hard to come by.

Not in Lewis County, Kentucky, though. Himes, the county clerk, recently replaced the Shouptronics with new equipment, bringing the machines' decades-long role in U.S. presidential contests to an end.

*Contributing: Catharina Felke of Columbia Journalism Investigations*

Exhibit A14

**The New York Times** | https://www.nytimes.com/2020/07/25/us/politics/georgia-election-voting-problems.html

## Anatomy of an Election 'Meltdown' in Georgia

**By Danny Hakim, Reid J. Epstein and Stephanie Saul**
Published July 25, 2020   Updated Nov. 4, 2020

Last month, Daryl Marvin got his first taste of voting in Georgia.

Mr. Marvin had previously lived in Connecticut, where voting was a brisk process measured in minutes. But on the day of the primary, June 9, he and his wife waited four hours to vote at Park Tavern, an Atlanta restaurant where more than 16,000 voters were consolidated into a single precinct. An electrical engineer by training, Mr. Marvin was baffled by what he saw when he finally got inside: a station with 15 to 20 touch screens on which to vote but only a single scanner to process the printed ballots.

*[When will we know who won? Here's a guide to Day 2 of election results.]*

"The scanner was the choke point," he said. "Nobody thought about it, and this is Operations Research 101. It's not very difficult to figure it out."

Captured in drone footage, beamed across airwaves and internet, the interminable lines at Atlanta polling sites became an instant and indelible omen of voting breakdown in this pandemic-challenged presidential election year.

Elections workers described a cascade of failures as they struggled to activate and operate Georgia's new high-tech voting system. Next came a barrage of partisan blame-throwing: The Republican secretary of state, Brad Raffensperger, accused the liberal-leaning Fulton County, which includes most of Atlanta, of botching the election, while Democratic leaders saw the fiasco as just the latest episode in Republicans' yearslong effort to disenfranchise the state's minority voters.

Six weeks later, as the political calendar bends toward November and the presidential campaigns look to Georgia as a possible battleground, the faults in the state's balky elections system remain largely unresolved. And it has become increasingly clear that what happened in June was a collective collapse.





Brad Raffensperger, Georgia's secretary of state.  Alyssa Pointer/Atlanta Journal-Constitution, via Associated Press

On-the-ground planning deficiencies emerged across the state, though they were far and away direst in Fulton County, the state's most populous. With a history of difficulty administering elections, Fulton showed little ability to adjust three months into the pandemic, struggling to process an unprecedented flood of absentee ballots and putting out a frantic call for 250 poll workers just days before in-person voting was held.

But an examination by The New York Times found that in the face of repeated warnings about counties' readiness for the rollout of the highly complex voting system, Georgia's top elections official, the secretary of state, remained largely passive. With the clock ticking fast toward Primary Day, Mr. Raffensperger and his office failed to ensure that hard-pressed counties had adequate equipment or received desperately needed support.

Training on the new $107 million system — a Rube Goldbergian assemblage of interrelated components — was widely described as wanting. The state deployed little more than one technician per county. And at most polling sites there was only a single scanner, with little apparent regard for the expected turnout.

"What I experienced was a complete meltdown," Jacoria Borders, a Fulton County poll worker hired the day before the election, testified at a legislative hearing.

Questions have also emerged about the accuracy of the vote count. County officials, good-government groups and elections experts expressed concern that Georgia's new system failed to count some mail-in ballots marked with check marks or X's instead of filled-in ovals. Some county officials believe that thousands of votes could remain uncounted.

Mr. Raffensperger's office insisted it was following the guidance of the federal Election Assistance Commission, which certified its voting machines, on how much of an oval must be filled in for a ballot to be reviewed. But the commission says no such guidelines exist.

"If the reports are true, something is wrong, I'm telling you," said a senior elections official in another state.

It was the historical failings of the secretary of state's office that got Georgia into this position in the first place. The state moved to the new system after a federal judge found in 2018 that elections officials "had buried their heads in the sand" as evidence mounted that their old machines were plagued by security flaws.

The story of Georgia's elections breakdown underscores the critical role played by secretaries of state, generally low-profile officials whose importance is magnified this year by twin challenges to the very act of casting a ballot: the pandemic and the fevered legal battles in many states over efforts to limit who can vote. Indeed, Mr. Raffensperger and his Republican predecessors have long worked to tighten the state's voting rules — policies that have fallen heaviest on communities of color, leading to continuing litigation with civil rights groups.

Central to November's election in Georgia, as the coronavirus surges through the South, will be questions about the availability of mail-in voting. Since the primary, Mr. Raffensperger has decided to stop sending absentee-ballot applications to registered voters, which seems certain to increase crowding at the polls. Instead, he plans to create a website where voters can apply for absentee ballots, a step that will not help many older Georgians or those without internet access.

He has also said he hopes to work with counties to deploy more technically skilled poll workers. But legislative remedies stalled amid partisan rancor.

In interviews, Mr. Raffensperger said repeatedly that he did not accept any responsibility for hourslong lines or malfunctioning voting equipment. He has begun an investigation of Fulton County's management of the primary.

"This all lays on Fulton County," Mr. Raffensperger said. "The counties run their elections, and the problems in Fulton County are problems with Fulton County and their management team, not with me."

Georgia's Democratic leaders, though, regard Mr. Raffensperger from a deep well of distrust.

"If there is an investigation, then the investigation should begin where the buck stops, at the top," said Michael L. Thurmond, the chief executive of DeKalb County, which encompasses parts of Atlanta and its suburbs, and recently moved on its own to send voters absentee-ballot applications. "They need to investigate themselves."

## A Court Intervenes

Republicans took control of the secretary of state's office in 2007, after decades of Democratic domination. They soon set about making it harder to vote.



After Karen Handel became Georgia's secretary of state, Republicans introduced strict new voter requirements.  Curtis Compton/Atlanta Journal-Constitution, via Associated Press

The newly elected secretary, Karen Handel, implemented an "exact match" system that could disqualify voters for minute differences between their registration forms and other government documents. That rule was overturned by the Justice Department, which found it "seriously flawed" and falling "disproportionately on minority voters." But Republicans reinstated such requirements after the Supreme Court stripped the Justice Department of its mandate to approve changes in voting rules.

Ms. Handel's successor, Brian Kemp, aggressively used the new powers, and in addition purged more than 1.4 million Georgians from the voter rolls, both bitter flash points with civil rights groups. In 2014, he balked at accepting thousands of registration forms collected by the New Georgia Project, which promotes minority voting, instead starting a three-year investigation of allegations that the organization had forged voter registrations; no wrongdoing by the group was found. Nearly all the registrations were ultimately accepted, though many came too late for the 2014 election.

Mr. Kemp was subsequently elected governor, in 2018, in a contest marred by charges of voter suppression. A group founded by his defeated opponent, Stacey Abrams, has filed a lawsuit charging that the state's electoral system is designed to be discriminatory.

