Exhibit B1

**S|STATECRAFT**
LAW · GOVERNMENT · CRISIS MANAGEMENT

649 North Fourth Avenue, First Floor
Phoenix, Arizona 85003
(602) 382-4078
Kory Langhofer, Ariz. Bar No. 024722
kory@ statecraftlaw.com
Thomas Basile, Ariz. Bar No. 031150
tom@ statecraftlaw.com

Brett W. Johnson (#021527)
Eric H. Spencer (#022707)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
bwjohnson@ swlaw.com
espencer@ swlaw.com

*Attorneys for Plaintiffs*

**IN THE SUPERIOR COURT FOR THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., a federal political committee; REPUBLICAN NATIONAL COMMITTEE, a federal political party committee; and the ARIZONA REPUBLICAN PARTY, a political party committee, | No. CV 2020-014248 |
| Plaintiffs, | **VERIFIED COMPLAINT** |
| v. | *(Expedited Election Matter)* |
| KATIE HOBBS, in her official capacity as the Secretary of State of Arizona; ADRIAN FONTES, in his official capacity as the Maricopa County Recorder; and JACK SELLERS, STEVE CHUCRI, BILL GATES, CLINT HICKMAN, AND STEVE GALLARDO, in their respective official capacities as members of the Maricopa County Board of Supervisors, | |
| Defendants. | |

IN THE SUPERIOR COURT
RECEIVED DOC #3
NIGHT DEPOSITORY

20 NOV -7 PM 3: 46

**FILED**
**BY R. MERINO, DEP**

election contest: new
pd 333.-
rcpt 28013663

1

Plaintiffs hereby state and allege as follows:

## SUMMARY OF THE CASE

1.     Qualified electors casting ballots in person on Election Day in Maricopa County submitted their completed ballot to an electronic tabulation machine. Numerous voters were alerted by these devices to a facial irregularity in their ballot—frequently an ostensible "overvote"—but were induced by poll workers to override the tabulator's rejection of the ballot in the good faith belief that their vote would be duly registered and tabulated. In actuality, overriding the electronic tabulator's alert automatically disqualifies the putative "overvotes" without additional review or adjudication.

2.     Arizona law requires that putative overvotes be subjected to further review in an effort to discern the actual intent of the voter. While this safeguard was afforded to putative overvotes cast on early ballots and on Election Day ballots that poll workers properly segregated in a separate repository, potentially thousands of voters across Maricopa County have been disenfranchised by systematic improper tabulator overrides.

3.     Upon information and belief, the adjudication and tabulation of these ballots will prove determinative of the outcome of the election for President of the United States in Arizona and/or other contested offices in Maricopa County.

4.     Declaratory, injunctive and mandamus remedies are necessary to prevent irreparable injury to the Plaintiffs, vindicate the clear directives of the Arizona Legislature, ensure the fair and equal treatment of all Maricopa County electors, and secure the integrity of the results of the November 3, 2020 general election.

## JURISDICTION

5.     This Court has jurisdiction over this action pursuant to Article 6, § 14 of the Arizona Constitution, and A.R.S. §§ 12-1801, 12-1803, 12-1831, and 12-2021.

6.     Venue lies in Maricopa County pursuant to A.R.S. § 12-401(7) and (16) because at least one of the Defendants resides or holds office in this county.

2

**PARTIES**

7.   Plaintiff Donald J. Trump for President, Inc. is the principal campaign committee of President Donald J. Trump, who is a candidate for the office of President of the United States in the November 3, 2020 general election.

8.   Plaintiff Republican National Committee is a national political party committee that is responsible for the day-to-day operation of the Republican Party at the national level and for promoting the election of Republican candidates for federal office in Arizona and across the United States.

9.   Plaintiff Arizona Republican Party is a political party committee organized and operated pursuant to Title 16, Chapter 5 of the Arizona Revised Statutes, and brings this action on its own behalf and on behalf of its membership, which consists of all registered Republican electors in the State of Arizona.

10.   Defendant Katie Hobbs is the Secretary of State of Arizona and is named in this action in her official capacity only.  The Secretary of State is the chief elections officer of the state, and is responsible for conducting the canvass of the statewide vote for the office of President of United States in the November 3, 2020 general election and certifying the candidate who received the highest number of votes.  *See* A.R.S. §§ 41-121(6), 16-142(A)(1), -648, -650.

11.   Defendant Adrian Fontes is Recorder of Maricopa County, and is named in this action in his official capacity only. The County Recorder is the principal elections officer of Maricopa County and is responsible for overseeing and directing numerous components of election administration within this jurisdiction, to include early voting procedures and the tabulation and auditing of votes.  *See* A.R.S. §§ 16-541, -542, -543, -544, -550, -602, -621.

3

12.     Defendants Jack Sellers, Steve Chucri, Bill Gates, Clint Hickman, and Steve Gallardo comprise the Maricopa County Board of Supervisors, and are named in this action in their respective official capacities only.  The Board of Supervisors is charged by law with conducting elections within its jurisdictional boundaries, to include overseeing the operations of polling locations on Election Day, and canvassing the returns of elections in Maricopa County.  *See* A.R.S. §§ 11-251(3), 16-446, -447(A), -511, -531, -642, -645.

## GENERAL ALLEGATIONS

### Overview of Voting Procedures

13.     Broadly speaking, the voting process in Arizona is bifurcated; qualified electors may cast either an "early ballot" or an Election Day ballot.

14.     A qualified elector may cast an "early ballot" at any time during the 27 days preceding the election.  Early ballots may be obtained and returned via mail.  Alternatively, early ballots may be cast in-person at designated early voting locations or dropped off at voting centers on Election Day.  In-person early voting concludes on the Friday preceding the election, although voters confronting unforeseen exigencies that would prevent them from voting in-person on Election Day may cast a ballot at an "emergency" early voting location during the ensuing three-day period.  *See* A.R.S. § 16-542.

15.     As an alternative to early voting, voters may obtain and cast a ballot in-person at a polling location on Election Day.

16.     Maricopa County utilized a "voting center" model in the November 3, 2020 general election.  Under this framework, a qualified elector of Maricopa County may appear at any designated voting center site within the county, regardless of whether the voting center is located within the precinct in which the voter resides.  Once the voter's identity is verified and s/he signs the electronic pollbook, the poll workers print a customized ballot that includes all candidate races and ballot propositions for which the elector is eligible to vote.

4

17.     The overwhelming majority of voting centers in Maricopa County employed electronic tabulation devices in the November 3, 2020 general election. Upon information and belief, the tabulation device model placed in most or all voting centers has never been used in any Maricopa County election prior to 2020.

18.     After marking their ballots, voters deposit them into the tabulation device. If the tabulator detects an apparent defect or irregularity on the face of the ballot, it will display an alert and eject the ballot. At that juncture, the voter may obtain and cast a new ballot, and the original ballot is deemed "spoiled." Alternatively, if the voter chooses to cast the original ballot notwithstanding the apparent defect or irregularity, the ballot must be physically deposited in a drawer (known as "Tray 3") within the tabulation device. Ballots in Tray 3 are later subjected to further review and adjudication at the counting center.

19.     As detailed below, however, poll workers frequently deviated from this protocol by pressing, or inducing voters to press, the so-called "green button" on tabulation devices when confronted with alerts signaling apparent defects or irregularities. Pushing the green button effectively overrides the tabulator's rejection and causes the ballot to be cast. Ballots cast in this manner do not receive any additional review or assessment at the counting center. If a field on the ballot contains what the tabulator deems an apparent defect or irregularity, the voter's intended selections in the affected candidate races or ballot proposition contests will not be tabulated, even if the voter's intent could be discerned by a visual review of the ballot.

### Disposition of Apparent Overvotes

20.     A frequently encountered defect or irregularity is an apparent "overvote." An "overvote" results when the voter selects more than the permitted number of candidates in a given race. For example, if a voter selects two candidates for the office of President of the United States, she or he has "overvoted" that contest.

21.     There is a critical distinction, however, between *apparent* overvotes detected by tabulation devices and *actual* overvotes. For example, ink splotches, stray markings, or

inadvertent voter errors can cause the tabulator to register an apparent "overvote," even though a manual inspection of the ballot would convey that the voter clearly intended to select only one identifiable candidate.

22. Recognizing the risk of disenfranchisement that inheres in exclusive reliance on electronic tabulation, Arizona law, as interpreted in the official Election Procedures Manual ("EPM"), mandates specific secondary review processes designed to identify and tabulate apparent "overvotes" from which the voter's actual intended choice can be ascertained.

23. Early ballots containing apparent overvotes or other ostensible defects or irregularities are subjected to a process known as electronic adjudication. Under this framework, an "Electronic Vote Adjudication Board" that consists of three members, including two judges who are members of different political parties, must "evaluate over-vote conditions to determine the voter's intent and make corresponding adjustments to the record if the voter's intent is clear." EPM, Electronic Adjudication Addendum, *available at*

https://www.azsos.gov/sites/default/files/2019-Elections-Procedures-Manual.pdf (last visited November 2, 2019) (hereinafter, EPM).

24. As set forth above, if a ballot generated and cast at a polling place on Election Day contains an apparent overvote and the voter chooses not to complete and submit a new ballot, the ballot must be deposited in Tray 3 of the electronic tabulator. Once at the counting center, ballots in Tray 3 are assessed by a Ballot Duplication Board that is comprised of two members affiliated with different political parties. If the Ballot Duplication Board can determine the voter's intended choice, it will manually transpose the voter's candidate selections onto a new ballot, which is then duly tabulated. If the Ballot Duplication Board members disagree in their assessments of the voter's intent, the ballot is forwarded to the Snag Board, which is appointed by the Board of Supervisors, for final adjudication. *See* A.R.S. § 16-621(A), EPM at pp. 201-02, 212.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

25.     By contrast, if a tabulator's alert signaling an apparent overvote or other putative defect or irregularity is overridden by pressing the green button, then the ballot is cast. All fields containing apparent overvotes or other putative defects or irregularities are not tabulated, and the ballot is not afforded any manual review or evaluation.

**Systemic Poll Worker Error in the November 3, 2020 General Election**

26.     Upon information and belief, when ballots containing ink "bleeds," splotches, stray marks, or other facial irregularities were submitted to the electronic tabulator, the tabulator frequently signaled an alert indicating that the ballot contained one or more overvotes or other apparent defects.

27.     Upon information and belief, when confronted with tabulator alerts, poll workers in Maricopa County regularly and systematically either (a) pressed the green button without the voter's authorization or assent, or (b) instructed or induced the voter to press the green button without disclosing that doing so would cause the ballot to be disqualified and not tabulated with respect to any candidate races or ballot propositions that contained the apparent overvote or other ostensible defect or irregularity.

28.     The Plaintiffs have received numerous phone calls and electronic messages from qualified electors in Maricopa County who attempted to cast ballots in-person on Election Day.  These individuals reported that upon receiving an alert on the electronic tabulator, either they or the poll worker pressed the green button to override the tabulator's indication.  In none of these instances was the voter informed that pressing the green button would cause one or more of the voter's candidate or ballot proposition selections to be automatically disqualified and not tabulated. *See* Decl. of Gina Swoboda, attached hereto as Exhibit A.

29.     Mia Barcello, a qualified elector of Maricopa County, appeared at a voting center in Anthem on Election Day.  When marking her ballot, Ms. Barcello noticed that the ink permeated the paper in certain locations.  The tabulation device rejected Ms. Barcello's ballot but did not indicate a reason.  After a second unsuccessful attempt to submit the

7

ballot, a poll worker instructed Ms. Barcello to push a green button labeled "Cast" on the tabulation device. The poll worker did not advise Ms. Barcello that doing so likely would cause her selections in all candidate races or ballot proposition affected by the putative overvote or other defect or irregularity to be automatically disqualified and not tabulated. *See* Decl. of Mia Barcello, attached hereto as Exhibit B.

30. Upon information and belief, a visual inspection of Ms. Barcello's ballot would confirm that she had not "overvoted" any candidate race or ballot proposition, and that her intended selections could be identified with reasonable certainty.

31. Bailey Larsen, a qualified elector of Maricopa County, appeared at a voting center in Mesa on Election Day. When marking her ballot, Ms. Larsen noticed that the ink permeated the paper in certain locations. The tabulation device rejected Ms. Larsen's ballot but did not indicate a reason. After Ms. Larsen inserted the ballot a second time, the poll worker queried whether Ms. Larsen observed a check mark on the tabulator screen. Ms. Larsen answered in the negative. The poll worker appeared to touch something on the tabulator and advised Ms. Larsen that she was "fine." The poll worker did not advise Ms. Larsen that overriding the tabulator would cause her selections in all candidate races or ballot proposition affected by the putative overvote or other defect or irregularity to be automatically disqualified and not tabulated. *See* Decl. of Bailey Larsen, attached hereto as Exhibit C.

32. Upon information and belief, a visual inspection of Ms. Larsen's ballot would confirm that she had not "overvoted" any candidate race or ballot proposition, and that her intended selections could be identified with reasonable certainty.

33. Colin T. Willoughby served as a credentialed polling place observer at a voting center in Phoenix on Election Day. Mr. Willoughby observed numerous instances in which a voter would encounter an error notification when attempting to feed his or her ballot into the electronic tabulator. Mr. Willoughby recalled approximately 80 occasions on which the poll worker provided vague or confusing explanations to the voter concerning

the reasons for the ballot's rejection and the consequences of pushing the green button on the tabulator. In approximately forty instances, the poll worker himself or herself depressed the green button. *See* Decl. of Colin T. Willoughby, attached hereto as <u>Exhibit D</u>.

34. Upon information and belief, visual inspections of these ballots would confirm that the electors had not "overvoted" any candidate race or ballot proposition, and that their intended selections could be identified with reasonable certainty.

35. Michelle Masters served as a credentialed polling place observer at a voting center in Mesa on Election Day. Ms. Masters observed numerous instances in which a voter would encounter an error notification when attempting to feed his or her ballot into the electronic tabulator. Poll workers regularly and consistently instructed or advised these voters to simply press the green button on the tabulator without explaining why the ballot had been rejected or the consequences of overriding the tabulator's determination. *See* Decl. of Michelle Masters, attached hereto as <u>Exhibit E</u>.

36. Upon information and belief, visual inspections of these ballots would confirm that the electors had not "overvoted" any candidate race or ballot proposition, and that their intended selections could be identified with reasonable certainty.

37. Upon information and belief, one at least one occasion a poll worker was observed removing approximately a dozen ballots from Tray 3, inserting them into the tabulator, and depressing the green button to override the tabulator's rejection of the ballots. *See* Decl. of Albert Joseph Garre, attached hereto as <u>Exhibit F</u>.

38. Upon information and belief, visual inspections of these ballots would confirm that the electors had not "overvoted" any candidate race or ballot proposition, and that their intended selections could be identified with reasonable certainty.

39. Upon information and belief, up to thousands of other qualified electors in Maricopa County had their ballots rejected by the tabulation device due to apparent overvotes or other ostensible defects or irregularities. Rather than advise these voters to either complete and submit a new ballot or to deposit the existing ballot in Tray 3 for further

9

adjudication at the counting center, the poll workers pressed the green button on the tabulator, or induced the voters to press the green button on the tabulator, without disclosing that doing so would cause the voter's selections in all candidate races or ballot propositions affected by the putative overvote or other defect or irregularity to be disqualified without further review and not tabulated.

40. Upon information and belief, visual inspections of these ballots would confirm that the electors had not "overvoted" any candidate race or ballot proposition, and that their intended selections could be identified with reasonable certainty.

41. Upon information and belief, the adjudication and tabulation of these ballots would yield up to thousands of additional votes for President Trump and other Republican candidates in the November 3, 2020 general election.

**COUNT I**
**Failure to Adjudicate and Tabulate Ballots**
**(A.R.S. §§ 16-611, -622(A), -452))**

42. The Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

43. Arizona law provides that "[i]f any ballot . . . is damaged or defective so that it cannot properly be counted by the automatic tabulating equipment, a true duplicate copy shall be made of the damaged ballot in the presence of witnesses and substituted for the damaged ballot." A.R.S. § 16-621(A).

44. The review and adjudication of putative overvotes or other defects or irregularities contained on ballots generated and cast on Election Day must be conducted by a duly constituted Ballot Duplication Board. *See* EPM at pp. 201-02.

45. A putative vote should be disqualified only if the Ballot Duplication Board (or, if necessary, the Snag Board) concludes that the elector actually marked more names than there are persons to be elected to an office, or "if from the ballot it is impossible to determine the voter's choice for an office." A.R.S. § 16-611.

10

46.     Upon information and belief, up to thousands of qualified electors in Maricopa County attempted to cast ballots at voting centers but had their ballots rejected by the electronic tabulation device.

47.     Poll workers had a legal duty to advise these voters to either (a) complete and cast a new ballot, or (b) if the voter chose to submit the original ballot notwithstanding the tabulator's inability to process it, the ballot must be deposited in Tray 3 for subsequent adjudication by the Ballot Duplication Board at the counting center.

48.     Upon information and belief, poll workers consistently, regularly and systematically overrode the tabulator's rejection of the ballot, or induced voters to override the tabulator's rejection of the ballot, without disclosing that doing so would cause the voter's selections in all candidate races or ballot propositions affected by the putative overvote or other defect or irregularity to be automatically disqualified and not tabulated, without any further review or adjudication.

49.     Upon information and belief, ballots that were submitted by overriding the tabulator's rejection have not in fact been reviewed or adjudicated by the Ballot Duplication Board.

50.     Upon information and belief, if these ballots are reviewed and adjudicated by the Ballot Duplication Board, they will yield up to thousands of additional votes for President Trump and for other Republican candidates in the November 3, 2020 general election.

51.     The Recorder and the Board of Supervisors have a nondiscretionary legal duty to provide for the review and adjudication of these ballots by the Ballot Duplication Board.

52.     The Recorder and Board of Supervisors' failure to provide for the review and adjudication of these ballots will irreparably injure the Plaintiffs by disqualifying valid votes that must by law be duly tabulated.

53.     The balance of equities and considerations of public policy support the entry of injunctive relief.

11

54.     Accordingly, the Plaintiffs are entitled to declaratory, injunctive and mandamus remedies requiring the Recorder and the Board of Supervisors to provide for the review and adjudication by the Ballot Duplication Board of all ballots generated and cast at voting centers on Election Day that have not been tabulated because ostensible overvotes or other defects or irregularities prevented the tabulation device from recording the voter's selection of a candidate.

## COUNT II
**Deprivation of the Franchise Without Due Process**
**(Ariz. Const. art. II § 4)**

55.     The Arizona Constitution guarantees that "no person shall be deprived of life, liberty, or property without due process of law." Ariz. Const. art. II, § 4.

56.     The right to vote is a liberty interest protected by the Arizona Constitution that cannot be abridged or divested without due process of law. *See generally Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1364 (D. Ariz. 1990).

57.     By disqualifying without review and adjudication by the Ballot Duplication Board voters' candidate selections on ballots that were cast by overriding the tabulation device's rejection of the ballot, the Recorder and Board of Supervisors have deprived thousands of Arizona voters, to include numerous supporters of President Trump and other Republican candidates, of a protected liberty interest without adequate due process of law.

58.     Upon information and belief, if these ballots are reviewed and adjudicated by the Ballot Duplication Board, they will yield up to thousands of additional votes for President Trump and for other Republican candidates in the November 3, 2020 general election.

59.     The Recorder and the Board of Supervisors have a nondiscretionary legal duty to provide for the review and adjudication of these ballots by the Ballot Duplication Board.

12

60. The Recorder and Board of Supervisors' failure to provide for the review and adjudication of these ballots will irreparably injure the Plaintiffs by disqualifying valid votes that must by law be duly tabulated.

61. The balance of equities and considerations of public policy support the entry of injunctive relief.

62. Accordingly, the Plaintiffs are entitled to declaratory, injunctive and mandamus remedies requiring the Recorder and the Board of Supervisors to provide for the review and adjudication by the Ballot Duplication Board of all ballots generated and cast at voting centers on Election Day that have not been tabulated because ostensible overvotes or other defects or irregularities prevented the tabulation device from recording the voter's selection of a candidate.

## COUNT III
### Violation of Equal Privileges and Immunities
### (Ariz. Const. art. II § 13)

63. The Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

64. Article 2, Section 13 of the Arizona Constitution secures the equal "privileges or immunities" of all citizens.

65. Arizona law requires that ostensible overvotes or other apparent defects or irregularities contained on early ballots or Election Day ballots must be reviewed and adjudicated by the Electronic Vote Adjudication Board or the Ballot Duplication Board, respectively. If the adjudicatory body can ascertain the voter's intended candidate selection, the vote must be tabulated.

66. Upon information and belief, the Recorder and Board of Supervisors have afforded these safeguards to early ballots and to Election Day ballots that were deposited in Tray 3 of the tabulation device, but not to Election Day ballots that were cast by overriding the tabulator's rejection of the ballot.

13

67.     By disqualifying without review and adjudication by the Ballot Duplication Board voters' candidate selections on ballots that were cast by overriding the tabulation device's rejection of the ballot, the Recorder and Board of Supervisors have deprived qualified electors of their right to cast, on the same terms as similarly situated voters elsewhere in Maricopa County, valid votes that are duly tabulated, in violation of the Equal Privileges & Immunities Clause.

68.     Upon information and belief, if these ballots are reviewed and adjudicated by the Ballot Duplication Board, they will yield up to thousands of additional votes for President Trump and for other Republican candidates in the November 3, 2020 general election.

69.     The Recorder and the Board of Supervisors have a nondiscretionary legal duty to provide for the review and adjudication of these ballots by the Ballot Duplication Board.

70.     The Recorder and Board of Supervisors' failure to provide for the review and adjudication of these ballots will irreparably injure the Plaintiffs by disqualifying valid votes that must by law be duly tabulated.

71.     The balance of equities and considerations of public policy support the entry of injunctive relief.

72.     Accordingly, the Plaintiffs are entitled to declaratory, injunctive and mandamus remedies requiring the Recorder and the Board of Supervisors to provide for the review and adjudication by the Ballot Duplication Board of all ballots generated and cast at voting centers on Election Day that have not been tabulated because ostensible overvotes or other defects or irregularities prevented the tabulation device from recording the voter's selection of a candidate.

## COUNT IV
### Violation of the Free & Equal Elections Clause
### (Ariz. Const. art. II § 21)

73.     The Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

14

74. The Arizona Constitution guarantees "the right of suffrage" and mandates that "[a]ll elections shall be free and equal." Ariz. Const. art. II, § 21.

75. "Arizona's constitutional right to a 'free and equal' election is implicated when votes are not properly counted." *Chavez v. Brewer*, 222 Ariz. 309, 320, ¶ 34 (App. 2009).

76. By disqualifying without review and adjudication by the Ballot Duplication Board voters' candidate selections on ballots that were cast by overriding the tabulation device's rejection of the ballot, the Recorder and Board of Supervisors have deprived qualified electors of their right to cast, on the same terms as similarly situated voters elsewhere in Maricopa County, valid votes that are duly tabulated, in violation of the Free & Equal Elections Clause.

77. Upon information and belief, if these ballots are reviewed and adjudicated by the Ballot Duplication Board, they will yield up to thousands of additional votes for President Trump and for other Republican candidates in the November 3, 2020 general election.

78. The Recorder and the Board of Supervisors have a nondiscretionary legal duty to provide for the review and adjudication of these ballots by the Ballot Duplication Board.

79. The Recorder and Board of Supervisors' failure to provide for the review and adjudication of these ballots will irreparably injure the Plaintiffs by disqualifying valid votes that must by law be duly tabulated.

80. The balance of equities and considerations of public policy support the entry of injunctive relief.

81. Accordingly, the Plaintiffs are entitled to declaratory, injunctive and mandamus remedies requiring the Recorder and the Board of Supervisors to provide for the review and adjudication by the Ballot Duplication Board of all ballots generated and cast at voting centers on Election Day that have not been tabulated because ostensible overvotes

or other defects or irregularities prevented the tabulation device from recording the voter's selection of a candidate.

## DEMAND FOR RELIEF

WHEREFORE, the Plaintiffs demand relief in the following forms:

A. A declaration pursuant to A.R.S. § 12-1831 that the Maricopa County Recorder and the Maricopa County Board of Supervisors are required by A.R.S. §§ 16-611, -621(A) and -452, and Arizona Constitution article II, §§ 4, 13, 21 to provide for the review and adjudication by the Ballot Duplication Board of all ballots that were cast by overriding the tabulator's rejection of the ballot.

B. Injunctive and/or mandamus remedies pursuant to A.R.S. §§ 12-1801, -2021 and Arizona Rule of Civil Procedure 65 providing that the Maricopa County Recorder and Maricopa County Board of Supervisors must:

(i)     Identify (by means of electronic tabulation devices or otherwise) all Election Day ballots that contain apparent overvotes or other putative defects or irregularities in connection with the voter's selection of a candidate that have not been adjudicated by the Electronic Vote Adjudication Board or the Ballot Duplication Board;

(ii)    Provide for the review, adjudication and duplication by the Ballot Duplication Board of all ostensible overvotes or other putative defects or irregularities in connection with the voter's selection of a candidate on ballots identified pursuant to subparagraph (i) above; and

(iii)   Tabulate and canvass all votes adjudicated and duplicated by the Ballot Duplication Board pursuant to subparagraphs (i) and (ii) above;

16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

C. Injunctive and/or mandamus remedies pursuant to A.R.S. §§ 12-1801, -2021, 16-650, and Arizona Rule of Civil Procedure 65 providing that the Secretary of State and Maricopa County Board of Supervisors:

    (i)     shall not canvass or certify any returns in the November 3, 2020 general election unless and until the Maricopa County Recorder and Maricopa County Board of Supervisors have completed the process set forth in paragraph B above; and

    (ii)    Shall include in their canvass and certification all votes that are tabulated pursuant to the process set forth in paragraph B above; and

D. Such other relief as the Court deems necessary, equitable, proper, and just.

DATED this 7th day of November, 2020.

STATECRAFT PLLC

By: _____

Kory Langhofer
Thomas Basile
649 North Fourth Avenue, First Floor
Phoenix, Arizona 85003

Brett W. Johnson
Eric H. Spencer
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202

*Attorneys for Plaintiffs*

17

## VERIFICATION

I hereby swear or affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Kelli Ward, Chairman of the Arizona Republican Party

Sworn to and subscribed before me this ___ day of November, 2020.

KAHLA M BISHOP
Notary Public, State of Arizona
Maricopa County
Commission # 068791
My Commission Expires
July 17, 2023

Notary Public

My commission expires: 7/17/2023

18

Exhibit B2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

DONALD J. TRUMP FOR
PRESIDENT, INC., MATTHEW
SEELY, ALEXANDRA SEELY,
PHILIP O'HALLORAN, ERIC
OSTERGREN, MARIAN
SHERIDAN, MERCEDES WIRSING,
and CAMERON TARSA,

     *Plaintiffs*,

v.                              No. _____

JOCELYN BENSON, in her official
capacity as Michigan Secretary of
State, MICHIGAN BOARD OF
STATE CANVASSERS, WAYNE
COUNTY, MICHIGAN, and
WAYNE COUNTY BOARD OF
COUNTY CANVASSERS,

     *Defendants*.

_____/

Mark F. (Thor) Hearne, II (P40231)
Stephen S. Davis (*pro hac* forthcoming)
TRUE NORTH LAW, LLC
112 S. Hanley Road, Suite 200
St. Louis, MO 63105
(314) 296-4000
thor@truenorthlawgroup.com

---

## COMPLAINT FOR DECLARATORY, EMERGENCY,
## AND PERMANENT INJUNCTIVE RELIEF

---

## SUMMARY OF THIS LAWSUIT[1]

Our United States Constitution provides that state legislatures determine the manner in which presidential electors are selected. *U.S. Const. Article II, Section 1. See also* Chiafalo, et al. v. Washington, *591 U.S. ___ (2020).* Justice Kagan, for a unanimous Court, wrote, "Every four years, millions of Americans cast a ballot for a presidential candidate. Their votes, though, actually go toward selecting members of the Electoral College. Those few 'electors' then choose the President." *Id.* The Constitution assigns state legislatures the authority to prescribe each state's process for selection of electors.

The United States Constitution guarantees due process of law and equal protection under the law. In an election for President and Vice President of the United States, this means that states must conduct the election in a manner that equally values each eligible citizen's lawfully-cast vote. The process for choosing Michigan's sixteen presidential electors is governed by the election code the Michigan Legislature adopted.

Michigan's election code contains a host of provisions intended to prevent fraudulent ballots from being counted. A fraudulent ballot, if counted, disenfranchises a lawful voter. Michigan's election code vests Secretary of State Jocelyn Benson, as Michigan's "chief election officer," with the responsibility to direct and oversee Michigan's counties, townships, and villages' conduct of elections.

Unfortunately, Wayne County did not conduct (and is not conducting) this election as required by Michigan law, and Secretary of State Benson did not require Wayne County to follow Michigan's election code. Among other things, election officials in Wayne County refused to permit statutorily designated challengers to observe the conduct of the election and the processing of ballots. Some election officials pre-dated ballots that were not eligible to be counted by altering the date the ballot was received.

Ballots that are ineligible to be counted will cancel out ballots Michigan eligible voters cast, effectively disenfranchising the votes cast by Michigan citizens. The Michigan Election Code provides detailed rules for the conduct of elections, and the Michigan Election Code should be uniformly and equally followed by all Michigan election authorities so that all Michigan voters have an equal opportunity to cast a lawful ballot.

We ask this Court to enjoin the Michigan board of state canvassers and the Wayne County canvassing boards from certifying any tally of

---

[1] This summary is not part of the Complaint but is provided for the convenience of the Court and parties.

*ballots containing fraudulent or unlawfully cast ballots. Likewise, we ask the Court to enjoin the Wayne County canvassing board and the state canvassing board from certifying any tally that includes ballots received after election day and ballots that were processed when statutorily designated challengers were excluded from a meaningful opportunity to observe the processing of ballots. And finally, ballots that were tabulated with defective or malfunctioning tabulating machines or software must be excluded from the tally or hand-counted to confirm they are accurately counted and may be included in any certified canvass.*

## JURISDICTION AND VENUE

1.     This Court has subject matter under 28 U.S.C. 1331 which provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

2.     This Court also has subject matter jurisdiction under 28 U.S.C. 1343 because this action involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932).

3.     The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. 2201 and 2202 and by Rule 57, Fed. R. Civ. P.

4.     This Court has jurisdiction over the related Michigan constitutional claims and state-law claims under 28 U.S.C. 1367.

5.     Venue is proper because Secretary Benson and the board of state canvassers are located in Lansing, Michigan. The Office of the Secretary of State is in Lansing, Michigan. The board of state canvassers meets in Lansing, Michigan. 28 U.S.C. 1391(b) & (c).

## PARTIES

6.      The entity, Donald J. Trump for President, Inc., is the campaign committee for the reelection of President Donald J. Trump and Vice President Michael R. Pence. President Trump and Vice President Pence have a substantial interest in assuring that Michigan election officials process and count Michigan citizens' ballots as required by the United States Constitution, the Michigan Constitution, and Michigan law so that every Michigan voter's lawfully-cast ballot is fairly and equally counted.

7.      Matthew and Alexandra Seely, Philip O'Halloran, Eric Ostergren, Marian Sheridan, Mercedes Wirsing, and Cameron Tarsa are Michigan citizens and registered voters.    Matthew and Alexandra Seely, Philip O'Halloran, Eric Ostergren, Marian Sheridan, and Mercedes Wirsing voted in the November 3, 2020 presidential election and served as credentialed election challengers in that election.  Matthew and Alexandra Seely are residents and registered voters in Wayne County, Michigan.  Philip O'Halloran is a resident and registered voter in Oakland County, Michigan.  Eric Ostergren is a resident and registered voter in Roscommon County, Michigan.  Marian Sheridan is a resident and registered voter in Oakland County, Michigan.   Mercedes Wirsing is a resident and registered voter in Oakland County, Michigan.  Cameron Tarsa is a resident and registered voter in Leelanau County, Michigan.

8.      Jocelyn Benson, Michigan's Secretary of State, is a defendant in her official capacity.  Jocelyn Benson is the "chief elections officer" responsible for overseeing the conduct of Michigan elections.  MCL 168.21 ("The secretary of state shall be the chief election officer of the state and shall have supervisory control over local election officials in the performance of their duties under the provisions of this act."); MCL 168.31(1)(a)

(the "Secretary of State shall … issue instructions and promulgate rules … for the conduct of elections and registrations in accordance with the laws of this state").  Local election officials must follow Secretary Benson's instructions regarding the conduct of elections. Michigan law provides that Secretary Benson "[a]dvise and direct local election officials as to the proper methods of conducting elections."  MCL 168.31(1)(b).  *See also Hare v. Berrien Co Bd. of Election*, 129 N.W.2d 864 (Mich. 1964); *Davis v. Secretary of State*, 2020 Mich. App. LEXIS 6128, at *9 (Mich. Ct. App. Sep. 16, 2020).  Secretary Benson is responsible for assuring Michigan's local election officials conduct elections in a fair, just, and lawful manner.  *See* MCL 168.21; 168.31; 168.32.  *See also League of Women Voters of Michigan v. Secretary of State*, 2020 Mich. App. LEXIS 709, *3 (Mich. Ct. App. Jan. 27, 2020); *Citizens Protecting Michigan's Constitution v. Secretary of State*, 922 N.W.2d 404 (Mich. Ct. App. 2018), aff'd 921 N.W.2d 247 (Mich. 2018); *Fitzpatrick v. Secretary of State*, 440 N.W.2d 45 (Mich. Ct. App. 1989).

9.      The Michigan board of state canvassers is "responsible for approv[ing] voting equipment for use in the state, certify[ing] the result of elections held statewide …." Michigan Election Officials' Manual, p. 4.  *See also* MCL 168.841, *et seq*.

10.      Wayne County is a political subdivision of the State of Michigan.  Wayne County has an Elections Division that conducts elections taking place within Wayne County under and subject to Secretary of State Benson's supervision and direction.

11.      The Wayne County board of county canvassers is "responsible for canvassing the votes cast within the county [it] serve[s].  The Board members certify elections for local, countywide and district offices which are contained entirely within the county they serve.  The Board members are also responsible for inspecting the county's

ballot containers every four years." Michigan Election Officials' Manual, p. 5. *See also* MCL 168.821, *et seq*.

## THE RELEVANT PROVISIONS OF THE UNITED STATES AND MICHIGAN CONSTITUTIONS AND MICHIGAN STATUTE

12.     The Fourteenth Amendment to the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

13.     Article I, Section 4 of the United States Constitution provides that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof."

14.     Article II, Section 1 of the United States Constitution provides the manner in which the President and Vice President are chosen:

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress….
>
> The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States.

15.     The Twelfth Amendment to the United States Constitution provides:

> The Electors shall meet in their respective states and vote by ballot for President and Vice-President … they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate….

16.     Michigan's Constitution declares that "[n]o person shall be denied the equal protection of the laws …." Mich. Const. 1963, art 1, §2.

17.     The Michigan Constitution's "purity of elections" clause states that "the legislature shall enact laws to regulate the time, place and manner of all nominations and elections, to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting." Mich. Const. 1963, art 2, §4(2).

## BACKGROUND

I.     **Secretary Benson and Wayne County election officials did not follow Michigan's Election Code and allowed fraud and incompetence to corrupt the conduct of the 2020 general election.**

   A.     **Michigan law requires Secretary Benson and local election officials to provide designated challengers a meaningful opportunity to observe the conduct of elections.**

18.     Challengers representing a political party, candidate, or organization interested in the outcome of the election provide a critical role in protecting the integrity of elections including the prevention of voter fraud and other conduct (whether maliciously undertaken or by incompetence) that could affect the conduct of the election. *See* MCL 168.730-738.

19.     Michigan requires Secretary of State Benson, local election authorities, and state and county canvassing boards to provide challengers the opportunity to meaningfully participate in, and oversee, the conduct of Michigan elections and the counting of ballots.

20.     Michigan's election code provides that challengers shall have the following rights and responsibilities:

   a.     An election challenger shall be provided a space within a polling place where they can observe the election procedure and each person applying to vote. MCL 168.733(1).

   b.     An election challenger must be allowed opportunity to inspect poll books as ballots are issued to electors and witness the electors' names being entered in the poll book. MCL 168.733(1)(a).

c.     An election Challenger must be allowed to observe the manner in which the duties of the election inspectors are being performed. MCL 168.733(1)(b).

d.     An election challenger is authorized to challenge the voting rights of a person who the challenger has good reason to believe is not a registered elector. MCL 168.733(1)(c).

e.     An election challenger is authorized to challenge an election procedure that is not being properly performed. MCL 168.733(1)(d).

f.     An election challenger may bring to an election inspector's attention any of the following: (1) improper handling of a ballot by an elector or election inspector; (2) a violation of a regulation made by the board of election inspectors with regard to the time in which an elector may remain in the polling place; (3) campaigning and fundraising being performed by an election inspector or other person covered by MCL 168.744; and/or (4) any other violation of election law or other prescribed election procedure. MCL 168.733(1)(e).

g.     An election challenger may remain present during the canvass of votes and until the statement of returns is duly signed and made. MCL 168.733(1)(f).

h.     An election challenger may examine each ballot as it is being counted. MCL 168.733(1)(g).

i.     An election challenger may keep records of votes cast and other election procedures as the challenger desires. MCL 168.733(1)(h).

j.     An election challenger may observe the recording of absent voter ballots on voting machines. MCL 168.733(1)(i).

21.     The Michigan Legislature adopted these provisions to prevent and deter vote fraud, require the conduct of Michigan elections to be transparent, and to assure public confidence in the outcome of the election no matter how close the final ballot tally may be.

22.     Michigan values the important role challengers perform in assuring the transparency and integrity of elections. For example, Michigan law provides it is a felony punishable by up to two years in state prison for any person to threaten or intimidate a challenger who is performing any activity described in Michigan law. MCL 168.734(4). It is a felony punishable by up to two years in state prison for any person to prevent the

presence of a challenger exercising their rights or to fail to provide a challenger with "conveniences for the performance of the[ir] duties." MCL 168.734.

23. The responsibilities of challengers are established by Michigan statute. MCL 168.730 states:

(1) At an election, a political party or [an organization] interested in preserving the purity of elections and in guarding against the abuse of the elective franchise, may designate challengers as provided in this act. Except as otherwise provided in this act, a political party [or interested organization] may designate not more than 2 challengers to serve in a precinct at any 1 time. A political party [or interested organization] may designate not more than 1 challenger to serve at each counting board.

(2) A challenger shall be a registered elector of this state. . . . A candidate for the office of delegate to a county convention may serve as a challenger in a precinct other than the 1 in which he or she is a candidate. . . .

(3) A challenger may be designated to serve in more than 1 precinct. The political party [or interested organization] shall indicate which precincts the challenger will serve when designating challengers under subsection (1). If more than 1 challenger of a political party [or interested organization] is serving in a precinct at any 1 time, only 1 of the challengers has the authority to initiate a challenge at any given time. The challengers shall indicate to the board of election inspectors which of the 2 will have this authority. The challengers may change this authority and shall indicate the change to the board of election inspectors.

24. Secretary Benson and Wayne County violated these provisions of Michigan law and violated the constitutional rights of Michigan citizens and voters when they did not conduct this general election in conformity with Michigan law and the United States Constitution.

25. More than one hundred credentialed election challengers provided sworn affidavits. These affidavits stated, among other matters, that these credentialed challengers were denied a meaningful opportunity to review election officials in Wayne County handling ballots, processing absent voter ballots, validating the legitimacy of absent voter

ballots, and the general conduct of the election and ballot counting.  *See* Exhibit 1 (affidavits of election challengers).

**B.** **Michigan voters were denied a fair, honest, and transparent election because, among other things, election challengers were denied opportunity to meaningfully observe the processing and counting of ballots.**

26.     Wayne County excluded certified challengers from meaningfully observing the conduct of the election.  This allowed a substantial number of ineligible ballots to be counted.  The following affidavits describe the specifics that were observed.  This conduct was pervasive in Wayne County as attested to in the affidavits attached at **Exhibit 1**.

27.     Many individuals designated as challengers to observe the conduct of the election were denied meaningful opportunity to observe the conduct of the election.  For example, challengers designated by the Republican Party or Republican candidates were denied access to the TCF Center (formerly called Cobo Hall) ballot counting location in Detroit while Democratic challengers were allowed access.  Exhibit 1 (Deluca aff. ¶¶7-9, 16-18; Langer aff. ¶3; Papsdorf aff. ¶3; Frego aff. ¶9; Downing aff. ¶¶2-9, 11, 15, 22; Sankey aff. ¶¶5-8; Ostin aff. ¶¶5-7; Cavaliere aff. ¶3; Cassin aff. ¶4; Rose aff. ¶18; Zimmerman aff. ¶8; Langer aff. ¶3; Poplawski aff. ¶3; Henderson aff. ¶7; Fuqua-Frey aff. ¶5; Ungar aff. ¶4; Eilf aff. ¶¶9, 17; Jeup aff. ¶¶6-7; Tietz aff. ¶¶9-18; McCall aff. ¶¶5-6; Arnoldy aff. ¶¶5, 8-9 (unlimited members of the media were also allowed inside regardless of COVID restrictions while Republican challengers were excluded)).

28.     Many challengers stated that Republican challengers who had been admitted to the TCF Center but who left were not allowed to return.  Exhibit 1 (Bomer aff. ¶16; Paschke aff. ¶4; Schneider aff., p. 2; Arnoldy aff. ¶6; Boller aff. ¶¶13-15 (removed and not allowed to serve as challenger); Kilunen aff. ¶7; Gorman aff. ¶¶6-8; Wirsing aff.,

p. 1; Rose aff. ¶19; Krause aff. ¶¶9, 11; Roush aff. ¶16; M. Seely aff. ¶6; Fracassi aff. ¶6; Whitmore aff. ¶5). Furthermore, Republican challengers who left the TCF Center were not allowed to be replaced by other Republican challengers while Democratic challengers were replaced. *See id.*

29. As a result of Republican challengers not being admitted or re-admitted, while Democratic challengers were freely admitted, there were many more Democratic challengers allowed to observe the processing and counting of absent voter ballots than Republican challengers. Exhibit 1 (Helminen aff. ¶12 (Democratic challengers outnumbered Republican challengers by at least a two-to-one ratio); Daavettila aff., p. 2 (ten times as many Democratic challengers as Republican); A. Seely aff. ¶19; Schneider aff., p. 2; Wirsing aff., p. 1; Rauf aff. ¶21; Roush aff. ¶¶16-17; Topini aff. ¶4).

30. Many challengers testified that election officials strictly and exactingly enforced a six-foot distancing rule for Republican challengers but not for Democratic challengers. Exhibit 1 (Paschke aff. ¶4; Wirsing aff., p. 1; Montie aff. ¶4; Harris aff. ¶3; Krause aff. ¶7; Vaupel aff. ¶5; Russel aff. ¶7; Duus aff. ¶9; Topini aff. ¶6). As a result, Republican challengers were not allowed to meaningfully observe the ballot counting process. *Id.*

31. Many challengers testified that their ability to view the handling, processing, and counting of ballots was physically and intentionally blocked by election officials. Exhibit 1 (A. Seely aff. ¶15; Miller aff. ¶¶13-14; Pennala aff. ¶4; Tyson aff. ¶¶12-13, 16; Ballew aff. ¶8; Schornak aff. ¶4; Williamson aff. ¶¶3, 6; Steffans aff. ¶¶15-16, 23-24; Zaplitny aff. ¶15; Sawyer aff. ¶5; Cassin aff. ¶9; Atkins aff. ¶3; Krause aff. ¶5; Sherer

aff. ¶¶15, 24; Basler aff. ¶¶7-8; Early aff. ¶7; Posch aff. ¶7; Chopjian aff. ¶11; Shock aff. ¶7; Schmidt aff. ¶¶7-8; M. Seely aff. ¶4; Topini aff. ¶8).

32.     At least three challengers said they were physically pushed away from counting tables by election officials to a distance that was too far to observe the counting. Exhibit 1 (Helminen aff. ¶4; Modlin aff. ¶¶4, 6; Sitek aff. ¶4).  Challenger Glen Sitek reported that he was pushed twice by an election worker, the second time in the presence of police officers.  *Id.* (Sitek aff. ¶4).  Sitek filed a police complaint.  *Id.*

33.     Challenger Pauline Montie stated that she was prevented from viewing the computer monitor because election workers kept pushing it further away and made her stand back away from the table.  Exhibit 1 (Montie aff. ¶¶4-7).  When Pauline Montie told an election worker that she was not able to see the monitor because they pushed it farther away from her, the election worker responded, "too bad."  *Id.* ¶8.

34.     Many challengers witnessed Wayne County election officials covering the windows of the TCF Center ballot counting center so that observers could not observe the ballot counting process.  Exhibit 1 (A. Seely aff. ¶¶9, 18; Helminen aff. ¶¶9, 12; Deluca aff. ¶13; Steffans aff. ¶22; Frego aff. ¶11; Downing aff. ¶21; Sankey aff. ¶14; Daavettila aff., p. 4; Zimmerman aff. ¶10; Krause aff. ¶12; Sherer aff. ¶22; Johnson aff. ¶7; Posch aff. ¶10; Rauf aff. ¶23; Luke aff., p. 1; M. Seely aff. ¶8; Zelasko aff. ¶8; Ungar aff. ¶12; Storm aff. ¶7; Fracassi aff. ¶8; Eilf aff. ¶25; McCall aff. ¶9).

35.     Many challengers testified that they were intimidated, threatened, and harassed by election officials during the ballot processing and counting process.  Exhibit 1 (Ballew aff. ¶¶7, 9; Gaicobazzi aff. ¶¶12-14 (threatened repeatedly and removed); Schneider aff., p. 1; Piontek aff. ¶11; Steffans aff. ¶26 (intimidation made her feel too afraid

to make challenges); Cizmar aff. ¶8(G); Antonie aff. ¶3; Zaplitny aff. ¶20; Moss aff. ¶4; Daavettila aff., pp. 2-3; Tocco aff. ¶¶1-2; Cavaliere ¶3; Kerstein aff. ¶3; Rose aff. ¶16; Zimmerman aff. ¶5; Langer aff. ¶3; Krause aff. ¶4; Sherer aff. ¶24; Vaupel aff. ¶4; Basler aff. ¶8; Russell aff. ¶5; Burton aff. ¶5; Early aff. ¶7; Pannebecker aff. ¶10; Sitek aff. ¶4; Klamer aff. ¶4; Leonard aff. ¶¶6, 15; Posch aff. ¶¶7, 14; Rauf aff. ¶24; Chopjian aff. ¶10; Cooper aff. ¶12; Shock aff. ¶9; Schmidt aff. ¶¶9-10; Duus aff. ¶10; M. Seely aff. ¶4; Storm aff. ¶¶5, 7; DePerno aff. ¶¶5-6; McCall aff. ¶¶5, 13).  Articia Bomer was called a "racist name" by an election worker and also harassed by other election workers.  *Id.* (Bomer aff. ¶7).  Zachary Vaupel reported that an election supervisor called him an "obscene name" and told him not to ask questions about ballot processing and counting.  *Id.* (Vaupel aff. ¶4).  Kim Tocco was personally intimidated and insulted by election workers.  *Id.* (Tocco aff. ¶¶1-2).  Qian Schmidt was the target of racist comments and asked, "what gives you the right to be here since you are not American?"  *Id.* (Schmidt aff. ¶9).  Other challengers were threatened with removal from the counting area if they continued to ask questions about the ballot counting process.  *Id.* (A. Seely aff. ¶¶6, 13, 15; Pennala aff. ¶5).

36.    Challenger Kathleen Daavettila observed that Democratic challengers distributed a packet of information among themselves entitled, "Tactics to Distract GOP Challengers."  *Id.* (Daavettila aff., p. 2).  An election official told challenger Ulrike Sherer that the election authority had a police SWAT team waiting outside if Republican challengers argued too much.  *Id.* (Sherer aff. ¶24).  An election worker told challenger Jazmine Early that since "English was not [her] first language…[she] should not be taking part in this process."  *Id.* (Early aff. ¶11).

37.     Election officials at the TCF Center in Detroit participated in the intimidation experienced by Republican challengers when election officials would applaud, cheer, and yell whenever a Republican challenger was ejected from the counting area.  Exhibit 1 (Helminen aff. ¶9; Pennala aff. ¶5; Ballew aff. ¶9; Piontek aff. ¶11; Papsdorf aff. ¶3; Steffans aff. ¶25; Cizmar aff. ¶8(D); Kilunen aff. ¶5; Daavettila aff., p. 4; Cavaliere aff. ¶3; Cassin aff. ¶10; Langer aff. ¶3; Johnson aff. ¶5; Early aff. ¶13; Klamer aff. ¶8; Posch aff. ¶12; Rauf aff. ¶22; Chopjian aff. ¶13; Shock aff. ¶10).

### C.     Illegal and ineligible ballots were counted.

38.     There is a difference between a ballot and a vote.  A ballot is a piece of paper.  A vote is a ballot that has been completed by a citizen registered to vote who has the right to cast a vote and has done so in compliance with Michigan election law by, among other things, verifying their identity and casting the ballot on or before Election Day.  It is the task of Secretary Benson and Michigan election officials to assure that only ballots cast by individuals entitled to cast a vote in the election are counted and to make sure that all ballots cast by lawful voters are counted and the election is conducted in accord with Michigan's Election Code uniformly throughout Michigan.

39.     Challengers provide the transparency and accountability to assure ballots are lawfully cast and counted as provided in Michigan's Election Code and voters can be confident the outcome of the election was honestly and fairly determined by eligible voters.

40.     Unfortunately, this did not happen in Wayne County.  Many challengers testified that their challenges to ballots were ignored and disregarded.  Exhibit 1 (A. Seely aff. ¶4; Helminen aff. ¶5; Miller aff. ¶¶10-11; Schornak aff. ¶¶9, 15; Piontek aff. ¶6; Daavettila aff., p. 3; Valice aff. ¶2; Sawyer aff. ¶7; Kerstein aff. ¶3; Modlin aff. ¶4; Cassin

- 14 -

aff. ¶6; Brigmon aff. ¶5; Sherer aff. ¶11; Early aff. ¶18; Pannebecker aff. ¶9; Vanker aff. ¶5; M. Seely aff. ¶11; Ungar aff. ¶¶16-17; Fracassi aff. ¶4).

41.     As an example of challenges being disregarded and ignored, challenger Alexandra Seely stated that at least ten challenges she made were not recorded.  *Id.* (A. Seely aff. ¶4).  Articia Bomer observed that ballots with votes for Trump were separated from other ballots.  *Id.* (Bomer aff. ¶5).  Articia Bomer stated, "I witnessed election workers open ballots with Donald Trump votes and respond by rolling their eyes and showing it to other poll workers.  I believe some of these ballots may not have been properly counted." *Id.* ¶8.  Braden Gaicobazzi challenged thirty-five ballots for whom the voter records did not exist in the poll book, but his challenge was ignored and disregarded.   Exhibit 1 (Giacobazzi aff. ¶10).  When Christopher Schornak attempted to challenge the counting of ballots, an election official told him, "We are not talking to you, you cannot challenge this." *Id.* (Schornak aff. ¶15).  When Stephanie Krause attempted to challenge ballots, an election worker told her that challenges were no longer being accepted because the "rules 'no longer applied.'"  *Id.* (Krause aff. ¶13).

### i.      Unlawful ballot duplication.

42.     If a ballot is rejected by a ballot-tabulator machine and cannot be read by the machine, the ballot must be duplicated onto a new ballot.  The Michigan Secretary of State has instructed, "If the rejection is due to a false read the ballot must be duplicated by *two election inspectors who have expressed a preference for different political parties*." Michigan Election Officials' Manual, ch. 8, p. 6 (emphasis added).  Thus, the ballot-duplicating process must be performed by bipartisan teams of election officials.  It must also be performed where it can be observed by challengers.

43. But Wayne County prevented many challengers from observing the ballot duplicating process. Exhibit 1 (Miller aff. ¶¶6-8; Steffans aff. ¶¶15-16, 23-24; Mandelbaum aff. ¶6; Sherer aff. ¶¶16-17; Burton aff. ¶7; Drzewiecki aff. ¶7; Klamer aff. ¶9; Chopjian aff. ¶10; Schmidt aff. ¶7; Champagne aff. ¶12; Shinkle aff., p. 1). Challenger John Miller said he was not allowed to observe election workers duplicating a ballot because the "duplication process was personal like voting." *Id.* (Miller aff. ¶8). Challenger Mary Shinkle stated that she was told by an election worker that she was not allowed to observe a ballot duplication because "if we make a mistake then you would be all over us." *Id.* (Shinkle aff., p. 1).

44. Many challengers testified that ballot duplication was performed only by Democratic election workers, not bipartisan teams. Exhibit 1 (Pettibone aff. ¶3; Kinney aff., p. 1; Wasilewski aff., p. 1; Schornak aff. ¶¶18-19; Dixon aff., p. 1; Kolanagireddy aff., p. 1; Kordenbrock aff. ¶¶3-4; Seidl aff., p. 1; Kerstein aff. ¶4; Harris aff. ¶3; Sitek aff. ¶4).

### ii. Ineligible ballots were counted – some multiple times.

45. Challengers reported that batches of ballots were repeatedly run through the vote tabulation machines. Exhibit 1 (Helminen aff. ¶4; Waskilewski aff., p. 1; Mandelbaum aff. ¶5; Rose aff. ¶¶4-14; Sitek aff. ¶3; Posch aff. ¶8; Champagne aff. ¶8). Challenger Patricia Rose stated she observed a stack of about fifty ballots being fed multiple times into a ballot scanner counting machine. *Id.* (Rose aff. ¶¶4-14). Challenger Articia Bomer stated, "I observed a station where election workers were working on scanned ballots that had issues that needed to be manually corrected. I believe some of these workers were changing votes that had been cast for Donald Trump and other Republican candidates." *Id.* (Bomer aff. ¶9). Articia Bomer further stated that she

witnessed the same group of ballots being rescanned into the counting machine "at least five times." *Id.* ¶12.

46.     Many challengers stated that the ballot number on the ballot did not match the number on the ballot envelope, but when they raised a challenge, those challenges were disregarded and ignored by election officials, not recorded, and the ballots were processed and counted.  Exhibit 1 (A. Seely aff. ¶15; Wasilewski aff., p. 1; Schornak aff. ¶13; Brunell aff. ¶¶17, 19; Papsdorf aff. ¶3; Spalding aff. ¶¶8, 11; Antonie aff. ¶3; Daavettila aff., p. 3; Atkins aff. ¶3; Harris aff. ¶3; Sherer aff. ¶21; Drzewiecki aff. ¶¶5-6; Klamer aff. ¶4; Rauf aff. ¶¶9-14; Roush aff. ¶¶5-7; Kinney aff. ¶5).  For example, when challenger Abbie Helminen raised a challenge that the name on the ballot envelope did not match the name on the voter list, she was told by an election official to "get away" and that the counting table she was observing had "a different process than other tables." *Id.* (Helminen aff. ¶5).

47.     Many challengers reported that when a voter was not in the poll book, the election officials would enter a new record for that voter with a birth date of January 1, 1900.  Exhibit 1 (Gaicobazzi aff. ¶10; Piontek aff. ¶10; Cizmer aff. ¶8(F); Wirsing aff., p. 1; Cassin aff. ¶9; Langer aff. ¶3; Harris aff. ¶3; Brigmon aff. ¶5; Sherer aff. ¶¶10-11; Henderson aff. ¶9; Early ¶16; Klamer aff. ¶13; Shock aff. ¶8; M. Seely aff. ¶9).  *See also id.* (Gorman aff. ¶¶23-26; Chopjian aff. ¶12; Ungar aff. ¶15; Valden aff. ¶17).  Braden Gaicobazzi reported that a stack of thirty-five ballots was counted even though there was no voter record.  *Id.* (Giacobazzi aff. ¶10).

48.     At least two challengers observed ballots being counted where there was no signature or postmark on the ballot envelope.  Exhibit 1 (Brunell aff. ¶¶17, 19; Spalding aff. ¶13; Sherer aff. ¶13).  Challenger Anne Vanker observed that "60% or more of [ballot]

envelopes [in a batch] bore the same signature on the opened outer envelope." *Id.* (Vanker aff. ¶5).

49.     Challenger William Henderson observed that a counting table of election workers lost eight ballot envelopes.  Exhibit 1 (Henderson aff. ¶8).

50.     At least two challengers observed spoiled ballots being counted.  Exhibit 1 (Schornak aff. ¶¶6-8; Johnson aff. ¶4).  Another challenger observed over-votes on ballots being "corrected" so that the ballots could be counted.  *Id.* (Zaplitny aff. ¶13).

51.     At least one challenger observed a box of provisional ballots being placed in a tabulation box at the TCF Center.  Exhibit 1 (Cizmar aff. ¶5).  At least one challenger observed poll workers adding marks to a ballot where there was no mark for any candidate.  *Id.* (Tyson aff. ¶17).  Another challenger observed election officials making mistakes when duplicating ballots.  *Id.* (Piontek aff. ¶9).

52.     An election challenger at the Detroit Department of Elections office observed passengers in cars dropping off more ballots than there were people in the car.  Exhibit 1 (Meyers aff. ¶3).  This challenger also observed election workers at the Detroit Department of Elections office handing t-shirts and food to voters in cars.  *Id.* ¶4.  This challenger also observed an election worker accepting a ballot after 8:00 p.m. on Election Day.  *Id.* ¶7.

53.     One Michigan voter stated that her deceased son has been recorded as voting twice since he passed away, most recently in the 2020 general election.  Exhibit 1 (Chase aff. ¶3).

        **iii.**      **Absent voter ballots were pre-dated.**

54.     Jessica Connarn is an attorney who was acting as a Republican challenger at the TCF Center in Wayne County.  **Exhibit 2**.  Jessica Connarn's affidavit describes how

an election poll worker told Jessica Connarn that the poll worker "was being told to change the date on ballots to reflect that the ballots were received on an earlier date." *Id.* ¶1. Jessica Connarn also provided a photograph of a note handed to her by the poll worker in which the poll worker indicated she (the poll worker) was instructed to change the date ballots were received. *See id.* Jessica Connarn's affidavit demonstrates that poll workers in Wayne County were pre-dating absent voter ballots, so that absent voter ballots received after 8:00 p.m. on Election Day could be counted.

55. A lawsuit recently filed by the Great Lakes Justice Center raises similar allegations of vote fraud and irregularities that occurred in Wayne County. *See* **Exhibit 3** (copy of complaint filed in the Circuit Court of Wayne County in *Costantino, et al. v. City of Detroit, et al.*). The lawsuit alleges the Detroit Election Commission "systematically processed and counted ballots from voters whose name failed to appear in either the Qualified Voter File (QVF) or in the supplemental sheets." *Id.* at 3. The complaint also alleges the Election Commission "instructed election workers to not verify signatures on absentee ballots, to backdate absentee ballots, and to process such ballots regardless of their validity" and "instructed election workers to process ballots that appeared after the election deadline and to falsely report that those ballots had been received prior to November 3, 2020 deadline." *Id.* The complaint further alleges the Election Board "systematically used false information to process ballots, such as using incorrect or false birthdays," including inserting "new names into the QVF after the election and recorded these new voters as having a birthdate of 1/1/1900." *Id.* The complaint includes supporting affidavits of witnesses.

          iv.      **Ballots were deposited in remote, unattended drop boxes without meaningful opportunity to observe or challenge the ballots.**

56.      Michigan's election code, MCL 168.24j, requires that ballot containers meet the following conditions:

(1)      A ballot container includes a ballot box, transfer case, or other container used to secure ballots, including optical scan ballots and electronic voting systems and data.

(2)      A manufacturer or distributor of ballot containers shall submit a nonmetal ballot container to the secretary of state for approval under the requirements of subsection (3) before the ballot container is sold to a county, city, township, village, or school district for use at an election.

(3)      A ballot container shall not be approved unless it meets both of the following requirements:

      (a)      It is made of metal, plastic, fiberglass, or other material, that provides resistance to tampering.

      (b)      It is capable of being sealed with a metal seal.

(4)      Before June 1 of 2002, and every fourth year after 2002, a county board of canvassers shall examine each ballot container to be used in any election conducted under this act. The board shall designate on the ballot container that the ballot container does or does not meet the requirements under subsection (3). A ballot container that has not been approved by the board shall not be used to store voted ballots.

(5)      A city, village, or township clerk may procure ballot containers as provided in section 669 and as approved under this section.

(6)      A clerk who uses or permits the use of a ballot container that has not been approved under this section is guilty of a misdemeanor.

57.      In October Michigan amended its election code to allow election authorities to establish remote unattended ballot drop-off boxes. *See* MCL 168.761d. A remote, unattended ballot drop box is essentially equivalent to a polling place where a person can deposit a ballot. But, unlike a polling place, there is no validation that the individual depositing a ballot in the box is an individual who is qualified to cast a vote or to lawfully

deliver a ballot cast by a lawful voter.  *See*, for example, MCL 168.932(f), which prohibits "A person other than an absent voter," and certain others, such as an immediate family member, from possessing and returning an absent voter ballot.  *See also Michigan Alliance for Retired Americans v. Secretary of State*, 2020 Mich. App. LEXIS 6931, *23-24 (Mich. Ct. App. Oct. 16, 2020) ("On balance, the ballot-handling restrictions pass constitutional muster given the State's strong interest in preventing fraud.").

58.     MCL 168.761d(4)(c) provides that "[t]he city or township clerk" who establishes a remote ballot drop box "must use video monitoring of that drop box to ensure effective monitoring of that drop box."

59.     An election challenger at the Detroit Department of Elections office observed ballots being deposited in a ballot drop box located at the Detroit Department of Elections after 8:00 p.m. on Election Day.  Exhibit 1 (Meyers aff. ¶6).

> **v.      Wayne County used ballot tabulators that were shown to miscount votes cast for President Trump and Vice President Pence and instead count them for the Biden-Harris ticket.**

60.     On the morning of November 4, unofficial results posted by the Antrim County Clerk showed that Joe Biden had over 7,700 votes — 3,000 more than Donald Trump.  Antrim County voted 62% in favor of President Trump in 2016.  The Dominion Voting Systems election management system and voting machines (tabulators), which were used in Antrim County, are also used in many other Michigan counties, including Wayne County, were at fault.

61.     Secretary of State Benson released a statement blaming the county clerk for not updating certain "media drives," but her statement failed to provide any coherent

explanation of how the Dominion Voting Systems software and vote tabulators produced such a massive miscount.[2]

62.     Secretary Benson continued: "After discovering the error in reporting the unofficial results, the clerk worked diligently to report correct unofficial results by reviewing the printed totals tape on each tabulator and hand-entering the results for each race, for each precinct in the county." *Id.*

63.     What Secretary Benson fails to address is what would have happened if no one "discover[ed] the error," for instance, in Wayne County, where the number of registered voters is much greater than Antrim County, and where the tabulators were not individually tested.

64.     Wayne County used the same Dominion voting system tabulators as did Antrim County, and Wayne County tested only a single one of its vote tabulating machines before the election.  The Trump campaign asked Wayne County to have an observer physically present to witness the process. *See* Exhibit 4.  Wayne County denied the Trump campaign the opportunity to be physically present.  Representatives of the Trump campaign did have opportunity to watch a portion of the test of a single machine by Zoom video.

65.     Tabulator issues occurred elsewhere in Michigan.  In Oakland County, Democrat Melanie Hartman was wrongly declared the winner of the commissioner's race by a 104-vote margin.  A computer issue at the Rochester Hills clerk's office caused them

---

[2] https://www.michigan.gov/documents/sos/Antrim_Fact_Check_707197_7.pdf (emphasis in original).

to double-count some votes. After elections officials caught the error, Republican Adam Kochenderfer was declared the winner with 1,127 more votes than Hartman.[3]

66.     These vote tabulator failures are a mechanical malfunction that, under MCL 168.831-168.839, requires a "special election" in the precincts affected.

67.     Michigan's Election Code, MCL 168.831-168.839, provides the board of canvassers shall order a special election as governed by those precincts affected by the defect or mechanical malfunction. The board of county canvassers "is responsible for resolving any claims that malfunctioning voting equipment or defective ballots may have affected the outcome of a vote on an office appearing on the ballot." Michigan Manual for Boards of County Canvassers.

## II.     The canvassing process in Michigan.

68.     Michigan has entrusted the conduct of elections to three categories of individuals, a "board of inspectors," a "board of county canvassers," and the "board of state canvassers."

69.     The board of inspectors, among its other duties, canvasses the ballots and compares the ballots to the poll books. *See* MCL 168.801. "Such canvass shall be public and the doors to the polling places and at least 1 door in the building housing the polling places and giving ready access to them shall not be locked during such canvas." *Id.* The members of the board of inspectors (one from each party) are required to seal the ballots and election equipment and certify the statement of returns and tally sheets and deliver the statement of returns and tally sheet to the township or city clerk, who shall deliver it to the

---

[3] https://www.freep.com/story/news/politics/elections/2020/11/08/election-misinformation-michigan-vote-antrim-county/6209693002/

probate court judge, who will than deliver the statement of returns and tally sheet to the "board of county canvassers."  MCL 168.809.  "All election returns, including poll lists, statements, tally sheets, *absent voters' return envelopes bearing the statement required [to cast an absentee ballot] ... must be carefully preserved*."  MCL.810a and 168.811 (emphasis added).

70.    After the board of inspectors completes its duties, the board of county canvassers is to meet at the county clerk's office "no later than 9 a.m. on the Thursday after" the election.  November 5, 2020 is the date for the meeting.  MCL 168.821.  The board of county canvassers has power to summon and open ballot boxes, correct errors, and summon election inspectors to appear.  Among other duties and responsibilities, the board of county canvassers shall do the following provided in MCL 168.823(3).

> The board of county canvassers shall correct obvious mathematical errors in the tallies and returns.  *The board of county canvassers may, if necessary for a proper determination, summon the election inspectors before them*, and require them to count any ballots that the election inspectors failed to count, to make correct returns in case, in the judgment of the board of county canvassers after examining the returns, poll lists, or tally sheets, the returns already made are incorrect or incomplete, and the board of county canvassers shall canvass the votes from the corrected returns.  In the alternative to summoning the election inspectors before them, the board of county canvassers may designate staff members from the county clerk's office to count any ballots that the election inspectors failed to count, to make correct returns in case, in the judgment of the board of county canvassers after examining the returns, poll lists, or tally sheets, the returns already made are incorrect or incomplete, and the board of county canvassers shall canvass the votes from the corrected returns.  When the examination of the papers is completed, or the ballots have been counted, they shall be returned to the ballot boxes or delivered to the persons entitled by law to their custody, and the boxes shall be locked and sealed and delivered to the legal custodians.[4]

---

[4] Emphasis added.

71.     The county board of canvassers shall "conclude the canvass at the earliest possible time and in every case no later than the fourteenth day after the election," which is November 17.  MCL 168.822(1).  But, "[i]f the board of county canvassers fails to certify the results of any election for any officer or proposition by the fourteenth day after the election as provided, the board of county canvassers shall immediately deliver to the secretary of the board of state canvassers all records and other information pertaining to the election.  The board of state canvassers shall meet immediately and make the necessary determinations and certify the results within the 10 days immediately following the receipt of the records from the board of county canvassers."  MCL 168.822(2).

72.     The Michigan board of state canvassers then meets at the Secretary of State's office the twentieth day after the election and announce its determination of the canvass "not later than the fortieth day after the election."  For this general election that is November 23 and December 3.  MCL 168.842.  There is provision for the Secretary of State to direct an expedited canvass of the returns for the election of electors for President and Vice President.

73.     The federal provisions governing the appointment of electors to the Electoral College, 3 U.S.C. 1-18, require Michigan Governor Whitmer to prepare a Certificate of Ascertainment by December 14, the date the Electoral College meets.

74.     The United States Code (3 U.S.C. 5) provides that if election results are contested in any state, and if the state, prior to election day, has enacted procedures to settle controversies or contests over electors and electoral votes, and if these procedures have been applied, and the results have been determined six days before the electors' meetings, then these results are considered to be conclusive and will apply in the counting of the

electoral votes. This date (the "Safe Harbor" deadline) falls on December 8, 2020. The governor of any state where there was a contest, and in which the contest was decided according to established state procedures, is required (by 3 U.S.C. 6) to send a certificate describing the form and manner by which the determination was made to the Archivist as soon as practicable.

75.     The members of the board of state canvassers are Democrat Jeannette Bradshaw, Republican Aaron Van Langeveide, Republican Norman Shinkle, and Democrat Julie Matuzak. Jeanette Bradshaw is the Board Chairperson. The members of the Wayne County board of county canvassers are Republican Monica Palmer, Democrat Jonathan Kinloch, Republican William Hartmann, and Democrat Allen Wilson. Monica Palmer is the Board Chairperson.

## COUNT I

**Secretary of State Benson and Wayne County violated the Equal Protection Clause of the United States Constitution and the corollary clause of Michigan's Constitution.**

76.     The Fourteenth Amendment to the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." *See also Bush v. Gore*, 531 U.S. 98, 104 (2000) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."); *Harper v. Virginia Board of Elections*, 383 U.S. 663, 665, (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

77.     Wayne County's failure to allow challengers and its counting of ineligible and illegal ballots that did not comply with the Michigan Election Code diluted the lawful ballots of these plaintiffs and of other Michigan voters and electors in violation of the United States Constitution and the Michigan Constitution guarantee of equal protection.

78.     President Trump's campaign committee and these Michigan voters and challengers seek declaratory and injunctive relief requiring Secretary Benson to direct that Wayne County allow a reasonable number of challengers to meaningfully observe the conduct of the Wayne County board of county canvassers and the board of state canvassers and that these canvassing boards exercise their duty and authority under Michigan law, which forbids certifying a tally that includes any ballots that were not legally cast.

79.     In addition, President Trump's campaign committee and these Michigan voters and challengers ask this Court to order that no ballot processed by a counting board in Wayne County can be included in the final vote tally unless a challenger was allowed to meaningfully observe the process and the handling and counting of the ballot.

80.     Secretary Benson violated these Michigan voters' right to equal protection by allowing Wayne County to process and count ballots in a manner that allowed ineligible ballots to be counted and by not requiring Wayne County to conduct the general election in a uniform manner as required by Michigan's Election Code as was done in other jurisdictions.

## COUNT II

**Secretary of State Benson and Wayne County violated the rights of these Michigan voters under the federal Elections and Electors Clauses.**

81.     The Electors Clause states that "[e]ach State shall appoint, in such Manner as *the Legislature* thereof may direct, a Number of Electors" for President.  U.S. Const. art. II, §1, cl. 2 (emphasis added).

82.     Likewise, the Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof."  U.S. Const. art. I, §4, cl. 1 (emphasis added).

83.     Michigan statutes enacted by the legislature protect the purity and integrity of elections by allowing ballot challengers to monitor the counting and processing of absentee ballots.  Wayne County and Secretary Benson violated this statutory guarantee by preventing Republican challengers from meaningfully observing and participating in the ballot processing and counting process as is provided by MCL 168.730-736.

84.     It is a violation of the rights of President Trump's campaign committee to have federal elections for presidential electors governed under rules prescribed by the state legislature for Secretary Benson and Wayne County to count ballots that are not lawfully cast, and it is a violation of Michigan law for the Wayne County board of county canvassers and the Michigan board of state canvassers to certify an election tally that includes ineligible or unlawfully cast ballots.

## COUNT III

**Secretary of State Benson and Wayne County violated Michigan's Election Code.**

85.     MCL 168.730 provides:

(1) At an election, a political party or [an organization] interested in preserving the purity of elections and in guarding against the abuse of the elective franchise, may designate challengers as provided in this act.  Except as otherwise provided in this act, a political party [or interested organization] may designate not more than 2 challengers to serve in a precinct at any 1 time.  A political party [or interested organization] may designate not more than 1 challenger to serve at each counting board.

(2) A challenger shall be a registered elector of this state. . . . A candidate for the office of delegate to a county convention may serve as a challenger in a precinct other than the 1 in which he or she is a candidate. . . .

(3) A challenger may be designated to serve in more than 1 precinct.  The political party [or interested organization] shall indicate which precincts the challenger will serve when designating challengers under subsection (1).  If more than 1 challenger of a political party [or interested organization] is serving in a precinct at any 1 time, only 1 of the challengers has the authority to initiate a challenge at any given time.  The challengers shall indicate to the board of election inspectors which of the 2 will have this authority.  The challengers may change this authority and shall indicate the change to the board of election inspectors.

86.     Secretary of State Benson and the election officials in Wayne County violated MCL 168.730-168.734 by denying Republican challengers' rights to meaningfully observe and participate in the ballot processing and counting process..

87.     Michigan Election Code, MCL 168.734 provides:

Any officer or election board who shall prevent the presence of any such challenger as above provided, or shall refuse or fail to provide such challenger with conveniences for the performance of the duties expected of him, shall, upon conviction, be punished by a fine not exceeding $1,000.00, or by imprisonment in the state prison not exceeding 2 years, or by both such fine and imprisonment in the discretion of the court.

88.     Wayne County's and Secretary Benson's denial of Republican challengers' right to participate and observe the processing of ballots violates Michigan's Election Code

- 29 -

and resulting in the casting and counting of ballots that were ineligible to be counted and diluted or canceled out the lawfully cast ballots of other Michigan voters.

## PRAYER FOR RELIEF

President Trump's and Vice President Pence's campaign committee and these Michigan citizens and voters ask this Court to enter a declaratory judgment in their favor as set forth in the foregoing counts and to grant the following injunctive relief:

A. An order directing Secretary Benson and the Michigan Board of State Canvassers to not certify the election results until they have verified and confirmed that all ballots that were tabulated and included in the final reported election results were cast in compliance with the provisions of the Michigan Election Code as set forth herein.

B. An order prohibiting the Wayne County board of county canvassers and the board of state canvassers from certifying any vote tally that includes:

(1) fraudulently or unlawfully cast ballots;

(2) ballots tabulated using the Dominion tabulating equipment or software without the accuracy of individual tabulators having first been determined;

(3) any ballots that were received after Election Day (November 3, 2020) where the postmark or date of receipt was altered to be an earlier date before Election Day; and

(4) any ballots that were verified or counted when challengers were excluded from the room or denied a meaningful opportunity to observe the handling of the ballot and poll book as provided in MCL 168.733.

C. An order directing the Wayne County board of county canvassers to summon and open the ballot boxes and other election material, as provided in MCL 168.823, and, in the presence of challengers who can meaningfully monitor the process, to review the poll lists, absent voter ballot envelopes bearing the statement required by MCL 168.761, and other material provided in MCL 168.811.

D. An order directing that challengers be allowed to be physically present with a meaningful opportunity to observe when the accuracy of each piece of tabulating equipment is determined, and if the accuracy of each piece of tabulation equipment used by Wayne County is not confirmed to be

accurate, an order directing a special election be held in the affected precincts as provided by MCL 168.831-168.839.

E.    An order directing the board of county canvassers and the board of state canvassers, with challengers present and meaningfully able to observe, to obtain and review the video of unattended remote ballot drop boxes.

Plaintiffs further pray the Court to grant such other relief as is just and proper, including but not limited to, the costs of this action and their reasonable attorney fees and expenses pursuant to 42 U.S.C. 1988.

Respectfully submitted,

TRUE NORTH LAW, LLC

*/s/ Mark F. (Thor) Hearne, II*
Mark F. (Thor) Hearne, II (P40231)
Stephen S. Davis (*pro hac* forthcoming)
TRUE NORTH LAW, LLC
112 S. Hanley Road, Suite 200
St. Louis, MO 63105
(314) 296-4000
thor@truenorthlawgroup.com

*Counsel for Plaintiffs*

Exhibit B3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| L. LIN WOOD, JR., | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION** |
| | ) | **FILE NO. _____** |
| v. | ) | |
| | ) | |
| BRAD RAFFENSPERGER, in his official | ) | |
| capacity as Secretary of State of the State | ) | |
| of Georgia, REBECCA N. SULLIVAN, | ) | |
| in her official capacity as Vice Chair of | ) | |
| the Georgia State Election Board, | ) | |
| DAVID J. WORLEY, in his official | ) | |
| capacity as a Member of the Georgia | ) | |
| State Election Board, MATTHEW | ) | |
| MASHBURN, in his official capacity as | ) | |
| a Member of the Georgia State Election | ) | |
| Board, and ANH LE, in her official | ) | |
| capacity as a Member of the Georgia | ) | |
| State Election Board, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COMES NOW Plaintiff **L. Lin Wood, Jr.** ("Plaintiff"), by and through his undersigned counsel of record, and file this his Verified Complaint for Declaratory and Injunctive Relief (the "Complaint"), respectfully showing this honorable Court as follows:

**INTRODUCTION**

1.

The citizens of the State of Georgia deserve fair elections, untainted by violations of the United States Constitution and other federal and state laws governing elections.

2.

The validity of the results of the November 3, 2020 general election in Georgia are at stake as a result of Defendants' unauthorized actions in the handling of absentee ballots within this state, actions that were contrary to the Georgia Election Code.

3.

Defendants' unilaterally, and without the approval or direction of the Georgia General Assembly, changed the process for handling absentee ballots in Georgia, including those cast in the general election.

4.

As a result, the inclusion and tabulation of absentee ballots for the general election (and potentially, for all future elections held within this state) is improper and must not be permitted. To allow otherwise would erode the sacred and basic

rights of Georgia citizens under the United States Constitution to participate in and rely upon a free and fair election.

## JURISDICTION AND VENUE

5.

This action arises under 42 U.S.C. § 1983, Articles I and II of the United States Constitution, and the First and Fourteenth Amendments to the United States Constitution.

6.

This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the United States Constitution and laws of the United States and involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932). This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

7.

Venue is proper under 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claim occurred or will occur in this District. Alternatively,

venue is proper under 28 U.S.C. § 1391(b) because at least one Defendant to this action resides in this District and all Defendants reside in this State.

## PARTIES

8.

Plaintiff L. Lin Wood, Jr. is an adult individual who is a qualified registered elector residing in Fulton County, Georgia. Plaintiff constitutes an "elector" who possesses all of the qualifications for voting in the State of Georgia, as set forth in O.C.G.A. §§ 21-2-2(7) and 21-2-216(a). Plaintiff brings this suit in his capacity as a private citizen. As a qualified elector and registered voter, Plaintiff has Article III standing to bring this action. *See Meek v. Metro. Dade County*, 985 F.2d 1471, 1480 (11th Cir. 1993).

9.

Defendant Brad Raffensperger ("Secretary Raffensperger") is named herein in his official capacity as Secretary of State of the State of Georgia. Secretary Raffensperger is a state official subject to suit in his official capacity because his office "imbues him with the responsibility to enforce the [election laws]." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). Secretary Raffensperger serves as the Chairperson of Georgia's State Election Board, which promulgates and enforces rules and regulations to (i) obtain uniformity in the practices and

proceedings of election officials as well as legality and purity in all primaries and general elections, and (ii) be conducive to the fair, legal, and orderly conduct of primaries and general elections. *See* O.C.G.A. §§ 21-2-30(d), 21-2-31, 21-2-33.1. Secretary Raffensperger, as Georgia's chief elections officer, is further responsible for the administration of the state laws affecting voting, including the absentee voting system. *See* O.C.G.A. § 21-2-50(b).

10.

Defendants Rebecca N. Sullivan, David J. Worley, Matthew Mashburn, and Anh Le (hereinafter the "State Election Board") are members of the State Election Board in Georgia, responsible for "formulat[ing], adopt[ing], and promulgat[ing] such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-2-31(2). Further, the State Election Board "promulgate[s] rules and regulations to define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote for each category of voting system" in Georgia. O.C.G.A. § 21-2-31(7). The State Election Board, personally and through the conduct of the Board's employees, officers, agents, and servants, acted under color of state law at all times relevant to this action and are sued for declaratory and injunctive relief in their official capacities.

## FACTS

I.    **Federal Constitutional Protections for Free and Fair Public Elections.**

11.

Free, fair, and transparent public elections are crucial to democracy – a government of the people, by the people, and for the people.

12.

The Elections Clause of the United States Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives *shall be prescribed in each State by the Legislature thereof*; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. Art. I, § 4, cl. 1 (emphasis added).

13.

The Legislature is "the representative body which ma[kes] the laws of the people." *Smiley*, 285 U.S. at 365. Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 807-08 (2015).

14.

In Georgia, the "legislature" is the General Assembly.  *See* Ga. Const. Art. III, § I, Para. I.

15.

Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers, including but not limited to Secretary Raffensperger, have no authority to unilaterally exercise that power, much less flout existing legislation.

16.

Nor can the authority to ignore existing legislation be delegated to an executive officer.  While the Elections Clause "was not adopted to diminish a State's authority to determine its own lawmaking processes," *Ariz. State Legislature*, 135 S. Ct. at 2677, it does hold states accountable to their chosen processes when it comes to regulating federal elections, *id.* at 2668.  "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question."  *Bush*, 531 U.S. at 113 (Rehnquist, C.J., concurring); *Smiley*, 285 U.S. at 365.

II.    **The Georgia Legislature's Laws Governing the Handling of Absentee Ballots.**

17.

The Georgia General Assembly (the "Georgia Legislature") provided a generous absentee ballot statute, O.C.G.A. § 21-2-380(b), which provides, in pertinent part, "An elector who votes by absentee ballot shall not be required to provide a reason in order to cast an absentee ballot in any primary, election, or runoff."

18.

The Georgia Legislature also established a clear an efficient process for handling absentee ballots.  To the extent that any change in that process could or could be expected to change the process, that change must, under Article I, Section 4 of the United States Constitution, be prescribed by the Georgia Legislature.

19.

Under O.C.G.A. § 21-2-386(a)(1)(B), the Georgia Legislature instructed the county registrars and clerks (the "County Officials") to handle the absentee ballots as directed therein.  The Georgia Legislature set forth the procedures to be used by each municipality for appointing the absentee ballot clerks to ensure that such clerks would "perform the duties set forth in this Article."  *See* O.C.G.A. § 21-2-380.1.

8

20.

The Georgia Election Code instructs those who handle absentee ballots to

follow a clear procedure:

> Upon receipt of each [absentee] ballot, a registrar or clerk **shall** write
> the day and hour of the receipt of the ballot on its envelope.  The
> registrar or clerk **shall** then compare the identifying information on
> the oath with the information on file in his or her office, **shall**
> compare the signature or make on the oath with the signature or mark
> on the absentee elector's voter card or the most recent update to such
> absentee elector's voter registration card and application for absentee
> ballot or a facsimile of said signature or maker taken from said card or
> application, and **shall**, if the information and signature appear to be
> valid and other identifying information appears to be correct, so
> certify by signing or initialing his or her name below the voter's oath.
> Each elector's name so certified shall be listed by the registrar or clerk
> on the numbered list of absentee voters prepared for his or her
> precinct.

O.C.G.A. § 21-2-386(a)(1)(B) (emphasis added).

21.

The Georgia Legislature's use of the word "shall" on three separate

occasions indicates the clear process that **must** be followed by the County Officials

in processing absentee ballots.

22.

Under O.C.G.A. § 21-2-386(a)(1)(C), the Georgia Legislature also

established a clear and efficient process to be used by County Officials if they

determine that an elector has failed to sign the oath on the outside envelope

9

enclosing the ballot or that the signature does not conform with the signature on file in the registrar's or clerk's office (a "defective absentee ballot").

23.

The Georgia Legislature also provided for the steps to be followed by County Officials with respect to defective absentee ballots:

> *If the elector has failed to sign the oath, or if the signature does not appear to be valid*, or if the elector has failed to furnish required information *or information so furnished does not conform with that on file in the registrar's or clerk's office*, or if the elector is otherwise found disqualified to vote, the registrar or clerk *shall* write across the face of the envelope "Rejected," giving the reason therefor. The board of registrars or absentee ballot clerk *shall* promptly *notify the elector of such rejection*, a copy of which notification *shall* be retained in the files of the board of registrars or absentee ballot clerk for at least one year.

O.C.G.A. § 21-2-386(a)(1)(C) (emphasis added).

24.

The Georgia Legislature again used the word "shall" to indicate when a defective absentee ballot shall be "rejected." The Georgia Legislature also contemplated the use of a written notification to be used by the county registrar or clerk in notifying the elector of the rejection.

10

**III.** **Defendants' Unauthorized Actions to Alter the Georgia Election Code and the Processing of Defective Absentee Ballots.**

25.

Notwithstanding the clarity of the applicable statutes and the constitutional authority for the Georgia Legislature's actions, on March 6, 2020, the Secretary of State of the State of Georgia, Secretary Raffensperger, and the State Election Board, who administer the state elections (the "Administrators") entered into a "Compromise and Settlement Agreement and Release" (the "Litigation Settlement") with the Democratic Party of Georgia, Inc., the Democrat Senatorial Campaign Committee, and the Democratic Congressional Campaign Committee (collectively, the "Democrat Party Agencies"), setting forth different standards to be followed by the clerks and registrars in processing absentee ballots in the State of Georgia.[1] A true and correct copy of the Litigation Settlement is attached hereto and incorporated herein as **Exhibit A**.

26.

The Litigation Settlement sets forth different standards to be followed by the clerks and registrars in processing absentee ballots in the State of Georgia than those described above.

---

[1] *See Democratic Party of Georgia, Inc., et al. v. Raffensperger, et al.*, Civil Action File No. 1:19-cv-05028-WMR, United States District Court for the Northern District of Georgia, Atlanta Division, Doc. 56-1.

11

27.

Although Secretary Raffensperger, as the Secretary of State, is authorized to promulgate rules and regulations that are "conducive to the fair, legal, and orderly conduct of primaries and elections" but all such rules and regulations must be "consistent with law." O.C.G.A. § 21-2-31(2).

28.

Under the Litigation Settlement, however, the Administrators agreed to change the statutorily-prescribed manner of handling absentee ballots in a manner that was not consistent with the laws promulgated by the Georgia Legislature for elections in this state.

29.

The Litigation Settlement provides that the Secretary of State would issue an "Official Election Bulletin" to county Administrators overriding the statutory procedures prescribed for those officials. That power, however, does not belong to the Secretary of State under the United States Constitution.

30.

The Litigation Settlement procedure, set forth in pertinent part below, is more cumbersome, and makes it much more difficult to follow the statute with respect to defective absentee ballots.

31.

Because of the COVID-19 pandemic and the pressures created by a larger number of absentee ballots, County Officials were under great pressure to handle an historical level of absentee voting.

32.

Additionally, the County Officials were required to certify the speed with which they were handling absentee ballots on a daily basis, with the goal of processing absentee ballots faster than they had been processed in the past.

33.

Under the Litigation Settlement, the following language added to the pressures and complexity of processing defective absentee ballots, making it less likely that they would be identified or, if identified, processed for rejection:

> County registrars and absentee ballot clerks *are required*, upon receipt of each mail-in absentee ballot, to compare the signature or make of the elector on the mail-in absentee ballot envelope with the signatures or marks in eNet and on the application for the mail-in absentee ballot. If the signature does not appear to be valid, registrars and clerks are required to follow the procedure set forth in O.C.G.A. § 21-2-386(a)(1)(C). When reviewing an elector's signature on the mail-in absentee ballot envelope, the registrar or clerk must compare the signature on the mail-in absentee ballot envelope to each signature contained in such elector's voter registration record in eNet and the elector's signature on the application for the mail-in absentee ballot. *If the registrar or absentee ballot clerk determines that the voter's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot*

13

*application, the registrar or absentee ballot clerk must seek review from two other registrars, deputy registrars, or absentee ballot clerks. A mail-in absentee ballot shall not be rejected unless a majority of the registrars, deputy registrars, or absentee ballot clerks reviewing the signature agree that the signature does not match any of the voter's signatures on file in eNet or on the absentee ballot application. If a determination is made that the elector's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot application, the registrar or absentee ballot clerk shall write the names of the three elections officials who conducted the signature review across the face of the absentee ballot envelope, which shall be in addition to writing "Rejected" and the reason for the rejection as required under O.C.G.A. § 21-2-386(a)(1)(C).* Then, the registrar or absentee ballot clerk shall commence the notification procedure set forth in O.C.G.A. § 21-2-386(a)(1)(C) and State Election Board Rule 183-1-14-.13.

(*See* Ex. A, Litigation Settlement, p. 3-4, ¶ 3, "Signature Match" (emphasis added).)

34.

The underlined language above is not consistent with the statute adopted by the Georgia Legislature.

35.

First, the Litigation Settlement overrides the clear statutory authorities granted to County Officials individually and forces them to form a committee of three if any one official believes that an absentee ballot is a defective absentee ballot.

14

36.

Such a procedure creates a cumbersome bureaucratic procedure to be followed with each defective absentee ballot – and makes it likely that such ballots will simply not be identified by the County Officials.

37.

Second, the Litigation Settlement allows a County Official to compare signatures in ways not permitted by the statutory structure created by the Georgia Legislature.

38.

The Georgia Legislature prescribed procedures to ensure that any request for an absentee ballot must be accompanied by sufficient identification of the elector's identity. *See* O.C.G.A. § 21-2-381(b)(1) (providing, in pertinent part, "In order to be found eligible to vote an absentee ballot in person at the registrar's office or absentee ballot clerk's office, such person shall show one of the forms of identification listed in Code Section 21-2-417…").

39.

Under O.C.G.A. § 21-2-220(c), the elector must present identification, but need not submit identification if the electors submit with their application

information such that the County Officials are able to match the elector's information with the state database, generally referred to as the eNet system.

40.

The system for identifying absentee ballots was carefully constructed by the Georgia Legislature to ensure that electors were identified by acceptable identification (O.C.G.A. § 21-2-417 even permits the use of an expired driver's license), but at some point in the process, the Georgia Legislature mandated the system whereby the elector be identified for each absentee ballot.

41.

Under the Litigation Settlement, any determination of a signature mismatch would lead to the cumbersome process described in the settlement, which was not intended by the Georgia Legislature, which authorized those decisions to be made by single election officials.

42.

The Georgia Legislature also provided for the opportunity to cure (again, different from the opportunity to cure in the Litigation Settlement), but did not allocate funds for three County Officials for every mismatch decision.

43.

In the primary preceding the November 3, 2020 election, news stories recorded that many absentee ballots did not reach voters until after the polls were closed. *See, e.g.*, F. Bajak and C. Cassidy, "Vote-by-mail worries: A 'leaky pipeline' in many states," Associated Press Aug. 8, 2020, https://apnews.com/article/u-s-news-ap-top-news-election-2020-technology-politics-52e87011f4d04e41bfffccd64fc878e7, retrieved Nov. 11, 2020).

44.

In response and to encourage confidence in absentee voting during the COVID-19 crisis, the Secretary of State launched Ballot Trax to track absentee ballots, permitting electors to track the progress of absentee ballots as they were processed.

45.

Announcing Ballot Trax further increased pressure on County Officials to process absentee ballot applications quickly, so that they would not be perceived as "falling behind" in processing ballots.

46.

County Officials were not incentivized to spend additional time to check absentee ballot applications – by increasing the number of reviewers and

17

complexity of the process, the Litigation Settlement procedures created further disincentives to accurate processing of signature matches.

47.

Finally, under paragraph 4 of the Litigation Settlement, the Administrators delegated their responsibilities for determining when there was a signature mismatch by considering in good faith "additional guidance and training materials" drafted by the "handwriting and signature review expert" of the Democrat Party Agencies. (*See* Ex. A, Litigation Settlement, p. 4, ¶ 4, "Consideration of Additional Guidance for Signature Matching.")

48.

Allowing a single political party to write rules for reviewing signatures is not "conducive to the fair…conduct of primaries and elections" or "consistent with law" under O.C.G.A. § 21-2-31.

49.

The Litigation Settlement by itself has created confusion, misplaced incentives, and undermined the confidence of the voters of the State of Georgia in the electoral system.

50.

Neither it nor any of the activities spawned by it were authorized by the Georgia Legislature, as required by the United States Constitution.

## COUNT I
### First Amendment and Equal Protection
### U.S. Const. amend. XIV, 42 U.S.C. § 1983

51.

Plaintiff incorporates by reference and realleges all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

52.

The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution, which prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

53.

The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights.

54.

The requirement of equal protection is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

55.

The Equal Protection Clause requires states to "'avoid arbitrary and disparate treatment of the members of its electorate.'" *Charfauros v. Bd. of Elections*, 249 F.3d 941, 951 (9th Cir. 2001) (quoting *Bush*, 531 U.S. at 105).

56.

That is, each citizen "has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Bloomstein*, 405 U.S. 330, 336 (1972).

57.

"Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05. Among other things, this requires "specific rules designed to ensure uniform treatment" in order to prevent "arbitrary and disparate treatment to voters." *Id.* at 106-07.

58.

"The right to vote extends to all phases of the voting process, from being permitted to place one's vote in the ballot box to having that vote actually counted. Thus, the right to vote applies equally to the initial allocation of the franchise as well as the manner of its exercise. Once the right to vote is granted, a state may not draw distinctions between voters that are inconsistent with the guarantees of the Fourteenth Amendment's equal protection clause." *Pierce v. Allegheny County Bd. of Elections*, 324 F.Supp.2d 684, 695 (W.D. Pa. 2003) (citations and quotations omitted).

59.

"[T]reating voters differently" thus "violate[s] the Equal Protection Clause" when the disparate treatment is the result of arbitrary, ad hoc processes. *Charfauros*, 249 F.3d at 954. Indeed, a "minimum requirement for non-arbitrary treatment of voters [is] necessary to secure the fundamental right [to vote]." *Bush*, 531 U.S. at 105.

60.

Defendants are not part of the Georgia Legislature and cannot exercise legislative power to enact rules or regulations regarding the handling of defective absentee ballots that are contrary to the Georgia Election Code.

61.

By entering the Litigation Settlement and altering the process for handling defective absentee ballots in Georgia, Defendants unilaterally, and without authority, altered the Georgia Election Code.

62.

The result is that absentee ballots have been processed differently by County Officials than the process created by the Georgia Legislature and set forth in the Georgia Election Code.

63.

Further, allowing a single political party to write rules for reviewing signatures, as paragraph 4 of the Litigation Settlement provides, is not "conducive to the fair…conduct of primaries and elections" or "consistent with law" under O.C.G.A. § 21-2-31.

64.

The rules and regulations set forth in the Litigation Settlement created an arbitrary, disparate, and ad hoc process for processing defective absentee ballots, contrary to Georgia law that was utilized in determining the results of the November 3, 2020 general election.

65.

This disparate treatment is not justified by, and is not necessary to promote, any substantial or compelling state interest that cannot be accomplished by other, less restrictive means.

66.

The foregoing injuries, burdens, and infringements that are caused by Defendants' conduct violates the Equal Protection Clause of the Fourteenth Amendment.

67.

The foregoing violations occurred as a consequence of Defendants acting under color of state law. Accordingly, Plaintiff is entitled to declaratory and injunctive relief against Defendants pursuant to 42 U.S.C. § 1983.

68.

As a result of Defendants' unauthorized actions and disparate treatment of defective absentee ballots, this Court should enter an order, declaration, and/or injunction that prohibits Defendants from certifying the results of the 2020 general election in Georgia on a statewide basis.

69.

Alternatively, this Court should enter an order, declaration, and/or injunction prohibiting Defendants from certifying the results of the General Elections which include the tabulation of defective absentee ballots, regardless of whether said ballots were cured.

70.

Alternatively, this Court should enter an order, declaration, and/or injunction that the results of the 2020 general election in Georgia are defective as a result of the above-described constitutional violations, and that Defendants are required to cure said deficiencies in a manner consistent with federal and Georgia law, and without the taint of the procedures described in the Litigation Settlement.

71.

Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm unless the relief requested herein is granted.

**COUNT II**
**Violation of the Electors & Election Clauses**
**U.S. Const. Art. I, § 4, cl. 1 & Art. II, § 1, cl. 2**

72.

Plaintiff incorporates by reference and realleges all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

73.

The Electors Clause states that "[e]ach State shall appoint, in such Manner as *the Legislature* thereof may direct, a Number of Electors" for President.  U.S. Const. art. II, § 1, cl. 2 (emphasis added).  Likewise, the Elections Clause of the United States Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof."  U.S. Const. art. I, § 4, cl. 1 (emphasis added).

74.

Secretary Raffensperger is not part of the Georgia Legislature and cannot exercise legislative power.

75.

Further, because the United States Constitution reserves for the Georgia Legislature the power to set the "Times, Places, and Manner" of holding elections for President and Congress, the Administrators have no authority to unilaterally exercise that power, much less to hold them in ways that conflict with existing legislation.  U.S. Const. Art. I, § 4, cl. 1.

76.

By entering the Litigation Settlement, Secretary Raffensperger imposed a different procedure for handling defective absentee ballots that is contrary to the Georgia Election Code. *See* O.C.G.A. § 21-2-386.

77.

The procedure set forth in the Litigation Settlement for the handling of defective absentee ballots is not consistent with the laws of the State of Georgia, and thus, Defendants' actions under the Litigation Settlement exceed their authority. *See* O.C.G.A. § 21-2-31(2).

78.

Defendants are not the Georgia Legislature, and their unilateral decision to implement rules and procedures regarding absentee ballots that are contrary to the Georgia Election Code constitutes a violation of the Electors and Elections Clauses of the United States Constitution.

79.

The foregoing violations occurred as a consequence of Defendants acting under color of state law. Accordingly, Plaintiff is entitled to declaratory and injunctive relief against Defendants pursuant to 42 U.S.C. § 1983.

80.

As a result of Defendants' unauthorized actions and disparate treatment of defective absentee ballots, this Court should enter an order, declaration, and/or injunction that prohibits Defendants from certifying the results of the 2020 general election in Georgia on a statewide basis.

81.

Alternatively, this Court should enter an order, declaration, and/or injunction prohibiting Defendants from certifying the results of the General Elections which include the tabulation of defective absentee ballots, regardless of whether said ballots were cured.

82.

Alternatively, this Court should enter an order, declaration, and/or injunction that the results of the 2020 general election in Georgia are defective as a result of the above-described constitutional violations, and that Defendants are required to cure said deficiencies in a manner consistent with federal and Georgia law, and without the taint of the procedures described in the Litigation Settlement.

83.

Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm unless the relief requested herein is granted.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief:

(a)    That, as a result of Defendants' violations of the United States Constitution and violations of other federal and state election laws, this Court should enter an order, declaration, and/or injunction that prohibits Defendants from certifying the results of the 2020 general election in Georgia on a statewide basis;

(b)    Alternatively, that, as a result of Defendants' violations of the United States Constitution and violations of other federal and state election laws, this Court should enter an order, declaration, and/or injunction prohibiting Defendants from certifying the results of the General Elections which include the tabulation of defective absentee ballots, regardless of whether said ballots were cured;

(c)    Alternatively, that, as a result of Defendants' violations of the United States Constitution and violations of other federal and state election laws, this Court should enter an order, declaration, and/or injunction that the results of the 2020 general election in Georgia are defective as a result of the above-described constitutional violations, and that Defendants are required to cure said deficiencies in a manner consistent with federal and Georgia law, and without the taint of the procedures described in the Litigation Settlement; and

(d)    Any and other such further relief that this Court or the Finder of Fact

deems equitable and just.

Respectfully submitted this 13th day of November, 2020.

SMITH & LISS, LLC

Ray S. Smith, III
Georgia Bar No. 662555
*Counsel for Plaintiff*

Five Concourse Parkway
Suite 2600
Atlanta, Georgia 30328
(404) 760-6000
rsmith@smithliss.com

## **CERTIFICATE OF COMPLIANCE**

The undersigned counsel certifies that the foregoing has been prepared in Times New Roman (14 point) font, as required by the Court in Local Rule 5.l (B).

Respectfully submitted this 13th day of November, 2020.

SMITH & LISS, LLC

Ray S. Smith, III
Georgia Bar No. 662555
*Counsel for Plaintiff*

Five Concourse Parkway
Suite 2600
Atlanta, Georgia 30328
(404) 760-6000
rsmith@smithliss.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused the foregoing and all exhibits and attachments thereto in the above-captioned matter to be filed with the United States District Court for the Northern District of Georgia, Atlanta Division, via the Court's CM-ECF system.  I also hereby certify that I caused the foregoing and all exhibits and attachments thereto in the above captioned matter to be served, via FedEx and email, with the appropriate Waiver of Service of Summons forms, upon:

> Secretary of State Brad Raffensperger
> 214 State Capitol
> Atlanta, Georgia 30334
> brad@sos.ga.gov
> soscontact@sos.ga.gov
>
> Rebecca N. Sullivan
> Georgia Department of Administrative Services
> 200 Piedmont Avenue SE
> Suite 1804, West Tower
> Atlanta, Georgia 30334-9010
> rebecca.sullivan@doas.ga.gov
>
> David J. Worley
> Evangelista Worley LLC
> 500 Sugar Mill Road
> Suite 245A
> Atlanta, Georgia 30350
> david@ewlawllc.com

Matthew Mashburn
Aldridge Pite, LLP
3575 Piedmont Road, N.E.
Suite 500
Atlanta, Georgia 30305
mmashburn@aldridgepite.com

Anh Le
Harley, Rowe & Fowler, P.C.
2700 Cumberland Parkway
Suite 525
Atlanta, Georgia 30339
ale@hrflegal.com

This 13th day of November, 2020.

SMITH & LISS, LLC

Ray S. Smith, III
Georgia Bar No. 662555
*Counsel for Plaintiff*

Five Concourse Parkway
Suite 2600
Atlanta, Georgia 30328
(404) 760-6000
rsmith@smithliss.com

<u>Exhibit B4</u>

## **DECLARATION OF** ███████████████

I, ██████████████████████, hereby state the following:

1. ████████████████████████████████████████
   ████████████████████████████████████████
   ██████████████████████

2. I am an adult of sound mine. All statements in this declaration are based on my personal knowledge and are true and correct.

3. I am making this statement voluntarily and on my own initiative. I have not been promised, nor do I expect to receive, anything in exchange for my testimony and giving this statement. I have no expectation of any profit or reward and understand that there are those who may seek to harm me for what I say in this statement. I have not participated in any political process in the United States, have not supported any candidate for office in the United States, am not legally permitted to vote in the United States, and have never attempted to vote in the United States.

4. I want to alert the public and let the world know the truth about the corruption, manipulation, and lies being committed by a conspiracy of people and companies intent upon betraying the honest people of the United States and their legally constituted institutions and fundamental rights as citizens. This conspiracy began more than a decade ago in Venezuela and has spread to countries all over the world. It is a conspiracy to wrongfully gain and keep power and wealth. It involves political leaders, powerful companies, and other persons whose purpose is to gain and keep power by changing the free will of the people and subverting the proper course of governing.

5. ████████████████████████████████████
   ████████████████████████ Over the course of my career, I specialized in the marines ████████████████
   ████████████████████████████████████████
   ████████████████████████████████████████

6. Due to my training in special operations and my extensive military and academic formations, I was selected for the national security guard detail of the President of Venezuela. ████████████████
   ████████████████████████████████████████
   ████████████████████████████████████████
   ████████████████████████████████████████

████████████████████████ - Page **1** of **8**

Ex. N to TRO Motion:
Redacted Declaration

███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
████████

7.  ███████████████████████████████

████ Señor Cabello was a long-time confederate of President Chavez and instrumental in his gaining power. In 2002, Señor Cabello had very briefly taken over the duties of the presidency while Hugo Chavez was imprisoned. Within hours of Señor Cabello taking over the presidency, Hugo Chavez was released from prison and regained the office of President. On December 11, 2011, Cabello was installed as the Vice-President of the United Socialist Party – the party of President Chávez and became the second most powerful figure in the party after Hugo Chávez. Cabello was appointed president of the National Assembly in early 2012 and was re-elected to that post in January 2013. After Hugo Chávez's death, Cabello was next in line for the presidency of the country, but he remained president of the National Assembly and yielded to Nicolás Maduro holding the position of President of Venezuela.

8.  ███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████ President Chavez was very precise and exacting in his instructions in the details about meetings he wanted, where the meeting was to occur, who was to attend, what was to be done. ████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
██████████████

9.  ███████████████████████████████
███████ I was witness to the creation and operation of a

████████████████████████ - Page 2 of 8

sophisticated electronic voting system that permitted the leaders of the Venezuelan government to manipulate the tabulation of votes for national and local elections and select the winner of those elections in order to gain and maintain their power.

10. Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic which included ██████████████. The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes *against* persons running the Venezuelan government to votes *in their favor* in order to maintain control of the government.

11. In mid-February of 2009, there was a national referendum to change the Constitution of Venezuela to end term limits for elected officials, including the President of Venezuela. The referendum passed. This permitted Hugo Chavez to be re-elected an unlimited number of times.

12. After passage of the referendum, President Chavez instructed me to make arrangements for him to meet with Jorge Rodriguez, then President of the National Electoral Council, and three executives from Smartmatic. Among the three Smartmatic representatives were ██████████████ ██████████████ President Chavez had multiple meetings with Rodriguez and the Smartmatic team at which I was present. In the first of four meetings, Jorge Rodriguez promoted the idea to create software that would manipulate elections. Chavez was very excited and made it clear that he would provide whatever Smartmatic needed. He wanted them immediately to create a voting system which would ensure that any time anything was going to be voted on the voting system would guarantee results that Chavez wanted. Chavez offered Smartmatic many inducements, including large sums of money, for Smartmatic to create or modify the voting system so that it would guarantee Chavez would win every election cycle. Smartmatic's team agreed to create such a system and did so.

13. I arranged and attended three more meetings between President Chavez and the representatives from Smartmatic at which details of the new

██████████████████████████ - Page 3 of 8

voting system were discussed and agreed upon. For each of these meetings, I communicated directly with ████████████ on details of where and when to meet, where the participants would be picked up and delivered to the meetings, and what was to be accomplished. At these meetings, the participants called their project the "Chavez revolution." From that point on, Chavez never lost any election. In fact, he was able to ensure wins for himself, his party, Congress persons and mayors from townships.

14. Smartmatic's electoral technology was called "Sistema de Gestión Electoral" (the "Electoral Management System"). Smartmatic was a pioneer in this area of computing systems. Their system provided for transmission of voting data over the internet to a computerized central tabulating center. The voting machines themselves had a digital display, fingerprint recognition feature to identify the voter, and printed out the voter's ballot. The voter's thumbprint was linked to a computerized record of that voter's identity. Smartmatic created and operated the entire system.

15. Chavez was most insistent that Smartmatic design the system in a way that the system could change the vote of each voter without being detected. He wanted the software itself to function in such a manner that if the voter were to place their thumb print or fingerprint on a scanner, then the thumbprint would be tied to a record of the voter's name and identity as having voted, but that voter would not tracked to the changed vote. He made it clear that the system would have to be setup to not leave any evidence of the changed vote for a specific voter and that there would be no evidence to show and nothing to contradict that the name or the fingerprint or thumb print was going with a changed vote. Smartmatic agreed to create such a system and produced the software and hardware that accomplished that result for President Chavez.

16. After the Smartmatic Electoral Management System was put in place, I closely observed several elections where the results were manipulated using Smartmatic software. One such election was in December 2006 when Chavez was running against Rosales. Chavez won with a landslide over Manuel Rosales - a margin of nearly 6 million votes for Chavez versus 3.7 million for Rosales.

17. On April 14, 2013, I witnessed another Venezuelan national election in which the Smartmatic Electoral Management System was used to manipulate and change the results for the person to succeed Hugo Chávez

Ex. N to TRO Motion:
Redacted Declaration

as President. In that election, Nicolás Maduro ran against Capriles Radonsky. ███████████████████████████████████

███████████████████████████████████████████████████████

███████████ Inside that location was a control room in which there were multiple digital display screens – TV screens – for results of voting in each state in Venezuela. The actual voting results were fed into that room and onto the displays over an internet feed, which was connected to a sophisticated computer system created by Smartmatic. People in that room were able to see in "real time" whether the vote that came through the electronic voting system was in their favor or against them. If one looked at any particular screen, they could determine that the vote from any specific area or as a national total was going against either candidate. Persons controlling the vote tabulation computer had the ability to change the reporting of votes by moving votes from one candidate to another by using the Smartmatic software.

18. By two o'clock in the afternoon on that election day Capriles Radonsky was ahead of Nicolás Maduro by two million votes. When Maduro and his supporters realized the size of Radonsky's lead they were worried that they were in a crisis mode and would lose the election. The Smartmatic machines used for voting in each state were connected to the internet and reported their information over the internet to the Caracas control center in real-time. So, the decision was made to reset the entire system. Maduro's and his supporters ordered the network controllers to take the internet itself offline in practically all parts in Venezuela and to change the results.

19. It took the voting system operators approximately two hours to make the adjustments in the vote from Radonsky to Maduro. Then, when they turned the internet back on and the on-line reporting was up and running again, they checked each screen state by state to be certain where they could see that each vote was changed in favor of Nicholas Maduro. At that moment the Smartmatic system changed votes that were for Capriles Radonsky to Maduro. By the time the system operators finish, they had achieved a convincing, but narrow victory of 200,000 votes for Maduro.

20. After Smartmatic created the voting system President Chavez wanted, he exported the software and system all over Latin America. It was sent to Bolivia, Nicaragua, Argentina, Ecuador, and Chile – countries that were in alliance with President Chavez. This was a group of leaders who wanted to be able to guarantee they maintained power in their countries. When Chavez died, Smartmatic was in a position of being the only

Ex. N to TRO Motion:
Redacted Declaration

company that could guarantee results in Venezuelan elections for the party in power.

21. I want to point out that the software and fundamental design of the electronic electoral system and software of Dominion and other election tabulating companies relies upon software that is a descendant of the Smartmatic Electoral Management System. In short, the Smartmatic software is in the DNA of every vote tabulating company's software and system.

22. Dominion is one of three major companies that tabulates votes in the United States. Dominion uses the same methods and fundamentally same software design for the storage, transfer and computation of voter identification data and voting data. Dominion and Smartmatic did business together. The software, hardware and system have the same fundamental flaws which allow multiple opportunities to corrupt the data and mask the process in a way that the average person cannot detect any fraud or manipulation. The fact that the voting machine displays a voting result that the voter intends and then prints out a paper ballot which reflects that change does not matter. It is the software that counts the digitized vote and reports the results. The software itself is the one that changes the information electronically to the result that the operator of the software and vote counting system intends to produce that counts. That's how it is done. So the software, the software itself configures the vote and voting result -- changing the selection made by the voter. The software decides the result regardless of what the voter votes.

23. All of the computer controlled voting tabulation is done in a closed environment so that the voter and any observer cannot detect what is taking place unless there is a malfunction or other event which causes the observer to question the process. I saw first-hand that the manipulation and changing of votes can be done in real-time at the secret counting center which existed in Caracas, Venezuela. For me it was something very surprising and disturbing. I was in awe because I had never been present to actually see it occur and I saw it happen. So, I learned first-hand that it doesn't matter what the voter decides or what the paper ballot says. It's the software operator and the software that decides what counts – not the voter.

24. If one questions the reliability of my observations, they only have to read the words of ████████████ ███████████████████████████ ████████████████████████████████████████████ a time period in

████████████████████████████ - Page 6 of 8

Ex. N to TRO Motion:
Redacted Declaration

which Smartmatic had possession of all the votes and the voting, the votes themselves and the voting information at their disposition in Venezuela. ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮▮ he was assuring that the voting system implemented or used by Smartmatic was completely secure, that it could not be compromised, was not able to be altered.

25. But later, in 2017 when there were elections where Maduro was running and elections for legislators in Venezuela, ▮▮▮▮▮ and Smartmatic broke their secrecy pact with the government of Venezuela. He made a public announcement through the media in which he stated that all the Smartmatic voting machines used during those elections were totally manipulated and they were manipulated by the electoral council of Venezuela back then. ▮▮▮▮▮▮ stated that all of the votes for Nicholas Maduro and the other persons running for the legislature were manipulated and they actually had lost. So I think that's the greatest proof that the fraud can be carried out and will be denied by the software company that ▮▮▮▮▮ admitted publicly that Smartmatic had created, used and still uses vote counting software that can be manipulated or altered.

26. I am alarmed because of what is occurring in plain sight during this 2020 election for President of the United States. The circumstances and events are eerily reminiscent of what happened with Smartmatic software electronically changing votes in the 2013 presidential election in Venezuela. What happened in the United States was that the vote counting was abruptly stopped in five states using Dominion software. At the time that vote counting was stopped, Donald Trump was significantly ahead in the votes. Then during the wee hours of the morning, when there was no voting occurring and the vote count reporting was off-line, something significantly changed. When the vote reporting resumed the very next morning there was a very pronounced change in voting in favor of the opposing candidate, Joe Biden.

27. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I have worked in gathering information, researching, and working with information technology. That's what I know how to do and the special knowledge that I have. Due to these recent election events, I contacted a number of reliable and intelligent ex-co-workers of mine that are still informants and work with the intelligence community. I asked for them to give me information that was up-to-date information in as far as how all these businesses are acting, what actions they are taking.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ - Page 7 of 8

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was prepared in Dallas County, State of Texas, and executed on November 15, 2020.

Page 8 of 8

Exhibit B5

# IN THE UNITED STATES DISTRICT COURT

# EASTERN DISTRCT OF MICHIGAN

**TIMOTHY KING,MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and DAREN WADE RUBINGH,**

      **Plaintiffs.**

**v.**

**GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, JOCELYN BENSON, in her official capacity as Michigan Secretary of State and the Michigan BOARD OFSTATE CANVASSERS.**

      **Defendants.**

**CASE NO.**

## COMPLAINT FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF

1

## NATURE OF THE ACTION

1.      This civil action brings to light a massive election fraud, multiple violations of the Michigan Election Code, *see, e.g.,* MCL §§ 168.730-738, in addition to the Election and Electors Clauses and Equal Protection Clause of the U.S. Constitution violations that occurred during the 2020 General Election throughout the State of Michigan,[1] as set forth in the affidavits of dozens of eye witnesses and the statistical anomalies and mathematical impossibilities detailed in the affidavits of expert witnesses.

2.      The scheme and artifice to defraud was for the purpose of illegally and fraudulently manipulating the vote count to manufacture an election of Joe Biden as President of the United States. The fraud was executed by many means,[2] but the most fundamentally troubling, insidious, and egregious ploy was the systemic adaptation of old-fashioned "ballot-stuffing."  It has now been amplified and rendered virtually invisible by computer software created and run by domestic and foreign actors for that very purpose.  This Complaint details an especially egregious range of conduct in Wayne County and the City of Detroit, though this conduct occurred throughout the State at the direction of Michigan state election officials.

3.      The multifaceted schemes and artifices implemented by Defendants and their collaborators to defraud resulted in the unlawful counting, or manufacturing, of hundreds of thousands of illegal, ineligible, duplicate or purely fictitious ballots in the State of Michigan, that

---

[1]   The same pattern of election fraud and voter fraud writ large occurred in all the swing states with only minor variations in Michigan, Pennsylvania, Arizona and Wisconsin. See Exh. 101, William M. Briggs, Ph.D. "An Analysis Regarding Absentee Ballots Across Several States" (Nov. 23, 2020) ("Dr. Briggs Report").

[2] 50 U.S.C. § 20701 requires Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation, but as will be shown wide-pattern of misconduct with ballots show preservation of election records have not been kept; and Dominion logs are only voluntary, with no system wide preservation system.  Without an incorruptible audit log, there is no acceptable system.

constitute a multiple of Biden's purported lead in the State. While this Complaint, and the eyewitness and expert testimony incorporated herein, identify with specificity sufficient ballots required to overturn and reverse the election results, the entire process is so riddled with fraud, illegality, and statistical impossibility that this Court, and Michigan's voters, courts, and legislators, cannot rely on, or certify, any numbers resulting from this election.

### Dominion Voting Systems Fraud and Manipulation

4.      The fraud begins with the election software and hardware from Dominion Voting Systems Corporation ("Dominion") used by the MichiganBoard of State Canvassers. The Dominion systems derive from the software designed by Smartmatic Corporation, which became Sequoia in the United States.

5.      Smartmatic and Dominion were founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election.See Exh. 1, Redacted Declaration of Dominion Venezuela Whistleblower ("Dominion Whistleblower Report"). Notably, Chavez "won" every election thereafter.

6.      As set forth in the DominionWhistleblower Report, the Smartmatic software was contrived through a criminal conspiracy to manipulate Venezuelan elections in favor of dictator Hugo Chavez:

> Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic. The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government. In mid-February of 2009, there was a national referendum to change theConstitution of Venezuela to end

term limits for elected officials, including the President of Venezuela. The referendum passed. This permitted Hugo Chavez to be re-elected an unlimited number of times. . . .

Smartmatic's electoral technology was called "Sistema de Gestión Electoral" (the "Electoral Management System"). Smartmatic was a pioneer in this area of computing systems. Their system provided for transmission of voting data over the internet to a computerized central tabulating center. The voting machines themselves had a digital display, fingerprint recognition feature to identify the voter, and printed out the voter's ballot. The voter's thumbprint was linked to a computerized record of that voter's identity. Smartmatic created and operated the entire system. *Id.* ¶¶ 10 & 14.

7.    A core requirement of the Smartmatic software design ultimately adopted by Dominion for the Michigan's elections was the software's ability to hide its manipulation of votes from any audit.  As the whistleblower explains:

Chavez was most insistent that Smartmatic design the system in a way that the system could change the vote of each voter without being detected. He wanted the software itself to function in such a manner that if the voter were to place their thumb print or fingerprint on a scanner, then the thumbprint would be tied to a record of the voter's name and identity as having voted, but that voter would not tracked to the changed vote. He made it clear that the system would have to be setup to not leave any evidence of the changed vote for a specific voter and that there would be no evidence to show and nothing to contradict that the name or the fingerprint or thumb print was going with a changed vote. Smartmatic agreed to create such a system and produced the software and hardware that accomplished that result for President Chavez.*Id.* ¶15.

8.    The design and features *of* the Dominion software do not permit a simple audit to reveal its misallocation, redistribution, or deletion of votes. First, the system's central accumulator does not include a protected real-time audit log that maintains the date and time stamps of all significant election events.  Key components of the system utilize unprotected logs. Essentially this allows an unauthorized user the opportunity to arbitrarily add, modify, or remove log entries, causing the machine to log election events that do not reflect actual voting tabulations—or more specifically, do not reflect the actual votes of or the will of the people.  *See* Exh. 107, August 24, 2020 Declaration of HarriHursti, ¶¶45-48).

9. Indeed, under the professional standards within the industry in auditing and forensic analysis, when a log is unprotected, and can be altered, it can no longer serve the purpose of an audit log.There is incontrovertible physical evidence that the standards of physical security of the voting machines and the software were breached, and machines were connected to the internet in violation of professional standards, which violates federal election law on the preservation of evidence.

10. In deciding to award Dominion a$25 million, ten-year contract (to a Dominion project team led by Kelly Garrett, former Deputy Director of the Michigan Democratic Party), and then certifying Dominion software, Michigan officials disregarded all the concerns that caused Dominion software to be rejected by the Texas Board of elections in 2018 because it was deemed vulnerable to undetected and non-auditable manipulation. An industry expert, Dr. Andrew Appel, Princeton Professor of Computer Science and Election Security Expert has recently observed, with reference to Dominion Voting machines: "I figured out how to make a slightly different computer program that just before the polls were closed, it switches some votes around from one candidate to another. I wrote that computer program into a memory chip and now to hack a voting machine you just need 7 minutes alone with it and a screwdriver."[3]

11. Plaintiff's expert witness, Russell James Ramsland, Jr. (Exh. 101, "Ramsland Affidavit"), has concluded that Dominion alone is responsible for the injection, or fabrication, of 289,866 illegal votes in Michigan, that must be disregarded. This is almost twice the number of Mr. Biden's purported lead in the Michigan vote (without consideration of the additional illegal, ineligible, duplicate or fictitious votes due to the unlawful conduct outlined below), and thus by itself is grounds to set aside the 2020 General Election and grant the declaratory and injunctive

---

[3] Andrew W. Appel, *et al.*, "Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters" at (Dec. 27, 2019), attached hereto as Exhibit 2 ("Appel Study").

relief requested herein.

12.     In addition to the Dominion computer fraud, this Complaint identifies several additional categories of "traditional" voting fraud and Michigan Election Code violations, supplemented by healthy doses of harassment, intimidation, discrimination, abuse and even physical removal of Republican poll challengers to eliminate any semblance of transparency, objectivity or fairness from the vote counting process.  While this illegal conduct by election workers and state, county and city employees in concert with Dominion, even if considered in isolation,  the following three categories of systematic violations of the Michigan Election Code cast significant doubt on the results of the election and mandate this Court to set aside the 2020 General Election and grant the declaratory and injunctive relief requested herein.

**Fact Witness Testimony of Voting Fraud & Other Illegal Conduct**

13.     There were three broad categories of illegal conduct by election workers in collaboration with other employee state, county and/or city employees and Democratic poll watchers and activists.First, to facilitate and cover-up the voting fraud and counting of fraudulent, illegal or ineligible voters, election workers:

A.     Denied Republican election challengers access to the TCF Center, where all Wayne County, Michigan ballots were processed and counted;

B.     Denied Republic poll watchers at the TCF Center meaningful access to view ballot handling, processing, or counting and lockedcredentialedchallengersoutofthe counting room so they could not observe the process, during which time tens of thousands of ballots wereprocessed;

C.     Engaged in a systematic pattern of harassment, intimidation and even physical removal of Republican election challengers or locking them out of the TCF Center;

D.     Systematically discriminated against Republican poll watchers and favored Democratic poll watchers;

E.     Ignored or refused to record Republican challenges to the violations outlined herein;

F. Refused to permit Republican poll challengers to observe ballot duplication and other instances where they allowed ballots to be duplicated by hand without allowing poll challengers to check if the duplication was accurate;

G. Unlawfully coached voters to vote for Joe Biden and to vote a straight Democrat ballot, including by going overtothevotingboothswithvotersinorder to watch them vote and coach them for whom to vote;

H. As a result of the above, Democratic election challengers outnumbered Republicans by 2:1 or 3:1 (or sometimes 2:0 at voting machines); and

I. Collaborated with Michigan State, Wayne County and/or City of Detroit employees (including police) in all of the above unlawful and discriminatory behavior.

14. Second, election workers illegally forged, added, removed or otherwise altered

information on ballots, the Qualified Voter File (QVF) and Other Voting Records, including:

A. Fraudulently adding "tens of thousands" of new ballots and/or new voters to QVF in two separate batches on November 4, 2020, all or nearly all of which were votes for Joe Biden;

B. Forging voter information and fraudulently adding new voters to the QVF Voters, in particular, e.g., when a voter's name could not be found, the election worker assigned the ballot to a random name already in the QVF to a person who had notvoted and recordedthesenewvotersashavingabirthdate of1/1/1900;

C. Changing dates on absenteeballots received after 8:00 PM Election Day deadline to indicate that such ballots were received before the deadline;

D. Changing Votes for Trump and other Republican candidates; and

E. Added votes to "undervote" ballots and removing votes from "Over-Votes".

15. Third, election workers committed several additional categories of violations of

the Michigan Election Code to enable them to accept and count other illegal, ineligible or

duplicate ballots, or reject Trump or Republican ballots, including:

A. Permitting illegal double voting by persons that had voted by absentee ballot and in person;

B. Counting ineligible ballots – and in many cases – multiple times;

C. Counting ballots without signatures, or without attempting to match signatures, and ballots without postmarks, pursuant to direct instructions from Defendants;

D.      Counting "spoiled" ballots;

E.      Systematic violations of ballot secrecy requirements;

F.      Unsecured ballots arrived at the TCF Center loading garage, not in sealed ballot boxes, without any chain of custody, and withoutenvelopes, after the 8:00 PM Election Day deadline, in particular, the tens of thousands of ballots that arrived on November 4, 2020; and

G.      Accepting and counting ballots from deceased voters.

**Expert Witness Testimony Regarding Voting Fraud**

16.     In addition to the above fact witnesses, this Complaint presents expert witness testimony demonstrating that several hundred thousand illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular: (1) a report from Russel Ramsland, Jr. showing the "physical impossibility" of nearly 385,000 votes injected by four precincts/township on November 4, 2020, that resulted in the counting of nearly 290,000 more ballots processed than available capacity (which is based on statistical analysis that is independent of his analysis of Dominion's flaws); (2) a report from Dr. William Briggs, showing that there were approximately 60,000 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots; and (3) a report from Dr. Eric Quinell analyzing the anomalous turnout figures in Wayne and Oakland Counties showing that Biden gained nearly 100% and frequently more than 100% of all "new" voters in certain townships/precincts over 2016, and thus indicated that nearly 87,000 anomalous and likely fraudulent votes from these precincts.

17.     As explained and demonstrated in the accompanying redacted declaration of a former electronic intelligence analyst under 305th Military Intelligence with experience gathering SAM missile system electronic intelligence, the Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections, including

the most recent US general election in 2020. This Declaration further includes a copy of the patent records for Dominion Systems in which Eric Coomer is listed as the first of the inventors of Dominion Voting Systems. (See Attached hereto as Ex. 105, copy of redacted witness affidavit, November 23, 2020).

18. Expert Navid Keshavarez-Nia explains that US intelligence services had developed tools to infiltrate foreign voting systems including Dominion. He states that Dominion's software is vulnerable to data manipulation by unauthorized means and permitted election data to be altered in all battleground states. He concludes that hundreds of thousands of votes that were cast for President Trump in the 2020 general election were transferred to former Vice-President Biden. (Ex. 109).

19. These and other "irregularities" provide this Court grounds to set aside the results of the 2020 General Election and provide the other declaratory and injunctive relief requested herein.

## JURISDICTION ANDVENUE

20. This Court has subject matter under 28 U.S.C. § 1331 which provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

21. This Court also has subject matter jurisdiction under 28 U.S.C. § 1343 because this action involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365(1932).

22. ThejurisdictionoftheCourttograntdeclaratoryreliefisconferredby28U.S.C. §§ 2201

and 2202 and by Rule 57, Fed. R. Civ. P.

23.    This Court has jurisdiction over the related Michigan constitutional claims and state-law claims under 28 U.S.C. § 1367. Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District. 28 U.S.C. § 1391(b) &(c).

24.    Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers, including but not limited to Secretary Benson, have no authority to unilaterally exercise that power, much less flout existing legislation.

## THE PARTIES

25.    Each of the following Plaintiffs are registered Michigan voters and nominees of the Republican Party to be a Presidential Elector on behalf of the State of Michigan: Timothy King, a resident of Washtenaw County, Michigan; Marian Ellen Sheridan, a resident of Oakland County, Michigan; and, John Earl Haggard, a resident of Charlevoix, Michigan;

26.    Each of these Plaintiffs has standing to bring this action as voters and as candidates for the office of Elector under MCL §§ 168.42 & 168.43 (election procedures for Michigan electors). As such, Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of Secretary of State in implementing or modifying State election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).  Each brings this action to set aside and decertify the election results for the Office of President of the United States that was certified by the Michigan Secretary of State on November 23, 2020.  The certified results showed a plurality of 154,188

10

votes in favor of former Vice-President Joe Biden over President Trump.

27.     Plaintiff James Ritchard is a registered voter residing in Oceana County.  He is the Republican Party Chairman of Oceana County.

28.     Plaintiff James David Hooper is a registered voter residing in Wayne County.  He is the Republican Party Chairman for the Wayne County Eleventh District.

29.     Plaintiff Daren Wade Ribingh is a registered voter residing in Antrim County.  He is the Republican Party Chairman of Antrim County. is

30.     Defendant Gretchen Whitmer (Governor of Michigan) is named herein in her official capacity as Governor of the State of Michigan.

31.     Defendant JocelynBenson ("Secretary Benson") isnamed as adefendantinherofficial capacity as Michigan'sSecretaryofState. Jocelyn Benson is the "chief elections officer" responsible for overseeing the conduct of Michigan elections. MCL § 168.21 ("The secretary of state shall be the chief election officer of the state and shall have supervisory control over local election officials in the performance of their duties under the provisions of this        act."); MCL § 168.31(1)(a)(the"SecretaryofStateshall…issueinstructions andpromulgaterules…fortheconduct of elections and registrations in accordance with the laws of this state"). Local election officials must follow Secretary Benson's instructions regarding the conduct of elections. Michigan law provides that Secretary Benson "[a]dvise and direct local election officials as to the proper methods of conducting elections." MCL § 168.31(1)(b). *See also Hare v. Berrien Co Bd. of Election*, 129 N.W.2d 864 (Mich. 1964); *Davis v. Secretary of State*, 2020 Mich. App. LEXIS 6128, at *9 (Mich. Ct. App. Sep. 16, 2020). Secretary Bensonis responsibleforassuringMichigan'slocalelectionofficialsconductelectionsinafair,just, and lawful manner. *See* MCL 168.21; 168.31; 168.32. *See also League of Women Voters of*

*Michigan v. Secretary of State*, 2020 Mich. App. LEXIS 709, *3 (Mich. Ct. App. Jan. 27, 2020); *Citizens Protecting Michigan's Constitution v. Secretary of State*, 922 N.W.2d 404(Mich.Ct.App.2018),aff'd921N.W.2d247(Mich.2018);*Fitzpatrickv.Secretaryof State*, 440 N.W.2d 45 (Mich. Ct. App. 1989).

32.     Defendant Michigan Board of State Canvassers is "responsible for approv[ing] votingequipmentforuseinthestate,certify[ing]theresultofelectionsheldstatewide…." Michigan Election Officials' Manual, p. 4. *See also* MCL 168.841, *etseq*.  On March 23, 2020, the Board of State Canvassers certified the results of the 2020 election finding that Joe Biden had received 154,188 more votes than President Donald Trump.

## STATEMENT OF FACTS

33.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988, and under MCL 168.861, to remedy deprivations of rights, privileges, or immunities secured by the Constitution and laws of the United States and to contest the election results, and the corollary under the Michigan Constitution.

34.     The United States Constitution sets forth the authority to regulate federal elections. With respect to congressional elections, the Constitution provides.

35.     The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators. U.S. CONST. art. I, § 4 ("Elections Clause").

36.     With respect to the appointment of presidential electors, the Constitution provides: Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the

State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.  U.S. CONST. art. II, § 1 ("Electors Clause").  Under the Michigan Election Code, the Electors of the President and Vice President for the State of Michigan are elected by each political party at their state convention in each Presidential election year.  *See* MCL §§ 168.42 & 168.43.

37.     Neither Defendant is a "Legislature" as required under the Elections Clause or Electors Clause. The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley*, 285 U.S. 365. Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." Id. at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 135 S. Ct. 2652, 2668 (U.S. 2015).

38.     While the Elections Clause "was not adopted to  diminish  a State's authority to determine its own lawmaking processes," *Ariz.State Legislature,* 135 S. Ct. at 2677, it does hold states accountable to their chosen processes when it comes to regulating federal elections, *id.* at 2668. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush,* 531 U.S. at 113 (Rehnquist, C.J., concurring); *Smiley,* 285 U.S. at 365.

39.     And Plaintiffs bring this action,to vindicate his constitutional right to a free and fair election ensuring the accuracy and integrity of the process pursuant to the Michigan Constitution, art. 2, sec. 4, par. 1(h), which states all Michigan citizenshave:

> The right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections.

40.     TheMich.Const.,art.2,sec.4,furtherstates,"Allrightssetforthinthissubsection    shall be self-executing. This subsection shall be liberally construed in favor of voters' rights in order to

effectuate itspurposes."

41.     Based upon all the allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to enjoin the certification of the election results pending a full investigation and court hearing, and to order an independent audit of the November 3, 2020 election to ensure the accuracy and integrity of theelection

## I.     LEGAL BACKGROUND:     RELEVANT PROVISIONS OF THE MICHIGAN ELECTION CODE AND ELECTION CANVASSING PROCEDURES.

### A.     Michigan law requires Secretary Benson and local election officials to provide designated challengers a meaningful opportunity to observe the conduct ofelections.

42.     Challengers representing a political party, candidate, or organization interested in the outcome of the election provide a critical role in protecting the integrity ofelectionsincludingthepreventionofvoterfraudandotherconduct(whethermaliciously  undertaken or by incompetence) that could affect the conduct of the election. *See* MCL § 168.730-738.

43.     MichiganrequiresSecretaryofStateBenson,localelectionauthorities,and stateandcountycanvassingboardstoprovidechallengerstheopportunitytomeaningfully    participate in, and oversee, the conduct of Michigan elections and the counting ofballots.

44.     Michigan'selectioncodeprovidesthatchallengersshallhavethefollowing   rights and responsibilities:

   a.     An election challenger shall be provided a space within a polling place where they can observe the election procedure and each person applyingto vote. MCL§ 168.733(1).

   b.     An election challenger must be allowed opportunity to inspect poll books as ballots are issued to electors and witness the electors' names being entered in the poll book. MCL§ 168.733(1)(a).

   c.     AnelectionChallengermustbeallowedtoobservethemannerinwhichthe duties of the election inspectors are being performed. MCL§ 168.733(1)(b).

    d.      An election challenger is authorized to challenge the voting rights of a person who the challenger has good reason to believe is not a registered elector. MCL § 168.733(1)(c).

    e.      An election challenger is authorized to challenge an election procedure that is not being properly performed. MCL § 168.733(1)(d).

    f.      An election challenger may bring to an election inspector's attention any of the following: (1) improper handling of a ballot by an elector or election inspector; (2) a violation of a regulation made by the board of election inspectors with regard to the time in which an elector may remain in the polling place; (3) campaigning and fundraising being performed by an election inspector or other person covered by MCL § 168.744; and/or (4) any other violation of election law or other prescribed election procedure. MCL § 168.733(1)(e).

    g.      An election challenger may remain present during the canvass of votes and until the statement of returns is duly signed and made. MCL § 168.733(1)(f).

    h.      An election challenger may examine each ballot as it is being counted. MCL § 168.733(1)(g).

    i.      An election challenger may keep records of votes cast and other election procedures as the challenger desires. MCL § 168.733(1)(h).

    j.      An election challenger may observe the recording of absent voter ballots on voting machines. MCL § 168.733(1)(i).

45.    The Michigan Legislature adopted these provisions to prevent and deter vote fraud, require the conduct of Michigan elections to be transparent, and to assure public confidence in the outcome of the election no matter how close the final ballot tally may be.

46.    Michigan values the important role challengers perform in assuring the transparency and integrity of elections. For example, Michigan law provides it is a felony punishable by up to two years in state prison for any person to threaten or intimidate a challenger who is performing any activity described in Michigan law. MCL § 168.734(4). It is a felony punishable by up to two years in state prison for any person to prevent the presence of a challenger exercising their rights or to fail to provide a challenger with "conveniences for the performance of the[ir] duties." MCL 168.734.

47. The responsibilities of challengers are established by Michigan statute. MCL § 168.730 states:

(1) At an election, a political party or [an organization] interested in preserving the purity of elections and in guarding against the abuse of the elective franchise, may designate challengers as provided in this act. Except as otherwise provided in this act, a political party [or interested organization] may designate not more than 2 challengers to serve in a precinct at any 1 time. A political party [or interested organization] may designate not more than 1 challenger to serve at each counting board.

(2) A challenger shall be a registered elector of this state . . . . . . . . . . A candidate for the office of delegate to a county convention may serve as a challenger in a precinct other than the 1 in which he or she is a candidate. . . .

(3) A challenger may be designated to serve in more than 1 precinct. The political party [or interested organization] shall indicate which precincts the challenger will serve when designating challengers under subsection (1). If more than 1 challenger of a political party [or interested organization] is serving in a precinct at any 1 time, only 1 of the challengers has the authority to initiate a challenge at any given time. The challengers shall indicate to the board of election inspectors which of the 2 will have this authority. The challengers may change this authority and shall indicate the change to the board of election inspectors.

48. Secretary Benson and Wayne County violated these provisions of Michigan law and violated the constitutional rights of Michigan citizens and voters when they did not conduct this general election in conformity with Michigan law and the United States Constitution.

**B.    The canvassing process in Michigan.**

49. Michigan has entrusted the conduct of elections to three categories of individuals, a "board of inspectors," a "board of county canvassers," and the "board of state canvassers."

50. The board of inspectors, among its other duties, canvasses the ballots and compares the ballots to the poll books. *See* MCL § 168.801. "Such canvass shall be public and the doors to the polling places and at least 1 door in the building housing the polling places and giving ready access to them shall not be locked during such canvas." *Id.* The members of the

board of inspectors (one from each party) are required to seal the ballots and election equipment and certify the statement of returns and tally sheets and deliver the statement of returns and tally sheet to the township or city clerk, who shall deliver it to the probate court judge, who will than deliver the statement of returns and tally sheet to the "board of county canvassers." MCL § 168.809. "All election returns, including poll lists, statements, tally sheets, *absent voters' return envelopes bearing the statement required [to cast an absentee ballot] ... must be carefully preserved*." MCL § 810a and § 168.811 (emphasis added).

51.    After the board of inspectors completes its duties, the board of county canvassers is to meet at the county clerk's office "no later than 9 a.m. on the Thursday after" the election. November 5, 2020 is the date for the meeting. MCL 168.821. The board of county canvassers has power to summon and open ballot boxes, correct errors, and summon election inspectors to appear. Among other duties and responsibilities, the board of county canvassers shall do the following provided in MCL 168.823(3).

52.    The board of county canvassers shall correct obvious mathematical errors in the tallies and returns.

> *The board of county canvassers may, if necessary for a proper determination, summon the election inspectors before them*, and require them to count any ballots that the election inspectors failed to count, to make correct returns in case, in the judgment of the board of county canvassers after examining the returns, poll lists, or tally sheets, the returns already made are incorrect or incomplete, and the board of county canvassers shall canvass the votes from the corrected returns. In the alternative to summoning the election inspectors before them, the board of county canvassers may designate staff members from the county clerk's office to count any ballots that the election inspectors failed to count, to make correct returns in case, in the judgment of the board of county canvassers after examining the returns, poll lists, or tally sheets, the returns already made are incorrect or incomplete, and the board of county canvassers shall canvass the votes from the corrected returns. When the examination of the papers is completed, or the ballots have been counted, they shall be returned to the ballot boxes or delivered to the persons entitled by law to their custody, and the boxes shall be locked and sealed and delivered to the

legalcustodians. The county board of canvassers shall "conclude the canvass at the earliest possible time and in every case no later than the fourteenth day after the election," which isNovember17.MCL168.822(1).But,"[i]ftheboardofcountycanvassersfailstocertify the results of any election for any officer or proposition by the fourteenth day after the election as provided, the board of county canvassers shall immediately deliver to the secretary of the board of state canvassers all records and other information pertaining to theelection.Theboardofstatecanvasserssshallmeetimmediatelyandmakethenecessary determinationsandcertifytheresultswithinthe10daysimmediatelyfollowingthereceip t of the records from the board of county canvassers." MCL168.822(2).

53.     The Michigan board of state canvassers then meets at the Secretary of State's office the twentieth day after the election and announce its determination of the canvass "not later than the fortieth day after the election." For this general election that is November 23 and December 3. MCL 168.842. There is provision for the Secretary of State to direct an expedited canvass of the returns for the election of electors for President and VicePresident.

54.     The county board of canvassers shall "conclude the canvass at the earliest possible time and in every case no later than the fourteenth day after the election," which isNovember17.MCL168.822(1).But,"[i]ftheboardofcountycanvassersfailstocertify the results of any election for any officer or proposition by the fourteenth day after the election as provided, the board of county canvassers shall immediately deliver to the secretary of the board of state canvassers all records and other information pertaining to theelection.Theboardofstatecanvasserssshallmeetimmediatelyandmakethenecessary determinationsandcertifytheresultswithinthe10daysimmediatelyfollowingthereceipt of the records from the board of county canvassers." MCL168.822(2).

55.     The Michigan board of state canvassers then meets at the Secretary of State's office the twentieth day after the election and announce its determination of the canvass "not later than the fortieth day after the election." For this general election that is November 23 and December 3. MCL 168.842. There is provision for the Secretary of State to direct an expedited

canvass of the returns for the election of electors for President and VicePresident.

56. The federal provisions governing the appointment of electors to the Electoral College, 3 U.S.C. §§ 1-18, require Michigan Governor Whitmer to preparea Certificate of Ascertainment by December 14, the date the Electoral Collegemeets.

57. The United States Code (3 U.S.C. §5) provides that if election results are contestedinanystate,andifthestate,priortoelectionday,hasenactedprocedurestosettle controversies or contests over electors and electoral votes, and if these procedures have been applied, and the results have been determined six days before the electors' meetings, thentheseresultsareconsideredtobeconclusiveandwillapplyinthecountingofthe electoral votes. This date (the "Safe Harbor" deadline) falls on December 8, 2020. The governor of any state where there was a contest, and in which the contest was decided according to established state procedures, is required (by 3 U.S.C. § 6) to send a certificate describing the form and manner by which the determination was made to the Archivist as soon as practicable.

58. The members of the board of state canvassers are Democrat Jeannette Bradshaw, Republican Aaron Van Langeveide, Republican Norman Shinkle, and Democrat Julie Matuzak. Jeanette Bradshaw is the Board Chairperson. The members of the Wayne County board of county canvassers are Republican Monica Palmer, Democrat Jonathan Kinloch, Republican William Hartmann, and Democrat Allen Wilson. Monica Palmer is the BoardChairperson.

59. More than one hundred credentialed election challengers provided sworn affidavits.Theseaffidavitsstated,amongothermatters,thatthesecredentialedchallengers were denied a meaningful opportunity to review election officials in Wayne County handling ballots, processing absent voter ballots, validating the legitimacy of absentvoterballots, and the general conduct of the election and ballot counting. *See* Exhibit 1 (affidavits of election challengers).

II.     FACTUAL        ALLEGATIONS        AND        FACT        WITNESS
        TESTIMONYREGARDINGMICHIGAN ELECTION CODE VIOLATIONS AND
        OTHER UNLAWFUL CONDUCT BY ELECTION WORKERS AND MICHIGAN
        STATE, WAYNE COUNTY AND/OR CITY OF DETROIT EMPLOYEES.

60.     Wayne County used the TCF Center in downtown Detroit to consolidate, collect,

and        tabulate        all        of        the        ballots        for

theCounty.TheTCFCenterwastheonlyfacilitywithinWayneCountyauthorizedtocountthe ballots.

**A.     Republican Election ChallengersWere Denied Opportunity to Meaningfully
        Observe the Processing and Counting of Ballots.**

61.     There is a difference between a ballot and a vote. A ballot is a piece of paper. A

vote is a ballot that has been completed by a citizen registered to vote who has the right to cast a

vote and has done so in compliance with Michigan election law by, among other things,

verifying their identity and casting the ballot on or before Election Day. It is the task of Secretary

Benson and Michigan election officials to assure that only ballots cast by individuals entitled to

cast        a        vote        in        the        election        are        counted        and        to        make

surethatallballotscastbylawfulvotersarecountedandtheelectionisconductedinaccord        with

Michigan's Election Code uniformly throughoutMichigan.

62.     Challengers provide the transparency and accountability to assure ballots are

lawfully cast and counted as provided in Michigan's Election Code and voters can be

confidenttheoutcomeoftheelectionwashonestlyandfairlydeterminedbyeligiblevoters.

63.     WayneCountyexcludedcertifiedchallengersfrommeaningfullyobserving        the

conduct of the election in violation of the Michigan Election Code. This allowed a substantial

number of ineligible ballots to be counted, as outlined in Section B. below.   These systematic

Michigan Election Code violations, and the disparate treatment of Republican vs. Democratic

poll challengers, also violated the Equal Protection Clause and other provisions of the U.S.

Constitution as detailed herein.   The following affidavits describe the specifics that were

observed. This conduct was pervasive in Wayne County as attested to in the affidavits attached at **EXHIBIT3**.

### 1. Republican Observers Denied Access to TCF Center

64.     Many individuals designated as challengers to observe the conduct of the election were denied meaningful opportunity to observe the conduct of the election. For example, challengers designated by the Republican Party or Republican candidates were denied access to the TCF Center (formerly called Cobo Hall) ballot counting location in Detroit while Democratic challengers were allowed access. Exhibit 3 (Deluca aff. ¶¶7-9, 16-18; Langer aff. ¶3; Papsdorf aff. ¶3; Frego aff. ¶9; Downing aff. ¶¶2-9, 11, 15, 22; Sankey aff. ¶¶5-8; Ostin aff. ¶¶5-7; Cavaliere aff. ¶3; Cassin aff. ¶4; Rose aff. ¶18; Zimmerman aff. ¶8; Langer aff. ¶3; Poplawski aff. ¶3; Henderson aff. ¶7; Fuqua-Freyaff.¶5; Ungar aff. ¶4; Eilf aff. ¶¶9, 17; Jeup aff. ¶¶6-7; Tietz aff. ¶¶9-18; McCall aff. ¶¶5-6; Arnoldyaff.¶¶5,8-9(unlimitedmembersofthemediawerealsoallowedinsideregardless of COVID restrictions while Republican challengers were excluded)).

65.     Many challengers stated that Republican challengers who had been admitted to the TCF Center but who left were not allowed to return. *Id.* (Bomer aff.¶16; Paschke aff. ¶4; Schneider aff., p. 2; Arnoldy aff. ¶6; Boller aff. ¶¶13-15 (removed and not allowed to serve as challenger); Kilunen aff. ¶7; Gorman aff. ¶¶6-8; Wirsing aff.,p. 1; Rose aff. ¶19; Krause aff. ¶¶9, 11; Roush aff. ¶16; M. Seely aff. ¶6; Fracassi aff. ¶6; Whitmore aff. ¶5). Furthermore, Republican challengers who left the TCF Center were not allowed to be replaced by other Republican challengers while Democratic challengers were replaced.

### 2. Disparate and Discriminatory Treatment of Republican vs. Democratic Challengers.

66.     As a result of Republican challengers not being admitted or re-admitted, while

Democratic challengers were freely admitted, there were many more Democratic challengers allowed to observe the processing and counting of absent voter ballots than Republican challengers. *Id.* (Helminen aff. ¶12 (Democratic challengers out- numbered Republican challengers by at least a two-to-one ratio); Daavettila aff., p. 2 (ten timesasmanyDemocraticchallengersasRepublican);A.Seelyaff.¶19;Schneideraff.,p. 2; Wirsing aff., p. 1; Rauf aff. ¶21; Roush aff. ¶¶16-17; Topini aff.¶4).

67.    Many challengers testified that election officials strictly and exactingly enforced a six-foot distancing rule for Republican challengers but not for Democratic challengers. *Id.* (Paschke aff. ¶4; Wirsing aff., p. 1; Montie aff. ¶4; Harris aff. ¶3; Krause aff. ¶7; Vaupel aff. ¶5; Russel aff. ¶7; Duus aff. ¶9; Topini aff. ¶6). As a result, Republican challengers were not allowed to meaningfully observe the ballot counting process.

### 3.    Republican Challengers Not Permitted to View Ballot Handling, Processing or Counting.

68.    Many challengers testified that their ability to view the handling, processing, and counting of ballots was physically and intentionally blocked by election officials.*Id*. (A.Seelyaff.¶15;Milleraff.¶¶13-14;Pennalaaff.¶4;Tysonaff.¶¶12- 13, 16; Ballew aff. ¶8; Schornak aff. ¶4; Williamson aff. ¶¶3, 6; Steffans aff. ¶¶15-16, 23- 24; Zaplitny aff. ¶15; Sawyer aff. ¶5; Cassin aff. ¶9; Atkins aff. ¶3; Krause aff. ¶5;Shereraff. ¶¶15, 24; Basler aff. ¶¶7-8; Early aff. ¶7; Posch aff. ¶7; Chopjian aff. ¶11; Shock aff.¶7; Schmidt aff. ¶¶7-8; M. Seely aff. ¶4; Topini aff. ¶8).

69.    At least three challengers said they were physically pushed away from counting tables by election officials to a distance that was too far to observe the counting. *Id.* (Helminen aff. ¶4; Modlin aff. ¶¶4, 6; Sitek aff. ¶4). Challenger Glen Sitek reported that he was pushed twice by an election worker, the second time in the presence of police officers. *Id.* (Sitek aff. ¶4).

Sitek filed a police complaint. *Id.*

70.     Challenger Pauline Montie stated that she was prevented from viewing the computer monitor because election workers kept pushing it further away and made her stand back away from the table. *Id.* (Montie aff. ¶¶4-7). When Pauline Montie told an election worker that she was not able to see the monitor because they pushed it farther away from her, the election worker responded, "too bad." *Id.*¶8.

71.     Many challengers witnessed Wayne County election officials covering the windows of the TCF Center ballot counting center so that observers could not observe the ballot counting process. *Id.* (A. Seely aff. ¶¶9, 18; Helminen aff. ¶¶9, 12; Deluca aff. ¶13; Steffans aff. ¶22; Frego aff. ¶11; Downing aff. ¶21; Sankey aff. ¶14; Daavettila aff.,p.4;Zimmermanaff.¶10;Krauseaff.¶12;Shereraff.¶22;Johnsonaff.¶7;Poschaff.¶10;Raufaff.¶23 ;Lukeaff.,p.1;M.Seelyaff.¶8;Zelaskoaff.¶8;Ungaraff.¶12;Storm aff. ¶7; Fracassi aff. ¶8; Eilf aff. ¶25; McCall aff.¶9).

### 4.     Harassment, Intimidation & Removal of Republican Challengers

72.     Many challengers testified that they were intimidated, threatened, and harassed by election officials during the ballot processing and counting process. *Id.* (Ballew aff. ¶¶7, 9; Gaicobazzi aff. ¶¶12-14 (threatened repeatedly and removed); Schneideraff.,p.1;Piontekaff.¶11;Steffansaff.¶26(intimidationmadeherfeeltooafraid to make challenges); Cizmar aff. ¶8(G); Antonie aff. ¶3; Zaplitny aff. ¶20; Moss aff. ¶4; Daavettila aff., pp. 2-3; Tocco aff. ¶¶1-2; Cavaliere ¶3; Kerstein aff. ¶3; Rose aff. ¶16; Zimmerman aff. ¶5; Langer aff. ¶3; Krause aff. ¶4; Sherer aff. ¶24; Vaupel aff. ¶4; Basler aff. ¶8; Russell aff. ¶5; Burton aff. ¶5; Early aff. ¶7; Pannebecker aff. ¶10; Sitek aff. ¶4; Klamer aff. ¶4; Leonard aff. ¶¶6, 15; Posch aff. ¶¶7, 14; Rauf aff. ¶24; Chopjian aff. ¶10; Cooperaff.¶12;Shockaff.¶9;Schmidtaff.¶¶9-10;Duusaff.¶10;M.Seelyaff.¶4;Storm aff. ¶¶5, 7;

DePerno aff. ¶¶5-6; McCall aff. ¶¶5, 13). ArticiaBomer was called a "racist name" by an election worker and also harassed by other election workers. *Id.* (Bomeraff.¶7). Zachary Vaupel reported that an election supervisor called him an "obscene name" andtoldhimnottoaskquestionsaboutballotprocessingandcounting. *Id.*(Vaupelaff.¶4). Kim Tocco was personally intimidated and insulted by election workers. *Id.* (Tocco aff. ¶¶1-2). Qian Schmidt was the target of racist comments and asked, "what gives you the right to be here since you are not American?" *Id.* (Schmidt aff. ¶9).

73.     Other challengers were threatened with removal from the counting area if they continued to ask questions about the ballot counting process. *Id.* (A. Seely aff. ¶¶6, 13, 15; Pennalaaff. ¶5).     Challenger Kathleen Daavettila observed that Democratic challengers distributed a packet of information among themselves entitled, "Tactics to Distract GOP Challengers." *Id.* (Daavettila aff., p. 2). An election official told challenger Ulrike Sherer that the election authority had a police SWAT team waiting outside if Republican challengers argued too much.     *Id.*     (Sherer     aff.     ¶24).     An     election     worker     told     challenger JazmineEarlythatsince"Englishwasnot[her]firstlanguage…[she]shouldnotbetaking part in this process." *Id.* (Early aff. ¶11).

74.     Election officials at the TCF Center in Detroit participated in the intimidation experienced by Republican challengers when election officials would applaud, cheer, and yell whenever a Republican challenger was ejected from the counting area. *Id.* (Helminen aff. ¶9; Pennala     aff.     ¶5;     Ballew     aff.     ¶9;     Piontek     aff.     ¶11; Papsdorfaff.¶3;Steffansaff.¶25;Cizmaraff.¶8(D);Kilunenaff.¶5;Daavettilaaff.,p.4; Cavaliere aff. ¶3; Cassin aff. ¶10; Langer aff. ¶3; Johnson aff. ¶5; Early aff. ¶13; Klamer aff. ¶8; Posch aff. ¶12; Rauf aff. ¶22; Chopjian aff. ¶13; Shock aff.¶10).

### 5. Poll Workers Ignored or Refused to Record Republican Challenges.

75.     Unfortunately, this did not happen in Wayne County. Many challengers testified that their challenges to ballots were ignored and disregarded. *Id.* (A.Seely aff. ¶4; Helminen aff. ¶5; Miller aff. ¶¶10-11; Schornak aff. ¶¶9, 15; Piontek aff. ¶6; Daavettila aff., p.3; Valice aff. ¶2; Sawyer aff. ¶7; Kerstein aff. ¶3; Modlin aff. ¶4; Cassin aff. ¶6; Brigmon aff. ¶5; Sherer aff. ¶11; Early aff. ¶18; Pannebecker aff. ¶9; Vanker aff. ¶5; M. Seely aff. ¶11; Ungar aff. ¶¶16-17; Fracassi aff. ¶4).

76.     As an example of challenges being disregarded and ignored, challenger Alexandra Seely stated that at least ten challenges she made were not recorded. *Id.* (A. Seely aff. ¶4). Articia Bomer observed that ballots with votes for Trump were separated from other ballots. *Id.* (Bomer aff. ¶5). Articia Bomer stated, "I witnessed election workers open ballots with Donald Trump votes and respond by rolling their eyes and showing it to other poll workers. I believe some of these ballots may not have been properly counted." *Id.* ¶8. Braden Gaicobazzi challenged thirty-five ballots for whom the voter records did not exist in the poll book, but his challenge was ignored and disregarded. *Id.* (Giacobazzi aff. ¶10). When Christopher Schornak attempted to challenge the counting of ballots, an election official told him, "We are not talking to you, you cannot challenge this." *Id.* (Schornak aff. ¶15). When Stephanie Krause attempted to challenge ballots, an election worker told her that challenges were no longer being accepted because the "rules 'no longer applied.'" *Id.* (Krause aff. ¶13).

### 6. Unlawful Ballot Duplication.

77.     If a ballot is rejected by a ballot-tabulator machine and cannot be read by the machine, the ballot must be duplicated onto a new ballot. The Michigan Secretary of State has instructed, "If the rejection is due to a false read the ballot must be duplicated by *two election*

*inspectors who have expressed a preference for different political parties.*" Michigan Election Officials' Manual, ch. 8, p. 6 (emphasis added). Thus, the ballot-duplicating process must be performed by bipartisan teams of election officials. It must also be performed where it can be observed bychallengers.

78.     But Wayne County prevented many challengers from observing the ballot duplicating process. *Id.* (Miller aff. ¶¶6-8; Steffans aff. ¶¶15-16, 23-24; Mandelbaumaff.¶6;Shereraff.¶¶16-

17;Burtonaff.¶7;Drzewieckiaff.¶7;Klameraff.¶9;Chopjianaff.¶10;Schmidtaff.¶7;Champagneaff.¶ 12;Shinkleaff.,p.1).Challenger John Miller said he was not allowed to observe election workers duplicating                                        a                                        ballot becausethe"duplicationprocesswaspersonallikevoting."*Id.*(Milleraff.¶8).Challenger Mary Shinkle stated that she was told by an election worker that she was not allowed to observeaballotduplicationbecause"ifwemakeamistakethenyouwouldbealloverus." *Id.* (Shinkle aff., p. 1).Anotherchallengerobservedelectionofficialsmakingmistakeswhen duplicating ballots. *Id.* (Piontek aff. ¶9).

79.     Many challengers testified that ballot duplication was performed only by Democratic election workers, not bipartisan teams. Exhibit 1 (Pettibone aff. ¶3; Kinney aff.,p.1;Wasilewskiaff.,p.1;Schornakaff.¶¶18-19;Dixonaff.,p.1;Kolanagireddyaff.,p.          1; Kordenbrock aff. ¶¶3-4; Seidl aff., p. 1; Kerstein aff. ¶4; Harris aff. ¶3; Sitek aff. ¶4).

### 7.    Democratic Election Challengers Frequently Outnumbered Republican Poll Watchers 2:1 or Even 2:0.

80.     Dominon contractor Melissa Carrone testified that there were significantly more Democrats than Republicans at the TCF Center, and that as a result there were "over 20 machines [that] had two democrats judging the ballots-resulting in an unfair process."  Exh. 5 ¶5.

Other affiants testified to the fact that Democrats outnumbered Republicans by 2:1 or more. *Id.* (Helminon aff. ¶12). Democrats also impersonated Republican poll watchers. *Id.* (Seely aff. ¶19).

> ### 8. Collaboration Between Election Workers, City/County Employees, and Democratic Party Challengers and Activists.

81. Affiants testified to systematic and routine collaboration between election workers, Michigan public employees and Democratic election challengers and activists present, in particular to intimidate, harass, distract or remove Republic election watchers. *See, e.g.,* Exh. 1 (Ballow aff. ¶9; Gaicobazzi aff. ¶¶12, 14; Piontek aff. ¶11).

> ### B. Election Workers Fraudulent Forged, Added, Removed or Otherwise Altered Information on Ballots, Qualified Voter List and Other Voting Records

82. A lawsuit recently filed by the Great Lakes Justice Center ("GLJC") raises similar allegations of vote fraud and irregularities that occurred in Wayne County. *See* Exhibit 4 (copyofcomplaintfiledintheCircuitCourtofWayneCountyin*Costantino,etal.v.City of Detroit, et al.*) ("GLJC Complaint").The allegations and affidavits included in the GLJC Complaint are incorporated by reference in the body of this Complaint.

> ### 1. Election Workers Fraudulently Added "Tens of Thousands" of New Ballots and New Voters in the Early Morning and Evening November 4.

83. The most egregious example of election workers fraudulent and illegal behavior concerns two batches of new ballots brought to the TCF Center after the 8:00 PM Election Day deadline. First, at approximately 4:30 AM on November 4, 2020, poll challenger Andrew Sitto observed "tens of thousands of new ballots" being brought into the counting room, and "[u]nlike the other ballots, these boxes were brought in from the rear of the room." Exh. 4, GLJC Complaint, Exh. C at ¶ 10. Mr. Sitto heard other Republican challengers state that "several

vehicles with out-of-state license plates pulled up to the TCF Center a little before 4:30 a.m. and unloaded boxes of ballots." *Id.* at ¶ 11. "All ballots sampled that I heard and observed were for Joe Biden." *Id.* at ¶ 12.

84. A second set of new boxes of ballots arrived at the TCF Center around 9:00 PM on November 4, 2020. According to poll watcher Robert Cushman, contained "several thousand new ballots." Exh. 4, GLJC Complaint, Exh. D at ¶ 5. Mr. Cushman noted that "none of the names on the new ballots were on the QVF or the Supplemental Sheets," *id.* at ¶ 7, and he observed "computer operators at several counting boards manually adding the names and addresses of these thousands of ballots to the QVF system." *Id.* at ¶ 8. Further, "[e]very ballot was being fraudulently and manually entered into the [QVF], as having been born on January 1, 1990." *Id.* at ¶ 15. When Mr. Cushman challenged the validity of the votes and the impossibility of each ballot having the same birthday, he "was told that this was the instruction that came down from the Wayne County Clerk's office." *Id.* at ¶ 16.

85. Perhaps the most probative evidence comes from Melissa Carone, who was "contracted to do IT work at the TCF Center for the November 3, 2020 election." Exh. 5, ¶1. On November 4, Ms. Carrone testified that there were "two vans that pulled into the garage of the counting room, one on day shift and one on night shift." *Id.* ¶8. She thought that the vans were bring food, however, she "never saw any food coming out of these vans," and noted the coincidence that "Michigan had discovered over 100,000 more ballots – not even two hours after the last van left." *Id.* Ms. Carrone witnessed this of this illegal vote dump, as well as several other violations outlined below.

### 2. Election Workers Forged and Fraudulently Added Voters to the Qualified Voter List.

86. Many challengers reported that when a voter was not in the poll book, the election

officials would enter a new record for that voter with a birth date of January 1, 1900. Exhibit 1
(Gaicobazzi aff. ¶10; Piontek aff. ¶10; Cizmer aff. ¶8(F); Wirsing aff., p. 1; Cassin aff. ¶9;
Langer aff. ¶3; Harris aff. ¶3; Brigmon aff. ¶5; Sherer aff. ¶¶10-11; Henderson aff. ¶9; Early ¶16;
Klamer aff. ¶13; Shock aff. ¶8; M. Seely aff. ¶9). *See also id.* (Gorman aff. ¶¶23-26; Chopjian
aff. ¶12; Ungar aff. ¶15; Valden aff. ¶17). Braden Gaicobazzi reported that a stack of thirty-five
ballots was counted even though there was no voter record. *Id.* (Giacobazzi aff.¶10).

87.     The GLJC Complaint alleges the Detroit Election Commission "systematically
processed and counted ballots from voters whose name failed to appear in either the Qualified
Voter File (QVF) or in the supplemental sheets." Exh. 3, GLJC Complaintat 3.  The GLJC
Complaint provides additional witness affidavits detailing the fraudulent conduct of election
workers, in particular, that of Zachary Larsen, who served as a Michigan Assistant Attorney
General from 2012 through 2020 and was a certified poll challenger at the TCF Center.  "Mr.
Larsen reviewed the running list of scanned in ballots in the computer system, where it appeared
that the voter had already been counted as having voted. An official operating the computer then
appeared to assign this ballot to a different voter as he observed a completely different name that
was added to the list of voters at the bottom of a running tab of processed ballots on the right side
of the screen."  *Id.* at ¶ 16.  Mr. Larsen observed this "practice of assigning names and numbers"
to non-eligible voters who did not appear in either the poll book or the supplement poll book.  *Id.*
at ¶ 17.  Moreover, this appeared to be the case for the majority of the voters whose ballots he
personally observed being scanned. *Id.*

### 3.     Changing Dates on Absentee Ballots.

88.     All absentee ballots that existed were required to be inputted into the QVF system
by 9:00 p.m. on November 3, 2020. This was required to be done in order to have a final list of
absentee voters who returned their ballots prior to 8:00 p.m. on November 3, 2020. In order to

have enough time to process the absentee ballots, all polling locations were instructed to collect the absentee ballots from the drop-box once every hour on November 3, 2020.

89.     Jessica Connarn is an attorney who was acting as a Republican challenger at the TCF Center in Wayne County. **EXHIBIT 6**. Jessica Connarn's affidavit describes how an election poll worker told Jessica Connarn that the poll worker "was being told to change the date on ballots to reflect that the ballots were received on an earlier date." *Id.* ¶1. Jessica Connarn also provided a photograph of a note handed to her by the poll worker in which the poll worker indicated she (the poll worker) was instructed to change the date ballots were received. *See id.* Jessica Connarn's affidavit demonstrates that poll workers in Wayne County were pre-dating absent voter ballots, so that absent voter ballots received after 8:00 p.m. on Election Day could be counted.

90.     Plaintiffs have learned of a United States Postal Service ("USPS") worker Whistleblower, on November 4, 2020 told Project Veritas that a supervisor named Johnathan Clarke in Traverse City, Michigan potentially issued a directive to collect ballots and stamp them as received on November 3, 2020, even though there were not received timely, as required by law:  "We were issued a directive this morning to collect any ballots we find in mailboxes, collection boxes, just outgoing mail in general, separate them at the end of the day so that they could hand stamp them with the previous day's date," the whistleblower stated. "Today is November 4th for clarification."[4]  This is currently under IG Investigation at the U.S. Post Office. According to the Postal worker whistleblower, the ballots are in "express bags" so they could be sent to the USPS distribution center.  *Id.*

91.     As set forth in the GLJC Complaint and in the Affidavit of Jessy Jacob, an

---

[4]https://townhall.com/tipsheet/bethbaumann/2020/11/04/usps-whistleblower-in-michigan-claims-higher-ups-were-engaging-in-voter-fraud-n2579501

employee of the City of Detroit Elections Department, "on November 4, 2020, I was instructed to improperly pre-date the absentee ballots receive date that were not in the QVF as if they hadbeen received on or before November 3, 2020. I was told to alter the information in the QVF to falselyshowthattheabsenteeballotshadbeenreceivedintimetobevalid.Sheestimatesthatthis was done to thousands of ballots." Exh. 4, GLJC Complaint, Exh. B at ¶ 17.

### 4. Election Workers Changed Votes for Trump and Other Republican Candidates.

92. Challenger ArticiaBomer stated, "I observed a station where election workers were working on scanned ballots that had issues that needed to be manually corrected. I believe some of these workers were changing votes that had been cast for Donald Trump and other Republican candidates." *Id.* (Bomer aff. ¶9). In addition to this eyewitness testimony of election workers manually changing votes for Trump to votes for Biden, there is evidence that Dominion Voting Systems did the same thing on a much larger scale with its Dominion Democracy Suite software. *See generally infra* Section IV.D, Paragraphs 123-131.

### 5. Election Officials Added Votes and Removed Votes from "Over-Votes".

93. Another challenger observed over-votes on ballots being "corrected" so that the ballots could be counted. Exh. 3(Zaplitny aff.¶13). At least one challenger observedpollworkersaddingmarkstoaballotwheretherewasnomarkforanycandidate. *Id.*(Tysonaff.¶17).

### C. Additional Violations of Michigan Election Code That Caused Ineligible, Illegal or Duplicate Ballots to Be Counted.

### 1. Illegal Double Voting.

94. At least one election worker "observedalargenumberofpeoplewhocametothesatellite location to vote in-person, but they had

already applied for an absentee ballot. These people were allowed to vote in-person and were not required to return the mailed absentee ballot or sign an affidavit that the voter lost the mailed absentee ballot." Exh. 4, GLJC Complaint (Exh. B) Jacob aff. at ¶ 10. Thiswouldpermitapersontovoteinpersonandalsosendinhis/herabsentee ballot, and thereby vote at least twice.

### 2. Ineligible Ballots Were Counted – Some Multiple Times.

95. Challengersreportedthatbatchesofballotswererepeatedlyrunthroughthe vote tabulation machines. Exh. 3 (Helminen aff. ¶4; Waskilewski aff., p. 1; Mandelbaum aff. ¶5; Rose aff. ¶¶4-14; Sitek aff. ¶3; Posch aff. ¶8; Champagne aff. ¶8). Challenger Patricia Rose stated she observed a stack of about fifty ballots being fed multiple times into a ballot scanner counting machine. *Id.* (Rose aff. ¶¶4-14). ArticiaBomer further stated thatshe witnessed the same group of ballots being rescanned into the counting machine "at least five times." *Id.* ¶12. Dominion contractor Melissa Carone observed that this was a routine practice at the TCF Center, where she "witnessed countless workers rescanning the batches without discarding them first" – as required under Michigan rules and Dominion's procedures – "which resulted in ballots being counted 4-5 times" by the "countless" number of election workers. Carone aff. ¶3. When she observed that a computer indicated that it had "a number of over 400 ballots scanned – which means one batch [of 50] was counted over 8 times," and complained to her Dominion supervisor, she was informed that "we are here to do assist with IT work, not to run their election." *Id.* at ¶4.

### 3. Ballots Counted with Ballot Numbers Not Matching Ballot Envelope.

96. Many challengers stated that the ballot number on the ballot did not match thenumberontheballotenvelope,butwhentheyraisedachallenge,thosechallengeswere disregarded and ignored by election officials, not recorded, and the ballots wereprocessed andcounted.Exh. 3(A.Seelyaff.¶15;Wasilewskiaff.,p.1;Schornakaff.¶13;Brunell aff. ¶¶17, 19;

Papsdorf aff. ¶3; Spalding aff. ¶¶8, 11; Antonie aff. ¶3; Daavettila aff., p. 3; Atkins aff. ¶3; Harris aff. ¶3; Sherer aff. ¶21; Drzewiecki aff. ¶¶5-6; Klamer aff. ¶4; Rauf aff. ¶¶9-14; Roush aff. ¶¶5-7; Kinney aff. ¶5). For example, when challenger Abbie Helminen raised a challenge that the name on the ballot envelope did not match the name on the voter list, she was told by an election official to "get away" and that the counting tables she was observing had "a different process than other tables." *Id.* (Helminen aff. ¶5).

### 4. Election Officials Counted Ineligible Ballots with No Signatures or with No Postmark on Ballot Envelope.

97.     At least two challengers observed ballots being counted where there was no signature or postmark on the ballot envelope. *Id.* (Brunell aff. ¶¶17, 19; Spalding aff. ¶13; Sherer aff. ¶13). Challenger Anne Vanker observed that "60% or more of [ballot] envelopes [in a batch] bore the same signature on the opened outer envelope." *Id.* (Vanker aff. ¶5). Challenger William Henderson observed that a counting table of election workers lost eight ballot envelopes. Exhibit 1 (Henderson aff. ¶8). The GLJC Complaint further alleges the Election Commission "instructed election workers to not verify signatures on absentee ballots, to backdate absentee ballots, and to process such ballots regardless of their validity."

### 5. Election Officials Counted "Spoiled" Ballots.

98.     At least two challengers observed spoiled ballots being counted. *Id.* (Schornak aff. ¶¶6-8; Johnson aff. ¶4). At least one challenger observed a box of provisional ballots being placed in a tabulation box at the TCF Center. Exhibit 1 (Cizmar aff. ¶5).

### 6. Systematic Violations of Ballot Secrecy Requirements

99.     Affiant Larsen identified a consistent practice whereby election officials would remove ballots from the "secrecy sleeve" or peek into the envelopes, visually inspect the ballots, and based on this visual inspection of the ballot (and thereby identify the votes cast), determine

whether to "place the ballot back in its envelope and into a 'problem ballots' box that required additional attention to determine whether they would be processed and counted." Exh. 4, GLJC Complaint, Exh. A at ¶14. Mr. Larsen also observed that some ballots arriving without any secrecy sleeve at all were counted after visual inspection, whereas many ballots without a secrecy sleeve were placed in the "problem ballots" box. *Id.* at ¶¶21-22. "So the differentiation among these ballots despite both ballots arriving in secrecy sleeves was perplexing and again raised concerns that some ballots were being marked as 'problem ballots' based on who the person had voted for rather on any legitimate concern about the ability to count and process the ballot appropriately." *Id.* at ¶24.

### 7. Election Workers Accepted Unsecured Ballots, without Chain of Custody, after 8:00 PM Election Day Deadline.

100. Poll challengers observed two batches of new ballots brought to the TCF Center after the 8:00 PM Election Day deadline, as detailed in the GLJC Complaint and Paragraphs 79-81 above. Affiant Daniel Gustafson further observed that these batches of ballots "were delivered to the TCF Center in what appeared to be mail bins with open tops." Exh. 4, GLJC Complaint, Exh. E at ¶4. Mr. Gustafson further observed that these bins and containers "did not have lids, were not sealed, and did not have the capability of having a metal seal," *id.* at ¶5, nor were they "marked or identified in any way to indicated their source of origin." *Id.* at ¶6.

101. An election challenger at the Detroit Department of Elections office observed passengers in cars dropping off more ballots than there were people in the car. Exh. 3 (Meyers aff. ¶3). This challenger also observed an election worker accepting a ballot after 8:00 p.m. on Election Day. *Id.* ¶7.

102. An election challenger at the Detroit Department of Elections office observed ballots being deposited in a ballot drop box located at the Detroit Department of Elections after

8:00 p.m. on Election Day. *Id.* (Meyers aff.¶6).

103.    On November 4, 2020, Affiant Matt Ciantar came forward who, independently witnessed, while walking his dog, a young couple delivered 3-4 large plastic clear bags, that appear to be "express bags", as reflected in photographs taken contemporaneously, to a U.S. Postal vehicle waiting.  *See generally* Exh. 7 Matt Ciantar Declaration.  The use of clear "express bags" is consistent with the USPS whistleblower Johnathan Clarke in Traverse City, Michigan. *See infra* Paragraph 78.

### 8.    Ballots from Deceased Voters Were Counted.

104.    One Michigan voter stated that her deceased son has been recorded as voting twice since he passed away, most recently in the 2020 general election. Exh. 3 (Chase aff.¶3).

## III.    EXPERT WITNESS TESTIMONY SUPPORTING INDICATING WIDESPREAD VOTING FRAUD AND MANIPULATION

### A.    Approximately 30,000 Michigan Mail-In Ballots Were Lost, and Approximately 30,000 More Were Fraudulently Recorded for Voters who Never Requested Mail-In Ballots.

105.    The attached report of William M. Briggs, Ph.D. ("Dr. Briggs Report") summarizes the multi-state phone survey data of 248 Michigan Republican voters collected by Matt Braynard, which was conducted from November 15-17, 2020 and covered voters in Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin.  *See* Exh. 101, Dr. Briggs Report at 1, and Att. 1 ("Braynard Survey").  The Braynard Survey sought to identify two specific errors involving unreturned mail-in ballots that are indicative of voter fraud, namely: "**Error #1:** those who were recorded as receiving absentee ballots *without* requesting them;" and "**Error #2:** those who returned absentee ballots but whose votes went missing (*i.e.*, marked as unreturned)."  *Id.* Dr. Briggs then conducted a parameter-free predictive model to estimate, within 95% confidence or prediction intervals, the number of ballots affected by these errors out of a total of 139,190

unreturned mail-in ballots for the State of Michigan.

106.    With respect to **Error #1**, Dr. Briggs analysis estimated that **29,611 to 36,529 ballots** out of the total 139,190 unreturned ballots (**21.27% - 26.24%**) were recorded for voters who had **not** requested them.  *Id.*  With respect to **Error #2**, the numbers are similar with **27,928 to 34,710 ballots** out of 139,190 unreturned ballots (**20.06% - 24.93%**) recorded for voters who **did return their ballots were recorded as being unreturned.**  *Id.*  Taking the average of the two types of errors together, **62,517 ballots, or 45% of the total, are "troublesome."**

107.    These errors are not only conclusive evidence of widespread fraud by the State of Michigan,[5] but they are fully consistent with the fact witness statements above the evidence regarding Dominion presented below insofar as **these purportedly unreturned absentee ballots provide a pool of  60,000-70,000 unassigned and blank ballots that could be filled in by Michigan election workers, Dominion or other third parties to shift the election to Joe Biden**. With respect to Error #1, Dr. Briggs' analysis, combined with the statements of the Michigan voters in the Braynard Survey, demonstrates that approximately **30,000 absentee ballots were sent to someone besides the registered voter named in the request**, and thus could have been filled out by anyone and then submitted in the name of another voter.  With respect to Error #2, Dr. Briggs' analysis indicates that approximately **30,000 absentee ballots were either lost or destroyed** (consistent with allegations of Trump ballot destruction) **and/or were replaced with blank ballots filled out by election workers, Dominion or other third parties.**  Accordingly, Dr. Briggs' analysis showing that almost half of purportedly "unreturned

---

[5] The only other possible explanations for the statements of 248 Michigan mail-in voters included in the Braynard Survey data is (a) that the 248 voters (who had no known pre-existing relationship apart from being listed as having unreturned absentee ballots) somehow contrived to collude together to submit false information or (b) that these 248 suffered from amnesia, dementia or some other condition that caused them to falsely claim that they had requested a mail-in ballot or returned a mail-in ballot.

ballots" suffers from one of the two errors above – which is consistent with his findings in the four other States analyzed (Arizona 58%, Georgia 39%, Pennsylvania 37%, and Wisconsin 31%) – provides further support that these widespread "irregularities" or anomalies was one part of much larger interstate fraudulent scheme to rig the 2020 General Election for Joe Biden.

**B.      Statistical Analysis of Anomalous and Unprecedented Turnout Increases in Specific Precincts Indicate that There Were at Least 40,000 "Excess Voters" in Wayne County and At Least 46,000 in Oakland County.**

108.    The attached affidavit of Eric Quinell, Ph.D. ("Dr. Quinell Report") analyzes the extraordinary increase in turnout from 2016 to 2020 in a relatively small subset of townships and precincts outside of Detroit in Wayne County and Oakland County, and more importantly how nearly 100% or more of all "new" voters from 2016 to 2020 voted for Biden. *See* Exh. 102. Using publicly available information from Wayne County and Oakland County, Dr. Quinell first found that for the votes received up to the 2016 turnout levels, the 2020 vote Democrat vs. Republican two-ways distributions (i.e., excluding third parties) tracked the 2016 Democrat vs. Republican distribution very closely, which was 55%-45% for Wayne County (outside Detroit) and 54%/46% for Oakland County. *Id.* at ¶¶18 & 20.

109.    However, after the 2016 turnout levels were reached, the Democrat vs. Republican vote share shifts decisively towards Biden by approximately 15 points, resulting in a 72%/28% D/R split for Oakland County and 70%/30% D/R split for Wayne County (outside of Detroit). What is even more anomalous – and suspicious – is the fact that nearly all of these "new" votes in excess of 2016 come from a small number of townships/precincts where the increased Biden vote share is nearly 100% or over 100% for Biden. *Id.* For example, in the township of Livonia in Wayne County, Biden gained 3.2 voters for every 1 new Trump voter, and Biden receive 97% of all "new" votes over 2016 and 151% of all new voter registrations. *Id.* at ¶6. In the township of Troy in Oakland County, the vote share shifted from 51%/49% in 2016

to 80%/20% in 2020 due to Biden receiving 98% of new votes above 2016 and 109% of new voter registrations. *Id.* at ¶20. Looking county-wide, Biden gained 2.32 new voters over 2016 levels to every 1 new Trump voter in Wayne County (outside Detroit) and 2.54 additional new voters per Trump voter for Oakland County. *Id.* ¶5.

110. Based on these statistically anomalous results that occurred in a handful of townships in these two counties, Dr. Quinell's model determined that there were 40,771 anomalous votes in Wayne County (outside Detroit) and 46,125 anomalous votes in Oakland County, for a total of nearly 87,000 anomalous votes or approximately 65% of Biden's purported lead in Michigan.

## C. Over 13,000 Ineligible Voters Who Have Moved Out-of-State Illegally Voted in Michigan.

111. Evidence compiled by Matt Braynard using the National Change of Address ("NCOA") Database shows that 12,120 Michigan voters in the 2020 General Election moved out-of-state prior to voting, and therefore were ineligible. Mr. Braynerd identified 1,170 Michigan voters in the 2020 General Election who subsequently registered to vote in another state, and were therefore ineligible to vote in the 2020 General Election. When duplicates from the two databases are eliminated, the merged number is 13,248 ineligible voters whose votes must be removed from the total for the 2020 General Election.[6]

## D. There Were At Least 289,866 More Ballots Processed in Four Michigan Counties on November 4 Than There Was Processing Capacity.

112. The expert witness testimony of Russell James Ramsland, Jr. ("Ramsland Affidavit"), which is described in greater detail below, identifies an event that occurred in Michigan on November 4 that is "physically impossible" *See* Exh. 104 at ¶14. The "event"

---

[6]Mr. Braynard posted the results of his analysis on Twitter. *See* https://twitter.com/MattBraynard/status/1329700178891333634?s=20. This Complaint includes a copy of his posting as Exhibit 103.

reflected in the data are "4 spikes totaling 384,733 ballots allegedly processed in a combined interval of 2 hour[s] and 38 minutes" for four precincts/townships in four Michigan counties (Wayne, Oakland, Macomb ne and Kent). *Id.* Based on Mr. Ramsland's analysis of the voting machines available at the referenced locations, he determined that the maximum processing capability during this period was only 94,867 ballots, so that "there were 289,866 more ballots processed in the time available for  processing in the four precincts/townships, than there was processing capacity." *Id.* This amount is alone **nearly twice the number of ballots by which Biden purportedly leads President Trump** (*i.e.,* approximately 154,180).

## IV. FACTUAL ALLEGATIONS RE DOMINION VOTING SYSTEMS

### A. Evidence of Specific Fraud Wayne County used ballot tabulators that were shown to miscount votes cast for President Trump and Vice President Pence and instead count them for the Biden-Harristicket.

113. On the morning of November 4, unofficial results posted by the Antrim County Clerk showed that Joe Biden had over 7,700 votes — 3,000 more than Donald Trump. Antrim County voted 62% in favor of President Trump in 2016. The Dominion Voting Systems election management system and voting machines (tabulators), which were used in Antrim County, are also used in many other Michigan counties, including Wayne County, were atfault.

114. However, Malfunctioning voting equipment or defective ballots may have affectedtheoutcomeofavoteonanofficeappearingontheballot."MichiganManualfor    Boards    of County    Canvassers.      Thesevotetabulatorfailuresareamechanicalmalfunctionthat,underMCL 168.831-168.839, requires a "special election" in the precincts affected.

115. SecretaryofStateBensonreleasedastatementblamingthecountyclerkfor notupdatingcertain"mediadrives,"butherstatementfailedtoprovideanycoherentexplanation of how

the Dominion Voting Systems software and vote tabulators produced such a massive miscount.[7]

116.    Secretary Benson continued: "*After discovering the error in reporting the unofficial results, the clerk worked diligently to report correct unofficial results by reviewing the printed totals tape on each tabulator and hand-entering the results for each race, for each precinct in the county.*"*Id.*What Secretary Benson fails to address is what would have happened if no one "discover[ed] the error," for instance, in Wayne County, where the number of registered voters is much greater than Antrim County, and where the tabulators were not individuallytested.

117.    Wayne County used the same Dominion voting system tabulators as did AntrimCounty,andWayneCountytestedonlyasingleoneofitsvotetabulatingmachines before the election. The Trump campaign asked Wayne County to have an observer physically present to witness the process. *See* Exhibit 4. Wayne County denied the Trump campaigntheopportunitytobephysicallypresent.RepresentativesoftheTrumpcampaign did have opportunity to watch a portion of the test of a single machine by Zoomvideo.

### B.    The Pattern Of Incidents Shows An Absence Of Mistake - Always In The Favor Of Biden.

118.    Rules of Evidence, 404(b), applicable to civil matters makes clear that,

(b) Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. **It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.**

119.    Tabulator issues and election violations occurred elsewhere in Michigan reflecting a pattern, where multiple incidents occurred. In Oakland County, votes flipped a seat to an incumbent Republican, Adam Kochenderfer, from the Democrat challenger when

---

[7] https://www.michigan.gov/documents/sos/Antrim_Fact_Check_707197_7.pdf (emphasis in original).

120. "A computer issue in Rochester Hills caused them to send us results for seven precincts as both precinct votes and absentee votes. They should only have beensent to us as absentee votes," Joe Rozell, Oakland County Director of Elections for the City of Huntington Woods, said.[8]

121. This Oakland County flip of votes is significant not only because it reflects a second systems error wherein both favored the Democrats, precinct votes were sent out to be counted, and they were counted twice as a result until the error was caught on a recount, but precinct votes should never be counted outside of the precinct, instead they are required to be sealed in the precinct.

## C. Dominion Voting Machines and Forensic Evidence of Wide-Spread Fraud in Defendant Counties

122. The State of Michigan entered into a contract with Dominion Systems' Democracy Suite 4.14-D first, and then included Dominion Systems Democracy Suite 5.0-S on or about January 27, 2017, which added a fundamental modification: "dial-up and wireless results transmission capabilities to the ImageCast Precinct and results transmission using the Democracy Suite EMS Results Transfer Manager module."

123. Whereas the same Dominion software in an updated contract with Pennsylvania, unlike in Michigan's contract, sets forth the standard as requiring physical security: *No components of the Democracy Suite 5.5A shall be connected to any modem or network interface, including the Internet, at any time, except when a standalone local area wired network configuration in which all connected devices are certified voting system components." Id. at 41 (Condition C).*

124. The Michigan Contract with Dominion Voting Systems Democracy packages

---

[8] Detroit Free Press, https://www.freep.com/story/news/local/michigan/oakland/2020/11/06/oakland-county-election-2020-race-results/6184186002/

include language that describes *Safety and Security*, which in part makes the risks of potential breach clear where keys can be lost despite the fact that they provide full access to the unit, and while it is clear that the electronic access provides control to the unit, and the ability to alter results, combined with the lack of observers, creates a lack of security that becomes part of a pattern of the absence of mistake, or fraud:

> The ImageCast tabulators are unlocked by an iButton security key, which is used to:
> • Authenticate the software version (ensuring it is a certified version that has not been tampered with)
> • Decrypt election files while processing ballots during the election
> • Encrypt results files during the election
> • Provide access control to the unit
> **It is anticipated that the iButton security keys may get lost; therefore, any substitute key created for the same tabulator will allow the unit to work fully.[9]**

125.    In late December of 2019, three Senators, Warren, Klobuchar, Wyden and House Member Mark Pocanwrote about their '*particularized concerns that secretive & "trouble - plagued companies"*'"have long skimped on security in favor of convenience," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S."

126.    As evidence of the risks of the Dominion Democracy Suite, as described above, the same Dominion Democracy Suite was denied certification in Texas by the Secretary of State on January 24, 2020 specifically because of a lack of evidence of efficiency and accuracy and

---

[9]See Exh. 8, State of Michigan Enterprise Procurement, Notice of Contract, Contract No. 071B770017 between the State of Michigan and Dominion Voting Systems Inc. at ¶2.6.2 ("Dominion Michigan Contract").

identified vulnerabilities **to fraud and unauthorized manipulation**.[10]

**D.** **"Red Flags" in Dominion's Michigan Results for 2020 General Election Demonstrate Dominion Manipulated Election Results, and that the Number of Illegal Votes Is Nearly Twice As Great as Biden's Purported Margin of Victory.**

127.    The expert witness testimony of Russell James Ramsland, Jr. ("Ramsland Affidavit")[11] analyzes several "red flags" in Dominion's Michigan results for the 2020 election, and flaws in the system architecture more generally, to conclude that Dominion manipulated election results.  Dominion's manipulation of election results enabled Defendants to engage in further voting fraud violations above and beyond the litany of violations recited above in Section II.A through Section II.C.

**1.** **Antrim County "Glitch" Was Not "Isolated Error" and May Have Affected Other Counties.**

128.    The first red flag is the Antrim County, Michigan "glitch" that switched 6,000 Trump ballots to Biden, and that was only discoverable through a manual hand recount.  *See supra* Paragraph 94.  The "glitch" was later attributed to "clerical error" by Dominion and Antrim Country, presumably because if it were correctly identified as a "glitch", "the system would be required to be 'recertified' according to Dominion officials.  This was not done."  Exh. 104, Ramsland Aff. at ¶10.  Mr. Ramsland is skeptical because "the problem most likely did occur due to a glitch where an update file did not properly synchronize the ballot barcode generation and reading portions of the system."  *Id.*  Further, **such a glitch would not be an**

---

[10] See Texas Analysis of February 15, 2019 from the Voting Systems Examiner to the Director of Elections (emphasis added).

[11] As detailed in the Ramsland Affidavit and the CV attached thereto, Mr. Ramsland is a member of the management team Allied Security Operations Group, LLC ("ASOG"), a firm specializing in cybersecurity, OSINT and PEN testing of networks for election security and detecting election fraud through tampering with electronic voting systems.

"isolated error," as it "would cause entire ballot uploads to read as zero in the tabulation batch, which we also observed happening in the data (provisional ballots were accepted properly but in-person ballots were being rejected (zeroed out and/or changed (flipped))." *Id.* Accordingly, Mr. Ramsland concludes that it is likely that other Michigan counties using Dominion may "have the same problem." *Id.*

### 2. Fractional Vote Counts in Raw Data Strongly Indicate Voting Manipulation through "Ranked Choice Voting Algorithm"

129.    Mr. Ramsland's analysis of the raw data , which provides **votes counts, rather than just vote shares, in decimal form** provides highly probative evidence that, in his professional opinion,  demonstrates that Dominion manipulated votes through the use of an "additive" or "Ranked Choice Voting"  algorithm (or what Dominion's user guide refers to as the "RCV Method"). *See id.* at ¶12.[12] Mr. Ramsland presents the following example of this data – taken from "Dominion's direct feed to news outlets" – in the table below. *Id.*

| state | timestamp | eevp | trump | biden | TV | BV |
|---|---|---|---|---|---|---|
| michigan | 2020-11-04T06:54:48Z | 64 | 0.534 | 0.448 | 1925865.66 | 1615707.52 |
| michigan | 2020-11-04T06:56:47Z | 64 | 0.534 | 0.448 | 1930247.664 | 1619383.808 |
| michigan | 2020-11-04T06:58:47Z | 64 | 0.534 | 0.448 | 1931413.386 | 1620361.792 |
| michigan | 2020-11-04T07:00:37Z | 64 | 0.533 | 0.45 | 1941758.975 | 1639383.75 |
| michigan | 2020-11-04T07:01:46Z | 64 | 0.533 | 0.45 | 1945297.562 | 1642371.3 |
| michigan | 2020-11-04T07:03:17Z | 65 | 0.533 | 0.45 | 1948885.185 | 1645400.25 |

130.    Mr. Ramsland describes how the RCV algorithm can be implemented, and the significance of the use of fractional vote counts, with decimal places, rather than whole numbers, in demonstrating that Dominion did just that to manipulate Michigan votes.

---

[12]*See id.* (*quoting*Democracy Suite EMS Results Tally and Reporting User Guide, Chapter 11, Settings 11.2.2., which reads, in part, "RCV METHOD: This will select the specific method of tabulating RCV votes to elect a winner.").

For instance, blank ballots can be entered into the system and treated as "write-ins." Then the operator can enter an allocation of the write-ins among candidates as he wishes. The final result then awards the winner based on "points" the algorithm in the compute, not actual votes. The fact that we observed raw vote data that includes decimal places suggests strongly that this was, in fact, done. Otherwise, votes would be solely represented as whole numbers. Below is an excerpt from Dominion's direct feed to news outlets showing actual calculated votes with decimals. *Id.*

### 3. StrongEvidence That Dominion Shifted Votes from Trump to Biden.

131. A third red flag identified by Mr. Ramslund is the dramatic shift in votes between the two major party candidates as the tabulation of the turnout increased, and more importantly, the change in voting share before and after 2 AM on November 4, 2020, after Wayne County and other Michigan election officials had supposedly halted counting.

Until the tabulated voter turnout reached approximately 83%, Trump was generally winning between 55% and 60% of every turnout point. **Then, after the counting was closed at 2:00 am, the situation dramatically reversed itself, starting with a series of impossible spikes shortly after counting was supposed to have stopped.** *Id.* at ¶13.

132. Once again the means through which Dominion appears to have implemented this scheme is through the use of blank ballots that were all, or nearly all, cast for Biden.

The several spikes cast solely for Biden could easily be produced in the Dominion system by pre-loading batches of blank ballots in files such as Write-Ins, then casting them all for Biden using the Override Procedure (to cast Write-In ballots) that is available to the operator of the system. A few batches of blank ballots could easily produce a reversal this extreme, a reversal that is almost as statistically difficult to explain as is the impossibility of the votes cast to number of voters described in Paragraph 11 above.*Id.*

### 4. The November 4 Ballot Dumps Wayne County and Other Michigan Counties Was "Physically Impossible" Because There Were More Ballots Than Machines in Those Four Counties Could Have Counted Or Processed.

133. Mr Ramsland and his team analyzed the sudden injection of totaling 384,733 ballots by four Michigan counties (Wayne, Oakland, Macomb, and Kent) in a 2 hour 38 minute period in the early morning of November 4 (which would have included the first ballot dump

described above in Paragraph 72), and concluded that "**[t]his is an impossibility, given the equipment available at the 4 reference locations (precincts/townships)."** *Id.* at ¶14.

134.    Specifically, Mr. Ramslund calculated that "94,867 ballots as the maximum number of ballots that could be processed" in that time period, and thus that "[t]here were 289,866 more ballots processed in the time available for processing in four precincts/townships, than the capacity of the system allows." *Id.* Mr. Ramsland concludes that "[t]he documented existence of the spikes are strongly indicative of a manual adjustment either by the operator of the system (see paragraph 12 above) or an attack by outside actors." *Id.* The vote totals added for all Michigan counties, including Wayne, Oakland, Macomb and Kent counties, for the period analyzed by Mr. Ramsland are reproduced in the figure below.



5. **The Number of Illegal Votes Attributable to Dominion Is Nearly Twice the Biden's Purported Margin in Michigan.**

135. Based on his analysis of the red flags and statistical anomalies discussed below, Mr. Ramsland concludes that:

> [T]hese statistical anomalies and impossibilities compels the conclusion to a reasonable degree of professional certainty that the vote count in Michigan and in Wayne County, in particular for candidates for President contain at least 289,866 illegal votes that must be disregarded.

Given that Mr. Biden's currently purported margin of victory is approximately 154,000, the number of illegal votes attributable Dominion's fraudulent and illegal conduct is by itself (without considering the tens or hundreds of thousands of illegal votes due to the unlawful conduct described in Section II), is nearly twice Mr. Biden's current purported lead in the State of Michigan. Thus Mr. Ramsland affidavit alone provides this Court more than sufficient basis to grant the relief requested herein.

E. **Additional Independent Findings of Dominion Flaws.**

136. Further supportive of this pattern of incidents, reflecting an absence of mistake, Plaintiffs have since learned that the "glitches" in the Dominion system -- that have the uniform effect of hurting Trump and helping Biden -- have been widely reported in the press and confirmed by the analysis of independent experts.

1. **Central Operator Can Remove, Discard or Manipulate Votes.**

137. Plaintiffs have also learned of the connection between Dominion Voting Systems, Smartmatic and the voting systems used in Venuezela and the Phillipines.

   a. Dominion Voting has also contradicted itself in a rush to denial a pattern of errors that lead to fraud. For example, Dominion Voting Systems machines can read all of these instruments, including Sharpies.https://www.dominionvoting.com/

   b. but Dominion Voting's Democracy Suite contract with Michigan specifically requires:

*Black Inc:  Black ink (or toner) must be dense, opaques, light-fast and permanent, with a measured minimum 1.2 reflection density (log) above the paper base.*[13]

138.    An Affiant, who is a network & Information cybersecurities expert, under sworn testimony explains that after studying the user manual for Dominion Voting Systems Democracy software, he learned that  the information about scanned **ballots can be tracked inside the software system for Dominion:**

(a)    When bulk ballot scanning and tabulation begins, the "ImageCast Central" workstation operator will load a batch of ballots into the scanner feed tray and then start the scanning procedure within the software menu. The scanner then begins to scan the ballots which were loaded into the feed tray while the "ImageCast Central" software application tabulates votes in real-time. Information about scanned ballots can be tracked inside the "ImageCast Central" software application.
(See Exh.Aff. of Watkins __, at par.11).

139.    The **Affiant further explains that the central operator can remove or discard batches of votes.**   "After all of the ballots loaded into the scanner's feed tray have been through the scanner, the "ImageCast Central" operator will remove the ballots from the tray then have the option to either "Accept Batch" or "Discard Batch" on the scanning menu …. "Id. at ¶ 12.

140.    Affiantfurther testifies that the user manual makes clear that the system allows for threshold settings to be set to find all ballots get marked as "problem ballots" for discretionary determinations on where the vote goes stating:

"*During the voting process, the voter will mark an oval on the ballot using a writing device. During the scanning process, the "ImageCast Central" software will detect how much of a percent coverage of the oval was filled in by the voter. The Dominion customer determines the thresholds of which the oval needs to be covered by a mark in order to qualify as a valid vote. If a ballot has a marginal mark which did not meet the specific thresholds set by the customer, then the ballot is considered a "problem ballot" and may be set aside into a folder named "NotCastImages". Through creatively tweaking the oval coverage threshold settings it should be possible to set thresholds in such a way that a non-trivial amount of ballots are marked "problem ballots" and sent to the "NotCastImages"*

---

[13]See Exh. 8, par. 2.6.2 of contract # 071B770017.

48

*folder. It is possible for an administrator of the ImageCast Central work station to view all images of scanned ballots which were deemed "problem ballots" by simply navigating via the standard "Windows File Explorer" to the folder named "NotCastImages" which holds ballot scans of "problem ballots". It is possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro operating system.*

*Id*. at ¶¶ 13-14.

141.    The Affiant further explains the vulnerabilities in the system when the copy of the

selected ballots that are approved in the Results folder are made to a flash memory card – and

that is connected to a Windows computer stating:

*It is possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro" operating system. ... The upload process is just a simple copying of a "Results" folder containing vote tallies to a flash memory card connected to the "Windows 10 Pro" machine. The copy process uses the standard drag-n-drop or copy/paste mechanisms within the ubiquitous "Windows File Explorer". While a simple procedure, this process may be error prone and is very vulnerable to malicious administrators.*

*Id*. at par. 14 and 15.

### 2.    Dominion – By Design – Violates Federal Election & Voting Record Retention Requirements.

142.    The Dominion System put in place by its own design violates the intent of Federal

law on the requirement to preserve and retain records – which was clearly requires preservation

of all records requisite to voting in such an election.

F.    **§ 20701.** Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation

Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are

voted for, **all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election,** except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

143.    A Penn Wharton Study from 2016 concluded that "Voters and their representatives in government, often prompted by news of high-profile voting problems, also have raised concerns about the reliability and integrity of the voting process, and have increasingly called for the use of modern technology such as laptops and tablets to improve convenience.

144.    As evidence of the risks of the Dominion Democracy Suite, as described above, the same Dominion Democracy Suite was denied certification in Texas by the Secretary of State on January 24, 2020 specifically because of a **lack of evidence of efficiency and accuracy and to be safe from fraud or unauthorized manipulation.**[14]

### 3.    Dominion Vulnerabilities To Hacking.

145.    Plaintiffs have since learned that the "glitches" in the Dominion system -- that have the uniform effect of hurting Trump and helping Biden -- have been widely reported in the press and confirmed by the analysis of independent experts.

146.    Plaintiffs can show, through expert and fact witnesses that:

A.    Massive End User Vulnerabilities.

---

[14]*See* Exh. X, Report of Review of Dominion Voting Systems Democracy Suite 5.5-A Elections Division by the Secretary of State's office, Elections Division, January 24, 2020.

(1) Users on the ground have full admin privileges to machines and software. The Dominion system is designed to facilitate vulnerability and allow a select few to determine which votes will be counted in any election. Workers were responsible for moving ballot data from polling place to the collector's office and inputting it into the correct folder. Any anomaly, such as pen drips or bleeds, is not counted and is handed over to a poll worker to analyze and decide if it should count. This creates massive opportunity for improper vote adjudication. (See Exh._____ For Affiant Watkins).

(2) Affiant witness (name redacted for security reasons[15]), in his sworn testimony explains he was selected for the national security guard detail of the President of Venezuela, and that he witnessed the creation of Smartmatic for the purpose of election vote manipulation:

"I was witness to the creation and operation of a sophisticated electronic voting system that permitted the leaders of the Venezuelan government to manipulate the tabulation of votes for national and local elections and select the winner of those elections in order to gain and maintain their power. Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic which included … The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government."

(*See* Exh. 14, pars. 6, 9, 10).

147.    Specific vulnerabilities of the systems in question that have been documented or reported include:

A. Barcodes can override the voters' vote: As one University of California, Berkeley study shows, "In all three of these machines [including Dominion Voting Systems] the ballot marking printer is in the same paper path as the mechanism to deposit marked ballots into an attached ballot box. This opens up a very serious security vulnerability: the voting machine can make the paper ballot (to add votes or spoil already-case votes) after the last time the voter sees the paper, and then deposit that marked ballot into the ballot box

_____

[15]The Affiant's name will be produced in camera to the court, with a motion for seal of the information.

without the possibility of detection." (See Ex. __,) [16]

B. Voting machines were able to be connected to the internet by way of laptops that were obviously internet accessible. If one laptop was connected to the internet, the entire precinct was compromised.

C. "We ... discovered that at least some jurisdictions were not aware that their systems were online," said Kevin Skoglund, an independent security consultant who conducted the research with nine others, all of them long-time security professionals and academics with expertise in election security. Vice. August 2019. [17]

D. October 6, 2006 – Congresswoman Carolyn Maloney calls on Secretary of Treasury Henry Paulson to conduct an investigation into Smartmatic based on its foreign ownership and ties to Venezuela. (See Exh. __,).

E. Congresswoman Maloney wrote that "It is undisputed that Smartmatic is foreign owned and it has acquired Sequoia ... Smartmatica now acknowledged that Antonio Mugica, a Venezuelan businessman has a controlling interest in Smartmatica, but the company has not revealed who all other Smartmatic owners are.

F. Dominion "got into trouble" with several subsidiaries it used over alleged cases of fraud. One subsidiary is Smartmatic, a company "that has played a significant role in the U.S. market over the last decade," according to a report published by UK-based AccessWire.

G. Litigation over Smartmatic "glitches" alleges they impacted the 2010 and 2013 mid-term elections in the Philippines, raising questions of cheating and fraud. An independent review of the source codes used in the machines found multiple problems, which concluded, "The software inventory provided by Smartmatic is inadequate, ... which brings into question the software credibility," ABS-CBN reported.

H. Dominion acquired Sequoia Voting Systems as well as Premier Election Solutions (formerly part of Diebold, which sold Premier to ES&S in 2009, until antitrust issues forced ES&S to sell Premier, which then was acquired by Dominion). This map illustrates 2016 voting machine data—meaning, these data do not reflect geographic aggregation at the time of acquisition, but

---

[16] Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters, Andrew W. Appel, Richard T. DeMello, University of California, Berkeley, 12/27/2019.

[17] https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems--have-been-left-exposed-online-despite-official-denials

rather the machines that retain the Sequoia or Premier/Diebold brand that now fall under Dominion's market share. (The Business of Voting, Penn Wharton, Caufield, p. 16).

I.  Dominion entered into a 2009 contract with Smartmatic and provided Smartmatic with the PCOS machines (optical scanners) that were used in the 2010 Philippine election, the biggest automated election run by a private company. The automation of that first election in the Philippines was hailed by the international community and by the critics of the automation. The results transmission reached 90% of votes four hours after polls closed and Filipinos knew for the first time who would be their new president on Election Day. In keeping with local Election law requirements, Smartmatic and Dominion were required to provide the source code of the voting machines prior to elections so that it could be independently verified.[18]

J.  In late December of 2019, three Democrat Senators, Warren, Klobuchar, Wyden and House Member Mark Pocan wrote about their 'particularized concerns that secretive & "trouble -plagued companies"' "have long skimped on security in favor of convenience," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S." (See Exh. ___, attached copy of Senators' letter).

K.  Senator Ron Wyden (D-Oregon) said the findings [insecurity of voting systems] are "yet another damning indictment of the profiteering election vendors, who care more about the bottom line than protecting our democracy." It's also an indictment, he said, "of the notion that important cybersecurity decisions should be left entirely to county election offices, many of whom do not employ a single cybersecurity specialist." Vice. August 2019.[19]

148.   The expert witness in pending litigation in the United States District Court of Georgia, _____, Harri Hursti, specifically testified to the acute security vulnerabilities, among other facts, by declaration filed on August 24, 2020, (See Exhibit

---

[18]LONDON, ENGLAND / ACCESSWIRE / August 10, 2017, *Voting Technology Companies in the U.S. - Their Histories and Present Contributions*
[19]*https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems-*

*have-been-left-exposed-online-despite-official-denials*

"____" attached hereto) wherein he testified or found:

A. "The scanner and tabulation software settings being employed to determine which votes to count on hand marked paper ballots are likely causing clearly intentioned votes to be counted" "The voting system is being operated in Fulton County in a manner that escalates the security risk to an extreme level" "Votes are not reviewing their BMD printed ballots, which causes BMD generated results to be un-auditable due to the untrustworthy audit trail." 50% or more of voter selections in some counties were visible to poll workers. Dominion employees maintain near exclusive control over the EMS servers. "In my professional opinion, the role played by Dominion personnel in Fulton County, and other counties with similar arrangements, should be considered an elevated risk factor when evaluating the security risks of Georgia's voting system." See Paragraph 26 of Hursti Declaration.

B. A video game download was found on one Georgia Dominion system laptop, suggesting that multiple Windows updates have been made on that respective computer.

C. There is evidence of remote access and remote troubleshooting which presents a grave security implication.

D. Certified identified vulnerabilities should be considered an "extreme security risk."

E. There is evidence of transfer of control the systems out of the physical perimeters and place control with a third party off site.

F. USB drives with vote tally information were observed to be removed from the presence of poll watchers during a recent election.

1. Hursti stated within said Declaration:

"The security risks outlined above – operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system." (See Paragraph 49 of Hursti Declaration).

149. Rather than engaging in an open and transparent process to give credibility to Michigan's Dominion-Democracy Suite voting system, the processes were hidden during the receipt, review, opening, and tabulation of those votes in direct contravention of Michigan's Election Code and Federal law.

150.    Finally, an analysis of the Dominion software system by a former US Military Intelligence expert concludes that the system and software have been accessible and were certainly compromised by rogue actors, such as Iran and China.  By using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, Dominion neglectfully allowed foreign adversaries to access data and intentionally provided access to their infrastructure in order to monitor and manipulate elections, including the most recent one in 2020.  *See* Exh. 105, Spider Declaration.

### 4.    Dominion Connections to Smartmatic and Hostile Foreign Governments and Domestic Groups Such as Antifa.

151.    Plaintiffs can also show Smartmatic's incorporation and inventors who have backgrounds evidencing their foreign connections, including Serbia, specifically its identified inventors:

Applicant: SMARTMATIC, CORP.

Inventors**:** Lino Iglesias, Roger Pinate, Antonio Mugica, Paul Babic, Jeffrey Naveda, Dany Farina, Rodrigo Meneses, Salvador Ponticelli, Gisela Goncalves, Yrem Caruso[20]

152.    Another Affiant witness testifies that in Venezuela, she was in official position related to elections and witnessed manipulations of petitions to prevent a removal of President Chavez and because she protested, she was summarily dismissed. She explains the vulnerabilities of the electronic voting system and Smartmatica to such manipulations.  (See Exh. __, Anna Mercedes Diaz Cardozo).

153.    Plaintiffs have also learned through several reports that in 2010 Eric Coomer joined Dominion as Vice President of U.S. Engineering.  According to his bio,

---

[20]https://patents.justia.com/assignee/smartmatic-corp

Coomer graduated from the University of California, Berkeley with a Ph.D. in Nuclear Physics. Eric Coomer was later promoted to Voting Systems Officer of Strategy and Security although Coomer has since been removed from the Dominion page of directors after Joe Oltmann disclosed that as a reporter he infiltrated ANTIFA< a domestic terrorist organization where he recorded Eric Coomer representing that "Don't worry Trump won't win the election, we fixed that." – as well as twitter posts with violence threatened against President Trump. (*See* Joe Oltmann interview with Michelle Malkin dated November 13, 2020 which contains copies of Eric Coomer's recording and tweets).[21]

154.  In sum, as set forth above, for a host of independent reasons, the Michigan certified election results concluding that Joe Biden received 154,180 more votes that President Donald Trump must be set aside.

## COUNT I

**Defendants Violated the Elections and Electors Clauses and 42 U.S.C. § 1983.**

155.  Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

156.  The Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President. U.S. Const. art. II, §1, cl. 2 (emphasis added). Likewise, the Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof." U.S. Const. art. I, §4, cl. 1 (emphasis added).

157.  The Legislature is "'the representative body which ma[kes] the laws of the

---

*21*
https://www.youtube.com/watch?v=dh1X4s9HuLo&fbclid=IwAR2EaJc1M9RT3DaUraAjsycM0uPKB3uM_-MhH6SMeGrwNyJ3vNmlcTsHxF4

people.'" *Smiley*, 285 U.S. at 193. Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." Id. at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015).

158.  Defendantsare not part of the Michigan Legislature and cannot exercise legislative power. Because the United States Constitution reserves for the Michigan Legislature the power to set the time, place, and manner of holding elections for the President and Congress, county boards of elections and state executive officers have no authority to unilaterally exercise that power, much less to hold them in ways that conflict with existing legislation. Defendants are not the legislature, and their unilateral decision to deviate from the requirements of the Michigan Election Code violates the Electors and Elections Clause of the United States Constitution.

159.  Many affiants testified to Defendants' failure to follow the requirements of the Michigan Election Code, as enacted by the Michigan Legislature, MCL §§ 168.730-738, relating to the rights of partisan election challengers to provide transparency and accountability to ensure that all, and only, lawful ballots casts be counted, and that the outcome of the election was honestly and fairly determined by eligible voters casting legal ballots. As detailed in Section II, many of these requirements were either disregarded altogether or applied in a discriminatory manner to Republican poll watchers. Specifically, election officials violated Michigan's Election Code by: (a) disregarding or violating MCL § 168.730 and § 168.733 requiring election challengers to have meaningful access to observe the counting and processing of ballots, *see supra* Paragraphs 59-75; (b) wanton and widespread forgery and alteration, addition or

removal of votes, voters, or other information from ballots, the QVF or other voting records, *see supra* Paragraphs 76-86; and (c) illegal double voting, counting ineligible ballots, failure to check signatures or postmarks, and several other practices in clear violation of the Michigan Election Code (and in some cases at the express direction of supervisors or Wayne County officials). *See supra* Paragraphs 87-98.

160.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted. Defendants have acted and, unless enjoined, will act under color of state law to violate the Elections Clause.

161.    Accordingly, the results for President in the November 3, 2020 election must be set aside.

## COUNT II

### Governor Whitmer, Secretary Benson and Other Defendants Violated TheFourteenth Amendment U.S. Const. Amend. XIV, 42 U.S.C. § 1983

### Denial of Equal Protection

### Invalid Enactment of Regulations Affecting Observation and Monitoring of the Election

162.    Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

163.    The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. *See also Bush v. Gore*, 531 U.S. 98, 104 (2000)(having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote

over the value of another's). *Harper v. Virginia Board of Elections*, 383 U.S. 663, 665 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."). The Court has held that to ensure equal protection, a problem inheres in the absence of specific standards to ensure its equal application. *Bush*, 531 U.S. at 106 ("The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude, necessary.").

164.    The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights. The requirement of equal protection is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

165.    In statewide and federal elections conducted in the State of Michigan, including without limitation the November 3, 2020 General Election, all candidates, political parties, and voters, including without limitation Plaintiffs, have a vested interest in being present and having meaningful access to observe and monitor the electoral process in each County to ensure that it is properly administered in every election district and otherwise free, fair, and transparent.

166.    Moreover, through its provisions involving watchers and representatives, the Michigan Election Code ensures that all candidates and political parties in each County, including the Trump Campaign, have meaningful access to observe and monitor the electoral process to ensure that it is properly administered in every election district and otherwise free, fair, and transparent. *See, e.g.,*MCL § 168.730 &§ 168.733(1). Further, the Michigan Election Code provides it is a felony punishable by

up to two years in state prison for any person to threaten or intimidate a challenger who is performing any activity described in Michigan law. MCL § 168.734(4). Defendants have a duty to treat the voting citizens in each County in the same manner as the citizens in other Counties in Michigan.

167. As set forth in Count I above, Defendants failed to comply with the requirements of the Michigan Election Code and thereby diluted the lawful ballots of the Plaintiffs and of other Michigan voters and electors in violation of the United States Constitution guarantee of Equal Protection.

168. Specifically, Defendants denied the Trump Campaign equal protection of the law and their equal rights to meaningful access to observe and monitor the electoral process enjoyed by citizens in other Michigan Counties by: (a) denying Republican poll challengers access to the TCF Center or physically removing them or locking them out for pretextual reasons; (b) denied Republican poll watchers meaningful access to, or even physically blocking their view of, ballot handling, processing, or counting; (c) engaged in a systematic pattern of harassment, intimidation, verbal insult, and even physical removal of Republican poll challengers; (d) systematically discriminated against Republican poll watchers and in favor of Democratic poll watchers and activists in enforcing rules (in particular, through abuse of "social distancing" requirements); (e) ignored or refused to record Republican challenges to the violations set forth herein; (f) refusing to permit Republican poll watchers to observe ballot duplication or to check if duplication was accurate; (g) unlawfully coached voters to vote for Biden and other democratic candidates, including at voting stations; and (h) colluded with other Michigan State, Wayne County and City of Detroit employees (including police) and

Democratic poll watchers and activists to engage in the foregoing violations. *See generally supra* Section II.A, Paragraphs 56-75.

169. Defendants further violated Michigan voters' rights to equal protection insofar as it allowed Wayne County and City of Detroit election workers to process and count ballots in a manner that allowed ineligible ballots to be counted, including: (a) fraudulently adding tens of thousands of new ballots and/or new voters to the QVF in two separate batches on November 4, 2020, all or nearly all of which were votes for Joe Biden; (b) systematically forging voter information and fraudulently adding new voters to the QVF (in particular, where a voter's name could not be found, assigning the ballot to a random name already in the QVF to a person who had not voted and recorded these new voters as having a birthdate of 1/1/1900); (c) fraudulently changing dates on absentee ballots received after 8:00 PM Election Day deadline to indicate that such ballots were received before the deadline; (d) changing Votes for Trump and other Republican candidates; (e) adding votes to "undervote" ballots and removing votes from "Over-Votes"; (f) permitting illegal double voting by persons that had voted by absentee ballot and in person; (g) counting ineligible ballots – and in many cases – multiple times; (h) counting ballots without signatures, or without attempting to match signatures, and ballots without postmarks, pursuant to direct instructions from Defendants; (i) counting "spoiled" ballots; (j) systematic violations of ballot secrecy requirements; (k) accepting unsecured ballots arrived at the TCF Center loading garage, not in sealed ballot boxes, without any chain of custody, and without envelopes, after the 8:00 PM Election Day deadline; (l) accepting and counting ballots from deceased voters; and (m) accepting and counting ballots collected from unattended remote drop

boxes.  *See generally infra* Section II.B. and II.C, Paragraphs 76-98.

170.    Plaintiffs have obtained direct eyewitness testimony confirming that certain of these unlawful practices were at the express direction of Wayne County election officials.  With respect to (a) and (b), Affiant Cushman testified that election supervisor Miller informed him that the Wayne County Clerk's office had expressly instructed them to manually to enter thousands of ballots arriving around 9 PM on November 4, 2020, from voters not in the QVF, and to manually enter these unregistered voters in the QVF with the birthdate of 1/1/1900.   Exh. 3, GLJC Complaint, Exh. D at¶¶ 14-17. With respect to (c), fraudulently back-dating absentee ballots, City of Detroit election worker Affiant Jacob affirmed that she was instructed by supervisors to "improperly pre-date the absentee ballots receive date … to falsely show that absentee ballots had been received in time to be valid."  *Id*. Exh. B at ¶17. With respect to (h) (accepting ballots without signatures or postmarks), affiants testified that election workers did so at the express direction of Wayne County election officials. *See id.* at ¶15.

171.    Other Michigan county boards of elections provided watchers and representatives of candidates and political parties, including without limitation watchers and representatives of the Trump Campaign, with appropriate access to view the absentee and mail-in ballots being pre-canvassed and canvassed by those county election boards without the restrictions and discriminatory treatment outline above.Defendants intentionally and/or arbitrarily and capriciously denied Plaintiffs access to and/or obstructed actual observation and monitoring of the absentee and mail-in ballots being pre-canvassed and canvassed by Defendants, depriving them of the

equal protection of those state laws enjoyed by citizens in other Counties.

172. Defendants have acted and will continue to act under color of state law to violate Plaintiffs' right to be present and have actual observation and access to the electoral process as secured by the Equal Protection Clause of the United States Constitution. Defendants thus failed to conduct the general election in a uniform manner as required by the Equal Protection Clause of the Fourteenth Amendment, the corollary provisions of the Michigan Constitution, and the Michigan Election Code.

173. Plaintiffs seek declaratory and injunctive relief requiring Secretary Benson to direct that the Michigan Counties allow a reasonable number of challengers to meaningfully observe the conduct of the Michigan Counties canvassers and board of state canvassers and that these canvassing boards exercise their duty and authority under Michigan law, which forbids certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

174. In addition, Plaintiffs ask this Court to order that no ballot processed by a counting board in the Michigan Counties can be included in the final vote tally unless a challenger was allowed to meaningfully observe the process and handling and counting of the ballot, or that were unlawfully switched from Trump to Biden.

175. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the declaratory and injunctive relief requested herein is granted. Indeed, the setting aside of an election in which the people have chosen their representative is a drastic remedy that should not be undertaken lightly, but instead should be reserved for cases in which a person challenging an election has clearly

established a violation of election procedures and has demonstrated that the violation has placed the result of the election in doubt. Michigan law allows elections to be contested through litigation, both as a check on the integrity of the election process and as a means of ensuring the fundamental right of citizens to vote and to have their votes counted accurately.

176.     In addition to the alternative requests for relief in the preceding paragraphs, hereby restated, Plaintiffs seek a permanent injunction requiring the Wayne County and other Michigan Election Boards to invalidate ballots cast by: (1) any voter added to the QVF after the 8:00 PM Election Day deadline; (3) any absentee or mail-in ballot received without a signature or postmark; (4) any ballot cast by a voter who submitted a mail-in ballot and voted in person; (5) any ballot cast by a voter not in the QVF that was assigned the name of a voter in the QVF; (6) voters whose signatures on their registrations have not been matched with ballot, envelope and voter registration check; and (7) all "dead votes". *See generally supra* Section II.A-II.C.

## COUNT III

**Fourteenth Amendment, U.S. Const. Art. I § 4, cl. 1; Art. II, § 1, cl. 2; Amend. XIV, 42 U.S.C. § 1983**

### Denial of Due Process On The Right to Vote

177.     Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

178.     The right of qualified citizens to vote in a state election involving federal

candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution. *Harper,* 383 U.S. at 665. *See also Reynolds*, 377 U.S. at 554 (The Fourteenth Amendment protects the "the right of all qualified citizens to vote, in state as well as in federal elections."). Indeed, ever since the Slaughter-House Cases,83 U.S. 36 (1873), the United States Supreme Court has held that the Privileges or Immunities Clause of the Fourteenth Amendment protects certain rights of federal citizenship from state interference, including the right of citizens to directly elect members of Congress. *SeeTwining v. New Jersey*, 211 U.S. 78, 97 (1908) (*citing Ex parte Yarbrough*, 110 U.S. 651, 663-64 (1884)). *See alsoOregon v. Mitchell*,400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

179.    The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562. Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," *Burson v. Freeman*, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (percuriam).

180.    "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299,315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555, n.29 (*quoting South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

181. "Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

182. The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (*quoting Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

183. Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. See *Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

184. Section II of this Complaint and the exhibits attached hereto describe widespread and systematic violations of the Michigan Election Code and/or the Equal Protection Clause described, namely: (A) Section II.A, Republican poll challengers were denied the opportunity to meaningfully observe the processing and counting of ballots; (B) Section II.B, election workers forged, added, removed or otherwise altered

information on ballots, the QFV and other voting records; and (C) Section II.C, several other Michigan Election Code violations that caused or facilitated the counting of tens of thousands of ineligible, illegal or duplicate ballots.

185.     Plaintiffs seek declaratory and injunctive relief requiring Secretary Benson to direct that Secretary Benson and Wayne County are enjoined from certifying the results of the General Election, or in the alternative, conduct a recount or recanvas in which they allow a reasonable number of challengers to meaningfully observe the conduct of the Michigan Counties canvassers and board of state canvassers and that these canvassing boards exercise their duty and authority under Michigan law, which forbids certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

## COUNT IV

### Wide-SpreadBallot Fraud

186.     Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

187.     The "glitches" in the Dominion system -- that seem to have the uniform effect of hurting Trump and helping Biden -- have been widely reported in the press and confirmed by the analysis of independent experts. *See generally supra* Section IV.

188.     And as evidenced by numerous sworn statements, Defendants egregious misconduct has included ignoring legislative mandates concerning mail-in ballots– including the mandate that mail-in ballots be post-marked on or before Election Day, and critically, preventing Plaintiff's poll watchers from observing the receipt, review, opening, and tabulation of mail-in ballots. Those mail-in ballots are evaluated on an entirely parallel track to those ballots cast in person.

189.     The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. *See, e.g., Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

190.     The disparate treatment of Michigan voters, in subjecting one class of voters to greater burdens or scrutiny than another, violates Equal Protection guarantees because "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. Rice v. McAlister, 268 Ore. 125, 128, 519 P.2d 1263, 1265 (1975); *Heitman v. Brown Grp., Inc.,* 638 S.W.2d 316, 319, 1982 Mo. App. LEXIS 3159, at *4 (Mo. Ct. App. 1982); *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 41, 56 P.3d 524, 536-37 (Utah 2002).

## COUNT V

## MICHIGAN STATUTORY ELECTION LAW VIOLATIONS

191.     Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein

### Violation of MCL 168.765a.

192.     Absent voter ballots must only be counted when "at all times" there is "at least 1 election inspector from each major political party." MCL 168.765a.

193.     Per eyewitness accounts described in this Complaint and its attached sworn

affidavits, Defendants habitually and systematically disallowed election inspectors from the Republican party, including Plaintiff, to be present in the voter counting place and refused access to election inspectors from the Republican party, including Plaintiff, to be within a closeenoughdistancefromtheabsentvoterballotstobeabletoseeforwhomtheballotswerecast. *See generally supra* Section II.A., Paragraphs56-75.

194.    Defendants refused entry to official election inspectors from the Republican party, including Plaintiff, into the counting place to observe the counting of absentee voter ballots. Defendants even physically blocked and obstructed election inspectors from the Republicanparty,includingPlaintiff,byadheringlargepiecesofcardboardtothetransparent  glass doors so the counting of absent voter ballots was notviewable.

**Violation of MCL 168.733**

195.    MCL 168.733requires sets forth the procedures for election challengers and the powers of election inspectors.  *See generally supra* Paragraph 39.

196.    Per eyewitness accounts described in this Complaint and its attached sworn affidavits, Defendants habitually and systematically failed to provide space for election inspectors from the Republican party, including Plaintiff, to observe election procedure, failed to allow the inspection of poll books, failed to share the names of the electors being entered in the poll books, failed to allow the examination of each ballot as it was being counted, and failed to keep records of obvious and observedfraud.*See generally supra* Section II.A., Paragraphs 56-75.

197.    Pollchallengers,includingPlaintiff,observedelectionworkersandsupervisors writing on ballots themselves to alter them, apparently manipulating spoiled ballots by hand and then counting the ballots as valid, counting the same ballot more than once, adding

information to incomplete affidavits accompanying absentee ballots, counting absentee ballots returned late, counting unvalidated and unreliable ballots, and counting the ballots of "voters"whohadnorecordedbirthdatesandwerenotregisteredintheState'sQualifiedVoter    File or on any Supplemental voterlists.

## Violation of MCL 168.765(5) and 168.764a

198.    Michigan election law, MCL 168.765(5), requires Defendants to post the specific absentee voting information anytime an election is conducted which involves a state or federal office, in particular, the number of absentee ballots distributed to absent voters.

199.    Upon information and belief, Defendants failed to post by 8:00 a.m. on Election Day the number of absentee ballots distributed to absent voters and failed to post before 9:00 p.m. the number of absent voters returned before on Election Day.

200.    Per Michigan Election law, all absentee voter ballots must be returned to the clerk before polls close at 8pm. MCL 168.764a. Any absentee voter ballots received by the clerk after the close of the polls on election day will not be counted.

201.    Michigan allows for early counting of absentee votes prior to the closings of the polls for large jurisdictions, such as the City of Detroit and Wayne County.

202.    Upon information and belief, receiving tens of thousands additional absentee ballots in the early morning hours after election day and after the counting of the absentee ballots had concluded, without proper oversight, with tens of thousands of ballots attributed to just one candidate, Joe Biden, indicates Defendants failed to follow proper electionprotocol.*See generally supra* Section II.B.1, Paragraphs 77-78.

## Violation of MCL 168.730

203.    MCL 168.730 sets forth the rights and requirements for election challengers. MCL 168.734 provides, among other things:

Any officer or election board who shall prevent the presence of any such challenger as above provided, or shall refuse or fail to provide such challenger with conveniences for the performance of the duties expected of him, shall, upon conviction, be punished by a fine not exceeding $1,000.00, or by imprisonment in the state prison not exceeding 2 years, or by both such fine and imprisonment in the discretion of the court.

204.     Wayne County's and Secretary Benson's denial of Republican challengers' right to participate and observe the processing of ballots violates Michigan's Election Code and resulting in the casting and counting of ballots that were ineligible to be counted and diluted or canceled out the lawfully cast ballots of other Michigan voters.

205.     Further, Secretary of State Benson and the election officials in Wayne County violated MCL 168.730-168.734 by denying Republican challengers' rights to meaningfully observe and participate in the ballot processing and counting process.

206.     Based upon the above allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to order appropriate relief, including, but not limited to, enjoining the certification of the election results pending a full investigation and court hearing, ordering a recount of the election results, or voiding the election and ordering a new election, to remedy the fraud.

**PRAYER FOR RELIEF**

207.　Accordingly, Plaintiffs seek an emergency order instructing Defendants to de-certify the results of the General Election for the Office of President.

208.　Alternatively, Plaintiffs seek an order instructing the Defendants to certify the results of the General Election for Office of the President in favor of President Donald Trump.

209.　In the alternative, Plaintiffs seek an emergency order prohibiting Defendants from including in any certified results from the General Election the tabulation of absentee and mailing ballots which do not comply with the Michigan Election Code, including, without limitation, the tabulation of absentee and mail-in ballots Trump Campaign's watchers were prevented from observing or based on the tabulation of invalidly cast absentee and mail-in ballots which (i) lack a secrecy envelope, or contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, (ii) do not include on the outside envelope a completed declaration that is dated and signed by the elector, (iii) are delivered in-person by third parties for non-disabled voters, or (iv) any of the other Michigan Election Code violations set forth in Section II of this Complaint.

210.　Order production of all registration data, ballots, envelopes, etc. required to be maintained by law. When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Michigan and did so on a large scale and widespread basis. The size of the voting failures, whether accidental or intentional, are multiples larger than the margin in the state. For these reasons, Michigan cannot reasonably rely on the results of the mail

72

vote.Relief sought is the elimination of the mail ballots from counting in the 2020 election. Alternatively, the electors for the State of Michigan should be disqualified from counting toward the 2020 election.  Alternatively, the electors of the State of Michigan should be directed to vote for President Donald Trump.

211.    For these reasons, Plaintiffs ask this Court to enter a judgment in their favor and provide the following emergency relief:

1.  An order directing Secretary Benson, Governor Whitmer, the Board of State Canvassers and Wayne County to de-certify the election results;

2.  An order enjoining Secretary Benson and Governor Whitmer from transmitting the currently certified election results to the Electoral College;

3.  An order requiring Governor Whitmer to transmit certified election results that state that President Donald Trump is the winner of the election;

4.  An immediate order to impound all the voting machines and software in Michigan for expert inspection by the Plaintiffs.

5.  An order that no votes received or tabulated by machines that were not certified as required by federal and state law be counted.

6.  A declaratory judgment declaring that Michigan's failed system of signature verification violates the Electors and Elections Clause by working a de facto abolition of the signature verification requirement;

7.  A declaratory judgment declaring that current certified election results violates the Due Process Clause, U.S. CONST. Amend. XIV;

8.  A declaratory judgment declaring that mail-in and absentee ballot fraud must be remedied with a Full Manual Recount or statistically valid sampling that properly verifies the signatures on absentee ballot envelopes and that invalidates the certified results if the recount or sampling analysis shows a sufficient number of ineligible absentee ballots were counted;

9.  An emergency declaratory judgment that voting machines be Seized and Impounded immediately for a forensic audit—by Plaintiffs' expects;

10. A declaratory judgment declaring absentee ballot fraud occurred in violation of Constitutional rights, Election laws and under state law;

11. A permanent injunction prohibiting the Governor and Secretary of State from transmitting the currently certified results to the Electoral College based on the overwhelming evidence of election tampering;

12. Immediate production of 48 hours of security camera recording of all rooms used in the voting process at the TCF Center for November 3 and November 4.

13. Plaintiffs further request the Court grant such other relief as is just and proper, including but not limited to, the costs of this action and their reasonable attorney fees and expenses pursuant to 42 U.S.C. 1988.

Respectfully submitted, this 25th day of November, 2020.

/s Sidney Powell*                                    /s/ Scott Hagerstrom
Sidney Powell PC                                     Michigan State Bar No. 57885
                                                     222 West Genesee
Texas Bar No. 16209700                               Lansing, MI 48933
                                                     (517) 763-7499
                                                     Scotthagerstrom @yahoo.com

                                                     /s/ Gregory J. Rohl P39185
                                                     The Law Offices of Gregory J. Rohl, P.C.
                                                     41850 West 11 Mile Road, Suite 110
                                                     Novi, MI 48375
                                                     248-380-9404
                                                     gregoryrohl@yahoo.com

Of Counsel:
Emily P. Newman (Virginia Bar No. 84265)
Julia Z. Haller (D.C. Bar No. 466921)

2911 Turtle Creek Blvd, Suite 300
Dallas, Texas 75219

*Application for admission pro hac vice
Forthcoming

L. Lin Wood
GA Bar No. 774588
L. LIN WOOD, P.C.
P.O. Box 52584
Atlanta, GA 30305-0584
Telephone: (404) 891-1402

Howard Kleinhendler
New York Bar No. 2657120
Howard Kleinhendler Esquire
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

Exhibit B6

## IN THE UNITED STATES DISTRICCT COURT, NORTHERN DISTRCOICT OF GEORGIA, ATLANTA DIVISION

| | |
|---|---|
| CORECO JA'QAN PEARSON, VIKKI TOWNSEND CONSIGLIO, GLORIA KAY GODWIN, JAMES KENNETH CARROLL, , CAROLYN HALL FISHER, CATHLEEN ALSTON LATHAM, and BRIAN JAY VAN GUNDY, | CASE NO. |
|     Plaintiffs. | |
| v. | |
| BRIAN KEMP, in his official capacity as Governor of Georgia, BRAD RAFFENSPERGER, in his official capacity as Secretary of State and Chair of the Georgia State Election Board, DAVID J. WORLEY, in his official capacity as a member of the Georgia State Election Board, REBECCA N.SULLIVAN, in her official capacity as a member of the Georgia State Election Board, MATTHEW MASHBURN, in his official capacity as a member of the Georgia State Election Board, and ANH LE, in her official capacity as a member of the Georgia State Election Board, | |
|     Defendants. | |

## COMPLAINT FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF

## NATURE OF THE ACTION

This civil action brings to light a massive election fraud, multiple violations of Georgia laws, including O.C.G.A. §§ 21-2-30(d), 21-2-31, 21-2-33.1 and §21-2-522, and multiple Constitutional violations, as shown by fact witnesses to specific incidents, multiple expert witnesses and the sheer mathematical impossibilities found in the Georgia 2020 General Election.[1]

1.

As a civil action, the plaintiff's burden of proof is a "preponderance of the evidence" to show, as the Georgia Supreme Court has made clear that, *"[i] was not incumbent upon [Plaintiff] to show how the [] voters would have voted if their [absentee] ballots had been regular. [Plaintiff] only had to show that there were enough irregular ballots to place in doubt the result." Mead v. Sheffield*, 278 Ga. 268, 272, 601 S.E.2d 99, 102 (2004) (*citing Howell v. Fears*, 275 Ga. 627, 571 S.E.2d 392 (2002).

---

[1] The same pattern of election fraud and voter fraud writ large occurred in all the swing states with only minor variations, see expert reports, regarding Michigan, Pennsylvania, Arizona and Wisconsin. (See William M. Briggs Decl., attached here to as Exh. 1, Report with Attachment). Indeed, we believe that in Arizona at least 35,000 votes were illegally added to Mr. Biden's vote count.

2

2.

The scheme and artifice to defraud was for the purpose of illegally and fraudulently manipulating the vote count to make certain the election of Joe Biden as President of the United States.

3.

The fraud was executed by many means,[2] but the most fundamentally troubling, insidious, and egregious is the systemic adaptation of old-fashioned "ballot-stuffing." It has now been amplified and rendered virtually invisible by computer software created and run by domestic and foreign actors for that very purpose. Mathematical and statistical anomalies rising to the level of impossibilities, as shown by affidavits of multiple witnesses, documentation, and expert testimony evince this scheme across the state of Georgia. Especially egregious conduct arose in Forsyth, Paulding, Cherokee, Hall, and Barrow County. This scheme and artifice to defraud affected tens of thousands of votes in Georgia alone and "rigged" the election in Georgia for Joe Biden.

---

[2] 50 USC § 20701 requires Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation, but as will be shown wide pattern of misconduct with ballots show preservation of election records have not been kept; and Dominion logs are only voluntary, with no system wide preservation system.

4.

The massive fraud begins with the election software and hardware from Dominion Voting Systems Corporation ("Dominion") only recently purchased and rushed into use by Defendants Governor Brian Kemp, Secretary of State Brad Raffensperger, and the Georgia Board of Elections. Sequoia voting machines were used in 16 states and the District of Colombia in 2006. Smartmatic, which has revenue of about $100 million, focuses on Venezuela and other markets outside the U.S. [3]

After selling Sequoia, Smartmatic's chief executive, Anthony Mugica. Mr. Mugica said, he hoped Smartmatic would work with Sequoia on projects in the U.S., though Smartmatic wouldn't take an equity stake." Id.

5.

Smartmatic and Dominion were founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election. (*See* Redacted whistleblower affiant, *attached as Exh.* 2) Notably, Chavez "won" every election thereafter.

---

[3] *See WSJ.com, Smartmatic to Sell U.S. Unit, End Probe into Venezuelan Links, by Bob Davis, 12/22/2006,* h*ttps://www.wsj.com/articles/SB116674617078557263*

6.

As set forth in the accompanying whistleblower affidavit, the

Smartmatic software was designed to manipulate Venezuelan elections in

favor of dictator Hugo Chavez:

> Smartmatic's electoral technology was called "Sistema de Gestión
> Electoral" (the "Electoral Management System"). Smartmatic was a
> pioneer in this area of computing systems. Their system provided for
> transmission of voting data over the internet to a computerized
> central tabulating center. The voting machines themselves had a
> digital display, fingerprint recognition feature to identify the voter,
> and printed out the voter's ballot. The voter's thumbprint was linked
> to a computerized record of that voter's identity. Smartmatic created
> and operated the entire system.

7.

A *core requirement* of the Smartmatic software design was the

*software's ability to hide its manipulation of votes from any audit.* As the

whistleblower explains:

> Chavez was most insistent that Smartmatic design the system in a
> way that the system could change the vote of each voter without
> being detected. He wanted the software itself to function in such a
> manner that if the voter were to place their thumb print or
> fingerprint on a scanner, then the thumbprint would be tied to a
> record of the voter's name and identity as having voted, but that voter
> would not be tracked to the changed vote. He made it clear that the
> system would have to be setup to not leave any evidence of the
> changed vote for a specific voter and that there would be no evidence
> to show and nothing to contradict that the name or the fingerprint or
> thumb print was going with a changed vote. Smartmatic agreed to
> create such a system and produced the software and hardware that

accomplished that result for President Chavez. (See Id., see also Exh. 3, Aff. Cardozo, attached hereto)).

8.

The design and features *of* the Dominion software do not permit a simple audit to reveal its misallocation, redistribution, or deletion of votes. First, the system's central accumulator does not include a protected real-time audit log that maintains the date and time stamps of all significant election events. Key components of the system utilize unprotected logs. Essentially this allows an unauthorized user the opportunity to arbitrarily add, modify, or remove log entries, causing the machine to log election events that do not reflect actual voting tabulations—or more specifically, do not reflect the actual votes of or the will of the people. (*See* Hursti August 2019 Declaration, attached hereto as Exh. 4, at pars. 45-48; and attached hereto, as Exh. 4B, October 2019 Declaration in Document 959-4, at p. 18, par. 28).

9.

Indeed, under the professional standards within the industry in auditing and forensic analysis, when a log is unprotected, and can be altered, it can no longer serve the purpose of an audit log. There is incontrovertible physical evidence that the standards of physical security of the voting machines and the software were breached, and machines were connected to

6

the internet in violation of professional standards and state and federal laws.
(*See Id.*)

10.

Moreover, lies and conduct of Fulton County election workers about a

delay in voting at State Farm Arena and the reasons for it evince the fraud.

11.

Specifically, video from the State Farm Arena in Fulton County shows

that on November 3rd after the polls closed, election workers falsely claimed

a water leak required the facility to close.  All poll workers and challengers

were evacuated for several hours at about 10:00 PM.  However, several

election workers remained unsupervised and unchallenged working at the

computers for the voting tabulation machines until after 1:00 AM.

12.

Defendants Kemp and Raffensperger rushed through the purchase of

Dominion voting machines and software in 2019 for the 2020 Presidential

Election[4].  A certificate from the Secretary of State was awarded to Dominion

---

[4]   Georgia Governor Inks Law to Replace Voting Machines, The Atlanta Journal-
Constitution, AJC News Now, Credit: Copyright 2019 The Associated Press, June 2019.
https://www.ajc.com/blog/politics/georgia-governor-inks-law-replace-voting-
machines/xNXs0ByQAOvtXhd27kJdqO/

Voting Systems but is undated. (*See* attached hereto Exh. 5, copy

Certification for Dominion Voting Systems from Secretary of State).

Similarly a test report is signed by Michael Walker as Project Manager but is

also undated. (See Exh. 6, Test Report for Dominion Voting Systems,

Democracy Suite 5-4-A)

13.

Defendants Kemp and Raffensperger disregarded all the concerns that

caused Dominion software to be rejected by the Texas Board of Elections in

2018, namely that it was vulnerable to undetected and non-auditable

manipulation. An industry expert, Dr. Andrew Appel, Princeton Professor of

Computer Science and Election Security Expert has recently observed, with

reference to Dominion Voting machines: "I figured out how to make a slightly

different computer program that just before the polls were closed, it switches

some votes around from one candidate to another. I wrote that computer

program into a memory chip and now to hack a voting machine you just need

7 minutes alone with it and a screwdriver." (Attached hereto Exh. 7, Study,

Ballot-Marking Devices (BMDs) Cannot Assure the Will of the Voters by

Andrew W. Appel Princeton University, Richard A. DeMillo, Georgia Tech

Philip B. Stark, for the Univ. of California, Berkeley, December 27, 2019).[5]

---

[5] Full unredacted copies of all exhibits have been filed under seal with the Court and Plaintiffs
have simultaneously moved for a protective order.

14.

As explained and demonstrated in the accompanying redacted

declaration of a former electronic intelligence analyst under 305th Military

Intelligence with experience gathering SAM missile system electronic

intelligence, the Dominion software was accessed by agents acting on behalf

of China and Iran in order to monitor and manipulate elections, including the

most recent US general election in 2020. This Declaration further includes a

copy of the patent records for Dominion Systems in which Eric Coomer is

listed as the first of the inventors of Dominion Voting Systems. (See

Attached hereto as Exh. 8, copy of redacted witness affidavit, 17 pages,

November 23, 2020).

15.

Expert Navid Keshavarez-Nia explains that US intelligence services

had developed tools to infiltrate foreign voting systems including Dominion.

He states that Dominion's software is vulnerable to data manipulation by

unauthorized means and permitted election data to be altered in all

battleground states. He concludes that hundreds of thousands of votes that

were cast for President Trump in the 2020 general election were transferred

to former Vice-President Biden. (Exh. 26).

16.

Additionally, incontrovertible evidence Board of Elections records demonstrates that at least 96,600 absentee ballots were requested and counted but were never recorded as being returned to county election boards by the voter. *Thus, at a minimum, 96,600 votes must be disregarded.* (See Attached hereto, Exh. 9, R. Ramsland Aff.).

17.

The Dominion system used in Georgia erodes and undermines the reconciliation of the number of voters and the number of ballots cast, such that these figures are permitted to be unreconciled, opening the door to ballot stuffing and fraud. The collapse of reconciliation was seen in Georgia's primary and runoff elections this year, and in the November election, where it was discovered during the hand audit that 3,300 votes were found on memory sticks that were not uploaded on election night, plus in Floyd county, another 2,600 absentee ballots had not been scanned. These "found votes" reduced Biden's lead over Donald Trump[6].

---

[6] *Recount find thousands of Georgia votes*, Atlanta Journal-Constitution by Mark Niesse and David Wickert,11/19/20. https://www.ajc.com/politics/recount-finds-thousands-of-georgia-votes-missing-from-initial-counts/ERDRNXPH3REQTM4SOINPSEP72M/

18.

Georgia's election officials and poll workers exacerbated and helped, whether knowingly or unknowingly, the Dominion system carry out massive voter manipulation by refusing to observe statutory safeguards for absentee ballots. Election officials failed to verify signatures and check security envelopes. They barred challengers from observing the count, which also facilitated the fraud.

19.

Expert analysis of the actual vote set forth below demonstrates that at least 96,600 votes were illegally counted during the Georgia 2020 general election. All of the evidence and allegation herein is more than sufficient to place the result of the election in doubt. More evidence arrives by the day and discovery should be ordered immediately.

20.

Georgia law, (OCGA 21-5-552) provides for a contest of an election where:

> (1) Misconduct, fraud, or irregularity by any primary or election official or officials sufficient to change or place in doubt the result; . . . (3) When illegal votes have been received or legal votes rejected at the polls sufficient to change or place in doubt the result; (4) For any error in counting the votes or declaring the result of the primary or election, if such error would change the result; or (5) For any other cause which shows that another was the person legally nominated, elected, or eligible to compete in a run-off primary or election.

11

21.

As further set forth below, all of the above grounds have been satisfied and compel this Court to set aside the 2020 General Election results which fraudulently concluded that Mr. Biden defeated President Trump by 12,670 votes.

22.

Separately, and independently, there are sufficient Constitutional grounds to set aside the election results due to the Defendants' failure to observe statutory requirements for the processing and counting of absentee ballots which led to the tabulation of more than fifty thousand illegal ballots.

**THE PARTIES**

23.

Plaintiff Coreco Ja'Qan ("CJ") Pearson, is a registered voter who resides in Augusta, Georgia. He is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia. He has standing to bring this action under *Carson v. Simon*, 2020 US App Lexis 34184 (8th Cir. Oct. 29, 2020). He brings this action to set aside and decertify the election results for the Office of President of the United States that was certified by the Georgia Secretary of State on November 20, 2020. The certified results showed a plurality of 12,670 votes in favor of former Vice-President Joe Biden over President Trump.

12

24.

Plaintiff Vikki Townsend Consiglio, is a registered voter who resides in Henry County, Georgia. She is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

25.

Plaintiff Gloria Kay Godwin, is a registered voter who resides in Pierece County, Georgia. She is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

26.

Plaintiff James Kenneth Carroll, is a registered voter who resides in Dodge County, Georgia. He is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

27.

Plaintiff Carolyn Hall Fisher, is a registered voter who resides in Forsyth County, Georgia. She is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

28.

Plaintiff Cathleen Alston Latham, is a registered voter who resides in Coffee County, Georgia. She is a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Georgia.

29.

Plaintiff Jason M. Shepherd is the Chairman of the Cobb County Republican Party and brings this action in his official capacity on behalf of the Cobb County Republican Party.

30.

Plaintiff Brian Jay Van Gundy is registered voter in Gwinnett County, Georgia. He is the Assistant Secretary of the Georgia Republican Party.

31.

Defendant Governor Brian Kemp (Governor of Georgia) is named herein in his official capacity as Governor of the State of Georgia. On or about June 9, 2019, Governor Kemp bought the new Dominion Voting Systems for Georgia, budgeting 150 million dollars for the machines. Critics are quoted, "Led by Abrams, Democrats fought the legislation and pointed to cybersecurity experts who warned it would leave Georgia's elections susceptible to hacking and tampering." And "Just this week, the Fair Fight voting rights group started by [Stacy] Abrams launched a television ad critical of the bill. In a statement Thursday, the group called it "corruption at its worst" and a waste of money on "hackable voting machines."[7]

---

[7] *Georgia Governor Inks Law to Replace Voting Machines*, The Atlanta Journal-Constitution, AJC News Now, Credit: Copyright 2019 The Associated Press, June 2019

14

32.

Defendant Brad Raffensperger ("Secretary Raffensperger") is named herein in his official capacity as Secretary of State of the State of Georgia and the Chief Election Official for the State of Georgia pursuant to Georgia's Election Code and O.C.G.A. § 21-2-50. Secretary Raffensperger is a state official subject to suit in his official capacity because his office "imbues him with the responsibility to enforce the [election laws]." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). Secretary Raffensperger serves as the Chairperson of Georgia's State Election Board, which promulgates and enforces rules and regulations to (i) obtain uniformity in the practices and proceedings of election officials as well as legality and purity in all primaries and general elections, and (ii) be conducive to the fair, legal, and orderly conduct of primaries and general elections. *See* O.C.G.A. §§ 21-2-30(d), 21-2-31, 21-2-33.1. Secretary Raffensperger, as Georgia's chief elections officer, is further responsible for the administration of the state laws affecting voting, including the absentee voting system. *See* O.C.G.A. § 21-2-50(b).

33.

Defendants Rebecca N. Sullivan, David J. Worley, Matthew Mashburn, and Anh Le (hereinafter the "State Election Board") are members of the State Election Board in Georgia, responsible for "formulating, adopting, and promulgating such rules and regulations, consistent with law, as will be

conducive to the fair, legal, and orderly conduct of primaries and elections."

O.C.G.A. § 21-2-31(2). Further, the State Election Board "promulgate[s] rules

and regulations to define uniform and nondiscriminatory standards

concerning what constitutes a vote and what will be counted as a vote for

each category of voting system" in Georgia. O.C.G.A. § 21-2-31(7). The State

Election Board, personally and through the conduct of the Board's employees,

officers, agents, and servants, acted under color of state law at all times

relevant to this action and are sued for emergency declaratory and injunctive

relief in their official capacities.

## JURISDICTION AND VENUE

### 34.

This Court has subject matter jurisdiction under 28 U.S.C. 1331 which

provides, "The district courts shall have original jurisdiction of all civil

actions arising under the Constitution, laws, or treaties of the United States.

### 35.

This Court also has subject matter jurisdiction under 28 U.S.C. 1343

because this action involves a federal election for President of the United

States. "A significant departure from the legislative scheme for appointing

Presidential electors presents a federal constitutional question." *Bush v.

Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*,

285 U.S. 355, 365 (1932).

36.

The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. 2201 and 2202 and by Rule 57 and 65, Fed. R. Civ. P. 7.

37.

This Court has jurisdiction over the related Georgia Constitutional claims and State law claims under 28 U.S.C. 1367.

38.

In Georgia, the "legislature" is the General Assembly. *See* Ga. Const. Art. III, § I, Para. I.

39.

Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers, including but not limited to Secretary Raffensperger, have no authority to exercise that power unilaterally, much less flout existing legislation or the Constitution itself.

## STATEMENT OF FACTS

40.

Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988, and under Georgia law, O.C.G.A. § 21-2-522 to remedy deprivations of rights,

privileges, or immunities secured by the Constitution and laws of the United

States and to contest the election results.

41.

The United States Constitution sets forth the authority to regulate

federal elections, the Constitution provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators. U.S. CONST. art. I, § 4 ("Elections Clause").

42.

With respect to the appointment of presidential electors, the

Constitution provides: Each State shall appoint, in such Manner as the

Legislature thereof may direct, a Number of Electors, equal to the whole

Number of Senators and Representatives to which the State may be entitled

in the Congress: but no Senator or Representative, or Person holding an

Office of Trust or Profit under the United States, shall be appointed an

Elector.  U.S. CONST. art. II, § 1 ("Electors Clause").

43.

Neither Defendant is a "Legislature" as required under the Elections

Clause or Electors Clause. The Legislature is "'the representative body which

ma[kes] the laws of the people.'" *Smiley* 285 U.S. 365.  Regulations of

congressional and presidential elections, thus, "must be in accordance with

18

the method which the state has prescribed for legislative enactments." Id. at

367; see also *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576

U.S. 787, 135 S. Ct. 2652, 2668 (U.S. 2015).

44.

While the Elections Clause "was not adopted  to  diminish  a State's

authority to determine its own lawmaking processes," *Ariz.  State Legislature,*

135 S. Ct. at 2677, it does hold states accountable to their chosen processes

when it comes to regulating federal elections, *id.* at 2668. "A significant

departure from the legislative scheme for appointing Presidential electors

presents a federal constitutional question." *Bush,* 531 U.S. at 113 (Rehnquist,

C.J., concurring); *Smiley,* 285 U.S. at 365.

45.

Plaintiffs also bring this action under Georgia law, O.C.G.A. § 21-2-522,

Grounds for Contest:

> A result of a primary or election may be contested on one or more of
> the following grounds:
>
> (1) Misconduct, fraud, or irregularity by any primary or election
> official or officials sufficient to change or place in doubt the result;
>
> (2) When the defendant is ineligible for the nomination or office in
> dispute;
>
> (3) When illegal votes have been received or legal votes rejected at
> the polls sufficient to change or place in doubt the result;
>
> (4) For any error in counting the votes or declaring the result of the
> primary or election, if such error would change the result; or

19

(5) For any other cause which shows that another was the person legally nominated, elected, or eligible to compete in a run-off primary or election.

O.C.G.A. § 21-2-522.

46.

Under O.C.G.A. *§* 21-2-10, Presidential Electors are elected.

47.

Under O.C.G.A. *§* 21-2-386(a)(l)(B), the Georgia Legislature instructed the county registrars and clerks (the "County Officials") to handle the absentee ballots as directed therein. The Georgia Legislature set forth the procedures to be used by each municipality for appointing the absentee ballot clerks to ensure that such clerks would "perform the duties set forth in this Article." *See* O.C.G.A. *§* 21-2-380.1.

48.

The Georgia Election Code instructs those who handle absentee ballots to follow a clear procedure:

> Upon receipt of each [absentee] ballot, a registrar or clerk ***shall*** write the day and hour of the receipt of the ballot on its envelope. The registrar or clerk ***shall*** then compare the identifying information on the oath with the information on file in his or her office, ***shall*** compare the signature or make on the oath with the signature or mark on the absentee elector's voter card or the most recent update to such absentee elector's voter registration card and application for absentee ballot or a facsimile of said signature or maker taken from said card or application, and ***shall,*** if the information and signature appear to be valid and other identifying information appears to be correct, so certify by signing or initialing his or her name below the

20

voter's oath. Each elector's name so certified shall be listed by the registrar or clerk on the numbered list of absentee voters prepared for his or her precinct.

O.C.G.A. § 21-2-386(a)(l )(B) (emphasis added).

49.

Under O.C.G.A. § 21-2-386(a)(l)(C), the Georgia Legislature also established a clear and efficient process to be used by County Officials if they determine that an elector has failed to sign the oath on the outside envelope enclosing the ballot or that the signature does not conform with the signature on file in the registrar's or clerk's office (a "defective absentee ballot").

50.

The Georgia Legislature also provided for the steps to be followed by County Officials with respect to defective absentee ballots:

> ***If the elector has failed to sign the oath, or if the signature does not appear to be valid***, or if the elector has failed to furnish required information ***or information so furnished does not conform with that on file in the registrar's or clerk's office***, or if the elector is otherwise found disqualified to vote, the registrar or clerk shall write across the face of the envelope "Rejected," giving the reason therefor. The board of registrars or absentee ballot clerk *shall* promptly ***notify the elector of such rejection***, a copy of which notification ***shall*** be retained in the files of the board of registrars or absentee ballot clerk for at least one year.

O.C.G.A. § 21-2 -386(a) (l)(C) (emphasis added).

21

## I.    DEFENDANTS' UNAUTHORIZED ACTIONS VIOLATED THE GEORGIA ELECTION CODE AND CAUSED THE PROCESSING OF DEFECTIVE ABSENTEE BALLOTS.

51.

Notwithstanding the clarity of the applicable statutes and the constitutional authority for the Georgia Legislature's actions, on March 6, 2020, the Secretary of State of the State of Georgia, Secretary Raffensperger, and the State Election Board, who administer the state elections (the "Administrators") entered into a "Compromise and Settlement Agreement and Release" (the "Litigation Settlement") with the Democratic Party of Georgia, Inc., the Democrat Senatorial Campaign Committee, and the Democratic Congressional Campaign Committee (collectively, the "Democrat Party Agencies"), setting forth different standards to be followed by the clerks and registrars in processing absentee ballots in the State of Georgia8.

52.

Under the Settlement, however, the Administrators agreed to change the statutorily prescribed manner of handling absentee ballots in a manner that is not consistent with the laws promulgated by the Georgia Legislature for elections in this state.

---

[8] *See Democratic Party of Georgia, Inc., et al. v. Raffensperger, et al.,* Civil Action File No. 1:1 9-cv-05028-WMR, United States District Court for the  Northern District of Georgia, Atlanta Division, Doc.  56-1.

53.

The Settlement provides that the Secretary of State would issue an "Official Election Bulletin" to county Administrators overriding the statutory procedures prescribed for those officials. That power, however, does not belong to the Secretary of State under the United States Constitution.

54.

The Settlement also changed the signature requirement reducing it to a broad process with discretion, rather than enforcement of the signature requirement as statutorily required under O.C.G.A. 21-2-386(a)(l).

55.

The Georgia Legislature instructed county registers and clerks (the "County Officials") regarding the handling of absentee ballots in O.C.G.A. S 21-2-386(a)(1)(B), 21-2-380.1. The Georgia Election Code instructs those who handle absentee ballots to follow a clear procedure:

> Upon receipt of each absentee ballot, a registrar or clerk shall write the day and hour of the receipt of the ballot on its envelope. The registrar or clerk shall then compare the identifying information on the oath with the information on file in his or her office, shall compare the signature or make on the oath with the signature or mark on the absentee elector's voter card or the most recent update to such absent elector's voter registration card and application for absentee ballot or a facsimile of said signature or maker taken from said card or application, and shall, if the information and signature appear to be valid and other identifying information appears to be correct, so certify by signing or initialing his or her name below the voter's oath …

23

O.C.G.A. S 21-2-386(a)(1)(B).

56.

The Georgia Legislature prescribed procedures to ensure that any

request for an absentee ballot must be accompanied by sufficient

identification of the elector's identity. *See* O.C.G.A. *§* 21-2-38 l(b )(1)

(providing, in pertinent part, "In order to be found eligible to vote an

absentee ballot in person at the registrar's office or absentee ballot clerk's

office, such person shall show one of the forms of identification listed in Code

Section 21-2-417 ...").

57.

An Affiant testified, under oath, that "It was also of particular interest

to me to see that signatures were not being verified and that there were no

corresponding envelopes seen in site." (Attached hereto as Exh. 10, Mayra

Romera, at par. 7).

58.

To reflect the very reason for process, it was documented that in the

primary election, prior to the November 3, 2020 Presidential election, many

ballots got to voters after the election. Further it was confirmed that "Untold

thousands of absentee ballot requests went unfulfilled, and tens of thousands

of mailed ballots were rejected for multiple reasons including arriving too late

to be counted.  See the Associated Press, *Vote-by-Mail worries: A leaky pipeline in many states*, August 8, 2020.[9]

59.

Pursuant to the Settlement, the Administrators delegated their responsibilities for determining when there was a signature mismatch by considering in good faith only partisan-based training - "additional guidance and training materials" drafted by the Democrat Party Agencies' representatives contradicting O.C.G.A. § 21-2-31.

### B. UNLAWFUL EARLY PROCESSING OF ABSENTEE BALLOTS

60.

In April 2020, the State Election Board adopted on a purportedly "Emergency Basis" Secretary of State Rule 183-1-14-0.9-.15, Processing Ballots Prior to Election Day. Under this rule, county election officials are authorized to begin processing absentee ballots up to three weeks befoe election day. Thus, the rule provides in part that "(1) Beginning at 8:00 AM on the third Monday prior to Election Day, the county election superintendent **shall be authorized to open the outer envelope of accepted absentee ballots** …" (Emphasis added).

---

[9]     *https://apnews.com/article/u-s-news-ap-top-news-election-2020-technology-politics-52e87011f4d04e41bfffccd64fc878e7*

61.

Rule 183-1-14-0.9-.15 is in direct and irreconcilable conflict with

O.C.G.A. § 21-2-386(a)(2), which prohibits the opening of absentee ballots

until election day:

> **After the opening of the polls** on the day of the primary, election, or runoff, the registrars or absentee ballot clerks **shall be authorized to open the outer envelope** on which is printed the oath of the elector in such a manner as not to destroy the oath printed thereon; provided, however, that the registrars or absentee ballot clerk shall not be authorized to remove the contents of such outer envelope or to open the inner envelope marked "Official Absentee Ballot," except as otherwise provided in this Code section.

(Emphasis added).

62.

In plain terms, the statute clearly prohibits opening absentee ballots

prior to election day, while the rule authorizes doing so three weeks before

election day. There is no reconciling this conflict. The State Election Board

has authority under O.C.G.A. § 21-2-31 to adopt lawful and legal rules and

regulations, but no authority to promulgate a regulation that is directly

contrary to an unambiguous statute. Rule 183-1-14-0.9-.15 is therefore

plainly and indisputably unlawful.

63.

The State Election Board re-adopted Rule 183-1-14-0.9-.15 on

November 23, 2020 for the upcoming January 2021 runoff election.

## C. Unlawful Audit Procedures

64.

According to Secretary Raffensperger, in the presidential general

election, 2,457,880 votes were cast in Georgia for President Donald J. Trump,

and 2,472,002 votes were cast for Joseph R. Biden, which narrowed in

Donald Trump's favor after the most recent recount.

65.

Secretary Raffensperger declared that for the Hand Recount:

Per the instructions given to counties as they conduct their audit triggered full hand recounts, designated monitors will be given complete access to observe the process from the beginning. While the audit triggered recount must be open to the public and media, designated monitors will be able to observe more closely. The general public and the press will be restricted to a public viewing area. Designated monitors will be able to watch the recount while standing close to the elections' workers conducting the recount.

Political parties are allowed to designate a minimum of two monitors per county at a ratio of one monitor per party for every ten audit boards in a county... Beyond being able to watch to ensure the recount is conducted fairly and securely, the two-person audit boards conducting the hand recount call out the votes as they are recounted , providing monitors and the public an additional way to keep tabs on the process.[10]

---

[10] *Office of Brad Raffensperger, Monitors Closely Observing Audit-Triggered Full Hand Recount: Transparency is Built Into Process*,
https://sos.ga.gov/index.php/elections/monitors_closely_observing_audit-triggered_full_hand_recount_transparency_is_built_into_process

66.

The audit was conducted O.C.G.A. § 21-2-498. This code section requires that audits be completed "in public view" and authorizes the State Board of Elections to promulgate regulations to administer an audit "to ensure that collection of validly cast ballots is complete, accurate and trustworthy throughout the audit."

67.

Plaintiffs can show that Democrat-majority counties provided political parties and candidates, including the Trump Campaign, no meaningful access or actual opportunity to review and assess the validity of mail-in ballots during the pre-canvassing meetings. While in the audit or recount, they witnessed Trump votes being put into Biden piles.

68.

Non-parties Amanda Coleman and Maria Diedrich are two individuals who volunteered to serve as designated monitors for the Donald J. Trump Presidential Campaign, Inc. (the "Trump Campaign") on behalf of the Georgia Republican Party (the "Republican Party") at the Hand Recount. (Attached hereto and incorporated herein as Exhibits 2 and 3), respectively, are true and correct copies of (1) the Affidavit of Amanda Coleman in Support of Plaintiffs' Motion for Temporary Restraining Order (the "Coleman Affidavit"), and (2) the Affidavit of Maria Diedrich in Support of Plaintiffs'

28

Motion for Temporary Restraining Order (the "Diedrich Affidavit"). (See Exh. 11, Coleman Aff.,2; Exh. 12, Diedrich Aff., 2.)

69.

The Affidavits set forth various conduct amounting to federal crimes, clear improprieties, insufficiencies, and improper handling of ballots by County Officials and their employees that Ms. Coleman and Ms. Diedrich personally observed while monitoring the Hand Recount. *(See* Exh. 11, Coleman Aff., 3-10; Exh. 12, Diedrich Aff., 4-14.)

70.

As a result of her observations of the Hand Recount as a Republican Party monitor, Ms. Diedrich declared, "There had been no meaningful way to review or audit any activity" at the Hand Recount. *(See* Exh. 12, Diedrich Aff.,14.)

71.

As a result of their observations of the Hand Recount as Republican Party monitors, Ms. Coleman likewise declared, "There was no way to tell if any counting was accurate or if the activity was proper." (See Exh. 12, Coleman Aff.,10).

72.

On Election Day, when the Republican poll watchers were, for a limited time, present and allowed to observe in various polling locations, they

29

observed and reported numerous instances of election workers failing to follow the statutory mandates relating to two critical requirements, among other issues:

>(1) a voter's right to spoil their mail-in ballot at their polling place on election day and to then vote in-person, and

>(2) the ability for voters to vote provisionally on election day when a mail-in ballot has already been received for them, but when they did not cast those mail-in ballots, who sought to vote in person during early voting but was told she already voted; she emphasized that she had not.  The clerk told her he would add her manually with no explanation as to who or how someone voted using her name. (Attached hereto as Exh. 13, Aff. Ursula Wolf)

73.

Another observer for the ballot recount testified that "*at no time did I witness any Recounter or individual participate in the recount verifying signatures [on mail-in ballots].*" (Attached hereto as Exh. 14, Nicholas Zeher Aff).

74.

In some counties, there was no actual "hand" recounting of the ballots during the Hand Recount, but rather, County Officials and their employees

30

simply conducted another machine count of the *same* ballots. (See. Exh. 9,

10).  That will not reveal the massive fraud of which plaintiffs complain.

75.

A large number of ballots were identical and likely fraudulent.  An

Affiant explains that she observed a batch of utterly pristine ballots:

> 14. Most of the ballots had already been handled; they had been
> written on by people, and the edges were worn. They showed obvious
> use. However, one batch stood out. It was pristine. There was a
> difference in the texture of the paper - it was if they were intended
> for absentee use but had not been used for that purposes. There was
> a difference in the feel.
>
> 15. These different ballots included a slight depressed pre-fold so
> they could be easily folded and unfolded for use in the scanning
> machines. There were no markings on the ballots to show where they
> had com~ from, or where they had been processed. These stood out.
>
> 16. In my 20 years of experience of handling ballots, I observed that
> the markings for the candidates on these ballots were unusually
> uniform, perhaps even with a ballot-marking device.  By my estimate
> in observing these ballots, approximately 98% constituted votes for
> Joe Biden.  I only observed two of these ballots as votes for President
> Donald J. Trump." (See Exh. 15 Attached hereto).

76.

The same Affiant further testified specifically to the breach of the chain

of custody of the voting machines the night before the election stating:

> we typically receive the machines, the ballot marking devices – on
> the Friday before the election, with a chain of custody letter to be
> signed on Sunday, indicating that we had received the machines and
> the counts on the machines when received, and that the machines
> have been sealed.  **In this case, we were asked to sign the chain
> of custody letter on Sunday, even though the machines were
> not delivered until 2:00 AM in the morning on Election Day.**

31

The Milton precinct received its machines at 1:00 AM in the morning on Election Day. This is unacceptable and voting machines should [not] be out of custody prior to an Election Day. *Id.*

## II. EVIDENCE OF FRAUD

### A PATTERN SHOWING THE ABSENCE OF MISTAKE

#### 77.

The stunning pattern of the nature and acts of fraud demonstrate an absence of mistake.

#### 78.

The same Affiant further explained, in sworn testimony, that the breach included: "when we did receive the machines, they were not sealed or locked, the serial numbers were not what were reflected on the related documentation…" *See Id.*

#### 79.

An affiant testified that "While in Henry County, I personally witnessed ballots cast for Donald Trump being placed in the pile for Joseph Biden, I witnessed this happen at table "A".' (See Exh. 14, par. 27).

#### 80.

The Affiant further testified, that "when this was brought to Ms. Pitts attention, it was met with extreme hostility. At no time did I witness any ballot cast for Joseph Biden be placed in the pile for Donald Trump. (See Exh. 14, par. 28).

81.

Another Affiant in the mail-in ballot and absentee ballot recounting process, testified in her sworn affidavit, that "on November 16, 2020 … It was also of particular interest to me to see that signatures were not being verified and there were no corresponding envelopes seen in sight." (See Exh. 10, at Par. 7).

82.

Yet another Affiant, in the recount process, testified that he received push back and a lack of any cooperation and was even threatened as if he did something wrong, when he pointed out the failure to follow the rules with the observers while open mail-in ballot re-counting was occurring, stating:

> "However, as an observer, I observed that the precinct had twelve (12) counting tables, but only one (1) monitor from the Republican Party.  I brought it up to Erica Johnston since the recount rules provided for one (1) monitor from each Party per ten (10) tables or part thereof…"

(See Attached hereto, Exh. 16, Ibrahim Reyes Aff.)

83.

Another Affiant explains a pattern of behavior that is alarming, in his position as an observer in the recount on absentee ballots with barcodes, he testified:

> ***I witnessed two poll workers placing already separated paper machine receipt ballots with barcodes in the Trump tray, placing them in to the Biden tray.*** I also witnessed the same two poll workers putting the already separated paper receipt ballots in

33

the "No Vote" and "Jorgensen" tray, and removing them and putting them inside the Biden tray,  They then took out all of the ballots out of the Biden tray and stacked them on the table, writing on the count ballot sheet.

(See Attached hereto, Exh.17, pars. 4-5, Aff. of Consetta Johson).

84.

Another Affiant, a Democrat, testified in his sworn affidavit, that before he was forced to move back to where he could not see, he had in fact seen "absentee ballots for Trump inserted into Biden's stack, and counted as Biden votes.  This occurred a few times".  (See attached hereto, Exh. 18 at Par. 12, Aff. of Carlos Silva).

85.

Yet another Affiant testified about the lack of process and the hostility only towards the Republican party, which is a violation of the Equal Protection Clause.   He testified:

> I also observed throughout my three days in Atlanta, not once did anyone verify these ballots.  In fact, there was no authentication process in place and no envelopes were observed or allowed to be observed.  I saw hostility towards Republican observers but never towards Democrat observers.  Both were identified by badges.

(See Id., at pars. 13-14).

86.

Another Affiant explained that his ballot was not only not processed in accordance with Election law, he witnessed people reviewing his ballot to decide where to place it, which violated the privacy of his ballot, and when he

tried to report it to a voter fraud line, he never received any contact or

cooperation stating:

> "I voted early on October 12 at the precinct at Lynwood Park …
> Because of irregularities at the polling location, I called the voter
> fraud line to ask why persons were discussing my ballot and
> reviewing it to decide where to place it. When I called the state fraud
> line, I was directed to a worker in the office of the Secretary of
> State…"

(See Attached hereto, Exh. 19, Andrea ONeal Aff, at par. 3).

87.

He further testified that when he was an Observer at the Lithonia

location, he saw many irregularities, and specifically "saw an auditor sort

Biden votes that he collected and sorted into ten ballot stacks, which [the

auditor] did not show anyone." Id. at p. 8.

88.

Another Affiant testified about the use of different paper for ballots,

that would constitute fraud stating:

> I noticed that almost all of the ballots I reviewed were for Biden.
> Many batches went 100% for Biden. I also observed that the
> watermark on at least 3 ballots were solid gray instead of
> transparent, leading me to believe the ballot was counterfeit. I
> challenged this and the Elections Director said it was a legitimate
> ballot and was due to the use of different printers. Many ballots had
> markings for Biden only, and no markings on the rest of the ballot.

(See Attached hereto, Exh. 20, Aff of Debra J. Fisher, at pars. 4, 5, 6).

35

89.

An Affiant testified, that while at the Audit, "**While in Henry County, I personally witnessed ballots cast for Donald Trump being placed in the pile for Joseph Biden.  I witnessed this happen at table "A"**".  (*See* attached hereto as Exh. 22, Kevin Peterford, at par. 29).   Another Affiant testified, that "I witnessed two poll workers placing already separated paper machine receipt ballots with barcodes in the Trump tray, placing them in to the Biden tray. I also witnessed the same two poll workers putting the already separated paper receipt abllots in the "No Vote" and "Jorgensen" tray, and removing them and putting them inside the Biden tray,  They then took out all of the ballots out of the Biden tray and stacked them on the table, writing on the count ballot sheet. (See Exh. 17, Johnson, pars. 4-5).

90.

Another Affiant, a Democrat, testified in his sworn affidavit, before he was forced to move back to where he could not see, he had in fact seen**, "*I also saw absentee ballots for Trump inserted**

*into Biden's stack, and counted as Biden votes. This occurred a few times".*  (See Exh. 18, Par. 12).

91.

A Republican National Committee monitor in Georgia's election recount, Hale Soucie, told an undercover journalist there are individuals counting ballots who have made continuous errors," writes O'Keefe. Project Veritas, Watch:  Latest Project Veritas Video reveals "Multiple Ballots Meant for Trump Went to Biden in Georgia.[11]

## B.   THE VOTING MACHINES, SECRECY SOFTWARE USED BY VOTING MACHINES THROUGHOUT GEORGIA IS CRUCIAL

92.

These violations of federal and state laws impacted the election of November 3, 2020 and set the predicate for the evidence of deliberate fraudulent conduct, manipulation, and lack of mistake that follows. The commonality and statewide nature of these legal violations renders certification of the legal vote untenable and warrants immediate

---

[11]     https://hannity.com/media-room/watch-latest-project-veritas-video-reveals-multiple-ballots-meant-for-trump-went-to-biden-in-georgia/

37

impoundment of voting machines and software used throughout Georgia for expert inspection and retrieval of the software.

93.

An Affiant, who is a network & information cyber-security expert, under sworn testimony explains that after studying the user manual for Dominion Voting Systems Democracy software, he learned that the information about scanned **ballots can be tracked inside the software system for Dominion**:

> (a) When bulk ballot scanning and tabulation begins, the "ImageCast Central" workstation operator will load a batch of ballots into the scanner feed tray and then start the scanning procedure within the software menu. The scanner then begins to scan the ballots which were loaded into the feed tray while the "ImageCast Central" software application tabulates votes in real-time. Information about scanned ballots can be tracked inside the "ImageCast Central" software application.

(*See* attached hereto Exh 22, Declaration of Ronald Watkins, at par. 11).

94.

**Affiant further explains that the central operator can remove or discard batches of votes.** "After all of the ballots loaded into the scanner's feed tray have been through the scanner, the "ImageCast Central" operator will remove the ballots from the tray then have the option to either "Accept Batch" or "Discard Batch" on the scanning menu …. "(*Id.* at par. 8).

38

95.

Affiant further testifies that the Dominion/ Smartmatic user manual itself makes clear that the system allows for threshold settings to be set to mark all ballots as "problem ballots" for *discretionary determinations* on where the vote goes.  It states:

> *During the scanning process, the "ImageCast Central" software will detect how much of a percent coverage of the oval was filled in by the voter. The Dominion customer determines the thresholds of which the oval needs to be covered by a mark in order to qualify as a valid vote. If a ballot has a marginal mark which did not meet the specific thresholds set by the customer, then the ballot is considered a "problem ballot" and may be set aside into a folder named "NotCastImages". Through creatively tweaking the oval coverage threshold settings it should be possible to set thresholds in such a way that a non-trivial amount of ballots are marked "problem ballots" and sent to the "NotCastImages" folder. It is possible for an administrator of the ImageCast Central work station to view all images of scanned ballots which were deemed "problem ballots" by simply navigating via the standard "Windows File Explorer" to the folder named "NotCastImages" which holds ballot scans of "problem ballots". It is possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro operating system.*

*Id*. at pars. 9-10.

96.

The Affiant further explains the vulnerabilities in the system when the copy of the selected ballots that are approved in the Results folder are made

to a flash memory card – and that is connected to a Windows computer

stating:

> It is possible for an administrator of the "ImageCast Central"
> workstation to view and delete any individual ballot scans from the
> "NotCastImages" folder by simply using the standard Windows delete
> and recycle bin functions provided by the Windows 10 Pro operating
> system. … The upload process is just a simple copying of a "Results"
> folder containing vote tallies to a flash memory card connected to the
> "Windows 10 Pro" machine. The copy process uses the standard drag-
> n-drop or copy/paste mechanisms within the ubiquitous "Windows
> File Explorer". While a simple procedure, this process may be error
> prone and **is very vulnerable to malicious administrators**.

*Id*. at par. 11-13 (emphasis supplied).

97.

It was announced on "Monday, [July 29, 2019], [that] Governor Kemp

awarded a contract for 30,000 new voting machines to Dominion Voting

Systems, scrapping the state's 17-year-old electronic voting equipment and

replacing it with touchscreens that print out paper ballots."[12]  Critics are

quoted: "Led by Abrams, Democrats fought the legislation and pointed to

cybersecurity experts who warned it would leave Georgia's elections

susceptible to hacking and tampering." And "Just this week, the Fair Fight

voting rights group started by [Stacy] Abrams launched a television ad

---

[12] *Georgia Buys New Voting Machines for 2020 Presidential Election, by Mark Niesse, the
Atlanta Journal-Constitution, July 30, 2019, https://www.ajc.com/news/state--regional-govt--
politics/georgia-awards-contract-for-new-election-system-dominion-
voting/tHh3V8KZnZivJoVzZRLO4O/*

40

critical of the bill. In a statement Thursday, the group called it "corruption at its worst" and a waste of money on "hackable voting machines."[13]

98.

It was further reported in 2019 that the new Dominion Voting Machines in Georgia "[w]ith Georgia's current voting system, there's **no way to guarantee that electronic ballots accurately reflect the choices of voters because there's no paper backup to verify results**, with it being reported that:

(a)    Recounts are meaningless on the direct-recording electronic voting machines because they simply reproduce the same numbers they originally generated.

(b)    But paper ballots alone won't protect the sanctity of elections on the new touchscreens, called ballot-marking devices.

(c)    The new election system depends on voters to verify the printed text of their choices on their ballots, a step that many voters might not take. The State Election Board hasn't yet created regulations for how recounts and audits will be conducted. And paper ballots embed selections in bar codes that are only readable by scanning machines, leaving Georgians uncertain whether the bar codes match their votes.[14]

---

[13] *Georgia Governor Inks Law to Replace Voting Machines, The Atlanta Journal-Constitution, AJC News Now, by Greg Bluestein and Mark Niesse, June 14, 2019; Credit: Copyright 2019 The Associated Press, June 2019*

**i.** *As part of the scheme and artifice to defraud the plaintiffs, the candidates and the voters of undiminished and unaltered voting results in a free and legal election, the Defendants and other persons known and unknown committed the following violations of law:*

50 U.S.C. § 20701 requires the retention and preservation of records

and papers by officers of elections under penalty of fine and imprisonment:

**§ 20701. Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation**

Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, **all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election,** except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

50 U.S.C.§ 20701.

99.

In the primaries it was confirmed that, "The rapid introduction of new

technologies and processes in state voting systems heightens the risk of

foreign interference and insider tampering.  That's true even if simple human error or local maneuvering for political advantage are more likely threats[15].

100.

A Penn Wharton Study from 2016 concluded that "Voters and their representatives in government, often prompted by news of high-profile voting problems, also have raised concerns about the reliability and integrity of the voting process, and have increasingly called for the use of modern technology such as laptops and tablets to improve convenience."[16]

101.

As evidence of the defects or features of the Dominion Democracy Suite, as described above, the same Dominion Democracy Suite was denied certification in Texas by the Secretary of State on January 24, 2020 specifically because of a **lack of evidence of efficiency and accuracy and to be safe from fraud or unauthorized manipulation.**[17]

---

[15] *See Threats to Georgia Elections Loom Despite New Paper Ballot Voting, By Mark Niesse, The Atlanta Journal-Constitution and (The AP, Vote-by-Mail worries: A leaky pipeline in many states, August 8, 2020).*

[16] Penn Wharton Study by Matt Caufield, The Business of Voting, July 2018.

[17] Attached hereto, Exh. 23, copy of Report of Review of Dominion Voting Systems Democracy Suite 5.5-A Elections Division by the Secretary of State's office, Elections Division, January 24, 2020.

102.

Plaintiffs have since learned that the "glitches" in the Dominion system–that have the uniform effect of taking votes from Trump and shifting them to Biden—have been widely reported in the press and confirmed by the analysis of independent experts.

103.

Plaintiffs can show, through expert and fact witnesses that:

**c.     Dominion/ Smartmatic Systems Have Massive End User Vulnerabilities.**

1.  Users on the ground have full admin privileges to machines and software.  Having been created to "rig" elections, the Dominion system is designed to facilitate vulnerability and allow a select few to determine which votes will be counted in any election.  Workers were responsible for moving ballot data from polling place to the collector's office and inputting it into the correct folder.  Any anomaly, such as pen drips or bleeds, results in a ballot being rejected.  It is then handed over to a poll worker to analyze and decide if it should count. This creates massive opportunity for purely discretionary and improper vote "adjudication."

2.  Affiant witness (name redacted for security reasons[18]), in his sworn testimony explains he was selected for the national security guard detail of the President of Venezuela, and that he witnessed the creation of Smartmatic for the purpose of election vote manipulation to insure Venezuelan dictator Hugo Chavez never lost an election and he saw it work. Id.

    "The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against

persons running the Venezuelan government to votes in their favor in order to maintain control of the government."

(*See* Exh. 2, pars. 6, 9, 10).

104.

Smartmatic's incorporators and inventors have backgrounds evidencing their foreign connections, including Venezuela and Serbia, specifically its identified inventors:

Applicant: SMARTMATIC, CORP.

Inventors: Lino Iglesias, Roger Pinate, Antonio Mugica, Paul Babic, Jeffrey Naveda, Dany Farina, Rodrigo Meneses, Salvador Ponticelli, Gisela Goncalves, Yrem Caruso.[19]

105.

The presence of Smartmatic in the United States—owned by foreign nationals, and Dominion, a Canadian company with its offices such as the Office of General Counsel in Germany, would have to be approved by CFIUS. CFIUS was created in 1988 by the Exon-Florio Amendment to the Defense Production Act of 1950. CFIUS' authorizing statute was amended by the Foreign Investment and National Security Act of 2007 (FINSA).

As amended, section 721 of the DPA directs "the President, acting through [CFIUS]," to review a **"covered transaction to determine the effects of the transaction on the national security of the United States."** 50 U.S.C. app. § 2170(b)(1)(A). Section 721 defines

_____

*19 https://patents.justia.com/assignee/smartmatic-corp*

45

a covered transaction as "any merger, acquisition, or takeover …, by or with any foreign person which could result in foreign control of any person engaged in interstate commerce in the United States." Id. § 2170(a)(3). *Ralls Corp. v. Comm. on Foreign Inv.*, 758 F.3d 296, 302, 411 U.S. App. D.C. 105, 111, (2014). Review of covered transactions under section 721 begins with CFIUS. As noted, CFIUS is chaired by the Treasury Secretary and its members include the heads of various federal agencies and other high-ranking Government officials with foreign policy, national security and economic responsibilities.

106.

Then Congresswoman Carolyn Maloney wrote October 6, 2006 to the

Secretary of Treasury, Henry M. Paulson, Jr., Objecting to approval of

Dominion/Smartmatic by CFIUS because of its corrupt Venezuelan

origination, ownership and control. (See attached hereto as Exh. 24, Carolyn

Maloney Letter of October 6, 2006). Our own government has long known of

this foreign interference on our most important right to vote, and it had

either responded with incompetence, negligence, willful blindness, or abject

corruption. In every CFIUS case, there are two TS/SCI reports generated.

One by the ODNI on the threat and one by DHS on risk to critical

infrastructure. Smartmatic was a known problem when it was nonetheless

approved by CFIUS.

107.

The Wall Street Journal in 2006 did an investigative piece and found

that, "Smartmatic came to prominence in 2004 when its machines were used

in an election to recall President Chávez, which Mr. Chávez won handily --
and which the Venezuelan opposition said was riddled with fraud.
Smartmatic put together a consortium to conduct the recall elections,
including a company called Bizta Corp., in which Smartmatic owners had a
large stake. For a time, the Venezuelan government had a 28% stake in Bizta
in exchange for a loan.'[20] …"Bizta paid off the loan in 2004, and Smartmatic
bought the company the following year. But accusations of Chávez
government control of Smartmatic never ended, especially since Smartmatic
scrapped a simple corporate structure, in which it was based in the U.S. with
a Venezuelan subsidiary, for a far more complex arrangement. The company
said it made the change for tax reasons, but critics, including Rep. Carolyn
Maloney (D., N.Y.) and TV journalist Lou Dobbs, pounded the company for
alleged links to the Chávez regime. *Id.* Since its purchase by Smartmatic,
Sequoia's sales have risen sharply to a projected $200 million in 2006, said
Smartmatic's chief executive, Anthony Mugica." *Id.*

108.

Indeed, Mr. Cobucci testified, through his sworn affidavit, that he born
in Venezuela, is cousins with Antonio ('Anthony') Mugica, and he has

---

[20] *See WSJ.com, Smartmatic to Sell U.S. Unit, End Probe into Venezuelan Links, by Bob Davis,*
*12/22/2006,* h*ttps://www.wsj.com/articles/SB116674617078557263*

personal knowledge of the fact that Anthony Mugica incorporated Smartmatic in the U.S. in 2000 with other family members in Venezuela listed as owners. He also has personal knowledge that Anthony Mugica manipulated Smartmatic to ensure the election for Chavez in the 2004 Referendum in Venezuela. He also testified, through his sworn affidavit, that Anthony Mugica received tens of millions of dollars from 2003- 2015 from the Venezuelan government to ensure Smartmatic technology would be implemented around the world, including in the U.S. (See attached hereto, Exh. 25, Juan Carlos Cobucci Aff.)

109.

Another Affiant witness testifies that in Venezuela, she was in an official position related to elections and witnessed manipulations of petitions to prevent a removal of President Chavez and because she protested, she was summarily dismissed. Corroborating the testimony of our secret witness, and our witness Mr. Cobucci, cousin of Anthony Mugica, who began Smartmatic, and this witness explains the vulnerabilities of the electronic voting system and Smartmatica to such manipulations. (See Exh. 3, Diaz Cardozo Aff).

110.

Specific vulnerabilities of the systems in question that have been documented or reported include:

48

a. Barcodes can override the voters' vote: As one University of California, Berkeley study shows, "In all three of these machines [including Dominion Voting Systems] the ballot marking printer is in the same paper path as the mechanism to deposit marked ballots into an attached ballot box. This opens up a very serious security vulnerability: the voting machine can make the paper ballot (to add votes or spoil already-cast votes) after the last time the voter sees the paper, and then deposit that marked ballot into the ballot box without the possibility of detection." (See Exh. 7). [21]

b. Voting machines were able to be connected to the internet by way of laptops that were obviously internet accessible. If one laptop was connected to the internet, the entire precinct was compromised.

c. We … discovered that at least some jurisdictions were not aware that their systems were online," said Kevin Skoglund, an independent security consultant who conducted the research with nine others, all of them long-time security professionals and academics with expertise in election security. Vice. August 2019. [22]

---

[21] *Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters,* Andrew W. Appel, Richard T. DeMillo, University of California, Berkeley, 12/27/2019.
[22] *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials, Motherboard Tech by Vice, by Kim Zetter, August 8, 2019,* https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems-have-been-left-exposed-online-despite-official-denials

d. October 6, 2006 – Congresswoman Carolyn Maloney called on Secretary of Treasury Henry Paulson to conduct an investigation into Smartmatic based on its foreign ownership and ties to Venezuela. (See Exh. 24)

e. Congresswoman Maloney wrote that "It is undisputed that Smartmatic is foreign owned and it has acquired Sequoia … Smartmatica now acknowledged that Antonio Mugica, a Venezuelan businessman has a controlling interest in Smartmatica, but the company has not revealed who all other Smartmatic owners are." *Id.*

f. Dominion "got into trouble" with several subsidiaries it used over alleged cases of fraud. One subsidiary is Smartmatic, a company "that has played a significant role in the U.S. market over the last decade," according to a report published by UK-based AccessWire[23].

g. Litigation over Smartmatic "glitches" alleges they impacted the 2010 and 2013 mid-term elections in the Philippines, raising questions of cheating and fraud. An independent review of the source codes used in the machines found multiple problems, which concluded, "The software

---

[23] *Voting Technology Companies in the U.S. – Their Histories and Present Contributions, Access Wire, August 10, 2017, https://www.accesswire.com/471912/Voting-Technology-Companies-in-the-US--Their-Histories.*

inventory provided by Smartmatic is inadequate, … which brings into question the software credibility…"[24]

h. Dominion acquired Sequoia Voting Systems as well as Premier Election Solutions (formerly part of Diebold, which sold Premier to ES&S in 2009, until antitrust issues forced ES&S to sell Premier, which then was acquired by Dominion).[25].

i. Dominion entered into a 2009 contract with Smartmatic and provided Smartmatic with the PCOS machines (optical scanners) that were used in the 2010 Philippine election—the biggest automated election run by a private company.  The international community hailed the automation of that first election in the Philippines.[26] The results' transmission reached 90% of votes four hours after polls closed and Filipinos knew for the first time who would be their new president on Election Day. In keeping with local election law requirements, Smartmatic and Dominion were required to provide the source code of

---

[24]  *Smartmatic-TIM running out of time to fix glitches, ABS-CBN News, May 4, 2010* https://news.abs-cbn.com/nation/05/04/10/smartmatic-tim-running-out-time-fix-glitches
[25] *The Business of Voting*, Penn Wharton, Caufield, p. 16.
[26] *Smartmatic-TIM running out of time to fix glitches, ABS-CBN News, May 4, 2010* https://news.abs-cbn.com/nation/05/04/10/smartmatic-tim-running-out-time-fix-glitches

the voting machines prior to elections so that it could be independently verified.[27]

j.  In late December of 2019, three Democrat Senators, Warren, Klobuchar, Wyden, and House Member Mark Pocan wrote about their ***'particularized concerns that secretive & "trouble -plagued companies'*** " "***have long skimped on security in favor of convenience***," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S."  (See attached hereto as Exh. 26, copy of Senator Warren, Klobuchar, Wyden's December 6, 2019 letter).

k.  Senator Ron Wyden (D-Oregon) said the findings [insecurity of voting systems] are "yet another damning indictment of the profiteering election vendors, who care more about the bottom line than protecting our democracy." It's also an indictment, he said, "of the notion that important cybersecurity decisions should be left entirely to county

---

[27] Presumably the machiens were not altered following submission of the code.  LONDON, ENGLAND / ACCESSWIRE / August 10, 2017, *Voting Technology Companies in the U.S. - Their Histories and Present Contributions*

election offices, many of whom do not employ a single cybersecurity specialist."[28]

111.

An analysis of the Dominion software system by a former US Military Intelligence expert concludes that the system and software have been accessible and were certainly compromised by rogue actors, such as Iran and China. By using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, Dominion neglectfully allowed foreign adversaries to access data and intentionally provided access to their infrastructure in order to monitor and manipulate elections, including the most recent one in 2020. (See Exh. 7).

112.

An expert witness in pending litigation in the United States District Court, Northern District Court of Georgia, Atlanta Div., 17-cv-02989 specifically testified to the acute security vulnerabilities, among other facts, by declaration filed on October 4, 2020, (See Exh. 4B, Document 959-4

---

[28] *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials, Motherboard Tech by Vice, by Kim Zetter, August 8, 2019, https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems-have-been-left-exposed-online-despite-official-denials*

attached hereto, paragraph. 18 and 20 of p. 28, Exh. 4, Hursti Declaration).

wherein he testified or found:

1)       The failure of the Dominion software "*to meet the methods and processes for national standards for managing voting system problems and should not be accepted for use in a public election under any circumstances*."

2)       In Hursti's declaration he explained that "There is evidence of remote access and remote troubleshooting which presents a grave security implication and certified identified vulnerabilities should be considered an "extreme security risk." *Id*. Hari Hursti also explained that USB drives with vote tally information were observed to be removed from the presence of poll watchers during a recent election. *Id*. The fact that there are no controls of the USB drives was seen recently seen the lack of physical security and compliance with professional standards, " in one Georgia County, where it is reported that 3,300 votes were found on memory sticks not loaded plus in Floyd county, another 2,600 were unscanned, and the "found votes" reduced Biden's lead over Donald Trump[29].

(a)       In the prior case against Dominion, supra, further implicating the secrecy behind the software used in Dominion Systems,

---

[29] *Recount find thousands of Georgia votes*, Atlanta Journal-Constitution by Mark Niesse and David Wickert,11/19/20.  https://www.ajc.com/politics/recount-finds-thousands-of-georgia-votes-missing-from-initial-counts/ERDRNXPH3REQTM4SOINPSEP72M/

54

Dr. Eric Coomer, a Vice President of Dominion Voting Systems,

testified that even he was not sure of what testing solutions were

available to test problems or how that was done, " *I have got to be*

*honest, we might be a little bit out of my bounds of understanding the*

*rules and regulations…* and in response to a question on testing for

voting systems problems in relation to issues identified in 2 counties,

he explained that "*Your Honor, I'm not sure of the complete test plan…*

*Again Pro V&V themselves determine what test plan in necessary based*

*on their analysis of the code itself*." (*Id.* at Document 959-4, pages 53,

62 L.25- p. 63 L3).

113.

Hursti stated within said Declaration:

"The security risks outlined above – operating system risks, the
failure to harden the computers, performing operations directly on
the operating systems, lax control of memory cards, lack of
procedures, and potential remote access are extreme and destroy the
credibility of the tabulations and output of the reports coming from a
voting system."

(See Paragraph 49 of Hursti Declaration).

114.

Rather than engaging in an open and transparent process to give

credibility to Georgia's brand-new voting system, the election processes were

55

hidden during the receipt, review, opening, and tabulation of those votes in direct contravention of Georgia's Election Code and federal law.

115.

The House of Representatives passed H.R. 2722 in an attempt to address these very risks identified by Hursti, on June 27, 2019:

> *This bill addresses election security through grant programs and requirements for voting systems and paper ballots.*
>
> *The bill establishes requirements for voting systems, including that systems (1) use individual, durable, voter-verified paper ballots; (2) make a voter's marked ballot available for inspection and verification by the voter before the vote is cast; (3) ensure that individuals with disabilities are given an equivalent opportunity to vote, including with privacy and independence, in a manner that produces a voter-verified paper ballot; (4) be manufactured in the United States; and (5) meet specified cybersecurity requirements, including the prohibition of the connection of a voting system to the internet.*

## ADDITIONAL SPECIFIC FRAUD

116.

On November 4, 2020, the Georgia GOP Chairman issued the following statement:

> *"Let me repeat.  Fulton County elections officials told the media and our observers that they were shutting down the tabulation center at State Farm Arena at 10:30 p.m. on election night to continue counting ballots in secret until 1:00 a.m. [30]*

56

117.

It was widely reported that "As of 7 p.m. on Wednesday Fulton County Elections officials said 30,000 absentee ballots were not processed due to a pipe burst."[31] Officials reassured voters that none of the ballots were damaged and the water was quickly cleaned up.  But the emergency delayed officials from processing ballots between 5:30 a.m. and 9:30 a.m.  Officials say they continued to count beginning at 8:30 a.m. Wednesday.  The statement from Fulton County continues:

> "Tonight, Fulton County will report results for approximately 86,000 absentee ballots, as well as Election Day and Early Voting results. These represent the vast majority of ballots cast within Fulton County.

> "As planned, Fulton County will continue to tabulate the remainder of absentee ballots over the next two days. Absentee ballot processing requires that each ballot is opened, signatures verified, and ballots scanned.  This is a labor-intensive process that takes longer to tabulate than other forms of voting. Fulton County did not anticipate having all absentee ballots processed on Election Day."  Officials said they will work to ensure every vote is counted and all laws and regulations are followed.[32]

---

[31] "4,000 remaining absentee ballots being counted in Fulton County", Fox 5 Atlanta, November 3, 2020,  https://www.fox5atlanta.com/news/pipe-burst-at-state-farm-arena-delays-absentee-ballot-processing
[32]  4,000 remaining absentee ballots being counted in Fulton County, Fox 5 Atlanta, November 3, 2020,  https://www.fox5atlanta.com/news/pipe-burst-at-state-farm-arena-delays-absentee-ballot-processing

118.

Plaintiffs have learned that the representation about "a water leak affecting the room where absentee ballots were counted" was not true. The only water leak that needed repairs at State Farm Arena from November 3 – November 5 was a toilet overflow that occurred earlier on November 3.  It had nothing to do with a room with ballot counting, but the false water break representation led to "everyone being sent home."  Nonetheless, first six (6) people, then three (3) people stayed until 1:05 a.m. working on the computers.

119.

An Affiant recounts how she was present at State Farm Arena on November 3, and saw election workers remaining behind after people were told to leave.  (See Exh. 28, Affidavit of Mitchell Harrison; Exh. 29, Affid. of Michelle Branton)

120.

Plaintiffs have also learned through several reports that in 2010 Eric Coomer joined Dominion as Vice President of U.S. Engineering.  According to his bio, Coomer graduated from the University of California, Berkeley with a Ph.D. in Nuclear Physics. Eric Coomer was later promoted to Voting Systems Officer of Strategy and Security although Coomer has since been removed from the Dominion page of directors.  Dominion altered its website after

Colorado resident Joe Oltmann disclosed that as a reporter he infiltrated

ANTIFA, a domestic terrorist organization where he recorded Eric Coomer

representing: "Don't worry. Trump won't win the election, we fixed that." – as

well as social media posts with violence threatened against President Trump.

(See Joe Oltmann interview with Michelle Malkin dated November 13, 2020

which contains copies of Eric Coomer's recording and tweets).[33]

121.

While the bedrock of American elections has been transparency, almost

every crucial aspect of Georgia's November 3, 2020, General Election was

shrouded in secrecy, rife with "errors," and permeated with anomalies so

egregious as to render the results incapable of certification.

**MULTIPLE EXPERT REPORTS AND STATISTICAL ANALYSES PROVE HUNDREDS OF THOUSANDS OF VOTES WERE LOST OR SHIFTED THAT COST PRESIDENT TRUMP AND THE REPUBLICAN CANDIDATES OF CONGRESSIONAL DISTRICTS 6 AND 7 THEIR RACES.**

122.

As evidenced by numerous public reports, expert reports, and witness

statements, Defendants egregious misconduct has included ignoring

legislative mandates concerning mail-in and ordinary ballots and led to

---

33 *Malkin Live: Election Update, Interview of Joe Oltmann,* by Michelle Malkin, November 13, 2020, *available at:*
https://www.youtube.com/watch?v=dh1X4s9HuLo&fbclid=IwAR2EaJc1M9RT3DaUraAjsycM 0uPKB3uM_-MhH6SMeGrwNyJ3vNmlcTsHxF4

59

disenfranchisement of an enormous number of Georgia voters.  Plaintiffs

experts can show that, consistent with the above specific misrepresentations,

analysis of voting data reveals the following:

(a)      Regarding uncounted mail ballots, based on evidence

gathered by Matt Braynard in the form of recorded calls and

declarations of voters, and analyzed by Plaintiff's expert, Williams M.

Briggs, PhD, shows, based on a statistically significant sample, **that**

**the total number of mail ballots that voters mailed in, but were**

**never counted, have a 95% likelihood of falling between 31,559**

**and 38,886 total lost votes.**  This range exceeds the margin of loss of

President Trump of 12,670 votes by at least 18,889 lost votes and by as

many as 26,196 lost votes. (See Exh. 1, Dr. Briggs' Report, with

attachments).

(b)      Plaintiff's expert also finds that **voters received tens of**

**thousands of ballots that they never requested.**    (See Exh. 1).

Specifically, Dr. Briggs found that in the state of Georgia, based on a

statistically significant sample, the expected amount of persons that

received an absentee ballot that they did not request ranges from

16,938 to 22,771.  **This range exceeds the margin of loss of**

**President Trump by 12,670 votes by at least 4,268 unlawful requests and by as many as 10,101 unlawful requests.** *Id.*

(c)     This widespread pattern, as reflected within the population of unreturned ballots analyzed by Dr. Briggs, reveals the unavoidable reality that, in addition to the calculations herein, third parties voted an untold number of unlawfully acquired absentee or mail-in ballots, which would not be in the database of unreturned ballots analyzed here.  See O.G.C.A. 21-2-522. **These unlawfully voted ballots prohibited properly registered persons from voting and reveal a pattern of widespread fraud down ballot as well.**

(d)     **Further, as calculated by Matt Braynard, there exists clear evidence of 20,311 absentee or early voters in Georgia that voted while registered as having moved out of state.**  (See Id., attachment to report).  Specifically, these persons were showing on the National Change of Address Database (NCOA) as having moved, or as having filed subsequent voter registration in another state also as evidence that they moved and even potentially voted in another state. The 20,311 votes by persons documented as having moved exceeds the margin by which Donald Trump lost the election by 7,641 votes.

(e)     Applying *pro-rata* the above calculations separately to Cobb

County based on the number of unreturned ballots, a range of 1,255

and 1,687 ballots ordered by 3rd parties and a range of 2,338 and 2,897

lost mail ballots, plus 10,684 voters documented in the NCOA as

having moved, **for a combined minimum of 14,276 missing and**

**unlawful ballots, and maximum of 15,250 missing and unlawful**

**ballots, which exceeds the statewide Presidential race total**

**margin by a range of as few as 1,606 ballots and as many as**

**2,580 in the County of Cobb alone impacting the Cobb County**

**Republican Party ("Cobb County Republicans").**

123.

As seen from the **expert analysis of Eric Quinnell**, mathematical

anomalies further support these findings, when in various districts within

Fulton County such as vote gains that exceed reasonable expectations

when compared to 2016, and a failure of gains to be normally distributed

but instead shifting substantially toward the tail of the distribution in

what is known as a platykurtic distribution.  Dr. Quinell identifies

numerous anomalies such as votes to Biden in excess of 2016 exceed the

registrations that are in excess of 2016.  Ultimately, he identifies the

counties in order of their excess performance over what would have fit in a

normal distribution of voting gains, revealing a list of the most anomalous counties down to the least. These various anomalies provide evidence of voting irregularities. (See Exh.27, Declaration of Eric Quinnell, with attachments).

124.

In sum, with the expert analysis of William M. Briggs PhD based on recorded calls and declarations, the extent of missing AND unlawfully requested ballots create substantial evidence that the mail ballot system has fundamentally failed to provide a fair voting mechanism. In short, tens of thousands of votes did not count while the pattern of fraud makes clear that tens of thousands were improperly counted. This margin of victory in the election for Mr. Biden was only 12,670 and cannot withstand most of these criticisms individually and certainly not in aggregate.

125.

Cobb county, based on lost votes, unlawfully requested votes and NCOA data on these facts alone would consume more than the entire margin of the statewide difference in the Presidential race. These election results must be reversed.

126.

Applying *pro-rata* the above calculations separately to Cobb County based on the number of unreturned ballots, a range of 1,255 and 1,687 ballots

63

ordered by 3ʳᵈ parties and a range of 2,338 and 2,897 lost mail ballots, plus 10,684 voters documented in the NCOA as having moved, **for a combined minimum of 14,276 missing and unlawful ballots, and maximum of 15,250 missing and unlawful ballots, which exceeds the statewide Presidential race total margin by a range of as few as 1,606 ballots and as many as 2,580 in the County of Cobb alone impacting the Cobb County Republican Party ("Cobb County Republicans").** (See Exh. 1).

127.

Mr. Braynard also found a pattern in Georgia of voters registered at totally fraudulent residence addresses, including shopping centers, mail drop stores and other non-residential facilities[34].

128.

In sum, with the expert analysis of William M. Briggs PhD based on extensive investigation, recorded calls and declarations collected by Matt Braynard, (See attachments to Exh. 1, Briggs' report) the extent of missing and unlawfully requested ballots create substantial evidence that the mail ballot system has fundamentally failed to provide a fair voting mechanism. In

---

[34] Matt Braynard, https://twitter.com/MattBraynard/status/1331324173910761476; https://twitter.com/MattBraynard/status/1331299873556086787?s=20; (a) https://twitter.com/MattBraynard/status/1331299873556086787?s=20

short, tens of thousands of votes did not count while the pattern of fraud and mathematical anomalies that are impossible absent malign human agency makes clear that tens of thousands were improperly counted. This margin of victory in the election for Mr. Biden was only 12,670 and cannot withstand most of these criticisms individually and certainly not in aggregate.

129.

Cobb county, based on lost votes, unlawfully requested votes and NCOA data on these facts alone would consume more than the entire margin of the statewide difference in the Presidential race.

130.

**Russell Ramsland confirms that data breaches in the Dominion software permitted rogue actors to penetrate and manipulate the software during the recent general election. He further concludes that at least 96,600 mail-in ballots were illegally counted as they were not cast by legal voters.**

131.

In sum, as set forth above, for a host of independent reasons, the Georgia certified election results concluding that Joe Biden received 12,670 more votes that President Donald Trump must be set aside.

## COUNT I

### DEFENDANTS VIOLATED THE ELECTIONS CLAUSE AND 42 U.S.C. § 1983

132.

Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

133.

The Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President. Art. II, § 1, cl. 2 (emphasis added). Likewise, the Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." Art. I, § 4, cl. 1 (emphasis added).

134.

The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley*, 285 U.S. at 193. Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015).

135.

Defendants are not part of the General Assembly and cannot exercise legislative power. Rather, Defendants' power is limited to "tak[ing] care that the laws be faithfully executed." Pa. Const. Art. IV, § 2. Because the United States Constitution reserves for the General Assembly the power to set the time, place, and manner of holding elections for the President and Congress, county boards of elections and state executive officers have no authority to unilaterally exercise that power, much less to hold them in ways that conflict with existing legislation.

136.

Defendants are not the legislature, and their unilateral decision to create a "cure procedure" violates the Electors and Elections Clauses of the United States Constitution.

137.

The Secretary of State and the State Election Board are not the legislature, and their decision to permit early processing of absentee ballots in direct violation of the unambiguous requirements of O.C.G.A. § 21-2-386(a)(2) violates the Electors and Elections Clauses of the United States Constitution.

138.

Many Affiants testified to many legal infractions in the voting process,

including specifically switching absentee ballots or mail-in ballots for Trump

to Biden.  Even a Democrat testified in his sworn affidavit that before he was

forced to move back to where he could not see, he had in fact seen, "*I also saw*

*absentee ballots for Trump inserted into Biden's stack, and counted as Biden*

*votes.  This occurred a few times*".  (See Exh. 18, Par. 12).

139.

Plaintiff's expert also finds that voters received tens of thousands of

ballots that they never requested. (See Exh. 1, Dr. Briggs' Report).

Specifically, Dr. Briggs found that in the state of Georgia, based on a

statistically significant sample, the expected amount of persons that received

an absentee ballot that they did not request one ranges from 16,938 to

22,771.   This range exceeds the margin of loss of President Trump by 12,670

votes by at least 4,268 unlawful requests and by as many as 10,101 unlawful

requests.

140.

This widespread pattern, as reflected within the population of

unreturned ballots analyzed by Dr. Briggs, reveals the unavoidable reality

that, in addition to the calculations herein, third parties voted an untold

number of unlawfully acquired absentee or mail-in ballots, which would not

be in the database of unreturned ballots analyzed here. *See* O.G.C.A. 21-2-522. These unlawfully voted ballots prohibited properly registered persons from voting and reveal a pattern of widespread fraud.

141.

Further, as shown by data collected by Matt Braynard, there exists clear evidence of 20,311 absentee or early voters in Georgia that voted while registered as having moved out of state. Specifically, these persons were showing on the National Change of Address Database (NCOA) as having moved, or as having filed subsequent voter registration in another state also as evidence that they moved and even potentially voted in another state. The 20,311 votes by persons documented as having moved exceeds the margin by which Donald Trump lost the election by 7,641 votes.

142.

Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted. Defendants have acted and, unless enjoined, will act under color of state law to violate the Elections Clauses of the Constitution. Accordingly, the results for President and Congress in the November 3, 2020 election must be set aside. The results are infected with Constitutional violations.

## COUNT II

69

## THE SECRETARY OF STATE AND GEORGIA COUNTIES VIOLATED THE FOURTEENTH AMENDMENT U.S. CONST. AMEND. XIV, 42 U.S.C. § 1983

### DENIAL OF EQUAL PROTECTION

### INVALID ENACTMENT OF REGULATIONS AFFECTING OBSERVATION AND MONITORING OF THE ELECTION

143.

Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

144.

The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. *See also Bush v. Gore*, 531 U.S. 98, 104 (2000)(having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over the value of another's). *Harper v. Virginia Board of Elections*, 383 U.S. 663, 665 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

70

145.

The Court has held that to ensure equal protection, a "problem inheres in the absence of specific standards to ensure its equal application. The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude, necessary." *Bush v. Gore*, 531 U.S. 98, 106, 121 S. Ct. 525, 530, 148 L. Ed. 2d 388 (2000).

146.

The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights. The requirement of equal protection is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

147.

In statewide and federal elections conducted in the State of Georgia, including without limitation the November 3, 2020, General Election, all candidates, political parties, and voters, including without limitation Plaintiffs, have a vested interest in being present and having meaningful access to observe and monitor the electoral process in each County to ensure that it is properly administered in every election district and otherwise free, fair, and transparent.

148.

Moreover, through its provisions involving watchers and representatives, the Georgia Election Code ensures that all candidates and political parties in each County, including the Trump Campaign, have meaningful access to observe and monitor the electoral process to ensure that it is properly administered in every election district and otherwise free, fair, and transparent. *See, e.g.* In plain terms, the statute clearly prohibits opening absentee ballots prior to election day, while the rule authorizes doing so three weeks before election day. There is no reconciling this conflict. The State Election Board has authority under O.C.G.A. § 21-2-31 to adopt lawful and legal rules and regulations, but no authority to promulgate a regulation that is directly contrary to an unambiguous statute. Rule 183-1-14-0.9-.15 is therefore plainly and indisputably unlawful.

Plaintiffs also bring this action under Georgia law, O.C.G.A. § 21-2-522, Grounds for Contest:

149.

A result of a primary or election may be contested on one or more of the following grounds:

150.

(1) Misconduct, fraud, or irregularity by any primary or election official or officials sufficient to change or place in doubt the result;

(2) When the defendant is ineligible for the nomination or office in dispute;

(3) When illegal votes have been received or legal votes rejected at the polls sufficient to change or place in doubt the result;

(4) For any error in counting the votes or declaring the result of the primary or election, if such error would change the result; or

(5) For any other cause which shows that another was the person legally nominated, elected, or eligible to compete in a run-off primary or election. O.C.G.A. § 21-2-522.

151.

Several affiants testified to the improper procedures with absentee ballots processing, with the lack of auditable procedures with the logs in the computer systems, which violates Georgia law, and federal election law. See

73

also, 50 U.S.C. § 20701 requires the retention and preservation of records and

papers by officers of elections under penalty of fine and imprisonment.

152.

The State Election Board re-adopted Rule 183-1-14-0.9-.15 on

November 23, 2020 for the upcoming January 2021 runoff election.

153.

A large number of ballots were identical and likely fraudulent.  An

Affiant explains that she observed a batch of utterly pristine ballots:

> 14. Most of the ballots had already been handled; they had been written on by people, and the edges were worn. They showed obvious use. However, one batch stood out. It was pristine. There was a difference in the texture of the paper - it was if they were intended for absentee use but had not been used for that purposes. There was a difference in the feel.
>
> 15. These different ballots included a slight depressed pre-fold so they could be easily folded and unfolded for use in the scanning machines. There were no markings on the ballots to show where they had com~ from, or where they had been processed. These stood out.
>
> 16. In my 20 years of experience of handling ballots, I observed that the markings for the candidates on these ballots were unusually uniform, perhaps even with a ballot-marking device.  By my estimate in observing these ballots, approximately 98% constituted votes for Joe Biden.  I only observed two of these ballots as votes for President Donald J. Trump."  (See Exh. 15).

154.

The same Affiant further testified specifically to the breach of the chain

of custody of the voting machines the night before the election stating:

we typically receive the machines, the ballot marking devices – on the Friday before the election, with a chain of custody letter to be signed on Sunday, indicating that we had received the machines and the counts on the machines when received, and that the machines have been sealed. **In this case, we were asked to sign the chain of custody letter on Sunday, even though the machines were not delivered until 2:00 AM in the morning on Election Day.** The Milton precinct received its machines at 1:00 AM in the morning on Election Day.  This is unacceptable and voting machines should [not] be out of custody prior to an Election Day. *Id*.

155.

 Defendants have a duty to treat the voting citizens in each County  in the same manner as the citizens in other counties in Georgia.

156.

As set forth in Count I above, Defendants failed to comply with the requirements of the Georgia Election Code and thereby diluted the lawful ballots of the Plaintiffs and of other Georgia voters and electors in violation of the United States Constitution guarantee of Equal Protection.

157.

Specifically, Defendants denied the plaintiffs equal protection of the law and their equal rights to meaningful access to observe and monitor the electoral process enjoyed by citizens in other Georgia Counties by:

(a) mandating that representatives at the pre-canvass and canvass of all absentee and mail-ballots be either Georgia barred

75

attorneys or qualified registered electors of the county in which
they sought to observe and monitor;

(b) not allowing watchers and representatives to visibly see and
review all envelopes containing official absentee and mail-in
ballots either at or before they were opened and/or when such
ballots were counted and recorded; and

(c) allowing the use of Dominion Democracy Suite software and
devices, which failed to meet the Dominion Certification Report's
conditions for certification.

158.

Instead, Defendants refused to credential all of the Trump Republican's
submitted watchers and representatives and/or kept Trump Campaign's
watchers and representatives by security and metal barricades from the
areas where the inspection, opening, and counting of absentee and mail-in
ballots were taking place. Consequently, Defendants created a system
whereby it was physically impossible for the candidates and political parties
to view the ballots and verify that illegally cast ballots were not opened and
counted

159.

Many Affiants testified to switching absentee ballots or mail-in ballots
for Trump to Biden, including a Democrat. He testified in his sworn
affidavit, that before he was forced to move back to where he could not see, he

76

had in fact seen, "absentee ballots for Trump inserted into Biden's stack, and counted as Biden votes. This occurred a few times". (See Exh. 18, Par. 12).

160.

Other Georgia county boards of elections provided watchers and representatives of candidates and political parties, including without limitation watchers and representatives of the Republicans and the Trump Campaign, with appropriate access to view the absentee and mail-in ballots being pre-canvassed and canvassed by those county election boards and without restricting representatives by any county residency or Georgia bar licensure requirements.

161.

Defendants intentionally and/or arbitrarily and capriciously denied Plaintiffs access to and/or obstructed actual observation and monitoring of the absentee and mail-in ballots being pre-canvassed and canvassed by Defendants, depriving them of the equal protection of those state laws enjoyed by citizens in other Counties.

162.

Defendants have acted and will continue to act under color of state law to violate Plaintiffs' right to be present and have actual observation and access to the electoral process as secured by the Equal Protection Clause of the United States Constitution.

77

163.

Defendants further violated Georgia voters' rights to equal protection insofar as Defendants allowed the Georgia counties to process and count ballots in a manner that allowed ineligible ballots to be counted, and through the use of Dominion Democracy Suite, allowed eligible ballots for Trump and McCormick to be switched to Biden or lost altogether. Defendants thus failed to conduct the general election in a uniform manner as required by the Equal Protection Clause of the Fourteenth Amendment and the Georgia Election Code.

164.

Plaintiffs seek declaratory and injunctive relief holding that the election, under these circumstances, was improperly certified and that the Governor be enjoined from transmitting Georgia's certified Presidential election results to the Electoral College. Georgia law forbids certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden, through the unlawful use of Dominion Democracy Suite software and devices.

165.

Alternatively, Plaintiffs seek declaratory and injunctive relief holding that the election, under these circumstances, was improperly certified and that the Governor be required to recertify the results declaring that Donald

Trump has won the election and transmitting Georgia's certified Presidential election result in favor of President Trump.

166.

Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the declaratory and injunctive relief requested herein is granted. Indeed, the setting aside of an election in which the people have chosen their representative is a drastic remedy that should not be undertaken lightly, but instead should be reserved for cases in which a person challenging an election has clearly established a violation of election procedures and has demonstrated that the violation has placed the result of the election in doubt. Georgia law allows elections to be contested through litigation, both as a check on the integrity of the election process and as a means of ensuring the fundamental right of citizens to vote and to have their votes counted accurately. O.C.G.A. § 21-2-520 et seq.

167.

In addition to the alternative requests for relief in the preceding paragraphs, hereby restated, Plaintiffs seek a permanent injunction requiring the County Election Boards to invalidate ballots cast by: 1) voters whose signatures on their registrations have not been matched with ballot, envelope and voter registration check; 2) all "dead votes"; and 4) all 900 military ballots in Fulton county that supposedly were 100% for Joe Biden.

79

Case 1:21-cv-02004-CJN Document 2514 Filed 11/25/21 Page 250 of 399

# COUNT III

## FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE U.S. CONST. AMEND. XIV, 42 U.S.C. § 1983

## DENIAL OF DUE PROCESS

## DISPARATE TREATMENT OF ABSENTEE/MAIL-IN VOTERS AMONG DIFFERENT COUNTIES

168.

Plaintiffs incorporate each of the prior allegations in this Complaint.

Voting is a fundamental right protected by the Fourteenth Amendment to the United States Constitution. The Fourteenth Amendment protects the right to vote from conduct by state officials which seriously undermines the fundamental fairness of the electoral process. *Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994); *Griffin*, 570 F.2d at 1077-78. "[H]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05.

169.

Defendants are not part of the General Assembly and cannot exercise legislative power. Rather, Defendants' power is limited to executing the laws as passed by the legislature  Although the Georgia General Assembly may enact laws governing the conduct of elections, "no legislative enactment may

80

contravene the requirements of the Georgia or United States Constitutions."
*Shankey*, 257 A. 2d at 898.

## 170.

Federal courts "possess broad discretion to fashion an equitable remedy." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1290 (11th Cir. 2015); *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1563 (11th Cir. 1988) ("The decision whether to grant equitable relief, and, if granted, what form it shall take, lies in the discretion of the district court.").

## 171.

Moreover, "[t]o the extent that a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of those requirements, … the decision to provide a 'notice and opportunity to cure' procedure to alleviate that risk is one best suited for the Legislature[,] . . . particularly in light of the open policy questions attendant to that decision, including what the precise contours of the procedure would be, how the concomitant burdens would be addressed, and how the procedure would impact the confidentiality and counting of ballots, all of which are best left to the legislative branch of Georgia's government." *Id.*

172.

The disparate treatment of Georgia voters, in subjecting one class of

voters to greater burdens or scrutiny than another, violates Equal Protection

guarantees because "the right of suffrage can be denied by a debasement or

dilution of the weight of a citizen's vote just as effectively as by wholly

prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. *Rice*

*v. McAlister*, 268 Ore. 125, 128, 519 P.2d 1263, 1265 (1975); *Heitman v.*

*Brown Grp., Inc.*, 638 S.W.2d 316, 319, 1982 Mo. App. LEXIS 3159, at *4 (Mo.

Ct. App. 1982); *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 41, 56 P.3d

524, 536-37 (Utah 2002).

173.

Defendants are not the legislature, and their unilateral decision to

create and implement a cure procedure for some but not all absentee and

mail-in voters in this State violates the Due Process Clause of the United

States Constitution. Plaintiffs have no adequate remedy at law and will

suffer serious and irreparable harm unless the injunctive relief requested

herein is granted.

## COUNT IV

### FOURTEENTH AMENDMENT, U.S. CONST. ART. I § 4, CL. 1; ART. II, § 1, CL. 2; AMEND. XIV, 42 U.S.C. § 1983

### DENIAL OF DUE PROCESS ON THE RIGHT TO VOTE

174.

Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

175.

The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution. *Harper*, 383 U.S. at See also *Reynolds*, 377 U.S. at 554 (The Fourteenth Amendment protects the "the right of all qualified citizens to vote, in state as well as in federal elections."). Indeed, ever since the Slaughter-House Cases, 83 U.S. 36 (1873), the United States Supreme Court has held that the Privileges or Immunities Clause of the Fourteenth Amendment protects certain rights of federal citizenship from state interference, including the right of citizens to directly elect members of Congress. *See Twining v. New Jersey*, 211 U.S. 78, 97 (1908) (*citing Ex parte Yarbrough*, 110 U.S. 651, 663-64 (1884)). *See also Oregon v. Mitchell,* 400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

176.

The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562. Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," Burson v. Freeman, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

177.

"Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555, n.29 (quoting *South v. Peters,* 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

178.

"Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); see also *Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or

84

fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

179.

The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (quoting *Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

180.

Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. *See Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

181.

In Georgia, the signature verification requirement is a dead letter. The signature rejection rate for the most recent election announced by the Secretary of State was 0.15%. The signature rejection rate for absentee ballot applications was .00167% - only 30 statewide. Hancock County, Georgia,

population 8,348, rejected nine absentee ballot applications for signature mismatch. Fulton County rejected eight. No other metropolitan county in Georgia rejected even a single absentee ballot application for signature mismatch. The state of Colorado, which has run voting by mail for a number of years, has a signature rejection rate of between .52% and .66%.[35] The State of Oregon had a rejection rate of 0.86% in 2016.[36] The State of Washington has a rejection rate of between 1% and 2%.[37]If Georgia rejected absentee ballots at a rate of .52% instead of the actual .15%, approximately 4,600 more absentee ballots would have been rejected.

## COUNT V

### THERE WAS WIDE-SPREAD BALLOT FRAUD.

### OCGA 21-2-522

182.

Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

---

[35] *See* https://duckduckgo.com/?q=colorado+signature+rejection+rate&t=osx&ia=web last visited November 25,2020
[36] *See* https://www.vox.com/21401321/oregon-vote-by-mail-2020-presidential-election, last visited November 25,2020.
[37] *See* https://www.salon.com/2020/09/08/more-than-550000-mail-ballots-rejected-so-far-heres-how-to-make-sure-your-vote-gets-counted/ last visited November 25, 2020.

183.

Plaintiffs contest the results of Georgia's election, with Standing
conferred under pursuant to O.G.C.A. 21-2-521.

184.

Therefore, pursuant to O.G.C.A. 21-2-522, for misconduct, fraud, or
irregularity by any primary or election official or officials sufficient to change
or place in doubt the result. The foundational principle that Georgia law
"nonetheless allows elections to be contested through litigation, both as a
check on the integrity of the election process and as a means of ensuring the
fundamental right of citizens to vote and to have their votes counted
accurately." *Martin v. Fulton County Bd. of Registration & Elections*, 307 Ga.
193, 194, 835 S.E.2d 245, 248 (2019). The Georgia Supreme Court has made
clear that Plaintiffs need not show how the [] voters would have voted if their
[absentee] ballots had been regular. [] only had to show that there were
enough irregular ballots to place in doubt the result." See OCGA § 21-2-520 et
seq., *Mead v. Sheffield*, 278 Ga. 268, 272, 601 S.E.2d 99, 102 (1994) the
Supreme Court invalidated an election, and ordered a new election because it
found that,

> Thus, [i]t was not incumbent upon [the Plaintiff] to show how the
> [481] voters would have voted if their [absentee] ballots had
> been regular. He only had to show that there were enough irregular
> ballots to place in doubt the result. He succeeded in that task.

87

*Id*. at 271 (citing *Howell v. Fears*, 275 Ga. 627, 571 SE2d 392, (2002) (primary results invalid where ballot in one precinct omitted names of both qualified candidates).

185.

The "glitches" in the Dominion system—that seem to have the uniform effect of hurting Trump and helping Biden have been widely reported in the press and confirmed by the analysis of independent experts.

186.

Prima facie evidence in multiple affidavits shows specific fraudulent acts, which directly resulted in the flipping of the race at issue:

a) votes being switched in Biden's favor away from Trump during the recount;

b) the lack of procedures in place to follow the election code, and the purchase and use, Dominion Voting System despite evidence of serious vulnerabilities;

c) a demonstration that misrepresentations were made about a pipe burst that sent everyone home, while first six, then three, unknown individuals were left alone until the morning hours working on the machines;

88

d) further a failure to demonstrate compliance with the Georgia's Election
Codes, in maintaining logs on the Voting system for a genuine and
sound audit, other than voluntary editable logs that prevent genuine
audits. While the bedrock of this Democratic Republic rests on citizens'
confidence in the validity of our elections and a transparent process,
Georgia's November 3, 2020 General Election remains under a pall of
corruption and irregularity that reflects a pattern of the absence of
mistake. At best, the evidence so far shows ignorance of the truth; at
worst, it proves a knowing intent to defraud.

187.

Plaintiff's expert also finds that voters received tens of thousands of
ballots that they never requested. (See Exh. 1, Dr. Briggs' Report).
Specifically, Dr. Briggs found that in the state of Georgia, based on a
statistically significant sample, the expected amount of persons that received
an **absentee ballot that they did not request ranges from 16,938 to
22,771.** This range exceeds the margin of loss of President Trump by 12,670
votes by at least 4,268 unlawful requests and by as many as 10,101 unlawful
requests.

188.

This widespread pattern, as reflected within the population of
unreturned ballots analyzed by Dr. Briggs, reveals the unavoidable reality
that, in addition to the calculations herein, third parties voted an untold
number of unlawfully acquired absentee or mail-in ballots, which would not
be in the database of unreturned ballots analyzed here. See O.G.C.A. 21-2-
522. These unlawfully voted ballots prohibited properly registered persons
from voting and reveal a pattern of widespread fraud.

189.

Further, there exists clear evidence of 20,311 absentee or early voters
in Georgia that voted while registered as having moved out of state.
Specifically, these persons were showing on the National Change of Address
Database (NCOA) as having moved, or as having filed subsequent voter
registration in another state also as evidence that they moved and even
potentially voted in another state. The 20,311 votes by persons documented
as having moved exceeds the margin by which Donald Trump lost the
election by 7,641 votes.

190.

Plaintiffs" expert Russell Ramsland concludes that at least 96,600
mail-in ballots were fraudulently cast. He further concludes that up to

136,098 ballots were illegally counted as a result of improper manipulation of the Dominion software. (Ramsland Aff).

191.

The very existence of absentee mail in ballots created a heightened opportunity for fraud.  The population of unreturned ballots analyzed by William Briggs, PhD, reveals the probability that a far greater number of mail ballots were requested by 3rd parties or sent erroneously to persons and voted fraudulently, undetected by a failed system of signature verification. The recipients may have voted in the name of another person, may have not had the legal right to vote and voted anyway, or may have not received the ballot at the proper address and then found that they were unable to vote at the polls, except provisionally, due to a ballot outstanding in their name.

192.

When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Georgia and did so on a large scale and widespread basis.  The size of the voting failures, whether accidental or intentional, are multiples larger than the margin of votes between the presidential candidates in the

91

state.  For these reasons, Georgia cannot reasonably rely on the results of the mail vote.

193.

The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. See, e.g., *Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

194.

Plaintiffs have no adequate remedy at law.  As seen from the expert analysis of William Higgs, PhD, based on actual voter data, tens of thousands of votes did not count, and tens of thousands of votes were unlawfully requested.

195.

The Fourteenth Amendment Due Process Clause protects the right to vote from conduct by state officials which seriously undermines the fundamental fairness of the electoral process. *Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994); *Griffin v. Burns*, 570 F.2d 1065, 1077-78 (1st Cir. 1978).

196.

Separate from the Equal Protection Clause, the Fourteenth Amendment's due process clause protects the fundamental right to vote against "the disenfranchisement of a state electorate." *Duncan v. Poythress*, 657 F.2d 691, 702 (5th Cir. 1981). "When an election process 'reaches the point of patent and fundamental unfairness,' there is a due process violation." *Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1183-84 (11th Cir. 2008) (*quoting Roe v. Alabama*, 43 F.3d 574, 580 (11th Cir.1995) (*citing Curry v. Baker*, 802 F.2d 1302, 1315 (11th Cir.1986))). *See also Griffin*, 570 F.2d at 1077 ("If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order."); *Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994) (enjoining winning state senate candidate from exercising official authority where absentee ballots were obtained and cast illegally).

197.

Part of courts' justification for such a ruling is the Supreme Court's

recognition that the right to vote and to free and fair elections is one that is

preservative of other basic civil and political rights. *See Black*, 209 F.Supp.2d

at 900 (quoting *Reynolds*, 377 U.S. at 561-62 ("since the right to exercise the

franchise in a free and unimpaired manner is preservative of other basic civil

and political rights, any alleged infringement of the right of citizens to vote

must be carefully and meticulously scrutinized.")); see also *Yick Wo v.*

*Hopkins*, 118 U.S. 356, 370 (1886) ("the political franchise of voting … is

regarded as a fundamental political right, because [sic] preservative of all

rights.").

198.

"[T]he right to vote, the right to have one's vote counted, and the right

to have ones vote given equal weight are basic and fundamental

constitutional rights incorporated in the due process clause of the Fourteenth

Amendment to the Constitution of the United States." Black, 209 F. Supp. 2d

at 900 (a state law that allows local election officials to impose different

voting schemes upon some portions of the electorate and not others violates

due process). "Just as the equal protection clause of the Fourteenth

Amendment prohibits state officials from improperly diluting the right to

vote, the due process clause of the Fourteenth amendment forbids state

officials from unlawfully eliminating that fundamental right." *Duncan*, 657 F.2d at 704. "Having once granted the right to vote on equal terms, [Defendants] may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05.

199.

In statewide and federal elections conducted in the State of Georgia, including without limitation the November 3, 2020 General Election, all candidates, political parties, and voters, including without limitation Plaintiffs, have a vested interest in being present and having meaningful access to observe and monitor the electoral process to ensure that it is properly administered in every election district and otherwise free, fair, and transparent.

200.

Moreover, through its provisions involving watchers and representatives, the Georgia Election Code ensures that all candidates and political parties, including without limitation Plaintiff, Republicans, and the Trump Campaign, shall be "present" and have meaningful access to observe and monitor the electoral process to ensure that it is properly administered in every election district and otherwise free, fair, and transparent.

201.

Defendants have a duty to guard against deprivation of the right to vote through the dilution of validly cast ballots by ballot fraud or election tampering. Rather than heeding these mandates and duties, Defendants arbitrarily and capriciously denied the Trump Campaign and Republicans meaningful access to observe and monitor the electoral process by: (a) mandating that representatives at the pre- canvass and canvass of all absentee and mail-ballots be either Georgia barred attorneys or qualified registered electors of the county in which they sought to observe and monitor; and (b) not allowing watchers and representatives to visibly see and review all envelopes containing official absentee and mail-in ballots either at the time or before they were opened and/or when such ballots were counted and recorded. Instead, Defendants refused to credential all of the Trump Campaign's submitted watchers and representatives and/or kept Trump Campaign's watchers and representatives by security and metal barricades from the areas where the inspection, opening, and counting of absentee and mail-in ballots were taking place. The lack of meaningful access with actual access to see the ballots invited further fraud and cast doubt of the validity of the proceedings.

202.

Consequently, Defendants created a system whereby it was physically impossible for the candidates and political parties to view the ballots and verify that illegally cast ballots were not opened and counted.

203.

Defendants intentionally and/or arbitrarily and capriciously denied Plaintiffs access to and/or obstructed actual observation and monitoring of the absentee and mail-in ballots being pre-canvassed and canvassed by Defendants, and included the unlawfully not counting and including uncounted mail ballots, and that they failed to follow absentee ballot requirements when thousands of **voters received ballots that they never requested.** Defendants have acted and will continue to act under color of state law to violate the right to vote and due process as secured by the Fourteenth Amendment to the United States Constitution.

204.

Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted.

205.

When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these

97

unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Georgia and did so on a large scale and widespread basis. The size of the voting failures, whether accidental or intentional, are multiples larger than the margin in the state. For these reasons, Georgia cannot reasonably rely on the results of the mail vote.

206.

Relief sought is the elimination of the mail ballots from counting in the 2020 election. Alternatively, the Presidential electors for the state of Georgia should be disqualified from counting toward the 2020 election.

207.

The United States Code (3 U.S.C. 5) provides that,

"[i]f any State shall have provided, by laws enacted prior to the day fixed for the appointment of the electors, for its final determination of any controversy or contest concerning the appointment of all or any of the electors of such State, by judicial or other methods or procedures, and such determination shall have been made at least six days before the time fixed for the meeting of the electors, such determination made pursuant to such law so existing on said day, and made at least six days prior to said time of meeting of the electors, shall be conclusive, and shall govern in the counting of the electoral votes as provided in the Constitution, and as hereinafter regulated, so far as the ascertainment of the electors appointed by such State is concerned.

3 USCS § 5.

98

## REQUEST FOR RELIEF

208.

Accordingly, Plaintiffs seek an emergency order instructing Defendants to de-certify the results of the General Election for the Office of President.

209.

In the alternative, Plaintiffs seek an emergency order prohibiting Defendants from including in any certified results from the General Election the tabulation of absentee and mailing ballots which do not comply with the Election Code, including, without limitation, the tabulation of absentee and mail-in ballots Trump Campaign's watchers were prevented from observing or based on the tabulation of invalidly cast absentee and mail-in ballots which (i) lack a secrecy envelope, or contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, (ii) do not include on the outside envelope a completed declaration that is dated and signed by the elector, or (iii) are delivered in-person by third parties for non-disabled voters.

210.

When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented

99

proper voting at the polls, the mail ballot system has clearly failed in the state of Georgia and did so on a large scale and widespread basis. The size of the voting failures, whether accidental or intentional, are multiples larger than the margin in the state. For these reasons, Georgia cannot reasonably rely on the results of the mail vote. Relief sought is the elimination of the mail ballots from counting in the 2020 election. Alternatively, the electors for the state of Georgia should be disqualified from counting toward the 2020 election. Alternatively, the electors of the State of Georgia should be directed to vote for President Donald Trump.

211.

For these reasons, Plaintiff asks this Court to enter a judgment in their favor and provide the following emergency relief:

1. An order directing Governor Kemp, Secretary Raffensperger and the Georgia State Board of Elections to de-certify the election results;

2. An order enjoining Governor Kemp from transmitting the currently certified election results to the Electoral College;

3. An order requiring Governor Kemp to transmit certified election results that state that President Donald Trump is the winner of the election;

4. An immediate order to impound all the voting machines and software in Georgia for expert inspection by the Plaintiffs.

5. An order that no votes received or tabulated by machines that were not certified as required by federal and state law be counted.

6. A declaratory judgment declaring that Georgia Secretary of State Rule 183-1-14-0.9-.15 violates the Electors and Elections Clause, U.S. CONST. art. I, § 4;

7. A declaratory judgment declaring that Georgia's failed system of signature verification violates the Electors and Elections Clause by working a de facto abolition of the signature verification requirement;

8. A declaratory judgment declaring that current certified election results violates the Due Process Clause, U.S. CONST. Amend. XIV;

9. A declaratory judgment declaring that mail-in and absentee ballot fraud must be remedied with a Full Manual Recount or statistically valid sampling that properly verifies the signatures on absentee ballot envelopes and that invalidates the certified results if the recount or sampling analysis shows a sufficient number of ineligible absentee ballots were counted;

10.     An emergency declaratory judgment that voting machines be Seized and Impounded immediately for a forensic audit—by plaintiffs' expects;

11.     A declaratory judgment declaring absentee ballot fraud occurred in violation of Constitutional rights, Election laws and under state law;

12.     A permanent injunction prohibiting the Governor and Secretary of State from transmitting the currently certified results to the Electoral College based on the overwhelming evidence of election tampering;

13.     Immediate production of 36 hours of security camera recording of all rooms used in the voting process at State Farm Arena in Fulton County, GA from 12:00am to 3:00am until 6:00pm on November 3.

14.     Plaintiffs further request the Court grant such other relief as is just and proper, including but not limited to, the costs of this action and their reasonable attorney fees and expenses pursuant to 42 U.S.C. 1988.

Respectfully submitted, this 25th day of November, 2020.

CALDWELL, PROPST & DELOACH, LLP

/s/ Harry W. MacDougald
Harry W. MacDougald
Georgia Bar No. 463076

CALDWELL, PROPST & DELOACH, LLP
Two Ravinia Drive, Suite 1600
Atlanta, GA 30346
(404) 843-1956 – Telephone
(404) 843-2737 – Facsimile
hmacdougald@cpdlawyers.com
Counsel for Plaintiffs

/s Sidney Powell*
Sidney Powell PC
Texas Bar No. 16209700
Julia Z. Haller *
Emily P. Newman*
Virginia Bar License No. 84265
2911 Turtle Creek Blvd, Suite 300
Dallas, Texas 75219

*Application for admission pro hac vice
Forthcoming

L. Lin Wood
GA Bar No. 774588
L. LIN WOOD, P.C.
P.O. Box 52584
Atlanta, GA 30305-0584
Telephone: (404) 891-1402

Howard Kleinhendler*
NEW YORK BAR NO. 2657120Howard Kleinhendler Esquire
369 Lexington Avenue, 12th Floor
New York, New York 10017
Office (917) 793-1188
Mobile (347) 840-2188
howard@kleinhendler.com
www.kleinhendler.com

*Application for admission pro hac vice
Forthcoming

*Attorneys for Plaintiffs*

Exhibit B7

Sidney Powell (pro hac application forthcoming)
Sidney Powell PC
Texas Bar No. 16209700
(517) 763-7499
Sidney@federalappeals.com

Alexander Kolodin, AZ Bar No. 030826
Christopher Viskovic, AZ Bar No. 035860[1]
**KOLODIN LAW GROUP PLLC**
3443 N. Central Ave. Ste. 1009
Phoenix, AZ 85012
Telephone: (602) 730-2985
Facsimile: (602) 801-2539
E-Mail:
Alexander.Kolodin@KolodinLaw.com
CViskovic@KolodinLaw.com
SAtkinson@KolodinLaw.com (file copies)

*Attorneys for Plaintiffs*
*(Additional counsel listed on signature page)*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TYLER BOWYER, MICHAEL JOHN BURKE, NANCY COTTLE, JAKE HOFFMAN, ANTHONY KERN, CHRISTOPHER M. KING, JAMES R. LAMON, SAM MOORHEAD, ROBERT MONTGOMERY, LORAINE PELLEGRINO, GREG SAFSTEN, SALVATORE LUKE SCARMARDO, KELLI WARD, and MICHAEL WARD<br><br>Plaintiffs,<br><br>v.<br><br>DOUG DUCEY, in his official capacity as Governor of the State of Arizona, and KATIE HOBBS, in her official capacity as the Arizona Secretary of State<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF**<br><br>(Election Matter)<br><br>(TRO Requested) |

---

[1] District of Arizona admission scheduled for 12/9/2020.

**NATURE OF THE ACTION**

1.     This civil action brings to light a massive election fraud, of the Election and Electors Clauses, and the Equal Protection and Due Process Clauses of the Fourteenth Amendment, of the U.S. Constitution and multiple violations of the Arizona election laws. These violations occurred during the 2020 General Election throughout the State of Arizona, as set forth in the affidavits of eyewitnesses and the voter data cited, the statistical anomalies and mathematical impossibilities detailed in the affidavits of expert witnesses.

2.     The scheme and artifice to defraud was for the purpose of illegally and fraudulently manipulating the vote count to manufacture an election of Joe Biden as President of the United States, and also of various down ballot democrat candidates in the 2020 election cycle. The fraud was executed by many means, but the most fundamentally troubling, insidious, and egregious ploy was the systemic adaptation of old-fashioned "ballot-stuffing." It has now been amplified and rendered virtually invisible by computer software created and run by domestic and foreign actors for that very purpose. This Complaint details an especially egregious range of conduct in Maricopa County and other Arizona counties using employing Dominion Systems, though this conduct occurred throughout the State at the direction of Arizona state election officials.

3.     The multifaceted schemes and artifices implemented by Defendants and their collaborators to defraud resulted in the unlawful counting, or fabrication, of hundreds of thousands of illegal, ineligible, duplicate or purely fictitious ballots in the State of Arizona, that collectively add up to multiples of Biden's purported lead in the State of 10,457 votes.

4.     While this Complaint, and the eyewitness and expert testimony incorporated herein, identify with specificity sufficient ballots required to set aside the 2020 General Election results, the entire process is so riddled with fraud, illegality, and statistical impossibility that this Court, and Arizona's voters, courts, and legislators, cannot rely on, or certify, any numbers resulting from this election. Accordingly, this Court must set aside the results of the 2020 General Election and grant the declaratory and injunctive relief

1    requested herein.

2                   **Dominion Voting Systems Fraud and Manipulation**

3         5.       The fraud begins with the election software and hardware from Dominion

4    Voting Systems Corporation ("Dominion") used in Maricopa County.  The Dominion

5    systems derive from the software designed by Smartmatic Corporation, which became

6    Sequoia in the United States.

7         6.       Smartmatic and Dominion were founded by foreign oligarchs and dictators

8    to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed

9    to make certain Venezuelan dictator Hugo Chavez never lost another election.  *See* Ex. 1,

10   Redacted Declaration of Dominion Venezuela Whistleblower ("Dominion Whistleblower

11   Report").  Notably, Chavez "won" every election thereafter.

12        7.       As set forth in the Dominion Whistleblower Report, the Smartmatic software

13   was contrived through a criminal conspiracy to manipulate Venezuelan elections in favor

14   of dictator Hugo Chavez:

15            Importantly, I was a direct witness to the creation and operation of an
             electronic voting system in a conspiracy between a company known as
16           Smartmatic and the leaders of conspiracy with the Venezuelan government.
             This conspiracy specifically involved President Hugo Chavez Frias, the
17           person in charge of the National Electoral Council named Jorge Rodriguez,
             and principals, representatives, and personnel from Smartmatic.  The
18           purpose of this conspiracy was to create and operate a voting system that
             could change the votes in elections from votes against persons running the
19           Venezuelan government to votes in their favor in order to maintain control
             of the government.  In mid-February of 2009, there was a national
20           referendum to change the Constitution of Venezuela to end term limits for
             elected officials, including the President of Venezuela. The referendum
21           passed. This permitted Hugo Chavez to be re-elected an unlimited number
22           of times.  . . .

23
             Smartmatic's electoral technology was called "Sistema de Gestión
24           Electoral" (the "Electoral Management System"). Smartmatic was a
             pioneer in this area of computing systems. Their system provided for
25           transmission of voting data over the internet to a computerized central
             tabulating center. The voting machines themselves had a digital display,
26           fingerprint recognition feature to identify the voter, and printed out the
27           voter's ballot. The voter's thumbprint was linked to a computerized record

28

                                            - 3 -

of that voter's identity. Smartmatic created and operated the entire system. *See Exh. 1.* ¶¶ 10 & 14.

8.     A core requirement of the Smartmatic software design ultimately adopted by Dominion for Arizona's elections was the software's ability to hide its manipulation of votes from any audit.  As the whistleblower explains:

> Chavez was most insistent that Smartmatic design the system in a way that the system could change the vote of each voter without being detected. He wanted the software itself to function in such a manner that if the voter were to place their thumb print or fingerprint on a scanner, then the thumbprint would be tied to a record of the voter's name and identity as having voted, but that voter would not tracked to the changed vote. He made it clear that the system would have to be setup to not leave any evidence of the changed vote for a specific voter and that there would be no evidence to show and nothing to contradict that the name or the fingerprint or thumb print was going with a changed vote. Smartmatic agreed to create such a system and produced the software and hardware that accomplished that result for President Chavez. *Id.* ¶15.

9.     The design and features of the Dominion software do not permit a simple audit to reveal its misallocation, redistribution, or deletion of votes.  First, the system's central accumulator does not include a protected real-time audit log that maintains the date and time stamps of all significant election events.  Key components of the system utilize unprotected logs.  Essentially this allows an unauthorized user the opportunity to arbitrarily add, modify, or remove log entries, causing the machine to log election events that do not reflect actual voting tabulations—or more specifically, do not reflect the actual votes of or the will of the people.[2]

10.     This Complaint will show that Dominion violated physical security standards by connecting voting machines to the Internet, allowing Dominion, domestic third parties

---

[2] *See* Ex. 7, August 24, 2020 Declaration of Harri Hursti, ¶¶45-48 (expert testimony in Case 1:17-cv-02989 in the U.S. District Court for the Northern District of Georgia). The Texas Secretary of State refused to certify Dominion for similar reasons as those cited by Mr. Hursti.  *See* Ex. 11A, 11B, State of Texas Secretary of State, Elections Division, Report of Review of Dominion Voting Systems Democracy Suite 5.5-A at 2 (Jan. 24, 2020).

or hostile foreign actors to access the system and manipulate election results, and moreover potentially to cover their tracks due to Dominion's unprotected log. Accordingly, a thorough forensic examination of Dominion's machines and source code is required to document these instances of voting fraud, as well as Dominion's systematic violations of the Voting Rights Act record retention requirements through manipulation, alteration, destruction and likely foreign exfiltration of voting records. See 52 U.S.C. § 20701.

11.     These and other problems with Dominion's software have been widely reported in the press and been the subject of investigations. In using Dominion Voting Systems Democracy Suite, Arizona officials disregarded all the concerns that caused Dominion software to be rejected by the Texas Board of elections in 2020 because it was deemed vulnerable to undetected and non-auditable manipulation. Texas denied Certification because of concerns that it was not safe from fraud or unauthorized manipulation. (See Exhs 11A&11B ).

12.     An industry expert, Dr. Andrew Appel, Princeton Professor of Computer Science and Election Security Expert has recently observed, with reference to Dominion Voting machines: "I figured out how to make a slightly different computer program that just before the polls were closed, it switches some votes around from one candidate to another. I wrote that computer program into a memory chip and now to hack a voting machine you just need 7 minutes alone with a screwdriver."[3]

13.     Further, Dominion's documented, and intentional, security flaws facilitated foreign interference in the 2020 General Election. For example, in the accompanying redacted declaration of a former electronic intelligence analyst with 305th Military Intelligence with experience gathering SAM missile system electronic intelligence, the Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections, including the most recent US general election in 2020. (See Ex. 12, copy of redacted witness affidavit).

---

[3] Andrew W. Appel, et al., "Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters" at (Dec. 27, 2019),( attached hereto as Ex. 10 ("Appel Study")).

14. Because this Complaint concerns mainly federal questions, it was not styled as a Statement of Contest within the meaning of ARS §§ 16-671 - 16-678.

15. Nonetheless, the factual basis of this Complaint would also support an election contest under Arizona law since A.R.S. § 16-672 allows for contests on the grounds of misconduct, offenses against the elective franchise, on account of illegal votes, and by reason of erroneous count of votes.

16. Similarly, the relief sought is in accord with Arizona law. A.R.S. § 16-676 provides clear remedies in the event of a successful contest, providing that the results of an election may either be annulled and set aside, A.R.S. § 16-676(B), or, if it appears that the winner was other than the person certified, the erroneously declared winner's certificate of election can be revoked A.R.S. § 16-676(C).

17. In the event that the election is annulled and set aside, there would certainly not be time to hold a new election, especially given the issues identified herein. However, it would be eminently proper for the question of the choice of electors to then revert to the legislature, for "[t]here is no doubt of the right of the legislature to resume the power [to appoint electors] at any time, for it can neither be taken away nor abdicated." *Bush v. Gore*, 531 U.S. 98, 104, 121 S. Ct. 525, 529-30, 148 L.Ed.2d 388, 398 (2000) (citing with approval *McPherson v. Blacker*, 146 U.S. 1, 35, 13 S. Ct. 3, 10, 36 L.Ed. 869, 877 (1892)).

18. Furthermore, this Court need not be concerned with whether such weighty questions can be addressed on an expedited timeline, because Arizona law provides very aggressive deadlines for the resolution of elections challenges. Specifically, Arizona law provides for election challenges to be resolved on the merits within 10 days of filing. A.R.S. § 16-676(A).

**Expert Witness Testimony on Widespread Voting Fraud**

19. This Complaint presents expert witness testimony demonstrating that several thousands of illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular:

A. Unreturned mail ballots unlawfully ordered by third parties (average for Dr. Briggs Error #1): 219,135

B. Returned ballots that were deemed unreturned by the state (average for Dr. Briggs Error #2): 86,845

C. Votes by persons that moved out of state or subsequently registered to vote in another state for the 2020 election: 5,790.

D. "Excess votes" to historically unprecedented, and likely fraudulent turnout levels of 80% or more in over half of Maricopa and Pima County precincts: 100,724.

E. And Plaintiffs can show Mr. Biden received a statistically significant Advantage, based on fraud, from the use of Dominion Machines in a nationwide Study, which conservatively estimates Biden's advantage at 62,282 Votes.

20.     Except for the estimate of illegal out-of-state votes, each of these experts has identified distinct sources of illegal votes in sufficient numbers (*i.e.*, greater than Biden's purported margin of 10,457 votes), not only to affect, but to change the result of the 2020 General Election in Arizona.  Taken together, the irregularities, anomalies and physical and statistical impossibilities, account for at least 412,494 illegal ballots that were counted in Arizona.  This provides the Court with sufficient grounds to set aside the results of the 2020 General Election and provide the other declaratory and injunctive relief requested herein.

21.     The specific factual allegations of fraud and statutory and constitutional violations are set forth in greater detail below.  Section I describes specific violations of Arizona law.  Section II provides expert witness testimony quantifying the number of illegal votes due to distinct categories of voting fraud and other unlawful conduct.  Section III provides fact and expert witness testimony, as well as summaries of other publicly available evidence (including judicial and administrative proceedings) regarding Dominion voting systems' voting fraud in Arizona during the 2020 General Election, the security flaws that allow election workers, or even hostile foreign actors, to manipulate Arizona election results, and the history of Dominion and its executives demonstrating that

Dominion had the specific intent to interfere, and change the results of, the 2020 General Election.

## JURISDICTION AND VENUE

22.     This Court has subject matter under 28 U.S.C. § 1331 which provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

23.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1343 because this action involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932).

24.     The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. §§ 2201 and 2202 and by Rule 57, Fed. R. Civ. P.

25.     This Court has jurisdiction over the related Arizona constitutional claims and state-law claims under 28 U.S.C. § 1367.

26.     Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in the District of Arizona. 28 U.S.C. § 1391(b) & (c).

27.     Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers have no authority to unilaterally exercise that power, much less flout existing legislation.

## THE PARTIES

28.     Each of the following Plaintiffs is a registered Arizona voter and a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Arizona: Tyler Bowyer, a resident of Maricopa County; Nancy Cottle, a resident of Maricopa County; Jake Hoffman, a resident of Maricopa County; Anthony Kern, a resident of Maricopa County; James R. Lamon, a resident of Maricopa County; Samuel Moorhead, a resident of Gila County; Robert Montgomery, a resident of Cochise County; Loraine Pellegrino, a

resident of Maricopa County; Greg Safsten, a resident of Maricopa County; Kelli Ward, a resident of Mohave County; and Michael Ward, a resident of Mohave County.

29.     Plaintiff Michael John Burke is a registered Arizona voter residing in Pinal County.  Mr. Burke is the Republican Party Chairman for Pinal County.

30.     Plaintiff Christopher M. King is a registered Arizona voter residing in Pima County.  Mr. Burke is the Republican Party Vice Chairman for Pima County.

31.     Plaintiff Salvatore Luke Scarmado is a registered Arizona voter residing in Mohave County.  Mr. Burke is the Republican Party Chairman for Mohave County.

32.     Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors."  *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of state officials implementing or modifying State election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).

33.     Plaintiffs bring this action to prohibit certification of the election results for the Office of President of the United States in the State of Arizona and to obtain the other declaratory and injunctive relief requested herein.  Defendants certified those results on November 30, 2020, indicating a plurality for Mr. Biden of 10,457 votes out of 3,420,565 cast.

34.     The Defendants are Arizona Governor Doug Ducey, and Arizona Secretary of State Katie Hobbs.

35.     Defendant Governor Doug Ducey is named as a defendant in his official capacity as Arizona's governor.

36.     Defendant Secretary of State Katie Hobbs is named as a defendant in her official capacity as Arizona Secretary of State, who serves as the chief election officer in the State of Arizona.

## STATEMENT OF FACTS

37.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988, to remedy deprivations of rights, privileges, or immunities secured by the Constitution and laws of the United States and to contest the election results, and the corollary provisions under the Arizona Constitution.

38.     The United States Constitution sets forth the authority to regulate federal elections. With respect to congressional elections, the Constitution provides:

39.

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators.
> U.S. CONST. art. I, § 4 ("Elections Clause").

40.     With respect to the appointment of presidential electors, the Constitution provides:

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.
> U.S. CONST. art. II, § 1 ("Electors Clause").

41.     None of Defendants is a "Legislature" as required under the Elections Clause or Electors Clause to set the rules governing elections. The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley*, 285 U.S. 365. Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." Id. at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 135 S. Ct. 2652, 2668 (U.S. 2015).

42.     While the Elections Clause "was not adopted to diminish a State's authority to determine its own lawmaking processes," *Ariz. State Legislature,* 135 S. Ct. at 2677, it does hold states accountable to their chosen processes when it comes to regulating federal elections, *id.* at 2668. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush,* 531 U.S. at 113 (Rehnquist, C.J., concurring); *Smiley,* 285 U.S. at 365.

43. Secretary Hobbs certified the Presidential Election results on November 30, 2020. The Presidential election results in Arizona show a difference of 10,457 "tallied" votes in favor of former Vice-President Joe Biden over President Trump.

44. The specific factual allegations of fraud and statutory and constitutional violations are set forth in greater detail below. Section I describes specific violations of Arizona law. Section II provides expert witness testimony quantifying the number of illegal votes due to distinct categories of voting fraud and other unlawful conduct. Section III provides fact and expert witness testimony, as well as summaries of other publicly available evidence (including judicial and administrative proceedings) regarding Dominion voting systems' voting fraud in Arizona during the 2020 General Election, the security flaws that allow election workers, or even hostile foreign actors, to manipulate Arizona election results, and includes a summary of information relating to the motive and opportunity, and a pattern of behavior to prove that Dominion and its executives demonstrating that Dominion had the specific intent to interfere, and change the results of, the 2020 General Election.

45. Based upon all the allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to enjoin the certification of the election results and invalidate the election results...

## I. VIOLATIONS OF ARIZONA ELECTION LAW

### A. Arizona Election Law

46. Pursuant to A.R.S. § 16-550(A), the county recorder or other officer in charge of elections shall compare the signatures on the early ballot affidavit with the signature of the elector on the elector's registration record. If the signature is inconsistent, the county recorder or other officer in charge of elections shall make reasonable efforts to contact the voter and allow the voter to correct or confirm the inconsistent signature.

47. Pursuant to A.R.S. § 16-625, the officer in charge of elections shall ensure that electronic data from and electronic or digital images of ballots are protected from physical and electronic access, including unauthorized copying or transfer, and that all

security measures are at least as protective as those prescribed for paper ballots.

**B.** Fact Witness Testimony of Arizona Law Violations

**1. Poll Watchers Failed to Adequately Verify Signatures on Ballots.**

48.     Affiant Burns stated that, while she was not permitted to be within viewing range of computer screens or monitors, she did have an opportunity to view "High Confidence" signatures following a brief power outage. *Id.* Upon seeing these, she was "disturbed … that the signatures were not even close to the signatures that they were 'comparing' the ballot signature to," and because she was told by the one poll worker with whom she was allowed to speak that "these signatures were counted." *(See Exh. 21)*

**2. Biased and Partisan Maricopa County Poll Referees.**

49.     Affiant Low expressed concern that "the two Maricopa County *referees*, who [were] called upon to settle any unresolved disputes between the adjudicators, were registered 'Independent Party' members." (See Exh. 20, Low aff. ¶7) (emphasis in original). When asked about that, they told Mr. Low that "this *set up* was laid out per Arizona Statute." *Id.* (emphasis in original).

Due to the high likelihood of the Dominion machine rejecting ballots, a "set up" like the one discussed above, impacts the outcome of the results of the election. The machines make determinations on what ballots to invalidate or validate based on an algorithm that operates offshore before tallying the votes locally..

To begin, the judges that adjudicate ballots must be evenly distributed amongst the major parties per A.R.S. § 16-531(A). There should be zero tolerance of fraud like this in any election system.

**3. Irregularities Involving Dominion Voting Machines & Employees.**

50.     Affiant Low and fellow poll watcher Greg Wodynski repeatedly asked the Dominion employee (named "Bruce") at their polling location as to whether the Dominion machines were connected to the internet and how data was backed up. The Dominion employee repeatedly denied that the machines were connected to the Internet, *id.* ¶11, but "admitted that he took a complete copy of the voter files, being stored in the Dominion

1   system out of the building with him every night as a form of a 'back up' copy." *Id.* ¶22.

2   51.     Low's fellow poll watcher, Affiant Gregory Wodynski, provides more detail

3   on these regularities.  First, Dominion employees and supervisors informed Mr. Wodynski

4   "that about 12% of mail in ballots were being rejected and needed human intervention in

5   the adjudication process," which "amounted to tens of thousands of ballots that required

6   intervention" in the days he was an observer.  Ex. 22, Wodynski aff at ¶9.  Mr. Wodynski

7   confirms that "Bruce" stated that "he would perform a manual daily system backup to an

8   external hard drive," *id.* ¶10, and that "he made a daily second disk backup to a new spare

9   hard drive[] … [that] were being physically moved off site to another building outside the

10  MTEC building," but would not say where. *Id.* ¶11.  Bruce further stated "**there was NO**

11  **CHAIN OF CUSTODY on data backup hard drives leaving the MTEC facility on a**

12  **daily basis for an undisclosed location."** *Id.* (emphasis in original).

13  52.     Mr. Wodynski also testified to a conversation with Dominion employee

14  Bruce of the "the specifics of a process where he was manually manipulating stored scanner

15  tabulation data files," which "he described as a processing issue at the numerous

16  adjudication computer workstations." *Id.* ¶12.  Bruce claimed that this was to split large

17  files into small files for adjudication.  *Id.* ¶13. Mr. Wydnoski was concerned because this

18  "**was a human intervention process and therefore creating a potential for intention or**

19  **non-intentional errors or lost ballot files."** *Id.*

20      **4. Problems with Certification of Dominion Voting Machines.**

21  53.     Affiant Linda Brickman, the 1st Vice-Chair of the Maricopa County

22  Republican Committee, oversaw the Secretary of State certification of Dominion voting

23  machines on November 18, 2020.  Ex. 23, Brickman Aff at 1.  Mr. Brickman observed the

24  following problems:

25          •     Signature verification standards were constantly being lowered by
                  Supervisors in order to more quickly process that higher amount of early
26                and mail-in ballots (from approx. 15 points of similarities, to a minimum of
                  3, lowered to 1, and ultimately to none – "Just pass each signature
27                verification through")  …

28

- Challenged signatures on envelopes where the signature was a completely different person than the name of the listed voter, was let through and approved by supervisors.

- Challenged runs or batches of envelopes for signature verification observed by me to be the exact same handwriting on the affidavit envelopes on numerous envelopes. When I asked if the County Attorney would be alerted for possible ballot fraud, I was told no, but supervisors would take care of it. …

- In the Duplication room, I observed with my Democratic partner the preparation of a new ballot since the original may have been soiled, damaged, or ripped, and wouldn't go through the tabulator. I read her a Trump/Republican ballot and as soon as she entered it into the system the ballot defaulted on the screen to a Biden/Democratic ballot. We reported this to supervisors, and others in the room commented that they had witnessed the same manipulation. We were never told what, if any, corrective action was taken.

- Election Office Observers – when it became apparent that more and more early and mail-in ballots would need to be processed, I mentioned that the current rule of the number of observers per party was not adequate (1 per party, unless all parties agreed to more). And since the Governor refused to call the Legislature into session for any reason, and little incentive for the Democrats to agree to a higher adequate number, there was no way 1 observer per Party, forced to the back of a room, or behind a see-through wall, had a legitimate opportunity to see what elections workers were seeing in real time and doing, especially where up to 20 or more workers processing tasks, sometimes in 10 seconds or less! And I personally observed most observers acting "clueless", and do not believe any of them even realized the challenges I made and referenced above.

- And lastly, one of the most egregious incidents in both the Duplication and Adjudication rooms which I worked, I observed the problem of Trump votes with voters checking the bubble for a vote for Trump, but ALSO, writing in the name "Donald Trump" and checking the bubble next to his hand written name again, as a duplicated vote, counting as an "OVERVOTE," which means – no vote was counted at all, despite the policy having been changed to allow these overvotes. Supervisors contradicted their own policies where the intent was clear. Ray Valenzuela, Director of Elections, told me openly at the morning of the Dominion Certification (November 18, 2020), that this was incorrect, the Supervisors were terribly mistaken and as an Adjudicator, I was instructed incorrectly, and these many votes SHOULD HAVE BEEN COUNTED AND NOT TURNED AWAY AS AN OVERVOTE.

*Id.* at 5-6.

## II. EXPERT WITNESS TESTIMONY:
## EVIDENCE OF WIDESPREAD VOTER FRAUD

**1.     In Arizona 86,845 Mail-In Ballots Were Lost, and 219,135 More Were Fraudulently Recorded for Voters who Never Requested Mail-In Ballots.**

54.     The attached report of William M. Briggs, Ph.D. ("Dr. Briggs Report") summarizes the multi-state phone survey that includes a survey of Arizona voters collected by Matt Braynard, which was conducted from November 15-17, 2020. *See* Ex., Dr. Briggs Report at 1, and Att. 1 ("Briggs Survey"). The Briggs Survey identified two specific errors involving unreturned mail-in ballots that are indicative of voter fraud, namely: "**Error #1:** those who were recorded as receiving absentee ballots ***without*** requesting them;" and "**Error #2:** those who returned absentee ballots but whose votes went missing (*i.e.*, marked as unreturned)." *Id.* Dr. Briggs then conducted a parameter-free predictive model to estimate, within 95% confidence or prediction intervals, the number of ballots affected by these errors are from a total population of 518,560 unreturned mail-in ballots for the State of Arizona.

55.     With respect to **Error #1**, Dr. Briggs' analysis estimated that **208,333 to 229,337 ballots** out of the total 518,560 unreturned ballots were recorded for voters who had **not** requested them. *Id.* All of these absentee ballots were sent to someone besides the registered voter named in the request, and thus could have been filled out by anyone and then submitted in the name of another voter. *Id.* (Ballots ordered by third parties that were voted, those would no longer be in the unreturned pool and therefore cannot be estimated from this data set.)

56.     With respect to **Error #2**, he found **78,714 to 94,975 ballots** out of 518,560 unreturned ballots recorded for voters who **did return their ballots, but were recorded as being unreturned.** *Id.* These absentee ballots were either lost or destroyed (consistent with allegations of Trump ballot destruction) and/or were replaced with blank ballots filled

out by election workers, Dominion or other third parties.

57.    Taking the average of the two types of errors together, **303,305 ballots, or 58% of the total, are disenfranchisement and unlawful.***Id.* These errors are not only conclusive evidence of widespread fraud by the State of Arizona, but they are fully consistent with the evidence about Dominion presented in Section III below insofar as **these unreturned absentee ballots represent a pool of blank ballots that could be filled in by third parties to shift the election to Joe Biden,** and also present the obvious conclusion that there must be absentee ballots unlawfully ordered by third parties that were returned.

58.    Dr. Briggs' finding that 58% of "unreturned ballots" suffer from one of the two errors above is consistent with his findings in the four other States analyzed (Georgia 39%, Michigan 45%, Pennsylvania 37%, and Wisconsin 45%).  His analysis also provides further support that these widespread "irregularities" or anomalies were one part of a much larger multi-state fraudulent scheme to rig the 2020 General Election for Joe Biden.

   **2.    Evidence That At Least 5,790 Ineligible Voters Who Have Moved Out-of-State Illegally Voted in Arizona.**

   3.    Evidence compiled by Matt Braynard using the National Change of Address ("NCOA") Database shows that 5,085 Arizona voters in the 2020 General Election moved out-of-state prior to voting, and therefore were ineligible.   Mr. Braynard also identified 744 Arizona voters who subsequently registered to vote in another state and were therefore ineligible to vote in the 2020 General Election.  The merged number is 5,790 ineligible voters whose votes must be removed from the total for the 2020 General ElectionEstimate of Illegal or Fictitious Votes Due to Dominion Voting Fraud and Manipulation.

59.    Expert witness Russell James Ramsland, Jr. identifies two types of statistical anomalies that he concludes are the result of voting fraud. (*See* Ex. 17).  First, as in other States Mr. Ramsland has analyzed (Georgia, Michigan and Wisconsin), Mr. Ramsland

finds historically unprecedented levels of turnout in specific counties or precincts. Using publicly available data, Mr. Ramsland determined that 66 percent of Pima County precincts (164 of 248) had turn out above 80%, and at least 36 had turnout above 90%, and that 54 percent of Maricopa County precincts (300 of 558) had turnout of 80% or more, and at least 30 over 90%. *Id.* ¶14. The report concludes that these extraordinary, and likely fraudulent, turnout levels "compels the conclusion to a reasonable degree of professional certainty that the vote count in Arizona, in particular for Maricopa and Pima counties for candidates for President contain at least 100,724 illegal votes that must be disregarded. *Id.*¶14.

60.      Mr. Ramsland also identifies an impossibility: "an improbable, and possibly impossible spike in processed votes," *id.* ¶16, like those also found in Georgia, Michigan and Wisconsin. Specifically, at 8:06:40 PM on November 3, 2020, there was a spike of 143,100 votes for Biden in Maricopa and Pima Counties. *Id.* Mr. Ramsland believes that the spike in Arizona, like those in the other three States he analyzed could have been manufactured by Dominion voting machines through a method described in greater detail in Section III below. *Id.*

61.      The summation of sections A through C above provide the following conclusions for the reports cited above, respectively.

- Returned ballots that were deemed unreturned by the state (average for Briggs Error #1): 219,135.

- Unreturned mail ballots unlawfully ordered by third parties (average for Briggs Error #1): 86,845.

- Votes by persons that moved out of state or subsequently registered to vote in another state for the 2020 election: 5,790.

- "Excess votes" to historically unprecedented, and likely fraudulent turnout levels of 80% or more in over half of Maricopa and Pima

County precincts: 100,724.

62.     In Conclusion, the Reports cited above show a total amount of illegal votes identified that amount to 412,494 or over 40 times the margin by which candidate Biden leads President Trump in the state of Arizona.

## III. FACTUAL ALLEGATIONS REGARDING DOMINION VOTING SYSTEMS

5.   The State of Arizona used Dominion Voting Systems in Maricopa County. Dominion's Results for 2020 General Election Demonstrate Dominion Manipulated Election Results.

63.     *I*

64.     Mr. Ramsland analyzed the Edison data reported to, and posted by, the New York Times, and concludes that this data "strongly suggests" the use of an "additive algorithm" (referred to as "ranked choice voting algorithm" ("RCV") in Dominion's user guide), combined with blank ballots loaded by the election workers or system operators, to manipulate votes in Arizona.[6]

65.     Mr. Ramsland cites two specific examples from the Edison data demonstrating Dominion's algorithmic vote manipulation.  The figure below, reproduced from his testimony, graphs the Edison data on election night for Arizona, where the blue bars "indicate the percentage of the batch that went for Biden," while the red trend lines and arrows "indicate the impossible consistencies" in that vote percentage.  *Id.* ¶15.  In other words, the blue bars and the horizontal trend lines show that "the percentage of the votes submitted in each batch that went towards candidate [Biden] remain unchanged for a series of time and for a number of *consecutive* batches …"  *Id.*  Mr. Ramsland concludes

---

[6]  *See* Ex. 17, ¶15 (quoting Democracy Suite EMS Results Tally and Reporting User Guide, Chapter 11, Settings 11.2.2, which reads in part, "**RCV METHOD: This will select the specific method of tabulating RCV votes to elect a winner.**")  Using the RCV method allows the operator to enter "blank ballots … into the system and treated as 'write-ins.' Then the operator can enter an allocation of the write-ins among candidates as he or she wishes. The result then awards the winner based on "points" that the algorithm computes, not actual voter votes."  *Id.*

that the probability of such a consistent percentage in multiple consecutive batches "approaches zero," and "makes clear an algorithm is allocating votes based on a percentage." *Id.*



Impossible consistency in percentage of votes counted

66. The second example analyzed by Mr. Ramsland is "the improbable, and



1   possibly impossible spike in processed votes" for Biden, namely, the insertion of 143,100

2   Biden votes in Maricopa and Pima Counties at 8:06:40 PM on November 3, 2020.  *See id.*

3   ¶16.

4   This spike, cast  largely for Biden, could easily be produced in the Dominion EMS

5   control system by pre-loading batches of blank ballots in files such as Write-Ins or other

6   adjudication-type files then casting them almost all for Biden using the Override

7   Procedure (to cast Write-In, Blank, or Error ballots) that is available to the operator of the

8   system.  A few batches of blank ballots electronically pre-loaded into the adjudication

9   files could easily produce a processed ballot stream this extreme so that actual paper

10  ballots would not be needed until later to create "corroboration" for the electronic count.

11  *Id.*

12  

13  

### 6. Administrative and Judicial Decisions Regarding Dominion's Security Flaws.

16  67.     **Texas.**  Texas, through its by the Secretary of State, denied certification to

17  nearly the same Dominion Democracy Suite on January 24, 2020, specifically because the

18  "examiner reports raise concerns about whether Democracy Suite 5.5-A system … **is safe**

19  **from fraudulent or unauthorized manipulation**."[7]

20  68.     **Wisconsin.** In 2018, Jill Stein was in litigation with Dominion Voting

21  Systems ("DVS") after her 2016 recount request pursuant to WISCONSIN

22  STAT.§5.905(4) wherein DVS obtained a Court Order requiring confidentiality on

23  information including *voting counting source code*, which Dominion claims is proprietary

24  – and must be kept secret from the public.  (*See* unpublished decision, Wisconsin Court of

25  Appeals, No. 2019AP272 issued April 30, 2020).  Rather than engaging in an open and

26  

---

27  [7]  See attached hereto, as Exh. 11, State of Texas Secretary of State, Elections Division,
    *Report of Review of Dominion Voting Systems Democracy Suite 5.5-A* at 2 (Jan. 24,
28  2020) (emphasis added).

transparent process to give credibility to Wisconsin's Dominion-Democracy Suite voting system, the processes were hidden during the receipt, review, opening, and tabulation of those votes in direct contravention of Wisconsin's Election Code and Federal law.

69.     **Georgia.** Substantial evidence of this vulnerability was discussed in Judge Amy Totenberg's October 11, 2020 Order in the USDC N.D. Ga. case of *Curling, et al. v. Kemp, et. al*, Case No. 1:17-cv-02989 Doc. No. 964. *See*, p. 22-23 ("This array of experts and subject matter specialists provided a huge volume of significant evidence regarding the security risks and deficits in the system as implemented in both witness declarations and live testimony at the preliminary injunction hearing."); p. 25 ("In particular, Dr. Halderman's testing indicated the practical feasibility through a cyber attack of causing the swapping or deletion of specific votes cast and the compromise of the system through different cyber attack strategies, including through access to and alteration or manipulation of the QR barcode.") The full order should be read, for it is eye-opening and refutes many of Dominion's erroneous claims and talking points.

70.     The Secretary of State appoints a committee of three people to test different voting systems.  The committee is required to submit their recommendations to the Secretary of state who then makes the final decision on which voting system(s) to adopt. A.R.S. § 16-442(A) and (C)In explaining that "In summary, [the court] rejected the Secretary's argument that her certification of voting machines for use in Arizona is **a** political question that is inappropriate for judicial review." In doing so, the court explained the application of HAVA because Arizona requires that its voting systems are HAVA compliant which includes accreditation pursuant to HAVA. *Chavez v. Brewer*, 222 Ariz. 309, 317, 214 P.3d 397, 405, 2009). During the subsequent four years, the Arizona Legislature amended and enacted several statutes to effectuate HAVA. Among these changes, the legislature amended Arizona Revised Statutes (**A**.R.S.) section **16-442**(**A**) to require that the secretary of state determine the voting machines that are "certified for use" in elections. 2003 Ariz. Sess. Laws, ch. 260, § 9 (1st Reg. Sess.). The

legislature also amended the process for selecting electronic voting machines by

requiring that the secretary of state certify only voting machines that "comply with

[HAVA]" and requiring that all election machines or devices be "tested and approved by

**a** laboratory that is accredited pursuant to [HAVA]." *Id.;* **A**.R.S. § **16-442**(B) (2006). The

legislature also authorized the secretary of state to revoke the certification of any voting

system that fails to meet the new standards. 2003 Ariz. Sess. Laws, ch. 260, § 9; 2005

Ariz. Sess. Laws, ch. 144, § 2; **A**.R.S. § **16-442**(**C**), (D).

*Chavez v. Brewer*, 222 Ariz. 309, 312, 214 P.3d 397, 400, (App. 2009).
Dominion Voting Systems is not currently certified pursuant to the EAC Voting
Systems

71.     A District Judge found that Dominion's BMD ballots are not voter verifiable,

and they cannot be audited in a software independent way. The credibility of a BMD ballot

can be no greater than the credibility of Dominion's systems, which copious expert analysis

has shown is deeply compromised.  Similar to the issues in Arizona and Wisconsin, Judge

Totenberg of the District Court of Georgia Northern District held:

> Georgia's Election Code mandates the use of the BMD system as the
> uniform mode of voting for all in-person voters in federal and statewide
> elections. O.C.G.A. § 21-2-300(a)(2). The statutory provisions mandate
> voting on "electronic ballot markers" that: (1) use "electronic technology to
> independently and privately mark a paper ballot at the direction of an
> elector, interpret ballot selections, ... such interpretation **for elector
> verification**, and print **an elector verifiable paper ballot**;" and (2)
> "produce paper ballots which are marked with the elector's choices **in a
> format readable by the elector**" O.C.G.A. § 21-2-2(7.1); O.C.G.A. § 21-
> 2-300(a)(2).  Plaintiffs and other voters who wish to vote in-person are
> required to vote on **a system that does none of those things**. Rather, the
> evidence shows that the Dominion BMD system does **not produce a voter-
> verifiable paper ballot or a paper ballot marked with the voter's
> choices in a format readable by the voter because the votes are
> tabulated solely from the unreadable QR code**.

> See Order, pp. 81-82. (Emphasis added).

72.     This case was later affirmed in a related case, in the Eleventh Circuit in 2018

related to Georgia's voting system in *Common Cause Georgia v. Kemp*, 347 F. Supp. 3d

1270 (11th Cir. 2018). The Court found that:

> In summary, while further evidence will be necessary in the future, the Court finds that the combination of the statistical evidence and witness declarations in the record here (and the expert witness evidence in the related *Curling* case which the Court takes notice of) persuasively demonstrates the likelihood of Plaintiff succeeding on its claims. Plaintiff has shown a substantial likelihood of proving that the Secretary's failure to properly maintain a reliable and secure voter registration system has and will continue to result in the infringement of the rights of the voters to cast their vote and have their votes counted. *Id.at* 1294-1295.

73.     The expert witness in the above litigation in the United States District Court of Georgia, Case 1:17-cv-02989-AT, Harri Hursti, specifically testified to the acute security vulnerabilities, *see* Ex. 107, wherein he testified or found:

A. "The scanner and tabulation software settings being employed to determine which votes to count on hand marked paper ballots are likely causing clearly intentioned votes to be counted" "The voting system is being operated in Fulton County in a manner that escalates the security risk to an extreme level" "Votes are not reviewing their BMD printed ballots, which causes BMD generated results to be un-auditable due to the untrustworthy audit trail." 50% or more of voter selections in some counties were visible to poll workers. Dominion employees maintain near exclusive control over the EMS servers. "In my professional opinion, the role played by Dominion personnel in Fulton County, and other counties with similar arrangements, should be considered an elevated risk factor when evaluating the security risks of Georgia's voting system." *Id.* ¶26.

B. A video game download was found on one Georgia Dominion system laptop, suggesting that multiple Windows updates have been made on that respective computer.

C. There is evidence of remote access and remote troubleshooting which presents a grave security implication.

D. Certified identified vulnerabilities should be considered an "extreme security risk."

E. There is evidence of transfer of control the systems out of the physical perimeters and place control with a third party off site.

F. USB drives with vote tally information were observed to be removed from the presence of poll watchers during a recent election.

G. "The security risks outlined above – operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system." *Id.* ¶49.

### 7. Foreign Interference/Hacking and/or Manipulation of Dominion Results.

#### a. The Origins of Dominion Voting Systems

74. Smartmatic and its inventors have backgrounds evidencing foreign connections with countries such as Serbia. Upon information and belief, the inventors listed below have such connections:

Applicant: SMARTMATIC, CORP.

Inventors**:** Lino Iglesias, Roger Pinate, Antonio Mugica, Paul Babic, Jeffrey Naveda, Dany Farina, Rodrigo Meneses, Salvador Ponticelli, Gisela Goncalves, Yrem Caruso[8]

75. Another Affiant witness testifies that in Venezuela, she was in official position related to elections and witnessed manipulations of petitions to prevent a removal of President Chavez and because she protested, she was summarily dismissed. She explains the vulnerabilities of the electronic voting system and Smartmatica to such manipulations. (See Ex. 17, Cardozo Aff. ¶8).

#### b. US Government Advisory on Vulnerability to Foreign Hackers.

76. In October of 2020 The FBI and CISA issued a JOINT CYBERSECURITY ADVISORY ON October 30, 2020 titled: **Iranian Advanced Persistent Threat Actor Identified Obtained Voter Registration Data**

---

[8] *See* Patents Assigned to Smartmatic Corp., *available at:* https://patents.justia.com/assignee/smartmatic-corp

This joint cybersecurity advisory was coauthored by the Cybersecurity and Infrastructure Security Agency (CISA) and the Federal Bureau of Investigation (FBI). CISA and the FBI are aware of an Iranian advanced persistent threat (APT) actor targeting U.S. state websites to include election websites. CISA and the FBI assess this actor is responsible for the mass dissemination of voter intimidation emails to U.S. citizens and the dissemination of U.S. election-related disinformation in mid-October 2020.[1] (Reference FBI FLASH message ME-000138-TT, disseminated October 29, 2020). Further evaluation by CISA and the FBI has identified the targeting of U.S. state election websites was an intentional effort to influence and interfere with the 2020 U.S. presidential election.

(See CISA and FBI Joint Cyber Security Advisory of October 30, 2020, a copy attached hereto as Ex. 18.)

### c. Expert Witness Testimony on Dominion Vulnerability to Foreign Interference and Ties to Hostile Foreign Governments

77.    A PhD Declarant analyzed the cumulative vote percentages sorted by ward or precinct sizes.  This concept was previously used throughout the report on voter irregularities in lulu Fries'dat and Anselmo Sampietro's "*An electoral system in crisis"* at http://www. electoralsystemincrisis.org/.    In Fries' dat's report there was an anomalous dependency on precinct size in many of the 2016 primary elections.  The larger precincts had introduced the use of voting machines.   However, one could also theorize the opportunity for cheaters to cheat in small precincts, where there may be less oversight. Normally, we would expect the cumulative vote percentage to converge to an asymptote, and bounce around the mean until convergence.  An example of this can be found from the 2000 Florida Democratic presidential primary between Gore and Bradley. (*See* Exh. __, at p. 8).  This is shown in Figure 8, and is taken from Fries' dat's report:

1
2
3
4
5
6
7
8
9
10
11
12
13
14



Figure 8: Baseline Cumulative Fractions Sorted by Precinct Size

15      (*See* Exh. __, at p. 9).

16

17   The Declarant then analyzed Maricopa county in Arizona, in addition to other swing

18   states. The data was obtained from the Maricopa county recorder website at

19   https://recorder.maricopa.gov/media/ArizonaExportByPrecinct_110320.txt

20   The Declarant sorted precincts by size and tallied the cumulative vote percentages. It

21   should rapidly approach an asymptote, but again in Figure 18 we see an anomaly. The

22   Biden percentage is higher in the smaller precincts, primarily at the expense of Trump,

23   again suggesting vote switching, since the 3rd party percentages immediately approach

24   the asymptote.

25
26
27
28

1

2

3



Figure 18: Maricopa County Arizona Percentage vs Precinct Size

(*See* Exh. 19, at p. 14).

In Figure 19 the Declarant focuses on the third-party percentages, which we see are indeed independent of precinct size and converge quickly to the asymptote. This is about what we would expect if the third-party candidates were counted fairly. It is in sharp contrast to the precinct size dependency and slow convergence of the Trump and Biden percentages.



Figure 19: Third Party Percentages vs Size in Maricopa County

(*See* Exh. 19, at p. 15).

78.     An analysis of the Dominion software system by a former US Military Intelligence expert subsequently found that the Dominion Voting system and software are accessible - and was compromised by rogue actors, including foreign interference by Iran and China.  (*See* Ex. 12, Spider Declaration (redacted for security reasons).)

79.     The expert does an analysis and explains how by using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, Dominion allowed foreign adversaries to access data and intentionally provided access to Dominion's infrastructure in order to monitor and manipulate elections, including the most recent one in 2020.  *Id*. Several facts are set forth related to foreign members of Dominion Voting Systems and foreign servers as well as foreign interference.).

80.     Another Declarant first explains the foundations of her opinion and then addresses the concerns of foreign interference in our elections through hardware components from companies based in foreign countries with adverse interests. (*See* Ex. 13).  She explains that Dominion Voting Systems works with SCYTL, and that votes on route, before reporting, go to SCYTL in foreign countries.  On the way, they get mixed and an algorithm is applied, which is done through a secretive process.

> The core software used by ALL SCYTL related Election Machine/Software manufacturers ensures "anonymity" Algorithms within the area of this "shuffling" to maintain anonymity allows for setting values to achieve a desired goal under the guise of "encryption" in the trap-door… *Id*.

81.     The Affiant goes on to explain the foreign relationships in the hardware used by Dominion Voting Systems and its subsidiary Sequoia and explains specifically the port that Dominion uses, which is called Edge Gateway and that is a part of Akamai Technologies based in Germany and China.

82.     This Declarant further explains the foundations of her opinion and then

addresses the concerns of foreign interference in our elections through hardware components from companies based in foreign countries with adverse interests.

> The concern is the HARDWARE and the NON – ACCREDITED VSTLs as by their own admittance use COTS. The purpose of VSTL's being accredited and their importance is ensuring that there is no foreign interference / bad actors accessing the tally data via backdoors in equipment software. The core software used by ALL SCYTL related Election Machine/Software manufacturers ensures "anonymity". **Algorithms within the area of this "shuffling" to maintain anonymity allows for setting values to achieve a desired goal under the guise of "encryption" in the trap-door…**

(See Id. at ¶32).

83.     Scytle, contracts with the AP – which receives the results tallied by SCYTL on  behalf of Dominion.  (See Exh. 13 at par. 33). This becomes highly relevant since SCYTLE is complete offshore.  (See Exh. 13 at par.44) And where the ballots go through a process described in three categories for a ballot cast, Step 1 involves Configuring the Data; Step 2 involves Cleansing which means determining which ballots are valid and which are not; and Step 3 involves "Shuffling" where the ballots get mixed and the algorithm is applied to distribute the votes. It is when the algorithm is applied, that happens secretly and the parameters of that algorithm are only known to SCYTL and Dominion. (See Exh. 13, pars. 44-50)  – and  where it gets encrypted as "ciphertexts."

> Certification Program, nor is its' provider.  China is not currently the only nation involved with COTS system provided to election machines or the networking, so is Germany via a LAOS founded Chinese linked cloud service company that works with SCYTL named Akamai Technologies – that have their offices in China and are linked to the server for Dominion Software.  (See Exh. 13 at par. 36))

Mathematical evidence of the seeding "injection"  of votes can be seen from the data feed on November 3, 2020 for Maricopa and Pima counties, where a spike can be seen which means a large number of votes were injected into the totals. (See Exh. 13 at par. 69).

84.     The Affiant explains the use of an algorithm and how it presents throughout the statement, but specifically concludes that,

**The "Digital Fix" observed with an increased spike in VOTES for Joe Biden can be determined as evidence of a pivot**. Normally it would be assumed that the algorithm had a Complete Pivot.  Wilkinson's demonstrated the guarantee as:

$$\frac{\|U\|_\infty}{\|A\|_\infty} \le n^{\frac{1}{2}\log(n)}$$

Such a conjecture allows the growth factor the ability to be upper bound by values closer to n. Therefore, complete pivoting can't be observed because there would be too many floating points. Nor can partial as the partial pivoting would overwhelm after the "injection" of votes. Therefore, external factors were used which is evident from the "DIGITAL FIX." (*See Id*. at pars. 67-69)

"The algorithm looks to have been set to give Joe Biden a 52% win even with an initial 50K+ vote block allocation was provided initially as tallying began (as in case of Arizona too). In the am of November 4, 2020 the algorithm stopped working, therefore another "block allocation" to remedy the failure of the algorithm. This was done manually as ALL the SYSTEMS shut down NATIONWIDE to avoid detection."

(*See Id*. at par. 73)

85.     And Russ Ramsland can support that further by documenting the data feed that came from Dominion Voting Systems to Scytl based on certain available data, that it was reported with decimal points, which is contrary to one vote as one ballot:  **"The fact that we observed raw vote data coming directly that includes decimal places establishes selection by an algorithm, and not individual voter's choice. Otherwise, votes would be solely represented as whole numbers (votes cannot possibly be added up and have decimal places reported)."**

## 8. Additional Independent Findings of Dominion Flaws.

86.     Further supportive of this pattern of incidents, reflecting an absence of mistake, Plaintiffs have since learned that the "glitches" in the Dominion system, that have the uniform effect of hurting Trump and helping Biden, have been widely reported in the press and confirmed by the analysis of independent experts.

### 1.Central Operator Can Remove, Discard or Manipulate Votes.

87.     Mr. Watkins further explains **that the central operator can remove or discard batches of votes.** "After all of the ballots loaded into the scanner's feed tray have been through the scanner, the "ImageCast Central" operator will remove the ballots from the tray then have the option to either "Accept Batch" or "Discard Batch" on the scanning menu …. " (Ex. 14, Watkins aff. ¶11). ¶8.

88.     Mr. Watkins further testifies that the user manual makes clear that the system allows for threshold settings to be set to find all ballots get marked as "problem ballots" for discretionary determinations on where the vote goes stating:

> 9.  During the ballot scanning process, the "ImageCast Central" software will detect how much of a percent coverage of the oval was filled in by the voter. The Dominion customer determines the thresholds of which the oval needs to be covered by a mark in order to qualify as a valid vote. If a ballot has a marginal mark which did not meet the specific thresholds set by the customer, then the ballot is considered a "problem ballot" and may be set aside into a folder named "NotCastImages".

> 10.  Through creatively tweaking the oval coverage threshold settings, and advanced settings on the ImageCase Central scanners, it may be possible to set thresholds in such a way that a non-trivial amount of ballots are marked "problem ballots" and sent to the "NotCastImages" folder.

> 11.  The administrator of the ImageCast Central work station may view all images of scanned ballots which were deemed "problem ballots" by simply navigating via the standard "Windows File Explorer" to the folder named

"NotCastImages" which holds ballot scans of "problem ballots". It may be possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro operating system. Id. ¶¶ 9-11.

89.    The Voting Rights Act, 52 U.S.C. §10101(e), provides, in relevant part:

… When used in the subsection, the word "vote" includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election;

a.    The VRA, 52 U.S.C. § 10307, also provides, in relevant part, that,

b.    No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote.

c.    Federal law also requires the states to maintain uniform voting standards. Section 301 of the Help America Vote Act of 2002 [HAVA], (Pub. L. 107–252, 116 Stat. 1704, codified at 42 U.S.C. § 15481.

d.    Each voting system used in an election for Federal office shall meet the following requirements:    (6) Each State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State. 42 U.S.C. §15481(a)(6)

e.    State laws define a "vote" as a "ballot" that clearly indicates the intent of the voter to choose a candidate.  "Ballot" means a ballot label, sheet of paper or

envelope on which votes are recorded. The term also includes a sheet or card, filmstrip or other device listing or containing information relative to offices, candidates and referenda which is placed, projected or composed on the board or screen inside a voting machine. Wis. Stat. § 5.02Every ballot, except a voting machine ballot, shall bear substantially the following information on the face: "Notice to electors: This ballot may be invalid unless initialed by 2 election inspectors. If cast as an absentee ballot, the ballot must bear the initials of the municipal clerk or deputy clerk. Wis. Stat. Ann. § 5.54 (emphasis in originalFederal law also requires the states to maintain uniform voting standards. Section 301 of the Help America Vote Act of 2002 [HAVA], (Pub. L. 107–252, 116 Stat. 1704, codified at 42 U.S.C. § 15481. Among other things, it provides that, "Each voting system used in an election for Federal office shall meet the following requirements: … (6) Each State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State." 42 U.S.C. §15481(a)(6)

### 2. Dominion – By Design – Violates Federal Election & Voting Record Retention Requirements.

90.     The Dominion System put in place by its own design violates the intent of Federal law on the requirement to preserve and retain records – which clearly requires preservation of all records requisite to voting in such an election.

> **§ 20701.** Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation
>
> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the

Commonwealth of Puerto Rico are voted for, **all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election,** except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

See 52 USC § 20701.

### 3. Dominion Vulnerabilities to Hacking.

91.  Plaintiffs have since learned that the "glitches" in the Dominion system -- that have the uniform effect of hurting Trump and helping Biden -- have been widely reported in the press and confirmed by the analysis of independent experts, a partial summary of which is included below.

(1) Users on the ground have full admin privileges to machines and software. The Dominion system is designed to facilitate vulnerability and allow a select few to determine which votes will be counted in any election. Workers were responsible for moving ballot data from polling place to the collector's office and inputting it into the correct folder. Any anomaly, such as pen drips or bleeds, is not counted and is handed over to a poll worker to analyze and decide if it should count. This creates massive opportunity for improper vote adjudication.  (Ex. 14 Watkins aff. ¶¶8 & 11).

(2) Affiant witness (name redacted for security reasons), in his sworn testimony explains he was selected for the national security guard detail of the President of Venezuela, and that he witnessed the creation of Smartmatic for the purpose of election vote manipulation:

I was witness to the creation and operation of a sophisticated electronic

voting system that permitted the leaders of the Venezuelan government to manipulate the tabulation of votes for national and local elections and select the winner of those elections in order to gain and maintain their power. Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic which included … The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government. (*Id.* ¶¶6, 9, 10).

92. Specific vulnerabilities of the systems in question that have been well documented or reported include:

A. Barcodes can override the voters' vote: As one University of California, Berkeley study shows, "In all three of these machines [including Dominion Voting Systems] the ballot marking printer is in the same paper path as the mechanism to deposit marked ballots into an attached ballot box. This opens up a very serious security vulnerability: the voting machine can make the paper ballot (to add votes or spoil already-case votes) after the last time the voter sees the paper, and then deposit that marked ballot into the ballot box without the possibility of detection." (See Ex. 10, Appel Study).

B. Voting machines were able to be connected to the internet by way of laptops that were obviously internet accessible. If one laptop was connected to the internet, the entire precinct was compromised.

C. October 6, 2006 – **Congresswoman Carolyn Maloney calls on Secretary of Treasury Henry Paulson to conduct an investigation into Smartmatic based on its foreign ownership and ties to Venezuela.** (See Ex. 15). Congresswoman Maloney wrote that "It is undisputed that Smartmatic is foreign owned and it has acquired Sequoia … Smartmatic now acknowledged that Antonio Mugica, a Venezuelan businessman has a controlling interest in Smartmatica, but the company has not revealed who all other Smartmatic owners are. *Id.*

D. Dominion "got into trouble" with several subsidiaries it used over alleged cases of fraud. One subsidiary is Smartmatic, a company "that

1
2
3
4
5
6
7
8

has played a significant role in the U.S. market over the last decade."[9] Dominion entered into a 2009 contract with Smartmatic and provided Smartmatic with the PCOS machines (optical scanners) that were used in the 2010 Philippine election, the biggest automated election run by a private company. The automation of that first election in the Philippines was hailed by the international community and by the critics of the automation. The results transmission reached 90% of votes four hours after polls closed and Filipinos knew for the first time who would be their new president on Election Day. In keeping with local Election law requirements, Smartmatic and Dominion were required to provide the source code of the voting machines prior to elections so that it could be independently verified. *Id.*

9
10
11
12

E. Litigation over Smartmatic "glitches" alleges they impacted the 2010 and 2013 mid-term elections in the Philippines, raising questions of cheating and fraud. An independent review of the source codes used in the machines found multiple problems, which concluded, "The software inventory provided by Smartmatic is inadequate, … which brings into question the software credibility."[10]

13
14
15
16
17
18

F. Dominion acquired Sequoia Voting Systems as well as Premier Election Solutions (formerly part of Diebold, which sold Premier to ES&S in 2009, until antitrust issues forced ES&S to sell Premier, which then was acquired by Dominion). This map illustrates 2016 voting machine data—meaning, these data do not reflect geographic aggregation at the time of acquisition, but rather the machines that retain the Sequoia or Premier/Diebold brand that now fall under Dominion's market share. Penn Wharton Study at 16.

19
20
21
22
23

G. In late December of 2019, three Democrat Senators, Warren, Klobuchar, Wyden and House Member Mark Pocan wrote about their 'particularized concerns that secretive & "trouble -plagued companies"' "have long skimped on security in favor of convenience," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, &

24
25
26

[9] *Voting Technology Companies in the U.S. – Their Histories and Present Contributions,* Access Wire, (Aug. 10, 2017)*, available at:* https://www.accesswire.com/471912/Voting-Technology-Companies-in-the-US--Their-Histories.

27
28

[10] *Smartmatic-TIM Running Out of Time to Fix Glitche*s, ABS-CBN News (May 4, 2010), *available at*: https://news.abs-cbn.com/nation/05/04/10/smartmatic-tim-running-out-time-fix-glitches.

Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S." (See Ex. 16).

H. Senator Ron Wyden (D-Oregon) said the findings [insecurity of voting systems] are "yet another damning indictment of the profiteering election vendors, who care more about the bottom line than protecting our democracy." It's also an indictment, he said, "of the notion that important cybersecurity decisions should be left entirely to county election offices, many of whom do not employ a single cybersecurity specialist."[11]

93.     The House of Representatives passed H.R. 2722 in an attempt to address these very risks on June 27, 2019:

> This bill addresses election security through grant programs and requirements for voting systems and paper ballots.
> The bill establishes requirements for voting systems, including that systems (1) use individual, durable, voter-verified paper ballots; (2) make a voter's marked ballot available for inspection and verification by the voter before the vote is cast; (3) ensure that individuals with disabilities are given an equivalent opportunity to vote, including with privacy and independence, in a manner that produces a voter-verified paper ballot; (4) be manufactured in the United States; and (5) meet specified cybersecurity requirements, including the prohibition of the connection of a voting system to the internet.

See H.R. 2722.

**9. Because Dominion Senior Management Has Publicly Expressed Hostility to Trump and Opposition to His Election, Dominion Is Not Entitled to Any Presumption of Fairness, Objectivity or Impartiality, and Should Instead Be Treated as a Hostile Partisan Political Actor.**

94.     Dr. Eric Coomer is listed as the co-inventor for several patents on

---

[11] Kim Zetter, *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials*, VICE (Aug. 8, 2019) ("VICE Election Article"), *available at:* https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems have-been-left-exposed-online-despite-official-denials.

1
2
3
4
5
6
7
8

ballot adjudication and voting machine-related technology, all of which were assigned to Dominion.[12]  He joined Dominion in 2010, and most recently served as Voting Systems Officer of Strategy and Director of Security for Dominion.  Dr. Coomer first joined Sequoia Voting Systems in 2005 as Chief Software Architect and became Vice President of Engineering before Dominion Voting Systems acquired Sequoia.  Dr. Coomer's patented ballot adjudication technology is built into Dominion voting machines sold throughout the United States, including those used in Arizona.  (See attached hereto Exh 6, Jo Oltmann Aff.).

9
10
11
12

95.     In 2016, Dr. Coomer admitted to the State of Illinois that Dominion Voting machines can be manipulated remotely.[13]  He has also publicly posted videos explaining how Dominion voting machines can be remotely manipulated. See Id.[14]

13

14
15
16
17
18
19
20
21
22
23

[12] *See* "Patents by Inventor Eric Coomer," *available at:* https://patents.justia.com/inventor/eric-coomer.  This page lists the following patents issued to Dr. Coomer and his co-inventors: (1) U.S. Patent No. 9,202,113, Ballot Adjudication in Voting Systems Utilizing Ballot Images (issued Dec. 1, 2015); (2) U.S. Patent No. 8,913,787, Ballot Adjudication in Voting Systems Utilizing Ballot Images (issued Dec. 16, 2014);  (3) U.S. Patent No. 8,910,865, Ballot Level Security Features for Optical Scan Voting Machine Capable of Ballot Image Processing, Secure Ballot Printing, and Ballot Layout Authentication and Verification (issued Dec. 16, 2014); (4) U.S. Patent No. 8,876,002, Systems for Configuring Voting Machines, Docking Device for Voting Machines, Warehouse Support and Asset Tracking of Voting Machines (issued Nov. 4, 2014); (5) U.S. Patent No. 8,864,026, Ballot Image Processing System and Method for Voting Machines (issued Oct. 21, 2014); (6) U.S. Patent No. 8,714,450, Systems and Methods for Transactional Ballot Processing, and Ballot Auditing (issued May 6, 2014), available at: https://patents.justia.com/inventor/eric-coomer.

24
25
26

[13] Jose Hermosa, *Electoral Fraud: Dominion's Vice President Warned in 2016 That Vote-Counting Systems Are Manipulable*, The BL (Nov. 13, 2020), *available at*: https://thebl.com/us-news/electoral-fraud-dominions-vice-president-warned-in-2016-that-vote-counting-systems-are-manipulable.html.

27
28

[14] See, *e.g.,* "Eric Coomer Explains How to Alter Votes in the Dominion Voting System" (Nov. 24, 2020) (excerpt of presentation delivered in Chicago in 2017), *available at:* https://www.youtube.com/watch?v=UtB3tLaXLJE.

96.     Dr. Coomer has emerged as Dominion's principal defender, both in litigation alleging that Dominion rigged elections in Georgia and in the media. An examination of his previous public statements has revealed that Dr. Coomer is highly partisan and even more anti-Trump, precisely the opposite of what would expect from the management of a company charged with fairly and impartially counting votes (which is presumably why he tried to scrub his social media history). (See Id.)

97.     Unfortunately for Dr. Coomer, however, a number of these posts have been captured for perpetuity. Below are quotes from some of his greatest President Trump and Trump voter hating hits to show proof of motive and opportunity. (See Id).

> If you are planning to vote for that autocratic, narcissistic, fascist ass-hat
> blowhard and his Christian jihadist VP pic, UNFRIEND ME NOW! No,
> I'm not joking. … Only an absolute F[**]KING IDIOT could ever vote
> for that wind-bag fuck-tard FASCIST RACIST F[**]K! … I don't give a
> damn if you're friend, family, or random acquaintance, pull the lever,
> mark an oval, touch a screen for that carnival barker … UNFRIEND ME
> NOW! I have no desire whatsoever to ever interact with you. You are
> beyond hope, beyond reason. You are controlled by fear, reaction and
> bullsh[*]t. Get your shit together. F[**]K YOU! Seriously, this f[**]king
> ass-clown stands against everything that makes this country awesome!
> You want in on that? You [Trump voters] deserve nothing but contempt.
> *Id.* (July 21, 2016 Facebook post).[15]

98.     In a rare moment of perhaps unintentional honesty, Dr. Coomer anticipates this Complaint and many others, by slandering those seeking to hold election riggers like Dominion to account and to prevent the United States' descent into Venezuelan levels of voting fraud and corruption out of which Dominion was born:

> Excerpts in stunning Trump-supporter logic, "I know there is a lot of voter
> fraud. I don't know who is doing it, or how much is happening, but I

---

[15] In this and other quotations from Dr. Coomer's social media, Plaintiffs have redacted certain profane terms.

know it is going on a lot." This beautiful statement was followed by, "It happens in third world countries, this the US, we can't let it happen here." *Id.* (October 29, 2016 Facebook post); (See also Exh. 6)

1. Dr. Coomer, who invented the technology for Dominion's voting fraud and has publicly explained how it can be used to alter votes, seems to be extremely hostile to those who would attempt to stop it and uphold the integrity of elections that underpins the legitimacy of the United States government:

> And in other news… There be some serious fuckery going on right here fueled by our Cheeto-in-Chief stoking lie after lie on the flames of [Kris] Kobach… [Linking Washington Post article discussing the Presidential Advisory Commission on Election Integrity, of which former Kansas Secretary of State Kris Kobach was a member, entitled, "The voting commission is a fraud itself. Shut it down."] *Id.* (September 14, 2017 Facebook post.] (Id.)

99. Dr. Coomer also keeps good company, supporting and reposting ANTIFA statements slandering President Trump as a "fascist" and by extension his supporters, voters and the United States military (which he claims, without evidence, Trump will make into a "fascist tool"). *Id.* (June 2, 2020 Facebook post). Lest someone claims that these are "isolated statements" "taken out of context", Dr. Coomer has affirmed that he shares ANTIFA's taste in music and hatred of the United States of America, *id.* (May 31, 2020 Facebook post linking "F[**]k the USA" by the exploited), and the police. *Id.* (separate May 31, 2020 Facebook posts linking N.W.A. "F[**]k the Police" and a post promoting phrase "Dead Cops"). *Id.* at 4-5.

100. Affiant and journalist Joseph Oltmann researched ANTIFA in Colorado. *Id.* at 1. "On or about the week of September 27, 2020," he attended an Antifa meeting which appeared to be between Antifa members in Colorado Springs and Denver Colorado," where Dr. Coomer was present. In response to a question as to what Antifa would do "if Trump wins this … election?", Dr. Coomer responded "Don't worry about the election. Trump is not going to win. I made f[**]king sure of that … Hahaha." *Id.* at 2.

101.     By putting an anti-Trump zealot like Dr. Coomer in charge of election "Security," and using his technology for what should be impartial "ballot adjudication," Dominion has given the fox the keys to the hen house ***and has forfeited any presumption of objectivity, fairness, or even propriety***.   It appears that Dominion does not care about even an appearance of impropriety, as its most important officer has his fingerprints all over a highly partisan, vindictive,  and personal vendetta against the Republican nominee both in 2016 and 2020, President Donald Trump.  Dr. Coomer's highly partisan anti-Trump rages show clear motive on the part of Dominion to rig the election in favor of Biden, and may well explain why for each of the so-called "glitches" uncovered, it is always Biden receiving the most votes on the favorable end of such a "glitch." (Id.)

102.     In sum, as set forth above, for a host of independent reasons, the Arizona election results concluding that Joe Biden received more votes that President Donald Trump must be set aside.

## COUNT I

**Defendants Violated the Elections and Electors Clauses and 42 U.S.C. § 1983.**

103.     Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

104.     The Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President.  U.S. Const. art. II, §1, cl. 2 (emphasis added).  Likewise, the Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof." U.S. Const. art. I, § 4, cl. 1 (emphasis added).

105.     The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley v. Holm,* 285 U.S. 355, 365 (1932).   Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments."  *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015).

106.     Defendants are not part of the Arizona Legislature and cannot exercise legislative power.  Because the United States Constitution reserves for the Arizona Legislature the power to set the time, place, and manner of holding elections for the President and Congress, county boards of elections and state executive officers have no authority to unilaterally exercise that power, much less to hold them in ways that conflict with existing legislation.

     **i.**   The VRA, 52 U.S.C. § 10307, also provides, in relevant part, that,

     **ii.**   No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote.

     **iii.**   Federal law also requires the states to maintain uniform voting standards. Section 301 of the Help America Vote Act of 2002 [HAVA], (Pub. L. 107–252, 116 Stat. 1704, codified at 42 U.S.C. § 15481.

     **iv.**   Each voting system used in an election for Federal office shall meet the following requirements: (6) Each State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State. 42 U.S.C. §15481(a)(6).

107.     With respect to unreturned ballots recorded for voters who did return their ballot but were recorded as being unreturned, Plaintiffs have identified 78,714 to 94,975 ballots out of 518,560 absentee / mail ballots.  Id.  These absentee ballots were either lost or destroyed (consistent with allegations of Trump ballot destruction) and/or were replaced with blank ballots filled out by election workers, Dominion or other third parties.

108.     Taking the average of the two types of errors together, 303,305 ballots, or

58% of the total, are defective. These errors are not only conclusive evidence of widespread fraud by the State of Arizona, but they are fully consistent with the evidence about Dominion presented in Section III below insofar as these unreturned absentee ballots represent a pool of blank ballots that could be filled in by third parties to shift the election to Joe Biden, and also present the obvious conclusion that there must be absentee ballots unlawfully ordered by third parties that were returned.

109.    There are also thousands of absentee ballots that Plaintiffs can show were sent to someone besides the registered voter named in the request, and thus could have been filled out by anyone and then submitted in the name of another voter specifically in violation of election law, one vote is one ballot.

110.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted. Defendants have acted and, unless enjoined, will act under color of state law to violate the Elections Clause.

111.    Accordingly, the results for President in the November 3, 2020 election must be set aside, the State of Arizona should be enjoined from transmitting the certified the results thereof, and this Court should grant the other declaratory and injunctive relief requested herein.

## COUNT II

**Defendants Violated The Equal Protection Clause of the**

**Fourteenth Amendment U.S. Const. Amend. XIV & 42 U.S.C.**

**§ 1983**

112.    Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

113.    The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. *See also Bush v. Gore*, 531 U.S. 98, 104 (2000) (having once granted the

- 43 -

right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over the value of another's). *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."). The Court has held that to ensure equal protection, a problem inheres in the absence of specific standards to ensure its equal application. *Bush*, 531 U.S. at 106 ("The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude, necessary.").

114. The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights. The requirement of equal protection is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

115. The disparate treatment of Arizona voters, in subjecting one class of voters to greater burdens or scrutiny than another, violates Equal Protection guarantees because "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. *Rice v. McAlister*, 268 Ore. 125, 128, 519 P.2d 1263, 1265 (1975); *Heitman v. Brown Grp., Inc.,* 638 S.W.2d 316, 319, 1982 Mo. App. LEXIS 3159, at *4 (Mo. Ct. App. 1982); *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 41, 56 P.3d 524, 536-37 (Utah 2002).

116. In statewide and federal elections conducted in the State of Arizona, including without limitation the November 3, 2020 General Election, all candidates, political parties, and voters, including without limitation Plaintiffs, have an interest in having the election laws enforced fairly and uniformly.

117. Defendants failed to comply with the requirements of Arizona law and the Equal Protection Clause and thereby diluted the lawful ballots of the Plaintiffs and of other Arizona voters and electors in violation of the United States Constitution guarantee

of Equal Protection. In Section II, Plaintiff experts provide testimony quantifying the number of illegal votes resulting from Defendants' statutory and constitutional violations. Finally, Section III details the additional voting fraud and manipulation enabled by the use Dominion voting machines, which had the intent and effect of favoring Biden and Democratic voters and discriminating against Trump and Republican voters.

118. Defendants have acted and will continue to act under color of state law to violate Plaintiffs' right to be present and have actual observation and access to the electoral process as secured by the Equal Protection Clause of the United States Constitution and Arizona law. Defendants thus failed to conduct the general election in a uniform manner as required by the Equal Protection Clause of the Fourteenth Amendment, the corollary provisions of Arizona election law.

119. Plaintiffs seek declaratory and injunctive relief forbidding Defendants from certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

120. In addition, Plaintiffs ask this Court to order that no ballot processed by a counting board in Arizona can be included in the final vote tally unless a challenger was allowed to meaningfully observe the process and handling and counting of the ballot, or that were unlawfully switched from Trump to Biden.

121. Clearly the dilution of lawful votes violates the Equal Protection clause; and the counting of unlawful votes violates the rights of lawful Citizens.

122. There are also thousands of absentee ballots that Plaintiffs can show were sent to someone besides the registered voter named in the request, and thus could have been filled out by anyone and then submitted in the name of another voter specifically in violation of election law, one vote is one ballot. That is the dilution of lawful votes, while 78,714 to 94,975 ballots out of 518,560 unreturned ballots recorded for voters who did return their ballot but were recorded as being unreturned, and their vote was taken from

1    them.

2       123.     Plaintiffs have no adequate remedy at law and will suffer serious and

3    irreparable harm unless the declaratory and injunctive relief requested herein is

4    granted. Indeed, the setting aside of an election in which the people have chosen

5    their representative is a drastic remedy that should not be undertaken lightly, but

6    instead should be reserved for cases in which a person challenging an election has

7    clearly established a violation of election procedures and has demonstrated that the

8    violation has placed the result of the election in doubt. Arizona law allows

9    elections to be contested through litigation, both as a check on the integrity of the

10    election process and as a means of ensuring the fundamental right of citizens to

11    vote and to have their votes counted accurately.

### COUNT III

### Fourteenth Amendment, Amend. XIV & 42 U.S.C. § 1983
### Denial of Due Process On The Right to Vote

15       124.     Plaintiffs refer to and incorporate by reference each of the prior

16    paragraphs of this Complaint as though the same were repeated at length herein.

17       125.     The right of qualified citizens to vote in a state election involving

18    federal candidates is recognized as a fundamental right under the Fourteenth

19    Amendment of the United States Constitution. *Harper,* 383 U.S. at 665. *See*

20    *also Reynolds*, 377 U.S. at 554 (The Fourteenth Amendment protects the "the right

21    of all qualified citizens to vote, in state as well as in federal elections."). Indeed,

22    ever since the *Slaughter-House Cases*, 83 U.S. 36 (1873), the United States

23    Supreme Court has held that the Privileges or Immunities Clause of the Fourteenth

24    Amendment protects certain rights of federal citizenship from state interference,

25    including the right of citizens to directly elect members of Congress. *See Twining*

26    *v. New Jersey*, 211 U.S. 78, 97 (1908) (*citing Ex parte Yarbrough*, 110 U.S. 651,

27    663-64 (1884)). *See also Oregon v. Mitchell*, 400 U.S. 112, 148-49 (1970)

28    (Douglas, J., concurring) (collecting cases).

126.     The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562.  Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," *Burson v. Freeman*, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

127.     "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941).  "[T]he right to have the vote counted" means counted "at full value without dilution or discount."  *Reynolds*, 377 U.S. at 555, n.29 (*quoting South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

128.     "Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

129.     The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast.  The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. *See, e.g., Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of

1    eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

2    130.    The right to an honest [count] is a right possessed by each voting

3    elector, and to the extent that the importance of his vote is nullified, wholly or in

4    part, he has been injured in the free exercise of a right or privilege secured to him

5    by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226

6    (*quoting Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to*

7    *absence of quorum*, 339 U.S. 974 (1950)).

8    131.    Practices that promote the casting of illegal or unreliable ballots or

9    fail to contain basic minimum guarantees against such conduct, can violate the

10   Fourteenth Amendment by leading to the dilution of validly cast ballots. See

11   *Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement

12   or dilution of the weight of a citizen's vote just as effectively as by wholly

13   prohibiting the free exercise of the franchise.").

14   132.    Arizona law makes clear with regard to the electronic voting systems, that

15   "[a]fter the close of the polls and after compliance with section 16-602 the members of the

16   election board shall prepare a report in duplicate of the number of voters who have voted,

17   as indicated on the poll list, and place this report in the ballot box or metal container, in

18   which the voted ballots have been placed, which thereupon shall be sealed with a numbered

19   seal and delivered promptly by two members of the election board of different political

20   parties to the central counting place or other receiving station designated by the board of

21   supervisors or officer in charge of elections, which shall not be more than fifty miles from

22   the polling place from which the ballots are delivered. The person in charge of receiving

23   ballots shall give a numbered receipt acknowledging receipt of such ballots to the person

24   in charge who delivers such ballots. B. The chairman of the county committee of each

25   political party represented on the ballot may designate a member of his party to accompany

26   the ballots from each polling place to the central counting place.  A.R.S. § 16-608.

27   133.    As Plaintiffs have shown the ballots processed by Dominion Voting Systems

28   reports to SCYTL, which is offshore, and uses an algorithm, that is secretive, and applies

                                            - 48 -

1    a cleansing of invalid versus valid ballots, before the votes get tallied for distribution.

2    134.    Plaintiffs seek declaratory and injunctive relief enjoining Defendants

3    from certifying the results of the General Election. This Court should enjoin

4    Defendants from certifying a tally that includes any ballots that were not legally

5    cast, or that were switched from Trump to Biden through the unlawful use of

6    Dominion Democracy Suite software and devices.

7                                    **COUNT IV**

8                              **Wide-Spread Ballot Fraud**

9    135.    Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

10   136.    The scheme of civil fraud can be shown with the pattern of conduct that

11   includes motive and opportunity, as exhibited by the high level official at Dominion Voting

12   Systems, Eric Coomer, and his visceral and public rage against the current U.S. President.

13   137.    Opportunity appears with the secretive nature of the voting source code, and

14   the feed of votes that make clear that an algorithm is applied, that reports in decimal points

15   despite the law requiring one vote for one ballot.

16   138.    The Supreme Court of Arizona set forth the standard of fraud for elections

17   when it that held in the State of Arizona, fraud in an election is based on ballots procured

18   in violation to the law: "We therefore hold that HN5 a showing of **fraud** is not a necessary

19   condition to invalidate absentee **balloting**. It is sufficient that an express non-

20   technical statute was violated, and **ballots** cast in violation of the statute affected the

21   election. *Miller v. Picacho Elementary Sch. Dist. No*. 33, 179 Ariz. 178, 180, 877 P.2d

22   277, 279, (S. Ct.1994).

23       "Contrary to *Findley,* election statutes are mandatory, not "advisory," or else they
24       would not be law at all. If a statute expressly provides that non-compliance
         invalidates the vote, then the vote is invalid. If the statute does not have such a
25       provision, non-compliance may or may not invalidate the vote depending on its
         effect. In the context of this case, "affect the result, or at least render it uncertain,"
26       *id.* at 269, 276 P. at 844, means **ballots** procured in violation of a non-technical
27       statute in sufficient numbers to alter the outcome of the election.

28   Id.

                                    - 49 -

139.     This Complaint presents expert witness testimony demonstrating that several hundred thousand illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular:

    A.   Unreturned mail ballots unlawfully ordered by third parties: 219,135

    B.   Returned ballots that were deemed unreturned by the state:  86,845

    C.   Votes by persons that moved out of state or subsequently registered to vote in another state for the 2020 election: 5,790.

    D.   "Excess votes" to historically unprecedented, and likely fraudulent turnout levels of 80% or more in over half of Maricopa and Pima County precincts: 100,724.

    E.   And Plaintiffs can show Mr. Biden received a statistically significant Advantage from the use of Dominion Machines in a nationwide Study, which conservatively estimates Biden's advantage at 62,282 Votes.

140.     The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. See, e.g., *Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

141.     Plaintiffs have no adequate remedy at law.  Plaintiffs contest the results of Arizona's 2020 General Election because it is fundamentally corrupted by fraud. Defendants should be enjoined from certifying an election where there were intentional violations of multiple provisions of Arizona law to elect Biden and other Democratic candidates and defeat President Trump and other Republican candidates.

**PRAYER FOR RELIEF**

142.     Accordingly, Plaintiffs seek an emergency order instructing Defendants to de-certify the results of the General Election for the Office of President.

143.     In the alternative, Plaintiffs seek an emergency order prohibiting Defendants from including in any certified results from the General Election the tabulation of absentee and mailing ballots which do not comply with Arizona law.

144.     Further, Plaintiffs ask this Court to order production of all registration data, ballot applications, ballots, envelopes, etc. required to be maintained by law.  When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Arizona and did so on a large scale and widespread basis.  The size of the voting failures, whether accidental or intentional, are multiples larger than the margin in the state.  For these reasons, Arizona cannot reasonably rely on the results of the mail vote. Relief sought is the elimination of the mail ballots from counting in the 2020 election. Alternatively, the electors for the State of Arizona should be disqualified from counting toward the 2020 election.  Alternatively, the electors of the State of Arizona should be directed to vote for President Donald Trump.

145.     For these reasons, Plaintiffs ask this Court to enter a judgment in their favor and provide the following emergency relief:

1.   An order directing Governor Ducey and Secretary Hobbs to de-certify the election results;

2.   An order enjoining Governor Ducey from transmitting the currently certified election results the Electoral College;

3.   An immediate emergency order to seize and impound all servers, software, voting machines, tabulators, printers, portable media, logs,

ballot applications, ballot return envelopes, ballot images, paper ballots, and all election materials related to the November 3, 2020 Arizona election for forensic audit and inspection by the Plaintiffs;

4. An order that no votes received or tabulated by machines that were not certified as required by federal and state law be counted;

5. A declaratory judgment declaring that Arizona's failed system of signature verification violates the Electors and Elections Clause by working a de facto abolition of the signature verification requirement;

6. A declaratory judgment declaring that currently certified election results violate the Due Process Clause, U.S. CONST. Amend. XIV;

7. A declaratory judgment declaring that mail-in and absentee ballot fraud must be remedied with a Full Manual Recount or statistically valid sampling that properly verifies the signatures on absentee ballot envelopes and that invalidates the certified results if the recount or sampling analysis shows a sufficient number of ineligible absentee ballots were counted;

8. A declaratory judgment declaring absentee ballot fraud occurred in violation of Constitutional rights, Election laws and under state law;

9. A permanent injunction prohibiting the Governor and Secretary of State from transmitting the currently certified results to the Electoral College based on the overwhelming evidence of election tampering;

10. Immediate production of 48 hours of security camera recording of all rooms used in Maricopa County for November 3, 2020 and November 4, 2020.

11. Plaintiffs further request the Court grant such other relief as is just and proper, including but not limited to, the costs of this action and their reasonable attorney fees and expenses pursuant to 42 U.S.C. 1988.

Respectfully submitted, this 1st day of December 2020.

/s Sidney Powell*                                         /s Alexander Kolodin

Sidney Powell PC                                   Kolodin Law Group PLLC
Texas Bar No. 16209700                               AZ Bar No. 030826

2911 Turtle Creek Blvd, Suite 300        3443 N. Central Ave Ste 1009
Dallas, Texas 75219                                      Phoenix, AZ 85012

*Application for admission pro hac vice
forthcoming

Of Counsel:
Emily P. Newman (Virginia Bar No. 84265)
Julia Z. Haller (D.C. Bar No. 466921)
Brandon Johnson (D.C. Bar No. 491730)

2911 Turtle Creek Blvd. Suite 300
Dallas, Texas 75219

*Application for admission pro hac vice Forthcoming

L. Lin Wood (Georgia Bar No. 774588)
L. LIN WOOD, P.C.
P.O. Box 52584
Atlanta, GA 30305-0584
Telephone: (404) 891-1402

Howard Kleinhendler (New York Bar No. 2657120)
Howard Kleinhendler Esquire
369 Lexington Ave. 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

Exhibit B8

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

WILLIAM FEEHAN and DERRICK VAN
ORDEN,

               Plaintiffs.

       v.

WISCONSIN ELECTIONS COMMISSION,
and its members ANN S. JACOBS, MARK
L. THOMSEN, MARGE BOSTELMAN,
JULIE M. GLANCEY, DEAN KNUDSON,
ROBERT F. SPINDELL, JR., in their official
capacities, GOVERNOR TONY EVERS, in
his official capacity,

           Defendants.

CASE NO.  2:20-cv-1771

---

**COMPLAINT FOR DECLARATORY, EMERGENCY, AND PERMANENT
INJUNCTIVE RELIEF**

---

### NATURE OF THE ACTION

1.  This civil action brings to light a massive election fraud, multiple violations of the
Wisconsin Election Code, *see, e.g.,* Wis. Stat. §§ 5.03, *et. seq.*, in addition to the Election and
Electors Clauses and Equal Protection Clause of the U.S. Constitution.  These violations occurred
during the 2020 General Election throughout the State of Wisconsin, as set forth in the affidavits
of dozens of eyewitnesses and the statistical anomalies and mathematical impossibilities detailed
in the affidavits of expert witnesses.

2.  The scheme and artifice to defraud was for the purpose of illegally and fraudulently

1

manipulating the vote count to manufacture an election of Joe Biden as President of the United States, and also of various down ballot democrat candidates in the 2020 election cycle. The fraud was executed by many means, but the most fundamentally troubling, insidious, and egregious ploy was the systemic adaptation of old-fashioned "ballot-stuffing."  It has now been amplified and rendered virtually invisible by computer software created and run by domestic and foreign actors for that very purpose.  This Complaint details an especially egregious range of conduct in Milwaukee County and the City of Milwaukee, along with Dane County, La Crosse County, Waukesha County, St. Croix County, Washington County, Bayfield County, Ozaukee County and various other counties throughout the Third District and throughout Wisconsin employing Dominion Systems, though this conduct occurred throughout the State at the direction of Wisconsin state election officials.

3.   The multifaceted schemes and artifices implemented by Defendants and their collaborators to defraud resulted in the unlawful counting, or fabrication, of hundreds of thousands of illegal, ineligible, duplicate or purely fictitious ballots in the State of Wisconsin, that collectively add up to multiples of Biden's purported lead in the State of 20,565 votes.

4.   While this Complaint, and the eyewitness and expert testimony incorporated herein, identify with specificity sufficient ballots required to set aside the 2020 General Election results, the entire process is so riddled with fraud, illegality, and statistical impossibility that this Court, and Wisconsin's voters, courts, and legislators, cannot rely on, or certify, any numbers resulting from this election.  Accordingly, this Court must set aside the results of the 2020 General Election and grant the declaratory and injunctive relief requested herein.

**Dominion Voting Systems Fraud and Manipulation**

5.  The fraud begins with the election software and hardware from Dominion Voting Systems Corporation ("Dominion") used by the Wisconsin Board of State Canvassers.  The Dominion systems derive from the software designed by Smartmatic Corporation, which became Sequoia in the United States.

6.  Smartmatic and Dominion were founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election.  *See* Ex. 1, Redacted Declaration of Dominion Venezuela Whistleblower ("Dominion Whistleblower Report").  Notably, Chavez "won" every election thereafter.

7.  As set forth in the Dominion Whistleblower Report, the Smartmatic software was contrived through a criminal conspiracy to manipulate Venezuelan elections in favor of dictator Hugo Chavez:

> Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic.  The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government.  In mid-February of 2009, there was a national referendum to change the Constitution of Venezuela to end term limits for elected officials, including the President of Venezuela. The referendum passed. This permitted Hugo Chavez to be re-elected an unlimited number of times.  . . .

> Smartmatic's electoral technology was called "Sistema de Gestión Electoral" (the "Electoral Management System"). Smartmatic was a pioneer in this area of computing systems. Their system provided for transmission of voting data over the internet to a computerized central tabulating center. The voting machines themselves had a digital display, fingerprint recognition feature to identify the voter, and printed out the voter's ballot. The voter's thumbprint was linked to a computerized record of that voter's identity. Smartmatic created and operated the

3

entire system.  *Id.* ¶¶ 10 & 14.

8.   A core requirement of the Smartmatic software design ultimately adopted by Dominion for Wisconsin's elections was the software's ability to hide its manipulation of votes from any audit.  As the whistleblower explains:

> Chavez was most insistent that Smartmatic design the system in a way that the system could change the vote of each voter without being detected. He wanted the software itself to function in such a manner that if the voter were to place their thumb print or fingerprint on a scanner, then the thumbprint would be tied to a record of the voter's name and identity as having voted, but that voter would not tracked to the changed vote. He made it clear that the system would have to be setup to not leave any evidence of the changed vote for a specific voter and that there would be no evidence to show and nothing to contradict that the name or the fingerprint or thumb print was going with a changed vote. Smartmatic agreed to create such a system and produced the software and hardware that accomplished that result for President Chavez. *Id.* ¶15.

9.   The design and features of the Dominion software do not permit a simple audit to reveal its misallocation, redistribution, or deletion of votes.  First, the system's central accumulator does not include a protected real-time audit log that maintains the date and time stamps of all significant election events.  Key components of the system utilize unprotected logs.  Essentially this allows an unauthorized user the opportunity to arbitrarily add, modify, or remove log entries, causing the machine to log election events that do not reflect actual voting tabulations—or more specifically, do not reflect the actual votes of or the will of the people.[1]

10.  This Complaint will show that Dominion violated physical security standards by connecting voting machines to the Internet, allowing Dominion, domestic third parties or hostile foreign actors to access the system and manipulate election results, and moreover potentially to

---

[1]  *See* Ex. 7, August 24, 2020 Declaration of Harri Hursti, ¶¶45-48 (expert testimony in Case 1:17-cv-02989 in the U.S. District Court for the Northern District of Georgia).  The Texas Secretary of State refused to certify Dominion for similar reasons as those cited by Mr. Hursti.  *See* Ex. 9, State of Texas Secretary of State, Elections Division, Report of Review of Dominion Voting Systems Democracy Suite 5.5-A at 2 (Jan. 24, 2020).

4

cover their tracks due to Dominion's unprotected log. Accordingly, a thorough forensic examination of Dominion's machines and source code (pursuant to Wisconsin Statute § 5.905) is required to document these instances of voting fraud, as well as Dominion's systematic violations of the Voting Rights Act record retention requirements through manipulation, alteration, destruction and likely foreign exfiltration of voting records. See 52 U.S.C. § 20701.

11.   These and other problems with Dominion's software have been widely reported in the press and been the subject of  investigations. In certifying Dominion Voting Systems Democracy Suite, Wisconsin officials disregarded all the concerns that caused Dominion software to be rejected by the Texas Board of elections in 2020 because it was deemed vulnerable to undetected and non-auditable manipulation.  Texas denied Certification because of concerns that it was not safe from fraud or unauthorized manipulation.  (See Exhs 11 A and B).

12.   An industry expert, Dr. Andrew Appel, Princeton Professor of Computer Science and Election Security Expert has recently observed, with reference to Dominion Voting machines: "I figured out how to make a slightly different computer program that just before the polls were closed, it switches some votes around from one candidate to another. I wrote that computer program into a memory chip and now to hack a voting machine you just need 7 minutes alone with a screwdriver."[2]

13.   In addition to the Dominion computer fraud, this Complaint identifies several additional categories of "traditional" voting fraud that occurred as a direct result of Defendant Wisconsin Election Commission ("WEC") and other Defendants directing Wisconsin clerks and other election officials to ignore or violate the express requirements of the Wisconsin Election Code.

---

[2] Andrew W. Appel, *et al.*, "Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters" at (Dec. 27, 2019),( attached hereto as Exh. 10 ("Appel Study")).

5

First, the WEC issued "guidance" to county and municipal clerks not to reject "indefinitely confined" absentee voters, even if the clerks possess "reliable information" that the voter is no longer indefinitely confined, in direct contravention of Wisconsin Statute § 6.86(2)(6), which states that clerks must remove such voters.  Second, the WEC issued further guidance directing clerks – in violation of Wisconsin Statute § 6.87(6)(d), which states that an absentee envelope certification "is missing the address of a witness, the ballot may not be counted" – to instead fill in the missing address information.

14.  This Complaint presents expert witness testimony demonstrating that several hundred thousand illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular:

    A.  A report from Dr. William Briggs, showing that there were approximately 29,594 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots;

    B.  Reports from Redacted Expert Witnesses who can show an algorithm was used to pick a winner.

15.  In the accompanying redacted declaration of a former electronic intelligence analyst with 305th Military Intelligence with experience gathering SAM missile system electronic intelligence, the Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections, including the most recent US general election in 2020.  (See Ex. 12, copy of redacted witness affidavit).

16.  These and other "irregularities" demonstrate that at least 318,012 illegal ballots were counted in Wisconsin.  This provides the Court with sufficient grounds to set aside the results of the 2020 General Election and provide the other declaratory and injunctive relief requested herein.

## JURISDICTION AND VENUE

17.  This Court has subject matter under 28 U.S.C. § 1331 which provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties

of the United States."

18.   This Court also has subject matter jurisdiction under 28 U.S.C. § 1343 because this action involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932).

19.   The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. §§ 2201 and 2202 and by Rule 57, Fed. R. Civ. P.

20.   This Court has jurisdiction over the related Wisconsin constitutional claims and state-law claims under 28 U.S.C. § 1367.

21.   Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District. 28 U.S.C. § 1391(b) & (c).

22.   Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers have no authority to unilaterally exercise that power, much less flout existing legislation.

### THE PARTIES

23.   Plaintiff William Feehan, is a registered Wisconsin voter and a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Wisconsin.  Mr. Feehan is a resident of the City of La Crosse and La Crosse County, Wisconsin.

24.   Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions

of state officials implementing or modifying State election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).

25.   Plaintiff Feehan has standing to bring this action as a voter and as a candidate for the office of Elector under Wis. Stat. §§ 5.10, et seq (election procedures for Wisconsin electors).  As such, Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors."  *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of state officials in implementing or modifying State election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).

26.   Plaintiff Derrick Van Orden is a former United States Navy SEAL, who was the 2020 Republican nominee for Wisconsin's Third Congressional District Seat for the United States House of Representatives.  Mr. Van Orden is a resident of Hager City, Pierce County, Wisconsin.

27.   Mr. Van Orden "lost" by approximately 10,000 votes to the Democrat incumbent, U.S. Representative Ron Kind.  Because of the illegal voting irregularities as will be shown below, Mr. Van Orden seeks to have a new election ordered by this court in the Third District, with that election being conducted under strict adherence with the Wisconsin Election Code.

28.   Plaintiff Van Orden has standing as the ostensible "defeated" candidate in the Third Congressional District race, and seeks an order for a new election, complying with Wisconsin election law.  Plaintiff Van Order received 189,524 votes or 48.67% as tallied versus Ron Kind who received 199,870 or 51.33% of the votes as reportedly tallied.

8

29.   Plaintiffs brings this action to prohibit certification of the election results for the Office of President of the United States in the State of Wisconsin and to obtain the other declaratory and injunctive relief requested herein.  Those results were certified by Defendants on November 30, 2020, indicating a plurality for Mr. Biden of 20,565 votes out of 3,240,867 cast.

30.   The Defendants are Wisconsin Elections Commission ("WEC"), a state agency, and its members Ann S. Jacobs, Mark L. Thomsen, Marge Bostelman, Julie M. Glancey, Dean Knudson, and Robert F. Spindell, Jr., in their official capacities

31.   Defendant Governor Tony Evers is named as a defendant in his official capacity as Wisconsin's governor.

32.   Defendant WEC was created in 2015 by the Wisconsin Legislature as an independent agency under the Executive branch to administer Wisconsin's election laws. Wis. Stat.  §§ 5.03 & 15.61.   The WEC is authorized to adopt administrative rules pursuant to Chapter 227 of the Wisconsin Statutes, but nothing under Wisconsin's election laws authorizes the WEC to issue any documents, make any oral determinations or instruct governmental officials administering elections to perform any act contrary to Wisconsin law governing elections.

33.   Furthermore, the Wisconsin Legislature also created municipal elections commissions for municipalities with a population greater than 500,000 and a county elections commissions for counties with a population greater than 750,000.  Wis Stat.  § 7.20.  As a result, the City of Milwaukee Elections Commission was created as well as the Milwaukee County Elections Commission and the Dane County Elections Commission. These county and municipal elections commissions are responsible for administering the elections in their respective jurisdictions.

9

## STATEMENT OF FACTS

34.   Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988, to remedy deprivations of rights, privileges, or immunities secured by the Constitution and laws of the United States and to contest the election results, and the corollary provisions under the Wisconsin Constitution.

35.   The United States Constitution sets forth the authority to regulate federal elections. With respect to congressional elections, the Constitution provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators.

> U.S. CONST. art. I, § 4 ("Elections Clause").

36.   With respect to the appointment of presidential electors, the Constitution provides:

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

> U.S. CONST. art. II, § 1 ("Electors Clause").

37.   None of Defendants is a "Legislature" as required under the Elections Clause or Electors Clause to set the rules governing elections. The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley*, 285 U.S. 365.   Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." Id. at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 135 S. Ct. 2652, 2668 (U.S. 2015).

38.   The WEC certified the Presidential Election results on November 30, 2020.   The Presidential election results in Wisconsin show a difference of 20,565 "tallied" votes in favor of former Vice-President Joe Biden over President Trump.

10

39.  Based upon all the allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to enjoin the certification of the election results pending a full investigation and court hearing, and to order an independent audit of the November 3, 2020 election to ensure the accuracy and integrity of the election.

## I.   VIOLATIONS OF WISCONSIN ELECTION CODE

### A.   WEC Directed Clerks to Violate Wisconsin Election Code Requirements for Absentee Voting by "Indefinitely Confined" without Photo ID.

40.  The Wisconsin State Legislature adopted Act 23 in 2011 to require Wisconsin electors to present an identification containing a photograph, such as a driver's license, to either a municipal or county clerk, when registering to vote and when voting. Wis. Stat. §§ 6.34; 6.79 (2). The Wisconsin State Legislature adopted the photo ID requirement to deter the casting of ballots by persons either not eligible to vote or persons fraudulently casting multiple ballots. *League of Women Voters of Wisconsin Education Network, Inc. v. Walker,* 851 N.W.2d 302, 314 (Wis. 2014).

41.  Wisconsin's absentee voting is governed by Wisconsin Statutes § 6.84 - § 6.89.  Under Wisconsin Statutes §6.86, every absentee elector applicant must present a photo ID when registering to vote absentee except absentee voters who registered as "indefinitely confined," Wis. Stat. §6.86 (ac), meaning someone confined "because of age, physical illness or infirmity or is disabled for an indefinite period." Wis. Stat. § 6.86(2)(a). As a result, Wisconsin election procedures for voting absentee based on "indefinitely confined" status circumvent the photo ID requirement, creating an avenue for fraudulent voting.

42.  In order to ensure that only those who are "indefinitely confined" may use the "indefinitely confined" absentee ballot in an election, Wisconsin Statutes §6.86 provides that any elector who files an application for an absentee ballot based on indefinitely confined status may not use the absentee ballot if the electoral is no longer "indefinitely confined."  Wisconsin Statutes § 6.86 (2)(b) further

11

provides that the municipal clerk "shall remove the name of any other elector from the list upon request of the elector or upon receipt of reliable information that an elector no longer qualifies for the service."

43.   Despite this clear statutory requirement, the Administrator of the Wisconsin Election Commission, Meagan Wolfe, issued a written directive on May 13, 2020 to the clerks across the State of Wisconsin stating that the clerks cannot remove an allegedly "indefinitely confined" absentee voter from the absentee voter register if the clerk had "reliable information" that an allegedly "indefinitely confined" absentee voter is no longer "indefinitely confined." The directive specifically stated:

> Can I deactivate an absentee request if I believe the voter is not indefinitely confined? No. All changes to status must be made in writing and by the voter's request. Not all medical illnesses or disabilities are visible or may only impact the voter intermittently.  (*See* WEC May 13, 2020 Guidance Memorandum).

44.   The WEC's directive thus directly contradicts Wisconsin law, which specifically provides that clerks "shall" remove an indefinitely confined voter from the absentee voter list if the clerk obtains "reliable information" that the voter is no longer indefinitely confined.

45.   As a result of the directive, clerks did not remove from the absentee voter lists maintained by their jurisdictions the absentee voters who claimed "indefinitely confined" status but who in fact were no longer "indefinitely confined."   This resulted in electors who were allegedly "indefinitely confined" absentee voters casting ballots as "indefinitely confined" absentee voters who were not actually "indefinitely confined" absentee voters.

### B. WEC Directed Clerks to Violate Wisconsin Law Prohibiting Counting of Absentee Ballot Certificates Missing Witness Addresses.

46.   In 2015, the Wisconsin Legislature passed Act 261, amending Wisconsin's election laws, including a requirement, codified as Wisconsin Statute § 6.87(d), that absentee ballots include both

elector and witness certifications, which must include the address of the witness.   If the address

of the witness is missing from the witness certification, however, "the ballot may not be counted."

*Id.*

47.   On October 18, 2016, WEC reacted to this legislation by issuing a memorandum, which,

among other things, permitted clerks to write in the witness address onto the absentee ballot

certificate itself, effectively nullifying this express requirement. (*See* WEC October 18, 2016

Guidance Memorandum).   Wisconsin election officials reiterated this unlawful directive in

publicly posted training videos.  For example, in a Youtube video posted before the November 3,

2020 General Election by Clarie Woodall-Voog of the Milwaukee Elections Commission, Ms.

Woodall-Voog advised clerks that missing items "like witness address may be written in red."[3]

## C.   WEC Directed Clerks to Illegally Cure Absentee Ballots by Filling in Missing Information on Absentee Ballot Certificates and Envelopes.

48.   On October 19, 2020, WEC instructed its clerks that, without any legal basis in the

Wisconsin Election Code, they could simply fill in missing witness or voter certification

information using, e.g., personal knowledge, voter registration information, or calling the voter or

witness.  The WEC further advised that voters or witnesses could cure any missing information at

the polling place, again without citing any authority to do so under Wisconsin Election Code.

## II. EXPERT WITNESS TESTIMONY: EVIDENCE OF WIDESPREAD VOTER FRAUD

### A.   Approximately 15,000 Wisconsin Mail-In Ballots Were Lost, and Approximately 18,000 More Were Fraudulently Recorded for Voters who Never Requested Mail-In Ballots.

49.   The attached report of William M. Briggs, Ph.D. ("Dr. Briggs Report") summarizes the

multi-state phone survey that includes a survey of Wisconsin voters collected by Matt Braynard,

---

[3] *See* https://www.youtube.com/watch?v=hbm-pPaYiqk (video a 10:43 to 11:07).

which was conducted from November 15-17, 2020.  *See* Ex. 101, Dr. Briggs Report at 1, and Att. 1 ("Braynard Survey").  The Briggs analysis identified two specific errors involving unreturned mail-in ballots that are indicative of voter fraud, namely: "**Error #1:** those who were recorded as receiving absentee ballots *without* requesting them;" and "**Error #2:** those who returned absentee ballots but whose votes went missing (*i.e.*, marked as unreturned)."  *Id.*  Dr. Briggs then conducted a parameter-free predictive model to estimate, within 95% confidence or prediction intervals, the number of ballots affected by these errors out of a total of 96,771 unreturned mail-in ballots for the State of Wisconsin.

50.  With respect to **Error #1**, Dr. Briggs' analysis estimated that **16,316-19,273 ballots** out of the total 96,771 unreturned ballots were recorded for voters who had **not** requested them.  *Id.*  With respect to **Error #2**, he found **13,991 – 16,757 ballots** out of 96,771 unreturned ballots recorded for voters who **did return their ballots were recorded as being unreturned.**  *Id.*  Taking the average of the two types of errors together, **29,594 ballots, or 31% of the total, are "troublesome."**

51.  These errors are not only conclusive evidence of widespread fraud by the State of Wisconsin, but they are fully consistent with the fact witness statements cited above regarding the evidence about Dominion presented below insofar as **these unreturned absentee ballots represent a pool of blank ballots that could be filled in by third parties to shift the election to Joe Biden,** and also present the obvious conclusion that there must be absentee ballots unlawfully ordered by third parties that were returned.

52.  With respect to **Error #1**, Dr. Briggs' analysis demonstrates that approximately **17,795 absentee ballots were sent to someone besides the registered voter named in the request**, and thus could have been filled out by anyone and then submitted in the name of another voter.

14

Regarding ballots ordered by third parties that were voted, those would no longer be in the unreturned pool and therefore cannot be estimated from this data set.

53.   With respect to **Error #2**, Dr. Briggs' analysis indicates that approximately **15,374 absentee ballots were either lost or destroyed** (consistent with allegations of Trump ballot destruction) **and/or were replaced with blank ballots filled out by election workers, Dominion or other third parties.**  Dr. Briggs' analysis shows that 31% of "unreturned ballots" suffer from one of the two errors above – which is consistent with his findings in the four other States analyzed (Arizona 58%, Georgia 39%, Pennsylvania 37%, and Wisconsin 45%) – and provides further support that these widespread "irregularities" or anomalies were one part of a much larger multi-state fraudulent scheme to rig the 2020 General Election for Joe Biden.

### B.   Nearly 7,000 Ineligible Voters Who Have Moved Out-of-State Illegally Voted in Wisconsin.

54.   Evidence compiled by Matt Braynard using the National Change of Address ("NCOA") Database shows that 6,207 Wisconsin voters in the 2020 General Election moved out-of-state prior to voting, and therefore were ineligible.  Mr. Braynard also identified 765 Wisconsin voters who subsequently registered to vote in another state and were therefore ineligible to vote in the 2020 General Election.  The merged number is 6,966 ineligible voters whose votes must be removed from the total for the 2020 General Election.[4]

### C.   A Statistical Study Reveals that Biden Overperformed in those Precincts that Relied on Dominion Voting Machines

55.   From November 13th, 2020 through November 28th, 2020, the Affiant conducted in-depth statistical analysis of publicly available data on the 2020 U.S. Presidential Election.  This data

---

[4] Mr. Braynard posted the results of his analysis on Twitter.
*See* https://twitter.com/MattBraynard/status/1329700178891333634?s=20.  This Complaint includes a copy of his Report, (attached hereto as Exh. 3).

15

included vote counts for each county in the United States, U.S. Census data, and type of voting machine data provided by the U.S. Election Assistance Committee.  The Affiant's analysis yielded several "red flags" concerning the percentage of votes won by candidate Biden in counties using voting machines provided by Dominion Voting Systems.   These red flags occurred in several States in the country, including Wisconsin.  (See attached hereto as Exh. 4, copy of redacted Affiant, B.S. Mathematics and M.S. Statistics).

56.  The Affiant began by using Chi-Squared Automatic Interaction Detection (CHAID), which treats the data in an agnostic way—that is, it imposes no parametric assumptions that could otherwise introduce bias.  Affiant posed the following question: "Do any voting machine types appear to have unusual results?"   The answer provided by the statistical technique/algorithm was that machines from Dominion Voting Systems (Dominion) produced abnormal results.  *Id.*

57.  Subsequent graphical and statistical analysis shows the unusual pattern involving machines from Dominion occurs in at least 100 counties and multiple States, including Wisconsin. The results from the vast majority of counties using the Dominion machines is 3 to 5.6 percentage points higher in favor of candidate Biden.  This pattern is seen easily in graphical form when the results from "Dominion" counties are overlaid against results from "non-Dominion" counties.  The results from "Dominion" counties do not match the results from the rest of the counties in the United States.  The results are clearly statistically significant, with a p-value of $< 0.00004$.  This translates into a statistical impossibility that something unusual involving Dominion machines is *not* occurring. This pattern appears in multiple States, including Wisconsin, and the margin of votes implied by the unusual activity would easily sway the election results.  *Id.*

58.  The following graph shows the pattern.  The large red dots are counties in Wisconsin that use Dominion voting machines.  Almost all of them are above the blue prediction line, when in

16

normal situations approximately half of them would be below the prediction line (as evidence by approximately half the counties in the U.S. (blue dots) that are below the blue centerline). The p-value of statistical analysis regarding the centerline for the red dots (Wisconsin counties with Dominion machines) is 0.000000049, pointing to a statistical impossibility that this is a "random" statistical anomaly. Some external force caused this anomaly:



*Id.*

59. To confirm that Dominion machines were the source of the pattern/anomaly, Affiant conducted further analysis using propensity scoring using U.S. census variables (including ethnicities, income, professions, population density and other social/economic data) , which was used to place counties into paired groups. Such an analysis is important because one concern could be that counties with Dominion systems are systematically different from their counterparts, so

17

abnormalities in the margin for Biden are driven by other characteristics unrelated to the election. *Id.*

60.   After matching counties using propensity score analysis, the only difference between the groups was the presence of Dominion machines.  This approach again showed a highly statistically significant difference between the two groups, with candidate Biden again averaging three percentage points higher in Dominion counties than in the associated paired county.   The associated p-value is < 0.00005, against indicating a statistical impossibility that something unusual is not occurring involving Dominion machines.  Id.

61.   The results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Wisconsin's vote tallies to be inflated by somewhere between three and five point six percentage points.  **Statistical estimating yields that in Wisconsin, the best estimate of the number of impacted votes is 181,440.**  *Id.*

62.   The summation of sections A through C above provide the following conclusions for the reports cited above, respectively.

- returned ballots that were deemed unreturned by the state: 15,374

- unreturned mail ballots unlawfully ordered by third parties: 17,795

- votes by persons that moved out of state or subsequently registered to vote in another state for the 2020 election: 6,966

- Votes that were improperly relying on the "indefinitely confined" exemption to voter ID:  96,437

- And excess votes arising from the statistically significant outperformance of Dominion machines on behalf of Joe Biden: 181,440

18

*In Conclusion, the Reports cited above show a total amount of illegal votes identified that amount to 318,012 or over 15 times the margin by which candidate Biden leads President Trump in the state of Wisconsin.*

### III. FACTUAL ALLEGATIONS REGARDING DOMINION VOTING SYSTEMS

63.   The State of Wisconsin, in many locations, used either Sequoia, a subsidiary of Dominion Systems, and or Dominion Systems, Democracy Suite 4.14-D first, and then included Dominion Systems Democracy Suite 5.0-S on or about January 27, 2017, which added a fundamental modification: *"*dial-up and wireless results transmission capabilities to the ImageCast Precinct and results transmission using the Democracy Suite EMS Results Transfer Manager module." (See Exh. 5, attached hereto, a copy of the Equipment for WI election systems).

### A. Dominion's Results for 2020 General Election Demonstrate Dominion Manipulated Election Results.

64.   Affiant Keshel's findings that reflect the discussion cited above:

> While Milwaukee County is focal for transparency and observation violations, including reporting statistically impossible vote counts in the early morning hours away from scrutiny, Dane County has surged far past support totals for President Obama, despite expected difficulties mobilizing student voters to polls. President Trump has reconsolidated the Republican base in suburban Milwaukee and far surpassed his 2016 support levels but has been limited in margin growth by historically improbable Democratic support in these strongholds, which defy years of data in Wisconsin in which the Republican party surged as the Democratic Party plunged. Finally, in strong Trump counties showing a double inversion cycle (one party up, the other down), particularly in rural and exurban Wisconsin, Trump's totals are soaring, and against established trends, Biden's totals are at improbable levels of support despite lacking registration population
> (*See* attached hereto, Exh. 9, Aff. of Seth Keshel, MBA)

19

| County | Rep '08 | Dem '08 | Rep '12 | Dem '12 | Rep '16 | Dem '16 | Rep '20 | Dem '20 | Dem Percentage of Obama 2008 Votes |
|---|---|---|---|---|---|---|---|---|---|
| Ozaukee | 32,172 | 20,579 | 36,077 | 19,159 | 30,464 | 20,170 | 33,912 | 26,515 | 128.8% |
| % Increase | N/A | N/A | 12.1% | (6.9%) | (15.6%) | 5.3% | 11.3% | 31.5% | |
| ---- | | | | | | | | | |
| Dane | 73,065 | 205,984 | 83,644 | 216,071 | 71,275 | 217,697 | 78,789 | 260,157 | 126.3% |
| % Increase | N/A | N/A | 14.5% | 4.9% | (14.8%) | 0.8% | 10.5% | 19.5% | |
| ---- | | | | | | | | | |
| Waukesha | 145,152 | 85,339 | 162,798 | 78,779 | 142,543 | 79,224 | 159,633 | 103,867 | 121.7% |
| % Increase | N/A | N/A | 12.2% | (7.7%) | (12.4%) | 0.6% | 12.0% | 31.1% | |
| ---- | | | | | | | | | |
| Racine | 45,954 | 53,408 | 49,347 | 53,008 | 46,681 | 42,641 | 54,475 | 50,154 | 117.6% |
| % Increase | N/A | N/A | 7.4% | (0.7%) | (5.4%) | (19.6%) | 16.7% | 17.6% | |

*Id.*

   65.   Keshel provides a graph reflecting the voter returns in a time-series.  The highly unlikely and remarkably convenient attainment of this block of votes provides for a stunning depiction of the election and generates many questions.  The analysis provided by Plaintiffs' multiple experts, including data, statistics and cyber, will reveal clear evidence of the multiple frauds that combined to change the outcome of the 2020 election.

20



*See Id.*

### B. Administrative and Judicial Decisions Regarding Dominion's Security Flaws.

66. **Wisconsin.** In 2018, Jill Stein was in litigation with Dominion Voting Systems ("DVS") after her 2016 recount request pursuant to WISCONSIN STAT.§5.905(4) wherein DVS obtained a Court Order requiring confidentiality on information including *voting counting source code*, which Dominion claims is proprietary – and must be kept secret from the public. (*See* unpublished decision, Wisconsin Court of Appeals, No. 2019AP272 issued April 30, 2020). Rather than engaging in an open and transparent process to give credibility to Wisconsin's Dominion-Democracy Suite voting system, the processes were hidden during the receipt, review, opening, and tabulation of those votes in direct contravention of Wisconsin's Election Code and Federal law.

67. **Texas.** The same Dominion Democracy Suite was denied certification in Texas by the

21

Secretary of State on January 24, 2020, specifically because the "examiner reports raise concerns about whether Democracy Suite 5.5-A system … **is safe from fraudulent or unauthorized manipulation**."[5]

68. **Georgia.** Substantial evidence of this vulnerability was discussed in Judge Amy Totenberg's October 11, 2020 Order in the USDC N.D. Ga. case of *Curling, et al. v. Kemp, et. al*, Case No. 1:17-cv-02989 Doc. No. 964. *See*, p. 22-23 ("This array of experts and subject matter specialists provided a huge volume of significant evidence regarding the security risks and deficits in the system as implemented in both witness declarations and live testimony at the preliminary injunction hearing."); p. 25 ("In particular, Dr. Halderman's testing indicated the practical feasibility through a cyber attack of causing the swapping or deletion of specific votes cast and the compromise of the system through different cyber attack strategies, including through access to and alteration or manipulation of the QR barcode.") The full order should be read, for it is eye-opening and refutes many of Dominion's erroneous claims and talking points.

69. A District Judge found that Dominion's BMD ballots are not voter verifiable, and they cannot be audited in a software independent way. The credibility of a BMD ballot can be no greater than the credibility of Dominion's systems, which copious expert analysis has shown is deeply compromised.  Similar to the issues in Wisconsin, Judge Totenberg of the District Court of Georgia Northern District held:

> Georgia's Election Code mandates the use of the BMD system as the uniform mode of voting for all in-person voters in federal and statewide elections. O.C.G.A. § 21-2-300(a)(2). The statutory provisions mandate voting on "electronic ballot markers" that: (1) use "electronic technology to independently and privately mark a paper ballot at the direction of an elector, interpret ballot selections, ... such interpretation **for elector verification**, and print **an elector verifiable paper**

---

[5]  See attached hereto, as Exh. 11, State of Texas Secretary of State, Elections Division, *Report of Review of Dominion Voting Systems Democracy Suite 5.5-A* at 2 (Jan. 24, 2020) (emphasis added).

22

**ballot**;" and (2) "produce paper ballots which are marked with the elector's choices **in a format readable by the elector**" O.C.G.A. § 21-2-2(7.1); O.C.G.A. § 21-2-300(a)(2). Plaintiffs and other voters who wish to vote in-person are required to vote on **a system that does none of those things**. Rather, the evidence shows that the Dominion BMD system does **not produce a voter-verifiable paper ballot or a paper ballot marked with the voter's choices in a format readable by the voter because the votes are tabulated solely from the unreadable QR code**.

See Order, pp. 81-82. (Emphasis added).

70.   This case was later affirmed in a related case, in the Eleventh Circuit in 2018 related to Georgia's voting system in *Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270 (11th Cir. 2018). The Court found,

> **In summary, while further evidence will be necessary in the future, the Court finds that the combination of the statistical evidence and witness declarations in the record here (and the expert witness evidence in the related *Curling* case which the Court takes notice of) persuasively demonstrates the likelihood of Plaintiff succeeding on its claims. Plaintiff has shown a substantial likelihood of proving that the Secretary's failure to properly maintain a reliable and secure voter registration system has and will continue to result in the infringement of the rights of the voters to cast their vote and have their votes counted.**

*Id.at* 1294-1295.

71.   The expert witness in the above litigation in the United States District Court of Georgia, Case 1:17-cv-02989-AT, Harri Hursti, specifically testified to the acute security vulnerabilities, *see* Ex. 107, wherein he testified or found:

> A.  "The scanner and tabulation software settings being employed to determine which votes to count on hand marked paper ballots are likely causing clearly intentioned votes to be counted" "The voting system is being operated in Fulton County in a manner that escalates the security risk to an extreme level" "Votes are not reviewing their BMD printed ballots, which causes BMD generated results to be un-auditable due to the untrustworthy audit trail." 50% or more of voter selections in some counties were visible to poll workers. Dominion employees maintain near exclusive control over the EMS servers. "In my professional opinion, the role played by Dominion personnel in Fulton County, and other counties with similar arrangements, should be considered an elevated risk factor when evaluating the security

23

risks of Georgia's voting system." *Id.* ¶26.

B. A video game download was found on one Georgia Dominion system laptop, suggesting that multiple Windows updates have been made on that respective computer.

C. There is evidence of remote access and remote troubleshooting which presents a grave security implication.

D. Certified identified vulnerabilities should be considered an "extreme security risk."

E. There is evidence of transfer of control the systems out of the physical perimeters and place control with a third party off site.

F. USB drives with vote tally information were observed to be removed from the presence of poll watchers during a recent election.

G. "The security risks outlined above – operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system." *Id.* ¶49.

C. **Foreign Interference/Hacking and/or Manipulation of Dominion Results.**

1. **Evidence of Vulnerability to Foreign Hackers.**

72. In October of 2020 The FBI and CISA issued a JOINT CYBERSECURITY

ADVISORY ON October 30, 2020 titled: **Iranian Advanced Persistent Threat Actor Identified**

**Obtained Voter Registration Data**

This joint cybersecurity advisory was coauthored by the Cybersecurity and Infrastructure Security Agency (CISA) and the Federal Bureau of Investigation (FBI). CISA and the FBI are aware of an Iranian advanced persistent threat (APT) actor targeting U.S. state websites to include election websites. CISA and the FBI assess this actor is responsible for the mass dissemination of voter intimidation emails to U.S. citizens and the dissemination of U.S. election-related disinformation in mid-October 2020.[1] (Reference FBI FLASH message ME-000138-TT, disseminated October 29, 2020). Further evaluation by CISA and the FBI has identified the targeting of U.S. state election websites was an intentional effort to influence and interfere with the 2020 U.S. presidential election.

24

(See CISA and FBI Joint Cyber Security Advisory of October 30, 2020, a copy attached hereto as Exh. 18.)

73.  An analysis of the Dominion software system by a former US Military Intelligence expert subsequently found that the Dominion Voting system and software are accessible - and was compromised by rogue actors, including foreign interference by Iran and China.  (*See* Exh. 1, Spider Declaration, (who remains redacted for security reasons).)

74.  The expert does an analysis and explains how by using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, Dominion allowed foreign adversaries to access data and intentionally provided access to Dominion's infrastructure in order to monitor and manipulate elections, including the most recent one in 2020.  (See Exh. 12, Spider Declaration. Several facts are set forth related to foreign members of Dominion Voting Systems and foreign servers as well as foreign interference.).

75.  Another Declarant first explains the foundations of her opinion and then addresses the concerns of foreign interference in our elections through hardware components from companies based in foreign countries with adverse interests.  She explains that Dominion Voting Systems works with SCYTL, and that votes on route, before reporting, go to SCYTL in foreign countries. On the way, they get mixed and an algorithm is applied, which is done through a secretive process.

> The core software used by ALL SCYTL related Election Machine/Software manufacturers ensures "anonymity" Algorithms within the area of this "shuffling" to maintain anonymity allows for setting values to achieve a desired goal under the guise of "encryption" in the trap-door…

(See Exh. 13, Aff. of Computer analysis, at par. 32).

76. The Affiant goes on to explain the foreign relationships in the hardware used by Dominion Voting Systems and its subsidiary Sequoia and explains specifically the port that

25

Wisconsin uses, which is called Edge Gateway and that is a part of Akamai Technologies based in

Germany:

> "Wisconsin has EDGE GATEWAY port which is AKAMAI TECHNOLOGIES
> based out of GERMANY. Using AKAMAI Technologies is allowing .gov sites to
> obfuscate and mask their systems by way of HURRICANE ELECTRIC (he.net)"

77.  This Declarant further explains the foundations of her opinion and then addresses the

concerns of foreign interference in our elections through hardware components from companies

based in foreign countries with adverse interests.

> The concern is the HARDWARE and the NON – ACCREDITED VSTLs as by
> their own admittance use COTS. The purpose of VSTL's being accredited and their
> importance is ensuring that there is no foreign interference / bad actors accessing
> the tally data via backdoors in equipment software. The core software used by ALL
> SCYTL related Election Machine/Software manufacturers ensures "anonymity".
> **Algorithms within the area of this "shuffling" to maintain anonymity allows
> for setting values to achieve a desired goal under the guise of "encryption" in
> the trap-door…**

> (See Id. at ¶32).

78.  This Declarant goes on to explain the foreign relationships in the hardware used by

Dominion Voting Systems and its subsidiary Sequoia and specifically the port that Wisconsin uses:

> "Wisconsin has EDGE GATEWAY port which is AKAMAI TECHNOLOGIES
> based out of GERMANY. Using AKAMAI Technologies is allowing .gov sites to
> obfuscate and mask their systems by way of HURRICANE ELECTRIC (he.net)
> Kicking it to anonymous (AKAMAI Technologies) offshore servers.
> Wisconsin Port.

> China is not the only nation involved in COTS provided to election machines or the
> networking but so is Germany via a LAOS founded Chinese linked cloud service
> company that works with SCYTL named Akamai Technologies that have offices
> in China and are linked to the server [for] Dominion Software.

> (See Id. at par. 21).

79.  The Affiant explains the use of an algorithm and how it presents throughout the statement,

but specifically concludes that,

26

**The "Digital Fix" observed with an increased spike in VOTES for Joe Biden can be determined as evidence of a pivot**. Normally it would be assumed that the algorithm had a Complete Pivot.  Wilkinson's demonstrated the guarantee as:

$$\frac{\|U\|_\infty}{\|A\|_\infty} \leq n^{\frac{1}{2}\log(n)}$$

Such a conjecture allows the growth factor the ability to be upper bound by values closer to n. Therefore, complete pivoting can't be observed because there would be too many floating points. Nor can partial as the partial pivoting would overwhelm after the "injection" of votes. Therefore, external factors were used which is evident from the "DIGITAL FIX."  (*See Id*. at pars. 67-69)

"The algorithm looks to have been set to give Joe Biden a 52% win even with an initial 50K+ vote block allocation was provided initially as tallying began (as in case of Arizona too). In the am of November 4, 2020 the algorithm stopped working, therefore another "block allocation" to remedy the failure of the algorithm. This was done manually as ALL the SYSTEMS shut down NATIONWIDE to avoid detection."

(*See Id*. at par. 73)

## 2. Background of Dominion Connections to Smartmatic and Hostile Foreign Governments.

80.  An expert analysis by Russ Ramsland agrees with the data reflecting the use of an algorithm that causes the spike in the data feed, which is shown to be an injection of votes to change the outcome, because natural reporting does not appear in such a way.

81.  And Russ Ramsland can support that further by documenting the data feed that came from Dominion Voting Systems to Scytl -- and was reported with decimal points, which is contrary to one vote as one ballot:  **"The fact that we observed raw vote data coming directly that includes decimal places establishes selection by an algorithm, and not individual voter's choice. Otherwise, votes would be solely represented as whole numbers (votes cannot possibly be added up and have decimal places reported)."**

82.  The report concludes that **"**Based on the foregoing, I believe these statistical anomalies and impossibilities compels the conclusion to a reasonable degree of professional certainty that the

27

vote count in Wisconsin, in particular for candidates for President contain at least 119,430 (Para. 13) up to 384,085 (Para. 15) illegal votes that must be disregarded. In my opinion, it is not possible at this time to determine the true results of the Wisconsin vote for President of the United States."

### The History of Dominion Voting Systems

83. Plaintiffs can also show Smartmatic's incorporation and inventors who have backgrounds evidencing their foreign connections, including Serbia, specifically its identified inventors:

> Applicant: SMARTMATIC, CORP.
>
> Inventors**:** Lino Iglesias, Roger Pinate, Antonio Mugica, Paul Babic, Jeffrey Naveda, Dany Farina, Rodrigo Meneses, Salvador Ponticelli, Gisela Goncalves, Yrem Caruso[6]

84. Another Affiant witness testifies that in Venezuela, she was in official position related to elections and witnessed manipulations of petitions to prevent a removal of President Chavez and because she protested, she was summarily dismissed. She explains the vulnerabilities of the electronic voting system and Smartmatica to such manipulations. (See Ex. 17, Cardozo Aff. ¶8).

### 3. US Government Warnings Regarding Hacking by Hostile Foreign Governments.

85. In October of 2020 The FBI and CISA issued a JOINT CYBERSECURITY ADVISORY ON October 30, 2020 titled: **Iranian Advanced Persistent Threat Actor Identified Obtained Voter Registration Data**

> This joint cybersecurity advisory was coauthored by the Cybersecurity and Infrastructure Security Agency (CISA) and the Federal Bureau of Investigation (FBI). CISA and the FBI are aware of an Iranian advanced persistent threat (APT) actor targeting U.S. state websites to include election websites. CISA and the FBI

---

[6] *See* Patents Assigned to Smartmatic Corp., *available at:* https://patents.justia.com/assignee/smartmatic-corp

assess this actor is responsible for the mass dissemination of voter intimidation emails to U.S. citizens and the dissemination of U.S. election-related disinformation in mid-October 2020.1 (Reference FBI FLASH message ME-000138-TT, disseminated October 29, 2020). Further evaluation by CISA and the FBI has identified the targeting of U.S. state election websites was an intentional effort to influence and interfere with the 2020 U.S. presidential election.

(See Ex. 18, CISA and FBI Joint Cyber Security Advisory of October 30, 2020)

### D. Additional Independent Findings of Dominion Flaws.

86.   Further supportive of this pattern of incidents, reflecting an absence of mistake, Plaintiffs have since learned that the "glitches" in the Dominion system, that have the uniform effect of hurting Trump and helping Biden, have been widely reported in the press and confirmed by the analysis of independent experts.

### 1.   Central Operator Can Remove, Discard or Manipulate Votes.

87.   Mr. Watkins further explains **that the central operator can remove or discard batches of votes.**  "After all of the ballots loaded into the scanner's feed tray have been through the scanner, the "ImageCast Central" operator will remove the ballots from the tray then have the option to either "Accept Batch" or "Discard Batch" on the scanning menu …. "  (Ex. 106, Watkins aff. ¶11). ¶8.

88.   Mr. Watkins further testifies that the user manual makes clear that the system allows for threshold settings to be set to find all ballots get marked as "problem ballots" for discretionary determinations on where the vote goes stating:

> 9.   During the ballot scanning process, the "ImageCast Central" software will detect how much of a percent coverage of the oval was filled in by the voter. The Dominion customer determines the thresholds of which the oval needs to be covered by a mark in order to qualify as a valid vote. If a ballot has a marginal mark which did not meet the specific thresholds set by the customer, then the ballot is considered a "problem ballot" and may be set aside into a folder named "NotCastImages".

29

10.  Through creatively tweaking the oval coverage threshold settings, and advanced settings on the ImageCase Central scanners, it may be possible to set thresholds in such a way that a non-trivial amount of ballots are marked "problem ballots" and sent to the "NotCastImages" folder.

11.  The administrator of the ImageCast Central work station may view all images of scanned ballots which were deemed "problem ballots" by simply navigating via the standard "Windows File Explorer" to the folder named "NotCastImages" which holds ballot scans of "problem ballots". It may be possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro operating system. Id. ¶¶ 9-11.

### 2. Dominion – By Design – Violates Federal Election & Voting Record Retention Requirements.

89.  The Dominion System put in place by its own design violates the intent of Federal law on the requirement to preserve and retain records – which clearly requires preservation of all records requisite to voting in such an election.

§ 20701. Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation

Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, **all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election,** except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

See 52 USC § 20701.

30

### 3. Dominion Vulnerabilities to Hacking.

90.  Plaintiffs have since learned that the "glitches" in the Dominion system -- that have the uniform effect of hurting Trump and helping Biden -- have been widely reported in the press and confirmed by the analysis of independent experts, a partial summary of which is included below.

(1) Users on the ground have full admin privileges to machines and software. The Dominion system is designed to facilitate vulnerability and allow a select few to determine which votes will be counted in any election. Workers were responsible for moving ballot data from polling place to the collector's office and inputting it into the correct folder. Any anomaly, such as pen drips or bleeds, is not counted and is handed over to a poll worker to analyze and decide if it should count. This creates massive opportunity for improper vote adjudication. (Ex. 106 Watkins aff. ¶¶8 & 11).

(2) Affiant witness (name redacted for security reasons), in his sworn testimony explains he was selected for the national security guard detail of the President of Venezuela, and that he witnessed the creation of Smartmatic for the purpose of election vote manipulation:

I was witness to the creation and operation of a sophisticated electronic voting system that permitted the leaders of the Venezuelan government to manipulate the tabulation of votes for national and local elections and select the winner of those elections in order to gain and maintain their power. Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic which included … The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government. (*Id.* ¶¶6, 9, 10).

91.  Specific vulnerabilities of the systems in question that have been well documented or reported include:

A.  Barcodes can override the voters' vote: As one University of California, Berkeley study shows, "In all three of these machines [including

31

Dominion Voting Systems] the ballot marking printer is in the same paper path as the mechanism to deposit marked ballots into an attached ballot box.  This opens up a very serious security vulnerability:  the voting machine can make the paper ballot (to add votes or spoil already-case votes) after the last time the voter sees the paper, and then deposit that marked ballot into the ballot box without the possibility of detection." (See Ex. 2, Appel Study).

B. Voting machines were able to be connected to the internet by way of laptops that were obviously internet accessible. If one laptop was connected to the internet, the entire precinct was compromised.

C. October 6, 2006 – **Congresswoman Carolyn Maloney calls on Secretary of Treasury Henry Paulson to conduct an investigation into Smartmatic based on its foreign ownership and ties to Venezuela.** (See Ex. 15).  Congresswoman Maloney wrote that "It is undisputed that Smartmatic is foreign owned and it has acquired Sequoia … Smartmatic now acknowledged that Antonio Mugica, a Venezuelan businessman has a controlling interest in Smartmatica, but the company has not revealed who all other Smartmatic owners are.  *Id.*

D. Dominion "got into trouble" with several subsidiaries it used over alleged cases of fraud. One subsidiary is Smartmatic, a company "that has played a significant role in the U.S. market over the last decade."[7] Dominion entered into a 2009 contract with Smartmatic and provided Smartmatic with the PCOS machines (optical scanners) that were used in the 2010 Philippine election, the biggest automated election run by a private company. The automation of that first election in the Philippines was hailed by the international community and by the critics of the automation. The results transmission reached 90% of votes four hours after polls closed and Filipinos knew for the first time who would be their new president on Election Day. In keeping with local Election law requirements, Smartmatic and Dominion were required to provide the source code of the voting machines prior to elections so that it could be independently verified. *Id.*

E. Litigation over Smartmatic "glitches" alleges they impacted the 2010 and 2013 mid-term elections in the Philippines, raising questions of cheating and fraud. An independent review of the source codes used in the machines found multiple problems, which concluded, "The software inventory provided by Smartmatic is inadequate, … which brings into

---

[7] *Voting Technology Companies in the U.S. – Their Histories and Present Contributions,* Access Wire, (Aug. 10, 2017)*, available at:* https://www.accesswire.com/471912/Voting-Technology-Companies-in-the-US--Their-Histories.

question the software credibility."[8]

    F.   Dominion acquired Sequoia Voting Systems as well as Premier Election Solutions (formerly part of Diebold, which sold Premier to ES&S in 2009, until antitrust issues forced ES&S to sell Premier, which then was acquired by Dominion). This map illustrates 2016 voting machine data—meaning, these data do not reflect geographic aggregation at the time of acquisition, but rather the machines that retain the Sequoia or Premier/Diebold brand that now fall under Dominion's market share. Penn Wharton Study at 16.

    G.   In late December of 2019, three Democrat Senators, Warren, Klobuchar, Wyden and House Member Mark Pocan wrote about their 'particularized concerns that secretive & "trouble -plagued companies"' "have long skimped on security in favor of convenience," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S." (See Ex. 16).

    H.   Senator Ron Wyden (D-Oregon) said the findings [insecurity of voting systems] are "yet another damning indictment of the profiteering election vendors, who care more about the bottom line than protecting our democracy." It's also an indictment, he said, "of the notion that important cybersecurity decisions should be left entirely to county election offices, many of whom do not employ a single cybersecurity specialist."[9]

   92.  The House of Representatives passed H.R. 2722 in an attempt to address these

very risks on June 27, 2019:

      This bill addresses election security through grant programs and requirements for voting systems and paper ballots.

      The bill establishes requirements for voting systems, including that systems (1) use individual, durable, voter-verified paper ballots; (2) make

---

   [8] *Smartmatic-TIM Running Out of Time to Fix Glitche*s, ABS-CBN News (May 4, 2010), *available at*: https://news.abs-cbn.com/nation/05/04/10/smartmatic-tim-running-out-time-fix-glitches.

   [9] Kim Zetter, *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials*, VICE (Aug. 8, 2019) ("VICE Election Article"), *available at:* https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems have-been-left-exposed-online-despite-official-denials.

a voter's marked ballot available for inspection and verification by the
voter before the vote is cast; (3) ensure that individuals with disabilities
are given an equivalent opportunity to vote, including with privacy and
independence, in a manner that produces a voter-verified paper ballot; (4)
be manufactured in the United States; and (5) meet specified cybersecurity
requirements, including the prohibition of the connection of a voting
system to the internet.

See H.R. 2722.

### E. Because Dominion Senior Management Has Publicly Expressed Hostility to Trump and Opposition to His Election, Dominion Is Not Entitled to Any Presumption of Fairness, Objectivity or Impartiality, and Should Instead Be Treated as a Hostile Partisan Political Actor.

93. Dr. Eric Coomer is listed as the co-inventor for several patents on ballot
adjudication and voting machine-related technology, all of which were assigned to
Dominion.[10]  He joined Dominion in 2010, and most recently served as Voting Systems
Officer of Strategy and Director of Security for Dominion.  Dr. Coomer first joined
Sequoia Voting Systems in 2005 as Chief Software Architect and became Vice President
of Engineering before Dominion Voting Systems acquired Sequoia.  Dr. Coomer's
patented ballot adjudication technology into Dominion voting machines sold throughout

---

[10] *See* "Patents by Inventor Eric Coomer," *available at:*
https://patents.justia.com/inventor/eric-coomer.  This page lists the following patents
issued to Dr. Coomer and his co-inventors: (1) U.S. Patent No. 9,202,113, Ballot
Adjudication in Voting Systems Utilizing Ballot Images (issued Dec. 1, 2015); (2) U.S.
Patent No. 8,913,787, Ballot Adjudication in Voting Systems Utilizing Ballot Images
(issued Dec. 16, 2014); (3) U.S. Patent No. 8,910,865, Ballot Level Security Features for
Optical Scan Voting Machine Capable of Ballot Image Processing, Secure Ballot
Printing, and Ballot Layout Authentication and Verification (issued Dec. 16, 2014); (4)
U.S. Patent No. 8,876,002, Systems for Configuring Voting Machines, Docking Device
for Voting Machines, Warehouse Support and Asset Tracking of Voting Machines (issued
Nov. 4, 2014); (5) U.S. Patent No. 8,864,026, Ballot Image Processing System and
Method for Voting Machines (issued Oct. 21, 2014); (6) U.S. Patent No. 8,714,450,
Systems and Methods for Transactional Ballot Processing, and Ballot Auditing (issued
May 6, 2014), available at: https://patents.justia.com/inventor/eric-coomer.

34

the United States, including those used in Wisconsin. (See attached hereto Exh 6, Jo Oltmann Aff.).

94. In 2016, Dr. Coomer admitted to the State of Illinois that Dominion Voting machines can be manipulated remotely.[11] He has also publicly posted videos explaining how Dominion voting machines can be remotely manipulated. See Id.[12]

95. Dr. Coomer has emerged as Dominion's principal defender, both in litigation alleging that Dominion rigged elections in Georgia and in the media. An examination of his previous public statements has revealed that Dr. Coomer is highly partisan and even more anti-Trump, precisely the opposite of what would expect from the management of a company charged with fairly and impartially counting votes (which is presumably why he tried to scrub his social media history). (See Id.)

96. Unfortunately for Dr. Coomer, however, a number of these posts have been captured for perpetuity. Below are quotes from some of his greatest President Trump and Trump voter hating hits to show proof of motive and opportunity. (See Id).

> If you are planning to vote for that autocratic, narcissistic, fascist ass-hat blowhard and his Christian jihadist VP pic, UNFRIEND ME NOW! No, I'm not joking. … Only an absolute F[**]KING IDIOT could ever vote for that wind-bag fuck-tard FASCIST RACIST F[**]K! … I don't give a damn if you're friend, family, or random acquaintance, pull the lever, mark an oval, touch a screen for that carnival barker … UNFRIEND ME NOW! I have no desire whatsoever to ever interact with you. You are beyond hope, beyond reason. You are controlled by fear, reaction and bullsh[*]t. Get your shit together. F[**]K YOU! Seriously, this f[**]king ass-clown stands

---

[11] Jose Hermosa, *Electoral Fraud: Dominion's Vice President Warned in 2016 That Vote-Counting Systems Are Manipulable*, The BL (Nov. 13, 2020), *available at*: https://thebl.com/us-news/electoral-fraud-dominions-vice-president-warned-in-2016-that-vote-counting-systems-are-manipulable.html.

[12] See, *e.g.,* "Eric Coomer Explains How to Alter Votes in the Dominion Voting System" (Nov. 24, 2020) (excerpt of presentation delivered in Chicago in 2017), *available at:* https://www.youtube.com/watch?v=UtB3tLaXLJE.

against everything that makes this country awesome! You want in on that? You [Trump voters] deserve nothing but contempt.  *Id.* (July 21, 2016 Facebook post).[13]

97.   In a rare moment of perhaps unintentional honesty, Dr. Coomer anticipates this Complaint and many others, by slandering those seeking to hold election riggers like Dominion to account and to prevent the United States' descent into Venezuelan levels of voting fraud and corruption out of which Dominion was born:

> Excerpts in stunning Trump-supporter logic, "I know there is a lot of voter fraud.  I don't know who is doing it, or how much is happening, but I know it is going on a lot."  This beautiful statement was followed by, "It happens in third world countries, this the US, we can't let it happen here." *Id.* (October 29, 2016 Facebook post); (See also Exh. 6)

1.   Dr. Coomer, who invented the technology for Dominion's voting fraud and has publicly explained how it can be used to alter votes, seems to be extremely hostile to those who would attempt to stop it and uphold the integrity of elections that underpins the legitimacy of the United States government:

> And in other news…  There be some serious fuckery going on right here fueled by our Cheeto-in-Chief stoking lie after lie on the flames of [Kris] Kobach…  [Linking Washington Post article discussing the Presidential Advisory Commission on Election Integrity, of which former Kansas Secretary of State Kris Kobach was a member, entitled, "The voting commission is a fraud itself. Shut it down."]  *Id.* (September 14, 2017 Facebook post.] (Id.)

98.   Dr. Coomer also keeps good company, supporting and reposting ANTIFA statements slandering President Trump as a "fascist" and by extension his supporters, voters and the United States military (which he claims, without evidence, Trump will make into a "fascist tool").  *Id.* (June 2, 2020 Facebook post).  Lest someone claims that these

---

[13]  In this and other quotations from Dr. Coomer's social media, Plaintiffs have redacted certain profane terms.

36

are "isolated statements" "taken out of context", Dr. Coomer has affirmed that he shares ANTIFA's taste in music and hatred of the United States of America, *id.* (May 31, 2020 Facebook post linking "F[\*\*]k the USA" by the exploited), and the police. *Id.* (separate May 31, 2020 Facebook posts linking N.W.A. "F[\*\*]k the Police" and a post promoting phrase "Dead Cops"). *Id.* at 4-5.

99.  Affiant and journalist Joseph Oltmann researched ANTIFA in Colorado.  *Id.* at 1.  "On or about the week of September 27, 2020," he attended an Antifa meeting which appeared to be between Antifa members in Colorado Springs and Denver Colorado," where Dr. Coomer was present.  In response to a question as to what Antifa would do "if Trump wins this … election?", Dr. Coomer responded "Don't worry about the election. Trump is not going to win. I made f[\*\*]king sure of that … Hahaha." *Id.* at 2.

100.  By putting an anti-Trump zealot like Dr. Coomer in charge of election "Security," and using his technology for what should be impartial "ballot adjudication," Dominion has given the fox the keys to the hen house *and has forfeited any presumption of objectivity, fairness, or even propriety*.  It appears that Dominion does not care about even an appearance of impropriety, as its most important officer has his fingerprints all over a highly partisan, vindictive,  and personal vendetta against the Republican nominee both in 2016 and 2020, President Donald Trump.  Dr. Coomer's highly partisan anti-Trump rages show clear motive on the part of Dominion to rig the election in favor of Biden, and may well explain why for each of the so-called "glitches" uncovered, it is always Biden receiving the most votes on the favorable end of such a "glitch." (Id.)

101.  In sum, as set forth above, for a host of independent reasons, the Wisconsin election results concluding that Joe Biden received 20,608 more votes that President

37

Donald Trump must be set aside.

## COUNT I

**Defendants Violated the Elections and Electors Clauses and 42 U.S.C. § 1983.**

102.   Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

103.   The Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President.  U.S. Const. art. II, §1, cl. 2 (emphasis added).  Likewise, the Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof." U.S. Const. art. I, § 4, cl. 1 (emphasis added).

104.   The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley v. Holm,* 285 U.S. 355, 365 (1932).  Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments."  *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015).

105.   Defendants are not part of the Wisconsin Legislature and cannot exercise legislative power.  Because the United States Constitution reserves for the Wisconsin Legislature the power to set the time, place, and manner of holding elections for the President and Congress, county boards of elections and state executive officers have no authority to unilaterally exercise that power, much less to hold them in ways that conflict with existing legislation.

106. Section I details three separate instances where Defendants violated the Wisconsin Election Code.  First, the WEC May 23, 2020 "guidance", see Ex. 16, on the treatment of "indefinitely confined" voters, who are exempt from Wisconsin's photo ID

38

requirement for absentee ballot application, that directly contravened the express requirement in Wisconsin Election Code that clerks "shall" remove an allegedly "indefinitely confined" voter if the clerk has "reliable information" that that voter is not, or is no longer, "indefinitely confined." Second, the WEC's October 18, 2016, see Ex. 18, directed clerks to violate the express requirements of Wisconsin Statutes § 6.87(6)(d), which states "[i]f a certificate is missing the address of a witness the ballot may not be counted," when it directed clerks to fill in missing information on absentee ballot envelopes. Third, WEC and Wisconsin election officials violated Wisconsin Election Code, or acted *ultra vires*, insofar as they filled in missing witness or voter information on absentee ballots and permitted voters to cure ballots without statutory authorization. Section II provides expert witness testimony quantifying the number of illegal or ineligible ballots that were counted, and lawful ballots that were not, as a result of these and Defendants' other violations.

107. A report from Dr. William Briggs, shows that there were approximately 29,594 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots.

108. Evidence compiled by Matt Braynard using the National Change of Address ("NCOA") Database shows that 6,207 Wisconsin voters in the 2020 General Election moved out-of-state prior to voting, and therefore were ineligible. Mr. Braynard also identified 765 Wisconsin voters who subsequently registered to vote in another state and were therefore ineligible to vote in the 2020 General Election. The merged number is 6,966 ineligible voters whose votes must be removed from the total for the 2020 General Election.

109. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable

39

harm unless the injunctive relief requested herein is granted.  Defendants have acted and, unless enjoined, will act under color of state law to violate the Elections Clause.

110.  Accordingly, the results for President in the November 3, 2020 election must be set aside, the State of Wisconsin should be enjoined from transmitting the certified the results thereof, and this Court should grant the other declaratory and injunctive relief requested herein.

## COUNT II

### Governor Evers and Other Defendants Violated The Equal Protection Clause of the Fourteenth Amendment U.S. Const. Amend. XIV & 42 U.S.C. § 1983

### Invalid Enactment of Regulations & Disparate Treatment of Absentee vs. Mail-In Ballots

111.  Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

112.  The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. *See also Bush v. Gore*, 531 U.S. 98, 104 (2000) (having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over the value of another's). *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").  The Court has held that to ensure equal protection, a problem inheres in the absence of specific standards to ensure its equal application. *Bush*, 531 U.S. at 106 ("The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude,

40

necessary.").

113.  The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights.  The requirement of equal protection is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

114.  The disparate treatment of Wisconsin voters, in subjecting one class of voters to greater burdens or scrutiny than another, violates Equal Protection guarantees because "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. *Rice v. McAlister*, 268 Ore. 125, 128, 519 P.2d 1263, 1265 (1975); *Heitman v. Brown Grp., Inc.,* 638 S.W.2d 316, 319, 1982 Mo. App. LEXIS 3159, at *4 (Mo. Ct. App. 1982); *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 41, 56 P.3d 524, 536-37 (Utah 2002).

115.  In statewide and federal elections conducted in the State of Wisconsin, including without limitation the November 3, 2020 General Election, all candidates, political parties, and voters, including without limitation Plaintiffs, in having the election laws enforced fairly and uniformly.

116.  As set forth in Section I above, Defendants failed to comply with the requirements of the Wisconsin Election Code and thereby diluted the lawful ballots of the Plaintiffs and of other Wisconsin voters and electors in violation of the United States Constitution guarantee of Equal Protection. Further, Defendants enacted regulations, or issued guidance, that had the intent and effect of favoring one class of voters – Democratic absentee voters – over Republican voters. Further, all of these invalidly enacted rules by Defendant Wisconsin executive and administrative agencies, had the intent and effect of

41

eliminating protections against voter fraud, and thereby enabled and facilitated the counting of fraudulent, unlawful and ineligible votes, which were quantified in Section II. Finally, Section III details the additional voting fraud and manipulation enabled by the use Dominion voting machines, which had the intent and effect of favoring Biden and Democratic voters and discriminating against Trump and Republican voters.

117.  Defendants have acted and will continue to act under color of state law to violate Plaintiffs' right to be present and have actual observation and access to the electoral process as secured by the Equal Protection Clause of the United States Constitution. Defendants thus failed to conduct the general election in a uniform manner as required by the Equal Protection Clause of the Fourteenth Amendment, the corollary provisions of the Wisconsin Constitution, and the Wisconsin Election Code.

118. Plaintiffs seek declaratory and injunctive relief forbidding Defendants from certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

119.  The Briggs analysis identified two specific errors involving unreturned mail-in ballots that are indicative of voter fraud, namely: "**Error #1:** those who were recorded as receiving absentee ballots *without* requesting them;" and "**Error #2:** those who returned absentee ballots but whose votes went missing (*i.e.*, marked as unreturned)."  Clearly the dilution of lawful votes violates the Equal Protection clause; and the counting of unlawful votes violates the rights of lawful Citizens.

120.  In addition, Plaintiffs ask this Court to order that no ballot processed by a counting board in the Wisconsin Counties can be included in the final vote tally unless a challenger

was allowed to meaningfully observe the process and handling and counting of the ballot, or that were unlawfully switched from Trump to Biden.

121.  Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the declaratory and injunctive relief requested herein is granted.  Indeed, the setting aside of an election in which the people have chosen their representative is a drastic remedy that should not be undertaken lightly, but instead should be reserved for cases in which a person challenging an election has clearly established a violation of election procedures and has demonstrated that the violation has placed the result of the election in doubt.  Wisconsin law allows elections to be contested through litigation, both as a check on the integrity of the election process and as a means of ensuring the fundamental right of citizens to vote and to have their votes counted accurately.

**COUNT III**

**Fourteenth Amendment, Amend. XIV & 42 U.S.C. § 1983**

**Denial of Due Process On The Right to Vote**

122.  Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

123.  The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution.  *Harper,* 383 U.S. at 665.  *See also Reynolds*, 377 U.S. at 554 (The Fourteenth Amendment protects the "the right of all qualified citizens to vote, in state as well as in federal elections.").  Indeed, ever since the Slaughter-House Cases, 83 U.S. 36 (1873), the United States Supreme Court has held that the Privileges or Immunities Clause of the Fourteenth Amendment protects certain rights of federal

43

citizenship from state interference, including the right of citizens to directly elect members of Congress. *See Twining v. New Jersey*, 211 U.S. 78, 97 (1908) (*citing Ex parte Yarbrough*, 110 U.S. 651, 663-64 (1884)). *See also Oregon v. Mitchell*, 400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

124. The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562. Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," *Burson v. Freeman*, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

125. "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555, n.29 (*quoting South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

126. "Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

127. The right to vote includes not just the right to cast a ballot, but also the right to have it

44

fairly counted if it is legally cast.  The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. *See, e.g., Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

128.  The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (*quoting Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

129.  Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. See *Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

130. Section I details the Defendants violations of the Wisconsin Election Code. Section II provides estimates of the number of fraudulent, illegal or ineligible votes counted, and demonstrates that this number is many times larger than Biden's margin of victory.

131. Plaintiffs seek declaratory and injunctive relief enjoining Defendants from

45

certifying the results of the General Election, or in the alternative, conduct a recount or recanvas in which they allow a reasonable number of challengers to meaningfully observe the conduct of the Wisconsin Board of State Canvassers and the Wisconsin county Boards of Canvassers and that these canvassing boards exercise their duty and authority under Wisconsin law, which forbids certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

## COUNT IV

### Wide-Spread Ballot Fraud

132.   Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

133.   The scheme of civil fraud can be shown with the pattern of conduct that includes motive and opportunity, as exhibited by the high level official at Dominion Voting Systems, Eric Coomer, and his visceral and public rage against the current U.S. President.

134.   Opportunity appears with the secretive nature of the voting source code, and the feed of votes that make clear that an algorithm is applied, that reports in decimal points despite the law requiring one vote for one ballot.

135.   The results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Wisconsin's vote tallies to be inflated by somewhere between 3 and 5.6 percentage points. Statistical estimating yields that in Wisconsin, the best estimate of the number of impacted votes is 181,440. *Id.*

136.   The Reports cited above show a total amount of illegal votes identified that amount to 318,012 or over 15 times the margin by which candidate Biden leads President Trump in the state

46

of Wisconsin.

137.   The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. See, e.g., *Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd*., 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

138.   Plaintiffs have no adequate remedy at law.  Plaintiffs contest the results of Wisconsin's 2020 General Election because it is fundamentally corrupted by fraud.  Defendants intentionally violated multiple provisions of the Wisconsin Election Code to elect Biden and other Democratic candidates and defeat President Trump and other Republican candidates.

## PRAYER FOR RELIEF

139.   Accordingly, Plaintiffs seek an emergency order instructing Defendants to de-certify the results of the General Election for the Office of President.

140.   Alternatively, Plaintiffs seek an order instructing the Defendants to certify the results of the General Election for Office of the President in favor of President Donald Trump.

141.  In the alternative, Plaintiffs seek an emergency order prohibiting Defendants from including in any certified results from the General Election the tabulation of absentee and mailing ballots which do not comply with the Wisconsin Election Code, including, without limitation, the tabulation of absentee and mail-in ballots Trump Campaign's watchers were prevented from

47

observing or based on the tabulation of invalidly cast absentee and mail-in ballots which (i) lack a secrecy envelope, or contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, (ii) do not include on the outside envelope a completed declaration that is dated and signed by the elector, (iii) are delivered in-person by third parties for non-disabled voters, or (iv) any of the other Wisconsin Election Code violations set forth in Section II of this Complaint.

142. Order production of all registration data, ballot applications, ballots, envelopes, etc. required to be maintained by law.  When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Wisconsin and did so on a large scale and widespread basis.  The size of the voting failures, whether accidental or intentional, are multiples larger than the margin in the state.  For these reasons, Wisconsin cannot reasonably rely on the results of the mail vote. Relief sought is the elimination of the mail ballots from counting in the 2020 election. Alternatively, the electors for the State of Wisconsin should be disqualified from counting toward the 2020 election.  Alternatively, the electors of the State of Wisconsin should be directed to vote for President Donald Trump.

143.  For these reasons, Plaintiffs ask this Court to enter a judgment in their favor and provide the following emergency relief:

1.   An order directing Governor Evers and the Wisconsin Elections Commission to de-certify the election results;

2.  An order enjoining Governor Evers from transmitting the currently certified election results the Electoral College;

3.  An order requiring Governor Evers to transmit certified election results that state that President Donald Trump is the winner of the election;

4.  An immediate emergency order to seize and impound all servers, software, voting machines, tabulators, printers, portable media, logs, ballot applications, ballot return envelopes, ballot images, paper ballots, and all "election materials" referenced in Wisconsin Statutes § 9.01(1)(b)11. related to the November 3, 2020 Wisconsin election for forensic audit and inspection by the Plaintiffs;

5.  An order that no votes received or tabulated by machines that were not certified as required by federal and state law be counted;

6.  A declaratory judgment declaring that Wisconsin's failed system of signature verification violates the Electors and Elections Clause by working a de facto abolition of the signature verification requirement;

7.  A declaratory judgment declaring that currently certified election results violate the Due Process Clause, U.S. CONST. Amend. XIV;

8.  A declaratory judgment declaring that mail-in and absentee ballot fraud must be remedied with a Full Manual Recount or statistically valid sampling that properly verifies the signatures on absentee ballot envelopes and that

49

invalidates the certified results if the recount or sampling analysis shows a sufficient number of ineligible absentee ballots were counted;

9.  A declaratory judgment declaring absentee ballot fraud occurred in violation of Constitutional rights, Election laws and under state law;

10. A permanent injunction prohibiting the Governor and Secretary of State from transmitting the currently certified results to the Electoral College based on the overwhelming evidence of election tampering;

11. Immediate production of 48 hours of security camera recording of all rooms used in the voting process at the TCF Center for November 3, 2020 and November 4, 2020.

12. Plaintiffs further request the Court grant such other relief as is just and proper, including but not limited to, the costs of this action and their reasonable attorney fees and expenses pursuant to 42 U.S.C. 1988.

Respectfully submitted, this 1st day of December, 2020.

LEAD COUNSEL FOR PLAINTIFFS

/s Sidney Powell**
Sidney Powell PC
Texas Bar No. 16209700
(517) 763-7499
sidney@federalappeals.com

Of Counsel:

Julia Z. Haller (D.C. Bar No. 466921) **
Brandon Johnson (D.C. 491730) **
Emily P. Newman (Virginia Bar No. 84265) **

2911 Turtle Creek Blvd.
Suite 300
Dallas, Texas 75219

L. Lin Wood **
GA Bar No. 774588
L. LIN WOOD, P.C.
P.O. Box 52584
Atlanta, GA 30305-0584
Telephone: (404) 891-1402

Howard Kleinhendler **
New York Bar No. 2657120
Howard Kleinhendler Esquire
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

** Applications for admission forthcoming

Local Counsel for Plaintiffs

Michael D. Dean
Wis. Bar No.01019171
P.O. Box 2545
Brookfield, WI 53008
(262) 798-8044
miked@michaelddeanllc.com


Daniel J. Eastman
Wis. Bar No.1011433
P.O. Box 158
Mequon, Wisconsin 53092
(414) 881-9383
daneastman@me.com

52

Exhibit B9

Declaration of █████████████

Pursuant to 28 U.S.C Section 1746, ███████████ make the following declaration.

1. I am over the age of 21 years and I am under no legal disability, which would prevent me from giving this declaration.

2. I was an electronic intelligence analyst under 305th Military Intelligence with experience gathering SAM missile system electronic intelligence. I have extensive experience as a white hat hacker used by some of the top election specialists in the world. The methodologies I have employed represent industry standard cyber operation toolkits for digital forensics and OSINT, which are commonly used to certify connections between servers, network nodes and other digital properties and probe to network system vulnerabilities.

3. I am a US citizen and I reside █████████ location in the United States of America.

4. Whereas the Dominion and Edison Research systems exist in the internet of things, and whereas this makes the network connections between the Dominion, Edison Research and related network nodes available for scanning,

5. And whereas Edison Research's primary job is to report the tabulation of the count of the ballot information as received from the tabulation software, to provide to Decision HQ for election results,

6. And whereas Spiderfoot and Robtex are industry standard digital forensic tools for evaluation network security and infrastructure, these tools were used to conduct public security scans of the aforementioned Dominion and Edison Research systems,

7. A public network scan of Dominionvoting.com on 2020-11-08 revealed the following inter-relationships and revealed 13 unencrypted passwords for dominion employees, and 75 hashed passwords available in TOR nodes:

1



```
Array
(
    [id] => 544167324
    [luser] => ian.macvicar
    [domain] => dominionvoting.com
    [password] => jamley
)

7
Array
(
    [id] => 599400504
    [luser] => jelena.tanaskovic
    [domain] => dominionvoting.com
```

8. The same public scan also showed a direct connection to the group in Belgrade as highlighted below:





9. A cursory search on LinkedIn of "dominion voting" on 11/19/2020 confirms the numerous employees in Serbia:

**Vukašin Đorđević** · 3rd
Software Developer at Dominion Voting Systems
Serbia

**Edvan Sabanovic** · 3rd
Senior Full-stack Web Developer
Belgrade, Serbia

Past: Senior Web Developer at Dominion Voting Systems

3

10. An additional search of Edison Research on 2020-11-08 showed that Edison Research has an Iranian server seen here:



Inputting the Iranian IP into Robtex confirms the direct connection into the "edisonresearch" host from the perspective of the Iranian domain also. This means that it is not possible that the connection was a unidirectional reference.



A deeper search of the ownership of Edison Research "edisonresearch.com" shows a connection to BMA Capital Management, where shareofear.com and bmacapital.com are both connected to edisonresearch.com via a VPS or Virtual Private Server, as denoted by the "vps" at the start of the internet name:

4



Dominionvoting is also dominionvotingsystems.com, of which there are also many more examples, including access of the network from China. The records of China accessing the server are reliable.







## CHINA UNICOM China169 Backbone - Fraud Risk

**Low Risk**

← Lowest Risk                                                          Highest Risk →

0                                    Fraud Score: 3                                    100

We consider **CHINA UNICOM China169 Backbone** to be a potentially low fraud risk ISP, by which we mean that web traffic from this ISP potentially poses a low risk of being fraudulent. Other types of traffic may pose a different risk or no risk. They operate 1,889,865 IP addresses, some of which are running

💬 6                    ⇄ 77                    ♡ 126                    ⬆



Domain Name: dominionvotingsystems.com
Registry Domain ID: 2530599738_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.godaddy.com
Registrar URL: http://www.godaddy.com
Updated Date: 2020-05-26T15:48:58Z
Creation Date: 2020-05-26T15:48:57Z
Registrar Registration Expiration Date: 2021-05-26T15:48:57Z
Registrar: GoDaddy.com, LLC
Registrar IANA ID: 146
Registrar Abuse Contact Email: abuse@godaddy.com
Registrar Abuse Contact Phone: +1.4806242505
Domain Status: clientTransferProhibited http://www.icann.org/epp#clientTransferProhibited
Domain Status: clientUpdateProhibited http://www.icann.org/epp#clientUpdateProhibited
Domain Status: clientRenewProhibited http://www.icann.org/epp#clientRenewProhibited
Domain Status: clientDeleteProhibited http://www.icann.org/epp#clientDeleteProhibited
Registrant Organization:
Registrant State/Province: Hunan
Registrant Country: CN
Registrant Email: Select Contact Domain Holder link at
https://www.godaddy.com/whois/results.aspx?domain=dominionvotingsystems.com
Admin Email: Select Contact Domain Holder link at
https://www.godaddy.com/whois/results.aspx?domain=dominionvotingsystems.com
Tech Email: Select Contact Domain Holder link at
https://www.godaddy.com/whois/results.aspx?domain=dominionvotingsystems.com
Name Server: NS1.DNS.COM
Name Server: NS2.DNS.COM
DNSSEC: unsigned

6



11. BMA Capital Management is known as a company that provides Iran access to capital markets with direct links publicly discoverable on LinkedIn (found via google on 11/19/2020):

www.linkedin.com › muhammad-talha-a0759660

**Muhammad Talha - BMA Capital Management Limited**

Manager, Money Market & Fixed Income at **BMA Capital** Management Limited. **BMA Capital** ...
Manager-FMR at Pak **Iran** Joint Investment Company. Pakistan.

Pakistan · Manager, Money Market & Fixed Income · BMA Capital Management Limited

The same Robtex search confirms the Iranian address is tied to the server in the Netherlands, which correlates to known OSINT of Iranian use of the Netherlands as a remote server (See Advanced Persistent Threats: APT33 and APT34):



12. A search of the indivisible.org network showed a subdomain which evidences the existence of scorecard software in use as part of the Indivisible (formerly ACORN) political group for Obama:



13. Each of the tabulation software companies have their own central reporting "affiliate". Edison Research is the affiliate for Dominion.

14. Beanfield.com out of Canada shows the connections via co-hosting related sites, including dvscorp.com:



This Dominion partner domain "dvscorp" also includes an auto discovery feature, where new in-network devices automatically connect to the system. The following diagram shows some of the related dvscopr.com mappings, which mimic the infrastructure for Dominion and are an obvious typo derivation of the name. Typo derivations are commonly purchased to catch redirect traffic and sometimes are used as honeypots. The diagram shows that infrastructure spans multiple different servers as a methodology.





The above diagram shows how these domains also show the connection to Iran and other places, including the following Chinese domain, highlighted below:



15. The auto discovery feature allows programmers to access any system while it is connected to the internet once it's a part of the constellation of devices (see original Spiderfoot graph).

16. Dominion Voting Systems Corporation in 2019 sold a number of their patents to China (via HSBC Bank in Canada):

# Assignment details for assignee "HSBC BANK CANADA, AS COLLATERAL AGENT"

## Assignments (1 total)

Assignment 1

| Reel/frame 050500/0236 | Execution date Sep 25, 2019 | Date recorded Sep 26, 2019 | Pages 7 |
|---|---|---|---|
| Conveyance SECURITY AGREEMENT | | | |
| Assignors DOMINION VOTING SYSTEMS CORPORATION | Correspondent CHAPMAN & CUTLER LLP 1270 AVENUE OF THE AMERICAS, 30TH FLOOR ATTN: SOREN SCHWARTZ NEW YORK, NY 10020 | Attorney docket | |
| Assignee HSBC BANK CANADA, AS COLLATERAL AGENT 4TH FLOOR, 70 YORK STREET TORONTO M5J 1S9 CANADA | | | |

## Properties (18)

| Patent | Publication | Application | PCT | International registration |
|---|---|---|---|---|
| 8844813 | 20130306724 | 13476836 | | |
| 8913787 | 20130301873 | 13470091 | | |
| 9202113 | 20150071501 | 14539684 | | |
| 8195505 | 20050247783 | 11121997 | | |
| 9870666 | 20120232963 | 13463536 | | |
| 9710988 | 20120259680 | 13525187 | | |
| 9870667 | 20120259681 | 13525208 | | |
| 7111782 | 20040238632 | 10811969 | | |
| 7422151 | 20070012767 | 11526028 | | |
| D599131 | | 29324281 | | |

View all

**This searchable database contains all recorded Patent Assignment information from August 1980 to the present.**

When the USPTO receives relevant information for its assignment database, the USPTO puts the information in the public record and does not verify the validity of the information. Recordation is a ministerial function—the USPTO neither makes a determination of the legality of the transaction nor the right of the submitting party to take the action.

**Release 2.0.0** | Release Notes | Send Feedback | Legacy Patent Assignment Search | Legacy Trademark Assignment Search

Of particular interest is a section of the document showing aspects of the nature of the patents dealing with authentication:



17. Smartmatic creates the backbone (like the cloud). SCYTL is responsible for the security within the election system.

13



18. In the GitHub account for Scytl, Scytl Jseats has some of the programming necessary to support a much broader set of election types, including a decorator process where the data is smoothed, see the following diagram provided in their source code:



19. Unrelated, but also a point of interest is CTCL or Center for Tech and Civic Life funded by Mark Zuckerberg. Within their github page (https://github.com/ctcl), one of the programmers holds a government position. The Bipcoop repo shows tanderegg as one of the developers, and he works at the Consumer Financial Protection Bureau:



# Tim Anderegg
tanderegg

| Follow | ... |

⟑ 38 followers · 23 following · ☆ 133

🏢 Consumer Financial Protection Bureau
⊙ Washington DC

20. As seen in included document titled "AA20-304A-Iranian_Advanced_Persistent_Threat_Actor_Identified_Obtaining_Voter_Registration_Data" that was authored by the Cybersecurity & Infrastructure Security Agency (CISA) with a Product ID of AA20-304A on a specified date of October 30, 2020, CISA and the FBI reports that Iranian APT teams were seen using ACUTENIX, a website scanning software, to find vulnerabilities within Election company websites, confirmed to be used by the Iranian APT teams buy seized cloud storage that I had personally captured and reported to higher authorities. These scanning behaviors showed that foreign agents of aggressor nations had access to US voter lists, and had done so recently.

21. In my professional opinion, this affidavit presents unambiguous evidence that Dominion Voter Systems and Edison Research have been accessible and were certainly compromised by rogue actors, such as Iran and China. By using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, these organizations neglectfully allowed foreign adversaries to access data

16

and intentionally provided access to their infrastructure in order to monitor and manipulate elections, including the most recent one in 2020. This represents a complete failure of their duty to provide basic cyber security. This is not a technological issue, but rather a governance and basic security issue: if it is not corrected, future elections in the United States and beyond will not be secure and citizens will not have confidence in the results.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge. Executed this November 23th, 2020.

