# Exhibit C1

# Smartmatic Announces Sale of Sequoia Voting Systems

Nov 8, 2007  | Press Release

WASHINGTON – Smartmatic, the voting machine firm with ties to the Venezuelan government, today announced that it is divesting ownership of the voting machine company Sequoia Voting Systems.  Congresswoman Carolyn Maloney (D-NY) shined the congressional spotlight on the Sequoia purchase last year by Smartmatic because it posed serious national security concerns about the integrity of our elections.  Last year, Smartmatic decided to sell Sequoia rather than complete an investigation by the Committee on Foreign Investment in the United States (CFIUS), the government entity charged with ensuring the safety of foreign investment in the U.S.  (To read the official Sequoia sale announcement: https://www.sequoiavote.com/press.php (https://www.sequoiavote.com/press.php)).

"I am relieved by the news of this sale – it was a long time coming," said Maloney.  "The integrity of our voting machines and elections is vital to national security.  Given all of the past uncertainty and anxiety surrounding electronic voting, it's nice that voters will have this added reassurance when they enter the voting booth this Election Day."

Smartmatic was the subject of controversy in 2004 when the Hugo Chavez-led Venezuelan government selected it to provide the voting machines system for the presidential recall election, even though it would have been the company's first time providing machines for an election.  Smartmatic teamed up with a Venezuelan software company, Bitza, which at the time was 28 percent owned by Chavez's government.  In 2005, a Chicago city alderman questioned the possible ties between Sequoia and the Venezuelan government when that company's machines were used in the March 2006 Chicago primaries.

"When I first raised concerns about the Smartmatic case with the U.S. Treasury Department, I knew it was ripe for a CFIUS investigation. There were just too many questions and lingering doubts, which Smartmatic was clearly unable to overcome," Maloney said.

At first, Smartmatic flatly refused to undergo a CFIUS review.  It eventually agreed to a review, but later dropped out of the review process and announced its intent to divest of Sequoia.
"The Smartmatic case reinforces the importance of a strong CFIUS review system.  That's why I worked hard to pass new CFIUS reforms this year that encourage safe foreign investment in the U.S. without jeopardizing our nation's security," added Maloney.

Maloney authored the new law to strengthen CFIUS.  For more information on Congresswoman Maloney's work on CFIUS reform.

Background/Timeline:

May 2006 - Maloney first raised questions about Smartmatic with then-Treasury Secretary Snow, inquiring whether the deal for Sequoia had undergone a CFIUS investigation

July 2006 - Treasury acknowledged that it had initially contacted Smartmatic, although a CFIUS investigation was not underway at the time. In early October, Maloney wrote to Treasury Secretary Paulson to apprise him of the lingering questions surrounding Smartmatic:
https://maloney.house.gov/sites/maloney.house.gov/files/documents/financial/acquisitions/20061006ElectionsCFIUS_paulson.pc
(/sites/maloney.house.gov/files/documents/financial/acquisitions/20061006ElectionsCFIUS_paulson.pdf)

October 2006: Smartmatic announced that it was undergoing a CFIUS investigation

December 2006: Smartmatic announced it was withdrawing from CFIUS review and selling Sequoia

# Exhibit C2

# Congress of the United States

## Washington, DC 20515

October 6, 2006

Henry M. Paulson, Jr.
Secretary
Department of the Treasury
1500 Pennsylvania Ave., N.W.
Washington, D.C. 20220

Dear Mr. Secretary:

I am writing to follow up on my letter of May 4, 2006, to Secretary Snow, seeking review by the Committee on Foreign Investment in the United States of the acquisition of Sequoia Voting Systems by Smartmatic, a foreign-owned company. I believe this transaction raises exactly the sort of foreign ownership issues that CFIUS is best positioned to examine for national security concerns. As discussed below, publicly reported information about Smartmatic's ownership and about the vulnerability of electronic voting machines to tampering raises serious concerns. I strongly urge CFIUS to independently verify the information provided to American officials and the public by Sequoia/Smartmatic, and to take all appropriate measures to safeguard our national security.

It is undisputed that Smartmatic is foreign-owned and it has acquired Sequoia, one of the three major voting machine companies doing business in the U.S. According to a Sequoia press release in May 2006 (copy attached) Sequoia voting machines were used to record over 125 million votes during the 2004 Presidential election in the United States. As we confront another election, Americans deserve to know that the Administration has made sure that any foreign ownership of voting machines poses no national security threat.

Although many press reports have tried, it appears that it is not possible to discern the true owners of Smartmatic from information available to the public. Smartmatic now acknowledges that Antonio Mugica, a Venezuelan businessman, has a controlling interest in Smartmatic, but the company has not revealed who all the other Smartmatic owners are. According to the press, Smartmatic's owners are hidden through a web of off-shore private entities. (See attached articles.)

The opaque nature of Smartmatic's ownership is particularly troubling since Smartmatic has been associated by the press with the Venezuelan government led by Hugo Chavez, which is openly hostile to the United States. According to press reports, Smartmatic shared a founder, officers, directors and a principal place of business with Bizta, a company in which, according to Smartmatic, the Venezuelan government previously held a 28% stake. Mugica is also a director of Bizta.

Henry M. Paulson, Jr.
October 6, 2006
Page 2

According to Smartmatic press releases, (copies attached) Smartmatic and Bizta were part of the consortium that received the government contract to provide the voting machines for the 2004 referendum election to recall Chavez as Venezuela's president, and have since been awarded other contracts by the Venezuelan government.

Smartmatic's possible connection to the Venezuelan government poses a potential national security concern in the context of its acquisition of Sequoia because electronic voting machines are susceptible to tampering and insiders are in the best position to engage in such tampering. The 2005 Government Accountability Office Report on electronic voting, GAO-05-956, and other private sector studies consistently support this conclusion. Thus, the reports that Sequoia brought Venezuelan nationals to the United States to work on the Chicago 2006 primary election raises questions about whether these individuals are subject to direction from a foreign interest that might pose a threat to the integrity of the election. Similarly, the use of Smartmatic software and machines developed in Venezuela, such as the HAAT software that was at issue in Chicago, raises questions as to whether this software is susceptible to manipulation by its unknown creators. Reportedly, Smartmatic may soon be introducing into the United States the type of electronic voting machines that were used (with Bizta software) in the controversial 2004 Venezuelan recall election, under the label AVC Edge II Plus.

In reviewing the Smartmatic acquisition of Sequoia, it is important that CFIUS understand the products and services that are of Venezuelan origin and evaluate Smartmatic's ownership to determine who could have influence and control over these and other Sequoia products and services that are in use or intended for use in U.S. elections. In light of Smartmatic's failure fully to answer these questions to date, this issue demands the most thorough independent investigation by CFIUS.

Thank you for your consideration of this letter.

Sincerely,

Carolyn B. Maloney
Member of Congress

Attachments

Exhibit C3

# The State of Texas



Elections Division
P.O. Box 12060
Austin, Texas 78711-2060
www.sos.texas.gov

Phone: 512-463-5650
Fax: 512-475-2811
Dial 7-1-1 For Relay Services
(800) 252-VOTE (8683)

### Ruth R. Hughs
### Secretary of State

## REPORT OF REVIEW OF DOMINION VOTING SYSTEMS DEMOCRACY SUITE 5.5-A

### PRELIMINARY STATEMENT

On October 2-3, 2019, Dominion Voting Systems ("Dominion" or the "Vendor") presented the Democracy Suite 5.5-A system for examination and certification. The examination was conducted in Austin, Texas. Pursuant to Sections 122.035(a) and (b) of the Texas Election Code, the Secretary of State appointed the following examiners:

1. Mr. Tom Watson, an expert in electronic data communication systems;
2. Mr. Brian Mechler, an expert in electronic data communication systems;
3. Mr. Brandon Hurley, an expert in election law and procedure; and
4. Mr. Charles Pinney, an expert in election law and procedure.

Pursuant to Section 122.035(a), the Texas Attorney General appointed the following examiners:

1. Dr. Jim Sneeringer, an expert in electronic data communication systems; and
2. Mr. Ryan Vassar, an employee of the Texas Attorney General.

On October 2, 2019, Mr. Pinney, Mr. Mechler, and Dr. Sneeringer witnessed the installation of the Democracy Suite 5.5-A software and firmware that the Office of the Texas Secretary of State (the "Office") received directly from the Independent Testing Authority. The next day, Mr. Pinney examined the accessibility components of the ImageCast X Ballot Marking Device.

On October 3, 2019, the Vendor demonstrated the Democracy Suite 5.5-A system and answered questions presented by the examiners. Test ballots were then processed on each voting device. The results were accumulated and later verified for accuracy by staff of the Secretary of State.

Examiner reports regarding the Democracy Suite 5.5-A system are attached hereto and incorporated herein by this reference.

On December 27, 2019, pursuant to Section 122.0371 of the Texas Election Code, the Office held a public hearing for interested persons to express views for or against the certification of the Democracy Suite 5.5-A system.

## BRIEF DESCRIPTION OF DEMOCRACY SUITE 5.5-A

The Democracy Suite 5.5-A system is an updated version of the Democracy Suite 5.5 system, which was denied certification by the Office on June 20, 2019. The Democracy Suite 5.5-A system includes certain software and hardware updates to the Suite 5.5 version.

Democracy Suite 5.5-A has been evaluated at an accredited independent voting system laboratory for conformance to the 2005 Voluntary Voting System Guidelines (VVSG). Democracy Suite 5.5-A was certified by the Election Assistance Commission (EAC) on January 30, 2019.

The components of Democracy Suite 5.5-A are as follows:

| Component | Version | Description |
|---|---|---|
| EMS – Election Management System | 5.5.12.1 | Election Management System |
| ADJ – Adjudication | 5.5.8.1 | |
| ICC – ImageCast Central | 5.5.3.0002 | Central scanner |
| ICX – ImageCast X BMD | 5.5.10.30 | Ballot marking device |
| ICP – ImageCast Precinct | 5.5.3-0002 | Precinct scanner |

## FINDINGS

The following are the findings, based on written evidence submitted by the Vendor in support of its application for certification, oral evidence presented at the examination, and the findings of the voting system examiners as set out in their written reports.

The examiner reports identified multiple hardware and software issues that preclude the Office of the Texas Secretary of State from determining that the Democracy Suite 5.5-A system satisfies each of the voting-system requirements set forth in the Texas Election Code. Specifically, the examiner reports raise concerns about whether the Democracy Suite 5.5-A system is suitable for its intended purpose; operates efficiently and accurately; and is safe from fraudulent or unauthorized manipulation. Therefore, the Democracy Suite 5.5-A system and corresponding hardware devices do not meet the standards for certification prescribed by Section 122.001 of the Texas Election Code.

**CONCLUSION**

Accordingly, based upon the foregoing, I hereby deny certification of Dominion Voting Systems' Democracy Suite 5.5-A system for use in Texas elections.

Signed under my hand and seal of office, this 24th day of January 2020.


JOSE A. ESPARZA
DEPUTY SECRETARY OF STATE

# Democracy Suite 5.5A

The Dominion Voting Systems Democracy Suite 5.5A election system (DVS) was re-examined in Austin on October 2-3, 2019. The same system was examined in January 2019, but failed to achieve certification at that time.

There were minor changes to the ICX firmware as outlined in the change notes. There were updates to the messaging for staigh-tparty crossover and the button text. Another firmware change was related to the removal of the ICX DRE configuration and it's VVPAT. None of the changes were material to the functionality or security of the system.

