**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> PATRICK BYRNE, <br><br> Defendant. | Case No. 1:21-cv-02131-CJN <br> Judge Carl J. Nichols |

**DOMINION'S OPPOSITION TO DEFENDANT**
**PATRICK BYRNE'S MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................1

LEGAL STANDARDS ...............................................................................................6

ARGUMENT ..............................................................................................................6

I.    Dominion's Allegations of Byrne's Actual Malice Are Overwhelming. ...........6

    A.    Byrne made inherently improbable claims. ...........................................9

    B.    Byrne relied on obviously unreliable sources and sham evidence. .......11

    C.    Byrne's false statements stem from a preconceived narrative he cooked up in August 2020, and Byrne manufactured fake evidence to support that narrative. .............................................................15

    D.    Byrne knowingly disregarded widely publicized evidence that disproved his statements......................................................................18

    E.    Byrne refused to retract his statements; instead, he doubled down and put them into a documentary.........................................................19

    F.    Byrne had a financial motive to make false statements about Dominion.............20

II.   Each of Byrne's Statements Is Actionable as Defamation. .............................21

    A.    The fair report privilege does not help Byrne......................................21

    B.    Byrne's statements are "of and concerning" Dominion because he either names or references Dominion. ...........................................................22

    C.    Byrne's argument that he did not publish Joshua Merritt's affidavit is factually wrong. ...............................................................................26

    D.    The Communications Decency Act does not protect Byrne's retweet because he is the sole content creator of the defamatory caption in his retweet, and because he was responsible at least in part for the creation or development of the defamatory content reported in the retweeted article.............26

    E.    Byrne's statements imply demonstrably false facts about Dominion....................29

    F.    Byrne's argument that certain of the accused statements are protected opinions based on fully-disclosed facts is poorly developed and meritless..........32

i

G.    Byrne's statements were not opinions because they expressed or implied false facts about Dominion. ........................................................................37

1.    Byrne's statements are not opinions because they are verifiable—even Byrne claimed he has evidence to prove them. ......................................37

2.    Byrne's appeal to "context" fails; context, on its own, does not protect statements that express or imply false facts. ..............................................42

CONCLUSION ..............................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Freedom Def. Initiative v. Lynch*,
  217 F. Supp. 3d 100 (D.D.C. 2016) .......................................................................29

*Antonovich v. Super. Ct.*,
  234 Cal. App. 3d 1041 (1991) ................................................................................7

*Arpaio v. Zucker*,
  414 F. Supp. 3d 84 (D.D.C. 2019) .........................................................................31

*Bauman v. Butowsky*,
  377 F. Supp. 3d 1 (D.D.C. 2019) ....................................................................33, 36

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................6

*Bello v. Howard Univ.*,
  898 F. Supp. 2d 213 (D.D.C. 2012) ........................................................................2

*Benic v. Reuters Amer., Inc.*,
  357 F. Supp. 2d 216 (D.D.C. 2004) ......................................................................30

*Biospherics, Inc. v. Forbes, Inc.*,
  151 F.3d 180 (4th Cir. 1998) .................................................................................36

*Blankenship v. Napolitano*,
  451 F. Supp. 3d 596 (S.D.W. Va. 2020) ...............................................................43

*Bufalino v. Associated Press*,
  692 F.2d 266 (2d Cir. 1982) ..................................................................................22

*Chandler v. Berlin*,
  998 F.3d 965 (D.C. Cir. 2021) ...............................................................................24

*Churchill v. State*,
  876 A.2d 311 (N.J. Super. App. Div. 2005) ..........................................................26

*Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Hous. & Urb. Dev.*,
  415 F. Supp. 3d 215 (D.D.C. 2019) ........................................................................6

*Colborn v. Netflix Inc.*,
  No. 19-CV-0484, 2021 WL 2138767 (E.D. Wis. May 26, 2021) ..........................34

*Competitive Enter. Inst. v. Mann*,
   150 A.3d 1213 (D.C. 2016) ..............................................................9, 17

*Condit v. Dunne*,
   317 F. Supp. 2d 344 (S.D.N.Y. 2004) ...........................................33, 42

*Croixland Props. Ltd. P'ship v. Corcoran*,
   174 F.3d 213 (D.C. Cir. 1999) .............................................................23

*Curling v. Raffensperger*,
   493 F. Supp. 3d 1264 (N.D. Ga. 2020) ................................................3

*Dameron v. Washington Mag., Inc.*,
   779 F.2d 736 (D.C. Cir. 1985) .......................................................21, 22

*Dershowitz v. Cable News Network, Inc.*,
   No. 20-CV-61872, 2021 WL 2621139 (S.D. Fla. May 25, 2021) ........43

*DiFolco v. MSNBC Cable L.L.C.*,
   622 F.3d 104 (2d Cir. 2010)..................................................................43

*Doctor's Data, Inc. v. Barrett*,
   170 F. Supp. 3d 1087 (N.D. Ill. 2016) ................................................26

*Duffy v. Fox News Networks, LLC*,
   No. 14-CV-1545, 2015 WL 2449576 (M.D. Fla. May 21, 2015)..........43

*Eastwood v. Nat'l Enquirer, Inc.*,
   123 F.3d 1249 (9th Cir. 1997) ...............................................................7

*Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*,
   194 F. Supp. 3d 263 (S.D.N.Y. 2016)............................................26, 41

*Eramo v. Rolling Stone, LLC*,
   209 F. Supp. 3d 862 (W.D. Va. 2016) .................................................18

*Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) (en banc) ......................................27, 29

*Farah v. Esquire Mag.*,
   736 F.3d 528 (D.C. Cir. 2013) .............................................................25

*Flowers v. Carville*,
   310 F.3d 1118 (9th Cir. 2002) .............................................................33

*Foretich v. Glamour*,
   741 F. Supp. 247 (D.D.C. 1990) ..........................................................26

*Franklin v. Pepco Holdings, Inc. (PHI)*,
  875 F. Supp. 2d 66 (D.D.C. 2012) ...................................................................................6

*Fridman v. Bean LLC*,
  No. 17-CV-2041, 2019 WL 231751 (D.D.C. Jan. 15, 2019) ....................................2

*FTC v. Accusearch Inc.*,
  570 F.3d 1187 (10th Cir. 2009) .......................................................................................27

*Gertz v. Robert Welch, Inc.*,
  680 F.2d 527 (7th Cir. 1982) ...................................................................................16, 22

*Golden Bear Distrib. Sys. of Tex., Inc. v. Chase Revel, Inc.*,
  708 F.2d 944 (5th Cir. 1983) ...........................................................................................8

*Goldwater v. Ginzburg*,
  414 F.2d 324 (2d Cir. 1969) .......................................................................................7, 8

*Gonzalez v. Google LLC*,
  2 F.4th 871 (9th Cir. 2021) ............................................................................................27

*Haefner v. N.Y. Media, LLC*,
  918 N.Y.S. 2d 103 (N.Y. App. Div. 2011) ..................................................................26

*Harris v. City of Seattle*,
  152 F. App'x 565 (9th Cir. 2005) ....................................................................................7

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657 (1989) .................................................................................................8, 20

*Herring Networks, Inc. v. Maddow*,
  8 F.4th 1148 (9th Cir. 2021). (Mot. .) .................................................................43, 44, 45

*Hutchinson v. Proxmire*,
  443 U.S. 111 (1979) ........................................................................................................8

*In re Phila. Newspapers, LLC*,
  690 F.3d 161 (3d Cir. 2012) ..........................................................................................26

*Johnson v. Arden*,
  614 F.3d 785 (8th Cir. 2010) .........................................................................................29

*Jones v. Dirty World Ent. Recordings LLC*,
  755 F.3d 398 (6th Cir. 2014) .........................................................................................27

*Kaelin v. Globe Commc'ns Corp.*,
  162 F.3d 1036 (9th Cir. 1998) ...........................................................................9, 17, 19

*King v. Whitmer*,
    No. 20-CV-13134, 2021 WL 5711102 (E.D. Mich. Dec. 2, 2021) ........................................14

*La Liberte v. Reid*,
    966 F.3d 79 (2d Cir. 2020)............................................................................................28, 29

*Lokhova v. Halper*,
    441 F. Supp. 3d 238 (E.D. Va. 2020) ..............................................................................26

*Mar-Jac Poultry, Inc. v. Katz*,
    773 F. Supp. 2d 103 (D.D.C. 2011) .................................................................................23

*McDougal v. Fox News Network, LLC*,
    489 F. Supp. 3d 174 (S.D.N.Y. 2020)..................................................................43, 44, 45

*Michel v. NYP Holdings, Inc.*,
    816 F.3d 686 (11th Cir. 2016) .........................................................................................43

*Milkovich v. Lorain J. Co.*,
    497 U.S. 1 (1990)................................................................................................33, 37, 42

*Moldea v. N.Y. Times Co.*,
    15 F.3d 1137 (D.C. Cir. 1994)........................................................................................30

*Moldea v. N. Y. Times Co.*,
    22 F.3d 310 (D.C. Cir. 1994)..........................................................................................36

*Moses v. Dodaro*,
    No. 06-CV-1712, 2009 WL 10695551 (D.D.C. Feb. 6, 2009) .................................................2

*Moss v. Stockard*,
    580 A.2d 1011 (D.C. 1990) .............................................................................................30

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)...........................................................................................................6

*Nader v. Toledano*,
    408 A.2d 31 (D.C. 1979) .................................................................................................17

*Obado v. Magedson*,
    No. 13-CV-2382, 2014 WL 3778261 (D.N.J. Jul. 31, 2014)....................................................29

*Palin v. N.Y. Times Co.*,
    940 F.3d 804 (2d Cir. 2019)..................................................................................6, 7, 18

*Parisi v. Sinclar*,
    774 F. Supp. 2d 310 (D.D.C. 2011) .................................................................................29

*Peay v. Curtis Pub. Co.*,
    78 F. Supp. 305 (D.D.C 1948) ...............................................................23

*Phillips v. Evening Star Newspaper Co.*,
    424 A.2d 78 (D.C. 1980) .......................................................................22

*Prins v. Int'l Tel. & Tel. Corp.*,
    757 F. Supp. 87 (D.D.C. 1991) .............................................................22

*Ramos v. ADR Vantage, Inc.*,
    No. 18-CV-01690, 2018 WL 6680531 (D.D.C. Dec. 19, 2018) ..............23

*Reader's Digest Assoc. v. Super. Ct.*,
    37 Cal. 3d 244 (Cal. 1984) ......................................................................7

*Restis v. Am. Coal. Against Nuclear Iran, Inc.*,
    53 F. Supp. 705 (S.D.N.Y. 2014) .....................................................41, 45

*Schiavone Const. Co. v. Time, Inc.*,
    847 F.2d 1069 (3d Cir. 1988) ................................................................17

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) .......................................................................7, 9, 11

*St. Surin v. Virgin Islands Daily News, Inc.*,
    21 F.3d 1309 (3d Cir. 1994) ..................................................................18

*Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*,
    330 F.3d 1110 (9th Cir. 2003) ....................................................8, 15, 20

*Thompson v. Bosswick*,
    855 F. Supp. 2d 67 (S.D.N.Y. 2012) .....................................................41

*US Dominion, Inc. v. Powell*,
    2021 WL 3550974 (D.D.C. Aug. 11, 2021) ................................... *passim*

*Vasquez v. Whole Foods Mkt., Inc.*,
    302 F. Supp. 3d 36 (D.D.C. 2018) .........................................................23

*Von Kahl v. Bureau of Nat. Affs., Inc.*,
    810 F. Supp. 2d 138 (D.D.C. 2011) .......................................................22

*Weyrich v. New Republic, Inc.*,
    235 F.3d 617 (D.C. Cir. 2001) ..........................................................41, 42

*White v. Fraternal Ord. of Police*,
    909 F.2d 512 (D.C. Cir. 1990) ...........................................................9, 37

*World Wrestling Fed'n Ent., Inc. v. Bozell,*
    142 F. Supp. 2d 514 (S.D.N.Y. 2001).................................................................43

*Zimmerman v. Al Jazeera Am., LLC,*
    246 F. Supp. 3d 257 (D.D.C. 2017).................................................................11

**Statutes**

47 U.S.C. § 230..........................................................................................5, 26, 27

47 U.S.C. § 230(c)(1)........................................................................................27

47 U.S.C. § 230(f)(3).........................................................................................27

Tex. Election Code § 122.031............................................................................31

**Rules**

Fed. R. Civ. P. 12(b)(6)........................................................................................6

**Treatises**

RESTATEMENT (SECOND) OF TORTS § 564 Comment b.......................................23

RESTATEMENT (SECOND) OF TORTS § 580A Comment d......................................8

**Other Authorities**

Big MAGA and QAnon Civil War Keeps Getting Nuttier and Sleazier, THE
    DAILY BEAST, Dec. 1, 2021 .............................................................................3

David Elder, *Defamation: A Lawyer's Guide* § 3:3 (2003)...............................22

David Elder, *Defamation: A Lawyer's Guide* § 7.12 (2016)...............................7

Election Security Experts Contradict Trump's Voting Claims, *The New York
    Times* (Nov. 16, 2021) .....................................................................................3

RODNEY SMOLLA, 1 LAW OF DEFAMATION § 6:70 (2d ed. 2021 Update) ...........43

RODNEY SMOLLA, 1 LAW OF DEFAMATION § 8:67:50 (2d ed. 2021 Update) .......22

## **INTRODUCTION**

Having been sued for publishing numerous false and defamatory statements about Dominion over many months, Patrick Byrne is now running from those statements as fast as he can. In his Motion to Dismiss, Byrne focuses on isolated snippets of statements, studiously ignoring the many times he defamed Dominion directly, clearly, and by name. Sometimes he tries to claim he was not talking about Dominion at all by simply ignoring where in the interview he or the reporter interviewing him called out Dominion by name. Other times, he mounts a defense of statements Dominion did not sue him on. Still other times, he makes broad arguments about First Amendment protections for "opinion," yet he does not bother to identify what specific accused statements were statements of "opinion" rather than fact. Presumably he does not try to defend specific accused statements because those statements are materially indistinguishable from statements by Sidney Powell and Mike Lindell that this Court has already held to be actionable assertions of fact.

