**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

US DOMINION, INC., *et al.*,          )
                                      )
      Plaintiffs,          )
                                      )
          vs.          )   Case No. 1:21-cv-02131-CJN
                                      )
PATRICK BYRNE,                        )
                                      )
      Defendant.          )
_____ )

**REPLY BRIEF IN SUPPORT OF
<u>DEFENDANT PATRICK BYRNE'S MOTION TO DISMISS COMPLAINT</u>**

MCGLINCHEY STAFFORD PLLC
Robert N. Driscoll (DC Bar #486451)
Alfred D. Carry (DC Bar #1011877)
1275 Pennsylvania Avenue NW, Suite 420
Washington, DC 20004
Tel: (202) 802-9999

*Counsel for Defendant Patrick Byrne*

Dated: January 5, 2022

## TABLE OF CONTENTS

Pages

I. INTRODUCTION ........................................................................................................ 1

II. ARGUMENT ............................................................................................................... 4

  A. Dominion's Allegations of Actual Malice Fall Short ............................................ 4

    1. Dominion is a Public Official or Limited Public Figure ............................. 4

    2. Dismissal is Appropriate Where a Public Figure Has Not Pled
      Facts to Infer Actual Malice ....................................................................... 5

      a. Dominion's Allegations Do Not Show that Byrne's
        Statements were Inherently Improbable ......................................... 6

      b. The Claims Made about Dominion were Not "Cooked Up,"
        "Preconceived," or "Manufactured" by Byrne ............................ 10

      c. Dominion's Attacks on the Reliability and Credibility of
        the Claims Made against Dominion Do Not Show that
        Byrne had Obvious Reasons to Doubt Them ............................... 12

      d. Dominion's Arguments on Byrne's "Profit Motive" are
        Attenuated and Unpersuasive ...................................................... 15

      e. Dominion's Fall Back on Byrne's Refusal to Retract his
        Statements Does Not Show Actual Malice .................................. 18

  B. Some of Byrne's Statements are Also Not Actionable as Defamation ................ 20

    1. Byrne Has Satisfied the Requirements for the Fair Report Privilege
      to Apply ................................................................................................... 20

    2. The Communications Decency Act Shields Byrne from Liability ........... 22

    3. Some of the Challenged Statements Still Aren't About Dominion .......... 24

III. CONCLUSION .......................................................................................................... 25

# TABLE OF AUTHORITIES

Pages

Cases

*Abbas v. Foreign Policy Group, LLC*,
  975 F. Supp. 2d 1 (D.D.C. 2013), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015) .............................. 25

*Adelson v. Harris*,
  973 F. Supp. 2d 467 (S.D.N.Y. 2013) ...................................................................... 22

*Agora, Inc. v. Axxess, Inc.*,
  90 F. Supp. 2d 697 (D. Md. 2000) .......................................................................... 22

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................... 6

*Boley v. Atlantic Monthly Group*,
  950 F. Supp. 2d 249 (D.D.C. 2013) ........................................................................ 21

*Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*,
  138 F. Supp. 3d 1191 (D. Colo. 2015), *aff'd*, 861 F.3d 1081 (10th Cir. 2017) ......................... 4

*Campbell v. Citizens for an Honest Gov't, Inc.*,
  255 F.3d 560 (8th Cir. 2001) ............................................................................... 16

*Curling v. Raffensperger*,
  492 F. Supp. 3d 1264 (N.D. Ga. 2020) .................................................................... 11

*Dameron v. Washington Magazine, Inc.*,
  779 F.2d 736 (D.C. Cir. 1985) ............................................................................. 21

*Deripaska v. Associated Press*,
  282 F. Supp. 3d 133 (D.D.C. 2017) ......................................................................... 5

*Fair Housing Council v. Roommates.com*,
  521 F.3d 1157 (9th Cir. 2008) ............................................................................. 24

*Gertz v. Robert Welch, Inc.*,
  680 F.2d 527 (7th Cir. 1982) .............................................................................. 20

*Harte-Hanks Communications, Inc. v. Connaughton*,
  491 U.S. 657 (1989) ................................................................................. 12, 16, 19

*Hourani v. PsyberSolutions LLC*,
  164 F. Supp. 3d 128 (D.D.C. 2016), *aff'd*, 690 F. App'x 1 (D.C. Cir. 2017) ............................ 3

*Jankovic v. Int'l Crisis Grp.*,
  822 F.3d 576 (D.C. Cir. 2016) ....................................................................... 6, 12, 15, 16

*Jones v. Dirty World Entertainment Recordings LLC*,
  755 F.3d 398 (6th Cir. 2014) .............................................................................. 23

*Kahl v. Bureau of Nat'l Affairs, Inc.*,
  856 F.3d 106 (D.C. Cir. 2017) ............................................................................. 5

*Klaxon v. Stentor Electric Mfg. Co.*,
   313 U.S. 487 (1941).................................................................................... 3

*La Liberte v. Reid*,
   966 F.3d 79 (2d Cir. 2020)........................................................................ 24

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
   838 F.2d 1287 (D.C. Cir. 1988)................................................................ 25

*Lohrenz v. Donnelly*,
   350 F.3d 1272 (D.C. Cir. 2003)................................................................ 19

*Lundell Mfg. Co., Inc. v. American Broadcasting Companies, Inc.*,
   98 F.3d 351 (8th Cir. 1996) ........................................................................ 4

*McFarlane v. Sheridan Square Press, Inc.*,
   91 F.3d 1501 (D.C. Cir. 1996) ................................................... 1, 5, 6, 13

*Michel v. NYP Holdings, Inc.*,
   816 F.3d 686 (11th Cir. 2016) .................................................................... 5

*Nat'l Ass'n of Letter Carriers v. Austin*,
   418 U.S. 264 (1974)................................................................................... 12

*Nicosia v. De Rooy*,
   72 F. Supp. 2d 1093 (N.D. Cal. 1999) ............................................... 16, 22

*O'Rourke v. Dominion Voting Systems Inc.*,
   No. 20-cv-03747-NRN, 2021 WL 5449070 (D. Colo. Nov. 22, 2021) ....... 5

*Parisi v. Sinclair*, 774 F. Supp. 2d 310 (D.D.C. 2011)................................. 23

*Parsi v. Daioleslam*,
   890 F. Supp. 2d 77 (D.D.C. 2012)............................................................ 15

*Philadelphia Newspapers, Inc. v. Hepps*,
   475 U.S. 767 (1986)................................................................................... 25

*Piscatelli v. Van Smith*,
   35 A.3d 1140 (Md. 2012) .......................................................................... 21

*Reuber v. Food Chemical News, Inc.*,
   925 F.2d 703 (4th Cir. 1991) ............................................................... 4, 16

*St. Amant v. Thompson*,
   390 U.S. 721 (1968)........................................................................ 6, 13, 14

*Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*,
   330 F.3d 1110 (9th Cir. 2003) ........................................................... 12, 17

*Tah v. Global Witness Publ., Inc.*,
   991 F.3d 231 (D.C. Cir. 2021),
   *cert. denied*, 142 S. Ct. 427, 2021 WL 5043599 (Nov. 1, 2021)............... 5, 6, 10, 19

