**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

US DOMINION, INC., *et al.*,

    *Plaintiffs*,

    v.

PATRICK BYRNE,

    *Defendant*.

Civil Action No. 1:21-cv-02131 (CJN)

<u>**MEMORANDUM OPINION**</u>

US Dominion, Inc. and other related corporate entities allege that Patrick Byrne defamed them in connection with the 2020 election.  *See generally* Compl. ("Compl."), ECF No. 1.  Byrne has moved to dismiss the Complaint, arguing among other things that Dominion has failed to plead that he made provably false statements about the Plaintiffs; that Dominion has failed to plead that he made his statements with actual malice; and that some of his statements are protected by the fair report privilege and the Communications Decency Act.  *See generally* Def.'s Mot. to Dismiss ("Def.'s Mot."), ECF No. 25.  For the following reasons, the Court denies the Motion.

## I.    The Parties

US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation are related corporate entities involved in the sale of electronic voting machines and software in the United States.  *See* Compl. ¶¶ 13–16; *see also id.* ¶ 29 ("Today, Dominion's business is organized as US Dominion, Inc., and its two wholly owned subsidiaries, Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation.").  John Poulos founded Dominion "out of his basement in Toronto," Canada.  *See id.* ¶ 25.  Dominion has grown over the years, and it now contracts with state and local governments throughout the United States to supply

voting systems and services in elections. *Id.* ¶¶ 25–30. Local election officials use Dominion's voting machines to tabulate votes and count paper ballots. *Id.* ¶ 31.

Patrick Byrne is a resident of Utah. In 1999, Byrne became the Chief Executive Officer of Overstock. *Id.*[1] Starting in 2014, Byrne directed Overstock's investments in several blockchain-based companies, including some that focused on using blockchain technology in elections. *Id.* ¶¶ 36–37. Byrne resigned from the role of CEO in 2019 after Overstock's insurance carrier issued an ultimatum: "it would not renew its policy as long as Byrne was in charge." *Id.* ¶ 34. Since then, Byrne has focused his attention on election integrity. *Id.* ¶ 41. Leading up to, during, and after the 2020 election, Byrne made numerous statements and media appearances in which he discussed Dominion's voting systems and election fraud. *See generally id.*

## II.    Factual & Procedural Background[2]

This case centers around the American election held on November 3, 2020, as well as the voting systems in place to count votes. *See generally Compl.* States employed a myriad of procedures to handle early, same-day, and mail-in votes throughout the election cycle. The different procedures resulted in no clear winner emerging from the presidential election on Tuesday, November 3, 2020. Days later, several news outlets declared Joseph Biden victorious. Those declarations did not end matters. Private citizens and public officials challenged, and local officials audited, election results throughout the country.

---

[1] Byrne received his B.A. from Dartmouth College, his master's degree as a Marshall Scholar from Cambridge University, and his PhD from Stanford University. *Id.* ¶¶ 16, 33.

[2] The Court has previously resolved similar motions involving similar (though not identical) factual backgrounds. *See US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42 (D.D.C. 2021), *appeal dismissed sub nom. US Dominion, Inc. v. My Pillow, Inc.*, No. 21-7103, 2022 WL 774080 (D.C. Cir. Jan. 20, 2022).

In August 2021, Dominion filed this lawsuit against Byrne, claiming that he made numerous statements actionable as defamation per se. *See id.* ¶ 161. The heart of Dominion's Complaint involves eighteen allegedly defamatory statements. *See* Compl. ¶ 153(a)–(r). The statements vary in length, scope, and content. *See id.* Byrne made some of the statements during interviews, while others appeared in print. *See id.* All involve allegedly false and defamatory statements about Dominion and the company's role in the 2020 election and elections more broadly. *See id.*

