# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| U.S. DOMINION, INC., et al.,<br><br>        *Plaintiffs / Counter-Defendants*,<br><br>v<br><br>PATRICK BYRNE,<br><br>        *Defendant*. | Civil Action 1:21-cv-02131 (CJN) |

---

## DEFEDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTIVE RELIEF AND TO DISQUALIFY COUNSEL

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

STATEMENT OF POINTS AND AUTHORITIES ..................................... 7

INTRODUCTION ....................................................................................... 8

BACKGROUND ........................................................................................ 12

1.  The Scope and Purpose Behind Dominion's Original Request for a
    Protective Order ................................................................................ 14

a.  Analyzing the Protective Order's Scope ............................................... 20

b.  Dominion Only Intended to Protect Trade Secrets and Proprietary
    Information Not General Communications by Dominion Concerning
    Basic Administrative Operations ........................................................ 21

DISCUSSION AND ANALYSIS ................................................................ 25

CONCLUSION .......................................................................................... 45

TABLE OF AUTHORITIES

**Constitutional Provisions**

U.S. Const., amend. I ................................................................................44

U.S. Const., amend. IX ......................................................................... 43, 44

U.S. Const., amend. XIV ...........................................................................44

U.S. Const., amend. XV ............................................................................44

**Statutes**

18 U.S.C. § 1343 .....................................................................................34

18 U.S.C. § 1346 .....................................................................................34

18 U.S.C. § 1846 .....................................................................................33

18 U.S.C. § 371 .................................................................................. 35, 38

52 U.S.C. § 10302 .............................................................................. 30, 31

52 U.S.C. § 10303 ...................................................................................30

52 U.S.C. § 10304 ...................................................................................30

52 U.S.C. § 10306 ...................................................................................30

52 U.S.C. § 10307 ...................................................................................30

52 U.S.C. § 10308 ....................................................................... 30, 32, 33, 38

52 U.S.C. § 20511 ........................................................................ 30, 32, 38

52 U.S.C. § 20701 ........................................................................... 17, 22

52 USCS § 10301 ............................................................................. 30, 31

**Cases**

*Dunn v. Blumstein*,
405 U.S. 330; 92 S. Ct. 995; 31 L. Ed. 2d 274 (1972) ............................................43

*Evans v. Artek Sys. Corp.*,
715 F.2d 788 (2d Cir. 1983) ....................................................................26

*Ex Parte Yarbrough*,
110 U.S. 651; 4 S. Ct. 152; 28 L. Ed. 274 (1884) ................................. 32, 35, 40, 42

*Hammerschmidt v. United States*,
265 U.S. 182; 44 S. Ct. 511; 68 L. Ed. 968 (1924) ............................................36

*Harper v. Va. State Bd. of Elections*,
383 U.S. 663; 6 S. Ct. 1079  (1966) ................................................. 41, 42

*In re BellSouth Corp.*,
334 F.3d 941 (11th Cir. 2003) .............................................................25

*Manning v. Waring, Cox, James, Sklar & Allen*,
849 F.2d 222 (6th Cir. 1988) .............................................................26

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) .............................................................44

*Mathews v. Diaz*,
426 U.S. 67; 96 S. Ct. 1883 (1976) ......................................................43

*Moore v. Ford Motor*,
755 F.3d 802 (5th Cir. 2014) .............................................................21

*Mynette Technologies, Inc v United States*,
163 Fed Cl 733 (2022) .............................................................21

*Neder v. United States*,
527 U.S. 1; 119 S. Ct. 1827; 144 L. Ed. 2d 35, (1999) ...........................................36

*Norton v. Tallahassee Mem'l Hosp.*,
689 F.2d 938 (11th Cir. 1982) ...............................................................................25

*Plyler v Doe*,
457 U.S. 202; 102 S. Ct. 2382; 72 L. Ed. 2d 786 (1982) ......................................43

*Reynolds v. Sims*,
377 U.S. 533; 84 S. Ct. 1362; 12 L. Ed. 2d 506 (1964) ...................... 35, 41, 43, 44

*Ross-Hime Designs, Inc v United States*,
109 Fed Cl 725 (2013) ...........................................................................................21

*Skilling v. United States*,
561 U.S. 358; 130 S. Ct. 2896; 177 L. Ed. 2d 619 (2010) .....................................33

*Tanner v. United States*,
483 U.S. 107; 107 S. Ct. 2739; 97 L. Ed. 2d 90 (1987) .................................. 36, 38

*United Pub. Workers v. Mitchell*,
330 U.S. 75; 67 S. Ct. 556 (1947).........................................................................44

*United States v O'Donovan*,
___F Supp 3d___; 2023 U.S. Dist. LEXIS 124059, at *4-5 (D Mass, July 19, 2023)
............................................................................................................................34

*United States v Singh*,
924 F3d 1030 (CA 9, 2019) ...................................................................................32

*United States v. Caldwell*,
989 F.2d 1056 (9th Cir. 1993) ...............................................................................36

*United States v. Classic*,
313 U.S. 299; 61 S. Ct. 1031; 85 L. Ed. 1368 (1941) ...................................... passim

*United States v. Falcón-Nieves*,
79 F.4th 116 (1st Cir. 2023) ...................................................................34

*United States v. Kanchanalak*,
41 F. Supp. 2d 1 (D.D.C. 1999) .............................................................36

*United States v. Sawyer*,
85 F.3d 713 (1st Cir. 1996) ...................................................................34

*Woods v. Covington Cnty. Bank*,
537 F.2d 804 (5th Cir. 1976) .................................................................25

*Yick Wo v. Hopkins*,
118 U.S. 356; 6 S. Ct. 1064; 30 L. Ed. 220 (1886) ...............................41

## Court Rules

Fed. R. Civ. P. 26 ...................................................................................19

Fed. R. Civ. P. 26(c)(1)(G) ....................................................................17

Fed. R. Civ. P. 5.2 ..................................................................................19

## Treatises

II Story, Commentaries on the Constitution of the United States (5th ed. 1891)....45

## Other Authorities

Annals of Congress 439 (Gales and Seaton ed. 1834)............................................45

## STATEMENT OF POINTS AND AUTHORITIES

Dominion's motion for "protective relief" and to disqualify counsel does not comply with the local rules or this Court's instructions the protective order, which requires all motions concerning the protective order to be filed under seal after consultation with counsel.  See **ATTACHMENT 1**, *U.S. Dominion, et al. v. Byrne,* Case No. 1:21-cv-02131, Docket No. 46, pp. 12-13, ¶ 12.

The information which Dominion's motion addresses is not "Confidential Discovery Material" within the meaning of this Court's protective order.

Counsel for Mr. Byrne previously agreed with Mr. Byrne to abide by the Court's discovery protective order, but the information which Dominion's Motion concerns is not "Confidential Discovery Material," and, in any event, evidence of criminal activity can be turned over to law enforcement, and is not covered by a discovery protective order in a civil action.

