# ATTACHMENT 5

Expert Reports Prepared for Counsel,
*Bailey v. Antrim County*

# EXHIBIT 3

Qualifications and Reports of Jeff Lenberg

## Exhibit B – Jeffrey Lenberg CV

Retired Distinguished Member of the Technical Staff Sandia National Laboratories Chief Technology Officer World Light Power LLC, World Light Africa Limited

Jeff Lenberg graduated from the University of New Mexico with a Bachelors degree (1978) and Masters degree (1980) in Electrical Engineering. While in college he gained two years experience at the NASA Dryden Flight Research Center at Edwards AFB, CA working on the development of flight simulators.

In 1980 Jeff joined Sandia National Laboratories. He retired in December, 2011 after thirty-one plus years at the labs. He spent several years as a first level supervisor and finished his career as a Distinguished Member of the Technical Staff.

The first twelve years at Sandia, Jeff developed satellite systems involving flight hardware, test software, test systems, project management, and supervisor roles.

For two and a half years, he led the development of secure national and international networks for export control while on assignment at DOE headquarters in Washington DC. While in DC and on his own time, he was involved in the investigation of potential election fraus associated with the 1994 Maryland gubernatorial election. He assisted the FBI with data analysis in their investigation which was initiated in March 1995.

After returning from Washington and for the rest of his career, Jeff performed national vulnerability assessments and led the development of national security related projects. These projects required systems analysis, hardware (including low power microsystems) and software design, team development, project management, and program development. These projects varied from a one person, $100K project to a one hundred person, $20M project.

While working on national security projects, Jeff held high level security clearances. He worked on projects with several governmental

agencies. He led "black hat" teams whose objective was to expose vulnerabilities by developing ways to break in (if possible) to what were considered to be secure systems and demonstrate that it could be done (physical security, secure hardware, and secure software systems).

In 2012 after Jeff retired from Sandia Labs, he started a renewable energy development company and in 2014 started a company based in Nairobi, Kenya to help create African jobs and bring energy to those who are without it.

**Analyst: Jeffrey Lenberg**
**Date: May 3, 2021**

**Executive Summary**

Vote modification in Antrim County was consistent with technical manipulation of the election project file. This project file was generated and deployed by ElectionSource for the November 3, 2020 election.

ElectionSource configured and deployed Antrim County's project files that resulted in the modification of the votes during the election. The modification demonstrates manipulation of any and all races on the ballot. Administrator access (via administrator password) permits modification to these project files and creates inaccurate vote tally results observed during the election in Antrim County.

The SQL Management Studio Version 17.1 was found to be installed on the Antrim County Election Management System (EMS) (see Douglas Logan's Report dated 4/9/2021). This software is not certified by the Election Assistance Commission for use on electronic voting systems. This software tool was utilized in expert testing to replicate the Antrim County November 3, 2020 election vote tally manipulation. Testing using this software tool was consistent with technical manipulation of the project file resulting in inaccurate vote tallies.

The ElectionSource staff responsible for the creation and deployment of the project have direct access to make specific modifications to the project files. Testing indicates that vote modification can be pre-planned and deployed prior to an election. ElectionSource staff possesses all of the administrative access to make selective modification of the project files to manipulate the vote tally for any targeted county, precinct, or race.

Logs from the EMS indicate ElectionSource technicians responsible for deploying the project files to Antrim County also had access to numerous other counties project files to include:

| | | | | |
|---|---|---|---|---|
| Alcona | Alger | Alpena | Arenac | Berrien |
| Calhoun | Charlevoix | Cheboygan | Gogebic | Houghton |
| Iosco | Isabella | Keweenaw | Manistee | Marquette |
| Menominee | Midland | Otsego | Presque Isle | Schoolcraft |
| Wayne | Wexford | | | |

It is unclear if modifications to the above counties listed impacted the Antrim County project file.

## Project Files

Testing of Antrim County project files indicates that modification of the project files can replicate the election inaccuracies observed in the November 3, 2020 election. In addition, further testing revealed that selective modification of the project files resulted in tailored manipulation of the votes tallied. The manipulation can be tailored to modify a specific county, precinct, or race. The steps used to manipulate the vote tally are listed below:

- Modify the specific precinct election files
  - Edit the VIF_BALLOT_INSTANCE.DVD
  - Note: Technical access to ElectionSource corporate resources would allow for these types of manipulations to the elections.

- Burn Compact Flash cards with the configurations for the tabulators

- Run the Election (Process the Ballots through the Tabulator)

The results of the modifications to the project file will show vote totals changed on the tabulator's printed tape as well as modified vote totals in the Results Tally Reporting (RTR) system.

In order to validate these findings; two test cases were run:

1. The swap of Trump and Jorgenson vote totals on both the paper tape and the RTR results

2. The swap of Biden and Trump (Presidential Race) and Ferguson and Bergman (Congressional) while leaving the Senate race unmodified on both the paper tape and the RTR results

Exhibit A contains photos of all the ballots that were run for test case number 2 as well as the paper tapes and RTR tallies showing the manipulations.

Both test cases were successful in that the modifications were made without any alerts or error messages being generated by the EMS or the tabulator. The test cases would not have been detected during the canvassing process because both the paper tapes and the RTR results matched.

## SQL Database Tools on the EMS

The SQL Management Studio Version 17.1 was found on the EMS (see Douglas Logan's report dated 4/9/2021) and this software is not certified by the Election Assistance Commission (EAC) for use on electronic voting systems. The SQL tool is a utility that enables the modification of project files and databases on the EMS.

Testing shows the replication of the Antrim County election vote manipulation as asserted by Halderman from November 3, 2020 modifying the vote totals on the EMS by utilizing the SQL tool resident on the EMS. The use of SQL tool requires no special access beyond being able to log into the EMS itself. Therefore, any actor with access to the EMS could create this manipulation of the election results.

**ElectionSource Staff Access to Other Counties**

ElectionSource staff that worked on the Antrim County project file also had access to a number of other counties across Michigan to include:

| | | | | |
|---|---|---|---|---|
| Alcona | Alger | Alpena | Arenac | Berrien |
| Calhoun | Charlevoix | Cheboygan | Gogebic | Houghton |
| Iosco | Isabella | Keweenaw | Manistee | Marquette |
| Menominee | Midland | Otsego | Presque Isle | Schoolcraft |
| Wayne | Wexford | | | |

These counties appeared in the UserInfo log file on the EMS as being previously opened projects that were being utilized by the ElectionSource technician during the same timeframe that the ElectionSource technicians was working to configure and deploy project files for Antrim County.

It is certain that the ElectionSource technician had access project files for more than just Antrim County. It is unclear whether the configuration of the other counties had an impact on the Antrim county election.

Jeffrey Lenberg
Date: 5/3/2021

## MICHIGAN NOTARY ACKNOWLEDGEMENT

State of Michigan
County of Michigan

The foregoing instrument was acknowledged before me on this 3rd day of May, 2021 by Jeffrey Lenberg.

Notary Public Signature: _____
Notary Printed Name: Ann M. Howard
Acting in the County of: Oakland
My Commission Expires: 2/24/2023

ANN M. HOWARD
Notary Public, State of Michigan
County of Oakland
My Commission Expires 02-24-2023
Acting in the County of _____

**Exhibit A – Test Case #2 – Presidential and Congressional Swap Only**



*Figure 1 - Trump/James/Bergman*



*Figure 2 - Trump/James/Bergman*



*Figure 3 - Trump/James/Bergman*



*Figure 4 - Trump/James/Bergman*



*Figure 5 - Biden / Peters / Ferguson*



*Figure 6 - Biden / Peters / Ferguson*



*Figure 7 - Jorgenson / Willis / Boren*

Contest:                        **President and Vice President of the United Stal**

Number Of Postions :   **1**

Precinct Portion:          **Helena Township, Precinct 1**

Ballot Manifestation :   **1124**

---

⬇ **Ballot Statistics**

⬆ **Contest Results**

Overvotes:          0

Undervotes:        0

Blank:                  0

Double Votes:     0

Invalid Votes:     0

Writein Overrides:   0

---

⬆ **Candidate Results**

| Name | Party | Votes |
|------|-------|-------|
| Joseph R. Biden / Kamala D. Harris | DEM | 4 |
| Donald J. Trump / Michael R. Pence | REP | 2 |
| Jo Jorgensen / Jeremy Cohen | LIB | 1 |
| Don Blankenship / William Mohr | UST | 0 |
| Howie Hawkins / Angela Walker | GRN | 0 |
| Rocky De La Fuente / Darcy Richardson | NLP | 0 |
| Write-in | | 0 |

*Figure 8 - Trump/Biden Flipped on RTR*

Contest:                     **United States Senator for State**

Number Of Postions :    **1**

Precinct Portion:         **Helena Township, Precinct 1**

Ballot Manifestation :   **1124**

### Ballot Statistics

### Contest Results

| | |
|---|---|
| Overvotes: | 0 |
| Undervotes: | 0 |
| Blank: | 0 |
| Double Votes: | 0 |
| Invalid Votes: | 0 |
| Writein Overrides: | 0 |

### Candidate Results

| Name | Party | Votes |
|---|---|---|
| Gary Peters | DEM | 2 |
| John James | REP | 4 |
| Valerie L. Willis | UST | 1 |
| Marcia Squier | GRN | 0 |
| Doug Dern | NLP | 0 |
| Write-in | | 0 |

*Figure 9 - Senate - Correct - No Flip*

| Contest: | **Representative in Congress 1st District** |
|---|---|
| Number Of Postions : | **1** |
| Precinct Portion: | **Helena Township, Precinct 1** |
| Ballot Manifestation : | **1124** |

**Ballot Statistics**

**Contest Results**

| | |
|---|---|
| Overvotes: | 0 |
| Undervotes: | 0 |
| Blank: | 0 |
| Double Votes: | 0 |
| Invalid Votes: | 0 |
| Writein Overrides: | 0 |

**Candidate Results**

| Name | Party | Votes |
|---|---|---|
| Dana Ferguson | DEM | 4 |
| Jack Bergman | REP | 2 |
| Ben Boren | LIB | 1 |
| Write-in | | 0 |

*Figure 10 - Congressional District - Ferguson/Bergman Flipped*



*Figure 11 - Paper Tape Results Showing Presidential/Congressional Flipped - Senate Correct*

Subject: Preliminary Report of Subversion in the Antrim County Election
Management System, Results Tallying and Reporting Application
Date: 5/9/2021
Analyst: Jeffrey Lenberg

## Executive Summary

The Antrim County Dominion Democracy Suite, Election Management System
(EMS), Results Tallying and Reporting (RTR) application has been found to be
subverted. Numerous error conditions that are identified by the tabulator are
ignored by the EMS/RTR. The error conditions are easily reproduced and displayed
on the tabulator, yet the EMS/RTR has been subverted in a fashion to purposefully
ignore vote manipulation. This technical behavior is consistent with a subversion
being deployed in the Antrim County EMS/RTR and is designed to mute such error
reporting. This subversion technique is common among malicious actors seeking to
proactively handle error conditions that would jeopardize their ability to modify
software's performance.

The J Alex Halderman expert report dated March 26, 2021 does not accurately
describe the conditions that occurred in the Antrim election. The shifting of votes
described by Halderman during the November 3, 2020 election should have resulted
in Biden's votes being shifted to the Natural Law Party, Straight Party Vote, which
in turn would have resulted in Rocky De La Fuente (the Natural Law Party
Candidate) receiving a large number of votes as a result, or an error condition
should have occurred on the EMS/RTR for a vote shift outside of the Presidential
contest. Neither of these scenarios occurred because the EMS/RTR was subverted in
a fashion to handle such an error silently and treat that situation as an undervote
(no vote for the Presidential race at all).

Testing of related scenarios has shown the ImageCast Precinct (ICP) tabulator
properly reported a critical error and shut down the tabulator when there were
votes shifted between contests. However, when the EMS/RTR was presented with
the same results file processed on the tabulator, it reported no errors, but instead
erroneously reported those vote choices as blanks (undervotes) instead of generating
a critical error.

The evidence of a subversion in the EMS/RTR is sufficient that an expert review of
the source code for the EMS/RTR is warranted to determine the extent of the
subversion and breadth of the configuration options available to the malicious
actors that would employ it.

This assessment is based on the review of the Antrim County EMS/RTR and testing
with an ICP tabulator. If more forensic information and source code becomes
available for review, this assessment will be reevaluated in the light of the new

evidence available. Upon receipt of the source code a specific evaluation of the error handling routines will be conducted along with static and dynamic code analysis to definitively determine the specific behavior of the software.

## Details

## Discovery of Subversion of the Antrim County EMS/RTR

A specific test was designed to determine how the Antrim County EMS/RTR along with the tabulator would handle the swap of Biden votes with the Natural Law Party (Straight Ticket Vote from the Contest Above on the ballot).

The rationale for making this test was the fact that Halderman indicated that the shift of votes that occurred would have changed the index of the candidate selection to cross the boundary from the Presidential contest to the Straight Party Ticket contest. This shifting across the boundary of a contest should have created a critical error condition during the processing of votes, however, in the case of Antrim County election it did not.

The test scenario is as follows:

Ballot Style: Helena Township, Precinct 1 (1124)
DVD File Name: 1120_8_8_0_DETAIL.DVD
internalMachineID for Biden: 3016
internalMachineID for Natural Law Party: 3015

Votes Cast on Test Ballots (See Appendix A):
Biden: 2
Trump: 4
Jorgenson: 1

Both the EMS/RTR and the ICP tabulator used exactly the same DVD file listed above.

The test scenario implemented a swap between the internalMachineID fields of Biden and the Natural Law Party in the VIF_BALLOT_INSTANCE.DVD file to attempt to cause Biden's votes to be swapped with the Straight Party/Natural Law Party.

The expected outcome was that Biden's votes would be assigned to the Natural Law Party (Straight Party Vote) and the result would be Biden's votes being tallied for the Natural Law Party Presidential Candidate Rocky De La Fuente.

The test revealed the following:

- The ICP reported a critical error and does not finish processing the vote file, does not print a paper tape, writes the error to the log file, and forces a mandatory shutdown of the tabulator
- The EMS/RTR loads the same file with no errors and takes all of the Biden votes and treats them as undervotes

The 1120_8_8_0_DETAIL.DVD file is a result file containing the votes that are cast on the ICP.  When the poll is closed, the ICP software processes the file containing the votes and produces a paper tape with the tallies for each candidate.  This process works normally as long as the internalMachineID is not modified or the modification stays within the boundaries of the those "expected" for the specific contest, for example the Presidential Contest.  In other words, a malicious actor can swap internalMachineIDs within the same Contest for any candidate so long as the index remains in the correct range for that same contest.

However, for the purposes of this test the internalMachineIDs were swapped between different Contests, the software in the ICP reports a critical error (see Figure 1). The ICP does not finish processing the vote file (Figure 1), does not print a paper tape, requires the operator to shut-down the tabulator (see Figure 2), and records details of the error in the slog.txt file (Figure 3) on the compact flash card. The tabulator takes drastic action to inform the operator that a very serious problem has been encountered. Note that the vote result file 1120_8_8_0_DETAIL.DVD is still correctly stored on the compact flash card.



*Figure 1 - ICP Error Loading Results File*



*Figure 2 - ICP Critical Error - Shutdown Required*

*Figure 3 - slog.txt File Contents from Compact Flash Card*

The same compact flash card is then loaded on to the Antrim EMS/RTR software. The card reports that it loaded successfully both the vote results and the log file (See Figure 4).  Prior to loading this compact flash card the EMS database is directly manipulated in the same way that the file sent to the tabulator was manipulated by swapping 3015 and 3016 internalMachineID in the ChoiceManifestion table of 5744 vote choices spanning all of the contests on all of the 49 ballots types.



*Figure 4 - EMS Successfully Loads Results File*

The displayed results indicated that Biden is missing his votes and they are reported as blank ballots and undervotes for that contest (See Figure 5). One of two things should have happened. Either Biden's votes should have been assigned to the Straight Party/Natural Law (internalMachineID = 3015) in which case Bidens vote for President would have been assigned to De La Fuente and note that this did not occur. The other possibility is that the software was able to check the range for internalMachineID range for the contest in which case it would not have found the reference for the Biden vote choice and it should have created an error very similar to what the ICP output. This would be a critical error that should have stopped the application from further processing the compact flash card. Because the Biden vote choice must exist and it did not exist, the application should have stopped loading the results with an error message as to the fact that the results were corrupted. However, no errors were indicated of any kind by the EMS/RTR. The Biden votes just became blank votes (no choice) when there clearly is a choice on the ballot. In summary, either the shifted votes should have gone to De La Fuente (via Straight Party – Natural Law Party) or the application should have created a critical error that would have kept the votes from being tallied and reported.



*Figure 5 - Biden Undervotes Results*

The conclusion of this test indicates EMS/RTR technical behavior consistent with a technical subversion. Further in-depth analysis of source code would be required to gain definitive clarity on the specific nature of the subversion. This would include analysis of the error handling routines, code traces, static and dynamic code analysis.

Under the penalties of perjury, I declare that I have read the foregoing report and that the fact stated in it are true.

Jeffrey Lenberg

Jeffrey Lenberg
Date: 5/9/2021

STATE OF MICHIGAN

COUNTY OF OAKLAND

The foregoing instrument was acknowledged before me this 9th of May, 2021 by Jeffrey Lenberg.

_Ann M. Howard_

Notary Public

Printed Name: Ann M. Howard

My Commission Expires:  2/24/2023

ANN M. HOWARD
Notary Public, State of Michigan
County of Oakland
My Commission Expires 02-24-2023
Acting in the County of Oakland

## Appendix A – Ballots Used in Test



*Figure 6 - Trump/James/Bergman*



*Figure 7 - Trump/James/Bergman*



*Figure 8 - Trump / James / Bergman*



*Figure 9 - Trump/James/Bergman*



*Figure 10 - Biden / Peters / Ferguson*



*Figure 11 - Biden / Peters / Ferguson*



*Figure 12 - Jorgenson / Willis / Boren*

Date: 5/15/2021
Subject: Evidence of Vote Shifting in Barry County Michigan
Analyst: Jeffrey Lenberg

## Executive Summary

The Dominion Voting Systems Election Management Systems (EMS), Results Tally & Reporting (RTR) application was subverted during the course of the November 3, 2020 election in Barry County Michigan. There is evidence of the same vote shifting discovered in Antrim County, Michigan occurring in Barry County during election night.

In a previous report by this author dated May 9, 2021, a subversion in the EMS/RTR system was demonstrated where critical errors were disregarded, and the processing of votes continued despite error conditions that should have triggered a critical error in the system.

One of the specific subversions to the error handling in the EMS/RTR noted was the use of logical "bumpers" that prevented the shifting of votes from one contest to another. These logical bumpers account for the shifted Biden votes in the Antrim County election going to the status of "undervote" for the Presidential contest. Without this subversion the vote shifting would result in votes being assigned to the Natural Law Party in the Straight Party Ticket contest on the ballot. The votes shifted from Biden to the Natural Law Party, Straight Party Ticket vote, would then result in the Presidential candidate Rocky De La Fuente receiving Biden's votes.

An affidavit from Jada Chadwick of Hastings, Barry County, Michigan dated December 5, 2020 indicates that she observed Rocky De La Fuente leading in the race with 8,883 votes at 11:17PM with 47% of the precincts reporting on November 3, 2020. Jada Chadwick attached a photo of her computer screen to her affidavit documenting Rocky De La Fuente leading the race.

The candidate Rocky De Law Fuente's final total vote count in Barry County was 16 votes. This type of aberration occurring during a live election is consistent with a subversion being employed operationally by a malicious actor in a misconfigured mode. We have established that the subverted EMS/RTR in Antrim County will not allow Biden votes to be shifted to the Natural Law Party, Straight Party Ticket vote. However, in Barry County during election night November 3, 2020 it is apparent that the subversion was misconfigured resulting in the shifting of votes and consequently causing votes to accrue to the Natural Law Party Candidate, Rocky De Law Fuente.

1

It is highly likely that the required error handling subversion observed in Antrim was not in place in Barry as would be required to force the cross-Contest vote shift to go to undervote. The accidental but observable extreme results generated from this vote manipulation were anticipated by the malicious actor and likely required a rapid deployment of a pre-planned software fix or an updated configuration to correct for this obvious error in logic. This update would have needed to be deployed across the State of Michigan on all Dominion Voting Systems EMS/RTR systems where the incomplete subversion had a similar malfunction when manipulating the vote totals. This could have been done by an unwitting technician or a download if there existed any remote path into the EMS computer.

The evidence of EMS/RTR subversion in Barry County is relevant to Antrim County because the same contractor, ElectionSource, was likely responsible for the design and deployment of the election project files in both Antrim and Barry County that take advantage of this subversion in order to manipulate votes. A definitive conclusion on the observed behavior of the EMS in Barry County and its relation to the subversion in Antrim can only be completed with a full forensic examination of the equipment and removable media in Barry County. The Michigan Secretary of State has previously ordered destruction of some removable media related to the November 3, 2020 election (See Appendix C). The removable media (compact flash card(s)) is crucial to understand the nature of the subversion that occurred.

### Details

This author's report dated May 9, 2021 indicated the presence of a subversion in the Dominion Voting Systems EMS/RTR system. The subversion specifically pertained to how the EMS/RTR system processed results files where a shift occurs in the targeted race.

The Antrim County shift impacted the internalMachineID field of the table named Choice_Manifestation in the EMS database. The subversion of the Antrim County EMS/RTR includes a logical bumper that does not allow the shifting of votes from one contest to another, only shifting of votes within the same contest. The subversion prevents the system from raising a critical error and permits the EMS/RTR to continue processing and posting results without any error or warning messages.

In Antrim County, Biden's votes (internalMachineID index) were shifted to the index number assigned to the Straight Party Ticket Contest, Natural Law Party vote. However, due to the logical bumpers deployed as part of the subversion, all of Biden's shifted votes were counted as "undervotes" by the EMS/RTR in Antrim. Without the subversion it would be expected that shifted Biden votes would cross into the Straight Party Ticket contest, leaving the Presidential contest with no vote within.  The internalMachineID index selected as a result of the shift would be the

Natural Law Party, Straight Party Ticket vote. If this selection were to be accurately executed by the Dominion Imagecast Precinct (ICP) and the EMS/RTR, the result would be a vote for the Natural Law Presidential candidate Rocky De La Fuente.

See Figure 1 containing a graphical explanation of the internalMachineID index of vote bullets on the ballot are assigned and used by the ICP and EMS/RTR.

## MICHIGAN NOTARY ACKNOWLEDGEMENT

State of Michigan
County of Oakland

The foregoing instrument was acknowledged before me on this 15th day of May, 2021 by Jeffrey Lenberg.

Notary Public Signature:

Notary Printed Name: Ann M. Howard
Acting in the County of: Oakland
My Commission Expires: 2/24/2023

8

internalmachineID = 3015

internalmachineID = 3016

Logical Bumper

When the manipulation of vote occurred in Antrim County, the index for Biden was shifted from 3016 to 3015. In Antrim, the shift of internalmachineID resulted in an undervote due to the subversion. However, the Natural Law Party would be the actual selection, resulting in Rocky De La Fuente receiving the Presidential vote because it had just been vacated.

In Barry County the affidavit of Jada Chadwick shows that the candidate Rocky De La Fuente received an abnormally high number of votes during the course of election night. See Figure 2.



*Figure 1 - Ballot with internalMachineID Annotated*

**Evidence of Subversion in Barry County, Michigan**

An affidavit filed by Jada Chadwick of Hastings in Barry County, Michigan dated December 5, 2020 indicated that she observed Rocky Del La Fuente leading in the Presidential contest having 8,883 votes at 11:17PM with 47% of the precincts reporting on November 3, 2020.  Figure 2 is the screenshot that Ms. Chadwick took of the vote totals from her computer screen.



*Figure 2 - Barry County Election Live Update 11:17PM November 3, 2020*
*See Appendix A for full Affidavit from J Chadwick*

The final vote totals for Barry County reflect that the candidate Rocky De La Fuente received only 16 total votes vice the 8,883 votes reported on election night when he was in the lead.

# President/Vice-President of the United States (Vote for 1)

Precincts Reported: 24 of 24 (100.00%)

| | | Election Day | AV Counting | Total | |
|---|---|---|---|---|---|
| Times Cast | | 21,099 | 15,047 | 36,146 / 0 | N/A |

| Candidate | Party | Election Day | AV Counting Boards | Total | |
|---|---|---|---|---|---|
| Joseph R. Biden/Kamala D. Harris | DEM | 4,522 | 7,275 | 11,797 | |
| Donald J. Trump/Michael R. Pence | REP | 16,088 | 7,383 | 23,471 | |
| Jo Jorgensen/Jeremy Cohen | LIB | 297 | 182 | 479 | |
| Don Blankenship/William Mohr | UST | 24 | 35 | 59 | |
| Howie Hawkins/Angela Walker | GRN | 50 | 33 | 83 | |
| Rocky De La Fuente/Darcy Richardson | NLP | 12 | 4 | 16 | |
| Total Votes | | 20,993 | 14,912 | 35,905 | |

| | Election Day | AV Counting Boards | Total | |
|---|---|---|---|---|
| Unresolved Write-In | 33 | 23 | 56 | |

*Figure 3 - Barry County, Michigan Final Vote Totals*

6

**Conclusion**

The subversion that impacted Antrim County was present yet not fully implemented in the EMS/RTR in Barry County on election night. The manifestation of votes being shifted to Rocky De La Fuente is consistent with the EMS/RTR subversion previously identified in Antrim County. The large number of votes for Rocky De La Fuente in Barry County during the live election results reporting can be attributed to a misconfiguration of the subversion or inadequate planning on the part of the subversion developer when writing the code to support the subversion. It is highly likely that a software update or some sort of "patch" had to be deployed to correct this issue and then the results files had to be reprocessed and reposted to the state and the election night reporting system.

