# ATTACHMENT 6

Speckin Forensics Qualifications and Report, July 27, 2023

## Speckin Forensics, LLC

120 N. Washington Square, Suite 300
PMB 5068
Lansing, Michigan 48823
517-349-3528 • Fax 517-349-5538

Please Direct Correspondence & Payment Here:
110 E. Broward Boulevard, Suite 1700
Fort Lauderdale, Florida 33301
954-763-6134 • Fax 954-688-4941

www.4N6.com

**Leonard A. Speckin**
Retired Document Analyst

**Michael J. Sinke**
Retired Latent Print Specialist
Retired Crime Scene Reconstruction
Retired Forensic Document Analyst

**Robert D. Kullman**
Retired Forensic Document Analyst

**Dr. George F. Jackson Ph.D.**
Toxicologist

**Erich J. Speckin**
Forensic Document Analyst
Ink Dating Specialist

**Roger J. Bolhouse MBA**
Laboratory Director
Crime Scene Reconstruction
Forensic Analyst & Consultant

**Thomas K. Huard Ph.D.**
DNA Analyst & Consultant

**Terry Nadeau**
Arson Investigator

**Richard L. Brunelle**
Retired Ink Dating Consultant

**Dr. Laurence R. Simson M.D.**
Retired Forensic Pathologist

**Anthony A. Milone**
Computer & Graphics Specialist

**Dr. Julie Howenstine**
Serologist
DNA Analyst & Consultant
Crime Scene Reconstruction

## Erich J. Speckin
Forensic Document Analyst
Ink Dating Specialist

**Experience:**
- Employed with Speckin Forensic Laboratories from 1993- Present
  President from 1999 – Present

**Education:**
- Purdue University at age 15 to study engineering
- Albion College at age 17 to study biology and pre-medical
- Michigan State University graduated with a degree in Chemistry (1995)

**Forensic Training:**
- Two-year residency with Leonard A. Speckin in the examination of questioned Documents (1993-1995)
- One-year residency with Brunelle Forensic Laboratories in the identification and dating of inks (1995-1996)

**Publications:**
Fourteen scientific papers and publications authored or co-authored including:

1. Obverse-Reverse Intersection of Lines, 1993 Midwestern Association of Forensic Scientists and 1996 American Society of Questioned Document Examiners

2. Chemical Removal of Magic Marker on Photocopied Documents, 1995 American Society of Questioned Document Examiners

3. A Private Examiner's Response to Ink Age Determination, 1996 American Academy of Forensic Sciences

4. Interpretation of Data Obtained in Relative Ink Age Determination Testing, 1997 American Academy of Forensic Sciences

5. How Do Forensic Chemists Detect 'Record Tampering'?, 1995 Michigan Lawyer's Weekly, 1995 Virginia Lawyer's Weekly

*Erich J. Speckin*

{ 1 }

6. Technical Report with Case Studies on the Accelerated Aging of Writing Inks, 1998 International Journal of Forensic Document Examination, 1999 Canadian Society of Forensic Science, 1999 GFS Hamburg, Germany

7. The Detection of Mastic on Plastic, 1996 Midwestern Association of Forensic Scientists, 1996 Southwestern Association of Forensic Document Examiners

8. More Forensic Solutions to Help Attorneys in Litigation, 1995 Michigan Lawyer's Weekly

9. Chapter in Encyclopedia of Crime & Punishment, 2001 Textbook

10. Ink Dating Examinations, 2000 NADE journal

11. Impression by Traced Forgery, 2001 American Society of Questioned Document Examiners (co-author)

12. Response to Criticism of Technique Use in Relative Ink Age Determination, 1999 American Academy of Forensic Sciences

13. The Dating of Writing Inks through 2-Phenoxyethanol Using Gas Chromatography-Mass Spectrometry: Advantages, Interpretation, and Limitations 2010, AFDE (co-author)

