**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION, | ) ) ) | Civil Action No. 1:21-cv-02131 (CJN) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Judge Carl J. Nichols |
| v. | ) | |
| | ) | |
| PATRICK BYRNE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPLY IN SUPPORT OF DOMINION'S EMERGENCY MOTION FOR PROTECTIVE
RELIEF AND TO DISQUALIFY COUNSEL**

## Table of Contents

I.    ADDITIONAL BACKGROUND ....................................................................2

      A.    Saturday March 17 through the Afternoon of Monday, March 18: Period
            Immediately After Dominion Files Its Emergency Motion. ....................................2

      B.    The Afternoon of Monday, March 18: Initial Hearing Before This Court.
            ....................................................................................................................5

      C.    Tuesday March 19, through Today: Period Between the Hearing and
            this Filing. ..............................................................................................6

      D.    Lambert's and Byrne's Breaches Have Gone Viral..............................................10

      E.    More Threats to Dominion and its Employees. ....................................................12

II.   ARGUMENT .........................................................................................13

      A.    Dominion properly filed its motion on the public docket......................................14

      B.    The Protective Order covers the leaked documents.............................................14

            1.    The Protective Order is not limited to documents marked
                  Confidential; it prohibits the use or disclosure of Discovery
                  Material for any purpose outside of this litigation....................................14

            2.    The Protective Order specifies procedures by which a Receiving
                  Party can challenge confidentiality designations and move for
                  any other relief from the order; Lambert ignored these
                  procedures ................................................................................16

            3.    Dominion's motion for a different protective order on the
                  Lindell docket has no relevance to the meaning of the Order
                  Lambert violated here ................................................................17

      C.    There is no law enforcement or public interest exception to the
            protective order ...........................................................................18

      D.    Dominion's motion to disqualify Lambert should be granted. .............................19

III.  CONCLUSION.....................................................................................24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re BellSouth Corp.*,
    334 F.3d 941 (11th Cir. 2003) ...............................................................................20

*Douglas v. United States*,
    488 A.2d 121 (D.C. Ct. of App. 1985) ..................................................................20

*Dunn v. Blumstein*,
    405 U.S. 330 (1972)...............................................................................................19

*Hammerschmidt v. United States*,
    265 U.S. 182 (1924)...............................................................................................18

*Harper v. Virginia State Bd. of Elections*,
    383 U.S. 663 (1966)...............................................................................................18

*Koller v. Richardson-Merrell, Inc.*,
    737 F.2d 1038 (D.C. Cir. 1984), *vacated on other grounds*, 472 U.S. 424
    (1985).....................................................................................................................19

*Mathews v. Diaz*,
    426 U.S. 67 (1976).................................................................................................18

*Plyler v. Doe*,
    457 U.S. 202 (1982)...............................................................................................19

*Reynolds v. Sims*,
    377 U.S. 533 (1964)...............................................................................................18

*Skilling v. United States*,
    561 U.S. 358 (2010)...............................................................................................18

*Tanner v. United States*,
    483 U.S. 107 (1987)...............................................................................................18

*U.S. Dominion et al. v. Michael J. Lindell et al.*,
    Case No. 1:21-cv-00445(CJN), Dkt. 145...............................................................16

*United States v. Caldwell*,
    989 F.2d 1056 (9th Cir. 1993) ...............................................................................18

*United States v. Classic*,
    313 U.S. 299 (1941)...............................................................................................18

*United States v. Falcón-Nieves,*
   79 F.4th 116 (1st Cir. 2023) ................................................................................18

*United States v. Kanchanalak,*
   41 F.Supp.2d 1 (D.D.C. 1999) ...........................................................................18

*United States v O'Donovan,*
   ___F Supp 3d___ ...............................................................................................18

*United States v. Sawyer,*
   85 F.3d 713 (1st Cir. 1996) ................................................................................18

*United States v Singh,*
   924 F3d 1030 (9th Cir. 2019) .............................................................................18

*Woods v. Covington County Bank,*
   537 F.2d 804 (5th Cir. 1976) ..............................................................................20

*Yick Wo v. Hopkins,*
   118 U.S. 356 (1886) ...........................................................................................18

**Statutes**

52 U.S.C. § 10308 .........................................................................................................18

**Constitional Provisions**

14th Amendment.............................................................................................................18

In its emergency motion to disqualify Stefanie Lambert as counsel of record for Patrick Byrne ("Emergency Motion"), Dominion detailed a series of knowing violations of this Court's governing Protective Order that—entirely predictably—have irreparably harmed Dominion.

In her opposition, Lambert does not rebut Dominion's version of events. Specifically, Lambert does not: (1) argue that she and Byrne did not knowingly leak Dominion's documents; (2) provide any authority for their unilateral decision to breach this Court's order; or (3) show any remorse for their actions. Lambert likewise does not engage with Dominion's caselaw supporting disqualification. Instead, Lambert urges a selective and incorrect reading of the Protective Order that even if accurate (it is not) would not save Lambert, and then devotes the bulk of her brief to advancing lies about the contents of the very documents she leaked. Lambert's opposition demonstrates that she has no justification for her misconduct, and that she continues to use her status as counsel of record in this litigation primarily (if not exclusively) to promote her and her client's campaign of lies against Dominion. That should end the inquiry.

