# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION, | ) ) ) ) ) | No. 1:21-cv-02131-CJN-MAU |
| *Plaintiffs*, | ) ) | Judge Carl J. Nichols |
| v. | ) ) | Hon. Magistrate Moxila A. Upadhyaya |
| PATRICK BYRNE, | ) ) | |
| *Defendant*. | ) ) | |

**SUPPLEMENTAL BRIEF IN SUPPORT OF DOMINION'S CURRENTLY
PENDING MOTION TO DISQUALIFY AND MOTION TO ENFORCE
PROTECTIVE AND STATUS QUO ORDERS**

Plaintiffs US Dominion Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation (collectively, "Dominion") file this supplemental brief in support of their pending Emergency Motion for Protective Relief and to Disqualify Counsel (Dkt. 75) and Motion to Enforce the Protective and Status Quo Orders (Dkt. 108) because Defendant Patrick Byrne and his counsel Stefanie Lambert appear to have violated this Court's orders yet again.

Previously unknown to Dominion or this Court, a Colorado attorney named John Case, who is working with Ms. Lambert on Mr. Byrne's defense in this case, has reviewed Dominion Discovery Material.[1] Mr. Case is also currently defending Mesa County, CO clerk Tina Peters on criminal charges. In a recent public filing in that criminal case, he purported to reference and

---

[1] "Discovery Material" is defined in the Protective Order as "documents, testimony (in any form whether by affidavit, declaration, or deposition), exhibits, transcripts, written discovery requests, interrogatory responses, responses to requests for admission, responses to requests for documents, and any other information or material produced, given, or exchanged, including any information contained therein or derived therefrom." Dkt. 79 at 2; Dkt. 46 at 1 (same).

incorrectly characterized Dominion Discovery Material.  Mr. Case is the same attorney who subpoenaed the production of Dominion Discovery Material from Ms. Lambert, as set forth in Dominion's Motion to Enforce (Dkt. 108).  Yet neither Mr. Byrne nor Ms. Lambert notified the Court of these facts, just as neither has done anything to stop Mr. Case.

 Ms. Lambert's and Mr. Byrne's seemingly collusive efforts to defy orders entered by this Court are harmful to Dominion.  They are also destructive to the integrity of the judicial process, including to Dominion's ability to litigate this case.  Based on the entirety of the record to date, as supplemented by these additional facts, Dominion asks the Court to disqualify Ms. Lambert and enter the other protective relief detailed in Dominion's proposed order on its Motion to Disqualify (Dkt. 75-24).  Dominion also asks the Court to grant Dominion's Motion to Enforce the Protective and Status Quo Orders (Dkt. 108-24).  Any lesser remedy will not suffice.

## I.

This Court is familiar with the record of Ms. Lambert's and Mr. Byrne's non-compliance with the Status Quo Order and Protective Order, and Dominion incorporates that extensive record by reference.  *See* Dkt. 75, Motion to Disqualify (Mar. 15, 2024); Dkt. 82, Reply in Support of Motion to Disqualify (Mar. 22, 2024); Dkt. 102, Supplemental Declaration of Davida Brook (May 17, 2024); Dkt. 105, Response to Order of Court (May 21, 2024); Dkt. 108, Motion to Enforce (July 5, 2024).

Mr. Byrne and Ms. Lambert appear to continue to violate both orders.  Last week, Dominion learned that yet another person working with Ms. Lambert—other than those Ms. Lambert previously disclosed to this Court—accessed Dominion Discovery Material.  This happened even though at the March 18 hearing, the Court told Ms. Lambert in no uncertain terms, "I am going to order that no one have access to those documents until we can sort this issue out."

2

Ex. 1, March 18, 2024 Hearing Transcript ("March 18 Tr."), 54:23-24.  And at two separate hearings, the Court and counsel for Dominion sought to get a complete picture from Ms. Lambert as to who is working with her on this case and who has access to Dominion's documents.  *See, e.g.*, Ex. 1, March 18 Tr., 31:15-37:17; Ex. 2, May 16, 2024 Hearing Transcript ("May 16 Tr."), 14:8-15:21.[2]  Yet, at neither the March 18 hearing nor May 16 hearing, nor in any brief, has Ms. Lambert disclosed that she is working with Mr. Case or that he accessed Discovery Material.

On June 10, 2024, while representing Ms. Peters on criminal charges ("the Peters Criminal Case"), Mr. Case made a filing that attached a declaration admitting that he ***"reviewed" emails produced by Dominion in this case***.  In his filing, Mr. Case also ***purported to discuss the contents of Dominion's emails***.  Mr. Case made this filing in opposition to a motion to quash the subpoena to testify and produce documents his office had served on Dominion's former General Counsel Mike Frontera.

Mr. Case is the same attorney who signed the subpoena to testify and produce documents issued in the Peters Criminal Case to Ms. Lambert.  *See* Dkt. 108-4, Subpoena to Lambert.  He also signed the subpoena to testify issued in the Peters Criminal Case to Dominion's CEO John Poulos.  And as recounted in Dominion's Motion to Enforce, Mr. Poulos was served with that subpoena last month as he entered a building to be deposed in this case, and Mr. Byrne posted a video of Mr. Poulos being served to his X account.  *See* Dkt. 108, Motion to Enforce at 5-8.

---

[2] At the March 18 hearing, the Court questioned Ms. Lambert extensively about all known locations of Dominion Discovery Material.  At that time, Ms. Lambert responded that she was not aware of any location she had not previously disclosed.  Ex. 1, March 18 Tr., 36:18-23, 37:12-17 ("THE COURT: Okay. All right. Any other places that you think that any of this confidential information is located either between you or your counsel -- you or your client of which you're aware?  MS. LAMBERT JUNTTILA: No. Not that I'm aware of that I can recall at this time.").

***Despite the fact that Ms. Lambert clearly knows Mr. Case, clearly knows Mr. Case accessed Dominion documents, and clearly knows about the filing in which Mr. Case (inaccurately) purported to describe what the documents show, she never told this Court about any of this.***

Mr. Case's statements in his July 10 filing are damning to Ms. Lambert, Mr. Byrne, and his legal team. Mr. Case admits he has "already seen many of the documents relevant to Clerk Peters' defense that were produced by Dominion Voting Systems Inc. in case number 1:21-cv-02131 (CJN), U.S. District Court for the District of Columbia, captioned *U.S. Dominion Inc., et al v. Byrne*." Ex. 3, Response to Motion to Quash Subpoena, *People of the State of Colorado v. Tina Peters*, Case No. 22CR371 (July 10, 2024) ("Response to MTQ") at ¶ 2.

Then, in an accompanying declaration, he admits he is "assisting Stefanie Lambert in her defense of Patrick Byrne" in this case, has signed the Protective Order's Undertaking, and has "reviewed emails produced by Dominion in 1:21-cv-02131." Ex. 4, Declaration of John Case in Support of Response to Motion to Quash ("Decl. of John Case") at ¶ 3.

He then falsely asserts that the documents somehow "corroborated" long-debunked conspiracy theories, *inter alia*, that Dominion's voting systems "are capable of manipulating ballots and vote tabulations, which violates federal and state law," and "show, in [his] opinion, that Dominion was aware it was violating election laws." Ex. 4, Decl. of John Case at ¶ 2.

On July 11, 2024, as soon as Dominion's team learned of Mr. Case's filing, Dominion's counsel emailed Ms. Lambert seeking additional information:

Please answer each of these questions in line, below. If you need to consult with Mr. Case, we trust you will do so as apparently you are working together.

1. Who is Mr. Case?

2. How long has he been "assisting" you in the Dominion v. Byrne case?

3. Provide his signed undertaking.

4. What Dominion documents has he accessed?

5. When did he access them?

6. Via what means? (Document vendor, a download of files, something else?)

7. Is there anyone else assisting you in the Dominion v. Byrne case?

8. If yes, please disclose them and answer questions 3-6 on their behalf as well.

9. We need answers to these questions, in writing, before close of business today.

Ex. 5, July 11, 2024 Email from Davida Brook to Stefanie Lambert ("July 11 Brook Email").

When she replied, Ms. Lambert tellingly did not profess to be unaware of Mr. Case's access to Discovery Material, but instead simply refused to provide any of the information Dominion requested:

| From: | AttorneyLambert (via Dominion list) |
|---|---|
| To: | Davida Brook |
| Cc: | Dominion SG Simplelist; OANService; Chris Kachouroff; Marc Eisenstein |
| Subject: | Re: Dominion/Byrne - Please review / respond by cob today |
| Date: | Thursday, July 11, 2024 2:04:13 PM |
| Attachments: | image001.png |

EXTERNAL Email
Dear Ms. Brooks,

Thank you for your email. I am unable to provide information protected by privilege/work product.

Mr. Poulos testified at his deposition █████████████

Please advise if your client is willing to remove the confidential/attorney eyes only label from any of the documents provided by Dominion in the course of discovery.

Thank you,

Stefanie

Sent from Proton Mail for iOS

*Id.*

Already, the Colorado court has rejected the merits of Mr. Case's opposition to the motion to quash the subpoena to Mr. Frontera. On July 12, the Colorado court granted the motion to quash and noted, "I do not find the requested materials are evidentiary or relevant." Ex. 6, Order Re: Motion to Quash SDT (filed July 12, 2024) ("Order on MTQ") at 4. The Court identified as a

"reoccurring theme" Mr. Case's use of the criminal proceeding to argue conspiracy theories against Dominion:

> The issue herein seems to be a reoccurring theme: Defendant wanting to make the case about the security of voting machines, purported collusion between Dominion and government authorities, and the like. This Court has yet to see an evidentiary basis for the admission of this type of evidence. And as I have said before, it appears the only basis for the admission of such evidence is not to show that Defendant didn't do what she is charged with, but rather to make the focus of the trial something separate from what the jury will be charged with deciding. This makes the information sought irrelevant, misleading, and likely to confuse the issues.

> Accordingly, the motion to quash is **GRANTED**.

Ex. 6, Order on MTQ at 5-6. But the Colorado court's order quashing the subpoena to Mr. Frontera will not stop **Ms. Lambert** from **voluntarily** complying with the subpoena to produce documents and testify that Mr. Case served on her for Dominion Discovery Material. That possibility is the primary focus of Dominion's pending Motion to Enforce. *See* Dkt. 108, Motion to Enforce.

Dominion's concerns are well founded. The public's response to Mr. Case's mischaracterization of Dominion Discovery Material in his filing was quick. For example, one popular X account posted Mr. Case's declaration online, noting it was obtained by Yehuda Miller:



Ex. 7, MJTruthUltra, https://twitter.com/MJTruthUltra/status/1811755146633675036.

The post has over 400k views.  Individuals quickly responded to the MJTruthUltra posting with comments such as "Hang them all for treason JMO…" and other anti-Dominion sentiment:



Ex. 7, MJTruthUltra, https://twitter.com/MJTruthUltra/status/1811755146633675036.

Nor did the events of last week end with those postings.  At 2:06pm CT Friday, July 12, Dominion's counsel received an email from Ms. Lambert stating that she had "received a request for the transcript of Mr. Poulos testimony at deposition" from a "Michigan State Representative." Ex. 8, July 12, 2024 Email from Stefanie Lambert to Davida Brook ("July 12 Lambert Email"). Within ten minutes, Dominion's counsel Jonathan Ross responded, stating, "We object to your sharing any Discovery Material in this litigation with anyone, as both the protective order and the Court's other orders prohibit.  That includes Mr[.] Poulos's deposition transcript and video and any other transcripts/videos."  Ex. 9, July 12, 2024 Email from Jonathan Ross to Stefanie Lambert ("July 12 Ross Email") at 2-3.  Hearing nothing, Mr. Ross followed up again at 3:41pm CT: "Please confirm you will not share."  *Id.* at 2.

Ms. Lambert replied, incorrectly, that this was "not a person requesting the transcript in his individual capacity. This is a request by the government.  The Michigan legislature." *Id.* at 2.  As explained below, that was untrue.  Regardless, Dominion's counsel asked again that Ms. Lambert confirm she would abide by the Protective Order.  Ms. Lambert's next response was a demand that Dominion "advise by close of business if Dominion intends to review the transcript and de-designate it as confidential pursuant to the protective order." *Id.* at 1.  Mr. Ross's answer again reminded Ms. Lambert of the Court's orders that prohibit her from sharing Discovery Material regardless of whether designated "confidential"; designated the transcript as confidential to avoid any confusion; and, for a third time, requested Ms. Lambert's confirmation that she would "not disseminate it." *Id.*  Ms. Lambert did not respond.

Of course, Ms. Lambert's statement that the Michigan legislature requested Mr. Poulos's deposition transcript is false.  The request came from Michigan State Representative James DeSana.  Ex. 8, July 12 Lambert Email.  The difference is important.  Mr. DeSana does not say he is making a request for the Michigan legislature.  He claims to need the transcript for his proposed "criminal complaint against John Poulos."  And in fact, Mr. DeSana and a few other current and former state legislators already asked that a criminal complaint be brought against Mr. Poulos and, nearly three months ago, the Michigan Attorney General declined their request.  Ex. 10, *Press Release: AG Nessel Rejects Call from Conspiracist Legislators for Renewed 2020 Election Investigation*, Apr. 25, 2024,  https://www.michigan.gov/ag/news/press-releases/2024/04/25/ag-nessel-rejects-call-from-conspiracist-legislators-for-renewed-2020-election-investigation.

Regardless, Ms. Lambert full well knows that a request by the government does not vitiate this Court's orders, including because she asked about precisely this scenario at the May 16 hearing, and the Court made clear that she must "follow the mechanism in the protective order":

MS. LAMBERT: Your Honor, if Dr. Byrne is requested by Congress or the DOJ or law enforcement to cooperate with an investigation, how should he proceed?

THE COURT: ***Well, if it involves discovery material in this case, follow the mechanism in the protective order for bringing it to the Court's attention, and, if it's confidential, you can seek to file something before this Court.***

But I'll just be very clear, some of the actions that appear to have been taken in the name of law enforcement aren't entirely supported, so that's why I'm saying you need to follow the strict guidelines of Judge Nichols' order and come to the Court if there are any such requests.

MS. LAMBERT: Thank you, Judge.

Ex. 2, May 16 Tr., 62:12-24 (emphasis added).

Lest there be doubt, this Court confirmed the same in its July 12, 2024 Minute Order:

MINUTE ORDER: As the Court has repeatedly ordered, Counsel and Parties are expressly prohibited from sharing any discovery materials subject to the Protective Order, ECF No. [79], outside of this case unless expressly authorized by this Court or in the relevant orders. ***To avoid any doubt, Defendant and Defendant's Counsel are expressly prohibited from sharing with any third party the deposition transcript or testimony that is the subject of the Parties' emails to the Court today pending briefing and further order of the Court.*** There are no exceptions. Violation of this Order may subject the party or counsel to the full range of available sanctions, including potential sanctions for contempt of court. SO ORDERED. Signed by Magistrate Judge Moxila A. Upadhyaya on 07/12/2024

July 12, 2024 Minute Order, *U.S. Dominion Inc. v. Patrick Byrne*, 1:21-cv-02131-CJN-MAU (emphasis added).

## II.

These events indicate at least four apparent violations by Mr. Byrne and his counsel of the letter and spirit of the Court's orders, for which they must be held to account:

1.    __Status Quo Order, Paragraph 6__: None of Mr. Byrne's attorneys or Mr. Byrne notified the Court that Mr. Case accessed Dominion documents, which means they failed for an unknown period of time to abide by the Status Quo Order's requirement at Paragraph 6 that

Mr. Byrne and his counsel "immediately notify the Court" of any "Dominion Litigation Documents, *existing in any form whatsoever*" that were "not already accounted to the Court on March 18, 202[4]" discovered to be in the possession any "associate" or "affiliate" of Ms. Lambert. Dkt. 77, Status Quo Order at ¶ 6 (emphasis added). The language of the Court's order would include Mr. Case, who is supposedly "assisting" Ms. Lambert "in her defense of Patrick Byrne." Ex. 4, Decl. of John Case at ¶ 3.

2. **Status Quo and Protective Orders, Paragraph 1**: Despite admitting that he has signed the Protective Order's Undertaking as part of his assistance to Ms. Lambert with Mr. Byrne's representation, Mr. Case is purporting to use information about Discovery Material in a public filing outside this litigation. Ex. 3, Response to MTQ at ¶ 2; Ex. 4, Decl. of John Case at ¶ 2. Not only does his false assertion of what that Discovery Material "shows" violate the spirit of Paragraph 1 of the Status Quo Order, it also reflects a concerted effort by Mr. Byrne's legal team to defy Paragraph 1 of the governing Protective Order. That provision states that "no Receiving Party will provide Discovery Material to any person or entity (including for any other litigation) or make any Discovery Material public except as permitted by this Order and in this Litigation." Dkt. 79, Protective Order at ¶ 1.

3. **Protective Order, Paragraph 27**: Further, contrary to Paragraph 27 of the Protective Order, Ms. Lambert has not taken "reasonable efforts to prevent disclosure" by "each unauthorized person who receives the information." Dkt. 79, Protective Order at ¶ 27. Having obtained access to leaked Discovery Material, Mr. Case then publicly stated that at trial in the Peters Criminal Case he "intend[s] to offer as exhibits emails authored by Dominion officers . . . ." He "understand[s] that these emails were produced by Dominion and its counsel in U.S. Dominion Inc. et al v. Byrne." Ex. 4, Decl. of John Case at ¶ 13. Ms. Lambert and Mr. Byrne have not raised

any objection—in the criminal proceeding or to this Court—to Mr. Case doing so. They had a duty to do so under Paragraph 27 of the Protective Order, just as they had a duty under Paragraph 26 of the Protective Order to object to the subpoena Ms. Lambert received from Mr. Case, as detailed in Dominion's Motion to Enforce. *See* Dkt. 108, Motion to Enforce.

4.      **Status Quo Order, Paragraph 1**: Finally, it appears Ms. Lambert may have understated to the Court at the March 18 hearing the universe of those who had access to Dominion Discovery Material. Alternatively, it is possible Mr. Case later accessed leaked documents, possibly under the guise of "assisting" Ms. Lambert for Mr. Byrne. We do not know which is the case because Ms. Lambert has not informed the Court or Dominion about the facts of Mr. Case's access and instead has (improperly) claimed "privilege / work product" over that information. Ex. 5, July 11 Brook Email. By whatever means Mr. Case accessed the documents, Ms. Lambert violated the spirit of Paragraph 1 of the Status Quo Order because she is allowing a member of Mr. Byrne's legal team to "shar[e], distribut[e], provid[e] access to or discuss[] any Discovery Material received in connection with" this case. Dkt. 77, Status Quo Order at ¶1.

Simply put, Ms. Lambert and Mr. Byrne both confirmed to this Court that they understood and would comply with the Court's orders. *See* Ex. 1, March 18 Tr., 44:6-46:12 (Ms. Lambert promising the Court she will "come directly to the Court" instead of violating the Protective Order); Ex. 2, May 16 Tr., 61:5-62:4 (Ms. Lambert and Mr. Byrne re-confirming they understood the Status Quo Order and would comply); *see also* Dkt. 84, Verifications. Yet not once over the past four months has Ms. Lambert informed the Court about Mr. Case or updated any of her prior statements. She has had ample opportunity to do so—including in hearings and as part of her various written submissions. Instead, it appears that she and Mr. Byrne have found brazen new ways to try to defy the Court's orders.

11

III.

Dominion respectfully asks that this Court disqualify Ms. Lambert, grant the other protective relief Dominion has sought in its Motion to Disqualify, and enforce compliance with the Protective and Status Quo Orders.

It is appropriate that a litigant's choice of counsel may be overridden in just these circumstances where "the client's selection . . . impede[s] or disrupt[s] the orderly administration of justice." *Douglas v. United States*, 488 A.2d 121, 143 (D.C. Ct. of App. 1985) (quoting *Harling v. United States*, 387 A.2d 1101, 1104 (D.C. Ct. of App. 1978)).   The history of the case demonstrates that "truly egregious misconduct [is] likely to infect future proceedings."  *Koller v. Richardson-Merrell, Inc.*, 737 F.2d 1038, 1056 (D.C. Cir. 1984), *vacated on other grounds*, 472 U.S. 424 (1985); *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991) (a "primary aspect" of a court's inherent power "is the ability to fashion an appropriate sanction for conduct which abuses the judicial process").   Significantly, this Court already warned Ms. Lambert that evidence of violations of the Status Quo Order would be taken into account in support of Dominion's Motion to Disqualify: "I want to make it very clear that ***going forward if I see any evidence that violates this order, I'm going to take that into account in my final resolution.***"  Ex. 2, May 16 Tr., 60:24-61:2 (emphasis added).

Here, Mr. Byrne and Ms. Lambert's violations and attempts to circumvent the Court's orders have been a danger and a distraction.   And they have further confirmed exactly what Dominion feared and predicted in the May 16 hearing on the pending Motion to Disqualify Ms. Lambert:

> Counsel for Dominion: Your Honor, I'll be blunt. My concern is this: If she's not removed from this case, all that will have happened is they will have gotten smarter about how to do this leak in the future.

12

Ex. 2, May 16 Tr., 24:21-24.

A lesser remedy will not suffice. *See In re BellSouth*, 334 F.3d 941, 963 (11th Cir. 2003) (upholding the disqualification of defendant's counsel after finding that the lawyer, a close relative of the judge, had been brought on for the sole purpose of forcing the judge's recusal).

The other relief Dominion has sought in its Motion to Disqualify is also vitally important as Dominion needs to understand the extent of Mr. Byrne's and Ms. Lambert's misdeeds, which is a gating issue to containing them. For example, we now know that at least Mr. Byrne, Ms. Lambert, and Mr. Case appear to have colluded with the wrongful purpose of disseminating Dominion Discovery Material. Their actions reinforce the need not only for disqualification but also for all the protective relief Dominion sought in its Proposed Order on its Motion to Disqualify (Dkt. 75-24), including a full accounting, in the form of sworn affidavits from Mr. Byrne and Ms. Lambert, that provide:

- The date of any fee agreement between Lambert and Byrne and the scope of representation or, if no such agreement exists, the date on which Lambert and Byrne understand that a lawyer/client relationship;

- A complete and accurate list of all Dominion-produced documents and information Byrne reviewed and the method and date of access;

- An accounting from Byrne's outside vendor showing what documents Byrne and or Lambert accessed, on what date, and whether they were downloaded; as well as any other data the vendor indicates may be helpful to Dominion's or this Court's efforts to understand the breach;

- A complete and accurate list of all Dominion-produced documents and information Lambert received and the method and date of access;

- An account of every step Lambert, Byrne's prior counsel from the McGlinchey firm, has already undertaken or that is underway to determine the scope of the breach and to ensure it is not continuing; and

- An accounting attesting (i) to whom Lambert and/or Byrne leaked, released, or otherwise disclosed documents or information protected by the Protective Order (including in court filings in any cases outside of this case); (ii) how and when they

provided it; (iii) every occasion on which they did so; and (iv) for each such instance, what specifically was leaked, released, or otherwise disclosed.

Dkt. 75-24, Proposed Order on Motion to Disqualify.

Finally, enforcement of this Court's Status Quo Order and Protective Order is necessary and appropriate to stop Ms. Lambert and Mr. Byrne from continuing to find new ways to try to disseminate Dominion Discovery Material and to protect the integrity of the judicial process.

IV.

Dominion respectfully and urgently requests that this Court enter an order (1) disqualifying Ms. Lambert and granting the protective relief sought in Dominion's Motion to Disqualify (Dkt. 75-24), (2) enforcing the Court's Status Quo Order and Protective Order (Dkt. 108-24), and (3) granting supplemental relief to account for the new factual developments in this filing.

Dated: July 16, 2024

Respectfully submitted,

By:  */s/ Davida Brook*
Laranda Walker (D.C. Bar No. TX0028)
Mary K. Sammons (D.C. Bar No. TX0030)
Jonathan Ross (D.C. Bar No. TX0027)
Elizabeth Hadaway (*Admitted pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1000 Louisiana St., Suite 5100
Houston, TX 77002
Tel: (713) 651-9366
Fax: (713) 654-6666
lwalker@susmangodfrey.com
ksammons@susmangodfrey.com
jross@susmangodfrey.com
ehadaway@susmangodfrey.com

Stephen Shackelford, Jr. (D.C. Bar No. NY0443)
Eve Levin (D.C. Bar No. 1672808)
Mark Hatch-Miller (*Admitted pro hac vice*)
Christina Dieckmann (*Admitted pro hac vice*)
**SUSMAN GODFREY L.L.P.**

14

One Manhattan West, 50th Floor
New York, NY 10001
Tel: (212) 336-8330
sshackelford@susmangodfrey.com
elevin@susmangodfrey.com
mhatch-miller@susmangodfrey.com
cdieckmann@susmangodfrey.com

Davida Brook (D.C. Bar No. CA00117)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
dbrook@susmangodfrey.com

Edgar Sargent (*Admitted pro hac vice*)
Katherine Peaslee (*Admitted pro hac vice*)
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 516-3880
esargent@susmangodfrey.com
kpeaslee@susmangodfrey.com

*Attorneys for Plaintiffs*

15

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of July 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which I understand to have served counsel for the parties.

<u>/s/ Davida Brook</u>

# Exhibit 1

```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3      * * * * * * * * * * * * * * *   )
        U.S. DOMINION, INC., et al.,    )    Civil Action
 4                                      )    No. 21-00445
                   Plaintiffs,          )
 5                                      )
           vs.                          )
 6                                      )
        MY PILLOW, INC., et al.,        )    Washington, D.C.
 7                                      )    March 18, 2024
                   Defendants.          )    3:08 p.m.
 8      * * * * * * * * * * * * * * *   )

 9

10      - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11      * * * * * * * * * * * * * * *   )
        U.S. DOMINION, INC., et al.,    )    Civil Action
12                                      )    No. 21-02131
                   Plaintiffs,          )
13                                      )
           vs.                          )
14                                      )
        PATRICK BYRNE,                  )    Washington, D.C.
15                                      )    March 18, 2024
                   Defendant.           )    3:08 p.m.
16                                      )
        * * * * * * * * * * * * * * *   )
17

18      - - - - - - - - - - - - - - - - - - - - - - - - - - - -

19      * * * * * * * * * * * * * * *   )
        U.S. DOMINION, INC., et al.,    )    Civil Action
20                                      )    No. 21-02130
                   Plaintiffs,          )
21                                      )
           vs.                          )
22                                      )
        HERRING NETWORKS, INC., et al., )    Washington, D.C.
23                                      )    March 18, 2024
                   Defendants.          )    3:08 p.m.
24      * * * * * * * * * * * * * * *   )

25
```

```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3       * * * * * * * * * * * * * *    )
         U.S. DOMINION, INC., et al.,   )    Civil Action
 4                                      )    No. 21-00445
                       Plaintiffs,      )
 5                                      )
            vs.                         )
 6                                      )
         SIDNEY POWELL, et al.,         )    Washington, D.C.
 7                                      )    March 18, 2024
                       Defendants.      )    3:08 p.m.
 8                                      )
         * * * * * * * * * * * * * *    )
 9

10                   TRANSCRIPT OF STATUS CONFERENCE
             (TRANSCRIBED FROM THE FTR-GOLD AUDIO RECORDING)
11             BEFORE THE HONORABLE MOXILA A. UPADHYAYA
                     UNITED STATES MAGISTRATE JUDGE
12

13

         APPEARANCES:
14

         FOR THE PLAINTIFFS:    DAVIDA BROOK, ESQ.
15                              SUSMAN GODFREY, LLP
                                1900 Avenue of the Stars
16                              Suite 1400
                                Los Angeles, California 90067
17
                                STEPHEN SHACKELFORD, ESQ.
18                              CHRISTINA DIECKMANN, ESQ.
                                SUSMAN GODFREY, LLP
19                              305 Ninth Avenue
                                50th Floor
20                              New York, New York 10001

21                              JONATHAN J. ROSS, ESQ.
                                SUSMAN GODFREY, LLP
22                              1000 Louisiana Street
                                Suite 5100
23                              Houston, Texas 77002

24       FOR THE DEFENDANTS     ABRAHAM S. KAPLAN, ESQ.
         MY PILLOW AND          PARKER, DANIELS, KIBORT, LLC
25       MICHAEL J. LINDELL:    123 North Third Street
                                Minneapolis, Minnesota 55401
```

```
 1      APPEARANCES, CONT'D:

 2      FOR THE DEFENDANT          STEFANIE L. LAMBERT JUNTTILA, ESQ.
            PATRICK BYRNE:         LAW OFFICE OF STEFANIE L. LAMBERT
 3                                 400 Renaissance Center
                                   26th Floor
 4                                 Detroit, Michigan 48243

 5      FOR THE OAN               CHARLES BABCOCK, ESQ.
             DEFENDANTS:          JACKSON WALKER, LLP
 6                                1401 McKinney
                                  Suite 1900
 7                                Houston, Texas 77010

 8                                MINOO S. BLAESCHE, ESQ.
                                  JONATHAN D. NEERMAN, ESQ.
 9                                JACKSON WALKER, LLP
                                  2323 Ross Avenue
10                                Suite 600
                                  Dallas, Texas 75201
11
        FOR THE DEFENDANT         GREGORY M. SINGER, ESQ.
12         CHRISTINA BOBB:        LAURO & SINGER
                                  400 North Tampa Street
13                                15th Floor
                                  Tampa, Florida 33602
14
        FOR THE POWELL            MARC CASARINO, ESQ.
15          DEFENDANTS:           KENNEDYS CMK, LLP
                                  919 North Market Street
16                                Suite 1550
                                  Wilmington, Delaware 19801
17
                                  JOSHUA A. MOONEY, ESQ.
18                                KENNEDYS CMK, LLP
                                  1600 Market Street
19                                Suite 1410
                                  Philadelphia, Pennsylvania 19103
20
        FOR THE DEFENDANT         DAVID C. TOBIN, ESQ.
21      DEFENDING THE REPUBLIC:   TOBIN, O'CONNOR & EWING
                                  5335 Wisconsin Avenue
22                                Suite 400
                                  Washington, D.C. 20015
23

24

25
```

4

```
1    TRANSCRIBED BY:          LISA EDWARDS, RDR, CRR
                              Official Court Reporter
2                             United States District Court for the
                                District of Columbia
3                             333 Constitution Avenue, Northwest
                              Room 6706
4                             Washington, D.C. 20001
                              (202) 354-3269
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURTROOM DEPUTY:  Good afternoon, your Honor.

2     This is Civil Case No. 21-445, U.S. Dominion, Inc., et al.,

3     versus My Pillow, Inc., et al.

4          This is Civil Case No. 21-2131, U.S. Dominion,

5     Inc., et al., versus Byrne; Civil Case No. 21-2130, U.S.

6     Dominion, Inc., et al., versus Herring Networks, Inc.,

7     et al.; and Civil Case No. 21-40, U.S. Dominion, Inc., et

8     al., versus Powell, et al.

9          All four matters are set for a status conference.

10          Parties, please introduce yourselves for the

11     record, stating with Plaintiffs' counsel.

12          MS. BROOK:  Good afternoon, your Honor.  May it

13     please the Court, Davida Brook of Susman, Godfrey on behalf

14     of the Dominion Plaintiffs.  And with me are my colleagues

15     Stephen Shackelford, Jonathan Ross and Christina Dieckmann.

16          THE COURT:  Good afternoon, counsel.

17          MR. CASARINO:  Good afternoon, your Honor.  Marc

18     Casarino of Kennedys CMK on behalf of the Powell Defendants.

19     And I have with me my partner, Joshua Mooney.

20          THE COURT:  Good afternoon.

21          MR. KAPLAN:  Good afternoon, your Honor.  Abraham

22     Kaplan of the law firm Parker, Daniels, Kibort on behalf of

23     My Pillow and Mike Lindell.

24          And I'm joined by counsel Chris Kachouroff and

25     Deborah McIlhenny of the law firm McSweeney, Cynkar &

```
1      Kachouroff, whose admission before this Court is pending.

2                  THE COURT:  Okay.  Good afternoon, counsel.

3                  MS. LAMBERT JUNTTILA:  Good afternoon, your Honor.

4      Stefanie Lambert Junttila appearing on behalf of Mr. Byrne.

5                  THE COURT:  Good afternoon, Ms. Lambert.

6                  MR. TOBIN:  Good morning, your Honor.  David Tobin

7      on behalf of Defending the Republic.

8                  THE COURT:  Good afternoon, Ms. Tobin.

9                  MR. TOBIN:  Nice to see you, your Honor.

10                 THE COURT:  I believe I know you from a prior

11     life.

12                 MR. TOBIN:  I believe so.

13                 MR. SINGER:  Good afternoon, your Honor.  Greg

14     Singer on behalf of Defendant Christina Bobb.

15                 THE COURT:  Good afternoon.

16                 Mr. Babcock?

17                 MR. BABCOCK:  Good afternoon, your Honor.  Chip

18     Babcock representing Herring Networks and Robert Herring,

19     Sr., Charles Herring and Chanel Rion, who we refer to as the

20     OAN Defendants.

21                 THE COURT:  Okay.

22                 MR. BABCOCK:  And I've got some bad news.

23                 I know how much you appreciate listening to me.

24     But today, my partners Minoo Blaesche and Jonathan Neerman

25     will be addressing the Court.  And hopefully I'll sit in the
```

1    back row and keep my mouth shut.

2              THE COURT:  That would be a great event if that

3    were to happen.

4              MR. BABCOCK:  I knew you would approve of that way

5    of proceeding.  Thank you, your Honor.

6              THE COURT:  Thank you, sir.

7              Thank you, counsel.

8              Does everyone who is going to be speaking today

9    have a seat at counsel table?  Or are you all comfortable?

10   Okay.  Mr. Neerman?  Okay.

11             All right.  Anyone else?

12             Okay.  It's my preference to try to have just one

13   counsel per party addressing the Court.  And we're going to

14   do this in a very orderly fashion today.  I know there's a

15   lot of filings that have been happening and some issues that

16   the parties wish to bring to my attention.  We'll do it, as

17   I mentioned, very orderly.  And I'm not necessarily going to

18   be hearing extended argument today, but we will set a

19   procedure for how to handle some of these matters going

20   forward.

21             So the first issue on the agenda just by virtue of

22   the fact that it's the most recently raised is Dominion's

23   request for emergency relief pursuant to an alleged

24   violation of the protective order.

25             So, Ms. Brook, I'll have you approach, and just

1    very briefly you can address it; and I'll give Ms. Lambert

2    an opportunity to respond as well.

3            Again, I'm not having full argument, but what I

4    would like to know from the parties -- and I'll have

5    questions for both of you -- is while we take this matter

6    under advisement what, if any, interim relief is Dominion

7    seeking, so that the Court can take up this issue in an

8    orderly fashion and give both sides an opportunity to fully

9    address this in oral argument.

10           MS. BROOK:  Thank you, your Honor.

11           Again, Davida brook on behalf of Dominion.  I'll

12   try to keep my remarks to a few minutes or less.

13           Your Honor, it has been nearly four years.  When

14   does it stop?  Dominion brought these very lawsuits to stop

15   the spread of false information about it, false information

16   which transformed a previously unknown voting machine

17   company into a household name that more than half of our

18   country associates with treason.  False information that

19   gutted Dominion's business, false information that resulted

20   in horrific threats to Dominion employees, that prompted an

21   armed man to attempt to gain access to Dominion's Denver

22   offices to do God knows what.

23           These wrongs are what these lawsuits were designed

24   to address, to stop the lies, to end the threats of

25   violence.  And yet Patrick Byrne and his attorney,

1    Ms. Lambert, are now using these very lawsuits to perpetuate

2    more wrongs against Dominion.  They are using documents

3    produced in this litigation to spread yet more lies and to

4    cause yet more harm.

5         More, Mr. Byrne and Ms. Lambert are saying it

6    wasn't them.  To the contrary, rather than taking the

7    weekend to respond to Dominion's request for an accounting

8    of who they shared Dominion's information with and when,

9    they spent it on the internet proudly taking credit for what

10   they'd done.

11        They have made clear, including by virtue of the

12   responsive brief that was filed just before this hearing,

13   which we have had an opportunity to review, that they took

14   these actions intentionally, that they don't care that this

15   Court's order provides for the contrary and that they have

16   no intention of stopping, regardless of what it means to our

17   national trust in our elections or the safety of Dominion

18   employees and anyone associated with Dominion.

19        There should be zero tolerance for these acts.

20   Zero.

21        So as our motion put forth, we are asking that

22   Stefanie Lambert be promptly disqualified from this case.

23   And it needs to be prompt, because her acts are continuing.

24        THE COURT:  Disqualification is a severe remedy.

25   Under the law of this circuit, the Court does not consider

1    disqualification lightly, doesn't take that lightly.  And

2    however promptly Dominion may wish for the Court to consider

3    a motion to disqualify, it's something that the attorney

4    who's being sought to be disqualified has the right to

5    respond and be heard.

6           And, you know, I don't think this is something

7    that the Court can do on a day's notice.

8           MS. BROOK:  Dominion agrees, your Honor.  We agree

9    with everything your Honor just said, including that

10   disqualification is a severe remedy and that it shouldn't be

11   handed out lightly.  But if ever there was a case that

12   called for it, Dominion thinks this is the case.

13          The reason for which we think that the action does

14   have to be prompt -- and we recognize it's not going to be

15   today -- is because the bad acts are continuing.

16          THE COURT:  Is the sole basis for Dominion's

17   request to disqualify Ms. Lambert the violation of the

18   protective order or are there -- the alleged violation of

19   the protective order or are there other reasons?

20          MS. BROOK:  I would say, your Honor, as the

21   numerous alleged violations of the protective order, which

22   we think are ongoing.  As recently as the last 24 hours,

23   sheriff Dar Leaf, who Ms. Lambert has admitted to giving the

24   Dominion documents to, has essentially created a Twitter

25   account, because he did not have one prior to these leaks,

1    and he's made approximately 40 posts featuring Dominion's

2    documents.  And these tweets have been viewed -- I checked

3    before entering the courthouse -- more than 150,000 times.

4    And we all know what's going to happen next in the comments

5    and the comments and comments to those posts.

6         So for all of these reasons, as well as the

7    reasons articulated in the motion, we are asking the Court

8    to enter an order for disqualification after full

9    consideration of the issues as well as, as the Court

10   mentioned in its opening remarks, some interim relief to

11   protect the status quo in the meantime.

12        And to answer your Honor's question directly, the

13   specific interim relief that we are seeking is laid out in

14   the proposed order that we filed and provided to the Court

15   on Friday.  And I'm happy to go through those specific

16   things now, if it would be helpful.

17        THE COURT:  Is there a reason you did not file

18   that -- file that motion under seal, as Ms. Lambert alleges

19   must be done under the protective order?

20        MS. BROOK:  I disagree with Ms. Lambert's reading

21   of that provision of the protective order and frankly most

22   of the protective order, your Honor.

23        The provision she cites says that if you are

24   challenging whether or not a document was appropriately

25   marked "confidential," then of course you shouldn't blast

12

1       that document publicly throughout the world.

2              This is not a case where Dominion brought a motion

3       because Mr. Byrne or any of the other Defendants in this

4       case stamped something as confidential or AEO and Dominion

5       wanted to challenge that, and therefore in putting the

6       document before the Court should absolutely have filed it

7       under seal so that the Court has an opportunity to consider

8       the confidentiality designation before it becomes public.

9              This is a situation where Dominion was addressing

10      a breach of the protective order relating to Dominion's own

11      documents that have already been made public.  The cat's out

12      of the bag.

13      THE COURT:  Well, why don't you recount what

14      Dominion would request that the Court order as interim

15      relief pending the resolution of the motions.

16             Now, the motion for disqualification, having just

17      been filed, has not been referred to me.  There is a

18      question as to whether the breach of the protective order --

19      I do think that likely falls within a discovery issue that

20      Judge Nichols has referred.  But as of today, the motion for

21      disqualification has not yet been referred to me.

22             But in light of the allegation that -- and I will

23      hear -- as I said, I will hear from Ms. Lambert and give her

24      a full and fair opportunity to respond.  If alleged

25      confidential information has been disseminated, there should

1    be a way to prevent any further bleeding, so to speak, or

2    further dissemination pending a resolution on the motion for

3    sanctions or the motion for disqualification.

4              So what does Dominion propose for the Court's

5    consideration?

6              MS. BROOK:  Thank you, your Honor.

7              And Dominion of course will take up the issue in

8    whatever way the Court prefers.

9              Dominion has suggested six specific things in

10   order to maintain the status quo while the Court takes up

11   the question of whether or not Ms. Lambert should be

12   disqualified.

13             The first is, we have asked for the date of any

14   fee agreement between Ms. Lambert and Mr. Byrne and the

15   scope of representation or, if no such agreement exists, the

16   date on which Lambert and Byrne understood that a

17   lawyer-client relationship exists.  And this is relevant to

18   whether or not it was proper to share the documents with

19   Ms. Lambert in the first place under the protective order.

20             THE COURT:  Well, that's not going to -- that

21   doesn't help you get to stopping any additional

22   dissemination.

23             MS. BROOK:  No, your Honor.  Our goals with these

24   six specific requests are twofold.  One is, as your Honor

25   pointed out, to stop any additional dissemination.

1    The other is to fully understand what went wrong

2  so that, as the Court evaluates Dominion's request for

3  sanctions and as Dominion previewed in its motion, to the

4  extent Dominion seeks additional requests for sanctions,

5  whether relating to Ms. Lambert or others, we have the most

6  and best information possible.

7    THE COURT:  Okay.  Well, go ahead.  But I don't

8  think that this is -- I don't think that that's -- I'm

9  looking at measures to try to stop further dissemination and

10  to try to understand where and in whose possession

11  confidential information currently is.

12    So --

13    MS. BROOK:  Let me focus on those, then, your

14  Honor.

15    So we have asked for a complete and accurate list

16  of all Dominion-produced documents and information that

17  Patrick Byrne or Ms. Lambert had access to.

18    We've asked for an accounting from Mr. Byrne's

19  outside vendor showing what documents he and Ms. Lambert had

20  access to, on what date, whether they were downloaded as

21  well as any other data the vendor indicates may be helpful

22  in understanding exactly the issue the Court just addressed.

23    We've asked for a complete and accurate list of

24  all Dominion-produced documents and information that

25  Ms. Lambert received and the method and date of access.

1          We've asked for an account of every step

2     Ms. Lambert or Mr. Byrne's prior counsel from the McGlinchey

3     firm has already undertaken or that is underway to determine

4     the scope of the breach and to ensure it is not continuing.

5          And we've asked for an attestation under oath from

6     both Mr. Byrne and Ms. Lambert for to whom Lambert and/or

7     Mr. Byrne leaked, released or otherwise disclosed documents

8     or information protected by the protective order, how and

9     when they provided it, every occasion on which they did so

10    and, for each such instance, what specifically was leaked,

11    released or otherwise disclosed.

12         As the Court knows from the briefing, we have also

13    sent letters to both the original outside document vendor

14    for Mr. Byrne and the current outside document vendor for

15    Mr. Byrne.  Our understanding is that the documents are in

16    the process of being migrated from one outside vendor to the

17    other, asking them not to provide Ms. Lambert or Mr. Byrne

18    with access to those documents unless and until this Court

19    decides this issue.

20         THE COURT:  And about what's the volume of the

21    documents?

22         MS. BROOK:  Dominion has produced more than a

23    million documents in this case, your Honor.

24         THE COURT:  No, no.  What's the volume of the

25    documents that have been released to a third party as far as

1    you know?

2            MS. BROOK:  The short answer is, I don't know,

3    because despite the protective order requiring that such

4    information be shared if and when there is an alleged

5    breach, Ms. Lambert nor Mr. Byrne's prior counsel have not

6    provided that information.

7            So what I do know, your Honor, from the public

8    tweeting is that I believe as of today -- and my team will

9    correct me if I have it wrong -- 2700 pages of Dominion's

10   confidential information have been publicly tweeted out.

11           I will say that Sheriff Leaf -- sorry.  I have my

12   little dyslexia.  It's 2,173.  I flipped the seven and the

13   one.  2,173 pages have been publicly tweeted.  To be clear,

14   what Sheriff Leaf did is he literally made them available

15   for download via a Google Drive on the internet that people

16   can click on and download.  So those 2,173 pages have been

17   shared God knows how many times at this point.

18           And when Sheriff Leaf made that tweet, he referred

19   to it as the, quote, "first tranche."

20           THE COURT:  Okay.  How could the Court do anything

21   to prevent that further dissemination by Sheriff Leaf?

22           MS. BROOK:  I don't believe the Court necessarily

23   can.  To the extent the Court believes it has any authority

24   over Sheriff Leaf, we welcome it to take any actions.

25           But what the Court does have authority over is

```
 1      Ms. Lambert, her client, Mr. Byrne, and the previous

 2      attorneys who can at least provide fulsome information about

 3      what was shared and when and why.

 4               THE COURT:  Okay.  Thank you, ma'am.

 5               Ms. Lambert.

 6               MS. LAMBERT JUNTTILA:  Thank you.

 7               THE COURT:  Can I ask, is Mr. Driscoll in the

 8      courtroom?  And is Mr. Byrne in the courtroom, Ms. Lambert?

 9               MS. LAMBERT JUNTTILA:  [Indiscernible.]

10               THE COURT:  Okay.  Thank you.

11               Ms. Lambert, you may respond.  I'd like to

12      understand in addition to anything you'd like to say in

13      response -- I'm not entertaining full argument right now,

14      but anything you'd like to say in response.  I'd like to

15      understand where these documents are currently located and

16      in whose possession as far as you're aware.

17               But why don't you first respond to the argument

18      that --

19               MS. LAMBERT JUNTTILA:  Thank you, your Honor.

20               Your Honor, my client, Mr. Byrne, did not bring

21      this lawsuit; Dominion did.  And when Dominion sued

22      Mr. Byrne, they sued a national intelligence asset.

23               Mr. Byrne has an obligation, as do I as an officer

24      of the Court, to report criminal activity.  In this

25      discovery, your Honor --
```

```
1              THE COURT:  So you don't deny that you

2     disseminated documents marked "confidential" in this

3     litigation after filing -- after signing an undertaking --

4              MS. LAMBERT JUNTTILA:  Your Honor --

5              THE COURT:  -- correct?

6              MS. LAMBERT JUNTTILA:  -- I did turn the documents

7     over to law enforcement.  And there is no law that would

8     prevent me from turning documents under a protective order

9     to law enforcement as I'm reviewing them.  It's law

10    enforcement's job to determine if there's a crime that's

11    been committed, investigate it and pursue it.  Just as if

12    Dominion had provided to me documents along with a dead

13    body, I'd be required to turn that in to the police as well

14    and not hide it and conceal it in a closet under a

15    protective order.

16              There's a different analysis with what is --

17              THE COURT:  What's your best authority for that

18    proposition?

19              MS. LAMBERT JUNTTILA:  I've done research, your

20    Honor.  There is no law that I can find that would prevent

21    me from turning in evidence of a crime.  And that is because

22    law enforcement needs to investigate that, and a civil

23    process should never interfere with it.

24              The Court can look at case law -- and I can

25    provide that when I do full argument -- that analyzes
```

 1   contracts.  For example, in contract, if you waive criminal

 2   liability, that's not a valid term of a contract.

 3            The criminal aspect is entirely separate.

 4            So when Dominion sued --

 5            THE COURT:  Ms. Lambert, hold on.  I'd just -- I'd

 6   like to get a few things on the timing --

 7            MS. LAMBERT JUNTTILA:  Sure.

 8            THE COURT:  -- down.

 9            So you entered your appearance in this case -- I

10   believe it was the 11th or the 12th.

11            MS. LAMBERT JUNTTILA:  I'm not sure of the exact

12   date, your Honor.  But when I have an opportunity to do full

13   argument before Judge Nichols, I think it would be

14   appropriate to decide first what is protected by

15   attorney-client privilege and what information that the

16   Court can obtain regarding Mr. Byrne's representation.

17            THE COURT:  Okay.  My understanding is that you

18   entered your appearance on the 12th.  And you did sign an

19   undertaking pursuant to the protective order, did you not?

20            MS. LAMBERT JUNTTILA:  I did, your Honor.

21            THE COURT:  Okay.  And what date is the date of

22   the undertaking that you signed?

23            MS. LAMBERT JUNTTILA:  I don't have that with me,

24   your Honor.  But I think that's where the judge would need

25   to do an analysis as to -- at what point -- what information

1    would be available for the Court that's not protected by

2    attorney-client privilege.

3           I think that we need to have a determination there

4    as to whether anything regarding the retainer and the

5    representation for Mr. Byrne --

6           THE COURT:  Yes.  I'm not talking about the

7    retainer.  What I'm trying to understand -- does anyone --

8    Ms. Brook, do you have the date of the undertaking that

9    Ms. Lambert signed?

10          MS. BROOK:  I can find it.  Yes.  It's an exhibit

11   to our motion.

12          THE COURT:  Okay.

13          MS. LAMBERT JUNTTILA:  And for the record, your

14   Honor, I did not provide that to counsel.  That must have

15   been provided by Mr. Byrne's previous counsel.  And I'm not

16   waiving attorney-client privilege with regards to

17   documentation provided by counsel.

18          THE COURT:  Okay.  You're claiming that the

19   undertaking that you signed, which is an exhibit to the

20   protective order in this case, in which you certified as an

21   officer of the Court that you would keep all documents

22   confidential and/or comply with the terms of the protective

23   order, you're claiming attorney-client privilege over that

24   document?

25          MS. LAMBERT JUNTTILA:  No, your Honor.

1          I did sign a protective order.  What I'm -- there

2    has been communication that I believe is inappropriate from

3    Mr. Byrne's previous counsel after they'd been terminated

4    with Dominion's counsel.

5          THE COURT:  Okay.  I don't -- I'm not privy to

6    those communications.  I don't know which communications

7    you're referring to.  And I don't want to wade into any

8    attorney-client-privileged communications if there are any

9    that you're referring to.

10          I'm trying to get a timeline here.  I'd like to

11   know the date -- so there is no dispute that you signed an

12   undertaking.  I'd like to know the date that you signed the

13   undertaking.

14          Ms. Brook seems to have it.

15          And, Ms. Brook, before you say on the record,

16   please give Ms. Lambert an opportunity to look at it to

17   confirm that that is her signature.

18          MS. LAMBERT JUNTTILA:  Sure.  And I can expedite

19   this for the Court.  I signed a protective order.  And after

20   signing the protective order, I reviewed very thoroughly the

21   discovery turned over --

22          THE COURT:  Ma'am, I just want to know the date.

23          MS. LAMBERT JUNTTILA:  Okay.  Right.

24          THE COURT:  Let's just take this step by step.

25          MS. LAMBERT JUNTTILA:  And then I turned it over

 1    to law enforcement.

 2              THE COURT:  Okay.  Well, we're going to get to

 3    that part in a second.  Okay?

 4              But I need to know the date of this undertaking.

 5              MS. BROOK:  That's correct.  December 12th, your

 6    Honor.

 7              THE COURT:  Okay.  And that is your signature?

 8              MS. LAMBERT JUNTTILA:  Yes.

 9              THE COURT:  All right.  This is the copy that has

10    been sent to the Court; is that correct?

11              MS. BROOK:  Correct, your Honor.  It is Exhibit 2

12    to Dominion's brief.  And it says December 12th, 2023.

13              THE COURT:  Okay.  So on that date, you were not

14    counsel of record for Mr. Byrne.  Correct?

15              MS. LAMBERT JUNTTILA:  Mr. Byrne had hired me and

16    I was in the process of taking over for the previous firm.

17              THE COURT:  Okay.  But given that you entered your

18    appearance in this case about three months later, you were

19    not counsel of record at that time.

20              MS. LAMBERT JUNTTILA:  Correct.

21              THE COURT:  So do I understand it correctly that

22    after that time that you signed the undertaking, you then

23    gave I don't know how many pages of documents, but a tranche

24    of documents that were clearly marked "confidential" in this

25    case, to a third party?

```
 1                    MS. LAMBERT JUNTTILA:  To law enforcement, your
 2      Honor.
 3                    THE COURT:  Okay.  To whom specifically?
 4                    MS. LAMBERT JUNTTILA:  I've given it to sheriff's
 5      departments and it's under review through Mr. Byrne by the
 6      United States Attorney's Office.
 7                    THE COURT:  I need names.
 8                    MS. LAMBERT JUNTTILA:  Sheriff Dar Leaf.
 9                    THE COURT:  And when did you give that information
10      over to Sheriff Dar Leaf?
11                    MS. LAMBERT JUNTTILA:  I'm not sure exactly of the
12      date.  I'd have to review the records.
13                    THE COURT:  Month?
14                    MS. LAMBERT JUNTTILA:  No.  More recent than that.
15                    THE COURT:  No; I'm saying, do you know the month
16      that you gave it over?
17                    MS. LAMBERT JUNTTILA:  Oh.  This month, your
18      Honor.
19                    THE COURT:  This month?
20                    MS. LAMBERT JUNTTILA:  Yes.
21                    THE COURT:  Okay.  Who else did you give the
22      information over to?
23                    MS. LAMBERT JUNTTILA:  I've given it to --
24      Mr. Byrne has it.  And he is working with the U.S.
25      Attorney's Office.
```

1              THE COURT:  So which --

2              MS. LAMBERT JUNTTILA:  And I don't have the names.

3              THE COURT:  Which district?

4              MS. LAMBERT JUNTTILA:  I'm not sure.  That would

5     be a question for Mr. Byrne.

6              THE COURT:  He's your client, ma'am.  And you

7     are -- and you have the obligation to be apprised of what is

8     happening with --

9              MS. LAMBERT JUNTTILA:  I --

10             THE COURT:  -- this confidential -- let me finish,

11    please.

12             MS. LAMBERT JUNTTILA:  Yes.

13             THE COURT:  And I'm just going to say this to

14    everyone:  I know everyone's heated.  I know there's a lot

15    going on.  But you've got to let the Court finish so that we

16    have a good transcript.  You'll thank me later.

17             So you don't know to whom Mr. Byrne has disclosed

18    this information other than --

19             MS. LAMBERT JUNTTILA:  To the government, your

20    Honor.

21             THE COURT:  Okay.  Well, to the --

22             MS. LAMBERT JUNTTILA:  And I don't know -- I don't

23    have that information with me and I don't know that I'll be

24    able to provide it, given that it's an ongoing confidential

25    investigation.

1          THE COURT:  Okay.  Who else did you give this

2     information to other than Sheriff Dar Leaf?

3          MS. LAMBERT JUNTTILA:  No one.

4          THE COURT:  Okay.  Did you attempt to give it to

5     any members of the press?

6          MS. LAMBERT JUNTTILA:  No.

7          THE COURT:  Have you attempted to give this

8     information to any other law enforcement officers?

9          MS. LAMBERT JUNTTILA:  No, your Honor.

10          And -- but Mr. Leaf, Sheriff Leaf, is working with

11     other sheriffs doing an investigation, as he's entitled to

12     do.  That's his job:  to investigate crime.  And he has --

13     there's a misrepresentation of Mr. Leaf posting on social

14     media.  It's not a mere post on social media.  Your Honor,

15     he wrote a letter to Congress asking Congress to do a very

16     serious investigation in light of what was in his possession

17     and to immediately take testimony given the public interest

18     involved in what was in his file.

19          THE COURT:  Ms. Lambert, you are aware that there

20     is a mechanism if you disagree that the information should

21     not be kept confidential.  There is a mechanism for you to

22     challenge that information and to come to this Court and

23     seek de-designation of that information, are you not?

24          MS. LAMBERT JUNTTILA:  Your Honor, I believe

25     that's for the civil lens on the information.

1          I don't believe that's appropriate with anything

2     criminal.  If it were literally a dead body, I don't think

3     I'd bring the dead body to the Court and ask the Court what

4     to do --

5          THE COURT:  That's such a hyperbole.  Okay?  We're

6     talking about documents that are clearly covered by a

7     protective order of this Court or at least were designated.

8     I'm not deciding today whether the documents were in fact

9     covered.  Okay?

10         But you have cited no authority, you can cite no

11    authority to this Court, that you can unilaterally disclose

12    this information without seeking to at least come to this

13    Court and have those documents de-designated for the purpose

14    of disseminating them.  And the analogy of the dead body, it

15    just -- it rings hollow to me, because there are exigencies

16    when you have a dead body.

17         Was there a particular exigency that required you

18    to go disclose this information right this instant --

19         MS. LAMBERT JUNTTILA:  Well, your Honor --

20         THE COURT:  -- as opposed to seeking emergency

21    review by this Court and challenging the documents and

22    seeking the Court's permission to disclose these documents

23    outside of the parties that are subject to the protective

24    order?

25         MS. LAMBERT JUNTTILA:  Absolutely, your Honor.

```
1              The evidence reflects -- and I can't go through
2    all of it; it's over a million documents -- but it reflects
3    foreign nationals entering our election system in realtime
4    while votes are being counted, being directed and tasked by
5    U.S. Dominion employees.  It reflects the honest services
6    fraud, where certain equipment and software was represented
7    to the EAC while they're communicating and lying and
8    providing a different product to --
9              THE COURT:  When did you get the documents?
10   December?
11             MS. LAMBERT JUNTTILA:  No.
12             THE COURT:  Well, you signed the undertaking in
13   December.  When --
14             MS. LAMBERT JUNTTILA:  Correct.  It took quite
15   some time, much after the holidays, when I received the
16   documents.
17             THE COURT:  Okay.  So sometime in January?
18             MS. LAMBERT JUNTTILA:  I would have to look, your
19   Honor.  I'm not exactly sure.  But I went through them.
20             And it's very important that Congress and law
21   enforcement immediately start investigating everything
22   that's contained in this -- in these files, because there's
23   ongoing elections that would absolutely be impacted
24   throughout this country by what is in the file.
25             THE COURT:  The elections that are forthcoming in
```

1    November?  Is that what you're referring to?

2              MS. LAMBERT JUNTTILA:  Well, there's primary

3    elections, your Honor.  There's local elections being run.

4              THE COURT:  So you received --

5              MS. LAMBERT JUNTTILA:  It's a national public --

6              THE COURT:  Ma'am, you received the documents

7    in -- sometime in January or sometime after the holidays.

8    It took you two months or several weeks to disclose them to

9    law enforcement.

10             You mean to tell me you couldn't come to this

11   Court and seek a challenge or make a challenge to the

12   confidential designation of these documents?  One of the

13   arguments you make -- and I haven't had an opportunity,

14   since you just filed your response about an hour ago or

15   about an hour and a half ago -- that one of the arguments

16   you make is that they -- that the documents themselves or

17   the protective order is only meant to cover trade secrets.

18             And if you really had an issue with these

19   documents and did not think they were confidential, the

20   protective order gives you a full and fair opportunity to

21   challenge that and bring that before the Court and let the

22   Court decide.

23             MS. LAMBERT JUNTTILA:  With all due respect, your

24   Honor, I think that's asking the Court to function in a dual

25   role:  one, preside over the civil matter; and, two, act as

1   law enforcement and evaluate whether or not in a narrow

2   scope whether or not the Court believes that it be a crime,

3   when there's already active investigations going on with law

4   enforcement that would have a full picture to evaluate the

5   evidence that's corroborating it.

6         THE COURT:  No.  No.  What it does is if you have

7   authority, which you don't have right now or can't point the

8   Court to right now that the documents could be released to a

9   third party, then you could have cited that to the Court;

10  you could have sought emergency relief; you could have taken

11  the position as you do now that these documents don't

12  constitute trade secrets or other sensitive confidential --

13  or commercial information.

14        But you didn't do any of that.  You had the

15  documents for several weeks and then you released them

16  without any notice.  In fact, you didn't even notify any

17  other party to the protective order.  It was your

18  predecessor counsel that did so.

19        MS. LAMBERT JUNTTILA:  Well, that would result in

20  obstruction of justice, your Honor.  And that's exactly what

21  happened.

22        The minute that the Dominion attorneys found out

23  that law enforcement was backing up and preserving the

24  files, they obstructed that investigation and notified the

25  vendor to lock me as counsel out.  I'm currently locked out

1     of the vendor.  I have no access to my client's discovery to

2     continue to defend him.

3              And I think that the reason there's no authority

4     to cite to the Court, it's essentially asking me to find

5     authority that water is wet.  I don't believe it's ever

6     appropriate for a civil court to interfere or evaluate a

7     criminal investigation that is separate.

8              And I believe that's why that authority doesn't

9     exist.

10             THE COURT:  Okay.  Well, I think the authority

11    doesn't exist for another reason.  But I'm not going to

12    prejudge that right now.

13             I will allow you all to make your arguments and

14    consider whether it's me or whether it's Judge Nichols to

15    consider the motion for sanctions and motion to disqualify.

16    As I mentioned, that is a severe remedy.  The law of this

17    circuit is clear.  So that's something that the Court needs

18    to do taking its time and thinking very seriously about

19    that.

20             But what I would like to know now on the record is

21    where -- I'd like you to walk me through, ma'am, where the

22    documents currently are located -- all the places in your

23    possession that these documents are currently located,

24    because while the Court takes this issue under advisement

25    and holds a hearing or sets a hearing on the motion, we need

1  to ensure that the status quo is maintained.  And it may

2  very well be after full hearing and argument that you're

3  right.

4        But until that time, these documents need to be,

5  to the extent they can be, we need to prevent any further

6  disclosure because they are marked "confidential" and

7  because you did not challenge their confidentiality

8  designation before the Court.  We could have been in a much

9  different position if you had actually come to the Court and

10  challenged their designation.  But be that you didn't do

11  that and didn't follow that procedure, I have to at least

12  try to stop any further dissemination by you or your client

13  while this issue is taken up and while we hear further

14  argument.

15        So first walk me through, Ms. Lambert, where and

16  on what devices you have these documents in your possession.

17        MS. LAMBERT JUNTTILA:  I am currently locked out

18  of the vendor site, your Honor.  So --

19        THE COURT:  Do you have any documents printed out

20  anywhere?

21        MS. LAMBERT JUNTTILA:  The documents have been

22  provided to law enforcement, and they are now locked out of

23  the vendor site as well.

24        THE COURT:  When you say they are locked out, law

25  enforcement?

```
 1              MS. LAMBERT JUNTTILA:  Correct.

 2              THE COURT:  When you say law enforcement, can you

 3      be more specific?  Do you mean Sheriff Leaf?

 4              MS. LAMBERT JUNTTILA:  Correct.

 5              THE COURT:  Okay.  Did you print out any documents

 6      at any time?

 7              MS. LAMBERT JUNTTILA:  I have printed out some

 8      documents.

 9              THE COURT:  And where are they located?

10              MS. LAMBERT JUNTTILA:  They're in my home.

11              THE COURT:  Okay.  And about how many documents

12      did you print out?  Or do you know which specific documents

13      you printed out?

14              MS. LAMBERT JUNTTILA:  Some of the discovery.  I

15      don't know which ones, your Honor.  I viewed them and

16      they're in possession of Dar Leaf.  So I -- I did not print

17      many documents.  I have a small --

18              THE COURT:  Can you give me a ballpark of how

19      many?

20              MS. LAMBERT JUNTTILA:  Maybe 50.

21              THE COURT:  50.

22              And who has access to those documents in your

23      home?

24              MS. LAMBERT JUNTTILA:  Just me.

25              THE COURT:  Are they kept in a safe?
```

1          MS. LAMBERT JUNTTILA:  No.  They're kept locked in

2     my office.

3          THE COURT:  Okay.  Does anyone have a key to that

4     office --

5          MS. LAMBERT JUNTTILA:  No.

6          THE COURT:  -- other than you?

7          MS. LAMBERT JUNTTILA:  No.

8          THE COURT:  And it's a home office?

9          MS. LAMBERT JUNTTILA:  Yes.

10          THE COURT:  Okay.  Do you have a laptop?

11          MS. LAMBERT JUNTTILA:  I do.

12          THE COURT:  And do you have any of the documents

13     downloaded on any laptop or desktop anywhere?

14          MS. LAMBERT JUNTTILA:  No.

15          THE COURT:  Nowhere?

16          MS. LAMBERT JUNTTILA:  No.

17          THE COURT:  Not even one page?

18          MS. LAMBERT JUNTTILA:  No.  No.  I've had laptop

19     issues lately.

20          THE COURT:  Okay.  Do you have any documents

21     downloaded on your phone or any tablet or any electronic

22     device?

23          MS. LAMBERT JUNTTILA:  I don't think they're

24     downloaded.  I viewed the documents.

25          THE COURT:  Okay.  Through the repository?

```
 1                    MS. LAMBERT JUNTTILA:  Yes.

 2                    THE COURT:  Okay.  And that's the one that you

 3        don't have access to right now?

 4                    MS. LAMBERT JUNTTILA:  Correct.

 5                    THE COURT:  Do you have any notes of these

 6        documents that you've kept of these documents reflecting

 7        confidential information?

 8                    MS. LAMBERT JUNTTILA:  I -- yes.  I've taken

 9        work-product attorney-client-privileged notes.

10                    THE COURT:  And where are those notes?

11                    MS. LAMBERT JUNTTILA:  In my private

12        communications.

13                    THE COURT:  Okay.  Where are they stored?  I don't

14        want the contents.  I don't want the contents of your work

15        product.  I just --

16                    MS. LAMBERT JUNTTILA:  On my device.

17                    THE COURT:  Which device?

18                    MS. LAMBERT JUNTTILA:  My phone.

19                    THE COURT:  Okay.  How many phones do you have,

20        ma'am?

21                    MS. LAMBERT JUNTTILA:  I have one phone.

22                    THE COURT:  Okay.  And are there any -- and those

23        are just notes that you took after reviewing the documents

24        or --

25                    MS. LAMBERT JUNTTILA:  Correct.
```

```
 1                    THE COURT:  -- while reviewing the documents?

 2              Does anyone have access to those notes?

 3                    MS. LAMBERT JUNTTILA:  My legal team.

 4                    THE COURT:  Okay.  When you say your legal team,

 5    who are you referring to?  Your staff?

 6                    MS. LAMBERT JUNTTILA:  Anyone working for me.

 7    Yes.

 8                    THE COURT:  And how many staff members do you

 9    have?

10                    MS. LAMBERT JUNTTILA:  Well, I have one assistant

11    and...

12                    THE COURT:  What's the assistant's name?

13                    MS. LAMBERT JUNTTILA:  And another attorney.

14                    THE COURT:  Okay.  That's in your law practice?

15                    MS. LAMBERT JUNTTILA:  Correct.  Yes.

16                    THE COURT:  And they have access to your notes?

17                    MS. LAMBERT JUNTTILA:  The attorney I don't think

18    has access to the notes.  No.

19                    THE COURT:  What's your assistant's name?

20                    MS. LAMBERT JUNTTILA:  Stephanie.

21                    THE COURT:  Last name?

22                    MS. LAMBERT JUNTTILA:  Scott.

23                    THE COURT:  And is that P-H-A-N-I-E?

24                    MS. LAMBERT JUNTTILA:  Yes.

25                    THE COURT:  Okay.  And so she has the ability to
```

```
 1    get into -- excuse me -- your notes on your phone?

 2              MS. LAMBERT JUNTTILA:  No.  We've exchanged

 3    information.

 4              THE COURT:  Okay.  And the attorney in your

 5    office's name?

 6              MS. LAMBERT JUNTTILA:  Russell.

 7              THE COURT:  Okay.  Can you give me a last name?

 8              MS. LAMBERT JUNTTILA:  Newman.

 9              THE COURT:  Sorry?

10              MS. LAMBERT JUNTTILA:  Yes.  Newman.

11              THE COURT:  Newman?

12              MS. LAMBERT JUNTTILA:  Yes.

13              THE COURT:  Is that the traditional spelling?

14              MS. LAMBERT JUNTTILA:  Yes.

15              THE COURT:  Okay.  And you don't believe that

16    Mr. Newman has access to those notes?

17              MS. LAMBERT JUNTTILA:  No.  I don't believe so.

18              THE COURT:  Okay.  Are there any other places that

19    either any of the confidential information, any other place

20    where the confidential information is located or notes about

21    the confidential information is located?

22              MS. LAMBERT JUNTTILA:  Not that I can recall at

23    this time.

24              THE COURT:  Okay.  Do you know whether Mr. Byrne

25    has printed out any documents?
```

```
 1              MS. LAMBERT JUNTTILA:  I don't know.

 2              THE COURT:  Okay.  Have you spoken to him about

 3      it?

 4              MS. LAMBERT JUNTTILA:  I've spoken to him about

 5      the discovery, yes.

 6              THE COURT:  Okay.  Do you know whether he has

 7      given the information to any third party?

 8              MS. LAMBERT JUNTTILA:  I believe law enforcement.

 9              THE COURT:  Okay.  The U.S. Attorney's --

10              MS. LAMBERT JUNTTILA:  And I have no further

11      information about that at this time.

12              THE COURT:  Okay.  All right.  Any other places

13      that you think that any of this confidential information is

14      located either between you or your counsel -- you or your

15      client of which you're aware?

16              MS. LAMBERT JUNTTILA:  No.  Not that I'm aware of

17      that I can recall at this time.

18              THE COURT:  I'll ask you to just have a seat,

19      ma'am, while I'll ask Ms. Brook whether she has any

20      questions about where there might be any other additional

21      information.

22              As I mentioned, for now, the concern is while the

23      Court considers the substantive issue as to whether you were

24      entitled to disclose this information and have a full and

25      fair argument on this and the motion for sanctions and
```

 1   disqualification, the Court is concerned about maintaining

 2   the status quo.

 3            So, Ms. Brook, is there any question that you

 4   have?

 5            MS. BROOK:  Briefly, your Honor.

 6            THE COURT:  Thank you, Ms. Lambert.

 7            MS. BROOK:  Thank you, your Honor.

 8            Three quick points.  This is the first -- well,

 9   first point.  We were --

10            THE COURT:  I'm sorry.  Can you start with any

11   followup questions that you have to ensure that I've

12   captured the full universe of any documents in Ms. Lambert

13   or Mr. Byrne's possession, custody or control, so that we

14   can try to put a lock on those?

15            MS. BROOK:  That's precisely my intent, your

16   Honor.

17            THE COURT:  Okay.

18            MS. BROOK:  So the first question I have is, in an

19   email to us from Mr. Byrne's exited attorneys, which is

20   Exhibit 7 to our motion, they say that Stefanie Lambert --

21   and I quote -- "publicly disclosed by her as part of a

22   filing she made in the criminal case styled *People of the*

23   *State of Michigan versus Stefanie Lynn Lambert Junttila*,

24   which is currently pending before the Sixth Circuit Court in

25   Oakland county, Michigan, as case number" -- and then it

1    provides the case number, closed quote.

2              So they said that in addition to providing the

3    documents to Sheriff Leaf, Ms. Lambert also herself filed

4    these documents publicly in an action in which she is the

5    Defendant.

6              So to the extent -- I would assume she has copies,

7    electronic and otherwise, in her possession of that filing,

8    where she attached some of these documents.  So that's the

9    first location, your Honor, that I know of that I don't

10   think was provided for in the accounting that was just made

11   by Ms. Lambert.

12             The second question I have, your Honor, if you'd

13   like me to continue -- or I can pause there.

14             The second question I had, your Honor,

15   Ms. Lambert's remarks today was the first I ever heard if I

16   understood her correctly that they've actually provided a

17   log-in and credentials to Sheriff Dar Leaf.  We had not

18   heard that before.  If I heard correctly, she says that's

19   currently closed off.

20             But did anyone else from the sheriff's office get

21   a log-in and credentials?  Who else has log-in and

22   credentials to either the old or the new document repository

23   so that we can make sure, as the Court said, the status quo

24   is protected?  We need to know that that is all turned off.

25             I had the --

```
1              THE COURT:  Who --

2              MS. BROOK:  -- same questions as the Court --

3    sorry?

4              THE COURT:  Who controls the document repository?

5              MS. BROOK:  Not Dominion, your Honor.  It is a

6    document repository paid for by Patrick Byrne, engaged by

7    Patrick Byrne, I would imagine, unless he has someone else

8    footing the bill.

9              THE COURT:  Okay.

10             MS. BROOK:  So it was her own filing which we were

11   told she attached these documents to.  It is a full

12   accounting of who had access to the document repository,

13   including whether the assistant and associate in her firm

14   that she mentioned had access.  We would think again it

15   should all just be paused pending this Court's

16   determination.

17             That answers the Court's questions that were

18   directed to me.

19             And then I just had one other point I wanted to

20   make very briefly, if allowed.

21             THE COURT:  Yes.

22             MS. BROOK:  I appreciate the Court's focus on the

23   fact that these documents were marked "confidential."  From

24   what I have seen, most if not all of the documents that

25   Ms. Lambert leaked were marked "confidential."
```

1          But I want to be clear that the governing

2    protective order in this case doesn't allow the sharing of

3    documents produced in discovery by any of the parties,

4    regardless of whether they were marked "confidential" or

5    not.

6          And the reason for that, your Honor, was plain:

7    We did not want these cases to be litigated in the press.

8    We wanted them to be litigated in the courtroom.

9          So I'll just briefly point the Court to Paragraph

10    1 of the protective order, which is Exhibit 6 to Dominion's

11    motion.  And it says, plain as day -- and this was a

12    negotiated point between the parties:  "Any discovery

13    material produced in the litigation will be used except by

14    the producing party solely for purposes of this litigation,

15    and no receiving party will provide discovery material to

16    any person or entity, including for any other litigation, or

17    make any discovery material public except as permitted by

18    this order and in this litigation."

19          So I just wanted to clarify that for the Court's

20    reference.

21          THE COURT:  Well, do you know whether the

22    documents that were filed on the public record in the

23    Michigan case were all marked "confidential"?

24          MS. BROOK:  I don't know whether they all were.  I

25    know that some of them certainly were, your Honor.

```
 1              THE COURT:  Okay.  Thank you.

 2              MS. BROOK:  Thank you.

 3              THE COURT:  Well, Ms. -- actually, Ms. Brook, what

 4     would -- other than returning or destroying the documents or

 5     placing them -- placing them in escrow with a third party,

 6     is there anything that Dominion is seeking for interim

 7     relief to -- just to maintain the status quo while the Court

 8     takes up this issue?  Anything that Dominion is asking the

 9     Court to do with respect to, say, attorney notes which, you

10     know, if they are work product, Dominion's not entitled to?

11              MS. BROOK:  Your Honor, to answer your question

12     directly, in terms of maintaining the status quo, we think

13     it should be clear that neither Ms. Lambert nor anyone

14     working with her as well as her client, Mr. Byrne, or anyone

15     working with him should have access to any of the vendors

16     right now.

17              And to the extent they've given these documents to

18     experts or anyone, it should all be cut off, which is I

19     think what the Court is trying to get at, frozen, during the

20     pendency of this decision that the Court has before it.

21              The other request -- and I want to be clear, your

22     Honor, that we think, Dominion thinks, that that order

23     should apply with equal force to Ms. Lambert and her client,

24     Mr. Byrne.

25              The other requests that I delineated earlier and
```

1   that are included in our proposed order, they go more

2   towards understanding the harm versus maintaining the status

3   quo.

4            I think there's information that's not

5   attorney-client privileged, that's not work product, in the

6   possession of, for example, the document vendors, in the

7   possession of Mr. Byrne's now outgoing counsel and in the

8   possession of Ms. Lambert and Mr. Byrne that would be

9   helpful to all in understanding the scope of the breach

10  here.

11           And those are the other requests delineated in our

12  proposed order.

13           THE COURT:  Okay.  Thank you.

14           Ms. Lambert, who has control of this document

15  repository?

16           MS. LAMBERT JUNTTILA:  Your Honor, if I could

17  respond to some of the things that counsel said.

18           THE COURT:  Who has control of the document -- you

19  can, but just --

20           MS. LAMBERT JUNTTILA:  Right.

21           THE COURT:  -- can you answer my question?

22           MS. LAMBERT JUNTTILA:  No one has access to the

23  documents at this time, your Honor.

24           And counsel misrepresented that I filed the

25  documents in my own case.  There was an affidavit from the

1   sheriff that he received a subpoena to provide the documents

2   in a case, and he responded with an affidavit and

3   attachments to the affidavit.  That was not my filing; that

4   was an affidavit from the sheriff.

5            So that was --

6            THE COURT:  You gave the documents to the sheriff,

7   did you not?

8            MS. LAMBERT JUNTTILA:  And he had an open

9   investigation, and he responded with an affidavit saying he

10  was going to seek to quash the subpoena in a large extent.

11           So, your Honor, the sheriff's office, the

12  appropriate chain of custody, the best chain of custody,

13  would be to obtain the documents from my log-in.

14           I was giving an -- and I find it very ironic that

15  Dominion sued the national intelligence asset and is

16  complaining about a breach when he's turned in evidence of

17  national security breaches done by Dominion.

18           Dominion had Serbian foreign nationals in our

19  elections system that they admit in this documentation, your

20  Honor, they couldn't do background checks on.  These could

21  be Serbian foreign military --

22           THE COURT:  We're getting --

23           MS. LAMBERT JUNTTILA:  -- and this is outrageous.

24           THE COURT:  We're getting into the underlying --

25           MS. LAMBERT JUNTTILA:  Sure.

1          THE COURT:  -- underlying arguments, which I

2    will -- Ms. Lambert, as I mentioned, I haven't had a chance

3    to read the filing, which I do appreciate you making and --

4          MS. LAMBERT JUNTTILA:  Sure.

5          THE COURT:  -- and getting in today.  But because

6    it came in so late, I haven't had the opportunity to review

7    everything except -- that's why I asked for your principal

8    authority today --

9          MS. LAMBERT JUNTTILA:  Sure.

10          THE COURT:  -- as to what you were relying on,

11   which I don't have any case that you're relying on that you

12   say allowed you to do this.  So I want to give you the

13   opportunity to make your full argument at a later time,

14   where you can present that.

15         But as far as the documents go, they're attached

16   to an affidavit by the sheriff in your case in Michigan.  Is

17   there a way that you can confer with -- or your lawyers --

18   who are you represented by in that case?

19         MS. LAMBERT JUNTTILA:  Daniel J. Hartman.

20         THE COURT:  Sorry.  Could you give me the --

21         MS. LAMBERT JUNTTILA:  Daniel J. Hartman.

22         THE COURT:  Okay.  So those documents are on the

23   public record in that case; is that correct?  I know you say

24   you didn't file them, but they were posted by the sheriff?

25         MS. LAMBERT JUNTTILA:  I attached his affidavit to

1   a filing.  Yes, I did.  And it was an affidavit -- he had

2   received a subpoena that he was -- that he needed to comply

3   with.  And he was stating in the affidavit to the Court that

4   he was going to file a motion to quash and that he had a

5   very serious investigation underway.

6           THE COURT:  Did he -- all right.  So everyone

7   needs -- I need everyone to speak to me very directly,

8   because you just led me to believe that you did not make the

9   filing, that it was the sheriff who made the filing.

10          So it was a filing that you made or that your

11  lawyers made on your behalf that attached the sheriff's

12  affidavit?  And then were the documents attached to his

13  affidavit?

14          MS. LAMBERT JUNTTILA:  They were exhibits to his

15  affidavit.

16          THE COURT:  Okay.

17          MS. LAMBERT JUNTTILA:  Right.  It's his affidavit,

18  though, your Honor.

19          THE COURT:  Okay.  So they were filed by your

20  counsel?

21          MS. LAMBERT JUNTTILA:  Correct.

22          THE COURT:  Okay.  So those documents are

23  currently in the public domain?

24          MS. LAMBERT JUNTTILA:  Correct.

25          THE COURT:  Okay.  At a minimum, while this

1    dispute is underway, I'm going to order you to request that

2    those documents be filed under seal or that those documents

3    be made under seal for the pendency of this dispute.  Okay?

4              MS. LAMBERT JUNTTILA:  Yes, Judge.

5              THE COURT:  Okay.  And I need Mr. Byrne to appear

6    at the next hearing in this case, because I need to

7    understand the full scope of what he -- what, if any,

8    dissemination he has made of confidential information.

9    Again, this is an interim order to maintain the status quo

10   until I can hear your arguments, hear his arguments and hear

11   Dominion's arguments.

12             With respect to the documents that are -- I just

13   want to take these one at a time.

14             So with respect to the documents that are the 50

15   or so documents that are printed out in your office, I will

16   order you to -- they can stay in Ms. Lambert's office if you

17   can verify that no one else will have access to them and

18   that you will not be further disseminating --

19             MS. LAMBERT JUNTTILA:  I keep my office locked,

20   your Honor.

21             THE COURT:  Okay.  So I'm taking your

22   representation as an officer of the Court that you are the

23   only person that has a key to that office and that no other

24   person is going to have access to that.

25             Is that -- is that sufficient for Dominion for

1    these 50 printed-out documents?

2              MS. BROOK:  Yes, your Honor.  That's fine.

3              THE COURT:  Okay.  With respect to the notes on

4    your phone, ma'am, I'm going to ask that you direct

5    Ms. Scott to destroy any communications that she had with

6    you that reflect your impressions or your notes based on

7    those documents.

8              And what would Dominion's request be with respect

9    to that?

10             My inclination would be, ma'am, that you put that

11   in a segregated file and that you have to -- that you cannot

12   discuss, share, disseminate those notes or refer to them at

13   all except with perhaps your counsel in your other case.

14             MS. BROOK:  Your Honor, respectfully, if I may, I

15   would -- Dominion would prefer that they not be destroyed

16   but instead segregated.  I don't want to jump ahead, but I

17   do believe there might be a crime fraud issue here.  And to

18   the extent there are communications where individuals were

19   talking about how to violate a court order or violate the

20   law, then those documents should frankly be preserved, as

21   they may become evidence in a future proceeding.

22             But we would request an oral order that Ms. Scott,

23   Ms. Lambert and anyone else segregate them in a file and not

24   access them again and of course not share them or

25   disseminate them during the pendency of the Court's review.

```
 1                   THE COURT:  Okay.

 2                   MS. BROOK:  Can --

 3                   MS. LAMBERT JUNTTILA:  Well, your Honor, I'll do

 4      whatever the Court asks me to do.  But I take exception with

 5      that, given that Dominion has directed a vendor to obstruct

 6      an investigation.  And I believe that Dominion has

 7      represented fraud to the Court with its defamation suit.

 8                   But I'll follow the Court's order.

 9                   THE COURT:  Thank you.

10                   Whatever arguments writ large either party has

11      about obstruction or, you know, whether Dominion has

12      instituted a fraud on the Court in the defamation case will

13      play out in the course of this case.  I can guarantee you

14      that both I and Judge Nichols will allow those arguments to

15      be played out and we'll consider all of those arguments

16      seriously.

17                   I'm dealing with the micro-issue of trying to

18      ensure that this information that's in your possession,

19      custody or control or that's in your client's possession,

20      custody or control are not further disseminated pending the

21      resolution so that I can consider your argument thoroughly

22      and give time and attention to your argument, ma'am, because

23      I do take it seriously.

24                   MS. LAMBERT JUNTTILA:  Thank you, Judge.

25                   THE COURT:  So just so that everyone's clear on
```

1      the record, the documents that you have with Ms. Scott, any

2      communications that you have with your assistant, Ms. Scott,

3      I'd like you to direct her to put that in a -- if she can,

4      in a locked or password-protected file on her computer or on

5      her phone, wherever they are located, wherever she was

6      communicating with you.  If they're both on a tablet -- or

7      if they're on a tablet, a phone, a computer, they need to be

8      locked down in all of those places.  And the same with your

9      side of the document -- or your side of the communications

10     that you may have had with Ms. Scott.

11          I also would like you to verify that Mr. Newman

12     does not have and never has had access to any of these

13     documents or to any of your -- and was not subject to any

14     communications or notes about these documents.

15          With respect to the documents in Michigan, I would

16     like you to request that your counsel in the Michigan case

17     speak with the prosecutor and explain the basis -- and I

18     will give you a copy of an order -- explain the basis for

19     the request of sealing of that filing pending further

20     resolution of this dispute and that you make the effort to

21     seal those documents pending further resolution of this

22     dispute, as they are currently subject to the protective

23     order, because, as I said before, you did not seek to

24     challenge them and have them de-designated, which you could

25     have easily come to this Court and done.  But you did not do

```
 1    that.
 2              Okay.  Now, with respect to the document
 3    repository, you don't have access -- you don't have --
 4              MS. LAMBERT JUNTTILA:  I'm currently locked out,
 5    your Honor.
 6              THE COURT:  Okay.  But do you know who controls
 7    that?  Dominion's saying that your client controls that
 8    repository.
 9              MS. LAMBERT JUNTTILA:  I believe that it's
10    Relativity --
11              THE COURT:  Okay.
12              MS. LAMBERT JUNTTILA:  -- is the vendor.
13              THE COURT:  Who is Relativity acting at the
14    direction of in this -- for those documents?
15              MS. LAMBERT JUNTTILA:  Well, the previous counsel
16    was moving the documents over to a different vendor.  So
17    I'll have to take a look at the contract and see who
18    currently has the documents with the vendor.  But I'm locked
19    out of both, the vendor that it was initially with, and then
20    I never had access to the new vendor.
21              THE COURT:  Okay.  I need to get some clarity from
22    the parties.  So I would ask you all to file within -- it's
23    4:00 -- by 9:00 tomorrow morning some detail, because no one
24    seems to know who's controlling this Relativity database.
25              MS. BROOK:  I believe my colleague Mr. Ross may
```

 1   have information relevant to that, if the Court would like

 2   to hear it.

 3                   THE COURT:  Yes.

 4                   Mr. Ross?

 5                   Thank you, Ms. Lambert.

 6                   MR. ROSS:  Thank you, your Honor.  Jonathan Ross.

 7                   I'm the one who wrote the letters to the vendor,

 8   so I have some insight on this.

 9                   So my understanding is that they were -- one

10   vendor was in the process of migrating the discovery in this

11   case that had been produced to another vendor at the

12   direction of Ms. Lambert's client.

13                   I sent the letters Friday after having had

14   conversations with prior counsel, who said that they

15   couldn't do anything, and said, Please do not continue

16   disseminating or allowing any dissemination of this

17   information until we have a hearing on Monday and the Court

18   can decide what the Court wants to do.

19                   The vendor who originally had the information, who

20   was in the process of migrating it, their chief operating

21   officer called me on Friday and said:  We have stopped the

22   process.  We are not giving anybody access, and we'll wait

23   until the Court tells us what we should or should not do.

24                   That's the status.  The information is no longer

25   available to anybody.  It is no longer being migrated to the

```
1    new vendor.  And they are awaiting this Court's ruling as to

2    what, if anything, they should do.

3              THE COURT:  Okay.  So if there is, say,

4    theoretically -- so do all of you have one repository or --

5              MR. ROSS:  No.

6              THE COURT:  -- each side has their own Relativity

7    database?

8              MR. ROSS:  Each party has their own vendor who

9    then when we -- for example, when we produced to the D.C.

10   Defendants, all of this group, they all get the production.

11   They can then download it with whatever vendor they're using

12   and then set it up in whichever type of database they choose

13   to do.

14             THE COURT:  Okay.  But you only have an allegation

15   against Mr. Byrne and Ms. Lambert.  Correct?

16             MR. ROSS:  Absolutely.

17             THE COURT:  So that database -- are you saying

18   that that database is -- no one has access to?

19             MR. ROSS:  My understanding is that their original

20   database vendor was migrating their information, unrelated

21   to this issue today, to a new one.

22             I sent letters to both on Friday saying, Please

23   stop until the Court can address this issue.

24             My understanding from my conversation with the COO

25   of the initial database vendor, who was in the process of
```

1  doing the migrating, was that they have stopped, that nobody

2  has access to the information and that they will await

3  further instruction from us or the Court as to what they

4  should or should not do.

5       THE COURT:  Okay.  So would that -- so just

6  playing that out, if there is, say, some third party who has

7  received a log-in and password for that database and that

8  that third party has received a log-in, say, from

9  Mr. Byrne -- I'm not saying that's what happened; I'm just

10  hypothetically speaking, or Ms. Lambert -- that person

11  cannot get into that database right now?

12       MR. ROSS:  From my conversation -- and I did not

13  have any understanding that they -- Ms. Lambert had actually

14  given out passwords and access to other third parties.  But

15  from my understanding from my conversation with the COO,

16  that he has stopped anyone from having access to these

17  documents pending this hearing today.

18       THE COURT:  Okay.  All right.  Thank you.

19       MR. ROSS:  Thank you, your Honor.

20       THE COURT:  Thank you.

21       All right.  Ms. Lambert, I would -- I assume you

22  have an objection to that database being under lock and key

23  for now.  But I am going to order that no one have access to

24  those documents until we can sort this issue out.

25       Do you have any --

1          MS. LAMBERT JUNTTILA:  I do, your Honor.  I do

2     have an objection [indiscernible].

3          THE COURT:  I assumed you did.  But that is the

4     only way that the Court can understand -- or can at least

5     stop further dissemination until the Court considers next

6     steps.  Okay.

7          What I would like -- now that I have an

8     understanding of that, what I would like is for the parties

9     to send me a proposed order.

10          I'm not going to at this time request -- grant

11     Dominion's request to get information about the details of

12     any fee arrangement or any fee agreement between Ms. Lambert

13     and her client.  That is not at this time, I think, what I'm

14     focused on.  I'm focused on trying to prevent -- trying to

15     prevent any further dissemination while we figure this out.

16          And the -- Ms. Byrne [sic], you're going to have

17     to direct your client to comply with this order as well.

18     And I will seek a verification from lawyer and client that

19     these steps were taken pending the resolution of this -- of

20     this dispute, given that there is -- that you all -- that

21     you've conceded that that information has been disseminated,

22     although you do have an argument as to why.  I will deal

23     with the "why" later.  But for now, I need to maintain the

24     status quo.

25          MS. BROOK:  Your Honor, may Dominion make one more

1    suggestion for that proposed order?

2            THE COURT:  Yes.

3            MS. BROOK:  We would also seek an instruction that

4    Ms. Lambert, Mr. Byrne and anyone else under the Court's

5    authority preserve all documents relating to this issue and

6    this dispute, including Mr. Byrne's prior counsel, who the

7    Court retains jurisdiction over under the protective order.

8            THE COURT:  Yes.  Again, please -- please draft a

9    proposed order.  I do want Mr. Driscoll and his firm covered

10   by this if they have any documents.

11           Of course, I assume that Mr. Driscoll had -- he

12   was entitled to review these documents.  So the fact that

13   prior counsel has them in their possession, I'm sure you

14   have a mechanism if you withdraw as counsel as to any return

15   of confidential information or destruction.  But for now, I

16   think any documents related to this dispute should be

17   preserved.

18           But you're not making the argument that

19   Mr. Driscoll was in possession of any documents improperly,

20   are you?

21           MS. BROOK:  No, your Honor.

22           And for the record, I would like to thank

23   Mr. Driscoll for his prompt notification of the issue to

24   Dominion.

25           THE COURT:  Okay.  Thank you.

1          I'd ask you to please draft that order to share

2     with Ms. Lambert and submit it to the Court as soon as

3     possible, no later than -- I will look at it tonight if I

4     get it by tonight.  But certainly no later than 9:00

5     tomorrow morning.

6          Okay.  I reviewed -- as for some of the other

7     issues on the agenda for today, here's what I'm going to do

8     in terms of how I'm going to handle this:

9          With respect to the deposition protocol -- I

10    appreciate you all sending in your Round 1 and Round 2

11    disputes.

12         With respect to the deposition protocol, all I

13    would like to just know very briefly is:  What is the

14    remaining dispute about remote depositions?  Because if I

15    can resolve that now, I will.  I understand that each party

16    may have a different position.  But I would just -- very

17    briefly.  Otherwise, I will do it on the papers.  If it

18    turns into full-blown argument, you'd better believe I'm

19    going to stop it.  So -- Mr. Babcock knows that for sure.

20         So can someone just tell me what the dispute is

21    about remote depositions?  Ms. Brook.

22         MS. BROOK:  Yes, your Honor.

23         And I'm sorry.  Before we move off the protective

24    order issue, the Court had mentioned that it was also going

25    to address a briefing schedule or anything like that.  Is

1    there something the Court would like us to include in the

2    draft proposed order?

3            THE COURT:  The draft proposed order should

4    address all the items we've discussed now about dealing with

5    kind of just maintaining the status quo on the documents;

6    and it should cover Mr. Byrne, Ms. Lambert and include the

7    components I've stated on the record.

8            With respect to briefing, we have -- we have a

9    response, which I do appreciate Ms. Lambert; I'm sure that

10   was -- took a great effort on your part to get that in.  So

11   I do appreciate the response to the emergency motion.

12           To the extent that Dominion wishes to file a

13   reply, I would order Dominion to do so by Friday at 5:00

14   p.m.

15           And then you will get a further order from -- I

16   mean, at that point, the exigency in terms of the

17   dissemination of documents to the extent it can be cabined

18   has been -- will hopefully be done.  And we can have a --

19   we'll set a briefing schedule -- I mean, oral argument, if

20   necessary.

21           And it will -- at this time, I'm trying to deal

22   with the emergency issue.  I will -- it will be either

23   before Judge Nichols or before me.  He has not had the

24   opportunity yet to decide whether this is a matter that will

25   be referred to me.

```
 1                MS. BROOK:  Thank you, your Honor.

 2                Switching hats, I will say it as briefly and

 3      hopefully, frankly, as neutrally as possible.

 4                In order to schedule all the depositions that need

 5      to happen in this case, Dominion proposes that they be

 6      remote unless the Defendants ask and we oblige for them to

 7      be in person.  And we've told them we're happy to do that

 8      for the ones that they want within reason.

 9                They have the opposite request.  They want the

10      default to be in person, and they've said they'd oblige if

11      we want them to be remote.

12                THE COURT:  Why would there -- why would these

13      depositions need to be remote?

14                MS. BROOK:  Your Honor, Dominion's opinion is

15      these depositions need to be remote because, if not,

16      scheduling is going to preclude them getting done on the

17      order set by the Court.

18                All Dominion wants is to move this case towards

19      trial as quickly as possible and bothering the Court as

20      little as possible.

21                As of today's date, standing before you right now,

22      Defendants and Dominion have already collectively flagged 86

23      different depositions that they want to happen.  Most of

24      them, the majority, are requests from Defendants for

25      Dominion witnesses.
```

1          As you can see just practically, there are a lot

2     of attorneys involved in these cases.  There are a lot of

3     attorneys located in a lot of different places involved in

4     these cases.  And if every time we schedule one of these

5     depositions we're building in travel time and coordinating

6     around so many different schedules that even with everyone

7     operating in the utmost of best faith, I think it's fairly

8     easy to predict that we're going to run into scheduling

9     issues.

10          So remote deposition technology makes it perfectly

11    able to do these depositions remotely.  We took all but I

12    think three of the depositions in the Dominion-Fox case

13    remotely without any issues.

14          But like we said, if there are certain ones where

15    they really want to sit down opposite these folks and talk

16    to them, we'll work with them on that.  But we think that

17    because of that -- and frankly, your Honor, because of some

18    of the trauma that the Dominion witnesses have suffered,

19    there are some of them, too, that walking into a conference

20    room with 30 attorneys sitting around it who they're

21    naturally going to view as being hostile to them is a big

22    ask.

23          THE COURT:  Well, I can understand that.  But this

24    is your case.  You've brought this case.  And remote

25    depositions are not the norm.  So if you all -- if there are

 1    parties that -- well, first of all, the only parties as far

 2    as I'm concerned that should be involved in dealing with

 3    scheduling is the party that noticed the deposition and the

 4    party that -- whose witness it is.  Okay?

 5           Any of the other parties, if they can make it,

 6    great.  If not, as far as I'm concerned, I don't think other

 7    parties all get a say in every single deposition that's

 8    scheduled.

 9           So if it's a Dominion -- let's say it's a Dominion

10    witness and Mr. Lindell notices that deposition.  The only

11    two attorneys that should be conferring on that and when it

12    takes place and where are Mr. Lindell's counsel and

13    Dominion.

14           So is -- are you saying that everyone else is

15    trying to get a say in on this?

16           MS. BROOK:  Yes, as is their right, your Honor,

17    under the deposition protocol that we've agreed to.

18           So we've agreed, to avoid putting disputes in

19    front of your Honor, that they each get a certain number of

20    hours for these witnesses.  So even though OAN might have

21    requested a specific witness, there's a protocol that

22    everyone's agreed to, we worked out, where each of them can

23    take a certain number of hours and our person will sit for

24    that whole time so that we can get it done within one swoop

25    right there and then.

1    So while you're absolutely right that it means

2    just one Defendant who's the one making the specific

3    request, they do all have a right to participate.  And as

4    we've begun to schedule depositions already, this is what's

5    coming up.  Someone can make it that day; someone can't,

6    et cetera, et cetera.

7    And so again, your Honor, as evidenced in our

8    briefing, our main reason for this is simply speed.  There

9    are a lot of depositions.  There are going to be even more

10   as we get into third parties and all of that.  And there's

11   no reason why they can't just default happen remote so that

12   we're not frankly coordinating this many different schedules

13   eight times a week.

14   And again, if there are certain people that they

15   really want in person, we frankly invited them.  We said:

16   Hey, you've already noticed 13 depositions for April -- or

17   requested, I should say -- 13 depositions for April.  Which

18   of those 13 would you really like in person?  Let us know.

19   And we'll agree right here right now that those

20   subset can be in person.

21   And their response to that was:  We want all 13 in

22   person.

23   So we're just trying to go fast, not bother the

24   Court.  And we think that having the default be remote is

25   the way to do that, whereas if the default is in person,

 1    we're going to be back before your Honor requesting

 2    extensions, which we don't want to do, Dominion does not

 3    want to do.

 4            And perhaps, your Honor, the best evidence of this

 5    is we had a meet-and-confer on Friday.  Dominion reached out

 6    to Defendants and said, Hey, we're all gearing up for this

 7    hearing.  Is there anything else we can knock out and let

 8    the Court know we have figured it out like adults and don't

 9    need to bother her with?

10            And we talked about this.

11            And one of the counsel for Defendants themselves

12    said:  Well, if the Court grants Defendants' request for

13    in-person depositions, then we'll need more time in the

14    schedule in order to schedule all those depositions.

15            And so it's exactly our point, which is just that

16    if they are in person, it's going to slow things down,

17    whereas if they are remote, it will keep things moving.  And

18    we've made every assurance, and I say it here again on the

19    record, that if there are specific ones they want in person,

20    we're happy to oblige.

21            THE COURT:  Okay.  Thank you.

22            Is there one person that can speak on behalf of

23    the Defendants, if that's possible --

24            MR. CASARINO:  I'll try to do that --

25            THE COURT:  -- on this issue.

1          MR. CASARINO:  Marc Casarino for the Powell

2     Defendants, your Honor.

3          So --

4          THE COURT:  I'm sorry, sir.  Which Defendants?

5          MR. CASARINO:  For Sidney Powell and Sidney

6     Powell, P.C.

7          THE COURT:  Okay.

8          MR. CASARINO:  Your Honor, in terms of the concern

9     we just heard about, scheduling nightmares, that's an

10    incredible red herring, because the protocol already

11    addresses that.  It addresses that dates are exchanged.  If

12    there can't be agreement on the dates, then the date of

13    the -- counsel for the witness and the person requesting the

14    deposition pick the date and everyone else has to show up or

15    be foreclosed.

16          So everything we just heard is actually not a

17    concern.  I don't know where they got that from, because

18    that's not actually what we agreed on in the protocol.

19    We've already agreed on how to address that in the protocol,

20    your Honor.

21          And your Honor is absolutely correct that

22    in-person is the standard.  We want to depose these people

23    in person.  They chose to bring these cases, six separate

24    cases, against a bunch of Defendants in a very public way.

25    We want to depose these witnesses in person.  And that's the

1   default.  And it's our right.

2          And if they have good cause for specific witnesses

3   as to why they should be remote, we'll hear them and we'll

4   meet and confer.  And where -- on those few that we can't

5   agree, if there is going to be those few that we can't

6   agree, we'll come to the Court and get decisions.

7          THE COURT:  Oh, if you come to the Court, I

8   guarantee it will not go well for anybody.

9          MR. CASARINO:  I --

10         THE COURT:  If you're going to --

11         MR. CASARINO:  I --

12         THE COURT:  -- come to me about who gets taken

13  over Zoom versus who gets to be taken in person, it's not

14  going to be a good day for anybody.

15         MR. CASARINO:  I've taken clear note of that, your

16  Honor.

17         THE COURT:  I spent the first several years of my

18  career traveling to all manner of random places to take

19  depositions.  So I mean, you've just got to work this out.

20         MR. CASARINO:  And on the defense side, we're

21  perfectly happy to do that, your Honor.  We're trying to do

22  them in person.  If they want to attend by remote or other

23  people want to attend by remote, that's on them.  That's

24  fine.  But my client wants me to take these depositions in

25  person.

1          THE COURT:  Well, I mean, if you have a one-hour

2     deposition, do you really need that to be taken in person?

3     You can't -- you can't confer and try to --

4          MR. CASARINO:  Those --

5          THE COURT:  -- see if you can get that done over

6     Zoom?

7          MR. CASARINO:  Those are the one-off situations

8     where we'd meet and confer.  But the default -- they want

9     the default to be flipped on its head, the default to be

10    remote, unless the Defendants come to the Court for good

11    cause to --

12         THE COURT:  No.  The default is in person.

13         MR. CASARINO:  Thank you, your Honor.

14         THE COURT:  So that said, however, you all have

15    the obligation under Federal Rule of Civil Procedure 1.

16         If anyone can tell what that rule says, you get

17    brownie points, is probably the -- does someone know?

18    Anyone?

19         UNIDENTIFIED SPEAKER:  [Indiscernible.]

20         THE COURT:  Thank you.  Okay.  Someone must have

21    read a previous transcript.

22         UNIDENTIFIED SPEAKER:  We did, your Honor.

23         THE COURT:  Okay.  Because usually not that many

24    people can say it.

25         UNIDENTIFIED SPEAKER:  All three.

1          THE COURT:  So you all have the obligation to do

2     that, as do I.  And I take the concern seriously.  I do.

3     But the rules do allow in-person questioning.  And being a

4     former trial lawyer myself, there is a benefit to

5     questioning someone in person.

6          However, if this is a minor witness, if there's a

7     real reason that this person should not be taken in person,

8     I expect the Defendants aren't doing this just for the sport

9     of it.  Okay?

10          If there is a particular trauma, you guys can talk

11     amongst yourselves that maybe doing it by Zoom is not really

12     going to yield any real benefit to Defendants and would

13     be -- would yield a benefit to that particular witness, you

14     know.  You all need -- you all have the obligation to and

15     need to talk about this in person.

16          And I expect that no one is going to be bringing a

17     dispute such as whether a witness needs to be taken in

18     person or over Zoom.  And if it's a party, I really don't

19     want to hear that dispute.  Okay?  If it's a party, a

20     Defendant, a Plaintiff, that person gets to have their

21     deposition taken however the noticing party requests it.

22     Okay?  Unless there's a compelling reason.

23          All right.  So that issue is resolved --

24          MR. CASARINO:  Thank you.

25          THE COURT:  -- but with the asterisk that I'm

1    expecting counsel to be working cooperatively on those

2    issues and not just doing this, you know, gratuitously.

3    Okay?

4              MR. CASARINO:  Understood, your Honor.

5              THE COURT:  And I'm not saying anyone is.  I'm

6    just saying that --

7              MR. CASARINO:  Understood.

8              THE COURT:  Okay.  All right.  So then can I get

9    the parties to send me a Word version of the deposition

10   protocol with that change made?  And if you all can send

11   that jointly to chambers, I will review it and enter that

12   deposition protocol order.

13             With respect to the discovery protocol, there are

14   a number of issues that I will take up.  It may be that I --

15   excuse me -- that I deal with these on the papers.  If I

16   need any argument, I will let you all know.

17             And then my understanding is that there are a

18   number of disputes that are OAN-specific disputes.  And so

19   if there are still some live discovery disputes, I will set

20   those down for a hearing.

21             And some of you all have appeared before me, so

22   you know how this works.  I don't allow full briefing if I

23   can resolve the dispute short of full briefing.  So I do

24   have a template that I have created that I wish the parties

25   to fill out jointly that's very -- should be hopefully not a

1    heavy lift, but essentially the request at issue, what the

2    objection to the request is, and then each party gets the

3    opportunity to say very briefly what their respective

4    argument is.

5           I come from the school of thought that if you

6    can't tell me in three pages why you need this discovery,

7    then you're going to have a hard time convincing me to give

8    you more space unless it's a particularly complicated issue.

9    And then I will, you know, consider giving you more space.

10          So I will send that -- I will have my chambers

11   send that template to you all so you all know how I like to

12   have these briefed up.  And that document gets submitted as

13   a joint submission so that there's not back-and-forth

14   briefing, which, you know, takes a lot of attorney time when

15   I could just get to the heart of the matter by looking at

16   that document and having a brief hearing.

17          So I will set a further hearing on that issue as

18   well.

19          Are there any issues that have been mooted that

20   weren't -- that were in the March 13th joint report?  And

21   I'll let anyone come up if they need to to address this.

22          MS. BROOK:  I think, your Honor -- so first of

23   all, we did read the previous orders and we were cognizant

24   that if any major issue was mooted we would alert the Court

25   so the Court did not waste its time.

```
 1              I think one minor issue that was mooted was the

 2    privilege log provision in the disputed discovery protocol.

 3              MR. CASARINO:  That's correct.

 4              MS. BROOK:  It turns out we were seeing eye to eye

 5    and just talking past each other.  So maybe if I can propose

 6    it, we will just send in Word doc or frankly in an email the

 7    exact language that the parties have agreed to as to that

 8    dueling provision.

 9              THE COURT:  Do you know which number -- this is in

10    the discovery protocol?

11              MS. BROOK:  Yeah.  It's No. 9, I believe.

12              THE COURT:  Okay.  Very well.

13              MS. BROOK:  And then there was further conferences

14    before the discovery protocol.

15              Was there anything else?

16              MR. CASARINO:  Your Honor, I do believe also at

17    least for the Powell Defendants on the custodians we agreed

18    on who the custodian would be:  Ms. Powell.

19              THE COURT:  Okay.

20              MR. CASARINO:  A surprise.

21              THE COURT:  There's the one custodian --

22              MR. CASARINO:  A spoiler alert for your Honor.

23              THE COURT:  Okay.

24              MR. CASARINO:  Ms. Powell.

25              THE COURT:  All right.
```

```
 1              MR. CASARINO:  So that one is off the list for

 2    Ms. Powell, anyway.

 3              MS. BROOK:  And I think unfortunately that was all

 4    that the parties were able to further resolve by virtue of

 5    the Zoom conference that we had on Friday.

 6              THE COURT:  Okay.  Thank you.

 7              And the request for a discovery deadline, it may

 8    have -- that has not yet been referred to me.  It may very

 9    well be that Judge Nichols does refer it to me.  But at this

10    time, I will confer with him and decide how that's going to

11    proceed forward.

12              And then I think the only -- I mean, unless I'm

13    mistaken, the only party with specific discovery disputes is

14    OAN.  Is that correct?  Mr. Neerman or Mr. Ross?

15              MR. ROSS:  We submitted a joint email.  Actually,

16    it was to Judge Nichols -- excuse me -- the day he then

17    referred everything to you.  And then we resubmitted it to

18    you.

19              THE COURT:  Probably --

20              MR. ROSS:  Four of those --

21              THE COURT:  That's probably why he referred it --

22              MR. ROSS:  It may have been the final match stick.

23    But four out of the five are OAN concerns about things that

24    we are objecting to.

25              The last one is our concern about something
```

1    they're objecting to, which will be familiar to you, because

2    it has to do with financial information.  That same issue is

3    in front of you in the *Smartmatic* case.  They've -- just so

4    you know, they've also agreed and the parties have agreed

5    based on your order in the *Smartmatic* case that anything

6    that is produced in the *Smartmatic* case by OAN is being

7    produced to us in this case and vice versa.

8            So your -- I think that motion is still pending in

9    front of you in the *Smartmatic* case.  And your resolution of

10   that may resolve it for us as well.

11           THE COURT:  Okay.

12           MR. ROSS:  Because they're very similar.  That's

13   my only point.

14           THE COURT:  Okay.

15           MR. ROSS:  But at some point, when we do submit --

16           THE COURT:  That's the financial document issue?

17           MR. ROSS:  Correct.

18           THE COURT:  Okay.

19           MR. ROSS:  At some point, when we do submit it,

20   we'll submit our views on it as well.  But it may be moot by

21   the time -- if you've already ordered that information,

22   because then we're going to get it as well.

23           THE COURT:  Okay.  All right.  I see.  Well, that

24   is a somewhat orderly way to deal with it.

25           But let me let Mr. Neerman or --

```
1              MR. ROSS:  Of course.

2              THE COURT:  Thank you.

3              If OAN wishes to respond.

4              MR. NEERMAN:  Hi, Judge.

5              THE COURT:  You finally get to say something.

6              MR. NEERMAN:  I know.

7              THE COURT:  Do you disagree with that?

8              MR. NEERMAN:  Well, as much as I'd like to, I

9    think Mr. Ross is correct.  I know that we've been meeting

10   and conferring on various issues, and I think there's a

11   further meet-and-confer set for this Thursday to discuss

12   OAN's issues.

13             And then with respect to the Smartmatic case that

14   Mr. Ross referenced, OAN and Smartmatic are continuing to

15   confer on that issue.  So it's still before your Honor, but

16   I don't think it's ripe yet because we're still conferring.

17             THE COURT:  Oh, okay.  Well, so then the issues

18   that are there in the joint status report at the very end,

19   the No. 5, OAN-specific disputes, those are issues you're

20   still going to confer on on Thursday?

21             MR. NEERMAN:  That is correct, your Honor.

22             THE COURT:  Then can you all let me know, then, by

23   Monday?  So I won't actually take these under advisement yet

24   or order further briefing yet until you all tell me which

25   were still live issues.
```

```
 1                    MR. NEERMAN:  I think that's right, your Honor.

 2                    THE COURT:  Okay.

 3                    MR. NEERMAN:  And I don't think -- I don't think

 4          we anticipated you being able to get to those today anyway

 5          because of the various issues you were dealing with.

 6                    THE COURT:  Yes.

 7                    MR. NEERMAN:  And so we're continuing to confer on

 8          those issues.

 9                    MR. ROSS:  But we're happy to let you know the

10          results.  I think at best we may narrow them down a little

11          bit.  I think there may still be some information for you to

12          take --

13                    THE COURT:  Well, some of you know how to deal

14          with discovery and how I interpret the rules.  So I hope

15          that you all are able to resolve them.

16                    And so I will not order the submission of those --

17          of that template document until I hear from you.  So if you

18          could let me know by Monday at 5:00 p.m. and just file a

19          supplemental joint status report as to these OAN-specific

20          disputes and let the Court know which ones are still live

21          disputes.

22                    MR. ROSS:  Yes, your Honor.

23                    THE COURT:  Okay.  Thank you.

24                    MR. NEERMAN:  Thank you, Judge.

25                    THE COURT:  Okay.  Just a moment.
```

```
 1                    Mr. Babcock I knew --

 2                    MR. BABCOCK:  [Indiscernible.]

 3                    THE COURT:  Well, of course.  I told you I didn't

 4          think it was --

 5                    MR. BABCOCK:  I know you told me.

 6                    Just in fairness to Smartmatic, that's not here,

 7          we have been talking about the financial documents, but it's

 8          been in fits and starts with me on our side and different

 9          lawyers on their side.

10                    I'm going to resolve myself next week to bite into

11          that and see if we can't get it done.  And I think we can.

12          But...

13                    THE COURT:  Okay.

14                    MR. BABCOCK:  But I think if they were here they

15          would say, Oh, no.  He hasn't called us back.

16                    THE COURT:  Okay.

17                    MR. BABCOCK:  Which is fair.

18                    THE COURT:  Well, let's -- we won't wade too much

19          into that since they're not here.

20                    MR. BABCOCK:  Okay.

21                    THE COURT:  But I appreciate that.

22                    MR. BABCOCK:  Thank you, your Honor.

23                    THE COURT:  Thank you.

24                    Okay.  Just a moment.

25                    (Pause in the audio recording.)
```

1           THE COURT:  Okay.  Is there anything further,

2   then, from Dominion?

3           MS. BROOK:  Your Honor, if it's all right with the

4   Court, can I just tick through the things that the Court is

5   expecting from us so that we --

6           THE COURT:  Yes.

7           MS. BROOK:  -- are sure we're all on the same page

8   before we leave here today?

9           THE COURT:  Yes.

10          MS. BROOK:  So the first one I have is that the

11   parties are to draft a joint -- we're to draft a proposed

12   order regarding the issue of Ms. Lambert and Mr. Byrne.  We

13   are to get that to the Court as soon as practicable, but in

14   no event later than 9:00 a.m. tomorrow morning.

15          THE COURT:  Yes.

16          MS. BROOK:  The second one I have is that we are

17   to get the Court a Word version of the depo protocol with

18   the default set as the Court has ordered today.

19          The third one -- and we'll do that via email, I

20   presume.

21          THE COURT:  Yes.  You can email my chambers.

22          MS. BROOK:  Thank you.

23          The third one I have, which I'm going to expand a

24   little with the Court's permission, is we will clarify again

25   via an email to chambers the privilege log issue that the

1    parties have agreed on relating to the deposition -- the

2    discovery protocol.  And to the extent there are any other

3    little things like custodians or timeframes which we're able

4    to reach agreement on, we'll update the Court of that at

5    that time as well.

6                The fourth one --

7                THE COURT:  And that's by -- what date did you

8    have?

9                MS. BROOK:  I don't know that you gave us a

10   timeline.

11               THE COURT:  I don't think I set it.  Yes.

12               Wednesday?

13               MS. BROOK:  That's fine.

14               THE COURT:  5:00 p.m.  Does that work for you all?

15               MR. CASARINO:  That works fine, your Honor.  Thank

16   you.

17               THE COURT:  Okay.  Thank you.

18               MS. BROOK:  The next one I have is that the Court

19   requested an update on the ongoing meets and confers with

20   OAN so that the Court knows what issues are still in dispute

21   or not.  And we're meeting and conferring about that on

22   Thursday.  And so I believe we can provide the Court with an

23   update on Friday or Monday, whenever is --

24               THE COURT:  Yes.  No later than Monday at 5:00

25   p.m.

```
 1                 MS. BROOK:  Monday at 5:00 p.m.

 2                 THE COURT:  Yes.

 3                 MS. BROOK:  Thank you.  I like rules.

 4                 THE COURT:  So do I.

 5                 MS. BROOK:  They help.

 6                 THE COURT:  And now all of you know Rule 1, which

 7       just makes me very happy.

 8                 MS. BROOK:  And then Dominion can file a reply

 9       brief on the Lambert-Byrne issue by no later than this

10       Friday --

11                 THE COURT:  Right.

12                 MS. BROOK:  -- on those issues.

13                 So then the only other housekeeping agenda item

14       that Dominion has to raise with the Court, Docket No. 149 in

15       the OAN case -- that's the 2130 case -- that is a fully

16       agreed-upon amended protective order that we would

17       appreciate the Court entering.  And the only reason we're

18       bugging you at all is because it has increased protections

19       for third parties.

20                 THE COURT:  Yes.

21                 MS. BROOK:  And as we start doing third-party

22       productions, we want to make sure we're all on the same

23       page.

24                 THE COURT:  Right.  And I was aware of that, and I

25       will take that up in short order as well.
```

1                 MS. BROOK:  Thank you, your Honor.

2                 THE COURT:  Okay.  Thank you.

3                 Anything from Defendants?  Anyone?

4                 MR. CASARINO:  No, your Honor.  Thank you.

5                 THE COURT:  Thank you all for your time.

6                 I'd like just to clear the courtroom, please, as

7      soon as practicable except I have one unrelated matter with

8      Ms. Lambert, if you could hang back.  Thank you.

9                 If there's any court personnel, they can stay.

10                Thank you all.  Have a good day.

11                MR. CASARINO:  Thank you, your Honor.

12                MR. ROSS:  Thank you, your Honor.

13                THE COURT:  Thank you.

14                (Proceedings concluded.)

15

16

17

18

19

20

21

22

23

24

25

1                         **<u>CERTIFICATE</u>**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4     certify that the foregoing constitutes a true and accurate

5     transcript of my stenographic notes, and is a full, true,

6     and complete transcript of the proceedings produced to the

7     best of my ability.

8

9

10                   Dated this 20th day of March, 2024.

11

12              <u>/s/ Lisa Edwards, RDR, CRR</u>
                Official Court Reporter
13              United States District Court for the
                  District of Columbia
14              333 Constitution Avenue, Northwest
                Washington, D.C. 20001
15              (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## /

**/s** [1] - 80:12

## 1

**1** [4] - 41:10, 57:10, 66:15, 78:6
**1000** [1] - 2:22
**10001** [1] - 2:20
**11th** [1] - 19:10
**123** [1] - 2:25
**12th** [4] - 19:10, 19:18, 22:5, 22:12
**13** [4] - 62:16, 62:17, 62:18, 62:21
**13th** [1] - 69:20
**1400** [1] - 2:16
**1401** [1] - 3:6
**1410** [1] - 3:19
**149** [1] - 78:14
**150,000** [1] - 11:3
**1550** [1] - 3:16
**15th** [1] - 3:13
**1600** [1] - 3:18
**18** [4] - 1:7, 1:15, 1:23, 2:7
**1900** [2] - 2:15, 3:6
**19103** [1] - 3:19
**19801** [1] - 3:16

## 2

**2** [2] - 22:11, 57:10
**2,173** [3] - 16:12, 16:13, 16:16
**20001** [2] - 4:4, 80:14
**20015** [1] - 3:22
**202** [2] - 4:4, 80:15
**2023** [1] - 22:12
**2024** [5] - 1:7, 1:15, 1:23, 2:7, 80:10
**20th** [1] - 80:10
**21-00445** [2] - 1:4, 2:4
**21-02130** [1] - 1:20
**21-02131** [1] - 1:12
**21-2130** [1] - 5:5
**21-2131** [1] - 5:4
**21-40** [1] - 5:7
**21-445** [1] - 5:2
**2130** [1] - 78:15
**2323** [1] - 3:9
**24** [1] - 10:22
**26th** [1] - 3:3
**2700** [1] - 16:9

## 3

**30** [1] - 60:20
**305** [1] - 2:19
**333** [2] - 4:3, 80:14
**33602** [1] - 3:13
**354-3269** [2] - 4:4, 80:15
**3:08** [4] - 1:7, 1:15, 1:23, 2:7

## 4

**40** [1] - 11:1
**400** [3] - 3:3, 3:12, 3:22
**48243** [1] - 3:4
**4:00** [1] - 51:23

## 5

**5** [1] - 73:19
**50** [4] - 32:20, 32:21, 47:14, 48:1
**50th** [1] - 2:19
**5100** [1] - 2:22
**5335** [1] - 3:21
**55401** [1] - 2:25
**5:00** [5] - 58:13, 74:18, 77:14, 77:24, 78:1

## 6

**6** [1] - 41:10
**600** [1] - 3:10
**6706** [1] - 4:3

## 7

**7** [1] - 38:20
**75201** [1] - 3:10
**77002** [1] - 2:23
**77010** [1] - 3:7

## 8

**86** [1] - 59:22

## 9

**9** [1] - 70:11
**90067** [1] - 2:16
**919** [1] - 3:15
**9:00** [3] - 51:23, 57:4, 76:14

## A

**a.m** [1] - 76:14
**ability** [2] - 35:25, 80:7
**able** [6] - 24:24, 60:11, 71:4, 74:4, 74:15, 77:3
**Abraham** [1] - 5:21
**ABRAHAM** [1] - 2:24
**absolutely** [6] - 12:6, 26:25, 27:23, 53:16, 62:1, 64:21
**access** [28] - 8:21, 14:17, 14:20, 14:25, 15:18, 30:1, 32:22, 34:3, 35:2, 35:16, 35:18, 36:16, 40:12, 40:14, 42:15, 43:22, 47:17, 47:24, 48:24, 50:12, 51:3, 51:20, 52:22, 53:18, 54:2, 54:14, 54:16, 54:23
**account** [2] - 10:25, 15:1
**accounting** [4] - 9:7, 14:18, 39:10, 40:12
**accurate** [3] - 14:15, 14:23, 80:4
**act** [1] - 28:25
**acting** [1] - 51:13
**action** [2] - 10:13, 39:4
**Action** [4] - 1:3, 1:11, 1:19, 2:3
**actions** [2] - 9:14, 16:24
**active** [1] - 29:3
**activity** [1] - 17:24
**acts** [3] - 9:19, 9:23, 10:15
**addition** [2] - 17:12, 39:2
**additional** [4] - 13:21, 13:25, 14:4, 37:20
**address** [8] - 8:1, 8:9, 8:24, 53:23, 57:25, 58:4, 64:19, 69:21
**addressed** [1] - 14:22
**addresses** [2] - 64:11
**addressing** [3] - 6:25, 7:13, 12:9
**admission** [1] - 6:1

**admit** [1] - 44:19
**admitted** [1] - 10:23
**adults** [1] - 63:8
**advisement** [3] - 8:6, 30:24, 73:23
**AEO** [1] - 12:4
**affidavit** [13] - 43:25, 44:2, 44:3, 44:4, 44:9, 45:16, 45:25, 46:1, 46:3, 46:12, 46:13, 46:15, 46:17
**afternoon** [13] - 5:1, 5:12, 5:16, 5:17, 5:20, 5:21, 6:2, 6:3, 6:5, 6:8, 6:13, 6:15, 6:17
**agenda** [3] - 7:21, 57:7, 78:13
**ago** [2] - 28:14, 28:15
**agree** [4] - 10:8, 62:19, 65:5, 65:6
**agreed** [11] - 61:17, 61:18, 61:22, 64:18, 64:19, 70:7, 70:17, 72:4, 77:1, 78:16
**agreed-upon** [1] - 78:16
**agreement** [5] - 13:14, 13:15, 55:12, 64:12, 77:4
**agrees** [1] - 10:8
**ahead** [2] - 14:7, 48:16
**al** [14] - 1:3, 1:6, 1:11, 1:19, 1:22, 2:3, 2:6, 5:2, 5:3, 5:5, 5:6, 5:7, 5:8
**alert** [2] - 69:24, 70:22
**allegation** [2] - 12:22, 53:14
**alleged** [5] - 7:23, 10:18, 10:21, 12:24, 16:4
**alleges** [1] - 11:18
**allow** [5] - 30:13, 41:2, 49:14, 67:3, 68:22
**allowed** [2] - 40:20, 45:12
**allowing** [1] - 52:16
**amended** [1] - 78:16
**analogy** [1] - 26:14
**analysis** [2] - 18:16, 19:25
**analyzes** [1] - 18:25
**AND** [1] - 2:24
**and..** [1] - 35:11
**Angeles** [1] - 2:16
**answer** [4] - 11:12,

16:2, 42:11, 43:21
**answers** [1] - 40:17
**anticipated** [1] - 74:4
**anyway** [2] - 71:2, 74:4
**appear** [1] - 47:5
**appearance** [3] - 19:9, 19:18, 22:18
**aPPEARANCES** [1] - 2:13
**APPEARANCES** [1] - 3:1
**appeared** [1] - 68:21
**appearing** [1] - 6:4
**apply** [1] - 42:23
**appreciate** [8] - 6:23, 40:22, 45:3, 57:10, 58:9, 58:11, 75:21, 78:17
**apprised** [1] - 24:7
**approach** [1] - 7:25
**appropriate** [4] - 19:14, 26:1, 30:6, 44:12
**appropriately** [1] - 11:24
**approve** [1] - 7:4
**April** [5] - 62:16, 62:17
**argument** [19] - 7:18, 8:3, 8:9, 17:13, 17:17, 18:25, 19:13, 31:2, 31:14, 37:25, 45:13, 49:21, 49:22, 55:22, 56:18, 57:18, 58:19, 68:16, 69:4
**arguments** [10] - 28:13, 28:15, 30:13, 45:1, 47:10, 47:11, 49:10, 49:14, 49:15
**armed** [1] - 8:21
**arrangement** [1] - 55:12
**articulated** [1] - 11:7
**aspect** [1] - 19:3
**asset** [2] - 17:22, 44:15
**assistant** [3] - 35:10, 40:13, 50:2
**assistant's** [2] - 35:12, 35:19
**associate** [1] - 40:13
**associated** [1] - 9:18
**associates** [1] - 8:18
**assume** [3] - 39:6, 54:21, 56:11
**assumed** [1] - 55:3
**assurance** [1] - 63:18
**asterisk** [1] - 67:25

**attached** [6] - 39:8,
40:11, 45:15, 45:25,
46:11, 46:12
**attachments** [1] -
44:3
**attempt** [2] - 8:21,
25:4
**attempted** [1] - 25:7
**attend** [2] - 65:22,
65:23
**attention** [2] - 7:16,
49:22
**attestation** [1] - 15:5
**attorney** [14] - 8:25,
10:3, 19:15, 20:2,
20:16, 20:23, 21:8,
34:9, 35:13, 35:17,
36:4, 42:9, 43:5,
69:14
**Attorney's** [3] - 23:6,
23:25, 37:9
**attorney-client** [5] -
19:15, 20:2, 20:16,
20:23, 43:5
**attorney-client-
privileged** [2] - 21:8,
34:9
**attorneys** [7] - 17:2,
29:22, 38:19, 60:2,
60:3, 60:20, 61:11
**audio** [1] - 75:25
**AUDIO** [1] - 2:10
**authority** [12] -
16:23, 16:25, 18:17,
26:10, 26:11, 29:7,
30:3, 30:5, 30:8,
30:10, 45:8, 56:5
**available** [3] - 16:14,
20:1, 52:25
**Avenue** [6] - 2:15,
2:19, 3:9, 3:21, 4:3,
80:14
**avoid** [1] - 61:18
**await** [1] - 54:2
**awaiting** [1] - 53:1
**aware** [5] - 17:16,
25:19, 37:15, 37:16,
78:24

---

**B**

---

**Babcock** [4] - 6:16,
6:18, 57:19, 75:1
**BABCOCK** [10] - 3:5,
6:17, 6:22, 7:4, 75:2,
75:5, 75:14, 75:17,
75:20, 75:22
**back-and-forth** [1] -
69:13

**background** [1] -
44:20
**backing** [1] - 29:23
**bad** [2] - 6:22, 10:15
**bag** [1] - 12:12
**ballpark** [1] - 32:18
**based** [2] - 48:6,
72:5
**basis** [3] - 10:16,
50:17, 50:18
**become** [1] - 48:21
**becomes** [1] - 12:8
**BEFORE** [1] - 2:11
**begun** [1] - 62:4
**behalf** [9] - 5:13,
5:18, 5:22, 6:4, 6:7,
6:14, 8:11, 46:11,
63:22
**believes** [1] - 16:23,
29:2
**benefit** [3] - 67:4,
67:12, 67:13
**best** [7] - 14:6,
18:17, 44:12, 60:7,
63:4, 74:10, 80:7
**better** [1] - 57:18
**between** [4] - 13:14,
37:14, 41:12, 55:12
**big** [1] - 60:21
**bill** [1] - 40:8
**bit** [1] - 74:11
**bite** [1] - 75:10
**Blaesche** [1] - 6:24
**BLAESCHE** [1] - 3:8
**blast** [1] - 11:25
**bleeding** [1] - 13:1
**blown** [1] - 57:18
**BOBB** [1] - 3:12
**Bobb** [1] - 6:14
**body** [5] - 18:13,
26:2, 26:3, 26:14,
26:16
**bother** [2] - 62:23,
63:9
**bothering** [1] - 59:19
**breach** [2] - 12:10,
12:18, 15:4, 16:5,
43:9, 44:16
**breaches** [1] - 44:17
**brief** [4] - 9:12,
22:12, 69:16, 78:9
**briefed** [1] - 69:12
**briefing** [9] - 15:12,
57:25, 58:8, 58:19,
62:8, 68:22, 68:23,
69:14, 73:24
**briefly** [8] - 8:1, 38:5,
40:20, 41:9, 57:13,
57:17, 59:2, 69:3
**bring** [5] - 7:16,

17:20, 26:3, 28:21,
64:23
**bringing** [1] - 67:16
**Brook** [1] - 5:13
**BROOK** [57] - 2:14,
5:12, 8:10, 10:8,
10:20, 11:20, 13:6,
13:23, 14:13, 15:22,
16:2, 16:22, 20:10,
22:5, 22:11, 38:5,
38:7, 38:15, 38:18,
40:2, 40:5, 40:10,
40:22, 41:24, 42:2,
42:11, 48:2, 48:14,
49:2, 51:25, 55:25,
56:3, 56:21, 57:22,
59:1, 59:14, 61:16,
69:22, 70:4, 70:11,
70:13, 71:3, 76:3,
76:7, 76:10, 76:16,
76:22, 77:9, 77:13,
77:18, 78:1, 78:3,
78:5, 78:8, 78:12,
78:21, 79:1
**brook** [9] - 7:25,
8:11, 20:8, 21:14,
21:15, 37:19, 38:3,
42:3, 57:21
**brought** [3] - 8:14,
12:2, 60:24
**brownie** [1] - 66:17
**bugging** [1] - 78:18
**building** [1] - 60:5
**bunch** [1] - 64:24
**business** [1] - 8:19
**but..** [1] - 75:12
**BY** [1] - 4:1
**BYRNE** [2] - 1:14,
3:2
**Byrne** [39] - 5:5, 6:4,
8:25, 9:5, 12:3, 13:14,
13:16, 14:17, 15:6,
15:7, 15:14, 15:15,
15:17, 17:1, 17:8,
17:20, 17:22, 17:23,
20:5, 22:14, 22:15,
23:5, 23:24, 24:5,
24:17, 36:24, 40:6,
40:7, 42:14, 42:24,
43:8, 47:5, 53:15,
54:9, 55:16, 56:4,
58:6, 76:12, 78:9
**Byrne's** [10] - 14:18,
15:2, 16:5, 19:16,
20:15, 21:3, 38:13,
38:19, 43:7, 56:6

---

**C**

---

**cabined** [1] - 58:17

**California** [1] - 2:16
**cannot** [2] - 48:11,
54:11
**captured** [1] - 38:12
**care** [1] - 9:14
**career** [1] - 65:18
**Casarino** [2] - 5:18,
64:1
**CASARINO** [25] -
3:14, 5:17, 63:24,
64:1, 64:5, 64:8, 65:9,
65:11, 65:15, 65:20,
66:4, 66:7, 66:13,
67:24, 68:4, 68:7,
70:3, 70:16, 70:20,
70:22, 70:24, 71:1,
77:15, 79:4, 79:11
**case** [41] - 9:22,
10:11, 10:12, 12:2,
12:4, 15:23, 18:24,
19:9, 20:20, 22:18,
22:25, 38:22, 38:25,
39:1, 41:2, 41:23,
43:25, 44:2, 45:11,
45:16, 45:18, 45:23,
47:6, 48:13, 49:12,
49:13, 50:16, 52:11,
59:5, 59:18, 60:12,
60:24, 72:3, 72:5,
72:6, 72:7, 72:9,
73:13, 78:15
**Case** [4] - 5:2, 5:4,
5:5, 5:7
**cases** [5] - 41:7,
60:2, 60:4, 64:23,
64:24
**cat's** [1] - 12:11
**Center** [1] - 3:3
**certain** [5] - 27:6,
60:14, 61:19, 61:23,
62:14
**certainly** [2] - 41:25,
57:4
**CERTIFICATE** [1] -
80:1
**certified** [1] - 20:20
**certify** [1] - 80:4
**cetera** [2] - 62:6
**chain** [2] - 44:12
**challenge** [7] - 12:5,
25:22, 28:11, 28:21,
31:7, 50:24
**challenged** [1] -
31:10
**challenging** [2] -
11:24, 26:21
**chambers** [4] -
68:11, 69:10, 76:21,
76:25
**chance** [1] - 45:2

**Chanel** [1] - 6:19
**change** [1] - 68:10
**Charles** [1] - 6:19
**CHARLES** [1] - 3:5
**checked** [1] - 11:2
**checks** [1] - 44:20
**chief** [1] - 52:20
**chip** [1] - 6:17
**choose** [1] - 53:12
**chose** [1] - 64:23
**Chris** [1] - 5:24
**CHRISTINA** [1] -
2:18, 3:12
**Christina** [2] - 5:15,
6:14
**Circuit** [1] - 38:24
**circuit** [2] - 9:25,
30:17
**cite** [2] - 26:10, 30:4
**cited** [2] - 26:10,
29:9
**cites** [1] - 11:23
**civil** [4] - 18:22,
25:25, 28:25, 30:6
**Civil** [9] - 1:3, 1:11,
1:19, 2:3, 5:2, 5:4,
5:5, 5:7, 66:15
**claiming** [2] - 20:18,
20:23
**clarify** [2] - 41:19,
76:24
**clarity** [1] - 51:21
**clear** [9] - 9:11,
16:13, 30:17, 41:1,
42:13, 42:21, 49:25,
65:15, 79:6
**clearly** [2] - 22:24,
26:6
**click** [1] - 16:16
**client** [21] - 13:17,
17:1, 17:20, 19:15,
20:2, 20:16, 20:23,
21:8, 24:6, 31:12,
34:9, 37:15, 42:14,
42:23, 43:5, 51:7,
52:12, 55:13, 55:17,
55:18, 65:24
**client's** [2] - 30:1,
49:19
**closed** [2] - 39:1,
39:19
**closet** [1] - 18:14
**CMK** [3] - 3:15, 3:18,
5:18
**cognizant** [1] - 69:23
**colleague** [1] - 51:25
**colleagues** [1] - 5:14
**collectively** [1] -
59:22
**Columbia** [2] - 4:2,

80:13
  **COLUMBIA** [2] - 1:1, 2:1
  **comfortable** [1] - 7:9
  **coming** [1] - 62:5
  **comments** [3] - 11:4, 11:5
  **commercial** [1] - 29:13
  **committed** [1] - 18:11
  **communicating** [2] - 27:7, 50:6
  **communication** [1] - 21:2
  **communications** [9] - 21:6, 21:8, 34:12, 48:5, 48:18, 50:2, 50:9, 50:14
  **company** [1] - 8:17
  **compelling** [1] - 67:22
  **complaining** [1] - 44:16
  **complete** [3] - 14:15, 14:23, 80:6
  **complicated** [1] - 69:8
  **comply** [3] - 20:22, 46:2, 55:17
  **components** [1] - 58:7
  **computer** [2] - 50:4, 50:7
  **conceal** [1] - 18:14
  **conceded** [1] - 55:21
  **concern** [5] - 37:22, 64:8, 64:17, 67:2, 71:25
  **concerned** [3] - 38:1, 61:2, 61:6
  **concerns** [1] - 71:23
  **concluded** [1] - 79:14
  **confer** [10] - 45:17, 63:5, 65:4, 66:3, 66:8, 71:10, 73:11, 73:15, 73:20, 74:7
  **CONFERENCE** [1] - 2:10
  **conference** [3] - 5:9, 60:19, 71:5
  **conferences** [1] - 70:13
  **conferring** [4] - 61:11, 73:10, 73:16, 77:21
  **confers** [1] - 77:19
  **confidential** [26] - 11:25, 12:4, 12:25,

14:11, 16:10, 18:2, 20:22, 22:24, 24:10, 24:24, 25:21, 28:12, 28:19, 29:12, 31:6, 34:7, 36:19, 36:20, 36:21, 37:13, 40:23, 40:25, 41:4, 41:23, 47:8, 56:15
  **confidentiality** [2] - 12:8, 31:7
  **confirm** [1] - 21:17
  **Congress** [3] - 25:15, 27:20
  **consider** [8] - 9:25, 10:2, 12:7, 30:14, 30:15, 49:15, 49:21, 69:9
  **consideration** [2] - 11:9, 13:5
  **considers** [2] - 37:23, 55:5
  **constitute** [1] - 29:12
  **constitutes** [1] - 80:4
  **Constitution** [2] - 4:3, 80:14
  **CONT'D** [1] - 3:1
  **contained** [1] - 27:22
  **contents** [2] - 34:14
  **continue** [3] - 30:2, 39:13, 52:15
  **continuing** [5] - 9:23, 10:15, 15:4, 73:14, 74:7
  **contract** [3] - 19:1, 19:2, 51:17
  **contracts** [1] - 19:1
  **contrary** [2] - 9:6, 9:15
  **control** [5] - 38:13, 43:14, 43:18, 49:19, 49:20
  **controlling** [1] - 51:24
  **controls** [3] - 40:4, 51:6, 51:7
  **conversation** [3] - 53:24, 54:12, 54:15
  **conversations** [1] - 52:14
  **convincing** [1] - 69:7
  **COO** [2] - 53:24, 54:15
  **cooperatively** [1] - 68:1
  **coordinating** [2] - 60:5, 62:12
  **copies** [1] - 39:6
  **copy** [2] - 22:9, 50:18
  **correct** [23] - 16:9,

18:5, 22:5, 22:10, 22:11, 22:14, 22:20, 27:14, 32:1, 32:4, 34:4, 34:25, 35:15, 45:23, 46:21, 46:24, 53:15, 64:21, 70:3, 71:14, 72:17, 73:9, 73:21
  **correctly** [3] - 22:21, 39:16, 39:18
  **corroborating** [1] - 29:5
  **counsel** [34] - 5:11, 5:16, 5:24, 6:2, 7:7, 7:9, 7:13, 15:2, 16:5, 20:14, 20:15, 20:17, 21:3, 21:4, 22:14, 22:19, 29:18, 29:25, 37:14, 43:7, 43:17, 43:24, 46:20, 48:13, 50:16, 51:15, 52:14, 56:6, 56:13, 56:14, 61:12, 63:11, 64:13, 68:1
  **counted** [1] - 27:4
  **country** [2] - 8:18, 27:24
  **county** [1] - 38:25
  **course** [7] - 11:25, 13:7, 48:24, 49:13, 56:11, 73:1, 75:3
  **COURT** [236] - 1:1, 2:1, 5:16, 5:20, 6:2, 6:5, 6:8, 6:10, 6:15, 6:21, 7:2, 7:6, 9:24, 10:16, 11:17, 12:13, 13:20, 14:7, 15:20, 15:24, 16:20, 17:4, 17:7, 17:10, 18:1, 18:5, 18:17, 19:5, 19:8, 19:17, 19:21, 20:6, 20:12, 20:18, 21:5, 21:22, 21:24, 22:2, 22:7, 22:9, 22:13, 22:17, 22:21, 23:3, 23:7, 23:9, 23:13, 23:15, 23:19, 23:21, 24:1, 24:3, 24:6, 24:10, 24:13, 24:21, 25:1, 25:4, 25:7, 25:19, 26:5, 26:20, 27:9, 27:12, 27:17, 27:25, 28:4, 28:6, 29:6, 30:10, 31:19, 31:24, 32:2, 32:5, 32:9, 32:11, 32:18, 32:21, 32:25, 33:3, 33:6, 33:8, 33:10, 33:12, 33:15, 33:17, 33:20, 33:25,

34:2, 34:5, 34:10, 34:13, 34:17, 34:19, 34:22, 35:1, 35:4, 35:8, 35:12, 35:14, 35:16, 35:19, 35:21, 35:23, 35:25, 36:4, 36:7, 36:9, 36:11, 36:13, 36:15, 36:18, 36:24, 37:2, 37:6, 37:9, 37:12, 37:18, 38:6, 38:10, 38:17, 40:1, 40:4, 40:9, 40:21, 41:21, 42:1, 42:3, 43:13, 43:18, 43:21, 44:6, 44:22, 44:24, 45:1, 45:5, 45:10, 45:20, 45:22, 46:6, 46:16, 46:19, 46:22, 46:25, 47:5, 47:21, 48:3, 49:1, 49:9, 49:25, 51:6, 51:11, 51:13, 51:21, 52:3, 53:3, 53:6, 53:14, 53:17, 54:5, 54:18, 54:20, 55:3, 56:2, 56:8, 56:25, 58:3, 59:12, 60:23, 63:21, 63:25, 64:4, 64:7, 65:7, 65:10, 65:12, 65:17, 66:1, 66:5, 66:12, 66:14, 66:20, 66:23, 67:1, 67:25, 68:5, 68:8, 70:9, 70:12, 70:19, 70:21, 70:23, 70:25, 71:6, 71:19, 71:21, 72:11, 72:14, 72:16, 72:18, 72:23, 73:2, 73:5, 73:7, 73:17, 73:22, 74:2, 74:6, 74:13, 74:23, 74:25, 75:3, 75:13, 75:16, 75:18, 75:21, 75:23, 76:1, 76:6, 76:9, 76:15, 76:21, 77:7, 77:11, 77:14, 77:17, 77:24, 78:2, 78:4, 78:6, 78:11, 78:20, 78:24, 79:2, 79:5, 79:13
  **court** [3] - 30:6, 48:19, 79:9
  **Court** [105] - 4:1, 4:2, 5:13, 6:1, 6:25, 7:13, 8:7, 9:25, 10:2, 10:7, 11:7, 11:9, 11:14, 12:6, 12:7, 12:14, 13:8, 13:10, 14:2, 14:22, 15:12, 15:18, 16:20, 16:22, 16:23, 16:25, 17:24, 18:24,

19:16, 20:1, 20:21, 21:19, 22:10, 24:15, 25:22, 26:3, 26:7, 26:11, 26:13, 26:21, 28:11, 28:21, 28:22, 28:24, 29:2, 29:8, 29:9, 30:4, 30:17, 30:24, 31:8, 31:9, 37:23, 38:1, 38:24, 39:23, 40:2, 41:9, 42:7, 42:9, 42:19, 42:20, 46:3, 47:22, 49:4, 49:7, 49:12, 50:25, 52:1, 52:17, 52:18, 52:23, 53:23, 54:3, 55:4, 55:5, 56:7, 57:2, 57:24, 58:1, 59:17, 59:19, 62:24, 63:8, 63:12, 65:6, 65:7, 66:10, 69:24, 69:25, 74:20, 76:4, 76:13, 76:17, 76:18, 77:4, 77:18, 77:20, 77:22, 78:14, 78:17, 80:12, 80:13
  **Court's** [12] - 9:15, 13:4, 26:22, 40:15, 40:17, 40:22, 41:19, 48:25, 49:8, 53:1, 56:4, 76:24
  **courthouse** [1] - 11:3
  **courtroom** [4] - 17:8, 41:8, 79:6
  **COURTROOM** [1] - 5:1
  **cover** [2] - 28:17, 58:6
  **covered** [3] - 26:6, 26:9, 56:9
  **created** [2] - 10:24, 68:24
  **credentials** [3] - 39:17, 39:21, 39:22
  **credit** [1] - 9:9
  **crime** [5] - 18:10, 18:21, 25:12, 29:2, 48:17
  **criminal** [6] - 17:24, 19:1, 19:3, 26:2, 30:7, 38:22
  **CRR** [3] - 4:1, 80:3, 80:12
  **current** [1] - 15:14
  **custodian** [2] - 70:18, 70:21
  **custodians** [2] - 70:17, 77:3
  **custody** [5] - 38:13, 44:12, 49:19, 49:20

84

**cut** [1] - 42:18
**Cynkar** [1] - 5:25

# D

**D.C** [8] - 1:6, 1:14, 1:22, 2:6, 3:22, 4:4, 53:9, 80:14
**Dallas** [1] - 3:10
**Daniel** [2] - 45:19, 45:21
**Daniels** [1] - 5:22
**DANIELS** [1] - 2:24
**Dar** [6] - 10:23, 23:8, 23:10, 25:2, 32:16, 39:17
**data** [1] - 14:21
**database** [10] - 51:24, 53:7, 53:12, 53:17, 53:18, 53:20, 53:25, 54:7, 54:11, 54:22
**date** [18] - 13:13, 13:16, 14:20, 14:25, 19:12, 19:21, 20:8, 21:11, 21:12, 21:22, 22:4, 22:13, 23:12, 59:21, 64:12, 64:14, 77:7
**Dated** [1] - 80:10
**dates** [2] - 64:11, 64:12
**DAVID** [1] - 3:20
**David** [1] - 6:6
**DAVIDA** [1] - 2:14
**Davida** - 5:13, 8:11
**day's** [1] - 10:7
**de** [3] - 25:23, 26:13, 50:24
**de-designated** [2] - 26:13, 50:24
**de-designation** [1] - 25:23
**dead** [5] - 18:12, 26:2, 26:3, 26:14, 26:16
**deadline** [1] - 71:7
**deal** [5] - 55:22, 58:21, 68:15, 72:24, 74:13
**dealing** [4] - 49:17, 58:4, 61:2, 74:5
**Deborah** [1] - 5:25
**December** [4] - 22:5, 22:12, 27:10, 27:13
**decide** [5] - 19:14, 28:22, 52:18, 58:24, 71:10

**decides** [1] - 15:19
**deciding** [1] - 26:8
**decision** [1] - 42:20
**decisions** [1] - 65:6
**defamation** [2] - 49:7, 49:12
**default** [10] - 59:10, 62:11, 62:24, 62:25, 65:1, 66:8, 66:9, 66:12, 76:18
**defend** [1] - 30:2
**DEFENDANT** [3] - 3:2, 3:11, 3:20
**Defendant** [5] - 1:15, 6:14, 39:5, 62:2, 67:20
**DEFENDANTS** [3] - 2:24, 3:5, 3:15
**Defendants** [21] - 1:7, 1:23, 2:7, 5:18, 6:20, 12:3, 53:10, 59:6, 59:22, 59:24, 63:6, 63:11, 63:23, 64:2, 64:4, 64:24, 66:10, 67:8, 67:12, 70:17, 79:3
**Defendants'** [1] - 63:12
**DEFENDING** [1] - 3:21
**Defending** [1] - 6:7
**defense** [1] - 65:20
**Delaware** [1] - 3:16
**delineated** [2] - 42:25, 43:11
**Denver** [1] - 8:21
**deny** [1] - 18:1
**departments** [1] - 23:5
**depo** [1] - 76:17
**depose** [2] - 64:22, 64:25
**deposition** [13] - 57:9, 57:12, 60:10, 61:3, 61:7, 61:10, 61:17, 64:14, 66:2, 67:21, 68:9, 68:12, 77:1
**depositions** [18] - 57:14, 57:21, 59:4, 59:13, 59:15, 59:23, 60:5, 60:11, 60:12, 60:25, 62:4, 62:9, 62:16, 62:17, 63:13, 63:14, 65:19, 65:24
**DEPUTY** [1] - 5:1
**designated** [3] - 26:7, 26:13, 50:24
**designation** [5] - 12:8, 25:23, 28:12,

31:8, 31:10
**designed** [1] - 8:23
**desktop** [1] - 33:13
**despite** [1] - 16:3
**destroy** [1] - 48:5
**destroyed** [1] - 48:15
**destroying** [1] - 42:4
**destruction** [1] - 66:15
**detail** [1] - 51:23
**details** [1] - 55:11
**determination** [2] - 20:3, 40:16
**determine** [1] - 15:3, 18:10
**Detroit** [1] - 3:4
**device** [3] - 33:22, 34:16, 34:17
**devices** [1] - 31:16
**Dieckmann** [1] - 5:15
**DIECKMANN** [1] - 2:18
**different** [18] - 18:16, 27:8, 31:9, 51:16, 57:16, 59:23, 60:3, 60:6, 62:12, 75:8
**direct** [3] - 48:4, 50:3, 55:17
**directed** [3] - 27:4, 40:18, 49:5
**direction** [2] - 51:14, 52:12
**directly** [3] - 11:12, 42:12, 46:7
**disagree** [3] - 11:20, 25:20, 73:7
**disclose** [5] - 26:11, 26:18, 26:22, 28:8, 37:24
**disclosed** [4] - 15:7, 15:11, 24:17, 38:21
**disclosure** [1] - 31:6
**discovery** [21] - 12:19, 17:25, 21:21, 30:1, 32:14, 37:5, 41:3, 41:12, 41:15, 41:17, 52:10, 68:13, 68:19, 69:6, 70:2, 70:10, 70:14, 71:7, 71:13, 74:14, 77:2
**discuss** [2] - 48:12, 73:11
**discussed** [1] - 58:4
**dispute** [14] - 21:11, 47:1, 47:3, 50:20, 50:22, 55:20, 56:6, 56:16, 57:14, 57:20, 67:17, 67:19, 68:23, 77:20
**disputed** [1] - 70:2

**disputes** [9] - 57:11, 61:18, 68:18, 68:19, 71:13, 73:19, 74:20, 74:21
**disqualification** [8] - 9:24, 10:1, 10:10, 11:8, 12:16, 12:21, 13:3, 38:1
**disqualified** [3] - 9:22, 10:4, 13:12
**disqualify** [3] - 10:3, 10:17, 30:15
**disseminate** [2] - 48:12, 48:25
**disseminated** [4] - 12:25, 18:2, 49:20, 55:21
**disseminating** [3] - 26:14, 47:18, 52:16
**dissemination** [11] - 13:2, 13:22, 13:25, 14:9, 16:21, 31:12, 47:8, 52:16, 55:5, 55:15, 58:17
**District** [3] - 4:2, 4:2, 80:13
**district** [2] - 24:3, 80:13
**DISTRICT** [4] - 1:1, 1:1, 2:1, 2:1
**doc** [1] - 70:6
**Docket** [1] - 78:14
**document** [19] - 11:24, 12:1, 12:6, 15:13, 15:14, 20:24, 39:22, 40:4, 40:6, 40:12, 43:6, 43:14, 43:18, 50:9, 51:2, 69:12, 69:16, 72:16, 74:17
**documentation** [2] - 20:17, 44:19
**documents** [103] - 9:2, 10:24, 11:2, 12:11, 13:18, 14:16, 14:19, 14:24, 15:7, 15:15, 15:18, 15:21, 15:23, 15:25, 17:15, 18:2, 18:6, 18:8, 18:12, 20:21, 22:23, 22:24, 26:6, 26:8, 26:13, 26:21, 26:22, 27:2, 27:9, 27:16, 28:6, 28:12, 28:16, 28:19, 29:8, 29:11, 29:15, 30:22, 30:23, 31:4, 31:16, 31:19, 31:21, 32:5, 32:8, 32:11, 32:12, 32:17, 32:22, 33:12, 33:20,

33:24, 34:6, 34:23, 35:1, 36:25, 38:12, 39:3, 39:4, 39:8, 40:11, 40:23, 40:24, 41:3, 41:22, 42:4, 42:17, 43:23, 43:25, 44:1, 44:6, 44:13, 45:15, 45:22, 46:12, 46:22, 47:2, 47:12, 47:14, 47:15, 48:1, 48:7, 48:20, 50:1, 50:13, 50:14, 50:15, 50:21, 51:14, 51:16, 51:18, 54:17, 54:24, 56:5, 56:10, 56:12, 56:16, 56:19, 58:5, 58:17, 75:7
**domain** [1] - 46:23
**DOMINION** [4] - 1:3, 1:11, 1:19, 2:3
**Dominion** [64] - 5:2, 5:4, 5:6, 5:7, 5:14, 8:6, 8:11, 8:14, 8:20, 9:2, 9:17, 9:18, 10:2, 10:8, 10:12, 10:24, 12:2, 12:4, 12:9, 12:14, 13:4, 13:7, 13:9, 14:3, 14:4, 14:16, 14:24, 15:22, 17:21, 18:12, 19:4, 27:5, 29:22, 40:5, 42:6, 42:8, 42:22, 44:15, 44:17, 44:18, 47:25, 48:15, 49:5, 49:6, 49:11, 55:25, 56:24, 58:12, 58:13, 59:5, 59:18, 59:22, 59:25, 60:12, 60:18, 61:9, 61:13, 63:2, 63:5, 76:2, 78:8, 78:14
**Dominion's** [19] - 7:22, 8:19, 8:21, 9:7, 9:8, 10:16, 11:1, 12:10, 14:2, 16:9, 21:4, 22:12, 41:10, 42:10, 47:11, 48:8, 51:7, 55:11, 59:14
**Dominion-Fox** [1] - 60:12
**Dominion-produced** [2] - 14:16, 14:24
**done** [10] - 9:10, 11:19, 18:19, 44:17, 50:25, 58:18, 59:16, 61:24, 66:5, 75:11
**down** [6] - 19:8, 50:8, 60:15, 63:16, 68:20, 74:10

**download** [3] - 16:15, 16:16, 53:11
**downloaded** [4] - 14:20, 33:13, 33:21, 33:24
**draft** [6] - 56:8, 57:1, 58:2, 58:3, 76:11
**Driscoll** [5] - 17:7, 56:9, 56:11, 56:19, 56:23
**Drive** [1] - 16:15
**dual** [1] - 28:24
**due** [1] - 28:23
**dueling** [1] - 70:8
**during** [2] - 42:19, 48:25
**dyslexia** [1] - 16:12

**E**

**EAC** [1] - 27:7
**easily** [1] - 50:25
**easy** [1] - 60:8
**Edwards** [1] - 80:12
**EDWARDS** [2] - 4:1, 80:3
**effort** [2] - 50:20, 58:10
**eight** [1] - 62:13
**either** [5] - 36:19, 37:14, 39:22, 49:10, 58:22
**election** [1] - 27:3
**elections** [6] - 9:17, 27:23, 27:25, 28:3, 44:19
**electronic** [2] - 33:21, 39:7
**email** [6] - 38:19, 70:6, 71:15, 76:19, 76:21, 76:25
**emergency** [5] - 7:23, 26:20, 29:10, 58:11, 58:22
**employees** [3] - 8:20, 9:18, 27:5
**end** [2] - 8:24, 73:18
**enforcement** [15] - 18:7, 18:9, 18:22, 22:1, 23:1, 25:8, 27:21, 28:9, 29:1, 29:4, 29:23, 31:22, 31:25, 32:2, 37:8
**enforcement's** [1] - 18:10
**engaged** [1] - 40:6
**ensure** [4] - 15:4, 31:1, 38:11, 49:18
**enter** [2] - 11:8,

68:11
**entered** [3] - 19:9, 19:18, 22:17
**entering** [3] - 11:3, 27:3, 78:17
**entertaining** [1] - 17:13
**entirely** [1] - 19:3
**entitled** [4] - 25:11, 37:24, 42:10, 56:12
**entity** [1] - 41:16
**equal** [1] - 42:23
**equipment** [1] - 27:6
**escrow** [1] - 42:5
**ESQ** [13] - 2:14, 2:17, 2:18, 2:21, 2:24, 3:2, 3:5, 3:8, 3:8, 3:11, 3:14, 3:17, 3:20
**essentially** [3] - 10:24, 30:4, 69:1
**et** [16] - 1:3, 1:6, 1:11, 1:19, 1:22, 2:3, 2:6, 5:2, 5:3, 5:5, 5:6, 5:7, 5:8, 62:6
**evaluate** [3] - 29:1, 29:4, 30:6
**evaluates** [1] - 14:2
**event** [2] - 7:2, 76:14
**evidence** [6] - 18:21, 27:1, 29:5, 44:16, 48:21, 63:4
**evidenced** [1] - 62:7
**EWING** [1] - 3:21
**exact** [2] - 19:11, 70:7
**exactly** [5] - 14:22, 23:11, 27:19, 29:20, 63:15
**example** [3] - 19:1, 43:6, 53:9
**except** [5] - 41:13, 41:17, 45:7, 48:13, 79:7
**exception** [1] - 49:4
**exchanged** [2] - 36:2, 64:11
**excuse** [3] - 36:1, 68:15, 71:16
**exhibit** [2] - 20:10, 20:19
**Exhibit** [3] - 22:11, 38:20, 41:10
**exhibits** [1] - 46:14
**exigencies** [1] - 26:15
**exigency** [2] - 26:17, 58:16
**exist** [2] - 30:9, 30:11
**exists** [2] - 13:15, 13:17

**exited** [1] - 38:19
**expand** [1] - 76:23
**expect** [2] - 67:8, 67:16
**expecting** [2] - 68:1, 76:5
**expedite** [1] - 21:18
**experts** [1] - 42:18
**explain** [2] - 50:17, 50:18
**extended** [1] - 7:18
**extensions** [1] - 63:2
**extent** [10] - 14:4, 16:23, 31:5, 39:6, 42:17, 44:10, 48:18, 58:12, 58:17, 77:2
**eye** [2] - 70:4

**F**

**fact** [5] - 7:22, 26:8, 29:16, 40:23, 56:12
**fair** [4] - 12:24, 28:20, 37:25, 75:17
**fairly** [1] - 60:7
**fairness** [1] - 75:6
**faith** [1] - 60:7
**falls** [1] - 12:19
**false** [4] - 8:15, 8:18, 8:19
**familiar** [1] - 72:1
**far** [5] - 15:25, 17:16, 45:15, 61:1, 61:6
**fashion** [2] - 7:14, 8:8
**fast** [1] - 62:23
**featuring** [1] - 11:1
**Federal** [1] - 66:15
**fee** [3] - 13:14, 55:12
**few** [4] - 8:12, 19:6, 65:4, 65:5
**figure** [1] - 55:15
**figured** [1] - 63:8
**file** [13] - 11:17, 11:18, 25:18, 27:24, 45:24, 46:4, 48:11, 48:23, 50:4, 51:22, 58:12, 74:18, 78:8
**filed** [10] - 9:12, 11:14, 12:6, 12:17, 28:14, 39:3, 41:22, 43:24, 46:19, 47:2
**files** [2] - 27:22, 29:24
**filing** [11] - 18:3, 38:22, 39:7, 40:10, 44:3, 45:3, 46:1, 46:9, 46:10, 50:19
**filings** [1] - 7:15

**fill** [1] - 68:25
**final** [1] - 71:22
**finally** [1] - 73:5
**financial** [3] - 72:2, 72:16, 75:7
**fine** [4] - 48:2, 65:24, 77:13, 77:15
**finish** [2] - 24:10, 24:15
**firm** [6] - 5:22, 5:25, 15:3, 22:16, 40:13, 56:9
**first** [16] - 7:21, 13:13, 13:19, 16:19, 17:17, 19:14, 31:15, 38:8, 38:9, 38:18, 39:9, 39:15, 61:1, 65:17, 69:22, 76:10
**fits** [1] - 75:8
**five** [1] - 71:23
**flagged** [1] - 59:22
**flipped** [2] - 16:12, 66:9
**Floor** [3] - 2:19, 3:3, 3:13
**Florida** [1] - 3:13
**focus** [2] - 14:13, 40:22
**focused** [2] - 55:14
**folks** [1] - 60:15
**follow** [2] - 31:11, 49:8
**followup** [2] - 38:11
**footing** [1] - 40:8
**FOR** [9] - 1:1, 2:1, 2:14, 2:24, 3:2, 3:5, 3:11, 3:14, 3:20
**force** [1] - 42:23
**foreclosed** [1] - 64:15
**foregoing** [1] - 80:4
**foreign** [3] - 27:3, 44:18, 44:21
**former** [1] - 67:4
**forth** [2] - 9:21, 69:13
**forthcoming** [1] - 27:25
**forward** [2] - 7:20, 71:11
**four** [4] - 5:9, 8:13, 71:20, 71:23
**fourth** [1] - 77:6
**Fox** [1] - 60:12
**frankly** [5] - 11:21, 48:20, 59:3, 60:17, 62:12, 62:15, 70:6
**fraud** [4] - 27:6, 48:17, 49:7, 49:12
**Friday** [9] - 11:15, 52:13, 52:21, 53:22,

58:13, 63:5, 71:5, 77:23, 78:10
**FROM** [1] - 2:10
**front** [3] - 61:19, 72:3, 72:9
**frozen** [1] - 42:19
**FTR** [1] - 2:10
**FTR-GOLD** [1] - 2:10
**full** [18] - 8:3, 11:8, 12:24, 17:13, 18:25, 19:12, 28:20, 29:4, 31:2, 37:24, 38:12, 40:11, 45:13, 47:7, 57:18, 68:22, 68:23, 80:5
**full-blown** [1] - 57:18
**fully** [3] - 8:8, 14:1, 78:15
**fulsome** [1] - 17:2
**function** [1] - 28:24
**future** [1] - 48:21

**G**

**gain** [1] - 8:21
**gearing** [1] - 63:6
**given** [10] - 22:17, 23:4, 23:23, 24:24, 25:17, 37:7, 42:17, 49:5, 54:14, 55:20
**goals** [1] - 13:23
**God** [2] - 8:22, 16:17
**GODFREY** [3] - 2:15, 2:18, 2:21
**Godfrey** [1] - 5:13
**GOLD** [1] - 2:10
**Google** [1] - 16:15
**governing** [1] - 41:1
**government** [1] - 24:19
**grant** [1] - 55:10
**grants** [1] - 63:12
**gratuitously** [1] - 68:2
**great** [3] - 7:2, 58:10, 61:6
**Greg** [1] - 6:13
**GREGORY** [1] - 3:11
**group** [1] - 53:10
**guarantee** [2] - 49:13, 65:8
**gutted** [1] - 8:19
**guys** [1] - 67:10

**H**

**half** [2] - 8:17, 28:15
**handed** [1] - 10:11

86

**handle** [2] - 7:19, 57:8
**hang** [1] - 79:8
**happy** [6] - 11:15, 59:7, 63:20, 65:21, 74:9, 78:7
**hard** [1] - 69:7
**harm** [2] - 9:4, 43:2
**Hartman** [2] - 45:19, 45:21
**hats** [1] - 59:2
**head** [1] - 66:9
**hear** [10] - 12:23, 31:13, 47:10, 52:2, 65:3, 67:19, 74:17
**heard** [6] - 10:5, 39:15, 39:18, 64:9, 64:16
**hearing** [12] - 7:18, 9:12, 30:25, 31:2, 47:6, 52:17, 54:17, 63:7, 68:20, 69:16, 69:17
**heart** [1] - 69:15
**heated** [1] - 24:14
**heavy** [1] - 69:1
**help** [2] - 13:21, 78:5
**helpful** [3] - 11:16, 14:21, 43:9
**hereby** [1] - 80:3
**Herring** [4] - 5:6, 6:18, 6:19
**herring** [1] - 64:10
**HERRING** [1] - 1:22
**herself** [1] - 39:3
**hi** [1] - 73:4
**hide** [1] - 18:14
**hired** [1] - 22:15
**hold** [1] - 19:5
**holds** [1] - 30:25
**holidays** [2] - 27:15, 28:7
**hollow** [1] - 26:15
**home** [3] - 32:10, 32:23, 33:8
**honest** [1] - 27:5
**Honor** [106] - 5:1, 5:12, 5:17, 5:21, 6:3, 6:6, 6:9, 6:13, 6:17, 7:5, 8:10, 8:13, 10:8, 10:9, 10:20, 11:22, 13:6, 13:23, 13:24, 14:14, 15:23, 16:7, 17:19, 17:20, 17:25, 18:4, 18:20, 19:12, 19:20, 19:24, 20:14, 20:25, 22:6, 22:11, 23:2, 23:18, 24:20, 25:9, 25:14, 25:24, 26:19, 26:25, 27:19,

28:3, 28:24, 29:20, 31:18, 32:15, 38:5, 38:7, 38:16, 39:9, 39:12, 39:14, 40:5, 41:6, 41:25, 42:11, 42:22, 43:16, 43:23, 44:11, 44:20, 46:18, 47:20, 48:2, 48:14, 49:3, 51:5, 52:6, 54:19, 55:1, 55:25, 56:21, 57:22, 59:1, 59:14, 60:17, 61:16, 61:19, 62:7, 63:1, 63:4, 64:2, 64:8, 64:20, 64:21, 65:16, 65:21, 66:13, 66:22, 68:4, 69:22, 70:16, 70:22, 73:15, 73:21, 74:1, 74:22, 75:22, 76:3, 77:15, 79:1, 79:4, 79:11, 79:12
**Honor's** [1] - 11:12
**HONORABLE** [1] - 2:11
**hope** [1] - 74:14
**hopefully** [4] - 6:25, 58:18, 59:3, 68:25
**horrific** [1] - 8:20
**hostile** [1] - 60:21
**hour** [3] - 28:14, 28:15, 66:1
**hours** [3] - 10:22, 61:20, 61:23
**household** [1] - 8:17
**housekeeping** [1] - 78:13
**Houston** [2] - 2:23, 3:7
**hyperbole** [1] - 26:5
**hypothetically** [1] - 54:10

**I**

**imagine** [1] - 40:7
**immediately** [2] - 25:17, 27:21
**impacted** [1] - 27:23
**important** [1] - 27:20
**impressions** [1] - 48:6
**improperly** [1] - 56:19
**in-person** [3] - 63:13, 64:22, 67:3
**inappropriate** [1] - 21:2
**Inc** [6] - 5:2, 5:3, 5:5, 5:6, 5:7

**INC** [6] - 1:3, 1:6, 1:11, 1:19, 1:22, 2:3
**inclination** [1] - 48:10
**include** [2] - 58:1, 58:6
**included** [1] - 43:1
**including** [5] - 9:11, 10:9, 40:13, 41:16, 56:6
**increased** [1] - 78:18
**incredible** [1] - 64:10
**indicates** [1] - 14:21
**indiscernible** [3] - 17:9, 66:19, 75:2
**indiscernible]** [1] - 55:2
**individuals** [1] - 48:18
**information** [55] - 8:15, 8:18, 8:19, 9:8, 12:25, 14:6, 14:11, 14:16, 14:24, 15:8, 16:4, 16:6, 16:10, 17:2, 19:15, 19:25, 23:9, 23:22, 24:18, 24:23, 25:2, 25:8, 25:20, 25:22, 25:23, 25:25, 26:12, 26:18, 29:13, 34:7, 36:3, 36:19, 36:20, 36:21, 37:7, 37:11, 37:13, 37:21, 37:24, 43:4, 47:8, 49:18, 52:1, 52:17, 52:19, 52:24, 53:20, 54:2, 55:11, 55:21, 56:15, 72:2, 72:21, 74:11
**initial** [1] - 53:25
**insight** [1] - 52:8
**instance** [1] - 15:10
**instant** [1] - 26:18
**instead** [1] - 48:16
**instituted** [1] - 49:12
**instruction** [2] - 54:3, 56:3
**intelligence** [2] - 17:22, 44:15
**intent** [1] - 38:15
**intention** [1] - 9:16
**intentionally** [1] - 9:14
**interest** [1] - 25:17
**interfere** [2] - 18:23, 30:6
**interim** [6] - 8:6, 11:10, 11:13, 12:14, 42:6, 47:9
**internet** [2] - 9:9, 16:15

**interpret** [1] - 74:14
**introduce** [1] - 5:10
**investigate** [3] - 18:11, 18:22, 25:12
**investigating** [1] - 27:21
**investigation** [8] - 24:25, 25:11, 25:16, 25:19, 29:24, 30:7, 44:9, 46:5, 49:6
**investigations** [1] - 29:3
**invited** [1] - 62:15
**involved** [4] - 25:18, 60:2, 60:3, 61:2
**ironic** [1] - 44:14
**issue** [33] - 7:21, 8:7, 12:19, 13:7, 14:22, 15:19, 28:18, 30:24, 31:13, 37:23, 42:8, 48:17, 49:17, 53:21, 53:23, 54:24, 56:5, 56:23, 57:24, 58:22, 63:25, 67:23, 69:1, 69:8, 69:17, 69:24, 70:1, 72:2, 72:16, 73:15, 76:12, 76:25, 78:9
**issues** [18] - 7:15, 11:9, 33:19, 57:7, 60:9, 60:13, 68:2, 68:14, 69:19, 73:10, 73:12, 73:17, 73:19, 73:25, 74:5, 74:8, 77:20, 78:12
**item** [1] - 78:13
**items** [1] - 58:4

**J**

**JACKSON** [2] - 3:5, 3:9
**January** [2] - 27:17, 28:7
**job** [2] - 18:10, 25:12
**joined** [1] - 5:24
**joint** [6] - 69:13, 69:20, 71:15, 73:18, 74:19, 76:11
**jointly** [2] - 68:11, 68:25
**JONATHAN** [2] - 2:21, 3:8
**Jonathan** [3] - 5:15, 6:24, 52:6
**JOSHUA** [1] - 3:17
**Joshua** [1] - 5:19
**judge** [1] - 19:24
**JUDGE** [1] - 2:11

**interpret** [1] - 74:14 (column 4 continues) ...

**Judge** [11] - 12:20, 19:13, 30:14, 47:4, 49:14, 49:24, 58:23, 71:9, 71:16, 73:4, 74:24
**jump** [1] - 48:16
**Junttila** [2] - 6:4, 38:23
**JUNTTILA** [119] - 3:2, 6:3, 17:6, 17:9, 17:19, 18:4, 18:6, 18:19, 19:7, 19:11, 19:20, 19:23, 20:13, 20:25, 21:18, 21:23, 21:25, 22:8, 22:15, 22:20, 23:1, 23:4, 23:8, 23:11, 23:14, 23:17, 23:20, 23:23, 24:2, 24:4, 24:9, 24:12, 24:19, 24:22, 25:3, 25:6, 25:9, 25:24, 26:19, 26:25, 27:11, 27:14, 27:18, 28:2, 28:5, 28:23, 29:19, 31:17, 31:21, 32:1, 32:4, 32:7, 32:10, 32:14, 32:20, 32:24, 33:1, 33:5, 33:7, 33:9, 33:11, 33:14, 33:16, 33:18, 33:23, 34:1, 34:4, 34:8, 34:11, 34:16, 34:18, 34:21, 34:25, 35:3, 35:6, 35:10, 35:13, 35:15, 35:17, 35:20, 35:22, 35:24, 36:2, 36:6, 36:8, 36:10, 36:12, 36:14, 36:17, 36:22, 37:1, 37:4, 37:8, 37:10, 37:16, 43:16, 43:20, 43:22, 44:8, 44:23, 44:25, 45:4, 45:9, 45:19, 45:21, 45:25, 46:14, 46:17, 46:21, 46:24, 47:4, 47:19, 49:3, 49:24, 51:4, 51:9, 51:12, 51:15, 55:1
**jurisdiction** [1] - 56:7
**justice** [1] - 29:20

**K**

**Kachouroff** [2] - 5:24, 6:1
**KAPLAN** [2] - 2:24, 5:21
**Kaplan** [1] - 5:22
**keep** [5] - 7:1, 8:12,

20:21, 47:19, 63:17
**KENNEDYS** [2] -
3:15, 3:18
**Kennedys** [1] - 5:18
**kept** [4] - 25:21,
32:25, 33:1, 34:6
**key** [3] - 33:3, 47:23,
54:22
**KIBORT** [1] - 2:24
**Kibort** [1] - 5:22
**kind** [1] - 58:5
**knock** [1] - 63:7
**knows** [5] - 8:22,
15:12, 16:17, 57:19,
77:20

## L

**laid** [1] - 11:13
**Lambert** [58] - 6:4,
6:5, 8:1, 9:1, 9:5,
9:22, 10:17, 10:23,
11:18, 12:23, 13:11,
13:14, 13:16, 13:19,
14:5, 14:17, 14:19,
14:25, 15:2, 15:6,
15:17, 16:5, 17:1,
17:5, 17:8, 17:11,
19:5, 20:9, 21:16,
25:19, 31:15, 38:6,
38:12, 38:20, 38:23,
39:3, 39:11, 40:25,
42:13, 42:23, 43:8,
43:14, 45:2, 48:23,
52:5, 53:15, 54:10,
54:13, 54:21, 55:12,
56:4, 57:2, 58:6, 58:9,
76:12, 78:9, 79:8
**LAMBERT** [120] -
3:2, 3:2, 6:3, 17:6,
17:9, 17:19, 18:4,
18:6, 18:19, 19:7,
19:11, 19:20, 19:23,
20:13, 20:25, 21:18,
21:23, 21:25, 22:8,
22:15, 22:20, 23:1,
23:4, 23:8, 23:11,
23:14, 23:17, 23:20,
23:23, 24:2, 24:4,
24:9, 24:12, 24:19,
24:22, 25:3, 25:6,
25:9, 25:24, 26:19,
26:25, 27:11, 27:14,
27:18, 28:2, 28:5,
28:23, 29:19, 31:17,
31:21, 32:1, 32:4,
32:7, 32:10, 32:14,
32:20, 32:24, 33:1,
33:5, 33:7, 33:9,
33:11, 33:14, 33:16,

33:18, 33:23, 34:1,
34:4, 34:8, 34:11,
34:16, 34:18, 34:21,
34:25, 35:3, 35:6,
35:10, 35:13, 35:15,
35:17, 35:20, 35:22,
35:24, 36:2, 36:6,
36:8, 36:10, 36:12,
36:14, 36:17, 36:22,
37:1, 37:4, 37:8,
37:10, 37:16, 43:16,
43:20, 43:22, 44:8,
44:23, 44:25, 45:4,
45:9, 45:19, 45:21,
45:25, 46:14, 46:17,
46:21, 46:24, 47:4,
47:19, 49:3, 49:24,
51:4, 51:9, 51:12,
51:15, 55:1
**Lambert's** [4] -
11:20, 39:15, 47:16,
52:12
**Lambert-Byrne** [1] -
78:9
**language** [1] - 70:7
**laptop** [3] - 33:10,
33:13, 33:18
**large** [2] - 44:10,
49:10
**last** [4] - 10:22,
35:21, 36:7, 71:25
**late** [1] - 45:6
**lately** [1] - 33:19
**LAURO** [1] - 3:12
**LAW** [1] - 3:2
**law** [25] - 5:22, 5:25,
9:25, 18:7, 18:9,
18:20, 18:22, 18:24,
22:1, 23:1, 25:8,
27:20, 28:9, 29:1,
29:3, 29:23, 30:16,
31:22, 31:24, 32:2,
35:14, 37:8, 48:20
**lawsuit** [1] - 17:21
**lawsuits** [3] - 8:14,
8:23, 9:1
**lawyer** [3] - 13:17,
55:18, 67:4
**lawyer-client** [1] -
13:17
**lawyers** [3] - 45:17,
46:11, 75:9
**Leaf** [14] - 10:23,
16:11, 16:14, 16:18,
16:21, 16:24, 23:8,
23:10, 25:2, 25:10,
32:3, 32:16, 39:3,
39:17
**leaf** [2] - 25:10, 25:13
**leaked** [3] - 15:7,

15:10, 40:25
**leaks** [1] - 10:25
**least** [6] - 17:2, 26:7,
26:12, 31:11, 55:4,
70:17
**leave** [1] - 76:8
**led** [1] - 46:8
**legal** [2] - 35:3, 35:4
**lens** [1] - 25:25
**less** [1] - 8:12
**letter** [1] - 25:5
**letters** [4] - 15:13,
52:7, 52:13, 53:22
**liability** [1] - 19:2
**lies** [2] - 8:24, 9:3
**life** [1] - 6:11
**lift** [1] - 69:1
**light** [2] - 12:22,
25:16
**lightly** [3] - 10:1,
10:11
**likely** [1] - 12:19
**LINDELL** [1] - 2:25
**Lindell** [2] - 5:23,
61:10
**Lindell's** [1] - 61:12
**Lisa** [1] - 80:12
**LISA** [2] - 4:1, 80:3
**list** [3] - 14:15, 14:23,
71:1
**listening** [1] - 6:23
**literally** [2] - 16:14,
26:2
**litigated** [2] - 41:7,
41:8
**litigation** [6] - 9:3,
18:3, 41:13, 41:14,
41:16, 41:18
**live** [3] - 68:19,
73:25, 74:20
**LLC** [1] - 2:24
**LLP** [7] - 2:15, 2:18,
2:21, 3:5, 3:9, 3:15,
3:18
**local** [1] - 28:3
**located** [9] - 17:15,
30:22, 30:23, 32:9,
36:20, 36:21, 37:14,
50:5, 60:3
**location** [1] - 39:9
**lock** [3] - 29:25,
31:17, 31:22, 31:24,
33:1, 47:19, 50:4,
50:8, 51:4, 51:18
**log** [6] - 39:17,
39:21, 44:13, 54:7,
54:8, 70:2, 76:25
**log-in** [6] - 39:17,

39:21, 44:13, 54:7,
54:8
**look** [5] - 18:24,
21:16, 27:18, 51:17,
57:3
**looking** [2] - 14:9,
69:15
**Los** [1] - 2:16
**Louisiana** [1] - 2:22
**lying** [1] - 27:7
**Lynn** [1] - 38:23

## M

**ma'am** [10] - 17:4,
21:22, 24:6, 28:6,
30:21, 34:20, 37:19,
48:4, 48:10, 49:22
**machine** [1] - 8:16
**MAGISTRATE** [1] -
2:11
**main** [1] - 62:8
**maintain** [4] - 13:10,
42:7, 47:9, 55:23
**maintained** [1] - 31:1
**maintaining** [4] -
38:1, 42:12, 43:2,
58:5
**major** [1] - 69:24
**majority** [1] - 59:24
**man** [1] - 8:21
**manner** [1] - 65:18
**MARC** [1] - 3:14
**marc** [2] - 5:17, 64:1
**March** [6] - 1:7, 1:15,
1:23, 2:7, 69:20,
80:10
**marked** [8] - 11:25,
18:2, 22:24, 31:6,
40:23, 40:25, 41:4,
41:23
**Market** [2] - 3:15,
3:18
**match** [1] - 71:22
**material** [3] - 41:13,
41:15, 41:17
**matter** [5] - 8:5,
28:25, 58:24, 69:15,
79:7
**matters** [2] - 5:9,
7:19
**McGlinchey** [1] -
15:2
**McIlhenny** [1] - 5:25
**McKinney** [1] - 3:6
**McSweeney** [1] -
5:25
**mean** [7] - 28:10,
32:3, 58:16, 58:19,

65:19, 66:1, 71:12
**means** [2] - 9:16,
62:1
**meant** [1] - 28:17
**meantime** [1] - 11:11
**measures** [1] - 14:9
**mechanism** [3] -
25:20, 25:21, 56:14
**media** [2] - 25:14
**meet** [4] - 63:5, 65:4,
66:8, 73:11
**meet-and-confer** [2]
- 63:5, 73:11
**meeting** [2] - 73:9,
77:21
**meets** [1] - 77:19
**members** [2] - 25:5,
35:8
**mentioned** [7] - 7:17,
11:10, 30:16, 37:22,
40:14, 45:2, 57:24
**mere** [1] - 25:14
**method** [1] - 14:25
**MICHAEL** [1] - 2:25
**Michigan** [7] - 3:4,
38:23, 38:25, 41:23,
45:16, 50:15, 50:16
**micro** [1] - 49:17
**micro-issue** [1] -
49:17
**might** [3] - 37:20,
48:17, 61:20
**migrated** [2] - 15:16,
52:25
**migrating** [4] -
52:10, 52:20, 53:20,
54:1
**Mike** [1] - 5:23
**military** [1] - 44:21
**million** [2] - 15:23,
27:2
**minimum** [1] - 46:25
**Minneapolis** [1] -
2:25
**Minnesota** [1] - 2:25
**MINOO** [1] - 3:8
**Minoo** [1] - 6:24
**minor** [2] - 67:6, 70:1
**minute** [1] - 29:22
**minutes** [1] - 8:12
**misrepresentation**
[1] - 25:13
**misrepresented** [1] -
43:24
**mistaken** [1] - 71:13
**moment** [2] - 74:25,
75:24
**Monday** [6] - 52:17,
73:23, 74:18, 77:23,
77:24, 78:1

month [4] - 23:13, 23:15, 23:17, 23:19
months [2] - 22:18, 28:8
MOONEY [1] - 3:17
Mooney [1] - 5:19
moot [1] - 72:20
mooted [3] - 69:19, 69:24, 70:1
morning [4] - 6:6, 51:23, 57:5, 76:14
most [5] - 7:22, 11:21, 14:5, 40:24, 59:23
motion [20] - 9:21, 10:3, 11:7, 11:18, 12:2, 12:16, 12:20, 13:2, 13:3, 14:3, 20:11, 30:15, 30:25, 37:25, 38:20, 41:11, 46:4, 58:11, 72:8
motions [1] - 12:15
mouth [1] - 7:1
move [2] - 57:23, 59:18
moving [2] - 51:16, 63:17
MOXILA [1] - 2:11
MR [64] - 5:17, 5:21, 6:6, 6:9, 6:12, 6:13, 6:17, 6:22, 7:4, 52:6, 53:5, 53:8, 53:16, 53:19, 54:12, 54:19, 63:24, 64:1, 64:5, 64:8, 65:9, 65:11, 65:15, 65:20, 66:4, 66:7, 66:13, 67:24, 68:4, 68:7, 70:3, 70:16, 70:20, 70:22, 70:24, 71:1, 71:15, 71:20, 71:22, 72:12, 72:15, 72:17, 72:19, 73:1, 73:4, 73:6, 73:8, 73:21, 74:1, 74:3, 74:7, 74:9, 74:22, 74:24, 75:2, 75:5, 75:14, 75:17, 75:20, 75:22, 77:15, 79:4, 79:11, 79:12
MS [174] - 5:12, 6:3, 8:10, 10:8, 10:20, 11:20, 13:6, 13:23, 14:13, 15:22, 16:2, 16:22, 17:6, 17:9, 17:19, 18:4, 18:6, 18:19, 19:7, 19:11, 19:20, 19:23, 20:10, 20:13, 20:25, 21:18, 21:23, 21:25, 22:5, 22:8, 22:11, 22:15,

22:20, 23:1, 23:4, 23:8, 23:11, 23:14, 23:17, 23:20, 23:23, 24:2, 24:4, 24:9, 24:12, 24:19, 24:22, 25:3, 25:6, 25:9, 25:24, 26:19, 26:25, 27:11, 27:14, 27:18, 28:2, 28:5, 28:23, 29:19, 31:17, 31:21, 32:1, 32:4, 32:7, 32:10, 32:14, 32:20, 32:24, 33:1, 33:5, 33:7, 33:9, 33:11, 33:14, 33:16, 33:18, 33:23, 34:1, 34:4, 34:8, 34:11, 34:16, 34:18, 34:21, 34:25, 35:3, 35:6, 35:10, 35:13, 35:15, 35:17, 35:20, 35:22, 35:24, 36:2, 36:6, 36:8, 36:10, 36:12, 36:14, 36:17, 36:22, 37:1, 37:4, 37:8, 37:10, 37:16, 38:5, 38:7, 38:15, 38:18, 40:2, 40:5, 40:10, 40:22, 41:24, 42:2, 42:11, 43:16, 43:20, 43:22, 44:8, 44:23, 44:25, 45:4, 45:9, 45:19, 45:21, 45:25, 46:14, 46:17, 46:21, 46:24, 47:4, 47:19, 48:2, 48:14, 49:2, 49:3, 49:24, 51:4, 51:9, 51:12, 51:15, 51:25, 55:1, 55:25, 56:3, 56:21, 57:22, 59:1, 59:14, 61:16, 69:22, 70:4, 70:11, 70:13, 71:3, 76:3, 76:7, 76:10, 76:16, 76:22, 77:9, 77:13, 77:18, 78:1, 78:3, 78:5, 78:8, 78:12, 78:21, 79:1
must [3] - 11:19, 20:14, 66:20
MY [2] - 1:6, 2:24

## N

name [6] - 8:17, 35:12, 35:19, 35:21, 36:5, 36:7
names [2] - 23:7, 24:2
narrow [2] - 29:1, 74:10

national [5] - 9:17, 17:22, 28:5, 44:15, 44:17
nationals [2] - 27:3, 44:18
naturally [1] - 60:21
nearly [1] - 8:13
necessarily [2] - 7:17, 16:22
necessary [1] - 58:20
need [25] - 19:24, 20:3, 22:4, 23:7, 30:25, 31:4, 31:5, 39:24, 46:7, 47:5, 47:6, 50:7, 51:21, 55:23, 59:4, 59:13, 59:15, 63:9, 63:13, 66:2, 67:14, 67:15, 68:16, 69:6, 69:21
needed [1] - 46:2
needs [5] - 9:23, 18:22, 30:17, 46:7, 67:17
Neerman [4] - 6:24, 7:10, 71:14, 72:25
NEERMAN [9] - 3:8, 73:4, 73:6, 73:8, 73:21, 74:1, 74:3, 74:7, 74:24
negotiated [1] - 41:12
Networks [2] - 5:6, 6:18
NETWORKS [1] - 1:22
neutrally [1] - 59:3
never [3] - 18:23, 50:12, 51:20
new [4] - 39:22, 51:20, 53:1, 53:21
New [2] - 2:20
newman [1] - 36:8
Newman [4] - 36:10, 36:11, 36:16, 50:11
news [1] - 6:22
next [5] - 11:4, 47:6, 55:5, 75:10, 77:18
nice [1] - 6:9
Nichols [7] - 12:20, 19:13, 30:14, 49:14, 58:23, 71:9, 71:16
nightmares [1] - 64:9
Ninth [1] - 2:19
nobody [1] - 54:1
norm [1] - 60:25
North [3] - 2:25, 3:12, 3:15
Northwest [2] - 4:3,

80:14
note [1] - 65:15
notes [16] - 34:5, 34:9, 34:10, 34:23, 35:2, 35:16, 35:18, 36:1, 36:16, 36:20, 42:9, 48:3, 48:6, 48:12, 50:14, 80:5
notice [2] - 10:7, 29:16
noticed [2] - 61:3, 62:16
notices [1] - 61:10
noticing [1] - 67:21
notification [1] - 56:23
notified [1] - 29:24
notify [1] - 29:16
November [1] - 28:1
nowhere [1] - 33:15
number [7] - 38:25, 39:1, 61:19, 61:23, 68:14, 68:18, 70:9
numerous [1] - 10:21

## O

O'CONNOR [1] - 3:21
Oakland [1] - 38:25
OAN [13] - 3:5, 6:20, 61:20, 68:18, 71:14, 71:23, 72:6, 73:3, 73:14, 73:19, 74:19, 77:20, 78:15
OAN's [1] - 73:12
OAN-specific [3] - 68:18, 73:19, 74:19
oath [1] - 15:5
objecting [2] - 71:24, 72:1
objection [3] - 54:22, 55:2, 69:2
obligation [5] - 17:23, 24:7, 66:15, 67:1, 67:14
oblige [1] - 59:6, 59:10, 63:20
obstruct [1] - 49:5
obstructed [1] - 29:24
obstruction [2] - 29:20, 49:11
obtain [2] - 19:16, 44:13
occasion [1] - 15:9
OF [4] - 1:1, 2:1, 2:10, 3:2

office [9] - 33:2, 33:4, 33:8, 39:20, 44:11, 47:15, 47:16, 47:19, 47:23
Office [2] - 23:6, 23:25
OFFICE [1] - 3:2
office's [1] - 36:5
officer [4] - 17:23, 20:21, 47:22, 52:21
officers [1] - 25:8
offices [1] - 8:22
Official [1] - 4:1
official [1] - 80:12
old [1] - 39:22
one [45] - 7:12, 10:25, 13:24, 15:16, 16:13, 25:3, 28:12, 28:15, 28:25, 33:17, 34:2, 34:21, 35:10, 40:19, 43:22, 47:13, 47:17, 51:23, 52:7, 52:9, 53:4, 53:18, 53:21, 54:23, 55:25, 60:4, 61:24, 62:2, 63:11, 63:22, 66:1, 66:7, 67:16, 70:1, 70:21, 71:1, 71:25, 76:10, 76:16, 76:19, 76:23, 77:6, 77:18, 79:7
one-hour [1] - 66:1
one-off [1] - 66:7
ones [5] - 32:15, 59:8, 60:14, 63:19, 74:20
ongoing [4] - 10:22, 24:24, 27:23, 77:19
open [1] - 44:8
opening [1] - 11:10
operating [2] - 52:20, 60:7
opinion [1] - 59:14
opportunity [13] - 8:2, 8:8, 9:13, 12:7, 12:24, 19:12, 21:16, 28:13, 28:20, 45:6, 45:13, 58:24, 69:3
opposed [1] - 26:20
opposite [2] - 59:9, 60:15
oral [3] - 8:9, 48:22, 58:19
order [66] - 7:24, 9:15, 10:18, 10:19, 10:21, 11:8, 11:14, 11:19, 11:21, 11:22, 12:10, 12:14, 12:18, 13:10, 13:19, 15:8, 16:3, 18:8, 18:15,

89

19:19, 20:20, 20:23, 21:1, 21:19, 21:20, 26:7, 26:24, 28:17, 28:20, 29:17, 41:2, 41:10, 41:18, 42:22, 43:1, 43:12, 47:1, 47:9, 47:16, 48:19, 48:22, 49:8, 50:18, 50:23, 54:23, 55:9, 55:17, 56:1, 56:7, 56:9, 57:1, 57:24, 58:2, 58:3, 58:13, 58:15, 59:4, 59:17, 63:14, 68:12, 72:5, 73:24, 74:16, 76:12, 78:16, 78:25

**ordered** [2] - 72:21, 76:18
**orderly** [4] - 7:14, 7:17, 8:8, 72:24
**orders** [1] - 69:23
**original** [2] - 15:13, 53:19
**originally** [1] - 52:19
**otherwise** [4] - 15:7, 15:11, 39:7, 57:17
**outgoing** [1] - 43:7
**outrageous** [1] - 44:23
**outside** [5] - 14:19, 15:13, 15:14, 15:16, 26:23
**own** [5] - 12:10, 40:10, 43:25, 53:6, 53:8

**P**

**P.C** [1] - 64:6
**p.m** [9] - 1:7, 1:15, 1:23, 2:7, 58:14, 74:18, 77:14, 77:25, 78:1
**page** [3] - 33:17, 76:7, 78:23
**pages** [5] - 16:9, 16:13, 16:16, 22:23, 69:6
**paid** [1] - 40:6
**papers** [2] - 57:17, 68:15
**Paragraph** [1] - 41:9
**Parker** [1] - 5:22
**PARKER** [1] - 2:24
**part** [3] - 22:3, 38:21, 58:10
**participate** [1] - 62:3
**particular** [3] - 26:17, 67:10, 67:13

**particularly** [1] - 69:8
**parties** [22] - 5:10, 7:16, 8:4, 26:23, 41:3, 41:12, 51:22, 54:14, 55:8, 61:1, 61:5, 61:7, 62:10, 68:9, 68:24, 70:7, 71:4, 72:4, 76:11, 77:1, 78:19
**partner** [1] - 5:19
**partners** [1] - 6:24
**party** [22] - 7:13, 15:25, 22:25, 29:9, 29:17, 37:7, 41:14, 41:15, 42:5, 49:10, 53:8, 54:6, 54:8, 57:15, 61:3, 61:4, 67:18, 67:19, 67:21, 69:2, 71:13, 78:21
**password** [2] - 50:4, 54:7
**password-protected** [1] - 50:4
**passwords** [1] - 54:14
**past** [1] - 70:5
**Patrick** [4] - 8:25, 14:17, 40:6, 40:7
**PATRICK** [2] - 1:14, 3:2
**pause** [2] - 39:13, 75:25
**paused** [1] - 40:15
**pendency** [3] - 42:20, 47:3, 48:25
**pending** [11] - 6:1, 12:15, 13:2, 38:24, 40:15, 49:20, 50:19, 50:21, 54:17, 55:19, 72:8
**Pennsylvania** [1] - 3:19
**people** [5] - 16:15, 62:14, 64:22, 65:23, 66:24
**People** [1] - 38:22
**per** [1] - 7:13
**perfectly** [2] - 60:10, 65:21
**perhaps** [2] - 48:13, 63:4
**permission** [2] - 26:22, 76:24
**permitted** [1] - 41:17
**perpetuate** [1] - 9:1
**person** [32] - 41:16, 47:23, 47:24, 54:10, 59:7, 59:10, 61:23, 62:15, 62:18, 62:20, 62:22, 62:25, 63:13,

63:16, 63:19, 63:22, 64:13, 64:22, 64:23, 64:25, 65:13, 65:22, 65:25, 66:2, 66:12, 67:3, 67:5, 67:7, 67:15, 67:18, 67:20
**personnel** [1] - 79:9
**PHANIE** [1] - 35:23
**Philadelphia** [1] - 3:19
**phone** [7] - 33:21, 34:18, 34:21, 36:1, 48:4, 50:5, 50:7
**phones** [1] - 34:19
**pick** [1] - 64:14
**picture** [1] - 29:4
**Pillow** [2] - 5:3, 5:23
**PILLOW** [2] - 1:6, 2:24
**place** [3] - 13:19, 36:19, 61:12
**places** [6] - 30:22, 36:18, 37:12, 50:8, 60:3, 65:18
**placing** [2] - 42:5
**plain** [2] - 41:6, 41:11
**Plaintiff** [1] - 67:20
**Plaintiffs** [5] - 1:4, 1:12, 1:20, 2:4, 5:14
**PLAINTIFFS** [1] - 2:14
**Plaintiffs'** [1] - 5:11
**play** [1] - 49:13
**played** [1] - 49:15
**playing** [1] - 54:6
**point** [12] - 16:17, 19:25, 29:7, 38:9, 40:19, 41:9, 41:12, 58:16, 63:15, 72:13, 72:15, 72:19
**pointed** [1] - 13:25
**points** [2] - 38:8, 66:17
**police** [1] - 18:13
**position** [3] - 29:11, 31:9, 57:16
**possession** [5] - 14:10, 17:16, 25:16, 30:23, 31:16, 32:16, 38:13, 39:7, 43:6, 43:7, 43:8, 49:18, 49:19, 56:13, 56:19
**possible** [6] - 14:6, 57:3, 59:3, 59:19, 59:20, 63:23
**post** [1] - 25:14
**posted** [1] - 45:24
**posting** [1] - 25:13
**posts** [2] - 11:1, 11:5

**Powell** [9] - 5:8, 5:18, 64:1, 64:5, 64:6, 70:17, 70:18, 70:24, 71:2
**POWELL** [2] - 2:6, 3:14
**practicable** [2] - 76:13, 79:7
**practically** [1] - 60:1
**practice** [1] - 35:14
**precisely** [1] - 38:15
**preclude** [1] - 59:16
**predecessor** [1] - 29:18
**predict** [1] - 60:8
**prefer** [1] - 48:15
**preference** [1] - 7:12
**prefers** [1] - 13:8
**prejudge** [1] - 30:12
**present** [1] - 45:14
**preserve** [1] - 56:5
**preserved** [2] - 48:20, 56:17
**preserving** [1] - 29:23
**preside** [1] - 28:25
**press** [2] - 25:5, 41:7
**presume** [1] - 76:20
**prevent** [7] - 13:1, 16:21, 18:8, 18:20, 31:5, 55:14, 55:15
**previewed** [1] - 14:3
**previous** [7] - 17:1, 20:15, 21:3, 22:16, 51:15, 66:21, 69:23
**previously** [1] - 8:16
**primary** [1] - 28:2
**principal** [1] - 45:7
**print** [3] - 32:5, 32:12, 32:16
**printed** [6] - 31:19, 32:7, 32:13, 36:25, 47:15, 48:1
**printed-out** [1] - 48:1
**private** [1] - 34:11
**privilege** [6] - 19:15, 20:2, 20:16, 20:23, 70:2, 76:25
**privileged** [3] - 21:8, 34:9, 43:5
**privy** [1] - 21:5
**Procedure** [1] - 66:15
**procedure** [2] - 7:19, 31:11
**proceed** [1] - 71:11
**proceeding** [2] - 7:5, 48:21
**proceedings** [2] - 79:14, 80:6

**Powell** ... 
**process** [7] - 15:16, 18:23, 22:16, 52:10, 52:20, 52:22, 53:25
**produced** [11] - 9:3, 14:16, 14:24, 15:22, 41:3, 41:13, 52:11, 53:9, 72:6, 72:7, 80:6
**producing** [1] - 41:14
**product** [5] - 27:8, 34:9, 34:15, 42:10, 43:5
**production** [1] - 53:10
**productions** [1] - 78:22
**prompt** [3] - 9:23, 10:14, 56:23
**prompted** [1] - 8:20
**promptly** [2] - 9:22, 10:2
**proper** [1] - 13:18
**propose** [2] - 13:4, 70:5
**proposed** [9] - 11:14, 43:1, 43:12, 55:9, 56:1, 56:9, 58:2, 58:3, 76:11
**proposes** [1] - 59:5
**proposition** [1] - 18:18
**prosecutor** [1] - 50:17
**protect** [1] - 11:11
**protected** [5] - 15:8, 19:14, 20:1, 39:24, 50:4
**protections** [1] - 78:18
**protective** [31] - 7:24, 10:18, 10:19, 10:21, 11:19, 11:21, 11:22, 12:10, 12:18, 13:19, 15:8, 16:3, 18:8, 18:15, 19:19, 20:20, 20:22, 21:1, 21:19, 21:20, 26:7, 26:23, 28:17, 28:20, 29:17, 41:2, 41:10, 50:22, 56:7, 57:23, 78:16
**protocol** [15] - 57:9, 57:12, 61:17, 61:21, 64:10, 64:18, 64:19, 68:10, 68:12, 68:13, 70:2, 70:10, 70:14, 76:17, 77:2
**proudly** [1] - 9:9
**provide** [8] - 15:17, 17:2, 18:25, 20:14,

24:24, 41:15, 44:1, 77:22
**provided** [9] - 11:14, 15:9, 16:6, 18:12, 20:15, 20:17, 31:22, 39:10, 39:16
**provides** [2] - 9:15, 39:1
**providing** [1] - 27:8, 39:2
**provision** [4] - 11:21, 11:23, 70:2, 70:8
**public** [10] - 12:8, 12:11, 16:7, 25:17, 28:5, 41:17, 41:22, 45:23, 46:23, 64:24
**publicly** [5] - 12:1, 16:10, 16:13, 38:21, 39:4
**purpose** [1] - 26:13
**purposes** [1] - 41:14
**pursuant** [2] - 7:23, 19:19
**pursue** [1] - 18:11
**put** [4] - 9:21, 38:14, 48:10, 50:3
**putting** [2] - 12:5, 61:18

### Q

**quash** [2] - 44:10, 46:4
**questioning** [2] - 67:3, 67:5
**questions** [5] - 8:5, 37:20, 38:11, 40:2, 40:17
**quick** [1] - 38:8
**quickly** [1] - 59:19
**quite** [1] - 27:14
**quo** [1] - 11:11, 13:10, 31:1, 38:2, 39:23, 42:7, 42:12, 43:3, 47:9, 55:24, 58:5
**quote** [3] - 16:19, 38:21, 39:1

### R

**raise** [1] - 78:14
**raised** [1] - 7:22
**random** [1] - 65:18
**rather** [1] - 9:6
**RDR** [3] - 4:1, 80:3, 80:12
**reach** [1] - 77:4
**reached** [1] - 63:5

read [3] - 45:3, 66:21, 69:23
**reading** [1] - 11:20
**real** [2] - 67:7, 67:12
**really** [7] - 28:18, 60:15, 62:15, 62:18, 66:2, 67:11, 67:18
**realtime** [1] - 27:3
**reason** [11] - 10:13, 11:17, 30:3, 30:11, 41:6, 59:8, 62:8, 62:11, 67:7, 67:22, 78:17
**reasons** [3] - 10:19, 11:6, 11:7
**received** [8] - 14:25, 27:15, 28:4, 28:6, 44:1, 46:2, 54:7, 54:8
**receiving** [1] - 41:15
**recent** [1] - 23:14
**recently** [2] - 7:22, 10:22
**recognize** [1] - 10:14
**record** [12] - 5:11, 20:13, 21:15, 22:14, 22:19, 30:20, 41:22, 45:23, 50:1, 56:22, 58:7, 63:19
**RECORDING** [1] - 2:10
**recording** [1] - 75:25
**records** [1] - 23:12
**recount** [1] - 12:13
**red** [1] - 64:10
**refer** [3] - 6:19, 48:12, 71:9
**reference** [1] - 41:20
**referenced** [1] - 73:14
**referred** [8] - 12:17, 12:20, 12:21, 16:18, 58:25, 71:8, 71:17, 71:21
**referring** [4] - 21:7, 21:9, 28:1, 35:5
**reflect** [1] - 48:6
**reflecting** [1] - 34:6
**reflects** [3] - 27:1, 27:2, 27:5
**regarding** [3] - 19:16, 20:4, 76:12
**regardless** [2] - 9:16, 41:4
**regards** [1] - 20:16
**related** [1] - 56:16
**relating** [4] - 12:10, 14:5, 56:5, 77:1
**relationship** [1] - 13:17
**Relativity** [4] - 51:10,

51:13, 51:24, 53:6
**released** [5] - 15:7, 15:11, 15:25, 29:8, 29:15
**relevant** [1] - 13:17, 52:1
**relief** [7] - 7:23, 8:6, 11:10, 11:13, 12:15, 29:10, 42:7
**relying** [2] - 45:10, 45:11
**remaining** [1] - 57:14
**remarks** [3] - 8:12, 11:10, 39:15
**remedy** [3] - 9:24, 10:10, 30:16
**remote** [15] - 57:14, 57:21, 59:6, 59:11, 59:13, 59:15, 60:10, 60:24, 62:11, 62:24, 63:17, 65:3, 65:22, 65:23, 66:10
**remotely** [2] - 60:11, 60:13
**Renaissance** [1] - 3:3
**reply** [2] - 58:13, 78:8
**report** [4] - 17:24, 69:20, 73:18, 74:19
**Reporter** [2] - 4:1, 80:12
**repository** [9] - 33:25, 39:22, 40:4, 40:6, 40:12, 43:15, 51:3, 51:8, 53:4
**representation** [4] - 13:15, 19:16, 20:5, 47:22
**represented** [3] - 27:6, 45:18, 49:7
**representing** [1] - 6:18
**REPUBLIC** [1] - 3:21
**Republic** [1] - 6:7
**request** [19] - 7:23, 9:7, 10:17, 12:14, 14:2, 42:21, 47:1, 48:8, 48:22, 50:16, 50:19, 55:10, 55:11, 59:9, 62:3, 63:12, 69:1, 69:2, 71:7
**requested** [3] - 61:21, 62:17, 77:19
**requesting** [2] - 63:1, 64:13
**requests** [6] - 13:24, 14:4, 42:25, 43:11, 59:24, 67:21
**required** [2] - 18:13,

26:17
**requiring** [1] - 16:3
**research** [1] - 18:19
**resolution** [7] - 12:15, 13:2, 49:21, 50:20, 50:21, 55:19, 72:9
**resolve** [6] - 57:15, 68:23, 71:4, 72:10, 74:15, 75:10
**resolved** [1] - 67:23
**respect** [13] - 28:23, 42:9, 47:12, 47:14, 48:3, 48:8, 50:15, 51:2, 57:9, 57:12, 58:8, 68:13, 73:13
**respectfully** [1] - 48:14
**respective** [1] - 69:3
**respond** [8] - 8:2, 9:7, 10:5, 12:24, 17:11, 17:17, 43:17, 73:3
**responded** [2] - 44:2, 44:9
**response** [6] - 17:13, 17:14, 28:14, 58:9, 58:11, 62:21
**responsive** [1] - 9:12
**resubmitted** [1] - 71:17
**result** [1] - 29:19
**resulted** [1] - 8:19
**results** [1] - 74:10
**retainer** [1] - 20:4, 20:7
**retains** [1] - 56:7
**return** [1] - 56:14
**returning** [1] - 42:4
**review** [8] - 9:13, 23:5, 23:12, 26:21, 45:6, 48:25, 56:12, 68:11
**reviewed** [2] - 21:20, 57:6
**reviewing** [3] - 18:9, 34:23, 35:1
**rings** [1] - 26:15
**Rion** [1] - 6:19
**ripe** [1] - 73:16
**Robert** [1] - 6:18
**role** [1] - 28:25
**room** [1] - 60:20
**Room** [1] - 4:3
**ROSS** [19] - 2:21, 52:6, 53:5, 53:8, 53:16, 53:19, 54:12, 54:19, 71:15, 71:20, 71:22, 72:12, 72:15, 72:17, 72:19, 73:1,

74:9, 74:22, 79:12
**Ross** [8] - 3:9, 5:15, 51:25, 52:4, 52:6, 71:14, 73:9, 73:14
**Round** [2] - 57:10
**row** [1] - 7:1
**Rule** [2] - 66:15, 78:6
**rule** [1] - 66:16
**rules** [3] - 67:3, 74:14, 78:3
**ruling** [1] - 53:1
**run** [2] - 28:3, 60:8
**Russell** [1] - 36:6

### S

**safe** [1] - 32:25
**safety** [1] - 9:17
**sanctions** [5] - 13:3, 14:3, 14:4, 30:15, 37:25
**schedule** [1] - 57:25, 58:19, 59:4, 60:4, 62:4, 63:14
**scheduled** [1] - 61:8
**schedules** [2] - 60:6, 62:12
**scheduling** [4] - 59:16, 60:8, 61:3, 64:9
**school** [1] - 69:5
**scope** [5] - 13:15, 15:4, 29:2, 43:9, 47:7
**Scott** [6] - 35:22, 48:5, 48:22, 50:1, 50:2, 50:10
**seal** [5] - 11:18, 12:7, 47:2, 47:3, 50:21
**sealing** [1] - 50:19
**seat** [2] - 7:9, 37:18
**second** [4] - 22:3, 39:12, 39:14, 76:16
**secrets** [2] - 28:17, 29:12
**security** [1] - 44:17
**see** [6] - 6:9, 51:17, 60:1, 66:5, 72:23, 75:11
**seeing** [1] - 70:4
**seek** [6] - 25:23, 28:11, 44:10, 50:23, 55:18, 56:3
**seeking** [6] - 8:7, 11:13, 26:12, 26:20, 26:22, 42:6
**seeks** [1] - 14:4
**segregate** [1] - 48:23
**segregated** [2] - 48:11, 48:16

**send** [6] - 55:9, 68:9, 68:10, 69:10, 69:11, 70:6
  **sending** [1] - 57:10
  **sensitive** [1] - 29:12
  **sent** [4] - 15:13, 22:10, 52:13, 53:22
  **separate** [3] - 19:3, 30:7, 64:23
  **Serbian** [2] - 44:18, 44:21
  **serious** [2] - 25:16, 46:5
  **seriously** [4] - 30:18, 49:16, 49:23, 67:2
  **services** [1] - 27:5
  **set** [10] - 5:9, 7:18, 53:12, 58:19, 59:17, 68:19, 69:17, 73:11, 76:18, 77:11
  **sets** [1] - 30:25
  **seven** [1] - 16:12
  **several** [3] - 28:8, 29:15, 65:17
  **severe** [3] - 9:24, 10:10, 30:16
  **SHACKELFORD** [1] - 2:17
  **Shackelford** [1] - 5:15
  **share** [4] - 13:18, 48:12, 48:24, 57:1
  **shared** [4] - 9:8, 16:4, 16:17, 17:3
  **sharing** [1] - 41:2
  **sheriff** [8] - 10:23, 23:8, 44:1, 44:4, 44:6, 45:16, 45:24, 46:9
  **Sheriff** [11] - 16:11, 16:14, 16:18, 16:21, 16:24, 23:10, 25:2, 25:10, 32:3, 39:3, 39:17
  **sheriff's** [4] - 23:4, 39:20, 44:11, 46:11
  **sheriffs** [1] - 25:11
  **short** [3] - 16:2, 68:23, 78:25
  **show** [1] - 64:14
  **showing** [1] - 14:19
  **shut** [1] - 7:1
  **sic** [1] - 55:16
  **side** [6] - 50:9, 53:6, 65:20, 75:8, 75:9
  **sides** [1] - 8:8
  **Sidney** [2] - 64:5
  **SIDNEY** [1] - 2:6
  **sign** [2] - 19:18, 21:1
  **signature** [2] - 21:17, 22:7

**signed** [8] - 19:22, 20:9, 20:19, 21:11, 21:12, 21:19, 22:22, 27:12
  **signing** [2] - 18:3, 21:20
  **similar** [1] - 72:12
  **simply** [1] - 62:8
  **Singer** [1] - 6:14
  **SINGER** [3] - 3:11, 3:12, 6:13
  **single** [1] - 61:7
  **sit** [3] - 6:25, 60:15, 61:23
  **site** [2] - 31:18, 31:23
  **sitting** [1] - 60:20
  **situation** [1] - 12:9
  **situations** [1] - 66:7
  **six** [3] - 13:9, 13:24, 64:23
  **Sixth** [1] - 38:24
  **slow** [1] - 63:16
  **small** [1] - 32:17
  **Smartmatic** [7] - 72:3, 72:5, 72:6, 72:9, 73:13, 73:14, 75:6
  **social** [2] - 25:13, 25:14
  **software** [1] - 27:6
  **sole** [1] - 10:16
  **solely** [1] - 41:14
  **someone** [7] - 40:7, 57:20, 62:5, 66:17, 66:20, 67:5
  **sometime** [3] - 27:17, 28:7
  **somewhat** [1] - 72:24
  **soon** [3] - 57:2, 76:13, 79:7
  **sorry** [7] - 16:11, 36:9, 38:10, 40:3, 45:20, 57:23, 64:4
  **sort** [1] - 54:24
  **sought** [2] - 10:4, 29:10
  **space** [2] - 69:8, 69:9
  **SPEAKER** [3] - 66:19, 66:22, 66:25
  **speaking** [2] - 7:8, 54:10
  **specific** [14] - 11:13, 11:15, 13:9, 13:24, 32:3, 32:12, 61:21, 62:2, 63:19, 65:2, 68:18, 71:13, 73:19, 74:19
  **specifically** [2] - 15:10, 23:3
  **speed** [1] - 62:8

**spelling** [1] - 36:13
  **spent** [2] - 9:9, 65:17
  **spoiler** [1] - 70:22
  **spoken** [2] - 37:2, 37:4
  **sport** [1] - 67:8
  **spread** [2] - 8:15, 9:3
  **Sr** [1] - 6:19
  **staff** [2] - 35:5, 35:8
  **stamped** [1] - 12:4
  **standard** [1] - 64:22
  **standing** [1] - 59:21
  **Stars** [1] - 2:15
  **start** [3] - 27:21, 38:10, 78:21
  **starts** [1] - 75:8
  **State** [1] - 38:23
  **States** [3] - 4:2, 23:6, 80:13
  **STATES** [3] - 1:1, 2:1, 2:11
  **stating** [2] - 5:11, 46:3
  **STATUS** [1] - 2:10
  **status** [15] - 5:9, 11:11, 13:10, 31:1, 38:2, 39:23, 42:7, 42:12, 43:2, 47:9, 52:24, 55:24, 58:5, 73:18, 74:19
  **stay** [2] - 47:16, 79:9
  **Stefanie** [4] - 6:4, 9:22, 38:20, 38:23
  **STEFANIE** [2] - 3:2, 3:2
  **stenographic** [1] - 80:5
  **step** [2] - 15:1, 21:24
  **Stephanie** [1] - 35:20
  **Stephen** [1] - 5:15
  **STEPHEN** [1] - 2:17
  **steps** [2] - 55:6, 55:19
  **stick** [1] - 71:22
  **still** [9] - 68:19, 72:8, 73:15, 73:16, 73:20, 73:25, 74:11, 74:20, 77:20
  **stop** [9] - 8:14, 8:24, 13:25, 14:9, 31:12, 53:23, 55:5, 57:19
  **stopped** [2] - 52:21, 54:1, 54:16
  **stopping** [2] - 9:16, 13:21
  **stored** [1] - 34:13
  **Street** [5] - 2:22, 2:25, 3:12, 3:15, 3:18
  **styled** [1] - 38:22
  **subject** [3] - 26:23,

50:13, 50:22
  **submission** [2] - 69:13, 74:16
  **submit** [4] - 57:2, 72:15, 72:19, 72:20
  **submitted** [2] - 69:12, 71:15
  **subpoena** [3] - 44:1, 44:10, 46:2
  **subset** [1] - 62:20
  **substantive** [1] - 37:23
  **sued** [4] - 17:21, 17:22, 19:4, 44:15
  **suffered** [1] - 60:18
  **sufficient** [1] - 47:25
  **suggested** [1] - 13:9
  **suggestion** [1] - 56:1
  **suit** [1] - 49:7
  **Suite** [7] - 2:16, 2:22, 3:6, 3:10, 3:16, 3:19, 3:22
  **supplemental** [1] - 74:19
  **surprise** [1] - 70:20
  **SUSMAN** [3] - 2:15, 2:18, 2:21
  **Susman** [1] - 5:13
  **switching** [1] - 59:2
  **swoop** [1] - 61:24
  **system** [2] - 27:3, 44:19

**T**

**table** [1] - 7:9
  **tablet** [3] - 33:21, 50:6, 50:7
  **Tampa** [2] - 3:12, 3:13
  **tasked** [1] - 27:4
  **team** [3] - 16:8, 35:3, 35:4
  **technology** [1] - 60:10
  **template** [3] - 68:24, 69:11, 74:17
  **term** [1] - 19:2
  **terminated** [1] - 21:3
  **terms** [5] - 20:22, 42:12, 57:8, 58:16, 64:8
  **testimony** [1] - 25:17
  **Texas** [3] - 2:23, 3:7, 3:10
  **THE** [247] - 1:1, 2:1, 2:10, 2:11, 2:14, 2:24, 3:2, 3:5, 3:11, 3:14, 3:20, 3:21, 5:1, 5:16,

5:20, 6:2, 6:5, 6:8, 6:10, 6:15, 6:21, 7:2, 7:6, 9:24, 10:16, 11:17, 12:13, 13:20, 14:7, 15:20, 15:24, 16:20, 17:4, 17:7, 17:10, 18:1, 18:5, 18:17, 19:5, 19:8, 19:17, 19:21, 20:6, 20:12, 20:18, 21:5, 21:22, 21:24, 22:2, 22:7, 22:9, 22:13, 22:17, 22:21, 23:3, 23:7, 23:9, 23:13, 23:15, 23:19, 23:21, 24:1, 24:3, 24:6, 24:10, 24:13, 24:21, 25:1, 25:4, 25:7, 25:19, 26:5, 26:20, 27:9, 27:12, 27:17, 27:25, 28:4, 28:6, 29:6, 30:10, 31:19, 31:24, 32:2, 32:5, 32:9, 32:11, 32:18, 32:21, 32:25, 33:3, 33:6, 33:8, 33:10, 33:12, 33:15, 33:17, 33:20, 33:25, 34:2, 34:5, 34:10, 34:13, 34:17, 34:19, 34:22, 35:1, 35:4, 35:8, 35:12, 35:14, 35:16, 35:19, 35:21, 35:23, 35:25, 36:4, 36:7, 36:9, 36:11, 36:13, 36:15, 36:18, 36:24, 37:2, 37:6, 37:9, 37:12, 37:18, 38:6, 38:10, 38:17, 40:1, 40:4, 40:9, 40:21, 41:21, 42:1, 42:3, 43:13, 43:18, 43:21, 44:6, 44:22, 44:24, 45:1, 45:5, 45:10, 45:20, 45:22, 46:6, 46:16, 46:19, 46:22, 46:25, 47:5, 47:21, 48:3, 49:1, 49:9, 49:25, 51:6, 51:11, 51:13, 51:21, 52:3, 53:3, 53:6, 53:14, 53:17, 54:5, 54:18, 54:20, 55:3, 56:2, 56:8, 56:25, 58:3, 59:12, 60:23, 63:21, 63:25, 64:4, 64:7, 65:7, 65:10, 65:12, 65:17, 66:1, 66:5, 66:12, 66:14, 66:20, 66:23, 67:1, 67:25, 68:5, 68:8, 70:9,

70:12, 70:19, 70:21, 70:23, 70:25, 71:6, 71:19, 71:21, 72:11, 72:14, 72:16, 72:18, 72:23, 73:2, 73:5, 73:7, 73:17, 73:22, 74:2, 74:6, 74:13, 74:23, 74:25, 75:3, 75:13, 75:16, 75:18, 75:21, 75:23, 76:1, 76:6, 76:9, 76:15, 76:21, 77:7, 77:11, 77:14, 77:17, 77:24, 78:2, 78:4, 78:6, 78:11, 78:20, 78:24, 79:2, 79:5, 79:13

**themselves** [2] - 28:16, 63:11

**theoretically** [1] - 53:4

**therefore** [1] - 12:5

**they've** [5] - 39:16, 42:17, 59:10, 72:3, 72:4

**thinking** [1] - 30:18

**thinks** [2] - 10:12, 42:22

**third** [13] - 15:25, 22:25, 29:9, 37:7, 42:5, 54:6, 54:8, 54:14, 62:10, 76:19, 76:23, 78:19, 78:21

**Third** [1] - 2:25

**third-party** [1] - 78:21

**thoroughly** [2] - 21:20, 49:21

**threats** [2] - 8:20, 8:24

**three** [5] - 22:18, 38:8, 60:12, 66:25, 69:6

**throughout** [2] - 12:1, 27:24

**Thursday** [3] - 73:11, 73:20, 77:22

**tick** [1] - 76:4

**timeframes** [1] - 77:3

**timeline** [2] - 21:10, 77:10

**timing** [1] - 19:6

**Tobin** [2] - 6:6, 6:8

**TOBIN** [5] - 3:20, 3:21, 6:6, 6:9, 6:12

**today** [17] - 6:24, 7:8, 7:14, 7:18, 10:15, 12:20, 16:8, 26:8, 39:15, 45:5, 45:8, 53:21, 54:17, 57:7, 74:4, 76:8, 76:18

**today's** [1] - 59:21

**tolerance** [1] - 9:19

**tomorrow** [4] - 51:23, 57:5, 76:14

**tonight** [2] - 57:3, 57:4

**took** [6] - 9:13, 27:14, 28:8, 34:23, 58:10, 60:11

**towards** [2] - 43:2, 59:18

**trade** [2] - 28:17, 29:12

**traditional** [1] - 36:13

**tranche** [2] - 16:19, 22:23

**TRANSCRIBED** [2] - 2:10, 4:1

**transcript** [4] - 24:16, 66:21, 80:5, 80:6

**TRANSCRIPT** [1] - 2:10

**transformed** [1] - 8:16

**trauma** [2] - 60:18, 67:10

**travel** [1] - 60:5

**traveling** [1] - 65:18

**treason** [1] - 8:18

**trial** [2] - 59:19, 67:4

**true** [2] - 80:4, 80:5

**trust** [1] - 9:17

**try** [8] - 7:12, 8:12, 14:9, 14:10, 31:12, 38:14, 63:24, 66:3

**trying** [10] - 20:7, 21:10, 42:19, 49:17, 55:14, 58:21, 61:15, 62:23, 65:21

**turn** [2] - 18:6, 18:13

**turned** [4] - 21:21, 21:25, 39:24, 44:16

**turning** [2] - 18:8, 18:21

**turns** [2] - 57:18, 70:4

**tweet** [1] - 16:18

**tweeted** [2] - 16:10, 16:13

**tweeting** [1] - 16:8

**tweets** [1] - 11:2

**Twitter** [1] - 10:24

**two** [3] - 28:8, 28:25, 61:11

**twofold** [1] - 13:24

**type** [1] - 53:12

## U

**U.S** [11] - 1:3, 1:11, 1:19, 2:3, 5:2, 5:4, 5:5, 5:7, 23:24, 27:5, 37:9

**under** [19] - 8:6, 9:25, 11:18, 11:19, 12:7, 13:19, 15:5, 18:8, 18:14, 23:5, 30:24, 47:2, 47:3, 54:22, 56:4, 56:7, 61:17, 66:15, 73:23

**underlying** [2] - 44:24, 45:1

**understood** [4] - 13:16, 39:16, 68:4, 68:7

**undertaken** [1] - 15:3

**undertaking** [10] - 18:3, 19:19, 19:22, 20:8, 20:19, 21:12, 21:13, 22:4, 22:22, 27:12

**underway** [3] - 15:3, 46:5, 47:1

**unfortunately** [1] - 71:3

**UNIDENTIFIED** [3] - 66:19, 66:22, 66:25

**unilaterally** [1] - 26:11

**united** [1] - 4:2

**United** [2] - 23:6, 80:13

**UNITED** [3] - 1:1, 2:1, 2:11

**universe** [1] - 38:12

**unknown** [1] - 8:16

**unless** [7] - 15:18, 40:7, 59:6, 66:10, 67:22, 69:8, 71:12

**unrelated** [2] - 53:20, 79:7

**up** [14] - 8:7, 13:7, 13:10, 29:23, 31:13, 42:8, 53:12, 62:5, 63:6, 64:14, 68:14, 69:12, 69:21, 78:25

**UPADHYAYA** [1] - 2:11

**update** [3] - 77:4, 77:19, 77:23

**utmost** [1] - 60:7

## V

**valid** [1] - 19:2

**various** [2] - 73:10, 74:5

**vendor** [24] - 14:19, 14:21, 15:13, 15:14, 15:16, 29:25, 30:1, 31:18, 31:23, 49:5, 51:12, 51:16, 51:18, 51:19, 51:20, 52:7, 52:10, 52:11, 52:19, 53:1, 53:8, 53:11, 53:20, 53:25

**vendors** [2] - 42:15, 43:6

**verification** [1] - 55:18

**verify** [2] - 47:17, 50:11

**versa** [1] - 72:7

**version** [2] - 68:9, 76:17

**versus** [7] - 5:3, 5:5, 5:6, 5:8, 38:23, 43:2, 65:13

**via** [3] - 16:15, 76:19, 76:25

**vice** [1] - 72:7

**view** [1] - 60:21

**viewed** [3] - 11:2, 32:15, 33:24

**views** [1] - 72:20

**violate** [2] - 48:19

**violation** [3] - 7:24, 10:17, 10:18

**violations** [1] - 10:21

**violence** [1] - 8:25

**virtue** [3] - 7:21, 9:11, 71:4

**volume** [2] - 15:20, 15:24

**votes** [1] - 27:4

**voting** [1] - 8:16

**vs** [4] - 1:5, 1:13, 1:21, 2:5

## W

**wade** [2] - 21:7, 75:18

**wait** [1] - 52:22

**waive** [1] - 19:1

**waiving** [1] - 20:16

**walk** [2] - 30:21, 31:15

**WALKER** [2] - 3:5, 3:9

**walking** [1] - 60:19

**wants** [3] - 52:18, 59:18, 65:24

**Washington** [7] -

1:6, 1:14, 1:22, 2:6, 3:22, 4:4, 80:14

**waste** [1] - 69:25

**water** [1] - 30:5

**Wednesday** [1] - 77:12

**week** [2] - 62:13, 75:10

**weekend** [1] - 9:7

**weeks** [2] - 28:8, 29:15

**welcome** [1] - 16:24

**wet** [1] - 30:5

**whereas** [2] - 62:25, 63:17

**whichever** [1] - 53:12

**whole** [1] - 61:24

**Wilmington** [1] - 3:16

**Wisconsin** [1] - 3:21

**wish** [3] - 7:16, 10:2, 68:24

**wishes** [2] - 58:12, 73:3

**withdraw** [1] - 56:14

**witness** [7] - 61:4, 61:10, 61:21, 64:13, 67:6, 67:13, 67:17

**witnesses** [5] - 59:25, 60:18, 61:20, 64:25, 65:2

**Word** [3] - 68:9, 70:6, 76:17

**work-product** [1] - 34:9

**works** [2] - 68:22, 77:15

**world** [1] - 12:1

**writ** [1] - 49:10

**wrongs** [2] - 8:23, 9:2

**wrote** [2] - 25:15, 52:7

## Y

**years** [2] - 8:13, 65:17

**yield** [2] - 67:12, 67:13

**York** [1] - 2:20

**yourselves** [2] - 5:10, 67:11

## Z

**zero** [2] - 9:19, 9:20

**Zoom** [5] - 65:13, 66:6, 67:11, 67:18, 71:5

# Exhibit 2

1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2

3  US DOMINION, INC., et al.,    )
                                 )
4            Plaintiffs,         )
                                 )
5        vs.                     )  CASE NO. 1:21-cv-02131(CJN)
                                 )
6  PATRICK BYRNE,                )
                                 )
7            Defendant.          )
   _____  )
8

9                 TRANSCRIPT OF MOTION HEARING [ECF 75]
    **BEFORE THE HONORABLE MOXILA A. UPADHYAYA, U.S. MAGISTRATE JUDGE**
10                      May 16, 2024
                   10:00 a.m. - 11:46 a.m.
11                     Washington, DC

12  **FOR THE PLAINTIFFS:**
         SUSMAN GODFREY, LLP
13       BY:  Davida Brook, Christina Dieckmann,
              Stephen Shackelford, Jr. and Jonathan Ross
14       1900 Avenue of the Stars, Suite 1400
         Los Angeles, California 90067
15       (310) 789-3100

16

17  **FOR THE DEFENDANT:**
         LAW OFFICE OF STEFANIE L. LAMBERT, PLLC
18       BY:  Stefanie L. Lambert
         400 Renaissance Center, Suite Fl.26
19       Detroit, Michigan 48243
         (313) 410-6872

20

21

22                       **SONJA L. REEVES**
                   **Registered Diplomate Reporter**
23                   **Certified Realtime Reporter**
                   **Federal Official Court Reporter**
24                   333 Constitution Avenue, NW
                       Washington, DC 20001
25          Transcript Produced from the Digital Record

1   **ALSO PRESENT:**

2   **PREVIOUS COUNSEL FOR THE DEFENDANT:**
       McGLINCHEY STAFFORD, PLLC
3      BY:  Robert Driscoll, Alfred Carry and Daniel Plunkett
       1275 Pennsylvania Avenue, NW, Suite 420
4      Washington, DC 20004
       (202) 802-9950

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 (Call to Order of the Court at 10:00 a.m.)

 2                 DEPUTY CLERK:  All rise.  This court is now in

 3      session, The Honorable Moxila A. Upadhyaya presiding.

 4                 Please be seated and come to order.

 5                 Good morning, Your Honor.  This is Civil Case No.

 6      21-2131, US Dominion, Inc., et al. versus Byrne.  This matter

 7      is set for a motion hearing.

 8                 Parties, please introduce yourselves for the record,

 9      starting with the government -- sorry, plaintiffs' counsel.

10                 MS. BROOK:  Good morning.  Davida Brook of Susman

11      Godfrey on behalf of the plaintiffs, Dominion.

12                 THE COURT:  Good morning.

13                 MR. SHACKELFORD:  Stephen Shackelford on behalf of

14      Dominion.

15                 MS. DIECKMANN:  Christina Dieckmann for Dominion.

16                 MR. ROSS:  And Jonathan Ross for Dominion.

17                 MS. LAMBERT:  Good morning, Your Honor, Stefanie

18      Lambert appearing on behalf of Mr. Byrne, who is present and to

19      my left.

20                 THE COURT:  Good morning.

21                 Good morning, Mr. Byrne.

22                 MR. PLUNKETT:  Daniel Plunkett from McGlinchey

23      Stafford Law Firm.  We were prior counsel to Mr. Byrne.  With

24      me are Mr. Driscoll and Mr. Carry.

25                 THE COURT:  Okay.  Good morning.  Just a moment.
```

1          (Pause)

2          THE COURT:  Okay.  We're here for -- we're here on

3    Dominion's emergency motion, which I heard initially in March

4    and issued a status quo order.  I would like -- each side will

5    have 30 minutes to argue.  I'm going to -- barring any

6    questions I have, which I'll take on my own time, I would

7    like -- I have sufficient briefing on the questions of whether

8    the documents themselves are covered by the protective order,

9    and I believe there is no dispute that defendant, Mr. Byrne and

10   Ms. Lambert disseminated that information, although if you wish

11   to address that, you can.  So I would like Dominion to focus

12   on, and the parties to focus on two specific issues, and then

13   if you wish to address anything else, you can do so with your

14   remaining time.

15          I would like you to focus on the requested sanction of

16   disqualification and the case law that supports that sanction,

17   as well as any evidence of subsequent alleged breaches of the

18   protective order or of my status quo order that I issued in

19   March.

20          So Ms. Brook, will you be arguing?

21          MS. BROOK:  Yes, Your Honor.

22          THE COURT:  Okay.  You may approach.

23          MS. BROOK:  Good morning, Your Honor.  Davida Brook of

24   Susman Godfrey on behalf of the Dominion plaintiffs.

25          May it please the Court, we have a slide deck that we

1    would like to use with our presentation.

2           THE COURT:  That's fine.

3           MS. BROOK:  I have copies of it if folks would like.

4           THE COURT:  That's fine.

5           MS. BROOK:  As Your Honor already mentioned, we are

6    here today on Dominion's motion to disqualify counsel, Stefanie

7    Lambert.  And I actually wanted to begin, Your Honor, exactly

8    where you have asked us to, which is with the case law and the

9    standard for disqualification, which Dominion completely

10   embraces, recognizing that it is a high standard.

11          Speaking personally for myself, I have never before

12   sought the disqualification of any attorney.

13          THE COURT:  I have, and I lost.

14          MS. BROOK:  But the case for Ms. Lambert's

15   disqualification, Your Honor, we think is clear under the case

16   law.  Her actions in the short time that she's been counsel in

17   this case constitute what the case law requires, which is, to

18   quote the *Koller* case, truly egregious misconduct.  And that

19   truly egregious misconduct, Your Honor, has already and will

20   continue to infect this and, frankly, all of Dominion's other

21   proceedings.

22          It's equally clear, Your Honor, that unfortunately no

23   lesser sanction will suffice.  And what I would like to do

24   today is I think pretty much what Your Honor asked, which is to

25   briefly recap what has happened and then focus on the new

1    breaches that have occurred and why together those constitute a

2    need for disqualification under the case law.

3         As an overview, Your Honor, Ms. Lambert has violated

4    no less than two rules of professional conduct, DC Rule of

5    Professional Conduct 3.4(c), "a lawyer shall not knowingly

6    disobey an obligation under the rules of a tribunal except for

7    an open refusal based on an assertion that no valid obligation

8    exists," and DC Rule of Professional Conduct 8.4(d).

9         She has also made numerous violations of the

10   protective order governing this case, including paragraphs 1,

11   8, 11, 15 and 27, as well as Your Honor's status quo order,

12   including paragraphs 1, 3 and 8.

13        So how did we get here?  I will focus on three

14   distinct time periods:  Pre March 15, 2024, the period leading

15   up to Dominion's motion for disqualification; post March 18,

16   2024, the period after this Court entered the status quo order;

17   as well as a very brief discussion of Ms. Lambert's relevant

18   history in other matters, because the case law tells us that

19   that is to be considered.

20        This all began because sometime in March 2020,

21   Ms. Lambert gave Sheriff Dar Leaf access to the document

22   discovery posting all of Dominion's documents produced in this

23   case; confidential, AEO, didn't matter.  She simply handed over

24   her login credentials.

25        Around this same time, on March 8th, Ms. Lambert

1   herself filed 48 pages of Dominion's documents on the public

2   docket of a criminal case pending against her in the State of

3   Michigan.

4           THE COURT:  Has that been taken down pursuant to my

5   order?

6           MS. BROOK:  No, it has not, Your Honor, and I will be

7   addressing that in my presentation.

8           Finally, on March 12th, in response to an email from

9   Dominion asking Ms. Lambert to provide an accounting of

10  everything she had done with its documents, Ms. Lambert

11  responds, not by claiming ignorance of the protective order or

12  by denying that she was the source of the improper disclosures

13  this Court has already noted, rather she accuses Dominion's

14  attorneys of being accessories after the fact and ignores our

15  requests for information.

16          These actions were clear violations of the protective

17  order governing this case.  Specifically, she violated

18  paragraph one by using discovery material for purposes outside

19  this litigation, and by providing that discovery material to

20  persons not permitted to receive it under that order.

21          And as explained at the last hearing, Your Honor, on

22  this matter, this provision applies to all documents,

23  confidential or not, and was heavily negotiated, briefed and

24  entered by Judge Nichols over the objection of some of the

25  defendants in these cases, specifically because Dominion

1   foresaw just this risk.

2          THE COURT:  Did Mr. Byrne object?

3          MS. BROOK:  Mr. Byrne did not object to the entry of

4   the protective order, Your Honor; though, to be clear, it did

5   not apply to him when it was initially briefed, but then when

6   it came time to enter the protective order in his matter, his

7   attorney stipulated to it without any objection.  And I believe

8   that's Docket 45 in the Byrne case, the stipulated entry of the

9   protective order.

10         She also violated paragraph eight of the protective

11  order, which discusses the prohibition of sharing Dominion's

12  confidential discovery material, and she also violated

13  paragraph 27, by not notifying Dominion of her impermissible

14  disclosure and refusing our repeated requests to provide us

15  with basic information of the details surrounding it.

16         There are other paragraphs in the protective order

17  Ms. Lambert no doubt violated, but the point is the same, she

18  clearly gave no regard to the fact that the Court had entered

19  the protective order in this matter, rather she rushed to

20  release as many of Dominion's documents to the public as

21  possible.

22         In response, as the Court knows, Dominion promptly

23  moved for relief, and this Court held a hearing on March 18th.

24  At that hearing, Your Honor made clear that she had not yet

25  been given the authority to decide this issue, and she was not

1    going to pre-judge it in any way, but that they wanted to enter

2    a status quo order to essentially stop the bleeding, if you

3    will.

4            The Court did that orally at that March 18th hearing,

5    and lest there be any confusion, the Court followed up with a

6    minute entry that same day and with a written order the next

7    day, March 19, 2024.

8            This Court's written order, which I will refer to as

9    the "status quo order," was crystal clear that, among other

10   things, Ms. Lambert and Mr. Byrne were to, quote, "Immediately

11   desist from sharing, distributing, providing access to or

12   discussing," end quote, any of the discovery material received

13   in connection with this case.

14           Ms. Lambert was also to, quote, "Immediately confer

15   with her counsel in the criminal matter and undertake every

16   reasonable effort to remove such documents from the public

17   record and file them under seal instead," end quote.

18           And Ms. Lambert and Mr. Byrne were to provide a signed

19   verification to this Court by no later than 5:00 p.m. on

20   March 21st confirming they had done these things.

21           Your Honor, you asked me to address the subsequent

22   violations, and that's what I intend to do.  Ms. Lambert has

23   violated every single one of the status quo provisions that I

24   just went through, and Mr. Byrne has violated every one that

25   applies to him.

1          First, you asked about whether or not the documents in

2   the criminal case have been sealed; they have not, Your Honor.

3   But it gets worse.  As far as Dominion can tell, Ms. Lambert

4   has not undertaken any reasonable effort to remove Dominion's

5   documents from the public record and file them under seal.  In

6   fact, it appears she's taken no effort.  There is no excuse for

7   her inaction.

8          What does Dominion base this on?  Dominion has been

9   tracking the docket in the relevant criminal matter and has not

10  seen any change indicating its documents have been filed under

11  seal.  Seeing nothing on the public docket, we sent an email to

12  one of the prosecutors overseeing Ms. Lambert's criminal case

13  yesterday afternoon asking his office to confirm what we were

14  seeing on the public docket.

15         I would like to read from his email.  Quote, "All

16  documents filed by Ms. Lambert in the Oakland County Circuit

17  Court and the Michigan Court of Appeals remain public.  This

18  includes documents that appear to be connected to your

19  litigation and have been deemed by our office as being

20  irrelevant in our pending criminal case.  Neither Ms. Lambert

21  nor her attorney, nor anyone acting on her behalf has reached

22  out to our office to attempt to seal any filings she has made

23  in the court of appeals or in the trial court.  The attorney of

24  record for Ms. Lambert in her criminal case is Attorney Daniel

25  Hartman.  Ms. Lambert has been appearing on her own behalf in

the court of appeals," and then I skip ahead.

"We are unaware of any other action being taken to limit the public disclosure of the documents filed by Ms. Lambert," end quote.

In the final paragraph of that email, Your Honor, and I do have a copy of that email if the Court would like it, the office also makes clear that they would be, of course, happy to cooperate with any request by Ms. Lambert or any orders from this Court pursuant to their own Michigan Rules of Professional Conduct, which require doing so.

So no, Your Honor, as far as Dominion can tell, she made no effort to seal its documents.

Moving on, both Ms. Lambert and Mr. Byrne failed to meet the verification deadline set by this Court, nor did they contact the Court or Dominion in advance to indicate that they would be late.  Rather, they waited until the day after the deadline to file an extension request that -- and this is critical -- implies that as of that point in time, which was several days after the issuance of the status quo order, Ms. Lambert had not yet even conferred with Mr. Byrne about this Court's order.  This delay, Your Honor, is inexcusable. And this isn't us nitpicking.  The delay mattered.

As you can see from slide 19, in the few days that Ms. Lambert apparently failed to communicate with her client, Mr. Byrne was very busy posting about Dominion all over the

1   internet, including making specific reference to information

2   released by him and Ms. Lambert through Sheriff Dar Leaf.

3          It is also worth pointing out, Your Honor, that any

4   claim by Ms. Lambert or Mr. Byrne that these two did not have

5   time to connect during this period is demonstrably false.  If

6   they had time to do all this posting, if they had time to file

7   a multi-page request for an extension, they had time to have a

8   simple conversation about the Court's order.

9          And yet it goes on.  "Adding to Ms. Lambert's failure

10  to take every reasonable effort to immediately seal the

11  documents she filed publicly, adding to her and Mr. Byrne's

12  failure to abide by the verification process, Ms. Lambert also

13  violated the Court's order requiring that Dominion's discovery

14  material not be discussed.

15         Quite frankly, Your Honor, Dominion does not have the

16  time at this hearing to detail all of the social media posts

17  and interviews that Ms. Lambert and Mr. Byrne have given on the

18  subject of their improper disclosure since the March 18th

19  hearing, nor do I imagine I have managed to collect them all,

20  but I want to bring a few of note to the Court's attention, and

21  we have prepared a timeline of all of them that we could find,

22  to the extent the Court would like it.

23         As one example, on March 19th, Ms. Lambert provided a

24  statement to ABC News, the day after this Court's hearing,

25  where she again defends her actions, fine, but she also

1  summarizes what she contends is contained in the impermissibly

2  disclosed documents.

3       As a second example, on March 22nd, Ms. Lambert sat

4  for an interview on Joe Oltmann Live, and, in that interview,

5  Mr. Oltmann turns to her at 42:25 and he says, "We have

6  evidence from Dar Leaf, and way more that has not been

7  released," and when he starts to discuss the evidence, he

8  hesitates and he turns to Ms. Lambert and he says, quote,

9  "Stefanie, I didn't get it from you, I got it from Twitter, X,"

10 end quote.  And Ms. Lambert does nothing to stop him from then

11 launching into a discussion of the documents.

12      In fact, Ms. Lambert follows up by telling Mr. Oltmann

13 that he should have Dar on the show himself, because he can go

14 through the investigation.  And when Mr. Oltmann asks

15 Ms. Lambert if Sheriff Dar Leaf is allowed to discuss his

16 investigation and evidence, Lambert says, "Sheriff Dar Leaf can

17 do whatever he wants, it's his investigation."

18      Next, Your Honor, as a third example, on April 7th,

19 Ms. Lambert sits for another interview, this time on

20 Mr. Lindell's Frank Speech platform in a segment entitled,

21 "Surviving attacks for standing up for fair elections with

22 Stefanie Lambert," end quote.  In it, she discusses the leaked

23 documents at various points and falsely claims Dominion's

24 attorneys had a security officer present false claims to this

25 Court, to Your Honor, to get her arrested last March.

1           Taken together, not only did Ms. Lambert violate two

2     court orders, numerous times in numerous ways, but she also

3     made material misrepresentations to this Court.  Perhaps most

4     notably, as we have already discussed, she provided a signed

5     verification saying she had undertaken all reasonable efforts

6     to seal a filing when the prosecutor says she hasn't so much as

7     picked up the phone.

8           But it doesn't end there, Your Honor.  Ms. Lambert

9     told this Court on March 18th, when she was standing at this

10    very podium, that the only folks who had access to the relevant

11    materials besides herself were a woman named Stephanie Smith

12    and a man named Russell Newman.

13          Now, I want to be very clear here.  The Court has

14    asked us to be precise, and I intend to be.  This is part of a

15    discussion where the Court is asking Ms. Lambert about notes,

16    but the Court's implication was clear, it wanted to know who

17    had access to the documents.

18          Well, it turns out in a letter we get some weeks later

19    from the McGlinchey firm, Mr. Byrne's prior counsel, that there

20    was another attorney, a gentleman named Michael Smith, who was

21    also given access.  Why didn't Ms. Lambert tell Dominion or

22    really this Court about Michael Smith?  Has Mr. Smith been

23    advised of the status quo order?  Has Mr. Smith been following

24    this?  Is he here today?

25          THE COURT:  Who is Mr. Smith?

1          MS. BROOK:  I don't know.

2          And yet another example, Your Honor, Ms. Lambert and

3     Mr. Byrne cannot even get their story straight on who directed

4     the impermissible disclosure, with Ms. Lambert telling Dominion

5     in writing that Mr. Byrne, quote, "insisted," end quote, on it,

6     while Mr. Byrne says, quote, "It wasn't at my instruction; she

7     felt a need to do it," end quote.

8          These misrepresentations, Your Honor, raise the real

9     elephant in this room, which is everything we do not know.

10     While Dominion contends the evidence it does know and has put

11     into this record is more than enough to grant its request for

12     disqualification, there is no doubt that there is more to this

13     story and more Dominion needs to learn in order to assess what

14     sanctions it should seek against Mr. Byrne, including, Your

15     Honor, notably what coordination has been happening between

16     Ms. Lambert, Mr. Byrne and Sheriff Dar Leaf, who, by the way,

17     Ms. Lambert apparently is an attorney for, and, therefore, when

18     another party subpoenaed Mr. Dar Leaf's office for documents,

19     he refused -- sorry, not subpoenaed, FOIAed, he refused to

20     produce the documents claiming attorney-client privilege with

21     Stefanie Lambert.

22          What we do know, Your Honor, however, and it's

23     relevant to the Court's analysis here, is this:  Ms. Lambert

24     and Mr. Byrne have shown no remorse for their actions.  To the

25     contrary, they are defiant that they did the right thing and

1    that they would do it again.  Here is a slide of Ms. Lambert

2    proudly announcing that she gave the evidence to law

3    enforcement.  And here is Mr. Byrne, Your Honor, saying out

4    loud in no uncertain terms exactly what he intends to do.

5          This is a transcript.  We have it certified,

6    transcribed should the Court like a copy, from a video that

7    Mr. Byrne uploaded on April 2nd.  And I'll read it into the

8    record.

9          "And I'm telling you here, and, Judge, with all due

10   respect, you decide what you want.  We're giving you the honor

11   this time of going through the steps that Stefanie evidently

12   was supposed to do last time, but there is no chance in hell

13   I'm not going to make this public.  I mean, I'm giving -- so

14   you can throw me in prison as long as you want.  I am going to

15   make this stuff public.  So I hope you make the right decision,

16   but I'm not going to keep this quiet.  I'm going to give you

17   time to make the right decision, and if you make the wrong

18   decision, I'm just going to do the right thing anyway and you

19   throw me in jail."  Expletive "you," end quote.

20         Your Honor, Mr. Byrne's words are shocking, but they

21   should come as no surprise to his attorney, or really to any of

22   us.  They are part of a pattern he has made very clear to

23   anyone who is willing to listen, namely that he will make

24   public whatever he thinks should be made public regardless of

25   what any judge says to the contrary.

1          Indeed, on slide 28, beyond his statement I just read

2    into the record, here are two recent posts he made to X, where,

3    as you can see, a judge in another matter ordered that certain

4    information not be shared by a party on social media, so what

5    does Mr. Byrne do?  He joins a movement to defy that judge's

6    order, spreading the information himself.

7          And Mr. Byrne has indicated he intends to do the same

8    thing here as well.  Take this post on slide 29 where you can

9    see him practically planning out what he will do with

10   Dominion's source code if it's produced in this case.

11        THE COURT:  He has the right to say these things on

12   Twitter, doesn't he?

13        MS. BROOK:  He has the right to say whatever he wants

14   to say on Twitter, Your Honor; however, I think that what he is

15   saying should be taken seriously.  They are his words and we

16   should believe him when he says he's going to do the things

17   he's going to do.

18          As this Court explained at the last --

19        THE COURT:  None of the, at least the past few posts

20   you have shown me are not a dissemination of any of the

21   confidential information in this case, are they?

22        MS. BROOK:  Let's get to that, Your Honor, no.  Here

23   are all of the posts we could find Mr. Byrne did since your

24   status quo order that talk about Dominion.  Not all of them

25   specifically reference a confidential document, but they are

1    all talking about Dominion, and many of them get to violating

2    Your Honor's order.

3           For example, at slide 32, here is a post Mr. Byrne

4    made immediately after the status quo hearing where he is

5    reposting the very letter from Sheriff Dar Leaf that kicked off

6    Sheriff Dar Leaf's exposure of all of the Dominion documents on

7    Twitter.  And while this document itself may not mention the

8    documents, it is obviously an effort by Mr. Byrne to promote

9    Sheriff Dar Leaf's letter, to send users to Sheriff Dar Leaf's

10   website, where as he knows, as this Court knows, anyone can

11   download an entire Google drive of Dominion documents to this

12   day.

13          Here is one from March 18, 2024, Your Honor.

14   Apparently he posted some video where he may very well have

15   been talking about the documents, including an apology to the

16   judge in DC, but he took it down, he deleted it.  That too,

17   Your Honor, is a violation of this Court's status quo order,

18   which said to preserve everything related to this issue.

19          I reached out to Ms. Lambert repeatedly and I asked

20   for this video and she said it was gone.  And here, Your Honor,

21   is I think exactly what you were asking for.  On slide 34, you

22   have Mr. Byrne making a post just some days ago, May 8, 2024,

23   where he is literally reposting one of the confidential

24   documents that were leaked by his attorney through Sheriff Dar

25   Leaf.  So yes, Your Honor, he has posted the very document that

1   Your Honor said he should not be discussing.

2          To the surprise of no one, and as flagged in

3   Dominion's papers and the earlier hearing on the subject, all

4   this activity has and will continue to lead to very serious

5   threats to Dominion's employees, to their safety, to their

6   families' safety, to say nothing of the erosion of public trust

7   in our elections.

8          To recap, Your Honor, what orders have they violated?

9   Ms. Lambert has violated the governing protective order

10  numerous times in numerous ways and indicated no interest in

11  stopping.  She has likewise violated the status quo order

12  numerous times in numerous ways and indicated no interest in

13  stopping.

14         She has misrepresented the truth to this Court and to

15  Dominion by submitting a signed verification saying that she

16  has and will comply with the status quo order, when she has

17  not.  And she also has sat back and done nothing as her client

18  has repeatedly violated this Court's orders.

19         Your Honor, as I started with, the case law standard

20  is truly egregious conduct that will infect this proceeding.

21  If this does not suffice as truly egregious conduct that will

22  infect this proceeding, I don't know what else will.

23         As Your Honor knows, the other thing the case law

24  talks about is because these disqualification motions usually

25  come up in the context of a conflict is whether or not it

1    impacts the allegedly conflicted attorney from zealously

2    representing their client.

3          Well, I can tell you that having Ms. Lambert on this

4    case is impacting my ability to represent my client.  Every

5    email I send to the joint defense group now, every document I

6    produce, every person I put up for deposition, I have no good

7    faith reason to believe that the person on the other side, the

8    attorney on the other side is going to follow the Court's

9    orders in this case.  That hampers my ability to do my job to

10   zealously represent my client.

11         And let's be clear, Your Honor --

12         THE COURT:  Is that the standard though for

13   disqualification?

14         MS. BROOK:  The standard for disqualification is

15   usually looking at whether the attorney with the conflict is

16   going to be hindered, but, Your Honor, I don't think there is

17   another case like this where you have an attorney that has

18   violated protective orders and other court orders so many times

19   that it might actually violate -- that it might actually hinder

20   the other side's ability to do their job, but I think the more

21   apt standard for this scenario is the truly egregious

22   misconduct standard.

23         THE COURT:  What is your best case supporting

24   disqualification under these circumstances?

25         MS. BROOK:  I think the *Paul v. Judicial Watch* case,

1   Your Honor, as well as the *Koller v. Richardson* case.  While in

2   *Koller*, the Court ended up not disqualifying, as I'm sure Your

3   Honor knows, the articulation and the explanation of the

4   standard there is very thorough, and I think as applied to the

5   facts here would have come out the other way.

6          Your Honor, the other issue I wanted to address in

7   terms of the case law is whether a lesser sanction would

8   suffice, and the answer is it would not.  First of all, as I

9   have gone through in some detail just now, Ms. Lambert has

10  shown repeatedly that she will not adhere to court orders.

11  There is nothing she could say in court today to convince us

12  that if Your Honor says, "I'm not going to throw you off this

13  case, but you got to follow the protective order going

14  forward," she will do that.

15         But more importantly perhaps, lesser sanctions will

16  not protect the integrity of this litigation because they have

17  already been doled out.  I'm not going to go into detail into

18  Ms. Lambert's history, it's in our briefing, which I am sure

19  the Court read, but Ms. Lambert has been the recipient of quite

20  serious sanctions in multiple other courts in multiple other

21  jurisdictions and it is clear she has not learned her lesson.

22         And one thing I didn't include in our briefing, Your

23  Honor, but to the extent it would be helpful, is there is case

24  law showing that, I couldn't find it in a disqualification

25  context, but in a Rule 11 context that you explicitly are

1    allowed to look outside the four corners of one case, one

2    representation, when disciplining, when sanctioning an

3    attorney.  The case law says that of course there should be

4    independent grounds within the confines of the case itself, but

5    you can also look at pattern and practice behavior.

6              THE COURT:  I would like that case law, please.

7              MS. BROOK:  I can hand it up to you and the others.

8              THE COURT:  Just make sure Ms. Lambert gets a copy of

9    it as well.

10             MS. BROOK:  Of course.

11             Your Honor, the other reason it's important to

12   disqualify here is because the other defendants are watching.

13   The other defendants that Dominion sued in this case are

14   watching, and they are noting what is happening, and this is

15   what they are saying.  They are saying, quote, "It takes heroes

16   like Sheriff Dar Leaf and Stefanie Lambert to save our

17   country," end quote.

18             The message needs to be clear to Ms. Lambert, to

19   Mr. Byrne, and to everyone pending before this Court that these

20   types of actions will not be tolerated, will not be sanctioned

21   and will have zero tolerance policy.

22             THE COURT:  I mean statements like that, you know,

23   Mr. Lindell has the right to make those.  I don't see how those

24   are as pertinent.  Anyone has a right to -- any defendant has a

25   right, within the confines of any orders that the Court sets,

 1    to comment about litigation or express their views freely.

 2         MS. BROOK:  Agree, Your Honor, but any defendant

 3    doesn't have the right to break this Court's orders, to violate

 4    those Court's orders, and their attorneys do not have the right

 5    to not abide by the rules of professional conduct.  And what

 6    I'm using those slides to show, Your Honor, is not that

 7    Mr. Lindell doesn't have a right to say that himself, but that

 8    I have a very real concern that if Ms. Lambert is not

 9    appropriately sanctioned for what she did, we are -- we will

10    see similar conduct from similar defendants in due time.

11         THE COURT:  Do you have any case from anywhere in the

12    country where a Court ordered disqualification as a sanction as

13    opposed to in a conflict setting?

14         MS. BROOK:  I believe so, Your Honor.  The *Paul* case

15    itself I think --

16         THE COURT:  I mean other than *Paul*.

17         MS. BROOK:  Not that I can think of off the top of my

18    head, Your Honor, but I would suggest that the reason for that

19    is not because Courts don't want to do that, Courts aren't

20    willing -- I don't think any Court ever wants to disqualify an

21    attorney.  It's not something anyone takes any joy or pleasure

22    in, but I think that the other reason that we don't find many

23    cases like that -- so I see my colleague handing me up one

24    other, which is right, the *In Re Bell South*.  It's in our reply

25    brief, the *In Re Bell South* case is another one of those cases.

1   You don't get this type of pattern of misconduct.  You just

2   don't.

3          This isn't her first offense in this court, even

4   though she's only been counsel of record for two months.  She

5   violated the protective order.  We came before this Court

6   several weeks ago and this Court gave her what I would call a

7   second chance.  It entered a status quo order.  And it might

8   have been a different story if standing up here today

9   Ms. Lambert had not violated that status quo order left, right

10  and center, if Mr. Byrne had not violated that status quo order

11  left, right and center, if in their own words since the status

12  quo order was entered, they have said, "We're going to violate

13  it again.  It doesn't matter what the Court does, we're going

14  to violate it."

15         Again, he's free to say that, but he's not free to do

16  it.  And so this Court gave Ms. Lambert a second chance and she

17  didn't take it; instead she went on TV and she said -- and she

18  found ways to continue directing, promoting, and pushing

19  viewers to the documents that she herself had leaked through

20  Sheriff Dar Leaf.

21         Your Honor, I'll be blunt.  My concern is this:  If

22  she's not removed from this case, all that will have happened

23  is they will have gotten smarter about how to do this leak in

24  the future.

25         I don't think that we would know what we knew today if

1  it wasn't for the fact that Mr. Byrne's exiting attorneys

2  alerted us to what had happened.   And since apparently

3  Ms. Lambert is also representing Sheriff Dar Leaf in another

4  action, she can try to claim attorney-client privilege over

5  anything she --

6          THE COURT:  What action is that?

7          MS. BROOK:  Some criminal -- I believe it's related to

8  the same criminal proceeding where she is a named defendant,

9  but my understanding actually is she is represented --

10          THE COURT:  There is two criminal proceedings in

11  Michigan, are there not?

12          MS. BROOK:  There are two criminal proceedings pending

13  right now against Ms. Lambert in Michigan, but my research

14  revealed actually, Your Honor, that Ms. Lambert has been

15  representing Sheriff Dar Leaf going back to, I believe, 2020.

16  I do not know in what cases.  I would love to know.

17          So, Your Honor, we're here today to re-up our request

18  that she be disqualified, that after disqualification, to be

19  clear, she remain banned from accessing Dominion's discovery

20  material.  I'll remind this Court that she gained access to

21  that discovery material before she appeared as counsel of

22  record in this case.  And so we're not suggesting she just not

23  be counsel of record in this case but still be allowed to

24  review and do what she wants with our discovery material.

25          We also renew our request for the other information

1    that we outlined in our proposed order.  And I would add to our

2    request in our proposed order, Your Honor, that we would like

3    information, discovery into the communications between

4    Mr. Byrne, Ms. Lambert, Sheriff Dar Leaf and their associates,

5    as we believe there is more to this story and we are trying to

6    decide what is an appropriate request as to Mr. Byrne and the

7    best way to do that is with information.

8              THE COURT:  Okay.  Thank you.

9              MS. BROOK:  Thank you.

10             THE COURT:  Do I have Mr. Driscoll here?

11             UNIDENTIFIED SPEAKER:  Mr. Driscoll is present in

12   court, Your Honor.

13             THE COURT:  Could you approach, please?  You can just

14   approach the podium.  Thank you.

15             I would like to get some information from the

16   McGlinchey firm, however you want -- I just picked Mr. Driscoll

17   as the author of the initial email -- to explain to the Court

18   how you came to learn about the -- without -- I'll make it very

19   clear, I'm not looking for any privileged communications or any

20   attorney work product protected information, but would like to

21   learn how you came to know about Ms. Lambert's dissemination of

22   confidential information.

23             MR. DRISCOLL:  Your Honor, we discovered the criminal

24   court Michigan filing on Twitter, I believe.  It was on a

25   social media site, there was a link to the filing.  And when we

1    clicked through the link, there were exhibits to the filing

2    that appeared that they might implicate the order.

3            THE COURT:  Did you know about Ms. Lambert's work on

4    the case up to that point or was she acting in a consultant

5    capacity?

6            MR. DRISCOLL:  I want to be careful, Your Honor,

7    because, obviously, I can't unring bells with this.

8            THE COURT:  I understand that.

9            MR. DRISCOLL:  I'll say that --

10           THE COURT:  Before you speak further, let me just say,

11   I know, and Ms. Lambert has admitted, that she signed an

12   undertaking in December of 2023, so we know that somehow she

13   got access to this information without having yet entered her

14   appearance in the case.

15           MR. DRISCOLL:  We were aware of that undertaking.  We

16   provided it.  It was returned to us.

17           THE COURT:  Okay.  Did you provide her information?

18   Did you provide her access to the database?

19           MR. DRISCOLL:  Yes, after the undertaking was signed.

20           THE COURT:  And was she retained as Mr. Byrne's

21   counsel at that point?

22           MR. DRISCOLL:  I believe so, Your Honor.

23           THE COURT:  That you know of.  Okay.

24           And so you came to learn about these documents being

25   filed in her criminal matter, correct?

1          MR. DRISCOLL:  Correct.

2          THE COURT:  And that's what we have seen here in the

3    slide deck where she's filed some documents pro se?  Is that

4    the same filing?

5          MR. DRISCOLL:  I believe so.  There was -- again, we

6    saw it on social media, which referenced the criminal matter.

7          THE COURT:  Okay.  Is it at that point in which you

8    reached out to Susman Godfrey?

9          MR. DRISCOLL:  Yes.

10         THE COURT:  Okay.  And do you know, again, without

11   revealing any confidential or privileged information,

12   particularly here in open court, beyond that post or beyond

13   that filing she made, rather, in her Michigan criminal case,

14   what the scope of her dissemination -- alleged dissemination

15   is?

16         MR. DRISCOLL:  No information on that, Your Honor.

17         THE COURT:  Okay.  And you all represent Mr. Byrne in

18   other matters; is that correct?

19         MR. DRISCOLL:  We do.  We're not counsel in this

20   matter.  We do represent him in some other matters.

21         THE COURT:  Okay.  I will address -- I know that you

22   have written a letter to the Court seeking some guidance on

23   what you can and can't do.  I will address that in the future,

24   but wanted to understand very clearly what the scope of your

25   knowledge was.  So did you -- I'm trying to understand the

1    timing.

2         After you alerted Dominion's counsel to this filing

3    that Ms. Lambert made, is that about the time that you withdrew

4    from the case?

5         MR. DRISCOLL:  Mr. Byrne made a change in counsel, and

6    so we withdrew when Ms. Lambert entered an appearance.

7         THE COURT:  Okay.  And I just want to confirm because

8    I haven't seen this in the record, but I would like you to

9    confirm that while you were representing Mr. Byrne, you never

10   sought to come to the Court to seek to lift the protective

11   order or seek to de-designate any documents or seek any relief

12   whatsoever from the protective order on behalf of Mr. Byrne?

13        MR. DRISCOLL:  We did not, Your Honor.

14        THE COURT:  All right.  Thank you very much.  You may

15   be seated.

16        All right.  Ms. Lambert?  Why don't you start with,

17   ma'am, responding to the allegation that you did not follow

18   this Court's March 18th order.

19        MS. LAMBERT:  Thank you, Judge.

20        I have a response from my attorney, Daniel J.

21   Hartman.  I did comply.  I did reach out to Daniel J. Hartman.

22        Without waiving attorney-client privilege, Daniel J.

23   Hartman stated that he could not ask the Court in good faith,

24   that the documents contained some of the most serious crimes in

25   national history and are a matter of national security.

1        THE COURT:  Well, you say that, and you have not cited

2   to me one single case anywhere in the country that supports

3   your position for that proposition.

4        MS. LAMBERT:  May I finish, Your Honor?  I want to

5   give the Court information regarding -- I complied with what

6   the Court said, to reach out to my attorney.  He said that he's

7   unable, he would be misleading the Court that these documents

8   contained any confidential information, that they are not trade

9   secret, that they are not intellectual property, and, in fact,

10  they have a matter of public interest, not only for the

11  sheriff's investigation, for the congressional investigation,

12  for the numerous investigations that were already taking place

13  by prosecutors, sheriffs and Congress across the United States,

14  that there would be no legal basis under the court rules and

15  Michigan law for him to file such a motion.

16        So I did comply with the Court's request, and I did --

17        THE COURT:  I didn't order -- Ms. Lambert, I don't

18  mean to cut you off, but we have limited time here today.

19  Shockingly, I have other matters to tend to other than this

20  case.

21        And the dissemination that has been made and what

22  appears to be the flagrant violations of my order, I

23  have received no communication from you that you were not able

24  to take care of that, and I didn't -- and my order didn't say

25  that you're supposed to contact your attorney.  My order said

1   you're supposed to take all reasonable steps to take that down.

2          And your attorney himself is objecting to getting

3   those documents filed under seal?  I'm not asking that you

4   withdraw them from that case.  I was ordering that you put them

5   under seal so that the confidential nature of them could be

6   protected pending a final order from this Court.

7          MS. LAMBERT:  My attorney stated -- first of all, Your

8   Honor, there has been material misrepresentations of fact to

9   this Court by Dominion's counsel.  Okay.  I need to correct

10  those because that's significant for the Court to be able to

11  make a determination.

12         What Dominion states is that I provided those

13  documents to the Court.  They were filed as an attachment of an

14  affidavit from the sheriff.

15         THE COURT:  Ma'am, I'm not going to waste time doing

16  it.  We went through this last time.  The reason I'm cutting

17  you off is because you, frankly, misrepresented to the Court

18  last time that you did not file these.

19         You were representing yourself pro se at that time,

20  were you not?

21         MS. LAMBERT:  This is the sheriff's affidavit.

22         THE COURT:  Just answer my question.

23         MS. LAMBERT:  That's correct, Your Honor.

24         THE COURT:  So as an attorney representing herself in

25  a criminal matter, you filed documents that were attached to

1    someone else's affidavit, but you made the filing, didn't you?

2           MS. LAMBERT:  Your Honor, the sheriff attached the

3    documents to his affidavit to support --

4           THE COURT:  In support of your case.

5           MS. LAMBERT:  No.

6           THE COURT:  While you were acting pro se.

7           MS. LAMBERT:  That's incorrect.

8           THE COURT:  Okay.

9           MS. LAMBERT:  He received a request for documents from

10   the prosecutor, which he's previously filed civil suits related

11   to the attorney general of Michigan.

12          Your Honor, as of May 16th --

13          THE COURT:  Ma'am, I'm going to ask you to be very

14   careful about representations you make to this Court today.

15          MS. LAMBERT:  My representations are accurate, Your

16   Honor, and I can provide documentation that support each and

17   every one.

18          As of today, May 16, 2024, I am an attorney in good

19   standing in the State of Michigan and otherwise.  I have never

20   had a bar grievance prior to entering my appearance against the

21   attorney general of the State of Michigan on a federal case in

22   December of 2020 as appellate counsel, local counsel to Sidney

23   Powell.

24          At that point, I received a request for sanctions,

25   which I won; I received a bar grievance, which I won.  And from

```
 1   that point forward, Dominion and the Michigan attorney general
 2   have sought to tarnish my reputation as a lawyer to prevent me
 3   from representing clients throughout the country.
 4           THE COURT:  All right.  Let's stay focused on this
 5   case.
 6           MS. LAMBERT:  I am focused on this case, Your Honor.
 7   Dominion --
 8           THE COURT:  Ma'am, I'm talking.
 9           MS. LAMBERT:  Thank you, Judge.
10           THE COURT:  Okay.  I would like you to respond,
11   because I do, in the limited time we have today, I do want to
12   get your response to the allegations that you saw in the slide
13   deck about the interviews that you were on and any posts that
14   you made.
15           Do you contest that those things happened?  That's
16   just the baseline question.
17           MS. LAMBERT:  I want to answer each question that the
18   Court has, but there are many --
19           THE COURT:  Ma'am.  Ma'am, you have got to let me
20   finish, okay.  Let's just have a clear record.  Let me finish
21   and then you can respond.  It's a yes or no answer.
22           Do you contest that those things happened?  I
23   understand you may have justification or substantive responses
24   to why you did them.
25           Do you contest that you made any of the posts or
```

1    appeared on those interviews?

2         MS. LAMBERT:  Well, Your Honor, I was not provided the

3    posts in advance of today's hearing that Dominion wanted to

4    provide to the Court.  I'm seeing a slide deck for the first

5    time.  I have spoken publicly about this case, as has Dominion

6    on its website.

7         Dominion continues to silence media and others by

8    posting on its own website --

9         THE COURT:  Is that a yes, that you did -- that those

10   posts are --

11        MS. LAMBERT:  I have spoken --

12        THE COURT:  I mean, they are your own posts.  You

13   know, you're saying you don't have notice of them, they are

14   your own posts and your own comments.  So I just want to

15   clarify whether you have any dispute that those things actually

16   occurred.

17        MS. LAMBERT:  I dispute that I disseminated documents.

18   I have clearly informed the Court from day one that documents

19   were provided directly to law enforcement.  How law enforcement

20   and Congress, where they already had open investigations --

21   there is a prosecutor in the State of Michigan, Pete Lucido,

22   who was a senator at the time he cross-examined John Poulos,

23   the CEO of Dominion.  He has publicly stated that there is an

24   open investigation regarding perjury and that the CEO of

25   Dominion has committed perjury.

1          These have been ongoing matters that Congress,

2     senators, law enforcement, have been reviewing now for years,

3     and as a result of Dominion's continuous misrepresentations and

4     attempts to control who's counsel on the case that they oppose,

5     the matters have not been able to be fully investigated to

6     date.

7          And election cycle after election cycle has taken

8     place with the most serious national security crimes that have

9     ever been committed on U.S. soil taking place in this file.

10         THE COURT:  Okay.  You don't contest -- all right.  I

11    have heard no response, so I'm going to assume that you concede

12    that the posts that you made and the comments you have made

13    publicly and the interviews that you have allegedly appeared

14    on, that those actually happened, because I have heard no

15    specific response to any of those.

16         But you also don't contest that you gave those

17    documents to Sheriff Leaf and to others, correct?  I know you

18    say you had a reason for doing so, and I'll get to that in a

19    minute, but you don't contest that you gave those documents --

20         MS. LAMBERT:  I do not, and to provide further

21    information, he was given direct access to allow for chain of

22    custody to be protected so there was no dispute as to the

23    validity and source of the documents, that they were Dominion's

24    documents, which Dominion has subsequently agreed with.

25         THE COURT:  Okay.  What's your best case, because I

1  didn't see any case supporting -- legal authority supporting

2  your position that you could bypass the order that Judge

3  Nichols set and the order of this Court and give access to

4  documents to a third party not involved in the case?

5         MS. LAMBERT:  Well, Your Honor, it would be the

6  ethical rules and my oath as an attorney.  My oath as an

7  attorney is to the Constitution --

8         THE COURT:  Which oath?

9         MS. LAMBERT:  The oath that I take when I am barred as

10  an attorney.

11         THE COURT:  Okay.  Which oath?

12         MS. LAMBERT:  In Michigan, and the federal bar has a

13  similar oath that I must uphold the Constitution.

14         THE COURT:  Anything other than your oath?

15         MS. LAMBERT:  And Dominion has continuously violated

16  the ethical rules, 4.1, regarding truthfulness.  It continues

17  to make material misstatements of law and fact to control who

18  Mr. Byrne's attorneys are.

19         THE COURT:  Do you have any -- you know, you have said

20  it's so clear that you were entitled to disseminate this

21  information, and there is no dispute that it's confidential

22  information, there is no dispute that you did it.  The dispute

23  is whether you were allowed to do it, or that's your position.

24         MS. LAMBERT:  There is a dispute, Your Honor.  I don't

25  agree that it was confidential information.  Dominion turned

1  over --

2        THE COURT:  Well, they were documents in the

3  litigation and the protective order that your client agreed to

4  and that Judge Nichols entered said that any document -- said

5  that any documents in the case should not be used for any

6  purpose other than litigation.

7        MS. LAMBERT:  My client did not agree to false labels

8  being placed on the documents by Dominion.

9        THE COURT:  And there is a mechanism for your client

10  and for you, which at this point I'm not really sure who you're

11  here on behalf of, ma'am.  I think there is a plausible

12  narrative here that you got involved in this case in order to

13  publicly disclose these documents, and that's very troubling

14  for the Court.

15        But there is a mechanism if there is an objection to

16  these documents not being -- you know, if you wanted to release

17  these, you could have come to this Court, I said that last

18  time, and you had access to these documents apparently for

19  months and you didn't come to this Court seeking any sort of

20  relief from the protective order.

21        MS. LAMBERT:  Your Honor, as I have previously stated,

22  the protective order applies to a civil case.  What is

23  contained in these documents is lies and criminal acts from

24  Dominion where Dominion has lied specifically to Congress.

25        Dominion stated that this is a U.S.-based company.

1  This is a -- Denver, the headquarters, is a front.  Dominion

2  states in these emails that 75 percent of its source code --

3          THE COURT:  Hold on.  Hold on.  Hold on.  Hold on.

4          MS. LAMBERT:  -- comes from --

5          THE COURT:  Stop.  Ma'am, we have an open courtroom.

6  So if we're going to talk about the contents of any document,

7  I'm going to seal the courtroom.  So let's stop short -- and

8  this goes for all counsel, let's stop short of talking about

9  what's in the documents or else I'm happy to clear the

10  courtroom and seal the courtroom, but I'm not going to allow

11  this to be a forum for you to continue to talk about what's

12  confidential in this case and what's meant to be protected by

13  Judge Nichols' order.

14          MS. LAMBERT:  Your Honor, in order to come to that

15  conclusion, the Court would need to review each document and

16  the Court would see that Dominion put a false and fraudulent

17  label on the document reflecting that it was trade secret,

18  intellectual property or confidential.

19          Dominion sought to silence media for several years

20  with these lawsuits, which was effective.

21          THE COURT:  Ma'am, I have heard your position.  I

22  really would like you to give me any authority, legal

23  authority, whatsoever, other than the oath that you took as an

24  attorney in Michigan, to support the proposition that you could

25  unilaterally bypass, or your client could unilaterally bypass

1    the order of this Court and disseminate this information to a

2    third party.  All I'm looking for, ma'am, because I'm trying to

3    come to some conclusion on this request by Dominion, I'm

4    looking for authority.  I'm asking you to help me.  Do you have

5    any case law?

6         MS. LAMBERT:  Your Honor, there is not one case that

7    says that a Court can prevent the report of a crime.  And I

8    reviewed numerous crimes.

9         THE COURT:  What is the case -- I asked you this at

10   the last hearing and I asked that you be prepared at this

11   hearing to answer this, if you could you.  And if you can't,

12   then you need to say you can't.

13        Is there any case that stands for the proposition that

14   you unilaterally can bypass the protective order, even when

15   there is a mechanism in protective order for to you come to the

16   Court and try to seek relief from it?  You ignored that.  Your

17   client ignored that.  There is no real dispute that both of you

18   did it.

19        So I'm looking for any legal authority that supports

20   the proposition that you can do that if you unilaterally

21   believe that there is evidence of a crime in those documents.

22        MS. LAMBERT:  There are numerous statutes, Your Honor,

23   that address obstruction.  If the Court were to rule that I was

24   not able to report criminal acts with ongoing investigations

25   already in place with Congress, law enforcement, prosecutors'

1    offices, that would be obstruction.  It's difficult --

2            THE COURT:  Other than obstruction laws.

3            MS. LAMBERT:  Right.  There are no cases --

4            THE COURT:  And I don't necessarily agree with that,

5    but other than general obstruction laws, do you have a case?

6            MS. LAMBERT:  There is no case that says there

7    is water -- that water is wet, Your Honor, and that's what we

8    have here.  I have an obligation to report criminal acts that I

9    reviewed in this discovery that are black and white and clear.

10   I can see fraud of services in these documents.  I can see

11   conspiracy in these documents.  I can look at the transcripts

12   of what Dominion testified before Congress and before the

13   Michigan Senate and the statements they made and the documents

14   contradicted, it's black and white.

15           THE COURT:  So if you were acting in good faith,

16   ma'am, why didn't you come to this Court and seek relief?

17           MS. LAMBERT:  Because I believe that would be

18   inappropriate to ask a civil court whether or not I can report

19   a crime.  And that's why I can't find a law that says or a case

20   that says that's how it works.  Everyone can go to law

21   enforcement and report crimes, and I have an oath and an

22   obligation to do that.

23           THE COURT:  All right.  Do you have any response to

24   Dominion's arguments about your and your client's subsequent

25   violations of my March 18th order?

         1          MS. LAMBERT:  Absolutely, and I would like to get to

         2    that.  Dominion has made material misstatements of fact

         3    regarding pattern of conduct.  Every time I enter my appearance

         4    on one of these cases, Dominion or the attorney general comes

         5    up with a new sham accusation.  For example --

         6          THE COURT:  Which attorney general are you talking

         7    about?

         8          MS. LAMBERT:  The Michigan attorney general.

         9          THE COURT:  Someone who is not before this Court and

        10    has nothing to do with this case?

        11          MS. LAMBERT:  Well, Your Honor, Dominion is seeking to

        12    use my case in Michigan for this Court to consider, and that

        13    has nothing to do with this case.  That case, Your Honor, I

        14    need to give background on, since Dominion wants the Court to

        15    consider it.  That case, the prosecutor had to file a dec

        16    action to ask the Court what is the law, because they were

        17    seeking to do something new and unique to me and my co-counsel,

        18    Matt DePerno, and a state representative in Michigan.

        19          We were opposing counsel on litigation in Michigan,

        20    and every single time we enter an appearance, there is a new

        21    criminal accusation or some type of bar grievance that is filed

        22    that we ultimately prevail on.  They have attacked us over and

        23    over and over again, and each time we win, but their goal is to

        24    prevent us from being a voice for our clients and having

        25    Dr. Byrne have an attorney that understands election law, that

1    has worked as a prosecutor for 12 years and has been in private

2    practice and understands exactly what she's looking at in order

3    to be his zealous advocate.

4           For example, in Pennsylvania, Dominion objected to my

5    pro hac vice application.  I have been admitted in numerous

6    states pro hac vice.  Dominion cited at the time the sanctions

7    and the bar grievance that I ultimately won to prevent me from

8    being counsel there.

9           Dominion has the pattern of seeking to prevent me from

10   being an attorney for my clients because I know too much and I

11   understand too much.  And despite all of the targeting that

12   takes place, I continue to win.

13          For example, my client, Clerk Scott, that we talked

14   about the last time I was here in court, her and I were charged

15   prior to this hearing.  In fact, we had to appear in court on

16   Monday.

17          THE COURT:  You told me she was your assistant at the

18   last hearing.

19          MS. LAMBERT:  She is my assistant.  She's a former

20   clerk.  I hired someone that intimately understands --

21          THE COURT:  I think I got half the story last time.

22          MS. LAMBERT:  Right.  So I hired someone that

23   intimately understands what I'm working on for my clients.  We

24   were just charged after we have announced that the attorney

25   general was under investigation, and I had to appear and delay

1    this court proceeding as a result of that.

2         The prosecutor in that case, after communicating with

3    Dominion, sought to have me removed from all election cases,

4    election-related cases throughout the country.  They do not

5    want me -- and he compared me to a habitual child molester.

6    The Court saw through it.  The Court rolled its eyes and said

7    no.

8         THE COURT:  Ma'am.  Ma'am, when I interrupt you, you

9    need to stop talking so that I can -- this is going off the

10   rails.  I need you to address the particular allegations made

11   against you.

12        Now, I understand if you don't want to, that's fine.

13   Do you have any response to any of the case law that Dominion

14   has cited in support of its DQ motion?

15        MS. LAMBERT:  I do, Your Honor.  There is no pattern

16   of conduct.  I have won everything that they have made an

17   accusation related to.  There is no gag order in this case.

18   There is a protective order that was designed to protect

19   intellectual property and trade secret, none of which was

20   disseminated.  I dispute the word "disseminated."

21        THE COURT:  The order is broader than that, ma'am.

22   The order is broader than trade secrets.  And this is an order

23   that was briefed.  Your client willingly agreed to it before

24   you joined the case and stipulated to it.  You just heard that

25   here in open court.  And it was litigated.  And Judge Nichols

1  entered it.

2          MS. LAMBERT:  I'm not sure that my client --

3          THE COURT:  Ma'am.  Ma'am, Judge Nichols --

4          MS. LAMBERT:  -- reviewed the protective order with

5  prior counsel.

6          THE COURT:  He did stipulate to it.  There is nothing

7  in the record that I have seen where your client objected to

8  the entry of the protective order, and even if he did, Judge

9  Nichols entered it over any objections.

10          But I need to know going forward what your position is

11  as to whether or not, if you come and gain access to any of the

12  documents in this case, whether you intend to follow the

13  protective order, simple as that.

14          MS. LAMBERT:  I will follow any orders that this Court

15  gives.  I want the Court to know that --

16          THE COURT:  Subject to what -- subject to your own

17  unilateral views as to what can and can't be disseminated?

18          MS. LAMBERT:  I will follow all specific orders that

19  this Court gives.

20          THE COURT:  What does that mean?

21          MS. LAMBERT:  That means anything that the Court

22  orders, I will follow.

23          THE COURT:  I haven't seen any evidence of that thus

24  far.  You violated the protective order.  You apparently have

25  no response.  I think it's conceded that you went on after my

1    March 18th order to continue to violate.

2         MS. LAMBERT:  I did not discuss confidential documents

3    after --

4         THE COURT:  You stood by while those documents were

5    discussed or others were directed to those documents, did you

6    not?

7         MS. LAMBERT:  Your Honor, I don't have an obligation

8    to anyone else but Dr. Byrne.  I can't control what others do.

9         THE COURT:  You have an obligation to the Court by the

10   oath that you just referenced.

11        MS. LAMBERT:  That's correct, but I can't stop law

12   enforcement from investigating.  I can't stop people from

13   discussing the matter, but I can defend --

14        THE COURT:  Let me pose -- this is a simple question.

15   I hope you'll answer it directly.

16        If you have access to any confidential documents in

17   this case in the future, and in your view, or your client's

18   view, those documents reflect some evidence of some crime, do

19   you intend to come to this Court and seek permission to

20   disseminate those, or do you intend to not feel bound by the

21   protective order in this case and disseminate it to third

22   parties, including law enforcement, as you're saying?

23        MS. LAMBERT:  I will come to this Court.

24        THE COURT:  Okay.  You haven't done that to date.  How

25   can I be sure of that, ma'am?

1           MS. LAMBERT:  Well, Your Honor, as the Court knows, I
2  did everything in good faith prior to this.  And --
3           THE COURT:  I don't know that, ma'am.
4           MS. LAMBERT:  Okay.  Well, I'm trying to reassure the
5  Court of that, that what I thought and what I viewed, and maybe
6  in time the Court will understand, are some of the most serious
7  national security issues that have ever taken place in this
8  country.
9           So if the Court wants me to come with any question I
10  might have about whether or not a document contains evidence of
11  a crime, I will do that.  I will not provide it to law
12  enforcement, I will come directly to this Court.
13          THE COURT:  All right.  Do you have anything else --
14  any case law you want to cite me to, any response to any
15  specific case cited by Dominion?
16          MS. LAMBERT:  Your Honor, everything that Dominion has
17  told this Court, in my opinion, has been a material
18  misstatement of fact that I had wanted to address, but the
19  Court, I think, had questions that were specific and I answered
20  them.
21          I did file a brief.  I did do thorough research.  In
22  my opinion, this is a request that I find a case that says
23  water is wet.  I see it slightly different than this Court, but
24  I want to reassure this Court, that the Court would like me to
25  come to this Court before providing any document to law

1    enforcement, and I will do just that.

2            THE COURT:  What was on your client's April 3rd, 2024

3    video?

4            MS. LAMBERT:  Your Honor, I'm not -- Dr. Byrne

5    travels --

6            THE COURT:  Have you seen it?

7            MS. LAMBERT:  -- frequently.

8            I have seen some of his videos.

9            THE COURT:  Have you seen that video?

10           MS. LAMBERT:  I did not watch the entire thing.  I

11   know I sent him a message that said, "Please pull down

12   anything.  We have a hearing coming up."

13           THE COURT:  Have you seen -- so you have seen parts of

14   it?

15           MS. LAMBERT:  I had saw that he did something that

16   appeared to address this Court.  He has many cases and has for

17   years been involved in a number of different investigations.  I

18   assumed it was related to this.  I sent him a message that

19   said, "Please pull that down," and he did.

20           THE COURT:  Okay.  Well, what was on the video?

21           MS. LAMBERT:  I'm sorry?

22           THE COURT:  It's not privileged information.  What was

23   on the video?

24           MS. LAMBERT:  I think he was addressing that he wanted

25   to comply with what the Court is ordering and that he believed

1    that we hadn't done anything wrong.  That's what I -- but I

2    said, "Just stop discussing it until we go to court."

3         THE COURT:  Is there any discussion of any of the

4    confidential information on that video, and I'm going to remind

5    you you're addressing the Court.

6         MS. LAMBERT:  I did not see that, but as I stated,

7    Your Honor, my client posts frequently about many, many topics.

8    I do not have time, nor do I want to bill him for babysitting

9    his social media.  That was one post that I notified him to

10   please pull down.

11        THE COURT:  Well, then -- so, you know, you say that

12   you're going to -- you would comply even if you yourself

13   thought that there was evidence of some crime in any

14   confidential documents or any documents in the case.

15        Let me just note that when I refer to "documents in

16   the case," the protective order that Judge Nichols has entered

17   has said -- I'll just repeat this -- that any documents that

18   are produced in this case are to be used for the litigation of

19   this case.  And so any use beyond that, you were obliged, or

20   your client was obliged, to come to this Court if you wished to

21   use them in any other way.

22        Is your client going to comply with the protective

23   order in the future if he's given access to any documents in

24   this case?

25        MS. LAMBERT:  Absolutely.  And, Your Honor, I would

1    like to point out at the time that --

2          THE COURT:  Again, what possible faith can I have

3    given what's happened thus far and what's undisputed thus far

4    that that will occur in the future?

5          MS. LAMBERT:  Well, Your Honor, I think you can

6    appreciate that we never anticipated, and I'm sure when I was

7    not counsel on this case, that Dr. Byrne never appreciated that

8    he would be given evidence of criminal acts from Dominion.

9    That has happened.

10         So now that we have sorted through how the Court would

11   like us to handle this, we will comply, so the Court can order

12   Dr. Byrne to comply with its order today.  He's present in

13   court, and we will absolutely comply and file motions to

14   address what Judge Nichols knew at the time he signed that

15   order and any requests that we have.

16         THE COURT:  What if a witness testifies at a

17   deposition and your or your client's view is that that reflects

18   some sort of evidence of a crime, is that something, that

19   deposition testimony something you would share publicly?

20         MS. LAMBERT:  We will file a motion before Judge

21   Nichols.

22         THE COURT:  Well, Judge Nichols has referred all

23   discovery matters to me in this case, so --

24         MS. LAMBERT:  Then we will file any issue before this

25   Court.

1          THE COURT:  All right.  Do you have anything else,

2    ma'am?

3          MS. LAMBERT:  No, Your Honor.  If the Court has any

4    further questions as to how we will satisfy and comply with any

5    further orders, I'm happy to address it.

6          THE COURT:  Okay.  Thank you.

7          Ms. Brook?

8          MS. BROOK:  Thank you, Your Honor.  I'll try to be as

9    concise as possible.

10          You asked Ms. Lambert months ago for any authority for

11    what she did prior to March 18, 2024.  She had none then.  She

12    has none now.  That's despite this Court giving her numerous

13    opportunities, really every opportunity to find it, including a

14    very late sur-reply.

15          The reason she has no authority is because you just

16    are not allowed to do what she did.  And let's be clear about

17    what she did.  She did not give documents to law enforcement.

18    I reject that phrasing.  She did not hand a folder of documents

19    to law enforcement.  She gave Sheriff Dar Leaf, and please

20    correct me if this is wrong, her personal login credential to

21    an entire database of documents so that he could, for all we

22    know, download the entire thing and sift through it as he

23    delights and for the next two years as this case is proceeding

24    towards trial, leak, leak, leak as he likes.

25          And, Your Honor, to that end, there is another

1    document I would like to provide to Ms. Lambert, of course, as

2    well as to this Court, this is a chart that we took pains to

3    create that lists every document, Dominion document, Sheriff

4    Dar Leaf has posted on his so-called Twitter account.  I have

5    no idea if it's his X account or not.  And the date in which he

6    posts it.  He has posted new information, new documents, as

7    recently as May 13th.

8              THE COURT:  How does he have access to those?

9              MS. BROOK:  Because for all we know, he downloaded the

10   entire thing.  That's the issue, Your Honor.  Of course she

11   says to you now that she'll come to the Court if she finds new

12   evidence of criminal activity because she doesn't have to

13   anymore.  For all we know, he has every single document we have

14   produced in this case.  She never needs to come to you again.

15             THE COURT:  Do you want to hand that up?  Do you have

16   a copy of that to hand up to the clerk?

17        (Pause)

18             MS. BROOK:  And worse yet, Your Honor, and this goes

19   to that legal standard to infecting the integrity of this

20   proceeding, I will never know which documents she gave to

21   Sheriff Dar Leaf or not, because even if this Court grants my

22   request, which I urge it to do, to have the document vendor

23   provide me with a full accounting of who logged in and when and

24   who downloaded what, it's all going to be under her name

25   because she gave her login.  So it's not like I'll be able to

1    say, "Oh, well, this one is presumably in Ms. Lambert's

2    possession, but this one is in Sheriff Dar Leaf's possession."

3    She gave him her login credentials to cover her tracks, not to

4    protect the chain of custody.

5          And she did not hand over documents.  She handed over

6    an entire repository of more than a million documents.  Is her

7    contention that all one million documents show the greatest

8    crimes in the history of the world?

9          On that point, Your Honor, too, as to why we should

10   suddenly believe her when she says she'll follow your Court's

11   orders, the only explanation I heard is that she and her client

12   never believed that Dominion's documents would show evidence of

13   criminal acts.  And so now that that's been sorted out, and

14   they know what to do if they find that evidence, she'll follow

15   the rules.

16         I'm sorry, if there is anything I can give Ms. Lambert

17   and Mr. Byrne credit for, they have been consistent for the

18   last four years that Dominion is responsible for the greatest

19   crimes in the history of this country.  They have been begging

20   Dominion to sue them.  They have been telling the world, as

21   Your Honor mentioned, as is their right apparently, they are

22   saying whatever they want to say, accusing my client of having

23   done these terrible things.

24         So to say that the reason she'll behave differently

25   now is because she was just so caught off guard before when the

1    documents showed apparently exactly what she and her client

2    have been saying the documents would show, it's just not

3    credible.

4            So, Your Honor, no authority for what she already did,

5    which is looking increasingly like an intentional effort to

6    launder these documents to Sheriff Dar Leaf.

7            Last point on that one, Your Honor, if she really

8    believed that they showed evidence of a crime and she didn't

9    think that this Court had jurisdiction over the criminal court,

10   go to law enforcement and report a crime.  There is no

11   explanation for why she gave Sheriff Dar Leaf her login to an

12   entire document repository, unless she wanted to do exactly

13   what she achieved, which is to give him presumably -- and I'm

14   going to presume it at this point -- access to every single

15   document Dominion has produced in this case thus far, that he

16   may very well have downloaded and have in his possession.

17           Your Honor, she also has no response to the violations

18   of the status quo order that I listed in my opening remarks.

19   As to the criminal proceeding where she was supposed to seal, I

20   won't go into detail on her lawyer's response as to whether or

21   not he did it or not, but I think the points in response are

22   obvious.

23           One, she represents herself pro se, she could have

24   picked up the phone herself and called the prosecutor's office

25   and asked them to seal these documents.  But, two, and, again,

1  this goes to why no lesser sanction will suffice, if she

2  believed her attorney, giving her every benefit of the doubt,

3  that he couldn't do this thing, it would be against his oath to

4  the Court, then the right thing to do under the rules of this

5  Court, under DC Rules of Professional Conduct, Rule 3.3, the

6  duty of candor to the Court, let us know, pick up the phone,

7  send something to the Court to say, "I am updating the Court

8  that I made a request of my attorney to do X, Y, and Z, and he

9  said no way."

10  That is what an attorney should have done in this

11  situation if, giving her every benefit of the doubt, she

12  believed him.  And it's that failure, that refusal to act in

13  that way that's going to continue to infect every single

14  dispute we have in this case.

15  Your Honor, lastly, she told Mr. Byrne, I think she

16  said, to pull down the video, because we have a hearing coming

17  up.  The status quo order said to preserve all documents

18  surrounding this dispute.  And I know she didn't instruct her

19  client to pull it down and preserve it, because, again, I

20  emailed her probably six or seven times on this issue and

21  reiterated, "I understand he pulled it down, but does he have a

22  copy on his phone that he used to upload, did he send it to a

23  friend, anything," and she made clear it's gone.

24  So that's yet another violation of the status quo

25  order that we learned about in her response.

1        THE COURT:  If I order disqualification, what would be

2   the need for any discovery -- why would Dominion need any

3   discovery into this alleged dispute?

4        MS. BROOK:  Because, Your Honor, we intend to bring a

5   motion as to Mr. Byrne as well, and I think it would benefit

6   both this Court and Dominion if we knew more about what he had

7   done.  If it turns out that Mr. Byrne has been coordinating

8   with Sheriff Dar Leaf in Sheriff Dar Leaf's posts, I believe

9   that is a fact that is not privileged, and that would bear on

10  this Court's decision as to whether any sanctions should fall

11  on Mr. Byrne.

12       So it's not necessary for you to disqualify

13  Ms. Lambert.  Like I said, we think the evidence that exists in

14  the record as of right now is more than enough to satisfy the

15  egregious misconduct standard as to her actions, but we do

16  intend to seek sanctions as to Mr. Byrne.

17       And I say this genuinely, I don't want to be here

18  doing this.  I have a really busy case to work on to try to

19  show that these folks lied about Dominion in 2020 and to bring

20  this case to trial as quickly as possible.  I would like to

21  bring as targeted and focused and helpful a motion as possible,

22  and in order to do that, I need to know.  And frankly I'm

23  entitled to know under Judge Nichols' protective order.

24       It says -- it's why I assume that Mr. Byrne's former

25  lawyers did what they did and informed us of the breach -- "If

1   you become aware of a breach, you're supposed to inform the

2   other side and you're supposed to provide information about

3   it."  So I'm not even asking for information we're not entitled

4   to really.  I just am saying I no longer really trust what they

5   are going to say, so I would like the documents to back it up.

6          And that really is where this ends, Your Honor, which

7   is the key question I think you asked Ms. Lambert, which is,

8   you know, will you follow my orders going forward.  And while I

9   appreciate she is saying she'll follow specific orders or

10  she'll follow any orders requiring to a specific thing, I just

11  at this point cannot go back to my client and tell them that I

12  can believe that and that I can believe that there is

13  information -- that we can produce more information, yet more

14  information to that side, and that I have any faith at all that

15  it won't be shared or that frankly other future breaches of

16  this Court's orders will go into effect.

17          THE COURT:  Okay.

18          MS. BROOK:  I was just going to say, the other things

19  I have for opposing counsel and for Your Honor, should you like

20  it, is the full email from the prosecutor's office in Michigan

21  if we could provide that.  And then the cases I mentioned,

22  which I'm happy to provide to both, we have them here today,

23  opposing counsel and Your Honor, that talk about looking beyond

24  the four corners, again, you need evidence within the four

25  corners as well are *Atkins v. Fischer*, 232 F.R.D. 116, that's

1   D.D.C. 2005.  We're also providing *Vollmer v. Publishers*

2   *Clearing House*, 248 F.3d 698.  That's a Seventh Circuit case,

3   2011.  And *Kramer v. Tribe*, 156 F.R.D. 96, the District of New

4   Jersey, 1994.

5          THE COURT:  Okay.  Thank you.

6          Ms. Lambert, is there a copy of this video anywhere,

7   the April 3rd video?

8          MS. LAMBERT:  No, Your Honor.  And I wanted to provide

9   further information about that.  I asked my client to take it

10  down, not to have it deleted.  I did not understand when I was

11  asking him to remove it from social media that it was not

12  preserved.

13         Apparently, it's posted on some platform where the

14  videos are not preserved.  He does not have a copy.  I did let

15  Dominion know that when they asked by email if there was a

16  copy, and I told him -- told them unfortunately, there wasn't.

17  And I didn't know that.

18         THE COURT:  Isn't it your obligation to ensure

19  preservation?

20         MS. LAMBERT:  Your Honor, I --

21         THE COURT:  Especially given my specific -- I mean, it

22  exists no matter what, but then specifically my order.

23         MS. LAMBERT:  I don't know, Your Honor, number one, as

24  a threshold consideration whether or not it discussed any

25  documents in violation of the order.  I don't know that.  I

1    just asked him to stop talking about it when I saw the post

2    come up.

3            THE COURT:  My question is:

4            Isn't it your obligation to ensure that everything is

5    preserved whether or not -- regardless of what's in it,

6    given --

7            MS. LAMBERT:  I did communicate that to my client

8    after the hearing, Your Honor.  And I did not know that it

9    would not be preserved.  Apparently -- and he didn't know that

10   either when he removed it from a public post that it is not

11   preserved.  So we just didn't know that, Your Honor.

12           To correct a few things, I am not pro se in my case.

13   I have an attorney representing me.  I am for the first time in

14   receipt of this email today in court that was sent on May 15th

15   that was not forwarded to me, and it also was not -- my

16   attorney was not copied on it -- to engage in conversation with

17   Dominion, nor did the prosecutor appear to forward it to my

18   attorney.  I am represented by counsel.  So I am in receipt of

19   this, but I wanted the Court to have that further information.

20           With regard to any questions that the Court might have

21   with us following further orders, everything that I did on

22   behalf of Dr. Byrne was in good faith and was consistent with

23   what I believed the laws and the rules and the ethical

24   obligations to be.

25           THE COURT:  Did you read the protective order at any

1   time --

2          MS. LAMBERT:  I did, and I --

3          THE COURT:  Just let me finish.

4          -- prior to Dominion filing its emergency motion?

5          MS. LAMBERT:  Yes, and signed it, and I provided it to

6   Mr. Driscoll's office.

7          THE COURT:  Right.  It's undisputed that you signed an

8   undertaking, so I'm assuming that you read it and you saw that

9   there were mechanisms that would have avoided this entire

10  situation.

11         MS. LAMBERT:  As I further stated, and I had wanted to

12  address with the Court, Your Honor, we did not anticipate the

13  discovery to contain evidence of criminal acts.  I believe this

14  is, in my view, but I understand the Court's view, asking for

15  water is wet.  If I were to go to the counsel for the criminals

16  and let them know that I believe there is evidence of a crime

17  that I want to report to the police, that could result in a

18  destruction of evidence, criminal actors fleeing, hiding, so --

19         THE COURT:  Ma'am --

20         MS. LAMBERT:  -- I want to follow any order that the

21  Court gives moving forward, but the Court needs to understand

22  my mindset was in good faith, and the Court does have the

23  ability to issue sanctions or remove me from the case should I

24  do anything inconsistent moving forward with a Court order.

25         THE COURT:  All right.  Ma'am, I have given you ample

1    opportunity to respond to any of the specific events that have

2    occurred.  I haven't really heard any response other than what

3    you said.  I'm going to take a brief break and I'll be back.

4            MS. LAMBERT:  Thank you, Judge.

5            THE COURT:  Thank you.

6            DEPUTY CLERK:  All rise.  Court stands in recess.

7        (Recessed from 11:17 a.m. to 11:38 a.m.)

8            DEPUTY CLERK:  All rise.  This Honorable Court is now

9    reconvened.

10            Please be seated and come to order.

11            THE COURT:  Okay.  A few matters that I would like to

12    address before wrapping up.

13            I would like to, for Ms. Lambert and Mr. Byrne's

14    benefit, just reiterate my status quo order.

15            Paragraph one states -- and this is at ECF No. 77 for

16    reference -- that pending any resolution by this Court, and

17    until further order of the Court, that Mr. Byrne and his

18    counsel, Ms. Lambert, are to immediately desist from sharing,

19    distributing, providing access to or discussing any discovery

20    material received in connection with the following cases, and

21    it goes on to list the related cases here.

22            Now, discovery material, as I reference it in that

23    order, is discovery material as is defined in Judge Nichols'

24    interim -- or Judge Nichols' protective order.  I want to make

25    it very clear that going forward if I see any evidence that

1    violates this order, I'm going to take that into account in my

2    final resolution.  And I'll be very clear, some of the things I

3    have seen since March are a violation of this, as I see it,

4    some of what I have seen today.

5            And so I would like you both to come up and confirm

6    that you understand that.  Now is the opportunity to ask me if

7    you have any questions.

8            I would like Mr. Byrne to confirm that he understands

9    this order and that he intends to comply with it as well.

10           So I'll let you go first, Ms. Lambert.  Do you

11   understand this order?

12           MS. LAMBERT:  I do, Your Honor, and I will comply with

13   it.

14           THE COURT:  Okay.  If there are any questions, are you

15   going to come to the Court?

16           MS. LAMBERT:  Absolutely.

17           THE COURT:  Instead of taking unilateral action?

18           MS. LAMBERT:  Correct.

19           THE COURT:  Okay.

20           Mr. Byrne, I just don't want you to say anything more

21   beyond whether or not you understand this order.

22           MR. BYRNE:  I do.

23           THE COURT:  And are you prepared to comply with it,

24   sir?

25           MR. BYRNE:  Yes.

```
 1              THE COURT:  All right.  Thank you.  You may be seated.
 2              Well, actually, let me ask instead of -- are you going
 3    to comply with it?
 4              MR. BYRNE:  Yes.
 5              THE COURT:  Okay.  Thank you.
 6              MR. BYRNE:  Actually, I have one question.  You asked
 7    if I had a question?
 8              THE COURT:  You probably want to ask your lawyer so
 9    that you can ask me -- and she can ask me, if you'd like.
10    Would you like to ask her and have her ask me?
11       (Pause)
12              MS. LAMBERT:  Your Honor, if Dr. Byrne is requested by
13    Congress or the DOJ or law enforcement to cooperate with an
14    investigation, how should he proceed?
15              THE COURT:  Well, if it involves discovery material in
16    this case, follow the mechanism in the protective order for
17    bringing it to the Court's attention, and, if it's
18    confidential, you can seek to file something before this Court.
19              But I'll just be very clear, some of the actions that
20    appear to have been taken in the name of law enforcement aren't
21    entirely supported, so that's why I'm saying you need to follow
22    the strict guidelines of Judge Nichols' order and come to the
23    Court if there are any such requests.
24              MS. LAMBERT:  Thank you, Judge.
25              THE COURT:  Thank you.
```

1        All right.  Just to clarify, as I mentioned, Judge

2   Nichols' protective order defines what discovery material is

3   and it applies to all discovery.  That's paragraph one of his

4   order, so I'm not slicing and dicing, and whatever positions

5   anyone is taking that something is or is not a trade secret,

6   his order, which he entered over objection, is much broader

7   than that, and that's how I'm going to define "any discovery

8   material" is the definition he's applied to it at paragraph one

9   of the protective order.

10       I would like to just address the McGlinchey firm's

11  questions.  I think there were some questions that the prior

12  counsel had for the Court or requests as to future cases.

13       MR. PLUNKETT:  Thank you, Judge.  Dan Plunkett from

14  the McGlinchey firm's office of general counsel.  We submitted

15  some proposed edits to clarify your order that are pretty

16  straightforward.  One, that it be limited to the documents

17  received from Dominion as opposed to documents produced by

18  Mr. Byrne to Dominion, and that he's free, of course, to use

19  his own documents in whatever fashion he may choose to do so,

20  and that the order restricts his ability to use, disseminate,

21  et cetera, Dominion's documents.

22       THE COURT:  I believe that's what the protective order

23  says.

24       Ms. Brook, is there any objection to that reading of

25  the protective order?

1          MS. BROOK:  No objection, Your Honor.

2          THE COURT:  So that's correct.  I think that, if I

3     recall correctly, the protective order says that any person's

4     own documents are their own and it's really material that you

5     gain as a result of the discovery process from another party

6     that's restricted.

7          MR. PLUNKETT:  Of course, Your Honor.  That is how we

8     read it as well, but out of an abundance of caution, we sought

9     the clarifications.

10          THE COURT:  I appreciate that.  Thank you.

11          MR. PLUNKETT:  Thank you, Ms. Brook.

12          THE COURT:  Okay.  Yes, Mr. Driscoll?

13          MR. DRISCOLL:  The other clarification is the status

14     quo order I believe had the document firms under an obligation

15     to let the Court know if anyone tried to access any documents

16     being held on behalf of Dr. Byrne.  And we want to make sure

17     that the Court clarified that that only applies to this case,

18     because there are other cases for which that same document firm

19     holds documents that have nothing to do with Dominion.  It's

20     parallel to what Mr. Plunkett discussed earlier, that that

21     obligation of the document firm applies only to the Dominion

22     matter.

23          THE COURT:  Well, to the cases here.  It's more than

24     just one matter, but, yes, I can't issue orders in those other

25     cases and so --

1          MR. DRISCOLL:  As long as we're not violating your
2     status quo order.
3          THE COURT:  I have to say I appreciate you -- I would
4     much rather you come out of an abundance of caution to the
5     Court, and I urge all parties to adhere to the manner in
6     which -- use your approach as a model for how to come to the
7     Court and try to get some clarification.
8          But, yeah, if there are other documents in other
9     cases, I can't restrict those, of course.
10          MR. DRISCOLL:  We thought it was clear, but we just
11     wanted to make sure.  Thank you, Your Honor.
12          THE COURT:  I appreciate that.  Thank you.
13          Okay.  I am going to take the matter under advisement.
14     I would ask that Dominion -- I would like to get a supplement
15     filed with your slide deck and any documents or posts, or if
16     there are videos that are cited in the slide deck, can you file
17     those as kind of an addendum to the slide deck?
18          MS. BROOK:  Of course, Your Honor.  I also have them
19     all printed out here too, in case Your Honor would like them,
20     and I have already provided everything I have in my hand to
21     Ms. Lambert.
22          THE COURT:  Is that a copy for the Court then?
23          MS. BROOK:  Yes, Your Honor.
24          THE COURT:  Okay.  I would like to take that, but we
25     would like to get it filed into the record, so if you could do

1 that no later than close of business tomorrow, does that work?

2   MS. BROOK:  Absolutely.  So just the pieces of

3 evidence essentially that we addressed today?

4   THE COURT:  Yes.  And you can mark them as subsequent

5 exhibit numbers beyond the exhibit numbers in your filings so

6 that we can keep track of everything.

7   Okay.  As I mentioned, I will take this matter under

8 advisement.  Is there anything else at this time, anyone?

9   All right.  Thank you all for your argument.  I

10 appreciate you being here.  Thank you, Mr. Byrne for being

11 here.  You are all excused.

12   DEPUTY CLERK:  All rise.  Court is now adjourned.

13  (Proceedings concluded at 11:46 a.m.)

14

15       CERTIFICATE

16  I, Sonja L. Reeves, Federal Official Court Reporter in and
for the United States District Court of the District of
17 Columbia, do hereby certify that the foregoing transcript is a
true and accurate transcript from the original digital record
18 in the above-entitled matter and that the transcript page
format is in conformance with the regulations of the Judicial
19 Conference of the United States.

20  Dated this 18th day of May, 2024.

21

22      /s/ Sonja L. Reeves
       SONJA L. REEVES, RDR-CRR
23       FEDERAL OFFICIAL COURT REPORTER

24

25

**/**

**/s** [1] - 66:22

**1**

**1** [2] - 6:10, 6:12
**10:00** [2] - 1:10, 3:1
**11** [2] - 6:11, 21:25
**116** [1] - 56:25
**11:17** [1] - 60:7
**11:38** [1] - 60:7
**11:46** [2] - 1:10, 66:13
**12** [1] - 42:1
**1275** [1] - 2:3
**12th** [1] - 7:8
**13th** [1] - 51:7
**1400** [1] - 1:14
**15** [2] - 6:11, 6:14
**156** [1] - 57:3
**15th** [1] - 58:14
**16** [2] - 1:10, 32:18
**16th** [1] - 32:12
**18** [3] - 6:15, 18:13, 50:11
**18th** [8] - 8:23, 9:4, 12:18, 14:9, 29:18, 40:25, 45:1, 66:20
**19** [2] - 9:7, 11:23
**1900** [1] - 1:14
**1994** [1] - 57:4
**19th** [1] - 12:23
**1:21-cv-02131(CJN** [1] - 1:5

**2**

**20001** [1] - 1:24
**20004** [1] - 2:4
**2005** [1] - 57:1
**2011** [1] - 57:3
**202** [1] - 2:4
**2020** [4] - 6:20, 25:15, 32:22, 55:19
**2023** [1] - 27:12
**2024** [10] - 1:10, 6:14, 6:16, 9:7, 18:13, 18:22, 32:18, 47:2, 50:11, 66:20
**21-2131** [1] - 3:6
**21st** [1] - 9:20
**22nd** [1] - 13:3
**232** [1] - 56:25
**248** [1] - 57:2
**27** [2] - 6:11, 8:13
**28** [1] - 17:1
**29** [1] - 17:8
**2nd** [1] - 16:7

**3**

**3** [1] - 6:12
**3.3** [1] - 54:5
**3.4(c** [1] - 6:5
**30** [1] - 4:5
**310** [1] - 1:15
**313** [1] - 1:19
**32** [1] - 18:3
**333** [1] - 1:24
**34** [1] - 18:21
**3rd** [2] - 47:2, 57:7

**4**

**4.1** [1] - 36:16
**400** [1] - 1:18
**410-6872** [1] - 1:19
**420** [1] - 2:3
**42:25** [1] - 13:5
**45** [1] - 8:8
**48** [1] - 7:1
**48243** [1] - 1:19

**5**

**5:00** [1] - 9:19

**6**

**698** [1] - 57:2

**7**

**75** [1] - 9:19, 38:2
**77** [1] - 60:15
**789-3100** [1] - 1:15
**7th** [1] - 13:18

**8**

**8** [3] - 6:11, 6:12, 18:22
**8.4(d)** [1] - 6:8
**802-9950** [1] - 2:4
**8th** [1] - 6:25

**9**

**90067** [1] - 1:14
**96** [1] - 57:3

**A**

**a.m** [6] - 1:10, 3:1, 60:7, 66:13
**ABC** [1] - 12:24
**abide** [2] - 12:12, 23:5
**ability** [5] - 20:4,

**20:9, 20:20, 59:23, 63:20
able** [5] - 30:23, 31:10, 35:5, 39:24, 51:25
**above-entitled** [1] - 66:18
**absolutely** [5] - 41:1, 48:25, 49:13, 61:16, 66:2
**abundance** [2] - 64:8, 65:4
**access** [18] - 6:21, 9:11, 14:10, 14:17, 14:21, 15:20, 27:13, 27:18, 35:21, 36:3, 37:18, 44:11, 45:16, 48:23, 51:8, 53:14, 60:19, 64:15
**accessing** [1] - 25:19
**accessories** [1] - 7:14
**account** [2] - 51:4, 51:5, 61:1
**accounting** [2] - 7:9, 51:23
**accurate** [2] - 32:15, 66:17
**accusation** [3] - 41:5, 41:21, 43:17
**accuses** [1] - 7:13
**accusing** [1] - 52:22
**achieved** [1] - 53:13
**act** [1] - 54:12
**acting** [4] - 10:21, 27:4, 32:6, 40:15
**action** [5] - 11:2, 25:4, 25:6, 41:16, 61:17
**actions** [7] - 5:16, 7:16, 12:25, 15:24, 22:20, 55:15, 62:19
**activity** [2] - 19:4, 51:12
**actors** [1] - 59:18
**acts** [6] - 37:23, 39:24, 40:8, 49:8, 52:13, 59:13
**add** [1] - 26:1
**addendum** [1] - 65:17
**adding** [2] - 12:9, 12:11
**address** [15] - 4:11, 4:13, 9:21, 21:6, 28:21, 28:23, 39:23, 43:10, 46:18, 47:16, 49:14, 50:5, 59:12, 60:12, 63:10

**addressed** [1] - 66:3
**addressing** [3] - 7:7, 47:24, 48:5
**adhere** [2] - 21:10, 65:5
**adjourned** [1] - 66:12
**admitted** [2] - 27:11, 42:5
**advance** [1] - 11:15, 34:3
**advised** [1] - 14:23
**advisement** [2] - 65:13, 66:8
**advocate** [1] - 42:3
**AEO** [1] - 6:23
**affidavit** [4] - 31:14, 31:21, 32:1, 32:3
**afternoon** [1] - 10:13
**ago** [3] - 18:22, 24:6, 50:10
**agree** [4] - 23:2, 36:25, 37:7, 40:4
**agreed** [3] - 35:24, 37:3, 43:23
**ahead** [1] - 11:1
**al** [2] - 1:3, 3:6
**alerted** [2] - 25:2, 29:2
**Alfred** [1] - 2:3
**allegation** [1] - 29:17
**allegations** [2] - 33:12, 43:10
**alleged** [3] - 4:17, 28:14, 55:3
**allegedly** [2] - 20:1, 35:13
**allow** [2] - 35:21, 38:10
**allowed** [5] - 13:15, 22:1, 25:23, 36:23, 50:16
**ALSO** [2] - 2:1
**ample** [1] - 59:25
**analysis** [1] - 15:23
**Angeles** [1] - 1:14
**announced** [1] - 42:24
**announcing** [1] - 16:2
**answer** [6] - 21:8, 31:22, 33:17, 33:21, 39:11, 45:15
**answered** [1] - 46:19
**anticipate** [1] - 59:12
**anticipated** [1] - 49:6
**anyway** [1] - 16:18
**apology** [1] - 18:15
**Appeals** [1] - 10:17
**appeals** [2] - 10:23,

**11:1
appear** [5] - 10:18, 42:15, 42:25, 58:17, 62:20
**appearance** [5] - 27:14, 29:6, 32:20, 41:3, 41:20
**appeared** [5] - 25:21, 27:2, 34:1, 35:13, 47:16
**appearing** [2] - 3:18, 10:25
**appellate** [1] - 32:22
**application** [1] - 42:5
**applied** [2] - 21:4, 63:8
**applies** [6] - 7:22, 9:25, 37:22, 63:3, 64:17, 64:21
**apply** [1] - 8:5
**appreciate** [6] - 49:6, 56:9, 64:10, 65:3, 65:12, 66:10
**appreciated** [1] - 49:7
**approach** [4] - 4:22, 26:13, 26:14, 65:6
**appropriate** [1] - 26:6
**appropriately** [1] - 23:9
**April** [4] - 13:18, 16:7, 47:2, 57:7
**apt** [1] - 20:21
**argue** [1] - 4:5
**arguing** [1] - 4:20
**argument** [1] - 66:9
**arguments** [1] - 40:24
**arrested** [1] - 13:25
**articulation** [1] - 21:3
**assertion** [1] - 6:7
**assess** [1] - 15:13
**assistant** [2] - 42:17, 42:19
**associates** [1] - 26:4
**assume** [2] - 35:11, 55:24
**assumed** [1] - 47:18
**assuming** [1] - 59:8
**Atkins** [1] - 56:25
**attached** [2] - 31:25, 32:2
**attachment** [1] - 31:13
**attacked** [1] - 41:22
**attacks** [1] - 13:21
**attempt** [1] - 10:22
**attempts** [1] - 35:4

**attention** [2] - 12:20, 62:17
**attorney** [44] - 5:12, 8:7, 10:21, 10:23, 14:20, 15:17, 15:20, 16:21, 18:24, 20:1, 20:8, 20:15, 20:17, 22:3, 23:21, 25:4, 26:20, 29:20, 29:22, 30:6, 30:25, 31:2, 31:7, 31:24, 32:11, 32:18, 32:21, 33:1, 36:6, 36:7, 36:10, 38:24, 41:4, 41:6, 41:8, 41:25, 42:10, 42:24, 54:2, 54:8, 54:10, 58:13, 58:16, 58:18
**Attorney** [1] - 10:24
**attorney-client** [3] - 15:20, 25:4, 29:22
**attorneys** [5] - 7:14, 13:24, 23:4, 25:1, 36:18
**author** [1] - 26:17
**authority** [9] - 8:25, 36:1, 38:22, 38:23, 39:4, 39:19, 50:10, 50:15, 53:4
**Avenue** [3] - 1:14, 1:24, 2:3
**avoided** [1] - 59:9
**aware** [2] - 27:15, 56:1

## B

**babysitting** [1] - 48:8
**background** [1] - 41:14
**banned** [1] - 25:19
**bar** [5] - 32:20, 32:25, 36:12, 41:21, 42:7
**barred** [1] - 36:9
**barring** [1] - 4:5
**base** [1] - 10:8
**based** [1] - 6:7
**baseline** [1] - 33:16
**basic** [1] - 8:15
**basis** [1] - 30:14
**bear** [1] - 55:9
**become** [1] - 56:1
**BEFORE** [1] - 1:9
**began** [1] - 6:20
**begging** [1] - 52:19
**begin** [1] - 5:7
**behalf** [10] - 3:11, 3:13, 3:18, 4:24, 10:21, 10:25, 29:12,

37:11, 58:22, 64:16
**behave** [1] - 52:24
**behavior** [1] - 22:5
**Bell** [2] - 23:24, 23:25
**bells** [1] - 27:7
**benefit** [4] - 54:2, 54:11, 55:5, 60:14
**best** [3] - 20:23, 26:7, 35:25
**between** [2] - 15:15, 26:3
**beyond** [7] - 17:1, 28:12, 48:19, 56:23, 61:21, 66:5
**bill** [1] - 48:8
**black** [2] - 40:9, 40:14
**bleeding** [1] - 9:2
**blunt** [1] - 24:21
**bound** [1] - 45:20
**breach** [2] - 55:25, 56:1
**breaches** [3] - 4:17, 6:1, 56:15
**break** [2] - 23:3, 60:3
**brief** [4] - 6:17, 23:25, 46:21, 60:3
**briefed** [1] - 7:23, 8:5, 43:23
**briefing** [3] - 4:7, 21:18, 21:22
**briefly** [1] - 5:25
**bring** [4] - 12:20, 55:4, 55:19, 55:21
**bringing** [1] - 62:17
**broader** [3] - 43:21, 43:22, 63:6
**Brook** [3] - 1:13, 3:10, 4:23
**brook** [4] - 4:20, 50:7, 63:24, 64:11
**BROOK** [30] - 3:10, 4:21, 4:23, 5:3, 5:5, 5:14, 7:6, 8:3, 15:1, 17:13, 17:22, 20:14, 20:25, 22:7, 22:10, 23:2, 23:14, 23:17, 25:7, 25:12, 26:9, 50:8, 51:9, 51:18, 55:4, 56:18, 64:1, 65:18, 65:23, 66:2
**business** [1] - 66:1
**busy** [2] - 11:25, 55:18
**BY** [3] - 1:13, 1:18, 2:3
**bypass** [4] - 36:2, 38:25, 39:14
**Byrne** [57] - 3:6,

3:18, 3:21, 3:23, 4:9, 8:2, 8:3, 8:8, 9:10, 9:18, 9:24, 11:13, 11:20, 11:25, 12:4, 12:17, 15:3, 15:5, 15:6, 15:14, 15:16, 15:24, 16:3, 16:7, 17:5, 17:7, 17:23, 18:3, 18:8, 18:22, 22:19, 24:10, 26:4, 26:6, 28:17, 29:5, 29:9, 29:12, 41:25, 45:8, 47:4, 49:7, 49:12, 52:17, 54:15, 55:5, 55:7, 55:11, 55:16, 58:22, 60:17, 61:8, 61:20, 62:12, 63:18, 64:16, 66:10
**BYRNE** [5] - 1:6, 61:22, 61:25, 62:4, 62:6
**Byrne's** [8] - 12:11, 14:19, 16:20, 25:1, 27:20, 36:18, 55:24, 60:13

## C

**California** [1] - 1:14
**candor** [1] - 54:6
**cannot** [2] - 15:3, 56:11
**capacity** [1] - 27:5
**care** [1] - 30:24
**careful** [2] - 27:6, 32:14
**Carry** [2] - 2:3, 3:24
**Case** [1] - 3:5
**CASE** [1] - 1:5
**case** [104] - 4:16, 5:8, 5:14, 5:15, 5:17, 5:18, 6:2, 6:10, 6:18, 6:23, 7:2, 7:17, 8:8, 9:13, 10:2, 10:12, 10:20, 10:24, 17:10, 17:21, 19:19, 19:23, 20:4, 20:9, 20:17, 20:23, 20:25, 21:1, 21:7, 21:13, 21:23, 22:1, 22:3, 22:4, 22:6, 22:13, 23:11, 23:14, 23:25, 24:22, 25:22, 25:23, 27:4, 27:14, 28:13, 29:4, 30:2, 30:20, 31:4, 32:4, 32:21, 33:5, 33:6, 34:5, 35:4, 35:25, 36:1, 36:4, 37:5, 37:12, 37:22, 38:12, 39:5, 39:6, 39:9,

39:13, 40:5, 40:6, 40:19, 41:10, 41:12, 41:13, 41:15, 43:2, 43:13, 43:17, 43:24, 44:12, 45:17, 45:21, 46:14, 46:15, 46:22, 48:14, 48:16, 48:18, 48:19, 48:24, 49:7, 49:23, 50:23, 51:14, 53:15, 54:14, 55:18, 55:20, 57:2, 58:12, 59:23, 62:16, 64:17, 65:19
**cases** [17] - 7:25, 23:23, 23:25, 25:16, 40:3, 41:4, 43:3, 43:4, 47:16, 56:21, 60:20, 60:21, 63:12, 64:18, 64:23, 64:25, 65:9
**caught** [1] - 52:25
**caution** [2] - 64:8, 65:4
**Center** [1] - 1:18
**center** [2] - 24:10, 24:11
**CEO** [2] - 34:23, 34:24
**certain** [1] - 17:3
**CERTIFICATE** [1] - 66:15
**Certified** [1] - 1:23
**certified** [1] - 16:5
**certify** [1] - 66:17
**cetera** [1] - 63:21
**chain** [2] - 35:21, 52:4
**chance** [3] - 16:12, 24:7, 24:16
**change** [2] - 10:10, 29:5
**charged** [2] - 42:14, 42:24
**chart** [1] - 51:2
**child** [1] - 43:5
**choose** [1] - 63:19
**Christina** [2] - 1:13, 3:15
**Circuit** [2] - 10:16, 57:2
**circumstances** [1] - 20:24
**cite** [1] - 46:14
**cited** [5] - 30:1, 42:6, 43:14, 46:15, 65:16
**Civil** [1] - 3:5
**civil** [3] - 32:10, 37:22, 40:18
**claim** [2] - 12:4, 25:4
**claiming** [2] - 7:11, 15:20

**claims** [2] - 13:23, 13:24
**clarification** [2] - 64:13, 65:7
**clarifications** [1] - 64:9
**clarified** [1] - 64:17
**clarify** [3] - 34:15, 63:1, 63:15
**clear** [25] - 5:15, 5:22, 7:16, 8:4, 8:24, 9:9, 11:7, 14:13, 14:16, 16:22, 20:11, 21:21, 22:18, 25:19, 26:19, 33:20, 36:20, 38:9, 40:9, 50:16, 54:23, 60:25, 61:2, 62:19, 65:10
**Clearing** [1] - 57:2
**clearly** [3] - 8:18, 28:24, 34:18
**CLERK** [4] - 3:2, 60:6, 60:8, 66:12
**Clerk** [1] - 42:13
**clerk** [2] - 42:20, 51:16
**clicked** [1] - 27:1
**client** [27] - 11:24, 15:20, 19:17, 20:2, 20:4, 20:10, 25:4, 29:22, 37:3, 37:7, 37:9, 38:25, 39:17, 42:13, 43:23, 44:2, 44:7, 48:7, 48:20, 48:22, 52:11, 52:22, 53:1, 54:19, 56:11, 57:9, 58:7
**client's** [4] - 40:24, 45:17, 47:2, 49:17
**clients** [4] - 33:3, 41:24, 42:10, 42:23
**close** [1] - 66:1
**co** [1] - 41:17
**co-counsel** [1] - 41:17
**code** [2] - 17:10, 38:7
**colleague** [1] - 23:23
**collect** [1] - 12:19
**COLUMBIA** [1] - 1:1
**Columbia** [1] - 66:17
**coming** [2] - 47:12, 54:16
**comment** [1] - 23:1
**comments** [2] - 34:14, 35:12
**committed** [2] - 34:25, 35:9
**communicate** [2] - 11:24, 58:7

**communicating** [1] - 43:2

**communication** [1] - 30:23

**communications** [2] - 26:3, 26:19

**company** [1] - 37:25

**compared** [1] - 43:5

**completely** [1] - 5:9

**complied** [1] - 30:5

**comply** [14] - 19:16, 29:21, 30:16, 47:25, 48:12, 48:22, 49:11, 49:12, 49:13, 50:4, 61:9, 61:12, 61:23, 62:3

**concede** [1] - 35:11

**conceded** [1] - 44:25

**concern** [2] - 23:8, 24:21

**concise** [1] - 50:9

**concluded** [1] - 66:13

**conclusion** [2] - 38:15, 39:3

**conduct** [7] - 6:4, 19:20, 19:21, 23:5, 23:10, 41:3, 43:16

**Conduct** [4] - 6:5, 6:8, 11:10, 54:5

**confer** [1] - 9:14

**Conference** [1] - 66:19

**conferred** [1] - 11:20

**confidential** [19] - 6:23, 7:23, 8:12, 17:21, 17:25, 18:23, 26:22, 28:11, 30:8, 31:5, 36:21, 36:25, 38:12, 38:18, 45:2, 45:16, 48:4, 48:14, 62:18

**confines** [2] - 22:4, 22:25

**confirm** [5] - 10:13, 29:7, 29:9, 61:5, 61:8

**confirming** [1] - 9:20

**conflict** [3] - 19:25, 20:15, 23:13

**conflicted** [1] - 20:1

**conformance** [1] - 66:18

**confusion** [1] - 9:5

**Congress** [7] - 30:13, 34:20, 35:1, 37:24, 39:25, 40:12, 62:13

**congressional** [1] - 30:11

**connect** [1] - 12:5

**connected** [1] - 10:18

**connection** [2] - 9:13, 60:20

**consider** [2] - 41:12, 41:15

**consideration** [1] - 57:24

**considered** [1] - 6:19

**consistent** [2] - 52:17, 58:22

**conspiracy** [1] - 40:11

**constitute** [2] - 5:17, 6:1

**Constitution** [3] - 1:24, 36:7, 36:13

**consultant** [1] - 27:4

**contact** [2] - 11:15, 30:25

**contain** [1] - 59:13

**contained** [4] - 13:1, 29:24, 30:8, 37:23

**contains** [1] - 46:10

**contends** [2] - 13:1, 15:10

**contention** [1] - 52:7

**contents** [1] - 38:6

**contest** [6] - 33:15, 33:22, 33:25, 35:10, 35:16, 35:19

**context** [3] - 19:25, 21:25

**continue** [7] - 5:20, 19:4, 24:18, 38:11, 42:12, 45:1, 54:13

**continues** [2] - 34:7, 36:16

**continuous** [1] - 35:3

**continuously** [1] - 36:15

**contradicted** [1] - 40:14

**contrary** [2] - 15:25, 16:25

**control** [3] - 35:4, 36:17, 45:8

**conversation** [2] - 12:8, 58:16

**convince** [1] - 21:11

**cooperate** [2] - 11:8, 62:13

**coordinating** [1] - 55:7

**coordination** [1] - 15:15

**copied** [1] - 58:16

**copies** [1] - 5:3

**copy** [9] - 11:6, 16:6,

22:8, 51:16, 54:22, 57:6, 57:14, 57:16, 65:22

**corners** [3] - 22:1, 56:24, 56:25

**correct** [11] - 27:25, 28:1, 28:18, 31:9, 31:23, 35:17, 45:11, 50:20, 58:12, 61:18, 64:2

**correctly** [1] - 64:3

**counsel** [30] - 3:9, 3:23, 5:6, 5:16, 9:15, 14:19, 24:4, 25:21, 25:23, 27:21, 28:19, 29:2, 29:5, 31:9, 32:22, 35:4, 38:8, 41:17, 41:19, 42:8, 44:5, 49:7, 56:19, 56:23, 58:18, 59:15, 60:18, 63:12, 63:14

**COUNSEL** [1] - 2:2

**country** [7] - 22:17, 23:12, 30:2, 33:3, 43:4, 46:8, 52:19

**County** [1] - 10:16

**course** [9] - 11:7, 22:3, 22:10, 51:1, 51:10, 63:18, 64:7, 65:9, 65:18

**Court** [130] - 1:23, 3:1, 4:25, 6:16, 7:13, 8:18, 8:22, 8:23, 9:4, 9:5, 9:19, 10:17, 11:6, 11:9, 11:14, 11:15, 12:22, 13:25, 14:3, 14:9, 14:13, 14:15, 14:22, 16:6, 17:18, 18:10, 19:14, 21:2, 21:19, 22:19, 22:25, 23:12, 23:20, 24:5, 24:6, 24:13, 24:16, 25:20, 26:17, 28:22, 29:10, 29:23, 30:5, 30:6, 30:7, 31:6, 31:9, 31:10, 31:13, 31:17, 32:14, 33:18, 34:4, 34:18, 36:3, 37:14, 37:17, 37:19, 38:15, 38:16, 39:1, 39:7, 39:16, 39:23, 40:16, 41:9, 41:12, 41:14, 41:16, 43:6, 44:14, 44:15, 44:19, 44:21, 45:9, 45:19, 45:23, 46:1, 46:5, 46:6, 46:9, 46:12, 46:17, 46:19, 46:23, 46:24, 46:25, 47:16, 47:25, 48:5, 48:20, 49:10, 49:11,

49:25, 50:3, 50:12, 51:2, 51:11, 51:21, 53:9, 54:4, 54:5, 54:6, 54:7, 55:6, 58:19, 58:20, 59:12, 59:21, 59:22, 59:24, 60:8, 60:16, 60:17, 61:15, 62:18, 62:23, 63:12, 64:15, 64:17, 65:5, 65:7, 65:22, 66:16, 66:16

**COURT** [135] - 1:1, 3:12, 3:20, 3:25, 4:2, 4:22, 5:2, 5:4, 5:13, 7:4, 8:2, 14:25, 17:11, 17:19, 20:12, 20:23, 22:6, 22:8, 22:22, 23:11, 23:16, 25:6, 25:10, 26:8, 26:10, 26:13, 27:3, 27:8, 27:10, 27:17, 27:20, 27:23, 28:2, 28:7, 28:10, 28:17, 28:21, 29:7, 29:14, 30:1, 30:17, 31:15, 31:22, 31:24, 32:4, 32:6, 32:8, 32:13, 33:4, 33:8, 33:10, 33:19, 34:9, 34:12, 35:10, 35:25, 36:8, 36:11, 36:14, 36:19, 37:2, 37:9, 38:3, 38:5, 38:21, 39:9, 40:2, 40:4, 40:15, 40:23, 41:6, 41:9, 42:17, 42:21, 43:8, 43:21, 44:3, 44:6, 44:16, 44:20, 44:23, 45:4, 45:9, 45:14, 45:24, 46:3, 46:13, 47:2, 47:6, 47:9, 47:13, 47:20, 47:22, 48:3, 48:11, 49:2, 49:16, 49:22, 50:1, 50:6, 51:8, 51:15, 55:1, 56:17, 57:5, 57:18, 57:21, 58:3, 58:25, 59:3, 59:7, 59:19, 59:25, 60:5, 60:11, 61:14, 61:17, 61:19, 61:23, 62:1, 62:5, 62:8, 62:15, 62:25, 63:22, 64:2, 64:10, 64:12, 64:23, 65:3, 65:12, 65:22, 65:24, 66:4, 66:23

**court** [24] - 3:2, 10:23, 11:1, 14:2, 20:18, 21:10, 21:11, 24:3, 26:12, 26:24, 28:12, 30:14, 40:18,

42:14, 42:15, 43:1, 43:25, 48:2, 49:13, 53:9, 58:14, 60:6, 66:12

**Court's** [20] - 9:8, 11:21, 12:8, 12:13, 12:20, 12:24, 14:16, 15:23, 18:17, 19:18, 20:8, 23:3, 23:4, 29:18, 30:16, 52:10, 55:10, 56:16, 59:14, 62:17

**courtroom** [4] - 38:5, 38:7, 38:10

**Courts** [2] - 23:19

**courts** [1] - 21:20

**cover** [1] - 52:3

**covered** [1] - 4:8

**create** [1] - 51:3

**credential** [1] - 50:20

**credentials** [2] - 6:24, 52:3

**credible** [1] - 53:3

**credit** [1] - 52:17

**crime** [10] - 39:7, 39:21, 40:19, 45:18, 46:11, 48:13, 49:18, 53:8, 53:10, 59:16

**crimes** [6] - 29:24, 35:8, 39:8, 40:21, 52:8, 52:19

**criminal** [27] - 7:2, 9:15, 10:2, 10:9, 10:12, 10:20, 10:24, 25:7, 25:8, 25:10, 25:12, 26:23, 27:25, 28:6, 28:13, 31:25, 37:23, 39:24, 40:8, 41:21, 49:8, 51:12, 52:13, 53:9, 53:19, 59:13, 59:18

**criminals** [1] - 59:15

**critical** [1] - 11:18

**cross** [1] - 34:22

**cross-examined** [1] - 34:22

**CRR** [1] - 66:22

**crystal** [1] - 9:9

**custody** [2] - 35:22, 52:4

**cut** [1] - 30:18

**cutting** [1] - 31:16

**cycle** [2] - 35:7

**D**

**D.D.C** [1] - 57:1

**Dan** [1] - 63:13

**Daniel** [6] - 2:3, 3:22, 10:24, 29:20, 29:21,

29:22
Dar [26] - 6:21, 12:2, 13:6, 13:13, 13:15, 13:16, 15:16, 15:18, 18:5, 18:6, 18:9, 18:24, 22:16, 24:20, 25:3, 25:15, 26:4, 50:19, 51:4, 51:21, 52:2, 53:6, 53:11, 55:8
database [2] - 27:18, 50:21
date [3] - 35:6, 45:24, 51:5
Dated [1] - 66:20
Davida [2] - 3:10, 4:23
davida [1] - 1:13
days [3] - 11:19, 11:23, 18:22
DC [7] - 1:11, 1:24, 2:4, 6:4, 6:8, 18:16, 54:5
de [1] - 29:11
de-designate [1] - 29:11
deadline [2] - 11:14, 11:17
dec [1] - 41:15
December [2] - 27:12, 32:22
decide [3] - 8:25, 16:10, 26:6
decision [4] - 16:15, 16:17, 16:18, 55:10
deck [7] - 4:25, 28:3, 33:13, 34:4, 65:15, 65:16, 65:17
deemed [1] - 10:19
defend [1] - 45:13
DEFENDANT [2] - 1:17, 2:2
Defendant [1] - 1:7
defendant [4] - 4:9, 22:24, 23:2, 25:8
defendants [4] - 7:25, 22:12, 22:13, 23:10
defends [1] - 12:25
defense [1] - 20:5
defiant [1] - 15:25
define [1] - 63:7
defined [1] - 60:23
defines [1] - 63:2
definition [1] - 63:8
defy [1] - 17:5
delay [3] - 11:21, 11:22, 42:25
deleted [2] - 18:16, 57:10

delights [1] - 50:23
demonstrably [1] - 12:5
Denver [1] - 38:1
denying [1] - 7:12
DePerno [1] - 41:18
deposition [3] - 20:6, 49:17, 49:19
DEPUTY [4] - 3:2, 60:6, 60:8, 66:12
designate [1] - 29:11
designed [1] - 43:18
desist [2] - 9:11, 60:18
despite [2] - 42:11, 50:12
destruction [1] - 59:18
detail [4] - 12:16, 21:9, 21:17, 53:20
details [1] - 8:15
determination [1] - 31:11
Detroit [1] - 1:19
dicing [1] - 63:4
DIECKMANN [1] - 3:15
Dieckmann [2] - 1:13, 3:15
different [3] - 24:8, 46:23, 47:17
differently [1] - 52:24
difficult [1] - 40:1
Digital [1] - 1:25
digital [1] - 66:17
Diplomate [1] - 1:22
direct [1] - 35:21
directed [2] - 15:3, 45:5
directing [1] - 24:18
directly [3] - 34:19, 45:15, 46:12
disciplining [1] - 22:2
disclose [1] - 37:13
disclosed [1] - 13:2
disclosure [4] - 8:14, 11:3, 12:18, 15:4
disclosures [1] - 7:12
discovered [1] - 26:23
discovery [23] - 6:22, 7:18, 7:19, 8:12, 9:12, 12:13, 25:19, 25:21, 25:24, 26:3, 40:9, 49:23, 55:2, 55:3, 59:13, 60:19, 60:22, 60:23, 62:15, 63:2,

63:3, 63:7, 64:5
discuss [3] - 13:7, 13:15, 45:2
discussed [5] - 12:14, 14:4, 45:5, 57:24, 64:20
discusses [2] - 8:11, 13:22
discussing [5] - 9:12, 19:1, 45:13, 48:2, 60:19
discussion [4] - 6:17, 13:11, 14:15, 48:3
disobey [1] - 6:6
dispute [13] - 4:9, 34:15, 34:17, 35:22, 36:21, 36:22, 36:24, 39:17, 43:20, 54:14, 54:18, 55:3
disqualification [15] - 4:16, 5:9, 5:12, 5:15, 6:2, 6:15, 15:12, 19:24, 20:13, 20:14, 20:24, 21:24, 23:12, 25:18, 55:1
disqualified [1] - 25:18
disqualify [4] - 5:6, 22:12, 23:20, 55:12
disqualifying [1] - 21:2
disseminate [5] - 36:20, 39:1, 45:20, 45:21, 63:20
disseminated [5] - 4:10, 34:17, 43:20, 44:17
dissemination [5] - 17:20, 26:21, 28:14, 30:21
distinct [1] - 6:14
distributing [2] - 9:11, 60:19
District [3] - 57:3, 66:16
DISTRICT [2] - 1:1, 1:1
docket [4] - 7:2, 10:9, 10:11, 10:14
Docket [1] - 8:8
document [21] - 6:21, 17:25, 18:7, 18:25, 20:5, 37:4, 38:6, 38:15, 38:17, 46:10, 46:25, 51:1, 51:3, 51:13, 51:22, 53:12, 53:15, 64:14, 64:18, 64:21
documentation [1] -

32:16
documents [92] - 4:8, 6:22, 7:1, 7:10, 7:22, 8:20, 9:16, 10:1, 10:5, 10:10, 10:16, 10:18, 11:3, 11:12, 12:11, 13:2, 13:11, 13:23, 14:17, 15:18, 15:20, 18:6, 18:8, 18:11, 18:15, 18:24, 24:19, 27:24, 28:3, 29:11, 29:24, 30:7, 31:3, 31:13, 31:25, 32:3, 32:9, 34:17, 34:18, 35:17, 35:19, 35:23, 35:24, 36:4, 37:2, 37:5, 37:8, 37:13, 37:16, 37:18, 37:23, 38:9, 39:21, 40:10, 40:11, 40:13, 44:12, 45:2, 45:4, 45:5, 45:16, 45:18, 48:14, 48:15, 48:17, 48:23, 50:17, 50:18, 50:21, 51:6, 51:20, 52:5, 52:6, 52:7, 52:12, 53:1, 53:2, 53:6, 53:25, 54:17, 56:5, 57:25, 63:16, 63:17, 63:19, 63:21, 64:4, 64:15, 64:19, 65:8, 65:15
DOJ [1] - 62:13
doled [1] - 21:17
DOMINION [1] - 1:3
Dominion [76] - 3:6, 3:11, 3:14, 3:15, 3:16, 4:11, 4:24, 5:9, 7:9, 7:25, 8:13, 8:22, 10:3, 10:8, 11:11, 11:15, 11:25, 12:15, 14:21, 15:4, 15:10, 15:13, 17:24, 18:1, 18:6, 18:11, 19:15, 22:13, 31:12, 33:1, 33:7, 34:3, 34:5, 34:7, 34:23, 34:25, 35:24, 36:15, 36:25, 37:8, 37:24, 37:25, 38:1, 38:16, 38:19, 39:3, 40:12, 41:2, 41:4, 41:11, 41:14, 42:4, 42:6, 42:9, 43:3, 43:13, 46:15, 46:16, 49:8, 51:3, 52:18, 52:20, 53:15, 55:2, 55:6, 55:19, 57:15, 58:17, 59:4, 63:17, 63:18, 64:19, 64:21, 65:14

Dominion's [23] - 4:3, 5:6, 5:20, 6:15, 6:22, 7:1, 7:13, 8:11, 8:20, 10:4, 12:13, 13:23, 17:10, 19:3, 19:5, 25:19, 29:2, 31:9, 35:3, 35:23, 40:24, 52:12, 63:21
done [8] - 7:10, 9:20, 9:17, 45:24, 48:1, 52:23, 54:10, 55:7
doubt [4] - 8:17, 15:12, 54:2, 54:11
down [10] - 7:4, 18:16, 31:1, 47:11, 47:19, 48:10, 54:16, 54:19, 54:21, 57:10
download [2] - 18:11, 50:22
downloaded [3] - 51:9, 51:24, 53:16
DQ [1] - 43:14
Dr [8] - 41:25, 45:8, 47:4, 49:7, 49:12, 58:22, 62:12, 64:16
DRISCOLL [16] - 26:23, 27:6, 27:9, 27:15, 27:19, 27:22, 28:1, 28:5, 28:9, 28:16, 28:19, 29:5, 29:13, 64:13, 65:1, 65:10
Driscoll [6] - 2:3, 3:24, 26:10, 26:11, 26:16, 64:12
Driscoll's [1] - 59:6
drive [1] - 18:11
due [2] - 16:9, 23:10
during [1] - 12:5
duty [1] - 54:6

E

ECF [2] - 1:9, 60:15
edits [1] - 63:15
effect [1] - 56:16
effective [1] - 38:20
effort [7] - 9:16, 10:4, 10:6, 11:12, 12:10, 18:8, 53:5
efforts [1] - 14:5
egregious [6] - 5:18, 5:19, 19:20, 19:21, 20:21, 55:15
eight [1] - 8:10
either [1] - 58:10
election [5] - 35:7, 41:25, 43:3, 43:4
election-related [1] - 43:4

**elections** [2] - 13:21, 19:7
**elephant** [1] - 15:9
**email** [10] - 7:8, 10:11, 10:15, 11:5, 11:6, 20:5, 26:17, 56:20, 57:15, 58:14
**emailed** [1] - 54:20
**emails** [1] - 38:2
**embraces** [1] - 5:10
**emergency** [2] - 4:3, 59:4
**employees** [1] - 19:5
**end** [11] - 9:12, 9:17, 11:4, 13:10, 13:22, 14:8, 15:5, 15:7, 16:19, 22:17, 50:25
**ended** [1] - 21:2
**ends** [1] - 56:6
**enforcement** [15] - 16:3, 34:19, 35:2, 39:25, 40:21, 45:12, 45:22, 46:12, 47:1, 50:17, 50:19, 53:10, 62:13, 62:20
**engage** [1] - 58:16
**ensure** [2] - 57:18, 58:4
**enter** [4] - 8:6, 9:1, 41:3, 41:20
**entered** [12] - 6:16, 7:24, 8:18, 24:7, 24:12, 27:13, 29:6, 37:4, 44:1, 44:9, 48:16, 63:6
**entering** [1] - 32:20
**entire** [8] - 18:11, 47:10, 50:21, 50:22, 51:10, 52:6, 53:12, 59:9
**entirely** [1] - 62:21
**entitled** [5] - 13:20, 36:20, 55:23, 56:3, 66:18
**entry** [4] - 8:3, 8:8, 9:6, 44:8
**equally** [1] - 5:22
**erosion** [1] - 19:6
**especially** [1] - 57:21
**essentially** [2] - 9:2, 66:3
**et** [3] - 1:3, 3:6, 63:21
**ethical** [3] - 36:6, 36:16, 58:23
**events** [1] - 60:1
**evidence** [24] - 4:17, 13:6, 13:7, 13:16, 15:10, 16:2, 39:21, 44:23, 45:18, 46:10, 48:13, 49:8, 49:18,

51:12, 52:12, 52:14, 53:8, 55:13, 56:24, 59:13, 59:16, 59:18, 60:25, 66:3
**evidently** [1] - 16:11
**exactly** [6] - 5:7, 16:4, 18:21, 42:2, 53:1, 53:12
**examined** [1] - 34:22
**example** [8] - 12:23, 13:3, 13:18, 15:2, 18:3, 41:5, 42:4, 42:13
**except** [1] - 6:6
**excuse** [1] - 10:6
**excused** [1] - 66:11
**exhibit** [2] - 66:5
**exhibits** [1] - 27:1
**exists** [3] - 6:8, 55:13, 57:22
**exiting** [1] - 25:1
**explain** [1] - 26:17
**explained** [2] - 7:21, 17:18
**explanation** [3] - 21:3, 52:11, 53:11
**Expletive** [1] - 16:19
**explicitly** [1] - 21:25
**exposure** [1] - 18:6
**express** [1] - 23:1
**extension** [2] - 11:17, 12:7
**extent** [2] - 12:22, 21:23
**eyes** [1] - 43:6

### F

**F.3d** [1] - 57:2
**F.R.D** [2] - 56:25, 57:3
**fact** [12] - 7:14, 8:18, 10:6, 13:12, 25:1, 30:9, 31:8, 36:17, 41:2, 42:15, 46:18, 55:9
**facts** [1] - 21:5
**failed** [2] - 11:13, 11:24
**failure** [3] - 12:9, 12:12, 54:12
**fair** [1] - 13:21
**faith** [8] - 20:7, 29:23, 40:15, 46:2, 49:2, 56:14, 58:22, 59:22
**fall** [1] - 55:10
**false** [4] - 12:5, 13:24, 37:7, 38:16
**falsely** [1] - 13:23

**families'** [1] - 19:6
**far** [6] - 10:3, 11:11, 44:24, 49:3, 53:15
**fashion** [1] - 63:19
**federal** [3] - 1:23, 32:21, 36:12
**Federal** [1] - 66:16
**FEDERAL** [1] - 66:23
**felt** [1] - 15:7
**few** [5] - 11:23, 12:20, 17:19, 58:12, 60:11
**file** [14] - 9:17, 10:5, 11:17, 12:6, 30:15, 31:18, 35:9, 41:15, 46:21, 49:13, 49:20, 49:24, 62:18, 65:16
**filed** [14] - 7:1, 10:10, 10:16, 11:3, 12:11, 27:25, 28:3, 31:3, 31:13, 31:25, 32:10, 41:21, 65:15, 65:25
**filing** [9] - 14:6, 26:24, 26:25, 27:1, 28:4, 28:13, 29:2, 32:1, 59:4
**filings** [2] - 10:22, 66:5
**final** [3] - 11:5, 31:6, 61:2
**finally** [1] - 7:8
**fine** [4] - 5:2, 5:4, 12:25, 43:12
**finish** [4] - 30:4, 33:20, 59:3
**Firm** [1] - 3:23
**firm** [4] - 14:19, 26:16, 64:18, 64:21
**firm's** [2] - 63:10, 63:14
**firms** [1] - 64:14
**first** [7] - 10:1, 21:8, 24:3, 31:7, 34:4, 58:13, 61:10
**Fischer** [1] - 56:25
**Fl.26** [1] - 1:18
**flagged** [1] - 19:2
**flagrant** [1] - 30:22
**fleeing** [1] - 59:18
**focus** [5] - 4:11, 4:12, 4:15, 5:25, 6:13
**focused** [3] - 33:4, 33:6, 55:21
**FOIAed** [1] - 15:19
**folder** [1] - 50:18
**folks** [3] - 5:3, 14:10, 55:19
**follow** [15] - 20:8, 21:13, 29:17, 44:12, 44:14, 44:18, 44:22,

52:10, 52:14, 56:8, 56:9, 56:10, 59:20, 62:16, 62:21
**followed** [1] - 9:5
**following** [3] - 14:23, 58:21, 60:20
**follows** [1] - 13:12
**FOR** [4] - 1:1, 1:12, 1:17, 2:2
**foregoing** [1] - 66:17
**foresaw** [1] - 8:1
**format** [1] - 66:18
**former** [2] - 42:19, 55:24
**forum** [1] - 38:11
**forward** [8] - 21:14, 33:1, 44:10, 56:8, 58:17, 59:21, 59:24, 60:25
**forwarded** [1] - 58:15
**four** [4] - 22:1, 52:18, 56:24
**Frank** [1] - 13:20
**frankly** [5] - 5:20, 12:15, 31:17, 55:22, 56:15
**fraud** [1] - 40:10
**fraudulent** [1] - 38:16
**free** [3] - 24:15, 63:18
**freely** [1] - 23:1
**frequently** [2] - 47:7, 48:7
**friend** [1] - 54:23
**front** [1] - 38:1
**full** [2] - 51:23, 56:20
**fully** [1] - 35:5
**future** [7] - 24:24, 28:23, 45:17, 48:23, 49:4, 56:15, 63:12

### G

**gag** [1] - 43:17
**gain** [2] - 44:11, 64:5
**gained** [1] - 25:20
**general** [9] - 32:11, 32:21, 33:1, 40:5, 41:4, 41:6, 41:8, 42:25, 63:14
**gentleman** [1] - 14:20
**genuinely** [1] - 55:17
**given** [10] - 8:25, 12:17, 14:21, 35:21, 48:23, 49:3, 49:8, 57:21, 58:6, 59:25
**goal** [1] - 41:23

**Godfrey** [3] - 3:11, 4:24, 28:8
**GODFREY** [1] - 1:12
**Google** [1] - 18:11
**governing** [3] - 6:10, 7:17, 19:9
**government** [1] - 3:9
**grant** [1] - 15:11
**grants** [1] - 51:21
**greatest** [2] - 52:7, 52:18
**grievance** [4] - 32:20, 32:25, 41:21, 42:7
**grounds** [1] - 22:4
**group** [1] - 20:5
**guard** [1] - 52:25
**guidance** [1] - 28:22
**guidelines** [1] - 62:22

### H

**habitual** [1] - 43:5
**hac** [2] - 42:5, 42:6
**half** [1] - 42:21
**hampers** [1] - 20:9
**hand** [6] - 22:7, 50:18, 51:15, 51:16, 52:5, 65:20
**handed** [2] - 6:23, 52:5
**handing** [1] - 23:23
**handle** [1] - 49:11
**happy** [4] - 11:7, 38:9, 50:5, 56:22
**Hartman** [4] - 10:25, 29:21, 29:23
**head** [1] - 23:18
**headquarters** [1] - 38:1
**heard** [7] - 4:3, 35:11, 35:14, 38:21, 43:24, 52:11, 60:2
**HEARING** [1] - 1:9
**hearing** [18] - 3:7, 7:21, 8:23, 8:24, 9:4, 12:16, 12:19, 12:24, 18:4, 19:3, 34:3, 39:10, 39:11, 42:15, 42:18, 47:12, 54:16, 58:8
**heavily** [1] - 7:23
**held** [2] - 8:23, 64:16
**hell** [1] - 16:12
**help** [1] - 39:4
**helpful** [2] - 21:23, 55:21
**hereby** [1] - 66:17
**heroes** [1] - 22:15

**herself** [6] - 7:1, 14:11, 24:19, 31:24, 53:23, 53:24
**hesitates** [1] - 13:8
**hiding** [1] - 59:18
**high** [1] - 5:10
**himself** [4] - 13:13, 17:6, 23:7, 31:2
**hinder** [1] - 20:19
**hindered** [1] - 20:16
**hired** [2] - 42:20, 42:22
**history** [5] - 6:18, 21:18, 29:25, 52:8, 52:19
**hold** [4] - 38:3
**holds** [1] - 64:19
**Honor** [117] - 3:5, 3:17, 4:21, 4:23, 5:5, 5:7, 5:15, 5:19, 5:22, 5:24, 6:3, 7:6, 7:21, 8:4, 8:24, 9:21, 10:2, 11:5, 11:11, 11:21, 12:3, 12:15, 13:18, 13:25, 14:8, 15:2, 15:8, 15:15, 15:22, 16:3, 16:20, 17:14, 17:22, 18:13, 18:17, 18:20, 18:25, 19:1, 19:8, 19:19, 19:23, 20:11, 20:16, 21:1, 21:3, 21:6, 21:12, 21:23, 22:11, 23:2, 23:6, 23:14, 23:18, 24:21, 25:14, 25:17, 26:2, 26:12, 26:23, 27:6, 27:22, 28:16, 29:13, 30:4, 31:8, 31:23, 32:2, 32:12, 32:16, 33:6, 34:2, 36:5, 36:24, 37:21, 38:14, 39:6, 39:22, 40:7, 41:11, 41:13, 43:15, 45:7, 46:1, 46:16, 47:4, 48:7, 48:25, 49:5, 50:3, 50:8, 50:25, 51:10, 51:18, 52:9, 52:21, 53:4, 53:7, 53:17, 54:15, 55:4, 56:6, 56:19, 56:23, 57:8, 57:20, 57:23, 58:8, 58:11, 59:12, 61:12, 62:12, 64:1, 64:7, 65:11, 65:18, 65:19, 65:23
**honor** [1] - 16:10
**Honor's** [2] - 6:11, 18:2
**Honorable** [2] - 3:3,

60:8
**HONORABLE** [1] - 1:9
**hope** [2] - 16:15, 45:15
**House** [1] - 57:2

**I**

**idea** [1] - 51:5
**ignorance** [1] - 7:11
**ignored** [2] - 39:16, 39:17
**ignores** [1] - 7:14
**imagine** [1] - 12:19
**immediately** [5] - 9:10, 9:14, 12:10, 18:4, 60:18
**impacting** [1] - 20:4
**impacts** [1] - 20:1
**impermissible** [2] - 8:13, 15:4
**impermissibly** [1] - 13:1
**implicate** [1] - 27:2
**implication** [1] - 14:16
**implies** [1] - 11:18
**important** [1] - 22:11
**importantly** [1] - 21:15
**improper** [2] - 7:12, 12:18
**inaction** [1] - 10:7
**inappropriate** [1] - 40:18
**INC** [1] - 1:3
**Inc** [1] - 3:6
**include** [1] - 21:22
**includes** [1] - 10:18
**including** [7] - 6:10, 6:12, 12:1, 15:14, 18:15, 45:22, 50:13
**inconsistent** [1] - 59:24
**incorrect** [1] - 32:7
**increasingly** [1] - 53:5
**indeed** [1] - 17:1
**independent** [1] - 22:4
**indicate** [1] - 11:15
**indicated** [3] - 17:7, 19:10, 19:12
**indicating** [1] - 10:10
**inexcusable** [1] - 11:21
**infect** [4] - 5:20, 19:20, 19:22, 54:13
**infecting** [1] - 51:19

**inform** [1] - 56:1
**information** [34] - 4:10, 7:15, 8:15, 12:1, 17:4, 17:6, 17:21, 25:25, 26:3, 26:7, 26:15, 26:20, 26:22, 27:13, 27:17, 28:11, 28:16, 30:5, 30:8, 35:21, 36:21, 36:22, 36:25, 39:1, 47:22, 48:4, 51:6, 56:2, 56:3, 56:13, 56:14, 57:9, 58:19
**informed** [2] - 34:18, 55:25
**initial** [1] - 26:17
**insisted** [1] - 15:5
**instead** [4] - 9:17, 24:17, 61:17, 62:2
**instruct** [1] - 54:18
**instruction** [1] - 15:6
**integrity** [2] - 21:16, 51:19
**intellectual** [3] - 30:9, 38:18, 43:19
**intend** [7] - 9:22, 14:14, 44:12, 45:19, 45:20, 55:4, 55:16
**intends** [3] - 16:4, 17:7, 61:9
**intentional** [1] - 53:5
**interest** [3] - 19:10, 19:12, 30:10
**interim** [1] - 60:24
**internet** [1] - 12:1
**interrupt** [1] - 43:8
**interview** [3] - 13:4, 13:19
**interviews** [4] - 12:17, 33:13, 34:1, 35:13
**intimately** [2] - 42:20, 42:23
**introduce** [1] - 3:8
**investigated** [1] - 35:5
**investigating** [1] - 45:12
**investigation** [8] - 13:14, 13:16, 13:17, 30:11, 34:24, 42:25, 62:14
**investigations** [4] - 30:12, 34:20, 39:24, 47:17
**involved** [3] - 36:4, 37:12, 47:17
**involves** [1] - 62:15
**irrelevant** [1] - 10:20
**issuance** [1] - 11:19

**issue** [8] - 8:25, 18:18, 21:6, 49:24, 51:10, 54:20, 59:23, 64:24
**issued** [2] - 4:4, 4:18
**issues** [2] - 4:12, 46:7
**itself** [3] - 18:7, 22:4, 23:15

**J**

**jail** [1] - 16:19
**Jersey** [1] - 57:4
**job** [2] - 20:9, 20:20
**Joe** [1] - 13:4
**John** [1] - 34:22
**joined** [1] - 43:24
**joins** [1] - 17:5
**joint** [1] - 20:5
**Jonathan** [2] - 1:13, 3:16
**joy** [1] - 23:21
**Jr** [1] - 1:13
**Judge** [22] - 7:24, 16:9, 29:19, 33:9, 36:2, 37:4, 38:13, 43:25, 44:3, 44:8, 48:16, 49:14, 49:20, 49:22, 55:23, 60:4, 60:23, 60:24, 62:22, 62:24, 63:1, 63:13
**JUDGE** [1] - 1:9
**judge** [4] - 9:1, 16:25, 17:3, 18:16
**judge's** [1] - 17:5
**Judicial** [2] - 20:25, 66:18
**jurisdiction** [1] - 53:9
**jurisdictions** [1] - 21:21
**justification** [1] - 33:23

**K**

**keep** [2] - 16:16, 66:6
**key** [1] - 56:7
**kicked** [1] - 18:5
**kind** [1] - 65:17
**knowingly** [1] - 6:5
**knowledge** [1] - 28:25
**knows** [6] - 8:22, 18:10, 19:23, 21:3, 46:1
**Koller** [3] - 5:18, 21:1, 21:2
**Kramer** [1] - 57:3

**L**

**label** [1] - 38:17
**labels** [1] - 37:7
**LAMBERT** [77] - 1:17, 3:17, 29:19, 30:4, 31:7, 31:21, 31:23, 32:2, 32:5, 32:7, 32:9, 32:15, 33:6, 33:9, 33:17, 34:2, 34:11, 34:17, 35:20, 36:5, 36:9, 36:12, 36:15, 36:24, 37:7, 37:21, 38:4, 38:14, 39:6, 39:22, 40:3, 40:6, 40:17, 41:1, 41:8, 41:11, 42:19, 42:22, 43:15, 44:2, 44:4, 44:14, 44:18, 44:21, 45:2, 45:7, 45:11, 45:23, 46:1, 46:4, 46:16, 47:4, 47:7, 47:10, 47:15, 47:21, 47:24, 48:6, 48:25, 49:5, 49:20, 49:24, 50:3, 57:8, 57:20, 57:23, 58:7, 59:2, 59:5, 59:11, 59:20, 60:4, 61:12, 61:16, 61:18, 62:12, 62:24
**Lambert** [78] - 1:18, 3:18, 4:10, 5:7, 6:3, 6:21, 6:25, 7:9, 7:10, 8:17, 9:10, 9:14, 9:18, 9:22, 10:3, 10:16, 10:20, 10:24, 10:25, 11:4, 11:8, 11:13, 11:20, 11:24, 12:2, 12:4, 12:12, 12:17, 12:23, 13:3, 13:8, 13:10, 13:12, 13:15, 13:16, 13:19, 13:22, 14:1, 14:8, 14:15, 14:21, 15:2, 15:4, 15:16, 15:17, 15:21, 15:23, 16:1, 18:19, 19:9, 20:3, 21:9, 21:19, 22:8, 22:16, 22:18, 23:8, 24:9, 24:16, 25:3, 25:13, 25:14, 26:4, 27:11, 29:3, 29:6, 29:16, 30:17, 50:10, 51:1, 52:16, 55:13, 56:7, 57:6, 60:13, 60:18, 61:10, 65:21
**Lambert's** [8] - 5:14, 6:17, 10:12, 12:9, 21:18, 26:21, 27:3,

52:1
**last** [13] - 7:21, 13:25, 16:12, 17:18, 31:16, 31:18, 37:17, 39:10, 42:14, 42:18, 42:21, 52:18, 53:7
**lastly** [1] - 54:15
**late** [2] - 11:16, 50:14
**launching** [1] - 13:11
**launder** [1] - 53:6
**LAW** [1] - 1:17
**law** [35] - 4:16, 5:8, 5:16, 5:17, 6:2, 6:18, 16:2, 19:19, 19:23, 21:7, 21:24, 22:3, 22:6, 30:15, 34:19, 35:2, 36:17, 39:5, 39:25, 40:19, 40:20, 41:16, 41:25, 43:13, 45:11, 45:22, 46:11, 46:14, 46:25, 50:17, 50:19, 53:10, 62:13, 62:20
**Law** [1] - 3:23
**laws** [3] - 40:2, 40:5, 58:23
**lawsuits** [1] - 38:20
**lawyer** [3] - 6:5, 33:2, 62:8
**lawyer's** [1] - 53:20
**lawyers** [1] - 55:25
**lead** [1] - 19:4
**leading** [1] - 6:14
**Leaf** [20] - 6:21, 12:2, 13:6, 13:15, 13:16, 15:16, 18:5, 18:25, 22:16, 24:20, 25:3, 25:15, 26:4, 35:17, 50:19, 51:4, 51:21, 53:6, 53:11, 55:8
**Leaf's** [6] - 15:18, 18:6, 18:9, 52:2, 55:8
**leak** [4] - 24:23, 50:24
**leaked** [3] - 13:22, 18:24, 24:19
**learn** [4] - 15:13, 26:18, 26:21, 27:24
**learned** [2] - 21:21, 54:25
**least** [1] - 17:19
**left** [3] - 3:19, 24:9, 24:11
**legal** [5] - 30:14, 36:1, 38:22, 39:19, 51:19
**less** [1] - 6:4
**lesser** [4] - 5:23, 21:7, 21:15, 54:1
**lesson** [1] - 21:21

**lest** [1] - 9:5
**letter** [4] - 14:18, 18:5, 18:9, 28:22
**lied** [2] - 37:24, 55:19
**lies** [1] - 37:23
**lift** [1] - 29:10
**likewise** [1] - 19:11
**limit** [1] - 11:3
**limited** [3] - 30:18, 33:11, 63:16
**Lindell** [2] - 22:23, 23:7
**Lindell's** [1] - 13:20
**link** [2] - 26:25, 27:1
**list** [1] - 60:21
**listed** [1] - 53:18
**listen** [1] - 16:23
**lists** [1] - 51:3
**literally** [1] - 18:23
**litigated** [1] - 43:25
**litigation** [8] - 7:19, 10:19, 21:16, 23:1, 37:3, 37:6, 41:19, 48:18
**Live** [1] - 13:4
**LLP** [1] - 1:12
**local** [1] - 32:22
**logged** [1] - 51:23
**login** [5] - 6:24, 50:20, 51:25, 52:3, 53:11
**look** [3] - 22:1, 22:5, 40:11
**looking** [8] - 20:15, 26:19, 39:2, 39:4, 39:19, 42:2, 53:5, 56:23
**Los** [1] - 1:14
**lost** [1] - 5:13
**loud** [1] - 16:4
**love** [1] - 25:16
**Lucido** [1] - 34:21

**M**

**ma'am** [21] - 29:17, 31:15, 32:13, 33:8, 33:19, 37:11, 38:5, 38:21, 39:2, 40:16, 43:8, 43:21, 44:3, 45:25, 46:3, 50:2, 59:19, 59:25
**MAGISTRATE** [1] - 1:9
**man** [1] - 14:12
**managed** [1] - 12:19
**manner** [1] - 65:5
**March** [22] - 4:3, 4:19, 6:14, 6:15, 6:20, 6:25, 7:8, 8:23, 9:4,

9:7, 9:20, 12:18, 12:23, 13:3, 13:25, 14:9, 18:13, 29:18, 40:25, 45:1, 50:11, 61:3
**mark** [1] - 66:4
**material** [20] - 7:18, 7:19, 8:12, 9:12, 12:14, 14:3, 25:20, 25:21, 25:24, 31:8, 36:17, 41:2, 46:17, 60:20, 60:22, 60:23, 62:15, 63:2, 63:8, 64:4
**materials** [1] - 14:11
**Matt** [1] - 41:18
**matter** [22] - 3:6, 6:23, 7:22, 8:6, 8:19, 9:15, 10:9, 17:3, 24:13, 27:25, 28:6, 28:20, 29:25, 30:10, 31:25, 45:13, 57:22, 64:22, 64:24, 65:13, 66:7, 66:18
**mattered** [1] - 11:22
**matters** [8] - 6:18, 28:18, 28:20, 30:19, 35:1, 35:5, 49:23, 60:11
**McGlinchey** [6] - 2:2, 3:22, 14:19, 26:16, 63:10, 63:14
**mean** [7] - 16:13, 22:22, 23:16, 30:18, 34:12, 44:20, 57:21
**means** [1] - 44:21
**meant** [1] - 38:12
**mechanism** [4] - 37:9, 37:15, 39:15, 62:16
**mechanisms** [1] - 59:9
**media** [8] - 12:16, 17:4, 26:25, 28:6, 34:7, 38:19, 48:9, 57:11
**meet** [1] - 11:14
**mention** [1] - 18:7
**mentioned** [5] - 5:5, 52:21, 56:21, 63:1, 66:7
**message** [3] - 22:18, 47:11, 47:18
**Michael** [2] - 14:20, 14:22
**Michigan** [22] - 1:19, 7:3, 10:17, 11:9, 25:11, 25:13, 26:24, 28:13, 30:15, 32:11, 32:19, 32:21, 33:1,

34:21, 36:12, 38:24, 40:13, 41:8, 41:12, 41:18, 41:19, 56:20, 58:20
**might** [6] - 20:19, 24:7, 27:2, 46:10, 58:20
**million** [2] - 52:6, 52:7
**mindset** [1] - 59:22
**minute** [2] - 9:6, 35:19
**minutes** [1] - 4:5
**misconduct** [5] - 5:18, 5:19, 22:20, 24:1, 55:15
**misleading** [1] - 30:7
**misrepresentations** [4] - 14:3, 15:8, 31:8, 35:3
**misrepresented** [2] - 19:14, 31:17
**misstatement** [1] - 46:18
**misstatements** [2] - 36:17, 41:2
**model** [1] - 65:6
**molester** [1] - 43:5
**moment** [1] - 3:25
**Monday** [1] - 42:16
**months** [3] - 24:4, 37:19, 50:10
**morning** [8] - 3:5, 3:10, 3:12, 3:17, 3:20, 3:21, 3:25, 4:23
**most** [4] - 14:3, 29:24, 35:8, 46:6
**MOTION** [1] - 1:9
**motion** [10] - 3:7, 4:3, 5:6, 6:15, 30:11, 43:14, 49:20, 55:5, 55:21, 59:4
**motions** [2] - 19:24, 49:13
**moved** [1] - 8:23
**movement** [1] - 17:5
**moving** [3] - 11:13, 59:21, 59:24
**MOXILA** [1] - 1:9
**Moxila** [1] - 3:3
**MR** [26] - 3:13, 3:16, 3:22, 26:23, 27:6, 27:9, 27:15, 27:19, 27:22, 28:1, 28:5, 28:9, 28:16, 28:19, 29:5, 29:13, 61:22, 61:25, 62:4, 62:6, 63:13, 64:7, 64:11, 64:13, 65:1, 65:10
**MS** [107] - 3:10, 3:15, 3:17, 4:21, 4:23, 5:3,

5:5, 5:14, 7:6, 8:3, 15:1, 17:13, 17:22, 20:14, 20:25, 22:7, 22:10, 23:2, 23:14, 23:17, 25:7, 25:12, 26:9, 29:19, 30:4, 31:7, 31:21, 31:23, 32:2, 32:5, 32:7, 32:9, 32:15, 33:6, 33:9, 33:17, 34:2, 34:11, 34:17, 35:20, 36:5, 36:9, 36:12, 36:15, 36:24, 37:7, 37:21, 38:4, 38:14, 39:6, 39:22, 40:3, 40:6, 40:17, 41:1, 41:8, 41:11, 42:19, 42:22, 43:15, 44:2, 44:4, 44:14, 44:18, 44:21, 45:2, 45:7, 45:11, 45:23, 46:1, 46:4, 46:16, 47:4, 47:7, 47:10, 47:15, 47:21, 47:24, 48:6, 48:25, 49:5, 49:20, 49:24, 50:3, 50:8, 51:9, 51:18, 55:4, 56:18, 57:8, 57:20, 57:23, 58:7, 59:2, 59:5, 59:11, 59:20, 60:4, 61:12, 61:16, 61:18, 62:12, 62:24, 64:1, 65:18, 65:23, 66:2
**multi** [1] - 12:7
**multi-page** [1] - 12:7
**multiple** [2] - 21:20
**must** [1] - 36:13

**N**

**name** [2] - 51:24, 62:20
**named** [4] - 14:11, 14:12, 14:20, 25:8
**namely** [1] - 16:23
**narrative** [1] - 37:12
**national** [2] - 29:25, 35:8, 46:7
**nature** [1] - 31:5
**necessarily** [1] - 40:4
**necessary** [1] - 55:12
**need** [14] - 6:2, 15:7, 31:9, 38:15, 39:12, 41:14, 43:9, 43:10, 44:10, 55:2, 55:22, 56:24, 62:21
**needs** [4] - 15:13, 22:18, 51:14, 59:21

**negotiated** [1] - 7:23
**never** [8] - 5:11, 29:9, 32:19, 49:6, 49:7, 51:14, 51:20, 52:12
**New** [1] - 57:3
**new** [7] - 5:25, 41:5, 41:17, 41:20, 51:6, 51:11
**Newman** [1] - 14:12
**News** [1] - 12:24
**next** [3] - 9:6, 13:18, 50:23
**Nichols** [10] - 7:24, 36:3, 37:4, 43:25, 44:3, 44:9, 48:16, 49:14, 49:21, 49:22
**Nichols'** [6] - 38:13, 55:23, 60:23, 60:24, 62:22, 63:2
**nitpicking** [1] - 11:22
**NO** [1] - 1:5
**none** [4] - 17:19, 43:19, 50:11, 50:12
**notably** [2] - 14:4, 15:15
**note** [2] - 12:20, 48:15
**noted** [1] - 7:13
**notes** [1] - 14:15
**nothing** [9] - 10:11, 13:10, 19:6, 19:17, 21:11, 41:10, 41:13, 44:6, 64:19
**notice** [1] - 34:13
**notified** [1] - 48:9
**notifying** [1] - 8:13
**noting** [1] - 22:14
**number** [2] - 47:17, 57:23
**numbers** [2] - 66:5
**numerous** [12] - 6:9, 14:2, 19:10, 19:12, 30:12, 39:8, 39:22, 42:5, 50:12
**NW** [2] - 1:24, 2:3

## O

**Oakland** [1] - 10:16
**oath** [11] - 36:6, 36:8, 36:9, 36:11, 36:13, 36:14, 38:23, 40:21, 45:10, 54:3
**object** [2] - 8:2, 8:3
**objected** [2] - 42:4, 44:7
**objecting** [1] - 31:2
**objection** [6] - 7:24, 8:7, 37:15, 63:6,

63:24, 64:1
**objections** [1] - 44:9
**obligation** [10] - 6:6, 6:7, 40:8, 40:22, 45:7, 45:9, 57:18, 58:4, 64:14, 64:21
**obligations** [1] - 58:24
**obliged** [2] - 48:19, 48:20
**obstruction** [4] - 39:23, 40:1, 40:2, 40:5
**obvious** [1] - 53:22
**obviously** [2] - 18:8, 27:7
**occur** [1] - 49:4
**occurred** [2] - 6:1, 34:16, 60:2
**OF** [3] - 1:1, 1:9, 1:17
**offense** [1] - 24:3
**OFFICE** [1] - 1:17
**office** [9] - 10:13, 10:19, 10:22, 11:7, 15:18, 53:24, 56:20, 59:6, 63:14
**officer** [1] - 13:24
**offices** [1] - 40:1
**OFFICIAL** [1] - 66:23
**Official** [2] - 1:23, 66:16
**Oltmann** [4] - 13:4, 13:5, 13:12, 13:14
**one** [31] - 7:18, 9:23, 9:24, 10:12, 12:23, 18:13, 18:23, 19:2, 21:22, 22:1, 23:23, 23:25, 30:2, 32:17, 34:18, 39:6, 41:4, 48:9, 52:1, 52:2, 52:7, 53:7, 53:23, 57:23, 60:15, 62:6, 63:3, 63:8, 63:16, 64:24
**Order** [1] - 3:1
**ordered** [2] - 17:3, 23:12
**ordering** [2] - 31:4, 47:25
**orders** [2] - 11:8, 14:2, 19:8, 19:18, 20:9, 20:18, 21:10, 22:25, 23:3, 23:4, 44:14, 44:18, 44:22, 50:5, 52:11, 56:8, 56:9, 56:10, 56:16, 58:21, 64:24
**original** [1] - 66:17
**otherwise** [1] - 32:19
**outlined** [1] - 26:1
**outside** [2] - 7:18, 22:1
**overseeing** [1] - 10:12
**overview** [1] - 6:3
**own** [12] - 4:6, 10:25, 11:9, 24:11, 34:8,

orally [1] - 9:4
**order** [114] - 3:4, 4:4, 4:8, 4:18, 6:10, 6:11, 6:16, 7:5, 7:11, 7:17, 7:20, 8:4, 8:6, 8:9, 8:11, 8:16, 8:19, 9:2, 9:6, 9:8, 9:9, 11:19, 11:21, 12:8, 12:13, 14:23, 15:13, 17:6, 17:24, 18:2, 18:17, 19:9, 19:11, 19:16, 21:13, 24:5, 24:7, 24:9, 24:10, 24:12, 26:1, 26:2, 27:2, 29:11, 29:12, 29:18, 30:17, 30:22, 30:24, 30:25, 31:6, 36:2, 36:3, 37:3, 37:12, 37:20, 37:22, 38:13, 38:14, 39:1, 39:14, 39:15, 40:25, 42:2, 43:17, 43:18, 43:21, 43:22, 44:4, 44:8, 44:13, 44:24, 45:1, 45:21, 48:16, 48:23, 49:11, 49:12, 49:15, 53:18, 54:17, 54:25, 55:1, 55:22, 55:23, 57:22, 57:25, 58:25, 59:20, 59:24, 60:10, 60:14, 60:17, 60:23, 60:24, 61:1, 61:9, 61:11, 61:21, 62:16, 62:22, 63:2, 63:4, 63:6, 63:9, 63:15, 63:20, 63:22, 63:25, 64:3, 64:14, 65:2

34:12, 34:14, 44:16, 63:19, 64:4

## P

**p.m** [1] - 9:19
**page** [2] - 12:7, 66:18
**pages** [1] - 7:1
**pains** [1] - 51:2
**papers** [1] - 19:3
**paragraph** [7] - 7:18, 8:10, 8:13, 11:5, 60:15, 63:3, 63:8
**paragraphs** [3] - 6:10, 6:12, 8:16
**parallel** [1] - 64:20
**part** [2] - 14:14, 16:22
**particular** [1] - 43:10
**particularly** [1] - 28:12
**parties** [4] - 3:8, 4:12, 45:22, 65:5
**parts** [1] - 47:13
**party** [5] - 15:18, 17:4, 36:4, 39:2, 64:5
**past** [1] - 17:19
**PATRICK** [1] - 1:6
**pattern** [6] - 16:22, 22:5, 24:1, 41:3, 42:9, 43:15
**Paul** [3] - 20:25, 23:14, 23:16
**Pause** [3] - 4:1, 51:17, 62:11
**pending** [6] - 7:2, 10:20, 22:19, 25:12, 31:6, 60:16
**Pennsylvania** [2] - 2:3, 42:4
**people** [1] - 45:12
**percent** [1] - 38:2
**perhaps** [2] - 14:3, 21:15
**period** [3] - 6:14, 6:16, 12:5
**periods** [1] - 6:14
**perjury** [2] - 34:24, 34:25
**permission** [1] - 45:19
**permitted** [1] - 7:20
**person** [2] - 20:6, 20:7
**person's** [1] - 64:3
**personal** [1] - 50:20
**personally** [1] - 5:11
**persons** [1] - 7:20
**pertinent** [1] - 22:24

**Pete** [1] - 34:21
**phone** [4] - 14:7, 53:24, 54:6, 54:22
**phrasing** [1] - 50:18
**pick** [1] - 54:6
**picked** [3] - 14:7, 26:16, 53:24
**pieces** [1] - 66:2
**place** [6] - 30:12, 35:8, 35:9, 39:25, 42:12, 46:7
**placed** [1] - 37:8
**Plaintiffs** [1] - 1:4
**plaintiffs** [2] - 3:11, 4:24
**PLAINTIFFS** [1] - 1:12
**plaintiffs'** [1] - 3:9
**planning** [1] - 17:9
**platform** [2] - 13:20, 57:13
**plausible** [1] - 37:11
**pleasure** [1] - 23:21
**PLLC** [2] - 1:17, 2:2
**plunkett** [1] - 64:20
**PLUNKETT** [4] - 3:22, 63:13, 64:7, 64:11
**Plunkett** [3] - 2:3, 3:22, 63:13
**podium** [2] - 14:10, 26:14
**point** [8] - 8:17, 11:18, 27:4, 27:21, 28:7, 32:24, 33:1, 37:10, 49:1, 52:9, 53:7, 53:14, 56:11
**pointing** [1] - 12:3
**points** [1] - 13:23, 53:21
**police** [1] - 59:17
**policy** [1] - 22:21
**pose** [1] - 45:14
**position** [5] - 30:3, 36:2, 36:23, 38:21, 44:10
**positions** [1] - 63:4
**possession** [3] - 52:2, 53:16
**possible** [5] - 8:21, 49:2, 50:9, 55:20, 55:21
**post** [8] - 6:15, 17:8, 18:3, 18:22, 28:12, 48:9, 58:1, 58:10
**posted** [5] - 18:14, 18:25, 51:4, 51:6, 57:13
**posting** [4] - 6:22, 11:25, 12:6, 34:8

**posts** [15] - 12:16, 17:2, 17:19, 17:23, 33:13, 33:25, 34:3, 34:10, 34:12, 34:14, 35:12, 48:7, 51:6, 55:8, 65:15
**Poulos** [1] - 34:22
**Powell** [1] - 32:23
**practically** [1] - 17:9
**practice** [2] - 22:5, 42:2
**pre** [2] - 6:14, 9:1
**pre-judge** [1] - 9:1
**precise** [1] - 14:14
**prepared** [3] - 12:21, 39:10, 61:23
**present** [4] - 3:18, 13:24, 26:11, 49:12
**PRESENT** [1] - 2:1
**presentation** [2] - 5:1, 7:7
**preservation** [1] - 57:19
**preserve** [3] - 18:18, 54:17, 54:19
**preserved** [5] - 57:12, 57:14, 58:5, 58:9, 58:11
**presiding** [1] - 3:3
**presumably** [2] - 52:1, 53:13
**presume** [1] - 53:14
**pretty** [2] - 5:24, 63:15
**prevail** [1] - 41:22
**prevent** [5] - 33:2, 39:7, 41:24, 42:7, 42:9
**PREVIOUS** [1] - 2:2
**previously** [2] - 32:10, 37:21
**printed** [1] - 65:19
**prison** [1] - 16:14
**private** [1] - 42:1
**privilege** [3] - 15:20, 25:4, 29:22
**privileged** [4] - 26:19, 28:11, 47:22, 55:9
**pro** [7] - 28:3, 31:19, 32:6, 42:5, 42:6, 53:23, 58:12
**proceed** [1] - 62:14
**proceeding** [7] - 19:20, 19:22, 25:8, 43:1, 50:23, 51:20, 53:19
**proceedings** [3] - 5:21, 25:10, 25:12
**Proceedings** [1] -

66:13
**process** [2] - 12:12, 64:5
**produce** [3] - 15:20, 20:6, 56:13
**produced** [6] - 6:22, 17:10, 48:18, 51:14, 53:15, 63:17
**Produced** [1] - 1:25
**product** [1] - 26:20
**professional** [2] - 6:4, 23:5
**Professional** [4] - 6:5, 6:8, 11:9, 54:5
**prohibition** [1] - 8:11
**promote** [1] - 18:8
**promoting** [1] - 24:18
**promptly** [1] - 8:22
**property** [3] - 30:9, 38:18, 43:19
**proposed** [3] - 26:1, 26:2, 63:15
**proposition** [4] - 30:3, 38:24, 39:13, 39:20
**prosecutor** [7] - 14:6, 32:10, 34:21, 41:15, 42:1, 43:2, 58:17
**prosecutor's** [2] - 53:24, 56:20
**prosecutors** [2] - 10:12, 30:13
**prosecutors'** [1] - 39:25
**protect** [3] - 21:16, 43:18, 52:4
**protected** [4] - 26:20, 31:6, 35:22, 38:12
**protective** [39] - 4:8, 4:18, 6:10, 7:11, 7:16, 8:4, 8:6, 8:9, 8:10, 8:16, 8:19, 19:9, 20:18, 21:13, 24:5, 29:10, 29:12, 37:3, 37:20, 37:22, 39:14, 39:15, 43:18, 44:4, 44:8, 44:13, 44:24, 45:21, 48:16, 48:22, 55:23, 58:25, 60:24, 62:16, 63:2, 63:9, 63:22, 63:25, 64:3
**proudly** [1] - 16:2
**provide** [15] - 7:9, 8:14, 9:18, 27:17, 27:18, 32:16, 34:4, 35:20, 46:11, 51:1, 51:23, 56:2, 56:21,

56:22, 57:8
**provided** [8] - 12:23, 14:4, 27:16, 31:12, 34:2, 34:19, 59:5, 65:20
**providing** [5] - 7:19, 9:11, 46:25, 57:1, 60:19
**provision** [1] - 7:22
**provisions** [1] - 9:23
**public** [15] - 7:1, 8:20, 9:16, 10:5, 10:11, 10:14, 10:17, 11:3, 16:13, 16:15, 16:24, 19:6, 30:10, 58:10
**publicly** [6] - 12:11, 34:5, 34:23, 35:13, 37:13, 49:19
**Publishers** [1] - 57:1
**pull** [5] - 47:11, 47:19, 48:10, 54:16, 54:19
**pulled** [1] - 54:21
**purpose** [1] - 37:6
**purposes** [1] - 7:18
**pursuant** [2] - 7:4, 11:9
**pushing** [1] - 24:18
**put** [4] - 15:10, 20:6, 31:4, 38:16

## Q

**questions** [9] - 4:6, 4:7, 46:19, 50:4, 58:20, 61:7, 61:14, 63:11
**quickly** [1] - 55:20
**quiet** [1] - 16:16
**quite** [2] - 12:15, 21:19
**quo** [24] - 4:4, 4:18, 6:11, 6:16, 9:2, 9:9, 9:23, 11:19, 14:23, 17:24, 18:4, 18:17, 19:11, 19:16, 24:7, 24:9, 24:10, 24:12, 53:18, 54:17, 54:24, 60:14, 64:14, 65:2
**quote** [17] - 5:18, 9:10, 9:12, 9:14, 9:17, 10:15, 11:4, 13:8, 13:10, 13:22, 15:5, 15:6, 15:7, 16:19, 22:15, 22:17

## R

**rails** [1] - 43:10

**raise** [1] - 15:8
**rather** [5] - 7:13, 8:19, 11:16, 28:13, 65:4
**RDR** [1] - 66:22
**RDR-CRR** [1] - 66:22
**Re** [2] - 23:24, 23:25
**re** [1] - 25:17
**re-up** [1] - 25:17
**reach** [2] - 29:21, 30:6
**reached** [3] - 10:21, 18:19, 28:8
**Real** [7] - 10:15, 16:7, 17:1, 21:19, 58:25, 59:8, 64:8
**reading** [1] - 63:24
**real** [3] - 15:8, 23:8, 39:17
**really** [12] - 14:22, 16:21, 37:10, 38:22, 50:13, 53:7, 55:18, 56:4, 56:6, 60:2, 64:4
**Realtime** [1] - 1:23
**reason** [8] - 20:7, 22:11, 23:18, 23:22, 31:16, 35:18, 50:15, 52:24
**reasonable** [5] - 9:16, 10:4, 12:10, 14:5, 31:1
**reassure** [2] - 46:4, 46:24
**recap** [2] - 5:25, 19:8
**receipt** [2] - 58:14, 58:18
**receive** [1] - 7:20
**received** [7] - 9:12, 30:23, 32:9, 32:24, 32:25, 60:20, 63:17
**recent** [1] - 17:2
**recently** [1] - 51:7
**recess** [1] - 60:6
**Recessed** [1] - 60:7
**recipient** [1] - 21:19
**recognizing** [1] - 5:10
**reconvened** [1] - 60:9
**record** [16] - 3:8, 9:17, 10:5, 10:24, 15:11, 16:8, 17:2, 24:4, 25:22, 25:23, 29:8, 33:20, 44:7, 55:14, 65:25, 66:17
**Record** [1] - 1:25
**Reeves** [2] - 66:16, 66:22
**REEVES** [2] - 1:22, 66:22

**refer** [2] - 9:8, 48:15
**reference** [4] - 12:1, 17:25, 60:16, 60:22
**referenced** [2] - 28:6, 45:10
**referred** [1] - 49:22
**reflect** [1] - 45:18
**reflecting** [1] - 38:17
**reflects** [1] - 49:17
**refusal** [2] - 6:7, 54:12
**refused** [2] - 15:19
**refusing** [1] - 8:14
**regard** [2] - 8:18, 58:20
**regarding** [4] - 30:5, 34:24, 36:16, 41:3
**regardless** [2] - 16:24, 58:5
**Registered** [1] - 1:22
**regulations** [1] - 66:18
**reiterate** [1] - 60:14
**reiterated** [1] - 54:21
**reject** [1] - 50:18
**related** [7] - 18:18, 25:7, 32:10, 43:4, 43:17, 47:18, 60:21
**release** [2] - 8:20, 37:16
**released** [2] - 12:2, 13:7
**relevant** [4] - 6:17, 10:9, 14:10, 15:23
**relief** [5] - 8:23, 29:11, 37:20, 39:16, 40:16
**remain** [2] - 10:17, 25:19
**remaining** [1] - 4:14
**remarks** [1] - 53:18
**remind** [2] - 25:20, 48:4
**remorse** [1] - 15:24
**remove** [4] - 9:16, 10:4, 57:11, 59:23
**removed** [3] - 24:22, 43:3, 58:10
**Renaissance** [1] - 1:18
**renew** [1] - 25:25
**repeat** [1] - 48:17
**repeated** [1] - 8:14
**repeatedly** [3] - 18:19, 19:18, 21:10
**reply** [2] - 23:24, 50:14
**report** [7] - 39:7, 39:24, 40:8, 40:18, 40:21, 53:10, 59:17

**REPORTER** [1] - 66:23

**Reporter** [4] - 1:22, 1:23, 1:23, 66:16

**repository** [2] - 52:6, 53:12

**reposting** [2] - 18:5, 18:23

**represent** [4] - 20:4, 20:10, 28:17, 28:20

**representation** [1] - 22:2

**representations** [2] - 32:14, 32:15

**representative** [1] - 41:18

**represented** [2] - 25:9, 58:18

**representing** [8] - 20:2, 25:3, 25:15, 29:9, 31:19, 31:24, 33:3, 58:13

**represents** [1] - 53:23

**reputation** [1] - 33:2

**request** [15] - 11:8, 11:17, 12:7, 15:11, 25:17, 25:25, 26:2, 26:6, 30:16, 32:9, 32:24, 39:3, 46:22, 51:22, 54:8

**requested** [2] - 4:15, 62:12

**requests** [5] - 7:15, 8:14, 49:15, 62:23, 63:12

**require** [1] - 11:10

**requires** [1] - 5:17

**requiring** [2] - 12:13, 56:10

**research** [2] - 25:13, 46:21

**resolution** [2] - 60:16, 61:2

**respect** [1] - 16:10

**respond** [3] - 33:10, 33:21, 60:1

**responding** [1] - 29:17

**responds** [1] - 7:11

**response** [15] - 7:8, 8:22, 29:20, 33:12, 35:11, 35:15, 40:23, 43:13, 44:25, 46:14, 53:17, 53:20, 53:21, 54:25, 60:2

**responses** [1] - 33:23

**responsible** [1] - 52:18

**restrict** [1] - 65:9

**restricted** [1] - 64:6

**restricts** [1] - 63:20

**result** [4] - 35:3, 43:1, 59:17, 64:5

**retained** [1] - 27:20

**returned** [1] - 27:16

**revealed** [1] - 25:14

**revealing** [1] - 28:11

**review** [2] - 25:24, 38:15

**reviewed** [3] - 39:8, 40:9, 44:4

**reviewing** [1] - 35:2

**Richardson** [1] - 21:1

**rise** [4] - 3:2, 60:6, 60:8, 66:12

**risk** [1] - 8:1

**Robert** [1] - 2:3

**rolled** [1] - 43:6

**room** [1] - 15:9

**Ross** [1] - 1:13, 3:16

**ROSS** [1] - 3:16

**Rule** [4] - 6:4, 6:8, 21:25, 54:5

**rule** [1] - 39:23

**rules** [9] - 6:4, 6:6, 23:5, 30:14, 36:6, 36:16, 52:15, 54:4, 54:23

**Rules** [2] - 11:9, 54:5

**rushed** [1] - 8:19

**Russell** [1] - 14:12

## S

**safety** [2] - 19:5, 19:6

**sanction** [6] - 4:15, 4:16, 5:23, 21:7, 23:12, 54:1

**sanctioned** [2] - 22:20, 23:9

**sanctioning** [1] - 22:2

**sanctions** [8] - 15:14, 21:15, 21:20, 32:24, 42:6, 55:10, 55:16, 59:23

**sat** [2] - 13:3, 19:17

**satisfy** [2] - 50:4, 55:14

**save** [1] - 22:16

**saw** [6] - 28:6, 33:12, 43:6, 47:15, 58:1, 59:8

**scenario** [1] - 20:21

**scope** [2] - 28:14, 28:24

**Scott** [1] - 42:13

**se** [5] - 28:3, 31:19, 32:6, 53:23, 58:12

**seal** [13] - 9:17, 10:5, 10:11, 10:22, 11:12, 12:10, 14:6, 31:3, 31:5, 38:7, 38:10, 53:19, 53:25

**sealed** [1] - 10:2

**seated** [4] - 3:4, 29:15, 60:10, 62:1

**second** [3] - 13:3, 24:7, 24:16

**secret** [4] - 30:9, 38:17, 43:19, 63:5

**secrets** [1] - 43:22

**security** [4] - 13:24, 29:25, 35:8, 46:7

**see** [14] - 11:23, 17:3, 17:9, 22:23, 23:10, 23:23, 36:1, 38:16, 40:10, 46:23, 48:6, 60:25, 61:3

**seeing** [3] - 10:11, 10:14, 34:4

**seek** [9] - 15:14, 29:10, 29:11, 39:16, 40:16, 45:19, 55:16, 62:18

**seeking** [5] - 28:22, 37:19, 41:11, 41:17, 42:9

**segment** [1] - 13:20

**Senate** [1] - 40:13

**senator** [1] - 34:22

**senators** [1] - 35:2

**send** [4] - 18:9, 20:5, 54:7, 54:22

**sent** [4] - 10:11, 47:11, 47:18, 58:14

**serious** [5] - 19:4, 21:20, 29:24, 35:8, 46:6

**seriously** [1] - 17:15

**services** [1] - 40:10

**session** [1] - 3:3

**set** [3] - 3:7, 11:14, 36:3

**sets** [1] - 22:25

**setting** [1] - 23:13

**seven** [1] - 54:20

**Seventh** [1] - 57:2

**several** [3] - 11:19, 24:6, 38:19

**Shackelford** [2] - 1:13, 3:13

**SHACKELFORD** [1] - 3:13

**shall** [1] - 6:5

**sham** [1] - 41:5

**share** [1] - 49:19

**shared** [2] - 17:4, 56:15

**sharing** [3] - 8:11, 9:11, 60:18

**sheriff** [2] - 31:14, 32:2

**Sheriff** [24] - 6:21, 12:2, 13:15, 13:16, 15:16, 18:5, 18:6, 18:9, 18:24, 22:16, 24:20, 25:3, 25:15, 26:4, 35:17, 50:19, 51:3, 51:21, 52:2, 53:6, 53:11, 55:8

**sheriff's** [2] - 30:11, 31:21

**sheriffs** [1] - 30:13

**shocking** [1] - 16:20

**shockingly** [1] - 30:19

**short** [3] - 5:16, 38:7, 38:8

**show** [6] - 13:13, 23:6, 52:7, 52:12, 53:2, 55:19

**showed** [2] - 53:1, 53:8

**showing** [1] - 21:24

**shown** [3] - 15:24, 17:20, 21:10

**side** [5] - 4:4, 20:7, 20:8, 56:2, 56:14

**side's** [1] - 20:20

**Sidney** [1] - 32:22

**sift** [1] - 50:22

**signed** [8] - 9:18, 14:4, 19:15, 27:11, 27:19, 49:14, 59:5, 59:7

**significant** [1] - 31:10

**silence** [1] - 34:7, 38:19

**similar** [3] - 23:10, 36:13

**simple** [3] - 12:8, 44:13, 45:14

**simply** [1] - 6:23

**single** [6] - 9:23, 30:2, 41:20, 51:13, 53:14, 54:13

**site** [1] - 26:25

**sits** [1] - 13:19

**situation** [2] - 54:11, 59:10

**six** [1] - 54:20

**skip** [1] - 11:1

**slicing** [1] - 63:4

**slide** [13] - 4:25, 11:23, 16:1, 17:1,

17:8, 18:3, 18:21, 28:3, 33:12, 34:4, 65:15, 65:16, 65:17

**slides** [1] - 23:6

**slightly** [1] - 46:23

**smarter** [1] - 24:23

**Smith** [6] - 14:11, 14:20, 14:22, 14:23, 14:25

**so-called** [1] - 51:4

**social** [6] - 12:16, 17:4, 26:25, 28:6, 48:9, 57:11

**soil** [1] - 35:9

**someone** [4] - 32:1, 41:9, 42:20, 42:22

**sometime** [1] - 6:20

**Sonja** [2] - 66:16, 66:22

**SONJA** [2] - 1:22, 66:22

**sorry** [4] - 3:9, 15:19, 47:21, 52:16

**sort** [2] - 37:19, 49:18

**sorted** [2] - 49:10, 52:13

**sought** [6] - 5:12, 29:10, 33:2, 38:19, 43:3, 64:8

**source** [4] - 7:12, 17:10, 35:23, 38:2

**South** [2] - 23:24, 23:25

**SPEAKER** [1] - 26:11

**speaking** [1] - 5:11

**specific** [10] - 4:12, 12:1, 35:15, 44:18, 46:15, 46:19, 56:9, 56:10, 57:21, 60:1

**specifically** [5] - 7:17, 7:25, 17:25, 37:24, 57:22

**Speech** [1] - 13:20

**spoken** [2] - 34:5, 34:11

**spreading** [1] - 17:6

**STAFFORD** [1] - 2:2

**Stafford** [1] - 3:23

**standard** [10] - 5:9, 5:10, 19:19, 20:12, 20:14, 20:21, 20:22, 21:4, 51:19, 55:15

**standing** [4] - 13:21, 14:9, 24:8, 32:19

**stands** [2] - 39:13, 60:6

**Stars** [1] - 1:14

**start** [1] - 29:16

**started** [1] - 19:19

**starting** [1] - 3:9
**starts** [1] - 13:7
**state** [1] - 41:18
**State** [4] - 7:2, 32:19, 32:21, 34:21
**statement** [2] - 12:24, 17:1
**statements** [2] - 22:22, 40:13
**STATES** [1] - 1:1
**States** [3] - 30:13, 66:16, 66:19
**states** [4] - 31:12, 38:2, 42:6, 60:15
**status** [24] - 4:4, 4:18, 6:11, 6:16, 9:2, 9:9, 9:23, 11:19, 14:23, 17:24, 18:4, 18:17, 19:11, 19:16, 24:7, 24:9, 24:10, 24:11, 53:18, 54:17, 54:24, 60:14, 64:13, 65:2
**statutes** [1] - 39:22
**stay** [1] - 33:4
**STEFANIE** [1] - 1:17
**Stefanie** [7] - 3:17, 5:6, 13:9, 13:22, 15:21, 16:11, 22:16
**stefanie** [1] - 1:18
**Stephanie** [1] - 14:11
**Stephen** [2] - 1:13, 3:13
**steps** [2] - 16:11, 31:1
**still** [1] - 25:23
**stipulate** [1] - 44:6
**stipulated** [3] - 8:7, 8:8, 43:24
**stood** [1] - 45:4
**stop** [10] - 9:2, 13:10, 38:5, 38:7, 38:8, 43:9, 45:11, 45:12, 48:2, 58:1
**stopping** [2] - 19:11, 19:13
**story** [5] - 15:3, 15:13, 24:8, 26:5, 42:21
**straight** [1] - 15:3
**straightforward** [1] - 63:16
**strict** [1] - 62:22
**stuff** [1] - 16:15
**subject** [4] - 12:18, 19:3, 44:16
**submitted** [1] - 63:14
**submitting** [1] - 19:15
**subpoenaed** [2] -

15:18, 15:19
**subsequent** [4] - 4:17, 9:21, 40:24, 66:4
**subsequently** [1] - 35:24
**substantive** [1] - 33:23
**suddenly** [1] - 52:10
**sue** [1] - 52:20
**sued** [1] - 22:13
**suffice** [4] - 5:23, 19:21, 21:8, 54:1
**sufficient** [1] - 4:7
**suggest** [1] - 23:18
**suggesting** [1] - 25:22
**Suite** [3] - 1:14, 1:18, 2:3
**suits** [1] - 32:10
**summarizes** [1] - 13:1
**supplement** [1] - 65:14
**support** [5] - 32:3, 32:4, 32:16, 38:24, 43:14
**supported** [1] - 62:21
**supporting** [3] - 20:23, 36:1
**supports** [3] - 4:16, 30:2, 39:19
**supposed** [6] - 16:12, 30:25, 31:1, 53:19, 56:1, 56:2
**sur** [1] - 50:14
**sur-reply** [1] - 50:14
**surprise** [2] - 16:21, 19:2
**surrounding** [2] - 8:15, 54:18
**surviving** [1] - 13:21
**SUSMAN** [1] - 1:12
**Susman** [3] - 3:10, 4:24, 28:8

### T

**talks** [1] - 19:24
**targeted** [1] - 55:21
**targeting** [1] - 42:11
**tarnish** [1] - 33:2
**tend** [1] - 30:19
**terms** [2] - 16:4, 21:7
**terrible** [1] - 52:23
**testified** [1] - 40:12
**testifies** [1] - 49:16
**testimony** [1] - 49:19
**THE** [138] - 1:1, 1:9,

1:12, 1:17, 2:2, 3:12, 3:20, 3:25, 4:2, 4:22, 5:2, 5:4, 5:13, 7:4, 8:2, 14:25, 17:11, 17:19, 20:12, 20:23, 22:6, 22:8, 22:22, 23:11, 23:16, 25:6, 25:10, 26:8, 26:10, 26:13, 27:3, 27:8, 27:10, 27:17, 27:20, 27:23, 28:2, 28:7, 28:10, 28:17, 28:21, 29:7, 29:14, 30:1, 30:17, 31:15, 31:22, 31:24, 32:4, 32:6, 32:8, 32:13, 33:4, 33:8, 33:10, 33:19, 34:9, 34:12, 35:10, 35:25, 36:8, 36:11, 36:14, 36:19, 37:2, 37:9, 38:3, 38:5, 38:21, 39:9, 40:2, 40:4, 40:15, 40:23, 41:6, 41:9, 42:17, 42:21, 43:8, 43:21, 44:3, 44:6, 44:16, 44:20, 44:23, 45:4, 45:9, 45:14, 45:24, 46:3, 46:13, 47:2, 47:6, 47:9, 47:13, 47:20, 47:22, 48:3, 48:11, 49:2, 49:16, 49:22, 50:1, 50:6, 51:8, 51:15, 55:1, 56:17, 57:5, 57:18, 57:21, 58:3, 58:25, 59:3, 59:7, 59:19, 59:25, 60:5, 60:11, 61:14, 61:17, 61:19, 61:23, 62:1, 62:5, 62:8, 62:15, 62:25, 63:22, 64:2, 64:10, 64:12, 64:23, 65:3, 65:12, 65:22, 65:24, 66:4
**themselves** [1] - 4:8
**therefore** [1] - 15:17
**thinks** [1] - 16:24
**third** [4] - 13:18, 36:4, 39:2, 45:21
**thorough** [2] - 21:4, 46:21
**threats** [1] - 19:5
**three** [1] - 6:13
**threshold** [1] - 57:24
**throughout** [2] - 33:3, 43:4
**throw** [3] - 16:14, 16:19, 21:12
**timeline** [1] - 12:21

**timing** [1] - 29:1
**today** [16] - 5:6, 5:24, 14:24, 21:11, 24:8, 24:25, 25:17, 30:18, 32:14, 32:18, 33:11, 49:12, 56:22, 58:14, 61:4, 66:3
**today's** [1] - 34:3
**together** [2] - 6:1, 14:1
**tolerance** [1] - 22:21
**tolerated** [1] - 22:20
**tomorrow** [1] - 66:1
**took** [3] - 18:16, 38:23, 51:2
**top** [1] - 23:17
**topics** [1] - 48:7
**towards** [1] - 50:24
**track** [1] - 66:6
**tracking** [1] - 10:9
**tracks** [1] - 52:3
**trade** [5] - 30:8, 38:17, 43:19, 43:22, 63:5
**transcribed** [1] - 16:6
**TRANSCRIPT** [1] - 1:9
**Transcript** [1] - 1:25
**transcript** [4] - 16:5, 66:17, 66:17, 66:18
**transcripts** [1] - 40:11
**travels** [1] - 47:5
**trial** [3] - 10:23, 50:24, 55:20
**tribe** [1] - 57:3
**tribunal** [1] - 6:6
**tried** [1] - 64:15
**troubling** [1] - 37:13
**true** [1] - 66:17
**truly** [5] - 5:18, 5:19, 19:20, 19:21, 20:21
**trust** [2] - 19:6, 56:4
**truth** [1] - 19:14
**truthfulness** [1] - 36:16
**try** [5] - 25:4, 39:16, 50:8, 55:18, 65:7
**trying** [4] - 26:5, 28:25, 39:2, 46:4
**turned** [1] - 36:25
**turns** [4] - 13:5, 13:8, 14:18, 55:7
**TV** [1] - 24:17
**Twitter** [6] - 13:9, 17:12, 17:14, 18:7, 26:24, 51:4
**two** [10] - 4:12, 6:4, 12:4, 14:1, 17:2, 24:4,

25:10, 25:12, 50:23, 53:25
**type** [2] - 24:1, 41:21
**types** [1] - 22:20

### U

**U.S** [2] - 1:9, 35:9
**U.S.-based** [1] - 37:25
**ultimately** [2] - 41:22, 42:7
**unable** [1] - 30:7
**unaware** [1] - 11:2
**uncertain** [1] - 16:4
**under** [19] - 5:15, 6:2, 6:6, 7:20, 9:17, 10:5, 10:10, 20:24, 30:14, 31:3, 31:5, 42:25, 51:24, 54:4, 54:5, 55:23, 64:14, 65:13, 66:7
**undertake** [1] - 9:15
**undertaken** [2] - 10:4, 14:5
**undertaking** [4] - 27:12, 27:15, 27:19, 59:8
**undisputed** [2] - 49:3, 59:7
**unfortunately** [2] - 5:22, 57:16
**UNIDENTIFIED** [1] - 26:11
**unilateral** [2] - 44:17, 61:17
**unilaterally** [4] - 38:25, 39:14, 39:20
**unique** [1] - 41:17
**UNITED** [1] - 1:1
**United** [3] - 30:13, 66:16, 66:19
**unless** [1] - 53:12
**unring** [1] - 27:7
**up** [24] - 6:15, 9:5, 13:12, 13:21, 14:7, 19:25, 20:6, 21:2, 22:7, 23:23, 24:8, 25:17, 27:4, 41:5, 47:12, 51:15, 51:16, 53:24, 54:6, 54:17, 56:5, 58:2, 60:12, 61:5
**UPADHYAYA** [1] - 1:9
**Upadhyaya** [1] - 3:3
**updating** [1] - 54:7
**uphold** [1] - 36:13
**upload** [1] - 54:22
**uploaded** [1] - 16:7

**urge** [2] - 51:22, 65:5
**US** [2] - 1:3, 3:6
**users** [1] - 18:9

## V

**valid** [1] - 6:7
**validity** [1] - 35:23
**various** [1] - 13:23
**vendor** [1] - 51:22
**verification** [5] - 9:19, 11:14, 12:12, 14:5, 19:15
**versus** [1] - 3:6
**vice** [2] - 42:5, 42:6
**video** [11] - 16:6, 18:14, 18:20, 47:3, 47:9, 47:20, 47:23, 48:4, 54:16, 57:6, 57:7
**videos** [3] - 47:8, 57:14, 65:16
**view** [5] - 45:17, 45:18, 49:17, 59:14
**viewed** [1] - 46:5
**viewers** [1] - 24:19
**views** [2] - 23:1, 44:17
**violate** [6] - 14:1, 20:19, 23:3, 24:12, 24:14, 45:1
**violated** [18] - 6:3, 7:17, 8:10, 8:12, 8:17, 9:23, 9:24, 12:13, 19:8, 19:9, 19:11, 19:18, 20:18, 24:5, 24:9, 24:10, 36:15, 44:24
**violates** [1] - 61:1
**violating** [2] - 18:1, 65:1
**violation** [4] - 18:17, 54:24, 57:25, 61:3
**violations** [6] - 6:9, 7:16, 9:22, 30:22, 40:25, 53:17
**voice** [1] - 41:24
**Vollmer** [1] - 57:1
**vs** [1] - 1:5

## W

**waited** [1] - 11:16
**waiving** [1] - 29:22
**wants** [6] - 13:17, 17:13, 23:20, 25:24, 41:14, 46:9
**Washington** [3] - 1:11, 1:24, 2:4
**waste** [1] - 31:15

**Watch** [1] - 20:25
**watch** [1] - 47:10
**watching** [2] - 22:12, 22:14
**water** [4] - 40:7, 46:23, 59:15
**ways** [4] - 14:2, 19:10, 19:12, 24:18
**website** [3] - 18:10, 34:6, 34:8
**weeks** [2] - 14:18, 24:6
**wet** [3] - 40:7, 46:23, 59:15
**whatsoever** [2] - 29:12, 38:23
**white** [2] - 40:9, 40:14
**willing** [2] - 16:23, 23:20
**willingly** [1] - 43:23
**win** [2] - 41:23, 42:12
**wish** [2] - 4:10, 4:13
**wished** [1] - 48:20
**withdraw** [1] - 31:4
**withdrew** [2] - 29:3, 29:6
**witness** [1] - 49:16
**woman** [1] - 14:11
**won** [4] - 32:25, 42:7, 43:16
**word** [1] - 43:20
**words** [3] - 16:20, 17:15, 24:11
**works** [1] - 40:20
**world** [2] - 52:8, 52:20
**worse** [2] - 10:3, 51:18
**worth** [1] - 12:3
**wrapping** [1] - 60:12
**writing** [1] - 15:5
**written** [3] - 9:6, 9:8, 28:22

## Y

**years** [6] - 35:2, 38:19, 42:1, 47:17, 50:23, 52:18
**yesterday** [1] - 10:13
**yourself** [2] - 31:19, 48:12
**yourselves** [1] - 3:8

## Z

**zealous** [1] - 42:3
**zealously** [2] - 20:1, 20:10

**zero** [1] - 22:21

# Exhibit 3

| | |
|---|---|
| DISTRICT COURT, MESA COUNTY, COLORADO<br>125 N. Spruce St. Grand Junction CO 81501<br>(970) 257-3630<br><br>**PEOPLE OF THE STATE OF COLORADO**<br>Plaintiff<br><br>v.<br><br>**TINA PETERS**<br>Defendant<br><br><br>DANIEL J. HARTMAN<br>Pro Hac Vice<br>PO BOX 307<br>Petoskey, MI 49770<br>(231) 348-5100<br>Michigan Atty. Reg # (P52632)<br><br>Local Attorney for the Defendant<br>Michael Edminister<br>Edminister Law<br>P.O. Box 1827,<br>Carbondale, CO 81623<br>Phone Number: (970) 963-7201<br>E-mail: mike.edministerlaw@gmail.com<br>Atty. Reg. #: 49808<br><br>John Case<br>6901 S. Pierce St. #340<br>Littleton, CO 80128<br>(303) 667-7407<br>brief@johncaselaw.com<br>Atty Reg. #2431 | **COURT USE ONLY**<br><br>_____<br><br>Case No: 22CR371<br><br>Div: 9/MDB |

**DEFENDANT'S PRELIMINARY RESPONSE TO DOMINION VOTING SYSTEMS INC. MOTION TO QUASH SUBPOENA TO MICHAEL FRONTERA AND REQUEST FOR REASONABLE TIME TO ALLOW DC COURT TO RULE**

1.    The subpoena served upon Michael Frontera, Dominion's in house counsel, commands him to appear and testify, as well as to produce specified documents.  Dominion does

1

not challenge the portion of the subpoena that commands Mr. Frontera to testify.  Dominion objects only to producing documents.  Therefore, even if the Court were to quash the portion of the subpoena that commands the production of documents, Mr. Frontera must still appear and give testimony.

2.      As a practicing Colorado attorney for more than 50 years, and an officer of the Court, undersigned counsel assures the Court that the subpoenaed materials not only exist, but they are relevant, exculpatory, and potentially a Brady violation.  Counsel has already seen many of the documents relevant to Clerk Peters' defense that were produced by Dominion Voting Systems Inc. in case number 1:21-cv-02131 (CJN), U.S. District Court for the District of Columbia, captioned *U.S. Dominion Inc., et al v. Byrne*.  The Documents produced by Dominion in the DC litigation are subject to a Protective Order which counsel signed.  Counsel does not want to produce documents subject to the Protective Order to this Court, without giving the DC Court an opportunity to rule on whether the documents were mislabeled by Dominion as "Confidential."  Please see attached Declaration of John Case, which attorney Stefanie Lambert will submit to the DC Court.

3.      As this Court noted in its Order Re: People's Motion to Strike Defense Experts 7/10/24:

> "The right to present a complete defense [] has roots in due process, which requires that criminal prosecutions comport with prevailing notions of fundamental fairness."  Indeed, "[f]ew rights are more fundamental than that of the accused to present witnesses in [her] own defense, and to put before the jury evidence that might influence the determination of guilt."

(Order at 2, Citations omitted)

4.      The Court correctly ruled in denying in part the People's Motion to Strike Defense Experts that it could not determine whether expert testimony would be relevant and material until it had heard the evidence prior to the expert being called, and then hearing an offer

2

of proof as to how the expert testimony would assist the jury as triers of fact.  The problem is the

same here.  The Court will not have enough information to grant or deny Dominion's Motion

until it has heard evidence at trial, including testimony from Mr. Frontera and other witnesses,

and a subpoenaed document is offered in evidence.  Only then will the Court have a sufficient

record to rule on whether the document is admissible.

WHEREFORE, Defendant prays that this Court deny Dominion's Motion to Quash Subpoena to

Michael Frontera, or in the alternative, that the Court allow additional time for the DC Court to

determine if the documents sought were mislabeled as "Confidential" and therefore are not

subject to the Protective Order.

Respectfully submitted July 10, 2024.


_s/ John Case_____
John Case, Colorado Reg. #2431

## CERTIFICATE OF SERVICE

I certify that on July 10, 2024, I filed and served the foregoing document via CCEF to the following:

Clerk of the District Court of Mesa County
125 N. Spruce St.
Grand Junction CO 81501

Daniel P. Rubinstein, District Attorney
Robert Scott Shapiro
Janet Stansberry Drake
P.O. Box 20,000
Grand Junction CO 81502

Daniel J. Hartman
Pro Hac Vice
PO Box 307
Petoskey, MI 49770
(231) 348-5100
Michigan Atty Reg. #(P52632)

Co-Counsel for Defendant
Michael Edminister
Edminister Law
P.O. Box 1827,
Carbondale, CO 81623
Phone Number: (970) 963-7201
E-mail: mike.edministerlaw@gmail.com
Atty. Reg. #: 49808

With email copies of this Preliminary Response and the Declaration of John Case to
stan.garnett@garnettlegalgroup.com and leah.regan-smith@garnettlegalgroup.com


*/s/John Case*

# Exhibit 4

## DECLARATION OF JOHN CASE

JOHN CASE declares under penalty of perjury that the following is true and correct.

1.     My full name is John McLean Case. I am a practicing attorney licensed in Colorado more than 50 years. I am admitted to all Colorado Courts, U.S. District Court for the District of Colorado, U.S. Court of Appeals for the 10th Circuit, and U. S. Supreme Court. I have represented the former clerks and recorders of Elbert County and Mesa County, as well as county commissioners and voters from other counties, in civil litigation challenging voting systems sold in Colorado by Dominion Voting Systems, Inc. I currently represent former Mesa County Clerk and Recorder Tina Peters in 22CR371, District Court of Mesa County, the criminal case scheduled for jury trial July 30, 2024. I also represent Clerk Peters as plaintiff-appellant in civil litigation, case numbers 1:23-cv-03014-NNYW, U. S. District Court for the District of Colorado, and 24-1013 U.S. Court of Appeals for the 10th Circuit.

2.     I have spoken with and read reports of nationally recognized computer cybersecurity experts who examined forensic images from the hard drives of Dominion voting systems computers. Those experts, including J. Alex Halderman, Walter C. Daugherity, and Clay Parikh, have independently concluded, based on their own scientific research, that Dominion voting systems (1) are not auditable, as required by federal and state law (2) they can connect to the internet during elections, which violates federal and state law; and (3) they are capable of manipulating ballots and vote

tabulations, which violates federal and state law; (4) the software overwrites Windows

Operating System log files that are recorded during elections, which are required by

federal and state law to be preserved.  All these deficiencies make Dominion voting

systems illegal to use in Colorado elections.  The independent expert findings are

corroborated by Dominion emails I reviewed in 1:21-cv-02131, which show, in my

opinion, that Dominion was aware it was violating election laws.

3.     I am assisting Stefanie Lambert in her defense of Patrick Byrne in 1:21-

cv-02131.  I signed Exhibit A to Protective Order, the "Undertaking" in which I agreed

to "access and use Discovery Material, Confidential Material, and Attorneys Eyes Only

Material only as the [Protective] Order permits."  I reviewed emails produced by

Dominion in 1:21-cv-02131.  The emails appear to be mis-labeled "Confidential,"

because their contents do not meet the definition of "Confidential Material" in

paragraph 2 of the Protective Order 6/16/23.

4.     Paragraph 2 of the Protective Order defines "Confidential Discovery

Material" as follows:

> Confidential Discovery Material is defined as material that consists of
> non-public customer information or information that is proprietary or
> otherwise commercially sensitive.

The emails that are essential to Clerk Peters' defense do not meet the definition of

"Confidential Discovery Material."  They are not non-public customer information,

because they contain no customer information.  They are not proprietary, because they

contain no trade-secret or software information.  They are <u>not</u> commercially sensitive, because they do not relate to sales or commercial activity.  Therefore, they were mislabeled by Dominion and/or its counsel and should be open to public view.

5.      Even if the emails meet the definition of Confidential Discovery Material, which they do not, the jury in Mesa County should be allowed to see them under appropriate instructions from the trial court, because they are essential to Clerk Peters' defense in a criminal case in which at least one Dominion employee has been listed as a "will call" witness by the prosecution, and she faces possible incarceration if convicted.

6.      I have not disclosed the Dominion emails to my client Tina Peters, or to anyone else.  I believe that I have an ethical obligation to disclose the emails to my client, and to present them as evidence in 22CR371, because the Dominion emails contain exculpatory material that is vital to Clerk Peters' defense.

7.      Starting in December 2020, Mesa County voters, including County Commissioner Cody Davis, asked Clerk Peters to conduct audits of the November 2020 election results in Mesa County, and the April 2021 municipal election in Grand Junction.  Constituents claimed the results tabulated on Dominion machines were improbable.

8.      52 U.S.C §20701 requires all officers of election, including Clerk Peters, to preserve election records for 22 months after any federal election.  There is a criminal penalty for violating this statute.  Department of Justice publication 7/28/21 titled

"Federal Law Constraints on Post-Election Audits" states in pertinent part: "Jurisdictions must therefore also retain and preserve records created in digital or electronic form."

9.      The charges against Clerk Peters in 22CR371 arise out of a forensic image of the Mesa County election management server hard drive that was made on May 23, 2021.  Colorado Deputy Secretary of State, Chris Beall, has admitted in sworn testimony that no statute or rule prohibited imaging the server at the time that the image was made.

10.     Clerk Peters engaged a qualified cybersecurity consultant to make a forensic image of the server before the Trusted Build, then observe the Trusted Build, and make a second forensic image of the server after the Trusted Build.  This was necessary to perform her public duty, under statutes and the U.S. and Colorado Constitutions, to preserve digital election records, and to investigate what Secretary of State personnel did to the Mesa County voting computers during the Trusted Build.

11.     Imaging the server before the Trusted Build preserved all digital data still available on the hard drive that had been generated during the November 2020 election and the April 2021 Grand Junction municipal election.  I say *still available on the server* because Dominion's recommended settings for its software causes Windows operating system log files to be overwritten during election ballot processing, which violates election record preservation laws.  Comparison of the forensic image made before the

Trusted Build to the forensic image made after the Trusted Build showed that the

Trusted Build erased over 29,000 digital election files, which is an election crime.  This

comparison confirmed the observations of the cybersecurity consultant that Secretary of

State personnel erased digital election records during the Trusted Build, which again is a

crime.

12.     Dominion apparently demanded that the Colorado Secretary of State

coordinate with federal and state law enforcement agencies including the FBI, DOJ,

Colorado Attorney General, and the District Attorney of Mesa County to investigate and

prosecute Clerk Peters.  I believe, based on documents I have seen, that because of

pressure from Dominion, law enforcement officials convened federal and state grand

juries in Colorado.  Clerk Peters was indicted by the Mesa County Grand Jury on March

8, 2022.

13.     One of Clerk Peters' affirmative defenses in 2022CR371 is execution of a

public duty.  The jury will want to hear evidence explaining why the government is

prosecuting Clerk Peters if she was performing a public duty.  On this issue, I intend to

offer as exhibits emails authored by Dominion officers Kay Stimson, Director of

Government Relations, Mike Frontera, in-house counsel, and John Poulos, Dominion

CEO, as well as other Dominion employees.  I understand that these emails were

produced by Dominion and its counsel in *U.S. Dominion Inc. et al v. Byrne*.  The emails

are exculpatory evidence that is vital to Clerk Peters' defense in the trial that begins July 30, 2024.

14.     In my opinion, Dominion has a financial motive to help convict Clerk Peters, by preventing its own emails from being used in her defense at trial.  If Clerk Peters' trial results in conviction, Dominion's secrets may remain buried. If a jury acquits Clerk Peters after hearing evidence in a nationally televised trial that Dominion was violating election laws, the company could lose its voting system revenue not only in Mesa County, but throughout Colorado and the nation.

15.     On July 1, 2024, my office served a subpoena to testify and produce documents on Dominion's in house counsel, Michael Frontera.  The documents commanded to be produced to the Court include documents that Dominion disclosed in this case, which were mislabeled "Confidential."  Today, July 10, 2024, Dominion's counsel filed a motion to quash the subpoena, alleging that the subpoena was a "fishing expedition."  In order to establish that the subpoena is not a "fishing expedition," and that the materials exist, I would ask respectfully that the DC Court rule quickly on whether the documents are mislabeled "Confidential."

I declare under penalty of perjury that the foregoing is true and correct.

Executed July 10, 2024.

/s/ *John Case*

John Case

# Exhibit 5

| | |
|---|---|
| **From:** | AttorneyLambert (via Dominion list) |
| **To:** | Davida Brook |
| **Cc:** | Dominion SG Simplelist; OANService; Chris Kachouroff; Marc Eisenstein |
| **Subject:** | Re: Dominion/Byrne - Please review / respond by cob today |
| **Date:** | Thursday, July 11, 2024 2:04:13 PM |
| **Attachments:** | image001.png |

EXTERNAL Email

Dear Ms. Brooks,

Thank you for your email. I am unable to provide information protected by privilege/work product.

Mr. Poulos testified at his deposition ████████████

Please advise if your client is willing to remove the confidential/attorney eyes only label from any of the documents provided by Dominion in the course of discovery.

Thank you,

Stefanie

Sent from Proton Mail for iOS

On Thu, Jul 11, 2024 at 1:39 PM, Davida Brook <DBrook@susmangodfrey.com> wrote:

Ms. Lambert,

We just learned of a filing in the Tina Peters case from yesterday in which a Mr. John Case declared the following:

> 3.    I am assisting Stefanie Lambert in her defense of Patrick Byrne in 1:21-cv-02131.  I signed Exhibit A to Protective Order, the "Undertaking" in which I agreed to "access and use Discovery Material, Confidential Material, and Attorneys Eyes Only Material only as the [Protective] Order permits."  I reviewed emails produced by Dominion in 1:21-cv-02131.  The emails appear to be mis-labeled "Confidential," because their contents do not meet the definition of "Confidential Material" in paragraph 2 of the Protective Order 6/16/23.

Please answer each of these questions in line, below.  If you need to consult with Mr. Case, we trust you will do so as apparently you are working together.

1. Who is Mr. Case?

2. How long has he been "assisting" you in the Dominion v. Byrne case?

3. Provide his signed undertaking.

4. What Dominion documents has he accessed?

5. When did he access them?

6. Via what means?  (Document vendor, a download of files, something else?)

7. Is there anyone else assisting you in the Dominion v. Byrne case?

8. If yes, please disclose them and answer questions 3-6 on their behalf as well.

9. We need answers to these questions, in writing, before close of business today.

Thank you,
Davida

To unsubscribe from this list please go to https://simplelists.susmangodfrey.com/confirm/?u=Nq1YeyJMMZGPz2FF9vL1X8vjOSEMy6rj

# Exhibit 6

| ☒ District Court ☐ Juvenile Court<br>Mesa County, Colorado<br>Court Address: 125 N. Spruce Street<br>        Grand Junction, CO 81506 | |
|---|---|
| PEOPLE OF THE STATE OF COLORADO,<br><br>v.<br><br>TINA PETERS, Defendant | DATE FILED: July 12, 2024 11:34 AM<br>CASE NUMBER: 2022CR371<br><br><br>▲                                              ▲<br><br>COURT USE ONLY |
| | Case Number:  22 CR 371<br><br>Division  9   Courtroom   Barrett |
| **ORDER RE: MOTION TO QUASH SDT** | |

Before is a motion to quash a *subpoenas duces tecum* ("SDT"). The motion was filed by Dominion Voting Systems ("Dominion") on behalf of their internal counsel, Mr. Michael Frontera. The SDT was issued by Defendant. I have reviewed the motion, the response, the SDT, and the file. After considering the foregoing, as well as the affidavit of counsel, I issue the following Order:

### *Background*

Defendant is charged with several crimes involving Attempting to Influence Public Servants, Identity Theft, Criminal Impersonation, Conspiracy to Commit Criminal Impersonation, Official Misconduct, Failure to Comply with Requirements of the Secretary of State, and Violation of a Duty.

The allegations in this case span a period beginning in or about April 2021 and into August 2021. Defendant was previously the Clerk and Recorder for Mesa County and oversaw elections for Mesa County. Defendant is alleged to have secreted an unknown

person into a trusted build, which is a process in which elections equipment is updated. In order to accomplish this, Defendant used the identifying information for someone else so the other person could attend the trusted build without being identified.  Defendant and others allegedly misrepresented the identity of the other person to several public servants.

It was later discovered that sensitive information from the trusted build was published on the internet. It was also discovered that data from Mesa County election equipment had been copied and published on the internet.

On or about July 1, 2024, Defendant issued two SDTs.  One was served on Dominion while the other was served on an attorney, Ms. Stefanie Lambert.  Ms. Lambert apparently is involved in an entirely unrelated case in the United States District Court, District of Columbia (the "DC Case").  The documents sought to be produced are, apparently, subject to a protective order in the DC Case.  The SDT seeks the production of: *[a]ll emails to or from any employee or agent of Dominion Voting Systems (including without limitation John Poulos, Kay Stimson, Mike Frontera, and Stan Garnett) to or from any employee or agent of the Colorado Secretary of State (including without limitation Jena Griswold, Chris Beall, Caleb Thornton, and Jessi Romero) during the period May 25, 2021, through March 8, 2022.*

 Dominion has moved to quash the SDT.  Dominion argues the materials sought are irrelevant to this case, the SDT is a fishing expedition, and the materials (if they exist) are available from other sources.

Defendant objects to the motion.  Even though he acknowledges he is subject to the aforementioned protective order, counsel for Defendant alleges the materials "exist",

are "relevant", are "exculpatory" and that "he believe[s], based on the documents [he has seen], that because of pressure from Dominion" law enforcement engaged in investigations.  Defendant seeks to have me defer ruling on the motion to quash until trial begins.

### *Applicable Law*

"There is no general constitutional right to discovery in a criminal case[.]" <u>Weatherford v. Bursey</u>, 429 U.S. 545, 559, 97 S. Ct. 837, 846, 51 L. Ed. 2d 30 (1977). "Both [the Colorado Supreme Court] and the United States Supreme Court have emphasized that their respective rules permit subpoenas only for the production of 'evidence'-not as an investigative tool."  <u>People v. Baltazar</u>, 241 P.3d 941, 944 (Colo. 2010).

Criminal subpoenas are governed by Crim. P. 17.  Documents requested pursuant to a subpoena issued under Crim. P. 17 should only be disclosed when:

> (1) A reasonable likelihood that the subpoenaed materials exist, by setting forth a specific factual basis;
>
> (2) That the materials are evidentiary and relevant;
>
> (3) That the materials are not otherwise procurable reasonably in advance of trial by the exercise of due diligence;
>
> (4) That the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and
>
> (5) That the application is made in good faith and is not intended as a general fishing expedition.

<u>People v. Spykstra</u>, 234 P.3d 662, 669 (Colo. 2010)

A court "may quash or modify the subpoena if compliance would be unreasonable or oppressive." Crim. P. 17(c). "[W]here a subpoena is issued for materials potentially protected by a privilege or a right of confidentiality, the defendant must make a greater showing of need and, in fact, might not gain access to otherwise material information depending on the nature of the interest against disclosure." People v. Battigalli-Ansell, 492 P.3d 376, 389–90 (Colo. App. 2021) (citations and quotations omitted).  Crim. P. 17 does not create a broad right to discovery as is the case in civil cases, and it is not a tool for discovery. Spykstra, 234 P.3d at 669.

*Findings and Order*

I begin by declining Defendant's invitation to defer ruling on the motion. The point of the motion to quash, in part, is to avoid the expense and hassle associated with the production of the requested documents.  Additionally, there is no law to support the request to delay ruling.  Indeed, the law plainly supports the opposite conclusion that Defendant bears the burden of establishing a basis to reject the motion to quash.  If a defendant cannot muster that response immediately, then such reflects a likelihood that the SDT is being utilized for an improper purpose.

Turning to the factors for consideration, I first find the requested materials exist. The requested materials are likely in the possession of Dominion. The records are also reasonably procurable from the Secretary of State through an open records request, too.

I do not find the requested materials are evidentiary or relevant.  The allegations in this case span the course of a handful of months in 2021 and the criminal conduct concluded in August 2021.  Other than the vague and conclusory allegations that

Dominion is pressuring law enforcement, there is no record support to believe that emails between Dominion and the Secretary of State have any bearing on whether Defendant committed the crimes. No showing has been made that any of these purported emails have anything to do with these allegations or would show that she didn't commit the crimes.

Further, the issue of election equipment is collateral.  The jury will not be asked to address any questions regarding the functioning of election equipment.  The issues in this case are whether Defendant attempted to deceive public servants, engaged in criminal impersonation, and the like.  This criminal case is not the forum for the matters raised by Defendant in her response to the motion.

Dominion is also not a victim in this case.  This makes the argument regarding the relevance of the emails even more tenuous because Dominion's position (or lack thereof) regarding the prosecution of Defendant cannot possibly bear upon whether she committed the crimes charged. Similarly, neither Dominion nor the Secretary of State are defendants.  Consequently, whether they are engaged in some coverup related to voting equipment cannot make a material fact at issue in this case more or less likely.

The broad nature of the request, coupled with the lack of support for the same, makes the SDT nothing more than a fishing expedition.

The issue herein seems to be a reoccurring theme: Defendant wanting to make the case about the security of voting machines, purported collusion between Dominion and government authorities, and the like.  This Court has yet to see an evidentiary basis for the admission of this type of evidence.  And as I have said before, it appears the only

basis for the admission of such evidence is not to show that Defendant didn't do what she is charged with, but rather to make the focus of the trial something separate from what the jury will be charged with deciding.   This makes the information sought irrelevant, misleading, and likely to confuse the issues.

Accordingly, the motion to quash is **GRANTED**.

**IT IS SO ORDERED** this 12th day of July, 2024.

_____
MATTHEW D. BARRETT
DISTRICT COURT JUDGE

# Exhibit 7

screenshot-twitter_com-2024_07_14-12_06_39
https://twitter.com/MJTruthUltra/status/1811755146633675036
14.07.2024

 **MJTruthUltra** ✔
@MJTruthUltra

 **Subscribe**   ...

 Colorado — this is big..

A Lawyer has Come Forward: Dominion Voting Machines can Connect to the Internet, Can Change Votes, and Cannot be Audited

• Lawyer John Case, under penalty of perjury, files declaration to CO Judge, stating Dominion Voting machines can connect to the internet, can switch votes, and cannot be audited

Tina Peters is reportedly entangled with subpoenas against Dominion... they are fighting tooth and nail for this information not get out.

Per Court Records Obtained by @yehuda_miller on X directly from Tina Peters Trial

"Dominion voting systems (1) are not auditable, as required by federal and state law (2) they can connect to the internet during elections, which violates federal and state law; and (3) they are capable of manipulating ballots and vote tabulations, which violates federal and state law; (4) the software overwrites Windows Operating System log files that are recorded during elections, which are required by federal and state law to be preserved. All these deficiencies make Dominion voting systems illegal to use in Colorado elections."

---

### DECLARATION OF JOHN CASE

JOHN CASE declares under penalty of perjury that the following is true and correct.

1. My full name is John McLean Case. I am a practicing attorney licensed in Colorado more than 50 years. I am admitted to all Colorado Courts, U.S. District Court for the District of Colorado, U.S. Court of Appeals for the 10th Circuit, and U. S. Supreme Court. I have represented the former clerks and recorders of Elbert County and Mesa County, as well an county commissioners and voters from other counties, in civil litigation challenging voting systems sold in Colorado by Dominion Voting Systems, Inc. I currently represent former Mesa County Clerk and Recorder Tina Peters in 22CR371, District Court of Mesa County, the criminal case scheduled for jury trial July 30, 2024. I also represent Clerk Peters as plaintiff-appellant in civil litigation, case numbers 1:23-cv-03014-NYYW, U. S. District Court for the District of Colorado, and 24-1013 U.S. Court of Appeals for the 10th Circuit.

2. I have spoken with and read reports of nationally recognized computer cybersecurity experts who examined forensic images from the hard drives of Dominion voting systems computers. Those experts, including J. Alex Halderman, Walter C. Daugherity, and Clay Parikh, have independently concluded, based on their own scientific research, that Dominion voting systems (1) are not auditable, as required by federal and state law (2) they can connect to the internet during elections, which violates federal and state law; and (3) they are capable of manipulating ballots and vote

contain no trade-secret or software information. They are not commercially sensitive, because they do not relate to sales or commercial activity. Therefore, they were mislabeled by Dominion and/or its counsel and should be open to public view.

5. Even if the emails meet the definition of Confidential Discovery Material,

tabulations, which violates federal and state law; (4) the software overwrites Windows Operating System log files that are recorded during elections, which are required by federal and state law to be preserved. All these deficiencies make Dominion voting systems illegal to use in Colorado elections. The independent expert findings are corroborated by Dominion emails I reviewed in 1:21-cv-02131, which show, in my opinion, that Dominion was aware it was violating election laws.

3. I am assisting Stefanie Lambert in her defense of Patrick Byrne in 1:21-cv-02131. I signed Exhibit A to Protective Order, the "Undertaking" in which I agreed to "access and use Discovery Material, Confidential Material, and Attorneys Eyes Only Material only as the [Protective] Order permits." I reviewed emails produced by Dominion in 1:21-cv-02131. The emails appear to be mis-labeled "Confidential," because their contents do not meet the definition of "Confidential Material" in paragraph 2 of the Protective Order 6/16/23.

4. Paragraph 2 of the Protective Order defines "Confidential Discovery Material" as follows:

> Confidential Discovery Material is defined as material that consists of non-public customer information or information that is proprietary or otherwise commercially sensitive.

The emails that are essential to Clerk Peters' defense do not meet the definition of "Confidential Discovery Material." They are not non-public customer information, because they contain no customer information. They are not proprietary, because they

"Federal Law Constraints on Post-Election Audits" states in pertinent part:

"Jurisdictions must therefore also retain and preserve records created in digital or electronic form."

9. The charges against Clerk Peters in 22CR371 arise out of a forensic image

which they do not, the jury in Mesa County should be allowed to see them under appropriate instructions from the trial court, because they are essential to Clerk Peters' defense in a criminal case in which at least one Dominion employee has been listed as a "will call" witness by the prosecution, and she faces possible incarceration if convicted.

6.  I have not disclosed the Dominion emails to my client Tina Peters, or to anyone else. I believe that I have an ethical obligation to disclose the emails to my client, and to present them as evidence in 22CR371, because the Dominion emails contain exculpatory material that is vital to Clerk Peters' defense.

7.  Starting in December 2020, Mesa County voters, including County Commissioner Cody Davis, asked Clerk Peters to conduct audits of the November 2020 election results in Mesa County, and the April 2021 municipal election in Grand Junction. Constituents claimed the results tabulated on Dominion machines were improbable.

8.  52 U.S.C §20701 requires all officers of election, including Clerk Peters, to preserve election records for 22 months after any federal election. There is a criminal penalty for violating this statute. Department of Justice publication 7/28/21 titled

of the Mesa County election management server hard drive that was made on May 23, 2021. Colorado Deputy Secretary of State, Chris Beall, has admitted in sworn testimony that no statute or rule prohibited imaging the server at the time that the image was made.

10.  Clerk Peters engaged a qualified cybersecurity consultant to make a forensic image of the server before the Trusted Build, then observe the Trusted Build, and make a second forensic image of the server after the Trusted Build. This was necessary to perform her public duty, under statutes and the U.S. and Colorado Constitutions, to preserve digital election records, and to investigate what Secretary of State personnel did to the Mesa County voting computers during the Trusted Build.

11.  Imaging the server before the Trusted Build preserved all digital data still available on the hard drive that had been generated during the November 2020 election and the April 2021 Grand Junction municipal election. I say still available on the server because Dominion's recommended settings for its software causes Windows operating system log files to be overwritten during election ballot processing, which violates election record preservation laws. Comparison of the forensic image made before the

4

6:31 AM · Jul 12, 2024 · **433.7K** Views

| 448 | 14K | 24K | 2.1K | |
|---|---|---|---|---|

C Post your reply **Reply**

**Gen Belisarius** ✔ @GenBelisarius · Jul 12 ···
@FoxNews Hey Fox, don't give Dominion another Billion dollars please.

| 17 | 89 | 769 | 14K | |

**MJTruthUltra** ✔ @MJTruthUltra · Jul 12 ···
lol

In reality, it's just one hand exchanging money with the other, on the same body.

| 13 | 26 | 461 | 13K | |

**SpudMemes 𝕏** ✔ @SpudMEMES · Jul 12 ···
Bingo

| | 1 | 8 | 414 | |

**JKash 🟠MAGA Queen** ✔ @JKash000 · Jul 12 ···
Get rid of all voting machines, especially Dominion.

| 10 | 77 | 569 | 8.8K | |

**Heritage Foundation** ✔ @Heritage  Ad ···
If you're concerned about election fraud and want your representatives to investigate and prosecute anyone who seeks to undermine our elections, please click below to join other concerned citizens by completing our National Survey on Election Fraud now! >>

## How concerned are you that <u>voter fraud</u> has impacted a previous election or could impact a future election?

○ **Extremely concerned**
○ **Somewhat concerned**
○ **Not at all concerned**
○ **Not Sure/ No opinion**

Take the survey »

From heritage.org

○ 122    ⇄ 84    ♡ 226    ᕫ 136K    🔖   ⬆

**Pat1776** ✓ @Matka1776 · Jul 12    •••
The truth was already uncovered in MI:

> **Patrick Byrne** ✓ @PatrickByrne · Feb 10
> THE DAM HAS BROKEN: PROSECUTOR ACCUSES DOMINION CEO OF LYING
>
> Listen to this leaked audio of 46 seconds. Explanation below.
>
> ...
> Show more
>
> **Stefanie Lambert** Host
>
> **MI Prosecutor Lucido: Dominion CEO John Poulos committed PERJURY!**
>
> 49K tuned in · Feb 9 · 0:46
>
> ▶ Play recording

○ 3    ⇄ 89    ♡ 284    ᕫ 8.8K    🔖   ⬆

🇺🇸🇺🇸**RedPill**🇺🇸🇺🇸 ✓ @AvanteSearch · Jul 12    •••
The key take-away- "All these deficiencies make Dominion voting systems illegal to use in Colorado elections." - but will CO be forced to remove

them?

💬 4          ↻ 22          ♡ 169          ▫ 4.9K          🔖 ⬆

 **Tod** ✔ @TodRevolution · Jul 12          ...
Same with all machines coming from ES&S.  The machines have to go.

1) Hand Counting process fight in South Dakota.


Hand Counting process fight in South Dakota

From rumble.com

💬 2          ↻ 33          ♡ 126          ▫ 4.4K          🔖 ⬆

 **Li'l Orwell - redeemed ghost** @LilOrwell1984 · Jul 12          ...
Who would've thunk it ? Allegedly ¯\_(ツ)_/¯



💬 10          ↻ 227          ♡ 546          ▫ 8.7K          🔖 ⬆

 **George Hatt** ✔ @gohatt · Jul 12          ...
No more DOMINION COMPUTERS!

NO more DOMINION COMPUTERS.

VOTER ID
PAPER BALLOTS
SAME-DAY VOTING

💬 3          🔁 38          ♡ 217          📊 2.7K          🔖  ↑

 **Tigerfan62🇺🇸NO DM's🚫No Crypto,No Porn.** ✔ @tmobley052 · Jul 12 •••
Dominion voting machines should be banned in all 50 states. Voter ID,
proof of citizenship, hand counted paper ballots with a back up counter.
Trust nothing . I truly hope citizens will report any thing they see and
monitor the drop boxes which should not be legal.

💬 2          🔁 51          ♡ 173          📊 2.5K          🔖  ↑

 **Michael Hustus** 🇺🇸 @HustusMichael · Jul 12          •••
That time Democrats in both House & Senate warned the country of the
dangers of Dominion Voting Machines.



---

 **Michael Hustus** 🇺🇸 @HustusMichael · Jun 24, 2021
Replying to @Charlen60403930 @BigLance111 and 7 others
Here it is

Kamala Harris and other leading Democrats testifying about how easy it
is to commit fraud using Dominion voting machines....
Show more

**ELECTION SECURITY**
**SEN. KAMALA HARRIS**
D-California
C-SPAN3
1:15
June 21, 201
Tuesday

💬 4          🔁 53          ♡ 86          📊 2.4K          🔖  ↑

---

 **Cyber Hunter** ✔ @Gene_SD · Jul 12          •••
Here is a breakdown of the states that use Dominion Voting Systems'
machines (Notice Anything):

Arizona: Dominion's machines are used in Maricopa County, which includes
Phoenix and the surrounding areas.
California: Dominion's machines are used in several counties, including Los
Show more

Show more

| ○ 8 | ⟲ 41 | ♡ 63 | ᕼ 2.2K | | ⬒ ⬆ |

**FancyNancy**🇺🇸 ✓ @SagesMonya · Jul 12
We all knew. Dens only can win by cheating. Stay frosty

| ○ 2 | ⟲ 5 | ♡ 73 | ᕼ 3.4K | | ⬒ ⬆ |

**DailyNoah.com** ✓ @DailyNoahNews                                    Ad ···
🔥 Big question! Should Trump sign a voter ID law?

✅ TAP to take the poll! SHARE for others!
Vote Here: trump.typeform.com/to/wOw5BltD



From typeform.com

| ○ 545 | ⟲ 589 | ♡ 7K | ᕼ 2.4M | | ⬒ ⬆ |

**JustAmerican** ✓ @JustFaithinaz · Jul 12                         ···
This is how they turned Colorado.  THEY HAVE BEEN CHEATING FOR
YEARS

| ○ 2 | ⟲ 9 | ♡ 83 | ᕼ 2.3K | | ⬒ ⬆ |

**River over troubled bridges** ✓ @JulietRedbird · Jul 12           ···
It would be a real shame if someone were to disrupt internet service and
jam all WiFi around point stations... Well, I guess that wouldn't have any
impact at all if things are on the up and up.

| ○ 6 | ⟲ 20 | ♡ 71 | ᕼ 3.2K | | ⬒ ⬆ |



**Sacred 🟥Valley 🟥Podcast** ✅ @CreteTara · Jul 12 ···
Is it big though? We've all been watching the proof of the stolen election for
4 years now yet nothing has changed.

💬 1　　　🔁 4　　　♡ 36　　　📊 1.2K　　　🔖 ⬆️



**Attention Disorder** ✅ @atndisorde38643 · Jul 12 ···
Then technically speaking, the hash# should change every time the file is
changed but with an inability to audit, you'd never be able to tell.

💬　　　🔁 2　　　♡ 10　　　📊 1K　　　🔖 ⬆️



**B Husker** ✅ @blittle47 · Jul 12 ···
Sadly, there are 10s of thousands of affidavits around the country just like
this. The courts ignore all of them and claim standing. Until we fix the
courts, you could have people write a million affidavits, and it will not
matter.

💬　　　🔁　　　♡ 11　　　📊 174　　　🔖 ⬆️



**hotStepper** ✅ @ChuteShoot · Jul 12 ···
The only reason machines would be designed this way is to facilitate
cheating.

💬　　　🔁 5　　　♡ 20　　　📊 641　　　🔖 ⬆️

**Wireman** ✅ @The_Wireman · Jul 12 ···
Why trust some computers with the sanctity of our elections?
Baffling.



💬    ↻ 5    ♡ 35    📊 1.9K    🔖 ↥

**Venitta Ricci Ferguson** ✔ @venitta · Jul 12    ···
Now what? More truth yet each truth revealed is met with indifference
refusing righteous consequence

💬    ↻ 3    ♡ 13    📊 509    🔖 ↥

**Eric D. Jarman** ✔ @EDJMrSanMan · Jul 12    ···
Sounds to me like dominion voting machines are appliances with a back
plane of server types and are internet edge nodes that connect back to the
home network in Serbia.

💬    ↻ 3    ♡ 10    📊 456    🔖 ↥

**Rupertgumpert96** ✔ @rupertgumpert · Jul 12    ···
They will try to steal the election again. Vote. Don't believe it's in the bag.

💬 1    ↻ 6    ♡ 20    📊 517    🔖 ↥

**Roger w** ✔ @Prov1_31233 · Jul 12    ···
No machines should be used for National or State elections, hand ballots
only.

If those machines used were illegal who is going after the companies?

💬    ↻ 6    ♡ 21    📊 558    🔖 ↥

**Hoodies Mom** ✔ @MomHoodies · Jul 12    ···
We've known this since 2020 in large part due to your telegram group MJ.
You've help many of us open our eyes and connect to a community where
we can share this information.

I hope that this situation will gain traction and we'll finally have some
justice.

💬    ↻ 6    ♡ 42    📊 2K    🔖 ↥

**Shadyblues117** ✔ @xDarklingx · Jul 12    ···
We knew this a long time ago but I guess either people forgot or didn't care
the first time they saw it. We have only ourselves to blame for all of this.

💬 1    ↻ 3    ♡ 11    📊 398    🔖 ↥

**Valerie G** ✔ @ValerieGoldst17 · Jul 12    ···
That is exactly what they did the last time too. Even a kid can program it to
do that.

💬    ↻    ♡ 3    📊 453    🔖 ↥



𝐶𝑜𝑛𝑠𝑒𝑟𝑣𝑎𝑡𝑖𝑣𝑒🦋𝐷𝑖𝑣𝑎™ ✔ @1776Diva · Jul 12    ···
@LauraLoomer

@TuckerCarlson
@dbongino
@RitaCosby
@deneenborelli
@tomborelli
@DineshDSouza

💬          ↻ 1          ♡ 8          📊 319          🔖  ↑

**Wee Volunteer** ✔ @WeeVolunteer · Jul 12          ···
Well then, let's not use Dominion Voting Machines

💬          ↻          ♡ 1          📊 272          🔖  ↑

**IcanAmer**🇺🇸 ✔ @IcanAmer_MAGA · Jul 12          ···
• • • • • •

💬          ↻          ♡ 1          📊 274          🔖  ↑

**Walts_Place** ✔ @Revwwthompson · 18h          ···
Dominion needs to be out of the voting. Period!!!

💬          ↻          ♡ 1          📊 21          🔖  ↑

**MikkyCanada** ✔ @H6Mikky · Jul 12          ···
WAKE UP OEOPLE

💬          ↻          ♡ 1          📊 105          🔖  ↑

**Tom Fabian** ✔ @TomFabian17 · Jul 12          ···
Old news....

💬          ↻          ♡ 2          📊 551          🔖  ↑

 **Epoch Times—Southern California** ✔ 📰 @EpochSoCal          Ad ···
The California Supreme Court ruled 7–0 that police cannot detain people
simply for avoiding contact.



# California Supreme Court:
## Police Cannot Detain
# Based on Evasive Behavior
Find Out More

From theepochtimes.com

💬 315    🔁 1K    🤍 4.5K    📊 6.7M    🔖    ⬆️

**Nicky Lucky** ✓ @N1ckyLucky · Jul 12    •••
We're using a Windows operating system for our elections😭😭😭

💬    🔁    🤍 3    📊 532    🔖    ⬆️

**Komrade** ✓ @SirKomrade · 14h    •••
@Timcast @philthatremains

💬    🔁    🤍    📊 9    🔖    ⬆️

**AceyAC** ✓ @ACCibock · Jul 12    •••
@MikeLindellpage

💬    🔁    🤍    📊 367    🔖    ⬆️

**Francisco de Miranda** ✓ @Ernestonewage · Jul 12    •••
MJ ... it is new for you? It's happening from 2006 bro ..!!

9:48    Any similarity with reality depicted in this material is purely coincidental, and the content is produced solely for recreational and fictional purposes. The views expressed in this material are personal opinions and are protected under the right of free speech.

💬    🔁 3    🤍 6    📊 325    🔖    ⬆️

**Spazcrypto** ✓ @OnE1HuManitY · Jul 12    •••
Nothing is going to ever become of this.

💬    🔁    🤍 2    📊 637    🔖    ⬆️

**The Guy** ✓ @RyanDay99 · Jul 12    •••
@elon

278

**Don Yoder** ✔ @Yoder12Don · Jul 12
It'll be better when they finally get convicted

💬    🔁 2    ♡ 7    📊 520    🔖  ⬆️

**Conservative Caveman** ✔ @ChiefPatriot70 · Jul 12
Will it matter? I would say doubtful

💬    🔁    ♡ 4    📊 915    🔖  ⬆️

**YORGOZAM** @free2bnetwirx · Jul 12
This is SUCH OLD NEWS!  Anyone watch 2000 Mules???

💬 1    🔁 1    ♡ 6    📊 353    🔖  ⬆️

**Robert H** ✔ @a_mericandragon · Jul 12
Do different states have different laws regarding this specific topic? Is this
a state by state kind of situation? Meaning…if this is illegal in Colorado…
would this be illegal California? Probably should find out.

💬    🔁 1    ♡ 1    📊 120    🔖  ⬆️

**Dan F. Stokka** ✔ @Sportacut · Jul 12
Soros in the making, this is unfolding beautifully epiQ.

💬 1    🔁    ♡ 3    📊 331    🔖  ⬆️

**YY** 🇺🇸🟠🟤🙏 ✔ @Yibbieyo11 · Jul 12
Better late than never I suppose but maddening af.

💬    🔁    ♡ 2    📊 469    🔖  ⬆️

**Mattx15** ✔ @Mattx15x · Jul 12
😡😡😡😡😡😡😡😡😡

💬    🔁    ♡ 1    📊 80    🔖  ⬆️

**Captain Mike** ✔ @TheCaptain320 · Jul 12
Yep – I knew this years ago .

💬    🔁    ♡ 3    📊 143    🔖  ⬆️

**Queer Majority** ✔ @QueerMajority                                    Ad ···
"The @innocence Project states that at least 375 wrongful convictions have
been overturned in the United States using DNA evidence." -
@CJFerguson1111

queermajority.com
The Messy Truths About False Rape Allegations — Qu
The online kangaroo court of public opinion is where
due process and women's safety go to die.

💬 5        🔁 14        ♡ 64        ıılı 160K        🔖 ᐩ

**JosephJS** 🇺🇸 ✓ @JosephJS777 · Jul 12                ···
I can't even… Paper ballots. Hand counting. I'll volunteer.

💬        🔁        ♡ 2        ıılı 95        🔖 ᐩ

**Bill Campbell** ✓ @trador58 · Jul 12                ···
I'm in Mesa County. Although 2020 went our way in Mesa, the tests Tina
performed were clearly showing problems with Dominion. We need to
sanction them before November, so we can show what happens when you
steal a landslide. This one will be so much bigger! I would love to see
Show more

💬        🔁 1        ♡ 1        ıılı 95        🔖 ᐩ

**Mashman** ✓ @Mashman78748 · 22h                ···
If they can connect to the internet, who and where are they connecting to?

I suspect that might become public later this month!

💬        🔁        ♡        ıılı 21        🔖 ᐩ

**BrownsFan** ✓ @TrumpWasRite · Jul 12                ···
All this proof and nothing will change. In November they'll be rolling these
easily corrupted, dumpster fires right back out hand the Dems another
election

💬        🔁        ♡ 4        ıılı 110        🔖 ᐩ

**Rene Aensland** 🇺🇸 ✓ @MyHeavener · Jul 13                ···
Is there a different way to opt in to vote?

💬        🔁        ♡        ıılı 46        🔖 ᐩ

**Jacob Smith** ✓ @XrealJacobSmith · Jul 12                ···
It could even be bigger

For 2024, just some questions here. NOTE: In order to understand this
you're required to impersonate your iur enemy, the cheaters. You need to
wonder what they would do at each step given the opportunity, then apply
that knowledge against them:

- Will
Show more

💬        🔁 2        ♡ 6        ıılı 121        🔖 ᐩ

**John Ayres** ✓ @JohnAyr12294351 · Jul 13                ···

"Don't Worry About
The Election, Trump's
Not Gonna Win. I



Made F*cking Sure Of That!"

- Eric Coomer
Director of Strategy and Security
Dominion Voting Systems
(talking on an antifa conference call)

"We put together, I think, the most extensive and inclusive voter fraud organization in the history of American politics." Joe Biden. Corrupt and too mentally feeble to keep it quiet.

| ♡ | ↺ 1 | ♡ 3 | �archi 30 | 🔖 ↥ |

**PaulPaulfusion** ✔ @PaulPaulfusion · Jul 12  ···
Get rid of them or lose the Republic !

| ♡ | ↺ 3 | ♡ 6 | �archi 358 | 🔖 ↥ |

**J (Froebel-Parker)** ✔ @Froebel · Jul 12  ···
@LWV @RNCVoteProtect

| ♡ | ↺ | ♡ 1 | �archi 337 | 🔖 ↥ |

**Texans for Abbott** ✔ @AbbottCampaign      Ad ···
Biden's ongoing lawsuits to BLOCK Texas from enforcing the laws should enrage every American! Help us send a LOUD message 👇



DO YOU AGREE TEXAS CAN ENFORCE BORDER SECURITY LAWS?



SEND A MESSAGE TO OPEN BORDER DEMOCRATS  ABBOTT

From winred.com

○ 30          ↻ 60          ♡ 289          ᴵᵢₗ 83K          ☐  ⎘

**Robert C.** ✓ @bobjrfarm1 · Jul 13                              ···
Two different arguments. There should be a way to find the truth by forcing
release of all research on these machines.

○              ↻              ♡ 1          ᴵᵢₗ 34          ☐  ⎘

**Tudahl Family Kathleen& Duane \*\*\*** ✓ @tudahl55 · 23h      ···
This is crazy stuff!! Stop the steal of our elections!!

○              ↻              ♡              ᴵᵢₗ 14          ☐  ⎘

**Mega MAGA WebDiva playing with 🔥 running** ✓ @OlyWebDi · Jul 12 ···
She's back! Go, Tina, go!!

○              ↻              ♡              ᴵᵢₗ 83          ☐  ⎘

**Libs-R-Tards** ✓ @PurpleK9000 · Jul 12                        ···
Too little, and WAY To LATE!!!!!!!!!

○              ↻              ♡ 1          ᴵᵢₗ 198          ☐  ⎘

**CorNpopSR.** ✓ @JacaDullBoy1983 · 22h                        ···
#America this is big..

○              ↻              ♡              ᴵᵢₗ 12          ☐  ⎘

**Darren Pelan** ✓ @crocpelan · Jul 13                          ···
Wake up America, get out and vote

○              ↻              ♡              ᴵᵢₗ 29          ☐  ⎘

**Person Here** @PersonHere26624 · Jul 12                       ···
Everyone already knows this. This isn't the issue. The issue is there are no
judges or prosecutors with any balls to do anything about it.

○              ↻ 1          ♡ 14          ᴵᵢₗ 308          ☐  ⎘

**White Coat Waste Project** ▌🗑 ✓ @WhiteCoatWaste      Ad ···
WCW Investigation: we've obtained disturbing new video & evidence of
wasteful government spending on dog & puppy tests. Contact Congress to
join the fight!

Obtained via investigation by



From whitecoatwaste.org

💬 159     🔁 738     ♡ 1K     📊 818K     🔖  ⬆️

---

 **JoeM** 😎 @General_JoeM · Jul 12     •••
That was revealed years ago in Congressional hearings

💬 1     🔁 2     ♡ 27     📊 894     🔖  ⬆️

---

 **Christoph Engelhardt** 🇺🇸 🍎=😀 @ChristophE55272 · Jul 12     •••
Corrupt Democrats and corrupt Democratic judges obviously don't care.
And corrupt RINO judges don't want Antifa to firebomb their houses. We've
known about the vulnerabilities of these machines for years, but corrupt
election lawyer, Marc Elias, just loves them.

💬 1     🔁 6     ♡ 19     📊 543     🔖  ⬆️

---

 **DDG43** @DDG43USN · Jul 12     •••



2:02

○ Annette Davis Jackson
   Republican

💬      ⟲ 4      ♡ 3      �III 99      🔖 ⬆

**Marlow62** @Marlow3456 · Jul 12                    ···



💬      ⟲ 2      ♡ 4      �III 34      🔖 ⬆

**Random normie, I am too old for this.** @amwick2 · Jul 12    ···
annnnnnnnd that is what we use in GA, where I vote.

💬      ⟲      ♡      �III 19      🔖 ⬆

**theFOX** @the512FOX · Jul 12                    ···
So how did dominion win the lawsuit?

💬      ⟲      ♡ 3      �III 19      🔖 ⬆

**JP** @ninja2k3 · Jul 12                    ···
@ScottPresler york county uses dominion just sayin

💬      ⟲      ♡ 2      �III 32      🔖 ⬆

**Random normie, I am too old for this.** @amwick2 · Jul 12    ···
Never trusted them.. Never.

💬      ⟲      ♡      �III 15      🔖 ⬆

**Pappy Granruth** @pappygranruth04 · Jul 12
NOW WHAT

♡ 1    ᶦᶦᶦ 24

**♥ Charda ♥** @CharlPier · Jul 12
Let's pray this attorney does not disappear. 🙏

♡ 2    ᶦᶦᶦ 17

**Texans for Abbott** ✓ @AbbottCampaign    Ad ···
Biden's ongoing lawsuits to BLOCK Texas from enforcing the laws should enrage every American! Help us send a LOUD message 👇



DO YOU AGREE TEXAS CAN ENFORCE BORDER SECURITY LAWS?

**TAKE THE POLL**

SEND A MESSAGE TO OPEN BORDER DEMOCRATS   **ABBOTT**

From winred.com

💬 30    ⟲ 60    ♡ 289    ᶦᶦᶦ 83K

**Jack Jernigan** @JackJernigan1 · Jul 12
Great. They are modern enough to connect to the internet. If needed.

♡ 2    ᶦᶦᶦ 31

**Thought Críminal** @Aether_Craft · Jul 12
Haven't we known this for years? It's just the people who are supposed to investigate these crimes are the ones who perpetuated them.

♡ 2    ᶦᶦᶦ 97

**Rocky 7777777** @Rocky_7777777 · Jul 12

Rocky_↑↑↑↑↑↑ @Rocky_↑↑↑↑↑↑ · Jul 12
@realMikeLindell @CarolineWren @KariLake

🗨  ↻  ♡ 1  �_____ 73  🔖 ⬆

**William Barnard** @William00075961 · Jul 12
I knew that 😄

🗨  ↻  ♡ 2  _____ 29  🔖 ⬆

**mike** @retributionsoon · Jul 12
Treason

🗨  ↻  ♡ 2  _____ 14  🔖 ⬆

**Minuteman76** @nicknam02636181 · Jul 12
@GregAbbott_TX @KenPaxtonTX @DanPatrick #txlege

The #txlege has maneuvered TX into the spot where the state can and will be stolen electorally. The statistics demonstrate that across multiple counties. Are you prepared UP FRONT to defend TX from what you know is occurring?

🗨  ↻ 4  ♡ 9  _____ 259  🔖 ⬆

**American Summer** @AmericanSummer4 · Jul 12
Interesting. I thought it was well know...here's Fulton County's Richard Barron talking about techs remotely accessing machines to fix issues in 2018.

> **American Summer** @AmericanSummer4 · Jul 17, 2021
> Techs had remote access and helped fix problems with machines in Fulton County according to Richard Barron #GAaudit #azaudit #ElectionIntegrity #electionaudit x.com/AmericanSummer...

🗨 2  ↻ 4  ♡ 10  _____ 249  🔖 ⬆

**Roger Redacted** 💬 @AltPublishNow · Jul 12
Lawyers should be able to make bank suing dominion. So why aren't they?

🗨  ↻  ♡ 2  _____ 15  🔖 ⬆

**Bryant Poland Sr** @bryant_poland13 · Jul 12
I am sure the judge will throw it out for lack of evidence! 🙁

🗨 2  ↻ 1  ♡ 9  _____ 325  🔖 ⬆

**John Blutarski** @JimBeam96584868 · Jul 12
I think I see where "the plan" might be going.......Dominion getting 'outlawed' right before the election. No other method other than hand counting paper ballots at that point. Ability to rig severely curtailed....especially foreign electronic interference. 🤔 Panic.

🗨 1  ↻ 3  ♡ 9  _____ 216  🔖 ⬆

 **White Coat Waste Project** 🏳️🗳️ ✅ @WhiteCoatWaste    Ad  •••

WCW Investigation: we've obtained disturbing new video & evidence of wasteful government spending on dog & puppy tests. Contact Congress to join the fight!



Obtained via investigation by
White Coat Waste Project (WCW)

...y white coats

at the University of
Pennsylvania.

0:42 | Contact Congress to Join the Fight!

WHITE COAT
WASTE
PROJECT

From whitecoatwaste.org

💬 159          ↻ 738          ♡ 1K          ﯼ 818K          🔖 ⬆️

 **Btowen81** @btowen81 · Jul 12                                      •••
Aaaand nothing will happen

💬 1          ↻          ♡ 9          ﯼ 872          🔖 ⬆️

 **Sam Joslin** @JoslinSam · Jul 12                                   •••
Huuge!

💬          ↻          ♡ 4          ﯼ 68          🔖 ⬆️

 **Jeremy Murphy** @jeremypmurphy · Jul 12                          •••
Yes it is. From Nebraska we're watching it.

💬          ↻          ♡ 3          ﯼ 49          🔖 ⬆️

 **luccasleo7** @luccasleo75 · Jul 12                                •••
how quickly will this attorney be charged and jailed with something

💬          ↻          ♡ 8          ﯼ 109          🔖 ⬆️

oldiron @oldiron4me2003 · Jul 12



**Meet Eric Coomer**
**Dominion Voting Systems Chief**
**Officer of Strategy and Security**

Dominion's top engineer told Antifa activists:
"Don't worry about the election, Trump's not
gonna win. I made f**king sure of that!"
*Coomer actually re-posted the Antifa manifesto to*
*President Trump on his Facebook page.*

💬   🔁 2   ♡ 5   ▎ɪ▎ 42   🔖 ⬆



**Tim Reynolds** @TimReynolds1911 · Jul 12
A University of Michigan Professor live in the courtroom, showed how to change votes only using a pen.

💬   🔁   ♡ 5   ▎ɪ▎ 48   🔖 ⬆

**Jessica Horton** @JessieIsHereNow · Jul 12
@elonmusk

💬   🔁 1   ♡ 5   ▎ɪ▎ 164   🔖 ⬆

**Chris Mack** @chrimack · Jul 12
It's been like this since electronic voting machines first started being used. Closed source machines can do anything they like, and in any open and free country would not exist. At a very minimum, they need to be open-source and audit-able by anyone.

💬   🔁 1   ♡ 4   ▎ɪ▎ 161   🔖 ⬆



**Dale** @Knuss182 · Jul 12
I'm 8n Colorado. Praying for saftey for Tina Peter's and her team. This is HUGE

💬   🔁   ♡   ▎ɪ▎ 65   🔖 ⬆

ThisIsMeIsThisU @AnManee67 · Jul 12
We have known this for 3 yrs

💬        ↻        ♡        ‖‖ 12        🔖  ⬆

Honest Elections Project Fund ✓ @HEP_Fund          Ad ···
We're looking for Americans who stand for secure voting practices to share
their thoughts on important aspects of voting integrity.

Will you take our Voter ID Poll now?

**We're looking for Americans who stand for secure voting practices to share their thoughts on important aspects of voting integrity.**

**Will you take our Voter ID Poll now?**

Take the short poll now »

From honestelectionsprojectfund.org

💬 15        ↻ 39        ♡ 128        ‖‖ 120K        🔖  ⬆

generationBip @generationBip · Jul 12          ···
The Fox-Dominion trial was a farce meant to give the public the impression
that Fox was wrong to accuse Dominion of cheating and stealing elections.
I doubt any money even changed hands

💬        ↻        ♡        ‖‖ 16        🔖  ⬆

wooop @horseisbro10576 · Jul 12          ···
SHOCKER

💬        ↻        ♡        ‖‖ 10        🔖  ⬆

Linda Tucker @LindaTu43720161 · Jul 12          ···
Conservatives know this, digging deeper enough under the rocks is really
difficult.  Thanks to this brave and persistent truth seeker.

💬 🔁 ♡ 📊 15 🔖 ⬆

**The Chad** @BrentsChad · Jul 12 ···
If this is true .. It's time to drop the Hammer ! Times a tickin

💬 🔁 ♡ 📊 12 🔖 ⬆

**Botsreverywhere** @botsrevery50446 · Jul 12 ···
So we have know. This for 3+ years and done exactly what about it

💬 🔁 ♡ 📊 66 🔖 ⬆

**Roger Thompson** @oldDiver_rt · Jul 12 ···
Well my pacemaker can connect as well..the connection is used to
download software updates which are needed for every election..New
races new candidates etc

💬 🔁 ♡ 1 📊 24 🔖 ⬆

**Admiral Byrd** @OPHighjump · Jul 12 ···
We need 1 day paper only voting

💬 🔁 ♡ 📊 96 🔖 ⬆

**Jan** @Jan47280831 · Jul 12 ···
And since no one's actually done anything about it expect the same thing
to happen this presidential election as the last one

💬 🔁 ♡ 1 📊 87 🔖 ⬆

**sheila** @stbarnett1 · Jul 12 ···
Now do California! Watch us turn RED!

💬 🔁 ♡ 1 📊 20 🔖 ⬆

**Ryan Lovins** @lovins_ryan · Jul 12 ···
We've known this for 4 years!

💬 🔁 ♡ 1 📊 17 🔖 ⬆

**Mountain States Legal Foundation** ✔ @MSLF Ad ···
Help! An elderly woman's home is being taken in Arizona over a $1,600 tax
bill.

Will you stand with her by signing our petition?



SIGN THE PETITION TO HELP
THIS WOMAN SAVE HER HOME »

Stand with Christine »

From mslegal.org

💬 86          🔁 279          ♡ 748          ᴧ 954K          🔖  ᐟ

**Katie** @saintmarsk · Jul 12                                      •••
Fix it Colorado!!

💬              🔁              ♡ 1              ᴧ 58              🔖  ᐟ

**Eric Morrison** @EMorrison2021 · 15h                            •••
😡🙏

💬              🔁              ♡              ᴧ 2              🔖  ᐟ

**Kim Ed** @Kimislearning2 · 17h                                  •••
It's about time this finally came out!

💬              🔁              ♡              ᴧ 3              🔖  ᐟ

**PatriotBob** @PatriotBobGe03 · Jul 12                           •••
I dont expect it to matter

💬              🔁              ♡ 1              ᴧ 23              🔖  ᐟ

**Jerry L** @jlew52x · Jul 12                                      •••
Nothing will happen and the beat goes on and on...

💬              🔁              ♡ 1              ᴧ 126             🔖  ᐟ

**Debbie Butler** @ibcruella · Jul 12                             •••
More evidence! Tina Peters  case could bring Dominion down.

💬              🔁              ♡              ᴧ 15              🔖  ᐟ

**Patrick Riker** @priker32 · Jul 12                              •••
Show me a maga lawyer that hasn't lied. I'll wait.

💬              🔁              ♡ 1              ᴧ 6              🔖  ᐟ



**Matt Phillips** @mip2982 · Jul 12
Is it 2020 again? Old news.

💬          ↻          ♡ 1          📊 46          🔖    ↥

**G0dfr0y** @g0dfr0y · Jul 12

.@xai More info on the rigging operation...

💬          ↻          ♡ 1          📊 46          🔖    ↥

**Silver is Freedom** @Freedomfiat · Jul 12



GIF

💬          ↻          ♡ 1          📊 47          🔖    ↥


**Coalition to Preserve American Jobs** ✔ @PreserveJobs      Ad ···
Urgent Action Needed: The IRS's delays are pushing small businesses to
the brink. Join the chorus of voices imploring the IRS to do its job.



"While the IRS won't
process one of my
constituents' ERC claim,



they are processing an intent to levy taxes on his business."

**Rep. Brad Wenstrup** (R–OH)

Voices Rise Against the IRS  *ERC Saves* JOBS  Voic

From ercsavesjobs.com

💬 1   🔁 2   ♡ 11   📊 384K   🔖   ⬆️

**Pete TX** @XALONETX · Jul 12   ···
🎆🎆🎆

We've known this for years.

💬   🔁   ♡ 3   📊 63   🔖   ⬆️

**C Huff** @CHuff7654321 · Jul 12   ···
Also with the top election machine seller in the US—ES&S let's not forget they lied regarding having "zero machines connected to the Internet"when many were found to be connected💥

💬   🔁 1   ♡ 1   📊 51   🔖   ⬆️

**Cap'n Sam** 🎣 🚢 @SamFish04986338 · Jul 12   ···
@elonmusk

💬   🔁   ♡ 1   📊 19   🔖   ⬆️

**Raul grump** @RaulGrump · Jul 12   ···
😡😡😡😡

💬   🔁   ♡ 1   📊 10   🔖   ⬆️

**Michael Frey** @Michael57421494 · Jul 12   ···
Or any election

💬   🔁   ♡ 1   📊 21   🔖   ⬆️

**Lady Chef BJ** @BettyLake17 · Jul 12   ···
😈😡😈

💬   🔁   ♡ 2   📊 47   🔖   ⬆️

**SanSunSucker SanSunSucker** @sansonsucker · Jul 12   ···
I've been saying this for years now. DOMINION HAS TO GO. Most of the world counts votes by hand. It's time we did! You REPUBLICANS BETTER GET TOUGHER Make it happen or lose my support

GET TOUGHER. Make it happen or lose my support

○    �similar    ♡ 2    ᵢₗᵢ 16    ◫    ↥

**Sharla Raider** ⓕ 🎗 ☠ @Sharla62997527 · Jul 12    ···
Ok.  We knew that four years ago.

○    �similar    ♡ 2    ᵢₗᵢ 95    ◫    ↥

**Truth** 🛡 **Social** @RedPill4America · Jul 12    ···
@realMikeLindell

○    �similar    ♡    ᵢₗᵢ 16    ◫    ↥

**DumpTrump** @owlmacarpenter · Jul 13    ···
We shall see if that true

○    �similar    ♡    ᵢₗᵢ 5    ◫    ↥

**Mitchell Everman** @MitchellEverman · Jul 12    ···
Trump lost

○    �similar    ♡ 1    ᵢₗᵢ 22    ◫    ↥

**SJ** @SJCO64 · Jul 12    ···
@charliekirk11

○    �similar    ♡    ᵢₗᵢ 25    ◫    ↥

**Hoke** ✓ @TheDavidCHoke    Ad ···
Please vote for Mirov on the 2024 Killer Nashville Readers' Choice Ballot.
I'm about halfway down the page. Thank you!

killernashville.forms-db.com/view.php?id=25...

# Vote for my book for the Killer Nashville Readers' Choice Award

### Mirov- David C. Hoke

Clay Stafford Presents...

www.KillerNashville.com    Killer Nashville



**Vote now!**

From forms-db.com

💬 2          🔁 6          ♡ 43          📊 465K          🔖 ⬆️

**Chuck Roast** @ChuckRo15976335 · Jul 12                    ···
Dominion, corrupt...???

I would've never guessed...

💬          🔁          ♡ 1          📊 148          🔖 ⬆️

**gambiny** @VinceRock10 · Jul 12                    ···
wtf... 🤬 👆

💬          🔁          ♡          📊 12          🔖 ⬆️

**britt** @britbrittbrit · Jul 12                    ···
@mrddmia @TomFitton @RepBoebert

💬          🔁          ♡          📊 4          🔖 ⬆️

**Mathew Abides** @DudeManMateo · Jul 13                    ···
'Kari Lake' level unlocked.

💬          🔁          ♡          📊 36          🔖 ⬆️

**AJ** @ajobean · Jul 12                    ···
This isn't new news.

💬          🔁          ♡          📊 6          🔖 ⬆️

**B** @AcerockJrod · Jul 12                    ···
This should be headline news and be stopped.

💬          🔁          ♡ 1          📊 10          🔖 ⬆️

**Michael** @Get_Smart_086 · 21h                    ···
I lost half a million $ because of the stolen election. It would have changed
my life.

💬          🔁          ♡          📊 7          🔖 ⬆️

**Rose Knight** @evilwoman1979 · Jul 12                    ···
Rudy Giuliani was ordered to pay two poll workers millions of dollars for
exposing them. There is video evidence but with a woke judge, what did we
expect? He is appealing and should win. He just needs to keep appealing.

💬 1          🔁 1          ♡ 3          📊 41          🔖 ⬆️

**Point Report** ✓ @realPointReport                    Ad ···
Andrew Bailey Advocates for Stopping Radical Transgender Procedures for

Children on Real America's Voice — On a recent episode of Just the News No Noise aired on Real America's Voice, Missouri Attorney General Andrew Bailey voiced... continue reading at pointreport.org/article/andrew...



○ 18    ↻ 99    ♡ 316    ᵢₗᵢ 590K    🔖 ⬆

**Honored General** @GeneralHonored · Jul 12    •••



My God, I'm just noticing this..

1) "Dominion," a word that is the opposite of freedom and democracy.

2) "Changing the way people vote" - Literally changing votes.

3) The actual logo is a "red" vote going in, and coming out a "blue vote."

They put it right in our faces!



○ 1    ↻ 15    ♡ 19    ᵢₗᵢ 345    🔖 ⬆



**Joshua Wild** @JoshuaWild603 · Jul 12    •••
This affidavit is hearsay also, it is not evidence.

○ 1    ↻    ♡ 1    ᵢₗᵢ 36    🔖 ⬆

**Djedi MᴀstƩr** @Djedi_Master · Jul 12
@elonmusk might be interested in reading this

💬 1   ↻   ♡ 1   ᕼᒷ 135   🔖 ⬆

**Kimberley Broadsword** @KimBroadsword · 22h
This should affect the lawsuits they filed against the people who spoke out about them right?

💬   ↻   ♡   ᕼᒷ 5   🔖 ⬆

**me** @twittybittybaby · 21h

🧑 🙏 🙏 **Mike** 🙏 🙏 ✔ @92michael · Nov 7, 2020
Don't believe the media when they tell you that voting can't be hacked. Download this pdf and read for your self:
media.defcon.org/DEF%20CON%2027...



**1. Commercially-Available Voting System Hardware Used in the U.S. Remains Vulnerable to Attack**

As in previous years, the 2019 Voting Village presented a range of currently marketed touch-screen direct recording electronic (DRE), optical scan paper voting devices, paper ballot marking devices (BMDs) and electronic poll books (e-poll books). While the Village did not attempt to (and could not) provide samples of every piece of voting equipment currently in use throughout the United States, every piece of equipment at the Village is currently certified for use in at least one U.S. jurisdiction.

And once again, Voting Village participants were able to find new ways, or replicate previously published methods, of compromising every one of the devices in the room in ways that could alter stored vote tallies, change ballots displayed to voters, or alter the internal software that controls the machines. In many cases, the DEF CON participants tested equipment they had no prior knowledge of or experience with, and worked with any tools they could find - in a challenging setting with far fewer resources (and far less time) than a professional lab (or even the most casual attacker) would typically have. In most cases, vulnerabilities could be exploited under election conditions surreptitiously by means of exposed external interfaces accessible to voters or precinct poll workers (or to any other individual with brief physical access to the machines). In particular, many vectors for so called "Advanced Persistent Threat (APT)" attacks continue to be found or replicated. This means that an attack that could compromise an entire jurisdiction could be injected in any of multiple places during the lifetime of the system.

As disturbing as this outcome is, we note that it is at this point an unsurprising result. It is well known that current voting systems, like any hardware and software running on conventional general-purpose platforms can be compromised in practice. However, it is notable - and especially disappointing - that many of the specific vulnerabilities reported over a decade earlier (in the California and Ohio studies, for example), are still present in these systems today.*

* See California Top-to-Bottom Review (2007). "Top-to-Bottom Review," California Secretary of State. Accessed September 26, 2019. https://www.sos.ca.gov/elections/ovsta/frequently-requested-information/top-bottom-review/ and
Ohio EVEREST (2007). McDaniel, Patrick, Matt Blaze, Giovanni Vigna, Joseph Lorenzo Hall, Laura Quilter, Kevin Butler, William Enck, et al. "EVEREST: Evaluation and Validation of Election- Related Equipment, Standards, and Testing." Secretary of State of Ohio, December 7, 2007. https://www.eac.gov/assets/1/28/EVEREST.pdf

Page 4

💬   ↻   ♡   ᕼᒷ 10   🔖 ⬆

**StonkTrades** @stonktrades · 14h
DOMINION SPECIAL THEY CALL IT. COMING TO AN ELECTION NEAR YOU

💬   ↻   ♡   ᕼᒷ 4   🔖 ⬆

**Jason Buster** @paladinsruse · Jul 12
@idontexistTore already proved this YEARS ago and nobody listened. Why

@idontexistrore already proved this YEARS ago and nobody listened. Why not post her affidavit?

♡ 5     ⟲     ♡ 2     ᴵⁱˡ 39     🔖 ⬆

**Mindoftheabyss** @mindoftheabyss · Jul 13     •••
We all know they "can" go online. But under EAC, during voting, they cannot be online. These devices are rigorously tested before and after voting. Any violation you could sue dominion to the ground. All lawsuits previously were thrown out or they won almost if not all suits.

♡ 1     ⟲     ♡     ᴵⁱˡ 6     🔖 ⬆

**TheHexBaron** @thehexbaron · Jul 12     •••
Great so who's going to jail ? No one.

♡     ⟲     ♡     ᴵⁱˡ 90     🔖 ⬆

**Jennifer** @Jenniferwolfcr1 · Jul 12     •••
My county in Colorado hand count ours twice. The whole county is only 800 ppl though.

♡     ⟲     ♡     ᴵⁱˡ 45     🔖 ⬆

# Exhibit 8

| | |
|---|---|
| **From:** | owner-dominion@lists.susmangodfrey.com on behalf of AttorneyLambert |
| **To:** | Dominion ListserveSusmanGodfrey; OANService; Chris Kachouroff; Marc S. Casarino; Davida Brook |
| **Subject:** | Fw: Request for a copy of John Poulos Deposition Transcript |
| **Date:** | Friday, July 12, 2024 2:05:21 PM |

EXTERNAL Email

Dear Ms. Brooks,

I've received a request for the transcript of Mr. Poulos testimony at deposition.

Please advise if Dominion objects to my firm complying with the request to provide the transcript to the Michigan State Representative.

Thank you,

Stefanie

Sent from Proton Mail for iOS


---------- Forwarded message ----------
From: James DeSana <JDeSana@house.mi.gov>
Date: On Fri, Jul 12, 2024 at 2:54 PM
Subject: Fw: Request for a copy of John Poulos Deposition Transcript
To: attorneylambert@protonmail.com <attorneylambert@protonmail.com>
Cc:
July 11th, 2024

Subject: Request for a copy of John Poulos Deposition Transcript

Dear Attorney Lambert,

It is my understanding that you have recently deposed Dominion CEO John Poulos in connection with the Dominion Patrick Byrne lawsuit. As you may be aware. I joined other Michigan State Representatives and a former State Senator in filing a criminal complaint against John Poulos with several law enforcement authorities in Michigan. The criminal complaint alleges that Mr. Poulos committed 15 counts of perjury during his sworn testimony before the Michigan Senate on December 15th, 2020. We anticipate that the content of the referenced deposition would likely yield additional evidence relating to our complaint. In this light, could you please provide me and my colleagues with a copy of the transcript from your deposition of John Poulos at your earliest convenience.

Kind regards,

James DeSana
State Representative
29th District

Carleton, Michigan
734-626-1166 (M)

Get Outlook for iOS

---

This e-mail contains communication that may constitute attorney/client privileged information
and/or attorney work product. If you received this message in error, please notify the sender
and delete it immediately.

To unsubscribe from the DOMINION list, click here

# Exhibit 9

| | |
|---|---|
| **From:** | owner-dominion@lists.susmangodfrey.com on behalf of Jonathan Ross |
| **To:** | AttorneyLambert |
| **Cc:** | AttorneyLambert; Dominion ListserveSusmanGodfrey; OANService; Chris Kachouroff; Marc S. Casarino; Davida Brook |
| **Subject:** | Re: Request for a copy of John Poulos Deposition Transcript |
| **Date:** | Friday, July 12, 2024 3:03:09 PM |

EXTERNAL Email

All discovery material is to be used solely for this litigation. You are not allowed to disseminate it, either under the protective order or the other orders of this Court. Regardless, for now we designate the entire transcript as confidential. Please confirm you will not disseminate it.

Jonathan J. Ross
Partner & General Counsel
Susman Godfrey LLP
1000 Louisiana Suite 5100
Houston, Texas 77002
713-653-7813

> On Jul 12, 2024, at 2:57 PM, AttorneyLambert
> <AttorneyLambert@protonmail.com> wrote:
>
>
>
> EXTERNAL Email
>
> Please advise by close of business if Dominion intends to review the transcript and de-designate it as confidential pursuant to the protective order.
>
>
> Sent from Proton Mail for iOS
>
>
> On Fri, Jul 12, 2024 at 3:50 PM, Jonathan Ross <JROSS@SusmanGodfrey.com> wrote:
>
> > There is no confusion. Please confirm you will abide by the Protective Order which prohibits sharing any discovery in this case with outside parties.
> >
> > Jonathan J. Ross
> > Partner & General Counsel
> > Susman Godfrey LLP
> > 1000 Louisiana Suite 5100
> > Houston, Texas 77002
> > 713-653-7813

On Jul 12, 2024, at 2:46 PM, AttorneyLambert
<AttorneyLambert@protonmail.com> wrote:

EXTERNAL Email

I believe there is some confusion. This is not a person
requesting the transcript in his individual capacity. This
is a request by the government. The Michigan
legislature.

Please review the deposition transcript and advise which
portions Dominion objects to providing to the Michigan
legislature.

I will follow the protective order.

Stefanie

Sent from Proton Mail for iOS

On Fri, Jul 12, 2024 at 3:41 PM, Jonathan Ross
<JROSS@SusmanGodfrey.com> wrote:

> Please confirm you will not share. Thanks.
>
> Jonathan J. Ross
> Partner & General Counsel
> Susman Godfrey LLP
> 1000 Louisiana Suite 5100
> Houston, Texas 77002
> 713-653-7813
>
>> On Jul 12, 2024, at 2:15 PM,
>> Jonathan Ross
>> <JROSS@susmangodfrey.com>
>> wrote:
>>
>>
>> We object to your sharing any
>> discovery material in this
>> litigation with anyone, as both
>> the protective order and the
>> Court's other orders prohibit.

That includes Mr, Poulos's deposition transcript and video and any other transcripts/videos.

Jonathan J. Ross
Partner & General Counsel
Susman Godfrey LLP
1000 Louisiana Suite 5100
Houston, Texas 77002
713-653-7813

On Jul 12, 2024, at 2:06 PM, AttorneyLambert <00000164acadf1fb-dmarc-request@lists.susmangodfrey.com> wrote:

EXTERNAL Email

Dear Ms. Brooks,

I've received a request for the transcript of Mr. Poulos testimony at deposition.

Please advise if Dominion objects to my firm complying with the request to provide the transcript to the Michigan State Representative.

Thank you,

Stefanie

Sent from Proton Mail for iOS

----------

Forwarded
message

----------

From:
James
DeSana
<[JDeSana@house.mi.gov](mailto:JDeSana@house.mi.gov)>
Date:
On Fri,
Jul 12,
2024 at
2:54
PM
Subject:
Fw:
Request
for a
copy
of John
Poulos
Deposition
Transcript
To:
attorneylambert@protonmail.com
<[attorneylambert@protonmail.com](mailto:attorneylambert@protonmail.com)>
Cc:
July
11th,
2024

Subject:
Request
for a
copy
of John
Poulos
Deposition
Transcript

Dear
Attorney
Lambert,

It is
my
understanding

that
you
have
recently
deposed
Dominion
CEO
John
Poulos
in
connection
with
the
Dominion
Patrick
Byrne
lawsuit.
As you
may be
aware.
I
joined
other
Michigan
State
Representatives
and a
former
State
Senator
in
filing a
criminal
complaint
against
John
Poulos
with
several
law
enforcement
authorities
in
Michigan.
The
criminal complaint
alleges
that
Mr.
Poulos

committed 15 counts of perjury during his sworn testimony before the Michigan Senate on December 15th, 2020. We anticipate that the content of the referenced deposition would likely yield additional evidence relating to our complaint. In this light, could you please provide me and my colleagues with a copy of the transcript from your deposition of John Poulos at your

earliest
convenience.

Kind regards,

James
DeSana
State
Representative
29th
District
Carleton,
Michigan
734-
626-
1166
(M)

Get
Outlook
for iOS

---

This e-mail
contains
communication that
may constitute
attorney/client
privileged
information and/or
attorney work
product. If you
received this
message in error,
please notify the
sender and delete it
immediately.

To unsubscribe
from the
DOMINION list,
click here

---

This e-mail contains communication that may constitute attorney/client privileged information

and/or attorney work product. If you received this message in error, please notify the sender and delete it immediately.

To unsubscribe from the DOMINION list, click here

# Exhibit 10

# AG Nessel Rejects Call from Conspiracist Legislators for Renewed 2020 Election Investigation

michigan.gov/ag/news/press-releases/2024/04/25/ag-nessel-rejects-call-from-conspiracist-legislators-for-renewed-2020-election-investigation



**LANSING** – Today, Michigan Attorney General Dana Nessel declined a request from Michigan State Representatives Neil Friske (PDF), James DeSana (PDF), and Steve Carra (PDF) to open a criminal investigation into Dominion Voting Systems CEO John Poulos' testimony before the Senate Oversight Committee in December 2020.

In her response, the Attorney General cited a comprehensive review of relevant materials by her department, including Poulos' recorded testimony, the Senate Oversight Committee's report on the November 2020 Election, individual letters from the state Representatives, former State Senator Patrick Colbeck's letter to the Michigan State Police, and alleged evidence against Poulos.

"Based on a thorough review of all relevant material, it is clear a criminal investigation is not warranted, and I respectfully decline your request," said Nessel in the letter.

Nessel also addressed the evidence provided by the three representatives, noting that the documents appeared to be a "carefully curated snippet" of over 2,000 documents publicly shared by criminal defendant Stefanie Lambert in violation of a protective order.

The Attorney General also referenced conclusions drawn by the Senate Oversight Committee in its own report (PDF) that dismissed claims of election fraud in Antrim County as "indefensible" and highlighted an appalling "willful ignorance" of public figures who continue to perpetrate such speculation.

Nessel reminded the representatives of the Senate Oversight Committee's findings related to actions similar to sending these letters to the Department of Attorney General: that such actions were found by the Committee "to be misleading and irresponsible, diminishing the overall credibility of those asserting this conclusion."

###


MI Newswire Attorney General Press Release Election

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION, | ) ) ) ) | No. 1:21-cv-02131-CJN-MAU |
| *Plaintiffs*, | ) ) | Hon. |
| v. | ) ) | Magistrate Judge Moxila A. Upadhyaya |
| PATRICK BYRNE, | ) ) | |
| *Defendant*. | ) ) ) | |

**[PROPOSED] ORDER**

Upon consideration of Plaintiffs' Motion to Supplement Dominion's Currently Pending Motion to Disqualify and Motion to Enforce Protective and Status Quo Orders (the "Motion"), Defendant's response, Plaintiff's reply, and oral argument, if any, and deliberation given thereto, the Motion is hereby **GRANTED**.

(1) The Court **GRANTS** Dominion's Emergency Motion for Protective Relief and to Disqualify Counsel (Dkt. 75), and **ENTERS** Dominion's Proposed Order (Dkt. 75-24), attached hereto as **Attachment 1**.

(2) The Court **GRANTS** Dominion's Motion to Enforce the Protective and Status Quo Orders (Dkt. 108), and **ENTERS** Dominion's Proposed Order (Dkt. 108-24), attached hereto as **Attachment 2**.

(3) Further, Stefanie Lambert and Patrick Byrne are hereby **ORDERED** to provide in sworn affidavits to the Court within **seven (7)** days of this order:

- The identity of every person who has or is presently assisting, working with, or helping Ms. Lambert or Mr. Byrne in defense of Mr. Byrne in *US Dominion Inc. et al. v. Patrick Byrne*;

- The identity of every person Ms. Lambert or Mr. Byrne knows accessed Dominion Discovery Material and the date, manner, and means by which they accessed the documents (excluding the Court and counsel for other Defendants and Plaintiffs in the cases specified in Paragraph 1 of the Status Quo Order), and an accounting of which documents they accessed;

- The date when John Case began assisting, working with, or helping Ms. Lambert or Mr. Byrne in *US Dominion Inc. et al. v. Patrick Byrne*, and the date on which Mr. Case stopped assisting, if any;

- The date of any fee agreement between Mr. Byrne and Mr. Case and the scope of representation or, if no such agreement exists, the date on which Mr. Case and Mr. Byrne understand that a lawyer/client relationship formed, if so;

- A complete and accurate list of all Dominion-produced documents and information Mr. Case reviewed and the method and date of access; and

- An accounting attesting (i) to whom Mr. Case disclosed documents or information protected by the Protective Order (including in court filings in any cases outside of this case); (ii) to whom and when he disclosed such information; (iii) every occasion on which he did so; and (iv) for each such instance, what specifically was disclosed.

(4) The Court further hereby **ORDERS** that John Case must abide by the Protective Order and Status Quo to the same extent as Ms. Lambert.

**IT IS SO ORDERED**.

SIGNED this _____ day of _____, 2024

_____
THE HONORABLE MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE

# Attachment 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION, | ) ) ) ) | Civil Action No. 1:21-cv-02131 (CJN) (MAU) |
| Plaintiffs, | ) ) | |
| v. | ) ) | Judge Carl J. Nichols |
| PATRICK BYRNE, | ) ) | Magistrate Judge Moxila A. Upadhyaya |
| Defendant. | ) ) ) | **JURY TRIAL DEMANDED** |

## [PROPOSED] ORDER GRANTING PLAINTIFFS' EMERGENCY MOTION FOR PROTECTIVE RELIEF AND TO DISQUALIFY COUNSEL

Upon consideration of Plaintiffs' Emergency Motion for Protective Relief and to Disqualify Counsel and deliberation given thereto, the Motion is hereby GRANTED.

Stefanie Lambert and Patrick Byrne are hereby prohibited from accessing any Dominion discovery materials and shall return or destroy any such materials in their possession. Lambert and Byrne are further ORDERED to each provide a full accounting, in the form of sworn affidavits to be provided no later than 5 pm on March 19, 2024, providing:

- The date of any fee agreement between Lambert and Byrne and the scope of representation or, if no such agreement exists, the date on which Lambert and Byrne understand that a lawyer/client relationship;

- A complete and accurate list of all Dominion-produced documents and information Byrne reviewed and the method and date of access;

- An accounting from Byrne's outside vendor showing what documents Byrne and or Lambert accessed, on what date, and whether they were downloaded; as well as

any other data the vendor indicates may be helpful to Dominion's or this Court's efforts to understand the breach;

- A complete and accurate list of all Dominion-produced documents and information Lambert received and the method and date of access;

- An account of every step Lambert, Byrne's prior counsel from the McGlinchey firm, has already undertaken or that is underway to determine the scope of the breach and to ensure it is not continuing; and

- An accounting attesting (i) to whom Lambert and/or Byrne leaked, released, or otherwise disclosed documents or information protected by the Protective Order (including in court filings in any cases outside of this case); (ii) how and when they provided it; (iii) every occasion on which they did so; and (iv) for each such instance, what specifically was leaked, released, or otherwise disclosed.

For the reasons set forth in Dominion's motion, it is further ORDERED that Stefanie Lambert is disqualified as counsel in this case.

IT IS SO ORDERED.

SIGNED this _____ day of _____, 2024

_____
THE HONORABLE CARL J. NICHOLS
UNITED STATES DISTRICT JUDGE


_____
THE HONORABLE MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE

# Attachment 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION, | ) ) ) ) | Civil Action No. 1:21-cv-02131-CJN-MAU |
| Plaintiffs, | ) ) | |
| v. | ) ) | Magistrate Judge Moxila A. Upadhyaya |
| PATRICK BYRNE, | ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) ) | |

**[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION TO ENFORCE THE
PROTECTIVE AND STATUS QUO ORDERS**

Upon consideration of Plaintiffs' Motion to Enforce the Protective and Status Quo Orders and deliberation given thereto, the Motion is hereby GRANTED.

Stefanie Lambert is hereby ordered to object to the subpoena issued to her in *People v. Tina Peters*, Case No. 2022-CR-371 (Colo. Dist. Ct), and to refrain from disseminating or producing any documents subject thereto. Ms. Lambert is further ordered to confirm in writing to Plaintiffs on or before 12:00 PM ET on July 8, 2024, that she has objected to the subpoena and has not produced any documents subject thereto and to provide a copy of her objection. Stefanie Lambert and Patrick Byrne are further ordered to preserve all documents relating to (1) the subpoena issued to Stefanie Lambert in *People v. Tina Peter*s, and (2) the subpoena issued in the same matter on John Poulos, including but not limited to its service by Yehuda Miller.

IT IS SO ORDERED.

SIGNED this _____ day of _____, 2024

_____
THE HONORABLE MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE