**UNITED STATES DISTRICT COURT FOR THE**

**DISTRICT OF COLUMBIA**

_____

U.S. DOMINION, INC., et al.,


*Plaintiffs / Counter-Defendants*,


                       Civil Action 1:21-cv-02131(CJN/MAU)

v.

PATRICK BYRNE,


*Defendant*.


_____


DEFENDANT, DR. BYRNE'S OBJECTION TO MEMORANDUM OPINION AND ORDER
OF MAGISTRATE JUDGE DISQUALIFYING COUNSEL AND IMPOSING ADDITIONAL
REQUIREMENTS REGARDING DISCOVERY MATERIAL

     Defendant, Dr. Patrick Byrne, pursuant to Federal Rules of Civil Procedure and Local Civil

Rule (LCvR) 72.2, files this Objection to the Magistrate's Order (Docket No. 125) and

Memorandum Opinion (Docket No. 126), granting Plaintiff Dominion's motion to disqualify Dr.

1

Byrne's counsel, Stefanie Lambert, and their motion for enforcement of the protective order, and further relief.

INTRODUCTION

This is a defamation suit by Dominion against Dr. Byrne, claiming damages in excess of 1.6 billion dollars. Without holding hearings on multiple additional filings by Dominion seeking to enforce the protective order and disqualify Dr. Byrne's counsel, and without ever holding hearings on or even ruling on Dr. Byrne's multiple motions to lift the protective order, the Magistrate granted Dominion's motion to enforce the protective order and to disqualify Dr. Byrne's attorney, a licensed Michigan attorney in good standing status.[1]

Dr. Byrne is entitled to counsel of his choice, and he has indicated previously to this Court that he wants Ms. Lambert to represent him in the instant lawsuit seeking 1.6 billion dollars. His counsel is highly qualified and an expert on election fraud cases and has represented Michigan, and Pennsylvania clients. As a result, she is intimately familiar with expert opinions findings, and election laws. Undersigned previously worked as a prosecutor prior to private practice. She is uniquely qualified with criminal law, civil law, and election law. Curiously, after months of lingering on the Magistrate's docket (Dominion's motion to disqualify was filed in March), the Magistrate disqualified Dr. Byrne's counsel during two crucial weeks in the discovery proceedings and just before two critical depositions that are critical to Dr. Byrne's affirmative defense and at the same time corroborate Dominion's criminal activity. It is important for the Court to understand that this is not an ordinary civil case in which the parties have only a mere commercial interest in the outcome. Dominion provides arguably the most important critical elements to the national

---

[1] The magistrate referred to Dominion's supplemental filings (Docket Nos. 118 and 122 (Dominion's Second and Third Supplemental Briefs in Support of Motion to Disqualify (Docket No. 75), and while she did not accept them for filing, the facts in her Memorandum Opinion are based on Dominion's allegations therein, and no hearings were held on those supplemental filings.

security and integrity of the Republic of the United States – the means and methods by which votes in national elections are cast and counted.  Moreover, the truth of the extent of Dominion's corruption and criminal activity directly correlates with Dr. Byrne's defense in Dominion's defamation action – the truth.

The "discovery materials" that have been provided outside of the litigation were provided to law enforcement. Law enforcement has appropriately referred portions of investigation and cooperated with official congressional inquiries and investigations.  Further, undersigned followed the protective order as it identifies parameters for office support throughout this litigation. And those individuals used the materials in the course of Dr. Byrne's defense. Further, Dr. Byrne's counsel specifically verified she was following the protective order.  She even confirmed to the Magistrate and Dominion despite Dominion's communicating ex parte with the Court in an attempt to further skew the Magistrate's opinion.

Ms. Lambert followed the protective order even though Dominion has misrepresented the facts to the Magistrate, who was willingly misled because she failed to hold additional hearings to consider Dr. Byrne's arguments, and she further refused to rule on Dr. Byrne's motions to lift the protective order.  The Magistrate referenced interviews that were given by Ms. Lambert, in which it was alleged she leaked information and thereby violated the protective order and the status quo order.  However, a review of these interviews reveal that in each case, Ms. Lambert refused to disclose information and declared that she had to abide by the Magistrate's orders (which included the protective order and the status quo order entered after the March 18 hearing).

Finally, and most importantly, Dr. Byrne has not just imagined or dreamt up that there is criminal activity being engaged in by Dominion warranting intervention by law enforcement and

Congressional inquiry, especially where there is an upcoming presidential election in which Dominion's voting systems are likely to play a significant role.

Since the March 2024 "emergency" motion filed by Dominion, many facts have been uncovered of which the Magistrate was unaware and regarding which she was misled concerning Dr. Byrne and his counsel's actions. Indeed, there are numerous ongoing law enforcement investigations and a congressional inquiry into Dominion's actions and prior testimony starting as early as January 2020.

On July 17, 2024, Arizona Senate Majority Leader Sonny Borrelli sent a letter to Ms. Lambert referencing the criminal complaint filed by a member of the Michigan Legislature along with investigations initiated by "several law enforcement authorities" concerning 15 counts of alleged perjury committed by John Poulos, Dominion's CEO, during his sworn testimony before the Michigan Legislature on December 15, 2020. (**ATTACHMENT 1**, July 17, 2024 Letter from Arizona Senate Majority Leader Sonny Borrelli). The letter requested the transcript of the deposition of Poulos to further inquire into these criminal allegations. The next day, on July 18, 2024, Senato Theresa Manzella sent a letter to Ms. Lambert also asking for the deposition testimony and also referencing the criminal investigations that had been initiated against Poulos. (**ATTACHMENT 2**, July 18, 2024 Letter from Senator Manzella of Montana). On July 16, 2024, James Desana of the Michigan House of Representatives sent a letter to Ms. Lambert requesting the deposition transcript of Poulos and referencing the criminal investigations that were ongoing since the December 2020 legislative testimony of Mr. Poulos was called into question. (**ATTACHMENT 3**, July 16, 2024 Letter from Michigan State Representative Desana). Undersigned has not provided the requested information to the government officials, and had indicated to the magistrate that she intended to file a motion to address the matter. Dr. Byrne has

no conflict of interest and desires truth and transparency, but undersigned was removed before she could make the request to this Court to comply with the numerous requests from government officials.

It is beyond doubt, and even Dominion admits, that the integrity of elections depends on the security of the implements used to conduct them.  As Dominion also admits, their voting machines and the software and hardware used in them are vulnerable.

Further, numerous indictments were just filed related to multiple Smartmatic employees and developers. Smartmatic people still work for Dominion.  On August 8, 2024, JUAN ANDRES DONATO BAUTISTA, ROGER ALEJANDRO PINATE MARTINEZ, JORGE MIGUEL VASQUEZ, and ELIE MORENO were indicted by the United States Department of Justice. (**ATTACHMENT 4**, DOJ Press Release and Smartmatic Indictment).  In 2005, Smartmatic purchased Sequoia. In 2009 Dominion purchased Sequoia.  There is little difference given the overlap and involvement by and between Dominion and Smartmatic given the number of former Smartmatic employees now working for Dominion.

Dominion has at least 23 employees from Smartmatic and Sequoia including but not limited to  Paul Chavez-Casanova (Software Developer III), Cheryl Holmes (Customer Relations Manager- FL, LA & MI),  Rakhi Mediratta Chaudhari (Software Product Specialist), David Moreno (Director of Product Strategy), Sheree Noell (Director of Sales), Eric Coomer (Director of Product Strategy), Waldeep Singh (Executive Vice President of Sales). (**ATTACHMENT 5**, Smartmatic Involvement). These are just a few examples of the valid criminal investigation and ties to Dominion.

There has been no violation of the court's order because the information is not covered by the order, and even if it was, there is an exception which would allow the disclosure to law

enforcement and the public due to the exigent public safety and national security issues involved; and there is a further public interest exception which even the judiciary has a constitutional obligation to acknowledge. Generally, and without restricting a court's discretion, protective orders enjoy a presumption against modification. However, there is a long-established common-law right of public access to documents that are of extreme public concern and interest. This "tradition of accessibility" is significant where the public interest in future elections is concerned. The right to public access is part of the rules itself, because the presumption is all litigation and discovery is subject to public view and access.

Indeed, state law enforcement interests override the interests of a protective order in civil cases. In Texas, for example, communications are required to be made available and open for public inquiry by and between state officials, voting machine companies, and their employees and contractors. See, e.g., Texas Election Code § 122.004. This provision specifically states that written letters, emails, or other communications, including those **confidential by other law**, **between public officials and voting systems vendors are not confidential and are considered public information.** This demonstrates that the state's interests in transparency and lawful conducting of elections override any deemed confidentiality in communications by and between voting systems vendors like Dominion and other entities and individuals, including governmental and quasi-governmental authorities. The information Dominion seeks to protect include such communications, and thus, they cannot be hidden from disclosure to legitimate state inquiries and investigations. This is all done to protect the right of citizens to free and fair elections and to ensure that their votes will be counted, counted properly, and not diluted by fraud or manipulation.

These public interests, the public's safety, and national security override any claimed attempts to withhold or conceal information of foreign involvement in national elections (including

the involvement of foreign governments like Serbia and China).  Dominion's involvement with these foreign entities runs deep.  Dominion's lead engineer, Goran Obradovic, is the president of the Canadian-Serbian business association (CANSEE) and a leader in developing a "digital" silk road/ one belt one road initiative with China.  (**ATTACHMENT 6**, Goran Obradovic Background).

