**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| LIBERTY VOTE HOLDINGS INC., LIBERTY VOTE USA INC., and DOMINION VOTING SYSTEMS CORPORATION, | ) ) ) ) ) | Civil Action No. 1:21-cv-02131-CJN-MAU |
| Plaintiffs, | ) ) | Judge Carl J. Nichols |
| v. | ) ) ) | **JURY TRIAL DEMANDED** |
| PATRICK BYRNE, | ) ) | |
| Defendant. | ) | |

**PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT AND
SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES**

PLEASE TAKE NOTICE that upon the accompanying Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Default Judgment; the Declaration of Davida Brook, and Exhibits 1-18, annexed thereto; and all the prior pleadings and proceedings herein, Plaintiffs shall move this Court, before the Honorable Carl J. Nichols, U.S.D.J., at the U.S. District Court for the District of Columbia at 333 Constitution Avenue N.W., Washington, D.C. 20001, on a date and time to be determined by the Court, for an Order granting Plaintiffs' Motion for Default Judgment against Defendant Patrick Byrne, and for such other and further relief as the Court deems just and proper.

## TABLE OF CONTENTS

**Page**

FACTUAL BACKGROUND ...................................................................................................... 4

I.  Mr. Byrne Agrees to the Terms of the Protective Order........................................... 4

II.  Mr. Byrne Brings in an Attorney Willing to Violate the Protective Order............. 5

III.  Judge Upadhyaya Issues a Status Quo Order Requiring Mr. Byrne to Cease Public Distribution of Plaintiffs' Documents............................................................ 6

IV.  Mr. Byrne Publicly Rescinds His Commitment to Comply with the Court's Rulings. ...................................................................................................................... 6

V.  Mr. Byrne Attends Argument on Plaintiffs' Motion to Disqualify and Affirms His Understanding and Willingness to Follow the Court's Orders.......................... 7

VI.  Mr. Byrne Continues to Flout This Court's Rules and Orders................................. 8

VII.  The Court Disqualifies Ms. Lambert. ...................................................................... 9

VIII.  Mr. Byrne and Ms. Lambert File Meritless Appeals and Ignore Plaintiffs' Proposed Document Destruction Protocol.............................................................. 11

IX.  Mr. Ticktin Appears, Delays the Joint Status Report, and Resumes Mr. Byrne's Campaign to Relitigate the Protective Order. ......................................................... 12

X.  Mr. Byrne and Ms. Lambert Defy the March 31 Order and File Baseless Appeals. ................................................................................................................... 16

XI.  Mr. Byrne Declares in a May 15, 2026, Interview, "I Will Put This on the Internet Before I Destroy It, Judge."....................................................................... 17

XII.  Mr. Byrne Declares in a May 19, 2026, Interview, "I Just Violated Some Federal Judge's Orders. I Don't Care."................................................................... 19

XIII.  Mr. Byrne Declares in a June 25, 2026, Interview, "Screw You, Judge. I'm Ignoring Your Orders." ........................................................................................... 20

XIV.  The Court Finds Mr. Byrne's and Ms. Lambert's Appeals to the March 31, 2026, Disclosure Order "Lack Merit" and "Denies Both." ................................... 21

XV.  Mr. Byrne Ignores the Court's July 1, 2026, Order, Files Another Frivolous Challenge to the Disqualification and Disclosure Orders, and Lies to the Court.................................................................................................................... 22

XVI.    Mr. Byrne Appears Live on Alex Jones's Podcast on July 23, 2026, and *The Absolute Truth* on July 31, 2026, Showing Viewers Actual Copies of Plaintiffs' Documents. .......................................................................................... 24

XVII.   Mr. Byrne Shares Plaintiffs' Produced Documents on X on August 6 and 7, 2026. ............................................................................................................... 27

LEGAL STANDARD ................................................................................................................. 27

ARGUMENT ............................................................................................................................... 28

I.      Mr. Byrne Has Severely Hampered Plaintiffs' Ability to Present Their Case. ..... 29

II.     Mr. Byrne's Misconduct Has Placed Significant Burdens on This Court. ............. 35

III.    Mr. Byrne's Pattern of Conduct Demonstrates a Willful and Unrepentant Disrespect for the Court and Its Authority. ............................................................. 38

IV.     Lesser Sanctions Are Inadequate and Would Be Futile. ....................................... 43

CONCLUSION ............................................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Biden v. Byrne*,
   2025 WL 2429688 (C.D. Cal. Aug. 5, 2025)................................................................15, 42, 43

*\*Biden v. Byrne*,
   2026 WL 2018273 (C.D. Cal. July 10, 2026)..................................................................41, 44

*\*Freeman v. Giuliani*,
   691 F. Supp. 3d 32 (D.D.C. 2023) .................................................................. *passim*

*Glob. Glass Techs., Inc. v. Rsch. Frontiers, Inc.*,
   2025 WL 2088421 (M.D. Fla. July 25, 2025) ...................................................................15, 43

*Guarantee Co. of N. Am. USA v. Lakota Contracting Inc.*,
   2021 WL 2036666 (D.D.C. May 21, 2021)...................................................28, 33, 38, 44

*Jankovic v. Int'l Crisis Grp.*,
   822 F.3d 576 (D.C. Cir. 2016) ........................................................................................34

*Marrocco v. Gen. Motors Corp.*,
   966 F.2d 220 (7th Cir. 1992) ..........................................................................................30

*Mwani v. bin Laden*,
   417 F.3d 1 (D.C. Cir. 2005).............................................................................................30

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*,
   427 U.S. 639 (1976)..........................................................................................................41

*Perez v. Berhanu*,
   583 F. Supp. 2d 87 (D.D.C. 2008) ..................................................................................44

*Richardson-Merrell, Inc. v. Koller*,
   472 U.S. 424 (1985)..........................................................................................................11

*SEC v. China Infrastructure Investment Corp.*,
   189 F. Supp. 3d 118 (D.D.C. 2016)...............................................................................38, 39

*Shepherd v. American Broadcasting Companies, Inc.*,
   62 F.3d 1469 (D.C. Cir. 1995).......................................................................................28, 43

*Smartmatic USA Corp. v. Herring Networks, Inc.*,
   2023 WL 8697830 (D.D.C. Dec. 16, 2023)........................................................................23

*Stone v. U.S. Embassy Tokyo,*
  2021 WL 1110735 (D.D.C. Mar. 23, 2021)..................................................................30, 31, 39

*The Florida Bar v. Ticktin,*
  14 So. 3d 928 (Fla. 2009)............................................................................................15, 43

*Trump v. Clinton,*
  640 F. Supp. 3d at 1332 .............................................................................................15, 43

*Wash. Metro. Area Transit Comm'n v. Reliable Limousine Serv. LLC,*
  776 F.3d 1 (D.C. Cir. 2015)................................................................................28, 30, 38, 43

*Webb v. District of Columbia,*
  146 F.3d 964 (D.C. Cir. 1998)....................................................................................29, 35

**Rules**

Fed. R. Civ. P. 37(b)(2)(A)(vi) .......................................................................................27

*THE COURT: Mr. Byrne, I just don't want you to say anything more beyond whether or not you understand this order.*

*MR. BYRNE: I do.*

*THE COURT: And are you prepared to comply with it, sir?*

*MR. BYRNE: Yes.*

*THE COURT: … Well, actually, let me ask instead of -- are you going to comply with it?*

*MR. BYRNE: Yes.*

--Hearing on Emergency Motion to Disqualify, May 16, 2024.

*I'd put it up on the Internet before I would destroy it, Judge.... You belong in prison, Judge Upadhyaya. Lawyer the fuck (bleep) up. Lawyer up, Judge. Lawyer up.*

--Patrick Byrne, interviewed on "Absolute Truth," May 15, 2026.

*Today I disclose Dominion's emails because I no longer follow traitorously illegal orders from Magistrate Judge Upadhyaya (a vile Indian who repped Madudo [sic] & VZ 2019-22), Deep State Judge Nichols, & their boss Judge Boasberg (a dirty Bolshevik).*

--Posted on X by Patrick Byrne, May 19, 2026.

*I want to take these guys in and give them a thrashing in a D.C. courtroom that goes down in history, notwithstanding the prophylactic efforts of this smelly Indian mob lawyer, whose been protecting -- a magistrate judge protecting them. And shame on Judge Nichols, you idiot, you deep state idiot, who's been over -- who had a mob lawyer from Venezuela acting as the impartial judge in our case. Screw you, judge. I'm ignoring your orders.*

--Patrick Byrne, interviewed on "Absolute Truth," June 25, 2026.

*Some of these I'm under order from a federal judge not to show, but the federal judge turns out to have been Venezuela's lawyer until 2022. So I'm now just ignoring her."*

--Patrick Byrne, interviewed on "AlexJonesLive.Com," July 23, 2026.

*So I'm under orders not to release things I got from the Dominion lawsuit, but the woman who gave me the orders turns out to have been Venezuela's lawyer until 2022. Biden plucked her out of the law firm of Mr. Kamala Harris and made her my magistrate judge who's been giving me these orders. This is national security, and I'm not going to sit quiet about it anymore.*

--Patrick Byrne, interviewed on "Absolute Truth," July 31, 2026.

1

Patrick Byrne has made one thing absolutely clear: He will not follow this Court's orders. Nobody put Mr. Byrne to that decision but himself. To the contrary, this Court gave Mr. Byrne extended opportunities to show that he could—and would—do just the opposite. But Mr. Byrne made his choice. And after years of chances, Mr. Byrne has shown nothing but "a pattern of disobedience or noncompliance with court orders" such that there can be only one remedy for his misconduct: entry of default judgment. *Freeman v. Giuliani*, 691 F. Supp. 3d 32, 65 (D.D.C. 2023) (citation omitted).

Mr. Byrne has long treated this litigation with contempt, refusing to produce responsive documents, answer interrogatories, or sit for deposition. Many of those failings are the subject of discovery disputes before the Court.

Much of the actual work on this case, however, has involved efforts to address Mr. Byrne's and his now-disqualified attorney's willful violations of the Protective Order. These violations consisted of, at a minimum, ***sharing the entire database of Plaintiffs' produced documents*** so scores of those documents could be posted on the Internet. It was in response to such prior violations that Magistrate Judge Upadhyaya issued an order disqualifying Mr. Byrne's prior attorney, Stefanie Lambert, requiring both Mr. Byrne and Ms. Lambert to submit affidavits detailing the scope and extent of their breaches, and ordering Ms. Lambert to return or destroy Plaintiffs' documents produced in discovery in their possession.

Before taking these steps, Judge Upadhyaya ordered Mr. Byrne to attend a hearing on the disqualification motion in person. When the Court called Mr. Byrne to the podium and asked if he understood the Protective Order, he affirmed. When the Court asked if he would comply with it, he again said yes. Twice.

To the extent he was ever telling the Court the truth, Mr. Byrne has flagrantly reneged on

that commitment, making no secret of his decision to "no longer follow traitorously illegal orders from Magistrate Judge Upadhyaya." Ex. 5. In recent weeks and months, having come face-to-face with a twenty-three-month-old order requiring him to disclose the scope and extent of his prior breaches of this Court's orders, rather than comply, he has taken to the Internet once again, sharing confidential discovery materials on podcasts, news shows, and X, in clear violation of several orders of this Court. He has stuck to this approach even after this Court told him on July 1, 2026, that his recent challenges to this Court's orders "lack[ed] merit" and were "frivolous," that he needed to comply with all aspects of the Court's disclosure orders by July 15, 2026, and that "[n]oncompliance and further attempts to evade enforcement of court orders … could certainly justify additional sanctions in the future." Dkt. 191 at 1, 5. But the July 15 deadline came and went without compliance. The evening Mr. Byrne's disclosures were due, he filed yet another frivolous motion, based on lies—this time to disqualify Magistrate Judge Upadhyaya. Dkts. 193, 195.

Civil litigation cannot function when one party lies in open court, refuses to follow orders (to say nothing of basic rules of civility), and treats the opposing party and Court as participants in a criminal conspiracy unworthy of any respect or consideration whatsoever.

No sanction short of an adverse judgment can address the character and level of this misconduct. Lesser sanctions have been tried and had no effect. Mr. Byrne has decided that he, and he alone, will be the judge of his conduct in discovery and in this litigation generally, regardless of what the Court has decided and regardless of any commitments he previously made. This renders the ordinary process of discovery and litigating this case completely unworkable. Neither Plaintiffs nor the Court should be required to expend resources on continued litigation when the opposing party has demonstrated—has ***publicly bragged***—that he will refuse to abide by the rules or Court orders and has repeatedly broadcast Plaintiffs' confidential discovery material

3

to the world in service of his continued false attacks, all while withholding his own discovery.