But it was his office's lax oversight of Georgia's elections machinery that was highlighted in the summer of 2016, when a cybersecurity expert named Logan Lamb found that he was easily able to obtain registration records for the state's nearly seven million voters, along with passwords for the state's central elections server.

Mr. Lamb informed state officials, but the problems were not fixed.



Brian Kemp, who succeeded Ms. Handel as secretary of state, was elected governor in 2018, in a contest marred by charges of voter suppression.  Audra Melton for The New York Times

There were other issues as well. Under Mr. Kemp, Georgia went years without fixing a widely known security flaw in its old Diebold voting machines that had been corrected in other states.

(The risks would be underscored in 2018 when Robert S. Mueller III, the special counsel investigating Russian interference in the 2016 election, indicted 12 Russian operatives who had targeted the voting systems of Georgia and two other states.)

In 2017, an advocacy group sued the secretary of state's office over the integrity of the voting system. Within days, the state mysteriously deleted election data critical to the case. The federal judge overseeing the matter, Amy Totenberg, later said the state "minimized, erased or dodged" underlying issues in the case, leaving "critical deficiencies and risks that impact the reliability and integrity of the voting system."

Last August, Judge Totenberg ordered the state to scrap its voting machines and undertake the daunting task of starting over for 2020.

---

**Let Us Help You Protect Your Digital Life**

- With Apple's latest mobile software update, we can decide whether apps monitor and share our activities with others. Here's what to know.

- A little maintenance on your devices and accounts can go a long way in maintaining your security against outside parties' unwanted attempts to access your data. Here's a guide to the few simple changes you can make to protect yourself and your information online.

- Ever considered a password manager? You should.

- There are also many ways to brush away the tracks you leave on the internet.

---

Amid the litigation, the state turned to Dominion Voting, a Denver-based company whose lobbyists included a former chief of staff to Mr. Kemp and a former secretary of state.

While Dominion technology is widely used, both in the United States and as far away as Mongolia, the particular system Georgia purchased is seen by some experts as unnecessarily complex, with a chain of components: a device to check in voters, another to cast votes, another to print ballots and a fourth to scan them.

Texas rejected a similar Dominion system, saying frequent problems during demonstrations had raised doubts that it could be implemented "without experiencing numerous and substantial errors," according to a state report. But versions of the system are used in a number of states, including Pennsylvania and California.

A primary attraction of the new machines is the paper record they create — an analog layer of security against a cyberattack. But some experts see the multitude of components as more vulnerable to attack and to technical problems.

Georgia's old system was "absolutely one of the worst in the country," said J. Alex Halderman, a computer scientist who was an expert witness for the plaintiffs in the lawsuit. The new system, he added, "still leaves a lot to be desired."

## 'A Management Problem'

Cathy Cox walked into her old offices last fall for a 90-minute demonstration of Georgia's new voting machines.

When Ms. Cox, Georgia's last Democratic secretary of state, introduced a new voting system back in 2002, her office held demonstrations at supermarkets, churches and county fairs. Mr. Raffensperger, she said, had no similar agenda, despite the complexities of navigating the new system. Instead, he planned a social-media campaign, which Ms. Cox warned would fail to reach thousands of older and low-income Georgians without internet access.

"Their response to that was that all older people have Facebook accounts to talk to their grandchildren," she recalled.

Mr. Raffensperger's office disputed Ms. Cox's account, saying it had modeled its approach on hers and had done regional demonstrations.

Hers was hardly the only voice of concern. In January, two months before Georgia's originally scheduled presidential primary, county elections administrators from across the state fretted they wouldn't have time to train poll workers on the new, and still undelivered, machines.



A poll worker at an Atlanta elementary school.  Erik S Lesser/EPA, via Shutterstock

"I'm getting a little worried," Sharon Gregg, the assistant elections director in Walton County, wrote in an email thread with other state and local elections officials. Robin Webb, the elections coordinator in Hart County, wrote that she had yet to receive needed guidance on poll-worker training from the state elections board. "Some days I am in a panic mode," she said.

The pandemic led Mr. Raffensperger to twice delay the presidential primary, ultimately combining it with primaries for Georgia's other federal races on June 9. To alleviate crowding at voting sites, he mailed absentee ballot applications to all active registered voters, a move supported by Democrats.

Come Election Day, the extra time afforded by the delay didn't help. At a recent state House hearing, Danielle Wynn, a poll watcher in Floyd County, which borders Alabama, testified that three of the four ballot-marking devices at her location failed at one point. Poll workers were also unprepared for a flood of questions about absentee ballots that voters had requested but not received, and unsure what to tell those who brought completed ballots to the polls. "Many voters just opted to leave without voting," she said.

Carol Beckham, manager of a small polling site in Carroll County, said confusion over absentee ballots was "just an abysmal failure" that the state might have helped with more public outreach. And problems she faced getting a ballot-marking device to communicate with a printer "would've caused chaos" in larger precincts, she said.

Jonathan Banes, a precinct manager in DeKalb County, said he had had only a rudimentary tutorial on the new voting machines in February, followed by an online refresher. "We didn't go into troubleshooting scenarios on how to deal with technical issues," he said, adding that he had been shown basics like how to "turn the machines on, turn them off — that's it."

That left him and a depleted crew of poll workers unable to start their equipment without outside help. "At the local and state level, there's just not great coordination," he said.

The state's most populous county, Fulton, was overwhelmed by absentee-ballot requests. Election offices also briefly closed after a worker became fatally ill with the coronavirus. Richard L. Barron, the county's elections director, likened the dual effort of mailing ballots and conducting in-person voting to running two elections simultaneously — all with a pandemic-depleted staff.

Fulton voters waited weeks for absentee ballots from the county that never came, or arrived damaged. After waiting a month for an absentee ballot, Jon Ossoff, who would win the state's Democratic Senate primary, waited four hours to vote early on June 5 at the C. T. Martin Natatorium in Atlanta. He returned home to find that his absentee ballot had finally arrived. Ms. Abrams said hers came with a return envelope that was sealed.

"There are a myriad of things that happened," Robb Pitts, the chairman of the Fulton County Board of Commissioners, said in an interview, including that at the 11th hour some longtime polling venues decided against welcoming voters amid the pandemic.

"We had to scramble about at the last minute to find new locations," Mr. Pitts said. "And in some cases, we didn't have a chance to check the power with respect to the machines, and the wattage." That led to electrical failures at some sites.

Confidence has waned in Mr. Raffensperger and in Fulton's leadership. One Democratic lawmaker in Fulton, Josh McLaurin, sought to give lawmakers greater oversight over the county's elections, but the move stalled in the State Senate.