There were hardware changes. Notably, the ICX DRE and  the ICX 15" tablet were removed. The hardware and software considered for certification for this examination are listed in the following table.

Proprietary/COTS Hardware/Software Components

| Name | Version/Firmware # | Hardware |
|------|--------------------|----------|
| Election Management System (EMS) | 5.5.12.1 | Dell PowerEdge R640 Server |
| Adjudication Services (ADJ) | 5.5.8.1 | Dell Precision 3431 Workstation |
| ImageCast Central  (ICC) | 5.5.3.0002 | Dell Optiplex 3050 AIO Workstation |
| ICC Scanner | DR-G1130 driver - version 1.2 SP6 | Canon DR-G1130 |
| ImageCast Precinct (ICP) | 5.5.3-0002 | PCOS-320C (proprietary device) |
| ICP Ballot Box | BOX-330A and BOX-341C | Stackable Molded Plastic and Foldable Coroplast Plastic |
| ImageCast X BMD | 5.5.10.30 - Android 5.1 | Avalue HID-21V-BTX (21.5 in. screen-Prime) |
| ICX BMD Printers | 402dn | HP LaserJet |
| ICP Ballot Box | BOX-330A and BOX-341C | Stackable Molded Plastic and Foldable Coroplast Plastic |

For a complete detailed listing of the hardware and software components used in the 5.5A system, please refer to the EAC certification Scope of Certification here.

## Findings

The findings listed below are in addition to the findings reported on the first examination of the 5.5A system. Rather than repeat many of those here, the reader should review the report for the first examination. If a finding for the second examination of a particular issue is different from the first examination, it will be pointed out in this report. Some of the key findings are repeated in this report.

- The Technical Data Package (TDP) documentation provided appears to be accurate and complete. However, there is documentation for devices and other features which were not part of the Texas configuration. This could cause confusion for a jurisdiction.

- The pre-marked and the manually voted test ballots were recorded and tallied correctly.

- * There was a problem installing the Dominion software. A fresh install of the MS-Windows operating system software was required after the failure. Since the Dominion experts had difficulty installing their system, Dominion should be required to do the installation, or the installation program must be improved.

  Eventually, the software was built successfully. The release numbers on the devices and the EMS were verified to match the releases that were used for the EAC (U.S. Elections Assistance Commission) testing.

- There are methods a jurisdiction can use to verify the integrity of the software/firmware programs (using hash codes). The methods are described in the document *SystemIDGuide-5.5* for each device, and the EMS.

  The method that Dominion provides to generate the hashes for the EMS programs on the server should be improved. It would be preferable that a read-only CD is provided that has a program to both generate and compare the hashes. The hashes generated by the testing lab should also be on the CD. This would simplify the operation so a jurisdiction could easily validate the software before and after each election.

  * Because it is difficult to verify, a jurisdiction may choose not to before and after an election.

- The ICP precinct scanner can utilize either a plastic collapsible ballot box or a rolling plastic ballot box. They both have 3 bins: regular, write-in, and emergency. The ballot box styles have locks and two places to use security seals.

  The cardboard collapsible ballot box with the punch-out emergency slot was not included in this examination and should not be sold as part of the system.

- The ICC scanner jammed when scanning a batch. The batch must be redone whenever this occurs.

- No paper jams occurred on the ICP during the examination even though an attempt was made to cause one.

- **\*** The messages on ICP display were visible only for about three seconds. One message said to press the "More" button for more information, but it quickly disappeared and the button could not be pressed. Messages should display until the user acknowledges.

- **\*** It was not necessary to get the Canon drivers for the ICC from Canon site. No explanation was given why this was necessary for the first examination.

- The two ICX machines used in this examination were configured as BMD's. The DRE configuration for an ICX was removed from the scope of certification.

- Straight-party voting can be turned off in the EMS when creating the election definition. This will be necessary when the law eliminating straight-party selection is in effect.

- The ICX BMD produces a printed summary ballot of the voter's choices. The ballot 2D barcode is read by the ICP precinct scanner. A ballot image of the text of the voter choices is also created. The images can be used for an election audit.

- Voter activation can be done on the ICX BMD by a poll worker, or on a standalone laptop using a pollbook application to create the voter activation cards.

- The ICX BMD system warns a voter that there is a problem if the laser printer paper tray is ajar. The warning instructs the voter to seek help from a poll worker.

- The ICX BMD can be used for curbside voting on a cart. It has an arm that can be used to extend the tablet into a vehicle. **\*** However, using it for curbside voting would be difficult and could damage the machine if the pathway to the curb is not very smooth.

- The ICP precinct scanner and ICX BMD can be used for a voting center. They are capable of providing all ballot styles. The collapsible ballot box is not appropriate for early voting because there is no cover to secure it at the end of the day.

- When voting on the ICX BMD during the examination, some screens had only one race; other screens had two races. Because of this, it was not clear that there was a second race on the page. It would be clearer if the layout was consistent (i.e. one race per screen). The ballot designer in the EMS has an option for this.

- **\*** The ballot on the ICX BMD screens did not have the party affiliation next to the candidate names. It also did not translate the race names (i.e. Senator). The system is capable of providing both so it is not clear how this occurred.

  The audio ballot did have the race names which presumably came from the same data entered in the ballot designer. It is odd that the information was not displayed on the screen. An operator should be alerted to this by the ballot designer software even though it is likely to be discovered before election day.

- **\*** The ethernet port is active on the ICX BMD during an election. It should be disabled when the machine is put into voting mode by the poll worker. This is an unnecessary open port during the voting period and could be used as an attack vector. An additional safeguard would be to automatically put the ICX in kiosk mode whenever the machine is open for voting.

3

- The ICP and ICC machines required an iButton dongle and the correct passcodes to access the poll worker and technician functions. Each type of iButton is programmed for a specific role.

  The ICX BMD machine requires a smart card and passcode. Session activation for the ICX is also done by a smart card. Each type of card is programmed for a specific role. Digital signatures are verified to match the signature in the election definition when the poll worker card or voter activation card is inserted.

- No problems were encountered during the adjudication testing. The wrong path error which happened during the previous examination did not occur. A better design would be to include all important paths in the election definition to eliminate human error.

  * During the previous examination, the system could not recover from the wrong path error and adjudication had to be redone. This is unacceptable. At the very least, the system should recover gracefully.

- * The Auditmark program keeps a record of all changes to a ballot during adjudication. Red boxes around a race indicates that the race needs to be adjudicated. The boxes were slightly offset from the race. It was necessary to look at the AuditMark view to verify the selection. This is unacceptable. The operator may not view the AuditMark record and adjudicate the wrong ballot and/or miss a ballot that need to be adjudicated.

- The images from the ICP scanner were much clearer and were easy to read during adjudication. Dominion offered that reason the ICP images from the previous exam were unreadable was that 1) they were compressed, or 2) the scanner was damaged. The system should not have an option to compressed images if it renders them unreadable. Also, it does not seem likely that the unreadable images were caused by a damaged scanner. * There was not a definitive root cause given for the problem, so it could occur again.

- Substantial training is essential to successful operation of the system. Dominion stated that training is customized for each customer. * The Dominion experts had difficulty operating the system at times, training and experience is critical to prevent errors during the election. Therefore, significant training should be included in a purchase contract.

- The server used for the examination was a rack mounted server. A rack mounted server would typically be in a room other than a room used for the central count. This could be a potential security risk since it is out of sight.

  A tower server can be purchased with the same internal chipset and disk storage as the rack mounted server used for the examination. This is preferred since it can operate in the same room as the scanner and workstations.

  The EMS software will run without the hardening script being applied. The following statement is from section 6.1.8 of the DemocracySuite System Security Specification document: "*No other component with the Democracy Suite platform is ever connected to a public or County network, and procedures for malicious software protection are specific and differ from regular IT systems*" . * However, the firewalls on the various central site

4

machines are not configured as part of the hardening procedures. This is left to the jurisdiction and since many jurisdictions do not have the expertise, the machines could be vulnerable to a rogue operator on a machine if the election LAN is not confined to just the machines used for the election. The machines should be configured to only allow networking between the server, central scanners, and the workstations use for the election system. No internet access or other machines should have access to the LAN.

- The voting devices logs and ballot images, and the EMS logs contain the necessary information to audit an election.

  \* However, when a second USB drive was inserted into the ICX BMD, it was not logged. It was explained that the second drive would not be read by the software and therefore was not a risk of infecting the machine. The second USB drive may be ignored by the election software, but a non-DVS drive should not be allowed as the disk could contain a rogue program that could access the election files directly.

  Text from the security document (4.4 Monitoring System Access and Use) states:
  *From the initial state of the election project, until the deactivation state, the EMS system maintains an activity log within the EMS Database. This activity log contains every action that any of the users have performed within the system and represents a detailed audit log that can be analyzed and printed in the form of an audit report. The audit record information cannot be modified or permanently deleted **using the EMS client applications.***

  \* This implies that the log could be modified by a SQL tool. The integrity of the audit log is essential. Therefore, it is important that no database access tools, other than the election software, be installed on the EMS server. The database and the log files are encrypted which helps to prevent unauthorized, unlogged editing, but they could be deleted.

## Conclusion

This examination went better overall than the last examination of the system, but many of the problems remain that caused it to fail certification previously. There have only been de minimis changes to the software since the previous examination. This is reflected by the same release number. The de minimis changes and the removal of the ICX DRE device did not correct all the problems stated in this and the previous report.

The Dominion experts still had problems installing the software. Therefore, installation cannot be assumed to be correct when installed by a jurisdiction. There are too many problems (see \* above) installing and operating the system that cannot be mitigated by documentation and training. Dominion should implement the improvements that have been suggested. It is disappointing that the problems documented in the previous examination's report were not read, or not taken seriously.

The Dominion Democracy Suite 5.5A system does not meet the standards required by the Texas Election Code. I **do not** recommend that it be certified.

Tom Watson - Examiner

# Voting System Examination of Dominion Voting Systems Democracy Suite 5.5-A

Brian Mechler, Technical Examiner
Exam Dates: October 2-3, 2019
Report Date: November 3, 2019

## 1   Background

An examination of the Dominion Voting Systems Democracy Suite (D-Suite) 5.5-A was conducted at the Texas Secretary of State Elections Division offices on October 2-3, 2019. D-Suite 5.5-A is  a comprehensive voting system which consists of the following components  [1][2]:

- Election Management System (EMS) – the set of client and server applications and hardware used to define and manage elections including the tabulation and reporting of results.

- Adjudication – EMS server and client components responsible for ballot adjudication as well as reporting and generation of adjudicated result files.

- ImageCast Central (ICC) - A ballot scan tabulator and associated ballot processing application for use in central elections offices.

- ImageCast Precinct (ICP) - An optical scan ballot tabulator for use at polling places.

- ImageCast X (ICX) Ballot Marking Device (BMD) – Commercial off-the-shelf (COTS) hardware and operating system, which utilizes custom applications to act as  a BMD.

The Election Assistance Commission (EAC) certification includes tables that describe in detail the voting system software components, voting system platforms, and hardware components. [3].