In light of how Byrne argued his Motion, it is useful to level-set regarding what statements Dominion actually sued Byrne for. In television interviews, internet posts, books, and a self-produced documentary, Byrne published numerous demonstrably false and damaging statements about Dominion, including claiming that:

- Dominion's voting software was built for Hugo Chavez to rig his elections;

- Dominion intentionally and purposefully designed and built its voting software to facilitate systemic election fraud;

- Dominion machines flipped votes from Trump to Biden in the 2020 Presidential Election, including through the use of a secret algorithm, even in jurisdictions where Dominion machines were not used;

- Dominion ran a rigged 2018 federal election in Dallas, Texas (a jurisdiction where Dominion machines were not even used);

- Dominion allowed foreign countries, including China, to hack its voting machines during the 2020 Presidential Election and flip votes from Trump to Biden;

- Dominion bribed senior officials in at least two states to win contracts to supply voting machines to those jurisdictions;

- Dominion servers were used in the 2016 Democratic presidential primary to steal votes for Hillary Clinton, and former DNC staffer Seth Rich was murdered because he knew it; and

- Dominion ordered and paid for the illegal shredding of ballots from the 2020 Election.

Byrne claimed to have hard evidence—photos, data, computer forensics—to support his claims. There was no such supporting evidence because Byrne's claims were utterly false.

Rather than address the statements Dominion sued him for publishing, Byrne chooses to talk about politics and past presidential elections.[1] This case is not about politics, past presidential elections, or whether Byrne has ever voted for Donald Trump. It also does not matter that Byrne made his false statements shortly after an election. This Court has recognized that "there is no blanket immunity for statements that are 'political' in nature." *US Dominion, Inc. v. Powell*, 2021 WL 3550974, at *7 (D.D.C. Aug. 11, 2021) [*Dominion I*]. Put another way: "[I]t is simply not the law that provably false statements cannot be actionable if made in the context of an election." *Id.*

Nor is Dominion's suit about any statements Byrne (or anyone else) made about election security generally, or alleged voting machine vulnerabilities. This suit is about Byrne falsely asserting that Dominion *in fact* played a part in "rigging" the 2020 election, including through software intentionally designed for election fraud—a key distinction this Court has recognized.

---

[1] The court should reject Byrne's request to take judicial notice of the items in Exhibits A–D. *See, e.g.*, *Fridman v. Bean LLC*, No. 17-CV-2041, 2019 WL 231751, at *5 n.1 (D.D.C. Jan. 15, 2019) (collecting cases) ("While some courts have taken judicial notice of news articles, in most such cases the courts have been careful to take notice only of the existence or nature of the articles."); *Bello v. Howard Univ.*, 898 F. Supp. 2d 213, 223 n.5 (D.D.C. 2012) (declining to take judicial notice of witness testimony for its truth); *Moses v. Dodaro*, No. 06-CV-1712, 2009 WL 10695551, at *1 (D.D.C. Feb. 6, 2009) (declining to take judicial notice of facts in "affidavits, notices and administrative complaints").

*See* Transcript of Mot. to Dismiss Hearing, *Dominion, et al. v. Powell, et al.*, No. 21-cv-00040, at 32:21–33:2 (D.D.C. June 24, 2021) ("Dominion is not arguing that it would have been defamatory to say that Dominion is at risk of being hacked or that there is a risk of election systems generally being hacked. ***They are saying what is defamatory is that your client says, we intentionally aided in election fraud. That is way different than saying, we are at risk of being hacked***."). Byrne's focus on *Curling v. Raffensperger*, a case involving *hypothetical* vulnerabilities, is just one of Byrne's attempts to divert attention from his false and defamatory statements about what *actually happened* in the 2020 election.[2]

In moving to dismiss Dominion's lawsuit, Byrne cited only twice—both times in footnotes—this Court's decision in *Dominion I*, 2021 WL 3550974. There, this Court found that Dominion stated plausible defamation claims against Sidney Powell and Mike Lindell. Dominion's core allegations against Powell and Lindell are nearly indistinguishable from Dominion's core allegations against Byrne. This is unsurprising, as Byrne worked closely with Powell to promote the false Dominion election fraud narrative from November 2020 until they had a falling-out in April 2021,[3] and he also provided fake evidence to Lindell to enlist Lindell's help with spreading the false narrative. (*See* Compl. ¶¶ 2, 4, 7, 92–93, 97–98.) This Court rejected

---

[2] Byrne's references to *Curling* also ignore the fact that the plaintiffs' experts in *Curling* put out a public statement a mere 13 days after the November 3, 2020 election, confirming that "no credible evidence has been put forth that supports a conclusion that the 2020 election outcome in any state has been altered through technical compromise." (Compl. ¶ 123.) *See also* Election Security Experts Contradict Trump's Voting Claims, *The New York Times* (Nov. 16, 2021), https://www.nytimes.com/2020/11/16/business/election-security-letter-trump.html.

[3] *See* The Big MAGA and QAnon Civil War Keeps Getting Nuttier and Sleazier, THE DAILY BEAST, Dec. 1, 2021 (reporting on call in which Byrne confirmed with former Powell confidante L. Lin Wood that Byrne had not spoken to Powell after he resigned from Defending the Republic), https://www.thedailybeast.com/lin-wood-and-michael-flynns-qanon-civil-war-keeps-getting-nuttier-and-sleazier. The recording of the call can be found here: https://mobile.twitter.com/hottub_twin/status/1464376386869608451. This evidence of Byrne's April 2021 rupture with Powell only became public on November 26, 2021.

Powell's and Lindell's motions to dismiss based on the same core allegations "in full." The Court should do the same here.

None of Byrne's grounds for dismissing Dominion's complaint are persuasive. For instance, Byrne argues that Dominion did not adequately plead actual malice. In August, this Court held that Dominion adequately pleaded actual malice against Powell and Lindell. *Dominion I*, 2021 WL 3550974, at *10–13. Dominion has alleged that Byrne, like Powell and Lindell, made his false statements with actual malice because:

- He published claims that are so inherently improbable that only a reckless person could have believed them.

- He relied on facially unreliable sources.

- He deliberately ignored widely available evidence that contradicted his statements.

- He fabricated evidence to support a preconceived narrative about election fraud.

- He has refused to retract his statements.

- He stood to financially benefit from his false statements.

These allegations sufficed to plead actual malice against Powell and Lindell, and they suffice to plead actual malice against Byrne.

Byrne also makes a hodgepodge of arguments asserting that Dominion did not adequately plead that some of his statements were defamatory, but none of these arguments is persuasive:

- **The Fair Report Privilege:** Byrne spends three pages trying to argue that a single hyperlink to an affidavit in a single one of the accused statements is protected by the fair report privilege, which protects persons who republish or accurately summarize official proceedings. Even as to that single hyperlink, though, the privilege does not apply because Byrne did not attribute the affidavit to a government proceeding. *See infra* section II.A.

- **The "Of or Concerning" Requirement:** Byrne argues that some of his statements are not "of or concerning" Dominion. Byrne's argument is based on sentences he cherry-picked out of paragraphs of quoted material. Dominion fills in Byrne's omissions, all of which explicitly name Dominion. *See infra* section II.B.

4

- **The Republished Affidavit:** Byrne argues that a hyperlink to a false affidavit is not a republication. But Byrne did not merely provide a hyperlink; he republished the affidavit on his own website and encouraged readers to access it, rendering the hyperlinked affidavit an actionable republication. *See infra* section II.C.

- **The Communications Decency Act:** Byrne argues that his retweet of a single article is protected by the Communications Decency Act. Rather than simply retweet, though, Byrne added his own defamatory caption above the retweet link. Moreover, Byrne played a role in creating the defamatory material reported in the article. Neither his caption nor his retweet are protected under the CDA. *See infra* section II.D.

- **Substantial Truth:** Byrne argues that the "gist" of six of the challenged statements is substantially true. Only one of the six statements, though, even mentions what Byrne claims to be the "gist" of all six. Moreover, all six statements include numerous false assertions about Dominion that are quite different than the "gist" Byrne tries to attribute to them. Finally, even the "gist" that Byrne argues for would be actionable, as it implies a demonstrably false fact. *See infra* section II.E.

- **Fully Disclosed Facts:** Byrne argues that he fully disclosed the facts on which his statements were based, making his statements protected opinions. For starters, Byrne fails to identify which specific assertions he is even arguing were assertions of "opinion" (rather than of facts). Moreover, the "facts" he cites were not facts at all. The "facts" that Byrne identifies were, among other things, his own prior statements, random unattributed graphs from Pinterest, and evidence that he paid to have manufactured. And finally, even a statement fairly characterized as an "opinion" is actionable if it is based on *false* disclosed facts. *See infra* section II.F.

- **Opinion Statements:** Byrne wrongly argues that a reasonable observer would understand some of his statements as being opinions. Here, Byrne cites nine specific statements that he claims are protected opinion. Dominion did not even sue Byrne, however, on four of these statements. The other five, in context, are parts of long passages that contain numerous verifiable (and false) factual assertions about Dominion—assertions that are nearly identical to Powell's assertions, which this Court held were not opinions. And even Byrne's claimed "opinions" are not protected because they imply false facts about Dominion. *See infra* section II.G.1.

- **Political Context:** Byrne argues that his statements, no matter how factual in nature, should be considered non-actionable opinions because they were made in the context of an election and sometimes on partisan news networks. This Court has previously rejected this argument, holding that there is no blanket immunity for political statements, and should do so again here. *See infra* section II.G.2.

Byrne's motion to dismiss should be denied in full.[4]

---

[4] Byrne repeatedly cites cases applying D.C. law. (Mot. at 19, 20, 30, 31). Byrne is thus embracing D.C. law, and Dominion agrees that D.C. law applies to its claims against him.

## LEGAL STANDARDS

"When evaluating a motion to dismiss, the Court must treat the complaint's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Hous. & Urb. Dev.*, 415 F. Supp. 3d 215, 221 (D.D.C. 2019). Construing the plaintiff's factual allegations as true, to survive a Rule 12(b)(6) motion to dismiss, the claim to relief must be "'plausible on its face,' enough to 'nudge [the] claims across the line from conceivable to plausible.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In the defamation context, District of Columbia courts have held that a claim survives a 12(b)(6) motion to dismiss if "the contested statements are both verifiable and reasonably capable of defamatory meaning." *Franklin v. Pepco Holdings, Inc. (PHI)*, 875 F. Supp. 2d 66, 74 (D.D.C. 2012).

## ARGUMENT

### I.     Dominion's Allegations of Byrne's Actual Malice Are Overwhelming.

Byrne acknowledges that Dominion can plead actual malice under "the more lenient reckless disregard" standard.[5] (Mot. at 42.) Under that standard, a complaint pleads actual malice if it alleges facts giving rise to a plausible inference that the defendant acted with reckless disregard for the truth. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–280 (1964) (a statement is made with "actual malice" when the defendant made it "with knowledge that it was false or with reckless disregard of whether it was false or not"); *Palin v. N.Y. Times Co.*, 940 F.3d 804, 814–16 (2d Cir. 2019) (vacating district court's dismissal of a complaint that plausibly alleged actual malice).