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987)................................................................... 16

iii

*Trudeau v. Fed. Trade Comm'n*,
  456 F.3d 178 (D.C. Cir. 2006) ............................................................... 12

*U.S. Dominion, Inc., et al., v. Powell, et al.*,
  Nos. 1:21-cv-0040, 1:21-cv-00213, 1:21-cv-00445,
  2021 WL 3550974 (D.D.C. Aug. 11, 2021) ........................................ 4, 12, 15, 17

<u>Statutes</u>

47 U.S.C. § 230 ......................................................................................... 22, 23

<u>Rules</u>

Fed. R. Evid. 201 .......................................................................................... 17

## I.   INTRODUCTION

A valid defamation claim by a public figure such as Dominion should be simple to plead. There should be a clearly identified published statement of *fact* by the defendant. That statement should be *about the plaintiff*. It should be *verifiably false* and capable of *defamatory meaning*— not an opinion, prediction, suspicion, or hyperbolic expression. And the statement should be made by the defendant with *actual malice*. This degree of fault is strongest when pled directly, but it can in some situations be established by inference based upon the cumulation of circumstances surrounding the statement. In either case, the inference of actual malice must be drawn solely upon information that was available to and considered by the defendant *prior to publication*. Information acquired after publication or information not considered by the defendant is not relevant. *See, e.g.*, *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1508 (D.C. Cir. 1996) (same). This is basic defamation law.

Were the foregoing principles not applicable, every factual disagreement—however rightly or wrongly contested—would essentially become an inchoate defamation claim that turns on each party's own belief in the truth or falsity of the statement and each side's support for the competing claims, without regard to the defendant's state of mind or whether the defendant was aware or even obligated to investigate the other's support at the time the statement was made. Moreover, particularly with respect to hot-button political issues and contested matters of considerable public interest, defamation cases would essentially hinge on consensus opinion. Contrary to this result, the law of defamation is not simply a "battle of the experts" where the party whose experts hold the so-called "correct" or majority view prevails. Indeed, being "wrong" or dissenting from consensus does not create a defamation claim, as the First Amendment protects errors or the minority view as vigorously as accuracies or the majority one.

Dominion's complaint and briefing contain pages and pages of mostly hand waving to

1

distract from the post-hoc nature of the facts alleged and their failure to plead what Byrne knew and was aware of at the time of his alleged statements. Dominion eschews simple pleading and chronological presentations and instead focuses on why it is "right" according to "widely publicized evidence" that came about days, weeks, or months after an alleged statement was made. (Mem. Opp. at 18.)

Throughout its complaint and briefing, Dominion asserts that various individuals or government officials—often after the alleged false statements were made—agree with Dominion about the broader questions of whether the election was "rigged" or "stolen." (Mem. Opp. at 15-18; Compl. ¶¶ 70-91.) If the mere invocation of official assurances that 'everything is fine' is sufficient to establish a presumptively "right" narrative, the deviation from which is punishable by a defamation lawsuit, then First Amendment law would surely be turned on its head.

Other times, Dominion points to surrounding newspaper clippings or other public information without alleging, beyond rank speculation, that Byrne actually knew, read, or was subjectively aware of it. (Mem. Opp. at 18; Compl. ¶¶ 56-70.)[1] Dominion essentially peddles *all* public reporting debunking claims of election fraud—however disconnected from the claims about Dominion or Byrne's awareness—to try to form some sort of unassailable consensus that is challenged at the speaker's peril. That reporting includes a *recent* court decision entered during the briefing of this very motion. (Mem. Opp. at 14 n.7.) But none of this is relevant. All

---

[1] It bears noting that some of Dominion's allegations about the supposed public record at the time are inaccurate or misleading themselves. For example, Dominion alleges that in a November 9, 2020 press conference, Georgia election official Gabriel Sterling confirmed that there were no issues with Dominion when he "rebutted inaccurate claims made about an update to the machines on the eve of the election." (Compl. ¶ 59 & n.52.) That reference by Sterling, however, was actually to poll pad software, not Dominion tabulators. In addition, the December 7, 2020 "*second* Georgia recount" that confirmed the results of the first hand recount (Compl. ¶ 79 (emphasis in original)), was conducted by machines and not by hand.

of these claims and arguments are far afield from what should be simple: What statement did Byrne make about Dominion? Why is it false and defamatory? And what evidence was actually available to and considered by Byrne to show he subjectively knew and had a high degree of awareness that his statement was false at the time he made it?

Even more frustrating than Dominion's non-chronological, expansive, and overlapping allegations is Dominion's latest contention that Byrne's motion to dismiss—which attempted to pin down and point out the weaknesses of the challenged statements—chose the wrong statements to attack, as it was one of the other cherry-picked statements, heavily isolated and without any context, that mattered. Dominion apparently views its complaint like a half full balloon that cannot be popped – the air simply moves somewhere else when it is pressed.

Below, Dominion's opposition brief will be addressed as best as it can and in good faith given the pleadings, exhibits, and other arguments Byrne is facing.[2] But to the extent that task is harder than it should be for both Byrne and the Court, the responsibility for that lies with Dominion, which is the master of its complaint and chose to ignore the short-and-plain statement requirements of Rule 8 of the Federal Rules of Civil Procedure in favor of the phone book it decided to file.[3]

_____

[2] For instance, Dominion cites to a hearing transcript from *Dominion I* that is not publicly available, and Dominion avoids producing a copy of that transcript so that the quoted portions might be assessed and put in context. (Mem. Opp. at 3.)

[3] Dominion suggests DC law applies in this matter because Byrne "repeatedly cites cases applying DC law." (Mem. Opp. at 5 n.4.) Contrary to the implication, federal courts sitting in diversity apply the forum state's choice-of-law rules to determine which state's substantive law applies. *See Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). In defamation cases, DC choice-of-law rules instruct courts to apply the law of the place where the plaintiff is domiciled and suffered reputational injury. *See, e.g.*, *Hourani v. PsyberSolutions LLC*, 164 F. Supp. 3d 128, 140 (D.D.C. 2016), *aff'd*, 690 F. App'x 1 (D.C. Cir. 2017). US Dominion Inc. is based in Colorado. (Compl. ¶¶ 14 and 28.) However, the Court need not determine the choice-

## II.   ARGUMENT

### A.      Dominion's Allegations of Actual Malice Fall Short

#### 1.      Dominion is a Public Official or Limited Public Figure

After arguing how Dominion is not a public figure in the earlier Dominion litigation, *see U.S. Dominion, Inc., et al., v. Powell, et al.*, Nos. 1:21-cv-0040, 1:21-cv-00213, 1:21-cv-00445, 2021 WL 3550974 (D.D.C. Aug. 11, 2021) (hereafter, "*Dominion I*"), the best Dominion can muster now in response to Byrne's motion to dismiss is a half-hearted attempt, buried in a footnote, to "reserve[ ] the right to argue that the proper standard is negligence." (Mem. Opp. at 6 n.5.)