For example, Dominion alleges that on November 17, 2020, Byrne stated while on a television show that the "election was hacked;" that he had "the data, the electronics, everything" to prove it; and that "Dominion ran" the election. *Id.* ¶ 153(a). As another example (the second in the Complaint), Dominion alleges that on November 18, 2020, Byrne claimed that the State of Texas hired "Dominion Voting Systems" to study the "Dallas election in 2018," which gave the company "two years to deconstruct and reverse engineer how to hack an election." *Id.* ¶ 153(b). On November 24, 2020, Byrne claimed that the "election machinery, especially Dominion's, is a joke," and that "the functionality built into these systems, especially Dominion's, by now everyone knows the story, that it was Hugo Chavez that wanted some election software built that he could go on." *Id.* ¶ 153(d). The sixth allegedly defamatory statement occurred on November 24, 2020, when Byrne stated that Smartmatic's software, which became Dominion's software "after a series of corporate mergers and acquisitions," "was developed in Venezuela, by Hugo Chavez for him to rig his elections." *Id.* ¶ 153(f). And on February 5, 2021, Byrne published a blogpost claiming that "Dominion" "paid for" a "shredding truck" to shred "3,000 pounds of ballots." *Id.* ¶ 153(p). Based on these and other allegedly false and defamatory statements, Dominion seeks

compensatory damages, lost profits, lost goodwill, security expenses, incurred expenses, punitive damages, and pre- and post-judgment interest. *See id. Prayer for Relief.*

Byrne has moved to dismiss. *See generally* Def.'s Mot. From Byrne's perspective, the allegations concern statements that, among other things, either: "(1) reflect fair and accurate reporting of official government and judicial proceedings; (2) contain Byrne's protected commentary or opinions; . . . (3) are not actionable under applicable law; . . . or (4) relate to minor details or do not even concern Dominion but rather other people or entities." *Id.* at 25. In particular, Byrne argues that his statements are not actionable because some of them are not false, some constitute protected opinion, he did not make them with actual malice, and his alleged defamatory statements receive protection under the fair report privilege and the Communications Decency Act. *Id.* at 26, 29, 36, 37, 45.

### III.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss filed under Rule 12(b)(6), a plaintiff must plead "facts to state a claim of relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A court treats the "complaint's factual allegations as true and afford[s] the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Atlas Brew Works, LLC v. Barr*, 391 F. Supp. 3d 6, 11 (D.D.C. 2019) (quotation omitted). Although the court accepts all well-pleaded facts in the complaint as true, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The claim to relief must be "plausible on its face," *id.*, meaning that the plaintiff must have pleaded "factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### IV.    Defamation

State law establishes the elements of a defamation claim.  *See Devin G. Nunes v. WP Company LLC*, No. 20-7121, 2022 WL 997826, at *3 (D.C. Cir. Apr. 1, 2022).  To state a claim for defamation under District law, a plaintiff must "show that (1) the defendant made a false and defamatory statement concerning the plaintiff; (2) the defendant published the statement without privilege to a third party; (3) the defendant's fault in publishing the statement [met the requisite standard]; and (4) publication of the statement caused the plaintiff special harm or the statement was actionable as a matter of law irrespective of special harm." *Robertson v. D.C.*, 269 A.3d 1022, 1031 (D.C. 2022).[3]  To state a claim for defamation per se, the plaintiff must show that the defendant has falsely accused the plaintiff of particularly bad conduct, such as committing an unlawful act, acquiring a repugnant disease, partaking in gross sexual misconduct, or engaging in conduct "so likely to cause degrading injury to the subject's reputation that proof of that harm is not required to recover compensation." *Franklin v. Pepco Holdings, Inc. (PHI)*, 875 F. Supp. 2d 66, 75 (D.D.C. 2012); *Couch v. Verizon Commc'ns, Inc.*, No. 20-2151 (RJL), 2021 WL 4476698, at *5 (D.D.C. Sept. 30, 2021) (quotation omitted) (noting that not only do the same elements apply to defamation claims and defamation per se claims, but also that the First Amendment overlay applies to both).