Information indicating the commission of criminal actions by foreign nationals and potential conspiracy with a party are of subject public concern, especially when the future of the country is at stake because elections are not secure and can still be compromised.  This criminal act / public interest exception exists notwithstanding the strictures of the protective order, *even if* Dominion's intent and the language of the protective order could be construed to apply to this information, which Mr. Byrne does not concede.

INTRODUCTION

Mr. Byrne came into possession of email communications produced by Dominion during discovery (some written in Serbian and foreign languages) with and from top level Dominion employees directing and tasking foreign nationals to remotely access voting machines utilized in the United States during the November 3, 2020 election. The remote access by these foreign nationals occurred while the states were still counting votes, determining a final tally, and prior to certification of the results. The email communications further established that background checks of the Serbian Dominion employees did not place; the United States had no knowledge or oversight of these Serbian individuals including whether or not they had prior Serbian military experience. The election machines have been in use in United States for approximately 20 years, and it seems reasonable that the United States should know who is entering/altering its election system and data, and whether or not these same individuals were involved in armed conflict in recent years against the United States.

These email communications to and from Serbian foreign nationals are evidence of criminal violations, and further support charges of, *inter alia*, perjury, foreign interference in a U.S. election, honest services fraud, and wire fraud.

Additionally, these email communications are corroborative evidence of forensic expert reports that have been previously disclosed in other unrelated litigation demonstrating interference with voting machines in the United States via remote access during the 2020 election. Pursuant to legal obligations, undersigned counsel released these emails to law enforcement.

Additional communications by and between Dominion indicates that Dominion misrepresented to the Election Assistance Commission (EAC) and its customers products for certification and products being leased and sold, allowing different products and platforms to be put into use.

Once discovered, Mr. Byrne had an obligation to immediately disclose these email communications to law enforcement.

Truth, and transparency are imperative not only to Mr. Byrne's defense in the instant case, but in order that past actions related to the 2020 election be appropriately exposed and investigated, and for government officials to make informed decisions as to how elections are to be conducted in the future.

Dominion's motion for "protective relief" and to disqualify counsel (Docket No. 75, "Dominion's Motion") was filed on the public record, was not compliant

with the rules of this Court or the Court's protective order,[1] and presents a panoply of irrelevant stories about Mr. Byrne's counsel that do not support disqualification, much less any type of sanction or ethical violation.

Furthermore, Dominion had no right to stop or restrict the flow of this information before any court order entered by the court. Nonetheless, Dominion did unilaterally command the entity handling discovery information to "cease and desist" providing information to Mr. Byrne, his counsel, and his own experts and consultants. (**ATTACHMENT 2**, Dominion's Cease and Desist Letter).

Undersigned counsel submits that Dominion's exorbitant *ad hominem* attacks on her are not relevant to the question of the propriety of releasing the information concerned (which is not "Confidential Discovery Material" as defined in the Court's order, and which, in any event, would not be covered by the scope of the order because it contains significant evidence of suspected criminal conspiracies and

---

[1] In the first instance, Dominion was not supposed to file any motion concerning the protective order on the public record. They did so only to provide irrelevant information to the public about Mr. Byrne and undersigned counsel, to attack and ridicule them, and to degrade their standing, rather than address the merits of the public exception allowing, indeed, requiring, the reporting of suspected and ongoing criminal activity and fraud upon the court to law enforcement. See **ATTACHMENT 1**, Docket No. 46, pp. 12-13, ¶ 12 ("***Any pleading, brief, memorandum, motion,*** letter, affidavit, declaration, or other document filed with the Court that discloses, ***summarizes, describes, characterizes, or otherwise communicates*** Confidential or Attorneys' Eyes Only Discovery Materials (a "Confidential Filing") must be filed with the Court under seal in accordance with Local Rule 5.1(h), along with a cover page bearing the caption of the Litigation and the title of the Confidential Filing….")

criminal conduct on the part of Dominion and other foreign nationals and third parties, which information is required to be reported to law enforcement.

Moreover, Dominion asserts that undersigned publicly released the information in a filing in her case in Michigan, but this is not an honest explanation of what occurred.  See Dominion's Motion, Docket No. 75, p. 9.  What Dominion conveniently omits is that the information referred to was attached to an affidavit from Sheriff Dar Leaf of Barry County, Michigan, who has been subpoenaed in that case, and who has also been investigating voter fraud concerning the use of electronic voting machines since well before the Dominion evidence was provided to him.

Dominion's continued efforts *ad hominem* attacks on undersigned counsel, even though all of the referenced efforts against her have failed to date to prevent her from representing her clients and exposing the truth to the American people, are truly irrelevant to the issues at hand.

Because Dominion chose to publicly file the motion for protective relief, *under the protective order*, and motion to disqualify, Dominion, not Mr. Byrne or his counsel, violated the protective order.  See **ATTACHMENT 1**, Docket No. 46, p. 12, ¶ 12.

In light of the sudden and improper filing by Dominion of this motion after undersigned counsel has just appeared on behalf of Mr. Byrne and in light of upcoming previously scheduled matters in this case, Counsel provides this preliminary response to Dominion's emergency motion, but reserves the right to further respond in the ordinary course and time provided by the rules for the filing of motions, responses, and replies, and will provide additional information in due course in accordance with a proper scheduling order.

<u>BACKGROUND</u>

Dominion's motion erroneously begins with the premise that there was a "violation" of this Court's protective order (**ATTACHMENT 1**, Docket No. 46) in the first instance. See Dominion's Motion, Docket No. 75, p. 3. This is not correct, so there is really no reason to consider disqualification of counsel without truly considering this preliminary question upon proper motion and briefing.

The original protective order was entered by the court on December 6, 2022. (**ATTACHMENT 3**, Protective Order in *U.S. Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation v. My Pillow, Inc., et al.*, Case No. 1:21-cv-00445, Document No. 152). An amended version was later entered in this case on June 16, 2023, which amended only the parties to whom it

was applicable and not the substance of the original order.  (**ATTACHMENT 1**, *U.S. Dominion, et al. v. Byrne,* Case No. 1:21-cv-02131, Document No. 46).

Dominion originally sought a protective order to protect proprietary information, trade secrets, and commercially sensitive information from disclosure through the *use of third-party subpoenas*.  (**ATTACHMENT 4**, Dominion's Motion for Protective Order Regarding Certain Third Party Subpoenas, *U.S. Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation v. My Pillow, Inc., et al*., Case No. 1:21-cv-00445, Document 145).

Ultimately, "Discovery Material" is defined and narrowed as only Confidential Discovery Material.  Therefore, not all information produced by Dominion (even if *marked* Confidential (because every document is or was so marked upon Dominion's instruction) fits into this category, nor does it warrant protection from public disclosure under the terms of the current protective order.