The Antrim County subversion is not an isolated incident, and it is apparent that whoever is responsible for creating election project files exercised their ability to manipulate voting in Barry County as well as Antrim County.

Under the penalties of perjury, I declare that I have read the foregoing report and that facts stated in it are true.

_Jeffrey Lenberg_

Jeffrey Lenberg

## Appendix A – Jada Chadwick Affidavit

Exhibit 3

**Affidavit & Sworn Statement**

Pages 1 of 8

I, Jada Chadwick, residing at ~~████████~~
Barry County Hastings, State of Michigan, do swear and attest under the penalties of perjury and upon personal knowledge that the contents of this sworn statement are true, accurate, and correct, and that I am competent to testify.

Description of account

1. On November 3, 2020 I voted for the presidential and local election. At the Hasting Baptist Church. at 10:30 AM

2. I went with my husband, Shawn Chadwick. When we arrived the parking lot was full. We made our

3. way inside and was directed to our ward, Ward 1.

4. We both stood in line waiting to vote for about 20

5. Minutes. My husband voted before me and the lady at the table handed him his ballot but she noticed that all

6. the booths were in use. There were 5 booths in total. There was a basket full of sharpie markers that were

7. Porvided to us. I noticed the person before us grab one and my husband and I used one. They were the

8. only writing untensils porvided. I went to the booth

9. to vote and noticed the marker bleed to the other Side of my ballot and it looked like a dalmatian

10. with dots everywhere. I turned my ballot in and it went into the counter but I didn't know if

Dated this 5th day of December 20 20
Signature Jada Chadwick

Diane Kay Patterson
Notary Public of Michigan
Kent County
Expires 08/08/2027
Acting in the County of Barry

SUBSCRIBED AND SWORN to before me this 5th day of December
2020
Diane Kay Patterson

8

Exhibit 3

Pages 2 of 3 (JC)

**Affidavit & Sworn Statement**

I, Julia Chadwick, residing at ~~_____~~
Barry County Hastings, State of Michigan, do swear and
attest under the penalties of perjury and upon personal knowledge that the contents of this
sworn statement are true, accurate, and correct, and that I am competent to testify.

Description of account

1. it was accepted. we both turned in our sharpies into a volunteer who wiped them with a clorox wipe.

2. After the election was over, it was about 11:00pm

3. and I was watching fox news. I noticed that Eaton County had it's final count in and Barry

4. had not. I clicked on barry County and the count was:

5. De La Fuente at 8,883 39.4%   Exhibit 1 (JC)
   Trump at 8,744 38.8%

6. Biden at 4,675 20.7%
   Reporting at 41%. I took a screen shot of this.

7. This concerned me because I had used a sharpie marker

8. (and I never used one before. I then went to the SOS.org to see what voting system was being used in

9. Barry County and Eaton county. Barry was using Dominion voting system and Eaton was using   Exhibit 2 & 3 (JC)

10. Heart voting system. I took screen shots of this as well. I ~~also~~ also viewed a Bscreen shot of

Dated this 5th day of December 20
Signature Jada Chadwick

Diane Kay Patterson
Notary Public of Michigan
Kent County
Expires 08/08/2027
Acting in the County of Barry

SUBSCRIBED AND SWORN to before me this 5th day of December 2020

Diane Kay Patterson

9

Pages 3 of 3

**Affidavit & Sworn Statement**

I, Juda Chadwick , residing at ~~████████~~ ,
Barry County Hastings , State of Michigan, do swear and
attest under the penalties of perjury and upon personal knowledge that the contents of this
sworn statement are true, accurate, and correct, and that I am competent to testify.

Description of account

1. a ballot that look very similar to mine that    Exhibit 4
2. night. Torly on December 5th 2020 I veewed
   the SOS. org website and it is now deleted.    Exhibit 5
3. I have no idea if my vote was even counted

4.

5.

6.

7.

8.

9.

10.

Dated this 5th day of December 20 20
Signature Juda Chadwick

Diane Kay Patterson
Notary Public of Michigan
Kent County
Expires 08/08/2027
Acting in the County of

SUBSCRIBED AND SWORN to before me this 5th day of December 2020
Diane Kay Patterson





State Representative Jack O'Malley's Post

🔒 michigan.maps.arcgis.c...

2 of 2

**EATON COUNTY**

**Vendor/Manufacturer:** Hart InterCivic

**Voting System Name**: Hart InterCivic Verity Voting 2.2.2

**Tabulator:** Verity Scan

**Number of Tabulators:** 57.00

*Exhibit 2*

**Accessible Equipment:** Verity Touch Writer

**Number of Accessible Equipment:** 38.00

**Implementation Timeframe:** 2018

...

Send

12





Exhibit 4

14



15

## Appendix B – Official Election Results from Barry County, Michigan

# Election Summary Report

General Election

Barry County, Michigan

November 03, 2020

Summary for: All Contests, All Precincts, All Tabulators, All Counting Groups

Precincts Reported: 24 of 24 (100.00%)
Registered Voters: 36,146 of 0 (N/A)
Ballots Cast: 36,146

## Straight Party Ticket (Vote for 1)

Precincts Reported: 24 of 24 (100.00%)

|  | | Election Day | AV Counting | Total | |
| --- | --- | --- | --- | --- | --- |
| Times Cast | | 21,099 | 15,047 | 36,146 / 0 | N/A |

| Candidate | Party | Election Day | AV Counting Boards | Total | |
| --- | --- | --- | --- | --- | --- |
| Democratic Party | DEM | 2,069 | 3,214 | 5,283 | |
| Republican Party | REP | 9,649 | 4,442 | 14,091 | |
| Libertarian Party | LIB | 87 | 35 | 122 | |
| U.S. Taxpayers Party | UST | 8 | 15 | 23 | |
| Working Class Party | WCP | 68 | 23 | 91 | |
| Green Party | GRN | 22 | 13 | 35 | |
| Natural Law Party | NLP | 16 | 0 | 16 | |
| Total Votes | | 11,919 | 7,742 | 19,661 | |

|  | | Election Day | AV Counting Boards | Total | |
| --- | --- | --- | --- | --- | --- |
| Unresolved Write-In | | 0 | 0 | 0 | |

16

## President/Vice-President of the United States (Vote for 1)

Precincts Reported: 24 of 24 (100.00%)

|  | | Election Day | AV Counting | Total | |
|---|---|---|---|---|---|
| Times Cast | | 21,099 | 15,047 | 36,146 / 0 | N/A |

| Candidate | Party | Election Day | AV Counting Boards | Total | |
|---|---|---|---|---|---|
| Joseph R. Biden/Kamala D. Harris | DEM | 4,522 | 7,275 | 11,797 | |
| Donald J. Trump/Michael R. Pence | REP | 16,088 | 7,383 | 23,471 | |
| Jo Jorgensen/Jeremy Cohen | LIB | 297 | 182 | 479 | |
| Don Blankenship/William Mohr | UST | 24 | 35 | 59 | |
| Howie Hawkins/Angela Walker | GRN | 50 | 33 | 83 | |
| Rocky De La Fuente/Darcy Richardson | NLP | 12 | 4 | 16 | |
| Total Votes | | 20,993 | 14,912 | 35,905 | |

|  | | Election Day | AV Counting Boards | Total | |
|---|---|---|---|---|---|
| Unresolved Write-In | | 33 | 23 | 56 | |

## United States Senator (Vote for 1)

Precincts Reported: 24 of 24 (100.00%)

|  | | Election Day | AV Counting | Total | |
|---|---|---|---|---|---|
| Times Cast | | 21,099 | 15,047 | 36,146 / 0 | N/A |

| Candidate | Party | Election Day | AV Counting Boards | Total | |
|---|---|---|---|---|---|
| Gary Peters | DEM | 4,428 | 6,941 | 11,369 | |
| John James | REP | 15,958 | 7,541 | 23,499 | |
| Valerie L. Willis | UST | 195 | 171 | 366 | |
| Marcia Squier | GRN | 132 | 109 | 241 | |
| Doug Dern | NLP | 64 | 31 | 95 | |
| Total Votes | | 20,777 | 14,793 | 35,570 | |

|  | | Election Day | AV Counting Boards | Total | |
|---|---|---|---|---|---|
| Unresolved Write-In | | 22 | 10 | 32 | |

17

## Appendix C – Michigan Secretary of State Memo December 2, 2020



STATE OF MICHIGAN
**BUREAU OF ELECTIONS**
LANSING

**MEMORANDUM**

DATE:       December 1, 2020
TO:         County Clerks
FROM:       Michigan Bureau of Elections
SUBJECT:    Recounts; Release of Voting Equipment

Please be advised of the following:

**STATE RECOUNTS:** The Board of State Canvassers completed its canvass of the November 3, 2020 general election on November 23, 2020. The deadline for filing a petition for a recount with the Secretary of State elapsed on November 30, 2020. The following lists the recount requests received by the Secretary of State by the recount petition filing deadline:

- 71st State House District: Eaton County

**CONDUCT OF LOCAL RECOUNTS:** Recounts requested for local offices that overlap the district listed above may <u>not</u> proceed until clearance is received through this office. Recounts requested for local offices that do not overlap the district listed above may proceed at this time.

**DEADLINE FOR COMPLETION OF RECOUNTS:** After a general election, each requested recount must be completed no later than 30 days after 1) the deadline for filing a counter petition or 2) the first date the recount may lawfully begin (MCL 168.875).

**CONDUCT OF POST-ELECTION AUDITS:** If a recount has been requested involving a precinct that has been selected for a post-election audit, the audit may not begin until after the recount has been completed. All other post-election audits may proceed at this time. All of the resources you will need to conduct post-election audits may be found at this link:  Post-Election Audit Resources.

The post-election procedure audit includes a hand count of the ballots for the U.S. Senate race in each precinct selected for audit. Additionally, we will be conducting a state-wide Risk Limiting Audit of the Presidential race.

**RELEASE OF VOTING EQUIPMENT:** The security of ballots and election equipment is released as follows:

BUREAU OF ELECTIONS
RICHARD H. AUSTIN BUILDING • 1ST FLOOR • 430 W. ALLEGAN • LANSING, MICHIGAN 48918
www.Michigan.gov/elections • (800) 292-5973

***Ballots, programs and related materials:*** The security of all optical scan ballots, programs, test decks, accuracy test results, edit listings and any other related materials will be released once all post-election audits are completed.

***E-Pollbook laptops and flash drives:*** The EPB software and associated files must be deleted from all devices by the seventh calendar day following the final canvass and certification of the election (November 30, 2020) unless a petition for recount has been filed and the recount has not been completed, a post-election audit is planned but has not yet been completed, or the deletion of the data has been stayed by an order of the court or the Secretary of State.

**FEDERAL BALLOT RETENTION REQUIREMENT:** If the office of President, U.S. Senator or U.S. Representative in Congress appears on the ballot (all appeared on the November 3, 2020 general election ballot), federal law requires that all documents relating to the election -- including optical scan ballots and the programs used to tabulate optical scan ballots -- be retained for 22 months from the date of the certification of the election. To comply with the requirement, the Bureau of Elections recommends that optical scan ballots and the programs relating to federal elections be stored in **sealed ballot bags** in a secure place during the 22-month retention period. The documents subject to the federal retention requirement must not be transferred to ballot bags for extended retention until after they are released under Michigan election law as detailed in this memo.

**Questions?**

If you have any questions, please contact us via email at elections@michigan.gov, or by phone at (517) 335-3234 or (800) 292-5973.

19

Date: 5/16/2021
Subject: Summary of Security Deficiencies in the Antrim County Voting Systems
Analyst: Jeffrey Lenberg

## Executive Summary

This summary describes a subset of the critical deficiencies in the security of the electronic voting systems used in Antrim County, Michigan for the November 3, 2020 election.

Election workers/contractors with the technician/supervisor passcode can change the date/time on the Imagecast Precinct (ICP) tabulator tapes by resetting the time on the tabulator after they enter their passcode. The election worker/contractor can then proceed to print a new election tape from the tabulator with whichever data/time stamp they prefer. If a malicious election worker/contractor wished to run additional ballots outside of the election window or after hours, the ability to reset the time to print new tapes makes it extremely difficult to identify fraudulent activities because the paper tapes figure prominently in the canvassing process. See the expert report by Penrose dated May 3, 2021 that shows in the EMS the technician passcode of "123456".

All of the Antrim County election workers and contractors that perform work on the EMS utilize the same account to work on the system. This account has administrative access and can be used to modify the EMS database to manipulate vote totals. The 6 account first name/last names pairs listed in the system database are as follows: Ben/Smythe, John/Smith, Ryan/Smoth, MRO/M01, Return Office/Admin, MRESuper/Admin. These are the only users that account for log entries regardless of who is actually logged into the system and making changes.

The password enforcement policies on the EMS are substandard, they even allow the users to set purposefully "weak" passwords as a feature.

The absence of best practice security procedures to require individual accounts for users to protect accounts and passwords is inexcusable in a system that is used to conduct elections. In addition, the ability to reset date/time on tabulators, reopen the polls, reprint tapes makes fraud very feasible for even low sophistication actors.

## Details

Election workers have the ability to set the time on a tabulator at any time in order to print paper tapes that show the appropriate date/time stamp. The technician/supervisor password enables the workers to have this capability. The

1

process is straightforward and is performed by traversing the menus on the tabulator itself.

For this demonstration scenario, the following steps were performed to illustrate that the ICP paper tabulator tapes can be custom modified to show a specific time of poll closure for the election, regardless of the actual date and time.

- The ICP is powered on.

- The ICP Poll is opened by scanning the security key fob on the ICP sensor and entering the poll worker security passcode of "11032020", and a zero tape is printed.

- 7 demonstration ballots (same reference ballots from Lenberg report dated May 3, 2020 Exhibit A) are fed into the tabulator demonstration purposes.
  - The vote breakdown on the original ballots for the Presidential Contest is as follows:
    - 4 votes for Trump
    - 2 votes for Biden
    - 1 vote for Jorgenson
  - The vote breakdown on the original ballots for Senate
    - 4 votes for James
    - 2 votes for Peters
    - 1 vote for Willis

- The ICP Poll is closed by placing the security key fob on the ICP sensor which brings up an administrative menu to close the poll.  As soon as the poll is closed a paper tape of the tabulation is automatically printed. The paper tape includes a flip of Trump and Biden votes.
  - The vote breakdown on the paper tape for the Presidential Contest is as follows:
    - 2 votes for Trump (flipped from Biden to Trump)
    - 4 votes for Biden (flipped from Trump to Biden)
    - 1 vote for Jorgenson
  - The vote breakdown on the paper tape for Senate
    - 4 votes for James
    - 2 votes for Peters
    - 1 vote for Willis

- The ICP Poll is reopened by placing the security key fob on the ICP sensor and entering the technician passcode "123456"



*Figure 1 - ICP LCD Closed Poll Menu*



*Figure 2 - ICP LCD Menu to Re-open the Poll*

- o 7 ADDITIONAL demonstration ballots are fed into the system with the same original ballot breakdown as the initial group of ballots used in the demonstration.
- o The security key fob is placed on the ICP sensor, and a menu appears automatically ICP LCD showing CLOSE THE POLL, UTILITIES, BALLOT REVIEW, POWER DOWN, and CANCEL



*Figure 3 - ICP LCD Administrative Menu*

- o The following menu selection is made on the tabulator LCD
  - UTILITIES -> DIAGNOSTICS -> INDIVIDUAL -> INTERNAL CLOCK -> SET DATE AND TIME
  - See Figures 4-9

4



*Figure 4 - ICP LCD Utilities Menu*



*Figure 5 - ICP LCD Selection Diagnostics Type*



*Figure 6 - ICP LCD Device Selection Menu*



*Figure 7 - ICP LCD Clock Diagnostic*



*Figure 8 - ICP LCD Set Date/Time*



*Figure 9 - ICP LCD Dialogue to Set Time*

- o Set the date/time to the election date/time the poll was originally closed
  - This specific action represents the most egregious vector for fraud for local election workers/contractors with administrative access to the tabulators and to any ballot(s)
  - The ballot images are stored on the EMS and additional blank ballots are in the possession of Election Source contractors and any local official with physical access to the media. (see Penrose report dated May 3, 2021)
  - The poll worker/technician passcodes along with access to additional ballots (could be only one) would be sufficient to perpetrate this fraud
- o On the ICP LCD select CANCEL on the DIAGNOSTICS sub-menu
- o On the ICP LCD select CLOSE POLL and enter the poll worker passcode "110302020"

- The malicious actor initially makes an estimate the number of fraudulent votes needed to win the election and programs for that scenario.  However, often they need to add additional votes beyond the pre-planned fraud estimates, requiring the polls to be *re-opened again* to add additional fraudulent votes to achieve their objectives.

- The ICP Poll is reopened by placing the security key fob on the ICP sensor and entering the technician passcode "123456"
  - o Once again, 7 ADDITIONAL demonstration ballots are fed into the system with the same original ballot breakdown as the initial group of ballots used in the demonstration.
  - o The security key fob is placed on the ICP sensor, and a menu appears automatically ICP LCD showing CLOSE THE POLL, UTILITIES, BALLOT REVIEW, POWER DOWN, and CANCEL
  - o The following menu selection is made on the tabulator LCD
    - UTILITIES -> DIAGNOSTICS -> INDIVIDUAL -> INTERNAL CLOCK -> SET DATE AND TIME
  - o Set the date/time to the election date/time the poll was originally closed
    - Again, this is done to ensure the paper tapes printed from the tabulator remain consistent and fraud is not detected during the canvassing process.
  - o On the ICP LCD select CANCEL on the DIAGNOSTICS sub-menu
  - o On the ICP LCD select CLOSE POLL and enter the poll worker passcode "110302020"

- This demonstration continues to follow the same process of injecting fraudulent votes and maintaining the exact same date and time for the poll opening, closing, and printout to the minute.
  - This is done for two more rounds of adding 7 more fraudulent ballots per round
  - The total number of fraudulent ballots added is 21 in this demonstration while maintaining the same date and time to the minute as the original election results on the ICP tabulator paper tape.

- The fraudulent actor may run this attack ad infinitum at their leisure.



*Figure 10 - Manipulated Vote Totals on Tabulator Tapes*



*Figure 11 - Specific Times Manipulated on the Tapes Corresponding to Figure 10*

## Administrator Accounts and Passwords

The Dominion Election Management System (EMS) database accounts have the following user names: John Smith, MRO M01, Return Office Admin, Ben Smythe, MRESuper Admin, Ryan Smoth.



*Figure 12 – Dominion EMS Database Administrator Accounts*

*Figure 13 - UserInfo Log Change from John Smith to Ben Smythe*

Any user with access to the EMS using the EMS Admin username and password to log into the Dominion Democracy Suite Election Event Designer (EED) application will appear to be "Ben Smythe" in the log files. This obfuscates identity of the true user on the system and makes it impossible to perform security audits and ongoing monitoring for suspicious activities. The EED application is used to design the entire election, it is used to program the election files on to the compact flash cards, and it is used to program the security key fobs that are required to open, close, reopen, or rezero the polls.

If there were inappropriate or fraudulent activities occurring on the EMS they would be attributed to the shared account and follow-on investigations would be

stymied by the lack of specificity when it comes to the identity of the user active on the system.

Similarly, any user with access to the RTR using the EMS RTRAdmin username and password to log into the Dominion Democracy Suite Result Tallying and Reporting (RTR) application will appear to be "Ryan Smoth" in the log files. This was found in the template for Michigan (Figures 14 and 15). So one can assume that all counties in Michigan that were programmed using this template will all have Ryan Smoth as the RTRAdmin User. This obfuscates identity of the true user on the system and makes it impossible to perform security audits and ongoing monitoring for suspicious activities. The RTRAdmin operator account offers the option of choosing a "weak" password as a feature. (Figure 16) This option to choose a weak password is against all best security practices and leaves the RTR Operator role susceptible to exploitation by malicious cyber attackers. The RTR application is the one used to import, reject, validate, publish, and unpublish results contained on the compact flash cards and/or results transmitted via modem to a county-located Listener computer (proposed for Antrim but apparently not purchased) that then relays them to the EMS computer. Results can also be manually entered at this point overriding results from any other source. Once they are "published" into the reports that then go out to the media there is no external indication that the results were "manually" entered into the system instead of coming from the tabulators.

| | | | |
|---|---|---|---|
| Admin | Instance with name '7ac70d62-bf0b-4d6e-8e78-3c66bf8ef83' of type 'AppUser' modified: password changed; firstName changed from 'John' to 'Ben'; lastName changed from 'Smith' to 'Smythe'; position = ''; description = ''; contactAddress = ''; contactPhone1 = ''; contactPhone2 = ''; contactEmail = ''; | 2019-01-08 09:27:28.340 | TraceMessage |
| Admin | Instance with name '20fe3ee1-22e3-4eb2-839d-cb69d505ef27' of type 'LanguageProfile' with id = '20fe3ee1-22e3-4eb2-839d-cb69d505ef27' is created. | 2019-01-08 09:27:28.340 | TraceMessage |
| Admin | User initiates generation of password. | 2019-01-08 09:27:28.343 | UserAction |
| Admin | User initiates generation of password. | 2019-01-08 09:27:32.063 | UserAction |
| Admin | User initiates generation of password. | 2019-01-08 09:27:32.063 | UserAction |
| Admin | Project security elements created | 2019-01-08 09:27:32.063 | UserAction |
| Admin | User initiates generation of password. | 2019-01-08 09:27:32.063 | UserAction |
| Admin | Project ElectionSource Famous Names Right Oval Closed | 2019-01-08 09:28:46.907 | UserAction |
| Admin | User initiates generation of password. | 2019-01-08 09:28:46.923 | UserAction |
| Admin | Prompt warning: 'Ballot style has not been set. Go to Settings/Election Event Properties menu, Ballot Settings option and select applicable ballot style.'; User answered with: 'OK' | 2019-01-08 09:28:52.440 | UserAction |
| Admin | Project Michigan Template opened | 2019-01-08 09:28:57.657 | UserAction |

*Figure 14 - Michigan Project Template Opened*

12

| 733 | Admin | Instance with name 'Transmit to Listener using SSL' of type 'NumberSystemParameter' modified: paramValue changed from '0' to '1'; | 2019-01-08 16:13:19.740 | TraceMessage |
| 734 | Admin | Instance with name 'Transmit Results via internal port' of type 'NumberSystemParameter' modified: paramValue changed from '0' to '1'; | 2019-01-08 16:13:19.740 | TraceMessage |
| 735 | Admin | Instance with name 'Disable SSL Certificate Verification' of type 'NumberSystemParameter' modified: paramValue changed from '0' to '1'; | 2019-01-08 16:13:19.740 | TraceMessage |
| 736 | Admin | Instance with name 'Transmit Totals Results' of type 'NumberSystemParameter' modified: paramValue changed from '0' to '1'; | 2019-01-08 16:13:19.740 | TraceMessage |
| 737 | Admin | Instance with name 'Transmit Results via external port' of type 'NumberSystemParameter' modified: paramValue changed from '0' to '1'; | 2019-01-08 16:13:19.740 | TraceMessage |
| 738 | Admin | Instance with name 'Cross-voted Ballot' of type 'NumberSystemParameter' modified: paramValue changed from '1' to '0'; | 2019-01-08 16:13:19.743 | TraceMessage |
| 739 | Admin | User initiates the Close Project activity | 2019-01-08 16:13:19.743 | UserAction |
| 740 | Admin | Instance with name 'write-in report enabled' of type 'NumberSystemParameter' modified: paramValue changed from '0' to '1'; | 2019-01-08 16:13:19.743 | TraceMessage |
| 741 | Admin | Project Michigan Template Closed | 2019-01-08 16:13:59.073 | UserAction |
| 742 | Techad* | Project Michigan Template opened | 2019-01-08 16:13:59.073 | UserAction |

*Figure 15 - Michigan Project Template Closed*

Thus "Ryan Smoth" can enter whatever numbers he would like while ignoring the original values on the encrypted compact flash cards and printed tapes. Mr. Smoth can then go back the next day or any day up until the day the canvass is performed and quietly reopen the polls, add a matching number of votes as he manipulated on election night, change the time to match the original paper tape, and print the results. When the canvass is performed the modified paper tape will match the modified manually entered results. This is obviously an unacceptable combination of features that should not be made available in a secure election system.

**Ability to set "Weak Passwords"**



*Figure 16 - RTR Operator Password Strength Dialogue Box*

13

The password policy enforcement tool for the EMS gives the following error when we attempt to enter the current passwords used on the Antrim County EMS system.

Under the penalties of perjury, I declare that I have read the foregoing report and that facts stated in it are true.

_____

Jeffrey Lenberg

**MICHIGAN NOTARY ACKNOWLEDGEMENT**

State of Michigan
County of Oakland

The foregoing instrument was acknowledged before me on this 16th day of May, 2021 by Jeffrey
Lenberg.

Notary Public Signature: *[signature]*


Notary Printed Name: Ann M. Howard
Acting in the County of: Oakland
My Commission Expires: 2/24/2023

# EXHIBIT 4

Qualifications and Reports of Ben Cotton

## <u>AFFIDAVIT OF BENJAMIN R. COTTON 23 FEBRUARY 2022</u>

I, Ben Cotton, being duly sworn, hereby depose and state as follows:

1)      I am over the age of 18, and I understand and believe in the obligations of an oath.  I

make this affidavit of my own free will and based on first-hand information and my own

personal observations.

2)      I am currently the Vice President for Incident Response for eSentire and am the founder

of CyFIR, LLC (CyFIR).

3)      I have a master's degree in Information Technology Management from the University of

Maryland University College. I have numerous technical certifications, including the Certified

Information Systems Security Professional (CISSP), Microsoft Certified Professional (MCP),

Network+, and Certified CyFIR Forensics and Incident Response Examiner.

4)      I have over twenty-five (25) years of experience performing computer forensics and other

digital systems analysis.