14. Can We Agree on Terminology Beyond Handwriting?, 2019, MAFS (Co-Author)

**Invited Speaker:**
Invited Speaker on the subject of forensic including the following groups and venues:
- Michigan State University
- Florida International University
- American Trial Lawyers Association
- International Association of Questioned Document Examiners
- Medical Legal Consultants
- National Association of Document Examiners
- Canadian Society of Forensic Sciences
- American Academy of Forensic Sciences
- American Society of Questioned Document Examiners
- Midwestern Association of Forensic Scientists
- Southwestern Association of Forensic Document Examiners
- Medical Defense Attorneys Meetings
- Wayne County Nursing Consultants
- Various Insurance and Private Investigators Associations
- Nevada State Bar Association
- Gesellschaft fur Forensische Schriftuntersuchung E.V. (GFS) in Hamburg, Germany

*Erich J. Speckin*

**Court Testified:**
Testified in cases in Federal Court, Circuit Court, District Court, Union Arbitrations, licensing matters, depositions, House of Representatives, and the State Board of Canvassers in Alaska, Alabama, Arizona, California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia, Washington D.C., Washington, West Virginia, and Wisconsin. Also, in Vancouver, British Columbia Canada; Eulex Court in EU; India, Germany, Netherlands, Monterrey, Mexico, London, England; Tokyo, Japan, Jamaica, and Hong Kong.

I have been appointed by judges in approximately thirty states, including Michigan, California, Kentucky, Maine, Florida and Australia to perform examinations at the request of the court.

I have also been retained by the Drug Enforcement Agency, various U.S. Attorney's Offices, Embassy of Uruguay, Florida Department of Law Enforcement, many county Prosecutors from Los Angeles to Michigan, Michigan Attorney General's Office, Department of Natural Resources, The State Board of Canvassers, Health Care Fraud Division, Federal Defenders Offices, National Labor Relations Board as well as many local, county, state, and federal offices.

My clients include General Motors, Ford Motor Company, Chrysler, Honda, many national banks, National Collegiate Athletic Association, National Basketball Association, National Hockey League Players Association, as well as many others.

I have performed examinations in over three thousand cases and presented sworn testimony in thirty-seven states and eleven other countries on several levels approximately four hundred times in total. I have worked cases from five continents and many countries. (separate list available upon request)

**National Media Appearances:**
- National Media Appearances including:
- Wall Street Journal (front page)
- America's Most Wanted
- The Learning Channel (Medical Detectives)
- Good Morning America
- Consulting and prop creation for CSI episodes on ink dating
- Forensic Files

**Professional Affiliations:**
- Society of Forensic Ink Analysts (Board of Directors & President) 1998-2008
- Midwestern Association of Forensic Sciences
- American Society of Testing and Materials

Erich J. Speckin

*Speckin Forensics, LLC*

120 N. Washington Square, Suite 300
PMB 5068
Lansing, Michigan 48933
517-349-3528 • Fax 954-839-8219

Please Direct Correspondence & Payment Here:
2450 Hollywood Boulevard, Suite 700
Hollywood, Florida 33020
954-763-6134 • Fax 954-839-8219

www.4N6.com

**Leonard A. Speckin**
Retired Document Analyst

**Michael J. Sinke**
Retired Latent Print Specialist
Retired Crime Scene Reconstruction
Retired Forensic Document Analyst

**Dr. George F. Jackson Ph.D.**
Forensic Toxicologist

**Michael P. Mulderig**
Forensic Firearms
Ballistics Specialist

**Erich J. Speckin**
Forensic Document Analyst
Ink Dating Specialist
Crime Scene Reconstruction

**Thomas K. Huard Ph.D.**
DNA Analyst & Consultant

**Juan Ruiz**
Computer, Mobile Device Specialist

**Marshaun J. Blake**
Arson Investigator
Vehicle Fire Specialist

**Anthony A. Milone**
Computer & Graphics Specialist
Forensic Document Specialist

**Dr. Julie A. Howenstine**
Serologist
DNA Analyst & Consultant
Crime Scene Reconstruction

Amended Report of July 26, 2023

July 27, 2023

I was asked to examine and recount ballots, the envelopes, totals tapes, record books and other associated documents for the 2020 election. This included AVCBs 1-134 and Precincts 1- 503 for the City of Detroit in their possession. This process took from the 17th of April 2023 to the 17th of May 2023. Additional photos were taken from 17th of July 2023 to 24th of July 2023.