But unfortunately, the situation has worsened. Since Monday's hearing, during which the Court orally ordered that Lambert and Byrne make efforts to maintain the status quo during the pendency of this Court's consideration of this issue, Lambert and Byrne have done nothing of the sort. Instead, they have chosen to continue to promote their false claims about the documents they leaked, violating at least the spirit (and likely also the letter) of this Court's most recent order ("Status Quo Order"). Their recent media and social media activity is further evidence that nothing short of Lambert's disqualification will preserve the integrity of this proceeding. And that sanctions will also need to be addressed for Byrne.

The full extent of Lambert's and Byrne's wrongdoing remains unknown. As Dominion learned for the first time at the March 18 hearing, it appears Lambert did not just hand over a

1

limited collection of documents to Sherriff Dar Leaf; instead, she apparently gave him username-and-password access to the entire repository of more than 1 million documents Dominion (to say nothing of the third parties in this case whose documents, including their confidential documents, have also been provided to Byrne) have served to date. As Dominion also learned for the first time at the hearing, Byrne himself claims to have provided Dominion's documents to a U.S. Attorney, and potentially to others. Dominion does not know whether any of these individuals who received documents from Lambert and Byrne signed the undertaking attached as Exhibit A to the Protective Order.

A complete accounting of the breach is thus still needed, but in no event should Lambert be permitted to continue as counsel of record in this case—a status she only took on less than two weeks ago, when her breaches were first disclosed by Byrne's longtime actual counsel of record.

## I.     ADDITIONAL BACKGROUND

### A.     Saturday March 17 through the Afternoon of Monday, March 18: Period Immediately After Dominion Files Its Emergency Motion.

The filing of Dominion's Emergency Motion, which followed several emails and a meet and confer, should have prompted Lambert, as an officer of this Court, to take immediate steps to cooperate with Dominion to contain her and her client's breach until this Court ruled on this issue. But it appears the opposite happened.

Dominion and this Court still do not know the date on which Lambert provided Leaf with access to Dominion's documents, but sometime this month Leaf created his first-ever "X" page (the social media platform formerly known as Twitter).[1] On the evening of Sunday, March 17, Leaf (or whoever is operating his X page) then began using it to publicly post Dominion's

---

[1] Dominion does not know whether Lambert encouraged or assisted Leaf to create this page, but notes that the timing is suspicious.

documents. It began at 11:03 p.m., with a link to a Google drive containing an open letter to Congressman Jim Jordan of Ohio, asking him to investigate several baseless claims against Dominion that, according to Leaf, are based upon evidence in his files.



Ex. 23.

Five minutes after the post of his letter, Leaf made clear what his "evidence" was by tweeting a link to "Traunche [*sic*] One," a PDF compiling 2,173 pages of Dominion's documents, all bearing the bates prefix DOM_DC, which is the prefix Dominion has been using for discovery served in this litigation:

3



Ex. 24. As of the time of this filing, these two posts alone have been viewed a combined total of more than 473,000 times.

Not content to just provide access to the entire Google drive, the next morning, Monday, March 18, Leaf (or whoever is operating his X page) began frantically tweeting a series of 37 additional posts on his X page, each linking to an individual DOM_DC Bates-stamped document. These posts occurred between 10:22am and 12:13pm—mere hours before the hearing at which the first item on the agenda was Dominion's request for court intervention to address Lambert's and Byrne's leak. Ex. 25 (compiling all 37 tweets).

For Lambert's part, despite twice representing to the Court (both in writing and at oral argument) that she was having computer problems last Monday (Hearing Tr. (3/18/2024), 33:18-19 (Dkt. 78)), she managed to take to X on Monday morning, as well, posting false claims about the substance of the Dominion documents she had leaked:

4



Ex. 26.

**B.**     **The Afternoon of Monday, March 18: Initial Hearing Before This Court.**

At the hearing on Monday, March 18, 2024, Lambert was present in court, but Byrne was

not. The Court made it clear to Lambert that it was not prejudging Lambert's actions or ruling on

Dominion's request for disqualification at that time. That said, the Court made equally clear that

it wanted to maintain the status quo while it took Dominion's Emergency Motion under

consideration. To that end, the Court asked for an oral account of to whom and where Lambert and

her client had disseminated copies of Discovery Materials. Lambert spoke for herself but was able

to provide only minimal information about what Byrne had done with the documents. The Court

then ordered a series of interim measures, including, among other things: (1) Lambert and Byrne must immediately stop disseminating and sharing Discovery Material from this case; (2) Lambert must confer with her Michigan counsel and make every effort to remove the documents she filed on the public docket and file them under seal instead; (3) Lambert, her employees and associates, Byrne, and his prior counsel at McGlinchey Stafford PLLC, must preserve and sequester notes and communications regarding the leaked documents, and must not share them; and (4) Lambert and Byrne were to provide a written affirmation by 5:00pm on Thursday, March 21, 2024 that they have complied with these orders. Hearing Tr. (3/18/2024) (Dkt. 78).