Goran was to be deposed this week by Ms. Lambert.  That deposition has been canceled on US soil the day after Lambert deposed CEO John Poulos. It had become abundantly clear Obradovic should not set foot on US soil to answer Lambert's questions under oath due to the exposure of the involvement of Obradovic and these foreign nationals who are also meddling in elections with the help of Dominion.  *Id.*

In 2013, a Serbian national, Darjan Karabasevic, was indicted for Conspiracy to Commit Trade Secret Theft, Theft of Trade Secrets, and Wire Fraud.  (**ATTACHMENT 10**).  Karabasevic was recruited by a Beijing company to commit corporate espionage and current and past Dominion employees are currently being investigated as it relates to Karabasevic.  Karabasevic returned to Serbia following his release from prison and lived 15 minutes from the Dominion Headquarters. He now works as a professor and is directly connected to CANSEE.  Again, this information was known only by Dr. Byrne and Ms. Lambert, and these were questions to be asked of the additional deponents.

Election Source (a Dominion sub-contractor in Michigan) was also scheduled to be deposed the day after Dominion succeeded in removing Lambert.  Lambert was co-counsel on the Antrim County case in Michigan, in which it was determined by experts formerly from the NSA, and National Sandia Labs that the election had been "subverted" by Dominion's subcontractor,

Election Source and that the report provided by the state expert, Haldeman, failed to disclose security breaches. (**ATTACHMENT 7**, Combined Antrim County Reports).

Ms. Lambert was familiar with these defects, the connections between Election Source and Dominion, and Dominion's involvement there as well.  The expert reports submitted in the Antrim County case demonstrated that Dominion's sub-contractor subverted the election.   Attorney Lambert knew this information, knew the extent of the involvement of all of these entities and government actors in the overall scheme in which Dominion is involved.  Dominion canceled the depositions days after she deposed Dominion's CEO, who removed his clipped microphone and stormed out of the deposition without answering questions all questions from Lambert.  Lambert was in the process of preparing a request to the magistrate to address his contempt and failure to participate fully in the deposition.

There has to be a means by which the government can be made aware of, discover, and prevent the criminal infiltration of national election systems.  This is both a matter of national security and public safety and should not be taken lightly.  Otherwise, Dominion just keeps filing lawsuits, procuring "protective" orders to hide this information, and using these litigation tactics in an offensive manner to silence all criticism and hide all the damning information and simultaneously silence the media.

If this were not the case, cases like those involving Agent Orange, tobacco companies, and Teflon would never have been exposed to the public.  See *In re "Agent Orange" Product Liability Litigation*, 821 F.2d 139, 145-46 (2d Cir.), *cert. denied*, 484 U.S. 953, 108 S. Ct. 344, 98 L. Ed. 2d 370 (1987), *aff'g* 104 F.R.D. 559, 567 (E.D.N.Y. 1985) and *Pub. Citizen v. Liggett Grp., Inc.*, 858 F.2d 775, 789 (1st Cir. 1988) (explaining the right of private citizens to access discovery material relevant to public health and safety).  The issues concerning the integrity of national

elections, and those statements made by Dr. Byrne that are allegedly defamatory, are now actually corroborated by the information contained in Dominion's information.  The fact that the Magistrate was misled and not able to dedicate time to hear and rule on Dr. Byrne's motion to lift the protective order, ruled on an "emergency" motion to disqualify filed in March on August 13, 2024, just before two critical depositions were to be taken by Dr. Byrne's counsel, the foremost leading expert advocate and attorney in the country, who has all the knowledge concerning Dominion's voting machine systems, their flaws, and the collusion and involvement by foreign nationals and foreign elements directly in federal elections, is telling.  Dominion's only way to prevent the truth from being further exposed was to remove Dr. Byrne's counsel.  The fact that this was done on the eve of the most important depositions and discovery events for his case is an indictment of the Magistrate's willingness to bend to the will of Dominion.

Disqualification of counsel occurs only rarely, and only where there is a conflict of interest by and between the attorney subject to disqualification and his or her client.  Dominion filed its "emergency" motion to disqualify counsel on March 15, 2024.  However, not only has the Magistrate been misled by the facts and allegations made by Dominion in its Motion and Supplemental Filings, but the fact is that multiple law enforcement investigations and congressional inquiries have been ongoing regarding Dominion since well before this case.   These investigations concern matters of national security concerning our nation's elections and election systems infrastructure, and the threats posed to them by foreign actors, which has been known by Dominion.

Without any further hearings to determine the extent to which the Magistrate was misled by the events that have unfolded with respect to these investigations and inquiries involving Dominion, and despite the involvement with Dominion of other actors and entities, some of whom have already been indicted, the Magistrate granted Dominion's "emergency" motion on August 13, 2024 (Docket No. 125) and issued a memorandum opinion. (Docket No. 126).

Dr. Byrne files this objection seeking to reverse the Magistrate's ruling, which deprives him of his counsel of choice, seeks to invade attorney-client privilege, and further restricts his First Amendment rights, and his constitutional rights defend himself in light of the restrictions placed on the access to discovery materials and information which necessarily aids in his defense.

As the Magistrate noted at the beginning of her 62-page opinion, disqualification is rarely granted and warranted only in cases where there is a conflict of interest. And, ultimately, the case cited as justifying the Magistrate's recommendation WAS IN FACT REVERSED and the attorney reinstated. See *Koller by and through Koller v. Richardson-Merrell, Inc.*, 737 F.2d 1038, 1056 (D.C. Cir. 1984), vacated on other grounds, *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424 (1985). There, the Court reiterated that "[t]he attorney is the client's choice" and "disqualification is wasteful and time-consuming." *Koller v. Richardson-Merrell*, 737 F.2d at 1056. And, the Court said that the only time counsel should be disqualified is "where there is…a serious question as to counsel's ability to act as a zealous and effective advocate for the client, see, e.g., *Groper v. Taff*, 717 F.2d 1415, 1418 (D.C. Cir. 1983); *Yablonski v. UMW*, 448 F.2d 1175, 1179 (D.C. Cir. 1971), or a substantial possibility of an unfair advantage to the current client because of counsel's prior representation of the opposing party, *cf. Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 501 F. Supp. 326, 329 (D.C. Cir. 1980), or prior responsibility as a government official, see *Kessenich v. Commodity Futures Trading Com.*, 221 U.S. App. D.C. 314, 684 F.2d 88, 97 (1982).

"A court should be conscious of its responsibility to preserve a reasonable balance between the need to ensure ethical conduct on the part of lawyers appearing before it and other social interests, which include the litigant's right to freely chosen counsel." *Woods v. Covington County Bank*, 537 F.2d 804, 810 (5th Cir. 1976).

None of the circumstances warranting disqualification exist here, as Dr. Byrne has repeatedly expressed who he wants as his counsel of choice and there is no prior representation by her of any of the opposing parties that would warrant disqualification. The fact that the Magistrate found no case in which disqualification was warranted under the circumstances demonstrates *de facto* that the Magistrate's decision was patently erroneous and must be reversed on the question of disqualification.

Rather than acknowledge that Dr. Byrne and Ms. Lambert had 14 days in which to file an objection and contest her opinion and onerous order, the Magistrate and Dominion have proceeded as if Dr. Byrne's fundamental rights to due process and fair litigation are non-existent. Since August 13, when the Magistrate entered her order (and before the 14 days had expired to file this objection), the Magistrate steamrolled this case over Dr. Byrne's rights knowing full well that she removed any legal representation. Among other things, the Magistrate requested dispositive and critical proceedings to be held,[2] issued onerous orders to compel Dr. Byrne (without counsel) to comply under impossible timelines; ordered him to disclose information that violates his rights to

---

[2]  On August 13, 2024, the same day the Magistrate issued her opinion and order, she placed a "Minute Order" on the record stating: "The Parties shall appear for a virtual discovery status hearing on **August 20, 2024** at 10:30 AM before Magistrate Judge Moxila A. Upadhyaya. **By August 16, 2024**, the Parties shall file one joint status report that lists the current remaining discovery disputes, the Parties' efforts to resolve them, and the order in which the Parties seek Court intervention to resolve the disputes. As part of this joint status report, the Parties shall update the Court on which if any disputes related to the Discovery Protocol they have resolved and which disputes remain. SO ORDERED. Signed by Magistrate Judge Moxila A. Upadhyaya on 08/13/2024. (lchk) (Entered: 08/13/2024)."

confidentiality and privilege with his attorneys and seeks to invade protected work product;[3] made

decisions regarding litigation and discovery that will be irreversible and prejudicial (all the while

Dr. Byrne's legal defense and representation are non-existent); colluded to inform (ex parte via

email) Dr. Byrne's prior counsel that certain proceedings are occurring (a severe ethical violation

in itself because these attorneys withdrew from representing Dr. Byrne and Dr. Byrne chose to

retain other counsel), see (**ATTACHMENT 8**, August 19, 2024 email sent at 4:55 p.m. directly

from the district court to Dr. Byrne's prior counsel informing them of the contents of the court's

August 13 minute order and of the "virtual discovery status conference" the next day at 10:30

a.m.), bent to the will of Dominion to rush through onerous requirements regarding handing of the

discovery material (Docket No. 128 (Notice of filing of order), made oral orders on the record

knowing full well that Dr. Byrne was not represented by counsel, and scheduled final resolutions

---

[3]  Among other things, the Magistrate's order required Dr. Byrne and undersigned to submit "sworn affidavits" by 5:00 p.m. Tuesday, August 20, 2024,detailing: "[t]he date of any fee agreement between Lambert and Byrne and the scope of representation or, if no such agreement exists, the date on which Lambert and Byrne understand that a lawyer/client relationship had formed; [a]an accounting from Byrne's outside vendor showing what documents Byrne and or Lambert accessed, on what date, and whether they were downloaded; [a] complete and accurate list of all Dominion-produced documents and information Lambert received and the method and date of access; [a]n account of every step Lambert has already undertaken or that is underway to determine the scope of the breach and to ensure it is not continuing; and [a]n accounting attesting (i) to whom Lambert and/or Byrne leaked, released, or otherwise disclosed documents or information protected by the Protective Order (including in court filings in any cases outside of this case); (ii) how and when they provided it; (iii) every occasion on which they did so; (iv) for each such instance, what specifically was leaked, released, or otherwise disclosed; and, if any of those individuals signed an Undertaking pursuant to the Protective Order. If so, Lambert and Byrne shall attach the Undertakings to their affidavits." The Magistrate also ordered Dr. Byrne and undersigned to "provide a detailed privilege log setting forth all sufficient detail of the communication to allow Dominion to assess the claim of privilege…to the extent Lambert or Byrne claim any of the material above is protected by the attorney-client privilege or work product doctrine." (Docket No. 125).

of discovery protocol (without Dr. Byrne's input or presence) to be completed by Friday, August 23.[4]

All of this has taken place despite the fact that Dr. Byrne advised the Magistrate on more than one occasion of his intention to exercise his rights to file an objection and specifically sought extensions, stays, and abeyance of these proceedings pending this Court's resolution thereof. (Docket No. 127, Motion for Extension of Time; Docket No. 129, Motion for Stay and Abey pending filing of Objection).