The Court should therefore enter judgment in Plaintiffs' favor and schedule a short jury "trial to determine any damages due on plaintiffs' claims." *Giuliani*, 691 F. Supp. 3d at 41.

## FACTUAL BACKGROUND

Mr. Byrne's and his now disqualified attorney's misconduct have been recounted in detail in prior filings. *See, e.g.*, Dkt. 183 at 2-20.[1] This includes willful violations of court orders, as well as Mr. Byrne's meritless and seemingly endless challenges to rulings by Judge Upadhyaya and this Court, treading the same ground over and over. And now, in recent months, Mr. Byrne's conduct has taken on an entirely new character: Along with violating this Court's rules and orders, he is now bragging about it, telling everyone there is nothing that can be done to get him to comply.

## I.      Mr. Byrne Agrees to the Terms of the Protective Order.

In this case and related actions Plaintiffs filed in this Court, Plaintiffs sought and obtained a robust Protective Order to protect themselves from the impact of the ongoing defamation fueled by mischaracterizations of their operations, and also to reduce the very real risk of violence to their employees, which has included an armed person seeking access to Plaintiffs' main offices. *See* Dkt. 75 at 4; Dkt. 96 at 12-13; Dkt. 126, Mem. Op. at 6, 24-25, 52. The Order provides that all discovery material, whether labeled "confidential" or not, may be used "solely for purposes of this Litigation and no Receiving Party will provide Discovery Material to any person or entity (including for any other litigation) or make any Discovery Material public except as permitted by this Order and in this Litigation." Dkt. 79 at ¶ 1.

Mr. Byrne stipulated and agreed to the Protective Order. Dkt. 45; Dkt. 126, Mem. Op. at

---

[1] The record is replete with evidence of Mr. Byrne's and Ms. Lambert's non-compliance with the Court's rules and orders, incorporated by reference here. *See* Dkts. 75, 82, 102, 105, 108, 113, 118, 122, 125, 126, 128, 135, 141, 144, 146, 149, 151, 154, 155, 165, 167, 175, 183, 189, 191, 195.

6-7. Plaintiffs then produced millions of pages to Mr. Byrne and his then-counsel at McGlinchey Stafford ("McGlinchey"), whose lawyers, as far as Plaintiffs are aware, had every opportunity to review the documents and no difficulty complying with the Protective Order.

**II.    Mr. Byrne Brings in an Attorney Willing to Violate the Protective Order.**

Sometime before March 2024, Mr. Byrne retained Stefanie Lambert as additional counsel. Although she did not appear until March 12, 2024, *see* Dkt. 71, she had signed an undertaking on December 12, 2023, swearing that she had read and would abide by the Protective Order. Dkt. 126, Mem. Op. at 7-8. Around then, McGlinchey gave Ms. Lambert login credentials to the database containing Plaintiffs' document production. *Id.* at 7. Plaintiffs did not learn that Ms. Lambert was retained or had access to Plaintiffs' documents until March 11, 2024, when McGlinchey informed them that she had publicly disclosed Plaintiffs' documents in violation of the Protective Order. *Id.* at 7-11. The next day, McGlinchey withdrew and Ms. Lambert appeared. Dkts. 71, 72.

Investigating the scope of the improper disclosure, Plaintiffs quickly learned of at least two breaches: Ms. Lambert filed Plaintiffs' documents on the public docket in a Michigan criminal case charging her with four felonies related to the 2020 election, and she gave login access to the entire database storing Plaintiffs' documents to a Michigan sheriff named Dar Leaf, who subsequently posted thousands of pages of Plaintiffs' documents to his X account. Dkt. 126, Mem. Op. at 8-9, 12-13, 31-32. Sheriff Leaf then created a public link for easy download. *Id.* at 12-13. Both disclosures included false allegations of criminal conduct supposedly revealed in Plaintiffs' production, encouraging further copying and distribution. Dkt. 82 at 7-10.

On March 12, 2024, the day after learning of the disclosures, Plaintiffs notified the Court of the willful breaches and their intent to seek emergency relief. Dkt. 73 at 5; Dkt. 73-4 (Ex. D). That evening, Ms. Lambert accused Plaintiffs of various "criminal acts" and Plaintiffs' counsel of being "potentially [an] accessory after the fact." Dkt. 75-3 (Ex. 2). She also wrote: "***My client***

***insisted the evidence of criminal acts be provided to law enforcement.***" *Id.* Three days later,

Plaintiffs filed a motion to disqualify Ms. Lambert based on these breaches. Dkt. 75. The motion

expressly reserved the right to seek additional sanctions against Mr. Byrne. *Id.* at 23.

III.   **Judge Upadhyaya Issues a Status Quo Order Requiring Mr. Byrne to Cease Public Distribution of Plaintiffs' Documents.**

On March 18, 2024, Judge Upadhyaya held a hearing originally set as a status hearing to

address the progress of the litigation but now focused on Mr. Byrne's and Ms. Lambert's

unauthorized disclosures. Dkt. 78. After Ms. Lambert denied none of the allegations and argued

only that her actions were justified, Judge Upadhyaya issued a Status Quo Order the next day. Dkt.

77. The Status Quo Order required Mr. Byrne and Ms. Lambert to "immediately desist from

sharing, distributing, providing access to or discussing any discovery material." *Id.* at ¶ 1. It also

required them to file signed verifications that they would comply with it. *Id.* at ¶ 8.

On March 26, 2024, after the Court granted multiple belatedly sought extensions to that

filing deadline, both Mr. Byrne and Ms. Lambert filed said signed verifications. Dkt. 84. Mr.

Byrne's statement reads, in full: "I, Defendant, Patrick Byrne, verify that I have and will comply

with the obligations set forth in the Court's March 19, 2024 Order (Docket No. 77) until further

Order of the Court." *Id.* at 3.

IV.   **Mr. Byrne Publicly Rescinds His Commitment to Comply with the Court's Rulings.**

Mr. Byrne quickly showed he did not take that commitment seriously. On April 2, 2024—

six days after signing and filing his affirmation—he posted a video making clear he would not

follow any order interfering with his public dissemination of conspiracy theories and baseless

allegations of criminal misconduct. In his own words:

> It's absolutely incorrect, Judge, to tell us we have to honor that agreement to keep
> these crimes secret. ***And I'm telling you here, and Judge, with all due respect, you
> decide what you want.... But there's no chance in hell I'm not going to make this
> public.... I'm affirmatively saying, I don't care. I have it now. I have it on my***

6

***machine. I'm not in the country. This stuff doesn't get unsealed, I'm just going to make it public. You can throw me in jail.... I'm going to make this stuff public. So I hope you make the right decision, but I'm not going to keep this quiet. I'm going to give you time to make the right decision. And if you make the wrong decision, I'm just going to do the right thing anyway.***

Dkt. 126, Mem. Op. at 58-59 (quoting Dkt. 102-3 at 11) (emphasis added). Mr. Byrne then deleted the post, violating the Status Quo Order's express requirement that discovery-related materials be preserved, as well as his obligations to preserve information relevant to this proceeding. *Id.*

Since posting and then deleting this statement, Mr. Byrne has engaged in ongoing, repeated violations of the Protective Order, demonstrating that he meant what he said: he will follow orders from this Court only when, in his view, those orders "make the right decision." *Id.* at 59.

## V.   Mr. Byrne Attends Argument on Plaintiffs' Motion to Disqualify and Affirms His Understanding and Willingness to Follow the Court's Orders.

Recognizing the seriousness of Plaintiffs' request to disqualify Ms. Lambert, Judge Upadhyaya held a second hearing on May 16, 2024, and ordered Mr. Byrne to appear personally. Dkt. 103; Minute Order, Apr. 25, 2024. The argument, set for one hour, lasted an hour and forty-five minutes, during which Ms. Lambert was given every opportunity to dispute that she and her client had done what Plaintiffs said they had done, let alone provide any legal authority or other credible justification for both her and her client's original and ongoing breaches of this Court's orders. Dkt. 103. She did neither. Instead, as at the March hearing, she claimed that she had no authority supporting her conduct because finding such authority "is a request that I find a case that says water is wet." *Id.* at 46:21-23; Dkt. 126, Mem. Op. at 40-41, 45. She also made the hyperbolic claim that her client's unilateral decision to leak Plaintiffs' materials was justified because, in her telling, the documents revealed "some of the most serious national security issues that have ever taken place in this country." Dkt. 103 at 46:4-8; Dkt. 126, Mem. Op. at 16, 44.

During the hearing, Judge Upadhyaya repeatedly noted that the Protective Order permits a

party to ask the Court to de-designate documents or seek other relief, including to report an alleged crime. Dkt. 103 at 45:16-23, 48:15-21, 49:16-25, 62:15-23. Mr. Byrne's attendance ensured he knew this procedure existed. Indeed, Judge Upadhyaya made this point specifically in response to a question posed by Mr. Byrne concerning disclosure of documents at the request of "Congress or the DOJ or law enforcement," noting:

> Well, if it involves discovery material in this case, follow the mechanism in the protective order for bringing it to the Court's attention, and, if it's confidential, you can seek to file something before this Court.

> But I'll just be very clear, some of the actions that appear to have been taken in the name of law enforcement aren't entirely supported, so that's why I'm saying you need to follow the strict guidelines of Judge Nichols' order and come to the Court if there are any such requests.

*Id.* at 62:12-23.

After hearing argument, Judge Upadhyaya read to Mr. Byrne and Ms. Lambert the March 19, 2024, Status Quo Order's requirement that they "immediately desist from sharing, distributing, providing access to or discussing any discovery material...." Dkt. 103 at 60:18-20. After Ms. Lambert confirmed that she understood and would comply, *id.* at 61:12-13, Judge Upadhyaya turned to Mr. Byrne. Asked if he understood her order, Mr. Byrne responded, "I do." *Id.* at 61:22. Asked if he was prepared to comply with it, Mr. Byrne responded, "Yes." *Id.* at 61:25. Asked if he would comply with it, Mr. Byrne again responded, "Yes." *Id.* at 62:4.

## VI.    Mr. Byrne Continues to Flout This Court's Rules and Orders.

In the following months, Mr. Byrne continued violating the Court's orders. On July 25, 2024, in a webinar titled *Cyber Crisis: Saving Tina Peters*, he falsely identified an employee of Plaintiffs as a "Cuban intelligence officer," the same day of that employee's deposition. Dkt. 118-1 (Supp. Br.) at 5-6; Dkt. 118-1 (Ex. 1) at 101:14-20; Dkt. 118-1 (Brook Decl.) at ¶ 3. On the same broadcast, Mr. Byrne discussed "facts" he claimed to have confirmed from Plaintiffs' documents:

> And what [convicted Colorado official Tina Peters] found is absolutely that the game is rigged. That in -- that these elections are being rigged. Boy, I wish I could tell you more. I do know more, I do know more, but a little bit comes -- I don't even want to say -- it comes from our discovery against Dominion, … which is the stuff that we got out of this very legalistic kabuki dance process, simply confirms all of the stuff that we actually got illegally.

Dkt. 118-1 (Ex. 1) at 43:24-44:14. This is part of the abuse that the Protective Order and Status Quo Orders were designed to prevent—making vague but scandalous allegations and then claiming that they have been confirmed as part of discovery in this case.

## VII.    The Court Disqualifies Ms. Lambert.

On August 13, 2024, Judge Upadhyaya granted Plaintiffs' motion to disqualify Ms. Lambert. Her 62-page order reviewed the events supporting that "extraordinary remedy" and concluded that "the circumstances of Lambert's misconduct are 'truly egregious' such that her continued involvement would 'infect future proceedings.'" Dkt. 126, Mem. Op. at 50-51 (citation omitted). The Court observed that Mr. Byrne may have hired Ms. Lambert "for the sheer purpose of" violating court rules and orders, *id.* at 3, found her breaches willful and ongoing despite commitments to the Court she would comply, *id.* at 50-55, and found that her misconduct "has significantly hampered discovery" and "completely subsumed what were supposed to be the final two months of discovery." *Id.* at 56.