Mr. Marvin, who was troubled by the lack of scanners when he voted in the Democratic primary at Park Tavern, said, "I don't blame the people working there, they had to deal with grumpy voters — and we *were* grumpy." It was "a management problem," he added, that "goes all the way to the top, which is the secretary of state of Georgia."

## Checking the Check Marks

One challenge lingered after the polls closed: how mail-in ballots were being counted. The Coalition for Good Governance is reviewing how Dominion scanners count such ballots and is considering suing the state, according to the group's executive director, Marilyn Marks.

"You'd be surprised how big the X's and check marks are that don't get counted," she said.





Some officials believe that thousands of votes could remain uncounted.

Workers examining mail-in ballots stumbled across the uncounted votes in the days after the primary, discovering that the Dominion scanners were programmed to ignore marks that filled in less than a certain percentage of a ballot's black-outlined oval. The secretary of state's office said the percentage thresholds used by Georgia "were the same ones certified" by the federal Election Assistance Commission.

But Kristen Muthig, an agency spokeswoman, said there was no federal standard. "It varies at the state and local level and by the various equipment," she said.

Mr. Raffensperger's aides seemed unsure of the threshold, saying at various points that it was 12 percent, 13 percent or 14 percent. In Colorado, by comparison, any black-colored ballot ovals that are less than 9 percent filled in are automatically not counted by scanners.

In Georgia's Morgan County, Jeanne Dufort, a former textile importer who served on an appointed vote review panel — and who has challenged state voting practices in the past — reviewed 150 ballots and counted about 20 unrecorded votes.

Adam Shirley, working on a similar panel in Athens-Clarke County, said his group reviewed 76 ballots and found 12 that included votes clearly visible to the human eye that had not been counted by the scanners. Mr. Shirley, a science teacher, worries about what could happen statewide in November.

"If you start talking about a few hundred votes per county, times 159," he said, "that could swing the election."

## The Next Election

To Ms. Abrams, the Democrat who has become the state's most visible voting-rights advocate, election problems were foreseeable, as was the fact they would not be foreseen.

"He had months to get this election right," she said of Mr. Raffensperger. "He rescheduled the primary twice and he still failed."

"He, of his own volition, invested in a complicated machine, a purchase that he inadequately prepared the counties for adoption of," she added. "He did not provide support when counties raised their hands and raised their voices saying, 'We are concerned about the deployment of these brand-new machines in what will likely be among the most contentious elections we've had in 20 years.'"

Since the primary, only limited action has been taken. Legislative remedies were derailed after Republicans tried to bar counties from mailing out ballot applications. ("That sent the bill into the ditch," said Mary Margaret Oliver, a Democratic member of the state House.)

Echoing President Trump, state Republicans have argued, without evidence, that mail-in voting is a recipe for widespread fraud. This spring, David Ralston, the speaker of Georgia's House, expressed opposition to sending out mail-in ballot applications amid the pandemic, saying it would "be extremely devastating to Republicans and conservatives."

Mr. Raffensperger was asked in the interviews whether he was concerned about his office's poor relations with Black voters. "I believe that I've been very open-minded and fair," he said, noting that he had demonstrated some voting machines at the King Center in Atlanta, a foundation run by the family of the Rev. Dr. Martin Luther King Jr. "Whenever we can reach out to groups, we've been very proactive."



State Farm Arena, home of the Atlanta Hawks NBA team, is an early-voting site for the August primary runoff and the general election.  Erik S Lesser/EPA, via Shutterstock

Some of Georgia's best hopes might come from outside government. The Atlanta Hawks NBA franchise recently announced that its State Farm Arena would become an early-voting location for August's primary runoff and the general election, potentially accommodating 250 voting machines. (State law restricts Election Day voting to local precincts.)

Evan Malbrough, a 2020 graduate of Georgia State University, has started recruiting and training a cavalry of college students to be Atlanta poll workers. Spurred by what he calls a desire to "fix voter suppression," he recently founded the Georgia Youth Poll Worker Project, figuring that students would be more adept at voting technology than typically older poll workers.

"It's like when you live with your parents, and they got a new phone or a new TV, and you have to set it up," said Mr. Malbrough, who knows from experience — he lives with his parents, and has also been a poll worker. "Even without training, I feel like most young people could intuitively fix a lot of these issues."

In suburban DeKalb, Mr. Thurmond, the chief executive, hopes to avoid a repeat of what he calls the "meltdown" in June. Under his plan, poll workers will be designated "front-line workers" and receive hazard pay. He is looking for new polling places with greater electrical capacity.

For Mr. Thurmond, a former state labor commissioner who is one of the few Black people ever elected statewide, the struggle over voting is personal.

"It's embedded in the DNA, here in Georgia, to suppress — first to deny, and then to suppress — the African-American vote," he said. "It's a sad and embarrassing part of the political history of the state of Georgia. It's unfortunate that in 2020 we're still engaged in this fight."

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Anatomy of an Election 'Meltdown' in Georgia

# Exhibit A15



*Democracy Dies in Darkness*

# Another showdown set this week over Georgia voting machines

By Kate Brumback | AP

September 9, 2020

ATLANTA — Voting integrity activists will try this week to convince a federal judge that Georgia should scrap its brand new touchscreen voting machines in favor of hand-marked paper ballots. The state, meanwhile, will ask her not to order any changes, especially with an election looming.

A hearing scheduled for Thursday and Friday will be the latest skirmish in a long-running fight. A lawsuit filed in 2017 against state and county election officials that originally challenged the state's old, outdated voting machines has morphed to target the new machines and election system that Georgia bought last year for more than $100 million.

U.S. District Judge Amy Totenberg, who scolded state officials for failing to address serious problems with the old system, said the purchase of a new system was a step in the right direction. Now she must decide whether the new system places an unconstitutional burden on the right to vote.

The election integrity activists say the new voting machines are unaccountable and unverifiable and have many of the same security vulnerabilities as the old ones, despite Totenberg's warnings that the state must have a secure and reliable voting system.

State officials argue the new machines have been thoroughly tested and that security measures will prevent problems. They say the activists are seeking changes through the courts after failing to get the outcome they wanted in the legislative process. They also argue the U.S. Supreme Court has cautioned lower courts against ordering changes close to an election.

The activists have sought help from the courts for years. They argued in 2018 that the touchscreen voting machines Georgia had been using since 2002 were vulnerable to hacking and provided no way to confirm that votes were recorded correctly because they lacked a paper trail. They asked Totenberg to order a switch to hand-marked paper ballots for the midterm elections.

Lawyers for the state argued that switch would be difficult, costly and would cause chaos.

In an order on Sept. 18, 2018, Totenberg said the activists had demonstrated "the threat of real harms to their constitutional interests," but she said forcing a change to hand-marked paper ballots less than two months before an election was too risky.