On June 20, 2019, the State of Texas denied certification of Dominion Voting Systems D-Suite  5.5 [4]. This denial was based on findings from the January 16-17, 2019 examination for which I was present [5]. Development of D-Suite  5.5-A was already complete by the time Dominion received feedback from the January exam of D-Suite 5.5. Thus, none of the changes in D-Suite  5.5-A were intended to address the issues raised during the January exam. The following is the complete list of changes between D-Suite  5.5-A and 5.5 [6]:

- "Modification to ICX straight party behavior to show  a modal pop-up window when a voter attempts to undervote  a partisan contest after selecting  a partisan choice in the straight party contest; the pop-up clarifies that the voter needs to remove their straight-party vote and manually vote all partisan contests if they wish for one or more of those contests affected by the straight party vote to be undervoted"

- "Updated default ICX localizations to change wording of final voter session wording to reflect that the ballot is being printed rather than cast"

- "Removed the ICX DRE configuration as it was not required by the State of Pennsylvania"

- "Removed the ICX Classic 15" model for marketing purposes"

- "Used MCF v5.5.10.19 (EMS 5.5 default configuration file for the ICX) as changes to MCF v5.5.10.20 from D-Suite 5.5 were related to VVPAT printer component and not relevant to the 5.5-A system configuration"

In addition to the above changes, D-Suite 5.5-A significantly reduced the number of hardware configurations available compared to D-Suite 5.5.

- The Express EMS hardware configuration is not offered, only the Standard client-server configuration.

- The ICX Prime BMD is the only available voting machine; all ICX Classic platforms, ICX Prime DRE, and ICX Prime DRE with VVPAT are not within the scope of certification for D-Suite 5.5-A.

The Secretary of State Elections Division obtained the software and firmware (FW) images used in the EAC certification directly from the EAC. Dominion personnel used those same files to perform installation under the supervision of the technical examiners. In [7], Dominion provides instructions for the identification and verification of the components included in D-Suite 5.5-A.

The examination also consisted of an accessibility test, vendor presentations and demos, a mock election, and a free-form session where examiners could ask follow-up questions and use the voting equipment in an unscripted manner.

I was not present for the accessibility portion of the exam. ADA compliance will be presented in the legal examiners' reports. A detailed description of the Texas Secretary of State examination, including my observations, concerns, and recommendations, is presented in the sections that follow.

# 2   Election Management System

The EMS is the set of client and server hardware and associated software used in pre-voting and post-voting activities.

The Standard EMS configuration is the only one available in D-Suite 5.5-A. The Standard configuration consists of a Dell PowerEdge R640 Server and one or more Dell Precision 3431 Workstations [8]. The server uses Microsoft Windows Server 2012 R2 as its OS and the workstations run on Microsoft Windows 10 Professional.

The server is configured with dual 1-TB hard drives in RAID 1 mode and four 1-TB hard drives in RAID 10 mode for data redundancy.

The server, EMS workstations, and ICC workstation communicate over a network switch that is provided by Dominion. The server host operates a DHCP server with a static pool of IP addresses. The

EMS system must be operated within its own isolated private network (i.e. not connected to any public or other internal networks). It should connected only to other components of the certified configuration.

The EMS system creates media for the voting and tabulating equipment. CFast cards are used to load election definitions on to the ImageCast Precinct. USB thumb drives are used to load election definitions on to the ICX BMD. The EMS system also creates iButton keys and SmartCards for two-factor authentication.

Backend applications and services are installed on the server hardware, and end-user applications (and some supporting services) are installed on the client workstations. In [2], Dominion describes the major software components:

- EMS Adjudication - "Server and client components responsible for adjudication, including reporting and generation of adjudicated result files from ImageCast Central tabulators."

- EMS AIMS Data Translator - "End-user application that transfers election definitions from Democracy Suite to EMS to AIMS, enabling users to program AutoMARK devices for ImageCast ballots."

- EMS Application Server - "Server side application responsible for executing long running processes, such as rendering ballots, generating audio files and election files, etc."

- EMS Audio Studio - "End-user helper application used to record audio files for a given election project. As such, it is utilized during the pre-voting phase of the election cycle."

- EMS Data Center Manager - "System level configuration application used in EMS back-end data center configuration."

- EMS Database Server - "Server side RDBMS repository of the election project database which holds all the election project data, including pre-voting and post-voting data."

- EMS Election Data Exchange Station (EDES) - "End-user helper application used to program the memory cards and iButton security keys required to properly operate the ImageCast series of counting devices. As such, it is utilized during the pre-voting phase of the election cycle."

- EMS Election Data Translator - "End-user application used to export election data from election project and import election data into election project."

- EMS Election Event Designer - "Integrates election definition functionality together with ballot styling capabilities and represents a main pre-voting phase end-user application."

- EMS File System Service - "Stand-alone service that runs on client machines, enabling access to low level operating system API for partitioning CF cards, reading raw partition on ICP CF card, etc."

- EMS NAS Server - "Server side file repository of the election project file based artifacts, such as ballots, audio files, reports, log files, election files, etc."

- EMS Results Tally and Reporting - "Integrates election results acquisition, validation, tabulation, reporting, and publishing capabilities and represents a main post-voting phase end-user application."

- EMS Result Transfer Manager - "Stand-alone application used to transfer result files from the remote locations to one or more central locations where the results can be tallied and reported on."

- EMSLogger - "a stand-alone application that runs on client or server machines and is used to gather diagnostics for troubleshooting."

- Smart Card Helper service - "Installed on a workstation or laptop at the polling place, and provides required data format for programming smart cards for ImageCast devices, or, for jurisdiction's voting registration system in case of integration."

- ImageCast Voter Activation application - Installed on a workstation or laptop at the polling place, that allows the poll workers to program smart cards for voters. The smart cards are used to activate voting sessions on ImageCast X."

Version numbers for the D-Suite 5.5-A EMS software components are the same as those included with D-Suite 5.5 [3][9].

## 2.1 Observations

The use of most of the EMS software components was not directly observed by examiners during the mock election and free-form portion of the exam. The following subsections will cover the installation process and components which were directly observed or responsible for issues during the exam.

### 2.1.1    Installation

Examiners witnessed Dominion personnel install the server and client software components. The installation process is very complex and requires the manual entry of certain paths and host names. Dominion provides a custom installation helper application which allows the user to navigate to and launch installers for individual components. Those components are not necessarily presented in order within the installation helper application. There is a point during the install process where the user must divert from using Dominion's custom installer to install certain 3rd party prerequisites from DVD. Users must take great care to follow the exact installation instructions provided by Dominion. Though hyperlinks are provided in the documentation to help the user navigate from one step to the next, instructions are not presented in order within the documentation and, in fact, are spread across multiple documents.

A problem was encountered during the installation of Adjudication Services on the server. The only way to resolve this issue was to wipe the server clean with a fresh installation of the operating system (as well as all of the prerequisites up to that point). According to Dominion personnel, the server hardware should have been rebooted prior to installing Adjudication services. As a result of missing that step, the installation of the EMS was delayed by hours.

## 2.1.2       Election Event Designer (EED)

The Secretary of State's office provided Dominion with election data for the mock election portion   of the exam. Prior to the exam, Dominion used EED to create paper ballots as well as election definitions for the ICC, ICP, and ICX. The election definition for the ICX includes the touchscreen representation of the ballot.

Aside from the misspelling of one candidate's name, there were no issues with the paper ballot. However, the touchscreen ballot had multiple errors beyond the simple spelling mistake. Party affiliations were   not listed next to candidate's names, voting instructions specific to each contest were missing, and ballot proposition language was missing. In addition, the wording of the instruction on the final screen of the ballot instructed the voter to "cast" their ballot instead of printing it. Note that this was   one of the very small number of changes that was supposed to have been picked up in this revision of D-Suite.

When asked, Dominion stated that this election definition had been put through an internal logic and accuracy (L&A) test prior to the exam. Yet   none of these issues were caught.

After the mock election portion of the exam, Dominion personnel created   a new election definition to show that they could fix all of the errors and misconfigurations, and it appeared that they did.

Similar to the install process, it appears that EED is overly complex and fragile. Many troubling questions come to mind. If Dominion personnel, theoretically the most expert users of this software, can create an election definition with so many glaring errors, how error-prone will the system be for jurisdictions that   opt to create their own election definitions? What level of service will jurisdictions receive if they outsource the creation of election definitions to Dominion? One would assume that   a certification exam sets the benchmark for the quality of service vendors provide to jurisdictions.

## 2.1.3       Adjudication

Examiners adjudicated hand marked ballots scanned on the ImageCast Central. The Adjudication user interface displays the scanned ballot image and highlights the machine interpretation of voter intent in green (see Figure 1). These green bars were occasionally offset   from where the chosen candidates appeared on the ballot creating a confusing and frustrating user experience (see Figure 2). The highlighting feature can be disabled should users find it to be counterproductive.

In the January exam of D-Suite 5.5, examiners witnessed a crash of Adjudication Services   due ostensibly to   a misconfigured path. The crash of Adjudication Services required the readjudication of all previously adjudicated ballots. This issue did   not occur during the exam of D-Suite 5.5-A. However, since there were no changes made to the Adjudication software, this issue could arise again.



*Figure 1: Properly Aligned Visual Aid*



*Figure 2: Misaligned Visual Aid*

### 2.1.4        Results Tally and Reporting (RTR)

RTR was used to tally votes and produce reports  from the mock election. No issues were observed. Votes were tallied and reported accurately.

# 3   Scanners

D-Suite 5.5-A includes two ballot scanners. The ImageCast Central (ICC) is for use at the jurisdiction's central office and is typically used to scan mail-in ballots. ImageCast Precinct (ICP) is  a polling place scanner. The ICC and ICP can both process hand-marked and machine-marked ballots.

## 3.1  ImageCast Central

The ICC utilizes  a COTS Canon DR-G1130 scanner connected to a Dell Optiplex 3050 AIO Workstation. The workstation runs Windows 10 (64-bit) Professional edition as its OS. The ICC workstation can  be connected over the isolated private network to the EMS server. If connected to the server, the ICC can be configured to save scanned ballot images and cast vote records (CVRs) on both the ICC workstation and the EMS server.

The Canon DR-G1130 has a feeder capacity of 500 sheets. It can scan one hundred 8.5"x11" pages per minute. Ballot stock in lengths ranging from 11" to 22" can be used.

An iButton security key is required for two-factor authentication, decryption of election files, and encryption of results files.

The ICC can be configured to reject ballots that have issues, such as ambiguous marks and under/over votes.

### 3.1.1      Observations

Examiners observed the installation of the ICC workstation software and there were no notable issues with this process.

During the mock election, examiners observed the processing of ballots through the ICC. The ICC properly rejected ballots that did not meet the criteria of the loaded configuration. There is some latency between the scanning of the ballot and the detection of an issue. As a result, a handful of ballots are scanned subsequent to the problem ballot. However, the ICC workstation application correctly informs the user of how many ballots need to be rescanned. The ICC jammed once during the processing. When the ICC encounters a paper jam, the entire batch must be rescanned.

## 3.2  ImageCast Precinct

The ICP is a custom hardware device with a scanner, integrated thermal printer, and LCD touchscreen. When a voter is finished marking their ballot (either by hand or using the ICX BMD), they insert it into the ICP where it is scanned and deposited into the ballot box. The ICP can read ballots in any orientation. It can be configured to reject ballots that have issues such as ambiguous marks and under/over votes.

Firmware is loaded from a CFast card along with an iButton Administrator key for authentication. Different iButton keys are required for other roles and actions. The iButton Administrator key is provided by Dominion and color-coded so that it is not accidentally confused with keys that are reprogrammed across elections.