---

[5] Byrne argues that Dominion is a "public official or limited public figure." (Mot. at 36–40.) For purposes of opposing Byrne's motion, Dominion assumes that the "actual malice" standard applies. The Court need not determine at this stage whether Dominion was in fact a public figure. Dominion reserves the right to argue that the proper standard is negligence. *See Dominion I*, 2021 WL 3550974, at *9 n.11.

Because most defamation defendants never directly admit that they knew they were lying, plaintiffs typically prove actual malice using indirect evidence, through which a jury can infer the defendant knew or recklessly disregarded the truth. As one court put it, "As we have yet to see a defendant who admits to entertaining serious subjective doubt about the authenticity of an article it published, we must be guided by circumstantial evidence. By examining the editors' actions we try to understand their motives." *Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1253 (9th Cir. 1997). "'Evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity.'" *Reader's Digest Assoc. v. Super. Ct.*, 37 Cal. 3d 244, 257 (Cal. 1984) (quoting *Goldwater v. Ginzburg*, 414 F.2d 324, 342 (2d Cir. 1969)). "Although the publisher may testify that he or she believed the statements to be true, such testimony is not determinative." *Antonovich v. Super. Ct.*, 234 Cal. App. 3d 1041, 1047 (1991). "Instead, the trier of fact must make its own finding concerning the good faith of the publisher." *Id.*

A defendant's actual malice can be inferred from many different kinds of evidence, including, for example, when a defendant publishes a defamatory statement that contradicts information known to him. *See* David Elder, *Defamation: A Lawyer's Guide* § 7.12 (2016) (collecting cases); *Palin*, 940 F.3d at 813–16. In addition, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports" or when the allegations are so "inherently improbable" that only a reckless broadcaster would have put them in circulation. *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). "[E]vidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story" is also evidence of actual malice and "may often prove to be quite powerful evidence.'" *Harris v. City of Seattle*, 152 F. App'x 565, 568 (9th

Cir. 2005) (citation omitted); *see also Goldwater v. Ginzburg*, 414 F.2d 324, 337 (2d Cir. 1969) (concluding "a jury might reasonably find a predetermined and preconceived plan to malign the Senator's character" based on "the totality of appellants' conduct, as evidenced by proffered materials"). Evidence of a publisher's financial motive to defame can likewise support a finding of actual malice. *See Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1136 (9th Cir. 2003); *see also Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) ("[I]t cannot be said that evidence concerning [profit] motive or care never bears any relation to the actual malice inquiry."). Finally, a defendant's later "refusal to retract a statement after it has been demonstrated to him to be both false and defamatory" can also be evidence of actual malice at the time of publication. *See, e.g.*, *Golden Bear Distrib. Sys. of Tex., Inc. v. Chase Revel, Inc.*, 708 F.2d 944, 950 (5th Cir. 1983) (quoting RESTATEMENT (SECOND) OF TORTS § 580A cmt. d).

Byrne argues that Dominion did not sufficiently allege that he made his false statements with actual malice because Dominion provided "only the singular threadbare allegation that 'Byrne actually knew' his statements 'were false.'" (Mot. at 40; *see id*. at 36–52.) That is not remotely true. As detailed below, Dominion alleged a multitude of facts showing that Byrne acted with actual malice, including that he: (1) made inherently improbable claims about Dominion; (2) relied on facially unreliable sources; (3) manufactured fake evidence to support a narrative he conceived before the election; (4) knowingly disregarded widely publicized contradictory evidence; (5) has refused to retract his demonstrably false statements; and (6) had a financial motive to make his false claims.

Because "proof of 'actual malice' calls a defendant's state of mind into question," this element "does not readily lend itself to summary disposition." *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979). Rather, a "finder of fact must determine whether the publication was indeed

made in good faith." *St. Amant*, 390 U.S. at 732; *see also Kaelin v. Globe Commc'ns Corp.*, 162 F.3d 1036, 1042 (9th Cir. 1998) ("The editors' statements of their subjective intention are matters of credibility for a jury."). Just as with the similar allegations in the Powell and Lindell cases, Dominion's copious allegations here are more than sufficient for a reasonable jury to conclude that Byrne recklessly disregarded the falsity of his statements—indeed, that he told intentional lies about Dominion. Many of these categories of actual malice evidence would be sufficient standing alone, on the facts alleged, to enable a reasonable jury to find actual malice. Construing the many different types of actual malice facts together as a whole and drawing all inferences in Dominion's favor (as the Court must at this stage), there can be no doubt that a reasonable jury could find Byrne acted with actual malice. *See Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1258 (D.C. 2016) (explaining that a "constellation of facts," many of which are inferential and circumstantial, taken together, can establish actual malice). Byrne, at best, raises factual disputes that a jury should decide. *See White v. Fraternal Ord. of Police*, 909 F.2d 512, 514 (D.C. Cir. 1990) (holding actual malice was a question for the jury).

### A.    Byrne made inherently improbable claims.

In *Dominion I*, this Court cited numerous statements by Mike Lindell that a reasonable juror could find inherently improbable for purposes of finding actual malice, including that:

- Dominion "stole the 2020 election by using an algorithm to flip and weight votes";

- "Trump received so many votes that that algorithm broke on election night";

- "Dominion's voting machines were 'built to cheat' and 'steal elections'";

- "a fake spreadsheet with fake IP and MAC addresses was 'a cyber footprint from inside the machines' proving that they were hacked"; and

- "Dominion's plot was kept under wraps because the government had not really investigated claims of election fraud (due to then-Attorney General Bill Barr becoming 'corrupt' and having been 'compromised')."

*Dominion I*, 2021 WL 3550974, at *12.

As the Court put it, "a reasonable juror could conclude that the existence of a vast international conspiracy that is ignored by the government but proven by a spreadsheet on an internet blog is so inherently improbable that only a reckless man would believe it." *Id.* The Court also noted that Dominion "alleges other facts that make those claims even more obviously improbable (or at least indicate that a reasonable juror could conclude that those claims are inherently improbable)," including public statements by "numerous government agencies," "independent audits," and "paper ballot recounts that disproved those claims." *Id.*

Dominion's well-pleaded complaint lays out in detail how Byrne told many of the same lies, right down to touting the same "spreadsheet on an internet blog," and did so in the face of the same enormous volume of widely reported facts that "ma[de] those claims even more obviously improbable," *id.* (*See* Compl. ¶¶ 2, 4, 7, 16, 92–94, 98.) A reasonable juror could find that Byrne's statements, many of which are nearly identical to Lindell's, are also so "inherently improbable that only a reckless man would believe" them, *Dominion I*, 2021 WL 3550974, at *12, including:

- Dominion machines used an "algorithm" to "weight one candidate greater than another." (Compl. ¶ 153j; *see also* Compl. ¶¶ 153o, 153n, 153q.)

- Dominion's voting machines were "built so that the election officials could use it to cheat." (Compl. ¶ 153d; *see also* Compl. ¶¶ 153j, 153n, 153o, 153r.)

- Dominion's election systems were developed in Venezuela and used "strategically & aggressively" to "rig" the 2020 election. (Compl. ¶ 153e; *see also* Compl. ¶¶ 153f, 153g, 153o.)

- Republican officials took bribes to install "Dominion software." (Compl. ¶ 153f.)

- Dominion machines were hacked from China through a "thermostat." (Compl. ¶¶ 153k, 153l.)

- A fake spreadsheet with fake MAC addresses and irrelevant IP addresses "documented" "hundreds of foreign entities (many in China)" that interfered with Dominion machines during the 2020 election. (Compl. ¶ 153o.)

These inherently improbable statements are proof of actual malice, both on their face and in light of the ample facts rendering such claims "even more obviously improbable."[6] *See Dominion I*, 2021 WL 3550974, at *12. (*See also* Compl. ¶¶ 58–70.)

### B. Byrne relied on obviously unreliable sources and sham evidence.

Evidence showing "obvious reasons to doubt the veracity of a defendant's source can support a finding of reckless disregard on its own." *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 281–83 (D.D.C. 2017); *see also St. Amant*, 390 U.S. at 732 ("[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."). Byrne, like Lindell, based his statements on "obviously problematic sources," even though Byrne had reason to doubt the veracity of those sources. *See Dominion I*, 2021 WL 3550974, at *12.

*(1) The Conspiracy Theorist*: Byrne hired Russell Ramsland of Allied Security Operations Group to manufacture a false report about voting results in Antrim County, Michigan. (Compl. ¶¶ 2, 42,45, 50–56.) Ramsland lacks even "basic familiarity with voting machines and election security." (*Id.* ¶ 53.) Ramsland's report has been widely debunked, including by Republican officials. (*Id.* ¶¶ 54–57.) And other courts have found Ramsland to be wholly unreliable. (*Id.* ¶¶ 18, 49.)

Ramsland's obvious unreliability was well summarized by this Court, when the Court addressed Sidney Powell's reliance on Ramsland:

> [Ramsland] was found to have provided "materially false information" in support
> of his claims of vote manipulation after referencing locations in Minnesota when

---

[6] Byrne argues that he did not harbor subjective doubts about his statements linking Dominion to Smartmatic and Venezuela because they are not "inherently improbable." (Mot. at 46.) A reasonable juror could find it inherently improbable that Dominion uses software developed over 20 years ago to help "Hugo Chavez . . . rig his elections." (Compl. ¶ 153f.) And a reasonable jury could find that Byrne harbored subjective doubt since it was widely reported that there was no ownership connection between Smartmatic and Dominion. (Compl. ¶ 67.)

> alleging voter fraud in Michigan, . . . ([Ramsland] has also publicly claimed that George Soros, President George H.W. Bush's father, the Muslim Brotherhood, and "leftists" helped form the "Deep State" in Nazi Germany in the 1930s—which would have been a remarkable feat for Soros, who was born in 1930.

*Dominion*, 2021 WL 3550974, at *11 (emphasis in original). (*See* Compl. ¶¶ 45–49.)

Yet Byrne not only knew that Ramsland had no expertise in cybersecurity—he deliberately misrepresented Ramsland's credentials to try to bolster Ramsland's credibility. He touted Ramsland as a professional with many "experiences and certifications in matters cyber" who had been hired by the State of Texas to investigate irregularities during the Dallas 2018 election. (Compl. ¶ 48.) Ramsland himself has admitted, though, that an "unidentified 'citizens group'" hired him, not the State of Texas. (*Id*.) Byrne's false bolstering of Ramsland's credentials is further proof of Byrne's actual malice.

*(2) The Fake Spreadsheet*: Byrne, like Lindell, relied on a fake spreadsheet containing fake MAC addresses that do not exist. (*Id*. ¶¶ 7, 92–94, 153o.) This Court has already addressed the same spreadsheet. *See Dominion I*, 2021 WL 3550974, at *12 ("Dominion alleges that the evidence on which Lindell *did* rely contains glaring discrepancies rendering it wholly unreliable," including a "spreadsheet [that] is obviously fake" with MAC addresses that "are not even MAC addresses that exist." (emphasis in original)). Basic searches show that this spreadsheet is false and unreliable. (Compl. ¶ 93.) Byrne sourced this spreadsheet from a conspiracy theorist's website that was facially unreliable. (*Id*. ¶ 94.)

*(3) The Convicted Felon*: Byrne published a video featuring what he described as a "clear-speaking mathematician," Edward Solomon, who in the video claims to have spreadsheets proving that Dominion machines manipulated votes, stealing the election from Trump in Philadelphia and elsewhere. (*Id*. ¶¶ 101, 153n.) Widely available information showed that "Dominion machines were not even used in Philadelphia in the 2020 election." (*Id*. ¶ 101.) Solomon is also not a

"mathematician," as Byrne claimed, but a convicted felon who works as a carpenter at a swing set construction company. (*Id.*) A reasonable jury could find Solomon an obviously unreliable source.

*(4) The Treasure Hunter*: Byrne repeated and endorsed claims by a "senior corporate security expert," Jovan Pulitzer, that a Dominion machine in Georgia had been accessed from China through a thermostat. (*Id.* ¶ 102.) Pulitzer's claims are inherently improbable, and Pulitzer presented no evidence to support them. Nor could he. Independent forensic analysis found no evidence of machine tampering, and Georgia's Republican Secretary of State publicly stated Pulitzer's claims were false. (*Id.*) Pulitzer is also a failed inventor and a treasure hunter, who claims that a magical magnetic sword proves that "Romans had visited North America by 200 A.D." (*Id.*) A reasonable jury could find Pulitzer an obviously unreliable source.

*(5) The Military Intelligence Course Dropout*: Byrne also republished and endorsed an affidavit from Josh Merritt, "an associate of Russell Ramsland." (*Id.* ¶ 104.) While Byrne claimed that Merritt is a "military intelligence analyst," Merritt failed out of the military's entry-level intelligence course and now works as an IT consultant. (*Id.*) Merritt has also distanced himself from his affidavit, calling it "misleading." (*Id.* ¶ 5.) *See Dominion I*, 2021 WL 3550974, at *10 ("Dominion alleges that the 'military intelligence expert' who was the source for one declaration has admitted that he never actually worked in military intelligence, that the declaration Powell's law firm drafted for him was 'misleading,' and that he was 'trying to backtrack' on it."). A reasonable jury could find Merritt an obviously unreliable source.