There is no reason to delay ruling on this issue. "The determination of a plaintiff's status as a private or public figure is an issue of law." *Lundell Mfg. Co., Inc. v. American Broadcasting Companies, Inc.*, 98 F.3d 351, 362 (8th Cir. 1996); *Reuber v. Food Chemical News, Inc.*, 925 F.2d 703, 708 (4th Cir. 1991) (same). This finding is critical to discerning the success of a defamation complaint on dismissal because of the heightened standard of proof required for public figures, and early resolution of defamation actions remains proper. *See, e.g.*, *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 138 F. Supp. 3d 1191, 1199 (D. Colo. 2015), *aff'd*, 861 F.3d 1081 (10th Cir. 2017).

Byrne's opening brief discusses the many reasons why Dominion qualifies as a public official or limited public figure. (Mem. Supp. at 37-40.) Dominion's opposition makes no attempt to dispute them. And a spokeswoman for Dominion recently echoed and endorsed the finding of a federal judge who found that a lawsuit filed against Dominion had "been . . . an interference with the machinery of government"—that is, admitting Dominion is the machinery

---

of-law questions at this stage in the proceedings, *see Dominion I*, 2021 WL 3550974, at *7 n.6 & 24, and Byrne reserves the right to argue which state's substantive law applies.

of government.[4] There can be no doubt that Dominion is a public figure.

### 2. Dismissal is Appropriate Where a Public Figure Has Not Pled Facts to Infer Actual Malice

Dominion suggests that Byrne's actual malice arguments are mere jury questions. (Mem. Opp. at 8-9.) That is not the law. Courts routinely dismiss defamation complaints that fail to plead sufficient facts of actual malice, as courts are advised to carefully scrutinize the pleadings of public figures "to expeditiously weed out unmeritorious defamation suits" because they can threaten one's freedom of speech. *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017); *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) (explaining that the "costs and efforts required to defend a lawsuit through [expensive discovery] could chill free speech nearly as effectively as the absence of the actual malice standard altogether.").

The actual malice standard is "famously daunting" and not met easily. *Tah v. Global Witness Publ., Inc.*, 991 F.3d 231 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 427, 2021 WL 5043599 (Nov. 1, 2021) (rejecting plaintiffs' "several interlocking theories to support the allegation of actual malice"). Claims of actual malice "must be supported by plausible factual allegations sufficient to meet the standard." *Deripaska v. Associated Press*, 282 F. Supp. 3d 133 (D.D.C. 2017). "Few public figures have been able clearly and convincingly to prove that the scurrilous things said about them were published by someone with 'serious doubts as to the truth of his publication.'" *McFarlane*, 91 F.3d at 1515 (quoting *St. Amant v. Thompson*, 390 U.S. 721,

---

[4] Rosalind S. Helderman, *Judge orders two lawyers who filed suit challenging 2020 election to pay hefty fees: 'They need to take responsibility'*, Washington Post, Nov. 23, 2021, *available at* https://www.washingtonpost.com/politics/they-need-to-take-responsibility-federal-judge-orders-hefty-fees-assessed-against-two-lawyers-who-filed-suit-challenging-2020-election/2021/11/22/b7ff5392-4be7-11ec-b0b0-766bbbe79347_story.html (last visited Jan. 5, 2022) (referring to the decision in *O'Rourke v. Dominion Voting Systems Inc.*, No. 20-cv-03747-NRN, 2021 WL 5449070, at *9 (D. Colo. Nov. 22, 2021), which ordered two Colorado lawyers who filed an election-result challenge to pay nearly $187,000 to defray the legal fees incurred).

731 (1968)). Accordingly, dismissal is appropriate where a complaint fails to plead sufficient facts to permit a reasonable inference of actual malice. *See, e.g.*, *Tah*, *supra*.

Dominion argues its allegations are sufficient under the reckless disregard prong for establishing actual malice. (Mem. Opp. at 6.) Yet none of the interlocking theories advanced by Dominion, alone or together, move their scienter claims "from conceivable to plausible" to satisfy the high bar for actual malice. *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009). And one should not mistake the bulk of Dominion's pleadings for probative and sufficient pleading.[5]

### a.    Dominion's Allegations Do Not Show that Byrne's Statements were Inherently Improbable

Implicitly acknowledging that it is bereft of any direct evidence of any actual malice by Byrne, Dominion relies chiefly on the argument that Byrne's statements were so "inherently improbable" on their face that this Court can infer reckless disregard from the statements alone. Leaving aside the conceptual problem of Dominion arguing that the statements at issue are simultaneously (1) so lacking in plausibility that no rational person would believe them and only a reckless person would utter them because their incredulity is apparent on their face, and yet (2) plausible enough to cause over a billion dollars in damages, presumably because people believed an obviously false statement and thus caused Dominion reputational harm—Dominion ignores the inherently prefix to the 'inherently improbable' standard, and simply clings to arguing over the truth of the statements rather than whether they were "*inherently* improbable" when made.[6]

---

[5] No matter how large, any number multiplied by zero is still zero. *See McFarlane*, 91 F.3d at 1516, *accord Jankovic*, 822 F.3d at 597.

[6] In *St. Amant*, 390 U.S. at 732, the Supreme Court observed that a profession of good-faith belief in the statement may be undermined if the plaintiff can show, with clear and convincing clarity, that when the statement was published, the defendant was subjectively aware that it was highly probable that the statement was so inherently improbable that only a reckless person would have put it into circulation.

For example, Dominion claims the following statements were so inherently improbable that only a reckless person would make them:

- Dominion machines used an "algorithm" to "weight one candidate greater than another." (Compl. ¶ 153j; *see also* Compl. ¶¶ 153o, 153n, 153q.)

- Dominion's voting machines were "built so that the election officials could use it to cheat." (Compl. ¶ 153d; *see also* Compl. ¶¶ 153j, 153n, 153o, 153r.)

- Dominion's election systems were developed in Venezuela and used "strategically & aggressively" to "rig" the 2020 election. (Compl. ¶ 153e; *see also* Compl. ¶¶ 153f, 153g, 153o.)

- Republican officials took bribes to install "Dominion software." (Compl. ¶ 153f.)

- Dominion machines were hacked from China through a "thermostat." (Compl. ¶¶ 153k, 153l.)

- A fake spreadsheet with fake MAC addresses and irrelevant IP addresses "documented" "hundreds of foreign entities (many in China)" that interfered with Dominion machines during the 2020 election. (Compl. ¶ 153o.)

(Mem. Opp. at 10.) But it is clear from a close reading of these statements that, separate and apart from any analysis of their truthfulness, they are not so "*inherently* improbable" as alleged.