To facilitate debate over matters of public concern, the Supreme Court has "held that the First Amendment protects, among other things, discussion about public officials and public

---

[3] All Parties agree that District law applies to the defamation claims here.  *See* Pls.'s Opp'n to Def.'s Mot., ECF No. 28 at 14 n.4.

figures." *Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106, 113 (D.C. Cir. 2017) (Kavanaugh, J.); *see Berisha v. Lawson*, 141 S. Ct. 2424 (2021) (Thomas, J., dissenting from the denial of certiorari) (questioning the actual malice standard).  To prevail on a defamation claim, a public-official or public-figure plaintiff must therefore also demonstrate that the defendant acted with "actual malice." *New York Times Co. v. Sullivan*, 376 U.S. 254, 267 (1964); *see also Curtis Publishing Co. v. Butts*, 388 U.S. 130 (1967) (extending the actual malice standard from "public officials" in government to "public figures" outside government); *Gertz*, 418 U.S. at 351 (applying the actual malice standard to those who have achieved "pervasive fame or notoriety" and those "limited" public figures who "voluntarily injec[t]" themselves or are "drawn into a particular public controversy").  The actual malice standard requires proof that the defendant either knew that the statement was false or recklessly disregarded whether it might be false.  *Kahl*, 856 F.3d at 113 (quotation omitted).  That standard "makes the speaker's state of mind the constitutional gravamen in any defamation case brought by a public figure or a public official." *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 245 (D.C. Cir. 2021) (Silberman, J., dissenting).

### A.  Statements of Fact or Opinion

An actionable statement must be false and defamatory.  *Rosen v. Am. Israel Pub. Affs. Comm., Inc.*, 41 A.3d 1250, 1256 (D.C. 2012).  A statement counts as defamatory "if it tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1241 (D.C. 2016) (quotation omitted).  The statement "must be more than unpleasant or offensive; the language must make the plaintiff appear odious, infamous, or ridiculous." *Id.* (quotation omitted).  The statement must also

at least express or imply a verifiably false fact about the plaintiff. *US Dominion, Inc.*, 554 F. Supp. 3d at 57 (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–20 (1990)).

Expressions of pure opinion, unlike statements of false facts, receive constitutional protection because "there is no such thing as a false idea." *Competitive Enter. Inst.*, 150 A.3d at 1241 (quoting *Milkovich*, 497 U.S. at 18). The context surrounding the statement helps illuminate whether it qualifies as opinion or whether it implies a provably false statement of fact. *See Sigal Const. Corp. v. Stanbury*, 586 A.2d 1204, 1210 (D.C. 1991) ("Thus, while certain words or phrases may not, in themselves, imply facts, the statement will be actionable if, taken as a whole, it is objectively verifiable."). What's more, a defendant's statements "may not be actionable if the defendant provides the facts underlying the challenged statements," but only if "it is clear that the challenged statements represent [the defendant's] own interpretation of those facts, . . . leaving the reader free to draw his own conclusions.'" *US Dominion, Inc.*, 554 F. Supp. 3d at 58 (quotation omitted). Where it turns out, however, that the disclosed defamatory facts undergirding an opinion are themselves false, the defendant may be held liable. *See TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1185 (10th Cir. 2007) (noting that in such a scenario "it is the publication of the defamatory facts, however, rather than the expression of opinion, that is actionable").

The question here is "whether a reasonable juror could conclude that [the defendant's] statements expressed or implied a verifiably false fact about Dominion." *US Dominion, Inc.*, 554 F. Supp. 3d at 58. As in the Court's prior opinion involving claims brought by Dominion against other defendants, *see generally id.*, the question is not a close one. Take, as an example, Byrne's alleged statement that someone with a "Dominion Voting" credit card paid to shred "3,000 pounds of ballots." Compl. ¶ 153p. That either happened or it did not. Or consider Byrne's alleged

7

statement that Dominion "was developed in Venezuela, by Hugo Chavez for him to rig his elections." *Id.* ¶ 153(f).  Again, that is either true or false.

Dominion claims that Byrne made numerous additional defamatory statements.  *See* Compl. ¶ 153 (listing eighteen of Byrne's allegedly defamatory statements touching on a variety of claims about Dominion).  Byrne contends that at least six of the eighteen alleged statements in the Complaint do not contain provably false statements.  *See* Def.'s Mot. at 37–39.  The Court need not parse those six statements, however, because the other alleged defamatory statements do make provably false assertions.  The standard is whether the Complaint states a claim for relief, not whether each and every statement mentioned in the Complaint states a claim for relief.