Furthermore, and more pertinent is the fact that the discovery contains information indicating criminal collusion and conspiracy with foreign nationals to create the means by which Dominion voting machines are vulnerable to manipulation from external sources, some of which is have been directed and tasked by Dominion.  Additionally, information has come to light that Dominion and its employees misled the EAC in presenting an uncertifiable election systems platform

13

by "renaming" it, but no fixing the errors and problems that existed to ensure certification and, therefore, to insure that the 2020 election was secure.

Therefore, not only is this information not among that which Dominion originally sought to protect and not covered by the court's protective order, but even if the court were to conclude it was so covered, an exception exists for modifying protective orders to disclose criminal conduct and, here, especially, to provide transparency to the American public in defense of the truth.

Allowing Dominion to put the stamp of confidentiality, trade secret, non-public, or commercially sensitive on every single document produced in discovery is not warranted.  This is especially pertinent because the judiciary has a duty to ensure that the public's access to information concerning the conducting of national elections is robust and as transparent as possible.  As explained herein, not only is there criminal activity, but the right to vote is a fundamental right which must be protected in the light of coming elections.

1.   The Scope and Purpose Behind Dominion's Original Request for a Protective Order

The protective order originally sought by Dominion in *U.S. Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation v. My*

*Pillow, Inc., et al*., Case No. 1:21-cv-00445 (**ATTACHMENT 4**, Dominion's Motion for Protective Order Regarding Certain Third Party Subpoenas, Document 145), was filed on September 30, 2022, in "response to certain third party subpoenas issued by Defendants Michael J. Lindell and MyPillow, Inc.," (Lindell), who sought to obtain "forensic copies" and "forensic images" of various materials that Dominion claims are "confidential and proprietary to Dominion." *Id*., Memorandum in Support, Document 145-1, pp. 1-2. According to Dominion's original motion, Lindell sought "these types of materials" from Dominion through "requests for production," and Dominion objected on the basis "that the materials are irrelevant to the claims and defenses in this litigation, confidential and proprietary, and that there is currently no protective order in place that would prohibit Defendants from publicly sharing Dominion's confidential information…." *Id*., Doc. 145-1, pp. 2.

Dominion further noted that Lindell then "served third party subpoenas on Dominion's customers, asking dozens of nonparties to produce the same type of confidential and proprietary materials to which Dominion has already objected." *Id*. Dominion then stated the scope and purpose behind its motion. "Good cause exists for the Court to enter a protective order prohibiting Defendants from *using third party subpoenas to pursue Dominion's confidential and proprietary information*." (emphasis supplied).

15

As Dominion saw it, "[o]ne of the contested issues with respect to a protective order is whether and the extent to which documents and information gathered through discovery should be treated as confidential.  Dominion has advocated that *all documents and information* be treated as confidential, given the confidential and proprietary nature of the voting systems and software at issue…."  *Id*, pp. 3-4 (emphasis supplied).  Dominion further explained that Lindell had issued subpoenas "to dozens of Dominion's customers – local elections officials in various states across the country" and that "thirty-nine (39) Dominion customers…in sixteen (16) jurisdictions ha[d] received subpoenas seeking production of a wide range of election-related materials and information, *some of which is confidential and proprietary to Dominion* and classified by the Election Assistance Commission (EAC) as critical election infrastructure."  *Id*., p. 7 (emphasis supplied).  Dominion explained that the subpoenas requested the disclosure of "forensic images of various drives attached to Dominion voting equipment used during the November 2020 election; forensic images of slog.txt and .dvd files generated from tabulators and ballot marking devices; forensic images of all election records related to the November 2020 election subject to 52 U.S.C. § 20701; network diagrams, credentials, and network logs from electronic election equipment; the identity of certain election personnel; copies of any reports, documents, and spreadsheets made

16

in relation to the November 2020 election; documents related to any indication of any intrusion attempt into the election systems; copies of cellular bills and connections supporting ballot scanners/devices; copies of all contracts with suppliers of any electronic election system equipment, devices, software, or support services; and copies of all contracts related to network security, network monitoring, or cybersecurity concerning all or any part of the customer's electronic election system." *Id*., pp. 4-5.

In reciting the legal support for the protective order, Dominion argued that a "protective order may '[require] that *a trade secret or other confidential research, development*, or *commercial information* not be revealed or be revealed only in a specified way.'" Fed. R. Civ. P. 26(c)(1)(G) (emphasis supplied). Dominion further explained that it was seeking protection from disclosure of its "confidential and proprietary information" and that "[g]ood cause" existed for an order "prohibiting Defendants from using third party subpoenas to pursue certain documents and information that are confidential and proprietary to Dominion." *Id*.

Dominion's original motion further explained that it was seeking a protective order to prevent the disclosure through third-party subpoenas of Dominion's "trade secrets," which it defined "as information that 'derives independent economic value…from not being generally known' when 'the owner…has taken reasonable

17

measures to keep such information secret.'" *Id*. at p. 8 (internal citations omitted). Later in the motion, Dominion argued that its "consistent efforts to keep its information confidential" supported a finding "that the materials at issue are entitled to protection as trade secret and confidential commercial information." *Id*. at 9. Dominion concludes that there was "good cause" for the court to enter a protective order prohibiting Defendants from using third party subpoenas to pursue Dominion's confidential and proprietary information from third parties." *Id*. at 15.

On December 6, 2022, the Court entered a protective order at the request of all parties, who "agreed that certain information produced in discovery would contain *proprietary*, *commercially sensitive*, and/or *non-public information*." (**ATTACHMENT 3**) (emphasis supplied). On June 8, 2023, the parties in the instant case filed a "joint motion" for protective order (Document 45), and on June 16, 2023, the Court entered an "amended protective order" to bind the parties in this case. (**ATTACHMENT 1**).

The language of this protective order is virtually identical to the original protective order entered by the court, with the exception of the additional parties to which it applies. However, Dominion claims that "all" and any information is covered by this Court's order. But that argument is belied by the federal rules, the case law, and language of the actual order.

In terms of disclosure, there is a presumptive right of public access to discovery in all civil cases. This is the premise from which one should begin. The protective order applicable to the parties (**ATTACHMENT 1**, Document No. 46), like the original order, even begins with and discusses a referenced defined term per the Federal Rules of Civil Procedure, and further orders, as follows:

> Under Rules 5.2 and 26(c) of the Federal Rules of Civil Procedure, this Order Governing the Production and Exchange of Confidential Information (the "Order"), will govern the handling of documents, testimony (in any form whether by affidavit, declaration, or deposition), exhibits, transcripts, written discovery requests, interrogatory responses, responses to requests for admission, responses to requests for documents, and any other information or material produced, given, or exchanged, including any information contained therein or derived therefrom ("Discovery Material"), by or among any Party or non-Party providing Discovery Material (each a "Producing Party") in the Litigation to the party receiving the Discovery Material ("Receiving Party"). (**ATTACHMENT 1**, p. 3).