5)      I have over eighteen (18) years of experience as an instructor of computer forensics and

incident response.  This experience includes thirteen (13) years of experience teaching students

on the Guidance Software (now OpenText) EnCase Investigator and EnCase Enterprise software.

6)      I have testified as an expert witness in state and federal courts and before the United

States Congress.

7)      I regularly lead engagements involving digital forensics for law firms, corporations, and

government agencies and am experienced with the digital acquisition of evidence under the

under the Federal Rules of Evidence.

8) I reviewed the Administrator manual for the Hart Verity system for the version of software that was purchased by the State of Michigan under contract number #071B7700128.

9) I reviewed the State of Michigan contract number #071B7700128, which is specific to the State of Michigan acquisition, deployment and operation of the Hart voting systems from March 1, 2017 to February 28, 2027 and was in effect during the November 3, 2020 general election.

10) I reviewed the Voting System Examination of Hart InterCivic Verity Voting 2.4 report dated May 16, 2020 the was conducted by Brian Mechler on behalf of the State of Texas.

11) The information from the reviews of these documents coupled with my experience allow me to make the following findings:

    a) **<u>Verity Devices Contain Internal Storage in Addition to USB VDrive Storage:</u>** The Hart administrative manual details that the devices contain and internal storage on a CFast drive as well as storage in the form of VDrive USB drives. This storage configuration is confirmed by the Texas report dated May 16, 2020.

    b) **<u>CFast Cards Contain Election Data:</u>** The Hart manuals detail that operational logs, cast vote records (CVRs) and other election related materials are stored on the CFast card. Hart estimates that the CFast storage will fill up after 22 months of elections given typical election schedules.

    c) **<u>CFast Cards Also Contain the Firmware for the Device:</u>** The Hart administrative manuals and the State of Michigan Contract specify that the firmware for the Verity devices are stored on the CFast card.

    d) **<u>CFast Cards Also Contain the Firmware for the Device:</u>** The Hart administrative manuals and the State of Michigan Contract specify that the firmware for the Verity

devices are stored on the CFast card in addition to the voting data contained in paragraph 11.c. of this affidavit.

e) **Hart Manuals do Not Proscribe Producing a Forensic Image of CFast Card:** A review of the Hart administrative manuals and the State of Michigan Contract reveals that neither document specifies that a forensic image or other form of data preservation be performed by personnel on the CFast card prior to updating the firmware of the Device.

f) **Updating Firmware Provides Full Device Level Accesses to the Device:** In my experience administrative level permissions and access is required to perform firmware upgrades on Devices.  This level of access would permit both read and write access to any storage connected to the Device.

g) **Any Update of the Device Firmware Would Change the CFast Card:** Given that the firmware for the Device is on the same Storage device that contains voting data, any update to the firmware would result in the overwriting of data on the CFast card.

12)   I have had the opportunity to examine a forensic image of an election system that was taken prior to a vendor update and a forensic image of that same system after the vendor update. Based on this examination it was clear that the update over wrote, and thus destroyed, the election data, system logs and program files that were contained on the system prior to the vendor update.  Depending on the level of backups and archiving of the original system by the clerk, the act of 'updating' the voting software could have deleted items that are necessary to be preserved under federal law.

13)   Updating election systems and subsequent certification of those systems is an inherent government function.  The abdication of this function to vendors is illegal under the Federal Acquisition Regulation.  Government officials must be able to adequately provide oversight to

3

vendors supporting the updating and certification of those systems to comply with the appropriate jurisdictional requirements and regulations.  In order to perform these oversight functions the government official must have the same levels of administrative access as the vendors, have access to detailed information concerning the full scope/impacts of the vendor activities and be able to independently validate that those activities did not violate the law.  I have discovered in the course of my analysis that the vendors of election software typically do not allow the counties that are using their software to have the level of access to the voting systems that would permit independent validation of the systems prior to certification.  Simply put, there currently is no mechanism for county clerks to independently validate the installation of firmware, system configurations, or other program installations without relying solely on the vendor provided data or data provided by a company closely associated with the vendor as the basis for certification.

14)     On 11 October 2021 I had the opportunity to attend the Logic and Accuracy meeting held in the Adams Township Hall located in County of Hillsdale, State of Michigan.  Following the conclusion of the Logic and Accuracy meeting I observed a tablet from a Hart Intercivic tabulator that was stored under lock and key in the clerk's office.  The tablet was removed from the secure storage location and I observed that all seals contained on the device were intact.  I further observed that the device was returned to the secure storage location and locked back up. It is my expert opinion that the action of removing the tablet from the Hart Intercivic tabulator and securing it in a more secure storage location would not have modified or destroyed any election data contained on the device, rather it would have provided an additional layer of protection for the device against unauthorized access or modification.

15)     It is clear from the configuration and operation of the Devices as defined in the manufacturer's administrative manuals, the results of the Texas report, the State of Michigan contract data and my experience that updating the firmware on the Hart CFast card would over write the data on that CFast card.  Without preservation of the CFast card prior to the firmware upgrade there is an extremely high probability that the election data stored on the CFast card would be overwritten or destroyed.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 23rd DAY OF FEBRUARY 2022.

Benjamin R. Cotton

## AFFIDAVIT OF BENJAMIN R. COTTON 11 JULY 2022

I, Ben Cotton, being duly sworn, hereby depose and state as follows:

1)      I am over the age of 18, and I understand and believe in the obligations of an oath.  I make this affidavit of my own free will and based on first-hand information and my own personal observations.

2)      I am the founder of CyFIR, LLC (CyFIR).

3)      I have a master's degree in Information Technology Management from the University of Maryland University College. I have numerous technical certifications, including the Certified Information Systems Security Professional (CISSP), Microsoft Certified Professional (MCP), Network+, and Certified CyFIR Forensics and Incident Response Examiner.

4)      I have over twenty-five (25) years of experience performing computer forensics and other digital systems analysis.

5)      I have over eighteen (18) years of experience as an instructor of computer forensics and incident response.  This experience includes thirteen (13) years of experience teaching students on the Guidance Software (now OpenText) EnCase Investigator and EnCase Enterprise software.

6)      I have testified as an expert witness in state and federal courts and before the United States Congress.

7)      I regularly lead engagements involving digital forensics for law firms, corporations, and government agencies and am experienced with the digital acquisition of evidence under the under the Federal Rules of Evidence.

8)      I reviewed the Administrator manual for the Hart Verity system for the version of software that was purchased by the State of Michigan under contract number #071B7700128.

9)      I reviewed the State of Michigan contract number #071B7700128, which is specific to the State of Michigan acquisition, deployment and operation of the Hart voting systems from March 1, 2017 to February 28, 2027 and was in effect during the November 3, 2020 general election.

10)     I reviewed the Voting System Examination of Hart InterCivic Verity Voting 2.4 report dated May 16, 2020 the was conducted by Brian Mechler on behalf of the State of Texas.

11)     The analysis and review of the Hart InterCivic administrative and user manuals state the following:

a)  State Michigan contract number #071B7700128 documents the inclusion of the State of MI Qualified Voter Files (QVF) loaded onto the tabulators on page 59 and are illustrated in the diagram on page 60.

b)  This download of QVF occurs 4-5 weeks prior to election via the Verity Drive USB stick (V-Drive).  This data is loaded onto the tabulator prior to the Public Accuracy Test and not modified by the clerk prior to election day.

c)  The Verity drive is provided by the County to the township clerk.

d)  The Hart InterCivic tabulator includes broadband technology and automatic transmission process. (Page 61)

e)  The ballot images are stored on the tabulator in PNG format. (page 77)

f)  The time stamp of the ballot insertion into the tabulator is removed per paragraph 1.1.A.24 of Hart contract.

g)  Ballot information is recorded in 3 physically separate locations:  internal memory, the paper ballot itself and on the V-drive.

12)  The Adams Township tabulator was confiscated by MI State Police and remains in their custody. Since maintenance was not performed prior to the seizure, the ballot information from the 2018 thru March 2021 elections should remain on the device.

2

13)     I have had the opportunity, with the permission of Adams Township, Michigan officials, to examine the contents of the Electronic Poll Book (EPB) USB drive from the November 2020 General Election.

14)     I have reviewed the letter from Jonathan Brater, Director of Elections, dated 15 October 2021 to Stephanie Scott.

15)     I have reviewed a series of emails between Stephanie Scott and Abe Dane dated 23 February 2021 through 24 February 2021.

16)     I have reviewed the Memorandum dated 12 February 2021 named 2021.02.12 Final Release of Security Memo Nov 2020.pdf.  This memorandum is unsigned but is written on Michigan Bureau of Elections letterhead.

17)     I have had the opportunity to review the reports that are generated and printed by the Secretary of State following the submission of precinct results for a given election.  These reports are referenced in the Jonathan Brater document dated 15 October 2021.

18)     The administrative and operator manuals for the Hart InterCivic voting system clearly state that the Qualified Voter Record is stored on the voting machines and poll books..

19)     The epb.accdb file on the EPB USB is a password-protected data base that contains the election definition data as well as qualified voter data.  At the point that these files are utilized in the course of the election, the data contained in these files becomes unique to that machine and election.  For example, when a qualified voter casts a vote the exact date and time that the vote is cast is added to the voter's record.  At this point, the data on the devices and the EPB USB becomes original evidence for the voting process.

20)     Under the Federal Rules of Evidence Rule 902 paragraph 14, data copied from an electronic device, storage medium or file is admissible if authenticated by a process of digital

3

identification and certified by a qualified person. This presumes that all data contained on the device is copied and reproduced. I saw no evidence that there is any such certification attesting to the completeness of the copied data associated with the conversion of the electronic EPB USB to the printed format that is produced by the Secretary of State. Without this certification, the original evidence must be preserved. In this case that would require that the systems involved in the election and the removable media used in the election be preserved in their digital state following the closure of the polls. There are forensic preservation processes that could have preserved the data, but there are no current processes or procedures approved by the Secretary of State to perform these operations.

21)     The EPB USB is original evidence. The basic principle governing the preservation of electronic data and ensuring that digital evidence is admissible in court is that original evidence is the best evidence. Preserving a digital device in an original state ensures that the evidence is reliable, dates and times are factual, and that the data has not been altered. Failure to preserve digital evidence in a forensically sound manner can result in charges of spoliation and the inadmissibility of that evidence in court. Based on my review of the Hart InterCivic manuals and the Secretary of State's instructions to the municipality election officials, I do not see any method or procedure to forensically preserve the voting systems or the digital media used in a Michigan election.

22)     The EPB USB contains data that is unique to that specific EPB USB and to the equipment that the USB is plugged into. The following items are not recorded anywhere else in the night-end reporting:

   a.   Same Day Voting Data. The quantity of same-day in-person registrations is not summarized on night-end reports.

4

b.  Same Day Voting Data.  The voter identification/ information is not recorded in the printed total votes cast nor is this information delineated in the end-of-night voter list.

c.  Same Day votes.  These votes are not separated out on the night-end ballot summary report.

d.  The reports produced at the closing of the polls will reconcile the voting numbers, but there is no method to separate out the same-day registers without the original EPB USB.

23)  I have analyzed reports produced by the Secretary of State for the preservation of voting data and materials under the Federal Statute and have determined that those reports do not capture and preserve all the data contained on the EBP USB.  The following data elements for and Electronic Pollbook and other voting equipment used in the election are not part of these reports:

a)  Computer Name that the Vote was Conducted On

b)  The Domain of the Computer

c)  Manufacturer of the Computer

d)  The Model of the Computer

e)  Processor Name

f)  Total Virtual Memory Size

g)  Free Virtual Memory

h)  Free Physical Memory

i)  Internet Connection Status

j)  Internet Connection Type

k)  Cable Internet Speed

l)  Cable Internet MAC Address

5

m) Wifi Internet Speed

n) Wifi Internet Mac Address

o) Windows Operating System Version

p) AntiVirus Program and Status

q) Firewall Type and Status

r) Bit Locker Disk Encryption Status

s) Bitlocker Hard Disk Status

t) Bitlocker Removeable Drive Status

u) .Net Version

v) Dymo Lable Version.

Once again, these data elements are not part of the reports that are produced for preservation by the Secretary of State, but would be data that should be preserved under the Federal statutes. Should an audit of the election or should the voting records be produced in support of a legal action, the above components would be critical to prove compliance with election law, validate voting system configurations and the demonstrate the fairness of the election. Failure to forensically preserve the EPB USB would have effectively deleted and wiped these elements of information, as they are not present or preserved on any other component of the voting system.

24) The following data fields for voter information from election day are not part of the night end reports:

a) VOTERID

b) BALLOTTYPE

c) PRECINCT

d) CREATE DATE – Recorded date of election.

e) ADDRESS_ID

f)  LICENSE_NUMBER

g)  IDENTIFICATION_STATUS_ID

h)  DISTINCT_POLITIAL_AREA_ID

i)  CODE

j)  PARTYID

25) I had the opportunity to review FOIA documents produced by the Secretary of State's office to Scott Aughney.  These documents included the official vote totals for Adams Township.  Analysis of these official totals revealed some significant deviations from the data contained on the voting media at the local Township level.

a)  The Electronic Poll Book USB data for Adams Township recorded 1,362 voters in night end reporting.  This includes the same-day registered voters.

b)  The Hillsdale County Canvassing Board confirms the quantity of 1362 votes in Adams Twp

c)  The State records indicate 1332 votes recorded in Adams Township.  This is short 30 votes from the end-of-day totals in the Adams Township data. These numbers do not include the fourteen (14) same-day registration voters.

d)  A comparison of names between the two data sources illustrates seventy-nine (79) unique names on the Electronic Poll Book data for Adams township that are not listed on the State's official records.

e)  Conversely, there are sixty-four (64) names unique to the State's records that are not represented on the Adams Township Electronic Poll Book records.

f)  The combination of these report discrepancies documents an 11.5% difference in votes between township and state.

Without the data contained on the EPB USB data there is no manner by which these discrepancies could be investigated and reconciled.  The EPB USB data is essential to any audit or reconciliation.

7

I have had the opportunity to review two reports created by Scott Aughney. The first report titled "BALLOTS CAST HILLSDALE COUNTY ADAMS TOWNSHIP ELECTION DATE 2020-11-03 was printed on 1/13/2022. The second report titled "BALLOTS CAST HILLSDALE COUNTY ADAMS TOWNSHIP ELECTION DATE 2020-11-03" was produced on 1/13/2022 as well. Both reports were produced in an Adobe Acrobat .pdf format document. Highlighting was applied to the "BALLOTS CAST HILLSDALE COUNTY ADAMS TOWNSHIP ELECTION DATE 2020-11-03" document on 1/17/2022. This was done to highlight voters, who according to the report, voted in the November 3, 2020 election but were not registered until after that date. In some cased these voters data of registration reflects registering to vote 7 months after the election. Figure one is a screen capture of this report. Voter identification data has been blocked to preserve privacy. The original document is available for review.



Figure 1 - Voter Registration After the Election

It is evident that the election date column reflects the date of the November 2020 general election and it is also apparent that on this one snippet of the report four (4) individuals registered well after the election date. A search was conducted on the QVR from the

EPB.accdb file and none of these individuals were shown to have been registered before the election.  A review of the total information contained in this report indicates that thirteen (13) individuals are recorded as successfully voting in the November 2020 general election that were not registered to vote until well after the election.

26)      I have had the opportunity to examine multiple voting systems from multiple software vendors.  It is clear from my experience that there is a blatant lack of cyber security protection within the election systems.  In the case of Adams Township I have had a limited opportunity to examine the complete voting system, but the items that I have been able to examine confirmed that there are shared passwords utilized by the personnel supporting the election process.  Specifically the primary data base that is utilized on the EPB USB is a Microsoft Access database named epb.accdb.  This file is password protected, which is sound security practices, but Microsoft Access only support a single password for multiple users.  Each person using this data base would have had to have possession of this single password.  This is known as a shared password.  Sharing passwords is a violation of one of the basic tenants of sound cyber security practices.

27)      It is clear from my examination of the materials, the Secretary of State's election reports and the digital EPB USB data that had Ms. Scott followed the directive from the Secretary of State's to delete the EPB USB data, none of these discrepancies could have been detected or substantiated.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 14th DAY OF July

2022.


_____//Original Signed//_____
                Benjamin R. Cotton

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF ANTRIM

WILLIAM BAILEY

     Plaintiff                          Case No. 20-9238-CZ

v.

ANTRIM COUNTY                        HON. KEVIN A. ELSENHEIMER

     Defendant,

SECRETARY OF STATE JOCELYN
BENSON

     Intervenor-Defendant,

| | |
|---|---|
| Matthew S. DePerno (P52622)<br>DePerno Law Office, PLLC<br>Attorney for Plaintiff<br>951 W. Milham Avenue<br>PO Box 1595<br>Portage, MI 49081<br>(269) 321-5064 | Haider A. Kazim (P66146)<br>Cummings, McClorey, Davis & Acho, PLC<br>Attorney for Defendant<br>319 West Front Street<br>Suite 221<br>Traverse City, MI 49684<br>(231) 922-1888 |
| | Heather S. Meingast (P55439)<br>Erik A. Grill (P64713)<br>Assistant Attorneys General<br>Attorneys for Proposed Intervenor-Defendant<br>Benson<br>PO Box 30736<br>Lansing, MI 48909<br>(517) 335-7659 |

## AFFIDAVIT OF BENJAMIN R. COTTON 8 APRIL 2021

I, Ben Cotton, being duly sworn, hereby depose and state as follows:

1)      I am over the age of 18, and I understand and believe in the obligations of an oath. I make this affidavit of my own free will and based on first-hand information and my own personal observations.

2)      I am the founder of CyFIR, LLC (CyFIR).

3)      I have a master's degree in Information Technology Management from the University of Maryland University College. I have numerous technical certifications, including the Certified Information Systems Security Professional (CISSP), Microsoft Certified Professional (MCP), Network+, and Certified CyFIR Forensics and Incident Response Examiner.

4)      I have over twenty five (25) years of experience performing computer forensics and other digital systems analysis.

5)      I have over eighteen (18) years of experience as an instructor of computer forensics and incident response.  This experience includes thirteen (13) years of experience teaching students on the Guidance Software (now OpenText) EnCase Investigator and EnCase Enterprise software.

6)      I have testified as an expert witness in state and federal courts and before the United States Congress.

7)      I regularly lead engagements involving digital forensics for law firms, corporations, and government agencies.

8)      In connection with this legal action I have had the opportunity to examine the following devices:

a)      Antrim County Election Management Server Image.  This image was acquired on 4 December 2020 by a firm named Sullivan and Strickler.

b)      Thirty eight (38) forensic images of the compact flash cards used in Antrim County during the November 2020 elections that were imaged on 4 December 2020 by a firm named Sullivan and Strickler.

c)      One (1) SID-15v-Z37-A1R, commonly known as the Image Cast X (ICX), that was used in the November 2020 elections

d)      Two (2) Thumbdrives that were configured for a precinct using the ES&S DS400 tabulator that were used during the November 2020 election.

e)      One ES&S server that was used in the November 2020 election.

9)      **Internet Communications with the Dominion ICX.**  I examined the forensic image of a Dominion ICX system utilized in the November 2020 election and discovered evidence of internet communications to a number of public and private IP addresses.  Of specific concern was the presence of the IP address 120.125.201.101 in the unallocated space of the 10th partition of the device.  This IP address resolves back to the Ministry of Education Computer Center, 12F, No 106, Sec.2,Hoping E. Rd.,Taipei Taiwan 106.  This IP address is contextually in close proximity to data that would indicate that it was part of the socket configuration and stream of an TCP/IP communication session.  Located at physical sector 958273, cluster 106264, sector offset 256, file offset 54407424 of the storage drive, the unallocated nature of the artifact precludes the exact definition of the date and time that this data was created.  Also located in close proximity to the Ministry of Education IP address is the IP address 62.146.7.79.  This IP address resolves to a cloud provider in Germany.

3

*Figure 1-IP Addresses Located in Unallocated Space*

Further examination of the ICX clearly indicates that this system is also actively configured to communicate on a private network of 10.114.192.x with FTP settings to connect to 10.114.192.12 and 10.114.192.25. Also apparent is that at one time this system was configured to have the IP address 192.168.1.50. This IP address is also a private IP range. These IP configurations and artifacts definitively identify two things, 1) the device has been actively used for network communications and 2) that this device has communicated to public IP addresses not located in the United States. Further analysis and additional devices would be required to determine the timeframe of these public IP communications.

10)   **ESS DS400 Communications.**  A careful examination of the ESS DS400 devices and thumb drives was conducted. This examination proved that each DS400 had a Verizon cellular wireless communications card installed and that the card was active on powerup, which meant that there is the ability to connect to the public internet on these devices as well. Both of the DS400 devices were configured to transmit election results to IP address 10.48.51.1. This is a private network, which means that it would only be accessible by the remote DS400 systems through leveraging the public internet and establishing a link to a communications gateway using a public IP or via a virtual private network (VPN). It is important to understand that this

4

communication can only occur if the cellular modems have access to the public internet.  I did not have the entire communications infrastructure for the private network and given this lack of device production associated with the DS200, I can not say which other devices may have connected to this private network nor the full extent of the communications of nor the remote accesses to the DS400 devices.

11)     **Out of Date Security Updates and Virus Definitions.** An analysis of operating system, and antivirus settings on the servers and computers provided to me was conducted.  It was immediately apparent that these systems were extremely vulnerable to unauthorized remote access and manipulation.  For example, none of the operating systems had been patched nor the antivirus definition files updated for years.  The Antrim EMS was last updated in 2016.  The other systems were in a similar state.  This lack of security updating has left these systems in an extremely vulnerable state to remote manipulation and hacking.  Since 2016 more than ninety seven (97) critical updates have been issued for the Windows 10 operating system to prevent unauthorized access and hacking.  The fact that these systems are in such a state of vulnerability, coupled with the obvious public and private internet access, calls the integrity of the voting systems into question.  The Halderman report dated March 26, 2021 relating to this matter validates this finding.  It also validates that the system is in a state such that an unauthorized user can easily bypass the passwords for the system and database to achieve unfettered access to the voting system in a matter of minutes.  These manipulations and password bypass methodologies can be performed remotely if the unauthorized user gains access to the system through the private network or the public internet.

12)     **Incomplete Compliance with the Subpoena for Digital Discovery.**  Antrim County has apparently failed to produce all of the voting equipment for digital preservation and analysis.  I

examined the purchase documents produced by Antrim County with respect to the purchase of the Dominion Voting system and note that the following system components listed on the purchase documents were not produced:

      (a)  ImageCast Listener Express Server

      (b)  ImageCast Express Firewall

      (c)  EMS Express Managed Switch

      (d)  ICP Wireless Modems (17)

      (e)  Image Cast Communications Manager Server

      (f)  ImageCast Listener Express RAS (remote access server) System

      (g)  ImageCast USB Modems (5)

Without these system components it will be impossible to determine the extent of public and private communications, the extent to which remote access to the voting system components is possible and to determine if or when unauthorized access occurred.

      SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 8th DAY OF April 2021.

Benjamin R. Cotton

## AFFIDAVIT OF BENJAMIN R. COTTON 8 JUNE 2021

I, Ben Cotton, being duly sworn, hereby depose and state as follows:

1)      I am over the age of 18, and I understand and believe in the obligations of an oath.  I make this affidavit of my own free will and based on first-hand information and my own personal observations.

2)      I am currently the Vice President for Incident Response for eSentire and am the founder of CyFIR, LLC (CyFIR).

3)      I have a master's degree in Information Technology Management from the University of Maryland University College. I have numerous technical certifications, including the Certified Information Systems Security Professional (CISSP), Microsoft Certified Professional (MCP), Network+, and Certified CyFIR Forensics and Incident Response Examiner.

4)      I have over twenty-five (25) years of experience performing computer forensics and other digital systems analysis.

5)      I have over eighteen (18) years of experience as an instructor of computer forensics and incident response.  This experience includes thirteen (13) years of experience teaching students on the Guidance Software (now OpenText) EnCase Investigator and EnCase Enterprise software.

6)      I have testified as an expert witness in state and federal courts and before the United States Congress.

7)      I regularly lead engagements involving digital forensics for law firms, corporations, and government agencies and am experienced with the digital acquisition of evidence under the under the Federal Rules of Evidence.

8)      I had the opportunity to observe Pro V&V personnel acquire the hard drives of an ES&S voting system on 12 October 2021 preparatory to Pro V&V performing an audit on that system. Pro V&V is one of two vendors approved by the U.S. Election Assistance Commission (EAC) and were following EAC approved processes and procedures.  In the course of this observation the following deficiencies were noted:

a)  **A Digital Hash of Original Hard Drives were not Created During the Process:** Chain of custody and evidence preservation is mandated by the Federal Rules of Evidence and as a matter of course in best practices in any digital audit or examination.  Creation of a digital hash value of the original evidence/device ensures that there are no changes to the evidence as part of the examination or subsequent handling.  Without this principle of digital forensics, any evidence that did not possess this digital hash would not be accepted as evidence in legal proceedings.

b)  **Failure to Protect the Original Hard Drives from Modification:** One of the basic principles evidence is that original evidence must not be modified as part of any imaging or preservation process.  It is a well documented that simply plugging a hard drive into a computer or other device can cause modifications on the device that was plugged in.  Pro V&V personnel did not use a forensically approved device to protect the original voting system hard drives from modification during the imaging process.  The device utilized to copy the original hard drive was a SABRENT USB SATA 2.5"&3.5" Dual Bay Hard Drive Docking Station model EC-HD2B.  This device is a dual bay docking station that, per the OEM documentation, allows for data writing to both bays simultaneously.  There is no protection provided to the original hard drive and thus can provide no assurance that changes were not made to the original hard drive.