Upon my arrival at the Detroit Department of Election Office located at 2978 W. Grand Blvd., Detroit, MI 48202, we were greeted, and the ground rules were explained and provided by the management staff. The rules included but are not limited to, no touching of the ballots, envelopes or register tapes. We could only direct the staff there to move, show, count, etc. the items desired. I was not allowed to proceed beyond the lobby area without being accompanied by a supervisor.

The ballots were located in locked cabinets that had a tag on them that had to be cut off. There were 17 cabinets in total of which 12 were filled with AVCB ballots and the other 5 were filled with Precinct Ballots. The ballots were stored in these cabinets by AVCB 1-8, 8-17, 17-24, 24-30, 31-36, 37-41, 42-51, 52-61, 62-70, 71-81, 82-92, 93-134 and by Precincts 1-88, 89-207, 208-301, 302-384, and 385-503. The ballots were all stacked in the cabinets one on top of the other and had to be sorted by the City staff upon removal from the cabinet.

The manner in which the ballots were counted was by the representative from the Election office moving the ballots from one pile to another while my team was tallying the vote totals. The tallies were recorded by Presidential candidate (Biden, Trump, or other) and by Congressional Senator candidate (Peters, James or other). In this context, the term "other could be anything other than the two main candidates such as another party, write in, undervote (blank), or overvote. This category was designed as a placeholder to keep the number of ballots total as well as the main parties' vote totals. While the ballots were in front of my team, we were able to observe that the printing on the mail in ballots have some inconsistencies, for example some have darker printing than others.

At the same time when this printing anomaly was noted, many of the City of Detroit staff commented to each member of my team that the ballot paper felt different on some of the ballots. We were unable to touch the paper or examine completely to determine this. It occurred while the representative was flipping the ballots, some were sticking to one another, and they made comments that some ballots felt

thicker than others. In my opinion, further examination should occur on these ballots and AV boards to confirm these differences, the number of instances where this may have occurred, patterns that may exist on voting on the different paper stock, and any further determinations that can be made from either paper that exists. This can be crucial evidence in light of the possibility of additional ballots being introduced as discussed in affidavits and evidenced by videos.

Below is a photograph of two ballots showing the representative difference in printing appearance that can be seen between two ballots from AV 26, similar differences were found in other AV boards.



The mail in envelopes, absentee applications, register tapes and record books were located in the same storage room as the ballots in file-like storage drawers. These drawers were not locked or sealed like the ballots at the time of our arrival.

The method used to count the envelopes was to observe the representative from the Election office count the envelopes in stacks of a 100 (sometimes 50 or 25), we then counted the total and I recorded that number. With regards to the register tapes and the record books; the City representative removed the tapes and record book from the envelope, I then documented the totals that were recorded and the materials were placed back in the same envelope.

In several of the AV boards, a comparison was made from the applications for mail in ballots to the envelopes. I was told by the City staff that many applications were sent out (even unsolicited in cases) for

mail in ballots in 2020. However, it was confirmed by the staff that in order to receive a mail in ballot, an application needed to be received, either by return mail or delivered in person.

This was a very time-consuming process to match up each returned ballot with a corresponding application, therefore only 2 AV boards were done like this as time allowed. In the two AV boards compared (AV 79 and AV 122), there were 289 mail-in ballots (249 in AV 79 and 40 in AV 122) found that had NO application in the file to receive the ballots. In some of those instances post it notes were found in the files that included "Ballot doesn't match poll book"; "not on list in QVF"; and "Not on list".

I have now been provided with what I am told is a "permanent AV voter list". I then compared the ballot return envelopes that have no corresponding application for AV ballot request to the "permanent list".