The order was reduced to writing and entered by this Court the next day, Tuesday March 19, 2024. (Dkt. 77.)

**C.     Tuesday March 19, through Today: Period Between the Hearing and this Filing.**

By its Status Quo Order, the Court gave Lambert (and Byrne) various things to do. For example, Lambert was ordered to confer with her Michigan counsel and undertake every reasonable effort to remove the Dominion documents she filed on the public docket, and file them under seal instead. But while as far as Dominion is aware this has yet to happen, Lambert and Byrne have found time to violate at least the spirit, and Dominion contends also the letter, of this Court's latest order by continuing to take to the internet to amplify the leaked documents and their false claims about them.

Beginning with Byrne, mere hours after the March 18 hearing during which the Court made clear that Lambert and Byrne's dissemination of the leaked documents must immediately stop, Byrne took to X to amplify Leaf's original tweet (the open letter to Congressman Jim Jordan):



Ex. 27; *see also* Exs. 28-30 (tweeting images of the other three pages of Leaf's letter). This letter

promotes the false allegations, supposedly shown in the documents that have "come into [his]

possession" (from Lambert), that Dominion committed various crimes relating to the November

2020 election. Byrne's posting of this document to his page and his 312,600 followers was clearly intended to draw attention to Leaf and his brand-new, much-less-followed X page, where the leaked documents had been posted.

Byrne returned to X the very next day, March 19, retweeting a video originally posted by Tina Peters, former county clerk of Mesa County, Colorado, who has been indicted for allowing unauthorized access to Dominion machines. Ex. 31. That video uses the name and photo of one of Dominion's employees in its Belgrade office, exposing him to the risk of renewed threats to his safety. This post is obviously intended to refer to the leaked documents, as Leaf and others have repeatedly emphasized the existence of Dominion's Serbian employees in their public statements about the documents.

And in a now-deleted tweet from later that afternoon, Byrne gave additional voice to the newly emerged false conspiracy theory that Lambert's arrest on an active, out-of-state warrant had been "cooked up" by Dominion:



Ex. 32.

Then, early this very morning, Byrne retweeted *yet another* post that contains the name and photo of a different employee in Dominion's Belgrade office. Ex. 33. Not long after, Byrne replied to a post on X about the source code protocol that has been entered in this case:



Ex. 34.

Turning to Lambert, she also took to the internet the day after the March 18 hearing to continue her attacks on Dominion. Specifically, the very next day, and despite everything that happened at the hearing, she gave the following statement to ABC News: "There was no leak of data. I provided evidence of criminal acts to law enforcement. The Dominion file contained evidence of perjury by John Poulos, Dominion CEO, Honest Service Fraud, Wire fraud, etc. I'm on my way back to Michigan, and I look forward to truth and transparency for everyone."[2]

Lambert also gave an interview that was posted to X on Wednesday, March 2024. Another guest on the same program was none other than Leaf, who used his time to discuss the leaked documents and perpetuate lies about Dominion. Even without mentioning the documents herself, Lambert's joint appearance with Leaf, coupled with their well-known coordination in advancing attacks on Dominion, is a tacit endorsement by her of everything he said.

Meanwhile, while Lambert and Byrne have found ample time over the last five days to repeat and amplify false accusations of crimes against Dominion rooted in their breach of the Protective Order in this case, make multiple posts on social media, appear on podcasts and give statements to reporters, they were apparently unable to find the time to comply with this Court's Status Quo Order. Including, but not limited to, that as of this writing, they have not provided the affirmation confirming their compliance with the Status Quo Order, though it was due on Thursday at 5:00pm.

**D.    Lambert's and Byrne's Breaches Have Gone Viral.**

---

[2] Laura Romero and Luke Barr, *Pro-Trump lawyer arrested on warrant after court hearing in separate case on Dominion leaks*, ABC News, https://abcnews.go.com/US/lawyer-election-denier-center-dominion-voting-systems-leak/story?id=108270385 (March 19, 2024).

To the surprise of no one, Dominion's leaked documents and the false claims about them now circulating the internet thanks to Lambert's and Byrne's breaches have been amplified by others, amassing **_millions_** of views.

By way of example only:

- As of the time of this filing, Leaf's original two posts alone (the open letter to Congressman Jordan and the link to the Google drive of Dominion's documents) have been viewed a combined total of more than 473,000 times. *See* Exs. 23-24.

- On March 18, Michael Flynn retweeted Leaf's letter to Congressman Jordan, a tweet that has been viewed 887,200 times as of this filing. Ex. 35.

- A March 18 tweet by Election Integrity Force promoted false claims about "evidence" against Dominion and linked to leaked Dominion documents, and as of this filing has 121,600 views. Ex. 36.