Finally, on August 23, 2024, the Magistrate entered another minute order:

Before the Court is Defendant Patrick Byrne's ECF No. 129 "Motion for an Immediate Abeyance and Stay of All Actions and Orders, or Entry of Orders, Pending Filing of his Objection within 14 Days of the Magistrate's August 13, 2024 Opinion and Order." The Court construes the Motion as a request from Defendant and his former counsel, Stefanie Junttila Lambert, to: 1) stay all proceedings in the five consolidated/coordinated cases pending his forthcoming objections to the Court's August 13, 2024 Order; and 2) stay the deadline for Ms. Lambert and Defendant to comply with part of the Courts Order at ECF No. 125 to submit affidavits by 5:00 PM on August 20, 2024.

The request to stay the entirety of this and/or all of the five consolidated/coordinated cases, which are currently in active discovery involving a number of other Parties, is DENIED. There is no basis to stay all proceedings in the consolidated cases in light of the Court's Order disqualifying Ms. Lambert from this case. In response to Defendant's alleged claimed hardship regarding the disqualification of Ms. Lambert, the Court notes that, not only is Defendant entitled to proceed pro se, he himself has previously identified at least one other "highly qualified" lawyer who is working with Defendant in this matter, *see* ECF No. 116 at 7. If Defendant wishes to have alternative counsel enter an appearance or seek pro hac vice admission, he remains free to do so.

The request to stay the deadline for Lambert and Byrne to submit their affidavits as required in ECF No. 125 pending Defendant's forthcoming objections to ECF Nos. 125 and 126 , however, is GRANTED to allow Defendant and/or Ms.

---

[4] After the August 20, 2024 "virtual discovery status hearing," held after the Magistrate disqualified Dr. Bryne's counsel with immediate effect, and thus when Dr. Byrne was ostensibly not being represented by counsel, the Magistrate ordered the "Parties to submit final Discovery Protocol Order incorporating [the] Court's oral rulings no later than August 23, 2024." Again, Dr. Byrne ostensibly had no counsel when these "oral rulings" were made on the record without him being present.

Lambert to pursue any objections to the District Court. Upon the District Court's resolution of any objections to the August 13, 2024 Order, the Court will consider Plaintiffs' proposal at ECF No. 128 . In the interim, however, the Court ORDERS that:

1. The Court shall retain jurisdiction over Lambert for purposes of ensuring her compliance with this and all other orders previously issued in this action, including the Status Quo Order (ECF No. 77 ), the Protective Order (ECF No. 79 ), and the Disqualification Order (ECF No. 125 );

2. With respect to all Dominion-produced documents contained in the repositories of ediscovery vendors iDiscovery Solutions and Innovative Driven, iDiscovery Solutions and Innovative Driven, those vendors shall continue not to allow any person access to such documents unless specifically authorized by this Court; and

3. Lambert and Byrne shall continue to "preserve all documents and communications relating to the issues raised by Dominion's [Motion for Protective Relief and to Disqualify Counsel], including but not limited to, the release of any Dominion Litigation Documents in this case to any other entity or individual," ECF No. 77[].

The Clerk of the Court is respectfully directed to mail a copy of this order to Defendant at his address of record. SO ORDERED. Signed by Magistrate Judge Moxila A. Upadhyaya on 08/23/2024. (lchk) (Entered: 08/23/2024).

This last minute order was not without Dominion's influence and involvement.  Indeed, knowing full well Dominion was without counsel and needed same to continue depositions, they purposefully interfered with Ms. Lambert's conducting of discovery on behalf of Dr. Byrne. Dominion interceded such that the Magistrate's order prevented Ms. Lambert from requesting a delay in the discovery through attending the follow-up call.  (**ATTACHMENT 9**, Email Correspondence from Dominion's Counsel Disrupting Discovery).

The Magistrate made much in her August 13, 2024, opinion out of the requirement that Dr. Byrne was required to file a motion to lift the protective order if he thought any of the discovery material subject to that order should be disclosed.  Dr. Byrne did in fact file such a motion, as acknowledged by the Magistrate, in April 2024, but that motion was never ruled on.  Magistrate's Opinion, p. 7, n. 5 ("Byrne filed a Motion to Lift Protective Order on April 18, 2024.").  In reality,

Dr. Byrne filed this motion under seal on *April 3, 2024* (much earlier than the Magistrate implies), but the motion was not accompanied with a request that it be sealed and so it was rendered moot by the Magistrate's subsequent request that such a motion accompany the Motion to Lift the Protective Order.  The motion was properly refiled on April 18).  In either case, as noted, despite Dominion's "emergency" filing in March and Dr. Byrne's filing two weeks later to Lift the Protective Order, *the Magistrate never ruled on* Dr. Byrne's Motion, deciding instead to go with Dominion's unilateral attacks.

Moreover, *another* renewed motion to lift the protective order was filed on July 26, 2024, which contained critical new and additional information concerning and with respect to Dominion's motion to disqualify counsel, and Dominion's efforts to suppress the information that has been provided to law enforcement and legislative elements.  (Docket No. 116, filed under seal, July 26, 2024).  This also was never ruled on by the Magistrate.

<u>BACKGROUND</u>

On March 15, 2024, Dominion filed a motion for protective relief and to disqualify Dr. Byrne's counsel.  (Docket No. 75).  The original protective order in this case was entered by the court on December 6, 2022.  (Protective Order in *U.S. Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation v. My Pillow, Inc., et al.*, Case No. 1:21-cv-00445, Document No. 152).  An amended version was later entered in this case on June 16, 2023, which amended only the parties to whom it was applicable and not the substance of the original order.  (*U.S. Dominion, et al. v. Byrne*, Case No. 1:21-cv-02131, Document No. 46).

Important perspective is required to orient the Court as to the evolution of Dominion's efforts to conceal its information from the public in this defamation suit.  Dominion had always advocated that all of its documents and information be treated as confidential, given the

confidential and proprietary nature of the voting systems and software at issue. In reciting the legal support for its protective order, Dominion has argued that a protective order may require that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way. Dominion further explained that it was seeking protection from disclosure of its confidential and proprietary information and that good cause existed for a protective order. Dominion argued that its consistent efforts to keep its information confidential supported a finding that the materials at issue are entitled to protection as trade secret and confidential commercial information.

On December 6, 2022, the Court entered a protective order on the basis "that certain information produced in discovery *would contain proprietary, commercially sensitive, and/or non-public information*." On June 8, 2023, the parties in the instant case filed a "joint motion" for protective order (Docket No. 45), and on June 16, 2023, the Court entered an "amended protective order" to bind the parties in this case (Docket No. 46).

The language of this protective order is virtually identical to the original protective order entered by the court, with the exception of the additional parties to which it applies. However, Dominion has claimed that "all" and "any" information is covered by this Court's order. With this enormous presumption in hand, Dominion has argued that any public disclosure is contrary to the order, and even in light of the official law enforcement investigations and congressional inquiries, it has continued to hide behind the narrow scope of the protective order.

Dominion had originally sought to protect only what it deemed as proprietary information, trade secrets, and commercially sensitive information. Dominion then surreptitiously sought a definition of "Discovery Material," to give the protective order sweeping and unconstitutional application; effectively turning an ordinary "proprietary information" protective order into a

16

"blanket" protective order restricting public access to any and all files and discovery in this litigation. Dr. Byrne's first counsel signed the consent to the protective order of June 2023, without knowing or understanding the extent of the corrupt and criminal evidence in the discovery.

Ultimately, despite the misnomer of "blanket" protective order, "Discovery Material" was defined and narrowed as only Confidential Discovery Material. Therefore, not all information produced by Dominion (even if marked Confidential (because every document is or was so marked upon Dominion's instruction)) fits into this category, nor does it warrant protection from public disclosure under the terms of the current protective order.

Furthermore, and more pertinent is the fact that the discovery contains information indicating criminal collusion and conspiracy with foreign nationals to create the means by which Dominion voting machines are vulnerable to manipulation from external sources, some of which have been directed and tasked by Dominion. Additionally, information has come to light that Dominion and its employees misled the election assistance commission (EAC) in presenting an uncertifiable election systems platform by "renaming" it, but not fixing the errors and problems that existed to ensure certification and, therefore, to insure that the 2020 election was secure.