Because Plaintiffs expressly reserved their request for sanctions against Mr. Byrne, the Disqualification Order did not address that remedy. It did find that Mr. Byrne personally violated the Protective Order, noting that his conduct "is relevant because Lambert refuses to ensure he complies with the Court's orders and, instead, attempts to justify his blatant violations with meritless and rejected arguments." *Id.* at 27.

The Disqualification Order also quotes the video Mr. Byrne posted to X on April 2, 2024, but later deleted. In it he said, "I'm telling you here, and Judge, with all due respect, you decide

9

what you want…. But there's no chance in hell I'm not going to make this public." *Id.* at 58 (quoting Dkt. 102-3 at 11). As the Court observed, "Byrne has made clear he has no intention of following this Court's orders." *Id.*

The Court found that Mr. Byrne's defiance continued after the May hearing, when he represented to the Court that he would comply with its orders, as the very next day he posted additional screenshots of Plaintiffs' documents to X. *See id.* at 19-20, 58.

The Court also observed that Plaintiffs had brought to its attention in supplemental filings "even more incidents of alleged misconduct by Lambert, highly concerning remarks from Byrne, and efforts to use Dominion's Litigation Documents in the Peters Criminal Case." *Id.* at 61-62 & n.30 (citing Dkts. 118, 122). However, the Court expressly did not consider this misconduct because: "The Court appreciates efforts to supplement as the Court previously requested, but it resolves this Motion without addressing these latest incidents because it appears that any other approach will only continue the cycle of alleged misconduct while this Motion is pending." *Id.*

In addition to disqualifying Ms. Lambert, Judge Upadhyaya ordered continuing relief to address the ongoing impact of Mr. Byrne's disclosures. These requirements included: (i) operative portions of the Status Quo Order would remain in effect through resolution of the case; (ii) Mr. Byrne and Ms. Lambert would submit sworn affidavits fully accounting for their unauthorized disclosures of Plaintiffs-produced documents, including what was accessed, when, by whom, and to whom it was disclosed; and (iii) Mr. Byrne would support related privilege claims with a detailed privilege log. Dkt. 125 at 2-3.

The Court also invited Plaintiffs to submit a document destruction protocol to prevent future breaches. *Id.* at 3. Plaintiffs proposed that protocol on August 20, 2024. Dkt. 128. Mr. Byrne and Ms. Lambert did not respond to it until 602 days later, after the Court had granted it as

unopposed. Dkts. 175, 179.

**VIII.   Mr. Byrne and Ms. Lambert File Meritless Appeals and Ignore Plaintiffs' Proposed Document Destruction Protocol.**

Mr. Byrne and Ms. Lambert sought review of Judge Upadhyaya's Disqualification Order, which Judge Nichols affirmed in full on October 22, 2024, stating that he "would affirm that decision even if [he] were reviewing the disqualification *de novo*." Dkt. 144 at 2. Mr. Byrne and Ms. Lambert then sought reconsideration and were again denied. Dkt. 154. Mr. Byrne then appealed to the D.C. Circuit despite binding Supreme Court precedent that disqualification orders are not immediately appealable. *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424 (1985). The D.C. Circuit dismissed the appeal for lack of jurisdiction, denied rehearing *en banc*, and issued its mandate. Per Curiam Order, No. 24-7195 (D.C. Cir. Mar. 24, 2025) (dismissing appeal); Per Curiam Order, No. 24-7195 (D.C. Cir. June 9, 2025) (denying *en banc* review); Dkt. 160. Finally, Mr. Byrne—with Peter Ticktin now as counsel of record—petitioned the U.S. Supreme Court for certiorari, which was denied on November 10, 2025. Order, No. 25-281 (U.S. Nov. 10, 2025).

The affidavit and destruction-protocol issues were pending throughout these failed appeals and challenges. Indeed, Judge Upadhyaya stayed only the affidavit deadline to permit Mr. Byrne to pursue objections to Judge Nichols, made clear that the case itself was not stayed, and stated that she would consider Plaintiffs' protocol after Judge Nichols resolved the objections to the Disqualification Order. Minute Orders, Aug. 23, 2024.

After Judge Nichols affirmed the Disqualification Order, Plaintiffs moved on November 1, 2024, to set a new affidavit deadline and enter their proposed document-destruction protocol. Dkt. 146. Mr. Byrne's opposition was due November 15, 2024, but neither he, Ms. Lambert, nor any other lawyer acting for them filed one; Plaintiffs' reply therefore notified the Court that the motion was unopposed and could be treated as conceded. Dkt. 149.

11

Meanwhile, Mr. Byrne failed to produce his own discovery. The case was not stayed before fact discovery closed: after Ms. Lambert's disqualification, Judge Upadhyaya denied a stay of "all proceedings," keeping the coordinated cases in active discovery; when Mr. Byrne renewed his stay request, Plaintiffs opposed it because he showed no basis for refusing to participate in discovery, either through new counsel or *pro se*, and the Court denied his request. Dkts. 129, 141, 142, 152-1; Minute Orders, Aug. 23, 2024 & Feb. 2, 2026. Yet Mr. Byrne still failed to participate in discovery, including by failing to produce key documents and search for information, Dkt. 167-5 (Ex. E); failing to answer interrogatories served August 30, 2024, Dkt. 167-6 (Ex. F); and refusing to appear for his properly noticed December 5, 2024, deposition, Dkt. 155-1 (Opp.) at 4-8.

His effort to avoid that deposition was itself misconduct. As Plaintiffs previously alerted the Court, after Plaintiffs noticed the deposition on November 6, followed up twice, and made clear that they would proceed absent a proper basis to adjourn, disqualified counsel Ms. Lambert surfaced two days before the deposition with a claimed medical excuse on behalf of Mr. Byrne. *Id.* Plaintiffs believed the excuse repeated an account another federal court had characterized as "a fraud upon the Court." *Id.* at 2, 5, 7, 12; Dkt. 155-1 (Ex. 1) at 11:15-17. When Mr. Byrne still did not appear, Plaintiffs went on the record and noticed his non-appearance. Dkt. 155-1 (Ex. 12).

## IX.    Mr. Ticktin Appears, Delays the Joint Status Report, and Resumes Mr. Byrne's Campaign to Relitigate the Protective Order.

Plaintiffs did not bring this motion while Mr. Byrne's appeals were pending, hoping he would turn over a new leaf once those appeals ended. He did not.

After the D.C. Circuit issued its mandate and the Supreme Court denied Mr. Byrne's certiorari petition, the Court directed the parties to file a joint status report addressing whether the stay should be lifted, what motions remained live, and the case's next steps. Minute Order, Oct. 31, 2025. On the November 14, 2025, deadline, Peter Ticktin entered his appearance and sought a

12

seven-day extension because he was traveling and supposedly had not yet familiarized himself with the case—even though he had been counsel of record on Mr. Byrne's Supreme Court petition. Dkts. 161, 162.

Plaintiffs consented to the extension but filed their own status report to comply with the Court's deadline when the extension had not yet been granted. Dkt. 163. After the Court granted the extension *nunc pro tunc*, Minute Order, Nov. 18, 2025, Mr. Ticktin filed a unilateral status report rather than joint report the Court had ordered, admitted he was still "in the process of familiarizing" himself with the record, and requested another 60-day stay, Dkt. 164.

On November 26, 2025, the Court continued the stay for 45 days to allow Mr. Ticktin "to familiarize himself with this case" and ordered a joint status report by January 10, 2026, addressing four specified topics. Minute Order, Nov. 26, 2025. The Court reminded Mr. Byrne that extension motions should be filed at least four days before a deadline and that the report "shall be a joint one," requiring a meet-and-confer before filing. *Id.*

Mr. Ticktin did not use that 45-day period to cure Mr. Byrne's discovery defaults, seek permission to access Plaintiffs' productions, advance the merits, or familiarize himself with the facts and history of the case. At the parties' meet-and-confer, he showed virtually no knowledge of the Court's orders concerning Ms. Lambert's disqualification or restrictions on access to Plaintiffs' productions. Dkt. 167 at 2-3 (citing Dkt. 167-1 (Ex. A) at 1; Dkt. 167-2 (Ex. B) at 1-5).

Instead of doing any of that work, Mr. Ticktin focused on supporting Mr. Byrne's quest to disclose Plaintiffs' confidential documents, proving he had been brought on as counsel for the same reasons as Ms. Lambert. Five days before the joint status report was due, Mr. Ticktin filed a motion to "fully lift" the Protective Order or, alternatively, permit Ms. Lambert to comply with a subpoena served by Joseph Oltmann in the *Coomer v. Oltmann* matter, so she could provide Mr.

13

Oltmann Plaintiffs' documents and communications subject to the Protective Order. Dkt. 166 at 1-3, 11. The motion sought to provide to a third party documents that Ms. Lambert should not have possessed, accessed, or used outside this case. Dkt. 77 at ¶¶ 1, 4-6; Dkt. 79 at ¶ 1; Dkt. 125 at 2-3. Mr. Ticktin should have complied with the Protective Order by alerting Plaintiffs of the subpoena and objecting to it on grounds of existence of the Protective Order. Dkt. 79 at ¶ 26.

The circumstances surrounding that motion further underscore the problem. Metadata for Mr. Byrne's motion showed that Ms. Lambert—not Mr. Ticktin—was the author of the filing, confirming that Mr. Ticktin had recycled a motion Ms. Lambert had filed twice before her disqualification and that Ms. Lambert remained involved in Mr. Byrne's defense notwithstanding the Court disqualifying her "effective immediately." Dkt. 173 at 6-7; Dkt. 125 at 3. After Plaintiffs raised this troubling fact, Mr. Ticktin changed the metadata on later filings—including Mr. Byrne's notice of intent to object, Dkt. 177, Mr. Byrne's appeal of the March 31 Order, Dkt. 179, and Mr. Ticktin's response to the March 31 Order, Dkt. 176—to list the author as "Richard P. Astley," the singer associated with the "Rick Roll"[2] Internet prank. Dkt. 183 at 42.

Further demonstrating his intent to not properly litigate this case, Mr. Ticktin opposed Plaintiffs' routine motion to amend the case caption for two renamed plaintiff entities. Dkt. 169; Dkt. 172. When the Court granted Plaintiffs' motion in a one-page order, the Court stated that "Defendant's arguments in opposition are frivolous." Dkt. 174.

Mr. Ticktin's conduct in this case, and Mr. Byrne's decision to retain Mr. Ticktin of all people, is significant. Judge Upadhyaya previously observed that Mr. Byrne may have hired Ms. Lambert "for the sheer purpose of" violating court rules and orders. Dkt. 126, Mem. Op. at 3. Mr.

---

[2] A "rick roll" is a well-known Internet prank in which a person is misled into clicking a hyperlink expecting to see one thing, but instead is unexpectedly subjected to the 1987 music video for the song "Never Gonna Give You Up" by the singer Rick Astley.

Ticktin, it turns out, has a well-documented history of misconduct across multiple jurisdictions. Mr. Ticktin has had his Florida law license suspended on at least two prior occasions. *See The Florida Bar v. Ticktin*, 14 So. 3d 928 (Fla. 2009); Dkt. 183-2 (Ex. 1). In 2025, the Middle District of Florida sanctioned Mr. Ticktin and his firm in the amount of $320,819.88 for his "failure to properly investigate the[] claim[s]" he brought, declining to accept a "nominal" sanction because "it would effectively greenlight this conduct in the future for firms, like the Ticktin Law group, which could simply build a nominal sanction cost into the cost of doing business in this fashion." *Glob. Glass Techs., Inc. v. Rsch. Frontiers, Inc.*, 2025 WL 2088421, at *1, *6 (M.D. Fla. July 25, 2025). In *Trump v. Clinton*, the Southern District of Florida sanctioned Mr. Ticktin and others because "[e]very claim was frivolous, most barred by settled, well-established existing law. These were political grievances masquerading as legal claims. This cannot be attributed to incompetent lawyering. It was a deliberate use of the judicial system to pursue a political agenda." 640 F. Supp. 3d 1321, 1332 (S.D. Fla. 2022), *aff'd*, 161 F.4th 671 (11th Cir. 2025). Even more recently, in *Biden v. Byrne*, the Central District of California revoked Mr. Ticktin's *pro hac vice* admission one week after granting it, finding that "Mr. Ticktin's history of prioritizing political pursuits over his ethical obligations, combined with his lack of transparency to the Court, 'suggests ... that he will not abide by the Court's rules and practices.'" 2025 WL 2429688, at *2-3 (C.D. Cal. Aug. 5, 2025) (citation omitted). And just this year, the District Court of Denver denied Mr. Ticktin's admission entirely, finding that he and his firm "have exhibited behaviors constituting a troubling pattern that demonstrates a lack of regard to the integrity of the judicial process. Even more disturbing is that this pattern has repeated itself in numerous jurisdictions over the span of years." Dkt. 183-4 (Ex. 3) at 9 (attaching Order, *Eric Coomer v. Donald J. Trump for President Inc. et al.*, No. 2020CV34319 (Denv. Dist. Ct. Apr. 3, 2026)). In a defamation case in the Middle District of

15

Florida involving a former employee of Plaintiffs, Mr. Ticktin physically assaulted opposing counsel at a deposition, shoving him twice—the second time after raising his fist—as captured on hotel surveillance video. *See* Ex. 10, Order at 17-20, *Eric Coomer v. Patrick Byrne et al.*, No. 8:24-cv-8-TPB-SPF (M.D. Fla. June 29, 2026) ("*Coomer*"), Dkt. 332. The court referred Mr. Ticktin to the Tampa Division Grievance Committee, awarded Mr. Coomer his attorneys' fees, and ordered all future depositions and mediations to proceed in the courthouse. *Id.* at 20-21.