Totenberg's ruling had harsh words for the state, saying election officials had "buried their heads in the sand," failing to address serious problems with the voting system that had long been evident. She warned that "further delay is not tolerable."

In the next legislative session, lawmakers authorized the purchase of a new election system to include ballot-marking

machines that would be paper-based. Secretary of State Brad Raffensperger in July announced the purchase from Dominion Voting Systems and vowed to have it ready for voters to use by March 2020.

With the state still planning to use the old system for some special and municipal elections in the interim, the voting integrity advocates asked Totenberg to order the state to immediately stop using the old system and to use hand-marked paper ballots instead.

On Aug. 15, 2019, Totenberg, once again, declined to order a switch to hand-marked paper ballots, citing worries about election officials' capacity to manage an interim switch while also implementing the new system on a tight timeline. But she prohibited the state from using the old system past the end of 2019 and ordered election officials to use hand-marked paper ballots if the new system wasn't ready in time for the presidential primary.

She also again offered scathing criticism, devoting a considerable portion of her 153-page order detailing the state's shortcomings in addressing concerns about its voting system. The state, she wrote, has "minimized, erased, or dodged the issues underlying this case."

In mid-January, with the March primary date fast approaching and many counties still awaiting delivery of the new voting machines, the activists urged Totenberg to order a more concrete backup plan. Lawyers for the state assured the judge they were on track to meet their deadlines.

Totenberg told both sides during a conference call that she didn't consider herself a "guarantor" for Georgia's election system roll-out.

"It may end up being a mess," she said during the call. "But that's on their heads at that point."

The primary elections were moved to June because of the coronavirus pandemic, with a runoff in August. The June election was marred by problems, including long lines and polling places that opened late in 20 counties.

Lawyers for one set of plaintiffs said the new system has proven to be "spectacularly chaotic and unreliable." Lawyers for the other set of plaintiffs, including the Coalition for Good Governance, argue that allowing the November election to proceed on the new system would result in "a colossal train wreck for democracy, which will leave counties and the State utterly unable to defend their election results against charges of fraud and error."

The new touchscreen voting machines print a paper ballot with a human-readable summary and a barcode that is read by a scanner to tally the votes. But voters can't be sure that the barcode read by the scanner accurately reflects their selections, the activists argue. Many voters also don't take the time to check the human-readable part, making meaningful audits impossible, they say.

The new system has many of the same security vulnerabilities as the old system, and equipment malfunctions inadequate poll worker training contributed to the long lines during the primary, the activists argue. The scanners also fail to count some valid marks on hand-marked absentee ballots, they say.

Switching to hand-marked paper ballots would be easy because that's already the backup in place in case of emergencies, like equipment failures, they argue.

State officials argue that the activists have failed to identify any specific problems with the new voting machines and haven't identified any active security risk or hacking potential. Now they're asking the federal judge to overstep her authority and wade into a process governed by state law, the state says.

With the November election "practically already underway," switching at this point would be too costly and disruptive, the state argues.

Copyright 2020 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or

redistributed without permission.



# Exhibit A16

**AP NEWS**

# With time short, judge mulls Georgia voting system changes

By KATE BRUMBACK    October 7, 2020

---



ATLANTA (AP) — With the start of early voting less than a week away and a software update being installed to address a glitch in Georgia's voting machines, a federal judge was still considering a request by voting integrity activists to sideline the new touchscreen voting machines in favor of hand-marked paper ballots for the November general election.

U.S. District Judge Amy Totenberg is presiding over a long-running lawsuit challenging the election system the state bought last year from Dominion Voting Systems for more than $100 million. The activists argue the system places an unconstitutional burden on the right to vote because voters cannot be confident their votes are accurately counted. A bug in the touchscreen machines and a hasty software update underscore that the machines aren't ready for use, they say.

State officials have countered that Georgia has made significant improvements in recent years to update and secure election infrastructure. They have urged Totenberg not to order any changes so close to the election, saying they would be extremely costly and difficult to implement in time. The new problem was identified through testing meant to catch such issues and was quickly addressed, they say.

The three-week in-person early voting period is set to begin Monday, and Election Day is less than four weeks away.

Totenberg said she had been ready to issue a ruling on Sept. 28 until the activists raised new concerns about the voting machines in a Friday night court filing three days earlier.

During preelection testing, county election officials discovered a problem with the display for a high-profile, 21-candidate U.S. Senate race. Under certain circumstances, not all of the candidates' names fit on a single screen.

Lawyers for the state told the judge during an emergency teleconference Sept. 28 that it was a "very minor issue" that could be addressed with a software change.

Lawyers for the activists raised concerns about the severity of the problem and the security of a last-minute fix.

Dominion submitted the fix to a third-party laboratory, Pro V&V, for evaluation. A report from Pro V&V says the problem is not found in the new version of the software and the change was minor.

The election integrity activists submitted declarations from two computer science experts who reviewed the Pro V&V report. They said the evaluation was insufficient to verify the cause of the problem and the effectiveness of the solution.

The experts also said the report indicates multiple changes to the source code, meaning there's a greater likelihood of unintended side effects and opening the door for hackers.

The safeguards and testing outlined by the state to mitigate those risks are inadequate, the experts said.

The process of updating the software requires completely replacing the core of the Dominion software on every voting machine, one of the experts, University of Michigan computer science professor J. Alex Halderman, testified last week according to a transcript of the closed-door hearing unsealed Monday.

"(T)his is not a typical procedure to be going through," he said. "In an emergency, perhaps you would need to. But even then, it would be an extremely risky thing to be doing both from a correctness standpoint and from a security standpoint."

Totenberg had asked the state to provide her with the Pro V&V report and any documents about the change submitted to the U.S. Election Assistance Commission, which sets voluntary guidelines for election management and certification.

The EAC was reviewing the request from Dominion after receiving it Tuesday, according to Ben Hovland, commission chairman. Dominion had previously submitted the change to a lab certified by the commission, which should help expedite the review, he said.

But the update was distributed to county election officials last week with instructions to install it on their machines.

Kevin Skoglund, another of the activists' experts, told the judge the EAC certification of a voting system would be voided if the change was made without the commission's prior written approval.

Georgia law says the voting voting machines "shall be certified by the United States Election Assistance Commission prior to purchase, lease, or acquisition."

The update was certified by the secretary of state after "thorough testing and validation" by Dominion, Pro V&V and the secretary of state's office, Deputy Secretary of State Jordan Fuchs said.

"Georgia law was expressly written to not require continued EAC certification for updates, but to only require it for the initial purchase of the system," she said.

Marilyn Marks, executive director for the Coalition for Good Governance, a plaintiff in the suit, rejected that.

"This is like saying that school buses need good tires when purchased but the tires can be replaced with bald tires as soon as they leave the factory," she said.

____

Associated Press writer Christina A. Cassidy contributed reporting.