Election definitions are loaded via CFast cards and stored in internal memory. CVRs and scanned images are stored on two CFast cards for data redundancy. Redundancy between the two cards is checked after each file write and if the cards ever fall out of sync, the ICP will cease to operate as a tabulator until the issue is resolved.

### 3.2.1      Observations

Examiners witnessed the installation of ICP firmware. The installation required the use of an iButton Administrator key. The PIN associated with the iButton Administrator key is only 1-digit long and cannot be changed. Dominion should at the very least make the PIN more complex and preferably issue keys protected by unique PINs.

The FW installer provides an option to install older versions of the ICP FW. According to Dominion, this feature exists to support the recount of an election conducted under an older version. The problem

with this feature is that jurisdictions would have the ability to install FW that has not received certification in Texas. This is an unnecessary convenience that risks the use of a non-certified system in an election. If jurisdictions have purchased older, certified versions of D-Suite, they should already have the FW install files for that particular version. Alternately, they should be able to obtain those files from Dominion.

During the free-form session of the exam, one of the examiners scanned a paper ballot with an ambiguous ballot mark. The ICP properly rejected the ballot, but the error messaged flashed so quickly across the LCD screen that examiners could not easily determine the reason for rejection. When a ballot is rejected, the error message should persist on the LCD screen so the voter and/or poll worker can determine what went wrong and resolve the issue.

Two different ballot box configurations were demonstrated. Both configurations provided adequate ballot security.

Two identical ICP scanners were in use during this exam. Though D-Suite 5.5-A uses the same ICP FW and HW as D-suite 5.5, examiners did not encounter issues with paper jams and poor quality images this time around. Dominion's best guess for the poor performance during the D-Suite 5.5 exam was that the ICP unit used was defective or damaged during shipping.

# 4    ImageCast-X Ballot Marking Device

The ICX BMD consists of custom software running on COTS hardware (Avalue HID-21V-BTX). The Avalue tablet runs the Android 5.1 OS. The tablet is connected to a HP M402dne COTS printer and optionally an audio-tactile controller and LED indicator light.

Two-factor authentication is role-based and accomplished via ACOS-6-64 SmartCards. The SmartCards authenticate one of three roles; Technician, Poll Worker, and Voter.

Technician cards are used when loading the ICX applications on the tablet and when loading the election definition files. Election definition files are stored on USB thumb drives; the election definition files are not transferred to the tablet's internal memory. EED is capable of programming Technician cards. A Technician card does not grant access to election day related functions.

Poll Worker cards are programmed by EED. They give poll workers the ability to open/close polls, extract audit logs, perform diagnostics tests, and manually activate voting sessions for voters. Election definitions are encrypted when first loaded. Poll Worker cards hold the decryption key which decrypts the election definition upon their first use. Every time a Poll Worker card is used, it verifies the digital signature of the loaded election definition.

The Voter card is typically programmed at the polling place by poll workers using an ImageCast Voter Activation workstation (a piece of hardware that is outside the scope of this certification exam). The Voter card is provided to voters so they can activate their own voting sessions. The Voter card only activates the ballot specific to the voter's precint. After it has been used to print a ballot, the Voter card cannot be used again until it has been reprogrammed by a poll worker.

## 4.1  Observations

Installation of the ICX application by Dominion personnel was witnessed by the examiners. A Technician card is required to install the ICX application. A Technician card is not required to install other applications. The technician must manually put the ICX tablet in kiosk mode after installing the ICX application. If one has access to ICX data ports, kiosk mode the only thing preventing someone from installing non-certified software. Only a user with Technician card credentials can take the ICX out of kiosk mode. In this exam, and in the January D-Suite 5.5 exam, Dominion personnel failed to place voting machines in kiosk mode after installing the ICX application. This critical step needs to receive greater focus in Dominion's internal training.

Examiners used the ICX BMD to mark ballots during the mock election. The touchscreen user interface is intuitive and easy to navigate. Any difficulty experienced marking a ballot was due to the misconfigured election definition (detail provided in Section 2.1.2).

In my report of the D-Suite 5.5 exam, I found that hasp seals insufficiently secured the doors protecting data and network ports. During the 5.5-A exam, Dominion recommend the use of tamper-evident adhesive seals to secure the doors. This is a very good recommendation. In fact, the same recommendation can be found in the ICX System Operation Procedures manual [12]. However, the ICX User Guide [13] is vague on whether adhesive seals should be used in addition to hasp seals. With regard to securing the doors, the Democracy Suite System Security Specification [14] simply refers the reader to the COTS manual [15]. The Avalue HID-21V-BTX manual only recommends hasp seals to secure the doors. Dominion needs to provide consistent guidance across all of their documentation regarding physical security of ICX devices.

A new hardware peripheral in the form of a COTS LED indicator light was demonstrated. The LED indicator provides voting system status to poll workers without violating the privacy of voters. In theory this would be a welcome feature. Unfortunately, this new peripheral exposed a secured USB port. The LED light is controlled by a detachable USB-C cable (see Figure 3). In [16], Dominion recommended two mitigation options (I recommend the latter):

- "Seal the connection between the LED light and the USB cable"

- "Remove the LED light from the Texas configuration altogether"

One issue with relying heavily on COTS equipment in the polling place is that often the end-use is not envisioned by the original COTS product designers. The Avalue tablet is a good example of this disconnect. Door 3 of the device secures DC in/out ports, the power button, and a USB port. Due to the presence of the USB port, this door must be sealed at all times during an election. During early voting, poll workers will have to break and replace this seal at the beginning of each day to power on the device.

It was discovered during an informal test that if a USB peripheral were added while the Avalue device was powered off, users of ICX (even those with Poll Worker card access) would not be made aware of the configuration change. The "Hardware Details" diagnostic provided by the Poll Worker menu only checks the status of defined peripherals (i.e. the printer, LED, and audio-tactile interface). Audit logs can be viewed on-screen, but those logs do not contain the level of detail necessary to discover the

presence   of a non-certified device. Only the system logs capture enough detail to detect the addition   of non-certified USB devices. The system logs are   not typically exported and examined each day during early voting.

In the 5.5-A configuration, the ICX can only be operated in BMD mode; thus it does   not create or store CVRs. It's unlikely someone could significantly alter the outcome of an election via this vulnerability (assuming voters carefully review their marked ballots). However, voter confidence in elections systems is   a critical component of democracy. Evidence of tampering on even one system undermines this confidence. After this discovery, Dominion recommended the use   of a serialized port lock   or a non-residue tape seal to secure the USB port behind Door 3 [16].



# 5   ImageCast Voter Activation (ICVA)

ICVA is an application that runs on a laptop or workstation located at the polling place. It is used to program Voter SmartCards that can activate voting sessions on ICX devices.

## 5.1   Observations

The ICVA software and hardware are not within the scope of this certification exam. My observations of this component will have no bearing on my recommendations regarding D-Suite 5.5-A. Nevertheless, examiners witnessed the installation and use of this application. No issues were observed. In general, voter activation stations such as ICVA can allow for a more streamlined polling place and reduce the burden on poll workers.

# 6   Conclusions

Multiple major issues are present in D-Suite 5.5-A (enumerated below):

1. Complexity and fragility of the EMS installation process

2. Complexity and fragility of the Election Event Designer revealed by multiple errors in the Dominion generated election definition file for the ICX BMD

3. Inability to gracefully recover from a crash of Adjudication Services (no crashes were witnessed in this exam, but this EMS software component is identical to the one in D-Suite 5.5)

4. Easily cracked PIN on Technician iButton key

5. ICP installer allows installation of non-certified firmware

6. ICP's unclear and buggy behavior in response to an ambiguous mark on a hand-marked ballot

7. ICX LED indicator exposes an otherwise secured data port

8. Unclear and insufficient guidance in technical data package regarding physical security of ICX

In aggregate, Issues 1-3 and prevent D-Suite 5.5-A from meeting Texas Voting System General Requirement 122.001(a)(2): "Must be suitable for the purpose for which it is intended."

In aggregate, Issues 1-3 and Issue 5 prevent D-Suite 5.5-A from meeting Texas Voting System General Requirement 122.001(a)(3): "Operates safely, efficiently, and accurately and complies with the voting system standards adopted by the EAC."

If operated properly, D-Suite 5.5-A could be a system that operates safely, efficiently, and accurately. However, we have not yet witnessed that even Dominion's own subject matter experts can operate the system properly. To be clear, the above statement is not an indictment of Dominion personnel. I found the representatives at the exam to be courteous, professional, knowledgeable, and eager to answer examiners' questions and resolve issues. It is the EMS system itself that is difficult to work within.

Issues 4, 7, and 8 prevent D-Suite 5.5-A from meeting Texas Voting Systems General Requirement 122.001(a)(4): "Is safe from fraudulent or unauthorized manipulation."

Many of these issues could be resolved by placing conditions on the certification of D-Suite 5.5-A.

- Require that Dominion deliver EMS to customers on pre-imaged drives (resolves Issue   1)

- Require that Administrator iButton key be protected by sufficiently complex PIN (resolves Issue   4)

- Remove non-certified firmware versions from ICP installer (resolves Issue   5)

- Remove the ICX LED peripheral from the Texas certification (resolves Issue   7)

- Update documentation to provide clear and consistent guidance regarding physical security best practices (resolves Issue   8)

Ultimately, this set of conditions is too large to be considered de minimis. I recommend against certification of Dominion Voting Systems Democracy Suite 5.5-A.

# 7   References

[1]   Application for Texas Certification of Voting System – Form 100, Signed Aug-28 2019

[2]   Democracy Suite System Overview, Version 5.5-A::155, Dec-12 2018

[3]   United States Election Assistance Commission Certificate of Conformance Dominion Voting Systems Democracy Suite 5.5-A, EAC Certification Number DVS-DemSuite5.5-A, Jan-30 2019 URL: https://www.eac.gov/voting-equipment/democracy-suite-55-a-modification/

[4]   J. A. Esparza, "Report of Review of Dominion Voting Systems Democracy Suite 5.5", Jun-20 2019, URL: https://www.sos.state.tx.us/elections/forms/sysexam/dominion-democracy-suite-5.5.pdf

[5]   B. J. Mechler, "Voting System Examination of Dominion Voting Systems Democracy Suite 5.5", Feb-15 2019, URL: https://www.sos.state.tx.us/elections/forms/sysexam/jan2019-mechler.pdf

[6]   Democracy Suite System Change Notes, Version 5.5-A::155, Dec-13 2018

[7]   Democracy Suite System Identification Guide, Version: 5.5-A::334, Dec-19 2018

[8]   D-Suite 5.5-A (TX) Component List, Oct-18 2019

[9]   United States Election Assistance Commission Certificate of Conformance Dominion Voting Systems Democracy Suite 5.5, EAC Certification Number DVS-DemSuite5.5, Sept-18 2018 URL: https://www.eac.gov/voting-equipment/democracy-suite-55/

[10]   Democracy Suite ImageCast Central Functionality Description, Version 5.5-A::180, Dec-12 2018

[11]   Democracy Suite ImageCast Precinct Functionality Description, Version 5.5-A::176, Dec-12 2018

[12]   Democracy Suite ImageCast X System Operations Procedures, Version 5.5-A::85, Dec-12 2018

[13]   Democracy Suite ImageCast X User Guide, Version 5.5-A::252, Dec-12 2018

[14]   Democracy Suite System Security Specification, Version 5.5-A:563, Dec-12 2018

[15]   Avalue HID-21V-BTX-A1R User Manual, Avalue Technology Inc., Feb-2 2018

[16]   Texas Certification Response, Correspondence from Dominion Voting Systems to Charles Pinney, Oct-30 2019

# BRANDON HURLEY, ESQ.

4122 Mapleridge Drive
Grapevine, Texas 76051
(817) 454-3142
brandon.hurley@outlook.com

November 4, 2019

Mr. Keith Ingram
Director of Elections
Texas Secretary of State
Elections Division
208 East 10th Street
Austin, Texas 78711

Re:    Inspection of the Dominion Voting Systems' Democracy Suite 5.5-A conducted on October 2 and 3, 2019

Dear Mr. Ingram:

Pursuant to my appointment by the Texas Secretary of State as a voting systems examiner under TEXAS ELECTION CODE § 122.035, please allow this letter to serve as my report concerning the above referenced examination.  I, along with the other statutory examiners and staff from the Secretary of State's office, examined the Democracy Suite 5.5-A voting system presented by Dominion Voting Systems ("**Democracy 5.5-A System**") on October 2 and 3, 2019, at the offices of Elections Division of the Texas Secretary of State in Austin, Texas.