\* \* \*

Byrne argues that his sources are reliable because some of them filed "verified complaints and sworn affidavits" in litigation across the country. (Mot. at 47.) It is unclear which sources Byrne is referencing (other than Merritt), but many of the post-election lawsuits, especially those

involving Byrne's associates like Powell and Rudy Giuliani, yielded attorney sanctions and revelations that affidavits had been fabricated.[7] (Compl. ¶¶ 5, 18, 49, 122.) In any event, to the extent Byrne argues that affidavits are *per se* reliable, this Court held otherwise in *Dominion I*: "there is no rule that a defendant cannot act in reckless disregard of the truth when relying on sworn affidavits." *Dominion I*, 2021 WL 3550974, at *10.

Byrne also argues that Dominion has alleged only "general controversy" over "the reliability and credibility of some of Byrne's sources." (Mot. at 47.) As detailed above, Dominion has alleged not only "controversy" over Byrne's sources—"controversy" that would have alerted him to their obvious unreliability—but specific, serious, facially apparent problems with those sources. (*See, e.g.*, Compl. ¶¶ 18, 45–47, 49, 52–53, 58.)

Finally, Byrne argues that a "reasonably prudent man" is not the "yardstick" for the reckless disregard standard, which is based on what the defendant subjectively knew. (Mot. at 46–47.) Byrne is a Marshall Scholar with a Ph.D. from Stanford who was "national entrepreneur of the year" and built a "$2 billion a year tech company"—credentials he often touted when spreading his lies. (Compl. ¶¶ 56, 153a.) Particularly in light of Byrne's educational and technical background, a jury could reasonably infer that Byrne knew (or at the very least recklessly disregarded) that these sources were plainly unreliable. *See Dominion I*, 2021 WL 3550974, at *11 ("Dominion further alleges that Powell's 'expert' reports are inherently unreliable and, as a former federal prosecutor, Powell had good reason to doubt their veracity.").

---

[7] Sidney Powell, who drafted Merritt's affidavit and was one of Byrne's closest associates, (*see* Compl. ¶¶ 5, 16), was recently ordered to pay $175,250.37 in sanctions for bringing a frivolous lawsuit challenging the 2020 election results in Michigan. *See King v. Whitmer*, No. 20-CV-13134, 2021 WL 5711102, at *10 (E.D. Mich. Dec. 2, 2021).

**C.    Byrne's false statements stem from a preconceived narrative he cooked up in August 2020, and Byrne manufactured fake evidence to support that narrative.**

As this Court recognized in *Dominion I*, evidence of a defamation defendant trying to advance a preconceived narrative goes to actual malice, particularly where the defendant has a hand in manufacturing false evidence to feed the narrative. *See Dominion I*, 2021 WL 3550974, at *10 (Powell "intentionally lied about and fabricated evidence to support a preconceived narrative about election fraud"); *see also Suzuki*, 330 F.3d at 1136 (finding proof of actual malice when the defendant car manufacturer "needed to boost its revenues to complete its capital campaign" and "rigged" the "testing [of a competing car] to produce the predetermined rollover result"). According to Dominion's well-pled complaint, Byrne was manufacturing evidence to fit a preconceived (and false) narrative about the 2020 Election since before that election even occurred.

***Byrne Hires Russell Ramsland:*** Dominion has alleged that as early as August 2020, Byrne committed to a "preconceived narrative" that the election would be stolen, and he paid a team of hackers to manufacture evidence to support that narrative. (Compl. ¶¶ 2, 40–57, 97, 114, 153j.) Before the election, Byrne hired Russell Ramsland to "reverse engineer" the evidence needed to "mislead people into believing" that Dominion helped steal the 2020 election. (*Id.* ¶¶ 42–43.) A quickly corrected error in reporting election results in Antrim County, Michigan, resulted from human user error, not any problems with Dominion's machines or software, but it gave Byrne his opening. (*Id.* ¶¶ 51–52, 56.) He dispatched Ramsland to write up a falsehood-riddled report wrongly blaming the reporting error on Dominion machines, to fit Byrne's preconceived narrative. (*Id.* ¶¶ 48–56.) Even after Ramsland's report had been widely debunked by Republican officials, Byrne continued to tout it as evidence for his false statements. (*Id.* ¶¶ 55–57.)

Byrne hired Ramsland specifically because he had committed to the same preconceived narrative and had a "willingness to tell brazen lies" about past elections. (*Id*. ¶¶ 46, 48); *see Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 539 (7th Cir. 1982) ("In summary, [the defendant] conceived of a story line; solicited . . . a writer with a known and unreasonable propensity to label persons or organizations as Communist, to write the article; and after the article was submitted, made virtually no effort to check the validity of statements. . . .").

Notably, though, Byrne was not content simply to endorse and repeat Ramsland's false claims about the 2020 election. Byrne went further, embellishing and even changing what his own handpicked conspiracy theorist "expert" was saying. Specifically, both Byrne and Ramsland knew that Dominion had nothing to do with the Dallas 2018 election; another election technology company's machines had been used in that election. (Compl. ¶ 48.) But while Ramsland was normally careful to avoid blaming the alleged "rigging" of the Dallas 2018 election on Dominion, Byrne had no such compunction. Instead, Byrne repeatedly and falsely asserted that Dominion had been involved in the Dallas 2018 election—indeed, that "Dominion ran it." (*Id*. ¶ 153a; *see also id*. ¶¶ 153b, 153c, 153d, 153f, 153h.) Why? Because that helped Byrne sell his preconceived narrative about Dominion, and link Ramsland's prior work more closely to that narrative. Byrne's false revision to the Dallas 2018 election narrative is further evidence of actual malice.

***Byrne Hires Doug Logan:*** Byrne followed the same strategy when he hired Doug Logan to manufacture a sham audit of the election results in Arizona. (*Id*. ¶¶ 4, 115.) Logan, like Ramsland, had publicly committed to the narrative that the election was stolen from Trump, claiming "votes had been switched by machine and that there were glitches with Dominion software." (*Id*. ¶ 115.) Byrne "raised and contributed millions of dollars" to help Logan "manufacture fake evidence" to support his narrative. (*Id*. ¶ 119.) Logan's sham audit, like

Ramsland's, has been widely debunked by Republican and independent election experts, including for the "auditors'" lack of basic election security knowledge. (*Id.* ¶¶ 116–117.)

Byrne argues that a preconceived narrative or "adversarial stance," standing alone, is not sufficient to show actual malice. (Mot. at 48 (citation omitted).) But that argument ignores the full scope of Byrne's crooked efforts to advance his false preconceived election fraud story. Dominion has alleged that Byrne developed an inherently improbable storyline before the 2020 election, manufactured evidence to support the storyline, ignored contradictory evidence from reliable sources that was available *before* he made his false statements, and instead promoted and funded obviously unreliable sources. Byrne does not address these allegations, which (along with many other well-pled allegations) take this case well beyond allegations of mere partisanship or an "adversarial stance."

Finally, while Byrne, like nearly all defamation defendants, claims that he made his statements in "genuine belief," (Mot. at 49), his "protestations of good faith and honest belief" do not "automatically insure a favorable verdict." *Schiavone Const. Co. v. Time, Inc.*, 847 F.2d 1069, 1090 (3d Cir. 1988) (citation omitted); *see also Nader v. Toledano*, 408 A.2d 31, 53 (D.C. 1979) (denying motion for summary judgment even though journalist claimed "he honestly believed in the truth of his statement when he published it"). A defamation defendant's stated intentions "are matters of credibility for a jury." *Kaelin*, 162 F.3d at 1042; *see also Mann*, 150 A.3d at 1255 (denying motion to dismiss in part because "[i]t is for the jury to determine the credibility of appellants' protestations of honest belief in the truth of their statements"). The rule is no different if the defendant asserts his pure intentions simultaneously with his defamatory statements. A reasonable jury could find, notwithstanding Byrne's protestations of innocence, that his preconceived narrative and efforts to manufacture supporting "evidence" are proof of actual

malice. *See Dominion I*, 2021 WL 3550974, at *10; *see also Palin*, 940 F.3d at 813 (reversing a decision to grant motion to dismiss and holding that plaintiff pleaded actual malice, in part, because she alleged that the defendant "had a 'pre-determined' argument he wanted to make in the editorial"); *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016) ("[P]laintiff offers evidence that could lead a jury to determine that [the defendant] had a preconceived story line and may have consciously disregarded contradictory evidence.").

### D. Byrne knowingly disregarded widely publicized evidence that disproved his statements.

A plaintiff can plead actual malice by alleging that the defendant "consciously disregarded contradictory evidence" demonstrating the falsity of its statements. *See Eramo*, 209 F. Supp. 3d at 872; *St. Surin v. Virgin Islands Daily News, Inc.*, 21 F.3d 1309, 1318 (3d Cir. 1994) (reversing a decision granting summary judgment on the issue of actual malice when a source's testimony "flatly contradicts" what the article stated). Dominion alleges an enormous amount of contradictory evidence disregarded by Byrne.

For starters, Byrne published statements (and continues to do so) asserting that Dominion machines manipulated elections in cities that did not use Dominion machines, such as Dallas in 2018, and Philadelphia in 2020. (Compl. ¶¶ 5, 48, 74, 101, 153n.) Byrne also disregarded widely reported, publicly available evidence, including audits and hand counts, that debunked the lies he was telling. (*Id.* ¶¶ 56–70, 73–91.) Most of this evidence was publicly reported before November 17, 2020, the date that Byrne made the first defamatory statement cited in the complaint. (*See id.* ¶ 153a.)

This Court has already held that the same countervailing evidence made Mike Lindell's claims "even more obviously improbable." *See Dominion I*, 2021 WL 3550974, at *12. A

reasonable juror could conclude that Byrne acted with actual malice by knowingly disregarding copious publicly available evidence that contradicted and disproved his defamatory statements.

### E.   Byrne refused to retract his statements; instead, he doubled down and put them into a documentary.

This Court previously held that a retraction letter notifying Mike Lindell of countervailing evidence could support a finding of reckless disregard when Dominion also alleged, as here, that Lindell relied on "obviously problematic sources to support a preconceived narrative he had crafted for his own profit." *Dominion I*, 2021 WL 3550974, at *12. Byrne, like Lindell, has refused to retract his statements, even after Byrne was expressly notified by Dominion and others that his statements were false. (Compl. ¶¶ 99–101, 103, 104, 109, 112–113.) Contrary to Byrne's suggestion that Dominion's retraction letters were simple flat denials, Dominion's letters on March 31 and June 18, 2021, pointed Byrne to *actual evidence* proving his statements were false. (*See* ECF No. 2-11; ECF No. 2-14.) Much of this evidence, such as Ramsland's background as a conspiracy theorist and statements from Michigan's Secretary of State debunking Ramsland's Antrim County report, was available *before* Byrne made many of his defamatory statements. (*See* ECF No. 2-11 at 9–10.) But rather than retract, Byrne repackaged his false statements about Dominion and featured them in a documentary, the *Deep Rig*, that repeats the "debunked lies of the Ramsland Report" and "Doug Logan." (Compl. ¶ 124.) Byrne's refusal to retract and, instead, his doubling down on his false statements are further evidence of actual malice.[8]

---

[8] Byrne argues that his photo of Dominion voting transport bags was not defamatory because he did not know that the boxes held storage bags rather than voting machines. (Mot. at 43–44.) Of course, Byrne has not retracted his statement that "Dominion machines are made in China," even after learning the truth. (Compl. ¶ 99.) Moreover, as Dominion pointed out, the boxes in the photo say, "transport bags." Byrne contends that he could not see those words in the photo, but that argument is a "matter[] of credibility for a jury." *See Kaelin*, 162 F.3d at 1042.

**F.      Byrne had a financial motive to make false statements about Dominion.**

Motive and the potential for financial benefit are additional evidence of actual malice. *See Suzuki*, 330 F.3d at 1136 ("While . . . financial motive cannot, by itself, prove actual malice, it nonetheless is a relevant factor bearing on the actual malice inquiry."); *Harte-Hanks*, 491 U.S. at 668 ("[I]t cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry.").