Consider that Dominion voting machines can be modified for use in ranked-choice voting (RCV) elections, in which an algorithm is used to weight one's preferential voting, among other various scoring methods that a particular contest may prescribe, to select the winning candidate. Of course one would hope that such features would not be used in a non-RCV election and that any such algorithms that could be enabled would not be employed by users or election officials to manipulate the results or "cheat." But whether such functionality was or wasn't actually enabled, the provision of RCV functionality by Dominion machines and their software—which

Dominion neither rejects nor denies (*see generally* Compl.)—means the first three allegations above are not inherently improbable.[7]

Moreover, consider what happened in Antrim County, Michigan. Antrim County is a Republican-leaning county. This county used Dominion voting machines (Compl. ¶ 51), and on election night, the county reported in its unofficial totals that Biden had won 7769 to 4509. (Compl. ¶ 55 n.49 (citing the Michigan Senate Report).)[8] Two days later, on November 5, the county issued "corrected" unofficial results, this time reporting that Trump won 9783 to 7289. This correction increased the total vote tallies for Trump by roughly 5000 votes. But then on November 6, the county reported yet another election result that adjusted the vote totals again with Trump winning 9748 to 5960.

Understandably, the fluctuating vote totals raised concerns. In response, Michigan Secretary of State Jocelyn Benson released a statement on November 6 that said Antrim County had misreported totals due to user error in the compilation of unofficial results by an Antrim County clerk. (Compl. ¶ 51 n.39 (citing Secretary of State Benson's statement).)[9] As part of some subsequent litigation commenced by a Michigan resident, Russell Ramsland and his company Allied Security Operations Group (ASOG) authored a report after inspecting the

---

[7] Dominion's allegations concerning statements linking Dominion to Smartmatic and/or Venezuela and Hugo Chavez are also not inherently improbable for the reasons mentioned in Byrne's opening brief (Mem. Supp. at 45-46), which Dominion does not answer.

[8] *See* Michigan Senate Oversight Committee, *Report on the November 2020 Election in Michigan* (Apr. 9, 2021), at 15-16, *available at* https://misenategopcdn.s3.us-east-1.amazonaws.com/99/documents/20210623/SMPO_2020ElectionReport.pdf (last visited Jan. 5, 2022).

[9] *See* The Office of Secretary of State Jocelyn Benson, *False claims from Ronna McDaniel have no merit* (Nov. 6, 2020), at https://www.michigan.gov/sos/0,4670,7-127-93094-544676--,00.html (last visited Jan. 5, 2022).

Antrim County Dominion machines that concluded that the erroneous initial vote totals were a result of error in Dominion's software. A Michigan state court judge ordered that the Ramsland report be released to the public on December 14, 2020.[10] Byrne made the Ramsland report available on his blog that same day. (Compl. ¶ 153j.)

The point here is not that the challenged statements and allegations made in the Ramsland report are actually true, but that the idea that the voting machines could have been manipulated or used to switch votes intentionally is not inherently improbable. Indeed, the state's explanation proves this point. The fact that changes in vote totals occurred at all because of user error means that manipulation is not inherently improbable, as what can happen unintentionally can just as easily happen intentionally.

As for the alleged statement that Republican officials took bribes, this statement isn't even about Dominion. (Compl. ¶ 153f.)[11] More importantly, accusing unnamed public officials of accepting bribes is not an inherently improbable proposition. Rooting out public corruption by government officials is a top criminal investigative priority of the Justice Department.[12]

Similarly, given that Congress and the Intelligence Community both thought that risk of foreign interference with vote counting processes was sufficiently credible to hold hearings and issue warnings regarding such interference heading into the 2020 election, respectively, specific allegations that a foreign government might have "hacked" a US election, via whatever means,

---

[10] Paul Egan, *Judge orders release of report examining Antrim County vote tabulators*, Detroit Free Press (Dec. 14, 2020), *available at* https://www.freep.com/story/news/politics/elections/2020/12/14/judge-orders-release-report-examining-antrim-county-vote-tabulators/6537004002/ (last visited Jan. 5, 2022).

[11] *See infra* section B.3.

[12] The Justice Department has a dedicated "Public Integrity Section" that exclusively investigates and prosecutes criminal abuses of the public trust by government officials.

are not inherently improbable. For instance, a poll taken two years after the 2016 election found

that 66% of Democratic voters believed that Russian manipulation of vote tallies was the cause

of President Trump's election.[13] In addition, FBI Director Christopher Wray testified before

Congress that Russia has made "very active efforts to influence our elections in 2020."[14]

      Given that the risk of foreign manipulation of vote counting has been warned of and that

a substantial portion of the population believes that it in fact has already happened, whatever the

ultimate truth of the matter, allegations of foreign interference (Compl. ¶¶ 153k, 153l, and 153o)

are not inherently improbable.[15]

            **b.**      **The Claims Made about Dominion were Not "Cooked Up,"**
                       **"Preconceived," or "Manufactured" by Byrne**

      Dominion also pushes back with a rather tortured argument that Byrne "preconceived"

the many claims made about Dominion. At the outset, the D.C. Circuit recently rejected any

inference to be drawn from a defendant's alleged preconceived story line as such accusations do

"little to show actual malice." *Tah*, 991 F.3d at 241. Even if a "preconceived narrative" had any

bearing on the actual malice standard, however, Dominion's allegations do not pass muster.

---

[13] Kathy Frankovic, YouGovAmerica (Mar. 9, 2018), *available at* https://today.yougov.com/topics/politics/articles-reports/2018/03/09/russias-impact-election-seen-through-partisan-eyes (last visited Jan. 5, 2022).

[14] Devlin Barrett, *FBI director affirms Russia's aim to 'denigrate' Biden ahead of election*, Washington Post (Sept. 17, 2020), *available at* https://www.washingtonpost.com/national-security/wray-fbi-election-security-threats-hearing/2020/09/16/4461526e-f869-11ea-a275-1a2c2d36e1f1_story.html (last visited Jan. 5, 2022).

[15] Dominion also misconstrues Byrne's arguments concerning the alleged "**misleading photograph**." Dominion initially complained that the posted photograph of Dominion boxes with Made in China stamped on the side, accompanied by a statement from Byrne that "Dominion machines are made in China," was misleading and inherently improbable because the boxes only contained transport bags. (Compl. ¶¶ 99 and 153o.) However, Dominion's own pleading acknowledges that some parts are in-fact manufactured in China and attempts to knock down an argument to create a supposed jury question that Byrne did not make. (*Compare* Mem. Supp. at 43-45, *with* Compl. ¶ 99 and Mem. Opp. at 19 n.8.)

Dominion attempts to accuse Byrne of inventing the claims against Dominion, committing to a preconceived narrative "as early as August 2020" by hiring Russel Ramsland and Doug Logan. (Mem. Opp. at 15-16). This is not true. Still, in August 2020, the integrity of electronic voting machines generally and Dominion's technology in particular had already been the subject of criticism and election integrity concerns before Byrne uttered his first statement.