The same goes for Byrne's argument that some of his statements qualify as protected opinions because he disclosed the underlying "facts."  Def.'s Mot. at 39–41.  Even if that might be true as to some of his alleged statements, it is not true of several others.  *See* Compl. ¶ 153(a)–(r).  In sum, Dominion has adequately alleged that Byrne made a number of statements that are actionable because a reasonable juror could conclude that the statements were either statements of fact or statements of opinion that implied or relied upon facts that are provably false.  *See US Dominion, Inc.*, 554 F. Supp. 3d at 59.

### B. Statements "of and concerning" Dominion

A defendant's alleged defamatory statement also must be "of and concerning" the plaintiff.  *See Luhn v. Scott*, No. 19-CV-1180 (DLF), 2019 WL 5810309, at *3 (D.D.C. Nov. 7, 2019).  A statement satisfies this requirement if it leads "the listener to conclude that the speaker is referring to the plaintiff by description, even if the plaintiff is never named or is misnamed."  *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 145 (D.D.C. 2017) (quotation omitted); *Vasquez v. Whole*

*Foods Mkt., Inc.*, 302 F. Supp. 3d 36, 64 (D.D.C. 2018) (noting that a "plaintiff can rely upon extrinsic evidence to show that listeners understood the statements to pertain to the plaintiff").

Byrne argues that his allegedly defamatory statements were not of and concerning Dominion. Several of Byrne's allegedly defamatory statements, however, refer by name to Dominion. Take, for instance, the sixteenth statement relied on by Dominion; Byrne published a blogpost claiming that "Dominion" "paid for" a "shredding truck" to shred "3,000 pounds of ballots." Compl. ¶ 153(p). Consider, too, Byrne's statement claiming that "Dominion" had "two years to deconstruct and reverse engineer how to hack an election with Dominion Voting Systems" after the State of Texas hired the company to study the 2018 Dallas election. *Id.* ¶ 153(b). In fact, more than a dozen of the eighteen alleged defamatory statements reference Dominion expressly; at the very least, a reasonable juror could decide that these statements referred to the company. *See generally id.* ¶ 153. The Court concludes that the Complaint adequately alleges that Byrne made defamatory statements that satisfy the "of and concerning" requirement as to Dominion.[4]

### C. Actual Malice

A public official or figure "must demonstrate by clear and convincing evidence that the defendant published the defamatory falsehood with actual malice, that is, with 'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964)). A defendant has acted recklessly if "the defendant in fact entertained serious doubts as to the truth of his publication" or acted "with a high degree of awareness of . . . probable

---

[4] Byrne argues that three of the eighteen alleged statements in the Complaint are not defamatory because they neither "expressly mention" Dominion, nor "lead the listener to conclude" that Byrne is "referring" to Dominion. Def.'s Mot. at 30. Again, the Court need not parse those three statements, because the other alleged defamatory statements do mention or reference Dominion.

falsity." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016) (quotation omitted). Seldom will a defendant "confess his state of mind and thus allow the plaintiff to prove actual malice with direct evidence." *Tah*, 991 F.3d at 245 (Silberman, J., dissenting). Rather, "a plaintiff may prove the defendant's subjective state of mind through the cumulation of circumstantial evidence." *Tavoulareas v. Piro*, 817 F.2d 762, 789 (D.C. Cir. 1987). Examples of circumstantial evidence that may support an inference of subjective recklessness include: "(1) evidence that indicates the defendant fabricated the story, or (2) evidence that suggests the allegedly defamatory statements are so inherently improbable that only a reckless man would have put them in circulation, or (3) evidence that demonstrates that there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 281 (D.D.C. 2017) (quotation omitted). Because "proof of 'actual malice' calls a defendant's state of mind into question," this element "does not readily lend itself to summary disposition." *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979).