Therefore, the order is already narrowed to "Confidential Information" in its reference to the defined term "Discovery Material" (written a with uppercase letters), to address the information to which it applies. Id. Further, "Confidential Discovery Material" and "Attorneys Eyes Only Material" is defined as material that consists of non-public customer information or information that is proprietary or otherwise commercially sensitive". (**ATTACHMENT 1**, Docket No. 46, pp. 4-5, ¶¶ 2-3) (emphasis supplied). Further, the reference to "non-public" customer information is further narrowed by paragraph 3 as "Attorneys Eyes Only" information that is, "(i)

19

nonpublic damages-related and financial information, including confidential pricing, customer, profit, sales, or other financial information; (ii) confidential business, marketing, or strategic plans, including business, marketing, and technical information regarding the future provision of services; and (iii) confidential and commercially sensitive trade secrets or technical information." *Id.*, p. 5, ¶ 3.

Dominion even envisioned that there was additional information that might be subject to future protection, meaning that not all information Dominion produced would be covered. Particularly, the protective order provides that if "source code is determined to be relevant and discoverable, the Parties will agree to terms and entry of a separate protective order for the source code before any is produced."

a.  Analyzing the Protective Order's Scope

Protective orders, like contracts, are subject to general rules of interpretation. The interpretation begins with the language of the written agreement. Provisions that are clear and unambiguous must be given their plain and ordinary meaning. *Ross-Hime Designs, Inc v United States,* 109 Fed Cl 725, 733 (2013). The textual interpretation of an agreed protective order is a legal question that begins with the "plain language" of the protective order. *Moore v. Ford Motor*, 755 F.3d 802, 806 (5th Cir. 2014). The plain meaning of a protective order's text controls, unless it is apparent that some other meaning was intended and mutually understood.

For example, parties can bargain for a protective order excluding certain specified content or they may include such provisions in their motion. *Mynette Technologies, Inc v United States*, 163 Fed Cl 733, 751 (2022). The parties' mutual intent, however, is the ultimate question, and if one party has expressed specified items in a protective order, and the other party has not, the protective order itself will not be deemed to include additional items. A protective order will not be construed to satisfy the purposes of only one of the parties to it. *Id*.

b. Dominion Only Intended to Protect Trade Secrets and Proprietary Information Not General Communications by Dominion Concerning Basic Administrative Operations

Dominion's motion for a protective order targets a very specific situation and sought to encompass only very specific, technical information – "trade secrets," "proprietary information," and "confidential information" pertaining thereto. (**ATTACHMENT 4**, *U.S. Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation v. My Pillow, Inc., et al*., Case No. 1:21-cv-00445, Docket No. 145, pp. 4-5). Moreover, the motion was only targeted at the "third-party subpoenas" that were the subject of the particular motion.

The subpoenas requested the disclosure of "forensic images of various drives attached to Dominion voting equipment used during the November 2020 election; forensic images of slog.txt and .dvd files generated from tabulators and ballot

marking devices; forensic images of all election records related to the November 2020 election subject to 52 U.S.C. § 20701; network diagrams, credentials, and network logs from electronic election equipment; the identity of certain election personnel; copies of any reports, documents, and spreadsheets made in relation to the November 2020 election; documents related to any indication of any intrusion attempt into the election systems; copies of cellular bills and connections supporting ballot scanners/devices; copies of all contracts with suppliers of any electronic election system equipment, devices, software, or support services; and copies of all contracts related to network security, network monitoring, or cybersecurity concerning all or any part of the customer's electronic election system." *Id.*, pp. 4-5.

As Dominion explained the intent of its motion, Lindell had issued subpoenas "to dozens of Dominion's customers – local elections officials in various states across the country" and that "thirty-nine (39) Dominion customers…in sixteen (16) jurisdictions ha[d] received subpoenas seeking production of a wide range of election-related materials and information, *some of which is confidential and proprietary to Dominion* and classified by the *Election Assistance Commission (EAC) as critical election infrastructure*." *Id.*, p. 7 (emphasis supplied). Again, these third-party subpoenas were sought to gain access to technical data and

information that Dominion considered "trade secrets" and "proprietary."  *Id*., pp. 4-5, 7.

Basic administrative and instructional emails from corporate officers and employees to others (here foreign nationals working directly with or for Dominion on the U.S. election) do not fall within this category.  Indeed, the EAC would presumably not consider such communications as being or having anything to do with "critical election infrastructure" because they are just the opposite in demonstrating a breach thereof.  Therefore, in the first instance, the information that Defendant has come across in Dominion's production does not contain any type of technical data or information that could be considered "trade secret" or "proprietary" or "confidential" pertaining thereto.  Moreover, the communications *do* assist in Mr. Byrne's defense before the Court and in the public sphere.

On this latter note, and equally, if not more, important, the information in the production contains information concerning criminal conduct and collusion and conspiracy with and by foreign nationals in the conducting of U.S. elections and therefore fall within an exception for matters of national security and constitutional important, which have always enjoyed a robust "tradition of accessibility" in this country.

Dominion asserts that undersigned did not have a right to receive or review the information, but the protective order itself allows, in addition to counsel, employees, assistants, consultants, in-house counsel, experts, independent litigation support services assisting counsel for the Parties, and partners, associates, paralegals, secretaries, clerical, regular and temporary employees, and service vendors of such experts or consultants (including outside copying services and outside support services) who are assisting with the Litigation).  Furthermore, undersigned entered into a specific agreement to receive discovery information.  Finally, even Dominion admits that they were advised that undersigned counsel was already assisting Mr. Byrne in his defense.  See Dominion's Motion to Disqualify and for Relief, p. 9.

Furthermore, the "sanctions" provision Dominion sites at page 8 of its "motion," only applies where release is made to those *not entitled* to be made. Again, Dominion exaggerates the power and restrictions of this ordinary civil action protective order.

As acknowledged by Dominion, undersigned counsel was absolved of ethical violations and sanctions in the King v Whitmer case.  The "grievances" filed against her by the Governor, Attorney General, and Secretary of State were held not to be valid or merit worthy by the state bar and dismissed.  These same "complainants" have now orchestrated an unlawful legal campaign against undersigned counsel.