*Figure 1-Back Cover SABRENT Packaging*

c) **Failure to Produce a Forensically Sound Image of the Original Hard Drives:** As a matter of practice examiners and auditors will connect original hard drives and devices to a forensic write block device and utilize forensic software to create a bit for bit forensic image file of the original digital device.  This forensic image is validated utilizing either a Md5 or SHA256 hash to ensure that no changes were made during the acquisition process or occurred in subsequent handling of the evidence.  If even one bit of data is changed, the hash value for the image will change.  During the acquisition process utilized by Pro

V&V there was no forensically sound image produced from the original hard drive.  Pro

V&V utilized the SABRENT EC-HD2B to simply copy content from the original hard

drive in bay 1 to a copy drive in bay 2.  There were no forensic integrity checks of the

transferred data nor was there a forensic comparison of the original hard drive and the

copy of the drive to ensure that they were exact forensic replicas.  The packaging of the

SABRENT EC-HD2B implicitly states that both reads and writes are permitted

simultaneously to both bays, thus eliminating any claim of forensic integrity by the

auditors.  As a matter of practice, any product of this device should not be used for

forensic audit or investigation due to the lack of forensic integrity within the process.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 25th DAY OF January

2022.

Benjamin R. Cotton

# EXHIBIT 5

Qualifications and Reports of Jim Penrose

May 15, 2021

Title: Necessity of Source Code Review for Dominion Voting Systems EMS and Tabulators
Analyst: James Thomas Penrose, IV

## Executive Summary

The Dominion Voting Systems Patent US8,876.002B2 dated Nov 4, 2014 details how Dominion voting machines support pre-election Logic and Accuracy testing (Pre-LAT) system.

This patent outlines the technology concepts and design of Dominion with respect to maximizing automation in the election configuration, ballot generation, processing, and testing process. The outcome is to save the maximum amount of time through automation with features and functionality that make it unnecessary to have humans in the loop of running elections with various configurations that impact the ballot configuration, vote casting, tabulation process, processing of ballot images, and final tallied vote totals.

The specific incident in Antrim county is related to the features and the functionality outlined in this patent; if any of the automated configuration and testing functionality implemented by Dominion were to be abused in a systematic fashion, modification of election outcomes would be trivial for an attacker. Patents do not specify the precise implementation of the features or functionality and the only way to determine the precise functionality implemented is to review the source code of the operational systems using this patented technology.

## Details

Here is an excerpt from the patent that speaks extensively about the use of networked functionality to allow for testing at scale in larger jurisdictions:

> *Additionally, the network communication device 28 enables the Voting machines to have polls opened in pre-LAT mode remotely over the network. Pre-LAT polls mode is a standard mode of operation for a voting device for conducting Pre-election Logic and Accuracy tests. Further, the communication device enables the voting machines 11 to be provided with a vote simulation script over the network. A vote simulation script is a set of commands that can simulate Voting patterns on the machine even to the level of providing pre canned scanned ballot images or PDF images of ballots with machine generated marks for testing the vote interpretation engine on the tabulator. The communication device 28 also*

May 15, 2021

*enables the voting machines 11 to be remotely instructed to run pre-LAT activities such as interpreting vote simulation Scripts and images, performing image calibration procedures, Verifying all system components for readiness and proper function, self printer test etc. Finally, results of all Pre-LAT tests can be communicated back to the EMS through the communications device 28.*

*Further, the network communication device 28 allows the Voting machines 11 to have pre-LAT polls opened remotely over the network, have pre-LAT polls closed remotely over the network and can communicate pre-LAT results back over the network. Additionally, the pre-LAT polls can be closed manually and can communicate pre-LAT results back over the network.*

*Thus, the Voting machines 11 can be programmed with an election ballot from over the network, have pre-LAT polls opened remotely over the network and then disable all net work ports thru the tabulator firmware and software. Further, the Voting machines 11 can be programmed with an election ballot from over the network, have pre-LAT polls opened remotely over the network, have pre-LAT polls closed manu ally and then disable all network ports.*

*Use of a Network to Prepare Voting Machines*
*Typically the warehouse process cycle consists of the fol lowing functions (see FIG.3): Storage and maintenance 100: Test 101: Repair 102: Machine Preparation 103; Pre-LAT 104; Distribution 105: Acceptance back after election 106: and Escrow storage 107.*

The Dominion Voting System's patent states that their machines have network connectivity that can be used to open the polls for pre-LAT activities. Being able to remotely open the polls using networked devices raises a number of questions related to the network security.

- What authentication controls the level of access to the voting machines using the remote access?

- What safeguards are in place to protect the mode of operation of the voting machines; for instance, what prevents a technician from placing the machines in the Pre-LAT mode during the time of an election, and how are such mode changes logged for security review?

May 15, 2021

The patent also indicates that a vote simulation script is used to produce votes and enable counting of votes for pre-LAT purposes. The vote simulation script includes additional features such as the ability to generate "pre-canned" ballots to scan.

- This script is configurable to generate various election results for testing purposes
- The results from the pre-LAT activities are reported back to the EMS for logging and validation of a successful test

It is unclear from the patent if all parts of networked voting machine infrastructure are properly logged when they are operating in Pre-LAT mode. Given the far-reaching interaction of the pre-LAT scripts across all of the voting machine infrastructure it is imperative to review the original source code of the pre-LAT scripts used by Dominion, their sub-contractors (eg ElectionSource) and the county staff. A review of the pre-LAT script source code would illuminate all of the ways that the networked voting machine infrastructure is manipulated to test. Moreover, to truly understand the impact and methods of the pre-LAT script, the source code for the tabulators, EMS, and other listener servers would be required to make an assessment.

In Antrim County, there was no evidence of pre-LAT test results on the EMS. The use of automated scripts designed to generate votes comes with inherent dangers, not the least of which is the fact that the script could fall into the hands of a malicious actor that wants to use those techniques for fraud.

The versatile pre-LAT set of tools used by Dominion to test the networked voting system is pivotal to understanding whether what happened in Antrim county is attributable to a script that is of the same parentage as pre-LAT scripts, or if the error was purely human in nature.

In order to determine if a pre-LAT script was used in Antrim County, it is critical that the source code be reviewed for the script(s) itself and the appropriate investigative steps be taken to determine if the scripts run to change the vote counting in Antrim are of the same parentage.

The source code for all elections systems is required to be retained by the Michigan Secretary of State in a third-party escrow account. The Michigan Election Code states the following:

> **168.797c Computer program; disposition and use of source code.**
>
> *Sec. 797c. A person or company providing a computer program that examines, counts, tabulates, and prints results of the votes cast by a voter on an electronic voting system shall place in an escrow account a copy of the source code of the program and any subsequent revisions or modifications of the source code. The secretary of state or an authorized agent of the secretary of state shall agree to use the information contained in the source code solely for the purpose of analyzing and testing the software and shall not disclose proprietary information to any other person or agency without the prior written consent of the vendor.*

Here are the relevant definitions of the terms above:

> **168.794 Definitions used in MCL 168.794 to 168.799a.**
>
> *Sec. 794. As used in sections 794 to 799a:*
>
> *(a) "Audit trail" means a record of the votes cast by each voter that can be printed, recorded, or visually reviewed after the polls are closed. The record shall not allow for the identification of the voter.*
>
> *(b) "Ballot" means a card, ballot label, paper ballot, envelope, or any medium through which votes are recorded.*
>
> *(c) "Ballot label" means the display or material containing the names of offices and candidates or the questions to be voted on.*
>
> *(d) "Counting center" means 1 or more locations selected by the board of election commissioners of the city, county, township, village, or school district at which ballots are counted by means of electronic tabulating equipment or vote totals are electronically received from electronic tabulating equipment and electronically compiled.*
>
> *(e) "Electronic tabulating equipment" means an apparatus that electronically examines and counts votes recorded on ballots and tabulates the results.*
>
> *(f) "Electronic voting system" means a system in which votes are recorded and counted by electronic tabulating equipment.*
>
> *(g) "Escrow account" means a third party approved by the secretary of state for the purpose of taking custody of all source codes, including all revisions or modifications of source codes.*
>
> *(h) "Source code" means the assembly language or high level language used to program the electronic voting system.*
>
> *(i) "Voting device" means an apparatus that contains the ballot label and allows the voter to record his or her vote.*
>
> *(j) "Voting station" means an enclosure provided to ensure ballot secrecy during the voting of the ballot.*
> *(k) "Memory device" means a method or device used to store electronic data.*

4

May 15, 2021

The benefit of analyzing source code from the third-party escrow account is the fact that all original source code and changes to the source code must be stored with the third-party to ensure that changes that impact any election voting, tabulation, reporting, and testing is memorialized for authorized investigations. The Michigan Election Code (law) provides for this transparency to ensure the integrity of the election system.

Source code is required to perform this evaluation from the following systems and technical tools:
- All scripts (source) used for pre-LAT activities
- All source code associated with all the varieties of tabulators, EMS, poll books, and other networked servers


Under the penalties of perjury, I declare that I have read the foregoing report and that the fact stated in it are true.



James Thomas Penrose, IV
Date: 5/15/2021

May 15, 2021

## MICHIGAN NOTARY ACKNOWLEDGEMENT

State of Michigan
County of Oakland

The foregoing instrument was acknowledged before me on this 15th day of May, 2021 by James Thomas Penrose, IV.

Notary Public Signature:

Notary Printed Name: Ann M. Howard
Acting in the County of: Oakland
My Commission Expires: 2/24/2023

6

US008876002B2

(12) **United States Patent**　　(10) **Patent No.:**　**US 8,876,002 B2**

Arnao et al.　　(45) **Date of Patent:**　**Nov. 4, 2014**

(54) **SYSTEMS FOR CONFIGURING VOTING MACHINES, DOCKING DEVICE FOR VOTING MACHINES, WAREHOUSE SUPPORT AND ASSET TRACKING OF VOTING MACHINES**

(75) Inventors: **Federico Arnao**, Oakland, CA (US); **Eric Coomer**, Oakland, CA (US); **Larry Korb**, Oakland, CA (US); **Josh Maletz**, Oakland, CA (US)

(73) Assignee: **Dominion Voting Systems, Inc.**, Denver, CO (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/092,604**

(22) Filed: **Apr. 22, 2011**

(65) **Prior Publication Data**

US 2012/0048930 A1　　Mar. 1, 2012

**Related U.S. Application Data**

(63) Continuation of application No. PCT/US2009/062069, filed on Oct. 26, 2009.

(60) Provisional application No. 61/193,062, filed on Oct. 24, 2008.

(51) **Int. Cl.**
　　**G07C 13/00**　　(2006.01)

(52) **U.S. Cl.**
　　CPC ...................................... **G07C 13/00** (2013.01)
　　USPC ............................ **235/386**; 235/51; 235/54 F

(58) **Field of Classification Search**
　　USPC ....... 235/51, 52, 54 E, 54 F, 56, 57, 386, 454,
　　　　　　　　235/462.01, 487, 492
　　See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 4,510,378 | A | * | 4/1985 | Dolson | 235/50 R |
| 4,641,240 | A | * | 2/1987 | Boram | 705/12 |
| 4,649,264 | A | * | 3/1987 | Carson | 235/54 R |
| 5,065,832 | A | * | 11/1991 | Mark | 108/60 |
| 5,666,765 | A | * | 9/1997 | Sarner et al. | 52/36.1 |
| 5,897,180 | A | * | 4/1999 | Singer | 312/265.3 |
| 6,173,352 | B1 | * | 1/2001 | Moon | 710/301 |
| 6,250,548 | B1 | * | 6/2001 | McClure et al. | 235/51 |
| 6,581,824 | B1 | * | 6/2003 | McClure et al. | 235/51 |
| 6,641,033 | B2 | * | 11/2003 | McClure et al. | 235/51 |
| 6,662,998 | B2 | * | 12/2003 | McClure et al. | 235/51 |
| 6,688,517 | B1 | * | 2/2004 | McClure et al. | 235/51 |
| 6,799,723 | B2 | * | 10/2004 | Kotob et al. | 235/386 |
| 6,827,262 | B2 | * | 12/2004 | McClure et al. | 235/386 |
| 6,951,303 | B2 | * | 10/2005 | Petersen et al. | 235/386 |
| 6,973,581 | B2 | * | 12/2005 | Chung et al. | 726/13 |
| 7,111,782 | B2 | * | 9/2006 | Homewood et al. | 235/386 |

(Continued)

*Primary Examiner* — Paultep Savusdiphol

(74) *Attorney, Agent, or Firm* — Holland & Hart LLP

(57) **ABSTRACT**

A system and device facilitate the storage and tracking of warehoused voting machines. A system includes a host computer, a plurality of voting machines that are connected via a network to the host computer, each voting machine having one or both of a wireless communication device and a data port that is coupled to the host computer. The system also includes an election and voting machine preparation portion included in the host computer to manage and/or control the connected voting machines. The election and voting machine preparation portion is configured to manage the status of the connected voting machines, is configured to instruct the voting machines to run self tests, is configured to receive results of the self tests back from the connected voting machines, and is configured to prepare/program the connected voting machines with an election ballot.

**17 Claims, 8 Drawing Sheets**



US 8,876,002 B2

Page 2

(56)         **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 7,392,993 | B1 * | 7/2008 | Prohl et al. | 280/33.998 |
| D578,564 | S * | 10/2008 | Bolton | D18/6 |
| 2001/0013547 | A1 * | 8/2001 | Kotob et al. | 235/386 |
| 2001/0042005 | A1 * | 11/2001 | McClure et al. | 705/12 |

| | | | | |
|---|---|---|---|---|
| 2002/0185395 | A1 * | 12/2002 | Lindamood | 206/320 |
| 2003/0047604 | A1 * | 3/2003 | McClure et al. | 235/386 |
| 2003/0047605 | A1 * | 3/2003 | McClure et al. | 235/386 |
| 2003/0066872 | A1 * | 4/2003 | McClure et al. | 235/51 |
| 2004/0169077 | A1 * | 9/2004 | Petersen et al. | 235/386 |
| 2006/0138226 | A1 * | 6/2006 | McClure et al. | 235/386 |
| 2008/0224582 | A1 * | 9/2008 | Boland | 312/330.1 |

* cited by examiner



FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9

US 8,876,002 B2

**1**

SYSTEMS FOR CONFIGURING VOTING
MACHINES, DOCKING DEVICE FOR
VOTING MACHINES, WAREHOUSE
SUPPORT AND ASSET TRACKING OF
VOTING MACHINES

This application is a continuation of International Application No. PCT/US2009/062069, filed Oct. 26, 2009, which claims the benefit of U.S. Provisional Application No. 61/193,062, filed Oct. 24, 2008, each of which are incorporated herein by reference in their entirety.

BACKGROUND

The warehousing processes associated with an election are some of the most problematic and time consuming in the entire election process, especially for larger jurisdictions. The complexity of these processes increases exponentially with the size of the jurisdiction.

Electronic voting systems consist of several disparate systems including the Election Management System (EMS), Ballot Tabulators (digital-optical scan voting machines, direct-record-electronic (DRE) voting machines, etc), as well as other ancillary systems including electronic poll-books, accumulation and consolidation devices, and wireless transmission systems for results. Managing these assets can be a significant burden to jurisdictions. In addition, current voting systems rely on a disconnected process for programming the voting machines to transfer the ballot definition data from the EMS to the voting machines. This is historically accomplished by writing the ballot definition data to a removable memory element from the EMS-flash drive usb drives, secure-digital flash drives, PCMCIA flash drives etc. This disconnected process introduces several failure points in the process, and significantly increases the overall effort required of jurisdictions to run an election.

Further, due to the periodic nature of elections, voting machines are necessarily stored for periods up to years in between elections. Therefore, it is desirable to produce apparatus for and methods of adequately, safely and efficiently storing voting machines in between elections.

Furthermore, in large jurisdictions having several voting machines, it is desirable to provide a means for tracking the voting machines as they are used in an election.

SUMMARY

In view of the above issues, a number of improvements are presented.

The system for configuring voting machines described herein has the following benefits. First, the system significantly reduces the effort required to test the functioning of the voting machine by automating the programming and testing of the machines. Second, the system significantly reduces the effort required to prepare and conduct pre-election Logic and Accuracy Tests (pre-LAT) on the voting machines, by automating as much of the process as possible in the warehouse. Third, this system allows warehouse workers to identify and locate voting machines that have faults. Fourth, this system allows warehouse workers to identify and locate voting machines that failed to prepare correctly. Fifth, this system allows warehouse workers to identify and locate voting machines that failed pre-LAT. And sixth, this system ensures voting machine integrity by ensuring that network functionality is not available after pre-LAT has been completed.

Some improvements allow for the safe stacking and storage of voting machines in a warehouse, allow voting

**2**

machines to be provided with power to operate and charge batteries while being stored in the warehouse, allow voting machines to be connected to a network while being stored in the warehouse, and allow the location of individual voting machines to be tracked while being stored in the warehouse.

Another improvement relates to a storage and docking station designed for each type of voting machine and allows voting machines to be stacked and stored safely such that the voting machines are protected from damage. The storage and docking station also is capable of providing power to the machines for battery charging and network connectivity, if supported, for connection to a warehouse management application. The docking station also provides security authentication, which will allow the voting machine to activate various interface ports and support various modes of operation.

The protective docking device can accept a voting machine such that the protective docking device provides physical protection for the voting machine while being stored. Additionally, the protective docking device is capable of being stacked on other protective docking devices such that no damage occurs to the voting machines while being stored. Additionally, the protective docking device can be stacked in position either with or without a voting machine attached therein. Another feature of this improvement is that the protective docking device can provide power and communication connections (including network connectivity) to the voting machine. The protective docking device can also provide loop-back connections on I/O ports to support external loop back tests.

Further, the docking device can have the necessary authentication devices in them for successful communication with the voting machines.

Furthermore, it is within the scope of the improvement that the voting machines can contain location tracking mechanisms such as unique barcodes and RFID tags.

Additionally, the plurality of protective docking devices can communicate location information of the voting machine to the asset tracking system.

Another improvement provides an asset tracking system that allows jurisdictions to accurately manage and account for their voting machine assets by allowing jurisdictions to monitor the locations of their voting machine assets both in the warehouse and in transit for an election. For example, the voting machine assets can be scanned when they are staged for shipment, scanned when they are loaded onto a truck or other vehicle, scanned when they are delivered to polling places, scanned when they are picked up from polling places and scanned when they are delivered back to the warehouse. The asset tracking system will then be able to track where the voting machine assets are in that lifecycle.

In the asset tracking system, each voting machine can have its own unique serial number identifier, which can be, for example, encoded in a bar code on the outside of the machine. Alternatively, the unique serial number identifier can be encoded in an RFID tag in the machine. Further, the RFID tag in the machine can be an RFID tag that is "read only."

Some improvements can further include asset tracking peripheral devices that are capable of reading the serial number identifiers of the plurality of voting machines via bar codes on the outside of the voting machines. In the case where the unique serial number identifiers are encoded in an RFID tag in the voting machines, the asset tracking peripheral devices are capable of reading the serial numbers of a plurality of voting machines via the RFID tags in the voting machines. These peripheral devices can consist of portable

US 8,876,002 B2

**3**

hand held devices containing supporting applications or fixed location devices directly connected to the asset tracking application.

One improvement also includes asset tracking applications that are capable of managing and tracking assets utilizing the serial number data collected from a plurality of voting machines that have unique serial number identifiers using a plurality of asset tracking peripheral devices. Further, the asset tracking peripheral devices are capable of communicating the serial number data to the asset tracking application.

Another improvement includes a tracking and preparation system for networked voting machines including a host computer, a plurality of voting machines connected via a network to the host computer, each voting machine having one or both of a wireless communication device and a data port for coupling to the host computer, and an election and voting machine preparation portion included in the host computer that is configured to manage and/or control the connected voting machines.

The election and voting machine preparation portion can be configured to manage the status of the connected voting machines, can be configured to instruct the voting machines to run self tests, can be configured to receive results of the self tests back from the connected voting machines, and can be configured to prepare/program the connected voting machines with an election ballot.

The self tests run by the voting machines can correspond to pre-LAT tests.

The election and voting machine preparation portion can be configured to open pre-LAT polls remotely over the network.

The election and voting machine preparation portion can also be configured to run simulation scripts on the voting machines over the network.

The election and voting machine preparation portion can further be configured to disable all network ports of the voting machines after the voting machines have been configured for an election.

Each voting machine can contain a location tracking mechanism. The location tracking mechanism can be a barcode and/or an RFID tag, for example.

Another improvement relates to a protective docking device for a voting machine. The protective docking device includes a voting machine accepting portion configured to accept and store a voting machine, a power connection portion to provide power to the voting machine stored in the voting machine accepting portion, a receiving portion on a top surface of the protective docking device that is configured to receive another protective docking device stacked thereon, a security authentication portion configured to manage interface ports and modes of operation of the voting machines, and a data connection port to provide a data connection to the voting machine stored in the voting machine accepting portion.

The protective docking device can include a plurality of docking stations, each docking station being configured to receive a voting machine.

The protective docking device can include a groove on a top surface of each of the docking stations.

The docking stations can be stacked in a tiered manner.

The protective docking device can include a bag on a back surface of each voting machine within each docking station to collect ballots that have been scanned by the voting machines.

Another improvement relates to a voting machine having an input portion, a network communication device, and a location tracking mechanism.

**4**

The voting machine can further include hardware interlocks that disable the network communication device to prevent the voting machine from being accessed via the network communication devices during an election.

BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing and further objects, features and advantages of the invention will become apparent from the following descriptions of exemplary embodiments with reference to the accompanying drawings, in which like numerals are used to represent like elements and wherein:

FIG. **1** is a diagram illustrating some of the components of a voting machine;

FIG. **2** is a diagram illustrating an example of warehouse networking system;

FIG. **3** is a diagram illustrating an example of a warehouse process cycle;

FIG. **4** is a diagram illustrating an example of a voting machine in a protective docking station;

FIG. **5** is a diagram illustrating an example of a protective docking station in a stacked configuration;

FIG. **6** is a is a diagram illustrating an example of a protective docking station in a stacked tiered configuration;

FIG. **7** is a flowchart illustrating an example of a process of asset tracking of voting machines;

FIG. **8** is a diagram illustrating an example of a hardware interlock; and

FIG. **9** is a diagram illustrating another example of a hardware interlock.

DETAILED DESCRIPTION OF EMBODIMENTS

FIG. **1** illustrates some of the components that can be included in each voting machine **11**. The voting machine **11** can include a CPU **32** that controls operation of the voting machine **11** including the functions described herein, a tracking device **34**, an audio device **33**, an input device **24**, an optical scanner **29**, a printer **30**, network connectors **28** and a visual display unit **22**. The network communication device (network connector **28**) can be, but is not limited to: ethernet; optical; and wireless communication devices. Voting machine **11** is not limited to these specific components as any number of other components known to one of ordinary skill in the art for inclusion on voting machines **11** could be incorporated therein.

Additionally, the voting machine **11** can completely disable the network communication device **28** using hardware interlocks **41**. The hardware interlocks **41** prevent the voting machine from being accessed via the network communication devices **28** during an election, for example. Further, the voting machine can run self tests such as, but not limited to: destructive memory tests; non-destructive memory tests; tests of I/O ports; I/O communication tests; detection of connected peripheral devices; tests of attached peripheral devices; detection of attached Removable Memory Elements (RME); tests of RMEs; and tests of power supplies and batteries (described below).

There are a variety of methods that can be employed to hardware interlock the secure RME element. A first implementation is to mount the RME port behind a door **42** that can be locked by a lock **45** and controlled by key access (see, for example, FIG. **8**). In addition, a sensor (not shown) can be added to detect whether the door **42** is open or not. If the door **42** is open, an electrical interrupt can be activated to disconnect all power and signal lines connected to the RME port.

5

FIG. **9** illustrates another embodiment of a hardware interlock **41** where a connection between network interface electronics **44** and network connector **28** is disrupted by a keylock switch **43**.

To facilitate the preparation of voting machines **11** prior to an election, the voting machines **11** can be remotely instructed to run the self tests mentioned above from over the network and can communicate the results of the tests back over the network. That is, in the warehouse, for example, a plurality of voting machines **11** can be coupled to a host computer over a network using the network connectors **28**. The host computer **10** can then control and/or monitor the plural voting machines **11**.

The network communication device **28** in each voting machine **11** enables the voting machine **11** to be configured and tested remotely. Examples of how voting machines **11** can be configured can include, programming the voting machines **11** with an election ballot over the network, performing validation of a loaded election ballot, and communicating results of that validation back over the network.

Additionally, the network communication device **28** enables the voting machines to have polls opened in the pre-LAT mode remotely over the network. Pre-LAT polls mode is a standard mode of operation for a voting device for conducting Pre election Logic and Accuracy tests. Further, the communication device enables the voting machines **11** to be provided with a vote simulation script over the network. A vote simulation script is a set of commands that can simulate voting patterns on the machine even to the level of providing precanned scanned ballot images or PDF images of ballots with machine generated marks for testing the vote interpretation engine on the tabulator. The communication device **28** also enables the voting machines **11** to be remotely instructed to run pre-LAT activities such as interpreting vote simulation scripts and images, performing image calibration procedures, verifying all system components for readiness and proper function, self printer test etc. Finally, results of all Pre-LAT tests can be communicated back to the EMS through the communications device **28**.

Further, the network communication device **28** allows the voting machines **11** to have pre-LAT polls opened remotely over the network, have pre-LAT polls closed remotely over the network and can communicate pre-LAT results back over the network. Additionally, the pre-LAT polls can be closed manually and can communicate pre-LAT results back over the network.

Thus, the voting machines **11** can be programmed with an election ballot from over the network, have pre-LAT polls opened remotely over the network and then disable all network ports thru the tabulator firmware and software. Further, the voting machines **11** can be programmed with an election ballot from over the network, have pre-LAT polls opened remotely over the network, have pre-LAT polls closed manually and then disable all network ports.

Use of a Network to Prepare Voting Machines

Typically the warehouse process cycle consists of the following functions (see FIG. **3**): Storage and maintenance **100**; Test **101**; Repair **102**; Machine Preparation **103**; Pre-LAT **104**; Distribution **105**; Acceptance back after election **106**; and Escrow storage **107**.