Looking into the math involved, AV 79 had a total of 1249 ballots counted according to the total printouts. 249 showed no application for the ballot, this is nearly 20%. When the "permanent list" is compared to these 249 without applications, 155 of them were still not found on this list or with an application. This is over 12%.

For AV 122 the total ballots shown in the printouts is 511, with 40 having no corresponding application which is approximately 8%. When the "permanent list" is compared to these 40 without applications, 33 of them were still not found on this list or with an application. This is over 6%.

It would follow that if all the boards were compared in this manner, with approximately 170,000 AV ballots, the range at 8%-20% would be 13,600 to 34,000 ballots with no application requesting the ballot.

My office will continue to analyze records and compare additional boards in the same manner as AV 79 and AV 122 above.

After the envelopes were counted, the total number of envelopes were compared to the total number of ballots for each AVCBs. Many of these boards had unexplainable differences. In some, the number of ballots was more than the number of envelopes. In a few instances, there were more envelopes than ballots present to be counted. A small discrepancy can exist by simple human error of an envelope missing or misfiled of course, but the differences in some cases are much bigger. For example, AV 18 contains 43 more envelopes than ballots; AV 38 contains 40 more ballots than envelopes; AV 40 contains 62 more ballots than envelopes. There are dozens of such examples, while other AVs match exactly or nearly exactly.

A comparison was then made to the vote totals on the tapes (in person) or printouts (AVCB) to the ballots present to be counted. Three AV boards had totals of ZERO votes on the printouts, but votes were recorded to the state. These boards are AV 33, AV 57, and AV 58. It is unclear how the totals were reported when the printouts show ZERO. At 11:23pm AV 33 shows the totals of zero, for AV 57 at 11:50pm shows zero, and for AV 58 at 11:50pm shows zero. These three AV envelopes showed no totals on any printouts.

See photos on the following page:



For AV 13, the ballots counted by hand and the vote totals reported to the state are nearly identical (1565 vs 1566), but the number of ballots scanned and shown on the printouts are 1621. This is over 50 ballots for this AV board that show as scanned but are not present in the ballots presented to us.

As for AV 14, the number of ballots on the totals printout as scanned and the votes reported are very similar (1764 vs 1757) this is also very similar to the number of envelopes counted for that AV board of 1765. However, the number of ballots actually present is 1740. This is approximately 25 more envelopes present than ballots. I am unable to determine where these previous approximately 25 ballots have gone.

In AV 15, the number of ballots present and the total ballots on the printout are similar (1762 vs 1765). The number of envelopes counted for the AV is 1795. This is approximately 30 more envelopes present than ballots. I am unable to determine where these previous approximately 30 ballots have gone.

In AV 19, the total number of ballots counted by my team and the number of ballots on the total printout are similar (2301 vs 2300). There were only 2270 envelopes counted for this AV board. This would leave approximately 30 ballots appearing and counted that have no corresponding envelope received.

In AV 23, the total envelopes counted, and the number of ballots scanned on the totals printout are similar (2858 vs 2855). The totals ballots presented in our count was only 2818. This would be a difference of 40 ballots missing, or possibly the same ballots that were also rescanned to account for scanned total than total ballots present.

In AV 26, the total number of ballots present, and the total number scanned on the printout are similar (3426 vs 3430). The number of envelopes returned for this AV board was 3385. This is approximately 45 more ballots presented and counted than envelopes found to return the ballots.

Similar anomalies in the ballot count, envelope count, or total votes scanned exist in the following additional AV boards: AV 27, AV 28, AV 32, AV 36, AV 38, AV 40, AV 41, AV 42, AV 43, AV 45, AV 62, AV 64, AV 68, AV 69, AV 77, AV 79, AV 82, AV 87, AV 88, AV 89, AV 95, AV 96, AV 101, and AV 122.

Further anomalies existed in the totals for an individual candidate, for instance in AV 49 the total we counted within the ballots present in the presidential race for Biden is 902, however, the total reported as votes cast and counted for AV board is 965 for Biden. It is unclear where these additional 63 votes would have come from as they are not present in the ballots presented. Duplicate scanning and counting of ballots is possible and could account for this discrepancy but the computer and system data including the scans of the ballots from the tabulators would need to be examined to confirm or deny this possibility.