- And yet another tweet suggesting that Lambert's post-hearing arrest by U.S. Marshals was related to her leak of Dominion documents—rather than the actual reason, namely, her open Michigan bench warrant—was made on March 19 (and liked by Byrne) and has been viewed 1 million times as of the time of this filing. Ex. 37.

Other media outlets have begun to pick up the claims as well. By way of example only, Joe Oltmann's "Conservative Daily Podcast" repeated the false claim that the leaked documents somehow show evidence of crimes. Referring to the Dominion documents posted online by Leaf: "I've been digging through these 2000 pages of documents, these 2200 pages of documents. . . . Dominion held on to emails and held on to things that were in commission of crimes."[3]

---

[3] https://app.criticalmention.com/cm/download/0fe7370b-cd4b-4a85-b1f0-a7828b365938?clientId=70925

To be clear: the documents that Lambert and her client have leaked to the public show absolutely no evidence of any crimes. Emails that, for example, Lambert's and Byrne's allies point to as conclusive proof of remote access to Dominion's voting machines are actually about updates to Dominion employees' office computers (not voting machines), remote access to the company's email server (not voting machines), or engineers working on updates to software security—including systems used to transmit unofficial vote tallies—in advance of the November 2020 general election—updates that would have been certified for use by the respective State and individually installed, locally (not remotely) by the election officials, on any election equipment that customers wished to update. Just as Byrne and others who spread the defamatory claims underlying this lawsuit failed to ever produce a shred of evidence supporting their lies, these latest falsehoods perpetuated against Dominion likewise bear no relation to the actual documents up on which they are supposedly based.

Considering these claims in light of the actual contents of the leaked documents, it is hard to escape the conclusion that they are driven primarily by the simple fact that some of Dominion's engineering employees live in Belgrade and speak Serbian. This information is neither new nor shocking; Dominion regularly discloses the existence of its Belgrade office in submissions to state election authorities, the office was discussed in news articles long before the 2020 election, and Dominion has used letterhead in the past that lists all of its office locations, including Belgrade.

**E.    More Threats to Dominion and its Employees.**

In a pattern that is all too familiar by now, the release of these documents and the perpetuation of false claims about their contents has led to renewed threats against Dominion and its employees. For example, one of Dominion's employees in its Belgrade office was doxed in a video posted to X and retweeted by Byrne. *See* Ex. 31. In another example, the name, mobile phone

12

number, and office address of an employee in Dominion's Denver office was posted online, pulled directly from one of the leaked documents. *See* Ex. 38. A selection of additional threats and/or calls for violence include:



Ex. 39.



Ex. 40.

## II.   ARGUMENT

By her Opposition, Lambert freely admits that she leaked Dominion's documents; she made similar representations about Byrne in Court. In response to Dominion's emergency motion, Lambert principally asserts that the leaked documents either were not covered by the Protective Order or were subject to some kind of "crime/public interest" exception. She further argues that

13

she should not be disqualified because she did nothing wrong and because of the strong right of Byrne to be represented by counsel of his choosing. Lambert is wrong on all counts.

### A. Dominion properly filed its motion on the public docket

As an initial matter, Lambert complains that Dominion should have filed its motion under seal. Dkt. 76 at 7, 11 (*citing* Dkt. 46 [Protective Order] at ¶12) (hereinafter "Opposition"). This is based on an incorrect reading of both the Protective Order and the emergency motion. Paragraph 12 of the Protective Order is a standard provision that requires parties to file documents marked Confidential or Attorneys Eyes Only, and filings discussing or otherwise disclosing the content of such documents, under seal. Ex. 6 (Protective Order) at ¶12. The purpose of this provision is to prevent one side from unilaterally making public documents that another party has marked Confidential or AEO. It does not apply here for the simple reason that Dominion in its motion was not discussing or otherwise disclosing any documents any other party had marked confidential. Dominion's motion was only addressing ***Dominion's*** confidential documents—which, of course, Lambert had already made public. As the Order itself makes clear: "This order has no effect upon, and will not apply to, a Producing Party's use or disclosure of its own Discovery Materials for any purpose."[4] *Id.* at ¶19. Dominion's motion was properly filed on the public docket, and any argument to the contrary is a red herring.

### B. The Protective Order covers the leaked documents.

#### 1. The Protective Order is not limited to documents marked Confidential; it prohibits the use or disclosure of Discovery Material for any purpose outside of this litigation

---

[4] Nothing in Dominion's motion "disclosed, summarizes, describes, characterizes, or otherwise communicates" Dominion's confidential material, anyway. So even if one were to ignore paragraph 19 of the Order, Dominion in no conceivable way violated paragraph 12 (or any other part of the Order).

Lambert argues that she did not violate the Protective Order because the materials she gave to Leaf are not covered by it. This claim relies on a plainly incorrect reading of the defined term "Discovery Material."