Therefore, not only is this information not among that which Dominion originally sought to protect, but even if the court were to conclude it was so covered, an exception exists for disclosing criminal conduct and matters concerning public safety and the integrity of national interests. Here, especially, it is necessary for law enforcement and legislative elements to investigate these serious matters and to provide transparency to the American public in defense of the truth.

Dr. Byrne believes allowing Dominion to put the stamp of confidentiality, trade secret, non-public, or commercially sensitive on every single document produced in discovery is and

never has been warranted.  This is especially pertinent because the judiciary has a duty to ensure that the public's access to information concerning the conducting of national elections is robust and as transparent as possible.  Not only is there criminal activity afoot, but the right to vote is a fundamental right which must be protected in the light of coming elections.

Dominion's arguments are belied by the federal rules, the case law, and language of the actual order.  In terms of disclosure, there is a presumptive right of public access to discovery in all civil cases.  This is the premise from which one should begin.

The protective order applicable to the parties (Document No. 46), like the original order, even begins with and discusses a referenced defined term per the Federal Rules of Civil Procedure, and further orders, as follows:

> Under Rules 5.2 and 26(c) of the Federal Rules of Civil Procedure, this Order Governing the Production and Exchange of Confidential Information (the "Order"), will govern the handling of documents, testimony (in any form whether by affidavit, declaration, or deposition), exhibits, transcripts, written discovery requests, interrogatory responses, responses to requests for admission, responses to requests for documents, and any other information or material produced, given, or exchanged, including any information contained therein or derived therefrom ("Discovery Material"), by or among any Party or non-Party providing Discovery Material (each a "Producing Party") in the Litigation to the party receiving the Discovery Material ("Receiving Party").

Therefore, the order was already narrowed to "Confidential Information" in its reference to the defined term "Discovery Material" (written a with uppercase letters), to address the information to which it applies.  Further, "Confidential Discovery Material" and "Attorneys Eyes Only Material" is defined as material that consists of non-public customer information or information that is proprietary or otherwise commercially sensitive".  (Docket No. 46, pp. 4-5, ¶¶ 2-3) (emphasis supplied).  Further, the reference to "non-public" customer information is further narrowed by paragraph 3 as "Attorneys Eyes Only" information that is, "(i) nonpublic damages-related and financial information, including confidential pricing, customer, profit, sales, or other

18

financial information; (ii) confidential business, marketing, or strategic plans, including business, marketing, and technical information regarding the future provision of services; and (iii) confidential and commercially sensitive trade secrets or technical information." *Id.*, p. 5, ¶ 3.

Dominion even envisioned that there was additional information that might be subject to future protection, meaning that not all information Dominion produced would be covered. Particularly, for example, the protective order provides that if "source code is determined to be relevant and discoverable, the Parties will agree to terms and entry of a separate protective order for the source code before any is produced."

Upon Dominion's motion (Docket No. 75), and with only a two-day window to respond and appear before the Magistrate, a "Status Quo Order" was entered by the Magistrate. Ultimately, the Magistrate granted Dominion's "EMERGENCY" motion to disqualify counsel. The Magistrate's order entered further restrictions and conditions, including the following:

> [IT IS] FURTHER ORDERED that the requirements set forth in the Status Quo Order, ECF No. 77, at ¶¶ 1, 2, 4, 5, 6, 7 shall remain in effect through the resolution of this case, and it is,
>
> FURTHER ORDERED that Attorney Stefanie Lynn Junttila [Lambert] ("Lambert") and Byrne shall each provide a full accounting, in the form of sworn affidavits, by no later than August 20, 2024 at 5:00 p.m. EST, detailing:
>
> • The date of any fee agreement between Lambert and Byrne and the scope of representation or, if no such agreement exists, the date on which Lambert and Byrne understand that a lawyer/client relationship had formed;
>
> • An accounting from Byrne's outside vendor showing what documents Byrne and or Lambert accessed, on what date, and whether they were downloaded;
>
> • A complete and accurate list of all Dominion-produced documents and information Lambert received and the method and date of access;
>
> • An account of every step Lambert has already undertaken or that is underway to determine the scope of the breach and to ensure it is not continuing; and

• An accounting attesting (i) to whom Lambert and/or Byrne leaked, released, or otherwise disclosed documents or information protected by the Protective Order (including in court filings in any cases outside of this case); (ii) how and when they provided it; (iii) every occasion on which they did so; (iv) for each such instance, what specifically was leaked, released, or otherwise disclosed; and, if any of those individuals signed an Undertaking pursuant to the Protective Order. If so, Lambert and Byrne shall attach the Undertakings to their affidavits.

To the extent Lambert or Byrne claim any of the material above is protected by the attorney-client privilege or work product doctrine, Lambert shall provide a detailed privilege log setting forth all sufficient detail of the communication to allow Dominion to assess the claim of privilege. It is,

FURTHER ORDERED that to the extent Dominion wishes to propose any destruction protocol with respect to Lambert, it is ordered to do so by August 20, 2024, and it is,

FURTHER ORDERED that Lambert is hereby DISQUALIFIED as Counsel to Byrne in this matter effective immediately, and it is,

FURTHER ORDERED that Byrne shall notify the Court by September 13, 2024 whether he has retained new counsel or whether he intends to proceed pro se. If he obtains new counsel, that new counsel must enter their formal notice of appearance by September 13, 2024…. (Docket No. 125).

The Magistrate's opinion outlined reasons for disqualifying counsel.  The Magistrate's Opinion contains several assertions that are mistaken and about which the Magistrate was misled to conclude that Dr. Byrne's counsel should be disqualified.  (Docket No. 126).  The Magistrate begins by noting that the only question it was considering was "[1] whether Lambert violated court orders and rules, and if so, [2] whether she should be disqualified from this case."  *Id.*, p. 2.

### 1.  *There was a legitimate exception to allow disclosure to law enforcement that Dr. Byrne and his Counsel were Obligated to Report*

Protective orders, like contracts, are subject to general rules of interpretation. They are also subject to constitutional limitations and must also protect the sanctity of attorney-client confidences and privileges recognized at common law.  Protective orders can also not impede

legitimate law enforcement and congressional investigations, and they cannot also violate (or allow others to violate) individual constitutional rights.

The party seeking a protective order has the burden of showing that good cause exists for issuance of that order. It is equally apparent that the obverse also is true, i.e., if good cause is not shown, the discovery materials in question should not receive judicial protection and therefore would be open to the public for inspection. . . . Any other conclusion effectively would negate the good cause requirement of rule 26(c): Unless the public has a presumptive right of access to discovery materials, the party seeking to protect the materials would have no need for a judicial order since the public would not be allowed to examine the materials in any event." *Pub. Citizen v. Liggett Grp., Inc.*, 858 F.2d 775, 789 (1st Cir. 1988) (explaining the right of private citizens to access discovery material relevant to public health and safety). See also *In re "Agent Orange" Product Liability Litigation*, 821 F.2d 139, 145-46 (2d Cir.), *cert. denied*, 484 U.S. 953, 108 S. Ct. 344, 98 L. Ed. 2d 370 (1987), *aff'g* 104 F.R.D. 559, 567 (E.D.N.Y. 1985) (discovery material that is relevant to public health subject to disclosure). Rule 26(c)'s good cause requirement means that, "as a general proposition, pretrial discovery must take place in the public unless compelling reasons exist for denying the public access to the proceedings." *American Telephone & Telegraph Co. v. Grady*, 594 F.2d 594, 596 (7th Cir. 1978), *cert. denied*, 440 U.S. 971, 99 S. Ct. 1533, 59 L. Ed. 2d 787 (1979); *accord Wilk v. American Medical Ass'n*, 635 F.2d 1295, 1299 (7th Cir. 1980); *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 101 F.R.D. 34, 38-41 (C.D. Cal. 1984).

The interpretation begins with the language of the written agreement. Provisions that are clear and unambiguous must be given their plain and ordinary meaning. *Ross-Hime Designs, Inc v United States*, 109 Fed Cl 725, 733 (2013). The textual interpretation of an agreed protective

order is a legal question that begins with the "plain language" of the protective order.  *Moore v. Ford Motor*, 755 F.3d 802, 806 (5th Cir. 2014).  The plain meaning of a protective order's text controls, unless it is apparent that some other meaning was intended and mutually understood.

For example, parties can bargain for a protective order excluding certain specified content or they may include such provisions in their motion.  *Mynette Technologies, Inc v United States*, 163 Fed Cl 733, 751 (2022).  The parties' mutual intent, however, is the ultimate question, and if one party has expressed specified items in a protective order, and the other party has not, the protective order itself will not be deemed to include additional items.  A protective order will not be construed to satisfy the purposes of only one of the parties to it.  *Id.*

Dominion only intended to protect trade secrets and proprietary information not general communications by Dominion concerning basic administrative operations.  Dominion's motion for a protective order targeted a very specific situation and sought to encompass only very specific, technical information – "trade secrets," "proprietary information," and "confidential information" pertaining thereto.

Basic administrative and instructional emails from corporate officers and employees to others (here foreign nationals working directly with or for Dominion on the U.S. election) do not fall within this category.  Indeed, the EAC would presumably not consider such communications as being or having anything to do with "critical election infrastructure" because they are just the opposite in demonstrating a breach thereof.  Therefore, in the first instance, the information that Defendant has from Dominion's production does not contain any type of technical data or information that could be considered "trade secret" or "proprietary" or "confidential" pertaining thereto.  Legitimate law enforcement and congressional investigations are valid reasons to provide discovery and information from a case in which the party seeking the protective order protections

is under investigation.  Moreover, the information will help Dr. Byrne with his defense, a major part of which is the truth of the matter asserted in the alleged defamatory statements.