## X.      Mr. Byrne and Ms. Lambert Defy the March 31 Order and File Baseless Appeals.

On March 31, 2026, Judge Upadhyaya granted in part Plaintiffs' unopposed motion to enter a document-destruction protocol, adopting its core protections. Dkt. 175. Judge Upadhyaya ordered Ms. Lambert to produce all Plaintiffs' Litigation Documents and related communications to Plaintiffs, transfer electronic materials by secure file transfer, sequester those materials with the e-discovery vendors, and provide any privilege log and supporting affidavit by April 13, 2026. *Id.* at 2-4. The Court also ordered Mr. Byrne and Ms. Lambert to submit their long-ordered affidavits providing a full accounting of their unauthorized disclosures of Plaintiffs-produced documents—including what was accessed, when, by whom, and to whom it was disclosed—by April 13. *Id.* at 1-2. And in light of the concerns Plaintiffs had raised about Mr. Ticktin's unauthorized access to Plaintiffs' documents and Ms. Lambert's continued involvement, the Court ordered Mr. Ticktin to personally answer: (i) "whether Lambert is still playing a role in this litigation and, if so, the specific role she is playing"; (ii) "[w]hether she has drafted, edited, or had any role in the preparation or filing of any of Byrne's filings since Ticktin entered his appearance"; and (iii) "[w]hether Ticktin has accessed any of the documents Dominion has produced in this litigation and, if so, where he obtained access to those documents." *Id.* at 4.

On April 10, 2026, Mr. Ticktin nominally responded to the Court's questions but confirmed that Ms. Lambert "does provide valuable insight and information" and that he saw "nothing

16

wrong" with having her draft or edit filings. Dkt. 176 at 2-3. ***He also admitted that "others in his office may have" accessed Plaintiffs' documents, contrary to the Court's orders.*** *Id.*

Rather than comply with Judge Upadhyaya's order, Mr. Byrne and Ms. Lambert filed notices of intent to object on the April 13 deadline and appeals on April 14 and 15, repeating the same baseless themes: that the Court could not enforce the Disqualification Order, that the protocol violated due process and privilege, and that returning or sequestering Plaintiffs' documents would obstruct criminal investigations. Dkts. 178-180. They filed these objections despite having already unsuccessfully appealed the Disqualification Order, which included the affidavit requirement, and despite allowing Plaintiffs' motion to enter the document-destruction protocol to go unopposed.

## XI.    Mr. Byrne Declares in a May 15, 2026, Interview, "I Will Put This on the Internet Before I Destroy It, Judge."

Having exhausted his appeals, retained another attorney willing to facilitate his conduct, and confronting the inevitability of addressing the merits of this case, Mr. Byrne tossed aside whatever restraint he had been exercising and declared the quiet part out loud: he has no respect for the Court and will not follow orders he personally disagrees with. In social-media posts and live interviews, he insisted on his right to continue breaching the Protective Order, then confirmed his boasts by purporting to reveal the contents of Plaintiffs' documents while making yet more outrageous false claims based on the documents.

On May 15, 2026, he appeared on *The Absolute Truth* for more than fifteen minutes. He began by suggesting he would only allude to alleged crimes disclosed in Plaintiffs' documents without details:

> ***I mean, it's black and white. And I can't really reveal, but I can say like, while the head of Dominion was going around and testifying to legislatures A, B, C, and D, his own emails are saying W, X, Y, and Z.***

Ex. 1 at 10:9-16 (emphasis added); *see also* Ex. 2 (video). This allusion itself violated the Status

17

Quo Order's prohibition on "discussing any discovery material" in a public forum. Dkt. 77 at ¶ 1.

But Mr. Byrne quickly moved from ominous but vague allegations about things "I can't really reveal" to ignoring any restrictions whatsoever, and falsely claiming to be disclosing material by describing the contents of actual documents produced by Plaintiffs:

> *So -- and these kind of documents that we've discussed on your show*, like the lap -- computers being made in China, BIOS, the hard -- the firmware on the systems, actually Chinese having -- by emails, it shows -- they get a chance to edit it and change it. So all this stuff they tell us, well, yeah, there's cellular modems on the motherboard, but they're disabled. Well, that's all true unless China has access to the BIOS, this firmware of the product, which the emails show they do. Crazy -- as we've discussed in our shows.

Ex. 1 at 11:23-12:13 (emphasis added). A few minutes later, Mr. Byrne again disclosed what he identifies as from Plaintiffs' emails:

> *We're sitting on documents. I'm dying to tell you -- okay. I'm going to tell you one. It's going to really blow their mind.* You know what they -- Dominion calls their stuff, Democracy Suite 5.0? You know what they call it internally? They call it Venezuela 5.0 in their own emails because they know it's Venezuela junk software that they just -- they've just -- they've just changed cosmetically. They call their own software Venezuela 5.0, that they market to the world as Democracy Suite 5.0 and, no, we don't have any relations with Venezuela….

*Id.* at 16:13-17:3 (emphasis added). Shortly after these comments, Mr. Byrne again openly acknowledged that his statements violate orders from this Court: "*I probably just blew some federal judge's mind saying that.*" *Id.* at 17:15-16 (emphasis added).

Mr. Byrne capped the interview with a tirade leaving no doubt that his violations were deliberate and willful and that he had no intention of stopping:

> It's ridiculous. *So she's -- and **now [Judge Upadhyaya]'s tried to order us to destroy these. Judge, I have lifelong intelligence obligations. I've signed contracts that say I've got lifelong obligations to do certain things. There's no chance, I'm destroying this, Judge, and neither is Ste[f]anie Lambert. I'd put it up on the Internet before I would destroy it, Judge.... You belong in prison, Judge Upadhyaya. Lawyer the fuck (bleep) up. Lawyer up, Judge. Lawyer up.***

Ex. 2 at 20:30-21:00 (video). Mr. Byrne's bizarre exhortation to Judge Upadhyaya apparently

refers to his claim, discussed at length earlier in the interview, to have used his connections at the U.S. Department of Justice to initiate a criminal investigation into the Judge (whose image was on screen throughout parts of the broadcast). *See id.* at 10:15-11:30.

**XII.    Mr. Byrne Declares in a May 19, 2026, Interview, "I Just Violated Some Federal Judge's Orders. I Don't Care."**

Four days later, Mr. Byrne appeared again on *The Absolute Truth*. LindellTV publicized the appearance as featuring his allegations that "***internal emails allegedly show*** developers in Belgrade, Serbia remotely accessing machines during the Antrim County controversy." Ex. 6 (emphasis added). In this interview, Mr. Byrne claimed to disclose information from Plaintiffs' emails and acknowledged he understood he was violating court orders. When the reporter asked "what evidence is so damning" in Plaintiffs' documents, he responded, "Well, Emerald, I'm -- sadly, *I'm under federal judicial order not to answer that question, but I'm going to do it anyway*, and I'm going to cause my lawyers' heads to explode." Ex. 3 at 5:14-19; *see also* Ex. 4 (video).

Before addressing Plaintiffs, Mr. Byrne described the source of the authority he believed allowed him to override the Court's orders: "I've got a letter, or there exists a letter from the Senate Judiciary Committee that says I get extraordinary latitude under the laws of the United States to disrupt the corrupt takeover." Ex. 3 at 5:23-6:5. In Mr. Byrne's view, this letter—which unsurprisingly he has never shared with the Court—gives him unfettered authority to decide when he can "break[] some federal judicial orders," *id.* at 6:5-6, in the name of rooting out corruption.

He then breached the Protective and Status Quo Orders by discussing facts he claimed to have learned from Plaintiffs' emails. Addressing errors in Antrim County, Michigan, Mr. Byrne insisted that Plaintiffs' Serbian engineers remotely manipulated the tally:

> In reality, ***there were emails within Dominion*** and over to Belgrade, Serbia to his head of development, in Belgrade, Serbia, where they're instructing the guys in Belgrade, Serbia, to come on and change the results in Antrim. Those results, the reason they went through different versions and it took so long, because there were

19

guys in Belgrade VPN-ing into the back of the machine and creating virtual machines and altering election results multiple times at the direction from -- of people of Dominion. And the CEO was in on all this. ***So that's all in the emails.***

*Id.* at 7:12-8:3. Mr. Byrne repeatedly returned to the claim that these facts were confirmed by

Plaintiffs' "emails." *Id.* at 8:18, 8:25, 11:5, 12:3. These claims are false.

Mr. Byrne concluded by emphasizing his awareness of the implications of his actions:

"***We've been under judicial order for years not to reveal that. I just violated some federal judge's***

***orders. I don't care.***" *Id.* at 9:1-4. He added moments later, "***The[y] were illegal orders anyway,***

***and I'm ashamed it took me this long to violate them.***" *Id.* at 9:6-8.

When the interview was released on LindellTV, Mr. Byrne publicized it for his followers

on X. His comments speak for themselves:

> ***Today I disclose Dominion's emails because I no longer follow traitorously illegal orders from Magistrate Judge Upadhyaya (a vile Indian who repped Madudo [sic] & VZ 2019-22), Deep State Judge Nichols, & their boss Judge Boasberg (a dirty Bolshevik).***
>
> cf. MLK, "Birmingham Jail"

Ex. 5.

## XIII.  Mr. Byrne Declares in a June 25, 2026, Interview, "Screw You, Judge. I'm Ignoring Your Orders."

On June 25, 2026, Mr. Byrne returned to *The Absolute Truth* and again publicly disclosed

what he represented as information from Plaintiffs' emails, despite this Court's orders and prior

warning. He expressly announced that he was "ignoring" the Court.

> By the way, J. Alex Halderman has his own problems. I think I revealed on his show -- on this show something I wasn't suppose to reveal, ***but I'm just ignoring this federal magistrate goon***, you know, mob lawyer in D.C.; there are emails from Halderman to Dominion in November 2020, where he contacts them saying, how can I help, how can I help. And they tell him, we want you to say this. He's like a little puppy. They tell him what he wants to say, and he goes out and he says it. He's just repeating Dominion's talking points. So Halderman really implicated himself in this greatest crime in U.S. history.

20

Ex. 7 at 5:10-22; *see also* Ex. 8 (video); Ex. 9 (Mr. Byrne X post).

Mr. Byrne did not merely violate a court order; he boasted about it. He identified protected material, described its alleged contents, and explained why he proceeded anyway. He then removed any doubt about his intent. In the same interview, he escalated from defiance to contempt for the Court and these proceedings, referring to Judge Upadhyaya as a "smelly Indian" and Judge Nichols as a "deep-state idiot" before declaring: "Screw you, Judge. I'm ignoring your orders."

> I want to take these guys in and give them a thrashing in a D.C. courtroom that goes down in history, notwithstanding the prophylactic efforts of this smelly Indian mob lawyer, whose been protecting -- a magistrate judge protecting them. And shame on Judge Nichols, you idiot, you deep state idiot, who's been over -- who had a mob lawyer from Venezuela acting as the impartial judge in our case. ***Screw you, judge. I'm ignoring your orders.***

Ex. 7 at 9:14-22 (emphasis added).

Plaintiffs do not highlight Mr. Byrne's racist and personal attacks on the Court because he lacks the right to think or say them, deplorable and false as they may be. Plaintiffs highlight them because, together with his admitted violations and unequivocal statements that he will ignore this Court's authority, they reveal Mr. Byrne's deep-seated, entrenched contempt for this Court's authority. They show that he will never comply with an order he disagrees with, and thus that nothing short of default judgment is appropriate.