# Exhibit A17



## The Atlanta Journal-Constitution

 Log In

Stay informed and know what's really going on.

Subscribe for 99¢.

# In high-stakes election, Georgia's voting system vulnerable to cyberattack



‹ Caption

Credit: JOHN SPINK / AJC

ELECTIONS 2021

By Alan Judd, The Atlanta Journal-Constitution

Oct 23, 2020

Advertisement

Headed into one of the most consequential elections in the state's history, Georgia's new electronic voting system is vulnerable to cyberattacks that could undermine public confidence, create chaos at the polls or even manipulate the results on Election Day.

Advertisement



Nespresso Festive Coffees

Enjoy our Limited Edition

SHOP NOW >

Computer scientists, voting-rights activists, U.S. intelligence agencies and a federal judge have repeatedly warned of security deficiencies in Georgia's system and in electronic voting in general. But state officials have dismissed their concerns as merely "opining on potential risks."

Instead, an investigation by The Atlanta Journal-Constitution shows, Secretary of State Brad Raffensperger's office weakened the system's defenses, disabling password protections on a key component that controls who is allowed to vote.



‹ Caption

Credit: Steve Schaefer

In addition, days before early voting began on Oct. 12, Raffensperger's office pushed out new software to each of the state's 30,000 voting machines through hundreds of thumb drives that

experts say are prone to infection with malware.

And what state officials describe as a feature of the new system actually masks a vulnerability.

Officials tell voters to verify their selections on a paper ballot before feeding it into an optical scanner. But the scanner doesn't record the text that voters see; rather, it reads an unencrypted quick response, or QR, barcode that is indecipherable to the human eye. Either by tampering with individual voting machines or by infiltrating the state's central elections server, hackers could systematically alter the barcodes to change votes.

---

Explore    Fix coming to Georgia touchscreens to restore missing Senate candidates

---

Advertisement

---

Such a manipulation could not be detected without an audit after the election. Georgia plans to audit just one race on this year's ballot.

The new voting system "presents serious security vulnerability and operational issues" caused by "fundamental deficits and exposure," U.S. District Judge Amy Totenberg wrote in a recent order, in which she criticized state officials for not taking the problems more seriously.

"These risks," Totenberg wrote, "are neither hypothetical nor remote under the current circumstances."

State officials zealously defend the new system, however, suggesting hackers could mount an attack only in person, not through online connections. In court papers, lawyers for the state said the system has been subjected to extensive testing and has a variety of security features built in. The secretary of state, who oversees Georgia elections, hired a consultant to assess the

system's security, but officials refuse to release the consultant's report, saying it contains sensitive information.



Credit: JOHN SPINK / AJC

The voting system's introduction in a statewide general election comes at a fraught moment in Georgia's political history.

For the first time in nearly three decades, the state's 16 electoral votes are in play and could swing the outcome of the presidential election. At the same time, both of the state's U.S. Senate seats are on the ballot as Democrats and Republicans fight for control of Congress.

> **"These risks are neither hypothetical nor remote under the current circumstances."**
>
> - U.S. District Judge Amy Totenberg

These circumstances make Georgia an unusually attractive target for foreign agents, political operatives or others who want to disrupt or raise doubts about the 2020 elections, said

Lawrence Norden, director of the election reform project at New York University's Brennan Center for Justice.

"You're going to target the places that have the most political value," Norden said. "I'm definitely going to be holding my breath for Georgia on election night."

---

## Explore   Georgia voter guide

---

### 'Manipulation'

Georgia purchased the $104 million system last year to replace 18-year-old equipment that recorded votes on a touchscreen device with no paper backup. The new system runs on a mind-boggling network of components: an electronic pollbook to check voters' registration, a device that encodes a ballot access card, a touchscreen ballot-marking device, a printer and, finally, an optical scanner.

No other state uses the system, manufactured by Canada-based Dominion Voting Systems, in every polling place. Texas rejected Dominion's equipment, saying its examiners encountered "multiple hardware issues" and could not certify that it was "safe from fraudulent or unauthorized manipulation."

Dominion disputed the Texas findings and noted that several large local governments across the United States have purchased the system. Among them are Cook County, Illinois, which includes Chicago, and San Francisco and San Diego counties in California.





Credit: JOHN SPINK / AJC

U.S. intelligence agencies, however, have warned that electronic voting systems are likely targets of foreign governments trying to disrupt elections. The Department of Homeland Security says that in 2016, operatives affiliated with the Russian government probed the election systems of all 50 states; in Illinois, they accessed as many as 200,000 voter registration records but apparently did not tamper with them.

Russian-controlled agents also tried to enter the computer networks of county election offices in Georgia, Florida and Iowa, according to an indictment obtained by Special Counsel Robert Mueller during his investigation of foreign meddling in the 2016 presidential election.

Explore   From June: Election fiasco reveals flaws with Georgia's new voting system

This year, "our adversaries also seek to compromise our election infrastructure," the National Counterintelligence and Security Center said in July. "We continue to monitor malicious cyber actors trying to gain access to U.S. state and federal networks, including those responsible for managing elections."

On Wednesday, national security officials said Iran and Russia had obtained American voter registration data in an effort to influence the presidential election. They said Iran was behind an email campaign that sought to intimidate likely Democratic voters.

The National Academies of Science and the U.S. Senate Intelligence Committee, among others, have said paper ballots with readable text are the safest method for conducting elections. In a preliminary ruling on a lawsuit seeking to force Georgia to adopt paper balloting, Judge Totenberg agreed. But she opted not to order a last-minute change, despite her exhaustive findings of security problems in the new system.

Raffensperger's office declined the Journal-Constitution's request for an interview about security issues.



Credit: JOHN SPINK / AJC

Jordan Fuchs, the deputy secretary of state, responded to the request in an email asking who else would be quoted in the story. "If the game plan is to simply interview 'experts' ... I doubt we are interested in participating."

In a news conference last Monday, Raffensperger said his office has "really strong cybersecurity defenses" and the Department of Homeland Security would observe the election from his agency's offices.

"I never want to say we don't have any concerns," he said. "We've always got concerns — new system, old system, it really didn't matter. We understand that hackers work 24/7.

"If you look at your emails, every day people are looking for ways to scam you out of money. People would also love to scam you out of a vote."

### Exposing 'the gospel'

Most Georgians got their first look at the new voting system on June 9, during primary elections that had been delayed twice because of the coronavirus pandemic.

It didn't go well.

Electronic pollbooks — computers that confirm voters' eligibility — crashed and rebooted at will. Some people were allowed to vote a second time even though they had also cast an absentee ballot. At some polling places, voters waited in lines so long that only a drone could see to the end.

Five days after the primary, the secretary of state's office devised a solution. To speed up voting, it would disable password protections for the pollbooks, which verify voters' identity and eligibility.