At the outset, it should be noted that the Democracy 5.5-A System is a derivation of the 5.5 System that Dominion previously submitted for examination in February of 2019.  The examiners reports (including mine) pointed out multiple concerns with the 5.5 System. Dominion officials made clear that the only substantive change to the 5.5-A System from the 5.5 System was a change in the wording of the straight ticket voting language that has been one of the points raised in the examiners previous reports.  Dominion expressed that other issues raised in the examiners' previous reports were a result of potentially damaged equipment, misunderstandings between the examiners and the previous Dominion officials that presented the 5.5 System and things that could not be explained since the Dominion presenters of the 5.5-A System were not present at the 5.5 System examination.    *It should be noted that Dominion removed the DRE device that was included in the 5.5 System from the 5.5-A System.*

I reviewed the written materials for the 5.5-A System before the October examination. These documents appear to be substantially similar to the documentation for the 5.5 System.  As was the case with the 5.5 System documents, Dominion submitted updated versions of some of the documents before the examination.

Although I was not present on the first day of the examination when the 5.5-A System was built and installed, it appears Dominion had difficulties accomplishing the task. As a result, Dominion officials had to re-install the operating system on some of its equipment and ran into difficulties in getting the build completed.

At the beginning of the second day of the examination, the vendor provided a general overview of the Democracy 5.5-A System. It is a complete voting system that includes ballot marking devices, ballot scanners, election tabulation and management software and supporting devices for accessibility needs. The 5.5-A System does not include a DRE device. The primary hardware and software components of the 5.5-A System are the same as the previously reviewed 5.5 System.

## ACCESSIBILITY TESTING

Officials from the Secretary of State's office tested the physical equipment of the Democracy 5.5-A System for accessibility compliance with the applicable state laws and regulations. These tests confirmed that the new components in the Democracy 5.5-A System complied with the accessibility requirements of Texas law; however, officials from the Secretary's office noted that while using the non-audio voting portion of the system (i.e.- reading items on a screen), only audio instructions were available and no written instructions were on the screen. This raises issues with voters that want written instructions on the screen as part of their voting experience. This same problem existed with the 5.5 System.

## TESTING OF HARDWARE AND SOFTWARE

On October 3rd, the examiners and Secretary of State staff tested each piece of equipment and software for security, functionality and accuracy. The examiners and staff cast a script of ballots on each voting machine and paper ballots were fed into the optical scanners that were marked by the ICX being used as a ballot marking n device and hand-marked ballots. The mock votes were tabulated and sorted with the election software included in the Democracy 5.5-A System.

## SPECIFIC ISSUES RAISED DURING THE INSPECTION

1.  As was the case with THE 5.5 System, some of the hardware in the Democracy 5.5-A System can be connected to the internet through Ethernet ports.

2.  The foldable ballot box offered with the Democracy 5.5 System could now be used in early voting because Dominion has developed a process to add a second lock to it that would mean two separate keyed locks would secure the box as required by Texas law.

3.  In the 5.5 System examination, the rolling ballot box dividers for provisional or disputed ballot storage were not present. At that time, the vendor claimed such dividers were available. However, at the October examination of the 5.5-A System, Dominion officials explained that there was not a separate divider or

location within the ballot box for provisional ballots, so those ballots would need to be segregated in a separate envelope at the polling location.

4.      Tamper seals and locks exist on the equipment; however, Dominion officials stated that the end-user (i.e. - Texas counties and other voting jurisdictions) had to implement procedures to make sure these security measures were effective.

5.      As several questions arose during the examination, Dominion officials referred to a "best practices" document that was not part of the documentation provided to the examiners.   Dominion officials claimed that the majority of the security concerns raised by the examiners were addressed by this document, but it was ultimately the responsibility of the end-users to make decisions and implement security measures they deemed appropriate.

6.      Although more appropriate for the technical examiners to address, the server and other portions of the hardware and software used by the Dominion officials during the exam were not part of the equipment/programs listed in the certification application. However, it appears that these items may be necessary for a complete system that would be sold to Texas election end-users.  This creates a conundrum concerning exactly what is being certified and what is being sold.

7.      As was the case with the 5.5 System, the use of non-sequential numbered paper ballots as required by the Texas Constitution cannot be created within the Democracy 5.5-A System.  Instead, the only way to comply with this requirement of the law would be to hand-write and/or pre-print paper with serial numbers in a range for the selected precinct and then manually intermingle the ballots so their numbers are not sequential.

8.      The problems with the adjudication portion of the tabulation process in the 5.5 System were dismissed by Dominion officials as a "bad path"; however, Dominion never showed why the bad path occurred or how it could be avoided end users.  Also, the previous poor resolution on the scanner for some of the printed wording on the ballots was dismissed either as damaged equipment or a setting issue.

## GENERAL OBSERVATIONS

A. While the previous examination of the 5.5 System and the current examination of the 5.5-A System are separate and distinct, it is clear that the two systems overlap in the sense that the issues with the 5.5 System should be addressed (or at least adequately explained) in the 5.5-A System examination.   I do not think this was completely done.    Dominion officials dismissed several questions from the previous examination that were once again raised at the 5.5-A System examination by stating "since we were not at the previous

inspection, I am not sure I can speak to that issue."   Several of these issues were of critical concern.

B. The build and installation process problems suggest that the 5.5-A System is complicated and may not be easily built and installed by the end-users.  There was a discussion of purchased the 5.5-A System already installed; however, that was not demonstrated to the examiners and, as presented, the on-site installation would be required.  The problems encountered by Dominion staff indicate that the same problems may occur in the field.  This leads to the potential conclusion that the 5.5-A System is may not be suitable for its intended purpose.

C. Without question, one or more of the components of the 5.5-A System can be connected to an external communication network and this can only be avoided if the end-user takes the proper precautions to prevent such a connection.

D. Many of the security features of the 5.5-A System are not automatic, but again depend on the end-user following the best practices promoted by Dominion.  I believe that Texas law requires safety measures that protects against fraud or unauthorized manipulation that provides the best possible protection.  In my opinion, leaving these security measures to the local jurisdiction is not in alignment with this standard.

E. As with the 5.5 System, The issues identified above could be corrected, but those corrections should be made and the System represented before the hardware and software components can be recommended for certification.


**<u>RECOMMENDATION</u>**

Based on the foregoing observations and my examination of the Democracy 5.5-A System, its accompanying literature and the presentation made by Dominion officials both in its literature and at the examination, I cannot recommend that the Democracy 5.5-A System be certified as compliant with the requirements of the TEXAS ELECTION CODE and the TEXAS ADMINISTRATIVE CODE.  While the applicable code and statutes provide that "conditions" can be suggested as a prerequisite to certification, I do not believe that the listing of conditions that need to be addressed with the 5.5-A System would be appropriate since the conditions, if listed, would require such a substantial re-work of the 5.5-A System that it would not be practical.

This report should not be construed as a tacit or implied comment on any of the technical aspects of the Democracy 5.5-A System except as expressly stated herein.  In the event any of the equipment, software or security devices examined are altered, changed or decertified by any accrediting agency (other than a "minor modification qualified for administrative certification process" as that term is defined in § 81.65 of the Texas Administrative Code), this report should be considered withdrawn.

Thank you for the opportunity to serve as an examiner and participate in this important process that ensures robust and safe voting systems in the State of Texas.

Sincerely,

Brandon T. Hurley

# The State of Texas



Elections Division
P.O. Box 12060
Austin, Texas 78711-2060
www.sos.state.tx.us

Phone: 512-463-5650
Fax: 512-475-2811
Dial 7-1-1 For Relay Services
(800) 252-VOTE (8683)

## Secretary of State

## MEMORANDUM

TO:          Keith Ingram, Director of Elections, Texas Secretary of State

FROM:     Chuck Pinney, Staff Attorney, Elections Division, Texas Secretary of State

DATE:      November 4, 2019

RE:          Dominion Voting Systems – Democracy Suite 5.5-A Voting System Examination

In accordance with my appointment by the Texas Secretary of State as a voting system examiner under Tex. Elec. Code §122.067, I present my report on the voting system examination which took place on October 2-3, 2019, in the offices of the Texas Secretary of State at the James E. Rudder Building, 1019 Brazos, Austin, Texas 78701.

On October 2-3, 2019, the examiners appointed by the Texas Secretary of State and the Texas Attorney General examined Democracy Suite 5.5-A, a voting system that was presented by Dominion Voting Systems ("Dominion") for certification in Texas.  The following hardware and software components were examined at the Office of the Secretary of State:

| Component | Version | Previous Texas Certification Date |
|---|---|---|
| EMS – Election Management System | 5.5.12.1 | None |
| ADJ – Adjudication | 5.5.8.1 | None |
| ICC – ImageCast Central | 5.5.3.0002 | None |
| ICX – ImageCast X BMD | 5.5.10.30 | None |
| ICP – ImageCast Precinct | 5.5.3-0002 | None |

For the reasons outlined below, I am unable to recommend that this system be certified by the Texas Secretary of State under Tex. Elec. Code §§122.031 and 122.039.

**Background**

Dominion Voting Systems previously sought certification in Texas for the Democracy Suite 5.5 voting system in January 2019. That certification was denied in June 2019.

The voting system that was the subject of this examination, Democracy Suite 5.5-A, was certified by the U.S. Election Assistance Commission ("EAC") on January 30, 2019.

**Summary of the Examination**

The examination of Democracy Suite 5.5-A took place on October 2-3, 2019.

The first day of the exam involved the installation of the software and firmware for Democracy Suite 5.5-A using of the trusted build provided to our office by the testing lab.

During the installation of the Adjudication software on the EMS server, the installation failed multiple times. As a result, the system needed to be fully wiped and required a full reinstallation of all EMS software, including the Windows operating system. The installation failed again on the first attempt after the full reinstallation, but succeeded on the second attempt.

Before the beginning of the vendor presentation on the second day of the exam, I conducted the accessibility testing and tested the visually impaired functions, the sip-and-puff controller, and the paddle controller. The system performed well during the accessibility testing and presented no issues.

On the second day of the exam, the vendor provided a presentation of the software and the updates involved in the current version of Democracy Suite. The vendor noted that the only difference between Democracy Suite 5.5 (which was denied certification in June 2019) and Democracy Suite 5.5-A was an update to an instruction relating to straight-party voting on the ICX Prime BMD. No other changes from Democracy Suite 5.5 were included in the update to 5.5-A.