Dominion has alleged that Byrne financially benefits from harming Dominion's reputation. First, Byrne has profited, and continues to profit, from his lies about Dominion through sales of his book (*The Deep Rig*) and his film (*Deep Rig*) and by charging a subscription fee for his website. (Compl. ¶¶ 110, 124–125 153q, 153r.) Second, Byrne has also held financial interests in blockchain voting technology—technology that directly competes with Dominion's voting technology. (*Id.* ¶¶ 35–39, 119, 124.) While Byrne alleges (outside of the pleadings) that he divested his Overstock-related holdings, he does not deny having a current financial interest in blockchain voting technology. (Mot. at 50–51.) Dominion has alleged that Byrne continues to promote blockchain voting technology, raising the plausible inference that he has a current financial interest in such technology apart from his allegedly divested Overstock holdings.[9] (Compl. ¶¶ 10, 39, 52, 119, 124.)

Byrne argues that financial benefit cannot, on its own, support a finding of actual malice. This argument is beside the point. In denying Lindell's motion to dismiss, this Court found that

---

[9] Byrne argues that his alleged "profit motive" is not "tied to any allegedly defamatory statements." (Mot. at 50.)  Dominion has alleged that Byrne profited directly from defamatory statements in his book, documentary, and blog. (*See, e.g.*, Compl. ¶¶ 110, 124–125 153q, 153r.) Dominion has also alleged that Byrne could profit from disparaging Dominion's reputation if government actors begin turning to blockchain voting technology as a replacement for Dominion's voting technology, as that would benefit Byrne financially to the extent he still holds financial interests in such technology. (*See id.* ¶¶ 10, 35–39, 52, 119, 124.)

Dominion pleaded actual malice when it alleged that Lindell had a profit motive, made "inherently improbable" claims based on "unreliable" sources, and "failed to acknowledge the validity of countervailing evidence." *Dominion I*, 2021 WL 3550974, at *13. Dominion has alleged the same facts here—Byrne made inherently improbable claims based on unreliable sources and failed to acknowledge countervailing evidence. On top of these facts, Byrne has a financial motive for defaming Dominion which here, as in the Lindell case, further supports a reasonable jury finding actual malice.

## II.    Each of Byrne's Statements Is Actionable as Defamation.

Byrne argues that many of his allegedly defamatory statements are not actionable for a variety of statement-specific reasons. Notably, Byrne does not address anywhere in his Motion the statements excerpted in ¶¶ 153l, 153n, 153o, 153p, and 153r, while for most of the other statements, he makes only a single argument in defense of them. Each of his arguments is addressed below.

### A.    The fair report privilege does not help Byrne.

Byrne begins the Argument section of his brief with nearly three pages discussing the fair report privilege, but he ultimately invokes that privilege solely to try to immunize a single hyperlink he included in a single defamatory publication. (Mot. at 17–19 (claiming hyperlink in statement accused in Complaint ¶ 153e is protected by the fair report privilege).) Even if the Court were to hold that Byrne's hyperlinking to Joshua Merritt's affidavit were protected by the privilege, the rest of that particular lengthy defamatory statement remains actionable (as do all his other statements).

Yet even Byrne's hyperlinking of the document is not properly protected by the privilege. As Byrne's own cases confirm, the privilege is meant to encourage "the dissemination of fair and accurate reports." *Dameron v. Washington Mag., Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985). Byrne

does not dispassionately report on the affidavit, but strongly endorses it ("Download this fine, heavily-documented affidavit . . .") and uses it to support his own false conclusions. *See id.* at 739 (privilege does not apply "where the government record is 'merely part of one's research.'" (quoting *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 536 (7th Cir. 1982)).

Byrne also fails to mention anywhere in his blog post that the affidavit was part of a court proceeding. The "case law requires that defendant reasonably identify its source as a precondition or 'major hurdle' to reliance on the fair report privilege." David Elder, *Defamation: A Lawyer's Guide* § 3:3 (2003). "To be covered by the fair report privilege, the publisher must attribute the material to the official proceeding that is being reported upon." RODNEY SMOLLA, 1 LAW OF DEFAMATION § 8:67:50 (2d ed. 2021 Update); *see also, e.g.*, *Bufalino v. Associated Press*, 692 F.2d 266, 271 (2d Cir. 1982) (privilege "should not be interpreted to protect unattributed, defamatory statements"). While legally sophisticated readers might recognize the blue text at the top of the affidavit as a PACER header, most readers will have no idea that the document they are reading—which has no case caption—was filed in court, let alone what court. *See Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 89 (D.C. 1980) (requiring "proper attribution of the article's statements to police sources"); *cf. Von Kahl v. Bureau of Nat. Affs., Inc.*, 810 F. Supp. 2d 138, 145 (D.D.C. 2011) (denying fair report privilege because defendant wrongly attributed a prosecutor's statement to a judge); *Prins v. Int'l Tel. & Tel. Corp.*, 757 F. Supp. 87, 93–94 (D.D.C. 1991) (denying fair report privilege because defendant attributed a statement by a private party to the prosecutor).

> **B.    Byrne's statements are "of and concerning" Dominion because he either names or references Dominion.**

Byrne argues that three of the eighteen accused statements in the Complaint are not defamatory because they neither "expressly mention" Dominion, nor "lead the listener to

conclude" that Byrne is "referring" to Dominion. (Mot. at 21.)  His arguments, though, depend entirely on snipping sentences out of context.

As Byrne admits, plaintiffs can satisfy the "of and concerning" requirement even if they were "never named or [were] misnamed." *Croixland Props. Ltd. P'ship v. Corcoran*, 174 F.3d 213, 216 (D.C. Cir. 1999); *see also Ramos v. ADR Vantage, Inc.*, No. 18-CV-01690, 2018 WL 6680531, at *1 (D.D.C. Dec. 19, 2018) ("The absence of an express reference to Plaintiff by name is not, however, fatal to his claim."). The sole requirement is that "a reasonable listener" or reader could understand the statement as "referring to the plaintiff." *Croixland*, 174 F.3d at 216. A plaintiff may "rely upon extrinsic evidence to show that listeners understood the statements to pertain to the plaintiff." *Vasquez v. Whole Foods Mkt., Inc.*, 302 F. Supp. 3d 36, 64 (D.D.C. 2018) (citing RESTATEMENT (SECOND) OF TORTS § 564 cmt. b). The "of and concerning" requirement is usually a question for the jury. *See Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103, 120 (D.D.C. 2011); *Peay v. Curtis Pub. Co.*, 78 F. Supp. 305, 307 (D.D.C 1948).

In *Croixland*, for example, the defendants stated that the owner of a racetrack was "connected to organized crime" but misidentified the racetrack owner. 174 F.3d at 217. Even though the defendants had "misidentified the owner of the facility," the misidentification "did not remove the taint to the true owner," because "a listener could perceive that the true owner [was] connected to organized crime." *Id.*

Byrne argues that three statements were not "of or concerning" Dominion. A reasonable listener, though, could find the opposite, as each one comes from a news segment in which Byrne discusses Dominion by name (contrary to his protestation that he "never mentioned Dominion" in these segments, (Mot. at 22)), or his interviewer prompts him to talk about Dominion by name.

**Paragraph 153c**: Byrne makes much of the fact that in this statement, Byrne himself "never mentioned Dominion." (*Id.*) The context of Byrne's statements, though, would lead a reasonable listener to conclude that Byrne is referencing Dominion—not, as he would have it, just abstractly "express[ing] his opinions and suspicions about the election results" (*Id.*)

Critically, the segment begins with the reporter directly prompting Byrne to talk about Dominion: "You've put together a group of individuals who are trying to crack down on ***the fraud that is Dominion***. Tell us more about what you've been doing." (Compl. ¶ 153c (emphasis added).) Byrne responds to the prompt by saying he "funded a team of hackers and cyber sleuths" and they have "been on this since August." (*Id.*) A reasonable listener could conclude, in light of that opening back-and-forth, that Byrne's other statements during the segment were about that same purported investigation of Dominion.

Moreover, Byrne is liable for statements he made to the reporter that the reporter then relayed to the audience, since a jury could reasonably infer that Byrne made those statements to the reporter knowing and intending they would be part of the report. *See Chandler v. Berlin*, 998 F.3d 965, 976–77 (D.C. Cir. 2021) ("[W]e [have] held that a jury could find a plaintiff responsible both for defamatory statements he made to a Washington Post reporter and for the paper's subsequent printing of those statements because the latter was a foreseeable consequence of the former."). While Byrne may at some point argue that the reporter lied about what he said to her, or that the footage was spliced in some misleading way, such arguments are not for the pleading stage. As pled, the statements of Byrne—both that he made directly to the camera, and that the reporter relayed him having made to her—are actionable false statements that a reasonable listener could conclude were "of and concerning" Dominion. *See id.*

**Paragraph 153f**: Byrne argues that, during the news segment excerpted in ¶ 153f, he "expressly accused the so-called 'elites' or 'elite class' of wrongdoing, not Dominion." (Mot. at 22.) Yet any accusations Byrne lobbed at "elites" do not erase the false accusations he also made against Dominion in the same segment, including (1) that the 2018 Dallas election, which Byrne claims was rigged, "had been run by Dominion"; (2) that election rigging "was done" in the 2020 election through, at least in part, "chicanery within the software"—in context, clearly Dominion software; (3) that "the guts of [Dominion] includes all this functionality and software that was actually from Venezuela to help a dictator rig his elections"; and (4) that Dominion bribed Georgia officials, and potentially officials in other states, "to bring the [Dominion] software in." (Compl. ¶ 153f.) At the very least, it is a question of fact whether a reasonable listener would interpret these false statements as "of and concerning" Dominion.

**Paragraph 153k**: For ¶ 153k, Byrne mostly ignores the accused portions of this segment, choosing instead to defend a different excerpt from the segment (about "the elites . . . using the black community as their shield") that Dominion did *not* include in ¶ 153k, because Dominion has *not* alleged those statements defamed it. (Mot. at 22.) Yet even that largely irrelevant excerpt includes Byrne's actionable defamatory statement that "[t]he election officials ***and the machinery*** is what cheated," (Compl. ¶ 153k (emphasis added)), which clearly impugns (wrongly) Dominion, not just "election officials." The rest of this accused segment, ignored by Byrne, includes other plainly defamatory statements about Dominion, such as the false accusation that a Dominion machine was hacked through a wireless thermostat as part of the alleged election rigging.[10]

---

[10] One of Byrne's cited cases, *Farah v. Esquire Mag.*, 736 F.3d 528, 536 (D.C. Cir. 2013), did not address the "of and concerning" requirement at all. *Farah* held only that "satire or parody . . . is not actionable if it cannot reasonably be interpreted as stating actual facts about an individual." *Id.*

**C.      Byrne's argument that he did not publish Joshua Merritt's affidavit is factually wrong.**

Byrne cites caselaw concerning the actionability of hyperlinks to try to argue that his hyperlinking of Joshua Merritt's affidavit is not actionable. (Mot. at 23–24.) Debates about whether and when a hyperlink constitutes an actionable "republication," though, are irrelevant here, because *Byrne published the affidavit itself on his blog*. The hyperlink in question leads to this web address: https://www.deepcapture.com/wp-content/uploads/Affadavit-from-M.I.-on-Foreign-Involvement.pdf (last visited December 9, 2021). This is thus not a situation where Byrne merely hyperlinked someone else's website that contained defamatory material; Byrne hyperlinked *his own website*, deepcapture.com, where he hosted, and published, to any willing viewer, the defamatory affidavit in its entirety. He also encouraged readers to view the affidavit. One who republishes (rather than merely links to) someone else's defamatory statements is unquestionably liable for defamation. *Foretich v. Glamour*, 741 F. Supp. 247, 253 (D.D.C. 1990) ("[U]nder the 'republication rule,' one who republishes a defamatory statement adopts it as his own and is liable for defamation."); *see also Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*, 194 F. Supp. 3d 263, 277–79 (S.D.N.Y. 2016) (distinguishing between cases in which defendants merely post a hyperlink and those in which defendants republish defamatory material and encourage readers to view it).[11]

**D.      The Communications Decency Act does not protect Byrne's retweet because he is the sole content creator of the defamatory caption in his retweet, and**

---

[11] Byrne's cited cases are inapposite because the defendant in each case posted only a hyperlink and neither encouraged readers to view the defamatory material nor republished defamatory material in a new place on the defendant's own website. *See Lokhova v. Halper*, 441 F. Supp. 3d 238, 255 (E.D. Va. 2020); *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1137 (N.D. Ill. 2016); *In re Phila. Newspapers, LLC*, 690 F.3d 161, 174 (3d Cir. 2012); *Haefner v. N.Y. Media, LLC*, 918 N.Y.S. 2d 103, 104 (N.Y. App. Div. 2011); *Churchill v. State*, 876 A.2d 311, 319 (N.J. Super. App. Div. 2005).