Byrne did not fabricate that there were "multiple hardware and software issues" that "raise[d] concerns about whether" Dominion's voting system "is safe from fraudulent or unauthorized manipulation[.]" The Texas Secretary of State found that in January 2020 after a two-day examination of Dominion's system by six experts. (Mem. Supp. at Ex. C3.) Byrne did not sound the cybersecurity alarms about foreign governments interfering or hacking election systems. U.S. intelligence agencies did that. (Mem. Supp. at Ex. A11.) Byrne did not cook up the fears of manipulation or abuse given the ability of voting machines to connect to the internet. Congress convened a hearing in January 2020 seeking testimony from the voting machine makers to examine that. (Mem. Supp. at Ex. A12.) And Byrne did not fabricate the security concerns in Dominion's voting machine technology. Various experts opined on that, and these experts were later credited by Judge Totenberg of the Northern District of Georgia. *See Curling v. Raffensperger*, 492 F. Supp. 3d 1264, 1279 (N.D. Ga. 2020) (discussing the expert testimony on how Dominion's system remained vulnerable to a "cyber-attack . . . causing the swapping or deletion of specific votes cast."). Frankly, no reasonable person could conclude that Byrne invented the "narrative" that the public should be skeptical or suspicious about Dominion's voting technology and the 2020 election results given the many known vulnerabilities about Dominion's technology as found in the *Curling* litigation, and this Court is not required to accept plaintiff's unreasonable conclusions or unwarranted inferences, especially when they are so

sharply contradicted by the facts and record. *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006).

In addition, even if Byrne had a jaundiced view of Dominion or voting machine technology when funding "a team of hackers and cyber sleuths" to look into everything (Mem. Opp. at 24; Compl. ¶ 153c), actual malice does not mean bias. *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1118-19 (9th Cir. 2003) ("Actual malice is not bias."). "'Ill will toward the plaintiff, or bad motives, are not elements of the *New York Times* standard.'" *Id.* (quoting *Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 281 (1974)); *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 666 n.7 (1989) ("actual malice may not be inferred alone from evidence of personal spite, ill will or intention to injure"). Further, spending money on research is not inconsistent with a pursuit of the truth and is not evidence that an individual acted with actual malice. *See, e.g.*, *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576 (D.C. Cir. 2016) ("concot[ing] a pre-conceived storyline" is "not antithetical to the truth[ ]").[16]

### c. Dominion's Attacks on the Reliability and Credibility of the Claims Made against Dominion Do Not Show that Byrne had Obvious Reasons to Doubt Them

Dominion next attacks the reliability of some of Byrne's sources to show Byrne acted recklessly in publishing his statements. In this regard, Dominion argues it alleged "specific, serious, [and] facially apparent" controversies from which the Court can infer Byrne had an obvious reason to doubt. (Mem. Opp. at 14.) However, these allegations about the reliability and

---

[16] Dominion appears to argue that the Court adopted Dominion's preconceived narrative arguments when denying the Powell motion to dismiss in *Dominion I*. (Mem. Opp. at 15.) But the passage from *Dominion I* marshalled by Dominion for support is simply a recitation of Dominion's own argument in that case, not a determination of the Court. That is, the Court simply restated Dominion's argument as follows: "Dominion contends it has alleged . . . [Powell] intentionally lied about and fabricated evidence to support a preconceived narrative[.]"). *See Dominion I*, 2021 WL 3550974, at *10.

credibility of Byrne's sources are insufficient to permit such an inference. At most, Dominion's complaint alleges the existence of publicly available information that would tend to cast doubt on the claims these sources were making had Byrne known about or investigated such information. But "[r]ecklessness 'is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.'" *Fairfax*, 2 F.4th at 293 (quoting *St. Amant*, 390 U.S. at 731). Further, actual malice is determined by the vantage point of the defendant when the statement was made, *see McFarlane*, 91 F.3d at 1508 ("the inference of actual malice must necessarily be drawn solely upon the basis of the information that was available to and considered by the defendant prior to publication"), and much of the publicly available information cited by Dominion was not even available or known to Byrne prior to publication.

For example, Dominion asserts that "***The Conspiracy Theorist***" Russel Ramsland of ASOG lacks even "basic familiarity with voting machines and election security." Even if true, this only implies that *Ramsland* knew the falsity of his claims, not Byrne. Dominion also contends that the Ramsland report had been "widely debunked, including by Republican officials." (Mem. Opp. at 11.) Yet, the "public sources" Dominion points to include newspaper reports from December 2020, for which there is no well-pled allegation that Byrne read or was aware of prior to his publications. Dominion also cites a press release by Republican Michigan State Senator Ed McBroom in June 2021 that post-dates Byrne's alleged publications, a statement from then-Attorney General Barr, and other pieces that recycle the statements from Michigan Secretary of State Benson. (Compl. ¶¶ 51-57, 78.) Being at odds with the "official story" is not actual malice. Further, the most these allegations can amount to is a claim that had Byrne acted more reasonably and investigated more diligently, he might have questioned

13

Ramsland's claims. Again, that is not actual malice. *See St. Amant*, 390 U.S. at 731.

Dominion's allegations regarding Powell and Giuliani are equally inadequate. (Mem. Opp. at 14.) Here, Dominion insists that the attorney sanctions against Powell and Giuliani last month in December 2021 is probative of Byrne's state of mind months earlier because these sanctions somehow confirm that their claims and the affidavits they filed in their post-election lawsuits "had been fabricated." (Mem. Opp. at 14 n.7.) Nothing about this shows how Byrne must have known that Powell and Giuliani—experienced attorneys and President Trump's lawyers—were obviously dubious sources.

As for "***The Convicted Felon***" Edward Solomon, who Byrne described as a "clear-speaking mathematician" (Mem. Opp. at 12), Dominion alleges Solomon is unreliable because he's a carpenter, his LinkedIn profile shows he didn't graduate from university, and court records show he pled guilty to criminal sale of a controlled substance. (Compl. ¶¶ 101, 153n.) In Dominion's view, contrary to common sense, a LinkedIn profile is always current and tells the whole story about someone, and an ex-criminal is forever disqualifying. Even so, when was Byrne allegedly made aware of this? Dominion asserts it informed Byrne about this via a March 2021 denial letter that was sent months after Byrne shared on his blog the allegedly false video of Edward Solomon. (*Compare* Compl. ¶ 101 *with* Compl. ¶ 153n.)

With regard to "***The Treasure Hunter***" Jovan Pulitzer (Mem. Opp. at 13), Dominion asserts his claims about a Dominion machine in Georgia being accessed from China through a thermostat were obviously unreliable because Georgia's Secretary of State publicly stated Pulitzer's claims were false on December 30, 2020, after Byrne's statement on December 22. (*Compare* Compl. ¶ 102, *with* Compl. 153k.)

The same problem plagues Dominion's allegations about "***The Military Intelligence Court Dropout***" Josh Merritt. (Mem. Opp. at 13.) When Byrne discussed and made the Merritt affidavit available on his blog in full in November 2020, his credibility and affidavit were not in dispute.[17]

Dominion finally attempts to assert that Byrne's experience and education means he should have known better; that he should have known these sources were obviously unreliable. (Mem. Opp. at 14.) But this argument is tantamount to finding actual malice based on an inadequate investigation or some objective standard, which is emphatically impermissible. "Even highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by reasonable publishers does not establish actual malice." *Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 81 (D.D.C. 2012). Relatedly, a defendant's objective educational background and experience is not and cannot be a proper measure or proxy for pleading, clearly and convincingly, that the defendant actually harbored subjective doubt.[18]

### d.      Dominion's Arguments on Byrne's "Profit Motive" are Attenuated and Unpersuasive

Despite having no connection to any false defamatory statement he allegedly made,

---

[17] Dominion's pleading also admits that Merritt didn't "distance[ ] himself" from his affidavit until after Byrne's publication. (Mem Opp. at 13 (citing Compl. ¶ 5).)