Byrne argues that, even if his alleged statements were provably false and defamatory statements about Dominion, Dominion has failed to allege that he made those statements with actual malice. Dominion responds that the Complaint adequately pleads actual malice because Byrne "(1) made inherently improbable claims about Dominion; (2) relied on facially unreliable sources; (3) manufactured fake evidence to support a narrative he conceived before the election; (4) knowingly disregarded widely publicized contradictory evidence; (5) has refused to retract his demonstrably false statements; and (6) had a financial motive to make his false claims." Pls.'s Mot. at 17.

The Court agrees that Dominion has adequately alleged actual malice. In other words, Dominion has alleged facts that, if proven at trial, would demonstrate that Byrne harbored serious

doubts as to the truth of some of his allegedly defamatory statements. *See Jankovic*, 822 F.3d at 589 (quotation omitted).

Consider Byrne's alleged statement that Dominion's election systems were developed in Venezuela and used "strategically & aggressively" to "rig" the 2020 election, Compl. ¶ 153(e), the alleged statement that Dominion machines used an "algorithm" to "weight one candidate greater than another," *id.* ¶ 153j; *see also id.* ¶¶ 153o, 153n, 153q., or the alleged statement that Dominion "paid for" a "shredding truck" to shred "3,000 pounds of ballots," *id.* ¶ 153(p). Accepting as true all of Dominion's allegations, a reasonable juror could find that at least some of Byrne's statements, including these, are so "inherently improbable that only a reckless man would believe" them. *US Dominion, Inc.*, 554 F. Supp. 3d at 63 (finding that a reasonable juror could find that Michael Lindell's statements, many of which resemble Byrne's, were so "inherently improbable that only a reckless man would believe" them). Construing the various allegations in the Complaint, considering the types of facts that can establish reckless disregard, and drawing all inferences in Dominion's favor, the Court concludes that a reasonable jury could find Byrne acted with actual malice. *See id.* at 62.[5]

One last note. Dominion assumes for purposes of this motion that the actual malice standard applies because Byrne has argued that Dominion counts as a public official or as a public figure. *See* Pls.'s Mot. at 15 n.5; Def.'s Mot. at 46; *US Dominion, Inc.*, 554 F. Supp. 3d at 60 n.11. The Court need not decide this question at this time. Discovery may bear additional fruit on this

---

[5] As discussed above, the Court concludes that multiple (if not all) of the alleged defamatory statements outlined in the Complaint state a claim for defamation under District law. At the very least, though, the Court is satisfied that Byrne's alleged blogpost claiming that "Dominion" "paid for" a "shredding truck" to shred "3,000 pounds of ballots," Compl. ¶ 153(p), states a plausible defamation claim. Indeed, the Court unpacked that particular statement in each of the preceding subsections.

question, which in turn will permit the Court to determine whether the actual malice standard or a negligence standard applies. *See* Pls.'s Mot. at 15 n.5.

### D.  Fair Report Privilege

Byrne also claims that a portion of one of his allegedly defamatory statements is privileged under District law.  In particular, Byrne asserts that a hyperlink to an affidavit he shared should receive protection under the so called "fair report privilege." *See* Def.'s Mot. at 28.

That privilege represents an exception "to the common law rule that one who repeats or republishes a defamation uttered by another 'adopts' it as his own." *Myers v. D.C. Hous. Auth.*, No. 1:20-CV-00700-APM, 2021 WL 1167032, at *2 (D.D.C. Mar. 26, 2021) (quotation omitted). The author of the allegedly defamatory statement must clear two hurdles for the privilege to attach. *See id.*  First, the statement must be a fair and accurate report of a qualified government source. *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 257 (D.D.C. 2013).  Second, it must be apparent that the author attributed the statement to the government source. *Jankovic v. Int'l Crisis Grp.*, 593 F.3d 22, 26 (D.C. Cir. 2010).  The privilege extends to "reports of judicial proceedings" as well as court documents. *Von Kahl v. Bureau of Nat. Affairs, Inc.*, 810 F. Supp. 2d 138, 144 (D.D.C. 2011); *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 258 (D.D.C. 2013).  Where an "author's work is a fair and accurate representation of an official report, the work is privileged, regardless of the veracity of the official report and even if the official documents contain erroneous information." *Montgomery v. Risen*, 197 F. Supp. 3d 219, 266 n.41 (D.D.C. 2016) (quotation omitted).