DISCUSSION AND ANALYSIS

A party moving to disqualify counsel bears the burden of proving the grounds for disqualification.  *In re BellSouth Corp.*, 334 F.3d 941, 961 (11th Cir. 2003)). When a court is presented with motion to disqualify, that court must "be conscious of its responsibility to preserve a reasonable balance between the need to ensure ethical conduct on the part of lawyers appearing before it and other social interests, which include the litigant's right to freely choose counsel." *Woods v. Covington Cnty. Bank*, 537 F.2d 804, 810 (5th Cir. 1976).   Moreover, "[d]isqualification of one's chosen counsel is a drastic remedy that should be resorted to sparingly." *Norton v. Tallahassee Mem'l Hosp.*, 689 F.2d 938, 941 n. 4 (11th Cir. 1982)). "Because a party is presumptively entitled to the counsel of his choice, that right may be overridden only if compelling reasons exist." *In re BellSouth*, *supra* (internal quotation marks and citations omitted). Furthermore, "[s]uch motions are generally viewed with skepticism because…they are often ***interposed for tactical purposes***." *Evans v. Artek Sys. Corp.*, 715 F.2d 788 (2d Cir. 1983); *Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222 (6th Cir. 1988).

Here, Dominion's entire view of the issue is skewed, and purposefully so.  It seeks to contain everything in the production of civil discovery within the scope of the Court's protective order even though "Discovery Material" is defined only as

25

specific information (Dominion's "stamp" of confidential on every single document and on everything produced notwithstanding), the court speaks through its written orders under the ordinary rules of interpretation, and understanding and appreciating the general availability of information for public access.

However, Dominion's only refers to *ad hominem* attacks on counsel in its effort to disqualify.  This is indeed a "tactical" effort to stifle the truth and to prevent undersigned counsel who has introduced and presented corroborating expert analysis of the deficiencies in Dominion voting systems, and now has fulfilled her ethical duty to report the discovery of potential criminal violations to law enforcement.

Dominion wants to disqualify undersigned because of her combined knowledge and the information she possesses from litigating cases in multiple jurisdictions, and with her expertise and knowledge, including multiple expert analyses of the deficiencies in Dominion voting systems' product, and to prevent her from using her expertise and knowledge to defend Mr. Byrne, who has a right to retain and have qualified counsel defend him.

Dominion's original puffery and effort to degrade undersigned counsel and Mr. Byrne as much as possible with the use of *ad hominem* attacks deflates rapidly when it actually analyses the legal basis for its sudden emergency request to hide the

truth from undersigned counsel, who has proved her expertise to be able to process it and analyze it and best defend Mr. Byrne.

Any contention that undersigned counsel has just appeared and therefore there is no harm in disqualification is belied by the fact that she has served as Mr. Byrne's expert legal consultant and has participated in litigating other cases in coordination with him.

Indeed, undersigned counsel has been successful in bringing the truth to the public about Dominion's deficiencies since the very beginning. As co-counsel for in the Antrim County case in Michigan, *Bailey v. Antrim County*, undersigned counsel produced evidence that Dominion's voting machines were being accessed by outside networks and were deficient. (**ATTACHMENT 5**, Antrim County Expert Reports). During the 2020 election, undersigned had experts reveal again that Dominion Voting Machines were deficient and not secure. (**ATTACHMENT 6,** Speckin Forensics Report, July 2023).

Furthermore, undersigned counsel has represented whistleblowers and government officials in numerous states, which have consistently revealed deficiencies and problems in Dominion's voting machines and systems. Now, the truth is coming to light with the revelations in the information produced by Dominion in this case.

In fact, there is no violation of the court's order because (1) the information is not covered by the order; (2) even if it was there is an exception which would allow the disclosure to law enforcement; and (3) there is a further *public interest exception* which even the judiciary has a constitutional obligation to acknowledge.

Generally, and without restricting a court's discretion, protective orders enjoy a presumption against modification. However, there is a long-established common-law right of public access to documents that are of extreme public concern and interest. This "tradition of accessibility" is significant where the public interest in future elections is concerned.

The Constitution demands that elections be fair and transparent, and indeed, as discussed herein, it is the duty of the judiciary to ensure that information bearing on the fundamental constitutional right to vote inherent in every citizen be protected.

Moreover, the performance of traditionally governmental functions, which include elections and the means by which elections are conducted, are even more of a significant public concern because, after all, it is supposed to be the people who decide by vote who represents their will, and those serving the people must be held to a higher standard when it comes to the election process. Dominion cannot simply say that it has no hand in the conducting of elections given the communications and information discovered to date.

In the instant case, the grounds for the protective order are that the materials may contain proprietary information and Dominion has sought to sweep into this categorization all materials included in the discovery.  Defendant is in possession of emails showing that foreign nationals are entering election systems in the United States before certification of the 2020 election.  The public has a right to know that these instances of foreign intrusion have occurred, and further, that Dominion is complicit in them.  Dominion has filed this lawsuit, and other lawsuits to hide these facts from the American public and to create a false narrative.

The interference in an election by foreign nationals is not only a prime example of this violation of the constitutional rights of every legally registered voter, but it is also a federal criminal act.  Under federal law, it is considered a criminal act for a foreign national to interfere in an election. The term "foreign election interference" is defined as conduct by a foreign person that violates federal criminal, voting rights, or campaign finance law, or is performed by any person acting as an agent of or on behalf of a foreign government or criminal enterprise. This conduct includes any covert, fraudulent, deceptive, or unlawful act or attempted act, or knowing use of information acquired by theft, undertaken with the specific intent to significantly influence voters, undermine public confidence in election processes or

institutions, or influence, undermine confidence in, *or alter the result or reported result* of a general or primary Federal, State, or local election or caucus.

> A person, including an election official, who in any election for Federal office…knowingly and willfully deprives, defrauds, or attempts to deprive or defraud the residents of a State of a fair and impartially conducted election process, by…the procurement, casting, *or tabulation of ballots that are known by the person to be materially false, fictitious or fraudulent* under the laws of the State in which the election is held, shall be fined in accordance with title 18, United States Code (which fines shall be paid into the general fund of the Treasury, miscellaneous receipts (pursuant to section 3302 of title 31, United States Code), notwithstanding any other law, or imprisoned not more than 5 years, or both.  52 U.S.C. § 20511 (emphasis added).

Further, 52 U.S.C. § 10308 provides:

> (a) Depriving or attempting to deprive persons of secured rights. Whoever shall deprive or attempt to deprive any person of any right secured by section 2, 3, 4, 5, or 10 [52 USCS § 10301, 10302, 10303, 10304, or 10306] or shall violate section 11(a) [52 USCS § 10307(a)], shall be fined not more than $5,000, or imprisoned not more than five years, or both.

> (b) Destroying, defacing, mutilating, or altering ballots or official voting records. Whoever, within a year following an election in a political subdivision in which an observer has been assigned (1) destroys, defaces, mutilates, or otherwise alters the marking of a paper ballot which has been cast in such election, or (2) *alters any official record of voting in such election tabulated from a voting machine or otherwise*, shall be fined not more than $5,000, or imprisoned not more than five years, or both.