6

The functions listed above, and illustrated in FIG. **3**, represent a major logistical effort in large jurisdictions. For example, a jurisdiction has to store its voting machines **11** in a benign environment and keep them charged. Prior to an election, the jurisdiction must test every voting machine **11** to ensure it is operational and repair those that are not. Further, the jurisdiction must then prepare each individual voting machine **11** with the ballot styles for the precinct to which the voting machine **11** is assigned. The preparation and machine function must then be validated against that expected in pre-LAT. The voting machines **11** that fail the "pre-LAT" process must either be re-prepared or repaired, depending on the issue. The voting machines **11** must then be distributed to the correct locations in a secure manner, where they are used in the election. After the day of election, the voting machines **11** then must be collected and returned to the warehouse and accounted for, where they are stored in escrow (securely) for auditing purposes. The voting machines **11** are finally retuned to their normal storage modes after auditing or after it is determined that auditing is not needed.

For a jurisdiction with just a few voting machines **11**, this process is not a major issue. However, for a large jurisdiction, such as a jurisdiction with 5,000 or more voting machines **11**, this presents a major logistical problem. Anything that can be done to automate this process and thus reduce the logistical burden on the jurisdictions will be extremely useful. Some of the improvements discussed herein achieve this goal. To solve this problem, the voting machines **11** are networked together to a central management system within the warehouse. Additionally, one improvement includes a software application that assists in the management and implementation of the process.

In order to address this logistical problem, all the voting machines **11** are networked together in the warehouse, either with physical network connections or via wireless technology, in their storage positions. Additionally, the voting machines **11** are supplied with power and operate in a special storage mode of operation when in storage. A warehouse management application is used that is capable of sending commands to and receiving data from, the individual voting machines **11**, groups of voting machines **11**, lists of voting machines or the entire group of voting machines **11** that are stored in the warehouse.

Additionally, the warehouse management application is capable of sending a command instructing voting machines **11** to respond by identifying their location in the warehouse and their current status. The networked voting machines **11** then respond by providing the appropriate data. The voting machines **11** are able to report their location by where they are networked and the status information that includes amongst other information, the firmware version, battery level, current mode of operation, whether the voting machines **11** have results cartridges present and the current configuration of the voting machines **11**. This feature allows the warehouse management application to verify the location of the voting machines **11** and receive information regarding the status of each voting machine **11**.

Further, the warehouse management application is capable of sending a command instructing the voting machines **11** to run a series of diagnostic tests. The purpose of these tests is to ensure that the hardware is operating correctly. The tests include, but are not limited to the following tests listed below.

| Internal Memory Tests | Destructive RAM test | This tests the RAM by writing data to memory address and reading it back to verify that it has written correctly. It is called destructive because any data residing |
|---|---|---|

US 8,876,002 B2

| 7 | | 8 |
|---|---|---|

-continued

| | | |
|---|---|---|
| | | in the memory is lost. |
| | Non-Destructive RAM tests | This tests the RAM by writing data to memory addresses that are not currently in use and reading it back to verify that it has written correctly. |
| | Destructive storage memory tests | This tests the storage memory (such as CF, hard disk etc.) by writing data to memory address and reading it back to verify that it has written correctly. It is called destructive because any data residing in the memory is lost. |
| | Non-Destructive storage memory tests | This tests the storage memory (such as CF, hard disk etc.) by writing data to memory addresses that are not currently in use and reading it back to verify that it has written correctly |
| Removable Memory Element (RME) Tests | Destructive RME tests | This tests the Removable Memory Element (RME) (results cartridge) by writing data to memory addresses and reading it back to verify that it has written correctly. It is called destructive because any data residing in the memory is lost. |
| | Non-Destructive RMW tests | This tests the Removable Memory Element (RME) (results cartridge) by writing data to memory addresses that are not currently in use and reading it back to verify that it has written correctly. |
| Serial Port Tests | Internal tests | These tests test the serial ports by performing internal chip set and internal loop back tests, by transmitting and receiving data in the various modes supported by the chipset. |
| | Loop-back tests | This tests the serial ports by performing an external loop back tests, by transmitting and receiving data over the port. The serial ports must have a connector that connects the Tx and Rx lines. |
| | Authentication Tests | This test authenticates any devices currently attached the serial ports of the voting machine. |
| USB Port Tests | Internal tests | This tests the USB ports by performing internal chip set and internal loop back test, by transmitting and receiving data in the various modes supported by the chipset. |
| | Loop-back tests | This tests the USB ports by performing an external loop back tests, by transmitting and receiving data over the port. The USB ports must have a connector that interfaces the Tx and Rx lines. |
| | Authentication Tests | This test authenticates any devices currently attached the serial ports of the voting machine. |
| Ethernet Tests | Internal tests | This tests the ethernet port by performing internal chip set and internal loop back tests, by transmitting and receiving data in the various modes supported by the chipset. |
| | Loop-back tests | This tests the ethernet port by performing an external loop back test, by transmitting and receiving data over Ethernet connection with the warehouse application. |
| Wi-Fi Tests | Internal tests | This tests the Wi-Fi connection by performing internal chip set and internal loop back tests, by transmitting and receiving data in the various modes supported by the chipset. |
| | Loop-back tests | This tests the Wi-Fi connection by performing an external loop back test, by transmitting and receiving data over Wi-Fi connection with the warehouse application. |
| | Authentication Tests | This test authenticates the data encryption and certificates used in the Wi-Fi connection |
| Other Port Tests | Internal tests | This tests the other ports by performing internal chip set and internal loop back tests, by transmitting and receiving data in the various modes supported by the chipset. |
| | Loop-back tests | This tests the other ports by performing an external loop back tests, by transmitting and receiving data over the port. The ports must |

US 8,876,002 B2

9
10

-continued

| | | have a connector that connects the Tx and Rx lines. |
|---|---|---|
| | Authentication Tests | This test authenticates any devices currently attached the other ports on the voting machine. |
| Processor Tests | | This tests the operation of the processor. |
| Security Tests | | These are a suite of tests that test the security features of the voting machine. |
| Display communication tests | | This tests the connections to the displays and the touch screen membrane. |
| Firmware authentication tests | | This authenticates the version of the firmware by calculating a HASH value of the firmware image using a seed passed to it by the warehouse application. |
| Audit/event logging tests | | These tests test the audit and event logging facilities by simulating events and then checking that the events have been written to the logs. |
| Printer tests | | This tests the operation of the printer and or VVPAT connected to the voting machine. |
| Battery Charging tests | | This tests the battery charging circuits and the state of the battery. |
| Audio sub-system tests | | This tests the correct operation of the audio sub-system. |
| ADA device interface tests | | These test the interfaces provided for the use of ADA devices, for example the audio control unit. |

After the tests have been run, the voting machines **11** report back the results of the tests identified above to the warehouse management application. The warehouse management application is then able to identify which voting machines **11** have problems via these tests. This allows the voting machines **11** to be tested remotely without human intervention, thereby reducing the time required to prepare the voting machines for an election.

Further, the warehouse management application is capable of setting system parameters in the voting machines **11**, such as setting the date and time as well as being capable of loading election definitions into the machines across the network. Once the election definitions are received, the voting machines **11** authenticate and verify the election definition and copy it to all necessary memory devices including any internal storage devices, and redundant removable memory elements, verifying that it has loaded correctly. The voting machines **11** then report their status back to the warehouse management application. The warehouse management application tracks and manages which voting machines **11** have been prepared successfully and which have had election load issues and thus may require further attention. FIG. **2** illustrates an example of the warehouse management system in a warehouse **9** including host computer **10**, and voting machines **11** that are, in this embodiment, connected to the host computer **10** via a wireless network. The host computer **10** includes RAM, ROM one or more CPUs and various interfaces. The warehouse management application is stored on and runs on the host computer **10**.

This allows the voting machines **11** to be prepared for an election with the election definition automatically without human intervention.

The warehouse management application also is capable of loading simulation scripts to the voting machines **11**. The voting machines **11** authenticate and verify the simulations scripts and report the status of the load back to the warehouse management application. The warehouse management application is capable of instructing voting machines **11** to open polls in pre-LAT and to run the vote simulation scripts. The voting machines **11** then report the status to the warehouse management application.

The warehouse management application can also instruct the voting machines **11** to open polls in pre-LAT mode, and to accept manual feeding of a deck of test ballots. Once the ballots have been fed into the voting machine **11**, a sequence can be initiated on the voting machine **11** to reconnect with the warehouse management application to transmit the results of the test deck for verification and validation.

These pre-LAT based processes using either a vote simulation script, or a set of test ballots allows the vast majority of pre-LAT to be run automatically without human intervention. Some pre-LAT tests may have to be done manually, such as verifying that: the user interface works correctly; that the scanner mechanism is operating correctly; that test ballots are read correctly; that the audio voting works correctly; and that the printer prints correctly. However, the tests capable of being conducted remotely represent a large reduction in the effort required to prepare the voting machines **11**.

The warehouse management application is capable of instructing voting machines **11** to close pre-LAT polls and to tally the pre-LAT data. The voting machines **11** then report the pre-LAT tally data back to the warehouse management application. The warehouse management application then compares the pre-LAT data with what was expected to automatically verify that pre-LAT was successfully passed. These measures allow pre-LAT to be conducted accurately and with minimum effort.

The warehouse management application also is capable of instructing the voting machines **11** to open polls in official election mode and the voting machines **11** then report this back to the warehouse management application.

Thus, the entire voting machine preparation and test process can be automated and the required effort to test and prepare the voting machines can be considerably reduced.

The warehouse management application also is capable of instructing the voting machines **11** to send their audit and event logs and is being capable of searching for certain types of events. The voting machines **11** can also send back their election tally data (ballot image records) if polls have been closed.

US 8,876,002 B2

11

One improvement relates to election and machine preparation applications running on a host computer system connected by a network to a plurality of voting machines **11** that each includes a network communication device via that network (see FIG. **2**). One function of the election and machine preparation applications is to manage the status of the connected voting machines **11**. Additional functions of the election and machine preparation applications are to instruct the voting machines **11** to run self tests (listed below), to receive the results of those self tests back from the voting machines **11**, and to display and archive the results. Any errors or issues identified can be communicated back to the user of the system thru these reports and communicated to the warehouse logistics management in order for the machines to be serviced.

Another function of the election and machine preparation applications is to prepare/program those voting machines **11** with an election ballot over the network. In addition, the election and machine preparation applications are capable of receiving verification that the ballot has loaded correctly.

Further, another function of the election and machine preparation applications is to instruct the voting machines that have an election ballot loaded but have not had any polls opened to open pre-LAT polls. The election and machine preparation applications can then receive verification back that pre-LAT polls were opened successfully.

The election and machine preparation applications are also able to provide a vote simulation script to the voting machines **11** that have pre-LAT polls open. The election and machine preparation applications can then receive verification that the simulation script was successfully loaded.

The election and machine preparation applications can also suspend operation after pre-LAT polls have been opened so that a set of test ballots can be manually fed into the system. Once the ballot has been fed, the pre-LAT polls can be manually closed and the results of the test ballots communicated back to the preparation system for verification.

The election and machine preparation applications also can provide those machines **11** that have pre-LAT polls open with instructions to close pre-LAT polls, and the election and machine preparation applications can receive verification that the ballots have been validated, and that pre-LAT polls have been closed successfully.

The election and machine preparation applications can further provide data on the operational health, pre-LAT data and polls status of the voting machines as well as data on the location in the warehouse of those voting machines

Voting Machine Docking and Storage Station

A storage and docking station is designed specifically for each type of voting machine **11**. This allows the voting machines **11** to be stored safely and protected from damage. Further, the storage and docking station allows the voting machines **11** to be stacked. The storage and docking station also is capable of providing power to the machines for battery charging and network connectivity, if supported, for connection to a warehouse management application. The docking station can also provide connection to support various I/O port loop back tests. The docking station also is capable of providing security authentication, which allows the voting machine to activate various interface ports and support various modes of operation.

FIG. **4** illustrates an exemplary embodiment of the storage and docking station **17**. As seen in FIG. **4**, the storage and docking station **17** includes a cavity **18** into which the voting machine **11** can be placed. FIG. **4** also illustrates some of the plugs and interfaces provided in the storage and docking station **17** for connection with the voting machine **11**. As seen in FIG. **4**, these connections can include, for example, a

12

power connection **19** and a data line **20**. In some examples, the storage and docking station **17** may comprise a channel **21** provided near a back portion of the docking station **17** to provide a conduit for the cables such as power connection **19** and a data line **20** connected to the voting machine **11**.

FIG. **5** illustrates how the storage and docking station **17** can be stacked on top of another storage and docking station **17**. As seen in FIG. **5**, in one embodiment, each docking station **17** can be placed directly on top of the other. Grooves **35** are provided on a top surface of each docking station **17** to facilitate stacking. The grooves **35** are configured to receive a corresponding projecting portion **36** on the bottom surface of another docking station **17**. Additionally, a channel **37** is provided near a back portion of each docking station **17** to provide a conduit for the cables such as a power connections **19** and a data lines **20** connected to each voting machine **11**.

FIG. **6** illustrates another embodiment of the stacked docking stations **17**. In this embodiment, the docking stations **17** are stacked in a tiered manner. Additionally, in this embodiment, the docking stations **17** are configured to allow ballots **1** to be fed into ballot feed trays **38** of the optical ballot scanner **29** in each voting machine **11** while the voting machines **11** are stacked. Therefore, the voting machines **11** do not need to be un-stacked to feed ballots during pre-LAT.

Similar to FIG. **4**, in the embodiment of FIG. **5**, a channel **37** is provided near a back portion of each docking station **17** to provide a conduit for the cables such as a power connection **19** and a data line **20** connected to each voting machine **11**.

Further, a bag **39** is provided on a back surface of each voting machine **11** to collect ballots that have been scanned. The bags **39** can be disposed on runners **40** so that the bags **39** can slide out to facilitate the removal of the ballots from the voting machines **11**.

Asset Tracking of Voting Machines

Each individual voting machine **11** can be configured with machine-readable identifiers on/in them such as bar codes or RFID devices. These are generally referred to as a tracking device **34** shown in FIG. **1**. These machine-readable identifiers can contain information such as, for example, the machine type and serial number. These identifiers can also be used to track the location and 'state' of the voting machines **11** within the election lifecycle.

The machine-readable identifiers are capable of being scanned by devices such as barcode scanners and RFID scanners so that the information can be retrieved and used by the tracking and warehouse applications. RFID is preferable as it allows automatic scanning of the devices without the need for manual interaction by a user.

When a voting machine **11** is stored in the warehouse, the voting machine **11** is scanned for its identifier information and its location is recorded. If the machine-readable identifier is contained in barcode, then the user will have to scan that bar code with a bar code reader. If the identifier is contained in an RFID tag, then this can be scanned automatically either by a hand held device or by a scanning device located in the storage area. The location of the voting machine **11** can be inputted in a number of ways. For example, the location of the voting machine **11** could be entered manually by the user, scanned in via a bar code identifying the location, or scanned in via an RFID tag at the location. If the voting machine **11** has an RFID tag, and the RFID scanners are located in warehouse storage area, the location of the voting machine **11** can be calculated automatically via comparing the relative strength of the RFID signals or by some other comparative technique. This identification and location information can be automatically passed to the warehouse management and asset tracking systems, preferably via a wireless network. These applica-

US 8,876,002 B2

13

tions mark the voting machines as being in a warehouse storage location and record that particular location. Hence the location of a particular voting machine 11 is known and verified.

When a voting machine 11 is removed from storage, a similar process occurs. The machine-readable identifier is scanned. Additionally, the reason for the voting machine 11 being moved can be entered into the system, preferably via a button press on a hand held device (which can include multiple selections from which to choose). Therefore, if the voting machine 11 has an RFID tag, the fact that it has been moved from the storage location may be detected automatically. Again, this information can be passed to the asset tracking system, so that its location is still known.

If the voting machine 11 is taken to a different location, such as a pre-LAT or audit area (for example to complete the manual aspects of pre-LAT prior to staging for deployment), then the voting machine 11 can be scanned and information such as the voting machines' 11 presence in that different location and that part of the process can be recorded and passed to the asset tracking and warehouse management applications.

If the jurisdiction uses a staging area prior to distribution of the voting machines 11, then when the voting machines 11 are placed in that area, the fact that the voting machines 11 are there and that particular location in that area can be recorded using similar means as described above with respect to the storage location at the warehouse.

Additionally, vehicles that are used for delivery of the voting machines 11 can also have machine-readable identifiers. Again, these machine-readable identifiers could be stored via barcodes or RFID tags. As voting machines 11 are deployed onto vehicles for delivery, they can be scanned and the vehicle identifier scanned. If the vehicle does not have a barcode or RFID tag, then the identifier could be entered manually. This information can then be relayed back to the asset management application, so that the presence of the voting machines 11 on a particular vehicle can be tracked.

In addition, each polling place also can have a machine-readable identifier. These machine-readable identifier could be stored, for example, as barcode or MD tags at the polling place; as codes or barcodes on the delivery sheet; as codes or barcodes in a booklet; or be stored in the hand held device used for scanning for manual selection. If the polling place identifier is contained in a barcode or RFID tag, this can be scanned by the handheld device. If the machine-readable identifier is a code, it can be manually entered in the handheld device. Further, if the machine-readable identifier is stored in the application in the handheld device, then it can be manually selected by the user. When a voting machine 11 is delivered, its ID can be scanned by the handheld device as is the polling place ID. This information is stored in the hand held device. If the process includes an acceptance by someone at the polling place, this can also be recorded in the hand held device (depending on the technology in the hand held device, this could be a signature, a thumb print, an acceptance code or just a button press). If an attempt is made to transport the voting machine 11 to an incorrect location, the handheld device can identify this and warn the user.

When the vehicle returns to the warehouse, the data collected can then be downloaded to the asset tracking application. Hence, the asset tracking application will know what voting machines 11 have been delivered and where the voting machines 11 are located. The asset tracking application also can identify if voting machines 11 have been incorrectly delivered.

14

When voting machines 11 are picked up from polling locations, the voting machines 11 can be scanned by the hand held device to show they have been collected. Similarly, when the voting machines 11 are placed back into storage or an escrow location, they can be scanned so that the location and this information can be relayed to the asset tracking system.

By using this process and information, the asset tracking system can accurately track the location and state of the voting machines 11. Therefore, if a voting machine 11 is mislaid, its path can be investigated to aid finding the voting machine 11. In the warehouse, if a voting machine 11 needs to be retrieved (for example, if it requires repair or is going to be audited) then the asset tracking system can identify its location for easy retrieval.

In addition, results cartridges can also have machine-readable identifiers, which can be in the form of barcodes or RFID tags, so that the results cartridges can be tracked in a similar manner as described above. The results cartridges can be scanned when inserted into a machine (which can be a voting machine or another machine) and that information can be relayed back to the warehouse management system so that a specific results cartridge can be associated with a specific voting machine 11. This step is not necessary if there is a networked warehouse management system in use as this can be done automatically via the warehouse management system.

If results cartridges are collected separately from the voting machines 11 at the end of the election, then as they are delivered to the tally center, they can be scanned in and tracked. Thus, a record can be kept of which cartridges have been delivered and the time of delivery.

FIG. 7 is a flowchart illustrating one example of how the asset tracking process can function. In step 200 the machine-readable identifier of the voting machine 11 is scanned and the location of the voting machine 11 is recorded and transmitted to the asset tracking application. In step 201 the machine-readable identifier of the voting machine 11 is scanned and the delivery location at the pre-LAT area is recorded and transmitted to the asset tracking application. In step 202 the voting machine 11 is ready for delivery and the machine-readable identifier of the voting machine 11 is scanned and the location of the staging area of the voting machine 11 is recorded and transmitted to the asset tracking application. In step 203 the voting machine 11 is placed on a delivery vehicle after scanning the machine-readable identifier of the voting machine 11 and the vehicle ID. This information is then transmitted to the asset tracking application. In step 204 the voting machine 11 is positioned at the polling place after scanning the machine-readable identifier of the voting machine 11 and the delivery vehicle ID. Additionally, when arriving at the polling place the poll worker acceptance criteria is entered. In step 205 the voting machine 11 is placed back on the delivery vehicle after having the machine-readable identifier of the voting machine 11 and the delivery vehicle ID scanned. Once again, this information is then transmitted to the asset tracking application. In step 206 the voting machine 11 is returned back to the warehouse where it is put in escrow. The machine-readable identifier of the voting machine 11 is scanned upon arriving back at the warehouse as well as the delivery location (pre-LAT area). This information is then transmitted to the asset tracking application. Finally, in Step 207 the voting machine 11 enters the audit/recount process. The machine-readable identifier of the voting machine 11 and the delivery location are scanned and the data is transmitted to the asset tracking application. Upon the completion of step 207 the cycle returns back to warehouse storage step 200.

US 8,876,002 B2

15

The foregoing description is considered as illustrative only of the principles of the improvements discussed above. The inventions described herein are not limited to specific examples provided herein.

What is claimed is:

**1**. A tracking and preparation system for networked voting machines comprising:

a host computer;

a plurality of voting machines connected via a network to the host computer, each voting machine comprising:
a processor;
a user interface coupled with the processor and configured to receive cast votes;
a network communication device coupled with the processor, the network communication device comprising a wireless communication device and a data port for coupling the voting machine to the host computer; and
a hardware interlock coupled with the network communication device and configured to disable the network communication device to prevent the voting machine from being accessed via the network during an election period, wherein disabling the network communication device comprises activating an electrical interrupt to prevent network communication with the voting machine while maintaining a physical network connection; and

an election and voting machine preparation portion included in the host computer that is configured to distribute programming information to each of the connected voting machines prior to receiving the cast votes at the polling location.

**2**. The system according to claim **1**, wherein the election and voting machine preparation portion is configured to manage the status of the connected voting machines, is configured to instruct the voting machines to run self tests, is configured to receive results of the self tests back from the connected voting machines, and is configured to prepare/program the connected voting machines with an election ballot.

**3**. The system according to claim **2**, wherein the self tests run by the voting machines correspond to pre-LAT tests.

**4**. The system according to claim **2**, wherein the election and voting machine preparation portion is configured to open pre-LAT polls remotely over the network.

**5**. The system according to claim **2**, wherein the election and voting machine preparation portion is configured to run simulation scripts on the voting machines over the network.

**6**. The system according to claim **2**, wherein the election and voting machine preparation portion is configured to dis-

16

able all network ports of the voting machines after the voting machines have been configured for an election.

**7**. The system according to claim **2**, wherein each voting machine contains a location tracking mechanism.

**8**. The system according to claim **7**, wherein the location tracking mechanism is a barcode.

**9**. The system according to claim **7**, wherein the location tracking mechanism is an RFID tag.

**10**. The system of claim **1**, wherein the election and voting machine preparation portion included in the host computer is further configured to upload vote information from the plurality of voting machines after receiving the cast votes at the polling location.

**11**. The system of claim **1**, wherein the election and voting machine preparation portion is configured to prepare or configure individual voting machines with election-specific information.

**12**. The system of claim **1**, wherein the election and voting machine preparation portion is configured to manage all pre-election preparation for the plurality of voting machines prior to deploying the voting machines to a polling location.

**13**. A voting machine comprising:

a processor;

an input portion coupled with the processor and configured to receive ballots to be scanned;

a network communication device coupled with the processor and configured to receive programming information from at least one external device;

a hardware interlock coupled with the network communication device and configured to disable the network communication device to prevent the voting machine from being accessed via the network during an election period, wherein disabling the network communication device comprises activating an electrical interrupt to prevent network communication with the voting machine while maintaining a physical network connection; and

a user interface coupled with the processor and configured to receive cast votes from a voter.

**14**. The voting machine of claim **13**, wherein the voting machine receives all pre-election preparation programming information via the network communication device prior to deployment to a polling location.

**15**. The system according to claim **13**, wherein the voting machine contains a location tracking mechanism.

**16**. The voting machine according to claim **15**, wherein the location tracking mechanism is a barcode.

**17**. The voting machine according to claim **15**, wherein the location tracking mechanism is an RFID tag.

\*   \*   \*   \*   \*

**Analyst: James Thomas Penrose, IV**
**Date: 2 May 2021**

Executive Summary

ElectionSource technicians responsible for the creation and deployment of project files have supreme power in creating configurations that can be used to modify the votes in the EMS and the output of the tabulator paper tapes. Upon review of the Lenberg report dated May 2nd, 2021, ElectionSource technicians create project files for their clients and as a result can access, control, and modify any election they support.

ElectionSource configured and deployed Antrim County's project files that resulted in the modification of the votes during the general election. The Lenberg report indicates that vote modification in Antrim County was consistent with technical manipulation of the project file. This project file was generated and deployed by ElectionSource for the November 3rd, 2020 general election.

In order to research and investigate the Antrim County vote modification it is necessary to perform a full forensic examination and testing of all equipment utilized during the election. Michigan clerks take an oath to faithfully discharge the duties of a clerk including to hold fair and accurate elections. ElectionSource has issued a threat to Michigan clerks interested in conducting independent forensic examinations and testing of election equipment. See Exhibit A.

ElectionSource has the responsibility to review the log files on the Dominion Voting Systems, Election Management System (EMS), the log files are typically viewed by trained technicians with the appropriate experience to properly interpret the software prompts/warnings. During the preparation for the general election their were prompts/warnings ignored by ElectionSource.

ElectionSource failed to utilize version control.  Version control is defined as the task of keeping a software system consisting of many versions and configurations well organized. Failure to utilize version control can lead to incorrect vote tally during an election. The lack of policy, procedures, and technical implementation on the part of ElectionSource led to a situation where an inaccurate tally could occur.

An ElectionSource whistleblower has also publicly spoke out about his concerns of fraud over technicians having access to a broad array of ballots from across the State of Michigan via ElectionSource thumb drives. The evidence of what occurred in Antrim County along with the statements of an ElectionSource whistleblower illustrate the multiple avenues for fraud.