Similar anomalies (of 10 or more votes) in total votes on the printouts of compared to the totals in the ballots exist in the following AV boards: AV 1 (32), AV 3 (22), AV 4 (16), AV 6 (10), AV 10 (-13), AV 12 (-12), AV 13 (53), AV 17 (57), AV 21 (16), AV 22 (13), AV 23 (36), AV 24 (19), AV 25 (15), AV 28 (46), AV 30 (-12), AV 35 (11), AV 36 (-15), AV 37 (-22), AV 40 (-10), AV 41 (53), AV 42 (10), AV 43 (27), AV 44 (-29), AV 45 (-41), AV 47 (23), AV 49 (63), AV 62 (92), AV 67 (19), AV 68 (-19), AV 72 (13), AV 73 (11), AV 75 (16), AV 77 (12), AV 84 (13), AV 86 (19), AV 88 (59), AV 92 (16), AV 93 (14), AV 94 (15), AV 95 (19), AV 99 (63), and AV 130 (46).

Based on these types of anomalies between scanned totals and ballots currently present, it is my opinion that the computer data relating to the scanning and tabulation from this 2020 election should be examined and compared for discrepancies as well as time sequences. This data should include ballot images to check for duplicate scans, comparison of totals, times of scanning, and other related features and possible access from outside sources. My office is ready and able to perform this additional analysis. The data and computer hardware should be preserved until complete analysis can be performed.

Erich J. Speckin

**Forensic Document Analyst**

## Speckin Forensics, LLC

120 N. Washington Square, Suite 300
PMB 5068
Lansing, Michigan 48933
517-349-3528 • Fax 954-839-8219

Please Direct Correspondence & Payment Here:
2450 Hollywood Boulevard, Suite 700
Hollywood, Florida 33020
954-763-6134 • Fax 954-839-8219

www.4N6.com

Leonard A. Speckin
RETIRED DOCUMENT ANALYST

Michael J. Sinke
RETIRED LATENT PRINT SPECIALIST
RETIRED CRIME SCENE RECONSTRUCTION
RETIRED FORENSIC DOCUMENT ANALYST

Dr. George F. Jackson Ph.D.
FORENSIC TOXICOLOGIST

Michael P. Mulderig
FORENSIC FIREARMS
BALLISTICS SPECIALIST

Erich J. Speckin
FORENSIC DOCUMENT ANALYST
INK DATING SPECIALIST
CRIME SCENE RECONSTRUCTION

Thomas K. Huard Ph.D.
DNA ANALYST & CONSULTANT

Juan Ruiz
COMPUTER, MOBILE DEVICE SPECIALIST

Marshaun J. Blake
ARSON INVESTIGATOR
VEHICLE FIRE SPECIALIST

Anthony A. Milone
COMPUTER & GRAPHICS SPECIALIST
FORENSIC DOCUMENT SPECIALIST

Dr. Julie A. Howenstine
SEROLOGIST
DNA ANALYST & CONSULTANT
CRIME SCENE RECONSTRUCTION

February 22, 2024

Ms. Stephanie Lambert:

I have reviewed the order from Judge Kevin A. Elsenheimer dated December 4, 2020 regarding forensic review. I have also reviewed the report of J. Alex Halderman dated March 26, 2020 and the reports of plaintiff's experts.

I have been performing forensic examinations for over 30 years. I have worked for the State Board Canvassers in Michigan in the past on election matters and across the country over the last 30 years. My CV is attached for more relevant experience and qualification details.

If my firm had been asked to perform the analysis addressed in the judge's order, I would have conducted my forensic analysis like the plaintiff's expert. In my opinion, this testing was within the scope of the court's order and the forensic field. For a complete review of the Halderman report and to determine what actually happened in this election, the steps taken by plaintiff's expert would be necessary.

Erich Speckin