Lambert's disclosure of Dominion's documents to Leaf (including, it would seem, by giving him access to the Dominion's entire production), her filing of Dominion's documents in her Michigan criminal proceeding, and Byrne's disclosure of whatever documents he disclosed to whomever he disclosed them to, all violate Paragraph 1 of the Protective Order, which provides in relevant part:

> Any Discovery Material produced in the Litigation will be used, except by the Producing Party, solely for purposes of this Litigation and no Receiving Party will provide Discovery Material to any person or entity (including for any other litigation) or make any Discovery Material public except as permitted by this Order and in this Litigation.

*Id.* at ¶1 (omitting exceptions not relevant to this motion). "Discovery Material" is a specifically defined term. The Protective Order provides that "Discovery Material" means:

> [D]ocuments, testimony (in any form whether by affidavit, declaration, or deposition), exhibits, transcripts, written discovery requests, interrogatory responses, responses to requests for admission, responses to requests for documents, and any other information or material produced, given, or exchanged, including any information contained therein or derived therefrom[.]

*Id.* at Introduction.

Lambert cannot dispute that the Dominion materials she leaked are documents. Thus, they fall within the explicit definition of "Discovery Material" and the limitations on disclosure contained in Paragraph 1 of the Protective Order. As Lambert acknowledges, the language in a

Protective Order should be analyzed according to its plain meaning. Opposition at 20. Because the meaning of the Order is clear and unambiguous, that is the end of the inquiry.[5]

Moreover, the majority (if not all) of the documents Lambert leaked were marked "Confidential." The Protective Order specifies a long list of individuals and entities with whom Confidential Discovery Material may be shared. Ex. 6 at ¶8(a)-(h). These enumerated individuals or entities do not include county sheriffs, United States Attorneys, or anyone else with whom Dominion is currently aware of the materials having been shared. *See id.*

## 2. The Protective Order specifies procedures by which a Receiving Party can challenge confidentiality designations and move for any other relief from the order; Lambert ignored these procedures

Lambert also asserts that she did not violate the Protective Order by unilaterally releasing Dominion's documents because they were improperly marked confidential. Again, that is no answer to Lambert's plain breach of Paragraph 1. But even on its own terms, Lambert's argument about confidential designations fails.

If Lambert really had doubts about the propriety of the designations, the Protective Order first requires the objecting Party to contact the Designating Party and discuss the disputed designation with them. *Id.* at ¶16. If the parties are unable to work it out between themselves, the objecting Party can file a motion (under seal), and the Court will resolve the dispute. *Id.*

If Lambert felt that any of the Discovery Material needed to be turned over to law enforcement, the Order also provides a provision that allows any party to seek an order from the Court to modify any terms of the Order. *Id.* at ¶17. The Order does not provide for a party's unilateral, secret breaching of the Order just because the Party doesn't like its terms.

---

[5] The purpose of this Paragraph 1 provision, to which all the parties (including Byrne) agreed, is to ensure that even where a party's document is not marked "Confidential," the parties cannot use that material for purposes unrelated to this litigation—including, but not limited to, trying to litigate in the press.

The Protective Order further provides the following regarding Leaf's (or any Non-Party's) receipt of and use of the Discovery Material, which was clearly not followed and should also be addressed:

> Absent court order, no person who is not a party to the Litigation who receives Confidential or Attorneys' Eyes Only Discovery Material as permitted under the terms of this order ("a Non-Party") will reveal any Confidential or Attorneys' Eyes Only Discovery Material or the information contained therein, to anyone not entitled to receive such Confidential or Attorneys' Eyes Only Discovery Material under the terms of this Order. In the event that Confidential or Attorneys' Eyes Only Discovery Material is disclosed to any person other than in the manner authorized by this Order, or that any information comes to the Non-Party's attention that may indicate there was or is likely to be a loos of confidentiality of any Confidential or Attorneys' Eyes Only Discovery Material, the Non-Party responsible for the disclosure or loss of confidentiality will immediately inform the Designating and Producing Party of all pertinent facts relating to the disclosure or loss of confidentiality, including, if known, the name, address, and employer of each person to whom the disclosure was made. The Non-Party responsible for the disclosure or loss of confidentiality will also make reasonable efforts to prevent disclosure of Confidential or Attorneys' Eyes Only Discovery Material by each unauthorized person who receives this information.

Dkt. 46 at ¶12.

### 3.  Dominion's motion for a different protective order on the Lindell docket has no relevance to the meaning of the Order Lambert violated here

Lambert argues that the Discovery Material she leaked is not covered by the Protective Order because of Dominion's motion for an entirely separate protective order it sought in *U.S. Dominion et al. v. Michael J. Lindell et al.*, Case No. 1:21-cv-00445(CJN), Dkt. 145. Opposition at 14-18, 21-23, Attachment 4. Dominion filed that motion for an additional protective order (to be clear the protective order Lambert and Byrne breached and discussed herein was also entered in the Lindell case) after Lindell issued dozens of third-party subpoenas to Dominion's customers around the country, seeking "forensic images" of Dominion equipment and software in the possession of Dominion's customers. These subpoenas thus sought sensitive confidential and proprietary information and Dominion's trade secrets. Dominion filed a motion seeking a

protective order against Lindell to prohibit him from using third-party subpoenas to obtain this information. After extensive motion practice and narrowing of the issues as ordered by the Court, *see id.* Dkts. 147, 149, 153, 154, 155, 156, 157, 158, Judge Nichols entered a protective order that pertained only to these particular third-party subpoenas to Dominion customers on February 9, 2023. *Id.* Dkt. 159.