On this latter note, and equally, if not more, important, the information in the production contains information concerning criminal conduct and collusion and conspiracy with and by foreign nationals in the conducting of U.S. elections and therefore fall within an exception for matters of national security and constitutional important, which have always enjoyed a robust "tradition of accessibility" in this country.

Dominion asserts that Ms. Lambert did not have a right to receive or review the information, but the protective order itself allows, in addition to counsel, employees, assistants, consultants, in-house counsel, experts, independent litigation support services assisting counsel for the Parties, and partners, associates, paralegals, secretaries, clerical, regular and temporary employees, and service vendors of such experts or consultants (including outside copying services and outside support services) who are assisting with the Litigation).  Furthermore, Ms. Lambert entered into a specific agreement to receive discovery information.  Finally, even Dominion admits that they were advised that Ms. Lambert counsel was already assisting Dr. Byrne in his defense. See Dominion's Motion to Disqualify and for Relief, p. 9.

Furthermore, the "sanctions" provision Dominion sites at page 8 of its "motion," only applies where release is made to those not entitled to be made.  Again, Dominion exaggerates the power and restrictions of this ordinary civil action protective order.  As acknowledged by Dominion, Ms. Lambert counsel was absolved of ethical violations and sanctions in the *King v Whitmer* case.  The "grievances" filed against her by the Governor, Attorney General, and Secretary of State were held not to be valid or merit worthy by the state bar and dismissed.  These

same "complainants" have now orchestrated an unlawful legal campaign against Ms. Lambert counsel.

In fact, there is no violation of the court's order because (1) the information is not covered by the order; (2) even if it was there is an exception which would allow the disclosure to law enforcement; and (3) there is a further public interest exception which even the judiciary has a constitutional obligation to acknowledge. Generally, and without restricting a court's discretion, protective orders enjoy a presumption against modification. However, there is a long-established common-law right of public access to documents that are of extreme public concern and interest. This "tradition of accessibility" is significant where the public interest in future elections is concerned. The right to public access is part of the rules itself, because the presumption is all litigation and discovery is subject to public view and access.

If this were not the case, cases like those involving Agent Orange, tobacco companies, and Teflon would never have been exposed to the public. See *In re "Agent Orange" Product Liability Litigation*, 821 F.2d 139, 145-46 (2d Cir.), *cert. denied*, 484 U.S. 953, 108 S. Ct. 344, 98 L. Ed. 2d 370 (1987), *aff'g* 104 F.R.D. 559, 567 (E.D.N.Y. 1985) and *Pub. Citizen v. Liggett Grp., Inc.*, 858 F.2d 775, 789 (1st Cir. 1988) (explaining the right of private citizens to access discovery material relevant to public health and safety). The issues concerning the integrity of national elections, and those statements made by Dr. Byrne that are allegedly defamatory, are now actually corroborated by the information contained in Dominion's information. The fact that the Magistrate failed to even rule on Dr. Byrne's motion to lift the protective order, ruled on an "emergency" motion to disqualify filed in March on August 13, 2024, just before two critical depositions were to be taken by Dr. Byrne's counsel, the foremost leading expert advocate and attorney in the country, who has all the knowledge concerning Dominion's voting machine systems, their flaws,

and the collusion and involvement by foreign nationals and foreign elements directly in federal elections, is telling.  Dominion's only way to prevent the truth from being further exposed was to remove Dr. Byrne's counsel.  The fact that this was done on the eve of the most important depositions and discovery events for his case is an indictment of the Magistrate's willingness to bend to the will of Dominion.

The Constitution demands that elections be fair and transparent, and indeed, as discussed herein, it is the duty of the judiciary to ensure that information bearing on the fundamental constitutional right to vote inherent in every citizen be protected.  Moreover, the performance of traditionally governmental functions, which include elections and the means by which elections are conducted, are even more of a significant public concern because, after all, it is supposed to be the people who decide by vote who represents their will, and those serving the people must be held to a higher standard when it comes to the election process.  Dominion cannot simply say that it has no hand in the conducting of elections given the communications and information discovered to date.

In the instant case, the grounds for the protective order are that the materials may contain proprietary information and Dominion has sought to sweep into this categorization all materials included in the discovery.  Defendant is in possession of emails showing that foreign nationals are entering election systems in the United States before certification of the 2020 election.  The government and public have a right to know that these instances of foreign intrusion have occurred, and further, that Dominion is complicit in them.  Dominion has filed this lawsuit, and other lawsuits to hide these facts from the American public and to create a false narrative.

The interference in an election by foreign nationals is not only a prime example of this violation of the constitutional rights of every legally registered voter, but it is also a federal

criminal act.  Under federal law, it is considered a criminal act for a foreign national to interfere in an election. The term "foreign election interference" is defined as conduct by a foreign person that violates federal criminal, voting rights, or campaign finance law, or is performed by any person acting as an agent of or on behalf of a foreign government or criminal enterprise. This conduct includes any covert, fraudulent, deceptive, or unlawful act or attempted act, or knowing use of information acquired by theft, undertaken with the specific intent to significantly influence voters, undermine public confidence in election processes or institutions, or influence, undermine confidence in, or alter the result or reported result of a general or primary Federal, State, or local election or caucus.

A person, including an election official, who in any election for Federal office…knowingly and willfully deprives, defrauds, or attempts to deprive or defraud the residents of a State of a fair and impartially conducted election process, by…the procurement, casting, or tabulation of ballots that are known by the person to be materially false, fictitious or fraudulent under the laws of the State in which the election is held, shall be fined in accordance with title 18, United States Code (which fines shall be paid into the general fund of the Treasury, miscellaneous receipts (pursuant to section 3302 of title 31, United States Code), notwithstanding any other law), or imprisoned not more than 5 years, or both.  52 U.S.C. § 20511 (emphasis added).  Further, 52 U.S.C. § 10308 provides:

> (a) Depriving or attempting to deprive persons of secured rights. Whoever shall deprive or attempt to deprive any person of any right secured by section 2, 3, 4, 5, or 10 [52 USCS § 10301, 10302, 10303, 10304, or 10306] or shall violate section 11(a) [52 USCS § 10307(a)], shall be fined not more than $5,000, or imprisoned not more than five years, or both.

> (b) Destroying, defacing, mutilating, or altering ballots or official voting records. Whoever, within a year following an election in a political subdivision in which an observer has been assigned (1) destroys, defaces, mutilates, or otherwise alters the marking of a paper ballot which has been cast in such election, or (2) alters any

official record of voting in such election tabulated from a voting machine or otherwise, shall be fined not more than $5,000, or imprisoned not more than five years, or both.

(c) Conspiring to violate or interfere with secured rights. Whoever conspires to violate the provisions of subsection (a) or (b) of this section, or interferes with any right secured by section 2, 3, 4, 5, 10, or 11(a) [52 USCS § 10301, 10302, 10303, 10304, 10306, or 10307(a)] shall be fined not more than $5,000, or imprisoned not more than five years, or both.

(d) Civil action by Attorney General for preventive relief; injunctive and other relief. Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 2, 3, 4, 5, 7, 10, 11 [52 USCS § 10301, 10302, 10303, 10304, 10306, 10307], or subsection (b) of this section, the Attorney General may institute for the United States, or in the name of the United States, an action for preventive relief, including an application for a temporary or permanent injunction, restraining order, or other order, and including an order directed to the State and State or local election officials to require them (1) to permit persons listed under this Act to vote and (2) to count such votes.

(e) Proceeding by Attorney General to enforce the counting of ballots of registered and eligible persons who are prevented from voting. Whenever in any political subdivision in which there are observers appointed pursuant to this Act any persons allege to such an observer within forty-eight hours after the closing of the polls that notwithstanding (1) their listing under this Act or registration by an appropriate election official and (2) their eligibility to vote, they have not been permitted to vote in such election, the observer shall forthwith notify the Attorney General if such allegations in his opinion appear to be well founded. Upon receipt of such notification, the Attorney General may forthwith file with the district court an application for an order providing for the marking, casting, and counting of the ballots of such persons and requiring the inclusion of their votes in the total vote before the results of such election shall be deemed final and any force or effect given thereto. The district court shall hear and determine such matters immediately after the filing of such application. The remedy provided in this subsection shall not preclude any remedy available under State or Federal law.

(f)  Jurisdiction of district courts; exhaustion of administrative or other remedies unnecessary. The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether a person asserting rights under the provisions of this Act shall have exhausted any administrative or other remedies that may be provided by law. 52 U.S.C. § 10308 (emphasis added).

Violations of these provisions have been prosecuted in the past.  See, e.g., United States v Singh, 924 F3d 1030, 1040 (CA 9, 2019).  Accepting, counting, tallying,

or manipulating illegal or void ballots or creating "fake" votes in a federal election, a federal crime, also disenfranchises and debases every individual who casts a legal vote.  See 52 U.S.C. § 20511 ("tabulation of ballots that are known by the person to be materially false, fictitious or fraudulent"; 52 U.S.C. § 10308(b) ("alter[ing] any official record of voting in such election tabulated from a voting machine or otherwise").