## XIV.  The Court Finds Mr. Byrne's and Ms. Lambert's Appeals to the March 31, 2026, Disclosure Order "Lack Merit" and "Denies Both."

On July 1, 2026, the Court denied Mr. Byrne's and Ms. Lambert's appeals of the March 31, 2026, disclosure order, finding their procedural and substantive objections "lack[ed] merit." Dkt. 191 at 1-3. The Court explained that their objections to Judge Upadhyaya's statutory authority "ignore[d] Rule 72's plain language" and that their challenges to her factual findings "ignore[d] the procedural history," which showed that "[t]he disclosure order was simply the next step in enforcing the disqualification order, which already made extensive findings about Byrne's and

21

Lambert's misconduct…." *Id.* at 3. The Court also held that Judge Upadhyaya properly treated Plaintiffs' document-destruction protocol as conceded because Mr. Byrne had "agreed in a later joint status report that Dominion's motion was 'live for the Court's ruling' without suggesting any opposition to it." *Id.* at 4 (quoting Dkt. 167 at 17-18). The Court further found that "to the extent [Mr. Byrne and Ms. Lambert] complain that the requirements to transfer and limit access to [Plaintiffs'] documents are strict, their well-documented past misconduct justifies such obligations to ensure compliance with court orders." *Id.* at 4. And the Court found the argument that Ms. Lambert's disqualification "cannot be enforced because it is not a final order for purposes of appellate jurisdiction" was "frivolous and suggests a fundamental misunderstanding of basic principles of jurisdiction." *Id.* "For all these reasons," the Court concluded, "the Court would affirm the disclosure order even under entirely *de novo* review." *Id.*

The Court therefore ordered "Byrne, Lambert, and Ticktin [to] comply with all the requirements—including the affidavit, production, transfer, privilege log, and response obligations—of the disclosure order, ECF 175, on or before July 15, 2026." *Id.* at 5.

The Court also issued a stark warning to Mr. Byrne when denying Plaintiffs' request for sanctions. *Id.* The Court agreed that Plaintiffs "put forth concerning allegations about unauthorized access to documents by individuals at Ticktin's firm and Lambert's continued involvement in this case," and warned Mr. Byrne: "Noncompliance and further attempts to evade enforcement of court orders, however, could certainly justify additional sanctions in the future." *Id.*

## XV.    Mr. Byrne Ignores the Court's July 1, 2026, Order, Files Another Frivolous Challenge to the Disqualification and Disclosure Orders, and Lies to the Court.

Mr. Byrne ignored the Court's July 1 warning. His July 15 deadline passed without compliance with the disclosure order. That evening, instead of complying, he filed a frivolous motion to disqualify Magistrate Judge Upadhyaya, asking the Court again to "reliev[e] the

22

Defendant of the affidavit deadline entered by Magistrate Judge Upadhyaya, and of any other deadline she has imposed, pending reassignment" and "determin[e] whether any prior ruling should be vacated and discovery reopened before a newly assigned Magistrate Judge." Dkt. 193 at 14. The request, of course, ignored Judge Nichols's confirmation that he would affirm the disqualification and disclosure orders on a *de novo* review. Dkt. 144 at 2; Dkt. 191 at 4.

As Plaintiffs' opposition explained, Mr. Byrne's motion was "another in a very long line of efforts to avoid compliance with the Court's orders requiring him to account for the disclosure of Plaintiffs' protected materials." Dkt. 195 at 16. Mr. Byrne filed it the day his disclosures were due, nearly two and a half years after all discovery disputes were referred to Judge Upadhyaya. *Id.* at 1-2. Worse, the motion rested on obvious lies. By way of example only:

- Mr. Byrne claimed that "[w]hile at Venable LLP, the Magistrate Judge worked on California litigation under the supervision of Douglas Emhoff," and "***Emhoff was deposed in this case***," Dkt. 193 at 7, 12 (emphasis added), even though Mr. Emhoff was ***not*** deposed in this or any other case brought by Plaintiffs, Dkt. 195 at 3.

- Mr. Byrne claimed that "***Defendant never examined Stimson***" because Judge Upadhyaya disqualified Ms. Lambert, Dkt. 193 at 4, 10 (emphasis added), even though Ms. Lambert deposed Ms. Stimson on August 8, 2024, Dkt. 195 at 3 (citing Dkt. 195-2 (Ex. 1)).

- Mr. Byrne claimed that Judge Upadhyaya "represented" Staple Street Capital and its co-founders, Dkt. 193 at 4, even though he cited no evidence of that representation and Venable LLP confirmed it has no record of representing Staple Street Capital or Messrs. Yaghoobzadeh or Owens, whether or not Judge Upadhyaya was involved, Dkt. 195 at 3.

The only theory with any factual basis was that Judge Upadhyaya briefly represented the Government of Venezuela several years ago in unrelated litigation, but Mr. Byrne ignored that the ***Court rejected that theory of disqualification*** when OAN raised it more than two years ago in *Smartmatic USA Corp. v. Herring Networks, Inc.*, 2023 WL 8697830 (D.D.C. Dec. 16, 2023).

After Plaintiffs identified these issues in opposition, Dkt. 195, Mr. Byrne requested a 14-day extension to reply, Dkt. 197. He sought this extension the day his reply was due, even though

the Court requires parties to seek extensions at least four days before their original deadline, Dkt. 15 at ¶ 9(b)—a requirement this Court specifically instructed Mr. Ticktin on when he first appeared, Minute Order, Nov. 26, 2025. The Court nevertheless granted Mr. Byrne a seven-day extension. Minute Order, Aug. 7, 2026. But when Mr. Byrne's reply came due on August 12, 2026, he filed nothing. Despite Plaintiffs calling out that the main premises of his motion were demonstrably false—and false in ways Mr. Byrne and Mr. Ticktin should have obviously known— and despite asking for more time to investigate their own false statements, they said nothing.

**XVI.   Mr. Byrne Appears Live on Alex Jones's Podcast on July 23, 2026, and *The Absolute Truth* on July 31, 2026, Showing Viewers Actual Copies of Plaintiffs' Documents.**

After filing his disqualification motion, Mr. Byrne resumed disclosing Plaintiffs' discovery materials on July 23, 2026, on Alex Jones's podcast, *see* Ex. 11 (transcript), Ex. 12 (video), and on July 31, 2026, on *The Absolute Truth*, *see* Ex. 14 (transcript), Ex. 15 (video), Ex. 16 (Mr. Byrne X post). He escalated his defiance by showing actual documents.

During the July 23, 2026, podcast, Mr. Byrne held up a green bottle cap, called it the "dirty, Smartmatic, cheating package from Venezuela," claimed it "lets you steal elections," and described a "shell game" from Smartmatic to Sequoia to Plaintiffs. Ex. 11 at 9:16-12:7. He further and falsely claimed, "that dirty package is still inside [Dominion]." *Id.* at 12:14-15.

Mr. Byrne then identified the source of this information: "I'm going to show you, I'm going to prove that to you today with some exhibits today. ***Some of these I'm under order from a federal judge not to show, but the federal judge turns out to have been Venezuela's lawyer until 2022. So I'm now just ignoring her***." *Id.* at 12:15-22.

One minute later, Mr. Byrne said, "[L]et's go to an internal Dominion email, which ***I'm not supposed to show anyone***." *Id.* at 13:25-14:2. He then spent thirteen minutes purporting to interpret Plaintiffs-produced "internal emails" from 2011 through 2020—which he presented ***to***

24

*the camera*—falsely claiming they showed Plaintiffs' systems consisted of "Serbian software on Chinese hardware being operated by Venezuelans" to steal and cheat elections. *Id.* at 14:2-20:19.



Ex. 12 at 1:00-14:25 (video). (The documents Mr. Byrne showed in this and the next program were not redacted; Plaintiffs added redactions in these screen captures to avoid further dissemination.)

Near the end of Mr. Byrne's presentation, Alex Jones said, "[a]nd that's a big deal that this judge told you not to do it and you're doing it." Ex. 11 at 20:20-20:22. Mr. Byrne responds:

> ***Oh, yeah. Well, but the -- the judge told me not to release these.*** She, in fact, put my lawyer in prison for giving these to law enforcement three years ago. Our answer is this is national security…. And we give you a month -- we gave her a month. She wouldn't -- it's been three years. She still has not given us permission to release anything. And we found out a month or two ago she was actually Venezuela's lawyer, and then Biden took her out and made her the magistrate judge…. So yeah, we're actually … she's looking down the barrel of a criminal indictment. A criminal referral has been made about her.

*Id.* at 20:23-21:21 (emphasis added); *see also* Ex. 13 (Mr. Jones X post)

On July 31, 2026, Mr. Byrne returned to *The Absolute Truth*. Ex. 14. The host, Emerald Robinson, introduced him: "Patrick, look, you've been sued by the voting machine companies, by the former executive Eric Coomer, and so you're privy to even more -- more evidence than anyone else." *Id.* at 3:12-16. She added, "I'm just going to let you take the floor and walk us through what you have." *Id.* at 3:22-24. Mr. Byrne then again showed contempt for the Court's authority:

*So I'm under orders not to release things I got from the Dominion lawsuit*, but the woman who gave me the orders turns out to have been Venezuela's lawyer until 2022. Biden plucked her out of the law firm of Mr. Kamala Harris and made her my magistrate judge who's been giving me these orders. This is national security, and ***I'm not going to sit quiet about it anymore***.

*Id.* at 4:16-5:2 (emphasis added).

Mr. Byrne then told Ms. Robinson and her audience, "I'm going to walk you through some emails very quickly. Let's go to the first." *Id.* at 5:13-15. With several Plaintiffs-produced internal emails on screen, he made false and dangerous claims about what those emails showed, including that Plaintiffs were part of an international criminal conspiracy to rig the 2020 election by allegedly injecting ballots into Plaintiffs' voting machines through technology that he asserted was developed by the KGB in the 1970s. *Id.* at 5:15-28:15.



*See* Ex. 15 at 2:50-21:30 (video).

These are the same false and inflammatory allegations that prompted Plaintiffs to file suit and seek the Protective Order. They also have endangered Plaintiffs' employees, including by inspiring an armed person appearing outside Plaintiffs' offices. *See* Dkt. 75 at 4; Dkt. 96 at 12-13; Dkt. 126, Mem. Op. at 6, 24-25, 52. Mr. Byrne knows this. He just doesn't care.

After Mr. Byrne's nearly twenty-minute defamatory rant, Ms. Robinson concluded, "I know you're going to have more in the next few days, Patrick," and Mr. Byrne responded, "***thanks***

*for letting me release these on your show.*" Ex. 14 at 33:8-13 (emphasis added).

**XVII.  Mr. Byrne Shares Plaintiffs' Produced Documents on X on August 6 and 7, 2026.**

The following week, Mr. Byrne did it again. On August 6 and 7, 2026, he used X to amplify and publish Plaintiffs-produced, Bates-stamped, confidential discovery materials. Exs. 17, 18. On August 6, he reposted a third party's X post, which had shared Plaintiffs' internal emails—documents produced in this case—and falsely claimed they proved that "election fraud is coming from our own government = CIA, FBI, DARPA, DIS, DIA, the State Dept. and its subcontractors, US Army and others." Ex. 17. The next day, Mr. Byrne posted additional Plaintiffs' internal emails and, consistent with the same playbook that necessitated the Protective Order in the first place, tried to recast routine election-day troubleshooting as something nefarious. Ex. 18.

\*          \*          \*

This history is more than enough to enter default judgment against Mr. Byrne. It is also only the history Plaintiffs know. Plaintiffs have invested substantial resources in seeking Mr. Byrne's documents and testimony, to say nothing of monitoring Mr. Byrne's public statements and conduct. But Plaintiffs cannot monitor everything he does or, of course, know what he does behind closed doors.

## LEGAL STANDARD

Rule 37 governs sanctions for discovery noncompliance. It authorizes sanctions against a party who fails to "obey an order to provide or permit discovery," including "rendering a default judgment against the disobedient party…." Fed. R. Civ. P. 37(b)(2)(A)(vi); *see, e.g.*, *Giuliani*, 691 F. Supp. 3d at 61-62. The Protective Order expressly makes those sanctions available when a Party violates it "by releasing, leaking, or otherwise disclosing Confidential or Attorneys' Eyes Only Discovery Material to persons or entities not entitled to such Discovery Material." Dkt. 79 at ¶ 29.