"It was decided after the June election that that was a redundant security measure," David Greenwalt, an executive with one of the state's election equipment vendors, said during a training webinar for election officials on June 14. "So we have excluded the poll worker login screen from the process."



Credit: Alyssa Pointer / Alyssa.Pointer@

The change did not prevent massive delays when early voting began this fall, when some voters waited six, eight and even 10 hours to cast ballots. The secretary of state's office has not explained what happened, except to say the system needed additional "bandwidth."

Officials had already suggested the passwords didn't protect the system, anyway.

"We were taking away an entryway password that was the same for everybody in the county, that really didn't add any security but an extra step that basically seemed unnecessary to us," Gabriel Sterling, the voting system implementation manager for the secretary of state's office, said in an interview this summer. "We're trying to make it easier for people to make the poll pad function."

This solution, however, overlooked the potential widespread harm that could occur if hackers infiltrated the system.

Pollbooks are "the gospel of who gets to vote," said Duncan Buell, a computer science professor at the University of South Carolina who studies electronic voting systems.

Access to a single electronic pollbook could enable hackers to invade the state's voter registration database. From there, Buell said, they could disenfranchise people in areas with certain demographics and voting patterns.

Some voters could be deleted from the rolls, making it appear they had never registered. Some could be surreptitiously assigned to a voting location other than their correct precinct. Others could be listed as having cast an absentee ballot or voted early, rendering them ineligible on Election Day. Or the entire database could be scrambled, bringing the election to a halt.

> **"We were taking away an entryway password that was the same for everybody in the county, that really didn't add any security but an extra step that basically seemed unnecessary to us. We're trying to make it easier for people to make the poll pad function."**
>
> - Gabriel Sterling, voting system implementation manager for Georgia

In a report last year, the U.S. Senate Intelligence Committee listed pollbooks among the "vulnerable components of the U.S. election infrastructure." The committee recommended that

officials institute multi-factor authentication on all voting databases, requiring at least two separate steps to confirm an authorized user's identity.

But when Georgia eliminated the password requirement, it created "a vulnerable, high-risk, high-reward target for an adversary of any skill level who either seeks publicity or is deliberately disenfranchising targeted voters," Harri Hursti, an election security expert, said in an affidavit supporting the lawsuit to block the state's new voting system. "Passwords must be required."

Tapping into the system would be relatively easy, Hursti said in an interview, because the pollbooks have internet capability, even if they are not always actively connected to a WiFi network, and are linked to each other through Bluetooth connections.

"You can be in a parking lot" and gain access wirelessly, Hursti said. "You can be in a nearby building."

Streamlining the voting process, he said, is not a valid reason to remove protections against intrusion.

"Convenience is always the enemy of security."

As Election Day approaches, President Donald Trump claims, without evidence, that the contest is "rigged" against him.

Democrats worry that changes in the U.S. Postal Service were intended to prevent the timely delivery of mail-in ballots, potentially disenfranchising millions of voters.

In Georgia and elsewhere, Republican politicians warn broadly of voter fraud, Democrats of voter suppression.

With so much distrust already in the political environment, Buell said, manipulating vote totals might not be necessary to disrupt the election.

"You could simply make it not possible to believe the result."

## About the Author

   **Alan Judd**



# Exhibit A18



## INSIDER

Subscribe

**US MARKETS CLOSED**    In the news

| ▼ **Dow Jones** +0.15% | ▼ **Nasdaq** +0.76% | ▼ **S&P 500** +0.39% | ▼ **TSLA** +5.1% | ◣ **FB** -1.44% | ▼ **BABA** +0.54% |

---

HOME  ›  POLITICS

# Trump and his allies filed more than 40 lawsuits challenging the 2020 election results. All of them failed.

**Jacob Shamsian and Sonam Sheth** Updated Feb 22, 2021, 4:03 PM

  



HOMEPAGE    Subscribe

**Trump and allies filed dozens of lawsuits in an effort to contest the results of the 2020 election.**

**His campaign filed lawsuits and motions to intervene in cases in several swing states.**

**They've notched zero victories.**

**Visit the Business section of Insider for more stories.**

**Get a daily selection of our top stories based on your reading preferences.**

Email address

SIGN UP

By clicking 'Sign up', you agree to receive marketing emails from Insider as well as other partner offers and accept our Terms of Service and Privacy Policy.

ADVERTISING



< HOMEPAGE                                                    Subscribe

doddering, and mentally deficient, President Donald Trump went on the offense,

spreading lies and conspiracy theories about a "rigged" election marred by "major fraud" from Democrats.

Before the Capitol insurrection on January 6, Trump's claims alternated between demanding that some states stop counting ballots, which he didn't have the power to do, and saying that others should keep counting, which they were doing anyway.

To that end, the Trump campaign, Republican allies, and Trump himself had mounted at least 42 legal challenges since Election Day.

They've won zero. President Joe Biden was inaugurated on January 20.

---

SPONSOR CONTENT

**Advanced recycling turns used plastic into a resource. Here's how it works and how it can reduce plastic waste**

Read the story



---

The lawsuits argued that states and counties violated election laws, playing into Trump's political strategy to discredit the results of the 2020 election. The House impeached him a second time in January, charging him with inciting an insurrection, and the Senate acquitted him on February 13.

< HOMEPAGE                                                                 Subscribe

direct appeals to the Supreme Court, all of which also failed.

 **FOR YOU**

**SMALL BUSINESS**

**A 24-year-old TikTok creator with 2.4 million followers and a newly launched business shares the daily schedule that keeps her organized**

The Trump campaign initially had a single win, when a Pennsylvania judge ruled on November 12 that first-time voters were supposed to confirm their IDs with county boards of election by November 9, rather than November 12. The decision opened the door to disqualify the ballots of people who didn't verify their IDs in time. But the state Supreme Court later overturned that decision.

Here's what happened with all of Trump's election lawsuits.

ADVERTISING

Learn more



‹  HOMEPAGE                                    Subscribe

## Direct appeals to the Supreme Court — 3 losses

- Several Republican politicians, led by Rep. Mike Kelly, asked the US Supreme Court to block the certification of Pennsylvania's election results. The court turned down the case.

- Texas Attorney General Ken Paxton sued Pennsylvania, Georgia, Michigan, and Wisconsin in the US Supreme Court seeking to overturn their election results. The Supreme Court rejected the case.

- The Trump campaign asked the US Supreme Court to overturn three decisions from the Pennsylvania Supreme Court over various technical rules regarding absentee and mail-in ballots. The court rejected the case on February 22, declaring it moot.

## Pennsylvania — 13 losses

- The Trump campaign and the Republican National Committee filed a lawsuit asking a state appeals court to reject the Pennsylvania secretary of state's announcement that registered voters had until November 12 to provide proof of identity for mail-in ballots. Republicans believe the deadline should be November 9. This is the one case that Trump won, before the state Supreme Court overturned the lower court decision.