After the vendor presentation, the examiners tested the equipment by voting a series of test ballots and comparing the results of those test ballots. The examiners also conducted additional testing on various components of the system.

**Analysis**

The standards for a voting system in Texas are outlined in Texas Election Code Chapter 122. Specifically, the system may only be certified for use in Texas if it satisfies each of an enumerated list of requirements contained in Texas Election Code §122.001. Because the system does not satisfy each of those requirements, I would recommend against certification of this system.

In the examination for Democracy Suite 5.5 that took place in January 2019, myself and the other examiners noted a number of issues that led to each of us recommending that certification for that system be denied. The system that we reviewed in this examination, Democracy Suite 5.5-A, did not contain any changes that addressed the issues identified in those examiner reports. The system that we reviewed in this examination was certified by the EAC on January 30, 2019, which was approximately two weeks before our examiner reports from the previous examination were completed on February 16, 2019. Therefore, it is impossible for this system to have addressed any issues in response to the issues raised in those examiner reports because this version was finalized and certified by the EAC before those reports were ever published.

Some of the issues we encountered in the previous exam could be attributed to errors in presentation or configuration in the previous exam and were not reproduced in this exam. The issue with image quality generated by the ImageCast Precinct in the previous exam did not occur in this exam, and the vendor indicated that the issue that occurred in the previous exam may have been caused by damage to that device in transit to the exam or due to the use of image compression settings that were not enabled in this exam. Similarly, the printer tray issue that occurred with the ICX Prime BMD in the previous exam did not occur in this exam, and the device properly provided an error message that allowed the poll worker to fix the printer tray issue without losing the voter's cast ballot.

However, many of the general concerns about the system's ability to be implemented by counties with low technical expertise due to the complexity of the configuration and installation process are still present. The fact that the only change between Democracy Suite 5.5 and Democracy Suite 5.5-A was a change to a straight-party instruction message indicates that these issues and other issues highlighted in the examiners' reports were not addressed in this version of the software.

Regardless of what occurred during the previous exam and the concerns that were raised during that process, there were several issues that occurred during this exam that support my recommendation against certification of this system:

- The installation process for the EMS software (including Adjudication) is incredibly complicated and is not intuitive for the user. The technician performed the install using the installation guide that was included in the vendor's documentation. That documentation provided guidance on how to perform the installation, but the design of the system and the documentation was not intuitive.

  The system required the technician to manually install every component of the system (including individual system fonts) in a very specific order, but the design of the installer makes this a fairly confusing process for the technician. For example, at one point, the technician is required to install the second item on the install list, then the first, then the third for the system in that exact sequence for the installation to function properly. This is a questionable design choice that is indicative of several similar choices that creates unnecessary complications that are likely to confuse users and result in incorrect installation of system components.

  During the installation the system also generated default file pathways which the user was required to change to a different pathway identified in the installation documentation. The vendor indicated that there was no situation in which the default pathway provided by the installer would be used. While this is a relatively minor issue, it raises questions as to why the system did not generate the correct pathway by default, or why the installer would generate an incorrect pathway instead of leaving the field blank. This is just another example of a design choice that is unintuitive and could lead to configuration errors during setup by a political jurisdiction.

- The installation of the Adjudication software failed on several occasions during the examination process. In an effort to address those failures, the technician referred to troubleshooting documentation and consulted with engineers from the vendor. These troubleshooting attempts included editing the system registries and other steps that could present issues for a user without substantial technical expertise. The vendor stated that the troubleshooting documentation used during this process was not part of the vendor's Technical Data Package and is an internal document.

  After the first few failures, the vendor chose to wipe the software and operating system off the server system and conduct a full reinstallation of the Windows operating system and EMS software. The installation failed again one more time after the full reinstallation, but succeeded on the second attempt. The system took approximately 10-15 minutes to complete the phase of the installation that had failed on previous attempts after the same amount of time.

  The vendor stated that this installation error occurred because a reboot step was skipped in the initial installation. The vendor also indicated that this part of the installation process takes a long time and that the system may have timed out during the previous attempts. The issues experienced in this part of the process by the vendor's own technical personnel raise concerns about the reliability of the system in general as well as the difficulty in installing and configuring this software.

- The ICX Prime BMD included an LED light to alert pollworkers to potential issues. That LED light was connected to the system via USB. During the examination process, one of the examiners was able to disconnect the LED light from the USB cable that connected it to the system without having to break any of the seals preventing physical access to the USB ports. The examiner was able to connect his cell phone to the voting machine using that exposed cable connection.

  It is unclear whether the system would have allowed any transferring of data or other malicious access to that device over that connection. The system did record that event in its audit logs, so there was at least a record of the incident occurring. However, it is concerning that the connection itself was available to expose the system to such access.

  The vendor recommended two possible forms of mitigation for this vulnerability, (1) that the connection between the LED light and the USB cable be sealed to prevent it from being disconnected, or (2) that the LED light be removed from the Texas configuration.

  If the system were certified, I would recommend that it be made conditional on the fact that this USB LED light or any similar device with an exposed connection cannot be used with the system.

- The ImageCast Precinct (ICP) has a few concerning issues. The firmware is installed using a 1 character pin code along with a physical technician key, and the pin code cannot be changed. While the physical key requirement alleviates part of the problem, it seems like an unnecessary security vulnerability to have such a rudimentary password requirement for a firmware installation.

The ICP also allows for the installation of firmware from prior versions of Democracy Suite which are not certified for use in Texas. This would theoretically allow a jurisdiction to install an uncertified version of the voting system during the firmware installation process. This feature should be removed, and any certification of this system should be made conditional on the vendor's removal of that feature through an administrative modification process before that device could be used in Texas elections.

The examiners also experienced an issue when trying to scan a ballot with an ambiguous mark through the ICP. The device correctly rejected the ballot, but the error message was only available while the ballot was still touching the portion of the scanner that catches the ballot, which only occurred in one of five tests. In the other tests, when the ballot was rejected the scanner pushed the ballot out so far that it was no longer touching that portion and the error message would disappear instantly. This design could create situations where voters' ballots are rejected without the voter having an opportunity to view the relevant error message and find out what needed to be corrected.

- The system does not provide a software solution to address the ballot numbering requirements of Texas law. If certification were granted for this system, it would have to be made conditional on the jurisdiction's use of hand-numbering devices or pre-printed ballot stock that complies with the ballot numbering requirements.

In theory, this system could be certified for use in Texas with a hefty list of conditions. However, there would still be significant concerns with the reliability of the system and the ability of Texas jurisdictions to configure and install the required software. Ultimately, I cannot recommend a system that would require a long list of conditions in order for a jurisdiction to adopt the system and still comply with Texas law and voting system standards.

The flaws and questionable design choices that were identified through this exam that indicate that the system is not suitable for the purpose for which it is intended and therefore cannot be certified for use in Texas under Texas Election Code 122.001(a)(2). In addition, the potential security vulnerabilities that were identified in the exam indicate that the system may not be safe from fraudulent or unauthorized manipulation, and therefore cannot be certified for use in Texas under Texas Election Code 122.001(a)(4).

**Conclusion and Recommendation**

For the reasons outlined above, I am unable to recommend certification of this system.

If the system is certified, then that certification will need to be made conditional based on the vendor's and the jurisdiction's compliance with several different conditions. However, the conditions that would need to be imposed are so numerous and affect so many fundamental aspects of the system that I am unable to recommend even a conditional certification of this system.

# Voting System Examination
# Dominion Voting Systems
# Democracy Suite 5.5-A

## Prepared for the
## Secretary of State of Texas

## James Sneeringer, Ph.D.
## Designee of the Attorney General

This report conveys the findings of the Attorney General's designee from an examination of the equipment listed below.

**Examination Date**     October 2-3, 2019
**Report Date**          November 3, 2019

## Components Examined

|  | Version | EAC/NASED Qualification Number | Date |
|---|---|---|---|
| EMS - Election Management System | 5.5.12.1 | DVS-DemSuite5.5-A | 1/30/2019 |
| ADJ - Adjudication | 5.5.8.1 | DVS-DemSuite5.5-A | 1/30/2019 |
| ICC - ImageCast Central | 5.5.3.0002 | DVS-DemSuite5.5-A | 1/30/2019 |
| ICP - ImageCast Precinct | 5.5.3.0002 | DVS-DemSuite5.5-A | 1/30/2019 |
| ICX - ImageCast X BMD | 5.5.10.30 | DVS-DemSuite5.5-A | 1/30/2019 |

The Democracy Suite 5.5-A (or D-Suite 5.5-A) is a modern voting system that is new to Texas, although D-Suite is in use in other states. A distinguishing feature is the extensive use of commercial off-the-shelf components, or COTS components, to use the industry parlance. COTS components are standard hardware or software products, as opposed to custom-made components.

For example, the D-Suite voting terminals are commercially available Android tablets that include the stand and the smart-card reader used for voter authentication. Similarly, the PCs, networking gear, hard drives, printers, and some scanners are COTS components.

## D-Suite Components

ImageCast X (or ICX) is the name of the line of voting stations, which all share identical software. The *X* in the name highlights the interchangeability of the software and, in one case, even the tablet hardware.

For this examination, Dominion is only seeking certification of one member of the ICX line – the ImageCast X BMD. (BMD stands for ballot-marking device.) When a voter is finished making his or her selections, the BMD prints the ballot on the attached printer but does not save the voter's choices on the device. Since these devices do not tabulate at all, they do not need zero-tapes, precinct tallies, or the like. The printed ballot must then be scanned before it is counted. Each ballot contains the cast-vote record in two formats: a QR code (for use by the scanner) and a

printed, human-readable list (which can be visually verified by the voter).  If there should be a question about whether the two match, it can be easily verified by scanning the QR code on the ballot and visually checking that it corresponds to the printed votes.

The voting stations are COTS Android tablets; they must be placed in kiosk mode, which prevents access to the Android features during voting.

Election setup, tabulation, and other related tasks are done with mostly COTS components and the proprietary EMS software.  Most of the components are on a LAN (local area network), and no other devices are to be connected to that LAN.

All election data and results are stored on self-encrypting hard drives and are also encrypted by the database software, Microsoft SQL Server.  The hard drives are redundant (RAID 10), meaning that each piece of data is stored on two separate hard drives, so nothing is lost even if one hard drive fails.  There are two configurations, one that allows multiple client computers connected to a single server computer, and one where everything is on the same computer.  We tested only the former, so the single-computer setup is not being certified.  These computers run a hardened Windows operating system.

## Voting

**Election Setup.**  Election setup (such as entering races and assigning candidates to them) is done using a GUI (graphical user-interface) that is part of the Election Management System.

**Authentication for election setup and central-count administration.**  D-Suite uses two-factor authentication for administration. Access is granted only after both entering the correct PIN and presenting a token, which will be either an iButton (see photos) or a smart card, depending on the device.  According to the vendor, an iButton is more durable than a smart card, but they serve the same purpose.  In either case, the electronic token is created and encoded on the iButton or smart card using the Election Management System. 

**Zero-total report.**  Zero totals are automatically printed by the scanners on paper tape.  Note that no zero report is needed for the ballot-marking devices (BMDs).