**because he was responsible at least in part for the creation or development of the defamatory content reported in the retweeted article.**

Byrne argues that his retweet shown in ¶ 153m of the complaint is protected under the Communications Decency Act.[12] (Mot. at 24–26.) The CDA immunizes a "provider or user of an interactive computer service" who republishes "information provided by *another* information content provider." 47 U.S.C. § 230(c)(1) (emphasis added). But the CDA does *not* immunize statements for which the defendant is the "information content provider." *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1197 (10th Cir. 2009) ("[A]n interactive computer service that is also an 'information content provider' of certain content is not immune from liability arising from publication of that content.").

An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). The majority of circuit courts have held that a defendant creates or develops content when he "materially contributes" to a defamatory statement. *See Gonzalez v. Google LLC*, 2 F.4th 871, 892 (9th Cir. 2021) (collecting cases). A material contribution requires more than simply displaying content or making it available; it requires being at least partially responsible for adding to the allegedly unlawful elements of the displayed content. *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1167–68 (9th Cir. 2008) (en banc) (Section 230 immunity did not apply to a roommate matching service that "contribute[d] materially to the alleged illegality of the conduct"); *see also Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 410 (6th Cir. 2014) ("[M]aterial contribution . . . means being responsible for what makes the displayed content allegedly unlawful").

---

[12] Byrne does not argue that the statements in ¶ 153m are protected on any other grounds.

This case does not present difficult questions about who qualifies as a content provider because, for starters, Byrne did not simply retweet another user's post. Rather, Byrne created and posted his own statements, saying "I vouch for this. I have seen the photographs, the computer forensics, and the IP traces back to China. To a corporation whose name has long been linked to CP [Communist Party]." (Compl. ¶ 153m.) True enough, someone following Patrick Byrne's Twitter account would have to click through to read the article to fully understand what Byrne "vouch[ed]" for, and what "photographs, … computer forensics, and … IP traces" he was talking about. But the CDA does not immunize the defamatory gist of what *Byrne himself* said here: that the accusations (about Dominion) in the linked article were true ("I vouch for this"), and that Byrne himself had "seen" the purported evidence proving them. While one might fairly argue that clicking a "like" button (available on Facebook, not Twitter) should not expose one to defamation liability for the underlying content, telling your Twitter audience that you "vouch" for the underlying content and "have seen" the evidence—in effect, attesting to the truth of the underlying lies—is a far different proposition that goes well beyond the reach of the CDA, since what is at issue is an affirmative (and false) attestation of truth.

Byrne's tweet is almost identical to the post at issue in *La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020). There, the defendant twice reposted a photograph on Instagram from another user and added her own allegedly defamatory caption both times. *Id.* at 84–85. Even though the defendant had reposted the photograph from another user, the Second Circuit held that the CDA did not immunize the statements in the caption that accompanied the photo because the defendant "authored both Posts at issue." *Id.* at 90. The court explicitly held that the defendant was not just a content contributor, but the "sole information content provider" because she "intensified and

specified" the allegedly defamatory content of the photo. *Id.* at 89 (quotation marks omitted). So too here: Byrne "intensified and specified" the defamatory content of the underlying article.

Yet even if all Byrne had done was retweet the underlying article with no commentary, the CDA would still not immunize him. The CDA does not protect defendants who played "a role in the 'creation or development' of the . . . allegedly defamatory statement." *See Parisi v. Sinclair*, 774 F. Supp. 2d 310, 317 (D.D.C. 2011). A leading case on "material contribution" held that a website materially contributed an unlawful statement by merely providing a form that required answers to standardized questions. *Fair Housing Council*, 521 F.3d at 1166 ("When a business enterprise extracts such information from potential customers as a condition of accepting them as clients, it is no stretch to say that the enterprise is responsible, at least in part, for developing that information."). The article Byrne retweeted publishes defamatory statements by Russell Ramsland about Dominion, and Dominion has plausibly pled that Byrne funded and directed Ramsland's Dominion work. (Compl. ¶¶ 2, 6, 45, 50, 52–53, 56, 74.) Given Byrne's "role in the 'creation or development'" of Ramsland's many defamatory false accusations about Dominion, at least at the pleading stage Byrne cannot escape liability for retweeting a story that republished Ramsland's Dominion falsehoods.[13]

### E.    Byrne's statements imply demonstrably false facts about Dominion.

Byrne argues that six statements excerpted in the complaint—¶¶ 153a, 153b, 153c, 153d, 153f, and 153h—are not false because the "gist" of the statements is substantially true. (Mot. at

---

[13] Byrne's other cited cases do not help him. In *Johnson v. Arden*, 614 F.3d 785, 792 (8th Cir. 2010), and *Obado v. Magedson*, No. 13-CV-2382, 2014 WL 3778261, at *4 (D.N.J. Jul. 31, 2014), the defendants were internet service providers that hosted websites on which the allegedly defamatory statements were published, but the defendants played no role in creating or developing the statements. In *American Freedom Defense Initiative v. Lynch*, 217 F. Supp. 3d 100, 104 (D.D.C. 2016), the plaintiffs sued then-Attorney General Loretta Lynch because Facebook, YouTube, and Twitter allegedly censored their speech by "repeatedly [taking] down some of Plaintiffs' posts criticizing Islam."

27–28.) *See Benic v. Reuters Amer., Inc.*, 357 F. Supp. 2d 216, 224 (D.D.C. 2004) ("A defendant can defend against a plaintiff's defamation claim by demonstrating that the 'gist' of the statement is true or that the statement is substantially true, as it would be understood by its intended audience."). A judge determines whether a statement is "capable of defamatory meaning," while a jury determines the ultimate question of whether the statement is "substantially true." *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C. 1990); *Moldea v. N.Y. Times Co.*, 15 F.3d 1137, 1150 (D.C. Cir. 1994) ("[I]t is the jury's province to determine whether the publication was sufficiently false so as to have defamed the plaintiff.").

In arguing that the "gist" of these six statements is true, Byrne essentially rewrites the statements as though all he said about Dominion each time was "that 'Texas outlawed [Dominion's system] in Texas as a result of [an] audit.'" (Mot. at 27.) A reasonable jury, however, could easily find that each of these statements conveyed far more to the listener or reader than just that Dominion's system was "outlawed" in Texas.

Only *one* of these six statements, in fact, even mentions Dominion machines being "outlawed" in Texas. (Compl. ¶ 153d.) What Byrne omits is that, before he said that Dominion was "outlawed" in Texas, he had much more to say about Dominion:

> [T]his election machinery, especially **Dominion's**, is a joke. . . . This election was, in fact, rigged. . . . **This election was completely rigged** . . . The evidence for this is overwhelming. . . . [T]he functionality built into these systems, especially **Dominion**, by now everyone knows the story, that **it was Hugo Chavez that wanted some election software built that he could goon** . . . . [T]his **Dominion** software was **built so that the election officials could use it to cheat**. . . . In 2018, the Dallas, Texas elections had 'irregularities,' much like the irregularities we're now hearing about. The Texas state government hired a cybersecurity group to investigate these odd facts about **the Dallas election that had been managed on Dominion equipment**.

(Compl. ¶ 153d.) Only after making all these demonstrably false claims about Dominion does Byrne get to what he now claims is the one and only "gist" of the ¶ 153d statement: "And, in fact,

in Texas, outlawed it in Texas as a result of that audit. . . ."  (Compl. ¶ 153d.) A reasonable jury could certainly find that the "gist" of this full passage was far more than that Dominion was "outlawed" in Texas.

Yet even the "gist" claimed by Byrne implies a false fact: that Dominion was audited **<u>due to</u>** the 2018 election. *See Arpaio v. Zucker*, 414 F. Supp. 3d 84, 90 (D.D.C. 2019) (referring to the misdemeanant plaintiff as an "ex-felon" without "any context for that label" was not substantially true because the term "ex-felon" carries "serious implications of criminality"). As Byrne notes in his motion, the only reason that the Texas Secretary of State reviewed Dominion's voting equipment was because Dominion voluntarily sought approval for use in the state, as required under Texas law. (Mot. at 10 n.3.)  *See* Tex. Election Code § 122.031 ("Before a voting system or voting system equipment may be used in an election, the system and a unit of the equipment must be approved by the secretary of state."). The Texas Secretary of State did not audit a Dominion machine because of "irregularities" in the 2018 Dallas election, for the obvious reason that Dominion machines were not used in that election. (*See* Compl. ¶¶ 2, 46–48.)

As for the other five of these six statements, they did not even repeat the "outlawed in Texas" accusation that Byrne claims was the "gist" of each of them. Rather, they made numerous other false and defamatory accusations against Dominion:

- ¶ 153a: "**These guys reverse engineered the 2018 irregularities**, which turned out to be a hack. Dominion, **<u>Dominion</u> ran it**. It was Dominion's technology that ran it. . . . [It is] [a]bsolutely provable [that Dominion "could in fact change votes for Donald Trump to Joe Biden"]. We have the data, we have the data."

- ¶ 153b: "[I]n **the Dallas election in 2018 had irregularities in it**. The State of Texas hired a cybersecurity firm to study it. **That firm—and it was <u>Dominion</u> Voting Systems**. They've had two years to deconstruct and reverse engineer **how to hack an election with <u>Dominion Voting Systems</u>**."[14]

---

[14] This is the only challenge Byrne makes to the statement in ¶ 153b.

- ¶ 153c: <u>Chanel Rion</u>: "**You've put together a group of individuals who are trying to crack down on the <u>fraud that is Dominion</u>**. Tell us more about what you've been doing." <u>Byrne</u>: "**Yes. Well, I funded a team of hackers and cyber sleuths** and other people with odd skills. We've been on this since August . . . . <u>Rion</u>: . . . Byrne says the election irregularities in Dallas, 2018 was **rooted in Dallas's use of Dominion voting machines**. **This group has been on Dominion's trail over two years.** <u>Byrne</u>: I've been up there with them since August and expanding and funding further and deeper investigations. So we really, **I felt kind of had the answer when everyone woke up November 4th and saying what happened**?"

- ¶ 153f: "The state government of Texas hired some local cyber security experts, very good with military intelligence and federal law enforcement kinds of backgrounds and a very high end cybersecurity group to study the 2018 Dallas election. **They studied these irregularities. It had been run by <u>Dominion</u> Election System.** They've had two years to study and unwind what the rest of America has had two weeks to try to figure out. Over those two years, they figured out 10 ways—there are at least 10 ways to hack an election, which uses this Dominion equipment, ten. . . . **[T]he guts of [Dominion] includes all this functionality and software that was actually from Venezuela to help a dictator rig his elections.**"

- ¶ 153h: "**In November of 2018, there was an election in Dallas** that had irregularities and the state government of Texas hired a blue ribbon governor's commission . . . . And they'd been studying what happened in Dallas for two years. **And how do you hack an election running on <u>Dominion</u> servers**. They came up with a dozen ways."[15]

Just reading these statements shows how specious Byrne's "gist" argument is.

### F.    Byrne's argument that certain of the accused statements are protected opinions based on fully-disclosed facts is poorly developed and meritless.

Byrne argues that some of his statements are protected opinions because he fully disclosed the underlying "facts." (Mot. at 28–30.) Sidney Powell made the same argument in her motion to dismiss, and this Court rejected it.[16] *Dominion I*, 2021 WL 3550974, at *8–9.

As the Court noted, a defendant's statements "may not be actionable if the 'defendant provides the facts underlying the challenged statements,'" but only if "it is 'clear that the challenged statements represent [the defendant's] own interpretation of those facts, . . . leaving the

---

[15] Byrne does not challenge the statement in ¶ 153h on any other grounds.

[16] Below, Dominion addresses Byrne's related contention that his statements are "opinions."

reader free to draw his own conclusions.'" *Dominion I*, 2021 WL 3550974, at \*8 (quoting *Bauman v. Butowsky*, 377 F. Supp. 3d 1, 11 n.7 (D.D.C. 2019)). This rule does not apply, though, when (1) the defendant lies about having underlying facts, (2) the defendant "has not disclosed" the underlying facts, or (3) the defendant's underlying "evidence . . . is either false or provides no factual basis" for the speaker's statements. *Dominion I*, 2021 WL 3550974, at \*8–9; *see also Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18–19 (1990) (opinion that fully discloses facts upon which it is supposedly based is actionable if those underlying "facts" are "either incorrect or incomplete"); *Condit v. Dunne*, 317 F. Supp. 2d 344, 364 (S.D.N.Y. 2004) ("A speaker does not necessarily find protection in the First Amendment, however, when he publishes opinions based on disclosed facts which are themselves false."); *cf. Flowers v. Carville*, 310 F.3d 1118, 1130 (9th Cir. 2002) ("[I]f someone knows that the [cited] news story is false, he can't sanitize his republication by purporting to rely on the news source. Nor can he claim immunity if he has conflicting information from another source and recklessly disregards it.").