[18] Although this Court referred in *Dominion I* to Powell's status as counsel in the election-related lawsuits when denying her argument on dismissal that she could not have acted with a high degree of awareness of the probable falsity of her claims because she relied on sworn affidavits that supported her statements, that decision relied "especially" on Powell's professional role in authoring and helping create the sworn affidavits in question. *See Dominion I*, 2021 WL 3550974, at *10. *Dominion I* did not alter the high standard to which public plaintiffs are held. A speaker's failure to meet an objective standard of reasonableness is insufficient. Actual malice is not measured by what a fictional person standing in the defendant's shoes knew or should have known. Actual malice is a subjective test. The speaker must have actually "harbored subjective doubt." *Jankovic*, 822 F.3d at 589.

15

Dominion argues Byrne's real purpose in discussing the 2020 election and Dominion's role in it was to eventually capitalize on those statements months later. The argument fails.

To be sure, profit motive *might* be persuasive under certain circumstances, but a plaintiff cannot "show actual malice in the abstract; they must demonstrate actual malice in conjunction with a false defamatory statement." *Tavoulareas v. Piro*, 817 F.2d 762, 794 (D.C. Cir. 1987). Dominion does not link Byrne's purported profit motive to any of his allegedly false defamatory statements. (*See generally* Compl. ¶ 153.)

Further, evidence of a profit motive should be considered with caution as allowing a profit motive to "strip communications of the otherwise available constitutional protection" would render the *New York Times* standard a dead letter. *Harte-Hank*, 491 U.S. at 667. As such, profit motive is rarely relevant to show actual malice. *See, e.g.*, *Fairfax*, 2 F.4th at 286 (finding that even if CBS had a self-serving profit motive and that motive can be relevant to the actual malice inquiry, "that does not support an inference that CBS seriously doubted the truth of the women's accusations against Fairfax."); *Reuber*, 925 F.2d at 716 ("evidence of a defendant [publishing] material to increase its profits does not suffice to prove actual malice."); *Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560, 570 (8th Cir. 2001) ("Evidence of a defendant's ill will, desire to injure, or political or profit motive does not suffice."); *Jankovic*, 822 F.3d at 596 (an ulterior motive, including profit motive, is insufficient to support a finding of actual malice); *Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1109 (N.D. Cal. 1999) (the "[e]conomic interests of the defendant . . . cannot serve as a basis for actual malice," nor do motivations of a desire to advance one's career).

Dominion relies heavily on two cases for its profit motive claims that are easily distinguishable from the facts here. In one, the defendant had a financial motive for rigging a

safety test, the results of which would directly affect its revenue within a competitive market involving plaintiff. *See Suzuki*, 330 F.3d at 1136. In the other, the defendant told audiences to purchase his company's products at the same time as he made his alleged defamatory statements. *See Dominion I*, 2021 WL 3550974, at *13 (offering promotional codes tied to defamatory remarks and stating that appealing to Trump supporters was needed as "good for business").

Here, the connection between Byrne's statements and the alleged profit motive is far more tenuous. He is not a competitor of Dominion interested in siphoning away customers. He did not make any false and defamatory statements about Dominion in conjunction with a clear financial motive. There's no allegation that Byrne even needed a profit. Simply put, Dominion's argument that "Byrne has profited, and continues to profit" from his statements about Dominion is not persuasive. (Mem. Opp. at 20.)

Consider Byrne's alleged profit source based on prior Overstock holdings in blockchain voting technology. First, Byrne sold all of his Overstock holdings prior to the challenged statements being made.[19] Second, if Byrne was motivated by a desire to profit from blockchain technology, why would he promote "that the U.S. should use only either blockchain *or paper ballots*," or comment that "I think our society needs to go to blockchain voting systems *or we need to go back to paper*"? (Compl. ¶ 119 & n.131 (emphasis added.))[20] Third, the idea that Byrne would make these statements with a corrupt motive to make money off of them later—that is, *if* the government uses blockchain technology for elections—is hardly convincing and runs

---

[19] Although outside the pleadings, Byrne's divesture is evidenced by public SEC filings and a federal court opinion that are appropriate for judicial notice. Fed. R. Evid. 201(b)(2). Dominion offers no argument for why these sources cannot be trusted.

[20] These comments were made in June 2021 (Compl. ¶ 119 & n.131)— months after Byrne's last blog post on February 4, 2021 (Compl. ¶ 153p) and self-published book on February 17, 2021 (Compl. ¶ 153q), and are linked in no way by Dominion to Byrne's film that aired just days later.

headlong into the many cases that hold an abstract or general profit motive is not sufficient to show actual malice. If the converse were true, then virtually every newspaper would have an actionable profit motive because they publish articles to make money.

Next, consider Byrne's alleged profit source based on sales of his book and film. For any profit motive to work, the motive must necessarily exist prior to the statement. Where in the Complaint does Dominion allege that Byrne even intended to publish a book or make a film about Dominion, or that he intended to profit from either? It doesn't and in fact states the opposite. In a blog post, Byrne indicated how he never intended to sell his book—which by the way is admittedly duplicitous of the free blog series—for a fee, much less profit:[21]

> Why am I charging $4.99? I started off expecting simply to put it up online for free as a pdf. A friend convinced me otherwise that it will mean more to more people if it has a price, both domestically and around the world. I accepted his argument. But I priced it as low as a serious book can go. And just so you know, the activities I mention in this book cost me about $1.5 million, and the 15 year DeepCapture project has cost me about $40 million.

(*See* Compl. ¶ 153q & n.171, and Compl. Ex. 368.)[22]

### e. Dominion's Fall Back on Byrne's Refusal to Retract his Statements Does Not Show Actual Malice

Lastly, Dominion maintains that Byrne acted with actual malice by ignoring the so-called "contradictory evidence" in its written denials that demanded a retraction. (Mem. Opp. at 19.)

---

[21] At paragraph 153q, Dominion pleads that Byrne's self-published book simply repackaged all the same alleged "false statements about Dominion from his January 27, 2021 , January 31, 2021, and February 4, 2021 blog posts[.]" (Compl. ¶ 153q.)

[22] The same problems afflict the $5 monthly "subscription fee"—an allegation that's based on a May 2021 Yahoo.com article. (Compl. ¶ 125 & n.137.) But date aside, more questions remain. Is the content on the fee-based website even about Dominion? The Complaint doesn't say. (*Id.*) As for the Yahoo article, it appears the content on the fee-based website is about election fraud generally. (*Id.*) More critically, the article adds that "Many of the videos used in Byrne's members-only posts *are available elsewhere free* and often in better quality," which further dooms Dominion's profit motive claims. (*Id.* (emphasis added).)