In a blogpost published in late November 2020, Byrne included a hyperlink to an affidavit in which a person named Joshua Merritt supposedly provided evidence to support numerous claims about election integrity and foreign interference in the American election. *See* Compl. ¶ 153(e).

Byrne's own assertions in the blogpost preceding the hyperlink include that "Smartmatic systems were developed in Venezuela with built-in functionality permitting precinct administrators to override security features it appeared to incorporate;" that Smartmatic became Dominion bringing "to US elections not only the generous functionalities permitting manipulation by administrators, but porous security, extending such powers to those abroad;" and that "Trump broke their algorithm, because he was on his way to a win that exceeded their ability to overcome through minor cheats alone." *See* Compl. 153(e).

The Court need not decide whether the linked affidavit itself receives protection under the fair report privilege because Byrne's own assertions preceding the hyperlink remain actionable. The substance of the Merritt affidavit does not mention Venezuela, Hugo Chavez, or that Trump broke Dominion's algorithms. *See* Compl. ¶¶ 153(e), 77 n.159; Def.'s Reply in Support of the Mot., ECF No. 31 at 25. Byrne made statements beyond the contents of the affidavit, which means he did more than accurately report on a qualified government source.

## E.  The Communications Decency Act

In his thirteenth allegedly defamatory statement, Byrne retweeted a story, which stated in part that a Dominion voting machine had been hacked during the 2020 election. *See* Compl. ¶ 153(m). Byrne himself made the following statements, which accompanied the retweeted link: "I vouch for this. I have seen the photographs, the computer forensics, the IP traces back to China. To a corporation whose name has long been linked to CP: Exam Indicates Georgia Tabulating Machine Sent Results to China." *See* Compl. ¶ 153(m). Byrne asserts that the retweeted link, as well as his statements accompanying the link, should receive protection under section 230 of the Communications Decency Act.

The Communications Decency Act provides Internet platforms with immunity "against causes of action of all kinds." *Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1267 (D.C. Cir. 2019); *see* 47 U.S.C. § 230(c). Section 230 contains two subsections that protect computer-service providers from some civil and criminal claims. *See Bennett v. Google, LLC*, 882 F.3d 1163, 1165 (D.C. Cir. 2018). The first, and the one relevant here, states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). That provision "immunizes internet services for third-party content that they publish, including false statements." *Marshall's Locksmith Serv. Inc.*, 925 F.3d at 1267. The second subsection states that "[n]o provider or user of an interactive computer service shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." 47 U.S.C. § 230(c)(2).

A so-called "information content provider" does not enjoy immunity under § 230. *Klayman v. Zuckerberg*, 753 F.3d 1354, 1356 (D.C. Cir. 2014). Any "person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service" qualifies as an "information content provider." 47 U.S.C. § 230(f)(3); *Bennett*, 882 F.3d at 1166 (noting a dividing line between service and content in that 'interactive computer service' providers—which are generally eligible for CDA section 230 immunity—and 'information content provider[s],' which are not entitled to immunity").

While § 230 may provide immunity for someone who merely shares a link on Twitter, *Roca Labs, Inc. v. Consumer Opinion Corp.*, 140 F. Supp. 3d 1311, 1321 (M.D. Fla. 2015), it does

not immunize someone for making additional remarks that are allegedly defamatory, *see La Liberte v. Reid*, 966 F.3d 79, 89 (2d Cir. 2020).  Here, Byrne stated that he "vouch[ed] for" the evidence proving that Dominion had a connection to China.  *See* Compl. ¶ 153(m).  Byrne's alleged statements accompanying the retweet therefore fall outside the ambit of § 230 immunity.

## F.  Conclusion

For the foregoing reasons, Patrick Byrne's motion to dismiss is **DENIED**.  An Order will be entered contemporaneously with this Memorandum Opinion.

DATE:  April 20, 2022

CARL J. NICHOLS
United States District Judge