> (c) Conspiring to violate or interfere with secured rights. Whoever conspires to violate the provisions of subsection (a) or (b) of this section, or interferes with any right secured by section 2, 3, 4, 5, 10, or 11(a) [52 USCS § 10301, 10302, 10303, 10304, 10306, or

10307(a)] shall be fined not more than $5,000, or imprisoned not more than five years, or both.

(d) Civil action by Attorney General for preventive relief; injunctive and other relief. Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 2, 3, 4, 5, 7, 10, 11 [52 USCS § 10301, 10302, 10303, 10304, 10306, 10307], or subsection (b) of this section, the Attorney General may institute for the United States, or in the name of the United States, an action for preventive relief, including an application for a temporary or permanent injunction, restraining order, or other order, and including an order directed to the State and State or local election officials to require them (1) to permit persons listed under this Act to vote and (2) to count such votes.

(e) Proceeding by Attorney General to enforce the counting of ballots of registered and eligible persons who are prevented from voting. Whenever in any political subdivision in which there are observers appointed pursuant to this Act any persons allege to such an observer within forty-eight hours after the closing of the polls that notwithstanding (1) their listing under this Act or registration by an appropriate election official and (2) their eligibility to vote, they have not been permitted to vote in such election, the observer shall forthwith notify the Attorney General if such allegations in his opinion appear to be well founded. Upon receipt of such notification, the Attorney General may forthwith file with the district court an application for an order providing for the marking, casting, and counting of the ballots of such persons and requiring the inclusion of their votes in the total vote before the results of such election shall be deemed final and any force or effect given thereto. The district court shall hear and determine such matters immediately after the filing of such application. The remedy provided in this subsection shall not preclude any remedy available under State or Federal law.

(f) Jurisdiction of district courts; exhaustion of administrative or other remedies unnecessary. The district courts of the United States shall

31

> have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether a person asserting rights under the provisions of this Act shall have exhausted any administrative or other remedies that may be provided by law.  52 U.S.C. § 10308 (emphasis added).

Violations of these provisions have been prosecuted in the past.  See, e.g., *United States v Singh*, 924 F3d 1030, 1040 (CA 9, 2019).  Accepting, counting, tallying, or manipulating illegal or void ballots or creating "fake" votes in a federal election, a federal crime, also disenfranchises and debases every individual who casts a legal vote.  See 52 U.S.C. § 20511 ("*tabulation of ballots that are known by the person to be materially false, fictitious or fraudulent*"; 52 U.S.C. § 10308(b) ("alter[ing] any official record of voting in such election tabulated from a voting machine or otherwise").

The rights protected by these provisions are fundamental, personal, and individual.  They are recognized and justiciable in any forum and in any manner in which they may be properly pled.  See, e.g., *Ex Parte Yarbrough*, 110 U.S. 651, 662; 4 S. Ct. 152; 28 L. Ed. 274 (1884).  Not only is it illegal for foreign nationals or "any person" to engage in this conduct, but it would also be a federal crime for a person or entity *to conspire with* a foreign national to break these aforementioned laws.  52 U.S.C. § 10308(c) ("Whoever conspires to violate the provisions of subsection (a) or (b)  ("alter[ing] any official record of voting in such election tabulated from a

voting machine or otherwise") "interferes with" the rights secured by the federal provisions protecting the fundamental right to vote).  Further, the compensation to a foreign national, whose receipt of compensation in exchange for engaging in subverting and otherwise manipulating or providing the means to manipulate an election would also be punishable.

Title 18 U.S.C. § 1846 proscribes the fraudulent deprivations of "the intangible right of honest services." "Honest services fraud is found where a third party enriches the offender, and an entirely different party suffers a betrayal or deception through a denial of their right to the offender's honest services."  See, e.g., *Skilling v. United States*, 561 U.S. 358, 400, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010).

In the instant case, Dominion receives compensation from governments to provide voting systems and voting machines so that Americans can exercise their fundamental right to vote. The collusion with foreign nationals to have them connect to and have access to these election systems is a betrayal of public trust, and a deeper deception that would appear to include honest services fraud.  Indeed, the provision by a private entity of a government service or for governmental functions may give rise to liability for honest services fraud where the third party is enriching whom he believes to be an offender, but does so under a mistaken premise orchestrated by the

government. *United States v O'Donovan*, ___F Supp 3d___; 2023 U.S. Dist. LEXIS 124059, at \*4-5 (D Mass, July 19, 2023).

Moreover, a conviction for honest services wire fraud under 18 U.S.C. §§ 1343 and 1346, is possible where the defendant's knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud, and (2) the use of the mails or interstate wire communications in furtherance of the scheme." *United States v. Sawyer*, 85 F.3d 713, 723 (1st Cir. 1996) (footnote omitted). See also, *United States v. Falcón-Nieves*, 79 F.4th 116, 126 (1st Cir. 2023).

In the instant case, email communications reveal that Dominion conspired with foreign nationals in Serbia to create the means by which the 2020 election could be subverted and manipulated. Serbians created the software and coded the machines at Dominion's headquarters in Serbia and accessed election systems in Michigan and Pennsylvania before the election was certified at Dominion's direction and pursuant to its instructions.

Every such act would deprive citizens of the United States of their fundamental right to vote because any form of diluting, deleting, or otherwise manipulating votes or the voting process is a direct violation of the guarantees in the Constitution. See, e.g., *United States v. Classic*, 313 U.S. 299, 314; 61 S. Ct. 1031; 85 L. Ed. 1368 (1941); *Reynolds v. Sims*, 377 U.S. 533, 560-563; 84 S. Ct. 1362; 12

L. Ed. 2d 506 (1964).  The right to cast a vote in an unimpaired manner and the right to have that vote counted, and counted properly, includes protection from manipulation of the votes and the voting process.  Moreover anyone has standing to sue for a violation of these fundamental rights, and to prosecute them under federal criminal laws. *Ex Parte Yarbrough*, 110 U.S. 651, 662; 4 S. Ct. 152; 28 L. Ed. 274 (1884).  And the government, including the judiciary, must act to ensure that elections and the means by which they are operated are transparent. *Id*. at 662-63

Further, title 18, Section 371 of the United States Code prohibits two distinct types of conspiracies: (1) conspiracies "to commit any offense against the United States" and (2) conspiracies "to defraud the United States, or any agency thereof[,] in any manner or for any purpose." 18 U.S.C. § 371. The Supreme Court has "stated repeatedly" that the "defraud" clause of § 371 is not limited to common-law fraud but "reaches any conspiracy for the purpose of impairing, obstructing or defeating *the lawful function* of any department of Government." *Tanner v. United States*, 483 U.S. 107, 128, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987) (emphasis added) (internal quotation marks omitted) (collecting cases). A conspiracy to impede the functions of a government agency "need not aim to deprive the government of property" or "involve any detrimental reliance." *United States v. Caldwell*, 989 F.2d 1056, 1059 (9th Cir. 1993), overruled on other grounds by *Neder v. United States*, 527 U.S. 1,