**Details**

1

## ElectionSource Threats Related to Forensics Analysis

ElectionSource sent a letter dated January 4th, 2021 stating that any independent forensic analysis of election equipment would require the Michigan Secretary of State's approval. This letter included a threat of legal action against any Michigan clerk that sought independent investigation related to their equipment in order to uphold their oath of office pertaining to elections.

## Weak and Hardcoded Passcodes

ElectionSource performed a number of functions on behalf of Antrim County in order to prepare for and conduct the November 3, 2020 general election. When examining the historic steps taken by the ElectionSource configuring the Antrim County EMS one of the actions taken was to set the default technician passcode for the entirety of Antrim County to a weak passcode.  The weak passcode was "123456" set by ElectionSource as found in the configuration files used for the election. Morever, the UserLog file on the EMS also indicated that the election password to open and close the polls was set to "1234678" for more than 19 months prior to the election at which time it was updated to a similarly weak and guessable passcode "11032020", the date of the general election. These passcodes work to give access to the tabulators to open/close, reopen, and rezero the tabulators.

A malicious actor seeking to commit fraud would need to know these passcodes to gain access to the tabulators and enable their operations. ElectionSource provisioned passcodes that were easily guessable and simple trial and error would reveal the correct passcodes with a tractable number of attempts, even done manually by hand by an attacker.

Table 1 below shows all the instances of the ElectionSource technicians making changes to the EMS and setting the default password for opening and closing the polls across the entirety of Antrim County precincts.

*Table 1 - UserInfo Log - Default Password Set Log Lines – Empty Columns Hidden*

| Id | userRelatedInfo | executedCommand | __classId | operationTimestamp | logLevel |
|---|---|---|---|---|---|
| 25BFF74B-6529-4D24-8875-016DE7DC8448 | Admin | Instance with name 'Project Settings' of type 'Project Parameters' modified: defaultPasswordValue changed from '50831972' to '12345678'; tabulatorSameHMACKey=True; cardPartitionSize changed from 'Size 256' to 'Size 512'; | LD01 | 2019-01-08 09:43:13.707 | TraceMessage |
| FDD149A7-99A6-4F43-8176-64A7DC45517A | Admin | Instance with name 'Project Settings' of type 'Project Parameters' modified: defaultPasswordValue changed from '50831972' to '12345678'; tabulatorSameHMACKey=True; cardPartitionSize changed from 'Size 256' to 'Size 512'; createSplitsManually=True; serviceUrl = ''; leadCardConsolidationLevel changed from 'Ballot Type' to 'Precinct Portion'; | LD01 | 2019-01-08 09:43:13.707 | TraceMessage |

| 654BC2E6-1F0C-4272-9260-CE67D466568B | Admin | Instance with name 'Project Settings' of type 'Project Parameters' modified: defaultPasswordValue changed from '50831972' to '12345678'; tabulatorSameHMACKey=True; cardPartitionSize changed from 'Size 256' to 'Size 512'; createSplitsManually=True; serviceUrl = '; | LD01 | 2019-01-08 09:43:13.707 | TraceMessage |
| 3B15E033-B474-4BEC-B614-E239660B18EF | Admin | Instance with name 'Project Settings' of type 'Project Parameters' modified: defaultPasswordValue changed from '12345678' to '11032020'; | LD01 | 2020-08-03 12:41:51.990 | TraceMessage |

On January 8, 2019 the default passcode to open/close the polls was set by ElectionSource to be "12345678". This default passcode remained the same until August 3, 2020 when it was changed to "11032020" which was the passcode used during the Antrim County general election in November of 2020.

ElectionSource also hardcoded into the election project files for Antrim County the passcode of "123456" as the "technician passcode." The technician passcode allows for the polls to be re-opened and the tabulators to be re-zeroed. This weak passcode was set by ElectionSource.



*Figure 1 - Default Passcode*

## Version Control, Configuration Management, and Development Practices

See Figures 3 and 4, ElectionSource set the "DCF File Version Number" associated with the Antrim County election to the same value, "50401," regardless of the updates that were being deployed to the Antrim County Election Project Files and ballot definitions. There was no distinction made between the ICX, ICP, and ICC configurations that were deployed. This lack of version control resulted in

ElectionSource's failure to track that incompatible election configurations and ballot definitions were being deployed in Antrim County on election day.



*Figure 2 – September 29, 2020 - ICP Version Control Value 50401 (Same for all Tabulators Types)*

*Figure 3 – October 23, 2020 - ICP Version Control Value 50401 (Same as ICP)*

Figure 2 shows the original election/ballot configuration provisioned by ElectionSource on September 29th, 2020 for use in Antrim County for their ICPs. Figure 3 shows the final, corrected revision from October 23, 2020, of the election/ballot configuration for use in Antrim County ICPs. There is no evidence of

a versioning process either technical or manual applied by ElectionSource to ensure that the proper version of the configuration would be deployed throughout the entirety of Antrim County. ElectionSource's failure to employ version control led to vote manipulation during the November 3rd, 2020 election.

**Error Handing and Remediation**

ElectionSource made substantive modifications to the election and ballot definitions that triggered the EMS to provide a number of "prompt" notifications that were acknowledged by the ElectionSource technician preforming the updates. The technician failed or elected not to take action on the notification messages and request a wholesale redeployment of all compact flash cards for all precincts that would be required to proceed with a fully updated election package. Table 2 below shows the notification messages that were generated from the EMS when the technician updated the configuration. The specific message directed to the technician states, "All previously created and deployed election files will be unusable." The technician is then presented with an option to click OK or Cancel based on whether or not they wish to proceed. The last record of this prompt in the log was on October 5, 2020 when the technician selected, "OK" acknowledging that new election files, provisioned on compact flash cards, would need to be deployed as the previously deployed versions will be unusable. ElectionSource failed to address the aforementioned prompts resulting in a modified vote tally.

| Id | userRelatedInfo | executedCommand | __classid | operationTimestamp | logLevel |
|---|---|---|---|---|---|
| 69196343-CC58-41C8-B770-6D25DEA61482 | Admin | Prompt information: 'Election Files will be created based on the following parameters. Press Continue to continue the process.<br><br>All previously created and deployed election files will be unusable.<br><br>General project information:<br>Number of Districts: 61<br>Number of Precincts (including split Precincts): 62<br>Number of Choices: 364<br>Number of Contests: 141<br>Number of Offices: 48<br>Number of Political Parties: 8<br>Number of Counting Groups: 2<br><br>Number of Tabulators: 42<br>Number of Polling Places: 22<br><br>Ballot generation options:<br>Lead Card Consolidation Level: Precinct Portion<br>Consolidate Tail Cards: False<br>Force District Splits: False<br>Separate Voting Box Per Party Affiliation: False<br>Ballot Content Creator: Default Ballot Content Creator<br><br>'; User answered with: 'OK' | LD01 | 2020-09-23 13:20:55.740 | UserAction |
| 7E017D17-224D-41FF-940D-060AF3740015 | Admin | Prompt information: 'Election Files will be created based on the following parameters. Press Continue to continue the process.<br><br>All previously created and deployed election files will be unusable.<br><br>General project information:<br>Number of Districts: 61<br>Number of Precincts (including split Precincts): 62<br>Number of Choices: 364<br>Number of Contests: 141<br>Number of Offices: 48<br>Number of Political Parties: 8<br>Number of Counting Groups: 2<br><br>Number of Tabulators: 42<br>Number of Polling Places: 22<br><br>Ballot generation options:<br>Lead Card Consolidation Level: Precinct Portion<br>Consolidate Tail Cards: False<br>Force District Splits: False<br>Separate Voting Box Per Party Affiliation: False<br>Ballot Content Creator: Default Ballot Content Creator<br><br>'; User answered with: 'OK' | LD01 | 2020-10-05 14:10:09.850 | UserAction |

Table 2 – UserInfo Log File – Empty Columns Hidden
See complete table in Exhibit B

The final update to the election files prior to the general election was performed by ElectionSource on October 22nd, however, to truly complete the deployment of all

the new election files to all precincts, completely new compact flash cards would need to be provisioned containing the new election files. From October 24th to November 2nd there were no entries in the UserInfo log file, indicating that there were no attempts made by either ElectionSource to complete this compact flash card update process during the crucial weeks ahead of the general election.

The Lenberg report indicates that manipulation of the project files can circumvent the canvassing process. ElectionSource technicians responsible for the creation and deployment of project files have supreme power in creating configurations that can be used to modify the votes in the EMS and the output of the tabulator paper tapes. ElectionSource technicians create project files for their clients and as a result can access, control, and modify any election they support.

ElectionSource configured and deployed Antrim County's project files that resulted in the modification of the votes during the general election. The Lenberg report indicates that vote modification in Antrim County was consistent with technical manipulation of the project file.

**ElectionSource Whistleblower Video**

A self-proclaimed ElectionSource employee made a video that was released shortly after the general election in 2020 stating that he believed the biggest risk to elections came from the use of thumb drives to transfer the ballot designs for all the various localities around the State of Michigan supported by ElectionSource. The whistleblower said that it is very easy for an attacker to get a copy of any ballot from the thumb drive and make copies of the ballot of the correct paper stock and then proceed to stuff the ballot box with their own home made ballots based on the ballot designs that ElectionSource has their technicians keep on their thumb drives as part of their routine procedures for handling such sensitive election data.

The full video transcript is attached Exhibit C.

Under the penalties of perjury, I declare that I have read the foregoing report and that the fact stated in it are true.

James Thomas Penrose, IV
Date: 5/3/2021

7

## <u>Exhibit A – Election Source Equipment License Agreements</u>



January 4, 2021

RE: Equipment License Agreements

Dear Clerks,

This letter is in response to an inquiry regarding a potential "forensic audit" of the Dominion system currently licensed to you.  Any transfer of equipment or software to a third party would be in direct violation of the State of Michigan software license terms and conditions, which govern the use of the voting system and software in your jurisdiction.  More specifically, the license terms state, "Licensor grants Licensee a non-exclusive, <u>non-transferrable</u> license to use the Software" (emphasis added).  Further, the license terms state that the licensee may NOT "Transfer or copy onto any other storage device or hardware or otherwise copy the Software in whole or in part except for purposes of system backup."

Any transfer of any component of the voting system to a third party would be a violation of the agreement and Election Source, the State or Dominion may take immediate legal action for such breach of contract.

**Both Election Source and Dominion are open to a review of the voting system by an EAC accredited testing laboratory, as previously done during the EAC and State of Michigan certification processes. Any such review must be coordinated with the Michigan Secretary of State.**

ElectionSource – 4615 Danvers DR SE – Grand Rapids, MI 89512 – P 888-742-8037 – E 616-864-0926 – www.electionsource.com

## Exhibit B – UserInfo Log

## Containing Prompt Messages Regarding Previous Election Files Being Unusable

| Id | userRelatedInfo | executedCommand | __classId | operationTimestamp | logLevel |
|---|---|---|---|---|---|
| 7E222529-6072-437A-BB80-E150D64D83C4 | Admin | Prompt information: 'Election Files will be created based on the following parameters. Press Continue to continue the process.<br><br>All previously created and deployed election files will be unusable.<br><br>General project information:<br>Number of Districts: 61<br>Number of Precincts (including split Precincts): 62<br>Number of Choices: 364<br>Number of Contests: 141<br>Number of Offices: 48<br>Number of Political Parties: 8<br>Number of Counting Groups: 2<br><br>Number of Tabulators: 42<br>Number of Polling Places: 22<br><br>Ballot generation options:<br>Lead Card Consolidation Level: Precinct Portion<br>Consolidate Tail Cards: False<br>Force District Splits: False<br>Separate Voting Box Per Party Affiliation: False<br>Ballot Content Creator: Default Ballot Content Creator<br><br>'; User answered with: 'OK' | LD01 | 2020-09-18 13:00:04.820 | UserAction |
| EC28AE11-9D75-4F01-972C-83316oF8984C | Admin | Prompt information: 'Election Files will be created based on the following parameters. Press Continue to continue the process.<br><br>All previously created and deployed election files will be unusable.<br><br>General project information:<br>Number of Districts: 61<br>Number of Precincts (including split Precincts): 62<br>Number of Choices: 364<br>Number of Contests: 141<br>Number of Offices: 48<br>Number of Political Parties: 8<br>Number of Counting Groups: 2<br><br>Number of Tabulators: 42<br>Number of Polling Places: 22<br><br>Ballot generation options:<br>Lead Card Consolidation Level: Precinct Portion<br>Consolidate Tail Cards: False<br>Force District Splits: False<br>Separate Voting Box Per Party Affiliation: False<br>Ballot Content Creator: Default Ballot Content Creator<br><br>'; User answered with: 'OK' | LD01 | 2020-09-18 13:12:31.543 | UserAction |

| FF93A344-C5EA-4A1E-8ABB-A1C6350DA80C | Admin | Prompt information: 'Election Files will be created based on the following parameters. Press Continue to continue the process.<br><br>All previously created and deployed election files will be unusable.<br><br>General project information:<br>Number of Districts: 61<br>Number of Precincts (including split Precincts): 62<br>Number of Choices: 364<br>Number of Contests: 141<br>Number of Offices: 48<br>Number of Political Parties: 8<br>Number of Counting Groups: 2<br><br>Number of Tabulators: 42<br>Number of Polling Places: 22<br><br>Ballot generation options:<br>Lead Card Consolidation Level: Precinct Portion<br>Consolidate Tail Cards: False<br>Force District Splits: False<br>Separate Voting Box Per Party Affiliation: False<br>Ballot Content Creator: Default Ballot Content Creator<br><br>'; User answered with: 'OK' | LD01 | 2020-09-18 14:08:43.700 | UserAction |
| 918CF1BD-F2DF-4C48-A537-FAFCAE2F40CE | Admin | Prompt information: 'Election Files will be created based on the following parameters. Press Continue to continue the process.<br><br>All previously created and deployed election files will be unusable.<br><br>General project information:<br>Number of Districts: 61<br>Number of Precincts (including split Precincts): 62<br>Number of Choices: 364<br>Number of Contests: 141<br>Number of Offices: 48<br>Number of Political Parties: 8<br>Number of Counting Groups: 2<br><br>Number of Tabulators: 42<br>Number of Polling Places: 22<br><br>Ballot generation options:<br>Lead Card Consolidation Level: Precinct Portion<br>Consolidate Tail Cards: False<br>Force District Splits: False<br>Separate Voting Box Per Party Affiliation: False<br>Ballot Content Creator: Default Ballot Content Creator<br><br>'; User answered with: 'OK' | LD01 | 2020-09-23 10:30:08.620 | UserAction |

10

| CD6C888C-B9F6-4B61-BAF4-11E95274538E | Admin | Prompt information: 'Election Files will be created based on the following parameters. Press Continue to continue the process.<br><br>All previously created and deployed election files will be unusable.<br><br>General project information:<br>Number of Districts: 61<br>Number of Precincts (including split Precincts): 62<br>Number of Choices: 364<br>Number of Contests: 141<br>Number of Offices: 48<br>Number of Political Parties: 8<br>Number of Counting Groups: 2<br><br>Number of Tabulators: 42<br>Number of Polling Places: 22<br><br>Ballot generation options:<br>Lead Card Consolidation Level: Precinct Portion<br>Consolidate Tail Cards: False<br>Force District Splits: False<br>Separate Voting Box Per Party Affiliation: False<br>Ballot Content Creator: Default Ballot Content Creator<br><br>'; User answered with: 'OK' | LD01 | 2020-09-21 08:48:54.560 | UserAction |
| 90CCE52F-E6B3-4EF3-A480-30B13E11C1FB | Admin | Prompt information: 'Election Files will be created based on the following parameters. Press Continue to continue the process.<br><br>All previously created and deployed election files will be unusable.<br><br>General project information:<br>Number of Districts: 61<br>Number of Precincts (including split Precincts): 62<br>Number of Choices: 364<br>Number of Contests: 141<br>Number of Offices: 48<br>Number of Political Parties: 8<br>Number of Counting Groups: 2<br><br>Number of Tabulators: 42<br>Number of Polling Places: 22<br><br>Ballot generation options:<br>Lead Card Consolidation Level: Precinct Portion<br>Consolidate Tail Cards: False<br>Force District Splits: False<br>Separate Voting Box Per Party Affiliation: False<br>Ballot Content Creator: Default Ballot Content Creator<br><br>'; User answered with: 'Cancel' | LD01 | 2020-09-21 09:11:57.397 | UserAction |

| | | | | | |
|---|---|---|---|---|---|
| **D7443ADD-BCC8-45E6-B0EF-278813BEF952** | Admin | Prompt information: 'Election Files will be created based on the following parameters. Press Continue to continue the process.<br><br>All previously created and deployed election files will be unusable.<br><br>General project information:<br>Number of Districts: 61<br>Number of Precincts (including split Precincts): 62<br>Number of Choices: 364<br>Number of Contests: 141<br>Number of Offices: 48<br>Number of Political Parties: 8<br>Number of Counting Groups: 2<br><br>Number of Tabulators: 42<br>Number of Polling Places: 22<br><br>Ballot generation options:<br>Lead Card Consolidation Level: Precinct Portion<br>Consolidate Tail Cards: False<br>Force District Splits: False<br>Separate Voting Box Per Party Affiliation: False<br>Ballot Content Creator: Default Ballot Content Creator<br><br>'; User answered with: 'OK' | LD01 | 2020-09-21 09:12:12.750 | UserAction |
| **2B43456A-C566-49AA-B7ED-53DEEF43D2B4** | Admin | Prompt information: 'Election Files will be created based on the following parameters. Press Continue to continue the process.<br><br>All previously created and deployed election files will be unusable.<br><br>General project information:<br>Number of Districts: 61<br>Number of Precincts (including split Precincts): 62<br>Number of Choices: 364<br>Number of Contests: 141<br>Number of Offices: 48<br>Number of Political Parties: 8<br>Number of Counting Groups: 2<br><br>Number of Tabulators: 42<br>Number of Polling Places: 22<br><br>Ballot generation options:<br>Lead Card Consolidation Level: Precinct Portion<br>Consolidate Tail Cards: False<br>Force District Splits: False<br>Separate Voting Box Per Party Affiliation: False<br>Ballot Content Creator: Default Ballot Content Creator<br><br>'; User answered with: 'OK' | LD01 | 2020-09-21 09:27:30.520 | UserAction |

| 918CF1BD-F2DF-4C48-A537-FAFCAE2F40CE | Admin | Prompt information: 'Election Files will be created based on the following parameters. Press Continue to continue the process.<br><br>All previously created and deployed election files will be unusable.<br><br>General project information:<br>Number of Districts: 61<br>Number of Precincts (including split Precincts): 62<br>Number of Choices: 364<br>Number of Contests: 141<br>Number of Offices: 48<br>Number of Political Parties: 8<br>Number of Counting Groups: 2<br><br>Number of Tabulators: 42<br>Number of Polling Places: 22<br><br>Ballot generation options:<br>Lead Card Consolidation Level: Precinct Portion<br>Consolidate Tail Cards: False<br>Force District Splits: False<br>Separate Voting Box Per Party Affiliation: False<br>Ballot Content Creator: Default Ballot Content Creator<br><br>'; User answered with: 'OK' | LD01 | 2020-09-23 10:30:08.620 | UserAction |
| A6069645-C72A-42AE-B6D1-9E586E8AB38B | Admin | Prompt information: 'Election Files will be created based on the following parameters. Press Continue to continue the process.<br><br>All previously created and deployed election files will be unusable.<br><br>General project information:<br>Number of Districts: 61<br>Number of Precincts (including split Precincts): 62<br>Number of Choices: 364<br>Number of Contests: 141<br>Number of Offices: 48<br>Number of Political Parties: 8<br>Number of Counting Groups: 2<br><br>Number of Tabulators: 42<br>Number of Polling Places: 22<br><br>Ballot generation options:<br>Lead Card Consolidation Level: Precinct Portion<br>Consolidate Tail Cards: False<br>Force District Splits: False<br>Separate Voting Box Per Party Affiliation: False<br>Ballot Content Creator: Default Ballot Content Creator<br><br>'; User answered with: 'OK' | LD01 | 2020-09-23 13:16:00.213 | UserAction |

13

| 69196343-CC58-41C8-B770-6D25DEA61482 | Admin | Prompt information: 'Election Files will be created based on the following parameters. Press Continue to continue the process.<br><br>All previously created and deployed election files will be unusable.<br><br>General project information:<br>Number of Districts: 61<br>Number of Precincts (including split Precincts): 62<br>Number of Choices: 364<br>Number of Contests: 141<br>Number of Offices: 48<br>Number of Political Parties: 8<br>Number of Counting Groups: 2<br><br>Number of Tabulators: 42<br>Number of Polling Places: 22<br><br>Ballot generation options:<br>Lead Card Consolidation Level: Precinct Portion<br>Consolidate Tail Cards: False<br>Force District Splits: False<br>Separate Voting Box Per Party Affiliation: False<br>Ballot Content Creator: Default Ballot Content Creator<br><br>'; User answered with: 'OK' | LD01 | 2020-09-23 13:20:55.740 | UserAction |
| 7E017D17-224D-41FF-940D-060AF3740015 | Admin | Prompt information: 'Election Files will be created based on the following parameters. Press Continue to continue the process.<br><br>All previously created and deployed election files will be unusable.<br><br>General project information:<br>Number of Districts: 61<br>Number of Precincts (including split Precincts): 62<br>Number of Choices: 364<br>Number of Contests: 141<br>Number of Offices: 48<br>Number of Political Parties: 8<br>Number of Counting Groups: 2<br><br>Number of Tabulators: 42<br>Number of Polling Places: 22<br><br>Ballot generation options:<br>Lead Card Consolidation Level: Precinct Portion<br>Consolidate Tail Cards: False<br>Force District Splits: False<br>Separate Voting Box Per Party Affiliation: False<br>Ballot Content Creator: Default Ballot Content Creator<br><br>'; User answered with: 'OK' | LD01 | 2020-10-05 14:10:09.850 | UserAction |

14

## Exhibit C – ElectionSource Whistleblower

Well, I'm probably gonna get fired over this, but it's something that's been weighing on my mind and something that I feel needs to be said, so I'm going to say it and. I'm just asking that people be respectful of my family. I just had a new baby and I'm just trying to be as open and honest as I possibly can be with where I see potential problems with how our state handled mail in voting. The machine issues that are being looked at by Rudy Giuliani, I think they're barking up the wrong tree there. There is they're going to go through that and they're going to find that the machine code is is pretty solid, in my opinion. Could things have been manipulated? Possibly. Possibly. But the reality of the situation is we've been through many elections in the past and in fact, even a democratic political action group came through in twenty sixteen. They were angry about Donald Trump winning that election. And they came to our our customers and they said, hey, we want we want to do a total recount of the entire state. So we want all of your ballot images. We want to compare them to the results that came out of the machines when it came to find out that the the ballot images and the machines were pretty much dead on. There's just there's just no financial incentive for a company like Dominion or a company like an election source to be involved with that that type of widespread fraud. I mean, you're risking your entire company to do that. So that's just that's just not happening, in my opinion. And if it is, it would be a huge surprise to me. It should be looked into for sure, because there's always bad actors. There could be bad actors at a company. But as far as I can tell, that that crowd is barking up the wrong tree. But there is. Unfortunately, because of the way that we did mass mail out voting, there is a potential for. A. A huge vulnerability in the election system and that vulnerability is this right here. All of the ballots that come out of the machines when they are made are digital PDF files. They are unsecured, they there is no chain of custody when it comes to them, and what I mean by that is when they are created on the on the county's software, the more software that is sent out to the printer, they are sent out to our company as as a as a company that needs to create tests for the machines. It's just a logical fact that we need that ballot in order to create those tests. So. You know, back before we did mass mail in voting, nobody thought twice about shipping those digital ballots to the appropriate sources. Nobody really felt like there needed to be a secure chain of command because, you know, what are you going to do with the digital ballot? You know, every precinct gets an allotment of ballots on Election Day and people come in and they vote in person. And there's a certain amount of registered absentee voters and it's minuscule. But the problem is the way we very sloppily handled mass mail out voting, we just kind of sent them around. And there wasn't a whole lot of accurate tracking as to where those ballots were going and who was receiving them and who is sending them back in. And there was some tracking. But just with the the the sheer amount of ballots, there wasn't there wasn't a good chain of custody for the physical ballots either, so. Because of that, I mean, this flash drive here, I wrote tests for the state of Michigan, so this flash drive here had all of the ballots for Wayne County on it. And I'm here in my bedroom right now. This is. All the ballots for Wayne County were on this, they're not on it anymore, you know, I've deleted them since, but. They were on that last drive before the election and weeks before the election, so, you know, if some. You know, if I can have them in my bedroom, right? You know, nobody nobody blinked

an eye about me having these digital files. So who else had them, right? If nobody cared that I had in my bedroom all the ballots for Wayne County. You know, I know for a fact that when those ballots gets into the printer, they get put on a Google Drive. You know, everybody thinks, you know, Google and Dropbox and Amazon are secure platforms, but in reality, any high level person at those companies has backdoor clearance to those drives. So. You know, all it takes is a scan of those drives and somebody at Google can have all the ballots for Wayne County. I mean, there's just there just is no chain of custody. And I'm not here saying that laws were broken. I'm not here saying that election source is nefarious. Not you're saying that dominion is even nefarious. But what I am saying is there is no chain of custody for digital ballots. So if some outside actor wanted to come in. With a nefarious goal of printing a hundred thousand ballots before election night, it's certainly possible. All they would have needed was this I had it in my bedroom. That's all they would have needed. And you can go. To any printer. You know, probably not a commercial one, because they'd probably be like, you know, why are you printing official ballots with us? You know, who are you? But if you had your own printer, you could I could print it on an inkjet printer at home. You know, I could have taken one of these ballots from this flash drive. And I could have printed 10000 of them. And on a laser printer. At my office. And if I had, you know, printed them there eight and a half by eleven, so it's very common, I could print them as long as I print them on cardstock. You know, there's a there's a there's a ballot stock thickness paper that you need. But I you know, that's about it, that's about the only you know, and I am pretty sure that a machine would read regular weighted paper, you know, don't quote me on that, but I'm pretty sure that they would. They probably read cardstock paper, too. But there's a specific ballot stock that next thickness. And I don't know if it's just regular card stock or not or if there is actually a specific ballot stock thickness. But yeah, it's the machine is agnostic as long as those timing marks which are on the PDF are correct. You know, about that's printed by the official printer versus a ballot is printed at home by a person that has. You know, the ballots ahead of time, because we need the ballots ahead of time, because we need to write tests, you know, it's just something that we need to do. You know, and I'm not in infectious actor. I didn't pass these ballots off to anybody, and I'm sure nobody at election source did and I'm sure nobody at Dominion did. But you know, who's to say somebody at the county knew about them or, you know, maybe not necessarily somebody at the county office, but somebody knew, you know, somebody knew that that these ballots were being stored somewhere and they took them or they or somebody at Google took them off of the Google Drive. I mean, there's plenty of avenues to get these ballots in digital form. And print them off. So I'm. That if there was election fraud. I'm not saying that there was. But if there was. That's probably where it would have been done. And because of our irresponsible. Mail in voting system where we just mass mailed it out, there's plenty of cover for a 100000 ballots coming in at midnight. You know who is going to say who's going to say, oh? You know. That's 100000 ballots, they all came in for Joe Biden. It doesn't matter because nobody there's no chain of custody. Nobody nobody knows what to expect, you know. You know, with any other election, if one hundred thousand ballots came in at midnight. You know, it would be obvious from. But nobody considers that fraud now because maybe there was one hundred thousand ballots that just were stored somewhere and nobody thought to open them up. Nobody knows, and all the

ballots are anonymous, so you'll never know. You'll never know. That's that's the story of this election, is you will never. Be guaranteed because of them, because of the mail system, you will never be guaranteed to know. For sure. The legitimate president. Or any of the downvotes, for that matter. This was a cluster fuck. This was a cluster and people are being disenfranchized. And what I'm here to tell you is that it's totally possible to bring a hundred thousand ballots, totally possible, I had this weeks before the election, plenty of time. You know, if you're a nefarious actor and you want to print a half thousand ballots and put them in boxes just in case. As long as you have this file that I had personally. You can do that. So. Is there avenues for election fraud? Yeah, absolutely. Or is it from the machines? I don't think so possible. Is there a nefarious actors at election source? No, I don't think so. Is there a serious actors at Dominion? I don't really know people at Dominion. I know people election source. They're very honest people. So please, for the love of God, leave us alone. I'm just trying to. I am just trying to tell you what's on my mind, that there is an avenue for possible fraud here. And I just had a new baby, so please, please be merciful to me, leave me alone. Please be merciful to the people at election source and leave them alone. They're good people and the people at Dominion, I'm sure most of them are just good people, you know. Is there a corruption at the top? I don't know anybody at the minute. I don't know the company at all, really. I don't know. We're a contractor for them. But, you know, we've run. Like I said, we run elections in the past for Dominion and they've come out completely scot free. OK. And the issue that happened in Antrim County, I mean, you got you have to leave that clerk alone. She's. You know, what happened there is completely, completely innocent and, you know, they had a late comer to the election, somebody that somebody that didn't get put on the ballot. Right. So they had Cotting for this ballot without that person on it. And they had a card with the coding for the person that. That was supposed to be on the ballot, so they were supposed to run the coding with the extra candidate, instead they ran the coding with the with the with the previous without the candidate in it. And that screwed everything up when they realized it on election night, they reran everything with the proper coding and everything was fine. It was no, it's not some sort of mass conspiracy from Dominion to switch votes. But is there an avenue for election fraud? Absolutely. This there's no chain of custody on ballots, it's a big deal. That's a big freaking deal. And if election officials don't take that seriously. Then they are screwing the public. Out of an accurate election. I wanted to say by.