Separately, this Court entered the general Protective Order at issue in this motion on December 6, 2022. *Id.* Dkt. 152.

Lambert's apparent confusion likely stems from the fact that filings related to the two different protective orders appeared on the Lindell docket at around the same time. But this temporal coincidence is where the similarities end. The litigation surrounding Lindell's third-party subpoenas was separate from the protective order generally governing discovery materials in this case. *Compare id.* Dkt. 152 *with id.* Dkt. 159.

This Court should thus disregard all portions of Lambert's argument that discuss Attachment 4, as they are based on a fundamental misunderstanding of the litigation. *See* Lambert Resp. at 14-18, 21-23.

## C.    There is no law enforcement or public interest exception to the protective order

Lambert asserts that she did not violate the Protective Order because an exception exists in the law that permits unilateral disclosure of protected material to law enforcement[6] or in the public interest. And, apparently, Lambert has bestowed authority on herself and her client to make the

---

[6] Dominion notes for the sake of clarity that while Lambert at times has implied that she disclosed the documents in response to a subpoena, Dominion is not aware of any subpoena. Rather, it appears she gave Dominion's discovery material to Leaf completely of her own free will. Even if Leaf had subpoenaed Lambert, however, unilateral production of Confidential Discovery Material in response to a subpoena without objecting to the subpoena and notifying the Designating and Producing Parties in advance of any production would violate ¶26 of the Protective Order. The fact that the Protective Order includes a detailed procedure for protecting a Designating or Producing Party in the event of a subpoena is further proof that of course the Protective Order does not permit the unilateral disclosure of protected material.

determination of whether discovery material contains evidence of a crime, or whether disclosure of that material serves the public interest. Nothing in the Protective Order permits this, and nothing in our law supports this sweeping position.

Lambert does not cite a ***single*** authority in support of this supposed law enforcement/public interest exception. Instead, she spills considerable ink promoting lies about crimes she falsely claims the leaked documents show Dominion committed, while cramming the brief with a litany of irrelevant authority addressing federal criminal statutes[7] and the uncontroversial proposition that the right to vote is fundamental to American democracy.[8]

**D.      Dominion's motion to disqualify Lambert should be granted.**

---

[7] *See, e.g.*, Opposition. at 30-32, *citing* 52 U.S.C. § 20511 (criminal penalties for acts interfering with certain election-related activities); 52 U.S.C. § 10308 (civil and criminal sanctions for specific actions relating to violating or interfering with the right to vote); *United States v Singh*, 924 F3d 1030 (9th Cir. 2019) (affirming in large part two defendants' convictions under various campaign finance and record-keeping laws). *See also* Opposition at 33-34, *citing* 18 U.S.C. § 1846 (there is no 18 U.S.C. § 1846; it appears the intended section is 18 U.S.C. § 1346); *Skilling v. United States*, 561 U.S. 358 (2010) (reversing defendant's conviction of honest services fraud); *United States v O'Donovan*, ___F Supp 3d___; 2023 WL 4628177 (D Mass, July 19, 2023) (denying defendant's motion to dismiss honest services fraud charge); *United States v. Sawyer*, 85 F.3d 713 (1st Cir. 1996) (reversing defendant's convictions for mail and wire fraud because jury instruction was legally erroneous as to one of several potential bases for conviction, and it was impossible to tell upon which basis jury had convicted); *United States v. Falcón-Nieves*, 79 F.4th 116, 126 (1st Cir. 2023) (vacating and/or reversing two defendants' convictions for honest services fraud on various grounds). *See also* Opposition at 35-36, *citing* 18 U.S.C. § 371 (conspiracy to commit an offense against or to defraud the United States); *Tanner v. United States*, 483 U.S. 107 (1987) (considering defendants' various claims of error at their trial on charges of conspiracy to defraud the United States); *United States v. Caldwell*, 989 F.2d 1056 (9th Cir. 1993) (reversing defendant's conviction of conspiring to defraud the United States); *Hammerschmidt v. United States*, 265 U.S. 182 (1924) (reversing defendants' convictions of conspiring to impair a lawful function of the government); *United States v. Kanchanalak*, 41 F.Supp.2d 1 (D.D.C. 1999) (denying defendant's motion to dismiss count of indictment charging a conspiracy to impair the lawful functions of the Federal Election Commission).