The rights protected by these provisions are fundamental, personal, and individual.  They are recognized and justiciable in any forum and in any manner in which they may be properly pled.  See, e.g., *Ex Parte Yarbrough*, 110 U.S. 651, 662; 4 S. Ct. 152; 28 L. Ed. 274 (1884).  Not only is it illegal for foreign nationals or "any person" to engage in this conduct, but it would also be a federal crime for a person or entity to conspire with a foreign national to break these aforementioned laws.  52 U.S.C. § 10308(c) ("Whoever conspires to violate the provisions of subsection (a) or (b)  ("alter[ing] any official record of voting in such election tabulated from a voting machine or otherwise") "interferes with" the rights secured by the federal provisions protecting the fundamental right to vote).  Further, the compensation to a foreign national, whose receipt of compensation in exchange for engaging in subverting and otherwise manipulating or providing the means to manipulate an election would also be punishable.

Title 18 U.S.C. § 1846 proscribes the fraudulent deprivations of "the intangible right of honest services."  "Honest services fraud is found where a third party enriches the offender, and an entirely different party suffers a betrayal or deception through a denial of their right to the offender's honest services."  See, e.g., *Skilling v. United States*, 561 U.S. 358, 400, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010).

In the instant case, Dominion receives compensation from governments to provide voting systems and voting machines so that Americans can exercise their fundamental right to vote. The collusion with foreign nationals to have them connect to and have access to these election systems is a betrayal of public trust, and a deeper deception that would appear to include honest services

fraud.  Indeed, the provision by a private entity of a government service or for governmental functions may give rise to liability for honest services fraud where the third party is enriching whom he believes to be an offender, but does so under a mistaken premise orchestrated by the government.  *United States v O'Donovan*, ___F Supp 3d___; 2023 U.S. Dist. LEXIS 124059, at *4-5 (D Mass, July 19, 2023).

Moreover, a conviction for honest services wire fraud under 18 U.S.C. §§ 1343 and 1346, is possible where the defendant's knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud, and (2) the use of the mails or interstate wire communications in furtherance of the scheme."  *United States v. Sawyer*, 85 F.3d 713, 723 (1st Cir. 1996) (footnote omitted).  See also, *United States v. Falcón-Nieves*, 79 F.4th 116, 126 (1st Cir. 2023).

In the instant case, email communications reveal that Dominion conspired with foreign nationals in Serbia to create the means by which the 2020 election could be subverted and manipulated.  Serbians created the software and coded the machines at Dominion's headquarters in Serbia and accessed election systems in Michigan and Pennsylvania, etc., before the election was certified at Dominion's direction and pursuant to its instructions.

The Dominion election infrastructure utilizes and has utilized the Serbia Broadband Network which is controlled by Huawei, owned by Nenad Kovac and the Serbian government. The Serbian government and the Chinese government have access to the United States elections in real time.

Every such act would deprive citizens of the United States of their fundamental right to vote because any form of diluting, deleting, or otherwise manipulating votes or the voting process is a direct violation of the guarantees in the Constitution.  See, e.g., *United States v. Classic*, 313

U.S. 299, 314; 61 S. Ct. 1031; 85 L. Ed. 1368 (1941); *Reynolds v. Sims*, 377 U.S. 533, 560-563; 84 S. Ct. 1362; 12 L. Ed. 2d 506 (1964).  The right to cast a vote in an unimpaired manner and the right to have that vote counted, and counted properly, includes protection from manipulation of the votes and the voting process.  Moreover anyone has standing to sue for a violation of these fundamental rights, and to prosecute them under federal criminal laws.  *Ex Parte Yarbrough*, 110 U.S. 651, 662; 4 S. Ct. 152; 28 L. Ed. 274 (1884).  And the government, including the judiciary, must act to ensure that elections and the means by which they are operated are transparent.  *Id.* at 662-63

Further, title 18, Section 371 of the United States Code prohibits two distinct types of conspiracies: (1) conspiracies "to commit any offense against the United States" and (2) conspiracies "to defraud the United States, or any agency thereof[,] in any manner or for any purpose." 18 U.S.C. § 371. The Supreme Court has "stated repeatedly" that the "defraud" clause of § 371 is not limited to common-law fraud but "reaches any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government." *Tanner v. United States*, 483 U.S. 107, 128, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987) (emphasis added) (internal quotation marks omitted) (collecting cases). A conspiracy to impede the functions of a government agency "need not aim to deprive the government of property" or "involve any detrimental reliance." *United States v. Caldwell*, 989 F.2d 1056, 1059 (9th Cir. 1993), overruled on other grounds by *Neder v. United States*, 527 U.S. 1, 8-9, 119 S. Ct. 1827, 144 L. Ed. 2d 35, (1999).  Nor must "the conspiracy's goal" or "the means used to achieve it" be "independently illegal." *Id.*  As long as the conspiracy aims to obstruct the lawful functions of a government agency through some form of "deceit, craft or trickery, or at least by means that are dishonest," see, e.g., *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S. Ct. 511, 68 L. Ed. 968 (1924),

it falls within § 371's reach.  In short, a defraud-clause conspiracy requires four elements: "that (1) [the defendants] entered into an agreement, (2) to obstruct a lawful function of the government or an agency of the government, (3) by deceitful or dishonest means, and (4) at least one overt act was taken in furtherance of that conspiracy."  *United States v. Kanchanalak*, 41 F. Supp. 2d 1, 9 (D.D.C. 1999), rev'd on other grounds, 192 F.3d 1037, 338 U.S. App. D.C. 200 (D.C. Cir. 1999).

Dominion conspired to impair "lawful government functions."  This function, "regulat[ing] and monitor[ing] the participation of foreign nationals in the American electoral process," and impairing the requisite "transparency in the American political and electoral process," to include administering, monitoring, and controlling national elections, is sacrosanct, because it threatens the very fabric of the American constitutional system of government.

In the instant case, by providing voting machines and systems, Dominion is itself performing a critical governmental function.  For all intents and purposes, it is a "state actor" acting in the furtherance of its enterprise.  All of the communications by Dominion, regardless of their status under the protective order, should be subject to FOIA.  Moreover, the email communications that are of interest demonstrate that the testimony of Dominion's CEO before the Michigan Legislature that Dominion has no ties to foreign nationals and no foreign nationals have control or oversight over the manner in which the machines function was a lie.  There, Mr. Poulos directly stated:  "Dominion does not have any ties to…[sic] source code transfer there are no ownership ties to any political parties nor to foreign governments" and further that its "voting systems are by design meant to be used as closed systems that are not networked. Meaning that they are not connected to the internet."  *Id.*  (emphasis supplied).  Further, Mr. Poulos testified that "no Dominion employee has given me any reason to suspect that they have or would do anything to try to alter an election outcome."

The emails and information revealed in discovery, coupled with multiple expert reports from around the country, disprove these claims – meaning that Mr. Poulos was not truthful in his testimony and Dominion knows it.  Dominion directed and tasked foreign nationals and conspired with them to engineer its voting systems in a manner that remote access could be gained and interference could occur before, during, and after the election commenced, and, critically, before certification.  The fact that Dominion, a governmental actor conspired with foreign nationals to engineer voting systems and machines that could not only connect to the internet, but could then be manipulated at will, is precisely the type of conduct prohibited and therefore criminalized by 52 U.S.C. § 10308 and 52 U.S.C. § 20511.  Indeed, section 10308 expressly prohibits "altering of any official record of voting in such election tabulated from a voting machine or otherwise."  A conspiracy exists where a foreign national and an entity such as Dominion conspires to violate these laws.  See, e.g., 18 U.S.C. § 371 and *Tanner v. United States*, 483 U.S. 107, 128, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987) (stating that the "defraud" clause of § 371 is not limited to common-law fraud but "reaches any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government.").

The fact that the voting systems and machines have the capacity to connect to the internet and the software was created and engineered by foreign nationals acting in concert with and for Dominion is sufficient in itself to lift the protective order to allow disclosure of these email communications.  Moreover, the email communications do not detail or describe proprietary information or technical details about the voting machines, they describe a conspiracy to inject a means by which elections in the United States are vulnerable, and purposefully so.  The fact that Dominion's CEO perjured himself should be enough to demonstrate the willfulness of Dominion to create these avenues for sabotage and to hide them from the public.  For example, Dominion's

CEO testified before a public body that Dominion had no foreign connections and was not influenced or part of any foreign companies run by or with the involvement of foreign nationals. The Dominion CEO also stated that the voting systems and machines could not connect to the internet and be accessed from outside sources. *Id.*

Dominion has represented to the EAC that its voting machines and systems comply by not being connected to networks and by not being connected to or accessed by foreign entities. This is now known not to be the case. Expert reports from Antrim County, Michigan, and Fulton County, Pennsylvania suggest otherwise. The Antrim County Court ultimately dismissed the Antrim lawsuit for procedure, but noted the significance of Plaintiff Bill Bailey's expert evidence and stated in its order that "The Plaintiff's reports and the news of the day, including a computer hack recently of a main petrol fuel pipeline on the East Coast might well suggest that this is something that policy makers should be looking into in the future."

Attached expert reports to Dr. Byrne's pleadings showed that the voting machines were accessed from outside the United States. While the information contained in the discovery reveals this, we are only now presenting the expert reports and corroborating evidence that is not within the current discovery produced by Dominion.

Dominion's continued denial of this in the public eye, to include hiding behind the protective order in this and other cases evidences a fraud upon the Court that Your Honor must assess in this objection to the Magistrate's hasty conclusion. Moreover, the public has a right to know and the judiciary has an obligation to order disclosure, because, as the Supreme Court has stated, any complaint, indeed, any public inquiry into the deprivation of the fundamental right to vote is actionable, and the judiciary has an express obligation to abide because it has a duty to ensure that the Constitutional rights of American citizens to vote and to have their votes properly

counted are secured.  *Yarbrough*, 110 U.S. at 661, 662-63.  The election process is particularly vulnerable as the time to vote is regulated and once an election is held, it is paramount that the tabulation of votes be secured and free from foreign intervention, and the means of outside influence and manipulation.