To obtain sanctions under Rule 37, the moving party must show a relevant order and its

27

violation. *Giuliani*, 691 F. Supp. 3d at 62. Default judgment requires evidence that failure to follow the order was willful or accompanied by bad faith or other fault. *Wash. Metro. Area Transit Comm'n v. Reliable Limousine Serv. LLC*, 776 F.3d 1, 4 (D.C. Cir. 2015).

This Circuit recognizes three basic justifications for default judgment. "And any one of them alone can be the basis for entering default judgment." *Guarantee Co. of N. Am. USA v. Lakota Contracting Inc.*, 2021 WL 2036666, at *3 (D.D.C. May 21, 2021). First, the misconduct severely hampers the opposing party's ability to present its case—*i.e.*, "the other party 'has been so prejudiced by the misconduct that it would be unfair to require him to proceed further in the case.'" *Giuliani*, 691 F. Supp. 3d at 63 (citation omitted). Second, the misconduct places "an intolerable burden on a district court by requiring the court to modify its own docket and operations in order to accommodate the delay." *Id.* (citation omitted). Third, "the need 'to sanction conduct that is disrespectful to the court and to deter similar misconduct in the future.'" *Id.* at 64 (citation omitted).

Courts also possess inherent authority to impose sanctions, including default judgments, for violating orders. *Id.* at 61-62. "When rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap." *Shepherd v. American Broadcasting Companies, Inc.*, 62 F.3d 1469, 1474 (D.C. Cir. 1995). "The inherent power encompasses the power to sanction attorney or party misconduct, and includes the power to enter a default judgment." *Id.*

Default judgment as a sanction requires clear and convincing evidence. *Id.* at 1478. A court must also consider lesser sanctions and explain why they would not be effective. *Id.* at 1480.

## ARGUMENT

Default judgment is an extraordinary remedy reserved as a last resort. But Mr. Byrne's conduct **is** extraordinary. And he has made perfectly clear that no lesser sanction will suffice.

Civil litigation requires parties to comply with court orders. This is not optional. It is not

subject to a litigant's personal assessment of whether the order is just. It is not overridden by a litigant's self-appointed role as judge of the public interest. When a party publicly, repeatedly, and proudly declares that he will not comply with orders he disagrees with and then makes good on that pledge over and over again, that party has made the judicial process impossible.

Mr. Byrne is that party. Despite telling this Court, on the record, that he will comply with its orders, he has publicly declared over and over again that he will not. He has declared that judges who issue orders he dislikes belong "in prison." He has announced that he possesses authority superior to this Court's, rendering its orders merely advisory.

Worse, Mr. Byrne followed through on those declarations of defiance. He has refused to provide Plaintiffs critical written and testimonial discovery, including discovery that this Court has repeatedly ordered be produced. And in the weeks after the Court denied his and Ms. Lambert's appeals of the March 31, 2026, disclosure order, ordered him to comply with all parts of the disclosure order by July 15, 2026, and warned that noncompliance could invite further sanctions, Mr. Byrne refused again. Instead, Mr. Byrne took to X, appeared on Alex Jones's podcast and *The Absolute Truth*, displayed and shared Plaintiffs' internal emails, and made false and dangerous claims about Plaintiffs' operations—acknowledging in real time that he was defying a court order.

The record therefore unequivocally shows that each justification for default judgment is met here and only one remedy is adequate: entry of judgment against Mr. Byrne.

## I.      Mr. Byrne Has Severely Hampered Plaintiffs' Ability to Present Their Case.

The first justification asks whether the "errant party's behavior has severely hampered the other party's ability to present his case"—that is, whether the opposing party "'has been so prejudiced by the misconduct that it would be unfair to require him to proceed further in the case.'" *Webb v. District of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998) (citation omitted). Mr. Byrne's misconduct prejudiced Plaintiffs in at least three significant ways.

First, Mr. Byrne's contempt for this Court's authority is clear and unrelenting. "I just violated some federal judge's orders. I don't care." Ex. 3 at 9:1-4. "The[y] were illegal orders anyway, and I'm ashamed it took me this long to violate them." *Id.* at 9:6-8. "I no longer follow traitorously illegal orders from Magistrate Judge Upadhyaya." Ex. 5.

A party who categorically refuses to comply with orders he dislikes and publicly disregards the court's authority cannot be a party to civil litigation. Every aspect of the process—discovery, motion practice, pretrial proceedings, and trial—assumes that both parties will abide by the Court's rulings. When one party repeatedly declares that he will not and follows through on that declaration—even after the Court has provided opportunities and warnings to correct course or face sanctions—the process collapses. Plaintiffs' prejudice is not merely that they lack discovery from Mr. Byrne or cannot share discovery with him; it is that continued litigation against Mr. Byrne is structurally impossible. *See Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005) (explaining default judgment is proper where "the adversary process has been halted because of an essentially unresponsive party" (citation omitted)); *Wash. Metro.*, 776 F.3d at 6 ("Litigants cannot pick and choose the legal proceedings they want to participate in at any given time.").

*Stone v. U.S. Embassy Tokyo* is instructive. There, the court found dismissal warranted where a *pro se* plaintiff promised to comply with a protective order, was warned that a violation could result in dismissal, and disseminated protected materials and admitted he would not comply: "Contreras, you can order what you want, but that doesn't mean I'll comply." 2021 WL 1110735, at *1-2 (D.D.C. Mar. 23, 2021). The court explained that "[a] litigant's willful disobedience of court orders … supports dismissal," and that "ignoring warnings is evidence of willfulness." *Id.* at *3; *see also Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992) (affirming dismissal sanction because of plaintiffs' "wilful and unexcused violations of the protective order").

30

Mr. Byrne's conduct is worse than in *Stone*. Unlike the *Stone* plaintiff, Mr. Byrne is not a *pro se* litigant who might not know better. He is a sophisticated party with enormous resources—in his words, he has "more money than God," Dkt. 118-1 (Ex. 1) at 136:10—represented by counsel who agreed to the Protective Order by signing an undertaking, Dkt. 167-1 (Ex. A) at 5; was personally admonished by the Court about the Protective and Status Quo Orders, Dkt. 103 at 61:13-62:4; responded to the Court's offer of a second chance by expressly telling the Court that he understood and would comply, *id.*; Dkt. 84 at 3; has previously been sanctioned through the disqualification of his counsel, Dkts. 125, 126; was more recently warned that he could be further sanctioned for his continued defiance, Dkt. 191 at 5; and yet has continued to violate the Court's orders anyway and openly dared the Court to enforce its orders, Exs. 1-9, 11-18. In his own words: "Screw you, Judge, I'm ignoring your orders." Ex. 7 at 9:22. And unlike in *Stone*, Mr. Byrne's misuse of protected discovery **compounds the harm that led to this suit**: he has used Plaintiffs' confidential materials to broadcast new false accusations and encourage further dissemination.

Mr. Byrne's contempt for the judicial process has also included explicit threats against federal workers and prosecutors. In a July 25, 2024, broadcast, he warned that "anybody in law enforcement or prosecution or federals" who did not abandon the prosecution of a co-conspirator would end up "facing a piano wire and blowtorch before this is over." Dkt. 118-1 (Ex. 1) at 50:19-51:11. This is not the behavior of a party who merely disagrees with a ruling; it is the behavior of a party who believes he can intimidate his way out of compliance with this Court's orders.

Second, Mr. Byrne's contempt for the Court has made it impossible for Plaintiffs to exchange discovery safely. Plaintiffs obtained the Protective Order to guard against defamation fueled by mischaracterizations of their operations and to reduce risks to their employees, many of whom received vicious threats after lies about the 2020 election. Relying on that Order—which

31

Mr. Byrne expressly accepted—Plaintiffs produced millions of pages of confidential business documents. Mr. Byrne responded by insisting that his attorney give the entire production database to at least one person who has nothing to do with this case, who then freely posted scores of documents online. *See* Dkt. 75-3 (Ex. 2) (March 12, 2024, email of Ms. Lambert: "My client insisted the evidence of criminal acts be provided to law enforcement."); Dkt. 126, Mem. Op. at 8-9, 12-13, 31-32. And he ultimately has declared he would "put it up on the Internet" rather than comply with the Court's orders governing this material. Ex. 1 at 26:20-27:15.

Mr. Byrne's Protective Order violations are not merely procedural; he uses them to compound the defamation underlying this litigation. On May 15, 2026, citing to Plaintiffs' documents, Mr. Byrne claimed that Plaintiffs' systems are "you know derived from the Venezuelan technology that was set up to steal their election." Ex. 1 at 19:12-16. Four days later, again citing to Plaintiffs' document, he claimed that Serbian engineers remotely manipulated Antrim County election at the CEO's direction. Ex. 3 at 7:12-8:3. In his July 23 and July 31, 2026 interviews, he continued the pattern, showing viewers Plaintiffs' internal emails and claiming they revealed an international conspiracy to fix the 2020 election. Ex. 11 at 20:17-19 (Byrne claiming on July 23, 2026, that Plaintiffs' systems consist of "Serbian software on Chinese hardware being operated by Venezuelans" to steal and cheat elections); Ex. 14 at 14:13-21 (Byrne claiming on July 31, 2026: "This was a KGB project that started in the '70s, and they started it out of Serbia, which was their satellite at the time. It has since shifted to be the satellite of China. This really started there. The CIA got on board around 2005, 2006. That's kind of my sense of things now."). And on August 6 and 7, he carried the same abuse to X, amplifying and publishing Plaintiffs-produced, Bates-stamped, confidential discovery materials to suggest that Plaintiffs' internal emails proved government-backed election fraud and that routine election-day troubleshooting

32

was something nefarious. Exs. 17, 18. There is not a shred of truth to these claims. Mr. Byrne is weaponizing access to Plaintiffs' confidential discovery material—access he was given solely for purposes of this litigation—to invent and broadcast false claims that constitute additional defamation, presenting them from a place of authority as someone who purportedly reviewed Plaintiffs' internal documents. The Protective Order exists to prevent this abuse.

Third, while weaponizing Plaintiffs' discovery, Mr. Byrne has refused to provide meaningful discovery of his own. He failed to produce documents from most email accounts and electronic devices. Dkt. 167-5 (Ex. E). His production contains only three text messages and no other responsive mobile data, despite the centrality of social media and electronic communications to his defamation campaign. *Id.* at 3-4 (CM/ECF pagination). He also failed entirely to answer Plaintiffs' Third Set of Interrogatories, served August 30, 2024. Dkt. 167-6 (Ex. F). And he refused to appear for his properly noticed December 5, 2024, deposition despite twenty-nine days' notice. *See* Dkt. 155-1 (Opp.) at 4-8; Dkt. 155-1 (Ex. 5) (Nov. 6, 2024 email and notice of deposition); Dkt. 155-1 (Ex. 12) (Dec. 5, 2024, transcript of Mr. Byrne's deposition). His claimed medical emergency was found by another federal court to be "a fraud upon the Court" when Mr. Byrne offered the same excuse there. Dkt. 155-1 (Opp.) at 2, 5, 7, 12; Dkt. 155-1 (Ex. 1) at 11:16-17.

That obstruction prejudices Plaintiffs' ability to prove their case. *See Guarantee Co. of N. Am. USA*, 2021 WL 2036666, at *4 (finding prejudice where defendants "made it all but impossible for Plaintiff to present its case"). For example, actual malice is an inquiry into a defendant's state of mind, and Mr. Byrne has withheld emails, text messages, social-media communications, and other documents that would show what he knew and disregarded and with whom he coordinated his publications. Dkt. 167-5 (Ex. E) at 3-4, 7-8 (CM/ECF pagination); Dkt. 167-6 (Ex. F) at 13-14 (Interrogatory Nos. 11, 17 & 18) (CM/ECF pagination). As *Giuliani* explained: "Without access

33

to circumstantial evidence of Giuliani's state of mind—in the form of his messages and email communications with associates or other contemporaneous records of his thoughts when he made the false statements against Freeman—plaintiffs are severely hampered in being able to refute Giuliani's defense that he made his statements about Freeman merely negligently." 691 F. Supp. 3d at 59. The same is true here.