- In a wide-ranging federal lawsuit, the Trump campaign sued over alleged irregularities in the way ballots were counted throughout the state. They've argued that 14,000 votes should be thrown out. The campaign submitted a revised version of the lawsuit days later that retracted many of its original allegations. A judge threw out the case, saying Trump's lawyers presented the court "with strained legal arguments without merit and speculative accusations, unpaid in the

failed.

- Another federal lawsuit brought by Republicans sought to delay the deadline for ballot requests. The judge rejected it.

- A third federal lawsuit sought to stop the Montgomery County Board of Elections from allowing voters to "cure" their ballots — a process that allows people to fix clerical errors on their ballots to make sure their votes count. Republicans abandoned the lawsuit and withdrew from the case.

- The campaign sued in yet another federal case to stop Philadelphia County from counting votes without Republicans present. The judge dismissed the case after Trump's lawyers said Republican election watchers were, in fact, present.

- In another Montgomery County case, this one filed in a local court, Trump's lawyers sought to stop the county from counting mail-in ballots. The lawyers withdrew from the case.

- A lawsuit in Bucks County filed by Republican congressional candidate Kathy Barnette on Election Day made a technical challenge on the county's method of organizing ballots before counting them. She withdrew the case two days later and lost the election.

- The Trump campaign appealed that Bucks County case soon afterward, but a judge rejected it and pointed out in his ruling that fraud wasn't an issue.

- In a state court, Republicans challenged an instruction from the Secretary of State's office regarding provisional ballots. A state appellate court judge dismissed the request but ordered the secretary of state to segregate provisional ballots in case their validity becomes contested.

❮  HOMEPAGE                                                    Subscribe

- A group of Pennsylvania Republicans lost at the state Supreme Court with a

- A group of Pennsylvania Republicans lost at the state Supreme Court with a lawsuit trying to invalidate absentee voting after the voting period already ended, and trying to block the certification of election results.

- Another group of Republicans filed a similar lawsuit and lost.

- The Trump campaign filed a motion to intervene in a Supreme Court case brought by Republicans that centers on the deadline by which Pennsylvania officials are allowed to receive ballots. Pennsylvania's Supreme Court ruled that officials could receive ballots until November 6 as long as they are postmarked by Election Day. Republicans appealed the decision to the high court, which was deadlocked at 4-4 because Justice Amy Coney Barrett did not participate, leaving the lower court's ruling in place. The Supreme Court signaled it could hear the case again but has not granted the request to intervene.

## Nevada — 4 losses

- The Trump campaign filed a lawsuit requesting that ballots stop being counted in the state over concerns about signature-matching technology and election observers' claims that they weren't being allowed to watch ballots being processed closely enough. The Nevada Supreme Court denied the request.

- The Trump campaign and the RNC filed a lawsuit in state court asking to stop ballot counting in Clark County — a heavily Democratic area — until GOP officials could observe the process. A district judge rejected the request on the grounds that the plaintiffs did not have evidence to back up their allegations. Republicans appealed the case to the Nevada Supreme Court, which said on November 5 that the campaign and Republican officials had reached a settlement that allowed

‹ HOMEPAGE                                                    Subscribe

- A group of Republicans dropped a lawsuit in Clark County challenging mail-in

ballots, including those sent by members of the military.

- The Trump campaign filed a different lawsuit in Carson City District Court alleging multiple irregularities that the campaign claimed, without providing specific evidence, would be enough to overturn the election results in Nevada and flip the state to Trump. It failed.

## Georgia — 5 losses

- A judge in Chatham County denied the Trump campaign's request to toss out 53 ballots that a GOP poll watcher said arrived after polls closed at 7 p.m. on November 3. The Washington Post reported that the poll watcher presented no evidence in court that the ballots came in late and that county officials testified that they were received in time.

- Republican elector Lin Wood, whose attorney also represents the Trump campaign, sued to stop vote certification because. He argued that because the Georgia Secretary of State agreed to allow signature matching on ballots — a measure designed to prevent voter fraud — eight months before the election, his rights as an individual voter had been infringed upon. A state judge dismissed the case, saying the arguments have "no basis in fact and law."

- Wood filed another lawsuit in federal court and lost that one as well, losing again upon appeal.

- Sidney Powell, who was kicked off of Trump's legal team after spreading numerous conspiracy theories about election fraud, filed a federal lawsuit in Georgia alleging widespread election fraud. A federal judge quickly dismissed the case, calling it "extraordinary" that the lawsuit sought to disqualify the votes of

< HOMEPAGE                                                          Subscribe

- Nearly two months after he lost the election, Trump sued Georgia Governor Brian

Kemp and Secretary of State Brian Raffensperger seeking to "de-certify" the election, arguing that it wasn't carried out in accordance with Georgia law. Trump withdrew the case on January 7, according to court records reviewed by Insider.

## Michigan — 5 losses

- In a federal lawsuit, the Trump campaign alleged a number of irregularities — such as that GOP election observers were told to stand six feet away from ballot counters because of the coronavirus — meant that Michigan should not certify its votes. The Trump campaign withdrew the lawsuit, with Rudy Giuliani falsely declaring it achieved the result the campaign wanted.

- A judge on the Michigan Court of Claims denied the Trump campaign's request to stop counting ballots in the state. Judge Cynthia Stephens said litigating the issue didn't make sense given that ballots in Michigan had more or less been fully counted.

- A poll challenger named Sarah Stoddard and a group called the Election Integrity claiming that absentee ballots were improperly reviewed. Judge Timothy Kenny denied the motion on the grounds that there was no proof that election oversight

< HOMEPAGE                                                          Subscribe

denied the motion on the grounds that there was no proof that election oversight protocol hadn't been followed. Kenny issued another ruling later denying other motions, including a request for an additional audit of the election.

- A Republican-aligned law firm called the Great Lakes Justice Center filed a lawsuit in Wayne County's Circuit Court against Detroit and Wayne County alleging

  "massive fraud in the election vote-counting procedures" and calling for an entirely new election. A judge denied the case.

- Trump ally Sidney Powell also has a federal lawsuit pending in Michigan. It asks the judge to "de-certify" the state's electoral votes, which have already gone to Biden. The lawsuit has numerous typos and cites voting statistics from a county that does not exist. A judge ruled against her and issued a scathing 35-page opinion tearing it down on multiple fronts. She has appealed it all the way to the Supreme Court, which has not yet decided whether to take the case.