**Ballot selection.**  Authorization to vote and ballot selection are done using smart cards generated by the Election Management System.  A poll worker enters the ballot style, and the software writes it on a smart card in a secure way.  The voter then takes the smart card to any voting station to vote. The voter cards are automatically cleared after voting, so they cannot be reused.  Also, as a backup, a poll-worker card can be inserted into the voting station to allow manual selection of the ballot style.



**Voting.**  Voting is done on the touch screen of the ImageCast X BMD, or ballots can be marked manually.

**Transfer Results.**  Vote totals are transferred from the ICP precinct scanner to central count using a removable memory device.

**Print precinct results.**  Precinct results are printed by the precinct scanner on paper tape.

**Straight party / crossover.**  Straight-party voting and crossover voting both work properly.

**Accessibility.**  Verification of accessibility is performed independently by the office of the Secretary of State, but the examiners had the opportunity to see the accessibility components.

## Comments

The use of many COTS components should reduce the cost of D-Suite significantly.  If this savings is passed on to the jurisdictions, then that's a very significant advantage.

The optical scanner has a clever feature that appends to each ballot image an "audit mark" that records in plain text how the ballot was interpreted by the scanner.

Although D-Suite can accommodate jurisdictions of all sizes, the client-server configuration submitted for certification has a minimum of one server and one workstation.  We did not examine the single-computer configuration, which would be more appropriate for small counties.

## Problems Identified in the Prior Exam on January 16-17, 2019

**Crossover Votes.**  In the January exam we saw a problem with handling crossover votes after a straight-party selection.  Dominion has fixed that problem.

**Adjudication results can be lost.**  In the January exam, during adjudication of the ballots in the test election, one of the Dominion representatives made a series of mistakes that caused the entire batch of adjudication results to be lost.  We did not see this problem again during this exam, but the adjudication system is unchanged, so this vulnerability is still present.

*Recommendation:*  Certification should be denied.

**DRE station failure.**  Examiner Brian Mechler discovered in January that simply unplugging and reconnecting the cord that supplies power to the VVPAT from the Android tablet will usually cause the tablet to fail.  Since Dominion is not submitting their DRE station for certification, this problem is not relevant to this exam.

**Voter May have to Start Over.**  In January the printer tray became ajar during voting, and the system did not notice until the voter attempted to cast his ballot.  The system would not accept the ballot and all the voter's choices were lost.  A poll worker card was required to clear the problem.  In this exam, we were unable to reproduce this problem, so perhaps it was fixed by the software upgrade.

## Concerns

1. **Installation is complex, error prone, and tedious.**  I counted 184 steps in their installation manual before deciding to estimate the remaining steps. I estimate a total of about 500 steps are required to install the software.  I did not count steps that merely said something like "Click OK" or "Click Next."  This installation manual is 412 pages long with an additional 23 pages of front matter -- contents, lists of figures, and the like.

Some of these steps were quite simple, but some were lengthy with several "if" clauses.  Here is a sample step:

> In the Command Prompt, run the following command, where X is the drive letter of the DVD-ROM drive where the Windows installation media is located:
>
> Dism /online /enable-feature /featurename:NetFx3 /All /Source:X:nsourcesnsxs /LimitAccess

According to the Dominion representatives, there are eight Windows services that must be started in a certain order; however, the order that steps must be done is not the same as the order they appear on the menus of the Dominion product.

The installation we witnessed took all day.  Apparently, a mistake was made (accidently skipping one of the reboot steps) and the Dominion representatives, although clearly knowledgeable, were not able to recover before we broke for lunch.  This was despite telephone consultations with other Dominion experts and the use of a troubleshooting guide that Dominion declined to make available to the examiners.  Over lunch they decided to start the installation over, and it was successful the second time, finishing before the end of the day.  Altogether, the installation took about 8 hours.

*Recommendation:*  Certification should be denied.

2. **Test Voting.**  During our voting test, we discovered that some party names and proposition text were not displayed, and one scanner was not accepting some ballots.  These all turned out to be errors Dominion made in setting up the standard test election used by the Secretary of State.  In the case of the scanner, it had accidently been configured not to accept machine-marked ballots.  The other problems were caused by leaving some fields empty during election setup, something that the EMS software should not allow, or at least highlight.

*Recommendation:*  Certification should be denied.

3. **Misleading Message.**  The ballot-marking devices incorrectly informed voters that they were *casting* their ballots, when in fact they were only *printing* them.  The ballots are not be counted until they were scanned on a different device.

*Recommendation:*  Certification should be denied.

4. **Disappearing Message.**  At one point while scanning ballots, something flashed on the display so briefly we could not read it.  After several attempts to re-scan the ballot, we were able to discern that it was a message reading "Ambiguous Marks" that was displayed for a second or less.  It then reverts to the "System Ready" message.  The voter has no way of knowing what, if anything, is wrong since the error message does not persist long enough to read it.

Furthermore, the message is confusing.  It would be better to say something like "Cannot read ballot."

*Recommendation:*  Certification should be denied.

5. **USB Port Vulnerability.**   The ICX ballot-marking device has an indicator light on top to show poll workers when the station is in use.  That light is connected by a USB port.



When Brian Mechler's phone was attached to the USB port, the ICX scanned the files on his phone and did not complain, although Dominion later showed that the event was logged.  When a USB drive with files was inserted, the ICX sometimes complained and sometimes did not, apparently according to the content of the USB drive and whether it was present when the ICX was first powered up or inserted later.

*Recommendation:*  Certification should be denied unless either (a) the indicator light is removed from the certified configuration or (b) a way is found to secure the USB connection to the light.

## Conclusion

I like the idea of using COTS components to save taxpayer money, and Dominion has done a good job of finding COTS components and minimizing the number of custom components.

Nevertheless, I cannot recommend certification.  Computer systems should be designed to prevent or detect human error whenever possible and minimize the consequences of both human mistakes and equipment failure.  Instead the Democracy Suite 5.5-A is fragile and error prone.  In my opinion it should not be certified for use in Texas.

If certification should be granted, it should be with the condition that all open network and USB ports be sealed.



# KEN PAXTON
ATTORNEY GENERAL OF TEXAS

November 4, 2019

Mr. Keith Ingram
Director of Elections, Texas Secretary of State
Elections Division
P.O. Box 12060
Austin, Texas 78711-2060

**Re:    Dominion Voting Democracy Suite 5.5-A—Examination October 2–3, 2019**

Dear Mr. Ingram:

Pursuant to Texas Election Code § 122.036 and 1 Texas Administrative Code § 81.60, by this letter I am transmitting my examiner's report for the Secretary of State's October 2–3, 2019 voting system examination. The subject of that examination was Dominion Voting ("Dominion") voting system Democracy Suite 5.5-A.

The factual background for this report includes Dominion's presentation to the examiners during an examination at the Secretary of State's office and statements made by Dominion's representatives during that examination and in response to questions raised by the examiners after that examination.

Both during and after the examination, the examiners raised specific concerns about legal compliance, including numerous technical and mechanical issues. Because these concerns at minimum suggest the system is not suitable for its intended purpose, Texas Election Code § 122.001(a)(2), and does not operate efficiently and accurately, *id.* § 122.001(a)(3), I do not recommend the Dominion Democracy Suite 5.5-A be certified at this time. Confidence in these key areas is necessary to ensure the system operates as required by the Texas Election Code.

Sincerely,

Ryan Vassar
General Counsel

cc:    Charles Pinney, Secretary of State's Office

Exhibit C4

# 2020 ELECTION SECURITY—PERSPECTIVES FROM VOTING SYSTEM VENDORS AND EXPERTS

# HEARING

BEFORE THE

## COMMITTEE ON HOUSE ADMINISTRATION

## HOUSE OF REPRESENTATIVES

ONE HUNDRED SIXTEENTH CONGRESS

SECOND SESSION

―――――

JANUARY 9, 2020

―――――

Printed for the use of the Committee on House Administration



Available on the Internet:
*http://www.govinfo.gov/committee/house-administration*

2020 ELECTION SECURITY—PERSPECTIVES FROM VOTING SYSTEM VENDORS AND EXPERTS

# 2020 ELECTION SECURITY—PERSPECTIVES FROM VOTING SYSTEM VENDORS AND EXPERTS

## HEARING

BEFORE THE

## COMMITTEE ON HOUSE ADMINISTRATION

## HOUSE OF REPRESENTATIVES

ONE HUNDRED SIXTEENTH CONGRESS

SECOND SESSION

———————

JANUARY 9, 2020

———————

Printed for the use of the Committee on House Administration



Available on the Internet:
*http://www.govinfo.gov/committee/house-administration*

———————

U.S. GOVERNMENT PUBLISHING OFFICE

41–318                    WASHINGTON : 2020

Committee on House Administration

ZOE LOFGREN, California, *Chairperson*

JAMIE RASKIN, Maryland
SUSAN A. DAVIS, California
G. K. BUTTERFIELD, North Carolina
MARCIA L. FUDGE, Ohio
PETE AGUILAR, California

RODNEY DAVIS, Illinois,
  *Ranking Member*
MARK WALKER, North Carolina
BARRY LOUDERMILK, Georgia

(II)

# CONTENTS

———

## JANUARY 9, 2020

Page

2020 Election Security—Perspectives From Voting System Vendors and Experts ................................................................. 1

## OPENING STATEMENTS

Chairperson Zoe Lofgren ............................................................... 1
    Prepared statement of Chairperson Lofgren ...................... 3
Hon. Rodney Davis, Ranking Member ...................................... 5
    Prepared statement of Ranking Member Davis ................ 7

## WITNESSES

Tom Burt, President and CEO, Election Systems & Software ... 10
    Prepared statement of Mr. Burt ......................................... 13
John Poulos, President and CEO, Dominion Voting Systems . 22
    Prepared statement of Mr. Poulos ..................................... 24
Julie Mathis, President and CEO, Hart InterCivic ................. 28
    Prepared statement of Ms. Mathis .................................... 30
Liz Howard, Counsel, Brennan Center for Justice ................. 66
    Prepared statement of Ms. Howard ................................... 68
Matt Blaze, Professor of Law, Georgetown University Law Center ........................................................................................ 120
    Prepared statement of Mr. Blaze ....................................... 122
Juan Gilbert, Ph.D., Banks Family Preeminence Endowed Professor, University of Florida ........................................... 138
    Prepared statement of Dr. Gilbert ..................................... 140
Rev. T. Anthony Spearman, President, North Carolina NAACP ...................................................................................... 158
    Prepared statement of Rev. Spearman ............................. 160
Hon. Don Palmer, Commissioner, Election Assistance Commission ...................................................................................... 166
    Prepared statement of Hon. Palmer .................................. 168
Michael C. Gianasi, County Clerk and Recorder, Christian County, Illinois ....................................................................... 172
    Prepared statement of Mr. Gianasi .................................. 174

## QUESTIONS FOR THE RECORD

Tom Burt, President and CEO, Election Systems & Software, answers to submitted questions ............................................ 182
John Poulos, President and CEO, Dominion Voting Systems, answers to submitted questions ............................................ 216

IV

Page

Julie Mathis, President and CEO, Hart InterCivic, answers
to submitted questions ............................................................   237
Liz Howard, Counsel, Brennan Center for Justice, answers
to submitted questions ............................................................   269
Matt Blaze, Professor of Law, Georgetown University Law
Center, answers to submitted questions [1] ............................
Juan Gilbert, Ph.D., Banks Family Preeminence Endowed
Professor, University of Florida, answers to submitted
questions ...................................................................................   281
Rev. T. Anthony Spearman, President, North Carolina
NAACP, answers to submitted questions ..............................   284
Hon. Don Palmer, Commissioner, Election Assistance Com-
mission, answers to submitted questions ..............................   286

SUBMISSIONS FOR THE RECORD

Securing the Vote: Protecting American Democracy, The Na-
tional Academies of Sciences, Engineering, Medicine, a
Consensus Study Report .......................................................   291
Electronic Privacy Information Center, Letter ........................   472

—————

[1] Mr. Blaze did not answer submitted questions for the record by the time of printing.