Dominion has generally alleged that Byrne, like Powell, lied about having evidence to support his claims, failed to disclose his so-called evidence, and presented manufactured false evidence or evidence that otherwise does not support his claims. (*See, e.g.*, Compl. ¶¶ 1–3, 41–43, 48–49, 52, 53, 56, 73, 92–94, 97–110.) *See Dominion I*, 2021 WL 3550974, at \*8–10. In each statement that Byrne argues is protected opinion, he fails the test set out by the Court in *Dominion I*.

**Paragraph 153e**: Byrne argues that his statements in ¶ 153e were simply his "interpretations, conclusions, and inferences based on fully-disclosed facts . . ." (Mot. at 29.) Yet Byrne does not bother to identify *any* specific defamatory statements from ¶ 153e that he claims are "opinion," let alone try to explain what "fully-disclosed" (and *true*) "facts" those "opinions"

are based on. He argues only in generalities, and then concludes by saying that his statement "Election 2020 is an egg that can't be unscrambled" is "a textbook form of constitutionally protected speech." (*Id*.) Dominion has not sued Byrne for his "unscrambled egg" assertion, which is not even mentioned in the Complaint.

Even if the Court were to consider the footnotes (despite no guidance from Byrne), they are a hodgepodge of Byrne's own statements; pictures of charts and graphs from Pinterest with unverified sources and no underlying data; statements that have nothing to do with Dominion; and false statements such as the false Joshua Merritt affidavit. (ECF No. 2-12 at 3, 5–6, 6–9, 10.) These sources are "either false or provide[] no factual basis for what [Byrne] said." *Dominion I*, 2021 WL 3550974, at *9.

**Paragraph 153f**: Byrne argues that he fully disclosed the "facts" underlying his opinions because he "shared his thoughts and opinions and told listeners to review the 'graphs I'll be putting up tonight or tomorrow morning . . . . I post things on DeepCapture.com.'" Characterizing his lengthy defamation of Dominion on this particular occasion as "shar[ing] his thoughts and opinions" does not magically convert his false factual assertions about Dominion into constitutionally protected opinion. As for the "graphs," Byrne did not disclose them while making the statements in ¶ 153f. *See Dominion I*, 2021 WL 3550974, at *8–9 (Powell's statements were not based on fully disclosed facts because, even though she referenced a video that supported her statements, she did not disclose it). Nor does Byrne in his Motion identify what graphs he was talking about and when (if ever) he posted them—though of course on a motion to dismiss, such supplementing of the factual allegations would be improper anyway. *See Colborn v. Netflix Inc.*, No. 19-CV-0484, 2021 WL 2138767, at *9 (E.D. Wis. May 26, 2021) ("Whether [the defendant] fully disclosed the true or privileged facts is the heart of [the plaintiff's] claim. . . . [The

defendant's] insistence that 'indisputable facts' support its position is misplaced; [the defendant] has filed a motion to dismiss and it is not the appropriate time to resolve such factual issues.").

**Paragraph 153j**: Byrne confusingly seems to argue that his hyperlinking to "a forensic report of the Allied Security Operations Group" somehow triggers the First Amendment protection for non-actionable opinions. (Mot. at 29–30.) The argument makes no sense. The ASOG report is littered with false statements of fact—or so Dominion has plausibly pled. (Compl. ¶¶ 54–57.) Byrne's republication of that report is not "Byrne giving opinions based on fully-disclosed facts" (Mot. at 29), but rather another occasion of Byrne publishing false and defamatory factual assertions about Dominion on his website. Byrne does not try to identify a non-actionable "opinion" in ¶ 153j, and even the sentence Byrne quotes from that same blog post (which Dominion did quote as an actionable statement in ¶ 153j)—"You wanted the evidence. Here is the evidence." (Mot. at 29)—is a false statement of fact, not opinion. Byrne does not challenge the statements in ¶ 153j on any other grounds.

**Paragraph 153q**: Byrne argues that statements he posted on his blog, DeepCapture.com, quoted in ¶ 153q are protected opinions because he included "screenshots of graphs filed in sworn affidavits that he relied on to support the claims made." (Mot. at 30.) As elsewhere, though, Byrne makes no effort to identify which statements in ¶ 153q are constitutionally protected opinion, let alone explain how the "screenshots of graphs filed in sworn affidavits" constitute "fully-disclosed facts" rendering those opinions immune from defamation liability.

The screenshots themselves—which nowhere mention having been "filed in sworn affidavits"—contain numerous assertions without any sourcing, such as "A normal vote pattern would look like a natural progression – smooth without extreme jumps," "simultaneous irregularity in hundreds of precincts," and "BACKDATED BIDEN MAIL IN BALLOTS." (Compl. ¶ 153q.)

And ¶ 153q includes numerous other defamatory statements about Dominion that have no connection to the mysterious graphs touted by Byrne in his Motion, including the false videos by Edward Solomon, and the false accusation that Dominion paid to "shred ballots" to avoid "a complete forensic audit" (an accusation Byrne never mentions in his Motion). (Compl. ¶ 153q.) Byrne does not argue that the statements in ¶ 153q are protected on any other grounds.

Byrne's cases are inapposite. In *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 185 (4th Cir. 1998), the defendant wrote that investors would "sour" on the plaintiff's artificial sugar product. The court held that the defendant's "sour" statement was a protected opinion, not defamation, because the defendant gave three specific, *true* facts supporting the prediction. *Id. Biospherics* did not involve a defendant who supports a demonstrably false statement of fact with more false statements.

In *Moldea v. New York Times Co.*, 22 F.3d 310, 317 (D.C. Cir. 1994), the court addressed statements in a book review that "were solely evaluations of a literary work," and the case, again, did not involve a defendant who based his false statements on other false statements. Relevant here, the court held that opinion statements are *not* protected if they "rely upon stated facts that are provably false." *Id.* at 313.

Finally, *Bauman v. Butowsky*, 377 F. Supp. 3d 1, 11–12 (D.D.C. 2019), addressed an opinion that was "incapable of being proven false" because the statement at issue—"that [the plaintiff's] role in the Seth Rich matter deserved serious scrutiny"—could not be proven false. *Bauman* did not involve statements, like Byrne's, that assert verifiable facts about the plaintiff. *See Dominion I*, 2021 WL 3550974, at *8 ("[E]ither Dominion was created to produce altered voting results in Venezuela for Hugo Chávez or (as Dominion alleges) it was not.").

### G.   Byrne's statements were not opinions because they expressed or implied false facts about Dominion.

Byrne argues that others of his statements are nonactionable opinions because they "are not capable of defamatory meaning or susceptible of proof." (Mot. at 30–36.) First, he argues that many of his statements cannot be proven false. (*Id*. at 30–33.) Second, he argues that a listener would understand his statements as opinions based on the context in which he made them. (*Id.* at 33–36.) Both arguments failed in *Dominion I*, and should likewise fail here.

### 1.   Byrne's statements are not opinions because they are verifiable—even Byrne claimed he has evidence to prove them.

The Supreme Court has rejected the idea that statements of opinion deserve special protection. *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 21 (1990) ("We are not persuaded that, in addition to these protections, an additional separate constitutional privilege for 'opinion' is required to ensure the freedom of expression guaranteed by the First Amendment."). A statement, whether couched as an opinion or not, is actionable as defamation if it expresses or implies "a provably false factual connotation" about the plaintiff. *Id.* at 20; *White*, 909 F.2d at 522 ("Assertions of opinion on a matter of public concern only receive full constitutional protection if they do not contain a provably false factual connotation."). Or as this Court put it, "statements of opinion regarding matters of public concern . . . are actionable if they imply a provably false fact or rely upon stated facts that are provably false." *Dominion I*, 2021 WL 3550974, at *7 (citing *Milkovich*, 497 U.S. at 20). The same is true of rhetorical hyperbole and imaginative expressions, which are not actionable *only if* they "cannot reasonably be interpreted as stating actual facts about an individual." *Milkovich*, 497 U.S. at 20.

In *Dominion I*, Sidney Powell argued, like Byrne, that many of her statements were merely opinions, including her statements that:

- Dominion "was created to produce altered voting results in Venezuela for Hugo Chávez";

- Dominion "flipped," "weighted," and "injected" votes during the 2020 election; and

- State officials "received kickbacks in exchange for using Dominion machines."

*Dominion I*, 2021 WL 3550974, at *8.

The question there, like here, was "whether a reasonable juror could conclude that [the defendant's] statements expressed or implied a verifiably false fact about Dominion." *Id.* This Court rejected Powell's argument, holding that it was "not a close call." *Id.* The Court held that Powell's statements—about Dominion having been created to rig elections in Venezuela, having manipulated votes in the 2020 election, and having bribed state officials—were "either true or [they were] not." *Id.*

So too here. Over and over, Byrne made precisely the same kinds of statements as this Court held were actionable in *Dominion I*, because "a reasonable juror could conclude that [the] statements expressed or implied a verifiably false fact about Dominion." For example, either the 2018 "Dallas election" was "managed on Dominion equipment," or it was not, (Compl. ¶ 153d.); either Dominion machines are "intentionally and purposefully designed with inherent errors to create systemic fraud and influence election results," or they are not, (*Id.* ¶ 153j); either someone with a "Dominion Voting" credit card paid to shred "3,000 pounds of ballots," or they did not, (*Id.* ¶ 153p). The pattern repeats with each of Byrne's statements. The Court should hold those statements actionable, just as in *Dominion I*.

Byrne himself all but admits that his statements imply facts Dominion. Byrne repeatedly claimed that he had evidence to support his claims. (*See, e.g.*, *id.* ¶¶ 93, 153f, 153k, 153l, 153m, 153p.) Byrne claimed to have "graphs," "photographs," "hard documentary" evidence, "computer forensics," "IP traces," and "film" to support his claims. (*Id.* ¶¶ 153f, 153k, 153l, 153m, 153p.) If Byrne's touting of his "supporting evidence" proves anything, it proves that his statements were meant to express facts, not opinions.

What of the nine statements Byrne specifically argues in this section of his brief were "mere imaginative expressions and constitutionally protected suspicions"? (Mot. at 32–33.) For starters, despite Byrne characterizing them all as "challenged statements," Dominion *did not mention* (let alone sue on) four of these nine statements in its complaint. That includes the "egg that can't be unscrambled" statement, the "elite class has always hid behind black people" statement, the "talking through their hats" statement, and the "eighth grader could hack this stuff" statement.[17] (*Id.* at 32.) Byrne's arguments about those particular statements not being actionable are utterly irrelevant, since Dominion has not sued on them.

As for the other five snippets Byrne argues are non-actionable opinion, they are small parts of longer passages that contain clear, verifiable, and false assertions of fact about Dominion:

**(1) Paragraph 153a**:

- "**These guys reverse engineered the 2018 [Dallas election] irregularities, which turned out to be a hack. Dominion, Dominion ran it**. It was Dominion's technology that ran it."

- The reporter asked Byrne whether the "Trump campaign," in pursuing lawsuits "specifically about Dominion," should hire "someone who would be able to prove that they could in fact change votes for Donald Trump."  Byrne said "**Absolutely provable. We have the data, we have the data**. You do not have to worry."

**(2) Paragraph 153c**:

- In this OAN interview, the newscaster asks Byrne to tell "more about what" he has "been doing" to "**crack down on the fraud that is Dominion.**"  Byrne then states that he has "funded a team of hackers and cyber sleuths" to crack down on Dominion. All of Byrne's statements in ¶ 153c are about what he is doing to address "the fraud that is Dominion"— or at the very least, a reasonable listener could so conclude.

**(3) Paragraph 153d**:

- "**[T]he functionality built into these systems, especially Dominion, by now everyone knows the story, that it was Hugo Chavez** that wanted some election software built that

---

[17] The "eighth grader" statement, which is not in the complaint, is part of the interview excerpted in ¶ 153g. Byrne does not challenge ¶ 153g on any other grounds.

he could goon. . . . **[T]his Dominion software was built so that the election officials could use it to cheat.**"

- "**The Texas state government hired a cybersecurity group to investigate these odd facts about the Dallas election that had been managed on Dominion equipment**. That cybersecurity group went in and discovered about ten different ways the systems could be cheated, ten different ways in which the Dominion stuff is garbage. And, in fact, in Texas, outlawed it in Texas as a result of that audit. . . . **So that group was on it for two years and has had two years to reverse-engineer the way to rig an election using Dominion.**"

**(4) Paragraph 153i**:

- "Our election got hacked. . . . Hugo Chavez came to power in '98. . . . **[Venezuelan scientists] created a system that Hugo Chavez could cheat. . . . Uh, and it's been on, it's been propagating since then. They have licensed their software to Dominion**. … When you have a Dominion machine that the machine is Dominion, but the software inside is the Smartmatic and it's under licensed to them. . . . [I]t's basically **when you have a dirty politician who wants to remain in power, he can bring in Smartmatic/Dominion, know that he can cheat and keep himself in power.**"[18]

- "What was Seth Rich, before he got killed, he was doing -- he had a particular position in the DNC, that would have put him in a position to know . . . that **you can use Dominion machines to steal elections or primaries**. . . . And it was a role that I'm asserting would put him in a position to have known everything that we're now saying, that **the Dominion servers had been used in the primaries to steal from Bernie to give to Hillary**."