This argument fails. Denials do not constitute evidence of actual malice as a matter of law. Denials do not provide "obvious reasons" to doubt the veracity of a publication. *Lohrenz v. Donnelly*, 350 F.3d 1272, 1285 (D.C. Cir. 2003). "'Denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.'" *Id.* at 1285 (quoting *Harte-Hanks*, 491 U.S. at 691 n.37).

Just last year in *Tah*, the D.C. Circuit had occasion to revisit the probative value of written denials, and it again underscored—over the solitary dissent of Senior Judge Silberman that Dominion champions here—that a publisher "need not accept denials, however vehement" as a matter of law. *Tah*, 991 F.3d at 242, *cert. denied*, 142 S. Ct. 427, 2021 WL 5043599.

In *Tah*, two former Liberian officials alleged that Global Witness, an international human rights organization, published a report that falsely implied they had accepted bribes. The district court dismissed the complaint for failing to plausibly allege actual malice. On appeal, the circuit court affirmed. Tah, represented by the same counsel as Dominion, then petitioned the Supreme Court for a writ of certiorari arguing that the circuit's decision that a publisher "need not accept denials" was error. *See* Pet. Cert., 2021 WL 3209835 (Jul. 26, 2021). Tah repeated the argument—which Dominion similarly advances here—that the letters sent to Global Witness were not "mere denials" but instead painstakingly-detailed explanations and evidence that refuted Global Witness's claims. *Id.* In Tah's view, "these were communications that led to a plausible inference that Global Witness was guilty of purposeful avoidance of the truth." *Id.* However, the D.C. Circuit expressly rejected this argument, *see Tah*, 991 F.3d at 242 ("need not accept denials, however vehement"), and the Supreme Court ostensibly did too when it denied the petition without any noted dissent. *See* Cert. Denied, 142 S.Ct. 427, 2021 WL 5043599.

19

**B.**     **Some of Byrne's Statements are Also Not Actionable as Defamation**

      **1.**     **Byrne Has Satisfied the Requirements for the Fair Report Privilege to Apply**

Dominion argues that Byrne is not protected by the fair report privilege because he "does not dispassionately report on the [Josh Merritt] affidavit, but strongly endorses it . . . and uses it to support his own false conclusions" in his blog post. (Mem. Opp. at 22.) For support, Dominion cites a case out of context in which the Seventh Circuit observed that the privilege under Illinois law does not apply where the government record is "merely part of one's research and is used to support an assertion not made in the public document[.]" *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 536 (7th Cir. 1982).

In his affidavit, Merritt stated under penalty of perjury that he "was an electronic intelligence analyst under 305th Military Intelligence," and that it was his "professional opinion" based on the information presented, that "Dominion Voter Systems and Edison Research have been accessible and were certainly compromised by rogue actors, such as Iran and China. By using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, these organizations neglectfully allowed foreign adversaries to access data and intentionally provided access to their infrastructure in order to monitor and manipulate elections, including the most recent one in 2020[.]" (Compl. ¶ 153e; *see also* Byrne's Mem. Supp. at Ex. B9.)

Dominion would have it that the fair report privilege is not available to Byrne because he commented to his blog readers that they should, "Download this fine, heavily-documented affidavit from a Military intelligence analyst[.]" (*Id.*; Compl. ¶ 153e.) Contrary to Dominion's claims, the fair report privilege does not disallow a defendant from liking the content of government records or commenting on them. *See, e.g.*, *Boley v. Atlantic Monthly Group*, 950

F. Supp. 2d 249, 259 (D.D.C. 2013) (concluding that the article was protected by the fair report and fair commenting privilege, even though the defendant characterized the plaintiff as "evil" and a "warlord" and further opined that the arrest and charging of plaintiff was a "good thing"); *see also Piscatelli v. Van Smith*, 35 A.3d 1140, 1153 (Md. 2012) (adding that "derogatory opinion based on privileged statements of fact" are protected).

Dominion would also have it that hyperlinking directly to an official court document does not satisfy the attribution requirement without providing the case caption and precise court the document was filed in. (Mem. Opp. at 22.) Dominion cites no authority for this proposition. Dominion also does not dispute that Merritt affidavit was actually filed in court. Still, Dominion appears to claim that "most readers will have no idea" that it "was filed in court" (*id.*), even though the document plainly states on each page in blue conspicuous letters "Filed." This is a bizarre argument.

In determining whether the attribution requirement has been met, the relevant inquiry is whether "the average reader would be [ ]likely to understand the article (or the pertinent section thereof) to be a report on or summary of an official document or proceeding. It must be apparent either from specific attribution or from the overall context that [it] . . . draw[s] upon official documents or proceedings." *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985).

Byrne hyperlinked to the affidavit itself, publishing the court document verbatim and in full. *Dameron*, 779 F.2d at 739 (permitting dissemination of an official record "whether verbatim or in fair summaries"). When hyperlinking to this court document, Byrne signaled to the reader that the hyperlink connects one to the affidavit itself—*i.e.*, "Download this . . . affidavit[.]" (Compl. ¶ 153e.) Affidavits rarely serve purposes outside of court or other official proceedings.

And on every page of this affidavit, the document is file-stamped with a unique electronic document stamp that identifies the federal court case number, ECF document number, PageID number, exact filing date, and page number:

Case 2:20-cv-13134-LVP-RSW   ECF No. 1-15, PageID.631   Filed 11/25/20   Page 1 of 17

(*See* Mem. Supp. at Ex. B9.) The average reader would understand that it was an official court document filed in court. Indeed, the federal judiciary has been using PACER and this customary header information for at least the past 20 years. Moreover, the "hyperlink is the twenty-first century equivalent of the footnote for purposes of attribution in defamation law, because it has become a well-recognized means for an author or the Internet to attribute a source." *Adelson v. Harris*, 973 F. Supp. 2d 467, 484 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017). Byrne has adequately fulfilled the requirement of proper attribution to a government source.[23]

### 2.       The Communications Decency Act Shields Byrne from Liability

Dominion does not deny Twitter is an "interactive computer service." Dominion does not deny Byrne is a "user" of that interactive computer service. Dominion does not deny that the CDA immunizes "users" of an interactive computer service, preempting all state laws to the contrary, to include defamation law. *See* 47 U.S.C. §§ 230(c)(1) and (e)(3). And Dominion does

---

[23] Undeterred, Dominion contends that the privilege is not available to Byrne with respect to the rest of the "lengthy" statements made in his blog post. (Mem. Opp. at 21.) Dominion does not bother to identify which of the statements in this blog post are actionable and why. However, as indicated in Byrne's opening brief, the contextual clues in this blog post show that these statements and others are Byrne's constitutionally protected opinions based on fully disclosed documents and facts that readers are free to accept or reject based upon their own independent evaluation. *See, e.g.*, *Adelson*, 973 F. Supp. 2d at 485 (discussing how hyperlinks can transform a statement into constitutionally protected opinion); *Nicosia*, 72 F. Supp. 2d at 1093 (defendant's assertion on her web-site, that plaintiff had embezzled funds from third parties, was not defamatory; defendant adequately disclosed, via hyperlinks, facts underlying her conclusion); *Agora, Inc. v. Axxess, Inc.*, 90 F. Supp. 2d 697, 704-05 (D. Md. 2000) (dismissing defamation claim based in part on facts disclosed in hyperlinked documents).