35

8-9, 119 S. Ct. 1827, 144 L. Ed. 2d 35, (1999).  Nor must "the conspiracy's goal" or "the means used to achieve it" be "independently illegal."  *Id*.  As long as the conspiracy aims to obstruct the lawful functions of a government agency through some form of "deceit, craft or trickery, or at least by means that are dishonest," see, e.g., *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S. Ct. 511, 68 L. Ed. 968 (1924), it falls within § 371's reach.  In short, a defraud-clause conspiracy requires four elements: "that (1) [the defendants] entered into an agreement, (2) to obstruct a lawful function of the government or an agency of the government, (3) by deceitful or dishonest means, and (4) at least one overt act was taken in furtherance of that conspiracy."  *United States v. Kanchanalak*, 41 F. Supp. 2d 1, 9 (D.D.C. 1999), rev'd on other grounds, 192 F.3d 1037, 338 U.S. App. D.C. 200 (D.C. Cir. 1999).

Dominion conspired to impair "lawful government functions."  This function, "regulat[ing] and monitor[ing] the participation of foreign nationals in the American electoral process," and impairing the requisite "transparency in the American political and electoral process," to include administering, monitoring, and controlling national elections, is sacrosanct, because it threatens the very fabric of the American constitutional system of government.

36

In the instant case, by providing voting machines and systems, Dominion is itself performing a critical governmental function. For all intents and purposes, it is a "state actor" acting in the furtherance of its enterprise. All of the communications by Dominion, regardless of their status under the protective order, should be subject to FOIA. Moreover, the email communications that are of interest demonstrate that the testimony of Dominion's CEO before the Michigan Legislature that Dominion has no ties to foreign nationals and no foreign nationals have control or oversight over the manner in which the machines function was a lie. (**ATTACHMENT 7**, Transcribed Testimony of Dominion CEO John Poulos, December 15, 2020, p. 3). There, Mr. Poulos directly stated: "Dominion does not have ***any ties to…[sic] source code transfer there are no ownership ties to any political parties nor to foreign governments***" and further that its "voting systems are by design meant to be used as ***closed systems that are not networked. Meaning that they are not connected to the internet***." *Id.* (emphasis supplied). Further, Mr. Poulos testified that "no Dominion employee has given me any reason to suspect that they have or would do anything to try to alter an election outcome." *Id.*

The emails and information revealed in discovery, coupled with multiple expert reports from around the country, disprove these claims – meaning that Mr. Poulos was not truthful in his testimony and Dominion knows it. Dominion directed

and tasked foreign nationals and conspired with them to engineer its voting systems in a manner that remote access could be gained and interference could occur before, during, and after the election commenced, and, critically, before certification. The fact that Dominion, a governmental actor conspired with foreign nationals to engineer voting systems and machines that could not only connect to the internet, but could then be manipulated at will, is precisely the type of conduct prohibited and therefore criminalized by 52 U.S.C. § 10308 and 52 U.S.C. § 20511.

Indeed, section 10308 expressly prohibits *"altering of any official record of voting in such election tabulated from a voting machine or otherwise*." A conspiracy exists where a foreign national and an entity such as Dominion conspires to violate these laws. See, e.g., 18 U.S.C. § 371 and *Tanner v. United States*, 483 U.S. 107, 128, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987) (stating that the "defraud" clause of § 371 is not limited to common-law fraud but "reaches any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government.").

The fact that the voting systems and machines have the capacity to connect to the internet *and* the software was created and engineered by foreign nationals acting in concert with and for Dominion is sufficient in itself to lift the protective order to allow disclosure of these email communications. Moreover, the email

communications do not detail or describe proprietary information or technical details about the voting machines, they describe a conspiracy to inject a means by which elections in the United States are vulnerable, and purposefully so. The fact that Dominion's CEO perjured himself should be enough to demonstrate the willfulness of Dominion to create these avenues for sabotage and to hide them from the public. For example, Dominion's CEO testified before a public body that Dominion had no foreign connections and was not influenced or part of any foreign companies run by or with the involvement of foreign nationals. (**ATTACHMENT 7**, p. 3). The Dominion CEO also stated that the voting systems and machines could not connect to the internet and be accessed from outside sources. *Id*.

Dominion has represented to the EAC that its voting machines and systems comply by not being connected to networks and by not being connected to or accessed by foreign entities. This is now known not to be the case. Expert reports from Antrim County, Michigan, and Fulton County, Pennsylvania suggest otherwise.

Attached expert reports from Ben Cotton and Speckin Forensics demonstrate that the voting machines were accessed from outside the United States. (**ATTACHMENT 5**). While the information contained in the discovery reveals

this, we are only now presenting the expert reports and corroborating evidence that is not within the current discovery produced by Dominion.

Dominion's continual denial of this in the public eye, to include hiding behind the protective order in this and other cases evidences a fraud upon the court. Moreover, the public has a right to know and the judiciary has an obligation to order disclosure, because, as the Supreme Court has stated, any complaint, indeed, any public inquiry into the deprivation of the fundamental right to vote is actionable, and the judiciary has an express obligation to abide because it has a duty to ensure that the Constitutional rights of American citizens to vote and to have their votes properly counted are secured. *Yarbrough*, 110 U.S. at 661, 662-63. The election process is particularly vulnerable as the time to vote is regulated and once an election is held, it is paramount that the tabulation of votes be secured and free from foreign intervention, and the means of outside influence and manipulation.

According to the United States Constitution every legally registered citizen voter is guaranteed the fundamental right to vote, to have their vote counted properly, and to not have their vote diluted, deleted, or otherwise adulterated by fraud, mistake, neglect, or other malfeasance, misfeasance, or malfunction in the running and operating of elections. *Classic*, *supra*; *Reynolds*, *supra*. No constitutional right is more fundamental than the right to vote, for if that is lost to fraud, deceit, mistake,

and/or basic neglect and incompetence, then all of the other fundamental, individual, constitutional rights guaranteed to every citizen of the United States is rendered irrelevant and meaningless.  The Supreme Court of the United States has recognized the "political franchise" of voting as a "fundamental political right, because preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 371; 6 S. Ct. 1064; 30 L. Ed. 220 (1886).  "[T]he right…is a fundamental matter in a free and democratic society.  Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667; 6 S. Ct. 1079, 1085 (1966).  A vote cast is an assurance to the one exercising that right that their choice of who will represent them will be properly recorded.   See, e.g., *Reynolds*, 377 U.S. at 560-563.   If the government cannot guarantee that this sacred right will be protected, and not destroyed or threatened, then there is no basic security or safety in the placing of any trust in those who claim to be elected to represent the people.  *Id*., see also, *Harper*, *supra* and *Classic*, 313 U.S. at 314; citing, *inter alia*, *Yarbrough*, 110 U.S. at 662.