## Exhibit D – CV James Thomas Penrose, IV

**James Thomas Penrose, IV**
2550 S. Clark St.
Arlington, VA, 22202
cv@jimpenrose.org

## Education

**George Washington University**, Washington, DC, USA
M.S. in Computer Science                                    **2004**

**Drexel University**, Philadelphia, PA, USA
B.S. Magna Cum Laude in Computer Science                    **2001**
Minor in History and Political Science

## Experience

Tenacity Cyber, LLC, Maryland, USA                    **April 2021-Present**
**Owner**
Cybersecurity consulting and advisory services.

BlueVoyant, LLC, College Park, MD, USA                **April 2021-Present**
**Senior Advisor**
Providing expert advice on cyber security products, operations, and business to
BlueVoyant senior leadership and customers.

BlueVoyant, LLC, College Park, MD, USA                    **2019-April 2021**
**Chief Operating Officer**
Responsible for all operational aspects of BlueVoyant's business focused on day-to-day
cybersecurity delivery and execution.  Primary driver responsible for innovating the Cyber
Risk Management Services (CRx) offering. Thought leader to engage with prospects,
customers, press and industry analysts articulating BlueVoyant's value proposition,
offerings, technology, and tradecraft. Cybersecurity expert with deep technical skills
devoted to leading a tremendously talented workforce and inspiring overachievement
through tenacious pursuit of success. Spearheaded the growth process by building product,
engineering, sales, and marketing capabilities to take the CRx offering from concept to full
operations with marquee reference customers over an 18-month period.  Supported
fundraising during the Covid-19 crisis to retain workforce and continued company
operations with no degradation in service throughout the pandemic.

Redacted, Inc, Elkridge, MD, USA                            **2015-2019**
**Executive Vice-President, Head of Product, Head of Services**
Served multiple leadership roles in various business units. Created a Managed Security
Services (MSS) business from the business case, technology stack selection, Security

Operations Center (SOC) stand-up to initial customer acquisition and onboarding. Senior advisor to clients on all aspects of cyber risk; providing risk assessment, threat analysis, and strategic counsel to C-level executives across the financial, energy, and manufacturing sector.  Offering innovative tactics to pursue and deter hostile cyber attackers targeting client businesses before a risk becomes a crisis. Created new 3rd party risk data product offerings and brought the new products to market leading to the creation of a new substantial stream of revenue.

Darktrace, Washington, DC, USA
**Executive Vice-President of Cyber Intelligence**　　　　　**2014-2015**
Responsible for overall cyber threat intelligence activities of Darktrace in support of customers globally.  Served as the primary assessor of cyber threats detected by Darktrace across all clients. Featured in public speaking engagements on behalf of Darktrace as a subject matter expert and thought leader on cyber operations. Performed media interviews with both television and print reporters on cyber issues.

National Security Agency (NSA), Fort George G. Meade, MD, USA
**Sub-Panel Member, National Security Agency Advisory Board**　　　**2014-2017**
Participates in the National Security Agency's Emerging Technologies Panel creating insight and recommendations for the Director of NSA.

**Chief – Operational Discovery Center**　　　　　　　　　**2013-2014**
Built and led a large organization with multiple project teams, both civilian and contractor, and managed a multi-million dollar budget to achieve top priority of enabling discovery in signals intelligence (SIGINT).

**Technical Director for Counterterrorism (CT) – SIGINT Directorate**  **2010-2013**
Ensured technical competence in the execution of global CT operations. Drove the creation of new SIGINT capabilities in support of the CT mission. Led engagements with foreign partners in order to build CT capacity with our allies.

Central Intelligence Agency, Langley, VA, USA　　　　　**2009-2010**
**Senior NSA Representative – Technical Targeting Department, Counterterrorist Center**
Coordinated joint NSA/CIA operational activities in support of Counterterrorism

National Security Agency, Fort George G. Meade, MD, USA　　　　**2008**
**Global Network Exploitation and Vulnerability Analyst – Remote Operations Center, Tailored Access Operations**
Provided analytic support to drive computer network operations against high priority targets.

**Global Network Exploitation and Vulnerability Analyst,**
　　　**NSA Commercial Solutions Center**　　　　　　**2007-2008**
Employed and integrated industry best practices and products into NSA analytic practices.

**Mission Manager – NSA/CSS Threat Operations Center**　　　**2005-2007**

Led intelligence production and military planning integration activities for a variety of missions focusing on computer network defense, exploitation, and attack.

**Watch Operations Officer – Computer Network Operations Fusion Center        2005**
Provided rotational 24-hour support as the focal point for intelligence queries from operational military elements conducting computer network operations.

**Technical Director – CNO Division, Office of Information Operations        2004-2005**
Led technical SIGINT exploitation activities of foreign CNO actors in support of military and intelligence community requirements.

**Global Network Exploitation and Vulnerability Analyst,**
**        - Office of SIGINT Support to Information Operations        2001-2004**
Performed software development, integration, and testing of SIGINT capabilities to support CNO analysis.  Created and integrated new capabilities into the SIGINT system for use by production analysts.

**Unix System Administrator – Directorate of Technology        1999-2000**
Performed a myriad of Unix system administration activities including full automation of Y2K upgrades for globally deployed, remotely administered systems.

**Intrusion Detection Analyst – Information Systems Security Organization  1997-1998**
Analyzed intrusion detection logs from various sources, evaluated threats, created incident reports, and made recommendations to remediate vulnerabilities.

## Awards

- Presidential Rank Award (Awarded Post Govt Service)        **2016**
- Director of National Intelligence Medal (Awarded Post Govt Service)    **2015**
- Elevated to Defense Intelligence Senior Level (DISL) from GS-14        **2008**
- National Intelligence Meritorious Unit Citation        **2001, 2007, 2008**
- Joint Meritorious Unit Award        **2003, 2007**
- Exceptional Performance Bonus        **2009, 2010, 2011, 2012**
- Spot promotion from GS-12 to GS-13 for Special Achievement        **2005**
- 13 Special Achievement Awards        **1998-2008**

## Professional Development

- NSA Director's Leadership Program        **2013**
- Joint Duty Assignment at Central Intelligence Agency        **2009-2010**
- NSA Senior Technical Development Program        **2010**
- Graduate Certificate in Computer Security and Information Assurance
  George Washington University        **2003**

## Research Experience

- Undergraduate Research Assistant, Drexel University,
  Software Engineering Research Group                           **2000-2001**

**Fraternal Organizations**

- Knights of Columbus

April 9, 2021

Analyst: James Thomas Penrose, IV

Report Title: Preliminary Assessment of Wireless Communications Technology for Michigan Voting Systems

**Executive Summary**

Two versions of Michigan voting systems both Dominion and ESS have been found to have utilized wireless technology. The Dominion Voting Systems proposal for Antrim County shows a quote for wireless transmission capabilities, see Figure 1. Dominion representatives also confirmed issues with wireless transmission of vote totals and even went as far as disabling the saving of ballot images without explicit authorization.

The ESS Model DS200 was found to have an internal wireless card, that has a private network address that was designed to communicate with an ES&S Primary Host Server. These devices and servers are ostensibly designed to operate on a virtual private network (VPN) that does not allow routing to the Internet. While each of the devices do have private network Internet Protocol (IP) addresses, testing revealed that the SIM card used for the DS200 could be utilized in a generic device 4G wireless device and allow for access to the same access point name (APN). There is substantial risk to the ES&S APN connected machines from malicious actors that have access to any SIM card with pre-programmed access to the APN.

The manufacturer of the wireless 4G card used in the ES&S DS200 is a company named Telit. Telit is an internet of things company that has recently taken major investment from a Chinese investment fund that has ties to the Chinese Communist Party according to UK media reporting.

**Antrim County Proposal for Wireless Results Transmission**




Figure 1

1

April 9, 2021

**Dominion Voting Systems ICX**

In Michigan, the Dominion Voting Systems ICX is used to allow for touchscreen voting for disabled voters. During the forensics examination of an ICX machine there were two IP addresses discovered in unallocated space on the hard drive of the Linux operating system. The existence of these IPs in unallocated space implies the ICX had previous communication with one or both of the IPs.

The first IP address was: 120.125.201.101. This IP address is registered to Ministry of Education Computer Center located in Taipei, Taiwan.

The second IP address was: 62.146.7.95. This IP address is registered to EDV-BV GmbH QSC Subkunde located in Nurenberg, Germany.

The ICX machine itself appears to be manufactured in Taiwan and shipped to the United States via airfreight using China Airlines. See the photos of the shipping box in Figure 2.



Figure 2

April 9, 2021

The ICX machine may also utilize an external wireless for communications modem with the central listener server for Dominion Democracy Suite. See the previously listed proposal from Dominion to Antrim County. The manual for the ICX also shows an Ethernet port for wired connectivity, see Figure 3.



Figure 3

**Dominion Summary Email to Michigan Counties**

Dominion sent a summary email dated August 25, 2020 (Figure 4) after the primaries describing how the process of running the election went. Notably in this summary email from Cheryl Homes of Dominion Voting Systems she describes the following issues related to the transmission of vote totals via modems. In addition, Dominion turned off image saving without any authorization from the Secretary of State noted in the communication.

> *"Modem transmission this election were (sic) terrible in some areas! Failures and timing out due to the weaker 3G signal and cellular network issues meant that some of your precincts weren't able to transmit but instead brought the cards in to tally. We turned off image saving which will improve the transmission by a few seconds. We are testing the maximum time out setting for receipt of the transmission on the servers to*

*see if that will improve the success rate. We will also be doing some testing In the county to see if there are any ways to improve the process."*

**From:** Cheryl Holmes <cheryl.holmes@dominionvoting.com>
**Sent:** Tuesday, August 25, 2020 9:23 AM

Bailey v Antrim County                                                                    MDOS_0000980
No. 20-9238-CZ

**Cc:** Tim Baumbach <tim.baumbach@dominionvoting.com>; David Stahl <david.stahl@dominionvoting.com>; Cheryl Holmes <cheryl.holmes@dominionvoting.com>
**Subject:** Michigan Post Election Follow up & Pre-Election Prep

Hello Everyone,

Congratulations on the success of your election and surviving the Primaries! I hope that you are well, safe and catching up on all the things that got set aside in the rush of absentee applications, mailings, inspector recruiting, training and election readiness.

This election we saw a higher than usual report of ballots jamming at the tabulator. This was partially due to the very long ballot, greater number of folds in the ballots at the AVCB. The rain on election day made it worse as the humidity made the ballot tear more easily. Dominion is actively working with our engineers to determine the cause of the jamming and a resolution to improve performance. To reduce the ballot exposure to moisture, we recommend that you keep your ballots in the protective shrink-wrap until needed and only remove the pads or stacks that you need.

Modem transmission this election were terrible in some areas! Failures and timing out due to the weaker 3G signal and cellular network issues meant that some of your precincts weren't able to transmit but instead brought the cards in to tally. We turned off image saving which will improve the transmission by a few seconds. We are testing the maximum time out setting for receipt of the transmission on the servers to see if that will improve the success rate. We will also be doing some testing In the county to see if there are any ways to improve the process.

Figure 4

**ESS DS200 Machine**

The DS200 machine was found to have a wireless 4G modem installed internally within the enclosure of the machine. The printed tapes that summarize the activity during the election show that the 4G modem was used to send the results to a central listener server via secure file transfer. The Telit LE910-SV1 in Figure 5 was found within the ES&S enclosure.



Figure 5

April 9, 2021

The printed summary tape from the ES&S machines also indicate that the submission of the vote totals occurred using the wireless 4G modem, see Figure 6.



Figure 6

The Telit LE910-SV1 card installed in the ES&S device was utilizing a commercial Verizon SIM card with an APN configuration specific to the ES&S DS200 provisioning. Testing revealed that the same SIM card could be utilized in a separate wireless hotspot device and the device could then join the same APN as the ES&S voting machines. An unauthorized user could gain access to this APN by an extra SIM card pre-provisioned for this APN, or by removing a SIM from an operational device and using it in another device.

**Telit LE910-SV1 Hardware Summary**

According to the hardware summary specifications datasheet from Telit, the LE910-SV1 comes standard with "Internet friendly integrated TCP/IP and UDP/IP stacks, as well as HTTP, SMTP,

5

April 9, 2021

FTP, SSL." (Figure 7) These features are very useful to application programmers, but are also ripe for abuse by unauthorized users of the APN devoted to the ES&S machines.



Figure 7

6

April 9, 2021

**Background on Telit**

Telit is a publicly traded company Internet of Things (IoT) and Machine to Machine (M2M) company headquartered in London, UK with an operations unit in Trieste, Italy.
In late 2017, Run Liang Tai Management in Hong Kong built a 14 percent stake in Telit. Mr. Yuxiang Yang sits on the board of directors for Telit (see Figure 8) and is CEO of Run Liang Tai Management Limited.



🔒 talent4boards.com/telit-communications-welcomes-yuxiang-yang-to-its-board-as-non-executive-director/

Telit Communications welcomes Yuxiang Yang to its Board as Non-Executive Director

June 25, 2020 by Talent4Boards Feed Up

– UK, London – **Telit Communications PLC** (LON: TCM), a global enabler of the Internet of Things, announced the appointment of **Yuxiang Yang** to its Board as a Non-Executive Director effective immediately.

*"On behalf of the Board, I am delighted to welcome Yuxiang Yang as a Director of Telit. We have got to know him well in recent years and are confident that his considerable knowledge of the sector, as well as some of our key markets, will add substantial value to the Board's activities and to the Company as a whole," said Board Chairman, Simon Duffy.*

Following this appointment, the Board comprises six non-executive and two executive directors.

About Yuxiang Yang

Mr. Yang brings considerable experience from a career in investment and financial markets and is founder and CEO of China Fusion Capital, a Chinese investment management group. As part of this, Mr. Yang is the CEO of Run Liang Tai Management Limited, a significant shareholder of Telit, holding approximately 15.1 per cent of the Company's shares. Mr. Yang is also CEO of Yidian Zixun a leading news aggregation platform. Prior to founding China Fusion Capital, Mr. Yang served as Chairman and CEO of Ping'an Securities (a China-focused investment bank) amongst other roles and is currently also a board member of Sunsea AIoT Technology Co. Ltd.

Figure 8

A media report from August 15, 2020 from the UK online publication *Financial Mail on Sunday* indicated that there were concerns raised about Chinese influence of the Telit firm within the UK government. Here is an excerpt from the news story located here:
https://www.thisismoney.co.uk/money/markets/article-8630685/Chinese-close-UK-internet-things-pioneer.html

> *…The maneuvering by powerful investors comes after secretive Chinese multi-millionaire banker Yuxiang Yang joined Telit's board earlier this summer.*

April 9, 2021

*His appointment may raise concern in Westminster that a Chinese businessman with ties to his country's Communist government could be seeking to gain influence over the business.*

*Yang runs China Fusion Capital, the parent company of Run Liang Tai Management, a mysterious investment fund that has built a 15 per cent stake in Telit to become its largest shareholder.*

*Sources said some of the firms that have invested in Run Liang are giant Chinese companies, such as coal mining group Wintime Energy and Jiangsu Shuangliang, a manufacturer of air conditioners and boilers.*

*Run Liang also owns a stake in Sunsea Telecommunications, a Shenzhen-listed 'internet of things' provider that recently raised around $200million (£1.5million) by issuing shares to Zhjzgroup, a state-backed tourism firm. Yang also sits on the board of Sunsea.  Speculation has been mounting that Run Liang is hoping to engineer a merger of some or all of Telit with China-based Sunsea.*

*Run Liang's move on Telit, which is listed on AIM, follows a period in which several other London-listed businesses have been bought by China-linked firms.*

*Imagination Technologies was bought by Canyon Bridge – a private equity fund bankrolled by Beijing – in 2017 for £550million. Concerns rose in the spring when Canyon Bridge tried to place four directors from China Reform Holdings on to Imagination's board.*

*Conservative MPs Tom Tugendhat, who now leads the China Research Group, and David Davis warned that Imagination's intellectual property could be shifted to China.*

*When asked about Telit, Bob Seely, chairman of the Foreign Affairs Select Committee, said: 'We do need a thorough review of investment security and we need an oversight board for purchases by high-risk vendors or from higher risk states.' Telit, which is due to unveil figures next week, declined to comment.*

# EXHIBIT 6

Doug Logan Reports

4/9/2021

# Antrim County, MI
## Election Management System
## Application Security Analysis



Cyber Ninjas
Phone: (941) 3-NINJAS
Fax:    (941) 364-6527
www.CyberNinjas.com
5077 Fruitville Rd #109-421, Sarasota, FL 34232

# 1  REVISION HISTORY

| Date | Revision | Notes |
|------|----------|-------|
| 01/10/2021 | DRAFT | Initial Draft Created |
| 01/11/2021 | DRAFT | Revision 1.0 Completed |
| 03/13/2021 | DRAFT | Additional Findings Added |
| 04/07/2021 | DRAFT | Additional Findings |
| 04/08/2021 | DRAFT | Revision 2.0 Completed |

# 2  TABLE OF CONTENTS

1    Revision History.................................................................................................................................1

3    Executive Summary.............................................................................................................................2

4    Scope..................................................................................................................................................3

5    Background.........................................................................................................................................3

  5.1    Architecture..................................................................................................................................3

  5.2    Definitions.....................................................................................................................................5

6    Findings..............................................................................................................................................5

  6.1    Authentication & Authorization....................................................................................................5

  6.2    Audit Logging & Tracking..............................................................................................................6

  6.3    Cryptography & Secret Storage ....................................................................................................7

  6.4    Credential Management ..............................................................................................................14

  6.5    Certification.................................................................................................................................15

7    Affirmation ......................................................................................................................................16

8    About Cyber Ninjas ..........................................................................................................................16

Appendix A: Bio – Douglas Logan.............................................................................................................17

# 3   EXECUTIVE SUMMARY

The Antrim County Election Management System (EMS) environment is setup in a manner where it would potentially be possible for an individual to alter the results of the election without leaving much of a digital trail.

- Users of the computer have enough access rights and the needed tools installed to directly modify election results in the database. Official results are generated from this database.
- The master encryption key utilized to encrypt election results is stored in plain text in the database, and its value exists both at the county and with Election Source. If Election Source was hacked, or this value otherwise got into a malicious actor's hand; it would be possible to create malicious tabulator configurations or alter the result files from tabulators. Either of these could be used to change the results of an election.
- Log levels are such on the system that it would be possible to delete files, delete logs, or the similar; and it would be difficult to have the necessary details available to investigate the incident.
- Application and computer system accounts are generic and shared among multiple individuals making it near impossible to determine who performed an action even if proper logging was in place.
- Hard-coded credentials, failure to use cryptography properly, and other well-known bad practices are utilized throughout the software suggesting that exploitation of the software is very possible. These types of problems are documented to be reoccurring with this EMS going back over 10 years.
- Ballot images are missing from the Compact Flash data, making it difficult to audit how the software interpreted any given ballot.

These types of findings and departures from best practices utilized across multiple industries for over 10 years is inexplicable for a system that is both highly sensitive, and a likely target for nation state activity.

It is highly recommended that all components of the EMS software immediately go through a full code-review audit to determine the extent of the problems encountered and how easily other areas of the application may be exploitable. In addition, it is recommended that the following items be reviewed to have a better understanding of the full impact of some of these findings:

- Election Source should be required to provide a list of all personnel that have access to the Election Definition databases utilized for Antrim County, as well as provide documentation on any controls that are in place to detect and prevent a breach or modification of election data.
  - Should the controls be determined to be insufficient to detect a nation state level attack, at a bare minimum; all Michigan election projects, and compact flash cards should be forensically imaged and reviewed to determine if any alterations of the data or systems took place.
- Documentation should be requested on the reasoning for installing Microsoft SQL Management Tools onto the EMS Server and who performed this action. This software is not on the EAC's approved list for certified systems, and a legitimate purpose for its installation is not apparent. Yet this software greatly facilitates the changing of database values.
- Copies of the tabulator tape result output for all precincts should be provided, in addition to chain-of-custody documentation showing that these files have been properly cared for and have not been altered. These numbers should then be compared against the numbers read directly from the compact flash cards.
- File definitions should be provided by Dominion for the various results and configuration files held on the compact flash cards, so that the decrypted files can easily be read and confirmed to match the EMS Server and therefore no alteration took place.

# 4   Scope

Cyber Ninjas was engaged to evaluate the security of the Election Management System (EMS) utilized in Antrim County, MI in order to determine if cyber security related flaws, abuse of functionality, misconfiguration or purposely malicious actions or code could account for the voting irregularities demonstrated in the county during the November 2020 General Election.

A forensic image of the Antrim County Election Management System (EMS) gathered on December 6th, 2020 was converted to a bootable virtual machine. This machine was then utilized to allow the EMS to be utilized in a "live" environment to examine logs, configurations, and functionality of the applications. All analysis was performed within this virtual environment.

# 5   Background

The following section outlines background details and definitions useful in understanding the overall Election Management System (EMS) architecture and structure, as well as definitions that are utilized throughout the report. Architecture details came from publicly available documentation, as well as reviewing the deployment within Antrim County.

## 5.1   Architecture

The architecture of the Election Management System (EMS) in Antrim County consisted of one or more ImageCast Precinct (ICP) tabulators and an ImageCast X (ICX) Ballot Marking Device (BMD) at every precinct, as well as the EMS Server that was centrally located at the county. While the ICP devices support a number of different ways to remotely report results, Antrim County stated that they aggregated the results by collecting the compact flash cards and manually importing the results off of these compact flash cards.

### 5.1.1   Election Management System Server (EMS Server)

The EMS Server is the primary device utilized in Antrim County in order to run an election and serves as the central aggregator for all election results within the county. While the EMS Election Event Designer software can be utilized to build an entire election from scratch, documentation provided indicates that the initial election definition was created by Election Source and exported as a package for Antrim County to then import into their system. This configuration was then utilized by the county in order to build the compact flash cards utilized to configure the ImageCast Precinct (ICP) devices, and after the polls were closed these same compact flash cards were brought back to the EMS in order to attempt to import and publish the results. The EMS software also supports the manual entry of result files.