[8] *See, e.g.*, Opposition at 32, 34-35, 41-42, *citing Ex Parte Yarbrough*, 110 U.S. 651 (1884) (upholding convictions of 8 people who had beaten an African-American man to prevent him from voting); *United States v. Classic*, 313 U.S. 299 (1941) (reinstating criminal charges relating to conspiracy to prevent the counting of ballots in a congressional election); *Reynolds v. Sims*, 377 U.S. 533 (1964) (holding that state electoral districts must be apportioned equally by population, under the equal protection clause of the 14th Amendment); *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) (invalidating, as violating the 14th Amendment's equal protection clause, the unequal application on the basis of race of San Francisco's law concerning permits to operate laundries in wooden buildings; mentioning the right to vote in dictum); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966) (holding Virginia's poll to tax to be unconstitutional); *Mathews v. Diaz*, 426 U.S. 67 (1976) (upholding a federal law that conditions non-citizen eligibility for Medicare Part B on five years of residency and admission as a permanent resident); *Dunn v. Blumstein*, 405 U.S. 330 (1972) (finding Tennessee's voter registration durational residency requirements to be an unconstitutional burden on the right to travel); *Plyler v. Doe*, 457 U.S. 202 (1982) (holding that a Texas law authorizing the school districts to deny enrollment to children not "legally admitted" to United States violates the equal protection clause).

Dominion explained in its opening brief why Lambert's actions represent a "case[] of truly egregious misconduct" that is "likely to infect future proceedings." *Koller v. Richardson-Merrell, Inc.*, 737 F.2d 1038, 1056 (D.C. Cir. 1984), *vacated on other grounds*, 472 U.S. 424 (1985). This is because (1) Lambert's actions violated the D.C. Rules of Professional Conduct and (2) the integrity of these proceedings cannot be protected by the imposition of any lesser sanction. *See* Opening Br. at 20-22. Despite Lambert's filing of a 48-page response, she neither asserts that she *didn't* violate the Rules of Professional Conduct, nor provides a single assurance that any lesser sanction or order of this Court will prevent her from violating the Protective Order again. Quite the opposite: Lambert advances a host of legally unsupported and incorrect justifications for her actions and insists that not only did she do nothing wrong, but her brazen misconduct was in service of the public interest. Lambert likewise does not take on any of Dominion's caselaw.

Events of the single week that has passed since Dominion filed its emergency motion provide additional support for disqualification. Since Monday, Lambert and Byrne breached orders of this Court in at least the following ways:

- Did not comply with this Court's order to file, by March 21, 2024 at 5:00 PM, an affidavit signed by her and her client, certifying their compliance with this Court's March 18, 2024 oral and March 19, 2024 written Interim Order to Preserve the Status Quo;

- Does not appear to have taken actions ordered by this Court including removing Dominion Discovery Material from Lambert's public filing in her pending criminal case in Michigan;

20

- Discussed and promoted the leaked documents after the March 18, 2024, hearing, as described in Section I, above, in violation of the Interim Order to Preserve the Status Quo.

Dominion also notes, as described in Section I, that the widespread dissemination of Dominion's confidential documents (and promotion of posts disseminating those documents) occurred primarily in the period *after* Dominion filed its Emergency Motion—along with a new wave of doxing and threats against Dominion and its employees. What happened here is exactly what Dominion was afraid of, and exactly why Dominion argued for the entry of this strict Protective Order in the first place.

Lambert does correctly observe that litigants are generally entitled to the counsel of their choice. *In re BellSouth Corp.*, 334 F.3d 941, 961 (11th Cir. 2003); *Woods v. Covington County Bank*, 537 F.2d 804, 810 (5th Cir. 1976). However, this right is not unlimited, and can be overridden when "the client's selection . . . impede[s] or disrupt[s] the orderly administration of justice." *Douglas v. United States*, 488 A.2d 121, 143 (D.C. Ct. of App. 1985) (quoting *Harling v. United States*, 387 A.2d 1101, 1104 (D.C. Ct. of App. 1978)); *In re BellSouth*, 334 F.3d at 943 (upholding the disqualification of defendant's counsel after finding that the lawyer—a close relative of the judge—had been brought on for the sole purpose of forcing the judge's recusal). While Byrne does generally have a right to counsel of his choosing, the problem with Lambert is that it appears her primary qualification over his prior counsel who withdrew within a day of disclosing Lambert's misconduct—is Lambert's willingness to violate court orders, and that is not a legitimate basis for wanting a particular attorney.[9]

---

[9] Lambert also argues that Dominion's Emergency Motion is a "tactical" effort to "stifle the truth." Opposition at 26. The irony of this proclamation is not lost on Dominion, considering that the motion has resulted in the renewed promotion of utterly false—and repeatedly debunked—claims about crimes Dominion is supposed to have committed, and their repetition in Lambert's papers and oral arguments.

Disqualification of Lambert will cause minimal prejudice to Byrne at this stage. Lambert entered her notice of appearance in this case just ten days ago, in a case that has already been pending for two-and-a-half years. Dominion does not know the reasons Byrne's prior counsel abruptly withdrew from the case, within 24 hours of the public discovery of a major violation of the Protective Order done at their client's direction. Clearly, however, Byrne is capable of selecting and hiring lawyers who can effectively represent him, as his previous counsel had been doing, without repeatedly violating court orders that put the integrity of the proceedings at risk. And any new counsel will only be a few days behind Lambert, who, again, only appeared as counsel of record a matter of days ago.