According to the United States Constitution every legally registered citizen voter is guaranteed the fundamental right to vote, to have their vote counted properly, and to not have their vote diluted, deleted, or otherwise adulterated by fraud, mistake, neglect, or other malfeasance, misfeasance, or malfunction in the running and operating of elections.  *Classic*, *supra*; *Reynolds*, *supra*.  No constitutional right is more fundamental than the right to vote, for if that is lost to fraud, deceit, mistake, and/or basic neglect and incompetence, then all of the other fundamental, individual, constitutional rights guaranteed to every citizen of the United States is rendered irrelevant and meaningless.  The Supreme Court of the United States has recognized the "political franchise" of voting as a "fundamental political right, because preservative of all rights."  *Yick Wo v. Hopkins*, 118 U.S. 356, 371; 6 S. Ct. 1064; 30 L. Ed. 220 (1886).  "[T]he right…is a fundamental matter in a free and democratic society.  Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights."  *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667; 6 S. Ct. 1079, 1085 (1966).  A vote cast is an assurance to the one exercising that right that their choice of who will represent them will be properly recorded.  See, e.g., *Reynolds*, 377 U.S. at 560-563.  If the government cannot guarantee that this sacred right will be protected, and not destroyed or threatened, then there is no basic security or safety in the placing of any trust in those who claim to be elected to represent the people.  *Id.*, see also, *Harper*, supra and *Classic*, 313 U.S. at 314; citing, inter alia, *Yarbrough*, 110 U.S. at 662.

In the latter case, the Court confirmed the standing of every citizen to petition the government to protect his right to cast a vote and to have that vote properly counted – it is a standing that does not depend on the status of the complainant but in circumstances where fraud, corruption, mistake, or neglect are charged in the conducting of an election, the power of the court "arises out of the circumstance that the function in which the party is engaged or the right which he is about to exercise is dependent on the laws of the United States." *Id.* at 662-63. The Court stated further regarding the duty of the government to protect the citizen's rights in this regard: "[I]t is the duty of…government to see that he may exercise this right freely…. This duty does not arise solely from the interest of the party concerned, but from the necessity of the government itself, that its service shall be free from the adverse influence of force and fraud practised on its agents, and that the votes by which its members of Congress and its President are elected shall be the free votes of the electors, and the officers thus chosen the free and uncorrupted choice of those who have the right to take part in that choice." *Id.* "Regulation of the electoral process receives unusual scrutiny because 'the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights.'" *Mathews v. Diaz*, 426 U.S. 67, 78-79, 96 S. Ct. 1883, 1890-91 (1976), quoting *Reynolds*, supra at 562. See also, *Dunn v. Blumstein*, 405 U.S. 330, 336; 92 S. Ct. 995; 31 L. Ed. 2d 274 (1972).

The standing of every citizen and the duty of the government to protect the right to vote extends directly to ensuring that no fraud, corruption, or mistake occurs in the counting, tabulation, and return of votes. In *Classic*, the Court stated "[t]o refuse to count and return the vote as cast [is] as much an infringement of that personal right as to exclude the voter from the polling place." 313 U.S. at 315. The Court has also recognized the Constitution guarantees that "free and

uncorrupted choice" shall be afforded to all in the decision of who should lead them.  *Id.* (emphasis added).

In other words, the right to vote is accorded extraordinary treatment because it is, in equal protection terms, an extraordinary right: a citizen cannot hope to achieve any meaningful degree of individual political equality if granted an inferior right of participation in the political process." *Plyler v Doe*, 457 U.S. 202, 233; 102 S. Ct. 2382; 72 L. Ed. 2d 786, 810 (1982).

For an added measure of assurance, it is declared that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const., amend. IX (emphasis added).  It was universally agreed by the Framers that there are additional fundamental rights, protected from governmental infringement, which exist alongside those specifically mentioned in the first eight amendments.   "The [Ninth] Amendment…was proffered to quiet expressed fears that a bill of specifically enumerated rights could not be sufficiently broad to cover all essential rights and that the specific mention of certain rights would be interpreted as a denial that others were protected." I Annals of Congress 439 (Gales and Seaton ed. 1834).  See also II Story, Commentaries on the Constitution of the United States (5th ed. 1891), pp. 626-627.

As "it cannot be presumed that any clause in the constitution is intended to be without effect…effect should be given to all the words it uses."   *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803).  See also *Myers v. United States*, 272 U.S. 52, 229 (1926).  And, indeed, a right to political affiliation and political choice has been addressed as protected, at least in part, by this amendment. *United Pub. Workers v. Mitchell*, 330 U.S. 75, 94-95, 67 S. Ct. 556, 567 (1947).  This includes, of course, the fundamental right to vote.  *Id.*  See also *Reynolds*, 377 U.S. at 560.

In addition to the specific, enumerated rights at issue in voting rights cases, inter alia, the First Amendment, U.S. Const., amend. I, the Ninth Amendment, U.S. Const. amend. IX and the Fourteenth, U.S. Const., amend. XIV and Fifteenth Amendments, U.S. Const., amend. XV, where an individual's constitutional rights to vote are at issue, there is no necessity to declare a violation of a specific enumerated right.  See, e.g., *Classic*, 313 U.S. at 315, wherein the Court specifically stated:

Included within the right to choose [the right to vote protected by the First Amendment, inter alia], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted at Congressional elections. This Court has consistently held that this is a right secured by the Constitution…. And since the constitutional command is without restriction or limitation, the right, unlike those guaranteed by the Fourteenth and Fifteenth Amendments, is secured against the action of individuals as well as of states." *Id.* (emphasis added).

Finally, whether a party can disclose such information to law enforcement without violating a protective order would depend on the specific terms of the protective order and the circumstances of the case.  There is nothing in the protective order, nor should it have been Dominion's intent to shield information such as this from disclosure.  There is no specific terminology in the protective order seeking to exclude general corporate communications, and certainly nothing that secures Dominion's right to protect potentially criminal conduct. *Mynette Technologies, Inc v United States*, 163 Fed Cl 733, 751 (2022).  Dominion originally sought to protect proprietary, technical, and commercially sensitive information and critical infrastructure about the configurations of software and hardware.  None of the information that has come to light is this type of information.  It may be covered by the "blanket" nature of the protective order, but

Dominion cannot expect it to shield them from criminal liability.  To hold otherwise would be to allow a party suing for defamation to hide the truth to avoid the defense.

### 2.   The Magistrate's Analysis for Disqualifying Counsel was Flawed

Factual assertions made by the Magistrate require clarification before analyzing her assessment of Dominion's Motion to Disqualify.  First, and foremost, the Magistrate held no additional hearings on Dominion's Motion to Disqualify and to Modify the Protective Order.  This, despite the fact that Dr. Byrne immediately filed a motion to lift the protective order (on April 3, 2024), and another such motion on July 26, 2024.  Both of these motions were never ruled on.  Dr. Byrne also responded to Dominion's Motion and additional supplemental filings.  Instead of considering these filings and the motions to lift the protective order, the Magistrate simply recited Dominion's motions and briefs as facts and accepted what they were asserting without proper vetting.

The Magistrate asserts that Dr. Byrne's counsel released documents by attaching Dominion Litigation Documents to a *pro se* motion in a criminal case in Michigan.  Magistrate's Opinion, pp. 8-9, 16, 36.  The Magistrate "found" that Dr. Byrne's counsel misrepresented that her counsel filed Dominion Litigation Documents – concluding that Ms. Lambert stated that it was her counsel that filed them and that they were attached to an affidavit of Barry County Sheriff Dar Leaf who is conducting a criminal investigation concerning Dominion.  *Id*., p. 36.  In fact, at the hearing referred to, Ms. Lambert *did not misrepresent* any material fact. She gave detail that the documents were attached to the Sheriff's affidavit and filed in *her* case. this information – her counsel filed the motion and attached the Sheriff's affidavit. There was no confusion that these documents were

attached to the Sheriff's affidavit and that Ms. Lambert stated that the affidavit was filed in her case attached to her pleading. However, there was much confusion at this time related to changing counsel. Without waiving attorney client privilege, Ms. Lambert had a new attorney, Dan Hartman who was counseling her and took over for Mr. Michael Smith. Smith had his office hacked from Cook County Chicago (coincidentally the new location of the Dominion office) and his paper filing offsite location had an explosion. The relationship between Lambert and Smith changed at that time, and she replaced counsel. There was no material misrepresentation. Lambert admitted it was her case, her filing and gave specific details as to the Sheriff's affidavit.

The Magistrate further asserted that it was somehow relevant that Stephanie Scott, who has assisted Ms. Lambert and signed the "Undertaking" to abide by the protective order, was a co-defendant in a criminal case against Ms. Lambert and Scott in the state of Michigan.  Not only is this not relevant, but the Magistrate concludes that Ms. Lambert was aware at the March 18, 2024 hearing of the indictment – that is not the case because the indictment involving herself and Scott was not filed until May 7, 2024. Ironically, approximately a week after Stephanie Scott, the former Adams Township clerk announced she was running for County Clerk in the November 2024 election. Lambert was Scott's attorney, and Clerk Scott has specialized experience to assist in Dr. Byrne's defense and had it was Clerk Scott who refused to delete EPB (registration poll data) which would be violation of law federal law at the direction of SOS Benson.