Likewise, Mr. Byrne's refusal to provide his court-ordered affidavit—which required him to provide a full accounting of his and Ms. Lambert's unauthorized disclosures of Plaintiffs-produced documents, including what was accessed, when, by whom, and to whom it was disclosed. Dkt. 125 at 2-3; Dkt. 175 at 1-2—prejudices Plaintiffs' ability to prove actual malice. That affidavit should identify all witnesses who received unauthorized disclosures from Mr. Byrne and Ms. Lambert, and discovery from those witnesses—indeed, the very identity of those witnesses, by itself—could illuminate Mr. Byrne's true purpose and state of mind when he made and repeated his false statements about Plaintiffs. Such evidence would also show whether Mr. Byrne's disclosures were part of the same vendetta against Plaintiffs that are reflected in his public attacks: a sustained campaign to punish Plaintiffs, justify his prior false statements, and keep his conspiracy theories alive regardless of the truth. That kind of "evidence of ill will or bad motive is … probative of a 'willingness to publish ***unsupported allegations***'" and thus is "suggestive of actual malice." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 590-91 (D.C. Cir. 2016) (emphasis in original).

Similarly, Ms. Lambert's failure to comply with the March 31 disclosure order also prejudices Plaintiffs' ability to prove actual malice. The March 31 disclosure order required Ms. Lambert to produce "[a]ll Dominion Litigation Documents," "[a]ll documents and communications in any way discussing or referencing Dominion Litigation Documents or their contents," and "[a]ll documents and communications in any way discussing or referencing

34

Dominion on this matter." Dkt. 175 at 3. Those materials would show the non-privileged communications that Ms. Lambert and Mr. Byrne made to others about Plaintiffs, Plaintiffs' documents, and their plan to use those documents outside this case. And her noncompliance is no mystery. Mr. Byrne publicly announced that Ms. Lambert would not comply, declaring: "There's no chance, I'm destroying this, Judge, and neither is Ste[f]anie Lambert." Ex. 1 at 26:20-27:15. In other words, Mr. Byrne has not merely failed to provide his own sworn accounting; he has publicly directed and celebrated Ms. Lambert's refusal to comply with this Court's orders.

Together, Mr. Byrne's repeated refusals to comply with court orders, unlawful weaponization of Plaintiffs' discovery, and total failure to produce discovery in return have made it impossible for Plaintiffs to litigate this case. His misconduct—just what is known to date, without further discovery including the long-overdue affidavit—warrants default judgment.

## II.    Mr. Byrne's Misconduct Has Placed Significant Burdens on This Court.

Mr. Byrne's misconduct has affected the Court as well, placing an intolerable burden on it. The second justification permits default judgment where misconduct has placed "an intolerable burden on a district court by requiring the court to modify its own docket and operations in order to accommodate the delay." *Webb*, 146 F.3d at 971 (citation omitted).

That standard is satisfied here. Since March 2024, when Plaintiffs first notified the Court of Mr. Byrne's and Ms. Lambert's Protective Order breaches, this case has been consumed almost entirely by addressing Mr. Byrne's willful defiance, preventing meaningful progress on the merits.

The judicial resources consumed by Mr. Byrne's misconduct are staggering. Before deciding Plaintiffs' motion to disqualify, the Court held an in-person hearing on March 18, 2024, entered a Status Quo Order, required verification from Mr. Byrne and Ms. Lambert, and held a second in-person hearing on May 16, 2024. Dkts. 77, 78, 103. Judge Upadhyaya then issued a sixty-two-page opinion documenting the "truly egregious" misconduct. Dkt. 126, Mem. Op. at 51

35

(citation omitted). The Court then disqualified Ms. Lambert, kept operative provisions of the Status Quo Order in effect through resolution of the case, required full-accounting affidavits from Ms. Lambert and Mr. Byrne, directed Plaintiffs to propose a document-destruction protocol, and required Mr. Byrne to retain new counsel or proceed *pro se*. Dkt. 125. None of these measures— all necessitated by Mr. Byrne's misconduct—has produced compliance.

Instead, each measure generated more litigation. Mr. Byrne sought review of the Disqualification Order from Judge Nichols, who held a hearing and denied his objections, Dkts. 133, 144; he sought reconsideration, which was denied, Dkts. 148, 154; he appealed to the D.C. Circuit, which dismissed the appeal, Per Curiam Order, No. 24-7195 (D.C. Cir. Mar. 24, 2025); he sought rehearing *en banc*, which was denied, Per Curiam Order, No. 24-7195 (D.C. Cir. June 9, 2025); and he petitioned for certiorari with Mr. Ticktin as counsel of record, which was denied, Order, No. 25-281 (U.S. Nov. 10, 2025). Plaintiffs' motion to set a new affidavit deadline and enter the document-destruction protocol went unopposed, Dkt. 146; Judge Upadhyaya granted it on March 31, 2026, Dkt. 175, and Mr. Byrne and Ms. Lambert again refused to comply. Instead, they appealed that order, forcing more litigation. Dkts. 179, 180. On July 1, 2026, the Court denied both appeals as meritless, ordered compliance by July 15, and warned that future attempts to avoid compliance could justify further sanctions. Dkt. 191. Mr. Byrne ignored that deadline and instead filed a frivolous motion to disqualify Judge Upadhyaya based on lies. Dkt. 193.

Mr. Byrne's motion to disqualify Judge Upadhyaya shows he will do anything but comply, even after being warned that future noncompliance could bring sanctions. It also shows that his counsel, Peter Ticktin, is willing to lie to the Court to do Mr. Byrne's bidding, including by claiming that the former second gentleman, Mr. Emhoff, was deposed in this case (he was not); that Judge Upadhyaya prevented Ms. Lambert from deposing Kay Stimson (Ms. Lambert deposed

her); and that Venable represented Staple Street Capital (it did not). Dkt. 195 at 3.

Mr. Ticktin's appearance has indeed generated additional litigation burdens. He entered his appearance on November 14, 2025, Dkt. 161; delayed the joint status report, Dkt. 162; filed a unilateral report, Dkt. 164; and received a 45-day stay to familiarize himself with the case, Minute Order, Nov. 26, 2025. He used that time to prepare a motion seeking to lift the Protective Order so Ms. Lambert could provide Plaintiffs' documents to Mr. Oltmann, raise collateral accusations about Plaintiffs and their counsel, and demand access to Plaintiffs' production without the required motion for Court authorization. Dkt. 166; Dkt. 167 at 7-8.

This was Mr. Byrne's ***third*** motion to lift the Protective Order. Dkts. 90, 116, 166; *see also* Dkt. 96 (opposing Dkt. No. 90); Dkt. 120 (opposing Dkt. No. 116). Even though the Court relieved Plaintiffs of the burden of responding to this plainly frivolous motion, *see* Minute Orders of Jan. 16 & 21, 2026, Ms. Lambert nevertheless thought it wise to consume more resources by filing a ***fourth*** motion to lift on June 17, 2026, Dkt. 188, which Plaintiffs timely opposed, Dkts. 189, 192.

Meanwhile, discovery as to Plaintiffs has long been complete, as Judge Upadhyaya confirmed on January 28, 2026. Minute Order, Jan. 28, 2026. During discovery, Ms. Lambert was permitted to attend and question Plaintiffs' witnesses at all depositions, and Plaintiffs produced their documents in full. But the case cannot move forward because Mr. Byrne's ongoing violations of court orders require constant judicial intervention and because he has weaponized his misconduct to delay the merits. As the Court observed, his discovery misconduct "completely subsumed what were supposed to be the final two months of discovery." Dkt. 126, Mem. Op. at 56. That dynamic has intensified: since the Disqualification Order, he has generated nearly two additional years of delay through frivolous appeals and refusals to comply with court orders, including the protective, disclosure, and document-destructions orders.

37

Meanwhile, Mr. Byrne has refused to produce large swaths of responsive documents, answer unobjectionable interrogatories, or sit for his deposition, requiring Plaintiffs to raise these issues with the Court. Dkt. 155-1 (Opp.); Dkt. 167-5 (Ex. E); Dkt. 167-6 (Ex. F).

The burden on this Court exceeds that sufficient for default judgment. In *Giuliani*, the court found this factor satisfied based on "two discovery motions, two discovery hearings, close monitoring of progress through the parties' submission of status reports, and issuance of multiple orders to secure Giuliani's and his businesses' compliance with discovery rules." 691 F. Supp. 3d at 64. In *SEC v. China Infrastructure Investment Corp.*, defendants' refusal to respond to discovery "completely stalled litigation." 189 F. Supp. 3d 118, 130-31 (D.D.C. 2016). In *Guarantee Co.*, the court observed that the "[t]ime and resources the Court has had to spend on defendants' contumaciousness can never be recovered and applied toward resolving other matters." 2021 WL 2036666, at *4. This Court should not expend any more resources on Mr. Byrne's misconduct.

At bottom, Mr. Byrne treats civil litigation as a game played on his terms: he follows orders when they suit him, ignores them when they do not, spends years challenging rulings, and then declares them illegal when the challenges fail. No court can accommodate such a litigant. It would be perverse to force a court to spend substantial resources on litigation in which one party shows unmitigated contempt for the process and its authority. The second justification supports default.

## III.   Mr. Byrne's Pattern of Conduct Demonstrates a Willful and Unrepentant Disrespect for the Court and Its Authority.

The third justification asks whether the court must "sanction conduct that is disrespectful to the court and to deter similar misconduct in the future." 146 F.3d at 971 (citation omitted). "Discovery sanctions serve two purposes: punishing disobedient parties and deterring others from emulating their behavior." *Wash. Metro.*, 776 F.3d at 6. A movant must show misconduct "accompanied by 'willfulness, bad faith, or fault.'" *Id.* at 4 (citation omitted). That standard usually

38

is satisfied by inference—*e.g.*, if a party fails to respond to orders without explanation, *China Infrastructure*, 189 F. Supp. 3d at 131, or "ignor[s] warnings," *Stone*, 2021 WL 1110735, at *3.

Here, no inference is required. No case in this Circuit—or, to Plaintiffs' knowledge, elsewhere—shows disrespect as brazen and unequivocal as this record. Mr. Byrne has told the Court and the world that his violations are deliberate, that he intends to continue them, and that he views the Court's orders as illegitimate impositions he may override at will.

The timeline shows a calculated, escalating pattern. On March 26, 2024, Mr. Byrne verified he "will comply with the obligations set forth in the Court's March 19, 2024 Order." Dkt. 84 at 3. Then, on April 2, 2024, he posted a video declaring: "there's no chance in hell I'm not going to make this public." Dkt. 126, Mem. Op. at 58-59 (quoting Dkt. 102-3 at 11). On May 16, 2024, he appeared before Judge Upadhyaya, where he confirmed he understood her order and would comply. Dkt. 103 at 61:22-62:4. But the next day, he posted screenshots of Plaintiffs' documents to X. Dkt. 126, Mem. Op. at 19-24. After losing every appeal before the District Court, D.C. Circuit, and Supreme Court, Mr. Byrne abandoned even the pretense of compliance. On May 15, 2026, he told a national audience: "There's no chance I'm destroying this, Judge, and neither is Ste[f]anie Lambert. I'd put it up on the Internet before I would destroy it, Judge.... You belong in prison, Judge Upadhyaya… Lawyer the fuck (bleep) up. Lawyer up, Judge. Lawyer up." Ex. 2 at 20:43-21:00 (video). Four days later, he declared: "I'm under federal judicial order not to answer that question, but I'm going to do it anyway...." Ex. 3 at 5:14-19. He then fabricated claims about Plaintiffs' emails and concluded: "I just violated some federal judge's orders. I don't care.... The[y] were illegal orders anyway, and I'm ashamed it took me this long to violate them." Ex. 3 at 9:1-8. That same day, he posted to X that he "no longer follow[s] traitorously illegal orders from Magistrate Judge Upadhyaya (a vile Indian who repped Madudo [sic] & VZ 2019-22), Deep State

39

Judge Nichols, & their boss Judge Boasberg (a dirty Bolshevik)." Ex. 5.

The pattern continued. On March 31, 2026, Judge Upadhyaya ordered Mr. Byrne to submit the long-overdue affidavit accounting for his and Ms. Lambert's unauthorized disclosures. Dkt. 175. Rather than comply, Mr. Byrne appealed. Dkt. 179. On July 1, 2026, this Court denied that appeal, found his objections meritless, ordered compliance by July 15, and warned that "[n]oncompliance and further attempts to evade enforcement of court orders ... could certainly justify additional sanctions in the future." Dkt. 191 at 5. Mr. Byrne missed that deadline and instead filed a frivolous motion to disqualify Judge Upadhyaya based on lies. Dkt. 193; Dkt. 195 at 3.