## Arizona — 4 losses

- The Trump campaign joined a lawsuit brought by two Republicans in Maricopa County claiming that a substantial number of GOP ballots were invalidated because voters used Sharpies to fill in their choices. There is no evidence that using Sharpies leads to issues with scanning ballots, and, in fact, officials have said using Sharpies is preferred. The Post also reported that the Maricopa County attorney's office said no ballots were rejected and that if they are, voters have an opportunity to cast another one. A Republican-aligned group abandoned the legal fight after Maricopa County officials challenged the factual basis for the lawsuit, and the Trump campaign lost the fight soon afterward.

‹ HOMEPAGE                                                          Subscribe

was improperly rejecting ballots cast by some voters. The lawsuit was dismissed after an audit found no problems with the votes.

- Arizona's Supreme Court unanimously rejected a case from the state GOP chair Kelli Ward, saying the facts she presented were incorrect and that she "fails to present any evidence of misconduct."

- Powell filed a lawsuit seeking to overturn election results as well, based on a conspiracy theory about voting machines used in the state. A judge dismissed the case.

## Wisconsin — 7 losses

- The Wisconsin Supreme Court rejected a case from the Trump campaign seeking to overturn election results.

- Trump personally filed a similar lawsuit in a federal court in Wisconsin. A Trump-appointed federal judge said he had standing to bring the case — a rare departure from other judges — and then ruled against him. An appeal failed as well, with the author of the appellate opinion also a Trump appointee.

- Wisconsin Voters Alliance, a right-wing group, sued the state elections commission and asked the state Supreme Court to throw out votes and have the Republican-controlled state legislature select the electoral college winner themselves. The state Supreme Court rejected it, saying it had little basis in fact.

- Wisconsin Voter Alliance also sued a number of defendants in Washington, DC, including Vice President Mike Pence, both houses of Congress, and the Electoral College, trying to block the certification of Wisconsin's votes as well as those of other states. A federal judge threw out the case, blasted it as an attempted "undermining of a democratic election" full of falsehoods, and said he would refer

‹ HOMEPAGE                                                                 Subscribe

- Another lawsuit backed by the Republican-aligned Amos Center for Justice and

Liberty argued that the use of ballot drop-boxes was illegal. It also asked that the state Supreme Court should throw out every vote cast and have the GOP legislature select the state's electoral votes. A judge ruled it moot.

- A lawsuit from Sidney Powell and Lin Wood, another Trump ally, makes numerous conspiratorial claims about the election. A federal judge criticized it for containing errors and typos, and one person listed as plaintiff said they never signed up to be a part of the lawsuit, later dismissing the case.

- Trump and Pence personally sued Biden and Vice President-elect Kamala Harris in a state court seeking to overturn votes in two Wisconsin counties with large Black populations, both of which sided with Democrats. A judge threw out the case. When Trump appealed the case, another judge rejected it and said it "smacks of racism." An appeal to the Supreme Court also failed.

## New Mexico — one loss

- The Trump campaign sued the state over what it claims was the illegal use of ballot drop boxes after the state had already certified its results and sent them to the Electoral College. It dropped the claim in January.

**Key cases and Supreme Court rulings before Election Day**

## Pennsylvania

In Pennsylvania, the state Supreme Court ruled that election officials could receive mail-in ballots until November 6 as long as they are postmarked by Election Day.

Republicans requested an immediate stay from the US Supreme Court that would have blocked the state Supreme Court's ruling.

But the US Supreme Court was deadlocked at 4-4, leaving the lower court's ruling in place. Justices Neil Gorsuch, Brett Kavanaugh, Clarence Thomas, and Samuel Alito voted to grant Republicans' request, while Chief Justice John Roberts, and Justices Stephen Breyer, Elena Kagan, and Sonia Sotomayor dissented.

Justice Amy Coney Barrett declined to participate in the case "because of the need for a prompt resolution of it and because she has not had time to fully review the parties' filings," the court said in a statement. However, Barrett has not recused herself, meaning she could cast a decisive fifth vote when the Supreme Court takes up the case again.

## North Carolina

In a similar case brought by Republicans in North Carolina, the Supreme Court ruled that ballots received up to nine days after November 3 could be counted as long as they are postmarked by Election Day.

⚡ **FOR YOU**

‹ **HOMEPAGE**                                                        Subscribe

**'I was literally screaming in pain': Young women say they met Barstool Sports founder**
Dave Portnoy for sex and it turned violent and humiliating

Dave Portnoy for sex and it turned violent and humiliating

The decision came after the Trump campaign and Republicans asked in two separate cases for the high court to put back in place a June statute from the state's Republican-controlled Legislature that would have allowed ballots to be counted only if they were received up to three days — not nine — after Election Day.

Five justices — Roberts, Kavanaugh, Breyer, Kagan, and Sotomayor — ruled against reinstating the statute. Gorsuch, Alito, and Thomas dissented, while Barrett did not participate in the North Carolina case.

## Wisconsin

Republicans notched a victory in a case involving the deadline to receive ballots in Wisconsin. The US Supreme Court ruled against reviving an appeals court decision that would have allowed election officials to receive absentee ballots up to six days after Election Day.

< HOMEPAGE                                                    Subscribe

Alito — ruled against reviving the lower court's ruling, while the three liberals —

Breyer, Kagan, and Sotomayor — dissented.



The Wisconsin case made headlines because of Kavanaugh's and Kagan's dueling opinions.

Kavanaugh, a Trump-appointed justice who was confirmed to the high court in 2018, wrote in a concurring opinion that all ballots should be received by Election Day.

⚡ FOR YOU

‹ HOMEPAGE                                                    Subscribe

**meeting with congressional investigators today**

"Those States want to avoid the chaos and suspicions of impropriety that can ensue if thousands of absentee ballots flow in after election day and potentially flip the results of an election," he wrote. "And those States also want to be able to definitively announce the results of the election on election night, or as soon as possible thereafter."

Kagan fired back in a sharp dissent, taking issue with Kavanaugh's assertion that the arrival of absentee ballots after Election Day could "flip" the results of the race.

< HOMEPAGE                                                                        Subscribe

wrote. "But there are no results to 'flip' until all valid votes are counted. And nothing

could be more 'suspicio[us]' or 'improp[er]' than refusing to tally votes once the clock strikes 12 on election night. To suggest otherwise, especially in these fractious times, is to disserve the electoral process."

## Texas

A federal court in Texas and the state's Supreme Court denied two Republican requests to throw out nearly 130,000 ballots that were cast via drive-thru polling sites in Harris County, one of Texas' most heavily Democratic areas.

The Texas Supreme Court rejected a request from Republican candidates and activists to toss the ballots. US District Judge Andrew Hanen, appointed by President George W. Bush, reached the same conclusion and denied the second request from GOP candidates and a right-wing radio host.

Hanen ruled that the plaintiffs did not have the standing to sue and ask that ballots that were legally cast be discounted. However, he ordered the county to set aside the 127,000 ballots in case an appeals court disagreed with him and ultimately threw those votes out.

---

< HOMEPAGE                                                            Subscribe