22

The CHAIRPERSON. Thank you very much.
We'd be pleased to hear from you, Mr. Poulos.

### TESTIMONY OF JOHN POULOS

Mr. POULOS. Thank you very much. Chairperson Lofgren, Ranking Member Davis, and distinguished Members of the Committee, thank you for the opportunity to testify today. My name is John Poulos, and I'm the Chief Executive Officer of Dominion Voting Systems. We are a U.S.-owned company that currently provides voting systems and services to jurisdictions across 30 States and Puerto Rico.

I agree with the importance of this—of the issues being raised by the Chairperson and Ranking Member regarding election security and integrity at today's hearing. American elections safeguard and preserve the freedoms and rights guaranteed by the U.S. Constitution. At Dominion, we take pride in our small role in assuring voters that they can have confidence in election results. We go to work every day understanding this important responsibility.

By way of background, I formed the company with my partners in 2003 as an engineer and entrepreneur living in Silicon Valley. We were one of 76 new entrants innovating in the post-HAVA era, and we are one of the only ones independently operating of those 76 in the industry today.

Dominion was founded on three key pillars: security, transparency, and accessibility. The company abides by these principles to this day, driving innovations and advancements for auditability and resilience directed by Federal, State, and local election officials.

Supporting elections is a full-time proposition for our company. This past year alone, Dominion assisted State and local election officials in conducting nearly 300 elections complete with the rigorous public scrutiny that comes with it. Dominion is constantly innovating and certifying enhancements and new features per State and local requirements. For 2020, we have been working closely with jurisdictions seeking to upgrade their voting systems. Older, end-of-life technology is being replaced with certified solutions that produce paper records for auditing and resilience. This comports with recommendations by DHS.

Consistent with our founding tenets, Dominion works hard to promote a company culture of security. This starts with our people, including annual mandatory background checks and cybersecurity awareness training for every employee in the company. It includes companywide adoption of advanced digital protections and a defense-in depth approach to cybersecurity. Moreover, we actively engage with the EAC, DHS, and other trusted third parties to maintain and enhance our enterprise security, including potential supply chain risks.

Finally, we meet all independent testing requirements, including EAC standards developed in conjunction with NIST and requirements set forth by individual States. This includes source code reviews, penetration testing, and post-election audits.

In terms of transparency, Dominion systems fully support independent third-party audits and reviews of all election data. For example, in 2018, the State of Colorado used Dominion systems in

23

conducting the first statewide risk-limiting audit in the United States. This effort was so successful, it has become a benchmark for other States in verifying with high confidence that equipment tallies are accurate and reliable.

To round out our company mission, we are committed to voter accessibility. Our systems ensure Federal protections for privacy and equal voting rights and ballot casting options for all, including American servicemembers abroad.

The existence of nation-state threats means that we must actively defend against any attempts to undermine faith in our democratic institutions. In this regard, we hope to see Congress continuing its work with State and local election officials to keep election systems secure. We commend Congress on its bipartisan investment of an additional $425 million to help election officials modernize their infrastructure.

In closing, we remain fully committed to providing technology that supports free and fair elections. This includes support for an industry wide coordinated vulnerability disclosure program for voting systems. We urge you to continue supporting and incentivizing real-time threat information sharing from the intelligence community, streamline certification options for patching and updating, and reliable baseline security standards for voting systems. All of these efforts will help make the voting process more secure.

Thank you again for the opportunity to share our company's perspective.

[The statement of Mr. Poulos follows:]

24

### Written Testimony of Mr. John Poulos, CEO

### Dominion Voting Systems

### before the Committee on House Administration

### "2020 Election Security-Perspectives from Voting System Vendors and Experts"

### January 9, 2020

Chair Lofgren, Ranking Member Davis, and Distinguished Members of the Committee, thank you for the opportunity to testify today.

My name is John Poulos, and I am the Chief Executive Officer and co-founder of Dominion Voting Systems. As a U.S.-owned company, we currently provide voting systems and services to jurisdictions across 30 states and Puerto Rico.

I co-founded the company in 2003 on three basic pillars:  security, accessibility and transparency. We continue to be committed to these founding principles and delivering best-in-class solutions for secure, transparent, and accessible elections.  The voting systems that we produce provide high assurance that election outcomes are accurately and reliably tallied.  All Dominion systems fully-support independent, third-party audits, and reviews of election data.

Together with my industry counterparts, I am here today to help explain how we are working to keep voting systems secure and resilient in the wake of today's sophisticated, nation-state threats.  I would like to focus on our core company values and how they impact our product innovations and the work that we do in collaboration with our federal, state, and local government partners.

Consistent with our founding tenants, Dominion works hard to promote a company culture of security.  This includes annual, mandatory background checks and cybersecurity awareness training for all employees. Dominion is committed to investing in security and innovation efforts, tracking risk and threat information, developing new capabilities and successfully supporting our customers.

Dominion has also adopted advanced digital protections while employing a Defense-in-Depth approach to our internal infrastructure. Multiple layers of protection are in place spanning user endpoints, network and systems infrastructure and cloud systems, along with multi-factor

25

authentication. We conduct continuous vulnerability scanning on our company network and utilize third-party services for threat hunting and breach detection. Specifically, we have implemented email verification records for Sender Policy Framework ("SPF"), DomainKeys Identified Mail ("DKIM"), and Domain-based Message Authentication ("DMARC") to protect communications with associates and customers.

We actively engage with the U.S. Department of Homeland Security ("DHS") and other trusted, third-party advisors to enhance and maintain our physical and cyber security posture. Together with federal, state and local government partners – as well as our industry counterparts, we conduct coordinated emergency drills, tabletop exercises and routine information-sharing as a member of the DHS Sector Coordinating Council for Election Infrastructure. Through these efforts, Dominion has refined our company's situational awareness and strengthened our procedures for handling incidents and emergencies.[1] We have also conducted security briefings and training sessions with state and local election officials who use our systems to educate and inform them of best practices for securing their voting equipment and chain of custody process. In these ways, we have made great strides to support and enhance the nation's collective readiness posture for the 2020 presidential election.

Dominion also works closely with jurisdictions seeking to upgrade or replace older, end-of-life systems with federally-certified solutions capable of producing paper records for auditing and resilience. These offerings have rigorous security features, and we provide hardware maintenance service and certified software/firmware updates on a routine basis.

In keeping with company security practices, all of our products are submitted to the U.S. Election Assistance Commission ("EAC") and state election authorities for further review, testing and certification. Systems are tested using an independent, federally-accredited Voting Systems Test Laboratory ("VSTL") in order to meet certification standards promulgated by the EAC, in conjunction with experts at NIST. They must also meet specific requirements set forth by individual states, including source code reviews, penetration testing, and post-election auditing.[2] These certified software packages and systems are the only versions allowed by law.

We are constantly innovating and certifying enhancements and new features, per federal, state and local election requirements. Our product advancements reflect the values of our state and local customers, with a focus on providing secure, reliable, quality systems that offer cutting-

---

[1] See U.S. Dept. of Homeland Security, "Incident Handling for Election Officials," 2018.
[2] Help America Vote Act of 2002 (HAVA). https://www.eac.gov/assets/1/6/HAVA41.PDF

26

edge features, including encryption, multi-factor authentication and trusted-user protections, as well as a robust auditing module for election officials who want to share post-election ballot images and other data with the public.

Dominion is actively engaged with the EAC and other stakeholders in the ongoing work to finalize VVSG 2.0 guidelines for 2020 and beyond.  Our development strategy has shifted towards the latest iteration of these standards to ensure that our voting systems advance to the next generation of security and resilience.  In 2018, Dominion equipment was used in the State of Colorado's risk-limiting audit ("RLA"), the first of this kind ever conducted in the U.S. Today, other states are conducting RLAs to ensure that election tallies are accurate and reliable.

Voting systems must also ensure federal protections for privacy, equal voting rights and ballot-casting options for all - including disabled voters, U.S. military and overseas voters, and those with literacy or language challenges who require some form of assistance in casting their ballot.[3]

Additionally, we are working with other industry companies to establish a Coordinated Vulnerability Disclosure ("CVD") program designed to strengthen the security and resilience of voting systems.  This work expands upon existing federal and state processes for certification, testing and reporting on risks and vulnerabilities regarding election infrastructure.  Government partners at all levels can help by supporting and incentivizing rapid modernization of the framework that is used for the certification and testing of election equipment.

Right now, the complex pathway from lab to market impacts the pace at which new or updated solutions can be introduced. While much of the current effort around VVSG has understandably focused on establishing thorough and comprehensive testing criteria for voting systems, there must also be clear mechanisms for streamlined updates and security-focused patching.  We are hopeful that VVSG 2.0 will provide a more effective process for introducing innovations and maintenance of deployed systems.

Dominion makes extensive disclosures to maintain our good standing as a registered federal and state voting systems manufacturer.  Like other providers, we submit a detailed "bill of materials" to the EAC as part of required submissions for federally-certified systems, which includes all component manufacturer and sourcing information for hardware. In addition to mandatory state and local disclosures for confirmed or suspected breaches and incidents, we also adhere to the

---

[3] See Americans with Disabilities Act, UOCAVA, Help America Vote Act (HAVA) and MOVE Act for specifics

27

EAC's mandatory requirement for reporting system issues in federal elections.[4]

Federal and state-level product testing and certification applications require voluminous amounts of manufacturer information, including but not limited to:

- Ownership information, business structure and credit rating
- Notifications to all U.S. customers of any business change of ownership
- Personnel oversight policies, including background checks
- Third-party vendor and manufacturing location information
- Proprietary software disclosures, third-party test reports, and documentation to verify reliable use of the system in other jurisdictions

Dominion has always maintained full federal and state compliance under law. Given the high headline risk and the public visibility of the support that Dominion provides to state and local governments, it would be difficult to thrive as a business without maintaining the highest standards as an elections industry provider. Notably, voting systems manufacturers remain the only technology providers in the election ecosystem subject to company disclosures and federal certification testing. Only a handful of states currently extend their requirements beyond voting systems to other types of technology.

In conclusion, Dominion Voting Systems is committed to ensuring that Americans are confident in the security and resilience of the nation's voting systems. We commend Congress for its most recent bipartisan efforts to increase federal investment in state and local government election security initiatives for 2020 by $425 million. We urge you to continuing work with election officials to help remove additional barriers that exist for modernizing their infrastructure.

We also seek continued assistance from our federal partners in evaluating cyber risks for voting technology, to include increased transparency around malign activity observed by intelligence agencies. This would go a long way towards enabling private sector election providers to better prioritize resource allocations in the same economic terms as other enterprise decisions.

Dominion continues to focus on being the best-in-class elections provider with a commitment to security, transparency, and accessibility. Thank you again for the opportunity to share the company's perspective on these very important issues.

---

[4] See "EAC Testing & Certification Program Manual Version 2.0." www.eac.gov/assets/1/6/Cert_Manual_7_8_15_FINAL.pdf