**(5) Paragraph 153k**:

- "**But I can tell you a Microsoft certified security guy has given us the photographs and the hard documentary or evidence of a Dominion vote counting machine tabulation machine** in a swing state that had a, has a, I mean, we have the photographs, everything has a wireless card inside it. And the forensics show that it connected to a wireless network in the thermostat of the room, there was a wireless network that connected into this machine . . . through a thermostat wireless into the wireless card on the vote counting machine. . . . **[T]hey were accessing through the internet, through a hidden port in a thermostat in the room, getting on the Dominion machine**."

These statements, like Powell's, express verifiable facts about Dominion. Either Dominion was created to cheat (in Venezuela or elsewhere), or it was not; either Dominion systems were used in the 2018 Dallas election (which Byrne claims was rigged), or they were not; either Byrne has evidence showing that Dominion machines were used to flip votes from Trump to Biden, or

---

[18] This is Byrne's only challenge to the statement in ¶ 153i.

he does not. *See Dominion*, 2021 WL 3550974, at *8 ("[E]ither Dominion was created to produce altered voting results in Venezuela for Hugo Chávez or (as Dominion alleges) it was not. . . . [E]ither state officials received such kickbacks or (as Dominion alleges) they did not."); *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 722 (S.D.N.Y. 2014) (denying motion to dismiss defamation claim where the "accusations are grounded in assertions of fact about Plaintiffs' business activities and are not framed in hyperbole, but rather purport to rely on documents that establish the existence of Plaintiffs' 'scheme.'"); *Enigma Software*, 194 F. Supp. 3d at 284 (accusations that technology company was a "deliberate scam" because it intentionally designed "ineffective" software that "generates false positives" of viruses to fool customers into buying spyware were actionable); *Thompson v. Bosswick*, 855 F. Supp. 2d 67, 80 (S.D.N.Y. 2012) (accusation that plaintiff "had been taking kickbacks from vendors" was actionable). The challenged statements are not constitutionally protected opinions.

Byrne also argues that his statements about the election being "rigged" are just "imaginative expression." (Mot. at 32.) To be clear, Dominion is not suing Byrne for making general claims that the election was rigged. Dominion is suing Byrne because he published numerous false statements asserting that the election was rigged *by Dominion*. (*See, e.g.*, Compl. ¶¶ 153d, 153g, 153n.) And even if Byrne made some hyperbolic or unverifiable statements, those statements do "not insulate the otherwise verifiable" statements he also made. *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 626 (D.C. Cir. 2001). Moreover, imaginative expression and rhetorical hyperbole are only valuable to the "free trade of ideas" when there is "a common understanding of the facts, which is undermined by provably untrue statements." *Dominion I*, 2021 WL 3550974, at *7 n.7; *see also Enigma Software*, 194 F. Supp. 3d at 286 n.19 ("As long as a publication contains at least some assertions of objective fact that, if proven false, could form

the predication for a maintainable libel action, dismissal of a complaint on the pleadings is improper." (citation and quotation marks omitted)); *cf. Milkovich*, 497 U.S. at 19 ("[T]he statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.'").

### 2.    Byrne's appeal to "context" fails; context, on its own, does not protect statements that express or imply false facts.

Byrne argues that observers would understand that his statements were opinions because they were made in the context of a public debate over a contested election. (Mot. at 33–36.)  This Court rejected an identical argument in *Dominion I*, holding that the political arena does **not** immunize demonstrably false statements:

> **[T]here is no blanket immunity for statements that are "political" in nature**: as the Court of Appeals has put it, the fact that statements were made in a "political 'context' does not indiscriminately immunize every statement contained therein." It is true that courts recognize the value in some level of "imaginative expression" or "rhetorical hyperbole" in our public debate. **But it is simply not the law that provably false statements cannot be actionable if made in the context of an election**.

*Dominion I*, 2021 WL 3550974, at *7 (quoting *Weyrich*, 235 F.3d at 626; *Milkovich*, 497 U.S. at 2). The Court also rejected the notion that commenting on matters of public concern can insulate false statements:

> [The defendant] appears to similarly argue that the First Amendment grants some kind of blanket protection to statements about "public debate in a public forum." Again, **there is no such immunity**.

*Id.* at *7 n.8.

While context can help a court or jury determine whether a statement implies a false fact about the plaintiff, context does not immunize provably false statements. *Condit*, 317 F. Supp. 2d at 367 ("While the context of allegedly defamatory statements influences the impact of the statements on the audience, ***no context gives free reign to a commentator to publish false facts***

*as if they are true*." (emphasis added)); *World Wrestling Fed'n Ent., Inc. v. Bozell*, 142 F. Supp. 2d 514, 520 (S.D.N.Y. 2001) ("The First Amendment does not protect statements that are false and defamatory even if they are made in the context of a public debate about issues of general concern."). Even statements made in op-eds and gossip columns are not automatically considered opinion. *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 699 (11th Cir. 2016) ("In short, the article's placement on the gossip page does not, standing on its own, compel finding that the factual averments found in the article must be considered to be opinion."); RODNEY SMOLLA, 1 LAW OF DEFAMATION § 6:70 (2d ed. 2021 Update) ("There is no automatic 'free pass' for statements in op-ed pages, gossip columns, or other common opinion forums.").

Byrne argues that courts "give a great deal of deference" to statements made on partisan networks, citing *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 183 (S.D.N.Y. 2020) and *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148 (9th Cir. 2021). (Mot. at 35–36.) Byrne's argument is undercut by the many cases finding that statements on partisan networks were verifiable statements of fact, not opinions.[19] He also reads too much into *Maddow* and *McDougal*. These cases hold that, in some circumstances, listeners might understand that TV personalities with established partisan agendas are more likely to make unverifiable statements of opinion. In neither decision, however, did the court hold that the context immunized a clear factual statement.

In *Maddow*, the court held that Maddow's statement that OAN "really literally is paid Russian propaganda" was not defamatory. 8 F.4th at 1160–61. Maddow made this statement in response to a *The Daily Beast* article reporting that OAN employed an on-air reporter who was

---

[19] *See, e.g.*, *Blankenship v. Napolitano*, 451 F. Supp. 3d 596 (S.D.W. Va. 2020); *Dershowitz v. Cable News Network, Inc.*, No. 20-CV-61872, 2021 WL 2621139 (S.D. Fla. May 25, 2021); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104 (2d Cir. 2010); *Duffy v. Fox News Networks, LLC*, No. 14-CV-1545, 2015 WL 2449576, at *3 (M.D. Fla. May 21, 2015).

"on the payroll of the Kremlin's official propaganda outlet, Sputnik." *Id.* at 1152. The court held that the statement was not defamatory, in part, because Maddow is a "liberal television host" and her viewers are more likely to understand that she will attempt to "persuade others" with "fiery rhetoric or hyperbole." *Id.* at 1157. The court also based its decision on Maddow's tone, the tenor of the segment, the contents of the statements, and the fact that Maddow "fully disclose[d] all relevant facts"—the contents of the article—before turning to "colorfully expressed commentary." *Id.* at 1158–59.

In *McDougal*, the court held that Tucker Carlson's statements that the plaintiff engaged in "extortion" and "blackmail" were not defamatory. 489 F. Supp. 3d at 183. The court held that the words "extortion" and "blackmail" were simply "loose, figurative, or hyperbolic language" because those words are frequently used in a derogatory, figurative sense rather than literally. *Id.* at 182. As support for its decision, the court noted that Tucker Carlson's viewers expect to hear "pitched commentary . . . with pundits debating the latest political controversies." *Id.* at 184.

In both cases, the speaker and the nature of his or her TV show, along with several other factors, provided some window into whether viewers were likely to interpret the speaker's statement as expressing a verifiable fact. Yet they were only one factor, and neither case holds that context can turn an otherwise verifiable statement of fact into an unverifiable opinion.

Byrne's statements here are not comparable to those by Maddow and Carlson. Byrne made numerous express factual assertions about Dominion, including that:

- Dominion machines used an "algorithm" to "weight one candidate greater than another." (Compl. ¶ 153j; *see also id*. ¶¶ 153o, 153n, 153q.)

- Dominion's voting machines were "built so that the election officials could use it to cheat," (*Id*. ¶ 153d; *see also id*. ¶¶ 153j, 153n, 153o, 153r.)

- Dominion's election systems were developed in Venezuela and were used "strategically & aggressively" to "rig" the 2020 election. (*Id*. ¶ 153e; *see also id*. ¶¶ 153f, 153g, 153o.)

44

- Dominion machines were hacked from China through a "thermostat." (*Id.* ¶ 153k; *see also id.* ¶ 153l.)

These statements are identical to the statements this Court previously held were provable assertions of fact. *See Dominion I*, 2021 WL 3550974, at *8 ("[E]ither Dominion was created to produce altered voting results in Venezuela for Hugo Chávez or (as Dominion alleges) it was not.").

Byrne is also not a partisan TV personality. *Maddow* and *McDougal* are particularly inapt in this case because Byrne often states that he did not vote for Trump; that he is a libertarian, not a Republican or Democrat; and that he just wants to present the truth. (*See, e.g.*, Compl. ¶¶ 153a, 153r; *see also* Mot. at 3–4, 27.) Byrne portrays himself as "an investigative and citizen journalist," not a partisan TV personality. (Mot. at 4.) Byrne made clear that his statements asserted provable facts when he told audiences that he had evidence to support his claims. (*See, e.g.*, Compl. ¶¶ 93, 153f, 153k, 153l, 153m, 153p.); *see Restis*, 53 F. Supp. 3d at 721–22 (rejecting the argument that the defendants' statements were "hyperbole" because the defendants "purport[ed] to rely on documents that establish[ed] the existence of Plaintiffs' 'scheme.'"). For all these reasons, Byrne's appeal to context fails.[20]

## **CONCLUSION**

Byrne committed to tell lies about Dominion in August 2020. He continues to tell lies about Dominion today. These lies have harmed, and continue to harm, Dominion. Like Powell's and Lindell's motions to dismiss, Byrne's motion should be denied it its entirety and discovery, including into the evidence Byrne claims to have, should proceed without delay.

---

[20] Byrne also begins to make some argument about the characteristics of his "personal blog, DeepCapture.com." (Mot. at 36.) Yet the best Byrne can do with that argument is to assert that his "personal blog had a specific brand that reasonable consumers would understand contain subjective beliefs." (*Id.*) That argument is pure *ipse dixit*, entirely divorced from the pleadings, and cannot overcome the factual nature of the defamatory statements Byrne posted on his blog.

Dated:  December 15, 2021

Respectfully submitted,

By:   */s/ Stephen Shackelford, Jr.*

Thomas A. Clare, P.C. (D.C. Bar No. 461964)
Megan L. Meier (D.C. Bar No. 985553)
Dustin A. Pusch (D.C. Bar No. 1015069)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
tom@clarelocke.com
megan@clarelocke.com
dustin@clarelocke.com

Rodney Smolla (*admitted pro hac vice*)
4601 Concord Pike
Wilmington, DE 19803
rodsmolla@gmail.com
(864) 373-3882

Justin A. Nelson (D.C. Bar No. 490347)
Brittany Fowler (*admitted pro hac vice*)
SUSMAN GODFREY LLP
1000 Louisiana Street, #5100
Houston, Texas 77002
(713) 651-9366
jnelson@susmangodfrey.com
bfowler@susmangodfrey.com

Stephen Shackelford, Jr.
(D.C. Bar No. NY0443*)*
Elisha Barron (*admitted pro hac vice*)
SUSMAN GODFREY LLP
1301 Avenue of the Americas, 32nd Fl
New York, NY 10019
(212) 336-8330
sshackelford@susmangodfrey.com
ebarron@susmangodfrey.com

Davida Brook (D.C. Bar No. CA00117)
Jordan Rux (*admitted pro hac vice*)
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
(310) 789-3100
dbrook@susmangodfrey.com
jrux@susmangodfrey.com

Stephen E. Morrissey (*admitted pro hac vice)*
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, WA  98101
(206) 516-3880
smorrissey@susmangodfrey.com

*Attorneys for Plaintiffs*

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of December 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which I understand to have served counsel for the parties:

<u>*/s/ Stephen Shackelford, Jr.*</u>
Stephen Shackelford, Jr.