not deny that a court "may consider CDA immunity on a 12(b)(6) motion[.]" *Parisi v. Sinclair*, 774 F. Supp. 2d 310, 316 (D.D.C. 2011). Its sole contention is that Byrne does not qualify for the immunity because he is an "information content provider." (Mem. Opp. at 27-29.) Dominion misunderstands the defined term.[24]

Consider the following analogy that distills Dominion's argument: John Doe pays a doctor to research the efficacy of covid vaccines. The research is allegedly flawed. The New York Times publishes the doctor's research in an article, circulating it online in a tweet. John Doe retweets the NYT tweet of the article. John Doe did not create or develop the NYT tweet or article. But according to Dominion, John Doe is still liable as its content provider.

No, an information content provider is not anyone under the sun who may have contributed to information that found its way into allegedly unlawful online content. It does not include ancillary persons who may have encouraged, funded, or helped develop information found in allegedly unlawful online content. In other words, a person only loses immunity under the CDA if he creates or develops, in whole or in part, the *specific* online content alleged to be unlawful. *See Hill v. StubHub, Inc.*, 727 S.E.2d 550, 558-61 (N.C. App. 2012) (after carefully surveying the approximately 300 reported decisions addressing section 230 immunity claims in federal and state courts, all of which, but for a handful, found the defendant was entitled to immunity from liability, the appellate court observed that two issues were clear: (1) section 230 must focus on the "specific content alleged to be unlawful;" and (2) "material contribution" requires much more than encouragement of the unlawful material or assent).[25]

---

[24] *See* 47 U.S.C. § 230(f)(3) (defining "information content provider").

[25] *Compare also Jones v. Dirty World Entertainment Recordings LLC*, 755 F.3d 398, 403-06, 414 (6th Cir. 2014) (rejecting plaintiff's claims that the defendant "theDirty.com" was responsible for defamatory user comments because it encouraged users to post gossip; "an encouragement test would

Byrne did not author or co-author, create or co-create, develop or co-develop, the specific allegedly unlawful tweet or content titled *Georgia Tabulating Machine Sent Results to China.* Another did – the Thinking Conservative ". . . via @TnkConservative" (Compl. ¶ 153m) created the allegedly unlawful tweet and content, and Byrne merely retweeted it. Dominion's remaining arguments regarding the caption in the retweet (Mem. Opp at 28) rest on state-law theories and concepts like the "defamatory gist of what Byrne himself said"—*i.e.*, "I vouch for this"—which are preempted by the CDA and, contrary to Dominion's briefing, are not even remotely close to the facts at issue in *La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020).[26]

### 3.    Some of the Challenged Statements Still Aren't About Dominion

Dominion acknowledges that Byrne's statements were not always about Dominion, but rather "elites," "left elites," or other unnamed "election officials." (Mem. Opp. at 25 (citing Compl. ¶ 153f, and ¶ 153k)), and yet Dominion still doubles down on its arguments that draw unreasonable inferences and mischaracterize Byrne's statements that are not about Dominion.

For example, Dominion argues that Byrne's statement "[t]he election officials **and the machinery** is what cheated" "clearly" impugns Dominion, not just the election officials. (Mem. Opp. at 25.) Dominion assumes that "machinery" refers to them, but put in context, it refers to

---

inflate the meaning of 'development' to the point of eclipsing the immunity from publisher-liability that Congress established."), *with Fair Housing Council v. Roommates.com*, 521 F.3d 1157, 1167-68 (9th Cir. 2008) (holding that the defendant Roommates.com qualified as the content provider because it "materially contributed" to the illegality of the online content provided by others; it developed the online form with pre-populated answers for subscribers to use to create the unlawful online content).

[26] There, a social media activist posted a photo showing the plaintiff La Liberte with open mouth in front of a minority teenager; the caption added that unnamed persons had yelled specific racist remarks at the young minority man depicted. The defendant Joy Reid retweeted that post, which La Liberte did *not* contend was defamatory. Rather the claims were based on Reid's *two later distinct posts* one of which juxtaposed the original posted photo with the 1957 image of a white woman in Little Rock screaming execrations at a Black child trying to go to school, all while attributing the specific racist remarks to La Liberte, which was false. *La Liberte*, 966 F.3d at 83.

the machinery of the elite class and "deep state" or permanent Washington bureaucracy. The Court can obviously read the statement for itself, but the implication of the word machinery is certainly not "clear" and at the very least is ambiguous. Given the importance of First Amendment principles at stake, the Court should err on the side of nonactionability. *Cf. Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988) (analogously erring on the side of nonactionability "[w]here the question of truth or falsity is a close one") (citing *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986)).

In addition, Dominion contends Byrne disparaged it when speculating whether Republican officials took bribes to install "Dominion software." (Mem. Opp. at 10; Compl. ¶ 153f.) This allegation fails for at least two reasons. First, speculating about public corruption is not an accusation because "questions invite the reader to form her own judgments," such that the "reader could arrive at a number of different conclusions." *Abbas v. Foreign Policy Group, LLC*, 975 F. Supp. 2d 1, 14-16 (D.D.C. 2013), *aff'd*, 783 F.3d 1328, 1338 (D.C. Cir. 2015) ("a question, however embarrassing or unpleasant to its subject, is not accusation.").

Second, even if more than a question, the challenged statement isn't about and doesn't implicate Dominion.[27] Nowhere in this statement does Byrne accuse Dominion of bribing Republican officials. At most, he accuses some unnamed officials of public corruption.

### III.  CONCLUSION

The Court should grant Byrne's motion to dismiss for failure to state a claim.

---

[27] Dominion alleges Byrne said: "[T]here were Republicans in on this. You're going to find – I believe you're going to find two senior Republican officials at the state level in two different states, took efforts to get this Dominion software accepted. In one case on a $100 million dollar contract was paid, and the Republican who did that, I think it's going to turn out that they got election insurance, which means they were told if you help this Dominion stuff get in there, we'll fix it so you never get out of office. There may have been gifts given to family members and such, but every state who uses Dominion, and there's 29 of them, should be investigating who was it that chose to bring the software in." (Compl. ¶¶ 78-79 & n.162, and ¶ 153f.)

Dated: January 5, 2022                         Respectfully submitted,

                                            /s/
                             _____
                             Robert N. Driscoll (DC Bar #486451)
                             Alfred D. Carry (DC Bar #1011877)
                             McGlinchey Stafford PLLC
                             1275 Pennsylvania Avenue NW, Suite 420
                             Washington, DC 20004
                             Tel: (202) 802-9999
                             Fax: (202) 318-1084
                             rdriscoll@mcglinchey.com
                             acarry@mcglinchey.com
                             *Counsel for Defendant Patrick Byrne*