In the latter case, the Court confirmed the standing of every citizen to petition the government to protect his right to cast a vote and to have that vote properly counted – it is a standing that does not depend on the status of the complainant but in circumstances where fraud, corruption, mistake, or neglect are charged in the

conducting of an election, the power of the court "arises out of the circumstance that the function in which the party is engaged or the right which he is about to exercise is dependent on the laws of the United States." *Id*. at 662-63. The Court stated further regarding the duty of the government to protect the citizen's rights in this regard: "[I]t is the duty of…government to see that he may exercise this right freely…. This duty does not arise solely from the interest of the party concerned, but from the necessity of the government itself, that its service shall be free from the adverse influence of force and fraud practised on its agents, and that the votes by which its members of Congress and its President are elected shall be the free votes of the electors, and the officers thus chosen the free and uncorrupted choice of those who have the right to take part in that choice." *Id*. "Regulation of the electoral process receives unusual scrutiny because 'the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights.'" *Mathews v. Diaz*, 426 U.S. 67, 78-79, 96 S. Ct. 1883, 1890-91 (1976), quoting *Reynolds*, *supra* at 562. See also, *Dunn v. Blumstein*, 405 U.S. 330, 336; 92 S. Ct. 995; 31 L. Ed. 2d 274 (1972).

The standing of every citizen and the duty of the government to protect the right to vote extends directly to ensuring that no fraud, corruption, or mistake occurs in the counting, tabulation, and return of votes. In *Classic*, supra, the Court stated

"[t]o refuse to count and return the vote as cast [is] as much an infringement of that personal right as to exclude the voter from the polling place."  313 U.S. at 315.  The Court has also recognized the Constitution guarantees that "free and uncorrupted choice" shall be afforded to all in the decision of who should lead them.  *Id.* (emphasis added).

In other words, the right to vote is accorded extraordinary treatment because it is, in equal protection terms, an extraordinary right: a citizen cannot hope to achieve any meaningful degree of individual political equality if granted an inferior right of participation in the political process."  *Plyler v Doe*, 457 U.S. 202, 233; 102 S. Ct. 2382; 72 L. Ed. 2d 786, 810 (1982).

For an added measure of assurance, it is declared that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."   U.S. Const., amend. IX (emphasis added).   It was universally agreed by the Framers that there are additional fundamental rights, protected from governmental infringement, which exist alongside those specifically mentioned in the first eight amendments.  "The [Ninth] Amendment…was proffered to quiet expressed fears that a bill of specifically enumerated rights could not be sufficiently broad to cover all essential rights and that the specific mention of certain rights would be interpreted as a denial that others were protected."  I Annals of

Congress 439 (Gales and Seaton ed. 1834).  See also II Story, Commentaries on the Constitution of the United States (5th ed. 1891), pp. 626-627.

As "it cannot be presumed that any clause in the constitution is intended to be without effect…effect should be given to all the words it uses."   *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803).  See also *Myers v. United States*, 272 U.S. 52, 229 (1926).  And, indeed, a right to political affiliation and political choice has been addressed as protected, at least in part, by this amendment.  *United Pub. Workers v. Mitchell*, 330 U.S. 75, 94-95, 67 S. Ct. 556, 567 (1947).  This includes, of course, the fundamental right to vote.  *Id.*  See also *Reynolds*, 377 U.S. at 560.

In addition to the specific, enumerated rights at issue in voting rights cases, *inter alia*, the First Amendment, U.S. Const., amend. I, the Ninth Amendment, U.S. Const. amend. IX and the Fourteenth, U.S. Const., amend. XIV and Fifteenth Amendments, U.S. Const., amend. XV, where an individual's constitutional rights to vote are at issue, there is no necessity to declare a violation of a specific enumerated right.  See, e.g., *Classic*, 313 U.S. at 315, wherein the Court specifically stated:

> Included within the right to choose [the right to vote protected by the First Amendment, *inter alia*], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted at Congressional elections. This Court has consistently held that this is a right secured by the Constitution…. And since the constitutional command is without restriction or limitation, the right,

*unlike those* guaranteed by the Fourteenth and Fifteenth Amendments, is secured against *the action of individuals as well as of states*." *Id.* (emphasis added).

Finally, whether a party can disclose such information to law enforcement without violating the protective order would *depend on the specific terms of the protective order and the circumstances of the case.* There is nothing in the protective order, nor should it have been Dominion's intent to shield information such as this from disclosure. There is no specific terminology in the protective order seeking to exclude general corporate communications, and certainly nothing that secures Dominion's right to protect potentially criminal conduct. *Mynette Technologies, Inc v United States*, 163 Fed Cl 733, 751 (2022). What Dominion did intend to do, as articulated in its specific, original motion for a protective order was to defend against subpoenas that were targeted at what Dominion viewed as proprietary, technical, and commercially sensitive information and critical infrastructure about the configurations of software and hardware. (**ATTACHMENT 4**, Dominion's Motion for Protective Order Regarding Certain Third Party Subpoenas, *U.S. Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation v. My Pillow, Inc., et al.*, Case No. 1:21-cv-00445, Document 145).

<u>CONCLUSION</u>

45

Dominion's motion to disqualify has no merit in terms of its efforts to attack and degrade undersigned counsel and prevent Mr. Byrne from having the most qualified counsel of his choice, who also happens to know the truth, and therefore, who is best qualified to defend him in this defamation action.

Further, Dominion's motion for "protective relief" is not based on a proper reading of the law or the scope of the protective order, and even if it was, there is an exception which requires the court to allow public access.

WHEREFORE, for the foregoing reasons, Dominion's motion to disqualify counsel should be denied, the protective order should be lifted to the extent that the information gleaned must be disclosed to law enforcement, are not Confidential Discovery Material, and reveal the truth underlying the claims of defamation against Mr. Byrne.

Respectfully submitted,

/s/ Stefanie Lambert

_____
Stefanie Lambert Juntilla
Law Offices of Stefanie L. Lambert, PLLC
400 Renaissance Drive, FLOOR 26
Detroit, MI 48243
attorneylambert@protonmail.com

46

Dated : March 18, 2024

<u>CERTIFICATE OF SERVICE</u>

I, Stefanie Lambert, hereby certify that on March 18, 2024, true and correct copies of the forgoing was served via email on counsel of record for every party in *US Dominion, et al. v. Patrick Byrne*, Case No. 1:21-cv-02131 (CJN).

Respectfully submitted,

/s/ Stefanie Lambert
_____
Stefanie Lambert Juntilla
Law Offices of Stefanie L. Lambert, PLLC
400 Renaissance Drive, FLOOR 26
Detroit, MI 48243
attorneylambert@protonmail.com