The EMS Server machine in smaller counties can at times also be utilized as the digital adjudication machine, but this software was not installed on the EMS Server image that was reviewed. Examining the Windows Event Logs shows that the DVS Adjudication Services software had been installed on April 10, 2019; but had later been removed on September 3rd, 2019. This explains the DVS Adjudication logs from 2019 referenced from the ASOG report, and also explains why there were not any adjudication logs for 2020. This is consistent with what the county has reported that all adjudication for 2020 was done manually.



*Figure 1 - DVS Adjudication Services software uninstalled 9/03/2019.*

### 5.1.2   IMAGECAST X (ICX) - BALLOT MARKING DEVICE (BMD)

ImageCast X (ICX) Ballot Marking Devices (BMD) are primarily utilized in Antrim County in order to support accessibility voting. With these devices an individual can vote via a touch screen or a number of specialized input devices, and this in turn prints out a ballot with a QR code which can then be fed into the ImageCast Precinct (ICP) tabulators where the votes are tabulated. These devices are configured utilizing USB drives created from the EMS Server.

### 5.1.3   IMAGECAST PRECINCT (ICP) – PRECINCT TABULATOR

ImageCast Precinct (ICP) devices are designed to handle the tabulation of ballots at a precinct level. These devices support both a standard hand-filled out bubble ballot, as well as the QR coded ballots created by the ICP device. As votes are cast the results are written simultaneously to two compact flash cards for redundancy. One of these compact flash cards also holds all the configuration for the ICP device. This configuration tells the ICP how to read and understand the various ballot types for the election. These compact flash cards are built on the EMS Server.

## 5.2   Definitions

The following section references various definitions to help clarify their meaning throughout the report, and to clear up some common misconceptions related to the systems reviewed.

### 5.2.1   Log Files

The term log files will be utilized for any place where an application or the operating system writes information about what happened as an audit trail, or to aid in debugging. This includes, but is not limited to, specialized and general Windows Event logs, the slog.txt files from the ICP tabulators, as well as the UserLog database table found within every election database.

### 5.2.2   Source Code

Source Code is the text which is written by a programmer which can be compiled into a program. The compiled program is then deployed onto a computer to perform the desired action. There was no source-code encountered on any of the compact flash drives, or on any of the forensic images captured. Only compiled programs were deployed on these systems.

# 6   Findings

The following sections outline the findings discovered over the course of the analysis. This included significant deviations from application security best practices, configurations that could allow the integrity of the system to be compromised, and suspicious actual usage of the EMS. This information is broken out by topic with sections that cover "Authentication & Authorization", "Audit Logging & Tracking", "Cryptography & Secrete Storage", "Credential Management", and "Tabulation Irregularities".

## 6.1   Authentication & Authorization

The application did not follow best practices related with assigning least privilege to the users required to do the job or implement proper account management. This represents a large risk to the integrity of the election data. With the current setup it would be simple for a malicious admin to modify the vote in a manner where it would be difficult to determine who did it.

### 6.1.1   System Administrator utilized for all Access

The only user that has been utilized to login to the EMS Server machine for the entire history available in the Security Event Logs is the use EMSADMIN. This means that the EMSADMIN user is being utilized for normal, everyday use of the various applications associated with voting. This is a huge security risk and could easily be utilized to compromise or change the entire vote.

The EMSADMIN user is a full administrator on the machine in addition to being a full administrator on the Microsoft SQL Database utilized to store all election data. Furthermore, the EMSSERVER has the appropriate tools installed to make it simple to manually update any value in the database. This means that regardless of what level of access a user has within the EMS application they'd be able to change anything they wanted because they're accessing the computer as an admin.

This could be utilized to:

- Change vote totals within the database affecting final results.
- Add, Edit, or Delete any user in the application, including changing passwords.
- Delete any sort of logs or audit trail that may exist on the computer, or in the database.

### 6.1.2 SYSTEM AND APPLICATION SHARED ACCOUNTS

The application utilizes generic usernames and passwords rather than creating usernames for the individuals that will be utilizing the application. This likely means that more than one user has the credentials to the same account in order to perform various election related operations in the application. This defies best practice and makes it impossible for you to know who it was that performed a given operation within the application since multiple people have access to the same username. Best practices dictate that each user should always have his or her own username and password to the application. This increases accountability and helps avoid situations where credentials might be leaked.

## 6.2   Audit Logging & Tracking

The EMS server configuration fails to implement audit logs and controls that would be typical of a high-risk application. In many cases this would prevent the audit logs from existing that would be required to look into or detect a security incident.

### 6.2.1 NO BALLOT IMAGES

None of the Compact Flash drives appeared to hold ballot images, and no ballot images had otherwise been imported into the EMS. Ballot images are a critical artifact and are essential for any type of system audit to determine how an electronic voting machine interpreted results and where it might be malfunctioning. Vendor training clearly state that ballot images should be imported into the EMS immediately following the election, but this was never done, and the images don't even seem to be present. Without ballot images its near impossible to match up and see the origin of where errors might be happening.

It is unclear how write-in candidates could have been properly handled without ballot images available for review.

### 6.2.2 INSUFFICIENT AUDIT LOGS

Audit logs should be configured in a manner that all sensitive operations are logged, that the logs include all details necessary to investigate suspicious activity, and that the logs are difficult to tamper with. This was not the case with the Windows Event logs, nor the EMS Application logs.

The Windows Operating System is configured with the standard log level which does not log the access of sensitive files, the deletion of files, or other sensitive actions. This is atypical for a machine that is as sensitive as serving as the central aggregator of all the votes in the county.

The EMS logs found in the UserLog table are also completely deleted any time an election package is loaded within EED. Loading an election package in this way is a standard way that organizations such as Election Source provide the election event. However, this would mean it would be possible for someone to set a malicious device configuration, build the compact flash cards; and then reset the database and put things back to normal. This process would destroy all evidence of the change. Furthermore, the user, EMSADMIN, which is the main account utilized on the machine; has full access to edit the database and delete any log entries. Best practices dictate that an account utilized for normal use of a system not have access to edit or remove logs.

### 6.2.3  Manual Entries Do Not Require A Comment

The Result Tally and Reporting application can be utilized to insert manual vote count totals rather than automatically importing those results from the tabulator. These manual entries appear to be a way to override and replace the existing vote totals rather than allowing an interface where the numbers that are pulled in from a tabulator can be adjusted with some sort of audit trail. This interface does not log the username submitting the details, require a comment explaining the changes, or even display a timestamp so it was clear when the manual count was done.

These type of entries and comments are standard for any inventory or financial services application. It seems the sensitivity of an election system would be higher than that of these systems.

## 6.3   Cryptography & Secret Storage

The application did not appear to follow best practices for credential storage. The full extent of the problem cannot be fully determined without a review of the actual source code. However, simply by working with the files on the file system and looking in the database it was possible to find various sensitive details that are not properly stored. This included everything from the master encryption key to hard coded credentials.

### 6.3.1  Plaintext Cryptographic Keys

The master cryptographic key utilized to encrypt all voting results and configuration from the tabulators is stored in plain text in a table within the database for this election. With this key and knowledge about the file formats utilized; it would be possible to alter election results prior to those result files being loaded into the EMS Server, or to alter configurations for the tabulators to make them behave in a certain way. Furthermore, since Election Source originally built the election package utilized by the county and is the originator of the database; any employee at Election Source who had access to the county's database file, or any nation state that compromised one of their computers; would have the encryption key needed to adjust files on the compact flash cards.

Best practices would dictate that any encryption key utilized for election files would only exist on the County's EMS Server and stored in a hardware Trusted Platform Module (TPM). Since the compact flash cards for the tabulators are always built locally, there is no reason for this encryption key to exist anywhere except for the location where the cards are built. Failing to do so significantly reduces the overall security of the election.



*Figure 2 - Cryptographic keys are in plain-text in the databases. The values are  redacted for security purposes.*

## 6.3.2  HARD CODED CREDENTIALS

Components of the EMS have hard-coded credentials compiled within the application itself. This is considered an extremely bad practice and is not something that should ever be done. Not only can credentials be exposed when they're hard coded in the application, but the fact that they're compiled in the application means that every single customer of this version of the EMS would utilize the same credentials. As a result, learning the credentials would allow you to attack them all.

Hard coding of credentials into this application appears to go back to at least 2010, based on the following report:

https://www.eac.gov/sites/default/files/voting_system/files/Deficiency%20Report.pdf

NOTE: These were detected by utilizing grep to search the binaries for the string "password".

| File Name(s) | Value |
|---|---|
| /Election Data Translator/DVS.DemocracySuite.DatabaseService.dll<br><br>/Election Event Designer/DVS.DemocracySuite.DatabaseService.dll<br><br>/Election Event Designer/DVS.DemocracySuite.DatabaseService.dll | username="Techadvisor"<br>password="YWanPlFl6ETqijhPNWFsyEjAy6eEzJM0A0DJ7O+YY4Q=" |
| /Election Data Translator/DVS.DemocracySuite.DatabaseService.dll<br><br>/Election Event Designer/DVS.DemocracySuite.DatabaseService.dll<br><br>/Election Event Designer/DVS.DemocracySuite.DatabaseService.dll | username="MRO01"<br>password="YWanPlFl6ETqijhPNWFsyEjAy6eEzJM0A0DJ7O+YY4Q=" |
| /Election Data Translator/DVS.DemocracySuite.DatabaseService.dll<br><br>/Election Event Designer/DVS.DemocracySuite.DatabaseService.dll<br><br>/Election Event Designer/DVS.DemocracySuite.DatabaseService.dll | username="ROAdmin"<br>password="YWanPlFl6ETqijhPNWFsyEjAy6eEzJM0A0DJ7O+YY4Q=" |
| /Election Data Translator/DVS.DemocracySuite.DatabaseService.dll<br><br>/Election Event Designer/DVS.DemocracySuite.DatabaseService.dll<br><br>/Election Event Designer/DVS.DemocracySuite.DatabaseService.dll | username="Admin"<br>password="YWanPlFl6ETqijhPNWFsyEjAy6eEzJM0A0DJ7O+YY4Q=" |

COMPANY CONFIDENTIAL – NOT FOR PUBLIC DISTRIBUTION

| | |
|---|---|
| /Election Data Translator/DVS.DemocracySuite.DatabaseService.dll<br><br>/Election Event Designer/DVS.DemocracySuite.DatabaseService.dll<br><br>/Election Event Designer/DVS.DemocracySuite.DatabaseService.dll | username="SAdmin" password="YWanPlFl6ETqijhPNWFsyEjAy6eEzJM0A0DJ7O+YY4Q=" |
| /Election Data Translator/DVS.DemocracySuite.DatabaseService.dll<br><br>/Election Event Designer/DVS.DemocracySuite.DatabaseService.dll<br><br>/Election Event Designer/DVS.DemocracySuite.DatabaseService.dll | username="Admin" password="oCFR3h+mPKykHkkE41o5cvyCSwY=" |
| /Election Data Translator/DVS.DemocracySuite.DatabaseService.dll<br><br>/Election Event Designer/DVS.DemocracySuite.DatabaseService.dll<br><br>/Election Event Designer/DVS.DemocracySuite.DatabaseService.dll | username="Admin" password="oCFR3h+mPKykHkkE41o5cvyCSwY=" |

### 6.3.3 Passwords Stored As An Unsalted Hash

Credentials to the EMS applications are stored within the Microsoft SQL Database utilizing the hashing algorithm SHA256. This is better than storing the credentials in the database as plain text, but industry best practices dictate that these passwords should also have a cryptographically random string tacked onto the front of them before being hashed. This is referred to as "salt"; and it prevents several common attacks that might allow an attacker to figure out the credentials. Because salt was not used, we were actually able to take the hash out of the database, 6166A73E5165E844EA8A384F35616CC848C0CBA784CC93340340C9ECEF986384, and run it through a database of pre-computed hashes at https://hashes.com/. This let us figure out that its value was, "dvscorp08!".



### 6.3.4  CREDENTIALS IN PLAIN TEXT

The application has several places that included credentials in plain text hard coded within various locations and configuration files. Best practices dictate that credentials should always be encrypted whenever they are stored on the filesystem of a machine. Failing to do so can allow sensitive credentials to potentially be compromised and utilized to manipulate results. This is considered a basic security requirement that even low-risk applications should follow. The Election Management System would be considered a high-risk system.

### 6.3.4.1  C:\PROGRAM FILES\DOMINION VOTING SYSTEMS\SMART CARD SERVICE\NLOG.CONFIG

Database credentials are stored in plain text without any encryption within a configuration file for the Smart Card Service. The naming of this password suggests that this default password has gone unchanged since 2008. This is supported by a 2010 defect report that cited this same password as being hard coded within the application:

https://www.eac.gov/sites/default/files/voting_system/files/Deficiency%20Report.pdf

## 6.3.4.2 C:\PROGRAM FILES\DOMINION VOTING SYSTEMS\RESULTS TALLY AND REPORTING\ DVS.DemocracySuite.ResultTally.exe.Config

The configuration for the Results Tally and Reporting Application has a location where a password would be stored in plain text. Since Antrim writes the results to the local file system rather than a network machine; this entry does not directly represent a risk to Antrim County. However, this shows a pattern of not following well recognized industry best practices.

```xml
<ConnectionConfiguration AppSrvIP="emsserver" AppSrvName="emsapplicationserver"
  AppSrvPort="" DbProvider="SqlServer" LastProject="Antrim November 2020"
  LeftBrowserPath="" MirrorMode="false" MirrorServerName="dvssqlserver"
  RightBrowserPath="" SqlServerName="emsserver" USBPort="1" UseSSL="False"
  VitnesServerName="dvssqlserver" XmlFileBrowserPath="" ConnectionStringMirror="Data
Source={3};Failover Partner={4};Connect Timeout=60;Load Balance Timeout=20;initial catalog={0};user
id={1};password={2}"
  ConnectionStringStandAllone="server={3};user
id={1};password={2};MultipleActiveResultSets=True;database={0};connection
reset=false;pooling=true;enlist=true;min pool size=1;max pool size=50" />
  <TransferPointSettings>
    <TransferPoints>
      <Clear />
      <TransferPointElement DirectoryPath="C:\Users\EMSADMIN\Desktop\Election Results November 2020"
        HostName="" IsLocal="True" IsPublic="False" Name="Results Export"
        Password="" Port="" TransferPointType="Folder" Username="" />
    </TransferPoints>
  </TransferPointSettings>
```

### 6.3.5   C:\PROGRAM FILES\DOMINION VOTING SYSTEMS\RESULTS TALLY AND REPORTING\NSLOG.CONFIG

The NSLog.Config for the Results Tally and Reporting has multiple database connections hard coded within the configuration file. Giving the naming and database types listed with the connections string, it's unclear if these are currently in-use in the application. However, it further demonstrates that storing passwords in plain text is common within the application suite.

```xml
  <targets>
    <target name="dbMsSqlAsync" xsi:type="AsyncWrapper" overflowAction="Discard">
      <target name="dbTargetMssql" type="Database">
        <dbprovider>mssql</dbprovider>
        <ConnectionString>Data Source=HERMES\DEVTEST;Initial Catalog=Logs;User ID=logwriter;Password=logwriter;
</ConnectionString>
        <commandText>
          INSERT INTO [Logs].[dbo].[DeveloperLog] ([Date] ,[ThreadID] ,[LogLevel] ,[Logger] ,[Username] ,[Project]
,[StackValues] ,[Message] ,[ExceptionMessage]) VALUES (@date ,@threadID, @logLevel, @logger, @username, @project,
@stackValues, @message, @exceptionMessage);
        </commandText>
        <parameter name="@date" layout="${date}"/>
        <parameter name="threadID" layout="${threadid}"/>
        <parameter name="@logLevel" layout="${level}"/>
        <parameter name="@logger" layout="${logger}"/>
        <parameter name="@username" layout="${mdc:item=EMSUser}"/>
        <parameter name="@project" layout="${mdc:item=EMSProject}"/>
        <parameter name="@stackValues" layout="${stacktrace:topFrames=12}"/>
        <parameter name="@message" layout="${message}"/>
        <parameter name="@exceptionMessage" layout="${exception:format=Message, Type, ShortType, ToString, Method,
StackTrace}"/>
        <!--<parameter name="@secCode" layout="${secCode:SecCodeCalcOn=true}"/>-->
      </target>
    </target>
    <target name="dbPostgreAsync" xsi:type="AsyncWrapper" overflowAction="Discard">
      <target name="dbTargetPostgre" type="Database">
        <dbprovider>Npgsql.NpgsqlConnection, Npgsql</dbprovider>
        <ConnectionString>Server=localhost;Port=5432;User Id=postgres;Password=postgresapwd13;Database=TestDatabase;
</ConnectionString>
```

COMPANY CONFIDENTIAL – NOT FOR PUBLIC DISTRIBUTION

### 6.3.6  C:\Program Files\Dominion Voting Systems\Election Event Designer\NSLog.config

The NSLog.Config for the Election Event Designer has multiple database connections hard coded within the configuration file. Giving the naming and database types listed with the connections string, it's unclear if these are currently in-use in the application. However, it further demonstrates that storing passwords in plain text is common within the application suite.

```xml
  <targets>
    <target name="dbMsSqlAsync" xsi:type="AsyncWrapper" overflowAction="Discard">
      <target name="dbTargetMssql" type="Database">
        <dbprovider>mssql</dbprovider>
        <ConnectionString>Data Source=HERMES\DEVTEST;Initial Catalog=Logs;User ID=logwriter;Password=logwriter;
</ConnectionString>
        <commandText>
          INSERT INTO [Logs].[dbo].[DeveloperLog] ([Date] ,[ThreadID] ,[LogLevel] ,[Logger] ,[Username] ,[Project]
,[StackValues] ,[Message] ,[ExceptionMessage]) VALUES (@date ,@threadID, @logLevel, @logger, @username, @project,
@stackvalues, @message, @exceptionMessage)
        </commandText>
        <parameter name="@date" layout="${date}"/>
        <parameter name="threadID" layout="${threadid}"/>
        <parameter name="@logLevel" layout="${level}"/>
        <parameter name="@logger" layout="${logger}"/>
        <parameter name="@username" layout="${mdc:item=EMSUser}"/>
        <parameter name="@project" layout="${mdc:item=EMSProject}"/>
        <parameter name="@stackValues" layout="${stacktrace:topFrames=12}"/>
        <parameter name="@message" layout="${message}"/>
        <parameter name="@exceptionMessage" layout="${exception:format=Message, Type, ShortType, ToString, Method,
StackTrace}"/>
        <!--<parameter name="@secCode" layout="${secCode:SecCodeCalcOn=true}"/>-->
      </target>
    </target>
    <target name="dbPostgreAsync" xsi:type="AsyncWrapper" overflowAction="Discard">
      <target name="dbTargetPostgre" type="Database">
        <dbprovider>Npgsql.NpgsqlConnection, Npgsql</dbprovider>
        <ConnectionString>Server=localhost;Port=5432;User Id=postgres;Password=postgresapwd13;Database=TestDatabase;
</ConnectionString>
```

### 6.3.7   C:\Program Files\Dominion Voting Systems\Election Data Translator\ DVS.Bridging.ImportAdapter.exe.config

The DVS.Bridging.ImportAdapter.exe.config for the Election Data Translator has multiple locations for credentials hard coded within the configuration file. It does not appear that Antrim utilizes this feature, so these appear to be blank. However, it further demonstrates that storing passwords in plain text is common within the application suite.

```
<appSettings>
  <add key="dvs" value="rDq6LWxe+bWypbsNj1TLOg=="/>
  <add key="dvsa" value="kh996vk9ch6ZCjK5sp0B6Q=="/>
  <add key="remSvr" value="http://localhost/emsapplicationserverdev/RemoteDbProviderImpl.rem"/>
  <add key="remoteAdo" value="false"/>
  <add key="isIpConst" value="false"/>
  <add key="srvName" value=""/>
  <add key="adminUserName" value=""/>
  <add key="adminPassword" value=""/>
  <add key="userPassword" value=""/>
  <add key="userName" value=""/>
  <add key="dirPath" value=""/>
  <add key="DbProvider" value="SqlServer"/>
  <add key="STA" value="true"/>
  <add key="BulkInsertCheckConstraints" value="true"/>
  <add key="ClientSettingsProvider.ServiceUri" value=""/>
  <add key="wcfBinding" value="net.tcp"/>
</appSettings>
```

## 6.4   Credential Management

Credential reuse appears to be relatively common across the organization, and across multiple deployments of the application. The password dvscorp08!, which was in use in Antrim County has showed up in prior deficiency reports, and in breach data associated with employees of the EMS vendor. Based on its naming, this password is over 12 years old and still in use today. The continued use of this password makes it easy for a potential attacker to guess a password and get into the system to manipulate data.

### 6.4.1   Password reuse

Reviewing the passwords utilized for Antrim County going back to August 2018; it appears that the password "dvscorp08!" has been utilized for at least one account since 2018 and in many cases that same password was utilized for most if not all the accounts.

An 2012 EAC report, "WYLE TEST REPORT NO. T57381-01APPENDIX A.11DEFICIENCY REPORT", reported on page 10 the **dvscorp08!** Password was hardcoded into the system and first reported on 2010-08-16 14:28.

https://www.eac.gov/sites/default/files/voting_system/files/Deficiency%20Report.pdf

### 6.4.2 Breach Data

A search of breach data associated with the EMS vendor's domains shows regular use of the password "dvscorp08!".

2017-07-19 Breach
EMAIL | SHA-1 | CLEAR PASS
masha.REDACTED@dominionvoting.com | a02151de1fa63caca41e4904e35a3972fc824b06 | dvscorp08!

2017-12-11 Breach

masha.REDACTED@dominionvoting.com:dvscorp08!
masha.REDACTED@dvscorp.com:dvscorp08!
masha.REDACTED@gmail.com:dvscorp08!

## 6.5  Certification

The Election Assistance Commission's (EAC) list of approved software for the EMS does not appear to include Microsoft SQL Server Management Studio, but this software is installed on the machine. Microsoft SQL Server Management Studio is a database administration tool which makes it easy to directly edit entries within the database. This could potentially be utilized to change vote values.

Since this tool is a separate install from Microsoft SQL Server, it is our understanding that it would be required to explicitly mentioned on the list of certified software in order to be allowed to exist on an EAC certified configuration (See pages 4-13):

https://www.eac.gov/sites/default/files/voting_system/files/Dominion_Voting_Systems_D-Suite_5.5-B_Test_Plan-Rev._02.pdf



*Figure 3 - SQL Management Tools allows the easy editing of a vote.*

# 7   AFFIRMATION

I declare that I am over the age of 18, and I understand and believe in the obligations of an oath. Under penalty of perjury laws of the State of Michigan and the United States I attest that the foregoing report is true and correct, and that this report was executed this 9th day of April, 2021.

Douglas Logan

# 8   ABOUT CYBER NINJAS

Cyber Ninjas is an application security consulting company specializing in code review, ethical hacking, training and security program development. Our staff represents decades of experience in a variety of areas including application support, development, product management, and application security. This experience across all areas of the software development life cycle gives us a unique perspective on how to build security into your existing processes. We can help you build a software security program, expand the capabilities of your existing staff, or simply perform a security assessment of your software or your company. With everything we do, our goal is to build the knowledge within your organization. We strongly believe that "Security comes with knowledge." ™; and that it is our job as Cyber Ninjas to train and teach through every engagement in order to build up capabilities within your organization.

## APPENDIX A: BIO – DOUGLAS LOGAN

**Douglas Logan** has handled Cyber Security for major companies and organizations around the country, such as the Federal Communications Commission, JP Morgan Chase, Bank of America, Citibank, Sally Mae, and more. In 2015, he was named a winner of the prestigious SANS 2015 Difference Makers Award.

Mr. Logan (CISSP, GWAPT, GCIH) is the CEO and Principal Consultant for Cyber Ninjas, a Sarasota, Florida-based company. Mr. Logan is responsible for working with organizations to evaluate their current cyber security risks, educate stakeholders on the nature and causes of those risks and establish policies, programs, and procedures that provide long-term protection.

Mr. Logan founded Cyber Ninjas under the mission of building organizations' cyber security capabilities by developing their people and processes, providing them with the opportunity to eventually handle their own security requirements. His solution-focused services include enterprise threat analysis and modeling, security program development, secure software development life-cycle (sSDLC) creation, malicious code detection, training, staff mentoring, code review and ethical hacking. "We believe there is no point in breaking something if you can't offer a reasonable way to fix it," he says**.**

Prior to founding Cyber Ninjas in 2013, Mr. Logan was a Senior Consultant for Cigital where, among other responsibilites, he helped launch the Bloomington, Indiana office. Under Mr. Logan's technical leadership, Cigital was able to scale their Vulnerability Assessement Managed Service in less than a year from three people conducting roughly 10 assessments a month, to about 20 individuals performing 250 assessments a month. Mr. Logan's process oriented methodology allowed him to place new hires straight out of college to billable work in under 10 days, and had those same individuals leading teams within 60 days. After a year of building people and processes, the entire system Mr. Logan built was self-propetuating and completely self-sufficient, allowing him to step into other projects.

Mr. Logan was also involved in many other areas of Cigital's business, including mobile threat modeling and threat analysis, red team enterprise risk assessments, advanced penetration testing, and instructor lead training. He is the author of Cigital's Android Penetration Testing class, and co-author and team-lead responsible for creating the iOS Penetration Testing class.

Before Cigital, Mr. Logan had 12 years combined experience in the IT field, including roles as Server Administration, Development, and Product Management.

His broad experience not only gives him a deep technical backing, but allows him to design solutions that integrate with normal day-to-day IT processes.

Outside of work Mr. Logan volunteers for the US Cyber Challenge; a non-profit organization dedicated to finding America's brightest and getting them plugged into the Cyber Security field. In that role he helps shape America's future cyber warriors to help defend our nation.

Mr. Logan holds Bachelors degrees in both Business Management and Accounting from Guilford College in Greensboro, NC.