In this instance, no remedy short of disqualification will suffice. Lambert's continued presence in the case will "disrupt the orderly administration of justice."

Dominion understands that disqualification of counsel is something the court may exercise its discretion to do in only the most extreme circumstances, but events here are extreme. Everything that has happened since Lambert entered the case, from her and her client's unapologetic violation of the Protective Order, to their efforts to advance patent falsehoods in briefing and in open court in purported reliance on documents they improperly publicly disclosed, to her long history of misconduct in her campaign against Dominion, *see* Opening Br. at 13-16— shows that Ms. Lambert's continued presence in this case will engender chaos in these proceedings.[10]

If Lambert is not disqualified, she will necessarily need to access the discovery in this case. There is nothing she could say, nor any undertaking she could sign, that at this point could provide

---

[10] https://www.azcentral.com/story/news/politics/elections/2023/10/04/stefanie-lambert-sued-by-xrvision-in-pennsylvania-voting-machine-dispute/71051050007/ (article detailing suit against Lambert for having allegedly "urged employees to manufacture findings in her efforts to overturn" the 2020 election results).

Dominion (or the Court) with any assurance that she will abide by it. Particularly given her past history. But it does not end there. She will need to attend depositions, where numerous Dominion witnesses will be required to answer any manner of questions including personal information such as addresses and other identifying information. What assurance could Lambert possibly give this Court or to ensure that she will not leak this information at the first opportunity? She has already promised to follow the Protective Order once, which she violated based on her and her client's utterly unsupported estimation that they had a right to do so. And when then again ordered by this Court—this time to stand down from further disseminating the information—she and her client continued to try to drive people to the very documents they had improperly made public.

What are we to tell our client if Lambert were left on this case? Don't worry, she'll probably follow the Court's order this time? Any assurance from Lambert at this point is completely meaningless to Dominion. Worse still, given her history of misconduct, the only lesson Lambert will likely learn is that next time, she needs to do a much better job laundering her improper disclosure of Discovery Material.

### III.   CONCLUSION

While Dominion acknowledges that disqualification is a severe remedy, if the facts outlined in its Emergency Motion do not warrant it, then Dominion struggles to understand what would.   As detailed in Dominion's opening brief, this is not Lambert's first offense. And in her ten days in this case, she has managed to violate two court orders in numerous ways, and empower others to do the same. Accordingly, for the reasons stated in its briefing and at argument, Dominion requests that the Court disqualify Stefanie Lambert from appearing as attorney of record for Patrick Byrne, and from accessing any Discovery Material produced in this case. Dominion also reaffirms its requests, detailed in its Emergency Motion on pp.18-19, for a complete accounting from Lambert and Byrne, and also Leaf and any other Non-Parties who received documents from Lambert and Byrne. Finally, Dominion awaits further guidance from the Court regarding a briefing schedule by which it may seek appropriate sanctions against Byrne.


Dated: March 22, 2024                                 Respectfully submitted,

                                        By:  */s/ Davida Brook*
                                             Laranda Walker (D.C. Bar No. TX0028)
                                             Mary K. Sammons (D.C. Bar No. TX0030)
                                             Jonathan Ross (D.C. Bar No. TX0027)
                                             Elizabeth Hadaway (*Admitted pro hac vice*)
                                             **SUSMAN GODFREY L.L.P.**
                                             1000 Louisiana St., Suite 5100
                                             Houston, TX 77002
                                             Tel: (713) 651-9366
                                             Fax: (713) 654-6666
                                             lwalker@susmangodfrey.com
                                             ksammons@susmangodfrey.com
                                             jross@susmangodfrey.com
                                             ehadaway@susmangodfrey.com

                                             Stephen Shackelford, Jr.
                                             (D.C. Bar No. NY0443)
                                             Eve Levin (D.C. Bar No. 1672808)
                                             Mark Hatch-Miller (*Admitted pro hac vice*)
                                             Christina Dieckmann (*Admitted pro hac vice*)

24

**SUSMAN GODFREY L.L.P.**
One Manhattan West, 50th Floor
New York, NY 10001
Tel: (212) 336-8330
sshackelford@susmangodfrey.com
elevin@susmangodfrey.com
mhatch-miller@susmangodfrey.com
cdieckmann@susmangodfrey.com

Davida Brook (D.C. Bar No. CA00117)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
dbrook@susmangodfrey.com

Edgar Sargent (*Admitted pro hac vice*)
Katherine Peaslee (*Admitted pro hac vice*)
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 516-3880
esargent@susmangodfrey.com
kpeaslee@susmangodfrey.com

*Attorneys for Plaintiffs/Counter-Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 22nd day of March 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which I understand to have served counsel for the parties.

*/s/ Davida Brook*
Davida Brook