Third, the Magistrate mistakenly concluded that Ms. Lambert misrepresented that at the time of the hearing (March 18, 2024) she not given access to the Dominion Litigation Documents to John Case, a lawyer assisting her and Dr. Byrne.  Magistrate's Opinion, pp. 36-37.  The Magistrate further concludes that if Ms. Lambert did give Case access to the documents after the hearing, then she violated the "status quo" order entered on March 19, 2024 (Docket No. 77).  *Id.*

at 37. The magistrate instructed Lambert to seek guidance if she was to give documents to law enforcement or congress in the future. The protective order clearly states how Lambert can work with assistants on Dr. Byrne's case. Lambert did just that and did not violate the order, nor did Mr. Case.

Prior to this lawsuit, there were open investigations into Poulos' honesty in testifying, in 2020, before the Michigan Legislature – so much so that the Macomb County prosecutor in Michigan began investigating the perjury charges.

The Magistrate also asserts that Ms. Lambert misrepresented when she signed her verification that she would abide by the "status quo order" on March 26, 2024, that she would make every effort to have the Dominion Litigation Documents attached to Sheriff Leaf's affidavit in the criminal case in Michigan removed from the public docket. Magistrate's Opinion, pp. pp. 37-38. Ms. Lambert's defense counsel had stated that he could not seek to have this evidence sealed or removed because of the gravity of the facts alleged in the Sheriff's affidavit and that the Sheriff had reported the documents to Congress in a public fashion. The Magistrate concluded that this did not resolve Ms. Lambert's non-compliance with the status quo order as stated in the verification.

The Magistrate further concluded that Ms. Lambert publicly discussed the Dominion Litigation Documents in an interview with the press after the status quo order was entered (and both prior to and after signing the verification on March 26, 2024). Magistrate's Opinion, p. 38. In fact, in every interview referred to Ms. Lambert specifically stated that she could not discuss the details because of the protective order.

The Magistrate further concluded, without any proof other than Dominion's assertions, that Dr. Byrne's counsel was colluding with attorney John Case to release the Poulos deposition, but

this never occurred.  Furthermore, Mr. Case had signed an Undertaking and began aiding Dr. Byrne before the date of Dominion's motion.  In any event, these activities cannot be the basis for disqualifying counsel.

Further, Dr. Byrne's counsel specifically verified she was following the protective order. She even confirmed to the Magistrate and Dominion despite Dominion's communicating ex parte with the Court in an attempt to further skew the Magistrate's opinion.

A party moving to disqualify counsel bears the burden of proving the grounds for disqualification.  *In re BellSouth Corp.*, 334 F.3d 941, 961 (11th Cir. 2003)).  When a court is presented with motion to disqualify, that court must "be conscious of its responsibility to preserve a reasonable balance between the need to ensure ethical conduct on the part of lawyers appearing before it and other social interests, which include the litigant's right to freely choose counsel." *Woods v. Covington Cnty. Bank*, 537 F.2d 804, 810 (5th Cir. 1976).  Moreover, "[d]isqualification of one's chosen counsel is a *drastic remedy that should be resorted to sparingly*."  *Norton v. Tallahassee Mem'l Hosp.*, 689 F.2d 938, 941 n. 4 (11th Cir. 1982) (emphasis added). "Because a party is presumptively entitled to the counsel of his choice, that right may be overridden only if compelling reasons exist."  *In re BellSouth*, supra (internal quotation marks and citations omitted).

"Such motions are generally viewed with *skepticism because…they are often interposed for tactical purposes*."  *Evans v. Artek Sys. Corp.*, 715 F.2d 788 (2d Cir. 1983); *Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222 (6th Cir. 1988).  The Magistrate made zero effort to hold a hearing, which at least would have allowed her to understand how the Court is being misled by Dominion's antics.  The Magistrate did not hold additional hearings or even consider Dr. Byrne's two motions to lift the protective order, the first of which he filed just after Dominion filed its motion.  Further, because the Magistrate held no further hearings and failed to consider

the motions to lift the protective order, she adopted the unilateral assertions and allegations of Dominion – in other words, the Magistrate's "findings of fact" were nothing more than a repetition of what Dominion was alleging, without any analysis or consideration of Dr. Byrne's arguments.

The Magistrate did not even properly go through the argument to justify Ms. Lambert's disqualification and how it might impact Dr. Byrne. Finally, there is no discussion in the Magistrate's order and opinion about the constitutional question concerning how this might affect Dr. Byrne's fundamental constitutional rights of freedom of speech and freedom of the press.

Dominion's entire view of the issue has been skewed, and purposefully so. It seeks to contain everything in the production of civil discovery within the scope of the Court's protective order even though "Discovery Material" is defined only as specific information (Dominion's "stamp" of confidential on every single document and on everything produced notwithstanding), the court speaks through its written orders under the ordinary rules of interpretation, and understanding and appreciating the general availability of information for public access. The Magistrate was also duped into believing this and did not provide any type of clarification as to how Dr. Byrne is supposed to retain counsel with this much expertise and experience in the very subject matter which will exonerate him from this lawsuit.

Dominion only refers to ad hominem attacks on counsel in its effort to disqualify. This is indeed a "tactical" effort to stifle the truth and to prevent Ms. Lambert counsel who has introduced and presented corroborating expert analysis of the deficiencies in Dominion voting systems, and now has fulfilled her ethical duty to report the discovery of potential criminal violations to law enforcement.

Dominion wants to disqualify Ms. Lambert because of her combined knowledge and the information she possesses from litigating cases in multiple jurisdictions, and with her expertise

and knowledge, including multiple expert analyses of the deficiencies in Dominion voting systems' product, and to prevent her from using her expertise and knowledge to defend Dr. Byrne, who has a right to retain and have qualified counsel defend him.

Dominion's original puffery and effort to degrade Ms. Lambert counsel and Dr. Byrne as much as possible with the use of ad hominem attacks deflates rapidly when it actually analyses the legal basis for its sudden emergency request to hide the truth from Ms. Lambert counsel, who has proved her expertise to be able to process it and analyze it and best defend Dr. Byrne.

Any contention that Ms. Lambert counsel has just appeared and therefore there is no harm in disqualification is belied by the fact that she has served as Dr. Byrne's expert legal consultant and has participated in litigating other cases in coordination with him. Indeed, Ms. Lambert counsel has been successful in bringing the truth to the public about Dominion's deficiencies since the very beginning.

<u>CONCLUSION</u>

Dominion's motion to disqualify had no merit in terms of its efforts to attack and degrade Ms. Lambert counsel and prevent Dr. Byrne from having the most qualified counsel of his choice, who also happens to know the truth, and therefore, who is best qualified to defend him in this defamation action.  Further, Dominion's "emergency" motion for "protective relief" was not based on a proper reading of the law or the scope of the protective order, and even if it was, there is an exception which requires the court to allow public access due to the national security concerns in allowing Dominion to continue to be involved in elections in the United States.

The Magistrate ostensibly disqualified Ms. Lambert, deprived Dr. Byrne of a hearing on the issues brought up on multiple occasions regarding Dominion's criminal conduct, and ultimately failed to place the burden on Dominion and determine whether Dominion's efforts were

not just tactical attempts to take out Dr. Byrne's counsel because of her vast knowledge about these subjects. The Magistrate also violates basic tenets of attorney client privileges and common-law doctrines by requiring the parties to disclose information which is protected, and which in any event the Court has been apprised.

The unilateral Order granting Dominion's motion establishes several conditional requirements, which appear to unconstitutionally compel Dr. Byrne to disclose privileged and confidential information with Ms. Lambert. This egregious breach of public trust and invasion of the sacrosanct realm of attorney-client privileges and confidentialities cannot be upheld without a hearing to determine Dr. Byrne's rights and to assess the harm and damages he will suffer as a result of this Court's hasty decision.

This is even more of a reason to expedite reconsideration and hold a hearing. Hearings on this critical matter is essential if the Court is to be fully informed about the extent to which it has been misled by Dominion and Dominion's counsel. Further, this comes in the middle of discovery when the most important revelations concerning national and international involvement by and between Dominion and several other actors and entities around the world are coming to light. Depriving Defendant of his counsel of choice in the midst of discovery and without any hearing or opportunity for Ms. Lambert to reply to Dominion's motions and demonstrate to the Court the extent to which it has been misled is a grave error, which must be remedied. In addition to the reconsideration of this Court's order, Dr. Byrne must also request an immediate hearing so that the Court can be made aware of the facts and circumstances concerning which it has been misled by Dominion, and further, an immediate stay of the discovery pending a hearing and ruling on this motion.

WHEREFORE, Dr. Byrne respectfully requests this Honorable Court to overturn and reverse the Magistrate's Order disqualifying counsel, granting Dominion's "emergency" motion to enforce protective order, and the additional "conditions" imposed on Ms. Lambert and Dr. Byrne, which violate attorney-client privilege, common-law privileges, and basic fundamental constitutional rights of Ms. Lambert and Dr. Byrne.

Respectfully submitted,

/s/ Stefanie Lambert
_____

Stefanie Lambert Junttila
Law Offices of Stefanie L. Lambert, PLLC
400 Renaissance Drive, FLOOR 26
Detroit, MI 48243
attorneylambert@protonmail.com

Date:  August 27, 2024

<u>CERTIFICATE OF SERVICE</u>

I, Stefanie Lambert, hereby certify that on August 27, 2024, true and correct copies of the foregoing were served via email on counsel of record for every party in *US Dominion, et al. v. Patrick Byrne*, Case No. 1:21-cv-02131 (CJN / MAU).

Respectfully submitted,

/s/ Stefanie Lambert
Stefanie Lambert Junttila
_____
Law Offices of Stefanie L. Lambert, PLLC
400 Renaissance Drive, FLOOR 26
Detroit,              MI              48243
attorneylambert@protonmail.com

Date: August 27, 2024