Days later, on July 23, 2026, Mr. Byrne appeared live on Alex Jones's podcast and displayed Plaintiffs' internal emails, telling Mr. Jones and his audience, "[s]ome of these I'm under order from a federal judge not to show, but … I'm now just ignoring her." Ex. 11 at 12:18-22. Near the end of Mr. Byrne's presentation of Plaintiffs' document, Mr. Jones remarked, "that's a big deal that this judge told you not to do it and you're doing it"—to which Mr. Byrne replied, "Oh, yeah…. [T]he judge told me not to release these." *Id.* at 20:20-25. On July 31, 2026, he did it again on *The Absolute Truth*, telling the host he was "under orders not to release things I got from the Dominion lawsuit" before doing exactly that for nearly twenty minutes. Ex. 14 at 4:16-5:2. And the next week, he did it again on X, amplifying and publishing Plaintiffs-produced, Bates-stamped, confidential discovery materials. Exs. 17, 18.

Mr. Byrne's words and conduct remove any doubt: he understands the Court's orders and has chosen, again and again, to violate them in public and on the record.

Mr. Byrne's conduct is egregious: he publicly celebrates his refusal to abide by the Court's orders, dares the Court to act, and directs vile attacks at the judicial officers whose orders he disobeys. And Mr. Byrne knows better: he is a wealthy, sophisticated businessman with untold

40

resources who is making a conscious choice to violate the Court's orders.

Mr. Byrne has demonstrated this pattern across multiple cases. In *Coomer v. Byrne*, the Middle District of Florida sanctioned Mr. Byrne and Mr. Ticktin for assaulting Mr. Coomer's counsel at a deposition. *See* Ex. 10, Order, *Coomer* Dkt. 332. The court explained that "Defendant Byrne readily admitted to stomping on Mr. Cain's feet and pushing him backwards before the videotaped altercation (albeit in somewhat of a braggadocios tone)," that "Defendant Byrne body checked Mr. Cain," and that "Mr. Ticktin and Defendant Byrne" had shown up to the deposition "fully intend[ing] to disrupt [it]," including by bringing Mr. Oltmann, who had threatened Mr. Coomer in the days prior, and by bringing "green berets and someone who was armed." *Id.* at 18-19. "Put simply," the court found, "Mr. Ticktin and Defendant Byrne knowingly turned a routine legal proceeding into a powder keg and ignited it." *Id.* at 19. In *Biden v. Byrne*, the Central District of California entered default judgment for Mr. Byrne's "sustained [] campaign of dilatory tactics that have indefinitely extended this years-long litigation"; his "failure to appear both at trial and the subsequent ordered hearings"; and his decision to "flagrantly continue[] to engage in the underlying conduct at issue in this case," including by appearing on "a show hosted by Alex Jones, where [Mr. Byrne] publicly restated the same statements at issue in this case and played for the public a voicemail discovered in this action and designated as 'HIGHLY CONFIDENTIAL,' in violation of a stipulated protective order." 2026 WL 2018273, at *4 (C.D. Cal. July 10, 2026).

The need for deterrence is clear. The Supreme Court has recognized that severe sanctions "must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976). In Mr. Byrne's world, any litigant who disagrees with a court's

41

ruling can claim a higher authority (whether the Constitution, the Senate, or a claimed intelligence mission) and simply refuse to comply. Mr. Byrne has gotten away with that behavior for several years now, despite the Court's repeated efforts to address it. Unless Mr. Byrne's conduct is now met with severe sanctions, it will serve as a roadmap for future litigants looking to delay, obstruct, and weaponize normal judicial processes.

Mr. Byrne's retention of Mr. Ticktin further shows his commitment to litigating on his own terms. While Mr. Byrne may of course retain counsel of his choice, he may not retain counsel in order to violate court rules and orders, as Mr. Byrne has done in this case. Judge Upadhyaya previously observed that Mr. Byrne may have hired Ms. Lambert "for the sheer purpose of" violating court rules and orders. Dkt. 126, Mem. Op. at 3. Mr. Ticktin has succeeded her: he refused to file the court-ordered joint status report, Dkt. 162; has advanced the same conspiracy theories against Plaintiffs in court filings and via email, Dkt. 167 at 5 (citing Dkt. 167-1 (Ex. A)); and has consumed the Court's docket with frivolous filings and serial challenges to the Court's orders, including a meritless and recycled motion to lift the Protective Order so Ms. Lambert could provide Plaintiffs' documents in response to a subpoena in a different case, Dkt. 166, Minute Orders of Jan. 16 & Jan. 21, 2026, a frivolous opposition to a routine case-caption motion, Dkts. 172, 174, a meritless challenge to Judge Upadhyaya's disclosure order, Dkts. 179, 191, and a motion to disqualify Judge Upadhyaya that is based on outright lies, Dkts. 193, 195. He has allowed Ms. Lambert to litigate from the shadows and has admitted that persons in his office may have accessed documents produced by Plaintiffs in violation of the Court's orders. Dkt. 176. He has also taken no steps to fulfill Mr. Byrne's outstanding discovery obligations.

As one court observed after revoking Mr. Ticktin's *pro hac vice* admission: "Mr. Ticktin's history of prioritizing political pursuits over his ethical obligations, combined with his lack of

42

transparency to the Court, 'suggests ... that he will not abide by the Court's rules and practices.'" *Biden*, 2025 WL 2429688, at *2 (citation omitted). Mr. Ticktin has been suspended by the Florida Bar twice, *see The Florida Bar v. Ticktin*, 14 So. 3d 928 (Fla. 2009) (affirming ninety-one day suspension); Dkt. 183-2 (Ex. 1); sanctioned $320,819.88 for pursuing claims without investigation, *Glob. Glass Techs., Inc.*, 2025 WL 2088421, at *1, *6; sanctioned for filing "political grievances masquerading as legal claims," *Trump v. Clinton*, 640 F. Supp. 3d at 1332; and sanctioned for assaulting opposing counsel, *see* Ex. 10, Order at 17-20, *Coomer* Dkt. 332.

Mr. Byrne's retention of Mr. Ticktin was deliberate. Courts across the country have found that Mr. Ticktin treats judicial proceedings as instruments for political objectives rather than forums for legitimate advocacy. That is how Mr. Byrne treats this litigation. The pattern confirms that Mr. Byrne and Mr. Ticktin have no intention of litigating this case within the bounds of the rules and intend to use it as a platform for political grievances regardless of the Court's orders, in willful disrespect of this Court and contempt of its authority.

## IV.    Lesser Sanctions Are Inadequate and Would Be Futile.

A court entering default judgment "must explain why a lesser sanction is inadequate, [but] it has no duty to impose it first, entering default judgment only after the lesser sanction fails." *Wash. Metro.*, 776 F.3d at 7; *see also Shepherd*, 62 F.3d at 1479 (similar). Here, no lesser sanction can address Mr. Byrne's misconduct because (1) lesser sanctions were tried; (2) Mr. Byrne told the Court he will never comply; and (3) his misconduct cannot be cured short of judgment.

First, the Court already imposed the "extraordinary remedy" of disqualifying Mr. Byrne's attorney, which did not deter him and apparently prompted further defiance. Dkts. 125, 126. Mr. Byrne has not even followed that order, as Ms. Lambert continues to litigate this case. Moreover, Mr. Byrne's current violations are framed as retaliation against that order and the judges who issued it. The Court also required a sworn accounting of unauthorized disclosures. Dkts. 125, 175,

43

191. But Mr. Byrne ignored every deadline the Court has set to submit that affidavit, instead filing baseless challenges over and over again, even after the Court warned him that "[n]oncompliance and further attempts to evade enforcement of court orders ... could certainly justify additional sanctions in the future." Dkt. 191 at 5. He has been sanctioned, he has been warned, and his conduct has only gotten worse.

Second, there is every reason to believe that another order will not produce compliance. Mr. Byrne has said so: "There's no chance in hell I'm not going to make this public." Dkt. 126, Mem. Op. at 58-59 (quoting Dkt. 102-3 at 11). "I just violated some federal judge's orders. I don't care." Ex. 3 at 9:1-4. "The[y] were illegal orders anyway, and I'm ashamed it took me this long to violate them." Ex. 3 at 9:6-8. "I no longer follow traitorously illegal orders from Magistrate Judge Upadhyaya." Ex. 5. "I'm under order from a federal judge not to show, but … I'm now just ignoring her." Ex. 11 at 12:18-22. These statements show a settled decision never to comply. *See Perez v. Berhanu*, 583 F. Supp. 2d 87, 91 (D.D.C. 2008) ("The extreme disregard defendants have shown for their discovery obligations and the schedule set by this Court shows that a court order to comply with deadlines or to take some other corrective action is unlikely to deter future misconduct."); *Guarantee Co.*, 2021 WL 2036666, at *5 ("there is no reason to believe that defendants will be responsive to any future orders" (citation omitted)). And some of this conduct occurred after the Central District of California entered default judgment against Mr. Byrne on July 10, 2026, in *Biden v. Byrne*—which notably, as described above, was partly based on Mr. Byrne's violations of the protective order in that case. 2026 WL 2018273, at *4.

Third, lesser sanctions are independently inadequate. Monetary sanctions would be meaningless against a party with Mr. Byrne's resources. By his admissions, Mr. Byrne is a billionaire with "unlimited funds" and "more money than God behind [him]."

44

> … Dominion has some female attorney who got all choked up in court. I want to tell that woman, try to be less emotional.... Dominion, you should talk to Goldman Sachs. Goldman Sachs thought they were going to make me back down. … I spent 34 million fighting them. … I now have unlimited funds. I'm over here in Baku, Azerbaijan. There are a lot of people who don't want to see the United States fall. … I've got more money than God behind me. You want to fight it out, Dominion? I'll fight this out. I've got people behind me with more money than God.

Dkt. 183-7 (Ex. 6) at 135:13-136:17; *see also* Dkt. 183 at 43.

As in *Giuliani*, "[i]mposing escalating monetary fines on Giuliani, particularly when he has already shown a recalcitrance to comply with Court orders, will do little more than delay the resolution of this defamation case." 691 F. Supp. 3d at 63 n.10. Nor could adverse evidentiary inferences remedy the harm because the problem is not merely missing evidence but the impossibility of litigating with a party who refuses to follow the rules. Contempt sanctions are equally futile: Mr. Byrne may not even be in the country, has declared that "you can throw me in jail," and has made clear incarceration will not change his conduct. *See* Dkt. 126, Mem. Op. at 58-59 (quoting Dkt. 102-3 at 11). Preclusion orders or partial-issue sanctions cannot address misconduct that pervades every aspect of the litigation and renders the entire process inoperable.

In sum, Mr. Byrne has publicly and irrevocably declared that he will not comply with this Court's orders. No lesser sanction can change Mr. Byrne's mind. No fine, adverse inference, or preclusion order will produce compliance from a party who calls court orders "traitorously illegal" and says he will never follow them. Civil litigation requires compliance with court orders. Mr. Byrne will not comply. Judgment is the only remedy that addresses this reality.

## CONCLUSION

Defendant Patrick Byrne's sustained and admitted commitment to violating this Court's rules and orders has made it impossible for this case to continue. Plaintiffs thus respectfully request that the Court enter default judgment against him and schedule a short jury trial on damages only.

Dated: August 13, 2026

Respectfully submitted,

By: */s/Davida Brook*

Davida Brook (D.C. Bar No. CA00117)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
dbrook@susmangodfrey.com

Stephen Shackelford, Jr. (D.C. Bar No. NY0443)
Eve Levin (D.C. Bar No. 1672808)
George El-Khoury *(Admitted pro hac vice)*
**SUSMAN GODFREY L.L.P.**
One Manhattan West, 50th Floor
New York, NY 10001
Tel: (212) 336-8330
sshackelford@susmangodfrey.com
elevin@susmangodfrey.com
gel-khoury@susmangodfrey.com

Jonathan Ross (D.C. Bar No. TX0027)
**SUSMAN GODFREY L.L.P.**
1000 Louisiana St., Suite 5100
Houston, TX 77002
Tel: (713) 651-9366
jross@susmangodfrey.com

Edgar Sargent (*Admitted pro hac vice*)
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 516-3880
esargent@susmangodfrey.com

*Attorneys for Plaintiffs*

46

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of August 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which I understand to have served counsel for the parties.

*/s/Davida Brook*
Davida Brook
